**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

DEMOND WESTON,

                Plaintiff,

                v.

CITY OF CHICAGO, ESTATE OF MICHAEL
KILL, ANTHONY MASLANKA, WILLIAM
MOSER, JOHN PALADINO, DAN
MCWEENY, ANDREW CHRISTOPHERSON,
JEROME RUSNAK, VICTOR BRESKA, and
UNKNOWN EMPLOYEES OF THE CITY OF
CHICAGO,

                Defendants.

Case No._____

**JURY TRIAL DEMANDED**

<u>**COMPLAINT**</u>

Plaintiff Demond Weston, by his attorneys, Loevy & Loevy, complains of defendants

City of Chicago, Estate of Michael Kill, Anthony Maslanka, William Moser, John Paladino, Dan

McWeeny, Andrew Christopherson, Jerome Rusnak, Victor Breska, and Unknown Employees of

the City of Chicago and states as follows:

**INTRODUCTION**

1.      In June 1990, 17-year-old Demond Weston falsely confessed to murder and

attempted murder, crimes of which he is wholly innocent. That false confession led to his

wrongful conviction and 29 years in prison before he was exonerated.

2.      Weston's arrest and false confession, like too many others in the City of Chicago,

were the product of abuse by police detectives working under Commander Jon Burge. Defendant

Chicago Police detectives Michael Kill, Anthony Maslanka, William Moser, and others held

Weston for more than 12 hours without food or water. They beat him, threatened to kill him and

called him racial slurs. After hours of abuse, Weston signed a false confession implicating himself in two crimes he did not commit.

3.      Not one piece of physical evidence ever connected him to the crimes.

4.      After nearly three decades fighting for his freedom, having spent well over half his life in prison, Weston was finally exonerated. He will never recover that lost time. But he brings this lawsuit seeking justice for the harms Defendants inflicted on him and the systemic abuse that allowed his wrongful conviction to happen.

## JURISDCTION AND VENUE

5.      Weston brings this action pursuant to 42 U.S.C. § 1983 and Illinois law to redress Defendants' tortious conduct and the deprivation under color of law of his rights secured by the United States Constitution.

6.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1367.

7.      Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district and the events and omissions giving rise to his claims occurred here.

## PARTIES

8.      Plaintiff Demond Weston is a 47-year-old resident of Chicago, Illinois. He spent 29 years in jail and prison for a murder he did not commit.

9.      At all times relevant to the events described in this complaint, Defendants Anthony Maslanka, William Moser, John Paladino, Dan McWeeny, Andrew Christopherson, Jerome Rusnak, and Victor Breska were police officers employed by the Chicago Police Department and the City of Chicago.

10.     Michael Kill was also a police officer employed by the Chicago Police Department and the City of Chicago at all relevant times. Kill died in 2018.

2

11.     Defendant Unknown Employees of the City of Chicago also participated in the misconduct alleged in this complaint.

12.     Defendant City of Chicago is a municipal corporation that is or was the employer of the above-named defendants.

13.     Each of the individually-named defendant police officers and Michael Kill (hereafter the "Defendant Officers") acted under color of law and within the scope of his employment at all times relevant to this lawsuit. Each individual Defendant is sued in his or her individual capacity.

## FACTS

### The Crimes

14.     On May 29, 1990, around 10 p.m., three separate shootings occurred on Chicago's south side.

15.     First, at 57th Street and Wolcott Avenue, 19-year-old Joseph Watson was shot to death and 14-year-old Timothy Jones was shot in the leg.

16.     Another shooting occurred a mile away at 5530 South Justine Street. There, Ronald Nesbit and his friend, 20-year-old Deneen Coats, were shot and injured.

17.     Third, at 58th Street and Honore Street, J.D. Lee, Pierre Solomon, and Derek L. Mason were shot and injured.

18.     About 10 days later, on June 8, 1990, Curtis Sims was shot and killed on the south side.

19.     Demond Weston did not know any of the victims of these crimes, and he was not involved in the crimes in any way.

3

**The Police Investigation**

20.    Defendant Officers investigated the three May 29 shootings and the shooting on June 8, 1990.

21.    Police interrogated numerous witnesses during their investigation of the May 29 shootings. None of those witnesses mentioned Demond Weston.

22.    On June 9, 1990, Defendant Kill received information that a man named Dwayne Macklin was involved in the Sims murder the night before.

23.    That same day, CPD raided Macklin's house and arrested him and William Childs. A third suspect, who Macklin identified as Vic "Cortez" Brown, fled from the house and evaded police.

**Defendant Officers Falsely Arrest Weston**

24.    On June 9, 1990, 17-year-old Demond Weston was walking from his house to the store around noon.

25.    Weston was suddenly confronted by two rapidly approaching unmarked cars, which came to a halt in front of him.

26.    Defendant Kill, wearing plainclothes, jumped out of one of the cars with his gun drawn. Defendants Breska and Rusnack were also present.

27.    Kill searched Weston, but found no evidence of any crime.

28.    Nevertheless, Defendant Officers handcuffed Weston and put him in the back of one of the police cars.

29.    Defendant Officers did not inform Weston of his *Miranda* rights or explain why he was being arrested.

30.    Defendant Officers took Weston to the to the Area 3 Detective Headquarters,

where Jon Burge was Commander.

**Defendants Interrogate Weston For Hours**

31.     At Area 3, Defendant Officers locked Weston in an interrogation room and handcuffed him to a chair. He was not allowed to call his mother nor was he read his *Miranda* rights; and despite asking several times, he was not told why he'd been arrested.

32.     For hours, Defendant Officers including Kill, Moser, and Maslanka interrogated Weston about the June 8 murder of Curtis Sims.

33.     Weston truthfully told Defendants he knew nothing about the Sims murder and was not involved in the shooting in any way.

34.     As many as eight officers, including Defendants Kill, Moser, and Maslanka, surrounded 17-year-old Weston, who was still handcuffed to a chair, locked in an interrogation room, and held incommunicado.

35.     Defendant Officers including Kill, Moser, and Maslanka physically abused Weston and yelled at him in an effort to coerce Weston into falsely confessing his involvement in the Sims murder.

**Defendants Coerce Weston Into Signing A False Confession**

36.     After Weston had been at Area 3 for hours, Defendant Officers began accusing him of the three unsolved shootings that had occurred on May 29, 1990.

37.     Weston truthfully told Defendant Officers he did not commit or witness those shootings.

38.     Defendant Officers, including Moser, falsely told Weston that they found evidence connecting him to the May 29 shooting. They expressed anger, used violence, and employed tactics that improperly overcame Weston's will.

5

39.     Terrified, injured, and physically and emotionally exhausted, 17-year-old Weston agreed to give a recorded statement to an Assistant State's Attorney (ASA) falsely implicating himself in the May 29 shootings.

40.     Defendant Officers including Moser told Weston exactly what to say to the ASA.

41.     The statement Weston gave said that he participated in a meeting with members of the Gangster Disciples to plan an attack on rival gang the Vice Lords on May 29, 1990. The statement said that Weston had a gun and fired the gun twice "towards," but not at, one of the men who was shot on 57th Street.

42.     The facts in the statement were entirely fabricated by and fed to Weston by Defendant Officers, including Moser.

43.     Weston's confession was signed at 1:35 a.m. on June 10, 1990.

44.     On information and belief, each Defendant Officer was present at some point during Weston's interrogation and participated in the coercion that resulted in his false statement.

45.     At all times, Defendant Officers knew Weston had no involvement in the May 29 shootings.

46.     After signing the confession, Weston was not immediately transported home, as Defendant Officers had promised.

47.     Instead, Weston was charged with murder and attempted murder for two of the May 29 shootings: the crimes that occurred on 55th Street and 57th Street.

**Defendant Officers Coerce Witnesses into Implicating Weston**

48.     While Defendant Officers were interrogating Weston, they were also interrogating Macklin.

49.     As with Weston, Defendant Officers used physical and psychological abuse to

coerce Macklin into signing a statement falsely implicating Weston in the May 29 shooting at 57th Street, which resulted in Watson's murder.

50.    Macklin ultimately signed a false statement implicating Weston in that crime.

51.    The statement contained the same fabricated account of a planning meeting between Weston and members of the Gangster Disciples that was set out in Weston's fabricated statement.

52.    The information in Macklin's statement implicating Weston was made up and fed to Macklin by Defendant Officers including Kill.

53.    Defendant Officers knew Macklin's statement was fabricated because Macklin was unable to tell them anything about Weston's alleged involvement and because they provided the information that was included in his statement.

54.    In addition, using improper and suggestive tactics, Defendant Officers later coerced Deneen Coats into falsely identifying Weston as the person who shot her and Nesbit on 55th Street on May 29, 1990.

55.    Defendant Officers knew Coats's identification was false because they instructed her to select Weston's photograph from the lineup.

**Plaintiff's Wrongful Prosecution and Conviction**

56.    Defendant Officers fabricated police reports to cover up their misconduct, and they provided those false reports to state prosecutors.

57.    Defendant Officers' reports and fabricated statements became the basis for charging and prosecuting Weston.

58.    In 1992, as a result of Defendants' misconduct and based on the false evidence described in this complaint, Weston was prosecuted for two of the three shootings on May 29,

7

1990: the 57th Street shooting that resulted in Joseph Watson's death and injured Timothy Jones;

and the 55th Street shooting that wounded Ronald Nesbit and Deneen Coats.

59.     Defendant Officers hid their fabrication of evidence from prosecutors and from

Weston's defense before his trial, and they suppressed all evidence that exonerated Weston.

60.     Defendant Officers gave false statements to state prosecutors, and Kill provided

false testimony at Weston's trial.

61.     The only evidence introduced at Weston's trial implicating him in the murders

was the material Defendant Officers fabricated and coerced.

62.     Because of Defendants' false and manufactured evidence, Plaintiff was

wrongfully convicted and sentenced to 75 years in prison.

63.     He was 19 years old at the time, and he was completely innocent, as Defendants

well knew.

**Plaintiff's Exoneration**

64.     After his conviction, Plaintiff fought hard to prove his innocence. He filed a direct

appeal, multiple petitions for post-conviction relief, and a petition for a writ of habeas corpus.

65.     In 2014, Weston petitioned for a new trial, detailing Defendant Officers' abuse

during his interrogation. By this time, Jon Burge and his disciples had risen to notoriety for

coercing false confessions from innocent, young, Black boys and men using physical and

psychological abuse.

66.     Weston's motion for new trial was granted in 2016. However, prior to the trial

taking place, Special Prosecutor Robert Milan moved to vacate Weston's conviction and dismiss

all charges against him.

67.     On December 19, 2019, after nearly 30 years in prison, the 47-year-old Weston

was finally freed.

### Policy and Practice of Wrongly Convicting Innocent Individuals

68.     The Chicago Police Department is responsible, by virtue of its official policies, for inflicting miscarriages of justice in scores of incidents like the one Weston endured.

69.     Since 1986, at least 150 cases have come to light in which Chicago police officers fabricated false evidence or suppressed exculpatory evidence to cause the convictions of an innocent person for serious crimes he did not commit.

70.     These cases include many in which Chicago police officers used the same tactics Defendants employed against Plaintiff in this case, including fabricating evidence, concealing exculpatory evidence, manipulating eyewitness identifications and testimony, and using other tactics to secure the arrest, prosecution, and conviction without probable cause and without regard for the person's actual guilt or innocence.

71.     The CPD's policy and practice of misconduct was recently described in a Federal Bureau of Investigation FD-302 Report of an interview with Assistant State's Attorney Terence Johnson. The Report documents, among other things, that in the 1990s Chicago police detectives fed information to witnesses and coached them through court-reported and handwritten statements, coerced witnesses into sticking to a detective's theory of the case, physically abused witnesses, and worked together to develop and rehearse false narratives so there were no inconsistencies in the witnesses' stories.

72.     At all relevant times, members of the Chicago Police Department, including Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information. This concealed material was kept in files that were maintained only at the police department and never disclosed

to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation rather than being preserved as part of the official file.

73.    Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

74.    The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established in the cases of, *inter alia*, *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.), *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.), and *Jones v. City of Chicago*, No. 87 C 2536 (N.D. Ill.).

75.    The policies and practices of suppressing exculpatory and/or impeaching evidence at issue in *Rivera*, *Fields*, and *Jones* applied throughout the timeframe from the 1980s through the 2000s, including at the time of the Sims and Watson murder investigations at issue here.

76.    In addition, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

77.    Before and during the period in which Plaintiff was falsely charged with and convicted of the Watson murder, the City of Chicago also operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. Further, the disciplinary apparatus had no

mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

78.     The U.S. Department of Justice recently issued a report finding that there were "engrained deficiencies in the systems CPD uses to provide officers with supervision and training." In particular, on the subject of training, the DOJ concluded that the "CPD's inattention to training needs, including a longstanding failure to invest in the resources, facilities, staffing, and planning required to train a department of approximately 12,000 members, leaves officers underprepared to police effectively and lawfully. Officer errors and misconceptions that result from lack of training are not corrected in the field, because CPD has neither structured supervision in a way that will adequately support officers, nor invested in programs and systems that will detect when officers are in need of help or exhibiting behavior that must be corrected. Officers' ability to stay safe, protect public safety, and police within constitutional standards suffers as a result."

79.     On the subject of supervision, the DOJ concluded among other things that "[i]nstead of encouraging the chain of command to instill proper policing tactics and respect for constitutional policing in CPD officers, CPD provides little incentive, or even opportunity, for supervisors to meaningfully guide and direct CPD officers. CPD provides even less incentive for supervisors to hold officers accountable when they deviate from CPD policy and the law. The City has long known that CPD's direct supervision of officers is inadequate, including through the fact that multiple reports in the last two decades have highlighted deficiencies in CPD's supervisory practices. Yet, City and CPD leadership have not made the necessary reforms to CPD's supervision structure and processes, and community and officer safety suffer as a result."

80.     The DOJ "confirmed that CPD's accountability systems are broadly ineffective at

deterring or detecting misconduct, and at holding officers accountable when they violate the law or CPD policy." In particular, the Department of Justice found that the City failed to investigate nearly half of misconduct complaints; where investigations did occur, there were "consistent patterns of egregious investigative deficiencies"; and where misconduct complaints were sustained, discipline was inconsistent and unpredictable.

81.     Similarly, the Chicago Police Accountability Task Force reported in April 2016 that "[g]oing back years, and continuing to the present day, CPD has missed opportunities to make accountability an organizational priority." Between 2004 and 2016, the City recommended disciplinary action in fewer than 4% of cases in which it paid settlements to plaintiffs alleging violation of their civil rights, and did not conduct any disciplinary investigations in over half of those cases.

82.     Since before Weston's arrest and continuing for years afterward, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

83.     Charlie Beck, the former interim superintendent of the CPD, recently acknowledged the existence of the CPD's code of silence.

84.     As a result of the City of Chicago's established practices, Defendant Officers came to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. The practices that enable this belief include failing to track and identify police officers who are repeatedly accused of serious misconduct, failing to investigate cases in which the police are

implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

85.     Defendant Officers engaged in such misconduct because they had no reason to fear that the City of Chicago and its police department would ever discipline them for doing so.

86.     These Defendants also worked in Area 3 alongside notorious Chicago Police Detective Burge, whose long history of engaging in the kind of investigative misconduct that occurred in this case, including manipulating eyewitness identifications and fabricating and concealing evidence in the course of maliciously prosecuting innocent persons, is well-known and widely acknowledged.

87.     There are dozens of known cases in which Burge, his partners, his colleagues, and other Chicago police officers engaged in the serious investigative misconduct described above. They engaged in such misconduct because they had no reason to fear that their supervisors would ever discipline them for doing so.

88.     The City of Chicago and its police department also failed in the years prior to Weston's conviction to provide adequate training to Chicago police detectives and other officers in many areas, including the following:

a.      The conduct of live lineup, photographic, and other identification procedures.

b.      Preserving material evidence, such as photographic arrays used for identification purposes;

c.      The constitutional requirement to preserve and disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory

evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

d.     The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses.

e.     The risks of wrongful conviction and the steps police officers should take to minimize risks.

f.     The risks of engaging in tunnel vision during investigation.

g.     The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

89.     The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph caused Weston's wrongful conviction and his injuries.

90.     The City's failure to train, supervise, and discipline its officers, including Defendants Kill, Maslanka, Moser, Paladino, Mcweeny, Christopherson, Rusnak, and Breska, condones, ratifies, and sanctions the kind of misconduct that the Defendants committed against Weston in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and de facto polices, as alleged above.

91.     The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful

practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

92.     The policies and practices described in the foregoing paragraphs were also approved the City of Chicago policymakers, who were deliberately indifferent to the violations of constitutional rights described herein.

**The Defendant Officers' Pattern of Misconduct that Extended to Mr. Weston**

93.     In addition, Defendant Officers' abuse and coercion in investigating the May 29, 1990 shootings was not an isolated incident. On the contrary, each individual defendant engaged in a pattern of similar misconduct that extended to Weston and continued after his interrogation.

94.     Before Weston's interrogation, Kill, for example, coerced confessions from dozens of innocent people using the same methods he applied to Weston.

95.     Kill has testified that in about 90% of the murder cases he worked on in which the suspects confessed (about 1500 cases), the defendants filed motions to suppress alleging Kill coerced their confessions using physical force.

96.     Kill has invoked his Fifth Amendment privilege against self-incrimination when asked to testify about his interrogations of suspects.

97.     Furthermore, the 2006 report on the torture victims of Jon Burge by Special Prosecutors Edward Egan and Robert Boyle (the "Egan Report") documented numerous abuses perpetrated by Kill, Maslanka, and Moser in the 1980s and 90s. The report includes allegations that these Defendants beat and threatened arrestees into confession, hit them with objects including guns, phones, flashlights, cords, nightsticks, fists and feet, kept them awake until they signed confessions, electrocuted them, repeatedly called arrestees "niggers" and conducted lineups of juvenile suspects without notifying their parents. *See* Egan & Boyle, Report of the

15

Special State's Attorney, Volume C, 275-90 (2006). *See also* Egan & Boyle, Special Prosecutor Investigation Reports, Volume D, 17; Volume F, 23-25; Volume G. 21-44; Volume K, 9-17; Volume L, 35-46; Volume N, 1-6 (2006).

98.     Regarding Defendant Maslanka specifically, the Report concluded beyond a reasonable doubt that a suspect he was interrogating—Alfred Pinex—soiled himself as a result of Maslanka's physical abuse, and that Maslanka perjured himself when he testified at Pinex's sentencing hearing. *See* Egan & Boyle, Report of the Special State's Attorney, at Volume C, 275-90.

99.     Likewise, The Illinois First District Appellate Court has found that "[n]umerous officers under the command of Burge, including officer[] . . . McWeeney [sic], have been implicated in many of . . . instances of physical abuse."

100.     The Illinois Supreme Court in *People v. Patterson*, 192 Ill. 2d 93 (2000), for example, cited "[e]ight cases involv[ing] McWeeny, who was usually identified as an officer who appeared to take a statement from the victim after the torture had been completed." Indeed, courts have described McWeeny as taking on the "good cop" role in interrogations."

101.     Cortez Brown, the same Brown who evaded arrest following Defendants' raid of Dwayne Macklin's house, was freed from prison after a post-conviction hearing at which Kill and Maslanka asserted their Fifth Amendment right to silence rather than testify about their interrogation of Brown, on grounds that truthful statements could implicate them in a crime.

102.     Likewise, Defendant McWeeny played a role in all four pardons based on innocence granted by Governor Ryan in 2003.

103.     Defendant McWeeny was also implicated in at least 11 cases of abuse as established by the 2007 follow-up "Report on the Failure of Special Prosecutors Edward J. Egan

and Robert D. Boyle to Fairly Investigate Police Torture in Chicago."

104.    In addition, McWeeny is mentioned in the Report as a participant in the beating of Madison Hobley and playing a role in the torture of Stanley Howard and Aaron Patterson.

105.    The Report also concluded that Melvin Jones was telling the truth about his claim of torture during an investigation in which McWeeny was involved.

106.    Further, in 2007, Cook County Judge Sumner pointed to "evidence presented by petitioner [James Andrews], which includes an OPS report, Appellate and Supreme Court opinions regarding the systematic brutality at Area 2, other incidences of torture at Area 2, and in particular at the hands of Detective McWeeny" in vacating Andrews' conviction based on the detectives' wrongdoing.

107.    Moreover, TIRC has referred to Defendant McWeeny as a "well-known Burge subordinate." As of July 25, 2013, TIRC noted that "McWeeny has been accused in 14 other cases of abuse and coercion of suspects in police custody" in crediting Robert Smith's torture claims.

108.    TIRC also determined in 2017 that Javan Deloney presented "sufficient evidence of torture" by Defendant McWeeny.

109.    Like Kill, Defendant McWeeny has asserted the Fifth Amendment protection against self-incrimination when questioned about abusing suspects in police custody. For example, McWeeny asserted his Fifth Amendment rights in connection with his participation in TyShawn Ross's conviction in response to this question: "Did you on or about June 4, 1991, participate in, witness, or otherwise become aware of the arrest, transport, interrogation, beating, threatening, placing a bag over the head of, electric shocking and/or any other physical or psychological abuse of arrestee TyShawn Ross?"

17

110.     Examples of abuses by Defendant Officers also include the following, all of which are corroborated by sworn testimony:

a.  On November 2, 1983, Defendant McWeeny, Jon Burge, and other CPD detectives tortured Darrell Cannon while interrogating him for the murder of Darrin Ross, a crime he did not commit. McWeeny participated in shoving a cattle prod into Cannon's mouth until he agreed to falsely confess, among other abuse. Defendant McWeeny later perjured himself, denying in court that Cannon was abused.

b.  Around September 1987, Defendant McWeeny and others interrogated Robert Smith in connection with a double murder. Defendant McWeeny beat Smith in the chest. Smith falsely confessed to the murder because of McWeeny's and other detectives' abuse. In 2013, TIRC found Smith's claim credible based, in part, on hospital records that substantiated the physical abuse.

c.  In June 1989, Defendant McWeeny and others physically and psychologically abused 19-year-old Corey Batchelor and his friend Kevin Bailey until each confessed to a murder of which they were innocent. McWeeny and others punched, kicked, and choked Batchelor; banged his head into a wall; deprived him of sleep; isolated him from family and attorneys; threatened to kill him; and made false promises of leniency over the course of an interrogation that lasted over 24 hours. After Batchelor served more than 15 years in prison, the State dismissed the charges against him and his conviction was vacated.

d.  In June 1991, Defendant McWeeny, Jon Burge, and other officers at Area 3, beat, shocked, and tortured Keith Walker over the course of two days. McWeeny later

18

assembled a suggestive photo lineup and coerced multiple witnesses into falsely implicating Walker in a murder. Thereafter, McWeeny and others coerced Walker into signing a false confession under threats of further torture.

e.  In 1991, Kill physically and psychologically abused 15-year-old Anthony Jakes, holding him at Area 3 incommunicado without food or water for more than 16 hours until he falsely confessed to participating in the murder of Rafael Garcia. Jakes was exonerated more than 20 years later and awarded a certificate of innocence by the State of Illinois.

f.  In November 1992, Defendant Christopherson and others induced Harold Hill, Dan Young, and Peter Williams to provide interlocking confessions to raping and killing a woman. Williams was incarcerated at the time of the crime, and was therefore never charged. But Hill and Young were convicted based on confessions that implicated the undeniably innocent Williams. DNA evidence later exonerated them.

g.  In 1994, Defendant Moser and other officers beat Anthony Williams into falsely confessing to murder and armed robbery.

**Weston's Damages**

111.    Weston spent 29 years of his life in prison and jail for a crime he did not commit.

112.    For 29 years, Weston was threatened and attacked by guards and inmates, experienced physical injuries, and lived in constant fear for his life.

113.    Additionally, the emotional pain and suffering Defendants' misconduct caused has been, and continues to be, substantial.

19

114.    Because of Defendants' misconduct, Weston was taken away from, and missed out on, the lives of his family and his friends. Weston was only 17 years old when he was arrested, and 19 years old when he was sentenced to 75 years in prison. He was robbed of opportunities to gain an education, to establish and develop a career, and to pursue his interests and passions.

115.    Weston has been deprived of all the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

116.    Weston lived in constant emotional anguish, never knowing whether the truth would come out and whether he would ever be exonerated.

117.    In addition to the severe trauma of wrongful imprisonment and Weston's loss of liberty, Defendants' misconduct continues to cause Weston extreme physical and psychological pain and suffering, humiliation, constant fear, nightmares, anxiety, depression, despair, rage, and other physical and psychological effects. Weston has also suffered profound and continuing reputational harm as a result of being labeled a murderer.

**COUNT I**
**42 U.S.C. § 1983 – Coerced and False Confession in Violation of the Fifth Amendment**

118.    Plaintiff incorporates each paragraph of this pleading as if fully restated here.

119.    In the manner described more fully above, Defendant Officers, individually, jointly, and in conspiracy with each other, under color of law and within the scope of their employment, forced Plaintiff to incriminate himself falsely and against his will, in violation of his rights secured by the Fifth Amendment.

120.    As described more fully above, Defendant Officers participated in, encouraged, advised, and ordered Plaintiff's unconstitutional and unlawful interrogation that caused him to

make involuntary and false statements implicating himself in the murder of Joseph Watson.

121. The coerced, involuntary, false statement Defendant Officers fabricated and attributed to Plaintiff was used against him to his detriment in a criminal case.

122. The misconduct described in this count was objectively unreasonable and was undertaken intentionally, with malice and reckless indifference to the rights of others, and with total disregard for the truth and Plaintiff's clear innocence.

123. As a result of Defendants' misconduct described in this count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

124. Plaintiff's injuries were caused by the policies, practices, and customs of Defendant City of Chicago.

125. At all relevant times and before the events giving rise to this lawsuit occurred, the City of Chicago promulgated rules, regulations, policies, and procedures for the conduct of interrogation, testing, and questioning of criminal suspects by officers and agents of the Chicago Police Department. In addition, the City of Chicago promulgated rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department with respect to the conduct of interrogations and the techniques to be used when questioning criminal suspects.

126. These rules, regulations, policies, and procedures were implemented by officers and agents of the Chicago Police Department, including the Defendant Officers who were responsible for interrogating suspects and witnesses in connection with the Watson homicide investigation.

127. In addition, at all times relevant to the events described in this pleading and for a

period of time before those events, Defendant City of Chicago had notice of a widespread practice by officers and agents of the Chicago Police Department under which individuals like Plaintiff who were suspected of criminal activity were routinely coerced against their will to implicate themselves in crimes of which they were innocent. It was common for suspects interrogated by the Chicago Police Department to falsely confess under extreme duress and after suffering abuse to committing crimes to which they had no connection and for which there was scant evidence to suggest they were involved.

128.    Specifically, at all relevant times and for a period of time before the events giving rise to this case, there existed a widespread practice among officers, employees, and agents of the Chicago Police Department under which criminal suspects were coerced to involuntarily implicate themselves by various means, including but not limited to the following: (a) individuals, including minors and individuals with mental disabilities and psychiatric conditions, were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (b) individuals were subjected to actual and threatened physical and psychological violence; (c) individuals were interrogated at length without proper protection of their constitutional right to have an attorney present or to remain silent; (d) individuals were forced to sign false statements fabricated by the police; (e) officers and employees were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily or falsely; and (f) supervisors with knowledge of permissible and impermissible interrogation techniques did not properly supervise or discipline police officers and employees such that the coercive interrogations continued unchecked.

129.    These widespread practices were allowed to flourish because the leaders,

22

supervisors, and policymakers of the Chicago Police Department directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees as to proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses like those that affected Plaintiff.

130.    The above widespread practices were so well-settled as to constitute *de facto* policy of the Chicago Police Department, and were able to exist and thrive because policymakers with authority exhibited deliberate indifference to the problem, thereby effectively ratifying it.

131.    In addition, the misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that the constitutional violations committed against Plaintiff were committed either directly by, or with the knowledge or approval of, people with final policymaking authority for the Chicago Police Department.

132.    The policies, practices, and customs set forth above have resulted in numerous well-publicized false confessions, including the false confession at issue here, where individuals were convicted of crimes they did not commit after being subjected to abusive interrogation techniques.

133.    Plaintiff's injuries were caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually-named Defendants who acted pursuant to the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

**COUNT II**
**42 U.S.C. § 1983 – Coerced Confession in Violation of the Fourteenth Amendment**

134.    Plaintiff incorporates each paragraph of this pleading as if fully restated here.

135.    In the manner described more fully above, Defendant Officers, individually,

23

jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, forced Plaintiff to incriminate himself falsely and against his will, in violation of his right to due process secured by the Fourteenth Amendment.

136.    As described in detail above, the misconduct described in this count was carried out using extreme techniques of physical and psychological coercion and torture against a 17-year-old boy. This misconduct was so severe as to shock the conscience, it was designed to injure Plaintiff, and it was not supported by any conceivable governmental interest.

137.    The misconduct described in this count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and with total disregard for the truth and Plaintiff's clear innocence.

138.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

139.    Plaintiff's injuries were caused by the policies, practices, and customs of Defendant City of Chicago in the manner more fully described above.

## COUNT III
### 42 U.S.C. § 1983 – Violation of Due Process under the Fourteenth Amendment

140.    Plaintiff incorporates each paragraph of this pleading as if restated fully herein.

141.    As described more fully above, Defendant Officers, while acting individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to due process and a fair trial.

142.    In the manner described more fully above, Defendant Officers deliberately withheld exculpatory and impeachment evidence from Plaintiff, his attorneys, and prosecutors, among others, thereby misleading and misdirecting Plaintiff's criminal prosecution.

143.    In addition, as described more fully above, Defendant Officers fabricated and solicited false evidence, including statements and testimony they knew to be false, fabricated police reports and other evidence falsely implicating Plaintiff, suborned perjury, obtained Plaintiff's conviction and continued prosecution using that false evidence, and failed to correct fabricated evidence they knew to be false when it was used against Plaintiff during his criminal trial.

144.    In addition, the Defendant Officers concealed and fabricated additional evidence that is not yet known to Plaintiff.

145.    Defendants' misconduct directly resulted in Plaintiff's unjust criminal prosecution and wrongful conviction, thereby denying him his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, Plaintiff's prosecution would not and could not have been pursued.

146.    The misconduct described in this count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and with total disregard for the truth and Plaintiff's clear innocence.

147.    As a result of Defendants' misconduct described in this count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

148.    Plaintiff's injuries were caused by the policies, practices, and customs of Defendant City of Chicago in that employees and agents of the City regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating individuals in criminal conduct, elicited false and coerced witness testimony, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a manner

similar to that alleged here.

149.    The above-described widespread practices were so well-settled as to constitute *de facto* policy of the City of Chicago, and were allowed to exist and flourish because municipal policymakers with authority over the City's policies exhibited deliberate indifference to the problem, thereby effectively ratifying the policy.

150.    The widespread practices described in the preceding paragraphs were allowed to flourish because the City of Chicago declined to implement sufficient training and any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful convictions.

151.    Indeed, the Chicago Police Department's systems for investigating and disciplining police officers and other employees accused of the type of misconduct that affected Plaintiff was and is, for all practical purposes, nonexistent.  The Department maintained a "code of silence" that effectively eliminated any form of accountability, discipline, or oversight.

152.    Chicago police officers and other employees of the City of Chicago who manufactured criminal cases against individuals like Plaintiff had every reason to know not only that they enjoyed *de facto* immunity from criminal prosecution and departmental discipline, but also that they stood to be rewarded for closing cases no matter what the cost. In this way, the City proximately caused abuses like the Defendant Officers' misconduct at issue in this case.

153.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that the constitutional violations committed against Plaintiff were committed either directly by, or with the knowledge or approval of, people with final policymaking authority for the Chicago Police Department.

154.    The policies, practices, and custom set forth above were the moving force behind

26

the numerous constitutional violations in this case and directly and proximately caused Plaintiff

to suffer the grievous and permanent injuries and damages set forth above.

**COUNT IV**
**42 U.S.C. § 1983 – Malicious Prosecution and Unlawful Pretrial Detention in Violation of**
**the Fourth and Fourteenth Amendments**

155.     Plaintiff incorporates each paragraph of this pleading as if restated fully herein.

156.     In the manner described more fully above, Defendants, while acting as

investigators, individually, jointly, and in conspiracy with each other, accused Plaintiff of

criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings

against Plaintiff without any probable cause for doing so and in spite of the fact that they knew

Plaintiff was innocent.

157.     In doing so, Defendants caused Plaintiff to be unreasonably seized without

probable cause and deprived of his liberty, in violation of Plaintiff's rights secured by the Fourth

and Fourteenth Amendments.

158.     The false judicial proceedings against Plaintiff were instituted and continued

maliciously, resulting in injuries.

159.     Defendants deprived Plaintiff of fair state criminal proceedings, including the

chance to defend himself during those proceedings, resulting in a deprivation of liberty.

160.     In addition, Defendants subjected Plaintiff to arbitrary governmental action that

shocks the conscience in that Plaintiff was deliberately and intentionally framed for crimes of

which he was totally innocent. This was accomplished through Defendants' fabrication and

suppression of evidence.

161.     The misconduct described in this count was objectively unreasonable and was

undertaken intentionally, with reckless and deliberate indifference to the rights of others, and

with total disregard of the truth and of Plaintiff's clear innocence.

162. Defendants' actions were taken under color of law and within the scope of their employment.

163. As a result of Defendants' misconduct described in this count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

164. Defendants' misconduct described in this count was undertaken pursuant to the policies, practices, and customs of Defendant City of Chicago, and by Defendants who were final policymakers for Defendant City of Chicago, in the manner described more fully above.

## COUNT V
### 42 U.S.C. § 1983 – Failure to Intervene

165. Plaintiff incorporates each paragraph of this pleading as if restated fully herein.

166. In the manner described above, during the constitutional violations described above, one or more of the Defendant Officers stood by without intervening to prevent the misconduct.

167. These Defendants had a reasonable opportunity to prevent harm to Plaintiff, but failed to do so.

168. The misconduct described in this count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

169. As a direct and proximate result of the Defendant Officers' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

170. Defendants undertook the misconduct described in this Count pursuant to the City

28

of Chicago's policies and practices in the manner more fully described above.

## COUNT VI
## 42 U.S.C. § 1983 – Conspiracy

171.     Plaintiff incorporates each paragraph of this pleading as if restated fully herein.

172.     All of the Defendant Officers reached an agreement among themselves to frame Plaintiff for Joseph Watson's murder and for the attempted murders of Timothy Jones, Deneen Coats, and Ronald Nesbit, and thereby to deprive Plaintiff of his constitutional rights, as described in above. This agreement was first reached before arresting Plaintiff for these crimes, and remained in place throughout all periods of his detention, prosecution, and incarceration.

173.     In addition, before Plaintiff's conviction the Defendant Officers conspired, and after his conviction they continued to conspire, to deprive Plaintiff of exculpatory materials to which he is entitled and that would have led to his earlier exoneration.

174.     In this manner, the Defendant Officers, acting in concert with each other and with other unknown co-conspirators, including people who are and are not members of the Chicago Police Department, have conspired by concerted action to accomplish an unlawful purpose or a lawful purpose by unlawful means.

175.     In furtherance of the conspiracy, each co-conspirator committed overt acts and was an otherwise willful participant in joint activity.

176.     As a direct and proximate result of this illicit prior agreement, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

177.     The misconduct described in this count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights.

178.     Defendants undertook the misconduct described in this count pursuant to the City

29

of Chicago's policies and practices in the manner more fully described above.

## COUNT VII
### State Law Claim – Malicious Prosecution

179.     Plaintiff incorporates each paragraph of this pleading as if restated fully herein.

180.     In the manner described more fully above, Defendants accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

181.     In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

182.     Plaintiff's criminal prosecution was terminated in his favor, in a manner indicative of innocence.

183.     Defendants' actions were taken under color of law and within the scope of their employment.

184.     As a result of Defendants' misconduct described in this count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VIII
### State Law Claim – Intentional Infliction of Emotional Distress

185.     Plaintiff incorporates each paragraph of this pleading as if restated fully herein.

186.     Defendants' actions, omissions, and conduct, as set forth above, were extreme and outrageous. These actions were rooted in an abuse of power and authority and were  undertaken with the intent to cause, or with reckless disregard for the probability that they would cause Plaintiff severe emotional distress, as more fully alleged above.

187.     As a direct and proximate result of the Defendant Officers' actions, Plaintiff

30

suffered and continues to suffer emotional distress and other grievous and continuing injuries and damages as set forth above.

## COUNT IX
### State Law Claim – Civil Conspiracy

188.    Plaintiff incorporates each paragraph of this pleading as if restated fully herein.

189.    As described more fully above, the Defendant Officers, acting in concert with other co-conspirators reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect each other from liability for depriving Plaintiff of these rights.

190.    In furtherance of their conspiracy, each co-conspirator committed overt acts and was otherwise a willful participant in joint activity.

191.    In furtherance of this conspiracy, a tortious action was committed against Plaintiff.

192.    As a result of the Defendant Officers' misconduct described in this Count, Plaintiff suffered damages as set forth above.

## COUNT X
### State Law Claim – *Respondeat Superior*

193.    Plaintiff incorporates each paragraph of this pleading as if restated fully herein.

194.    While committing the misconduct alleged in the preceding paragraphs, the Defendant Officers were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

195.    Defendant City of Chicago is liable as principal for all state law torts committed by its agents.

## COUNT XI
## State Law Claim – Indemnification Pursuant to 745 ILCS 10/9-102

196.    Plaintiff incorporates each paragraph of this pleading as if restated fully herein.

197.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

198.    The Defendant Officers were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

199.    The City of Chicago is responsible for paying any judgment entered against the Defendant Officers. Plaintiff therefore demands judgment against Defendant City of Chicago in the amounts awarded to Plaintiff against the individual Defendants as damages, attorneys' fees, costs, and interest.

WHEREFORE, Plaintiff Demond Weston, respectfully requests that this Court enter a judgement in his favor and against Defendants the City of Chicago, Estate of Michael Kill, Anthony Maslanka, William Moser, John Paladino, Dan McWeeny, Andrew Christopherson, Jerome Rusnak, Victor Breska, and Unknown Employees of the City of Chicago awarding compensatory damages, attorneys' fees, and costs against each Defendant, and, because they acted willfully, wantonly, and/or maliciously, punitive damages against each of the Individual Defendants, and any other relief that this Court deems just and appropriate.

## JURY DEMAND

Plaintiff Demond Weston hereby demands a trial by jury pursuant to Federal Rules of Civil Procedure 38(b) on all issues so triable.

Dated: October 16, 2020

Respectfully submitted,

DEMOND WESTON

By: /s/ Mariah Garcia
       *One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Alison R. Leff
Mariah Garcia
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
mariah@loevy.com

33