# Exhibit 5



# KENTUCKIANA
## COURT REPORTERS

CASE NO. 1:20-CV-06189

DEMOND WESTON

V.

CITY OF CHICAGO, ET AL.

DEPONENT:

RICHARD RUDOLPH

DATE:

May 09, 2024



schedule@kentuckianareporters.com
877.808.5856 | 502.589.2273

www.kentuckianareporters.com

Page 22

1  A. Yeah, as needed.
2  Q. Okay. And so, would you say -- well, strike
3  that, please. Do you receive a pension from NYPD?
4  A. I do.
5  Q. Okay. What percentage of your income at this
6  point is coming from your expert work?
7  A. What percentage of my income?
8  MR. ZECCHIN: I'm going to object to form.
9  THE WITNESS: I -- I -- I don't -- I'd have to
10 guess. I wouldn't even know. 10, 15, 20 percent?
11 I don't know. Because it's not all the time, so --
12 the pension is all the time.
13 BY MS. KLEINHAUS:
14 Q. You did pretty well in your first year as an
15 expert; would you agree? 85,000 in expert work?
16 A. It was a lot of work. It was a lot.
17 Q. Yeah.
18 A. So it wasn't -- it wasn't easy money. I could
19 tell you that.
20 Q. Okay. I wanted to look at your CV. SO that's
21 addendum A. So it's Page 28 of your report.
22 A. Okay.
23 Q. So the report we'll mark as Exhibit 1.
24     (EXHIBIT 1 MARKED FOR IDENTIFICATION)
25 MS. KLEINHAUS: Tony, I assume you have it in

Page 23

1  front of you, but if you need me to --
2  MR. ZECCHIN: I do have it. No, I do have
3  it --
4  MS. KLEINHAUS: Okay.
5  MR. ZECCHIN: -- in front of me. If you could
6  just reference the pages you're looking at, that
7  would make it easier for me, so --
8  MS. KLEINHAUS: Okay, sure.
9  MR. ZECCHIN: Thanks.
10 BY MS. KLEINHAUS:
11 Q. Okay. So sir, if you can turn to Page 30 of
12 your report, it lists your education there. Do you see
13 that part?
14 A. I'm catching up. Okay.
15 Q. Are you on Page 30?
16 A. I got it.
17 Q. Okay. All right. There are no years included
18 here, so I just wanted to clarify. Starting at the top
19 there, it's graduate of the FBI National Academy. What
20 year did you do that?
21 A. That was in 2009. So we started in September
22 and we graduated December.
23 Q. And were you attending classes full-time
24 during that --
25 A. Oh, yes. Yeah, the FBI is run just like when

Page 24

1  you go to college. You -- you have a dorm, roommate,
2  share a bathroom with two other people, class Monday --
3  Monday, Tuesday, Wednesday -- Monday, Tuesday, Thursday,
4  Friday, and Wednesday's what they call an enrichment
5  day.
6  Q. Okay.
7  A. So I guess you do some training.
8  Q. The next item is a master of arts from Seton
9  Hall?
10 A. Yes.
11 Q. What year did you receive your master's from
12 Seton Hall?
13 A. That was probably 2006 or '7, I believe.
14 Yeah, so it was right before I made lieutenant. Yeah, I
15 think that was 2006 or '7.
16 Q. Okay. And beneath that, you have bachelor of
17 science from St. John's University. What year did you
18 receive that?
19 A. I finalized that in -- I think it was -- it
20 had to be the fall. Yeah, the fall -- fall semester of
21 '91, because I had -- I dropped out and went to the
22 police academy. Went back and finished.
23 Q. Okay. So you actually finished and got your
24 degree in '91; is that right?
25 A. Yeah. So I joined the police department,

Page 25

1  October '90. I graduated April '91. And I picked up my
2  remaining credits that following fall semester and
3  graduated, I guess, December. Or I think it was
4  January.
5  Q. Okay. And you can put that page to the side
6  for now. I want to go through your career at NYPD
7  briefly. So I think you've just told us you attended
8  the police academy in '91; is that right?
9  A. October '90. Graduated in '91. Went for six
10 months.
11 Q. Okay. And -- oh, I forgot to ask you this:
12 Have you ever worked for any law enforcement agency
13 besides NYPD? And when I say law enforcement agency,
14 I'm using that very broadly. So like, if you were a
15 correctional officer, you were a parole officer, I'm
16 including that. Have you ever had any other job in law
17 enforcement?
18 A. No, only NYPD.
19 Q. Okay. And then, what was -- I know you said
20 you made supervisor in 1996. So what -- tell me about
21 the work that you did from '91 to '96.
22 A. So 1991, I graduated from the police academy,
23 was assigned to a precinct out in Queens. And typical,
24 we're assigned to a field training sergeant for six
25 months. Basically, foot patrol, doing details. When we

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 26

1  say details, we mean, like, parades and demonstrations,
2  things like that.  And then, after that six months, I
3  was assigned to the platoon, which would be the 4:00 to
4  12:00, regular patrol.  I think it was probably around
5  1994.  I was assigned to the precinct's anti-crime unit,
6  which is basically what we call plain clothes, not
7  undercover.
8         So jeans and T-shirts and -- or proactively
9  trying to, you know, prevent burglaries, robberies, any
10 violent street crime.  From there, I was assigned to the
11 citywide street crime unit.  Almost the same type of
12 job, except we were citywide, so we would work sometimes
13 up in the Bronx, Manhattan, Queens.  But in a few months
14 after that, we had gotten decentralized, and I was
15 assigned back to Queens South, just Queens.  And so
16 basically, I was doing the same thing.  We would work
17 strictly nights.  So from 6:00 in the morning to -- 6:00
18 at night to 2:00 in the morning, and four -- four days
19 on, two days off.
20        And that's all we did was work, you know,
21 trying to prevent violent street crimes, burglaries,
22 robberies, things like that.  From there, I was assigned
23 to narcotics, and I was assigned to the Manhattan --
24 northern Manhattan initiative, which is up in northern
25 Manhattan, specifically Washington Heights, around --

Page 27

1  well, now you guys would know Columbia University is
2  right -- right there.  So just active drug enforcement.
3  It was a big initiative back then with the city to
4  combat major drug -- drug enforcement.  So we did a lot
5  of case work, a lot of buy and bust operations.  And so,
6  I was assigned specifically -- my module spot was
7  specifically assigned to 161st Street, 162, 163rd
8  Street.
9         So that's how -- that's how big this module
10 was.  We only had three streets to take care of.  We
11 were responsible in our module.  From there, I was
12 promoted to sergeant, and I was sent out to -- back out
13 to Queens, on South Jamaica in the 113 Precinct, where I
14 was a -- a patrol supervisor.  So the theory in New York
15 City Police Department, no matter how high you make it,
16 once you get promoted, you go back to patrol.  And the
17 theory is to bring whatever you learn back to the new
18 people out on the street.  So I was there and then I
19 wanted to go to -- I know you said up to supervisor.
20        Want me to keep going?
21   Q.  Yes, keep going, actually.  I think that's --
22   A.  Okay.
23   Q.  -- that's the way to do it.  Yeah.
24   A.  So I wanted to go be a supervisor in an
25 investigative unit.  And I thought my background is

Page 28

1  street crime narcotics, I wanted to go to the gang unit.
2  So I applied to Detective Bureau.  So in New York City,
3  once you applied to Detective Bureau as a supervisor,
4  you have to serve two years in Internal Affairs if you
5  can get that, before you get assigned to an
6  investigative assignment.  So I was assigned to Internal
7  Affairs. Transferred to Internal Affairs, and I was
8  assigned to the force unit, which is called Group 54.
9  And essentially, we investigated all allegations of
10 excessive force.  Anything from handcuffs too tight to
11 what we call MOS.
12        MOS is a -- a -- a -- a -- a member of the
13 police department.  MOS-involved shootings where we
14 actually shot and hit somebody.  If the police officer
15 had let a round go and didn't hit anybody, that would
16 not be handled by us, but -- and everything in-between.
17 So any allegations citywide.  We had the entire city.
18 And from there, I didn't -- I -- I was doing a lot of
19 investigative detective work, which I liked. And so,
20 when my time was up in Internal Affairs, I was also
21 getting a little bit older.  I really enjoyed the
22 investigative part of it, so I was assigned to the
23 Detective Bureau instead of going to Gang.  And that's
24 where I ended up --
25   Q.  Sorry.

Page 29

1   A.  Sorry?
2   Q.  What year was that that you were assigned
3  to --
4   A.  Oh, it was --
5   Q.  -- the Detective Bureau?
6   A.  2000.  2000, I went there.  So it was probably
7  -- it was probably '99 that I went to Internal Affairs.
8  Yeah, so it'll be two years before that.  '98, '99.  And
9  then -- so I was -- I've been in the Detective Bureau
10 since then.  I was up in Astoria, Queens.  So I was the
11 executive officer of the 114 Precinct detective squad.
12 And then, from -- want me to keep going?
13   Q.  Let me just ask you a couple of follow-ups --
14   A.  Yeah.
15   Q.  -- on what you've said so far.  So in order
16 for you to become a sergeant, did you have to take any
17 type of exam for that?
18   A.  I did.  Straight civil service test.
19   Q.  Okay.  How many times did you take the test?
20   A.  Oh, God.  I think I failed every test at least
21 once.  Because the first time, I was too young to
22 appreciate what I was doing.  I figured I could pass it,
23 no problem.  But I think I passed it on my second time
24 for sergeant.  Yeah.
25   Q.  Okay.  And then in order to switch from being



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 30

1 a patrol sergeant to being in Internal Affairs, do you
2 have to take a test for that?
3    A.   No, it's a -- it's a -- you apply, like a job
4 application.
5    Q.   Okay.  And then, when you were assigned to
6 Internal Affairs investigating allegations of excessive
7 force, did you investigate any allegations of force used
8 during interrogations?
9    A.   Well, any allegation of excessive force.  I
10 mean, if -- if -- if somebody had made an allegation
11 that he was beaten during his interrogation, then we're
12 going to investigate that.  And, you know, sometimes, it
13 -- you know, it was so unbelievable, it couldn't happen,
14 and then when we got there, guess what, it did happen.
15 So it was -- you know, it wasn't a fun time and I didn't
16 take any enjoyment out of it, but we did our job.  And
17 -- so one of the cases that I -- one of the cases that I
18 -- when I first got assigned there -- like you asked me
19 before, did I reference any material for this case.  And
20 Internal Affairs, we call it, like, a clean team.  It
21 doesn't mean -- you know, it -- it doesn't mean dirty or
22 not.  It's clean team means I have no -- no knowledge of
23 this case.  So I got to the tail end of that.  It was
24 called Diallo.  I don't know if you remember that.  He
25 got --

Page 31

1    Q.   I'm familiar.
2    A.   Yeah, he got a stick inserted into him by the
3 cops.  And it was so horrific, nobody believed it, but
4 guess it was true.  And so, as a clean team, I would go
5 in there and conduct follow-up interviews, not knowing
6 anything about the case.  So I think it made for a
7 better investigation.  I mean, it was so dark -- it
8 was --
9    Q.   Sorry.  Were you finished?
10   A.   That's all right.  I'm just saying stuff like
11 that is more stressful on us than probably, you know --
12 I'm not talking about the victim.  I'm talking about,
13 you know, police officers, but yeah.
14   Q.   Right.
15   A.   Seeing -- seen them a lot.
16   Q.   So when you say a clean team, you mean you
17 were trying to as best you could go in unbiased?
18   A.   Well, clean team means that I -- I didn't read
19 the case file.  I don't know anything about it.  And my
20 lieutenant would say, all right.  I want you to go and
21 interview this person about what he did on Saturday,
22 June 4th, 19-whatever.  Okay.  And I would have, you
23 know, basic some questions to ask him, but not know what
24 he had said before in prior interviews or anything like
25 that, because the federal government was involved and --

Page 32

1 and they wanted to make sure everything was, you know,
2 all the bases were covered.  So it was -- it was a tough
3 thing to deal with.
4    Q.   Sure.  And in cases like that -- I'm just
5 trying to make sure I understand the concept of the
6 clean team.
7    A.   Uh-huh.
8    Q.   Would you have reviewed police reports to know
9 why that person was arrested or what the police version
10 of events was?
11   A.   Well, we knew what the case was, but you know,
12 we didn't want -- my supervisor didn't want us to know
13 any intimate details about the case.  You know,
14 everybody knows what was on TV and -- and -- and, you
15 know, talking around the office, but they don't want to
16 know if anything -- that way it makes somewhat for -- I
17 don't know if you want to say better interview, but
18 that's how they wanted it done.
19      Similar to like when I get a case like this, I
20 don't want to know any -- I don't Google any cops.  I
21 don't Google any, you know, defendants.  I just want to
22 read what's in front of me and get my own idea.
23   Q.   Other than the Diallo case, did you
24 investigate any other allegations of excessive force
25 that occurred during an interrogation or allegedly

Page 33

1 occurred during an interrogation?
2    A.   Yeah, I had a few of them.  The majority of
3 them weren't substantiated.  You know, all our cases
4 that we have, Internal Affairs, we conduct our
5 investigation and before we're able to interview a
6 member of the service or a detective or any allegation
7 against that member of the New York City Police
8 Department, we have to present that case to the district
9 attorney.
10      And once the district attorney refuses to
11 prosecute, then we can conduct an interview because the
12 department and the -- New York City is a little bit
13 complex with, you know, if he -- if we interview him
14 during an official police department investigation, you
15 have to answer my questions.  If you answer my
16 questions, it can't be used against you at trial because
17 that's Miranda and -- and -- and legal issues and stuff
18 like that.  So yeah.
19   Q.   So you would conclude any criminal
20 investigation before you do, like, an administrative
21 investigation; is that right?
22      MR. ZECCHIN:  I'm object -- I'm object to form.
23   You can answer.
24      THE WITNESS:  Yes.  So we conduct our
25   investigation and the results of my investigation,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 194

1  Q.  Okay.
2  A.  It should be in the case file.
3  Q.  And do you have any issue with the fact that,
4  in this case, there's a, like, an eight- or nine-page
5  supplemental report describing the investigation listing
6  eight arresting officers referring to everybody as RD or
7  RO?
8  A.  Yeah.  So --
9      MR. ZECCHIN:  I'm going to object to that --
10     the form and misstates the documents that are being
11     asked about.  Go ahead.
12     THE WITNESS:  Talking about the -- the sup
13     part, right?
14 BY MS. KLEINHAUS:
15  Q.  Yeah.  There's like -- I mean, I can bring it
16 up if you want to take a look at it.
17  A.  No, that's all I -- I know what you're talking
18 about.
19  Q.  Okay.  There's, like, one main case report --
20  A.  Yeah.
21  Q.  -- right?  It describes the investigation.
22  A.  I get it, but you know, obviously I want every
23 detective to type their own or her own what they did
24 that day on one separate piece of paper and then put it
25 together like a book.  That being said, the other

Page 195

1 detective -- the other cases that I read for the Chicago
2 PD back in 1990, that was the way they did it.  That was
3 their practice.
4       I mean, did I like it?  Not really.  I mean,
5 I'd rather have it separated, which, you know, and have
6 each person -- so we don't end up in court with hearsay
7 stuff or, you know, trying to find out, you know,
8 exactly what happened from another detective.  Each
9 detective should type their own investigative steps that
10 they conducted on their separate form and then put it in
11 the case file.  I don't know how Chicago does it today.
12 I would hope probably they -- maybe they changed that
13 since then, but that's how they did it in 1990.
14  Q.  That's how they did it in 1990.  Is it your
15 opinion that the national standard for police practices
16 in 1990 was that you could write a report where it's not
17 clear who did what?
18  A.  The --
19     MR. ZECCHIN:  Object to argumentative.  Go
20     ahead.
21     THE WITNESS:  Yeah.  Yeah.  That's not what I
22     said at all.  Yeah, so that's the --
23 BY MS. KLEINHAUS:
24  Q.  Okay.  Sure.  I mean, I hear you saying that's
25 what they did in Chicago in 1990.  And I've worked on a

Page 196

1 lot of Chicago in 1990 cases, too.  So I -- I'll agree
2 with you:  That is what they did.  My question is a
3 little bit different.  Was that the standard across the
4 profession in 1990?
5  A.  I don't think we really had investigative
6 standards back in 1990.  And obviously, you know, I
7 didn't read a lot of cases from 1990.  I only read them
8 later on in my career and I could tell you the cases
9 that I read from New York City Police Department, some
10 of them were worse than the cases that I read for
11 Chicago PD, but that was their -- that was their
12 standard and their -- and how they operated back then.
13 So the standards were in their rules and procedures on
14 how to write supplemental reports, and that's how they
15 did it.  I mean, I would like it to be different, but
16 that's how they did it back then.
17  Q.  Okay.  Are you aware of any standard or manual
18 or document from 1990 that you believe sets forth what
19 the police practices standard was for police writing in
20 1990?
21  A.  Yeah, the -- I don't know if they actually had
22 a format for Chicago PD.  I did read one.  I think it
23 was a format for supplement report.  And I don't
24 remember when -- when I read it, but -- excuse me.
25 That's the -- that's the only thing that I could recall.

Page 197

1 It wasn't, you know, how to write it, it was more the
2 format.
3  Q.  Okay.  And you would agree with me, generally
4 speaking, that police reports are going to be relied on
5 by people who weren't actually part of the
6 investigation, right?
7  A.  Absolutely.
8  Q.  Okay.  Let's talk for a moment about the
9 lineups.  You -- if I understand your report correctly,
10 you concluded that you don't think Deneen Coats was
11 shown photos before she viewed a lineup, right?
12  A.  I didn't say that.  I said -- what -- what
13 page are we on?  I'm sorry.
14  Q.  I didn't give you a page, so let's --
15  A.  Yeah, I know what you're talking about.  I
16 just don't have it in front of me.  18?  Oh, no, that's
17 -- that's the line-up.  Swanson is on 19.  19?
18  Q.  Sure.  I mean, I'm not directing you actually
19 to a specific part, but if you need your report to
20 answer it...
21  A.  Okay.  I'm just following along.
22  Q.  Okay.  You describe -- you say this -- I'm
23 sorry.  Let me give you a reference.  So in the first
24 paragraph you're discussing Swanson's report of what
25 happened you say, "This strongly suggests that this

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com