# Exhibit 1

IND DEF 0297960

### AFFIDAVIT OF DEMOND WESTON

I, Demond Weston, hereby submit this Affidavit and, under oath and upon penalty of perjury, state that the following information is true and correct:

1.     On April 21, 1992, I was convicted of first degree murder and attempted first degree murder.  I was sentenced to 45 years in custody of the Illinois Department of Corrections for the murder of Joseph Watson and to 30 years in custody for the attempted murders of Timothy Jones, Deneen Coats and Ronald Nesbit.   The court ordered my 45-year and 30-year sentences to run consecutively.

2.     I had recently turned 17 years old at the time I was arrested on June 9, 1990.  On April 1 of last year (2013), I had my 40th birthday at the Hill Correctional Center in Galesburg, Illinois.

3.     I am innocent of the crimes for which I was convicted.  To this day, I have never even shot a gun in my life, much less aimed one or fired at another human being.  I was beaten and psychologically manipulated by detectives of the Chicago Police Department into giving a false statement that resulted in my convictions.

4.     On June 9, 1990, I left my house at around noon to walk to a store.  I was then living with my mother, grandmother, and three sisters.  After crossing Union Avenue, I noticed two unmarked police cars drive by and turn onto 60th Street.  One of the unmarked cars sped up from behind me on the wrong side of the road and screeched to halt.  A plainclothes police officer jumped out of the car with his gun drawn and aimed it directly at me.

5.     The officer, who I later learned was Detective Michael Kill, ordered me to turn around and not to move.  He placed the gun against the back of my head, threatened to shoot, and then searched me.  Detective Kill then grabbed me by the arm and led me into the yard of a

1

IND DEF 0297961

nearby house on Union Avenue, ordering me to stay there. Confused, I complied. Detective Kill returned to the area near his car, where a second unmarked car had parked.

6.      There were a few people sitting on the porch of the house near me. I knew some of these individuals. One of them said that the police had arrested a man named Dwayne Macklin, pointing him out in the back of the second unmarked police car. They also said that the police were looking for Cortez "Vic" Brown.

7.      Detective Kill returned to the yard and asked me if I was "Vic." I told him that I was not. Detective Kill responded, "Well, you'll do." Other individuals sitting on the stoop spoke up and told Detective Kill that he had the wrong person, to which Detective Kill responded that they should "shut the hell up and mind [their] business," and to "take a good look at [my] black ass because [they] will never see [me] again."

8.      Detective Kill handcuffed me and placed me in the back seat of the car. No one read me my Miranda rights or told me why I was being detained or arrested.

9.      Detective Kill drove me to a vacant lot nearby, where he parked his car side by side with the other unmarked police car. Detective Kill walked over to the other car, opened one back door, and shouted something at Macklin. Detective Kill then returned to the car I was in and opened one back door and said loudly: "Your fucking name is not Vic Brown?" I said no. Because Detective Kill had opened both doors, I could see Macklin shaking his head no, and I heard him tell Detective Kill that I was not Vic Brown. Macklin, who was much older than me, eventually said that my name was Demond and that I was the little brother of one of his sister's friends. He also told Detective Kill that I was not involved in anything because I was only a kid. Detective Kill responded that I "would do." Upset, I asked him several times, "What'd I do?" Detective Kill refused to tell me, saying that he would tell me when we got to the station.

2

IND DEF 0297962

Detective Kill also said that he still believed that I was Vic Brown and that Macklin had agreed to point me out but was now lying to cover for me. Detective Kill told me he was going to "make sure we get the death penalty for [me]," and threatened that he was going to "make sure [I] spend the rest of [my] life getting raped." He also said that he "wished [he] could put [us] all in Solder Field and let [us] have at each other."

10.     When I got to the police station at 39th and California, Detective Kill took me to a room on the third-floor and handcuffed my right arm to the back of a chair. He then returned with a Polaroid camera and took two photographs of me, then took the camera back out with him. I still did not know why I had been arrested.

11.     While Detective Kill was out, several officers came into and out of the room, occasionally surrounding me to intimidate me. They made comments such as, "I thought you'd be bigger," that "You don't look so tough," and said that I was a "big fish." Some of them also commented that I was "another rubber band for Detective Kill." Later, when I was put into a line-up, I heard Detective Kill say that he added a rubber band to the handle of his gun for "every nigger" he arrested.

12.     Detective Kill returned to the room. I then asked why I had been arrested, and he responded "For killing Curtis." When I asked who "Curtis" was, Detective Kill simply left the room.

13.     I was left by myself, with one arm handcuffed behind me, for what I believe was around one or two hours. I was struggling to think of who "Curtis" was and why I was brought here. I did not know anyone named Curtis. I did not drink, did not smoke, and never did any drugs. I had never been convicted of a crime or owned, possessed, or even fired a gun in my life.

3

IND DEF 0297963

Macklin and I are from the same area, but he was much older than me, and we had a different group of friends.

14.     Eventually, two detectives, who I later learned were Detectives William Moser and Tony Maslanka, entered the interrogation room. They started interrogating me and showed me pictures of people that I did not recognize. I said repeatedly that I did not know the people in the photographs. They also told me that they had a gun with my fingerprints on it. They asked who all was involved besides me and Macklin, to which I responded, "Involved in what?" They also asked what my role was in the shooting, but I asked "What shooting?" I told them they must be mistaken because I have never shot a gun before and have never been involved in any shooting. They said they knew I was involved and that the people in the pictures they showed me had said as much.

15.     During this time, other officers kept coming and going from the room. At certain times, I believe there were as many as eight officers present. I felt surrounded and suffocated. I repeatedly told the police that I had been on my way to the store, and I asked several times for permission to call my mother, who could verify who I was and where I had been going. I was crying and shaking now. At times officers surrounded me or walked behind me so that I could not see them, and I could not turn around because I was cuffed to the chair. They yelled at me to stop crying and said my mother could not save me because no one knew where I was. They told me to stop lying and "playing stupid."

16.     At some point, Detective Moser grabbed me by my shirt and pulled me up off of the chair, saying that he knew I had done "it." I could not move and told Moser I did not know what he was talking about. Detective Moser slapped me across the face, grabbed me by my shirt, lifted me up off of the chair, and yelled at me to stop crying like a baby. He said that he was

4

IND DEF 0297964

trying to be nice, but because I wouldn't stop crying and wouldn't cooperate, they were going to make me talk. He hit me several more times and threatened to hurt me further.

17.     Detective Maslanka began talking about how "niggers don't have any rights" and that he didn't care if I "shit my pants," I was not going to get out of that chair until I started telling them what they wanted to hear. I again stated that I did not know what they were talking about, but if they would just call my mother, she could come down to the station and tell them I was not lying. Detective Moser slapped me repeatedly after this and said that he was warning me, that my mother and no one else knew where I was, so they "could do whatever they wanted to do" to me, and no one would ever know or care.

18.     After a while of this, Detective Kill returned to the room and asked the other officers, "Did you all break him yet?" Detectives Moser and Maslanka told him I was "playing stupid" and asking to call my mother. Detective Kill then left the room again.

19.     A short time later, Detective Kill returned to the interrogation room and told the officers that I was not Vic Brown.

20.     When they all realized that I was not who they thought I was, they looked at me and asked, "If you are not Vic Brown, then who are you?" Detective Kill said that Dwayne Macklin said my name was Demond, and I told them that was in fact my name.

21.     All of the officers left the room, leaving me alone and still handcuffed to the chair. I was praying and hoping that they realized they had the wrong person and would let me free so that I could go home. It was dark now, and I had been there for a long time.

22.     Detective Moser returned to the room after a while. He told me about a shooting that took place on 57th and Wolcott, and he said that they really did have a gun with my fingerprints on it that was used in that shooting. I later learned that this was untrue. He also said

5

IND DEF 0297965

that Dwayne Macklin and two of the other people in the photographs they showed me earlier had claimed that I was involved in this shooting.

23.    Detective Moser then said that, even though they had my fingerprints, he could "help" me, because Macklin had said that Vic Brown killed "Joseph." Moser stated that he would let me call my mother, give me something to eat, and that I would be home in a few hours if I would give a statement saying that I saw Vic Brown shoot "Joseph." He also wanted me to say that two of the people he showed me in the photographs were there at the scene of the shooting.

24.    I told him that I did not know what he was talking about, that I did not know any "Vic Brown," that I had never seen anyone shoot anyone else, and that I did not know anyone named "Joseph." I also asked him which person was shot, "Curtis" or "Joseph," because the police had said earlier that I was being held for "killing Curtis." I was extremely confused by this time.

25.    In response, Detective Moser reached over and slapped me again, yelling that I had been crying for my mother like a baby since I got there, but now that he was trying to "help" me, I was still "playing stupid." He said that if I ever wanted to make it home at all, I had better take his offer and cooperate. He then left the room.

26.    A few minutes later, Detective Moser returned to the room with Detective Maslanka and several other officers. Detective Moser stayed at my side, while Detective Maslanka walked behind me. The other officers gathered around much as they had before. Detective Maslanka put both of his hands on my shoulders. He squeezed them and said, "You know we can kill you right now, right? No one would ever know because no one knows where

6

you are. We should take you out back and string you up and make you beg for your life, just like Joe did."

27. Detective Moser said that he was only going to ask me one more time. But before I could give any response, Detective Maslanksa wrapped his arm around my neck and strangled me from behind. My right arm still handcuffed to the chair, I struggled to free myself using my left hand, while also gasping for air. Because I was struggling but could not breathe, I began to feel my head go light and my body go limp. I lost consciousness.

28. I cannot say how long I was unconscious. The next thing I remember is waking up by being slapped in the face. I recall seeing the dark sky and smelling a foul odor. Although disoriented, I recall hearing Moser laugh and say, "Oh, we thought we'd lost you." I was still handcuffed to the chair, but it had been moved over by the window of the room. Someone was holding me down in the chair.

29. I did not immediately understand or comprehend what had happened. I believed that they just tried to kill me and maybe had moved me close to the window so that they could throw my body out of it to make it look like I had tried to escape. I heard everyone in the room laughing and joking. They made comments about how "nigger shit stinks," and that something "must have crawled in him and died." I then realized that at some point while being choked, I had defecated in my pants. The officers in the room were giving each other high fives as they continued to make jokes about choking me and the fact that I had shit my pants. Still handcuffed to the chair, they then made me stand up and sit down repeatedly, so that I would have to, as they put it, "stew in my own shit."

30. The officers asked me whether now I was ready to cooperate with them. I was sitting there, my clothes soiled by my own feces, and I was humiliated. I had been degraded and

7

IND DEF 0297967

dehumanized by their racist comments and jokes, the physical violence, and the fact that they took pride in having choked me into unconsciousness. I was in pain and had been there for a long time, exhausted without food or water. I felt alone and truly believed that they could and would kill me, because no one knew where I was. More than that, throughout all of this, no one in the room ever spoke up and said that the officers should not be doing what they were doing, and no one had made any effort to stop anything. Instead, all of the officers encouraged the behavior because they wanted to break me.

31.     And they did. They broke my will and crushed my spirit. I do not believe that any human being could go through that and have any dignity left. In my mind, I recall thinking that no one could save me. When I had screamed, nothing happened and no one came. I was barely seventeen years old; had I known then what I now know as an adult, maybe I could have been stronger. But on that night, my priority quickly became getting out of that room and avoiding any more abuse and humiliation. I just wanted to call my mother and go home.

32.     The detectives told me that if I said what they wanted me to say, I would be able to call my mother to come and take me home. Detective Moser began telling me what I should say.

33.     After some time passed—I am not sure how long—a man walked into the room and asked the officers if I was ready to talk. I later learned that the man was an Assistant State's Attorney named Paul Sabin. Detective Moser told Sabin that he needed more time with me before I'd be ready. The attorney left, commenting on the way out that I should just cooperate and I'd be allowed to go home sooner.

8

IND DEF 0297968

34. At that point, I had been at the station for many hours and had not eaten anything. One of the officers brought some McDonald's into the room and placed it on the side of the table, but out of my reach. I was told that I could eat it if I said what I was supposed to say.

35. Detective Moser continued to drill me on what I was supposed to say about the night of the 57th and Wolcott shooting. He wanted me to say that I remembered seeing Vic Brown and some of the other people from the photographs they had shown me previously being present on the night of whatever shooting they were investigating. He also wanted me to say that I saw Vic Brown shoot someone. He asked me to read Macklin's written statement. Macklin's statement, which appeared to have Macklin's handwriting and initials on it, said that I was present for a meeting with some Gangster Disciples on the night of the shooting, that I left to go on a mission with them, and that Vic Brown was carrying a .9 mm gun. Detective Moser told me that the person who was shot, someone named "Joseph," had been killed with the same .9 mm gun that Macklin said Vic Brown used. They told me to say that I had carried a .22 "derringer," but at the time I did not even know what a "derringer" was. Detective Moser said that since "Joseph" was not killed with a .22, I could just say that and would then be free to go home that night.

36. Sometime later that night or early the next morning, ASA Sabin returned to take my statement, accompanied by a court reporter. Detective Moser instructed me that if the question called for a yes or no answer, I was to look at him, and he would shake his head yes or no. If the question required more detail, Sabin would ask a couple of questions, tell me to think about my answers, and both he and the court reporter would leave the room. Once they left the room, Detective Moser would then tell me how to answer those questions. If he felt that I had answered a previous question incorrectly, Detective Moser would threaten me, and hit me until I

9

IND DEF 0297969

had the answers correct. This type of conduct went on throughout my statement. I had never been in this position, but it certainly felt wrong to me. The detectives, however, told me that I was doing okay and that I would soon be free to leave.

37. After they finished taking my statement, the officers gave me the McDonald's and left the room, while I remained handcuffed to the chair in my soiled clothes. I am not sure how much time went by, but Detectives Moser returned with Sabin, and he instructed me to make a few specific corrections on my statement. They would point out the spots, and I put my initials where they told me to. I finally believed that I would soon be able to clean up and go home.

38. The officers left the room, and I was exhausted and tried to lay my head down on the table to go to sleep. I am not sure how long I was left there, sitting alone and handcuffed to the chair, but it seemed like several hours. At some time in the morning, officers came and uncuffed me, stood me up, and handcuffed me behind my back. Without even letting me clean up, they led me out of the station and into an awaiting vehicle. I was taken to a station at 61st and Racine, where I learned that I would be charged with murder. I was later transferred to 26th and California. There, I was allowed my one phone call. I called my mother and told her about what had happened to me.

39. I was represented by a court appointed attorney named Paul Katz.

40. I explained to Mr. Katz what happened to me on the night I was arrested. Mr. Katz said that it would likely be impossible for me to convince a judge and jury to believe what I had told him. In fact, I did not meet with Mr. Katz more than a few times in preparing my defense and for trial, maybe around 5 or 10 minutes before each of my appearances in court. Mr. Katz was concerned that no one would believe a seventeen-year-old African American kid from

10

IND DEF 0297970

the South Side over the word of multiple white detectives, and also that if the judge thought I was making up the abuse, it would harm my overall credibility.

41.     As a result, Mr. Katz recommended that I offer only minimal details about the abuse I suffered. I followed my lawyer's advice. I kept my answers short and did not disclose the full extent of what happened to me that night at the Area 3 station.

42.     I was not involved in any way in the murder of Joseph Watson or the attempted murders of Timothy Jones, Deneen Coats, or Ronald Nesbit. I do not know who killed Mr. Watson or who shot at Mr. Jones, Ms. Coats, or Mr. Nesbit. I did not even know the men who were charged as my co-defendants for these shootings before I was arrested: Jerrod Smith, Keith Jackson, John Walker, or Nate McCurrine.

43.     I was not a member of the Gangster Disciples or any other gang.

44.     I was assigned an appellate attorney who filed an appeal for me on June 21, 1994. I did not raise the torture or abuse the Area 3 detectives inflicted on me as a basis for relief, because I was not able to speak with my appellate attorney before the brief was filed. I also did not bring up in the full extent of the torture and abuse I suffered at Area 3 in my habeas or post-conviction petitions because I did not know that I could.

45.     I have now been in prison for over twenty-three years. While incarcerated, I have obtained my GED and taken some college classes. I am now several credits short of obtaining my associate's degree. I have also obtained certificates of completion for several educational programs the prison offers, and I have learned to work on a computer. I have also held a volunteer job in the kitchen for over 13 years. I am trying to make the most of my time incarcerated.

11

IND DEF 0297971

Signed, this 15 day of January 2014,

Demond Weston

*Demond Weston*

SIGNED AND AFFIRMED BEFORE ME
this 15th day of January 2014.

*David Mansfield*
NOTARY PUBLIC

DAVID MANSFIELD
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
October 20, 2014

12

IND DEF 0297972

IND DEF 0297973

# Exhibit 2

```
1    STATE OF ILLINOIS   )
                         )  SS:
2    COUNTY OF COOK      )

3              IN THE CIRCUIT COURT OF COOK COUNTY
                 COUNTY DEPARTMENT-CRIMINAL DIVISION
4
     THE PEOPLE OF THE   )
5    STATE OF ILLINOIS   )
                         )
6                        )    Indictment Nos. 90 16376
            VS           )                    91 640
7                        )    Charge:  Murder
                         )
8    DEMOND WESTON       )

9                    REPORT OF PROCEEDINGS

10           BE IT REMEMBERED that on the 20th day of

11   April, A.D., 1992, this cause came on for trial

12   before the Honorable EDWARD M. FIALA, JR., Judge of

13   said court, and a jury, upon the indictment herein,

14   the defendant having entered a plea of not guilty.

15           APPEARANCES:

16                   HON. JACK O'MALLEY,
                     State's Attorney of Cook County, by
17                   MESSRS. BERNARD MURRAY and
                     JAMES MC KAY,
18                   Assistant State's Attorneys,
                         appeared for the People;
19
                     MR. PAUL KATZ,
20                       appeared for the Defendant.

21

22   Brenda D. Hayes, CSR
23   Official Court Reporter
     2650 S. California
24   Chicago, Illinois  60608
```

Weston 033717

18

1          THE COURT:  Call your next witness,

2     counsel.

3          MR. KATZ:  Call the defendant, Demond

4     Weston.

5          THE COURT:  Defendant.

6                    (Witness sworn.)

7          THE COURT:  Kindly proceed, Mr. Katz.

8               DEMOND WESTON,

9     the defendant herein, called as a witness in his

10    own behalf, having been first duly sworn, was

11    examined and testified as follows:

12               DIRECT EXAMINATION

13               BY MR. KATZ:

14         Q    Sir, would you state your full name,

15    please?

16         A    Demond Weston.

17         Q    Mr. Weston, you are the defendant in this

18    case; is that correct?

19         A    Yes, I am.

20         Q    Calling your attention, Demond -- Strike

21    that.  How old are you, Demond?

22         A    Nineteen.

23         Q    And at the time of these alleged shootings

24    how old were you?

G206

Weston 033896

18

1    A    I had just turned seventeen.

2    Q    In May of 1990 where did you live?

3    A    623 West 61st Street.

4    Q    Is that in Chicago?

5    A    Yes, it is.

6    Q    With whom did you live at that time?

7    A    My mother, my grandmother and three

8  sisters.

9    Q    Were you attending school at that time,

10  sir?

11    A    Yes, I was.

12    Q    Where were you attending school?

13    A    Andrew Jackson.

14    Q    Can you please explain to the ladies and

15  gentlemen of the jury what Andrew Jackson is?

16    A    It's a school where you go to get your

17  GED.

18    Q    GED is what, General Equivalency Degree?

19    A    Yes.

20    Q    Is that a board of education school?

21    A    Yes, it is.

22    Q    Previously you attended high school; is

23  that correct?

24    A    Yes.

G207

Weston 033897

18    1        Q     Where had you attended high school?

2        A     I went to Hyde Park and Tilden.

3        Q     In Chicago?

4        A     Yes.

5        Q     Calling your attention to May 29, 1990,

6   did you have occasion to be somewhere in the

7   evening hours, the early evening hours of May 29,

8   1990?

9        A     Yes.

10       Q     Where, if anywhere, were you at that time?

11       A     At -- Early in the evening?

12       Q     Yes, in the early evening hours.

13       A     At home.

14       Q     All right.  And again the address of that

15   home was?

16       A     623 West 61st Street.

19   17       Q     Approximately what time would that have

18   been?

19       A     Like from 12:00 in the afternoon I had

20   been in the house.

21       Q     Until when?

22       A     Close to 6:00, 5:00.

23       Q     5:00 or 6:00 p.m.?

24       A     Yes.

G208

Weston 033898

19

1    Q    And what happened then?

2    A    I left out.

3    Q    And where, if anywhere, did you go?

4    A    I went down to my friend's house.

5    Q    Who is your friend?

6    A    William Childs.

7    Q    Was that the individual that just

8    testified a moment before?

9    A    Yes.

10   Q    When you went to his house what happened?

11   A    He had -- I had asked him was he going up

12   there to shoot some ball and he told me to come

13   back later and pick him up.

14   Q    All right.  And what happened then, what

15   did you do?

16   A    I left, went back home and I came back

17   about an hour later, hour and a half later.

18   Q    What time would that have been

19   approximately?

20   A    If it was at 5:00 so that would have been

21   like 6:00, 6:30, somewhere up in there.

22   Q    Do you recall looking at a clock or a

23   watch at that time?

24   A    Just glanced at it.

G209

Weston 033899

1    Q    All right.  What did you do when you left

2    your house the second time?

3    A    I went back to his house.

4    Q    When you went back to his house what

5    happened?

6    A    I went in his house and sat down while he

7    got ready and then we left.

8    Q    How long would you say you were in his

9    house?

10   A    Five, maybe ten minutes.

11   Q    And what was William Childs doing during

12   the five or ten minutes you were in his house, if

13   you know?

14   A    He was in the washroom preparing.

15   Q    And did you happen to have occasion to

16   leave his house?

17   A    Yes, we did.

18   Q    And when you left his house where, if

19   anywhere, did you go?

20   A    To the basketball court on 60th and

21   Halsted.

22   Q    And by the way, where did William Childs

23   live at that time?

24   A    He stayed on the corner of 61st and Union.

G210

Weston 000702

1       Q       How far from your house was that?

2       A       A block, half a block.

3       Q       Now, when you left his house and went to

4    the basketball courts how did you get there?

5       A       We walked.

6       Q       How far was the basketball court from

7    William's house?

8       A       A good block.

9       Q       How long would you say it took you to get

10   over there?

11      A       Not even five minutes.  Maybe five

12   minutes.

13      Q       Was it light out or dark out at the time

14   that you arrived at the basketball court?

15      A       It was dark.

16      Q       Do you have any idea approximately what

17   time it was when you got there?

18      A       No, I do not.

19      Q       Do you recall at what point it had gotten

20   dark?

21      A       After I left his house the first time.

22      Q       What did you do when you got to the

23   basketball court?

24      A       It was three guys already there.

G211

1    Q    And what did you do?

2    A    We joined in and shot some games, picked

3  some teams and shot some games.

4    Q    And how long would you say you stayed over

5  at that basketball court?

6    A    A couple of hours.

7    Q    At any time did you leave the basketball

8  court?

9    A    Yes, I did.

10   Q    Could you please tell the court when you

11  left the basketball court?

12   A    About an hour after we was there I ran to

13  the store across the street.

14   Q    All right.  How long were you in that

15  store, sir?

16   A    A minute, two minutes, not long.

17   Q    And what did you do after you left that

18  store?

19   A    I came right back.

20   Q    Other than that at any time did you leave

21  that basketball court?

22   A    When we left finally for good.

23   Q    During -- Strike that.

24        THE COURT:  Stricken.

G212

Weston 000704

1    BY MR. KATZ:

2         Q    You had occasion to leave the basketball

3    court at some point, correct?

4         A    Yes.

5         Q    Do you know approximately what time it was

6    that you left the basketball court?

7         A    It was about 10:45, close to 10:45.

8         Q    How were you able to pinpoint that time,

9    and I assume you're talking about p.m.?

10        A    Yes, nighttime.

11        Q    How were you able to pinpoint that time?

12        A    Because when he we first got there William

13   Childs had told one of the other fellas to let him

14   know when 10:45 come.

15        Q    And did somebody let him know?

16        A    Yes.

17        Q    Who was that?

18        A    Tramell.

19        Q    Do you remember what he told him?

20        A    Yes.  He --

21        Q    What did he tell him?

22        A    He told him it was 10:45.

23        Q    And did you leave at that point?

24        A    Yes.

G213

Weston 000705

```
 1      Q      With whom, if anyone, did you leave?

 2      A      William Childs.

 3      Q      And where did you go?

 4      A      We went back the same way we came, back to

 5   his house.

 6      Q      On foot?

 7      A      Yes.

 8      Q      How long would you say it took you to get

 9   to William's house?

10      A      About less than five minutes.

11      Q      And when you got to William's house what

12   happened.

13      A      Went in his house for a minute.

14      Q      And then?

15      A      And then I left because he had to

16   baby-sit.  I left and went home.

17      Q      Who did he have -- If you know, who did he

18   have to baby-sit for?

19      A      For his sister.

20      Q      Did he mention to you what time he was

21   scheduled to baby-sit that evening?

22      A      Yes.

23      Q      What time was that?

24      A      11:00 p.m.
```

G214

Weston 000706

```
 1        Q    And where did you go after you left his
 2   house?
 3        A    I went to my house.
 4        Q    At any time did you leave your house after
 5   that?
 6        A    No, I did not.
 7        Q    During the course of the evening were you
 8   ever at 57th and Wolcott, in that vicinity?
 9        A    That night?
10        Q    Yes.
11        A    No.  I don't think so.
12        Q    Were you ever at -- in the vicinity of
13   5530 South Justine that evening?
14        A    No.
15        Q    Were you ever in the vicinity of 5759
16   South Honore that evening?
17        A    No.
18        Q    Did you have a gun in your possession that
19   evening?
20        A    No.
21        Q    Did you shoot anyone that evening?
22        A    No.
23        Q    Did you belong to a Wrecking Crew that
24   evening?
```

G215

Weston 000707

```
 1       A    No.

 2       Q    Did you take a bus or drive a car and go

 3  over to any of those locations that evening?

 4       A    No.

 5       Q    Now, calling your attention to June 9,

 6  1990, you had occasion to be -- did you have

 7  occasion to be arrested?

 8       A    Yes.

 9       Q    And when you were arrested were you taken

10  anywhere?

11       A    Yes.

12       Q    Where were you taken?

13       A    To 39th and California.

14       Q    Police station?

15       A    Yes.

16       Q    And were you put anywhere specifically

17  inside that station?

18       A    He took me to the third floor and put me

19  in a room.

20       Q    Do you remember the police officer who

21  arrested you?

22       A    Yes.

23       Q    Do you recall what his name was?

24       A    Officer Kill.
```

G216

1        Q     At any time did you tell Detective Kill

2    that you had used a .22 caliber gun and that -- and

3    he mentioned a .9 millimeter gun?

4        A     No, I did not.

5        Q     Would you describe the room that you were

6    placed in when you went to the police station?

7        A     It's -- Okay.  When you first come in the

8    door you walk past a cell and then you go into the

9    room, it's about three desks, some typewriters and

10   some phones.

11       Q     Now, did you have a watch with you on this

12   date, sir?

13       A     No, I did not.

14       Q     Were you placed in this room by Detective

15   Kill?

16       A     Yes.

17       Q     Were you handcuffed at that time, sir?

18       A     He uncuffed me and handcuffed me to a

19   chair.

20       Q     And did he have occasion to stay with you

21   in that room for any period of time?

22       A     Occasionally he'll leave, come and go.

23       Q     And during this period of time were you

24   handcuffed or unhandcuffed?

                         G217

Weston 000709

```
 1        A    I was still handcuffed.

 2        Q    After a period of time -- Strike that.

 3             THE COURT:  Stricken.

 4   BY MR. KATZ:

 5        Q    After detective -- Strike that.

 6             THE COURT:  Stricken.

 7   BY MR. KATZ:

 8        Q    Did certain other police detectives come

 9   into that room at some later time?

10        A    Yes.

11        Q    And do you recall who those police

12   detectives were?

13        A    Moser and Maslanka.

14        Q    By the way, directing your attention back

15   to when Detective Kill had brought you into the

16   room did he say anything to you?

17        A    No.

18        Q    When -- Strike that.

19             THE COURT:  Stricken.

20   BY MR. KATZ:

21        Q    You say Moser and Maslanka came into the

22   room?

23        A    Yes.

24        Q    Did they come in together or separately?
```

G218

```
 1        A     Together.

 2        Q     Did they begin to question you regarding

 3   the shooting that took place at 57th and Wolcott on

 4   May 29, 1990?

 5        A     Yes.

 6        Q     And what did you tell them?

 7        A     I denied it.

 8        A     And what happened then, sir?

 9        A     They kept telling me I was lying.

10        Q     Who specifically was telling you that?

11        A     The heavyset, Moser.

12        Q     And what happened then?

13        A     I kept telling them I still don't know

14   what y'all talking about.

15        Q     And what happened then?

16        A     Kept on questioning me.

17        Q     And then?

18        A     Then he hit me.

19        Q     Who hit you?

20        A     Moser.

21        Q     How did he hit you?

22        A     With his -- He smacked me with an open

23   fist, with his palm.

24        Q     You mean with a slap?
```

G219

Weston 000711

1        A       Yes.

2        Q       And on what part of your body did he

3    strike?

4        A       My face.

5        Q       Now, how many times did he strike you?

6        A       If I was counting I'd say about ten.

7        Q       Was he saying anything to you while he was

8    striking you?

9        A       You lying.

10       Q       Were there pauses between these strikes?

11       A       Yes.

12       Q       Was he questioning you during this period

13   of time?

14       A       He say I'm going to ask you again.

15       Q       And what was your answer at that time?

16       A       Ask me what.

17       Q       Now, after he struck you this series of

18   slaps in the face what happened then?

19       A       He just -- He kept telling me like, you

20   know, what happened.

21       Q       And what happened next?

22       A       Then I kept saying I don't know what

23   happened, then he was like it happened like this

24   showing me and trying to describe how it happened

G220

Weston 000712

1    to me.

2        Q    All right.  And what did you do then or

3    what did you say then?

4        A    I still didn't know what he was talking

5    about.

6        Q    All right.  And did this go on for a

7    period of time?

8        A    Yes, it did.

9        Q    How long would you say this went on for,

10    if you know?

11        A    Couple of hours.

12        Q    And what happened then?

13        A    Then I just got scared, got tired of him

14    hitting me.

15        Q    And what did you do?

16        A    I agreed.  I was like whatever you say.

17        Q    Now, who were you speaking to at that

18    time?

19        A    Moser.

20        Q    Was Maslanka in there at that time?

21        A    No.

22        Q    Were you handcuffed or unhandcuffed while

23    Detectives Moser and Maslanka were questioning you?

24        A    Handcuffed.

Weston 000713

1    Q    To anything in particular?

2    A    Still to the chair.

3    Q    When you say you were scared, what were

4 you scared of?

5    A    Scared of him.  I thought he was going to

6 really hurt me.

7    Q    So what did you decide to do at that

8 point?

9    A    Cooperate with him.

10   Q    And what did he do?

11   A    He was telling me how -- this how it went,

12 for me to say this how it went when some guy come

13 in.

14   Q    All right.  And what did you say?

15   A    I said okay.

16   Q    Did he -- After this did he have occasion

17 to leave?

18   A    Yes.

19   Q    By the way, did you have any marks on your

20 body from the slapping?

21   A    No, I did not except my face just red,

22 that's it.

23   Q    After he left did you have occasion to

24 speak with the state's attorney, an assistant

G222

1    state's attorney, probably the one who testified

2    here today?

3         A    If that's who that was, yes.

4         Q    You spoke with him in front of a court

5    reporter; isn't that correct?

6         A    Later on in the morning, yes.

7         Q    You weren't represented by an attorney; is

8    that correct?

9         A    No.

10         Q    Did you call your family?

11         A    He wouldn't let me.

12         Q    Did you ask to call your family?

13         A    Yes, I did.

14         Q    When did you ask to call your family?

15         A    I asked when I had first got down to that

16    station.

17         Q    Who, if anyone, did you ask to call your

18    family?

19         A    I asked Officer Kill but he just kept

20    walking like he didn't hear me.

21         Q    Did you ever ask Detective Moser or

22    Maslanka to call your family?

23         A    No.

24         Q    Did Detective Moser or Maslanka ever offer

G223

Weston 000715

1    that you could call your family?

2        A    No.

3        Q    Later on you indicated you spoke with the

4    state's attorney in front of a court reporter; is

5    that correct?

6        A    Yes.

7        Q    And you gave them a statement; is that

8    correct?

9        A    Yes.

10        Q    And the things that you told them in that

11    statement, was it the truth?

12        A    No, it was not.

13        Q    Why did you tell them the things that were

14    in that statement?

15        A    Because I was afraid.

16        Q    Afraid of what or whom?

17        A    Officer Moser.

18        Q    Where did you get the information that was

19    in that statement?

20        A    From him.

21        Q    If you know.

22        A    From him.

23        Q    From who?

24        A    Officer Moser.

G224

1    Q    At any time during this period of

2    questioning had you ever been allowed to leave that

3    interview room other than for going to the

4    washroom?

5    A    No.

6    Q    Were you handcuffed while you were left

7    alone in there?

8    A    Yes.

9    Q    Were you also handcuffed at other times?

10   A    Yes.

11        MR. KATZ:  Nothing further.

12        THE COURT:  You may inquire.

13                   CROSS-EXAMINATION

14                   BY MR. MC KAY:

15   Q    Mr. Weston, you are a Gangster Disciple,

16   right?

17   A    No, I'm not.

18   Q    How about your buddy, Mr. Childs?

19   A    No, he is not.

20   Q    How about Vic, he's a Gangster Disciple,

21   isn't he?

22   A    I don't really know.

23   Q    How about Johnny Walker?

24   A    Who?

G225

1    Q    J.D.?

2    A    I don't know.

3    Q    How about Dwayne Macklin Buttercup, he's a

4    GD, isn't he?

5    A    I don't know.

6    Q    Did you ever hear of the gang the Gangster

7    Disciples?

8    A    Yes.  It's in my neighborhood.

9    Q    Did you ever hear of a gang called the

10   Vice Lords?

11   A    Yes.

12   Q    The Gangster Disciples and the Vice Lords

13   are enemies; isn't that correct?

14   A    I don't know.

15   Q    How long have you been living in that

16   neighbor where the GD's are present?

17   A    About five years.

18   Q    You've heard of that gang, the Gangster

19   Disciples, right?

20   A    Yes.

21   Q    You know that the Gangster Disciples are

22   Folks, don't you?

23   A    Yes.

24   Q    You've heard of a gang called Vice Lords,

G226

Weston 000718

1    haven't you?

2        A    Yes.

3        Q    You know the Vice Lords are Brothers;

4    isn't that correct?

5        A    Yes.

6        Q    And Folks don't like the Brothers, right?

7        A    I guess so.

8        Q    And, in fact, so much so that they shoot

9    at each other; isn't that correct?

10       A    I don't know about all that.

11           MR. KATZ:   Judge, I'm going to object to

12   this, it's hypothetical questions.

13           THE COURT:   If, in fact, he knows he may

14   answer.   With that kindly continue.

15   BY MR. MC KAY:

16       Q    Do you have a nickname, Mr. Weston?

17       A    Demond.

18       Q    That's your real name?

19       A    That's my nickname.

20       Q    Do you go by the name of Boo Man?

21       A    No, I do not.

22       Q    Well, Mr. Weston, you say that you were

23   handcuffed at the police station, right?

24       A    Yes, I was.

G227

Weston 000719

```
 1        Q    You were arrested at 59th and Union on the

 2   afternoon of June 9, 1990; isn't that correct?

 3        A    Yes, I was.

 4        Q    And there's a car, a burned out car, in a

 5   gangway there on that block; isn't that correct?

 6        A    A burned out car?

 7        Q    A Mustang?

 8        A    I don't know.

 9        Q    Well, Detective Kill arrested you that

10   afternoon about 4:00 o'clock; isn't that correct?

11        A    I don't know if it was 4:00, but he

12   arrested me.

13        Q    Did you see Dwayne Macklin that afternoon

14   you were arrested?

15        A    Yes.

16        Q    Did you see the gun Detective Kill

17   recovered, that .9 millimeter?

18        A    I saw it yesterday.

19             MR. KATZ:   Judge, I'm going to object.

20   Foundation.

21             THE COURT:   I'm going to leave it stand.

22   Overruled.   Proceed.

23

24


                        G228
```

Weston 000720

BY MR. MC KAY:

    Q    Did you see the gun Detective Kill recovered that afternoon you were arrested?

    A    I saw him when he had it in court.

    Q    How about that day you were arrested, Mr. Weston?

    A    Did I see it that day?

    Q    Yeah.

    A    No, I did not.

    Q    Okay.  Showing you People's Exhibit No. 60, you never saw this gun before court; is that right?

    A    No, I have not.

    Q    Well, you've testified that you did give a court reported statement; isn't that correct?

    A    Yes, I did.

    Q    All right.  Showing you this exhibit, People's Exhibit No. 17, that's a statement that you gave that early morning at Area Three; isn't that correct?

    A    Yes, it is.

    Q    And your initials appear on each and every page; isn't that correct?

    A    Yes, it is.

G229

Weston 000721

1      Q     Your signature appears on the very last

2   page; isn't that correct?

3      A     Yes, it is.

4      Q     And this document is fifteen pages long,

5   right?

6      A     Yes, it is.

7      Q     And certain changes are made on this

8   statement; isn't that correct?

9      A     Yes, it is.

10      Q     Okay.  Let's start with the change on page

11   four, there's a change there; isn't that correct?

12      A     Yes.

13      Q     In fact, it's an addition that says

14   "p.m.", 8:00 o'clock p.m., right?

15      A     Yes.

16      Q     Your initials are right next to that,

17   right?

18      A     Yes.

19      Q     Who made that change?

20      A     They told me to make it so I made it.

21      Q     And you made that change, right?

22      A     Yes.

23      Q     You put the p.m. and you put your initials

24   down there, right?

G230

1     A    Yes.

2     Q    Let's go to page six, Mr. Weston, there's

3  an addition on this page as well; isn't that

4  correct?

5     A    Yes.

6     Q    And, in fact, the question is:  After

7  Buttercup handed Vic and you had the gun in your

8  possession where did you go?  Did you see "the gun"

9  was inserted in that statement?

10     A    Yes.

11     Q    You put it there, right?

12     A    Yes.

13     Q    And your initials are there, right?

14     A    Yes.

15     Q    On page seven there are two corrections on

16  this page; isn't that correct?

17     A    Yes.

18     Q    In the middle you put down "or" in the

19  question:  And what, if anything, did you or Vic

20  say to them and what did he say to you, right?

21     A    Yes.

22     Q    You put the word "or" there, right?

23     A    Yes.

24     Q    And you initialed it, right?

G231

1    A    Yes.

2    Q    And then the next answer is:  Vic said,

3    and then you put down "where were" they and they

4    said down there, right?

5    A    Yes.

6    Q    And you put the words "where" and "were"

7    on this statement; isn't that correct?

8    A    I put all that on there.

9    Q    You put all those changes on that

10   statement, right?

11   A    Yes.

12   Q    All of these changes in this statement you

13   made; isn't that correct?

14   A    Yes.

15   Q    But this statement isn't true?

16   A    No.  You just fail to realize who

17   suggested that I make them.

18   Q    Sir, are you saying this statement is true

19   or are you saying it's false?

20   A    Yeah, it's true.

21   Q    It's true?

22   A    It's true that I made all those

23   corrections.  It ain't true that it happened like

24   that.

G232

Weston 000724

1      Q    Let me tell you -- Let me ask you this:

2   When you were in that room you were handcuffed to

3   that chair, right?

4      A    Yes, I was.

5      Q    It's a chair much like these we have in

6   the courtroom; isn't that correct?

7      A    No.  It got the -- I don't know if it's --

8   It ain't like that.  I ain't seen the chair in

9   years, man.

10     Q    Okay.  But you were handcuffed to the

11  chair, right?

12     A    Yes, I was.

13     Q    You were handcuffed to the armrest of that

14  chair, right?

15     A    Yes.

16     Q    Okay.  You were alone in that room for a

17  long time; isn't that correct?

18     A    I wouldn't say that long.

19     Q    Okay.  Well, there were times when the

20  police officers left that room and closed that

21  door, right?

22     A    Yes.

23     Q    And you were all alone in that room,

24  weren't you?

G233

Weston 000725

1       A       Handcuffed.

2       Q       Handcuffed.  And you had some McDonald's

3   food that night, didn't you?

4       A       Yes, I ate.

5       Q       And you were allowed to go to the

6   bathroom, weren't you?

7       A       If I wanted to go.

8       Q       If you wanted to go, right?

9       A       Yes.

10       Q       Well, now, you've testified that you were

11   not at 5530 South Justine, right?

12       A       Yes.

13       Q       And that's Vice Lords territory, isn't it?

14       A       I don't know.

15               MR. KATZ:  Objection.

16               THE COURT:  If he knows.

17   BY MR. MC KAY:

18       Q       And you testified that you were not at

19   5759 South Honore, right?

20       A       Not on that night.  No, I was not.

21       Q       I'm talking about that night.

22       A       No.

23       Q       But you said you don't think you were at

24   57th and Wolcott that night; isn't that correct?

G234

Weston 000726

1      A     Correct.

2      Q     Now, you testified Detective Moser slapped

3    you ten times; is that correct?

4      A     I said about ten.

5      Q     Okay.  He slapped you about ten times with

6    an open palm; is that correct?

7      A     Yes.

8      Q     And this hurt, didn't it?

9      A     Yes, it did.

10     Q     It scared you, didn't it?

11     A     Yes, it did.

12     Q     It left your face red, didn't it?

13     A     Yes, it did.

14     Q     How long was that pain there, sir?

15     A     For a long time.

16     Q     In fact, the next day, wasn't it?

17     A     It was gone by then.

18     Q     But the pain was still there wasn't it,

19   Mr. Weston?

20     A     It's the feeling inside.

21     Q     The feeling inside.  Well, you didn't tell

22   Paul Sabin, the state's attorney, what the police

23   did to you, did you?

24     A     I didn't know who he was.

G235

1      Q    The state's attorney that testified this

2  morning, Mr. Weston, you didn't tell him that the

3  police slapped you, did you?

4      A    No, I did not.  No.

5      Q    Okay.  You were alone in that room with

6  Mr. Sabin, weren't you?

7      A    Yes.

8      Q    In fact, he went into that room at least

9  three times, didn't he?

10     A    I don't know about the exact number.

11     Q    Mr. Weston, when he went into that room

12  you didn't tell him how badly Detective Moser had

13  treated you; isn't that correct?

14     A    I don't know who he is.

15     Q    Isn't that correct?

16     A    Correct.

17     Q    Now, Mr. Weston, was your face still red

18  when you were giving that court reported statement

19  just an hour later?

20     A    No, it was not.

21     Q    It wasn't red then?

22     A    It wasn't no hour later.

23     Q    Okay.  Now, you agreed to say what is in

24  this police -- what is in this statement; is that

G236

1  correct?

2      A    Yes.

3      Q    And you agreed to say this because Moser

4  made you afraid; isn't that correct?

5      A    Yes.

6      Q    And you said whatever Moser wanted you to

7  say; is that correct?

8      A    Yes.

9      Q    Well, let's talk about the gun that's in

10  that statement, okay?

11      A    Yes.

12      Q    Now, you told the state's attorney that

13  you had a .22; is that right?

14      A    Yes.

15      Q    And you told the state's attorney that

16  this was a .22 caliber Derringer, right?

17      A    Yes.

18      Q    The police never recovered that .22 in

19  this case, did they?

20      A    No.

21      Q    Well, do you remember telling

22  Detective Maslanka that "I had my .22 caliber blue

23  steel with taped grips," do you remember saying

24  that?

G237

Weston 000729

1      A    No.

2      Q    Do you remember saying it had a break

3   open, that it was a break open Derringer, do you

4   remember saying that?

5      A    If that's what's on that there that's what

6   I said.

7      Q    I'm asking you do you remember saying

8   that?

9      A    If it's on there that's what I said.

10     Q    Did you say that to Detective Maslanka?

11     A    If that's what's on there.

12     Q    Do you remember saying it didn't have a

13  trigger guard?

14     A    I don't know about no trigger guard.

15     Q    Do you remember saying it had two live .22

16  caliber rounds?

17     A    Yes.

18     Q    By the way, what happened to that gun,

19  Mr. Weston?

20     A    I don't even know if it even existed.

21     Q    Do you remember telling Paul Sabin and the

22  court reporter that you took that gun and you hid

23  it behind some bricks, first in the alley behind

24  your house and then later behind some bricks at a

G238

Weston 000730

1    church on 60th and Union?

2        A    Yes.

3        Q    And there is a church at 60th and Union,

4    isn't there?

5        A    Yes, there is.

6        Q    That's the truth then, there's a church

7    there, right?

8        A    Yes, it is.

9        Q    So some of this statement is true; isn't

10   that correct?

11       A    That part.

12       Q    And you did hide that gun behind that

13   church, didn't you?

14       A    I never had the gun.

15       Q    All right.  Well, Dwayne Macklin is

16   Buttercup; isn't that correct?

17       A    Yes.

18       Q    And Vic is a Gangster Disciple; isn't that

19   correct?

20       A    I don't know about all that.

21       Q    You don't know Vic's real name, right?

22       A    No.

23       Q    Had you ever heard the name Cortez Brown?

24       A    Since I been in here, yes.

G239

Weston 000731

1    Q    Do you remember the photographs that the

2    state's attorney showed you during the time that

3    statement was being given?

4    A    Yes.

5    Q    And you recognized the people that were in

6    those photographs, didn't you?

7    A    I recognized my picture.

8    Q    Well, you recognized the picture of Vic;

9    isn't that correct?

10   A    Yes.

11   Q    And you recognized the picture of Keith

12   Jackson and John Walker, right?

13   A    Yes.

14   Q    You didn't know their names but you knew

15   their faces, right?

16   A    Because I just walked past them when I

17   came in the door.

18   Q    You had seen them before that night; isn't

19   that correct?

20   A    No.  I seen them that night.

21   Q    Sir, is there anything wrong with your

22   hearing?

23   A    No, it's not.

24   Q    You'd seen them before that night; isn't

G240

Weston 000732

1    that correct?

2        A    Yes, it is.

3        Q    Thank you.  Now, this statement said --

4    This is on page four, Mr. Weston.

5            "Q    Did they say what kind of trouble the

6                  Vice Lords were giving them?

7            "A    They had shot at them."

8                  You were asked that question and you

9    gave that statement, right?

10       A    Yes.

11       Q    Okay.  You said Vice Lords, right?

12       A    Yes.

13       Q    And then on the next page, on page five,

14   it said:

15           "Q    When you say "they left" you're

16                 talking about John Walker and Keith

17                 Jackson, the people you identified as

18                 John Walker and Keith Jackson?

19           "A    Yes.

20           "Q    They left?

21           "A    Yes.

22           "Q    How did they leave?

23           "A    In the car.

24           "Q    What kind of an automobile was it?

G241

Weston 000733

1          "A    It was a Delta 88."

2              Right?  You gave those answers to

3     those questions; isn't that correct?

4         A    Yes, I did.

5         Q    You said it was a Delta 88; isn't that

6     correct?

7         A    Yes, I did.

8         Q    On page nine, at the top of page nine, you

9     were asked:  "What kind of gun did Buttercup hand

10    to Vic?"  And you said:  "A .9 millimeter."  And

11    the question was:  "Is that a semiautomatic

12    handgun?"  And you said:  "Yes."

13             And then you were asked:  "And did

14    you have a gun in your possession?"  And you said:

15    "Yes."  And the question is:  "What type of gun did

16    you have?"  And you said:  "A .22 Derringer."  And

17    then you were asked:  "How many shot Derringer was

18    that?"  And you said:  "It was a two shot."

19             And then you were asked:  "Were the

20    barrels on the Derringer over and under or side by

21    side?"  And you said:  "Over and under."  Isn't

22    that correct?

23        A    Yes, it is.

24        Q    Those are your words; isn't that correct?

G242

Weston 000734

1      A    Those not my words, but I said that.

2      Q    You said that.  Uh-huh.

3           Later on in this statement, sir, in

4  fact on page nine you were asked:  "What happened

5  to the third person that you had orginally seen?"

6  And you said:  "He was laying down.  He was laying

7  down in the street."  And then you said -- Then you

8  were asked:  "He was laying down in the street?"

9  And you said:  "Yes."

10          Then you were asked:  "Could you

11 describe how he was laying down?"  And you said:

12 "Like in a sit-up position."  You said that, didn't

13 you?

14     A    That's what they told me to say.

15     Q    But that's what you said, right?

16     A    Yes.

17     Q    And that was in front of the state's

18 attorney and the court reporter, right?

19     A    Yes, it was.

20     Q    And then you were asked:  "And what did

21 you do when you saw him lying on the street in the

22 sit-up position?"  You said:  "He was hollering

23 don't shoot, don't shoot, and I shot two times."

24 Do you remember saying that?

G243

Weston 000735

1      A    Yes, I do.

2      Q    The state's attorney didn't tell you to

3   say that, did he?

4      A    I ain't never said the state's attorney.

5      Q    The court reporter never told you to say

6   that?

7      A    I ain't never said him.

8      Q    The state's attorney went into that room

9   at least three times and asked you how you were

10  treated by the police; isn't that correct?

11     A    So what I'm supposed to say?

12     Q    Answer my question, Mr. Weston.

13     A    Yes, it is.

14     Q    And the police officer wasn't in the room

15  at that time the state's attorney asked you, was

16  he?

17     A    No, he was not.

18     Q    You could have said something then,

19  couldn't you?

20     A    I don't know who --

21          MR. KATZ:  I would ask, if I may --

22          THE COURT:  Step back, Mr. State's

23  Attorney.

24          MR. KATZ:  -- that the state's attorney

G244

Weston 000736

1    will step back from Mr. Weston.

2          THE COURT:  Counsel, that's already been

3    done.  Ask a question.  I want to proceed.

4    BY MR. MC KAY:

5      Q    You didn't say anything to the state's

6    attorney, Paul Sabin, when he was alone in that

7    room with you; isn't that correct, Mr. Weston?

8      A    Correct.

9      Q    And further on in this statement you said:

10          "Q   And what did you do with this gun

11               that you had in your hand when you

12               were just about -- when you were

13               about fifteen feet away from the

14               individual lying on the ground?

15          "A   I shot towards him."

16    And the question was:  "You shot at him?"  And then

17    you said:  "Yes, towards him."

18          You said towards; isn't that correct,

19    Mr. Weston?

20      A    Yes.

21      Q    The police officer when he questioned you

22    without the state's attorney you said to him -- he

23    says you said at him; isn't that correct?

24      A    No, it's not.

G245

Weston 000737

1    Q    Okay.  But when the state's attorney asked

2   you what happened to the man on the ground you said

3   you shot towards him.  Those are your words that

4   you said in front of that court reporter; isn't

5   that correct, Mr. Weston?

6    A    Yes, it is.

7    Q    In fact, later on when you were asked

8   further by the state's attorney he asked you this:

9            "Q    When you say they started shooting

10               people anyway, that includes you too;

11               isn't that correct?"

12   And you said:  "No.  I didn't shoot nobody."  Those

13   are your words, right, Mr. Weston?

14    A    Yes.

15    Q    And then the question was:  "But you said

16   earlier that you did, in fact, shoot at a person

17   that was on the ground; isn't that correct?"  And

18   then you said:  "I shot up by his head, way over."

19            "Q    You shot by his head?

20            "A    Way over."

21               You said that, didn't you?

22    A    Yes.

23    Q    So early in the statement you said towards

24   him and later in the statement you said you shot

G246

Weston 000738

1    way over his head, right?

2        A    Yes.

3        Q    You changed it, didn't you, Mr. Weston?

4        A    It all means the same.

5        Q    It does?

6        A    Yes.

7        Q    Showing you People's Exhibit No. 18,

8    Mr. Weston, that's how you looked at the police

9    station that night; isn't that correct?

10       A    Yes, it is.

11       Q    And you were wearing that black jacket at

12   the police station; isn't that correct?

13       A    Yes, it is.

14       Q    And black is one of the colors of the

15   Gangster Disciples; isn't that correct?

16           MR. KATZ:  Objection.

17           THE COURT:  If he knows he may answer.

18           THE WITNESS:  I don't know.

19   BY MR. MC KAY:

20       Q    Well, you left Area Three and you were

21   looked at by a paramedic at Cermak Hospital on

22   June 11th; isn't that correct?

23       A    At Cermak Hospital?

24       Q    Yeah.  The jail Hospital.

G247

Weston 000739

1      A      Yes.

2      Q      Okay.   There weren't any police officers

3    there for that physical examination, were there,

4    Mr. Weston?

5      A      When I left Area Three I went to 61st and

6    Racine.

7      Q      But then when you went to the jail intake

8    center at Cermak Hospital you were looked at for a

9    physical examination, weren't you?

10     A      Yes.

11     Q      And there weren't any Chicago police

12   officers there, were there?

13     A      No, it was not.

14     Q      Did you tell that paramedic who examined

15   you that the police had slapped you?

16     A      No, I did not.

17     Q      No.   In fact, you were in perfect health

18   when you went through that intake procedure,

19   weren't you?

20     A      What that got to do with me telling them?

21            THE COURT:   Just answer the question, sir.

22            THE WITNESS:   What was the question?

23

24

G248

BY MR. MC KAY:

    Q    You were in perfect health on June 11th when you went through that intake procedure?

    A    I don't know.

    MR. KATZ:  Judge, I'm going to object to the nature of the question, it's calling for a conclusion of this witness that he was in perfect health.

    THE COURT:  As to perfect health, counselor, I'll sustain the objection to the form of the question.

BY MR. MC KAY:

    Q    You didn't have any bruises on your face, did you, Mr. Weston?

    A    No, I did not.

    Q    You didn't have any redness in your face, did you?

    A    Not when I --

    Q    You didn't have any scratches on your face, did you?

    A    No.

    Q    You never complained to that paramedic officer that the police beat you up, did you?

    A    No.

G249

1          MR. MC KAY:  Nothing further, judge.

2          THE COURT:  Redirect, if any.

3                REDIRECT EXAMINATION

4                BY MR. KATZ:

5      Q     This paramedic officer counsel is

6   referring to never asked you if you had been beat

7   up, did he?

8      A     No, he didn't.

9      Q     I'm sorry.  I couldn't hear your answer.

10     A     No, he did not.

11     Q     Now, calling your attention to May 29,

12  1990, were you at the vicinity of 57th and Wolcott

13  in the evening hours?

14     A     No.

15     Q     Now, in regard to the specific information

16  that you stated in the court reported statement,

17  you told them that you had a .22 caliber Derringer?

18     A     Yes.

19     Q     And I believe you stated that the barrels

20  were over and under?

21     A     Yes.

22     Q     Was that the truth?

23     A     No, it was not.

24     Q     Why did you say -- Strike that.

G250

Weston 000742

1              Why did you describe -- Strike that.

2              Why did you say you had a weapon in

3      that statement?

4          A    Because he told me to.

5          Q    Who is he?

6          A    The officer, Officer Moser.

7          Q    Why did you specifically describe it as a

8      .22 caliber Derringer with an over and under

9      barrel?

10         A    That's how he described it to me.

11         Q    Why did you state in this court reported

12     statement that you met with certain individuals at

13     about 8:00 p.m. with the idea of going to scare

14     some Vice Lords, why did you say that?

15         A    That's what he told me to say.

16         Q    Who is he?

17         A    Officer Moser.

18         Q    Why did you state in this court reported

19     statement that you shot over his head or you shot

20     towards him, why did you say that?

21         A    Because that's what he told me to say.

22         Q    What specifically did he tell you to say

23     in regards to that issue?

24         A    He said don't say you shot him, just say

G251

1    you shot at him.

2        Q    You mentioned in the statement that

3    certain individuals were driving a Delta 88; is

4    that correct?

5        A    Yes.

6        Q    Why did you state that?

7        A    Because that's what he described to me, a

8    Delta 88.

9        Q    Who is he?

10        A    Officer Moser.

11            MR. KATZ:  Thank you.  Nothing further.

12            THE COURT:  Recross, if any.

13                    RECROSS-EXAMINATION

14                    BY MR. MC KAY:

15        Q    A few minutes ago your lawyer asked you,

16    and this is before I started questioning you,

17    whether you were at 57th and Wolcott and you said

18    you didn't remember, right?

19            MR. KATZ:  Objection.  That wasn't the

20    testimony.

21            THE WITNESS:  I never said I didn't

22    remember.

23            THE COURT:  Overruled.  The ladies and

24    gentlemen heard his testimony.  With that kindly

                        G252

1    continue.

2    BY MR. MC KAY:

3         Q    You said you didn't remember being at 57th

4    and Wolcott that night I, right?

5         A    I didn't never say that.

6         Q    What did you say?

7         A    I said:  No, I was not over there.

8         Q    You never said:  No, I don't think I was

9    there or I don't remember I was there?

10        A    You said:  No, I don't think I remember.

11   I never said --

12             THE COURT:  The ladies and gentlemen heard

13   the testimony.  With that, counselor, ask another

14   question.

15   BY MR. MC KAY:

16        Q    Are you sure, Mr. Weston?

17        A    Yes, I'm sure.

18             MR. KATZ:  Objection, judge.

19             MR. MC KAY:  Nothing further, judge.

20             THE COURT:  You may step down.

21                       (Witness excused.)

22             MR. KATZ:  Judge, we have nothing further.

23             THE COURT:  Do you rest?

24             MR. KATZ:  Yes.

G253

Weston 000745

# Exhibit 3

**Deposition of Demond Weston**
**Role:  Plaintiff**
**Taken:  March 2, 2023**



Transcript of the Deposition of
**Demond Weston**

**Case:** Demond Weston v. City of Chicago; et al.
**Taken On:** March 2, 2023

Royal Reporting Services, Inc.
Phone:312.361.8851
Email:info@royalreportingservices.com
Website: www.royalreportingservices.com

Demond Weston v. City of Chicago; et al.
Deposition of Demond Weston - Taken 3/2/2023

Page 22

1      A.   Yes.

2      Q.   Okay.  You're talking about -- Strike that.

3           When you say you later learned who these

4    officers were, it was because they had testified in your

5    criminal case, correct?

6      A.   And plus, the reports.

7      Q.   Okay.

8      A.   Yes.

9      Q.   You're talking about Detective Moser, right?

10     MS. KLEINHAUS:  Objection to form.

11          You can answer.

12   BY THE WITNESS:

13     A.   Rusnak -- We're talking about Rusnak and

14   Breska right now, right?

15     Q.   No, I'm asking you about you later learned --

16   You said someone testified against you.  Who were you

17   talking -- Who were you referring to?

18     A.   I'm talking about the police that you just

19   mentioned.

20     Q.   Your -- your testimony is that Breska

21   testified against you?

22     A.   The police you just mentioned, I later learned

23   their names through paperwork and/or a hearing.

24     Q.   Okay.  I gotcha.

Demond Weston v. City of Chicago; et al.
Deposition of Demond Weston - Taken 3/2/2023

Page 73

1    BY THE WITNESS:

2        A.   Not harassment.

3        Q.   **Okay.  So what would you -- what would -- How**

4    **would you describe your interactions with Vice Lords?**

5        A.   So my father stays out West, and where he --

6    his -- his job is located is out West.  So in that

7    community, there's Vice Lords.

8        Q.   **You're talking about the West Side of Chicago?**

9        A.   The West Side of Chicago.  So I travel from

10   south to west weekly.  So that's why I asked you about

11   your question as it relate to interaction.

12       Q.   **Okay.**

13       A.   So I've been where Vice Lords is at.  There

14   was no issue because I'm coming and going.

15       Q.   **Is this where you would have been working at**

16   **your father's store?**

17       A.   Yes, at his upholstery shop.  So yes, yeah.

18       Q.   **And that was on Division, on the West Side?**

19       A.   Also where he stayed, where I grew up shortly

20   on Keeler, yes.

21       Q.   **Okay.  So is it your testimony then you never**

22   **had any issues with Vice Lords?**

23       A.   No.

24       Q.   **Any Vice Lords ever shoot out any of your**

Royal Reporting Services, Inc.
312.361.8851

Demond Weston v. City of Chicago; et al.
Deposition of Demond Weston - Taken 3/2/2023

Page 84

1      A.   No.

2      Q.   You testified that you worked at your father's

3  upholstery store --

4      A.   Yes.

5      Q.   -- is that correct?

6           What time period did you work at your father's

7  upholstery store?

8      A.   Saturdays.

9      Q.   How would you get to the alternative school

10  during the spring of 1990?

11     A.   Bus.

12     Q.   Did you go with any friends to that school?

13     A.   No.

14  MS. KLEINHAUS:  Objection to form.

15  BY MR. BAZAREK:

16     Q.   And you've testified about the -- the

17  Black P. Stones.  Did they have certain colors that they

18  wore, that gang?

19  MS. KLEINHAUS:  Objection:  foundation.

20          You can answer.

21  BY THE WITNESS:

22     A.   At that time, not that I can remember.

23     Q.   Okay.  How about Gangster Disciples?  Do they

24  wear a -- a certain type of color clothing?

Demond Weston v. City of Chicago; et al.
Deposition of Demond Weston - Taken 3/2/2023

Page 153

1   do?  Didn't you say words to that effect?

2        A.   Yes.

3        Q.   And what did you mean by that?

4        A.   So I was not present at the locations where

5   you mentioned the guy getting shot on the bike, the

6   other guy, Nesbit, or Co- -- excuse me.  I was not

7   present at those --

8        Q.   Okay.

9        A.   -- at that incident.

10        Q.   And you're -- I mean, you are aware --

11        A.   Yes.

12        Q.   -- from your, you know, criminal trial --

13        A.   Yes.

14        Q.   -- and your -- I mean, I know you know your

15   case, right?  It's your case.  There were -- there were

16   three separate shootings on May 29th, 1990, right?

17        A.   Yes.

18        Q.   Okay.  And it's your testimony that you had no

19   involvement?

20        A.   None.

21        Q.   Okay.  So let me ask you, where were you on

22   May 29th, 1990, between 10:00 p.m. and midnight?

23        MS. KLEINHAUS:  Just objection to form, asked and

24   answered.  We've gone through this a hundred times.

Demond Weston v. City of Chicago; et al.
Deposition of Demond Weston - Taken 3/2/2023

Page 161

1   of the three different shooting locations, they were in

2   close proximity?

3        MS. KLEINHAUS:  Objection:  calls for speculation.

4            You can answer if you know if they were in

5   close proximity to each other or not.

6   BY THE WITNESS:

7        A.   I don't -- I don't know if they're in close

8   proximity or not.

9        Q.   You don't -- So you don't -- Your testimony is

10  you don't know whether they were just a few blocks away

11  from each other?

12       A.   No.

13       Q.   Had you ever been to those three shooting

14  locations ever?

15       A.   No.

16       MS. KLEINHAUS:  Objection to form.

17  BY MR. BAZAREK:

18       Q.   Okay.  In your neighborhood, were there gang

19  conflicts between the Gangster Disciples and the Vice

20  Lords?

21       MS. KLEINHAUS:  Objection to form.

22            You can answer.

23  BY THE WITNESS:

24       A.   No.

Demond Weston v. City of Chicago; et al.
Deposition of Demond Weston - Taken 3/2/2023

Page 202

1   BY THE WITNESS:

2       A.   I don't know.

3       Q.   Okay.  Well, to your knowledge, was Macklin

4   ever arrested for Curtis Sims' murder?

5       A.   I believe so, yes.

6       Q.   Okay.  So you said Detective Kill brings you

7   to the third floor?

8       A.   Yes.

9       Q.   What happened once you were brought to the

10  third floor by Detective Kill?

11      A.   He takes me into a room.  He uncuffs my hand

12  and then cuffs me to a chair.

13      Q.   So do you have one free -- free hand then?

14      A.   Yes, my left hand.

15      Q.   Your left -- left hand was free?

16      A.   Yes.

17      Q.   Okay.  When Detective Kill brought you to the

18  room, was anyone else in the room?

19      A.   No.

20      Q.   As Detective Kill brought you to that room,

21  was anyone else present?

22      MS. KLEINHAUS:  Objection to form and asked and

23  answered.

24          You can answer if you know.

Royal Reporting Services, Inc.
312.361.8851

Demond Weston v. City of Chicago; et al.
Deposition of Demond Weston - Taken 3/2/2023

Page 203

1    BY THE WITNESS:

2        A.   Not that I recall, no.

3        Q.   **Okay.  What happened next?**

4        A.   So I asked him what was I under arrest for,

5    and he kept walking like he ain't hear me.  He left out,

6    and he came back in with a camera; then he took my

7    picture.

8        Q.   **Do you recall what type of camera it was?**

9        A.   It was a Polaroid where the -- I don't know if

10   it was a Polaroid, but the picture comes out of the

11   camera.

12       Q.   **Okay.**

13       A.   So then he took my hat off and then took a

14   second picture.

15       Q.   **What kind of hat were you wearing?**

16       A.   A Pirates hat.

17       Q.   **What color is -- was the hat?**

18       A.   Black and gold.

19       Q.   **Pittsburgh Pirates?**

20       A.   Pittsburgh Pirates, yes.

21       Q.   **Was Kill saying anything during this time?**

22   MS. KLEINHAUS:  Objection to form as to time.

23            You can answer.

24

Royal Reporting Services, Inc.
312.361.8851

Demond Weston v. City of Chicago; et al.
Deposition of Demond Weston - Taken 3/2/2023

Page 211

1  BY MR. BAZAREK:

2      **Q.   Go ahead.**

3      MR. BAZAREK:  In fact, read the question back,

4  please.

5                  (Record read as requested.)

6      MS. KLEINHAUS:  Same objection.

7          Go ahead.

8      MR. BAZAREK:  Baseless objection.

9  BY THE WITNESS:

10     A.   I'm not sure how long I had been there.

11     **Q.   Was it ten minutes?**

12     A.   Nah, I had been there for a while now at this

13  point.

14     **Q.   Well, you -- you said that Kill had left you**

15  **alone in the room for hours, right?**

16     A.   Yes.

17     **Q.   So this is after the hours had passed, right?**

18     A.   Yes.

19     **Q.   So your testimony at this deposition is you**

20  **have no idea what time it was when you had contact with**

21  **Detectives Maslanka and Moser?**

22     MS. KLEINHAUS:  Objection:  form, mischaracterizes

23  the testimony, asked and answered.

24          You can answer again.

Demond Weston v. City of Chicago; et al.
Deposition of Demond Weston - Taken 3/2/2023

Page 212

1    BY THE WITNESS:

2        A.    I do -- do not know exact time that they

3    started questioning me.

4        Q.    **I'm not -- At any time.**

5        A.    But it was hours after Kill first brought me

6    there.

7        Q.    **All right.  So it could have been 9:00 o'clock**

8    **at night?**

9        MS. KLEINHAUS:  Objection:  calls for speculation.

10            You can answer if you know.

11   BY THE WITNESS:

12       A.    I'm not sure.

13       Q.    **Was there a window in the room you were in?**

14       A.    Yes.

15       Q.    **Okay.  When you first observed Detectives**

16   **Maslanka and Moser, was it still light out or was it**

17   **dark?**

18       A.    It was still light out.

19       Q.    **Was it evening time?**

20       MS. KLEINHAUS:  Objection to form, asked and

21   answered.

22            You can answer again.

23   BY THE WITNESS:

24       A.    Again, it was hours later after Kill initially

Royal Reporting Services, Inc.
312.361.8851

Demond Weston v. City of Chicago; et al.
Deposition of Demond Weston - Taken 3/2/2023

```
                                                    Page 220
 1        MS. KLEINHAUS:  He said he's okay.
 2        MS. HAMILTON:  I think he said he's okay.
 3        MR. BAZAREK:  Oh, he's okay?  Okay.
 4        MS. KLEINHAUS:  Sorry.
 5        MR. BAZAREK:  I apologize.
 6   BY MR. BAZAREK:
 7        Q.   Go ahead.  Sorry, sir.
 8        A.   No, they just kept asking me what happened.
 9        Q.   And you were denying it, right?
10        A.   I'm not denying it.  I just didn't know what
11   happened.  Like --
12        Q.   So you were asking them what happened?
13        A.   Yeah.  I -- I told them I didn't know what
14   happened.  I don't know what y'all want me to tell
15   y'all.
16        Q.   And what did they say?
17        A.   They kept saying that I was lying, that I did
18   know.
19        Q.   Was one of the officers doing --
20        A.   Moser was doing --
21        Q.   -- most of the talking?
22        A.   -- most.
23        Q.   Okay.  So would you agree that -- that
24   Detective Moser, he was leading the interview?
```

Demond Weston v. City of Chicago; et al.
Deposition of Demond Weston - Taken 3/2/2023

Page 221

```
 1        A.    Yes.
 2        Q.    Okay.  And then you're asking Detective Moser
 3   what happened?
 4        A.    I --
 5        MS. KLEINHAUS:  Objection to form,
 6   mischaracterizes.
 7              You can answer.
 8   BY THE WITNESS:
 9        A.    I was explaining to him that I did not know
10   what happened.  They're asking me to tell them what
11   happened.  I didn't know what happened to tell them --
12   tell them what happened.
13        Q.    Did they say what the "what happened" was?
14        A.    No --
15        Q.    Okay.
16        A.    -- not at that time.
17        Q.    So you don't even know what they're talking
18   about?
19        A.    No.  They was accusing me of playing dumb, but
20   I wasn't playing dumb.  I didn't know what -- what
21   happened, so I didn't know what to tell them.
22        Q.    Did -- did Moser say anything about anyone
23   being murdered?
24        A.    No.
```

Demond Weston v. City of Chicago; et al.
Deposition of Demond Weston - Taken 3/2/2023

Page 233

1      A.   Yes.

2      **Q.   You had a -- one open hand, right?**

3      A.   Yes.

4      **Q.   And your left hand was open?**

5      A.   Yes.

6      **Q.   Did you try and block the slap?**

7      A.   As a 17-year-old kid, sir, I never expected a

8  police to slap me, so no, I did not prepare for that.

9      **Q.   You know, when he slapped you that first**

10 **time -- I know you said you didn't see a mirror or you**

11 **weren't by a mirror -- did you fe- -- did you touch**

12 **your -- your -- your face to see if it was swollen?**

13     A.   Sir, my face was on fire.  That's how hard it

14 hurt.

15     **Q.   Were you bleeding?**

16     A.   I don't believe I was bleeding, sir.

17     **Q.   Was there a cut or a mark on your face?**

18     MS. HAMILTON:  Objection:  form, foundation, calls

19 for speculation.  He already testified he didn't look in

20 a mirror.

21     MR. BAZAREK:  That's not the --

22 BY MR. BAZAREK:

23     **Q.   The question is, was there a cut or a mark on**

24 **your face?**

Demond Weston v. City of Chicago; et al.
Deposition of Demond Weston - Taken 3/2/2023

Page 234

1      A.   I don't know.  I was not able to see myself in
2   that moment.
3      **Q.   Was there any bruising on your face?**
4      MS. HAMILTON:  Same objection.
5          You can answer.
6   BY THE WITNESS:
7      A.   Again, I was not able to see myself in that
8   moment, sir.
9      **Q.   At -- at any time after Detective Moser struck**
10  **you, did you ever observe any visible injury to your**
11  **face at any time?**
12     MS. HAMILTON:  Objection:  form and to the extent
13  that calls for expert testimony.
14  BY THE WITNESS:
15     A.   So, again, I wasn't able to see myself, and I
16  wasn't looking for any bruises.
17     **Q.   Right.  So you would agree you never saw any**
18  **cut, scrape, bruise, scratch, swelling on your face,**
19  **right?**
20     A.   I didn't say there was no swelling.
21     **Q.   Oh, did you observe swelling?**
22     A.   So, again, the way you just manipulated
23  that -- No, sir.  No, sir.
24     **Q.   Okay.  So Detective Moser slaps you one time.**

Demond Weston v. City of Chicago; et al.
Deposition of Demond Weston - Taken 3/2/2023

Page 239

1   me and nobody would ever know.

2       Q.   **Sir, any time you need to take a break, let us**

3   **know.**

4       MS. HAMILTON:  Do you want to take a break?

5       MR. BAZAREK:  Let's take a break.

6       THE VIDEOGRAPHER:  The time is 3:42 p.m.  We're now

7   going off the record.

8                   (A short break was had.)

9       THE VIDEOGRAPHER:  The time is -- the time is

10  3:58 p.m.  We're now back on the record.

11                  (Record read as requested.)

12  BY MR. BAZAREK:

13      Q.   **Did Maslanka do anything else other than rub**

14  **your shoulders?**

15      A.   Yes.

16      Q.   **What did he do?**

17      A.   As he was rubbing my -- as he was rubbing my

18  shoulders, Moser was also still questioning me saying he

19  was going to ask me one more time.

20      Q.   **What happened next?**

21      A.   As -- as Moser asking me -- or telling me that

22  he going to ask me one more time what happened, Maslanka

23  began to choke --

24      Q.   **How did he choke you?**

Demond Weston v. City of Chicago; et al.
Deposition of Demond Weston - Taken 3/2/2023

Page 257

1    to go.

2         Q.   **Who was that person?**

3         MS. HAMILTON:  Objection:  foundation.

4              You can answer.

5    BY THE WITNESS:

6         A.   At that time, I didn't know who he was.

7         Q.   **Do you know who it is now?**

8         A.   Yes.

9         Q.   **Who?**

10        A.   This guy, Paul Sabin.

11        Q.   **Okay.  The State's Attorney?**

12        A.   Yes.

13        Q.   **So you said Moser was coming back into the**

14   **room, and he was telling you things?**

15        A.   Yes.

16        Q.   **What was he telling you?**

17        A.   About the crime itself.

18        Q.   **What did he --**

19        A.   The shooting on Wolcott.

20        Q.   **What did he tell you?**

21        A.   About how it happened.

22        Q.   **Well, tell me how he said it to you.**

23        A.   That he knew I wasn't the one that shot --

24   that shot Joseph, and he was talking me through how it

Royal Reporting Services, Inc.
312.361.8851

Demond Weston v. City of Chicago; et al.
Deposition of Demond Weston - Taken 3/2/2023

Page 258

1   happened.

2       Q.    And how -- What did he say -- Strike that.

3             How did he say it happened?

4       A.    That Joseph was shot on the streets.

5       Q.    What else did he say?

6       A.    That he knows -- Or he wanted me to say that I

7   saw somebody else shoot him and the other two guys was

8   with me.

9       Q.    Who -- who did Detective Moser say that you

10  were supposed to say shot Joseph?

11      A.    Vic Brown.

12      Q.    And what did you say to that?

13      A.    I didn't know Vic Brown.

14      Q.    Well, you knew Vic Brown from Beale school.

15      A.    I knew Vic.

16      MS. HAMILTON:  Objection.

17  BY MR. BAZAREK:

18      Q.    Okay.  So when you heard Vic Brown, you didn't

19  connect that to Vic?

20      A.    No.

21      Q.    Okay.  Did -- did Moser tell you anything

22  about the shooting involving Joseph Watson other than

23  what you just testified to?

24      A.    Yes, that they had the gun that was used in

Demond Weston v. City of Chicago; et al.
Deposition of Demond Weston - Taken 3/2/2023

Page 259

1    the shooting, and they had the two witnesses.

2        Q.    **Who were the two witnesses?**

3        A.    I don't know.

4        Q.    **Did -- did Moser show you any photographs of**

5    **anyone?**

6        A.    Yes.

7        Q.    **Who did he show you photographs of?**

8        A.    Of me, Dwayne Macklin, and my two

9    codefendants.

10       Q.    **Who were your two codefendants?**

11       A.    John Walker and Keith Jackson.

12       Q.    **And it was Moser that showed you the**

13   **photographs?**

14       A.    Yes.

15       Q.    **And what did you say when you looked at the**

16   **photographs?**

17       A.    What do you mean what did I say?

18       Q.    **Did -- did you say anything when you were**

19   **shown the photographs?**

20       A.    This was -- The photographs were shown to me

21   when they was taking my statement.

22       Q.    **Okay.  So what other things was Moser telling**

23   **you about the -- the murder of Joseph Watson?**

24       A.    Nothing.  He was just telling me how Joseph

Demond Weston v. City of Chicago; et al.
Deposition of Demond Weston - Taken 3/2/2023

Page 260

1   was shot.

2       Q.   **What did he say?**

3       A.   That he was shot on the street.

4       Q.   **Did he say what type of gun he was shot with?**

5       A.   He told me they had the gun.  So he didn't get

6   into the -- I think you're jumping ahead too.  But

7   anyhow, he was -- As they was taking my state --

8   statement is when he's telling me how to answer certain

9   questions.

10      Q.   **So did -- When -- when do you first become**

11  **aware that Assistant State's Attorney Paul Sabin was**

12  **present?**

13      A.   Once he came in the room and told me as soon

14  as I start answering the questions, I'll be free to go

15  home.

16      Q.   **And you had already defecated yourself,**

17  **right --**

18      A.   Yes.

19      Q.   **-- when you saw Sabin for the first time?**

20      A.   Yes.

21      Q.   **Did you tell Sabin what had occurred?**

22      A.   I didn't know who he was.

23      Q.   **Okay.  Did you tell Sabin that you had been**

24  **physically abused by -- while in police custody?**

Demond Weston v. City of Chicago; et al.
Deposition of Demond Weston - Taken 3/2/2023

Page 261

1      A.   I didn't know who he was.

2      **Q.   The question is, did you -- did you ever**

3  **tell --**

4      A.   And the answer is, I did not know if he was a

5  police or not.  He never told me who he was, so I never

6  thought to mention it to him.

7      **Q.   So you're saying that Assistant State's**

8  **Attorney Sabin never identified himself as a member of**

9  **the Cook County State's Attorney's Office?**

10     A.   Even if he did, I wouldn't have known what

11  that was.

12     **Q.   So you don't know if he did or didn't?**

13     A.   No.

14     MS. HAMILTON:  Objection:  mischaracterizes prior

15  testimony.

16  BY MR. BAZAREK:

17     **Q.   So --**

18     MS. HAMILTON:  You can answer.

19  BY MR. BAZAREK:

20     **Q.   -- I want to ask again:  At any time, did you**

21  **ever tell Assistant State's Attorney Sabin that you had**

22  **been physically abused while in police custody?**

23     A.   No.

24     MS. HAMILTON:  Objection:  asked and answered.

Royal Reporting Services, Inc.
312.361.8851

Demond Weston v. City of Chicago; et al.
Deposition of Demond Weston - Taken 3/2/2023

Page 290

1      A.   I want to believe -- I want to believe Cook

2   County.

3      Q.   **Okay.**

4      A.   So yes.

5      Q.   **And when you're at Cook County, they screen**

6   **you, right?**

7      A.   Yes.

8      Q.   **And did you report any injury to anyone**

9   **when -- when you arrived at Cook County Jail?**

10     A.   No.

11     Q.   **Did -- did you -- Had you -- had you seen your**

12  **face?**

13     A.   No.  And let me -- let me say this too:  Cook

14  County announces to you they don't care what happened to

15  you before you got to them.  They said this.  They says

16  this to -- as you coming in.  They don't want to hear

17  it; they don't care, take it up with your lawyer,

18  whatever.  They don't care.  So no.

19     Q.   **Let's take a look at Deposition Exhibit No. 4.**

20              **(Weston Deposition Exhibit No. 4**

21               **marked as requested.)**

22  BY MR. BAZAREK:

23     Q.   **Okay.  Mr. Weston, have you ever seen this**

24  **report before?**

# Exhibit 4

| Sheet #<br>20 | CRIMINAL DISPOSITION SHEET<br>Defendant Sheet #1 | | Branch/Room/Location<br><br>Criminal Division, Courtroom 302<br>2650 South California Avenue, Chicago, IL, 60608 | Court Interpreter |
|---|---|---|---|---|

| Case Number<br>90CR1637602 | Defendant Name<br>WESTON, DEMOND | Attorney Name<br>WEXLER BRUCE, .16002 | Session Date<br>12/18/2019 | Session Time<br>09:00 AM - |
|---|---|---|---|---|

| CB/DCN#<br>008567796 | IR #<br>0926658 | EM | Case Flag | Bond # | Bond Type | Bond Amt |
|---|---|---|---|---|---|---|

| CHARGES | COURT ORDER ENTERED | CODES |
|---|---|---|
| C001  38-9-1-A(1)<br>MURDER<br>5/18/1992 DEFT. SENTENCED TO IDOC | | |
| C002  38-9-1-A(2)<br>MURDER<br>5/18/1992 DEFT. SENTENCED TO IDOC | | |
| C003  38-8-4(38-9-1)<br>ATT (MURDER)<br>5/18/1992 DEFT. SENTENCED TO IDOC | | 103 |
| C004  38-33A-2/I<br>ARMED VIOL (CAT I WPN)<br>4/13/1992 Nolle Prosequi | | |
| C005  38-33A-2/I<br>ARMED VIOL (CAT I WPN)<br>4/13/1992 Nolle Prosequi | | |
| C006  38-33A-2/I<br>ARMED VIOL (CAT I WPN)<br>4/13/1992 Nolle Prosequi | | |
| C007  38-33A-2/I<br>ARMED VIOL (CAT I WPN)<br>4/13/1992 Nolle Prosequi | | |
| C008  38-8-2(38-9-1)<br>CON (MURDER)<br>4/13/1992 Nolle Prosequi | | |
| C009  38-12-4-A<br>AGG BATTERY<br>4/13/1992 Nolle Prosequi | | |

*Court order handwritten text:*

Sp Pros Robert Milan
Sp Pros Martin Doyle
PVJS Katallen Garvey
Rita Siravastava
Scott Schutter

N/G nolle
all counts
S agrees not to seek
certificate of innocence
— S released this case only
conviction vacated
— see written order

| JUDGE: Munari-Petrone, Angela | JUDGE'S NO: 1963 | RESPONSIBLE FOR CODING AND COMPLETION BY DEPUTY CLERK: | VERIFIED BY: |
|---|---|---|---|

*Signature: Angela M. Petrone #1963*

IND DEF 362570

| Sheet #<br>20 | CRIMINAL DISPOSITION SHEET<br>Defendant Sheet #2 | | Branch/Room/Location<br>Criminal Division, Courtroom 302<br>2650 South California Avenue, Chicago, IL, 60608 | | Court Interpreter |
|---|---|---|---|---|---|

| Case Number<br>90CR1637602 | Defendant Name<br>WESTON, DEMOND | Attorney Name<br>WEXLER BRUCE, 16002 | Session Date<br>12/18/2019 | Session Time<br>09:00 AM - |
|---|---|---|---|---|

| CB/DCN#<br>008567796 | IR #<br>0926658 | EM | Case Flag | Bond # | Bond Type | Bond Amt |
|---|---|---|---|---|---|---|

| CHARGES | COURT ORDER ENTERED | CODES |
|---|---|---|
| **C010 38-12-4-B(1)**<br>AGG BATTERY<br>4/13/1992 Nolle Prosequi | | |
| **C011 38-12-4-B(8)**<br>AGG BATTERY<br>4/13/1992 Nolle Prosequi | | |

| UDGE: Munari-Petrone, Angela | JUDGE'S NO: 1963 | RESPONSIBLE FOR CODING AND COMPLETION BY DEPUTY CLERK: | VERIFIED BY: |
|---|---|---|---|

IND DEF 362571

Addendum to Previous Order                (Rev. 10/06/14) CCCR N707

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### CRIMINAL DIVISION/MUNICIPAL DEPARTMENT-DISTRICT

| PEOPLE OF THE STATE OF ILLINOIS | CASE NUMBER | 91CR0064002201 |
| | | 90CR-16376 (02) |
| **v.** | SID NUMBER | |
| **DEMOND WESTON** | IR NUMBER | 0926658 |
| Defendant | | |

**ADDENDUM TO PREVIOUS ORDER SETTING BAIL AND COMMITTING THE DEFENDANT TO THE COOK COUNTY DEPARTMENT OF CORRECTIONS FOR FAILURE TO DEPOSIT BAIL**

## ORDER

**THIS MATTER COMING BEFORE THE COURT AND THE COURT BEING FULLY ADVISED IN THE PREMISES, IT IS HEREBY ORDERED:**

*ON THESE CASES ONLY*

**DEFENDANT TO BE RELEASE ~~FROM CUSTODY~~**

NEXT COURT DATE: ~~01/02/2020~~

| By Agreement |
| Defendant In Custody – IDOC     CONVICTION **S** VACATED |
| ~~Custody status/receipt~~ |

*RELEASE THESE CASES ONLY*

**ENTERED**

DEC 19 2019

**DISPOSITION(S) MUST REFLECT WHICH COUNT(S) THE ORDER(S) ARE APPLICABLE TO**

ENTERED:    12/18/2019            Judge   **Munari Petrone, Angela**      Judge's No.

DEPUTY CLERK:   C. Edwards-Bowen        ROOM/BRANCH:    Criminal Division, Courtroom 302

VERIFIED BY:                   AT:    9:30 AM

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
Page 1 of 1

Printed: 12/18/2019 2:55 PM

IND DEF 362572

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT – CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS )
    Prosecution/Respondent, )
                   )   Nos. 90CR-16376(02) and
    versus )        91CR-00640(01)
                   )
DEMOND WESTON, )
    Defendant/Petitioner. )

**ORDER**

1.  The office of the Special Prosecutor, having been appointed to investigate claims made by Demond Weston, has nolle prose all charges against petitioner in Case Numbers 90CR-16376 (02) and 91CR-00640.

2.  Petitioner has entered into an agreement with the Office of the Special Prosecutor that petitioner will not be seeking a certificate of innocence in this matter.

3.  This action terminates the need for any further post-conviction proceedings.

4.  Therefore, based on the above, the conviction in each case is hereby vacated and defendant is ordered released from custody in each case.

_Angela M. Petrone_ #1963

Angela M. Petrone
Circuit Court of Cook County, Criminal Division

_12-18-19_

Date

ENTERED
Judge Angela Munari Petrone-1963

DEC 18 2019

DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL
DEPUTY CLERK

IND DEF 362573

# Exhibit 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| DEMOND WESTON, | |
| *Plaintiff*, | Case No. 20-cv-6189 |
| v. | |
| CITY OF CHICAGO, ESTATE OF MICHAEL KILL, ANTHONY MASLANKA, WILLIAM MOSER, JOHN PALADINO, DAN MCWEENY, ANDREW CHRISTOPHERSEN, JEROME RUSNAK, VICTOR BRESKA, and UNKNOWN EMPLOYEES OF THE CITY OF CHICAGO, | Hon. Jorge L. Alonso |
| | Hon. Susan E. Cox |
| *Defendants*. | |

**PLAINTIFF'S RESPONSES TO DEFENDANT
BRESKA'S FIRST SET OF INTERROGATORIES**

Plaintiff, Demond Weston, by and through his attorneys, responds as follows to Defendant Breska's Interrogatories to Plaintiff as follows:

**GENERAL OBJECTIONS**

Plaintiff's investigation is ongoing as to all matters referenced in the objections and responses below. Plaintiff's objections and responses are based upon, and necessarily limited by, information now reasonably available to Plaintiff. Plaintiff specifically reserves all rights to revise, correct, supplement, modify, or clarify the content of his objections and responses below, in accordance with the applicable Federal Rules of Civil Procedure and Federal Rules of Evidence.

Each objection below applies to each instruction, definition, and specific request included in the interrogatories; and unless otherwise stated, shall have the same force and effect as if set forth in full in response to each instruction, definition, and specific request.

1

Plaintiff construes Defendant's interrogatories to request information within his possession, custody, or control, consistent with the requirements of the Federal Rules of Civil Procedure.

Plaintiff objects to the interrogatories to the extent that they seek information that is protected by the attorney-client privilege, the work-product doctrine, the joint-defense or common-interest privilege, the psychotherapist-patient privilege, the marital communications privilege, or any other applicable law, regulation, privilege, immunity, or discovery protection, or that are otherwise protected by disclosure under the Federal Rules of Civil Procedure and/or Federal Rules of Evidence. In responding to these interrogatories, Plaintiff preserves all objections and intends to make no waiver with regard to any claim of privilege. Plaintiff reasonably interprets the instructions, definitions, and interrogatories to not seek information that is privileged, and therefore outside of the scope of discovery as defined by Federal Rule of Civil Procedure 26(b)(1), or protected as work product, which falls presumptively outside the scope of discovery as set forth in Federal Rule of Civil Procedure 26(b)(3)(A).

Plaintiff objects to the interrogatories to the extent that they purport to impose burdens or obligations on Plaintiff that are broader than, inconsistent with, not authorized under, or not reasonable pursuant to the applicable Federal Rules of Civil Procedure and Federal Rules of Evidence. Plaintiff further reserves the right to assert additional objections which may become apparent in the course of this action, including those based on undue burden.

Plaintiff objects to the interrogatories as a whole and to each interrogatory contained therein, to the extent that they are compound and a violation of the applicable Rules, which limit Defendant's interrogatories, including all discrete subparts. Plaintiff objects to the interrogatories that exceed the permitted number of requests and/or include multiple questions

on the basis that they should not be considered a single interrogatory under the applicable Rules.

Plaintiff objects to these Requests to the extent the information sought is not relevant and proportional to the needs of the case, and to the extent that the Requests are not limited temporally to time relevant to this lawsuit.

Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

**RESPONSES**

1. Please state and identify: (a) your full name and any other names or nicknames you have ever used; (b) all of your resident addresses within the last five (5) years prior to your arrest on June 9, 1990, and since your release from incarceration; and (c) your date of birth.

**RESPONSE**: Plaintiff objects to this interrogatory as overly broad, unreasonable, unduly burdensome, and of an inappropriate temporal scope. Plaintiff objects to this multi-part request, which is actually three distinct requests and will be treated as such. Plaintiff objects that this interrogatory seeks private and confidential information from Plaintiff, and he provides the following response subject to the protective order entered, or to be entered, in this case. Plaintiff objects further that this interrogatory seeks information that is irrelevant and not proportional to the needs of the case, such as his residences up to 37 years ago, prior to Defendants' framing of him for crimes he did not commit. Plaintiff objects on privacy and relevance grounds to disclosure of his residential address since his release from prison, but he will provide such information if and when all Individual Defendants agree to do the same for the same time period.

Subject to these and the general objections, and without waiving Plaintiff's objections to this interrogatory and to Defendants' definitions and instructions, Plaintiff states he has used the names Demond Lamont McIntosh (name at birth and throughout childhood) and Demond

3

Lamont Weston. He has been referred to as the nickname "Dolla." In 1990, Plaintiff lived at 623 W. 61st St. and had lived there for the previous five years.

2. Please state and identify all of the educational institutions you have attended, and the dates attended for each, subsequent to the eighth grade.

RESPONSE: Plaintiff objects to this interrogatory on the ground that it is overbroad with respect to time frame and subject matter and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving these and the general objections, Plaintiff states he attended Hyde Park High School, Tilden High School, and Andrew Jackson High School. Plaintiff obtained his GED while incarcerated and took vocational classes and obtained educational certificates while in prison. Plaintiff obtained an associate's degree from Lakeland College in 2018.

3. Please identify by name and address all persons who, to the best of your understanding, have knowledge of the facts that relate to any of the claims or defenses in this action, including but not limited to, all persons who are not listed in Plaintiff's Rule 26(a) disclosures and what specific knowledge you believe each person possesses.

RESPONSE: Plaintiff objects to this interrogatory as vague, ambiguous, overly broad, and unduly burdensome, in that it seeks "by name and address all persons who . . . have knowledge of the facts that relate to any of the claims or defense in this action" without any limitation whatsoever. Plaintiff objects further that this interrogatory is being propounded before Plaintiff has had an opportunity to depose the Defendants and other relevant witnesses and calls for information that Plaintiff does not now know and that is equally accessible to Defendants. Plaintiff also objects to the extent this interrogatory calls for any information protected by attorney-client or work-product privilege.

4

Subject to these and the general objections, and without waiving Plaintiff's objections to this interrogatory and to Defendants' definitions and instructions, please see the witnesses identified in the parties' Rule 26(a)1 disclosures, all of Plaintiff's responses to Defendants' interrogatories, and the documents produced by the parties in discovery. Plaintiff's investigation into this matter continues and he reserves the right to supplement or modify this answer as new information comes to light.

4. With respect to each individual Defendant Officer identified in your Complaint, please provide, with specificity, what actions you allege that Defendant Officer performed that were wrong and the facts upon which you base these allegations.

**RESPONSE**: Plaintiff objects to this interrogatory as it is being propounded at the outset of discovery, before Plaintiff has had an opportunity to depose Defendants and many of the relevant witnesses. Plaintiff further objects because much of the information relevant to this inquiry is principally in the possession, custody, or control of the Defendants. Plaintiff also objects to any term used in these interrogatories that are vague and ambiguous and to the extent the call for a legal conclusion or otherwise are defined in a manner that is unsupported by the law and is irrelevant to the legal claims in this case. Plaintiff objects further to the extent that this interrogatory seeks information protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other statutory or common-law privilege.

Plaintiff also objects to this interrogatory on the basis that it is premature as discovery in this matter is just getting underway. Indeed, this interrogatory is akin to a contention interrogatory, which is inappropriate at this stage of the litigation. Parties are typically not required to provide complete answers to contention interrogatories until the end of discovery, though courts may at times require answers before then. *See, e.g., In re Northfield Labs. Inc.*

*Sec. Litig.*, 264 F.R.D. 407, 412 (N.D. Ill. 2009) ("Though the general policy is to defer contention interrogatories until discovery is near an end, courts have discretion to allow use of such interrogatories before discovery is complete."). Moreover, as with any interrogatory, parties may supplement their answers to contention interrogatories as they learn additional responsive information during discovery. *E.g., Am. Needle, Inc. v. New Orleans*, No. 04 C 7806, 2012 WL 4327395, at *2 (N.D. Ill. Aug. 17, 2012) (requiring party to answer contention interrogatories because fact discovery was nearly closed, but limiting questions to "material" facts rather than "all" relevant facts, and explaining that responding party should supplement response if additional discovery provided additional responsive information).

Subject to and without waiving these and the general objections, Plaintiff responds that he has prepared an extensive complaint that alleges in detail how each of the Defendants acted individually and in conspiracy with one another to conceal and withhold exculpatory evidence from Plaintiff, his defense counsel, and the State's Attorney's Office, to fabricate false evidence against Plaintiff implicating him in a crime he had not committed, and to prosecute Plaintiff without any probable cause to believe that he had committed the shootings that occurred on May 29 and June 8, 1990. *See* Plaintiff's Complaint.

Plaintiff specifically alleges that, as part of the investigative team, these Defendants, acting in conspiracy with one another, and others still unknown to Plaintiff, fabricated evidence in order to connect Plaintiff to the crimes, including false police reports (including false statements about the nature and circumstances of the crimes and the purported motive for the crime) and witness statements (including false statements attributed to Dwayne Macklin and Nathaniel McCurine) regarding Plaintiff's purported connection to the crimes; manipulated and coerced eyewitnesses to make false identifications and manufactured false witness testimony that

was used to implicate Plaintiff.

Defendant Officers, including Kill, Moser, and Maslanka, coerced Plaintiff to provide a false confession through the use of physical violence and emotional manipulation, and then suppressed that information during criminal proceedings; covered up their misconduct and destroyed or suppressed additional evidence that would have exculpated Plaintiff, hiding that information from Plaintiff, his attorneys, and state prosecutors; presented false evidence to state prosecutors and judicial authorities in order to secure and continue charges against Plaintiff; and provided false reports, statements and testimony in order to implicate Plaintiff in a crime he had not committed. Answering further, Plaintiff states that Defendants engaged in this misconduct even though there was absolutely no evidence (forensic, eyewitness, circumstantial, character, or otherwise), apart from that evidence fabricated by the Defendants, that connected Plaintiff to the shootings on May 29 and June 8, 1990.

Answering further, Plaintiff states that Defendants withheld the following evidence from Plaintiff prior to trial: (1) Macklin's inability to tell Defendant Officers anything about Plaintiff's alleged involvement in the Watson murder, until he was coerced by Defendant Officers to do so; (2) Defendant Officers' coercion of Macklin, through physical and psychological abuse; (3) Coats's inability to identify Plaintiff as a suspect in the 55th Street shooting, until she was manipulated by Defendant Officers to do so; (4) Defendants Officers' manipulation of Coats, when they instructed her to select Plaintiff's photograph from a line-up; (5) Defendants coercion of Plaintiff's co-defendants and witnesses to the shootings; (6) Defendant Officers' coercion of Nathaniel McCurine in order to obtain a statement from McCurine implicating Plaintiff; (7) Defendant Officers' coercion or attempted coercion of the May 29, 1990 shooting victims and witnesses. Defendants also suppressed evidence of their longstanding pattern and practice of

denying criminal suspects due process, through the use of suggestive, coercive, or otherwise

unreliable identification procedures, and that Plaintiff was convicted as part of this established

practice.

In addition, Plaintiff references and incorporates the detailed allegations in his

Complaint, the post-conviction briefs and evidence supporting those briefs which resulted in his

conviction being vacated, and the documents he has or will produce in response to Defendants'

requests for production. Plaintiff's investigation into this matter continues, and he reserves the

right to supplement or modify this answer as new information comes to light.

5. Please describe all injuries (physical, emotional, and mental) you claim to have

sustained as a result of the events giving rise to your Complaint.

**RESPONSE**: Plaintiff objects to the extent that this interrogatory asks him to quantify

all of his injuries—Plaintiff continues to suffer tremendous injury because of the Defendants'

misconduct and cannot presently quantify the extent of all his injuries. Plaintiff objects to this

interrogatory to the extent that it prematurely seeks expert discovery; Plaintiff will disclose non-

privileged expert opinions as required by Rule 26 and on the schedule set by the Court. Subject

to and without waiving said objections, Plaintiff states that he has suffered tremendous injury as

a result of Defendants' misconduct, since he was seized in June of 1990 when he was 17 years

old. He summarizes his injuries here as follows: Defendants' misconduct inflicted severe

injuries, including but not limited to extended loss of liberty, emotional trauma that persists to

the present day, physical injuries, and loss of a normal life. Plaintiff was denied the opportunity

to live a normal young adulthood, grow up around family and friends, and attend college.

Plaintiff was denied the opportunity to develop an interest in and pursue a career. He

was denied the opportunity to develop professional skills as a free person. Defendants'

misconduct also deprived him of the opportunity to pursue further education. Defendants'
misconduct prevented Plaintiff from pursuing romantic relationships, getting married, and
having a family during his twenties, thirties, and most of his forties.

More specifically, as a result of Plaintiff's wrongful conviction, he was incarcerated in a
for 29 years, the majority of the time in maximum-security prisons. Plaintiff's time in prison was
defined by suffering and harsh conditions. For nearly three decades Plaintiff was threatened and
attacked by guards and inmates, experienced physical injuries, and lived in constant fear of his
life throughout his incarceration. Plaintiff also became extremely depressed and suffered anxiety
as a result of his experiences in prison.

Because of his wrongful incarceration, Plaintiff was unable to spend time with members
of his family. During his time in prison, Plaintiff missed the funerals of his family members and
friends, including his father, grandmother, step-brother cousin, and best friend. The deprivation
of Plaintiff's liberty was made more traumatic by Plaintiff's knowledge that he was innocent, and
that he might die in prison an innocent man.

Plaintiff also continues to experience depression and anxiety. In addition, he now has
difficulty building and maintaining relationships with people.

Plaintiff is fearful of police officers.

Plaintiff further states that the stress and trauma of his wrongful imprisonment has had,
and will continue to have, emotional and physical manifestations well into the future. Plaintiff
has not been treated for all his injuries. Plaintiff's investigation into this matter continues and he
reserves the right to supplement or modify this answer as new information comes to light.

6. Have you suffered any personal injury, including but not limited to prolonged, serious
and/or chronic physical and/or mental illness before, during, or after the May 29th shootings? If

so, state: (1) when and how you were injured and/or became ill, (2) where you were injured and/or became ill, (3) describe the injuries, and/or illness suffered, and (4) state the name and address of each physician, or other health care professional, hospital and/or clinic rendering treatment to you for each injury and/or chronic illness. In addition, please state, what steps, if any, you took to heal, treat or care for the injury or illness.

      **RESPONSE**: Plaintiff objects to this interrogatory on the ground that it is overbroad with respect to time frame and subject matter and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff also objects to the extent that this interrogatory seeks: (1) medical or psychiatric diagnoses and opinions that he is not qualified to offer, (2) information protected from disclosure by the work product doctrine, or (3) information protected by therapist-client privilege. Plaintiff further objects to this interrogatory to the extent that it prematurely seeks expert discovery; Plaintiff will disclose non-privileged expert opinions as required by Rule 26 and on the schedule set by the Court. Subject to and without waiving these objections, Plaintiff states that prior to Defendants' framing of him when he was 17 years old, he had no chronic injuries or illnesses. Since Defendants' misdeeds he has suffered tremendously, as described more fully above in Response No. 5.

      7. Please identify any and all employment you have held prior to your arrest in 1990 and after your release from incarceration. For each employer, please state the full name and address of each employer, the dates of commencement and termination, why you left that employment, a brief description of the services or work performed, the average weekly wages or earnings, and the annual income as reported to the IRS for those calendar years.

      **RESPONSE**: Plaintiff objects to this Interrogatory as overbroad, and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff objects further to the extent

that this interrogatory is vague, ambiguous, and unduly burdensome. Plaintiff also objects to this interrogatory on the basis that it calls for narrative and is better posed during deposition. Plaintiff further objects to this interrogatory because it seeks irrelevant information; Plaintiff is not seeking compensation for lost wages as a category of his damages. Subject to these and the general objections, and without waiving Plaintiff's objections to this interrogatory and to Defendants' definitions and instructions Plaintiff states as follows: prior to his arrest in June 1990 he performed odd jobs in his father's furniture shop. Since his release from prison, Plaintiff worked for Acclivus as a Community Navigator from April 2020-May 2021. He is currently a Re-entry Case Manager for Precious Blood Ministries (May 2021-present). In both roles, he has assisted formerly incarcerated individuals access community resources and acted as a mentor to formerly incarcerated individuals.

8. State with specificity every piece of evidence that was fabricated and used against you in your criminal case. For each piece of evidence identified please state which individual defendant fabricated the evidence and how the evidence was fabricated. If you refer to documentsor other records in response to this interrogatory, provide specific page numbering for thedocuments or other records you refer to.

**RESPONSE:** Plaintiff objects to this interrogatory as it is being propounded at the outset of discovery, before Plaintiff has had an opportunity to depose Defendants and many of the relevant witnesses. Plaintiff further objects because much of the information relevant to this inquiry is principally in the possession, custody, or control of the Defendants. Plaintiff also objects to any used in these interrogatories that are vague and ambiguous and to the extent the call for a legal conclusion or otherwise are defined in a manner that is unsupported by the law and is irrelevant to the legal claims in this case. Plaintiff objects further to the extent that this

11

interrogatory seeks information protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other statutory or common-law privilege.

Plaintiff also objects to this interrogatory on the basis that it is premature as discovery in this matter is just getting underway. Indeed, this interrogatory is akin to a contention interrogatory, which is inappropriate at this stage of the litigation. Parties are typically not required to provide complete answers to contention interrogatories until the end of discovery, though courts may at times require answers before then. *See, e.g., In re Northfield Labs. Inc. Sec. Litig.*, 264 F.R.D. 407, 412 (N.D. Ill. 2009) ("Though the general policy is to defer contention interrogatories until discovery is near an end, courts have discretion to allow use of such interrogatories before discovery is complete."). Moreover, as with any interrogatory, parties may supplement their answers to contention interrogatories as they learn additional responsive information during discovery. *E.g., Am. Needle, Inc. v. New Orleans*, No. 04 C 7806, 2012 WL 4327395, at *2 (N.D. Ill. Aug. 17, 2012) (requiring party to answer contention interrogatories because fact discovery was nearly closed, but limiting questions to "material" facts rather than "all" relevant facts, and explaining that responding party should supplement response if additional discovery provided additional responsive information).

Subject to these and the general objections, and without waiving Plaintiff's objections to this interrogatory and to Defendants' definitions and instructions, Plaintiff directs Defendants to his objections and response to Request No. 4 above, which he expressly references and incorporates herein.

9. State the factual basis for your allegation in paragraph 54 of the Complaint that Defendant Officers later coerced Deneen Coats into falsely identifying Weston as the person who shot her and Nesbit on 55th Street on May 29, 1990.

**RESPONSE:** Plaintiff objects to this interrogatory as it is being propounded at the outset of discovery, before Plaintiff has had an opportunity to depose Defendants and many of the relevant witnesses. Plaintiff further objects because much of the information relevant to this inquiry is principally in the possession, custody, or control of the Defendants. Plaintiff also objects to any terms used in these interrogatories that are vague and ambiguous and to the extent the call for a legal conclusion or otherwise are defined in a manner that is unsupported by the law and is irrelevant to the legal claims in this case. Plaintiff objects further to the extent that this interrogatory seeks information protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other statutory or common-law privilege.

Plaintiff also objects to this interrogatory on the basis that it is premature as discovery in this matter is just getting underway and no person has yet been deposed. Indeed, this interrogatory is akin to a contention interrogatory, which is inappropriate at this stage of the litigation. Parties are typically not required to provide complete answers to contention interrogatories until the end of discovery, though courts may at times require answers before then. *See, e.g., In re Northfield Labs. Inc. Sec. Litig.*, 264 F.R.D. 407, 412 (N.D. Ill. 2009) ("Though the general policy is to defer contention interrogatories until discovery is near an end, courts have discretion to allow use of such interrogatories before discovery is complete."). Moreover, as with any interrogatory, parties may supplement their answers to contention interrogatories as they learn additional responsive information during discovery. *E.g., Am. Needle, Inc. v. New Orleans*, No. 04 C 7806, 2012 WL 4327395, at *2 (N.D. Ill. Aug. 17, 2012) (requiring party to answer contention interrogatories because fact discovery was nearly closed, but limiting questions to "material" facts rather than "all" relevant facts, and explaining that responding party should supplement response if additional discovery provided additional

responsive information).

Subject to and without waiving these and the general objections, Plaintiff directs Defendants to his objections and response to Request No. 4 above, which he expressly references and incorporates herein.

10. Identify the individual defendant(s) you claim gave false statements to state prosecutors as alleged in paragraph 60 of your complaint, the date of the false statements, the substance of the false statements, and which individual defendant(s) gave each such alleged statement.

**RESPONSE**: Plaintiff objects to this interrogatory as it is being propounded at the outset of discovery, before Plaintiff has had an opportunity to depose Defendants and many of the relevant witnesses. Plaintiff further objects because much of the information relevant to this inquiry is principally in the possession, custody, or control of the Defendants. Plaintiff also objects to any used in these interrogatories that are vague and ambiguous and to the extent the call for a legal conclusion or otherwise are defined in a manner that is unsupported by the law and is irrelevant to the legal claims in this case. Plaintiff objects further to the extent that this interrogatory seeks information protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other statutory or common-law privilege.

Plaintiff also objects to this interrogatory on the basis that it is premature as discovery in this matter is just getting underway. Indeed, this interrogatory is akin to a contention interrogatory, which is inappropriate at this stage of the litigation. Parties are typically not required to provide complete answers to contention interrogatories until the end of discovery, though courts may at times require answers before then. *See, e.g., In re Northfield Labs. Inc. Sec. Litig.*, 264 F.R.D. 407, 412 (N.D. Ill. 2009) ("Though the general policy is to defer

14

contention interrogatories until discovery is near an end, courts have discretion to allow use of such interrogatories before discovery is complete."). Moreover, as with any interrogatory, parties may supplement their answers to contention interrogatories as they learn additional responsive information during discovery. *E.g., Am. Needle, Inc. v. New Orleans*, No. 04 C 7806, 2012 WL 4327395, at *2 (N.D. Ill. Aug. 17, 2012) (requiring party to answer contention interrogatories because fact discovery was nearly closed, but limiting questions to "material" facts rather than "all" relevant facts, and explaining that responding party should supplement response if additional discovery provided additional responsive information).

Subject to these and the general objections, and without waiving Plaintiff's objections to this interrogatory and to Defendants' definitions and instructions, Plaintiff directs Defendants to his objections and response to Request No. 4 above, which he expressly references and incorporates herein.

11. Are you claiming any psychiatric, psychological and/or emotional injuries as a result of your arrest and conviction for the May 29th shootings? If so, please state:

    a. The name of any psychiatric, psychological, and/or emotional injury claimed, the name and address of each psychiatrist, physician, psychologist, therapist, or other health care professional rendering you treatment for each injury;

    b. Whether you had suffered any psychiatric, psychological and/or any emotional injury prior to the date of the Occurrence; and

    c. If the answer to (b) is yes, please state:

        i. The dates of any psychiatric, psychological, and/or emotional injury, and ifthe injury persists today;

        ii. Describe the nature of any psychiatric, psychological, and/or emotionalinjury; and

        iii. The name and address of each psychiatrist, physician, psychologist, therapist, or other health care professional rendering your treatment for each injury.

**RESPONSE**: Plaintiff objects to this interrogatory on the ground that it is overbroad with

respect to time frame and subject matter and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff also objects to the extent that this interrogatory calls for medical or psychiatric diagnoses and opinions that he is not qualified to offer or information protected from disclosure by the work product, doctor-patient and therapist-client privileges. Plaintiff objects to this interrogatory to the extent that it prematurely seeks expert discovery; Plaintiff will disclose non-privileged expert opinions as required by Rule 26 and on the schedule set by the Court. Plaintiff further objects that this interrogatory is compound and includes multiple questions and subparts that are properly set forth in multiple interrogatories.

Subject to and without waiving said objections, Plaintiff incorporates his response to interrogatory No. 5 above. He further states that he has seen therapists Bobbie Logan and Nate Gilham of the Chicago Torture Justice Center for treatment.

12. Please identify any and all statements you (or anyone acting on your behalf) have made about the events giving rise to your Complaint. Please include the following:

      d.   The identity of the individual making such statement;

      e.   The date of such statement;

      f.   The purpose of such statement;

      g.   Location where the statement was made;

      h.   Any individuals present when the statement was made;

      i.   The type of statement;

      j.   If a transcript/recording/copy of the statement exists and the location of such transcript/recording/copy, including if said document is in your possession, custody, or control. If you refer to documents or other records in response to this interrogatory, provide specific page numbering for the documents or other records you refer to.

**RESPONSE**: Plaintiff objects to this interrogatory as vague, ambiguous, overly broad, and unduly burdensome, in that it seeks information regarding anyone who "any and all statements you (or anyone acting on your behalf) have made about the events giving rise to your

Complaint" without any time or scope limitation whatsoever. Plaintiff objects further that this interrogatory is being propounded before Plaintiff has had an opportunity to depose the Defendants and other relevant witnesses and calls for information that is equally accessible to Defendants. Plaintiff also objects to the extent this interrogatory calls for any information protected by attorney-client or work-product privilege. Plaintiff objects that this interrogatory is compound and includes multiple questions and subparts that are properly set forth in multiple interrogatories. Plaintiff objects to the extent that this interrogatory seeks information that is publicly available or information equally available to Defendants as Plaintiff. Plaintiff further objects to the extent this interrogatory seeks information protected by the doctor-patient or patient-psychotherapist privileges

Subject to these and the general objections, and without waiving Plaintiff's objections to this interrogatory and to Defendants' definitions and instructions, Plaintiff answers that it would be impossible for him to identify each and every time over the past 32 years that he or anyone speaking on his behalf has made statements regarding the events giving rise to his complaint, which began when Defendants first wrongfully accused him of murder and attempted murder and which continues to this day. Answering further, Plaintiff directs Defendants to the documents and things that have been or will be produced in this case, which include affidavits, statements, and court documents regarding the facts that gave rise to Plaintiff's complaint. Plaintiff's investigation into this matter continues and he reserves the right to supplement or modify this answer as new information comes to light.

13. Identify all crimes you have been convicted of. For each crime, please include the date and location of the arrest; (b) criminal offenses you were charged with; (c) criminal offenses you were found guilty of; (d) whether the finding of guilt was by plea or trial; (e) date of

conviction; (f) the sentence received; and (g) the dates for which you served time in custody, if any, for the conviction.

    **RESPONSE**: Plaintiff objects to this interrogatory on the ground that it seeks irrelevant and inadmissible evidence. Subject to and without waiving this objection, Plaintiff states that other than the wrongful convictions described in his complaint, he was convicted of aggravated battery on a peace officer in 1994. He pled guilty and was sentenced to four years.

    14. Identify all of the times you have been arrested (including juvenile arrests and detentions) For each arrest, please state the (a) date and location of the arrest; (b) the law enforcement agency that arrested you; (c) the offenses, if any you were charged with; (d) the courtfile number (i.e., docket number); and (e) the disposition of the case.

    **RESPONSE**: Plaintiff objects to this interrogatory on the ground that it seeks irrelevant and wholly inadmissible evidence. Subject to and without waiving that objection and Plaintiff's general objections, above, Plaintiff states that, as a result of Defendants' misconduct, he was arrested for murder and attempted murder in June 1990. He was also arrested in April 1990 for alleged possession of narcotics in Chicago. He was also arrested in 1994 as described in Response No. 13 above.

    15. Please identify every individual and entity that worked on your case and on your behalf from the time of your arrest for the May 29th shootings through the present. This interrogatory includes, but is not limited to, any individuals and/or entities that worked on your case or provided you with legal advice or assistance from the time of your arrest, before and duringyour trial, on direct appeal, during the preparation and submission of any post-conviction petitionsand associated investigations, and on your habeas corpus petition, its related appeal, and any socialservice individuals or entities. For each such individual and/or entity, please include a

current address, phone number, and contact person.

**RESPONSE**: Plaintiff objects to the terms "worked on your case" and "on your behalf" as vague and overly broad. Plaintiff objects to providing the names or entities that may have provided "social services" as such information is irrelevant and disproportionate to the needs of the case. Subject to and without waiving these objections, Plaintiff answers at this time he can recall the following individuals: Francis Baumgart, Paul Katz, the Office of the State Appellate Defender, Andrea Monsees, Patrick Pursley (a jailhouse lawyer), Susan Swanson, Jane Raley, McGuire Woods (Luis Pineda & Erin McCalister), Morgan Lewis (Scott Schutte, Rita Srivastava, Katie Garvey, Shannon Callahan, Sarah Wasson (paralegal), Latiera Rayford), Matt (last name unknown). Additional individuals at the firms listed above may have worked on his case without Plaintiff's knowledge or recollection.

16. Please identify any and all penal institutions you were incarcerated in relating to this case. With respect to each penal institution, please identify (a) the dates in which you entered and exited; and (b) the names of your cellmates at each penal institution.

**RESPONSE**: Plaintiff objects that this interrogatory calls for irrelevant information (the names of cellmates at each institution) and seeks information which is equally available to Defendants. Subject to and without waiving these objections, Plaintiff states that to the best of his recollection he was imprisoned in the following IDOC facilities:

- Joliet Receiving in 1992 for a few weeks
- Pontiac 1992-January 1996
- Stateville January 1996-May 2011
- Galesburg May 2011-2013
- Stateville 2013-2016
- Western Illinois 2016-2018
- Danville 2018-2019

- Dixon 2019

17. For any Document requested in Defendant Officers' Requests for Production which have been lost, discarded or destroyed, please identify each such document as completely as possible and state the approximate date it was lost, discarded or destroyed; the circumstances andmanner in which it was lost, discarded or destroyed, including the identities of all persons involved; the reasons for losing, discarding, or destroying the Document; the identity of any persons with knowledge of its content; and the identity of the last person known to have seen it. In answering this Interrogatory, please list all steps taken to discover documents that have been lost, discarded or destroyed, and the names of the individuals who took those steps.

**RESPONSE**: Plaintiff objects to this request because it seeks information which is equally available to Defendants. Subject to and without waiving this objection, Plaintiff states that during post-conviction proceedings, the court determined that certain documents and evidence in his case had been lost or destroyed by the State's Attorney's Office. Plaintiff directs Defendant Breska to documents that have been produced regarding that issue. Investigation continues.

18. Identify all material exculpatory evidence that you claim was withheld from you prior to your criminal trial, during any post-conviction proceedings or appeal. For each individualdocument or piece of information, please identify the following information:

    k.   The author(s) of the document;

    l.   The basis for your belief that the document is exculpatory or impeaching;

    m.  The first date you became aware of the existence of the document;

    n.   From whom you learned of the document's existence;

    o.   From where (entity and/or organization) and/or from whom (individual)was the document produced, disclosed, or first learned of by Plaintiff; and

20

      p. Which individual defendant(s) you claim wrongfully withheld the specific document.

**RESPONSE**: Please see Plaintiff's objections and response to Interrogatory No. 4 which he incorporates as though fully restated here.

19. Identify each and every fact upon which you will rely at trial to support yourcontention that all of the Defendant Officers identified in your Complaint reached an agreement to frame you, Desmond Weston, for Joseph Watson's murder and for the attempted murders of Timothy Jones, Deneen Coats, and Ronald Nisbit and the basis for each purported fact. At a minimum your response should include: (a) where the alleged agreement was reached; (b) when the agreement allegedly was reached; (c) what specifically was said and by whom; (d) the individuals present for the alleged agreement; and (e) the purpose of the alleged agreement.

**RESPONSE**: Plaintiff objects to identifying "each and every fact upon which he will rely at trial" as overly broad, unduly burdensome, and impossible to comply with, as doing so would require Plaintiff to list all evidence in the case. Plaintiff further objects that this interrogatory seeks information which is equally (if not more) available to Defendants. Subject to and without waiving this objection, Plaintiff directs Defendant Breska to his objections and response to Request No. 4 which he incorporates as though fully restated here. Investigation continues.

20. Is it your contention that you are actually innocent of the crime or crimes for which you were convicted relating to the murder of Joseph Watson and the attempted murder of TimothyJones, Deneen Coats and Ronald Nisbit? If your answer is anything other than an unqualified no, please state with state with specificity each witness, piece of evidence, and fact

upon which you will reply to support this contention at trial.

**RESPONSE:** Plaintiff objects that this Interrogatory is a premature contention interrogatory propounded at the outset of discovery and before Plaintiff has had the opportunity to depose the relevant witnesses or receive discovery responses from Defendants in this case. *See, e.g., In re Northfield Labs. Inc. Sec. Litig.*, 264 F.R.D. 407, 412 (N.D. Ill. 2009) ("Though the general policy is to defer contention interrogatories until discovery is near an end, courts have discretion to allow use of such interrogatories before discovery is complete."). Moreover, as with any interrogatory, parties may supplement their answers to contention interrogatories as they learn additional responsive information during discovery. *E.g., Am. Needle, Inc. v. New Orleans*, No. 04 C 7806, 2012 WL 4327395, at *2 (N.D. Ill. Aug. 17, 2012) (requiring party to answer contention interrogatories because fact discovery was nearly closed, but limiting questions to "material" facts rather than "all" relevant facts, and explaining that responding party should supplement response if additional discovery provided additional responsive information). Plaintiff further objects that this interrogatory is overly broad and unduly burdensome in that it requests that he "state with specificity each and every witness, piece of evidence, and fact upon which [he] will rely." Responding "with specificity" would require Plaintiff to identify nearly all evidence in the case. Plaintiff further objects to identifying as evidence materials that are equally available to Defendants, such as documents that have been produced to all parties. Subject to and without waiving these objections, Plaintiff responds yes, he is actually innocent of the crimes of which he was convicted. Answering further, Plaintiff refers Defendant Breska to his objections and response to Interrogatory No. 4 which he incorporates as though fully restated here.

21. Please state with specificity all damages you are seeking against the Individual

Defendants and the factual basis for your claim of damages.

**RESPONSE**: Please see Plaintiff's objections and response to Interrogatory No. 5 which he incorporates as though fully restated here.

22. Have you ever been a member of a street gang? If so, please provide the following information:

    q.  Which gang did you and/ or belong to?

    r.  When did you join?

    s.  List all of the ranks that you held and when you held each such rank?

**RESPONSE:** Plaintiff objects to this interrogatory as vague and overbroad. Plaintiff further objects that this interrogatory is compound and consists of multiple subparts. Plaintiff further objects that this interrogatory requests irrelevant information. Subject to and without waiving these objections, Plaintiff states that he was a member of the Gangster Disciples from 1992-1996 while he was imprisoned. He never held any rank.

Respectfully submitted,

/s/ Theresa Kleinhaus
*One of Plaintiff's Attorneys*

Jon Loevy
Theresa Kleinhaus
Danielle Hamilton
Mariah Garcia
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
tess@loevy.com

## <u>CERTIFICATE OF SERVICE</u>

I, Theresa Kleinhaus, an attorney, certify that March 3, 2022, I served the foregoing document upon all counsel of record via electronic mail.

/s/ Theresa Kleinhaus ____
*One of Plaintiff's Attorneys*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

DEMOND WESTON,

*Plaintiff,*

v.

CITY OF CHICAGO, ESTATE OF MICHAEL
KILL, ANTHONY MASLANKA, WILLIAM
MOSER, JOHN PALADINO, DAN
MCWEENY, ANDREW CHRISTOPHERSEN,
JEROME RUSNAK, VICTOR BRESKA, and
UNKNOWN EMPLOYEES OF THE CITY OF
CHICAGO,

*Defendants.*

Case No. 20-cv-6189

Hon. Jorge L. Alonso

Hon. Susan E. Cox

## **VERIFICATION**

I, Demond Weston, verify under penalty of perjury that I have reviewed the attached
Responses to Defendant Breska's First Set of Interrogatories, and I certify that the answers
are true and correct to the best of my knowledge, information, and memory.

Date: 2/23/22

Demond McIntosh
Demond Weston

# Exhibit 6

```
 1  STATE OF ILLINOIS   )
                         )  SS.
 2  COUNTY OF COOK       )

 3        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
               COUNTY DEPARTMENT - CRIMINAL DIVISION
 4
    THE PEOPLE OF THE STATE OF    )
 5  ILLINOIS,                     )
                                  )
 6                    Plaintiff,  )
                                  )
 7              vs.               ) No. 1991-CR-00640-01
                                  )
 8  DEMOND WESTON,                )
                                  )
 9                    Defendant.  )

10           REPORT OF PROCEEDINGS had of the

11  above-entitled cause, before the HONORABLE ANGELA

12  M. PETRONE, one of the judges of said court, on the

13  18th day of December, A.D., 2019.

14  APPEARANCES:

15        HON. KIMBERLY M. FOXX,
          State's Attorney of Cook County, by:
16        MR. ROBERT MILAN,
          MR. MARTIN DOYLE,
17        Assistant State's Attorney,
          appeared on behalf of the People;
18

19        MR. SCOTT SCHUTTE,
          MS. KATHLEEN GARVEY,
20        MS. RITA SIRVASTAVA,
          Attorneys at law,
21        appeared on behalf of the Defendant.

22
    MELISSA K. NAGY
23  Official Court Reporter
    Criminal Division
24  CSR: #084-004845
```

1

IND DEF362727

1     THE COURT: Demond Weston.  While, we are waiting

2  for Mr. Weston, could everybody please identify

3  themselves for the record.

4     MS. GARVEY:  Kathleen Garvey on behalf of

5  Petitioner Weston.

6     MS. SIRVASTAVA:  Rita Sirvastava,

7  S-I-R-V-A-S-T-A-V-A, on behalf of Petitioner Demond

8  Weston.

9     MR. SCHUTTE:  Good afternoon, your Honor.  Scott

10  Schutte on behalf of Petitioner Demond Weston.

11     THE COURT:  How do you spell your last name,

12  please?

13     MR. SCHUTTE:  Sure.  S-C-H-U, T as in Tom, T as

14  in Tom, E, your Honor.

15     THE COURT:  You can all have a seat, please.

16        And for the prosecution, please.

17     MR. MILAN:  Robert Milan and Martin Doyle,

18  M-I-L-A-N, D-O-Y-L-E on behalf of the Office of the

19  Special State's Attorney.

20     THE COURT:  All right.  And we're just waiting for

21  Mr. Weston.

22        Okay.  What is your name, please.

23     THE DEFENDANT:  Demond Weston.

24     THE COURT:  Mr. Weston, have a seat with your

2

1    attorney, please.  This is in the matter of the two

2    case numbers 90-CR-1637602 and 91-CR-00640.  These

3    matters are before this court relating to events that

4    that occurred on May 29th, 1990.  I will very briefly

5    recount the procedural history that has brought us to

6    this point.

7              Petitioner Demond Weston was convicted by a

8    jury and sentenced on May 18th, 1992 to 45 years in the

9    Illinois Department of Corrections for the first degree

10   murder of Joseph Watson, a consecutive 30 years for the

11   attempt first degree murder of a Deneen Coats, a

12   concurrent 30 years for the attempt first degree murder

13   of Timothy Jones, and a concurrent 30 years for the

14   attempt first degree murder of Ronald Nesbit.

15             On March 31st, 1995 convictions and sentences

16   were affirmed on direct appeal.  On June 1st, 1995,

17   petition for leave to appeal to the Illinois Supreme

18   Court was denied.  On February 20th, 1998, Petitioner

19   filed a pro se petition for post conviction relief

20   repeating arguments he had made on direct appeal and

21   adding that he was subject to brutality and coercion by

22   detectives.  And a witness who implicated Petitioner

23   did so after himself being subjected to brutality and

24   coercion by the police.

3

IND DEF362729

1        On March 3rd, 1998 the pro se petition for

2   post conviction relief was denied as frivolous patently

3   without merit.

4        On October 13th, 1998 Petitioner was sent a

5   letter from the Office of the Cook County Public

6   Defender informing him they had filed the petition for

7   leave to withdraw believing his appeal had no issues of

8   arguable merit.  On December 3rd, 1998 the appellate

9   court affirmed the judgment of the trial court and

10  allowed the motion of the public defender to withdraw.

11       On March 31st, 1999 petition for leave to

12  appeal to the Illinois Supreme Court was denied.  On

13  August 4th, 1999 petitioner filed a pro se federal

14  petition for writ of habeas corpus alleging that he

15  gave a confession after being abused and coerced by

16  police and that the trial and appellate court abused

17  their discretion where his pro se post conviction

18  petition was dismissed.

19       On June 30th, 2002, the United States

20  District Court for the northern District of Illinois

21  dismissed the habeas corpus petition.  On June 13th,

22  2002 the appellate court granted the State Appellate

23  Defender's motion to withdraw.

24       On January 21st, 2014 attorneys for

4

1  Petitioner asked leave to file a successive petition

2  for post conviction relief alleging that Petitioner had

3  been abused by police and coerced into making a false

4  confession.  Petitioner added that as many as eight

5  officers tortured him and he alleged complicit behavior

6  by an assistant state's attorney and a court reporter

7  in the taking of a court recorded statement from him

8  and that he had not previously disclosed all the

9  torture on the advice of his trial counsel.  There has

10  since been 17 bankers boxes of filings which this court

11  has read.

12          On September 3rd, 2014, after reading the

13  entirety of petitioner's filings including all

14  transcripts of pretrial motions and trial and extensive

15  report of other investigations, this court provided a

16  specific typed list of missing material and pages from

17  Petitioner's filings including missing trial testimony

18  of the petitioner, civil witnesses, one of the

19  surviving victims, a police employee, and detective

20  including a detective being accused of torture.  The

21  missing transcripts also included parts of testimony

22  from a motion to quash arrest including part of the

23  testimony from another detective and the Court's ruling

24  on that motion.

5

1         On October 1st, 2014 Petitioner provided this

2  court with a binder of materials which contained some

3  but not all of the missing materials which to date has

4  still not been received by this court.

5         On November 7th, 2014 Petitioner's attorneys

6  hand delivered a letter to this court accusing the Cook

7  County State's Attorneys Office of failure to disclose

8  exculpatory evidence which would have supported his

9  claim that this confession was physically coerced and

10  that other statements implicating him also were false

11  and the product of police abuse.

12         Another issue was pending for well over one

13  year about trying to locate evidence which had been

14  impounded in the office of the clerk of the Circuit

15  Court of Cook County and allegedly released to a

16  non-specific person.

17         On May 11th, 2015 Petitioner's attorneys

18  asked for leave to file an amended petition for post

19  conviction relief.  Extensive arguments were made and

20  this court granted leave to file an amended petition on

21  January 7th, 2016.

22         On January 12th, 2016 Petitioner's attorneys

23  made a motion to reassign this case from the Cook

24  County State's Attorney's Office to a special

6

1   prosecutor.  That motion was granted by the presiding

2   judge on February 29th, 2016.  Counsel for Petitioner

3   objected to Robert Milan being the special prosecutor.

4   A different special prosecutor was appointed who began

5   reviewing anew the filings and reinvestigating

6   Petitioner's claims.  This court signed orders to

7   subpoena records of officers and to take depositions.

8           On December 15th, 2016 this court advanced

9   petitioner's claims of abuse and torture to a third

10  stage evidentiary hearing.  Since then, the parties

11  have requested continuances to prepare for the hearing.

12  This court set a week's time aside for that hearing.

13          On September 9th, 2019, the special

14  prosecutor appeared in this court with one of the

15  petitioner's attorneys and informed this court that the

16  petitioner's attorneys had appeared in another court

17  and withdrawn their previous objection to Robert Milan

18  being the special prosecutor, the petitioner's

19  attorneys would not be ready to participate in an

20  evidentiary hearing, and Robert Milan had been

21  reappointed to re-investigate the petitioner's claims.

22          That brings us to today.  We have pending

23  claims of torture by police, alleged complicit behavior

24  by an assistant state's attorney and a court reporter,

7

IND DEF362733

1   and an alleged Brady Violation by the Cook County

2   State's Attorney's Office and a claim of actual

3   innocence.  And I believe those are all pending as we

4   speak.

5          Mr. Milan.  And I've summarized years, but I

6   wanted to do it the safe way because we'd be here for

7   hours.

8      MR. MILAN:  Your Honor, we agree with your summary

9   that you just laid out.

10         As you noted, I was appointed -- I was

11  recused for a number of years, and then I was appointed

12  on this case in September of this year.  Requests by

13  the defense made of me and my colleague Mr. Doyle were

14  to conduct a reinvestigation of the entire case to look

15  at whether the evidence against Mr. Demond Weston, the

16  evidence was there beyond a reasonable doubt and

17  whether the allegations -- there is any substance to

18  the allegations of abuse against Mr. Weston.

19         In light of that, the Office of the Special

20  State's Attorney has completed a three and a half month

21  investigation regarding the Demond Weston cases.  The

22  investigation covered five separate shootings and

23  included reviewing thousands of pages of police reports

24  and Grand Jury transcripts, motion transcripts, trial

8

1  transcripts, evidence reports, and medical reports.

2  The investigation also included interviewing more than

3  two dozen witnesses in numerous visits to the various

4  crimes scenes.  The Office of the Special State's

5  Attorney has reached the following conclusions:

6        First, Mr. Weston's allegations of abuse are

7  unsubstantiated.  Second, the evidence against Demond

8  Weston regarding all pending charges related to the

9  May 29th, 1990 shooting does not meet the burden of

10  beyond a reasonable doubt.

11        Therefore, with the Court's permission the

12  State is dismissing all pending charges against Demond

13  Weston relating to the May 29th, 1990 shootings of

14  Joseph Watson, Timothy Jones, Deneen Coats and Ronald

15  Nesbit.

16  THE COURT:  Thank you.  All right.  The Court will

17  enter the following order.  And before I enter the

18  order, I will say that having spent years reviewing the

19  evidence I have seen no credible evidence presented to

20  support the petitioner's claims of any complicit

21  behavior by an assistant state's attorney or court

22  reporter with police in the torture of petitioner or a

23  Brady Violation by members of the Cook County State's

24  Attorney's Office.  The Office of the Special

IND DEF362735

1   Prosecutor having been appointed to investigate claims

2   made by Demond Weston has nolle pros'd all charges

3   against Petitioner in case numbers 90-CR-1637602 and

4   91-CR-0064001.

5           Therefore, based on the above the conviction

6   in each case is hereby vacated and Defendant is ordered

7   released from custody in each case.  Mr. Weston, please

8   go back with the deputy to be processed.

9       MR. MILAN:  Judge, one moment.  As part of the

10  dismissal, we have an order in place we would ask your

11  Honor to sign for two purposes; one, is there an

12  agreement where we will not be seeking a certificate of

13  innocence in this case and the second reason is we have

14  to take it over to the Illinois Department of

15  Corrections.  There has to be a member of the Office of

16  Special State's Attorney to do that along with defense

17  counsel in order to get Mr. Weston's release.  So with

18  your permission -- Do you have those orders ready?

19      MR. GARVEY:  Yes.

20      THE COURT:  All right.  I have retyped the

21  phraseology of the orders and I will sign my own

22  orders.

23      MR. MILAN:  Thank you very much.

24      THE COURT:  Please take Mr. Weston.

10

1      MR. SCHUTTE:  Your Honor, if I may, one other

2 housekeeping issue.  We haven't discussed this ahead of

3 time, but I believe that this order now moots the post

4 conviction petition, so --

5      THE COURT:  I agree with you.

6      MR. SCHUTTE:  So I don't know what needs to be

7 entered to resolve that, but I believe --

8      THE COURT:  I believe my order will cover that.

9      MR. SCHUTTE:  All right.  Thank you, your Honor.

10      THE COURT:  Please take Mr. Weston.

11             (Which were all the proceedings had

12              in the above-entitled matter.)

13

14

15

16

17

18

19

20

21

22

23

24

IND DEF362737

1    STATE OF ILLINOIS      )
                            )   SS.
2    COUNTY OF COOK         )

3

4            I, MELISSA K. NAGY, an Official Court

5    Reporter within and for the Circuit Court of Cook

6    County, Criminal Division, do hereby certify that I

7    have reported in shorthand in the report of

8    proceedings had in the above-entitled cause; that I

9    thereafter caused the foregoing to be transcribed

10   into typewriting, which I hereby certify is a true

11   and accurate transcript of the proceedings had

12   before the Honorable ANGELA M. PETRONE, Judge of

13   said court.

14

15

16

                              _____
17                            MELISSA K. NAGY
                              Official Shorthand Reporter
18                            Circuit Court of Cook County
                              County Department - Criminal
19                            Division
                              Certification No. 084-004845
20

21

22

23   Dated this 17th day of

24   April, 2023.

IND DEF362738

# Exhibit 7

**SUPPLEMENTARY REPORT**
CHICAGO POLICE – FOR USE BY B.I.S. PERSONNEL ONLY

4. DATE OF ORIG. OCCURRENCE  TIME — DAY 29 MO. May YR. 90  2228

1. OFFENSE/CLASSIFICATION LAST PREVIOUS REPORT: HOMICIDE/MURDER 1st Degree
I-UCR OFF. CODE: 0110
2. ADDRESS OF ORIG. INCIDENT/OFFENSE: 1904 W. 57th St.
3. BEAT OF OCCUR.: 714

5. VICTIM'S NAME AS SHOWN ON CASE REPORT: WATSON, Joseph, W.
7. BEAT ASSIGNED: 5312

6. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED: Street
LOCATION CODE: 304
9. NO. OF VICTIMS: 2
10. NO. OF OFFENDERS: 4

**PERMANENT RETENTION FILE**

50. OFFENSE/CLASS, THIS DATE: D. N. A.  D.N.A.
52. METHOD ASSIGNED: FIELD  UNIT NO.: 632

95. NARRATIVE

VICTIM: WATSON, Joseph, W., M/B/20 yrs., DOB- 13 Oct 70, LKA- 6211 S. Wolcott, Tx- 264-5639; Wearing: black leather waist-length jacket, blue jean pants, white socks, white short sleeve undershirt, pair of grey "Converse" gym shoes.

ADDITIONAL VICTIM: JONES, Timothy, M/B/14 yrs., DOB- 16 Apr 76 of 5653 S. Wolcott, Tx- 434-5914; 7th grade student at Henderson grammer school.

WANTED: Four (4) Unk./M/B's/18-19 yrs., N.F.D.,

INJURIES: WATSON: Single G.S.W. entered left side of chest 4" below left

90. EXTRA COPIES REQUIRED: Normal
91. DATE THIS REPORT: 29 May, 90
92. SUPERVISOR APPROVING (PRINT NAME): Sgt Bonk  Star No. 7108

93. REPORTING OFFICER (PRINT NAME): Det. Tony MASLANKA #16161
94. REPORTING OFFICER (PRINT NAME): Det. John PALADINO #8938
96. DATE APPROVED: 30 MAY 90  1800

DETECTIVE DIVISION
AREA THREE VIOLENT CRIMES UNIT             - - - PAGE #2 - - -              29 May 90

Homicide/Murder 1st Degree                                          RD# N-242748
VICTIM: WATSON, Joseph                                              29 May 90

INJURIES (Cont.):          nipple; lodged under skin right ribs.

                           JONES: G.S.W. left thigh (T & T); G.S.W. left calf (T & T);
                           G.S.W. right calf (embedded).

TAKEN TO:                  WATSON: Cook County Hospital by C.f.D. Ambulance#1; Pronounced
                           D.O.A. by Dr. ERNST at 2314 hrs.; M.E. TURNER.
                           M.E. Case# 546 of May 90.

                           JONES: U. of Chicago Wyler Childrens Hospital by C.f.D. Ambulance
                           #14; Treated by Dr. QUINLAN.

WEAPON:                    .9mm handgun (not recovered).

LOCATION:                  WATSON: Found lying on right side of body, head to West feet to East,
                           in the curb/gutter at 1904 W. 57th St..

                           JONES: On sewer cover located at NorthWest corner of 57th And Wolcott
                           1900 W. 57th St..

DATE & TIME:               Both victims shot, Jones first, WATSON second, on 29 may 90 (Tue.);
                           Approx. 2228 hrs..

WEATHER/LIGHTING:          Clear/Cool/Artificial street lighting.

MANNER/MOTIVE:             Both victim's, standing seperately at their respective locations, were
                           shot by unkown teens with a .9mm handgun after which the offenders
                           yelled a gang slogan. Offenders were standing on the SouthEast corner
                           of 57th and Wolcott at time of shooting. Offenders fled in unkown di-
                           rection on foot from scene. Gang related shooting.

IDENTIFIED BY:             WATSON: PHILLIPS, McKinley, M/B/27 yrs., DOB- 9 Jun 62; Employed as a
                           Chicago Police Officer, Star#12708, 2nd watch, at the 012th Dist,
                           100 S. Racine, Tx-744-8396 (Brother of deceased, WATSON).

VEHICLE USED:              Unkown, if any.

EVIDENCE:                  Inv.#773282- Two(2) .9mm "Winchester" luger cartridge cases found on
                           the sidewalk at 5701 S. Wolcott.
                           Three(3) .9mm "Winchester" luger cartridge cases found on
                           curb at the SouthEast corner of 57th and Wolcott.
                           One(1) .9mm "Winchester" luger cartridge case found on the
                           street at the NorthEast corner of 57th and Wolcott.
                           (All casings recovered and inventoried by Bt#9602).

                           Overall photos of the scene at 1904 W. 57th st.

                           Blood sample taken from sewer cover on the parkway at 1900 W. 57th st.

EVIDENCE TECHNICIAN:       Bt#9602: Tech's J. MORAN#7073 and A. KLASER#5529.

PERSONNEL ASSIGNED:        Bt#736- Ptmn. M. HARTFIELD#17990 and L. EDWARDS#15387 (paper).
                           Bt#724- Ptmn. N. HARVEY#6690 and J. BATTAGLIA#13486 (crime scene).
                           Bt#763A- ptmn. J. O'BRIAN#3966, J. FOLEY#8825 and N. PANEK#14027.
                           Bt#5310- Sgt. J. BYRNE#1454.
                           Bt#5312- Det's T. MASLANKA#16161 and J. PALADINO#9938, a/3 V/C.
                           Bt#5319- Det. W. MOSER#5056, A/3 V/C.
INTERVIEWED:               WILLIAMS, Mimi, F/B/20 yrs., DOB- 2 May 70 of 5514 S. Winchester,
                           Tx- 737-5815 (girlfriend of WATSON). WATSON arrived at her house at
                           1900-1930 hrs. and left at 2200-2230 hrs. and stated he was going out
                           to look for his brother. A short time later she heard several gunshots
                           but did not realize that WATSON had been shot.

                           - - - CONTINUED ON PAGE THREE - - -

DETECTIVE DIVISION
AREA THREE VIOLENT CRIMES UNIT          - - - PAGE #3 - - -          29 May 90

Homicide/Murder 1st Degree          **PERMANENT RETENTION FILE**          RD# N-242748
VICTIM: WATSON, Joseph                                                   29 May 90

INTERVIEWED (Cont.):     MAXEY, Charles, M/B/20 yrs., DOB- 27 Feb 70 of 2124 W. 52nd Pl.,
                         1st Fl., Tx- 925-8091; SS#███████████ (Half brother of WATSON).He
                         recieved a telephone call from a female named Helen, Tx-776-5997, who
                         told him that his brother , Joseph, had been shot by some boys. He,
                         along with Samuel BROWN then went to Cook County Hospital.

                         BROWN, Samuel, M/B/19 yrs.; DOB- 19 Jan 71 of 6245 S. Damen, Tx-
                         778-5566; SS#███████████. (friend of MAXEY). Was with MAXEY when
                         MAXEY got the phone call about WATSON and went to Cook County Hospital
                         with MAXEY.

INVESTIGATION:           The reporting, on Bt#5312, were assigned, per COS., to a shooting at
                         1904 W. 57th st.. Upon arrival the reporting met Bt#724, who informed
the reporting that there had been two males shot at that location. One victim, WATSON, was found
lying in a curb at 1904 W. 57th St, shot in his left side, and taken to Cook County Hospital by
CFD ambulance#1, possibly a DOA.. The other victim, JONES, was found lying atop a sewer cover on
the NorthWest corner of 57th and Wolcott, 1900 W. 57th st., on the parkway, shot three times in
both of his legs and subsequently transported to U. of Chicago Wyler Children's Hospital by CFD
ambulance#14. Also present was Bt#763A who informed the reporting that there were two more sim-
ilar shootings, with additional victims in the immidiate area. Those being RD# 242754, an Aggravate
Battery at 5530 S. Justine with two victim's shot and RD# N-242763 at 5759 S. Honore with three
victims shot. At that time Bt's 5310 and 5319 arrived to 1904 W. 57th St.. Bt#5319 then went to
Cook County Hospital where Bt#736 was met and the victim's, WATSON, clothing and wound noted. While
at that Hospital Bt#5319 met and interviewed the victim's half brother, MAXEY, and MAXEY's friend,
BROWN (SEE INTERVIED Catagory, this report).

                         The scene at 1904 W. 57th St. was noted to be a residential neighbor-
                         hood with Henderson Grammer School taking up the entire block of
between 56th and 57th and Wolcott, West side of Wolcott. The reporting attempted to interview var-
ious neighborhood residents at the scene with negative results, no one willing to speak to the
Police. The reporting then canvassed the scene and found blood to be atop the sewer cover where
JONES was found to be lying. Also found were .9mm cartridge casings on the NorthEast corner of
57th and Wolcott and the SouthEast corner of 57th and Wolcott (SEE EVIDENCE Catagory, this report).
During that time Bt#9602, mobile Crime Lab, arrived at the scene and processed same before pro-
ceeding to Cook County Hospital and Wyler's Children's Hospital.

                         The reporting then proceeded to Wyler Children's Hospital where
                         JONES was then being treated for his wounds. It should be noted that
at that time he was under sedatives for those wounds and was in and out of consciousness. The re-
porting were then able to conduct a short interview with JONES and the following is a summerization
of that interview:

JONES, Timothy:          He was standing at the NorthWest corner of 57th and Wolcott when he
                         observed WATSON, whom he had seen in the neighborhood on previous
occasions, to be approximately thirty feet West of him on the same side of 57th St., North side.
They were not together, but happended to be in the same location at the same time. JONES then
observed four male blacks, approximately 18-19 years old to be standing at the SouthEast corner
of 57th and Wolcott. The offenders yelled out some type of gang slogan and then began firing
numerous shots at his direction. JONES was struck first, falling to the ground, and then he observe
WATSON to be struck and fall to the curb. After the shooting the offenders yelled "G.D.'s", a gang
slogan for the Gangster Disciple street gang, and fled from the scene on foot in an unkown directio
JONES stated he did not believe he had/ever seen the offenders before but stated he would be able
to identfy them if seen again. JONES then lost consciousness.

                         The reporting then went to the 007th Dist. and obtained copies of the
                         original case report and then went to area three headquarters where
Bt#5319 was again met and information exchanged. while at area three, the reporting contacted
WATSON's girlfirend, WILLIAMS, via telephone, and interviewed.

CONTINUED ON PAGE FOUR - - -

# Exhibit 9

Identify and describe all property or possible evidence recovered at the end of the Narrative in column form. Show exactly where found, when found, who found it and its description (include Property Inventory numbers). If property taken was scribed for Operation Identification, indicate I.D. number at end of Narrative. Offender's approximate description, if possible, should include name if known, nickname, sex, race code, age, height, weight, color eyes & hair, complexion, scars, marks, etc. If suspect is arrested, give name, sex, race code, age, C.B. or I.R. number, if known, and state "In Custody."

# SUPPLEMENTARY REPORT
## CHICAGO POLICE — FOR USE BY B.I.S. PERSONNEL ONLY

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

4. DATE OF ORIG. OCCURRENCE—TIME
DAY 29 | MO. May | YR. 90 | 2228

| 1. OFFENSE/CLASSIFICATION LAST PREVIOUS REPORT | 1-UCR OFF. CODE | 2. ADDRESS OF ORIG. INCIDENT/OFFENSE ☒1 VERIFIED ☐2 CORRECTED | 3. BEAT OF OCCUR. |
|---|---|---|---|
| Homicide/Murder, 1st Degree | 0110 | 1904 West 57th Street | 714 |

| 5. VICTIM'S NAME AS SHOWN ON CASE REPORT | 1 CORRECT ☒1 YES ☐2 NO | IF NO, CORRECT ALL VICTIM INFORMATION IN BOXES 20 THROUGH 27. | 6. FIRE RELATED ☐1 YES ☒2 NO | 7. BEAT ASSIGNED |
|---|---|---|---|---|
| WATSON, Joseph W. | | | | 5312 |

| 8. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | LOCATION CODE | 9. NO. OF VICTIMS | 10. NO. OF OFFENDERS |
|---|---|---|---|
| Street | 304 | 2 | 5 |

| PROPERTY | 11. ☐ VERIFIED ☐ UPDATE TO | 12. OBJECT/WEAPON CODE NO. | 13. FIREARM FEATURES CODE NO. | 14. POINT/ENTRY CODE NO. | 15. POINT/EXIT CODE NO. | 16. BURGLAR ALARM CODE NO. | 17. SAFE BURGLARY METHOD CODE NO. | 18. IF RESIDENCE WHERE WERE OCCUP CODE NO. |
|---|---|---|---|---|---|---|---|---|
| | | 19. DESCRIBE PROPERTY IN NARRATIVE. T = TAKEN; R = RECOVERED | | | | FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE ORIGINAL CASE REPORT OR THE LAST PREVIOUS SUPPLEMENTARY REPORT. | | | |

| | 1 MONEY ☐T $ ☐R | 2 JEWELRY ☐T $ ☐R | 3 FURS ☐T $ ☐R | 4 CLOTHING ☐T $ ☐R | 7 OFFICE EQUIPMENT ☐T $ ☐R | 8 TV, RADIO, STEREO ☐T $ ☐R |
|---|---|---|---|---|---|---|
| | 9 HOUSEHOLD GOODS ☐T $ ☐R | 0 CONSUM. GOODS ☐T $ ☐R | 3 FIREARMS ☐T $ ☐R | 4 NARC./DANGEROUS DRUGS ☐T $ ☐R | 5 OTHER ☐T $ ☐R | 6 NONE ☐T ☐R |

| VICTIMS UPDATE ONLY | 20. NAME (LAST—FIRST—M.I.) | 21. 1-UCR OFFENSE CODE | 22. HOME ADDRESS (NO., DIR., STREET, APT. NO.) | 23. SEX-RACE-AGE CODE | 24. HOME PHONE | 25. BUSINESS PHONE | 26. IN. AVFD YES NO | 27. VICTIM REL. CODE |
|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | |
| 2. | | | | | | | | |
| 3. | | | | | | | | |

**PERMANENT RETENTION FILE**

| OFFENDERS UPDATE ONLY | 28. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | | | | EYES | HAIR | COMPL. |
|---|---|---|---|---|---|---|---|
| 1. | See Narrative | | | | | | |
| 2. | | | | | | | |

| | 31. C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER REL. CODE | C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER REL. CODE | 32. NO. ARRESTED | ARREST UNIT NO. |
|---|---|---|---|---|---|---|---|---|
| OFF. 1 | #8567-764 | #863 533 | OFF. 2 | #8567-765 | #890 107 | | 3 | 632 |

| 33. OFF'S. VEHICLE YEAR | MAKE | BODY STYLE | COLOR | V.I.N. | STATE LICENSE NO. | STATE |
|---|---|---|---|---|---|---|
| ☐USED ☐STOLEN | | | | | | |

| 34. SERIAL NOS. OR IDENTIFICATION NOS. | ☐1 DNA | ☐2 VERIFIED | ☐3 CORRECTED | LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS. OBTAINED IN NARRATIVE |
|---|---|---|---|---|

| 50. OFFENSE/CLASS. THIS DATE (IF SAME ENTER DNA) | REV. CODE | 51. METHOD CODE | 52. METHOD ASSIGNED ☒1 FIELD ☐3 SUMMARY | UNIT NO. | 53. STATUS ☐0 PROGRESS | ☐1 SUSPENDED | ☐2 UNFOUNDED |
|---|---|---|---|---|---|---|---|

54. IF CASE CLEARED, HOW CLEARED

| STATUS CONT'D. ☐3 CLRD. CLOSED | ☒4 CLRD. OPEN | 5 EXC. ☐CLRD. CLOSED | 6 EXC. ☐CLRD. OPEN | 7 CLSD. ☐NON- CRIM. | ☒1 ARREST & PROSEC. | ☐2 DIRECTED TO JUV. CRT. | ☐3 COMPL. REFUSD. TO PROSECUTE | ☐4 COMMUNITY ADJUSTMENT | ☐5 OTHER EXCEPT. | ☒ADULT ☐JUV. |
|---|---|---|---|---|---|---|---|---|---|---|

55. FOR SUMMARY CASES ONLY — THE ORIGINAL CASE REPORT IS SUBSTANTIALLY CORRECT, AND CONTACT WITH THE VICTIM HAS DISCLOSED NO ADDITIONAL PERTINENT INFORMATION.

**60. NARRATIVE**

```
IN CUSTODY:                    1.) WALKER, John (nmi) M/B 18 yrs. DOB 9 December 71

            ( 3 )              5301 South Laflin Street   2nd floor  #434-2334

                               Single/Unemployed  5'11"  140 lbs.. black hair,

                               brown eyes, medium brown complexion.  Tatoo on the

                               lower left forearm of " Sweetie J "

                               CB #8567-764        IR #863 533


     ( Cont.. on page #2 )
```

| 90. EXTRA COPIES REQUIRED (NO. & RECIPIENT) | 91. DATE THIS REPORT SUBMITTED — DAY | MO. | YR. | TIME | 92. SUPERVISOR APPROVING (PRINT NAME) | STAR NO. |
|---|---|---|---|---|---|---|
| Normal | 10 | June | 90 | 1930 71 | Sgt. Bonfer | 7-08 |

| 93. REPORTING OFFICER (PRINT NAME) | STAR NO. | 94. REPORTING OFFICER (PRINT NAME) | STAR NO. | 95. DATE APPROVED (DAY-MO.-YR.) | TIME |
|---|---|---|---|---|---|
| DEt. William Moser | #5056 | Det. Tony Maslanka | #16161 | 10 Jun 90 | 2030 |

SIGNATURE: William Moser
SIGNATURE: Det. Tony Maslanka

CPD-11.411-B (Rev. 8/85)     *MUST BE COMPLETED IN ALL CASES

31. I.R.D. NO. N - 242 748

CRC ☐ 226

CITY-DW-000027

```
Homicide/Murder, 1st Degree          Page #2              10 June 90
RE: Watson, Joseph  W.                                    N - 242 748
     M/B   20 yrs..
```

IN CUSTODY:                 2.)  JACKSON, Keith (nmi) M/B 18 yrs. 19 Feb 72
                                 5302 So. Hoyne Street  2nd floor no phone
                                 Single/Unemployed 5'7" 145 lbs.. black hair,
                                 brown eyes, medium brown complexion.
                                 AKA " Keith Cool "
                                 CB #8567-765              IR #890 107

                            3.)  WESTON, Demond J. M/B 17 yrs. 1 April 73
                                 623 West 61st Street  house  #651-4436
                                 Single/Unemployed 5'8" 145 lbs.. black hair,
                                 brown eyes, medium brown complexion.
                                 CB #8567-796              IR #926 658

ARRESTING OFFICERS:              Det's T. Maslanka #16161 & Wm. Moser #5056
                                 J. Paladino #9938
                                 BT #5312          Area #3 Violent Crimes

                                 Det's M. Kill #4123 & D. McWeeny #14367
                                 BT #5315          Area #3 Violent Crimes

                                 Det's J. Rusnak #11162 & V. Breska #5325
                                 BT #5314          Area #3 Violent Crimes

                                 Det. A. Christopherson #13244
                                 BT #5318          Area #3 Violent Crimes

**PERMANENT RETENTION FILE**

DATE, TIME & LOCATION/ARREST:    Offenders #1 & #2 arrested on 9 June 90
                                 at approximately 2355 hours in Area #3 VC.

                                 Offender #3 arrested on 9 June 90 at app-
                                 roximately 1600 hours at 5926 S. Union St.

CHARGES:                         All offenders charged with 1st Degree Murder
                                 per ASA's Murray, Sabin & Rodi.

COURT DATE & BRANCH:             11 June 90 in Branch #66

WANTED:                          BROWN, Cortez (nmi) M/B 19 yrs. 3 Dec 70
                                 5701 So. Hoyne St.  House  No Phone
                                 5'10"  140 lbs.. black hair, brown eyes,
                                 medium brown complexion.  IR #856 666 "Vic"

                                 SMITH, Jerrod (nmi) M/B 18 yrs. 31 Dec 71
                                 5426 So. Loomis Street  house  no phone
                                 5'7"  155 lbs.. black hair, brown eyes,
                                 medium brown complexion.  IR #877 704
                                 AKA " J Dilla "

                         Continued on page #3

CITY-DW-000028

```
Homicide/Murder, 1st Degree          Page #3              10 June 90
RE:  Watson, Joseph  W.                                   N - 242 748
     M/B   20 yrs..
```

WEAPON:                    Model Taurus 9mm B/S semi-automatic pistol
                           PT #92 fully loaded with 15 9mm cartridges.
                           Inventoried under #757 539 / Crimes Lab.
                           Weapon recovered inside a 1980 Ford Mustang
                           with Ill/84' XDQ 951 at 5925 So. Union St..
                           by Det. Michael Kill #4123.  Clear and not
                           registered per the Gun Desk.


EVIDENCE:                  See Weapon Catagory, this report.

                           Signed, court reported statements of
                           Weston & Macklin.

                           Signed, hand-written statement of Lee.

**PERMANENT RETENTION FILE**

                           Inventory #737 200 / Area #3 Violent Crimes:
                           Four (4) black & white Chicago Police photos

                           Line Up Reports - this RD Number


REFERENCE:                 RD # N - 258 729, N - 242 763 & N - 242 754


NOTIFICATIONS:             Cook County States Attorney's Office,
                           Felony Review Section, ASA's Murray, Sabin
                           and Rodi responding into Area #3 VC.


INTERVIEWS:                HALE, James M/B 18 yrs.  10 June 72
                           2016 West 67th St., 3rd fl. #883-1770

                           MONTAGUE, Solomon M/B 22 yrs. 27 July 67
                           5637 So. Paulina St., home  #925-3670

                           HAMPTON, Bryan M/B 19 yrs. 3 July 70
                           5651 So. Michigan St.. 3rd fl. no phone
                           ( circumstantial )   AKA " Biz "

                           JOHNSON, Maria F/B 23 yrs. 18 Jan 67
                           5247 So. Marshfield St..  No Phone

                           MCCURINE, Nathaniel M/B 18 yrs. 3 May 72
                           6453 So. Racine St.. 1st fl. #873-4820
                           ( eye )     AKA " Nate "

                           WALKER, John M/B 18 yrs.  9 Dec 71
                           5301 So. Loflin St., 2nd fl. #434-2334
                           AKA " J.D. "

Continued on page #4

CITY-DW-000029

```
Homicide/Murder, 1st Degree        Page #4              10 June 90
RE:  Watson, Joseph                                     N - 242 748
     M/B  20 yrs..
```

```
INTERVIEWS:                        JACKSON, Keith M/B 18 yrs. 19 Feb 72
                                   5302 So. Hoyne St.. 2nd fl.. No Phone
                                   AKA " Keith Cool "

                                   GLADNEY, Anita L. F/B 19 yrs. 20 Mar 71
                                   5318 So. Laflin St.. 2nd fl.  #776-1658
                                   Walker's Girlfriend

                                   MACKLIN, Dwayne M/B 24 yrs. 27 Dec 65
                                   5543 So. May St.. house  #778-0657
                                   " Buttercup "

                                   WESTON, Demond L. M/B 17 yrs. 1 Apr 73
                                   623 West 61st St.. house  #651-4436

                                   LEE, Jacob  M/B 16 yrs. 22 Aug 73
                                   649 West 61st Street house  #651-5261

                                   JONES, Timothy M/B 14 yrs. 16 Apr 76
                                   5653 So. Wolcott St.. #434-5914

                                   LAWS, Darrin  M/B 19 yrs. 30 June 70
                                   6005 So. Paulina St.. house No Phone
```

**PERMANENT RETENTION FILE**

INVESTIGATION:            In the continuance of this investigation,
        ( cont...)        the R/D's were informed by Officers Foley
                          #3966 & O'Brian #8825, assigned to the
007th District working BT #763-A, that they had located two subjects who had
information concerning this incident.  Both subjects, HALE, James and MONTAGUE,
Solomon were transported into Area #3 by the Officers.

                          HALE, James M/B 18 years was interviewed
                          in Area #3.  He related, but not for ver-
batim, that he was in the area of 57th & Damen Avenue in the company of Solomon
Montague, when he observed a dark blue 77' or 78' Chevrolet Caprice, four door
with a white top, stop and let four or five M/B's out.  They proceeded to walk
East on 57th Street.  He recognized two of the M/B's as WALKER, John and " C.C."
Hale also knew that the others were part of a street gang known as the " Cottage
Boys."  Hale went on to relate that he walked East on 55th Street and he heard
several shots.  As he approached Wood Street, Hale observed the same auto moving
at a high rate of speed, North on Wood across 55th Street.  It had the same M/B's
in it.  Hale went on to say that he hurried to Montague's house on Paulina and
sat on the front porch until Montague arrived.

                          MONTAGUE, Solomon M/B 22 years was also
                          interviewed.  He related, but not for
verbatim, basically the same as stated by Hale.  He added that he had driven
Hale to the area of 57th & Damen.  Montague had observed the dark blue Chevy
being operated without headlites in operation.  When the M/B's got out of the

Continued on page #5

CITY-DW-000030

```
Homicide/Murder, 1st Degree        Page #5              10 June 90
RE: Watson, Joseph                                      N - 242 748
     M/B  20 yrs..
```

**PERMANENT RETENTION FILE**

INVESTIGATION:                    auto, Montague recognized them as the
              ( cont...)          " Cottage Boys " members of the Black
                                  Disciple Street Gang from the area of
53rd & Wood Street.  Montague also related that he observed the subjects
walk East on 57th Street from Damen, two of the subjects known to him as
Johnny Walker and C.C..  Montague went on to say that as he was driving home,
he heard numerous gun shots.  He had nothing else to offer at this time.

                                  Officers Foley & O'Brian had sent a
                                  flash message in regards to the wanted
auto.  Officers Hull #8809 & Perkins #17723, assigned to BT #4172, observed
an auto fitting this description parked in the 7200 block of South Harvard.
They notified this Office.  Upon the arrival of the R/D's at their location,
they were informed that a M/B subject had entered said auto and had been de-
tained.  This subject, now known as HAMPTON, Bryan was advised of his Con-
stitutional Rights.  He stated that he understood those Rights and asked what
he was being held for.  Questioned briefly, Hampton stated that he had let a
person by the name of Nate McCurin drive his car tonight and that McCurin was
up in an apartment at 7256 South Harvard Street.  It was a 3rd floor apartment
belonging to Tanya Bonner.  It was found that McCurin had left, but another
subject by the name of LAWS, Darrin was found in same.  He also was advised
of his Rights and together with Hampton, transported into Area #3 in further-
ence of this investigation.

                                  In Area #3, Montague and Hale viewed
                                  the 1979 dark blue four door Chevrolet
with no plates.  Both identified this auto as the one observed with the poss-
ible suspects riding in.  It should be noted that this auto, with VIN #1N69-
G9J194477, was later processed by the Mobile Crime Lab for fingerprints.

                                  After re-advising Hampton of his
                                  Rights in Area #3, Hampton states that
Nate McCurin came to the apartment on Harvard and borrowed his auto.  This was
about 2230 hours.  He came over at approximately midnight and returned same.
During that time, Hampton had also left the apartment with a few girls and
drove around in a maroon Cadillac.  He stated that he saw the ambulances at
57th & Wolcott.  He then returned to the apartment on Harvard.

                                  The R/D's spoke with Darrin Laws after
                                  re-advising him of his Rights.  Laws
related, but not for verbatim, that he is on the corner of 53rd & Wood Street
along with Bryan Hampton, also known to him as " Biz " and Nate McCurin. They
have a conversation with John Walker and Jerrod Smith.  Smith, aka " J Dilla "
and Walker, aka " J.D." tell he and McCurin and Hampton that they are putting
a wrecking crew together and that they want them to come along.  Laws goes on
to relate that he is dropped off at the apartment on Harvard at 1830 hours.
Hampton and McCurin leave.  Both return around 2300 hours.  They all smoke
some reefer and Hampton and McCurin tell Laws about all the bodies left on
57th Street.  Laws had nothing else to add at this time.

                                  On 31 May 90, Hampton was transported
                                  to 1121 South State Street and given

                      Continued on page #6

CITY-DW-000031

Homicide/Murder, 1st Degree      Page #6         10 June 90
RE: Watson, Joseph                                     N - 242 748
    M/B 20 yrs..

**PERMANENT RETENTION FILE**

INVESTIGATION:                 a polygraph examination by Technician
          ( cont..)           Tovar. He was subsequently tranported
                                 by to Area #3 Violent Crimes. Questioned
further, Hampton told the R/D's that he had not been truthful in his account of
his knowledge of this incident. He related, but not for verbatim, that on 29 May
90, Tuesday, he was driving his auto with Nate McCurin and Darrin Laws in it. AT
53rd & Wood Street, they met up with " J Dilla " ( Jerrod Smith ) and John Walker.
Both explained to them that they were getting a wrecking crew together because the
Vice Lords had been shooting at them recently. In fact, Walker's rear window had
been shot out by the Vice Lords about one week ago. J Dilla wanted Hampton's car
because Walker's front passenger door was broken. Smith and Walker told them to
meet them at " Rose's " apartment at 53rd & Ashland at 2100 hours. Hampton and
McCurin then drove Laws to 72nd & Harvard and let him out. This was about 1800
or 1900 hours. Both then drove back to the area of 53rd & Wood, meeting with a
couple of females, one being Maria Johnson. Hampton then gave his car keys to
McCurin so that he could use the car for the wrecking crew. McCurin told Hampton
to meet him later at the apartment. Hampton went on to say that he drove around
with Maria Johnson in their maroon Cadillac. They went to get something to eat,
and upon returning, found his auto gone. Driving around the area of 57th and
Wolcott, Hampton observed the police cars and ambulances. He stopped to speak
with a M/B by the name of " Terry " who told him that " Folks " had shot his
Brother. Foks meaning Disciples. Hampton then drove around until he found his
car at 54th & Wolcott with McCurin sitting in same. McCurin told them to follow
him to his house at 6457 South Racine Street.

                                Hampton went on to relate that upon arr-
                                iving at Nate McCurin's house on Racine,
McCurin related to him that he had picked up Jerrod Smith, John Walker and "Baldy"
Servan Allen at Rose's, then drove them to 57th & Damen where they got out, with
McCurin still in the auto. All three of them had guns. The three walked East on
57th Street towards Winchester. McCurin told Hampton that he also saw " Pope G "
Sylvester WAshington walking with other Gangster Disciples. A short time later,
McCurin related to Hampton, numerous gun shots were heard. McCurin went on telling
Hampton that he then drove to 57th & Wood where Smith, Walker and Allen got back
into the car and told him that they had " Done their business." McCurin then
drove all back to 53rd and Ashland. Hampton then drove his auto with McCurin to
the apartment on South Harvard Street. Hampton had nothing further to add at this
time.

                                JOHNSON, Maria F/B 23 years was located
                                and interviewed. She related, but not for
verbatim, that she is the girlfriend of Nate McCurin. She was with her friend
Tracy Murphy on the night of the shootings. They were in Murphy's maroon colored
Cadillac at 54th & Wood. Nate drove up with Biz in Hampton's car. Hampton got into
the Cadillac with them. Johnson went on to say that they followed McCurin to 64th
and Racine Street. McCurin drove Hampton's auto. On the way, they stopped at 57th
Street to see about the people shot. We then proceed to McCurin's house. We
listened to music and drank. Around 2400 hours Hampton & McCurin left in Hampton's
auto. Johnson stated that they beeped Hampton later, only to be informed by Mc-
Curin that Hampton and Laws had been grabbed by the Police.

Continued on page #7

CITY-DW-000032

Homicide/Murder, 1st Degree          Page #7          10 June 90
RE:  Watson, Joseph                                    N - 242 748
     M/B  20 yrs..

**PERMANENT RETENTION FILE**

INVESTIGATION:                    On 6 June 90, the R/D's were able to
          ( cont...)              locate ALLEN, Servan ( Baldy ) and
                                  MCCURIN, Nathaniel ( Nate ) both
were given their Constitutional Rights and transported into Area #3 for
further investigation.

                                  Servan Allen M/B 20 years was re-advised
                                  of his Rights.  He stated that he under-
sttod his Rights and would speak with the R/D's.  He denied any participation
in the shooting of Joseph Watson.  He stated that he was in the area of 53rd
and Wood until about 1800 hours.  At that time, he took public transportation
home to 73rd & Dante.  He had heard about the shootings from a relative by the
name of Lawrence Gowdy.  Questioned further, Allen stated that he had never
been in Hampton's blue Chevrolet.  He had nothing else to add at this time.

                                  Nathaniel McCurin M/B 18 years was
                                  also re-advised of his Rights.  He
stated that he understood his Rights and wished to speak with the R/D's.  At
first McCurin denied any knowledge of this incident.  Questioned further, he
stated that he was in the auto owned by Hampton, a blue Chevy.  Also in the
car was Darrin Laws.  They were in the area of 53rd & Wood when two M/B's came
up to the car.  McCurin knew them to be John Walker and Jerrod Smith.  Both
told them that they were getting a wreckinf crew together to take care of the
Vice Lords who had been shooting at Walker recently.  They had found out that
some of the Vice Lords were having a meeting at 56th & Wolcott that night.
Hampton sort of laughed it off and drove away.  Later that night, McCurin was
with Hampton and two girls, Tracy and Maria, in a red Cadillac.  They were at
54th & Honore Street.  They had decided to go to " Duk's " for a hotdog, but
McCurin got beeped by his girlfriend, Monique Adams at 5753 So. Winchester ST..
He took Hampton's auto and drove over to the telephone that she normally beeps
him at, 56th & Damen.  He does not see her there so drives to her home.  On the
way, he observes numerous police cars and ambulances at 57th & Wolcott.  McCurin
did not hear any shots.  When he finally speaks with his girlfriend, she tells
him that she had heard numerous gun shots.  McCurin states that is all he knows.

                                  Questioned further about his possible
                                  envolvement, McCurin tells the R/D's
that he has not been truthful.  He now states that on the way to his girl-
friends beep, he sees J Dilla, Johnny Walker and " Keith Cool " Keith Jackson
in Jerrod Smith Rust colored 88 Olds, parked in the gas station parking lot at
55th & Damen, the Amoco Station.  He adds that on Tuesday, 5 June 90, he is in
Cornell Park at 51st & Wood along with Hampton, Stacey Weeb, Joseph Mattrix and
Nelson Hannon.  Keith Jackson, Jerrod Smith and John Walker approach them and
tell them about their part in the shootings on 29 May 90.  They told them how
they shot some " dudes " around 57th & Wolcott and chased others into a hallway
and shot them also.  McCurin added that Smith was armed with a .38 calibre hand-
gun.  Walker had a 9mm semi-automatic pistol.  Jackson had some type of auto-
matic machine pistol.  Questioned further, McCurin agreed to take a polygraph
examination.

Continued on page #8

CITY-DW-000033

Homicide/Murder, 1st Degree    Page #8          10 June 90
RE: Watson, Joseph                               N - 242 748
    M/B   20 yrs..

**PERMANENT RETENTION FILE**

INVESTIGATION:                  At this time, the R/D's traveled to
              ( cont...)        5653 South Wolcott Street and re-
                                interviewed Timothy Jones M/B 14
years, the 2nd victim in this investigation.  Due to his condition at the
time of the initial interview at the hospital, this interview was needed.
Timothy related, but not for verbatim, that he was on his bicycle going to
the store at 55th & Damen.  While on the East side of Wolcott, M/B's came
out of the gangway at approximately 5629 South Wolcott and started shooting
at him, striking him in the leg.  Jones was able to flee thru the gangway,
jump over the fence and enter his home from the rear.  Numerous other shots
were heard.  A short time later, Jones was helped to the ambulance by his
Brother.  Jones stated that he could identify the offender who shot him.

                                The suspects WALKER, John aka J.D.
                                and JACKSON, Keith aka Keith Cool
were located at 53rd & Wood.  Both agreed to accompany the R/D's into Area
#3 in furtherance of this investigation.

                                Keith Jackson M/B 18 years was given
                                his Constitutional Rights.  He stated
that he understood those Rights and would talk with the R/D's.  Jackson went
on to say that he had heard about the shootings, but knew little of just why
they had occurred.  He stated that he knew two of the victims, J.D. Lee and
Tim Jones.  On the day of the shootings, Jackson stated that he was around
53rd & Wood but went to a restaurant near 63rd & Damen to eat with a guy by
the name of " Bis O."  Jackson did not know the guys real name.  He returned
to 53rd & Wood and drank some beer.  He heard about the shootings the next
day from his girlfriend, Jackie Jones.

                                Questioned further, Jackson stated
                                that he is a member of the Gangster
Disciple Street Gang.  He knew John Walker and that Wlaker had had his car
window shot out by Vice Lords.  He denied any involvement in this incident.

                                WALKER, John M/B 18 years was also
                                advised of his Constitutional Rights.
He stated that he understood those Rights and would speak with the R/D's.
He went on to state that he heard about the shootings when he read the
" Defender " newspaper.  He stated that on the day of the incident, he arrived
at his girlfriend's house at approximately 1200 hours and did not leave until
Thursday at 1200 hours.  His girlfriend is GLADNEY, Anita of 5318 S. Laflin,
telephone #776-1658.  Walker went on to say that he has not seen Jerrod Smith
for about 2 or 3 weeks.  Walker had nothing else to add at this time.

                                The R/D's traveled to the home of
                                GLADNEY, Anita F/B 19 years.  She
agreed to speak with the R/D's.  Ms. Gladney first stated that she has
known Walker for three to four years.  They have one child together.  Walker
belongs to the " Folks," that is the Disciple Street Gang.  On 29 May 90,

Continued on page #9

CITY-DW-000034

Homicide/Murder, 1st Degree    Page #9        10 June 90
RE: Watson, Joseph                            N - 242 748
    M/B  20 yrs..

**PERMANENT RETENTION FILE**

INVESTIGATION:                 Walker came over to her house.  This
          ( cont...)           was about 1200 hours.  They left and
                               walked to his home.  They stayed a
short time before returning to her home.  Once there, Walker spent a couple of
days with her, never leaving.

                               Questioned further, Ms. Gladney stated
                               that was not exactly what took place.
She stated that she beeped Walker at about 2300 hours.  He called and said that
he would pick her up around midnight as soon as he dropped someone off.  He
came by and picked her up in his red Delta 88.  They drove to his apartment at
approximately 1364 East 52nd Street.  They stayed there all day Wednesday, going
back to her home on Thursday.

                               At this time, Ms. Gladney told the R/D's
                               that she was not being totally truthful
about her envolvement.  She went on to say that she and Walker did arrive at
his apartment in Hyde Park after midnight on 29 May 90.  It was near 0100 hours.
There were 3 or 4 other M/B's already there.  She new them as " Baldy," " Keith
Cool," " J Dilla " and " Mackey."  As Gladney placed her 8 week old baby in a
bedroom, she left Walker in the frontroom with the others, talking about shootings
of some kind around 57th Street.  A short time later, Walker and I went to bed.
The others stayed in the front room.  All of them stayed until Thursday.

                               Ms. Gladney went on to say that Walker
                               told her to tell the Police, if asked,
that he stayed at her house from 1200 hours on Tuesday, 29 May 90, till Thurs-
day 1200 hours, neaver leaving.

                               Confronted with this, John Walker
                               stated that he had nothing else to
talk about.  He did agreed to take a polygraph examination.

                               Both Walker and McCurin were given the
                               polygraph examinations on 8 June 90.
Both failed the exams.  Returning to Area #3, Walker stated that he still did
not have anything else to add to his version of this incident.

                               McCurin stated that he wished to speak
                               once again with the R/D's.  McCurin
went on to say that on 29 May 90 he was in Hampton's auto along with Hampton
and Laws.  They met J Dilla and John Walker near 53rd & Wood.  J.D. & Dilla
told Biz that he was lected into the wrecking crew.  Bis laughed them off and
drove away.  After drinking beer for awhile at my house, Biz and McCurin drove
to 54th & Honore, near where McCurin has an Uncle who fixes cars.  McCurin got
beeped by his girlfriend Monique.  McCurin took Hampton's auto, leaving Hampton
with Tracy and Maria in the red Cadillac.  McCurin drove to 53rd & Wood seeing
John Walker, Keith Jackson, Jerrod Smith get out of a red Delta 88 being driven
by Stacey Webb.  They walked over to McCubin's auto.  This was about 2145 hours.
They asked McCurin what he was doing.  McCurin replied that he was trying to
find his girlfriend Monique.  Dilla & Walker told him that they wanted him to

Continued on page #10

CITY-DW-000035

Homicide/Murder, 1st Degree      Page #10      10 June 90
RE: Watson, Joseph                               N - 242 748
     M/B   20 yrs..

**PERMANENT RETENTION FILE**

INVESTIGATION:                drop them off at 56th & Seeley. McCurin
           ( cont...)          drove South on Damen. McCurin went on
                                    to say that he dropped the crew off at
the alley between Seeley and Damen. They were saying gang slogans. McCurin
then drove to Monique's house at 5753 So. Winchester Street. Monique to McCurin
that she had heard shots. They talked for awhile. McCurin then left, driving
by Wolcott at 58th Street. McCurin saw the ambulances and the police cars.

                        McCurin went on to say that when they
                        were in the auto driving to 56th and
Seeley, he could see that J.D. had a 9mm pistol, J Dilla had a .38 calibre
b/s revolver and that he knew Jackson had a weapon because he was talking about
it as he held it. Jackson sat behind him as he drove so McCurin could not see
the gun.

                        McCurin then drove back to 54th & Honore.
                        Left there and went home to 64th & Racine
to pick up some reefer, but his Mother took his key. He then went to 72nd and
Harvard.

                        McCurin stated that his version of
                        what took place in Cornell Park was
true. Jackson, Smith & Walker all were describing how they were shooting at
the Vice Lords, or " Hooks."

                        It should be noted that the R/D's made
                        use of Chicago Police Department photos
in properly identifying John Walker, Keith Jackson and Jerrod Smith. These
photos were shown to persons who knew these individuals for several years by
the nick-names given; or in fact knew them by both.

                        On 9 June 90, the R/D's were informed by
                        Det. Michael Kill #4123 that, while inv-
estigating a homicide recorded under RD # N - 258 729, information was being
obtained that could be pertinent to our investigation of 29 May 90.

                        The R/D's then had a interview with one
                        MACKLIN, Dwayne M/B 24 years. He was
advised of his Constitutional Rights by Det. Maslanka #16161. He stated that he
understood those Rights and wished to speak with the R/Ds'. Macklin went on to
relate, but not for verbatim, that he was in the area of 5928 South Union Street
on 29 May 90. It was approximately 1800 hours. He was in the company of " Vic "
BROWN, Cortez and " Boo-man " WESTON, Demond, and other members of the Gangster
Disciples from 59th & Union when they were approached by several other gang
members known to him from 53rd & Wood. Ronnie Black and others he did not know.
It was explained to them that they were forming a wrecking crew in order to take
care ob business against some Vice Lords that were selling narcotics on their
turf. Macklin was shown various photos, identifying Keith Jackson and Johnny
Walker and Tony Miller as ones who told him about taking care of the hooks at
57th & Wolcott Street. Macklin stated that those going were told to be ready at

Continued on page #11

CITY-DW-000036

Homicide/Murder, 1st Degree     Page #11     10 June 90
RE: Watson, Joseph                                  N - 242 748
     M/B 20 yrs..

## PERMANENT RETENTION FILE

INVESTIGATION:

( cont...)           between 2100 & 2200 hours. At approximately
that time, 2 cars returned, a red Delta 88, and a black/blue Cadillac containing about ten M/B's. Macklin identified from photo John Walker, Keith Jackson and Tony Miller and Ronnie Black among them. Willie Walker, Cortez Brown and Demond Weston got into the red Delta 88 with John Walker & Keith Jackson. Tony Miller and Ronnie Balck got into the Caddy with others. Macklin went on to say that he observed both John Walker and Keith Jackson to have handguns. Cortez " Vic " Brown had a b/s 9mm semi-automatic pistol and Weston either had a .38 calibre handgun or a .22 cal-bre, a break open type.

At approximately 2330 hours, Weston, Brown and Willie Walker came walking back to the area of 59th & Union. All they told Macklin was that business was taken care of and that Macklin should watch the news, they had layed some niggers down. Macklin added that on the following day, he, in the company of LEE, Jacob and Cortez Brown drove in Brown's Oldsmobile, brown 98 around the area of the shootings. Brown was pointing to various houses and showing the bullet holes in same that he stated he had caused. Macklin stated that he was shown the area around 57th & Winchester, amongst others.

It should be noted that Macklin identified a model Taurus 9mm b/s automatic recovered under RD # N - 258 729, as the weapon used by Cortez Brown in this incident. It should be further noted that Technician Warner of the Chicago Police Department's Firearm's Section of the Crime Lab has matched this weapon to recovered shell caseings found at the scene of this shooting and several others. ( SEE REFERENCE SECTION, THIS RD )

WESTON, Demond M/B 17 years was taken into custody at 5926 South Union Street at approximately 1600 hours on 9 June 90. He was advised of his Constitutional Rights ans transported into Area #3 for processing. He was re-advised of his Rights by Det. Moser. Weston stated that he understood those Rights and would speak with the R/D's. Weston related that he was at 5928 South Union Street in the company of Vic, ( Cortez Brown ) and Dwayne Macklin. A rust colored Olds 88 pulled up and three M/B's exited. They went up to Vic and told him that some Vice Lords were giving them trouble and that they were getting a crew together to take care of it, but wanted some help. Weston related that they agreed because they were all G.D.. meaning Gangster Disciples. We were told to be around 57th and Winchester at 2130 hours or 2200 hours. Weston went on to say he observed Macklin give Brown a b/s 9mm pistol. This was a gun Brown always used. Weston stated that he had a .22 calibre two shot derringer already in his pocket. At about 2100 hours, Weston and Vic walked to the bus at 55th Street and took it West to Wood Street. He and Vic got off the bus and walked to 57th and Winchester. Once there, Vic and WEston saw four M/B's that Weston said he did not know but Vic did. Weston heard Vic ask them where were the guys at, meaning the Vice Lords. Other words were exchanged that Weston did not hear. Weston went on to say that the group then walked down 57th Street then North on Wolcott, he and Vic on the East side of the street and the other group on the West Side. Weston went on to

continued on page #12

CITY-DW-000037

Homicide/Murder, 1st Degree          Page #12                    10 June 90
RE: Watson, Joseph                                              N - 242 748
    M/B  20 yrs..

**PERMANENT RETENTION FILE**

INVESTIGATION:                       relate that he observed three unknown
              ( cont...)             M/B's walking South on the West side of
                                     Wolcott in the 5600 block.  He observed
that they had hats on that were turned to the left, denoting them as Vice Lords.
As the three pasted his group of four, the group of four turned and started
shooting at the group of three.  Weston then went into a gangway at approximately
5629 South Wolcott Street.  Vic had gone into the gangway next to Weston.  Weston
then heard Vic shooting also.  Weston left the gangway and observed Vic running
South on Wolcott.  Weston ran into the street and also proceeded South.  He saw
one of the M/B's fall along the West side of Wolcott.  As he got near to him,
Weston saw Vic and the other members of his group chaseing the others in the
5700 block of Wolcott.  Weston stated that as he got to within approximately
15 feet of the fallen M/B, he heard the M/B tell him, " Don't shoot me, don't
shoot me."  Weston goes on to say that he points his .22 calibre derringer in
the direction of the M/B and fires twice.  Weston then hears the M/B say to
him " Help me, help me."  Weston said that he did not understand anything else
the M/B said.  He then fled East on 57th Street then North to 55th, taking the
bus back to Halsted Street.  Weston related that he then went home, first hiding
the gun in the alley behind his home.  He later moved it to the rear of a church
a 60th & Union, placing the weapon under some bricks.  He stated that it was
later missing from his hiding place.

                                     Weston was also shown photos, iden-
                                     tifying Keith Jackson and John Walker
as two of the individuals asking for assistance in pursuit of the Vice Lords.
Weston had nothing further to add at this time.  It should be noted that
Weston also viewed a photo of Cortez Brown IR #856 666 and identified him as
the person he has known as Vic.

                                     The R/D's also interviewed LEE, Jacob
                                     M/B 16 years.  He related, but not for
verbatim, that he had heard about the shootings on 57th Street.  About one or
two days after the shootings, he was in a brown Olds being driven by a older
M/B by the name of Griffin.  Vic was in the front seat and he was in the back
seat with Buttercup, Dwayne Macklin.  Vic was having Griffin drive them around
55th & Justine and 57th Street, pointing out houses that Vic said " He had to
put some niggers down."  Lee stated that the houses Vic pointed out had bullet
in them.  Lee went on to say that he last saw Vic on 8 June 90 cleaning two guns,
one a 9mm automatic and the other a big, fat one.  Lee had nothing further to
add at this time.

                                     The Cook County States Attorney's
                                     Office was notified with Assn't States
Attorneys Sabin & Rodi responding into Area #3 Violent Crimes.  After re-viewing
the facts surrounding this matter and interviewing all concerned, court reported
statements, type written, were taken from Demond Weston and Dwayne Macklin.  A
hand-written statement was taken from Jacob Lee.  These statements were subse-
quently read and signed by those involved.  (After confering with ASA Murray of
the Gang Prosecution Unit, ASA Rodi concurred with his approval of 1st Degree
Murder charges against Demond Weston, Keith Jackson & John Walker.

Continued on page #13

CITY-DW-000038

```
Homicide/Murder, 1st Degree        Page #13              10 June 90
RE:  Watson, Joseph                                      N - 242 748
     M/B  20 yrs..
```

```
INVESTIGATION:                     Further efforts are being made to locate
                ( cont...)         Cortez " Vic Brown IR #856 666 and Jerrod
                                   " J Dilla " Smith  IR #877 704.

                                   The reporting Detectives request that
                                   this investigation be cleared / open with
       the arrest & prosecution of John Walker IR #863 533, Keith Jackson  IR #890 107
       and Demond Weston  IR #926 658.
```

PERMANENT RETENTION FILE

```
REPORT OF:                         Det. William Moser      #5056
                                   Det. Tony Maslanka      #16161
                                   Det. John Paladino       #9938
                                   Det. Michael Kill        #4123
                                   Det. Dan McWeeney       #14367
                                   Det. A. Christopherson  #13244
                                   Det. J. Rusnak          #11162
                                   Det. V. Breska           #5325

                                   Area #3 Violent Crimes Section
```

12 JUN 1990 16
58

CITY-DW-000039

```
1   STATE OF ILLINOIS  )
                       )  SS:
2   COUNTY OF C O O K  )

3       IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
              COUNTY DEPARTMENT - CRIMINAL DIVISION
4
    THE PEOPLE OF THE       )
5   STATE OF ILLINOIS,      )
                            )
6          Plaintiff,       )
                            )
7          vs.              )  No. 90 CR 16376
                            )
8   EDMOND WESTON,          )
                            )
9          Defendant.       )

10

11                 REPORT OF PROCEEDINGS at the trial

12  of the above-entitled cause, before the HONORABLE

13  EDWARD M. FIALA on the 15th day of April 1992.

14  A P P E A R A N C E S:
15            MR. JACK O'MALLEY
              State's Attorney of Cook County
16            BY:  MR. BERNARD MURRAY and
                   MR. JAMES MC KAY
17                 Assistant State's Attorneys
                   Appeared on behalf of the Plaintiff;
18
              MR. PAUL KATZ
19                 Appeared on behalf of the Defendant.

20  JO ANN KROLICKI, CSR
    Official Court Reporter
21

22

23

24

                        E1
```

Weston 033621

1   reflect the ladies and gentlemen of the jury are

2   present.  The defendant is present.  All counsel

3   are present.

4              Mr. Murray, call your next witness.

5         MR. MURRAY:  DeNeen Coats.

6         THE COURT:  Would you please raise your

7   right hand.

8             (Witness sworn.)

9         THE COURT:  Thank you.  Please be

10   seated.  Please keep your voice up.

11           With that, you may inquire.

12   WHEREUPON,

13         DE NEEN COATS,

14   called as a witness on behalf of the people,

15   having been first duly sworn, was examined and

16   testified as follows:

17         DIRECT EXAMINATION

18         BY MR. MURRAY:

19   Q.  Can you please state your name and spell

20   your name for the ladies and gentlemen of the jury

21   and the court reporter?

22   A.  DeNeen Coats, C-o-a-t-s.

23   Q.  Miss Coats, do you live in Chicago,

24   Illinois?

E204

Weston 033659

1      A.   Yes.

2      Q.   And directing your attention back to

3  May 29th of 1990, where did you live on that day?

4      A.   5530 South Justine.

5      Q.   Back in May of 1990, were you working?

6      A.   Yes.

7      Q.   Where were you working back then?

8      A.   Pamilo Computer Services.

9      Q.   What were you doing for them?

10     A.   Assistant manager.

11     Q.   Back on May 29th of 1990, did you work

12 late that day?

13     A.   Yes, I did.

14     Q.   And what day did you get home?  What time

15 did you get home that day?

16     A.   About 7:00, 7:30.

17     Q.   When you got home to 5530 South Justine,

18 did you find any information out about an old

19 friend?

20     A.   Yes.

21     Q.   And what did you find out?

22     A.   I found out that my ex-boyfriend was in

23 town, Ronald Nesbit, and he hadn't been there for

24 awhile.

E205

Weston 000474

1    Q.   How long had it been since he had left

2  town?

3    A.   About four years.

4    Q.   And when you found that information out,

5  did you run into him later that evening?

6    A.   Yes, I did.

7    Q.   Where did you meet him?

8    A.   Down in front of my friend, Lisa's,

9  house.

10   Q.   Is that on your same block?

11   A.   Yes, it is.  It's on the same side.  It's

12 two houses down.

13   Q.   And when you ran into Ron down there, was

14 there anybody else down there that you knew?

15   A.   Yeah, a lot of our friends.  We were just

16 sitting around talking.

17   Q.   And was there also a friend named

18 Reginald Norwood there?

19   A.   Yes.

20   Q.   During the course of the evening, did

21 there come a time when you left in front of Lisa's

22 house and went somewhere else?

23   A.   Yes, we left from the front of Lisa's

24 house and went back in front of my house.

E206

Weston 000475

1    Q.    And when you went down there, was it

2    just you and Ron, or did anybody else come with

3    you?

4    A.    Me, Ron, and Reggie met us on the way.

5    Q.    When you got back in front of your

6    house, where were you standing or sitting at that

7    time?

8    A.    We were standing outside the front gate,

9    outside the outside gate.

10    Q.    When you were standing at that location

11    in front of your house, did you notice anything

12    happening across the street from you?

13    A.    Yes.  We noticed a group of guys.  We'd

14    noticed it earlier when we were all down there

15    talking, but we really didn't pay any attention.

16    We knew they weren't from around there.

17            So when we walked down to my house,

18    we noticed that they were still hanging around

19    there.

20    Q.    Where did you notice them?

21    A.    Hanging around at the corner of 55th

22    going towards 56th across the street.

23    Q.    All right.  And when you noticed them,

24    did you see them across the street from your

E207

Weston 000476

1    house?

2        A.    Yes.

3        Q.    When you saw them across the street from

4    your house, what were they doing?

5        A.    Well, when they were walking from the

6    corner, a friend of mine was in the middle of the

7    group, a guy who lives across the street one house

8    away.  And they were pushing him around and

9    everything, and they pushed him into his house.

10       Q.    Where is his house?

11       A.    It's directly across the street, but one

12   house over towards 56th Place.

13       Q.    How many people were in this group?

14       A.    I would say approximately about -- around

15   about eight.

16       Q.    And when you saw this group and you saw

17   them pushing your neighbor from across the street,

18   what did you and Ron and Reggie do?

19       A.    We went on the inside of the gate.

20       Q.    What is on the inside of the gate?

21       A.    Just two cement stoops, like seats,

22   something like seats, but stoops.

23       Q.    Are they part of your porch?

24       A.    Yeah.

E208

Weston 000477

1    Q.    What did you do when you got there?

2    A.    We just sat down.

3    Q.    And where were you sitting?

4    A.    I was sitting on the stoop going towards

5    56th, me and Ron.  And Reggie was sitting on the

6    other stoop going towards Garfield.

7    Q.    What did you notice about the group of

8    young men that were across the street at this

9    time?

10   A.    They were just -- they were pushing my

11   friend into the door.  Then they came to the

12   middle of the street.

13   Q.    When they came to the middle of the

14   street, could you tell what type of clothing they

15   were wearing?

16   A.    Yeah.

17   Q.    Could you describe that clothing, please?

18   A.    Jeans, dark clothes, starter jacket type

19   things, hats, caps.

20   Q.    And when you saw them in the middle of

21   the street, were they coming on an angle or

22   straight across the street?  Describe how they

23   were walking across the street.

24   A.    They were coming on sort of like an angle

E209

1    from the 56th direction, and they stopped right in

2    front of our house.

3        Q.   What happened when they stopped right in

4    front of your house?

5        A.   They pulled out guns and started

6    shooting.

7        Q.   And could you tell how many of them were

8    pulling out guns and shooting?

9        A.   It looked like all of them.

10       Q.   And when they were shooting, what could

11   you see actually happening?

12       A.   Them shooting at me.  The actual -- I was

13   looking at them in disbelief and shock, and I

14   didn't understand why.  And I was looking at the

15   guns and them.

16       Q.   Could you also see their faces?

17       A.   Yes.

18       Q.   Now, when this was happening, was there

19   any light in the area?  Was there any

20   streetlights?

21       A.   Yes.  It's a streetlight directly across

22   the street in front of my house, and it's directly

23   across the street, but it's directly in front of

24   it.  And, also, my inside porch light was on.

                        E210

Weston 000479

1     Q.   And was that streetlight working as well?

2     A.   Yes.

3     Q.   When they were shooting and you were

4 looking at the guns and at their faces, what

5 happened then?

6     A.   I got shot in the leg once.  That's when

7 I realized it was time to run.  And I turned

8 around and made it to the top of the stairs, and I

9 got shot again in my back.

10     Q.   Now, you said you got shot in the leg; is

11 that right?

12     A.   The upper hip, like.  Well, the doctor

13 calls it the upper femur, left femur.

14     Q.   And that area that got shot, was that the

15 part of your body that was facing out to the

16 street?

17     A.   Yes.

18     Q.   And you said you started to turn and run

19 at that point; is that right?

20     A.   Yes.

21     Q.   When you started to turn and run, where

22 was Ron and Reggie at this point?

23     A.   They had ran in.  They had ran on the

24 inside porch.

E211

Weston 000480

1      Q.   Now, you said that you were also shot

2   again; is that right?

3      A.   Yes.

4      Q.   Where were you shot the second time?

5      A.   In my back.

6      Q.   When you were shot in the back, what

7   happened to you?

8      A.   I fell forward onto my porch, and after

9   I scooted in a little bit, Ron kicked the door

10  shut with his foot, and he kept his foot on the

11  door.

12     Q.   Now, as you were running up the stairs

13  and as you got shot in the back and fell onto the

14  porch, what was going on with the guns that were

15  being fired?  Could you hear anything?

16     A.   They were still shooting.

17     Q.   You said you got inside the door now, and

18  Ron --

19     A.   Kicked the door shut.

20     Q.   Was it Ron or Reggie?  I'm sorry.

21     A.   Ron.

22     Q.   Ron kicked the door closed.  What was

23  going on with the shooting at this point?

24     A.   They were still shooting.  They were

E212

Weston 000481

1    still out there shooting.

2        Q.    Could you tell where the bullets were

3    going?

4        A.    Well, I heard it busting glass, so I knew

5    it hit one of our windows.

6        Q.    What happened then when you got inside

7    the porch area?

8        A.    After they finally stopped shooting,

9    Reggie ran inside.  Ron asked Reggie, you know,

10   what was going on, who were they and everything.

11   Reggie was saying he didn't know.

12                 Reggie ran inside my house to get

13   my phone.  He didn't understand how to work the

14   phone.

15       Q.    What type of phone was it?

16       A.    It was a portable phone.

17       Q.    Were you conscious this whole time?

18       A.    Yeah.

19       Q.    What happened next after he got the

20   phone?

21       A.    He called the police and the ambulance,

22   and I kept telling Ron I was going to die.  I

23   thought I was going to die, and he kept telling

24   me, no, I wasn't going to die.  And I kept saying

E213

Weston 000482

1   yeah, they shot me in my back.  And at that --

2            MR. KATZ:  Excuse me, Miss Witness.

3            I'm going to object to this,

4   Judge.  It's really irrelevant.

5            THE COURT:  I'll leave that stand.  Ask

6   another question.

7   BY MR. MURRAY:

8       Q.   As you were talking to Ron, did the

9   police or an ambulance arrive?

10      A.   Yes, police.

11      Q.   What happened then?

12      A.   The police -- the police officer went

13  inside.  The lady police officer went inside the

14  house, got a towel, and was trying to see where

15  was I shot in my back.

16      Q.   And what did she do with the towel?

17      A.   I can't recall.  At that point, I blacked

18  out.

19      Q.   Did you go to a hospital?

20      A.   Yes.

21      Q.   And what hospital did you go to?

22      A.   Cook County.

23      Q.   How long were you in Cook County?

24      A.   I was in there about a month, maybe

                    E214

Weston 000483

1   more.

2       Q.   What injuries did you sustain from these

3   two gunshots?

4       A.   I had a pierced lung.  The bullet went

5   through my leg and --

6           MR. KATZ:  Judge, excuse me.  I'm going

7   to have to object.  The witness is not a medical

8   expert and cannot testify as to such.

9           THE COURT:  She may indicate where she

10  was wounded.  I'll permit that.

11  BY MR. MURRAY:

12      Q.   You said one of wounds was to your leg;

13  is that correct?

14      A.   Yes.

15      Q.   Were you able to use your leg immediately

16  after the shooting?

17      A.   No.

18      Q.   How long were you in the hospital after

19  the shooting?

20          MR. KATZ:  Objection, asked and

21  answered.

22          THE COURT:  It's been asked and

23  answered, Counsel.

24          MR. MURRAY:  Judge, I asked about Cook

                    E215

Weston 033661

```
 1    County Hospital.
 2    BY MR. MURRAY:
 3        Q.   How long were you in hospitals total
 4    after the shooting?
 5        A.   I was in hospitals in and out for about
 6    16 to 18 months.
 7        Q.   When was the first time you were able to
 8    walk without a crutch or any sort of device like
 9    that?
10        A.   I would say approximately 16, 14, 16
11    months later.
12        Q.   14, 16 months later?
13        A.   Mm-hmm.
14             MR. MURRAY:  If I could just have one
15    moment, Judge.
16             THE COURT:  Of course.
17                      (Brief pause.)
18                      (WHEREUPON, People's Exhibit
19                      Numbers 29 and 30 were marked
20                      for identification.)
21             MR. MURRAY:  If I may approach, your
22    Honor?
23             THE COURT:  Of course.
24
                         E216
```

Weston 033662

BY MR. MURRAY:

Q.   Miss Coats, I'm going to show you People's Exhibit Number 29 and Number 30 for identification.  I'd ask if you recognize what house is shown in those two photographs?

A.   Yes.  It's our house.

Q.   Are those two different views of the front of your house?

A.   Yes.

Q.   Do those two photographs show the area where you were sitting on -- first off, does it show the area outside the fence where you were standing with Ron and Reggie?

A.   Yes, this one does.

Q.   That would be People's Exhibit Number 30; is that correct?

A.   Yes.

Q.   Could you put an "X" for the area where all three of you were standing?

A.   The gate was closed.

THE COURT:  The witness has marked on People's 30 for identification purposes.

BY MR. MURRAY:

Q.   Now, in the photograph the gate is open.

E217

Weston 033663

1    But you just said the gate was closed when you

2    were standing there; is that correct?

3        A.   Mm-hmm.

4        Q.   Do the two photographs show the area on

5    the stoop or on part of the cement porch where you

6    were standing -- where you were sitting after you

7    entered through the gate?

8        A.   Mm-hmm.

9        Q.   Could you mark one "X" for the area where

10   you and Ron were sitting and another "X" for the

11   area where Reggie was?

12       A.   Oh, this is where me and Ron was sitting,

13   and this was where Reggie was sitting

14   (indicating).

15       Q.   The second "X" where Reggie was, maybe

16   you should put a 2 next to that so we know it's a

17   different location from where you and Ron were.

18       A.   Okay (indicating.)

19                   (WHEREUPON, People's Exhibit

20                   Numbers 31 and 32 were marked

21                   for identification.)

22   BY MR. MURRAY:

23       Q.   Showing you People's Exhibit Number 31

24   for identification and Number 32.  Do you

                         E218

Weston 033664

1    recognize the area that's shown in these two

2    photographs?

3        A.   Yes.

4        Q.   And what is shown in those two

5    photographs?

6        A.   My inside front porch.

7        Q.   And those two photographs, do they

8    show the inside area from two different points of

9    view?

10       A.   Yes.

11       Q.   And does People's Exhibit Number 32 show

12   the outside door that you came through?

13       A.   Yes.

14       Q.   Is that the same door that Ron held

15   closed with his foot?

16       A.   Yes.

17       Q.   Now, you also described that a police

18   officer grabbed an article of clothing when she

19   arrived on the scene.  Do you see that in either

20   one of the two photographs?

21       A.   Yes.  This is it right here, and I'm sure

22   that's it right there (indicating).

23       Q.   It's in both photographs; is that

24   correct?

                    E219

Weston 033665

1          A.    Mm-hmm.

2          Q.    Could you please circle it in both

3    photographs?

4                THE COURT:  Which photograph is she

5    marking, Counsel?

6                MR. MURRAY:  31 she's circling now, and

7    now she's circling it in 32.  It's in both

8    photographs, your Honor.

9                THE COURT:  Thank you.

10                        (WHEREUPON, People's Exhibit

11                        Number 33 was marked for

12                        identification.)

13   BY MR. MURRAY:

14         Q.    Finally, I'd like to show you People's

15   Exhibit Number 33.  Do you recognize what's shown

16   in that photograph?

17         A.    Yes.

18         Q.    And what is shown in that photograph?

19         A.    The gunshot holes in my window.

20         Q.    And now, the window that we're looking at

21   there --

22                THE COURT:  Excuse me.  Please keep your

23   voice up.

24                     Miss Reporter, kindly read the

                          E220

Weston 033666

```
 1    witness' last statement.
 2                    (WHEREUPON, the record was
 3                    read as requested.)
 4            THE COURT:  Thank you.
 5                    Madam, the acoustics in this room
 6    are terrible.  Please keep your voice up so the
 7    juror in the far corner can hear you.
 8                    Please continue.
 9    BY MR. MURRAY:
10        Q.   Now, that window, is that window adjacent
11    to the doorway?
12        A.   Yes.
13        Q.   The photographs that I have shown you, 29
14    through 33, do they truly and accurately show your
15    porch and the bullet holes after the shooting took
16    place on May 29th of 1990?
17        A.   Yes.
18                    (WHEREUPON, People's Exhibit
19                    Number 34 through 37 were
20                    marked for identification.)
21            MR. MURRAY:  If I can again approach,
22    your Honor?
23            THE COURT:  Of course.
24


                        E221
```

Weston 033667

BY MR. MURRAY:

Q.    Showing you People's Exhibit Number 34, do you recognize what's shown in that photograph?

A.    Yes.

Q.    And what is shown in that photograph?

A.    Two bullet holes.

Q.    And where are they located on the photograph?  What building is shown in that photograph?

A.    My house.

Q.    And where in your house are those two bullet holes located?

A.    At the top of the house, top of the porch, outside porch.

Q.    Is that the area above the doorway?

A.    Yes.

Q.    Could you circle those bullet holes, please?

A.    (Indicating.)

THE COURT:  The witness is marking upon People's Exhibit Number 34 for identification purposes.

E222

Weston 033668

BY MR. MURRAY:

Q.   I'm now showing you People's Exhibit Number 35.  Do you recognize what's shown in that photograph?

A.   Yes.

Q.   What is that?

A.   That's the inside, two bullet holes.  That's on the inside of my porch, though.

Q.   So 35 is the inside of what we have just looked at on 34; is that correct?

A.   Yes.

Q.   Can you circle the two bullet holes again in that photograph?

A.   (Indicating.)

Q.   I'd like to show you People's Exhibit Number 36 for identification.  Let me just take those two out of your way.

Do you recognize what's shown in People's Exhibit Number 36?

A.   Yes.

Q.   What do you recognize there?

A.   The bullet holes on the side of my door.

Q.   Could you please circle those bullet holes?

E223

Weston 033669

```
1        A.    (Indicating.)

2        Q.    And that's three circles you have placed

3   in that exhibit; is that correct?

4        A.    Yes, it is.

5              THE COURT:  The witness is marking upon

6   People's Exhibit Number 36 for identification

7   purposes.

8   BY MR. MURRAY:

9        Q.    I'm now showing you 37 for

10  identification.  Do you recognize what's shown in

11  that photograph?

12       A.    Yes.

13       Q.    What is shown in that photograph?

14       A.    Bullet holes in the door and inside of

15  the wall.

16       Q.    And do those two photographs that I have

17  just shown you, 36 and 37, kind of cover parts of

18  the same area?

19       A.    Yes.

20       Q.    Could you please circle the bullet hole

21  that you have not circled from 35?

22       A.    (Indicating.)

23             THE COURT:  The witness is marking upon

24  People's Exhibit Number 37 marked for
```

E224

Weston 033670

1    identification purpose.

2    BY MR. MURRAY:

3        Q.   Do these photographs show the condition

4    of your house after the shots were fired on May

5    29th of 1990?

6        A.   Yes.

7        Q.   Miss Coats, of that group of individuals

8    that were firing at you and shot you on the

9    evening of May 29th, do you see any of those

10   people that were shooting at you in the courtroom

11   today?

12       A.   Yes.

13       Q.   Could you please point that person out

14   and describe what he's wearing today?

15       A.   Him.  He has on a black-and-white sweater

16   and a black tie, black-and-white tie (indicating).

17            MR. MURRAY:  Indicating for the record

18   the in-court identification of the defendant,

19   Demond Weston.

20            THE COURT:  It will so reflect.

21   BY MR. MURRAY:

22       Q.   Miss Coats, after you sustained these

23   gunshot wounds, and you spent some time in the

24   hospital, did you also go to a police station in

                        E225

1    July of 1990 to look at a lineup?

2        A.    Yes, I did.

3        Q.    The day you went to look at that lineup,

4    what was your condition that day?

5        A.    I was just recently out of the hospital.

6    I was still on crutches.

7        Q.    And the police station was at Area 3 at

8    39th and California; is that correct?

9        A.    Yes.

10        Q.    When you went to that lineup, were you

11    able to get up to the area -- when you went to

12    that police station, were you able to get up to

13    the area where the lineup was held?

14        A.    Yeah.  We had a hard time trying to

15    figure out how I was going to get up, because it

16    doesn't have an elevator, and it was on the third

17    floor.  So the police officers helped me up the

18    stairs.

19        Q.    When you looked at that lineup, what

20    room -- or do you recall the area where you were

21    at when you looked at the lineup?

22        A.    Yes.

23        Q.    And can you describe that area?

24        A.    It was like -- it resembled a closet.

E226

Weston 000485

1      Q.    And were you looking through a window?

2   Was there a window between you and the people in

3   the lineup?

4      A.    Yes.

5      Q.    When you looked at the lineup, did the

6   police describe to you how they were going to

7   conduct the lineup?

8      A.    Yes, they did.

9      Q.    What did they say to you how they would

10  conduct the lineup?

11     A.    They would ask each person to step

12  forward, side to side, step back, and for me not

13  to say anything until after everyone had stepped

14  forward after the whole thing was finished.

15     Q.    And did they do that?

16     A.    Yes, they did.

17     Q.    And while the police were doing that, did

18  you see anyone you recognized as being people out

19  there that night shooting at you?

20     A.    Yes, I did.

21     Q.    How many total did you see that you

22  recognized?

23     A.    Three.

24     Q.    And was the man you just identified in

E227

Weston 000486

1    court in that lineup that day?

2         A.   Yes, he was.

3         Q.   And did you identify him on that day?

4         A.   Yes, I did.

5         Q.   And you identified two others; is that

6    correct?

7         A.   Yes.

8              MR. MURRAY:  If I may approach again?

9              THE COURT:  Of course.

10   BY MR. MURRAY:

11        Q.   Miss Coats, I'm going to show you what

12   I'll first mark People's Exhibit Number 39.

13             MR. MC KAY:  38.

14             THE COURT:  38 is your next number.

15                  (WHEREUPON, People's Exhibit

16                  Number 38 was marked for

17                  identification.)

18   BY MR. MURRAY:

19        Q.   Do you recognize what this is a picture

20   of?

21        A.   Yes, the lineup.

22        Q.   Now, is that in the same area of Area 3

23   where you saw the lineup --

24        A.   Yes.

                        E228

Weston 000487

1     Q.   -- or is it in a different room?

2     A.   Well, I wasn't in the room with them, so

3  I was in the closet area.  But it basically looks

4  like where they were.

5     Q.   And those people as best you can recall,

6  are they in the same order they were when you

7  viewed them that afternoon?

8     A.   Yes.

9     Q.   And do you see the people you identified

10  in that lineup?

11     A.   Yes.

12     Q.   Can you please place an "X" over each one

13  of the three?

14     A.   (Indicating.)

15        THE COURT:  The witness is marking upon

16  People's Exhibit 38 marked for identification

17  purposes.

18  BY MR. MURRAY:

19     Q.   Now, I'm going to show you --

20        MR. MURRAY:  Judge, may the record

21  reflect that as left to right in the lineup, she's

22  placed an "X" over one, five, and seven.

23        THE COURT:  So reflect.

24

E229

Weston 033672

```
 1                          (WHEREUPON, People's Exhibit

 2                          Numbers 39 and 40 were marked

 3                          for identification.)

 4    BY MR. MURRAY:

 5         Q.   I'm going to show you People's Exhibit

 6    Numbers 39 and 40.  Do you recognize what's shown

 7    in those two photographs?

 8         A.   Yes.

 9         Q.   And what do you recognize to be shown in

10    those two photographs?

11         A.   The side views of the same.

12         Q.   And those are the same side views that

13    the officers asked you to look at --

14         A.   Yes.

15         Q.   -- before you made your identification;

16    is that correct?

17         A.   Yes.

18                          (WHEREUPON, People's Exhibit

19                          Numbers 41 through 43 were

20                          marked for identification.)

21    BY MR. MURRAY:

22         Q.   Showing you 41, 42, and 43, do you

23    recognize first what's shown in 41?

24         A.   Yes.
```

E230

Weston 033673

1    Q.   Is that one of the men you identified in

2    the lineup that day in July at Area 3

3    Headquarters?

4    A.   Yes.

5         MR. KATZ:   Judge, I'm going to object to

6    the relevancy of the witness identifying

7    individual photographs.

8         THE COURT:   I'm going to permit this to

9    stand.   Overruled.

10             You may proceed.

11   BY MR. MURRAY:

12   Q.   Showing you People's Exhibit Number 42,

13   is that another one of the individuals you

14   identified in the lineup?

15   A.   Yes, it is.

16   Q.   And showing you Number 43, is that

17   another one of the individuals you identified in

18   that lineup?

19   A.   Yes.

20   Q.   And People's Number 43, is that the same

21   person you have identified in court today?

22   A.   Yes.

23   Q.   All these photographs that I have shown

24   you from the lineup, do they truly and accurately

                    E231

1      show the composition of that lineup as you saw it

2      on that day?

3          A.   Yes.

4                        (WHEREUPON, People's Exhibit

5                        Number 44 was marked for

6                        identification.)

7                  MR. MURRAY:   Judge, I'm going to ask

8      if the witness can step down from the witness

9      stand.

10                 THE COURT:   You may step down, ma'am.

11     BY MR. MURRAY:

12         Q.   Miss Coats, do you recognize the area

13     shown in this diagram?

14         A.   Yes.

15         Q.   I'd ask you to stand a little bit to the

16     side so all the jurors can see it.

17                 Do you see your address on Justine

18     located on -- in this photograph?

19         A.   Yes.

20         Q.   And could you please put an "X"

21     underneath the address so we know which building

22     we're talking about.

23                 THE COURT:   Counsel, what is this

24     Exhibit Number?

                        E232

Weston 000489

1         MR. MURRAY:  44, I believe.

2         THE COURT:  The witness has marked on

3  People's Exhibit 44 for identification purposes.

4  BY MR. MURRAY:

5      Q.  In this photograph, can you look at this

6  photograph -- not this photograph, this diagram.

7  Can you see the area where you saw the group of

8  individuals across the street before they started

9  crossing on the diagonal towards your house?

10     A.  I'd say like about here (indicating.)

11     Q.  You placed a dot on there.  Could you put

12  a number one next to that dot?

13     A.  (Indicating.)

14     Q.  Now, you said they walked across the

15  street on a diagonal.  Can you draw a line to the

16  point where they stopped in front of your house

17  before they started shooting?

18     A.  Yes.

19     Q.  Would you please do that now, draw a

20  line?

21     A.  (Indicating.)

22     Q.  Would you put a number two in that area

23  where they stopped.

24     A.  (Indicating.)

E233

Weston 000490

1      Q.    Now, on the diagram you have drawn a

2   line and then you have drawn another little line.

3   That second line you've drawn there, does that

4   indicate where they stopped before they started

5   shooting?

6      A.    Yes.

7      Q.    Was the group all in one area, or were

8   they spread out a little bit?

9      A.    They were kind of spread out.

10     Q.    Now, also, in this photograph, we can

11  see -- can you see -- can you see the area where

12  you were seated, you and Ron and Reggie?

13     A.    Yes.

14     Q.    Can you put a couple of dots where you,

15  Ron, and Reggie were seated?

16     A.    Right here and right here (indicating.)

17          MR. MURRAY:  Indicating the witness has

18  placed two dots on either side of a drawing of

19  stairs.

20          THE COURT:  So reflect.

21  BY MR. MURRAY:

22     Q.    In this diagram, can you also place a

23  letter, "L," for where the light post was, the

24  city light post that you described earlier?

E234

1      A.    (Indicating) right here.

2           MR. MURRAY:  Indicating for the record,

3      the witness has placed an "L" on the diagram.

4           THE COURT:  So reflect.

5           MR. MURRAY:  You can take the witness

6      stand.

7      BY MR. MURRAY:

8      Q.   Miss Coats, when you were looking at the

9      lineup, you told us the detectives told you to

10     wait until the end of the lineup before you made

11     the identifications; is that correct?

12     A.   That's correct.

13     Q.   As you were viewing the lineup, what was

14     your reaction as you looked at the people in the

15     lineup?

16     A.   Fear, anger.

17          MR. KATZ:  Judge, objection.  It's

18     irrelevant what her emotional reaction was.

19          MR. MURRAY:  If I can rephrase the

20     question, Judge?

21          MR. KATZ:  Ask it be stricken.

22          THE COURT:  Very well.  I'll strike the

23     answer and sustain the objection.

24

E235

Weston 000492

BY MR. MURRAY:

Q. Before you communicated with the police officers the fact of your identification, did you recognize those three people as being part of the group that shot you on the evening of May 29, 1990?

A. Yes.

Q. That was before you communicated to the police officers; is that correct?

A. Yes.

MR. KATZ: Objection, asked and answered.

THE COURT: No, that answer will stand. Ask another question.

MR. MURRAY: Judge, I have no further questions.

THE COURT: You may inquire.

MR. KATZ: Thank you.

CROSS EXAMINATION

BY MR. KATZ:

Q. Miss Coats, do you know approximately what time this shooting took place?

A. I wasn't looking at my watch, but it was approximately -- after 10:00, a little bit after

E236

Weston 000493

1    10:00.

2         Q.   And how do you know it was a little bit

3    after 10:00?

4         A.   Because I know approximately how long I

5    had been out there.  My grandmother went out that

6    night, and I knew she had to be where she was

7    going at 10:00 o'clock, and I remember telling her

8    she was running late.

9         Q.   Now, when you say a little bit after

10   10:00, can you give us an idea of what you mean by

11   a little bit after?

12             MR. MURRAY:  Judge, I would object.  I

13   think the witness has tried to explain it to the

14   best of her ability already.

15             THE COURT:  I'm going to sustain the

16   objection.  With that, you may ask another

17   question, Counselor.

18             MR. KATZ:  Judge, I would just say

19   that --

20             THE COURT:  Counsel, if you have another

21   treadstone that may tend to refresh her

22   recollection, I'm not precluding you from pursuing

23   it.  That form of the question you have asked.

24   That objection is sustained.  Ask another

                        E237

```
 1    question.
 2    BY MR. KATZ:
 3         Q.   Can you be more specific as to the time?
 4         A.   I can't be specific.  I wasn't looking at
 5    my watch exactly.
 6         Q.   Was it before 10:30?
 7              MR. MURRAY:  Judge, I object.
 8    BY THE WITNESS:
 9         A.   It was a little after --
10              THE COURT:  I'll leave it stand.  I'll
11    leave the question stand.
12    BY MR. KATZ:
13         Q.   I'm sorry.  What was your answer?
14              THE COURT:  You may answer, ma'am.
15    BY THE WITNESS:
16         A.   It was a little after 10:00.  Yes, I
17    believe it was before 10:30.
18         Q.   A little after 10:00, before 10:30?
19         A.   Yes.
20         Q.   After the shooting took place, you
21    indicated the police came; is that correct?
22         A.   Yes.
23         Q.   Do you have -- did they come rather
24    quickly?
```

E238

Weston 000495

1      A.   I wouldn't be a good judge because it

2   seemed like a lifetime to me.  But I mean, I

3   wasn't looking at my watch.  I don't know how --

4   about the time that they came.

5      Q.   Fine.  You were still lying in the same

6   area on the porch --

7      A.   Yes.

8      Q.   -- when the police arrived, though; is

9   that correct?

10      A.   Yes.

11      Q.   Now, you had stated that you were with

12   both Ronald Nesbit and Reginald Norwood; is that

13   correct?

14      A.   Yes, that's correct.

15      Q.   And you had also stated that you had

16   noticed a group of guys hanging around; is that

17   correct?

18      A.   That's correct.

19      Q.   Okay.  Now, when was it that you first

20   noticed this group of guys hanging around?

21      A.   When we first -- when we were down in

22   front of my friend, Lisa's, house.

23      Q.   And can you tell us where that is?

24      A.   Two houses down from --

E239

Weston 000496

1    Q.   Do you know the address offhand?

2    A.   No.

3    Q.   Two houses in which direction?

4    A.   Going towards 56th.

5    Q.   So that would have been south, I believe;

6  right?

7    A.   Yeah.

8    Q.   Okay.  And when you saw this group, as

9  you characterized it, as hanging around, where

10  exactly were they located?

11   A.   On the corner of 55th but across the

12  street going towards 56th.

13   Q.   I'm sorry.  They were on the corner of

14  55th, but it was going towards 56th?

15   A.   This is my side of the house.  They were

16  across the street on this side of the house, but

17  on this corner.  This is 56th.  They were on this

18  corner.  We were over here.  They were over here

19  on this corner (indicating).

20   Q.   So they were actually on the corner of --

21   A.   It was still the corner --

22   Q.   -- 56th and Justine?

23   A.   No, it's still the corner of 55th.  You

24  have to cross the street to get to 56th.  They

E240

Weston 000497

1    were still on the corner of 55th going towards the

2    direction of 56th.

3         Q.   All right.   Just so that I understand.

4    I'm not getting it.   But they were on the corner

5    adjacent to 56th Street?

6         A.   This is our side of the house -- of the

7    block.

8         Q.   You're in the middle of the block; is

9    that correct?

10        A.   Right.   Okay.   But this is our side of

11   the block.   This is the other side of the block.

12   5530 is over here; I guess 5531 would be over

13   here, the odd numbers and whatever.

14               And this is where they were, right

15   over here on 55th.   You have to cross the street.

16   Then you'll be on the block of 56th.   It's on the

17   corner of 55th.

18        Q.   So they were about a half a block down

19   from your house; correct?

20        A.   Correct.

21        Q.   On the other side of the street?

22        A.   Correct.   Correct.

23        Q.   And they were standing right next to the

24   cross street?

                        E241

Weston 000498

1       A.    Right.

2       Q.    Of 56th?

3       A.    Of 55th.

4       Q.    Of 55th.  So they were in which direction

5    from your house, north or south?

6       A.    South.

7       Q.    They were south of your house?

8       A.    Yes.

9       Q.    But they were on 55th Street?

10      A.    On 55th Street.

11      Q.    Well, isn't 55th Street north of your

12   house, ma'am?

13      A.    We live on 55 -- my address was 5530

14   South Justine.  The block I lived on was the 5500

15   block of Justine.  This side -- that whole block

16   is the 5500 block of Justine.  They were still on

17   55th side.  You have to cross the street to go to

18   56th side.

19            THE COURT:  Counselor, perhaps you'd

20   like to look at one of the exhibits, that may be

21   of some assistance to you.

22            MR. KATZ:  Maybe we can try, Judge.  I'm

23   just not understanding this at all.

24            THE COURT:  Very well.  I'll permit a

                          E242

1    limited inquiry.

2              MR. KATZ:  Thank you.  I think we can

3    just leave it here because I think the jury can

4    see it.

5              THE COURT:  I'm going to suggest,

6    Counsel, you put it in the middle of the room.

7                   Madam, you may step down in the

8    middle of the courtroom as well.

9    BY MR. KATZ:

10       Q.   All right.  I'll show you what's been

11   marked People's Exhibit Number --

12              MR. MC KAY:  The plat is Number 44,

13   Judge.

14   BY MR. KATZ:

15       Q.   -- 44 for identification.  Does this

16   diagram show where the individuals were standing?

17       A.   No.

18       Q.   It does not?

19       A.   No.

20       Q.   Well, in looking at this diagram, can you

21   point the direction --

22       A.   Yeah.  This is the 5500 block.  They

23   weren't on this side.  They were on this side of

24   the street, but still on the corner of our block.

                        E243

Weston 000500

1          THE COURT:  I'm going to ask that you

2     rotate that exhibit for the benefit of the jurors

3     on the other side.  These ladies and gentlemen

4     haven't had the opportunity to see that exhibit as

5     well.

6     BY MR. KATZ:

7          Q.   Okay.  Well, let me ask you this, ma'am.

8     As you look at this diagram, straight up would be

9     north; is that correct?

10         A.   Yes.

11         Q.   So Garfield Boulevard is -- do you know

12    how far south that is?

13         A.   No.

14         Q.   Okay.  And your address is 5530; is that

15    correct?

16         A.   Yes.

17         Q.   And these individuals were located

18    somewhere down here; is that correct?

19         A.   Yes.

20         Q.   Okay.  So they were south of your

21    location towards 56th Street; is that correct?

22         A.   Exactly, yes.

23         Q.   But on the other side of Justine?

24         A.   Exactly.

                         E244

Weston 000501

```
 1        Q.    About a half a block south?

 2        A.    Right.

 3        Q.    Okay.  Thank you.

 4              Now, were they located at this

 5    location when you first saw them?

 6        A.    Yes.

 7        Q.    And approximately how much earlier before

 8    the shooting did you first see these -- this

 9    group?

10        A.    I'd say about maybe an hour around about,

11    maybe a little less.

12        Q.    So you saw them about an hour, which

13    would be maybe a little bit after 9:00 o'clock in

14    the evening?

15        A.    Yes.

16        Q.    Okay.  And when you did see them, where

17    were you -- I'm sorry.  Strike that.

18              You were at Lisa's house; isn't

19    that correct?

20        A.    Yes.

21        Q.    Okay.

22        A.    Lisa's house is three blocks from the

23    corner of 56th.

24        Q.    Lisa's house is three blocks from the
```

E245

1    corner?

2        A.    One, two, three.  Three houses.  I'm

3    sorry.

4        Q.    Okay.  Three houses from the corner.  But

5    two houses away from your house; is that correct?

6        A.    Yes.  Yes.

7        Q.    And you were conversing with your friends

8    in front of Lisa's house for some period of time;

9    is that correct?

10       A.    Yes.

11       Q.    From a little bit after 9:00 until about

12   what time?

13       A.    Until about 10:00.

14       Q.    Shortly before the shooting?

15       A.    Yes.

16       Q.    Okay.  And during this period of time,

17   was this group of boys, as you put it, hanging

18   around?

19       A.    Yeah.  They were just hanging around over

20   there.

21       Q.    Was it the same individuals that

22   eventually turned out to end up in front of your

23   house and engage in the shooting?

24       A.    Yes.

                        E246

1    Q.   And did you happen to notice whether my
2  client, Demond Weston -- strike that.
3            THE COURT:   Stricken.
4  BY MR. KATZ:
5    Q.   Did you happen to recognize my client in
6  that group when they were hanging around the
7  corner of 55th, 56th, however you want to put it,
8  and Justine?
9    A.   When they were at the corner, I didn't
10 pay much attention to them.
11   Q.   Okay.  Now, you walked toward your house?
12   A.   Yes.
13   Q.   And when you got there, did you happen to
14 notice where this group was at that time?
15   A.   Yes.  They were still at the corner.
16   Q.   The same corner you had originally seen
17 them a little bit after 9:00?
18   A.   Yes.
19   Q.   Okay.  And did you happen to notice what
20 they did?
21   A.   Well, they had -- well, we saw that they
22 were messing -- well, they were bothering
23 somebody, but at the time, I couldn't see who it
24 was.  Then when they got a little bit closer, I

E247

Weston 000504

1  saw that it was my neighbor across the street.

2      Q.   So you noticed them walking down the

3  street in your direction?

4      A.   Yes.

5      Q.   The entire group?

6      A.   Yes.

7      Q.   And approximately how many people were in

8  this group when you saw them a little bit after

9  9:00 would you say?

10     A.   Around about eight.

11     Q.   And it was the same number of people that

12 you saw later on in front of your house when the

13 shooting started; right?

14     A.   Yes.

15     Q.   Were they walking down the sidewalk

16 towards your house or towards the street?  And

17 when I say towards your house, I mean in the

18 direction of your house.

19     A.   Yes.

20     Q.   I'm sorry.  What was it, the street or

21 the sidewalk?

22     A.   They were walking on the sidewalk until

23 they got to my friend across the street's house,

24 and then they started walking in towards the

E248

Weston 000505

1   street.

2       Q.   All right.   That's when you indicated

3   they went diagonally --

4       A.   Yes.

5       Q.   -- toward your house?

6       A.   Yes.

7       Q.   And you indicated they were messing with

8   a friend of yours or an acquaintance of yours from

9   the neighborhood?

10      A.   Yes.

11      Q.   And when did that start up?

12      A.   Well, by the time we had made it down to

13  in front of my house, we turned around, and that's

14  what they were doing.

15      Q.   All right.   This individual that you're

16  saying was being messed around with, he wasn't

17  part of the original group, was he?

18      A.   No.

19      Q.   He was just standing there by his

20  house?

21      A.   No.   I don't know where he came from.

22      Q.   Oh.

23      A.   But I know that was him.

24      Q.   And when you say messing, you mean like

E249

Weston 033675

1    they were maybe pushing him?

2        A.    Pushing him around and stuff.

3        Q.    Okay.  And you indicated they pushed him

4    into his house?

5        A.    Yes.

6        Q.    Physically pushed him into his house?

7        A.    Pushed him.

8        Q.    And that's when they headed diagonally

9    towards your house?

10       A.    Yes.

11       Q.    And during this period of time, you were

12    watching them; is that correct?

13       A.    Yes.

14       Q.    It was dark out?

15       A.    Yes.

16       Q.    There was a streetlight across the street

17    from your house?

18       A.    Yes.

19       Q.    And when they headed diagonally towards

20    your house, did they stop in the middle of the

21    street in front of your house?

22       A.    Yeah, closer to my house.

23       Q.    A little bit closer, but still in the

24    street?

E250

Weston 033676

1      A.    Yes.

2      Q.    And now, you were located outside the

3  gate at that time?

4      A.    No, inside the gate.

5      Q.    Inside the gate?

6      A.    Yes.

7      Q.    And the gate was closed?

8      A.    Yes.

9      Q.    Now, the gate is pretty close to the

10  sidewalk, however; isn't that correct?

11      A.    Yes.

12      Q.    And then a short way from the gate, also,

13  is the steps up into an enclosed porch; is that

14  correct?

15      A.    Yes.

16      Q.    And you noticed that these individuals

17  were -- had jeans on, you said?

18      A.    Yes.

19      Q.    And they had dark clothes?

20      A.    Yes.

21      Q.    Starter jackets?

22      A.    Yes.

23      Q.    What do you mean by starter jackets?

24      A.    Starter jackets are gang jackets.

E251

Weston 000506

1      Q.   Well, you mean, like, baseball jacket

2   type things, sports jackets?

3      A.   Yeah.  Not exactly what I would call a

4   sports jacket.  It's like a baseball jacket or a

5   basketball team or football team, and it's their

6   starter jacket.

7      Q.   Starter is the manufacturer of the

8   jacket, I believe; is that correct?

9      A.   I don't know who manufactures it.

10      Q.   But it's a sports type jacket?

11      A.   Yes.

12      Q.   And they also -- some of them had hats

13   on?

14      A.   Yes.

15      Q.   What kind of hats?

16      A.   Caps, wool.

17      Q.   Baseball caps?

18      A.   Yes, and wool.

19      Q.   Wool hats?

20      A.   Yeah.

21      Q.   Like the winter type?

22      A.   Like the -- you know (indicating).

23      Q.   The knitted type?

24      A.   Yeah, like that.

E252

1    Q.   Okay.  Did they all have hats on if you

2 remember?

3    A.   I remember some of them did.

4    Q.   And you said that they got to this point

5 near your house, and they all just pulled out

6 their guns, and they all started shooting; is that

7 correct?

8    A.   Yes.

9    Q.   All eight of them?

10   A.   Yes.

11   Q.   Okay.  And each one had a gun?

12   A.   From what I can see, yes.

13   Q.   And was it almost immediately that you

14 were shot the first time?

15   A.   No, because Ron and Reggie had time to

16 run into the house, and I just stood there.

17   Q.   Up until the time that the shooting

18 started, Ron and Reggie were standing there in the

19 same location that you were?

20   A.   Yes.

21   Q.   As far as you could tell, they were

22 looking at the same individuals?

23   A.   Yes.

24   Q.   While you were looking at them?

E253

Weston 000508

1          MR. MURRAY:   Objection to what she could

2     tell they're looking at, Judge.

3          THE COURT:   Sustained.   Proceed.   Answer

4     stricken.

5     BY MR. KATZ:

6          Q.   Now, can you tell me what the man that

7     you have identified as Demond Weston -- when you

8     first noticed him?

9          A.   I first noticed him across the street

10    when he pushed -- when they were pushing my friend

11    into the house.  I noticed him as they were

12    walking to the front in the middle of the street,

13    and I noticed him when he shot me.

14         Q.   Okay.  You had never seen him before; is

15    that correct?

16         A.   No, I hadn't.

17         Q.   You had never seen any of these

18    individuals before?

19         A.   No.

20         Q.   Can you tell me what type of hat he had

21    on at that time?

22         A.   I can't recall his hat.

23         Q.   Can you tell me what type of other

24    clothing that he had on at that time?

                        E254

Weston 000509

1    A.    Jeans, dark clothing.

2    Q.    But they all had jeans and dark clothing

3  on; isn't that correct?

4    A.    From what I could see, yes.

5    Q.    From what you can see?

6    A.    Yes.

7    Q.    It was dark out; isn't that correct?

8    A.    They were standing under the light.

9    Q.    While they were pushing this guy around

10  or when they were shooting?

11    A.    The light is on his side of the street.

12  It's directly in front of his house.  It shines

13  right in front of his house.  You can see the

14  light reflection right in front of his house to

15  the middle of the street.

16    Q.    Is his house directly across the street

17  from yours, your friend's?

18    A.    His house is directly across the street,

19  one house over.

20    Q.    One house over.  This group of eight

21  individuals, when they started shooting, were

22  they, like, all in one line, or how were they

23  arrayed?

24    A.    They weren't standing all in one line.

E255

**Weston 033678**

1    They were, like, sort of straddled, but straight

2    across like that.

3        Q.   All right.   And where was Demond

4    standing, the man you have identified as Demond,

5    within this group when the shooting started?

6        A.   I'd say he was standing closer to the

7    middle.

8        Q.   And you actually saw him take out a

9    gun?

10       A.   Yes, I did.

11       Q.   Can you describe the gun that he took

12   out?

13       A.   A gun.   I mean, I don't know anything

14   about guns.   I just knew it was a gun.

15       Q.   But at the same time, you saw the other

16   seven individuals taking out guns, too; isn't that

17   correct?

18       A.   Yes.

19       Q.   And you don't really know who shot you,

20   do you?

21       A.   Yes, I do.

22       Q.   Who are you saying shot you?

23       A.   I'm saying it was them, all of them.

24       Q.   Oh.   You don't know specifically which

E256

Weston 033679

1     one of the group shot you is what I'm asking you,

2     ma'am.

3          A.   I don't know.

4          Q.   How long do you think they were messing

5     with your friend across the street?

6          A.   From the time -- from the corner to his

7     house.

8          Q.   Oh, he was down on the corner where they

9     were originally hanging out?

10         A.   That's when I saw them start messing with

11    him.  I don't know where he came from.

12         Q.   How long were they under the streetlight

13    messing with your friend across the street?

14         A.   Very brief.  Because they pushed him in

15    the house, and he just ran in the house.

16         Q.   A few seconds?

17         A.   I don't know exactly.  I would say

18    approximately around about maybe 30 seconds maybe.

19         Q.   How long did it take them to walk

20    diagonally across the street to where they started

21    shooting?

22         A.   I don't know.

23         Q.   Was it pretty quick?

24         A.   Yeah, they got there pretty quick.

E257

Weston 033680

1      Q.   And I take it that the shooting happened
2  pretty quickly, too?
3      A.   Not to me, it didn't.
4      Q.   After you were shot, though, you turned
5  your back and ran; is that correct?
6      A.   I turned my back and ran up the stairs
7  where I was shot again.
8      Q.   Right.
9      Q.   Did some of these individuals that were
10 wearing the knitted hats, did they have them
11 pulled down over their heads?
12     A.   No.
13     Q.   No?
14     A.   No.
15     Q.   How about the ones that were wearing
16 the baseball hats, did they have them pulled
17 down?
18     A.   No.
19     Q.   Did they have them turned to either the
20 left or the right, the bills of the hat that you
21 recalled?
22     A.   They had them turned.
23     Q.   They did or they did not?
24     A.   Did.

E258

Weston 033681

1     Q.  Which direction?  Do you recall?

2     A.  No, I don't recall which direction.

3     Q.  Now, do you recall speaking with an

4  Officer Thompson, T-h-o-m-p-s-o-n, or an Officer

5  McLaughlin, M-c-L-a-u-g-h-l-i-n, on May 29,

6  1990?

7     A.  I spoke to a lot of officers.  I don't

8  know their names.

9     Q.  Do you recall telling these officers that

10  you spoke with on that date that there were five

11  individuals that were involved in this?

12     A.  Yeah.

13     Q.  You did tell them that?

14     A.  Yeah, I recall.

15     Q.  And the only clothing

16  description -- strike that.

17            You gave them a clothing

18  description of what these individuals were

19  wearing, also; isn't that correct?

20     A.  Very brief.  I was laying on the trauma

21  unit board.  I was in and out of it.  I gave them

22  what I could remember at the time.  What I could

23  recall at the time.

24     Q.  And what you told them was that they were

E259

Weston 033682

1    all wearing starter jackets; correct?

2           MR. MC KAY:  Judge, objection.  That's

3    not impeaching.

4           THE COURT:  Well, what ultimately is

5    impeaching is for the ladies and gentlemen of the

6    jury to make a determination.

7               With that, you may proceed.  You

8    may answer the question, ma'am.

9    BY MR. KATZ:

10       Q.   Do you recall telling the officers that?

11       A.   I don't recall what I told them.

12       Q.   Do you recall telling these same officers

13   that six shots were fired?

14       A.   I don't recall telling them.  I mean,

15   that day was -- that night --

16          MR. KATZ:  Okay.  Thank you.

17          MR. MC KAY:  Judge, objection.

18          MR. KATZ:  I would object as not

19   responsive after the initial answer.

20          THE COURT:  Her answer will be

21   completed.

22               Finish your answer, madam.

23   BY THE WITNESS:

24       A.   I don't recall what was happening when I

                        E260

Weston 033683

1    was laying on the emergency room table.

2          THE COURT:  Ask another question,

3    please.

4          MR. KATZ:  Thank you.

5    BY MR. KATZ:

6       Q.   Do you recall speaking with a Detective

7    Maskala, M-a-s-k-a-l-a, either on May 29th or May

8    30th of 1990?

9       A.   I might have.

10       Q.   Okay.  I assume he would have been in

11    plain clothes?

12       A.   I don't know.

13       Q.   Do you recall telling this particular

14    officer that -- and by the way, do you recall

15    speaking with this officer in the hospital,

16    Cook County Hospital, Ward Number 32?

17       A.   I spoke to quite a few officers.

18       Q.   Okay.  Do you recall telling this officer

19    that one of the offenders pulled out a gun and

20    started shooting?

21       A.   I don't recall saying that.

22       Q.   Do you recall telling the same officer

23    that there were ten or more offenders?

24       A.   I don't recall saying that.

E261

Weston 033684

1    Q.    Do you recall telling the officer that

2  you weren't hit at first or that nothing was hit

3  at first?

4          MR. MURRAY:  Objection, Judge.  It's not

5  impeaching.

6          THE COURT:  It may well be.  He has a

7  right to ask the question.  It's for the ladies

8  and gentlemen of the jury to determine the facts

9  in this case.

10          You may ask that question if you

11  like, however, Counsel.

12          MR. KATZ:  Thank you.

13          THE COURT:  You may answer, ma'am.

14          THE WITNESS:  Can you repeat the

15  question?  I'm sorry.

16  BY MR. KATZ:

17    Q.    Sure.  Do you recall telling the same

18  officer that the -- after the one individual

19  started firing, he didn't hit anything or words to

20  that effect?

21    A.    I don't recall.

22    Q.    Okay.  And then do you recall telling

23  the same officer then that then more started

24  shooting?

E262

Weston 033685

```
 1        A.    I don't recall saying that.

 2        Q.    Okay.  Now, your friend, Reggie, knew

 3   these people; right?

 4        A.    I don't know if he did or didn't.  He

 5   told me he didn't.

 6        Q.    He told you he didn't?

 7        A.    Yes, he told me he didn't.

 8        Q.    Didn't you again tell the same officers

 9   that Reggie told you that he did know them?

10        A.    No, I don't recall saying that.

11        Q.    Okay.  Do you recall Reggie saying

12   anything to these individuals --

13        A.    Yes.

14        Q.    -- at that time?  And what did Reggie say

15   if you recall?

16        A.    He said, What up now, Folk.

17        Q.    Now, when you viewed this lineup on July

18   17th of 1990, you went there with another

19   individual; is that correct?

20        A.    When I viewed the lineup?

21        Q.    Well, when you went to the police

22   station?

23        A.    No.

24        Q.    Well, to the best of your knowledge, was
```

E263

Weston 033686

1    there another individual -- strike that.

2                    Was Reginald Norwood there to view

3    the lineup, also, as far as you could tell?

4        A.   Yes, he was there, but he didn't come

5    with me.

6        Q.   Okay.  And as far as you know, he did

7    view that lineup; isn't that correct?

8        A.   As far as I know.

9             MR. KATZ:  Thank you, Miss Coats.

10            THE COURT:  Redirect if any?

11                 REDIRECT EXAMINATION

12                 BY MR. MURRAY:

13       Q.   Miss Coats, there was also a couple of

14   defense attorneys present when you were doing that

15   lineup, were there not?

16       A.   Yes, there was.

17       Q.   Miss Coats, you said that you told the

18   police officers there was only five people in the

19   group?  Did you tell the police officers that?

20       A.   I probably did.

21       Q.   And, Miss Coats, when you told the police

22   officers that, what condition were you in?

23       A.   I was on -- I was under anesthesia.  I

24   was on the trauma unit.  I had just came in.  They

                        E264

1  were working on me.  They put the officers out.

2      Q.   Miss Coats, in fact, it was more than

3  five people; is that correct?

4      A.   Yes.

5          MR. MURRAY:  Nothing else.

6          THE COURT:  Recross if any?

7          MR. KATZ:  Nothing further.

8          THE COURT:  You may step down, ma'am.

9              (Witness excused.)

10          THE COURT:  Ladies and gentlemen, one

11  additional witness will be called for today.

12              With that, you may call your next

13  witness.

14          MR. MURRAY:  Judge, we might need a

15  minute.  He might be down the hallway.

16          THE COURT:  Very well.

17              (Brief pause.)

18          THE COURT:  Please raise your right

19  hand.

20              (Witness sworn.)

21          THE COURT:  Please be seated.  Please

22  keep your voice up.

23

24

E265

Weston 033688

# Exhibit 11

**Case Review and Analysis**

January 22, 2024

To: Theresa Kleinhaus

From: Joseph Allio

Subject: Demond Weston v City of Chicago

**Purpose:**

This review was conducted at the request of Theresa Kleinhaus of Loevy & Loevy regarding the lawsuit, Demond Weston v. City of Chicago. The purpose of this review is to analyze the investigation leading to the arrest and conviction of Demond Weston with an emphasis on the investigative process and procedures. Specifically, the assessment will examine the quality and content of this investigation.

**Subject Matter Expertise:**

As the reviewer of this case, I have more than 30 years of municipal law enforcement experience. I began my career in 1984 and most recently served as an interim police chief in 2022, a career span of 38 years.

As a California Police Officer, I attended more than 2,300 hours of training certified by the California Commission on Peace Officer Standards and Training (POST). I obtained all POST certifications from Basic POST through the completion of the Executive Certification. Relevant to this case review are the following POST training courses:

• Basic POST course; covering basic crime scene response, neighborhood canvassing, report writing, evidence documentation, collection, interviewing, and suspect identification (580Hrs)
● Homicide and Violent Crime Investigation (36Hrs)
● Search and Arrest Warrant Course (28Hrs)
● Supervisory Course (80Hrs)
● Leadership and Accountability Course (16Hrs)
● Critical Incident Response for Supervisor (32Hrs)
● Management Course (104Hrs)

Additionally, I am also a member of the International Association of Chiefs of Police and have attended training conferences in furtherance of my criminal justice and leadership career. Relevant to this case, I have served as a violent crime detective. In this role, I worked homicide cases for nearly five years, including during the 1990s. I then supervised and managed violent crime/homicide investigations throughout my role in police leadership.

I have served as police chief in three Northern California cities: the cities of Fairfield, Vacaville, and Vallejo.

As the interim police chief for the City of Vallejo, I facilitated a comprehensive audit of all areas of law enforcement in that city. I worked closely with the designated OIR Group from Southern California with an overarching goal of providing 100% accessibility within the police department. A key achievement was opening a line of communication for internal information needed to accurately audit policing in the city.

When I completed my term as the interim police chief for the City of Vallejo, the law firm Sloan Sakai Yeung & Wang LLP hired me as a subject matter expert to develop an implementation plan for the City of Vallejo, based on the OIR Group's audit and recommendations. After completing the implementation plan, the City of Vallejo approached and offered me the position of assistant police chief to make the recommendations operational.

The audit review was broad-based, and the completed audit's majority focus was on officer-involved shootings, use-of-force incidents, training, and community engagement. Relevant to this review, however, was the additional focus on accountability across multiple areas of the department. The lack of appropriate supervision within the organization led to a lack of accountability within the police department.

During this assignment, the California Department of Justice entered into an overview agreement with the Vallejo Police Department. The Justice Department contracted with Hillard Heintze of Chicago to facilitate the Vallejo oversight and implement the audit recommendations. By the conclusion of the assignment, I had worked effectively with both the Justice Department, the Hillard Heintze group, and the City of Vallejo work group and initiated the necessary reforms that had been designated as priorities for the City's police department.

Most recently, between 2021 and 2022, I served as interim police chief for the City of Vacaville. They asked me to review areas of needed reform within the police

2

department and to hire an outside firm to conduct an audit of police activity within the department's jurisdiction. By the conclusion of the assignment in January 2022, I had selected an audit firm and also accomplished a number of high-priority reforms that were identified.

**Approach:**

I have reviewed the documents listed in the attached Appendix, provided to me by Loevy & Loevy and I have also completed a review of the criminal investigation's source material. I have applied my knowledge of police procedure and investigative practices, based on my training, education, and experience, to the facts and allegations in this case in order to render my opinions.

The conclusion and opinions drawn within this report are based on my examination of all the information available at the time of the review. Those same conclusions and opinions rely upon my knowledge and expertise, drawn from 30-plus years of service.

**Criminal Investigations Source Material:**

*Practical Homicide Investigation; Vernon J. Gerberth (Fifth Edition) O'Hara's*

*Fundamentals of Criminal Investigation; DeVere D. Woods, Jr. 2019 US*

*Scientific American Magazine; Hal Arkowitz, January 1, 2010*

**Review: Factual Background on the Investigation of the May 29, 1990 Shootings and the June 8, 1990 Murder of Curtis Sims**

**A. Investigation May 29, 1990-June 9, 1990**

**1. Evidence at the Scenes**

On May 29, 1990, at approximately 10:28 pm, Joseph Watson was shot and killed near 57th and Wolcott in the city of Chicago. Timothy Jones was also wounded in this shooting. Watson and Jones were only 19 and 14 respectively.

After the shooting, Timothy Jones stated he could identify the suspects who shot him. According to police reports, Jones stated there were four offenders approximately

18-19 years old and that they yelled "G.D.," a slogan for the "Gangster Disciples" street gang. Jones later explained that the shooters stepped out of a gangway.

Two other shootings with multiple shooting victims occurred close in time and location to the murder of Watson:

Between 10 and 10:30 on May 29, 1990, Deneen Coats and Ronald Nesbitt were shot at 5530 S. Justine, a little over half a mile away from the 57th and Wolcott shooting. According to police reports, Reginald Norwood, a witness to the shooting, saw seven people walk up to the address where he and Deneen were talking. One of them pulled out a gun and started shooting.

According to the police reports, Coats saw ten or more individuals. According to the General Progress Report (GPR), Coats stated she had never seen the guys before but "Reggie knew them." When Deneen asked Reggie, Reggie told her the names of offenders. The police file does not demonstrate any follow up investigation with Reginald Norwood as to the names of offenders he identified to Deneen Coats.

Ronald Nesbitt described "five to ten guys" and thought that Reginald Norwood may have said something to them before they shot. Ronald Nesbitt, who was next to Coats on the porch, testified that he could not see the faces of the offenders because it was dark outside.

Between 10:30 and 10:40 on May 29, 1990, JD Lee and Pierre Solomon were shot at 5759 S. Honore, about .7 miles from the Justine shooting. A witness reported seeing 6-7 people, around 17-18 years old some of whom were dressed in all black with hoods.

Cartridges from a .9 mm gun were found at each scene.

### 2. Initial Description of a Car Near One of the Scenes and Interrogation of Hampton

Two witnesses, James Hale (identified as a Vice Lord) and Solomon Montague said they had seen a Blue Chevy near the shooting at 57th & Wolcott and that four "Cottage Boys" (members of the "Black Disciples") including "Johnny Walker" and "C.C.[1], got out of the vehicle." Hale walked down the block and heard gunshots. Hale later saw the same car "traveling at a high rate of speed."

---

[1] "C.C." was never identified or attempted to be identified in the investigation. No witness or suspect was ever identified as a member of the "Black Disciples."

4

Shortly thereafter, detectives located a Blue Chevy and determined that Bryan Hampton was the owner. Hampton's nickname was "Biz." They brought Hampton to the police station for questioning. Police towed the vehicle and tested it for fingerprints.

According to Bryan Hampton and Nate McCurine, they shared the Blue Chevy and McCurine had taken the vehicle near 57th and Wolcott on May 29, 1990 to see a girlfriend who lived near there. Hampton testified at deposition that he did not know anything about the shootings on May 29, 1990. He told this to the police, but they refused to accept his account. He reports being detained by police for nearly three days where he was coerced by officers who used physical force and threatened him into giving a fabricated account of the shootings, fed to him by police. He testified that police later pressured him to give the same account to the grand jury.

According to police, Hampton gave the following narrative: He, Darrin Laws, and McCurine met up with Jerrod Smith ("J. Dilla") and John Walker; Walker and Smith talked about putting a "wrecking crew" together "because the Vice Lords had been shooting at them recently," and "Walker's rear window had been shot out;" J. Dilla wanted use of Hampton's car because "Walker's front passenger door was broken;" Hampton gave his car to McCurine for the "wrecking crew;" McCurine later told Hampton that he picked up Jerrod Smith, John Walker, and Servan Allen, and dropped them off at 57th and Wolcott, he heard gun shots, and then Smith, Walker, and Allen[2] got back in the car and said they had "done their business." Hampton never mentioned Demond Weston.

### 3. Smith, Jackson, and Walker were known to police prior to May 29, 1990.

Smith, Jackson, and Walker had had a previous negative encounter with Area Three Detectives, including Defendants Kill and Paladino. Specifically, a few months before the May 29, 1990 shootings, they reported that they were interrogated related to another shooting and were let go because the victim of that shooting did not identify them. Subsequently (and before the May 29, 1990 shootings), detectives would harass them and make sarcastic comments to them in the neighborhood.

### 4. Interrogations of McCurine, Jackson, & Walker

McCurine, Jackson, and Walker were questioned by police about the May 29, 1990 shootings. According to the police reports, McCurine gave an evolving account where at first he only admitted to discussing a "wrecking crew" with Walker and Smith, then later "admits" that he saw Jerrod Smith, John Walker, and Keith Jackson the night

---

[2] The police reports state that Allen denied any involvement in the shootings.

of the shooting and that later Jackson, Smith, and Walker admitted to being involved in the shootings and that "Smith was armed with a .38 caliber handgun and Walker had a .9 mm semi-automatic pistol. Jackson had some sort of semi-automatic pistol," then later "admitted" to driving Jackson, Smith, and Walker on the night of the shooting. As explained below, McCurine testified this was part of a false narrative fed to him by police. He never mentioned Demond Weston.

According to police, Keith Jackson denied involvement with the shootings; he didn't know who "Biz" was; he "knew John Walker and Walker had had his window shot out by Vice Lords." Keith Jackson (now known as Keith Strong) testified at his deposition that he knew Tim Jones, JD Lee, Pierre Solomon, and Derek Mason (all victims in the shootings) at the time of the shootings. He was not involved in the shootings and would never have shot those individuals. He testified that police used physical force and verbal abuse during a lengthy interrogation and tried to lead him into a fabricated story about the shootings.

According to police reports, John Walker denied all involvement in the shootings. At his deposition, he testified that police arrested him and he truthfully denied involvement with the shootings. The police used physical force on him during a lengthy interrogation. Officer Kill choked him and put his cigarette in his face. Walker testified he had never been in Hampton's vehicle. He further testified that police interviewed his girlfriend and mother of his child and also threatened her. Walker testified his car (a red Delta 88) had not suffered any damage in May 1990.

Hampton, Walker, Jackson, and McCurine all testified they never knew Demond Weston before they were ultimately charged together for the May 29, 1990 shootings. Indeed, none of them were even asked about Weston during their interrogations. Nor is Weston mentioned in the police summary of their interviews.

**5. "Shank" is identified as a suspect with a bullet-damaged car fitting the description of the car near the 57th & Wolcott scene and a .9 mm gun.**

On June 1, 1990, detectives spoke with Sylvester Washington who reported that a "Shank" had a four-door Blue Chevy with a bullet hole in it. "Shank" had a .9 mm gun. "Shank" is not identified by his proper name in the police file.

Washington added that "Terrell" knew who did the shooting[3]; the file does not show any follow up on that lead. According to police, Washington later implicated Hampton and McCurine in the shootings, along with Darrin Laws.

---

[3] Elsewhere witnesses identified a "Don Teril" as a relative of Deneen Coats and a Vice Lord.

On June 4, 1990, a "Kavin McMorris" was given a polygraph exam. Nothing in the homicide file identifies who Mr. McMorris is or why he was interviewed. However, the prosecutor's file contains polygraph notes that state that Mr. McMorris's nickname was "Shank." The polygraph report notes appear to state "'S' stated Farmer Dell told him he & six others involved in shooting—Farmer Dell say he shoot one in the head."

Detective Moser testified he would have interviewed Mr. McMorris, a suspect in the shootings, before sending him to be polygraphed and that a report of that interview should exist. It is not in the police file or prosecutor file.

### 6. Additional Suspects Never Pursued

Other witnesses blamed the "Bogus boys" and "Dan Tanna and boys" for the shootings as well as "Black Mike, Killer Ed, Baby Midnite," and "Pac Man." These individuals apparently wanted to retaliate against the Vice Lords. Another witness noted the presence of "Sly" and "Ezell." The police file records show no follow-up on any of these leads beyond a few notes of potential identifying information.

### 7. No One Mentioned Demond's Name During the Entire Investigation from May 29, 1990-June 8, 1990.

Between the murder of Joseph Watson and the arrest of Demond Weston, the following persons were interviewed by CPD: James Hale, Solomon Montague, Bryan Hampton, Darrin Laws, Nathaniel McCurine, Maria Johnson, Servan Allen, Keith Jackson, John Walker, Anita Gladney. Each person interviewed gave various descriptions of what they did and who they saw on the night of Watson's murder.

It is clear reviewing the totality of these 10 person's statements, that many, if not all, know each other. Some link the possibility of persons in this group discussing and taking gang action against others on May 29, 1990. Some name potential suspects, for example:
- Hale names Walker and CC
- Montague also names Walker and CC
- Hampton names McCurine and Laws
- Laws named Walker and Smith
- McCurine names Smith, Walker, and Allen, stating they all had guns

None of the people name Demond Weston as being seen with any of those named the night of Watson's murder. In fact, Weston is not mentioned at all by any of the 10 persons listed.

### 8. The Firearms Analysis

On June 1, 1990, police determined that the same gun had fired .9 mm cartridges found at each of the three scenes of the May 29 shootings.

A June 1, 1990 memorandum written to Captain Paul Gall from Firearms Examiner Ernest Warner connects the weapon used in the May 27, 1990 Murder of Michael Thomas to the three shootings on May 29, 1990.

On June 2, 1990, police learned that bullets from a .38 mm and .22 mm were found in the body of Joseph Watson.

### B. The Murder of Curtis Sims

On June 8, 1990, Curtis Sims was shot and killed. Chicago Police Department (CPD) detectives developed suspects in the Sims murder. The suspects were identified as Dwayne Macklin, William Childs, and "Cortez Brown" (an alias used by Victor Safford) also known as "Vic."

On June 9, 1990, at approximately 10 a.m. police came to 5928 S. Union Street and arrested Dwayne Macklin for the murder of Curtis Sims. Apparently, Brown fled from this location causing CPD detectives to drive around the neighborhood with Macklin looking for Brown.

Police seized a gun believed to be used in the Sims shooting. Police determined that the same gun, a .9 mm, had been used in the May 29, 1990 shootings and the shooting of Curtis Sims. In 2009, it came to light that Pamela McCurdy, the mother of Vic Brown, purchased the .9 mm gun on May 14, 1990.

### 1. The Search for Vic Brown and Arrest of Demond Weston

According to Macklin and Weston, Macklin was in the back of Detective Kill's police car at about 12:00 p.m. when Detective Kill stopped the vehicle and seized Weston on the street at 5926 S. Union, next door to the location where Defendants had arrested Macklin and from which Brown had escaped, earlier that morning.

8

In a 2019 affidavit Macklin names a fellow suspect as William Childs being arrested with him on June 9, 1990 related to the Sims murder. Macklin calls him "Boo-man."

According to Detective Kill, he arrested Macklin on June 9, 1990 and took him back to the station and interrogated him, at which point Macklin implicated Weston in the May 29, 1990 shootings. According to Kill, he then went and arrested Weston at approximately 4:00 p.m.

By contrast, Macklin stated that he watched Kill seize Weston from the street without ever having been taken to a police station and without ever having implicated Weston in anything.

Weston testified that Kill asked him more than once if he was "Vic." Weston testified that he said no, Kill said "you'll do," and later said "Macklin better come up with something." Weston describes Detective Kill telling persons present to mind their own business because they will "never see his (Weston) black ass again." Michael Covington, who was present that day, also testified in his deposition that he remembered a remark to that effect.

## 2. The Interrogation of Dwayne Macklin

Macklin testified at his deposition that police officers, including Kill, physically abused him and threatened him during his interrogation. The police eventually fed him facts about the May 29, 1990 shootings. According to Macklin, his entire statement was fabricated by police.

According to police, Macklin reported that on May 29, 1990 he was with "Vic Brown" and "Boo Man Demond Weston[4]" when they were approached by Ronnie Black and told they were forming a "wrecking crew" because Vice Lords were selling drugs on their turf. According to police, Keith Jackson and "Tony Miller" approached Macklin. In this account, Macklin saw a "Cadillac" with ten male Black persons in it, including "John Walker, Keith Jackson, Tony Miller and Ronnie Black." Willie Walker, Cortez Brown, and Demond Weston got in a "red Delta 88" with John Walker and Keith Jackson while "Tony Miller and Ronnie Black" got in the Cadillac "with others." Walker and Jackson had handguns. According to this statement, Macklin said Brown had a .9 mm and "Weston either had a .38 caliber handgun or a .22 caliber, a break open type." Weston, Brown and Walker later reported to Macklin that "business was taken care of" and the

---

[4] Macklin denies saying that Demond Weston's nickname was "Boo Man." Weston also denies that nickname. "Boo man" was a nickname for William Childs (who originally gave the name William Walker).

following day Brown and "Jacob Lee" drove around and Brown pointed out to Macklin where the shootings occurred.

### C. The Interrogation of Demond Weston

During the drive to the CPD, Weston stated that Detective Kill told him that Kill can't stand gangsters and would like them all to be placed at Soldier Field and "have at" each other. He also told Weston he hopes he spends the rest of his life in jail getting raped and is given the death penalty.

Once at CPD Weston describes various forms of abuse that occurred over numerous hours. Weston says he was arrested at 12 p.m. and police say it was around 3-4 pm. He was still at the CPD detective bureau at 4 am the next morning. The only actual time accounted for in the CPD homicide report is the 25 minutes the court recorded interview took place. All other comments in the report related to Weston are in summary form without the time noted. This leaves more than 11 hours unaccounted for during which Weston states he was abused by CPD detectives.

At CPD Weston said he was handcuffed to a chair on the third floor and Detective Kill told him he was arrested for killing Curtis (Curtis Sims). Weston describes being interviewed first by Detective Moser and Detective Maslanka, with Detective Moser leading the interview. Weston was told they had his prints on a gun and two witnesses. Weston told them he did not know what they were talking about, asked to see his mother, and asked to use the bathroom.

Detective Maslanka told him he did not care if Weston "shit his pants" he wasn't getting out of the chair until he answered their questions and his mother was not going to save him. Defendants threatened to "make him talk," that he could never leave till he said what they wanted to hear, that no one knew where he was so they could do whatever they wanted to him.

Detective Moser told Weston to quit playing stupid at that point and told him he was there for shooting Joseph. Weston responded "Who is Joseph the other cop said it was Curtis", at which point Detective Moser slapped him. Weston said Detective Moser slapped him 3-4 more times.

Weston denied any involvement in the murder of Curtis Sims. It appears, based on the criminal investigation as well as depositions taken at later times, that CPD detectives initially thought Weston was Vic "Cortez" Brown. When it was discovered this was not true, the interrogation shifted to the multiple shootings on May 29, 1990.

Later, Weston describes multiple detectives in the interview room. They told him that he was playing stupid for denying what he had been accused of. At this point, Detective Maslanka placed him in a chokehold and began to choke him until he passed out.

Weston said he then defecated himself which was a "high-five moment" for the detectives. They told him to stand up and then sit down because they wanted to see a "nigger stew in his own shit." They laughed about how bad "nigger shit" smelled. Defendants made him stand up and sit down in his own waste, and used racial slurs. Defendants continued to deny him access to his mother, food, and sleep.

Detective Moser told Weston someone was going to ask him questions and the sooner he answered the questions the sooner he would be home. Weston said Detective Moser told him what to say when interviewed.

Weston describes significant fact-feeding in the course of his interrogation, including: showing Weston photos of others who were purportedly involved in the shooting, telling him other people had already implicated him, telling him his fingerprints were on a gun, telling him he was involved in a shooting at 57th and Wolcott, telling him about "Joseph," that Macklin and Brown were involved and that he could be home soon if he explained about killing "Joseph." Defendant Moser "drilled" Weston on what to say. This included showing him Macklin's statement, telling him about a meeting of Gangster Disciples, a "mission" for the gang, and Vic Brown carrying a .9 mm gun. Moser told Weston that he (Weston) used a .22 derringer and that since "Joseph" was not killed with a .22, Weston would be free to go home. Moser coached Weston throughout his court-reported statement.

When he was interviewed by the state's attorney with the court reporter, Detective Moser would motion by nodding up or down for yes and no questions. If it was a longer answer that Weston needed help with the facts the attorney and reporter would leave the room so Detective Moser could tell Weston what to say.

After more than nine hours in police custody Weston allegedly confessed to the murder of Joseph Watson.

Keith Jackson and John Walker testified that they saw Demond Weston at 39th & California after Weston was arrested. Walker saw police hit Weston and heard Weston scream. Jackson also heard Weston screaming during Weston's interrogation, as if

Weston were dying. Jackson saw Weston in the transport vehicle from the station and Weston looked disheveled.

According to police, Weston stated that he was with Brown and Macklin when a car pulled up and the occupants said they the Vice Lords were giving them trouble so they were "putting a crew together." Weston said Macklin gave Brown a .9 mm. and that "this was the gun Brown always used." Weston confessed to having a .22 caliber two-shot derringer already in his pocket. Weston took the bus and then walked to 57th and Winchester where Weston saw four individuals he did not know. He and Vic walked down one side of the street while the other guys walked down the other side until they saw three Vice Lords. The group on the other side of the street shot at the Vice Lords and Brown and Weston each ended up in a gangway. Weston "heard Vic shooting also." Weston left the gangway, saw Vic running, and saw a male Black person fall to the ground while "his group" continued chasing "the others." Weston got close to the person on the ground and shot him twice. Weston then took the bus and hid the weapon.  Weston's confession provides no information about the shootings on Honore and Justine.

All of the information recorded in Weston's confession was known by CPD detectives prior to his interview. In a March 2023 Deposition, Weston reported all of the facts in his confession were told to him by Detective William Moser. Weston described Detective Moser motioning with his head yes and no answers to questions asked by the Assistant State Attorney. If the answer required more than a yes or no answer the attorney and court reporter would step out of the interview room, so Detective Moser could give Weston the answer he wanted him to give to the State Attorney.

After Weston's confession to the Assistant State's Attorney, recorded by a court reporter, he was arrested, charged, and convicted in the murder of Joseph Watson and additional criminal offenses.

**D. The Arrest & Interrogation of Jerrod Smith**

After Weston's arrest, Jerrod Smith ("J. Dilla") was later arrested. He testified at deposition that he was interrogated by Detective Kill along with other detectives. He was physically abused by detectives in the course of the interrogation. Despite the fact that he had no knowledge of the May 29, 1990 shootings and told the detectives that, the police told him a "narration" of what his part in the May 29, 1990 shootings supposedly was and that there was supposedly a meeting in Cornell Park about a "wrecking crew." Smith testified that when he participated in a line-up he heard Tim Jones's sister saying to police "you can't make him say it was him."

### E. Line Ups in the Investigation of the May 29, 1990 Shootings

Timothy Jones was interviewed after being shot during the same incident in which Joseph Watson was murdered. When interviewed, Jones said he did not believe he had ever seen the suspects before the shooting. However, he would be able to identify them. On July 17, 1990, Jones viewed a live line-up which Weston was in. Timothy Jones, the only eyewitness to the murder of Joseph Watson, did not identify Weston as one of the shooters.

After the line-up, Keith Jackson learned that Jones was shown photos before the line-up and the officers were trying to suggest who Jones should select.

Deneen Coats was also interviewed by the detectives. She reported to investigator Susan Swanson that about a week after the shooting, the police told her that they had the people who committed the shooting. The police showed her photographs of possible perpetrators on at least two occasions. The first time, Coats was early on, perhaps the next day, while she was in the hospital. She picked out two photographs that she was allegedly 100% sure of. The second time the police showed her photographs was shortly before the lineup. At that time, Coats picked out two photographs and the police picked out two additional photographs for her. According to Swanson's interview of Coats, Coats told her that the detectives told Coats that the first two offenders that Coats picked out implicated the other two individuals that the police identified. Coats was then shown a lineup at the police station on July 17, 1990. According to the lineup report, there were 9 people in the lineup, including five suspects: Jerrod Smith, Demond Weston, Dwayne Macklin, John Walker and Keith Jackson. Coats selected three people from this lineup: Smith, Weston and Jackson. It is not clear from Swanson's interview what two people Coats was 100% sure of and what two people the police selected for her. Coats died before Swanson could show her any photographs.

### F. The Statement of Nathaniel McCurine

Nathaniel McCurine testified at his deposition that he had nothing to do with the May 29, 1990 shootings, but police would not accept his account. The police coerced him into providing a fabricated account. He signed a handwritten statement in July1990 implicating Demond Weston. He testified that he could not read or write at the time he signed the statement.  He did not know Demond Weston before being charged.

13

According to the statement attributed to McCurine taken on July 14, 1990, well after Demond Weston's arrest, McCurine was driving the Blue Chevy when John Walker, Jerrod Smith and Keith Jackson got in the car. According to the statement, Jerrod Smith had a .38, John Walker had a .9 mm, and Keith Jackson had a "fully automatic gun." McCurine parked the car at 56th and Damen and Vic Brown, Dwayne Macklin, and Demond Weston were all there. Brown had a "very large gun," Macklin had a .9 mm, and Weston had a small gun. He saw Jerrod Smith shoot a boy on a bike. He saw Walker shoot a guy on a porch. He saw Demond with a gun and heard a shot from behind him while he and Demond were separated. His statement describes his supposed route running from shooting location to shooting location (information that was not included in Demond Weston's confession). Detective Moser took Demond's confession and later took McCurine's confession.

### G. The Arrest of Vic Brown (also known as "Victor Safforld" or "Cortez Brown")

Victor Safforld (also known as Vic Brown and Cortez Brown) was eventually arrested and charged with the Sims murder. Neither the Watson homicide file nor the Sims homicide file demonstrate that he was interrogated or arrested regarding the May 29, 1990 shootings.

### H. The City's File-keeping Practices

In 1990, police detectives within CPD, including the detectives involved in investigating the May 29, 1990 shootings, maintained "working files." Working files were known also as "street files" or "running files." This practice came to light a decade earlier during the prosecution of George Jones. When the CPD investigated the use of street files, it found that the files were being used to communicate steps to be taken during the investigation; opinions of the detectives; and information about alternative suspects.

The use of street files was supposed to end with the issuance of various orders— Detective Notice 82-2, G.O. 83-1, G.O. 83-2, G.O. 86-3; and then the 1988 SOP. The problem in practice, however, was that it did not actually end. For example, two civil juries found that the practice of street files continued well after it was supposed to end (*Rivera*, *Fields*). James Hickey, the City's corporate representative in *Kluppelberg* testified that there were no efforts to determine whether the "street file" practice ended and the orders were implemented.

**Analysis: Opinions Based on Review of the Above Facts**

14

**Opinion 1: The Defendants' Investigation Departed From Generally Accepted Law Enforcement Principles.**

CPD's investigation of the Watson and Sims murders departed significantly from generally accepted law enforcement practices in several respects. The result of those failures are investigations into two murders that are nearly impossible to follow, and at many points, simply, make no sense.

**A. Defendants' Failed to Follow Up on Leads & Engaged in "Tunnel Vision"**

Early on in the investigation, Defendants began focusing on the Blue Chevy which was seen near one of the three shootings. While there is no error in trying to develop further information from that fact, Defendants proceeded to build their entire theory of the case based on that one fact—including accusing young men they had encountered a few months earlier as prime suspects. Numerous other leads were disregarded. And if the witnesses testimony is credited, any new witness or suspect who was interviewed was apparently coerced to make that person's account fit the facts that Defendants had already decided upon.

**1. CPD Did Not Make Links Between Weston and Other Witnesses**

The arrest of Demond Weston occurred more than 10 days after the May 29 shootings. Prior to his arrest, Defendants had never heard his name from any witness. Between the dates of May 29, 1990 and the arrest of Demond Weston on June 9, 1990 CPD detectives interviewed numerous potential witnesses and suspects. Each interview provided names of potential suspects involved in the murder of Joseph Watson. The following names were recorded in the CPD report, James Hale, John Walker, CC Hale, Solomon Montague, Darrin Laws, Bryan Hampton, Nathaniel McCuren, Jerrod Smith and Keith Jackson. Weston was not mentioned in any of the interviews prior to June 9, 1990.

It is clear that most of the above-named persons knew each other prior to the murder of Watson and some were members of a local Chicago street gang, the Gangster Disciples. The CPD homicide report does not record a nexus between Weston and the above persons. The CPD homicide report also does not show a nexus between Weston and the other named and arrested suspects in the murder of Watson. Hampton, McCurine, Jackson, Walker, and Smith all testified they never knew Weston before they were arrested.

15

A generally accepted law enforcement practice in a multiple suspect case is to record the relationship between the suspects through prior contacts with CPD. For example, CPD located them together on a prior date, arrested them together, suspects went to school together etc. There is no record of this. Weston was not named in the investigation of Watson's murder until the arrest of Dwayne Macklin on June 9, 1990.

Detective Moser in his deposition January 2023, stated when Detective Kill told him about Demond Weston, he responded, "Okay, who is he? I wasn't even sure who Demond Watson was, no one was naming him?"

Once Defendants decided the shootings must be linked to Bryan Hampton, Nathaniel McCurine, John Walker, Keith Jackson, and Jerrod Smith, they seem to have worked to make the rest of the facts "fit"—including adding in Demond Weston's name even though none of those individuals were connected to Weston in any way. Nor did Defendants try to "test" the reliability of any purported statement from Dwayne Macklin. As discussed more fully below, Defendants failed to develop evidence leading to other suspects. This approach was contrary to generally accepted law enforcement practices in 1990.

Vic Brown was never arrested—or even interrogated—about the May 29, 1990 shootings, despite his link to the .9mm which was used in all four shootings. This also demonstrates tunnel vision because once police settled on their suspects, they didn't even try to determine if physical implicated Brown in the crime.

## 2. Weston Was Apparently Arrested Because of Mistaken Identity for the Sims Murder and Then Charged with the Watson Murder

Crediting the testimony of Weston and Macklin, it appears Weston was drawn into the investigation entirely because he was seen on the street near where Vic Brown had been an hour before. Arresting a suspect because of his location, without any verification of his actual identity, is another example of extreme tunnel vision.

In the alternative, if one credits Defendant Kill's testimony[5], Weston was arrested based soley on a statement from Dwayne Macklin—but total reliance on an incentivized witness also amounts to tunnel vision, and was also a departure from law enforcement practices, as I explain below.

---

[5] Detective McWeeny testified in his deposition that he spoke to Macklin on June 9, 1990 after his arrest around 10am. McWeeny states that Macklin "never implicated Weston in the shooting of Sims" which was the case he was investigating.

There is not a record attempting to link Weston to the murder of Joseph Watson. A generally accepted law enforcement practice would be to corroborate Macklin's statement by linking Weston to the murder of Joseph Watson. This could be done by common police investigative practices for example:

Physical evidence linking Weston to the murder scene
CPD database search showing a relationship between Weston and the victim or other suspects
Confirmation of the name "Boo-man" supposedly given by Macklin, a name which he also used in reference to another suspect, William Childs

Suspect Macklin's statement recorded in the CPD homicide report states the murder of Watson was connected to a drug turf issue, which contradicts the numerous prior statements taken by CPD detectives which link the murder to retaliation for an earlier shooting and car damage. This contradiction should challenge his credibility, yet Macklin's statement alone is used as the only cause to arrest Weston.

## B. Defendant Kill's Seizure of Demond Weston Departed From Generally Accepted Law Enforcement Principles

The arrest of Demond Weston, as described by Michael Covington, Dwayne Macklin, and Demond Weston, does not comport with generally accepted law enforcement principles. Crediting Macklin, Kill was provided no information implicating Weston in any criminal activity whatsoever. Instead, Weston happened to be standing a few houses away from the house where Kill, Christopherson, and McWeeny had arrested Macklin earlier that morning and from which Brown apparently escaped. From this, it appears Detective Kill believed that Weston was Brown.

A reasonable professional officer in Detective Kill's position would have tried to verify Demond's identify, perhaps by speaking with family members, checking Weston's name, photo, or date of birth in CPD databases, or checking for Brown's name, photo, or date of birth in CPD databases. Even after Weston and Macklin confirmed that Weston was not Brown, Kill took no steps to verify his identity. The arrest was outside of generally accepted law enforcement principles because a reasonable, professional officer would have had no reason to believe that Weston had been involved in any criminal activity. A reasonable professional officer would have taken steps to verify Weston's identity before placing him in handcuffs and in the police car, but if this wasn't done, then such verification should have taken place at the station prior to interrogating Weston.

17

Even if the fact finder credits Kill's account over Macklin's, the arrest of Weston is still outside of generally accepted police practices. Dwayne Macklin was interviewed on June 9, 1990, after his arrest in the Curtis Sims murder. The CPD report notes that Detective Kill had information that could be pertinent to the Joseph Watson homicide investigation. The report does not note what that information was and as I will cover in the report writing portion of this review it appears Detective Kill did not complete any reports related to the Watson murder.  The next paragraph in the CPD report starts; The R/D's then had an interview with one Macklin, Dwayne M/B 24 years. The reader must make the assumption that Detective Kill's information is related to Macklin and that one of the eight detectives from Area #3 Violent Crimes interviewed Macklin. In addition to not documenting which of the eight detectives listed as authoring this report interviewed Macklin, the time of the interview is not listed.

Macklin's alleged statement is that he was with Cortez Brown "Vic" and "Boo-man" Demond Weston on May 29, 1990, at approximately 6 pm near 5928 South Union Street. Ronnie Blatt and others Macklin identified by photograph as Keith Jackson, Johnny Walker, and Tony Miller were forming a wrecking crew to take action against the Vice Lords for selling drugs on their turf. They were specifically going after the Vice Lords on 57th and Wolcott.

Between 9-10 pm, he saw members of the above-named group get into two cars, Weston was one of the people who entered a car. Macklin said that Weston was in possession of a .38 or .22 caliber break-open style handgun. At approximately 11:30 pm Demond Weston, Cortez Brown, and Willie Walker walked back to 59th and Union, and "they" told Macklin they had taken care of business and laid some "niggers" down.

Even crediting the police version of Macklin's interrogation (that he gave a voluntary statement implicating Weston), an experienced detective would immediately be suspicious of Macklin's statement. He is in custody on serious charges, and detectives know when you have an incentivized witness he or she must be corroborated. An incentivized witness is one who can trade their testimony for less time in custody for their crimes. It has been my experience that the greatest currency for a person in custody is less time in custody.

Macklin does not provide new information that the CPD detectives can corroborate but rather is recorded allegedly providing information they would have already known. For example, the caliber weapon Macklin describes Weston as having "a .38 or .22" which would match either expended projectile collected during the autopsy of Watson. The autopsy report records "1 medium caliber 1 small caliber" collected. The

18

interview of Macklin does not narrow down this scope leaving conveniently with an either-or scenario related to Weston's alleged gun possession.

Macklin, however, is not asked to describe the gun or how he knows about the gun, - did he see it or hear a conversation about it. If he had seen Weston with it before May 29, 1990, where did he conceal it? These questions were not asked.

Macklin is not asked how he knows Weston. They are not close in age and would not have been in school together. The connection between them would be very important. Macklin is naming Weston as a possible suspect in a murder and the CPD detectives fail to follow generally accepted interview methods to develop information that would link the witness to the suspect and the suspect to the crime.

Macklin also very specifically states the wrecking crew is going to take action at 57th and Wolcott, the location of the Watson murder, and the focus of this CPD investigation. Did the conversation not include the other two locations of the May 29th shootings? This homicide report does not record Macklin linking the shootings together.

In both affidavit statements given years after this murder by Macklin and his deposition, he describes coercion and just repeating facts that CPD detectives told him to say. Due to him being an incentivized witness he clearly had the motivation to repeat the information provided to him. CPD detectives fail to corroborate Macklin's statement with any other witness and or physical evidence which would be a generally accepted police practice.

Macklin's statement alone was not sufficient evidence to arrest Weston for any crime, especially murder. Macklin was not a witness to the Watson murder. A generally accepted law enforcement practice would be to verify Macklin's statement with other facts, evidence, and or witness statements/identification. The State never relied on Macklin's statements in the prosecution of Weston or any of his codefendants.

**C. Defendants' Interrogation Tactics With Suspects Departed From Generally Accepted Law Enforcement Practices.**

  **1. The Tactics Used During the Interrogations of Hampton, Jerrod Smith, Keith Jackson, John Walker, Nathaniel Mccurine, Dwayne Macklin, and Vic Brown Departed From Generally Accepted Law Enforcement Practices.**

Defendants violated fundamental principles of law enforcement by conducting coercive and abusive interrogations of numerous witnesses and suspects in the May 29 shooting investigation and the investigation of the murder of Curtis Sims. These individuals describe shocking physical abuse, such as pulling hair, slapping, hitting, beatings, and putting cigarette butts put in individuals' faces. For example, Bryan Hampton explained when he answered a question in a way that Defendants did not like he would get hit and if he echoed back a version of the story that Defendants gave him, he would not get hit. The witnesses describe being threatened with harsh sentences if they didn't provide a statement to police or being told that if they just provided the statement they could be released. The witnesses were lied to, being told that co-defendants had made statements against them, or that they could go home if they gave statements. In addition, these witnesses were typically held for lengthy interrogations—nearly three days in the case of Hampton. McCurine was questioned over and over again over several months.

Defendants' interrogation tactics were contrary to generally accepted law enforcement practices in 1990. Detectives were well aware that statements must be freely and voluntarily given and not the result of violence or coercion.

### 2. The Interrogation Tactics Used with Witnesses and Suspects in the May 29, 1990 Shooting Investigation Were Consistent with Tactics Used by Defendants in Other Cases, and Tactics Used Within CPD.

Between 1980-1998 at least 59 citizen complaints were filed against Detective Anthony Maslanka, Detective William Moser, and Detective Michael Kill. A review of the allegations noted numerous cases of physical abuse, with suspects being struck, kicked, choked, knocked to the ground, struck with nightsticks, metal clubs, flashlights, and phonebooks. Threats and verbal abuse are recorded in the allegations and one subject describes defecating himself during physical abuse. Nothing in the materials I reviewed suggested that the detectives said they thought these were acceptable practices, just that they deny such abuse; a jury will decide the credibility of those denials.

Assistant State Attorney Terrance Johnson describes a corrupt system of prosecution based on "teamwork" between the ASA office and CPD detectives. Johnson in a statement to the Department of Justice in 2012 describes working for the Cook County State's Attorney's Office from 1990-2000.

The training materials provided to me indicate that the police were trained that they should convince a suspect he is guilty, and that the confession must be "provoked

and manipulated" and that such tactics are the "essence of interrogation." Detective Training 1990 Lesson plans by Sgt. Paul Carroll, under the topic interrogations, instructs on the voluntariness of a statement. Carroll does say that the statement must not be forced from the suspect and the suspect must not be beaten. But those statements ring hollow given the broader context where detectives are told to "bait" suspects and are encouraged to coerce and provoke confessions.

Thus, the tactic described by witnesses in the May 29, 1990 investigation were not isolated and instead were common for Defendants and across their department. Homicide detectives were well-aware in 1990 that such tactics were unacceptable and led to unreliable witness statements. Defendants in this case agreed that physical abuse of suspects is not a legitimate law enforcement practice.

### 3. The Tactics Used During the Interrogation of Demond Weston are Contrary to Generally Accepted Law Enforcement Practices.

Defendants Moser, Maslanka, and Kill used an even greater degree of physical violence and threats with Weston than with the other suspects and doing so was completely at odds with acceptable law enforcement practices. Detective Kill set the tone for the entire encounter by drawing his weapon when he first seized Weston. He also immediately began threatening Weston with rape in prison and the death penalty. None of these tactics is consistent with sound law enforcement investigative approaches. Law enforcement officers were well aware in 1990 that false confessions could occur as a result of physical abuse.

If the factfinder credits Weston's testimony, the physical abuse inflicted on Weston was absolutely unacceptable. Police officers are trained to use physical force in very discrete circumstances (including active resistance or violence by the arrestee), none of which were present here. The physical violence inflicted on Weston appears to have been intended to elicit a false confession. Choking, hitting, and slapping suspects is inherently at odds to free and voluntary confessions.

Defendants' humiliation of Weston, including taunting him, using racial slurs, and having him stand up and sit down in soiled clothing, is far outside the realm of reasonable law enforcement tactics. Of course, such tactics are also unlikely to result in reliable statements.

Telling Weston that no one knew where he was, threatening to kill him, denying him access to his mother, to food, or to a bathroom, are all extremely coercive and

contrary to generally accepted law enforcement practices. These tactics break a subject's will, which is contrary to a voluntary confession.

Moreover, during the lengthy interrogation, Defendants tried to coerce Weston into confessing to not only the Sims murder, but also the Watson murder. Needless to say, coercing a suspect into confessing to multiple murders is not appropriate investigative work either.

### D. Defendants' Feeding Facts to Suspects Departed from Generally Accepted Law Enforcement Practices

Law enforcement officers are trained, now as well as for many decades before 1990, to try to find out information from witnesses or suspects, not give information to the witnesses or suspects. Simply put, if investigators tell witnesses and suspects about the investigators' theory of the case, the integrity of the investigation is called into question; officers no longer can determine whether suspects are telling them accurate information or providing officers information that was suggested to them. Investigators should not "lead" witnesses or suspects during their interviews, let alone engage in the tactics which witnesses and suspects (including Demond Weston) described here, such as:

- continually telling suspects they are lying (especially when they don't have any evidence suspects are lying)
- showing a suspect photos and telling him to say he knew the people in the photos
- saying they had his fingerprints on something when they didn't
- making promises that suspects could go home/get something to eat if they made a statement
- telling the suspect how the crime could have occurred
- abusing a suspect when he doesn't parrot back the version that detectives proposed in leading questions
- showing witnesses statements of other witnesses or allowing them to overhear one another's statements
- rehearsing statements in advance of the final statement and pausing statements to "correct" the suspect

According to the statements of John Walker, Dwayne Macklin, Jerrod Smith, Keith Jackson, Bryan Hampton, Nathaniel McCurine, Victor Safford, and Demond Weston, Defendants fed facts or attempted to feed facts in every interrogation in this investigation.

The statements of ASA Johnson indicate that Defendants and their colleagues in the CPD were well aware that a confession could solve a case and fed suspects facts in order to do just that, but that they also knew it was not a legitimate practice that could be openly discussed and acknowledged.

ASA Johnson said in general when he was called to meet a suspect in a case the suspect seemed "prepped" by the detective regarding what to say. Johnson believed detectives fed suspects information for both the court-reported and written statements. If the suspect said something that did not match up the detective would say "That's not what you told me." Johnson worried the suspect statements were fabricated because they were too consistent and the cops fed the subjects information during the statements.

Johnson's statement to the Department of Justice corroborates the statements of Demond Weston, John Walker, Keith Strong, Nathaniel McCurine, Jeremiah Smith, and Dwayne Macklin.

Johnson's statement additionally corroborates Weston's statement in the fact that Johnson believed suspects statements were too consistent and so likely fabricated. Weston's court reported statement was consistent with all facts already known by CPD detectives prior to his arrest, Weston provided no new information.

Based on the fact that no witnesses place Weston at the scene of the Joseph Watson murder, no physical evidence linked to the scene, and even Macklin's coerced statement about Weston was of limited value, there was intense pressure to obtain a confession.

The following information related to the shootings on May 29, 1990, were known by CPD detectives, and allegedly given by Weston in his court reported statement:

- Location of a meeting of Gangster Disciples on May 29, 1990
- "Vic" and Dwayne were linked to the gun
- Keith Jackson, John Walker were involved
- Trouble with Vice Lords
- Walker and Jackson looking for help to take action against Vice Lords
- "Vic" got a gun from "Buttercup"
- .22 caliber projectile recovered during Watson autopsy
- 57th and Wolcott is the location of a shooting
- Victim Watson was found laying in the street/position of the body and trajectory

Weston's interview with the Assistant State Attorney is reported to have taken 25 minutes. A reading of the transcript at a normal reading pace takes 11-12 minutes. The missing 13-14 minutes lend credence to Weston's description of the interaction with Detective Moser and the Assistant State Attorney.

Terence Johnson stated it was his experience that suspects were prepared to give a statement that would match the facts known by detectives. Demond Weston's statement is that he gave the above facts as they were provided to him by Detective Moser after ongoing physical, verbal, and psychological abuse by Detective Moser, Detective Maslanka, and other CPD detectives. Weston's statement is consistent with Johnson's experience of a subject being fed facts by CPD detectives thus giving a fabricated statement.

The interrogation tactics used by Defendants, and their efforts to make Weston's statements "match" the information they already had (or had fabricated) about the crimes, were not legitimate law enforcement practices. Fact feeding was apparently widespread in the Chicago Police Department, but police officers were well aware in 1990 that fact feeding is not an acceptable approach to interrogations. Defendants admit that they knew they should not provide facts to witnesses or suspects and should instead receive information from those witnesses or suspects. If a fact finder credits the testimony of the witnesses and suspects who were interrogated in this case, then the interrogation methods in this case were contrary to generally accepted law enforcement standards at the time of this incident. This type of contamination of statements is entirely at odds with generally accepted police practices in 1990 and well before that.

### E. Defendants' Failure to Document the Investigation Departed from Generally Accepted Law Enforcement Principles

### 1. The Documents Do Not Explain Who Did What

Author Vernon Geberth comments on the official police report; "The official police report is a tool used by the criminal investigator to document the findings of his investigation. It is the principal source used by the courts, the defense, the district attorney's office, and the police department to evaluate the thoroughness of an investigation and the ability of the reporting detective."[6]

The Joseph Watson homicide report lists eight detectives as the authors of the report without designating specific roles completed by specific detectives. An example

---

[6] Practical Homicide Investigation, Vernon J. Geberth p1144

of this is the interview of Dwayne Macklin, a key interview in this investigation. The report reads' "The R/D's then had an interview with one Macklin, Dwayne." The reader is left wondering which of the eight detectives interviewed this witness.

Another very important example of the lack of clarity in this report is the arrest of Demond Weston. The report simply states he was taken into custody listing the time and date as well as the location. It does not list the arresting officer, the circumstances surrounding the arrest, the probable cause for the arrest, or any statements made by Weston.

Detective Dan McWeeney in his deposition in 2023 stated he had no involvement in the Watson homicide investigation yet he is listed as an author of the homicide report.

Detective McCarthy is not listed as an author of this homicide report yet in a supplemental report she is the detective requesting a polygraph examination of Sylvester Washington.

These examples place this homicide report outside the generally accepted police practice for report writing and leave many unanswered questions as to what detective did what when and challenges the reliability of the report itself.

## 2. Detective Kill's Failure to Document Reports Is Outside the General Practice of Homicide Detectives.

During the criminal proceedings for victim Watson, Detective Kill testified that Officers Maslanka and Moser were the primary detectives in this murder case. He also testified after he arrested Demond Weston he transported him to the police department where he read him his Miranda warnings which he waived. Detective Kill did not document these critical facts in the police report.

Detective Kill testified he told Weston they had arrested Dwayne Macklin and had recovered a 9-millimeter pistol. At this time Weston allegedly responded per Detective Kill, "You've got the wrong gun. I shot him with a .22." Detective Kill did not record these critical facts in the police report. Based on what I reviewed, that critical fact is first discussed in his testimony.

Detective Kill testified he informed Officers Maslanka and Moser of Weston's arrest and statement but did not document these facts in a police report. It is well outside generally acceptable police practices to not document an arrest and alleged

murder confession in a police report. Detective Kill's failure to document is not consistent with generally accepted police practices.

**3. Defendants' Failure to Document an Interview with Suspect McMorris Was Outside Generally Accepted Law Enforcement Practices.**

From the evidence I have reviewed, any interview of suspect Kavin McMorris ("Shank") was either not documented or the interview documents were not included in the police file. Although McMorris is only identified by nickname in the police file, the prosecutor file reveals that his proper name as well as certain notes about his polygraph exam. Documents in the police file corroborate that Kavin McMorris was sent for a polygraph. Interviewing, and documenting the interview, of suspects is a standard part of police investigations, now and in 1990. Defendants should have documented an interview of McMorris and ensured that such documentation was provided to the prosecutor (who would then provide it to the defense). Failure to document interviews with suspects (or failing to provide the relevant report to the prosecutor) ultimately can prevent further investigation as to that suspect, both by the police or by the criminal defendant. In this case, McMorris was not only apparently a suspect, but he also had a 9 mm gun and a car damaged by gunfire and provided information to the polygraph technician about who committed the crime. Failure to document the initial interview of McMorris before the polygraph, as well as the information he provided during the polygraph, was outside generally accepted police practices in 1990.

**4. The Failure to Document Evidence In Formal Police Reports Is Contrary to Generally Accepted Law Enforcement Practices**

Sylvester Washington is another key person in this investigation that does not have his statement recorded as part of the homicide report. A General Progress Report authored by Detective Tony Maslanka records Washington naming potential suspects to the May 29, 1990 shootings as well as who was in possession of firearms; however, this information was not recorded in the Homicide report.

These exclusions are problematic specifically as they relate to Demond Weston, both McMorris and Washington name potential shooting suspects, however neither name Weston. Excluding their statements from the view of the courts, prosecuting and defense attorneys are outside the generally accepted police practice.

Defendants seem to have used handwritten GPRs, that are often nearly illegible, without putting that information into a legible, typewritten police report. This is contrary

to police practices because it does not allow prosecutors or defendants to make use of the evidence police documented.

**5. The Failure to Adequately Document the Interrogation of Demond Weston Is Contrary to Generally Accepted Law Enforcement Practices.**

The alleged confession of Demond Weston is also problematic from a report-writing perspective. The report simply gives a summary of the alleged statement. It does not list the time of the interview, who conducted the interview, was it one interview as recorded or was it multiple interviews over a period of time? The report does not record any questions or follow-up questions asked by detectives.

The reports lack of specific information that would allow for corroboration, for example:
- Weston was not asked how he knew other persons he named as potential suspects.
- Weston allegedly said Brown had the gun he always used, He was not asked how he knew that fact.'
- Weston allegedly said he heard Vic shooting, he was not asked if he saw anyone actually shooting, or how did you know it was Vic?
- Weston was not asked follow-up questions about the .22 caliber gun he allegedly possessed.

This lack of documentation is consistent throughout the Watson homicide report with all persons interviewed leaving many unanswered questions as well as the lack of information that could be corroborated.

The Joseph Watson homicide reports do not meet generally acceptable police practice in key areas. If Detective Moser was the lead detective for this investigation it would have been his as well as his supervisor's responsibility to provide a thorough homicide report, which did not happen.

**F. Defendants' Failure to Investigate Alternative Suspects Was Contrary to Generally Accepted Law Enforcement Principles.**

Defendants failed to follow up on many leads related to alternative suspects.

On June 1, 1990, Sylvester Washington was interviewed by Detective Maslanka recorded on a GPR. Sylvester named potential suspects to the May 29, 1990 shootings. Sylvester was with a group of people who got into "Biz's" car. "Biz" has been identified

by CPD as Bryan Hampton. Washington states "Ezel" had a .38 and "Shank" had a 9mm. They went to the area of 57th and Wolcott and saw approximately 5 people. The notes end without further information.

Washington names two persons with firearms at the scene of the Joseph Watson murder. "Ezel" with a .38 and "Shank" with a 9mm, of note he does not mention Demond Weston in his statement.

CPD detectives do not investigate or interview potential suspect "Ezel" which is outside of generally acceptable police practice.

The polygraph notes (from the prosecutor's file and absent from the homicide file) state about McMorris, "S alleged to be involved in shootings." The polygraph was on June 4, 1990 days after McMorris was named a suspect by Washington which may explain why he is named as a potential suspect.

The examiner notes "deception" and also that McMorris names a shooting suspect. "S stated Farmer Dell told him he & six of his involvement in shootings-Farmer Dell said he shoot one in the head."

Three persons are clearly named as potential suspects in the May 29, 1990 shootings, "Ezel", McMorris, and "Farmer Dell." There is no documentation in the CPD homicide report that these suspects were investigated.

As discussed above, "Dan Tanna," and the "Bogus boys" and were blamed for the shootings by various witnesses as well as "Black Mike, Killer Ed, Baby Midnite," and "Pac Man." "Terril" is discussed as someone who "knows" who did the crimes. Coats told police that Reginald Norwood apparently knew the shooters. According to the police version of events, Macklin named "Ronnie Blatt" and "Tony Miller" as being involved.

None of these alternative suspects were ever followed up on in any way.

Firearms examiner Ernest Warner confirmed on June 1, 1990 that a 9mm firearm used in the murder of Michael Thomas on May 27, 1990 was the same firearm used in the murder of Joseph Watson and the two other related shootings on May 29, 1990. This physical evidence connects the suspect in the murders of Thomas and Watson, this suspect is another alternative suspect to the May 29, 1990 shootings. Generally accepted police practice would be for the CPD detectives to record this fact in their investigation. The Michael Thomas murder was not connected to the Joseph

Watson investigation which prevented Weston access to an additional alternative suspect to be considered in his defense.

A generally acceptable criminal justice principle is that it is more important that the innocent are not arrested than the guilty go free. Exculpatory evidence is evidence that exonerates or tends to exonerate a defendant of guilt. In this case, Demond Weston was arrested several days after the above-named suspects were known by CPD detectives. And there is no indication that the detectives attempted to link these alternative suspects to the murder of Watson. That means that either the detectives never bothered to follow these leads—which is contrary to accepted practice—or the detectives followed these leads but the evidence about the leads was placed in a street file and not disclosed to the prosecutor—which is also contrary to accepted police practices. I will discuss the street file below.

### G. Defendants' Photographic Array with Deneen Coats Was Unduly Suggestive and Contrary to Generally Accepted Law Enforcement Principles

As noted above, Deneen Coats spoke to Susan Swanson about the identifications that she made in her case. In summary, Ms. Coats told Ms. Swanson that she was shown photographs on two occasions prior to viewing the lineup. First, she was shown photographs while she was in the hospital shortly after the shooting – she said either the same day or next day after the shooting. She told Ms. Swanson that before she saw the photographs, the police told her that they had the one or the guys who killed the boy. She then said she was shown photographs and she selected two suspects out of those photographs. Second, Ms. Coats said she saw photographs, again in the hospital, right before the lineup. According to Ms. Swanson, Ms. Coats told her that she saw a book of pages of small photographs. She picked two photographs out. Police showed her larger, different pictures of those two photographs. Police then told her that the two people she selected implicated two other people. The police then identified for her those two additional people.

Ms. Coats then viewed a lineup. Although she told Ms. Swanson that she identified four people at the lineup, the supplementary report indicates that she only identified three people: Jerrod Smith, Demond Weston and John Walker. The lineup had nine people in it, five of which were suspects: Jerrod Smith, Demond Weston, Dwayne Macklin, John Walker and Keith Jackson. According to the supplementary reports in the Watson and Sims investigation, these suspects ranged in height from 5'7" to 6'3", and in age from 17 to 20 years old. The fillers in the lineup were in positions 2, 3, 4 and 8, and ranged in age from 21 to 32 years (ages were 32, 30, 21 and 20).

If we credit Ms. Swanson's interview of Ms. Coats, the way in which Ms. Coats's identification procedures were conducted deviated from police practices (and the CPD SOP) in a number of ways. First, the detectives told Ms. Coats prior to her viewing any photographs that they had the guys that committed the crime. This statement was improper and could have influenced her decision to pick someone out of the lineup.

Second, the detectives showed Ms. Coats photographs on multiple occasions and did not document the fact that they did that. That is not only a significant deviation from expected practice but also from CPD requirements as described in its own Investigative Manual and training materials —particularly because Ms. Coats made identifications.[7] The failure to document this information also meant that it was likely not disclosed to the prosecutor or to the defense attorney notwithstanding its obvious importance. For example, if Ms. Coats was repeatedly shown photographs of the same four people—including in different formats or from different views—then it would reinforce to her that those are the four people, the guys, that the police told her they had found who had committed the crime.

Third, the detectives told Ms. Coats who to select. The point of showing a witness photographs is for the witness to select who he or she remembers seeing, if anyone—not to confirm the detectives' version of the crime. It is not appropriate for the police to tell Ms. Coats who to select—either by actually selecting persons for her or by telling her that the two she selected implicated two other people that the police pointed out—and then falsely attribute that selection to her. That is contrary to basic policing.

## H. Defendants' Line Up Techniques Departed from Generally Accepted Law Enforcement Principles.

On May 29, 1990, Deneen Coats was shot at 5530 South Justine at approximately 11:35 pm. Ronald Nesbitt, who was next to Coats at the time of the shooting, testified that it was too dark for him to see the offenders' faces.

On July 17, 1990 Coats viewed a live line-up at CPD. The line-up consisted of nine individuals, five of which had been named as potential suspects in the multiple shootings on May 29, 1990, including the shooting of Coats.

To meet the generally accepted police practice line-up there must be a limited number of suspects as compared to non-suspects in a line-up. In the case of the line-up

---

[7] Chicago Police Department Investigator's Manual (1990), p. 1 (WESTON 47770); Chicago Police Department Detective Training 1990, p. 2 (WESTON 047780).

viewed by Coats more than half of those viewed were known as potential suspects by CPD detectives.

CPD General Order 88-18 September 24, 1988, states that if there is more than one suspect placed in a line-up ideally four non-suspects should also be in the line-up. While G.O. 88-18 allowed detectives to include multiple suspects in the same lineup as a general matter, it was only permissible to do so if there was no "great disparity" between the suspects in terms of their appearance (e.g., height, weight, age, skin color). Here, there was substantial variation in height between Mr. Weston, for example, and Dwayne Macklin, who was standing beside him. According to the supplementary reports in the Watson and Sims homicide files, Mr. Weston was 5'8" and Mr. Macklin was 6'3". In addition, Mr. Jackson had much longer hair than anyone else in the photo array.

Based on CPD policy then, the detectives should have separated out the suspects into separate lineups. At a minimum, the detectives should have separated the suspects potentially into three smaller line-ups to meet policy. The recommendation from DeVere Woods in his book on the criminal investigation is a "line-up with six persons including the one suspect."[8]

The identification by Coats is problematic as she had a more than 50% chance of identifying any person in the line-up as a suspect. In addition, Coats was being shot at which decreases the ability of a person to make an eyewitness identification as eyewitness testimony by itself can be questionable.

An article in Scientific Magazine by Hal Arkowitz, January 1, 2010, is titled "Why science tells us not to rely on eyewitness accounts."[9] This article lists reasons why eyewitness testimony can be error-prone. Two factors he lists that can reduce the accuracy of a witness are:

- Extreme witness stress at the crime scene.
- Presence of a weapon at the crime scene.

Both of these factors occurred in this case, as well as Coats being shot at and struck.

Generally accepted police practice would have been to provide an explanation as to why Demond Weston was added to a live line-up viewed by Coats and then to have Coats view an unbiased line-up, this did not happen in this case.

---

[8] Fundamentals of Criminal Investigation, DeVere Woods p162
[9] Scientific Magazine, Arkowitz, January 1, 2010

31

**I. Defendant Officers Failure to link Weston to Any Physical Evidence Departed From Generally Accepted Police Practices**.

The CPD homicide report does not record a witness identifying Demond Weston as being present at the scene of the murder of Joseph Watson. Without eyewitness testimony, a generally accepted police practice would be to then link him to the scene or other known suspects through physical evidence. That did not happen in this investigation.

At the scene of the Watson murder, numerous 9mm expended casings were located and collected by CPD. No attempt was made to collect latent fingerprints from these casings, failing to follow generally accepted police practice.

A 9mm Taurus semi-automatic handgun was collected during this investigation by Detective Kill. Based on eyewitness Timothy Jones' statement CPD knew at the time of the Watson murder that there were at least four suspects. Generally accepted police practice would be to examine this weapon for latent fingerprints to link a suspect to the weapon. CPD did not do this, thus not linking any suspect to the weapon.

A suspect vehicle in the Watson homicide was processed by CPD Evidence Technicians. A 1976 Chevrolet blue in color, it appears seven fingerprints were lifted from this vehicle. The CPD homicide report does list a Blue Chevrolet as a possible suspect vehicle in the Watson murder. Generally accepted police practice would be to attempt to match the lifted fingerprints to suspects in this case however the report does not record this being done. Demond Weston is not linked to this potential suspect vehicle by any physical evidence.

No physical evidence links Demond Weston to the scene of Watson's murder.

**J. The Failure to Maintain Accurate and Complete Homicide Files Departed from Standard Police Practices.**

In the CPD, there were multiple files for any given homicide investigation: a records division ("RD") file, an investigative file kept at the Area where the crime was being investigated and possibly a street file or working file. These files were not the same. For example, the RD file did not have any GPRs in it.

The City has identified the Bates range for the various files in this case:

- RD File: City 11-70

- Investigative File: City 71-310 and City 9338-9350

Having multiple files for the same investigation was unusual and could be problematic: It made it difficult to keep track of documents and keep track of the entire contents of the police investigation. Additionally, if the files were not the same, and only one was produced to the prosecutor in discovery, significant and important information could be withheld.

The CPD required that an Inventory be made of the Investigative File. That Inventory would be copied and kept in the RD file to show what the contents were of the Investigative File. That way anyone looking at the RD file would presumably know what documents were missing from the RD file, what documents were in the Investigative File and what the full set of documents that made up the police investigation were.

There are three problems with the Inventory for the Watson homicide. First, there are two different inventories for the Watson file, and only one of those Inventories is in the Records Division File (City 13-15). By the City's own rules, both of the Inventories for the Investigative File should be in the Records Division File. But the Records Division file is missing the second Inventory in the Investigative File (City 72-74), which lists 44 GPRs and several other documents. Even if this second inventory is considered a supplemental inventory—although the dates on both inventories overlap—it still does not explain why the inventory is not also in the Records Division file.

Second, the Inventory does not match up with the contents of the file. For example, there are things that are in the Investigative File but not inventoried—e.g., a lineup report, a memo/letter, and a supplementary report. Additionally, there appear to be things on the Inventory that are not in the Investigative File. For example, the number of GPRs do not seem to add up. If you add up City 13-15 (14 GPRs) and City 72-74 (44 GPRs), there should be 58 GPRs. If you count as 1 GPR, a GPR that has multiple pages (the same way you would count a supplementary report that has multiple pages as 1 supplementary report, and do not include notes that are not on a GPR, there are 55 GPRs in the file. This begs the question of where the missing 3 GPRs are. If you include notes that are not on a GPR as a GPR (notwithstanding the fact that there are entries for "Written Notes"), then there are 59 GPRs in the file. That also does not match up.

Third, and related, some of the entries in the Inventory are so vague as to be almost meaningless. For example, most entries for "GPR" just say "GPR"--it does not say how many pages are on each GPR, when the GPR was written or who it was written by. As a result, it is virtually impossible to keep track of what the actual contents of the Investigative File were.

The disconnect between the Inventory and the Investigative File begs the question of whether there was in fact a street file in this case that contained some of the

33

missing documents; or whether certain documents that were in the Investigative File but not inventoried were disclosed to the prosecutor.

Additionally, there was yet another file in this case—that was the file maintained at the Crime Lab, in the polygrapher's office. According to Detective Tovar, polygraph documents—such as the Polygraph Case Review, Polygraph Worksheet and raw data—would be stored in the file for a case in the Polygraph Unit. Polygraphers would generally not disclose materials to the police or prosecutor beyond the final report absent a subpoena for them. I did not see any indication in the documents that I reviewed that there was a subpoena for the polygraph notes or other materials in this case although a copy of them was located in the prosecutor's file. It is unclear when those documents were placed in that file.

This is yet another illustration of the problem of not having a central repository for documents. The polygrapher worksheet and case review were important because they provided investigative leads in the case. For example, according to the Polygraph Case Review relating to Kavin McMorris, McMorris told Tovar that "Farmer Dell told him he and six others involved in shooting" and that "Farmer Dell said he shot one in the head." Although Tovar appears to have asked him if the information about Farmer Dell was truthful, there is no indication that the detectives followed up on this lead—e.g., by trying to identify and question "Farmer Dell." The detectives could not have followed up on this information if they were not aware of it. I did not see any mention in the police files of "Farmer Dell" or of any attempts to identify "Farmer Dell" or test the truthfulness of this information.

Finally, it appears that even when police believed different crimes were related to one another and committed sequentially—as in the case of the May 29, 1990 shootings—they still maintained separate files for each shooting and there was no policy about putting evidence that related to more than one shooting in more than one file. The Deneen Coats aggravated battery CPD file has long been destroyed per CPD retention policy, but we know that the Coats lineup report is not in the Watson file. This suggests that there was no uniform policy for ensuring that all material relevant to a string of shootings was in one place. This, too, was contrary to sound police file keeping practices.

If called to testify, I would testify consistently with this report. I am being compensated at a rate of $250/hour for my work on this matter.

I have previously testified in the following matters in the last four years:

Deposition Michael Liggins v. City of Chicago, October 3, 2022;
Deposition Robert Bouto v. City of Chicago, January 30, 2023;
Deposition John Whitney v. City of Vallejo, et al., March 16, 2023.

/s/ Joseph Allio

# Appendix A: Materials Reviewed

Complaint

Successive Petition for Post-Conviction Relief, Bates stamped WESTON 3666

Watson Homicide File, Bates stamped CITY-DW-11-310

Sims Homicide File, Bates stamped CITY-DW-311-477

Weston trial transcripts A-I, Bates stamped WESTON 33126-34084

Motion to Suppress Testimony *People v. Macklin*; IND DEF 312420-32

William Moser Deposition with Exhibits

Johnny Walker Deposition

Nathaniel McCurine Deposition

Jeremiah Smith Deposition

Victor Breska Deposition with Exhibits

Andrew Christophersen Deposition with Exhibits

Dwayne Macklin Deposition with Exhibits

John Paladino Deposition with Exhibits

Demond Weston Pro Se Post Conviction Petition, Bates stamped IND DEF 292517-292556

Demond Weston Habeas Petition, Bates stamped IND DEF 297605-297660

Demond Weston Affidavit, Bates stamped IND DEF 297960-297973

OSP Closing Memo from Patrick Calihan, March 5, 2006, Bates stamped IND DEF 298704-298706

OSP Closing Memo from Parick Calihan, April 5, 2006, Bates stamped IND DEF 298707-298708

Demond Weston Statement for OSP with Patrick Calihan, Bates stamped IND DEF 299762-299798

Audio of Demond Weston talking to the Torture Inquiry Relief Commission, Bates stamped IND DEF 302501-302502

Demond Weston Victim Impact Statement, Bates stamped WESTON 34191-34197

Demond Weston Deposition with Exhibits

**Kill Complaints**
- 86-CR-15796; Testimony of Jason Gray, Bates stamped IND DEF 50563-50565

- 86-CR-15796; Testimony of Manuel Bobe, Bates stamped IND DEF 98951-99050
- 2006-CV-06772; Affidavit of Peter Williams, Bates stamped IND DEF 50696-50698
- 2006-CV-06772; Amended Complaint, Bates stamped IND DEF 97164-97199
- Dwayne Macklin affidavit; Bates stamped IND DEF 246034
- Complaint Register 159408 (Johnny Walker); Bates stamped IND DEF 29446-29448
- Complaint Register 162922 (James Coston); Bates stamped IND DEF 25650-25652
- Complaint Register 166416 (Mark Craighead); Bates stamped IND DEF 27998-28002
- Complaint Register 179723 (Deshawn and Bobby Spencer); Bates stamped IND DEF 33478-33513
- Complaint Register 191637 (Alnoraindus Burton); Bates stamped IND DEF 34124-34270
- Documents Bates stamped FOIA_034-000001-000476 (Michael Kill Deposition, Kenneth Boudreau Deposition, police reports from Permanent Retention File
- Kill Deposition in Harold Hill; Bates stamped IND DEF 282562-282611
- Kill Deposition in Harold Hill part 2; Bates stamped IND DEF 195049-195299
- Kill Deposition in Ronald Kitchen, Vol 1; Bates stamped IND DEF 282612-282887
- Kill Deposition in Ronald Kitchen, Vol 2; Bates stamped IND DEF 282888-283046
- Testimony of Dan Young in People v. Harold Hill and Dan Young; Bates stamped IND DEF 50757-50779
- Testimony of Demond Weston; Bates stamped IND DEF 362465-362506
- Testimony of Eric Wilson; Bates stamped IND DEF 97077-97122
- Testimony of George Ellis Anderson; Bates stamped IND DEF 89225-89234
- Testimony of James Coston; Bates stamped IND DEF 163397-163400
- Testimony of Johnnie Plummer; Bates stamped IND DEF 247830-247929
- Testimony of Marcus Wiggins; Bates stamped IND DEF 246090-246118
- Testimony of Anthony Jakes in 92-CR-5073; Bates stamped IND DEF 42798-42660
- Torture Relief Inquiry Commission form for Geral Reed; Bates stamped IND DEF 238404-238405

## Maslanka Complaints

- Complaint Register 193591 (Damoni Clemon); Bates stamped IND DEF 57029-57108
- Complaint Register 195947 (Bryan Etten(; Bates stamped IND DEF 22694-22838
- Complaint Register 231432 (Louis Pannos, Jack Accardi, George Robertazzo, Joseph Imbragono); Bates stamped IND DEF 34465-34531
- Complaint Register 239430 (Anthony Mariel Nanasi); Bates stamped IND DEF 28234-28271
- Complaint Register 289235 (Rekia Carothers); Bates stamped IND DEF 23144-23172
- Special Prosecutor's Report and Supplement: Bates stamped IND DEF 159683-160209
- OPS Decision suspending Maslanka for 5 days; Bates stamped IND DEF 283859-283865
- Maslanka Deposition in Post-Conviction case; Bates stamped Sidley 1140-1160

### Anderson
  - Anderson testimony, 11/16/1990; Bates stamped IND DEF 251053-251061
  - Anderson testimony, 5/1/1991; Bates stamped IND DEF 258714-258763
  - Anderson affidavit in support of Motion to Vacate Pleas, 10/23/1991; Bates stamped IND DEF 251783-251784
  - Anderson affidavit, 10/19/1999; Bates stamped IND DEF 252039-252040
  - Anderson memo to Special Prosecutor, 8/31/04; Bates stamped IND DEF 258645-258649

- o Anderson memo to Egan, 10/25/04; Bates stamped IND DEF 258827
- o Anderson memo to Special Prosecutor, 10/1/05; Bates stamped IND DEF 259650
- o Anderson TIRC form, 5/19/11; Bates stamped IND DEF 263728-263729
- o Anderson affidavit (undated); Bates stamped IND DEF 252725
- o Anderson testimony; Bates stamped 258199-258234

**Brown**
- o Cortez Brown statement, 9/21/90; Bates stamped IND DEF 310438-310443
- o Cortez Brown statement, 9/22/91; Bates stamped IND DEF 310444-310458
- o Cortez Brown affidavit, 7/27/2000; Bates stamped IND DEF 318820-318821
- o Cortez Brown affidavit, 12/6/2000; Bates stamped IND DEF 122509-122510
- o Brown testimony (aka Victor Safford), 5/18/09; Bates stamped IND DEF 355682-355824
- o Victor Safford (aka Brown) letter to Judge Strahorn; bates stamped IND DEF 351369-351371

**Daniel**
- o Complaint Register 155072; Bates stamped CITY-DW 6342-6374
- o Complaint Register 155072 (Daniel); Bates stamped IND DEF 25103-25139

**Harris**
- o Complaint Register 150921 (Harris); Bates stamped CITY-DW 5870-5999

**Johnson**
- o Eric Johnson affidavit, 3/28/06; Bates stamped IND DEF 113565-113571
- o Eric Johnson affidavits, 3/28/06; Bates stamped IND DEF 112173-112183
- o Eric Johnson interview, 4/13/06; Bates stamped IND DEF 113572-113628
- o Complaint Register 1009053; Bates stamped IND DEF 221778-221798
- o Complaint Register 1035379 (Johnson); Bates stamped IND DEF 89898-89954
- o Johnson testimony (Motion to Quash Arrest, Motion to Suppress Statements); Bates stamped IND DEF 112204-112239
- o Johnson TIRC form; Bates stamped IND DEF 283867-283868

**Mack**
- o Complaint Register 180224 (Raymond Mack); Bates stamped IND DEF 33514-33719
- o Complaint Register 180224; Bates stamped CITY-DW 6885-7205

**Morissette**
- o Case Disposition (Morissette); Bates stamped 283891-283892
- o Morissette – Burge victim claim form and letter; Bates stamped 283884-283890

**Pinex**
- o Pinex testimony, 3/26/86; Bates stamped IND DEF 353830-353902
- o Pinex statement, 6/29/95; Bates stamped IND DEF 353792-353793
- o Report of Special Prosecutor regarding McKeever murder; Bates stamped IND DEF 353775-353793
- o Pinex deposition in Wilson v. Chicago; Bates stamped IND DEF 37841-37930

**Smith**

- o Complaint Register 215387 (JT Smith); Bates stamped IND DEF 34361-34449

**Torrence**
- o Complaint Register 170457, 9/19/89; Bates stamped IND DEF 25613-25635
- o OPS File Memo regarding Donald Torrence, 6/7/04; Bates stamped IND DEF 328143-328146
- o Torrence v. Chicago, Amended Complaint; Bates stamped IND DEF 342626-342629

**Wiggins and Clemon**
- o Statement of Damoni Clemon, 9/26/91; Bates stamped IND DEF 175263-175268
- o Complaint Register 193591; Bates stamped CITY-DW 7568-8303
- o Complaint Register 193591; Bates stamped IND DEF 57029-57108
- o File related to CR 193591; Bates stamped IND DEF 283055-286865
- o Wiggins affidavit; Bates stamped IND DEF 162496-162500
- o Wiggins Deposition; Bates stamped IND DEF 94128-94229
- o Wiggins interview; Bates stamped IND DEF 94236-94290
- o Wiggins letter in support of actual innocence; Bates stamped IND DEF 94233-94235
- o Wiggins letter; Bates stamped IND DEF 94291
- o Wiggins letter; Bates stamped IND DEF 94400-94403
- o Wiggins statement, 9/26/91; Bates stamped IND DEF 94230-94232
- o Wiggins testimony (no case info); Bates stamped IND DEF 94292-94366
- o Wiggins testimony (note says Cortez Brown); Bates stamped IND DEF 94367-94399
- o Wiggins v. Burge complaint; Bates stamped IND DEF 94084-94127

**Zahora**
- o Complaint Register 186135; Bates stamped IND DEF 25578-25612

**Moser**
- o Testimony of Sean Tyler, 94-CR-11503; Bates stamped IND DEF 246582-246623
- o Michael Taylor affidavit, 1994; Bates stamped IND DEF 228356-228359
- o Peter Williams affidavit, 2006-CV-6772; Bates stamped IND DEF 50696-50698
- o Harold Hill amended Complaint, 2006-CV-6772; Bates stamped IND DEF 97164-97199
- o Peter Williams testimony, 2006-CV-6772; Bates stamped IND DEF 133641-133691
- o Dwayne Macklin affidavit, 10/4/97; Bates stamped IND DEF 246034
- o Eric Johnson affidavit, 3/28/06; Bates stamped IND DEF 112173-112180
- o Complaint Register 173046 (Eric Johnson); Bates stamped IND DEF 278068-278123
- o Complaint Register 173046 and interview (James Gibson); Bates stamped IND DEF 1366-1370, 1411
- o Complaint Register 183196 and interview (Sandy Curtis); Bates stamped IND DEF 28706, 28715
- o Complaint Register 186135 (Steve Zahora); Bates stamped IND DEF 29730-29733
- o Complaint Register 189688 (Julia Murray); Bates stamped IND DEF 25671-25677

- o Complaint Register 200398 (Emmett White); Bates stamped IND DEF 208570-208574
- o Complaint Register 247568 and interview (Joy Marie); Bates stamped IND DEF 22965-22978, 23008-23010
- o Testimony of Dan Young, 9/19/94; Bates stamped IND DEF 50757-50779
- o Testimony of Harold Hill, Bates stamped IND DEF 51097-51149
- o Testimony of Reginald Henderson, 5/21/96; Bates stamped IND DEF 228373-228417

Daniel McWeeny Deposition with Exhibits

Jerome Rusnak Deposition with Exhibits

Training Materials – Weston 47767-48053
- Training materials regarding lineups, including General Order 88-18; Bates stamped WESTON 47767-47786
- Training materials regarding interviewing and interrogations, including General Orders 87-7 and 85-2; Bates stamped WESTON 47787-48038
- Training materials regarding identification procedures; Bates stamped WESTON 48039-48053

Orlandis McCurdy affidavit, 3/31/14, Bates stamped WESTON 14290-92

Lineup Report, Deneen Coats; Bates stamped CCSAO 2455-2456

Bryan Hampton Deposition with Exhibits

Paul Katz Deposition with Exhibits

Demetrise McIntosh Deposition with Exhibit

Bernard Murray Deposition with Exhibits

Victor Safforld Deposition with Exhibits

Robert Tovar Deposition with Exhibits

Kavin McMorris Documents, Bates stamped CITY-DW 9888-9955

Maslanka Complaint, CR 17830, Bates stamped IND DEF 24930-25016

Moser Complaint, CR 197216, Bates stamped IND DEF 22490-22551

Pamela McCurdy document; Bates stamped IND DEF 332208-332215

Pamela McCurdy testimony; Bates stamped IND DEF 334680-334702

Paul Sabin Deposition with Exhibits

Terrence Johnson 302; Bates stamped WESTON 56601-56606

Michael Covington Deposition

Nathson Fields – Judgment

Nathson Fields v City of Chicago,et al. – Westlaw

Jacques Rivera v Reynaldo Guevara, et al – Westlaw

Transcript from Fields case & Post trial exhibit from Fields case; Bates-Stamped WESTON 48054-56041

Susan Swanson Deposition with Exhibits

Janet McCarthy Deposition with Exhibits

City of Chicago response to Plaintiff's second set of interrogatories