# Exhibit 21

**Deposition of Nathaniel McCurine**
**Taken:  February 8, 2022**
**Role:  Witness**

LOUISVILLE  LEXINGTON  LONDON  FLORENCE  CINCINNATI  INDIANAPOLIS  ORLANDO  JACKSONVILLE  TAMPA



# KENTUCKIANA
## COURT REPORTERS

**CASE NO. 1:20-CV-06189**

**DEMOND WESTON**

**V.**

**CITY OF CHICAGO, ET AL.**

**DEPONENT:**

**NATHANIEL MCCURINE**

**DATE:**

**February 08, 2022**



a courtroom **powerhouse**

✉ schedule@kentuckianareporters.com
☎ 877.808.5856  |  502.589.2273

www.kentuckianareporters.com

```
 1        Q    Did you know Jerrod Smith in May of 1990?

 2        A    Yeah.  I knew Jerrod Smith.  Which is,

 3   "J Dilla."

 4        Q    Okay.  So you knew him by the nickname,

 5   J Dilla?

 6        A    Yeah.  I didn't know his whole name.  I just

 7   know him by the name -- nickname.

 8        Q    And was J Dilla ever in the Chevy four-door

 9   that you shared with Brian Hampton?

10        A    No, ma'am.

11        Q    Did you know Keith Jackson or "Keith Kool," in

12   May of 1990?

13        A    Yes.  We grew up in the same neighborhood.  I

14   knew him by Keith Kool.

15        Q    And was he ever in the vehicle that you shared

16   with Mr. Hampton?

17        A    Not to my knowledge.  No.

18        Q    Did you know Demond Weston in May of 1990?

19        A    No.

20        Q    Was Demond Weston ever in the vehicle that you

21   shared with Mr. Hampton?

22        A    Nope.  Not to my knowledge.

23        Q    Did you know someone named Cortes Brown or

24   "Vic Brown," in May of 1990?

25        A    No.  I didn't know him.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q      At 64th and Racine?

 2        A      Yes.

 3        Q      Okay.  When police first questioned you about

 4   the shootings on May 29th, where did that interview with

 5   them or interrogation with them take place?

 6        A      It was on -- a police station on California

 7   somewhere.

 8        Q      Okay.

 9        A      I don't know exactly what area, but I know it

10   was up California, I believe -- the police station.

11        Q      And how did you end up going there?  Did they

12   ask you to come down or did you go there yourself?

13        A      No.  I was in the -- around the area, a couple

14   days later.  I was back over in that area, and they just

15   swooped in, detectives, and picked me up.

16        Q      Okay.  And when you say, picked you up, did

17   they put you in handcuffs?

18        A      Yeah.  They put me in handcuffs, and put me in

19   the back of the car.

20        Q      Did they tell you what it was about?

21        A      Nope.

22        Q      Did you have any idea what it was about?

23        A      Nope.  I asked them, but they wouldn't say

24   nothing.

25        Q      And do you know who the officers were that
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-06189 Document #: 327-3 Filed: 02/11/25 Page 5 of 94 PageID #:5663
The Deposition of NATHANIEL McGORINE, taken on February 06, 2024

27

1  think I was, like, handcuffed, like, to a wall or
2  something.  I can't remember.
3       Q     And what happened next?
4       A     Start asking me about the shootings on 56th,
5  57th, and Honore, and Wolcott.  They started asking me
6  about some shootings over there.
7       Q     Okay.  And did you witness any shootings on
8  May 29, 1990?
9       A     No.  I did not.
10      Q     Did you participate in any shootings on May
11 29th of 1990?
12      A     No.  I did not.
13      Q     Did you tell the police that you didn't know
14 anything about the shootings?
15      A     Yes.  I did.  I told them.
16      Q     Okay.  And did they accept that, when you said
17 you didn't know anything about it?
18      A     No.  They did not accept it.
19      Q     What happened when you -- after you told them
20 you didn't know anything about it?
21      A     They started pressuring me a little bit more
22 about what happened over there.  Then they saying that
23 Biz said that I used his car, I supposedly took two guys
24 over there to go shoot up some people. And I kept
25 telling them, I know that's a lie.  Biz had never told

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   you that.  Because I with Biz before I even went down
 2   that area to go see my girlfriend.  Well, he's saying
 3   that, well, that's what Biz said.  That you used his car
 4   to take some guys down there, to go shoot up some
 5   people.  And after that, I kept denying it and denying
 6   it, and it kept going on and on.  They feed me -- they
 7   telling me, that I'm not going to leave until I tell the
 8   truth.  And I told them -- I said, officer, I told you
 9   the truth already.
10        Q     And do you know which detectives -- or strike
11   that, please.  How many detectives were talking to you
12   about the shootings?
13        A     I believe there was two of them in the room,
14   if I'm not mistaken -- I believe there was two of them
15   in there.
16        Q     And do you know who they were?  What their
17   names were?
18        A     I don't recall -- I don't recall their names.
19        Q     Okay.  Do you recall anything about their
20   physical description, how they looked?
21        A     It's been so long.  I couldn't even -- if I
22   see them right now, I probably wouldn't recognize them
23   -- I wouldn't know.
24        Q     So they told you, that Biz was saying you
25   drove people to the shootings, right?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of NATHANIEL McGUIRE, taken on February 06, 2020

30

```
 1        Q     Were you familiar with the term wrecking crew
 2   at that time?
 3        A     No.
 4        Q     Did police tell you at some point, something
 5   about JD's car being damaged?
 6        A     I -- I don't recall.  I don't remember -- I
 7   don't remember that.  You said, JD's car being damaged?
 8        Q     Yeah.  Did anyone say anything to you about
 9   that?
10        A     No.
11        Q     Okay.  You said -- or you testified earlier,
12   that when you said you didn't know anything about the
13   shootings, the police did not accept that, right?
14        A     No.  They didn't accept it.  They kept on
15   pressuring me and pressuring me until, you know, giving
16   me certain people's names, which I hadn't -- I knew the
17   nickname, but they was giving me the, like, so you
18   telling me you don't know John Walker, or Jerrod Smith.
19   You know? But these -- I knew the nicknames.  I didn't
20   know they last name.
21        Q     Okay.  Do you remember any other names that
22   they were saying to you during that first time they
23   questioned you, besides John Walker and Gerard Smith?
24        A     I don't -- I don't recall.  I don't recall any
25   other names that they -- it's been so long.  I think I
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  might have heard the name Dwayne Macklin.  I don't know

2  -- you know, it's been so long.  So I don't -- I can't

3  say for sure -- I can't say for sure.

4      **Q    Sure.  I understand.  And when you say they**

5  **were pressuring you in this first time that they were**

6  **questioning you, what did they do to pressure you?**

7      A    I asked to see if I could have my mother come

8  down and, you know, they saying, well, you don't really

9  need your mother to come down.  You know, there's going

10  to be over with quick, you know, this and that, you

11  know?  And I'm like, you keep asking -- you keep asking

12  the same question over and over, and I keep giving you

13  the same answer.  You know, it's just, like, you not

14  believing me.  Because they coming back, you know,

15  telling me, okay.  Well, Biz said this and, you know,

16  you're not -- you say -- you're not telling me the

17  truth.  So, you know, you're not going to go home.

18  You're going face murder charges.  And, you know, as a

19  kid, as -- you know, I was scared.  I didn't know what

20  to do.  You know, I had nobody there.  I never -- I

21  didn't know about can I have a lawyer there while, you

22  know, I'm being questioned.  I didn't know that at the

23  time, you know?  So I didn't -- I didn't know, you know,

24  that I should have a lawyer there, this and that.  So as

25  I kept on -- they kept on pressuring me, you going to go

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-06189 Document #: 327-3 Filed: 02/11/25 Page 9 of 94 PageID #:5667
The Deposition of NATHANIEL MCCURTIS, taken on February 06, 2020

32

1  down for murder, this and that, if you don't tell me

2  what happened.  So the information they feeding me, you

3  know, I just -- just started just saying things that the

4  -- the stuff that they feed me, and the names they

5  giving me, you know.  And they telling me that when we

6  done, I can go home.

7      **Q    How long did the first interrogation, where**

8  **the first time that they picked you up and were talking**

9  **about the murder, how long did that interrogation last?**

10     A    I can't exact -- I can't remember how long it

11 last -- I know it lasted a while.  Maybe lasted -- I

12 don't know, maybe a day or two -- or two days, something

13 like that there.  I don't know exactly, but I think it

14 was to the next day, because they let me go from the

15 police station and it was at nighttime.

16     **Q    Okay.  During that first interrogation in**

17 **June, did they use any physical force on you?**

18     A    When I kept -- when I kept telling them that I

19 didn't know this and that, the one officer just slapped

20 me in the back of head.  Come on, man.  Tell us the

21 fucking truth, man.  You know, you want to go home or

22 not, you know what I'm saying?  Or, you're going to go

23 down for murder, this and that.  And then later on in

24 the line, you know, I'm so drained, and so, you know,

25 just -- you know, like, this murder charge, I'm thinking

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-06189 Document #: 327-3 Filed: 02/11/25 Page 10 of 94 PageID #:5668
The Deposition of NATHANIEL MCGRUDER, taken on February 08, 2023

33

1    about my -- my girlfriend pregnant, my mother's

2    pregnant, you know, and all this stuff running through

3    my head, you know,  And I'm just so tired and exhausted,

4    you know.  So after a while, you know, I tried to, you

5    know, tell them what they wanted to hear, you know, just

6    to get up out of there.

7         Q    And after you told them what you thought they

8    wanted to hear, did they let you go?

9         A    Yes.  I signed -- I signed a -- I signed some

10   type of -- I signed a paper, which is, I know now, is a

11   statement.  I signed that, because I had to sign that.

12        Q    Do you know whether they had you sign a

13   statement that first time that you got interrogated, or

14   if that was later on?

15        A    I -- I think it was later on, because they

16   came back and got me again out of the county.

17        Q    Okay.  So eventually, after you're

18   interrogated for a long time -- one or two days in June,

19   eventually they let you go; is that right?

20        A    Right.  They let me go.

21        Q    Okay.  And then at some point, did you

22   participate in a lineup in June?

23        A    Yeah.  They put me in a lineup.

24        Q    Do you remember anything about the

25   circumstances of that lineup?  How it happened or where

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-06189 Document #: 327-3 Filed: 02/11/25 Page 11 of 94 PageID #:5669
The Deposition of NATHANIEL MCGRONE, taken on February 08, 2023

37

1    Q    Okay.  At some point while you were in county,
2  did police remove you from county, and question you
3  again about the May 29th shootings?
4    A    Yes.
5    Q    And do you recall at all which police were
6  involved in taking you from county to question you
7  again?
8    A    No.  I don't -- I don't recall.
9    Q    Okay.  At the time that you were in county on
10 the robbery, did you have an attorney?
11   A    I had a public defender, I believe.  Yes.
12   Q    Okay.  And what do you recall about being
13 removed from county to go be questioned again?
14   A    I asked them, why, you know, did they coming
15 to get me from the county to -- well, they said that the
16 statement that you gave, it didn't -- it didn't -- it
17 wasn't good enough.  It didn't work.  So we need you to
18 tell us a little bit more, you know, about what
19 happened.
20   Q    And when they took you from county to question
21 you, do you know where they took you for that
22 interrogation?
23   A    I don't recall.
24   Q    During that interrogation, when they took you
25 from county, did they tell you again what they said

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-06189 Document #: 327-3 Filed: 02/11/25 Page 12 of 94 PageID #:5670
The Deposition of NATHANIEL McGRONE, taken 12 February 08, 2020

38

1   happened during the shootings?

2       A    I don't -- can you repeat that one more time?

3   I didn't understand.

4       Q    Yeah.  Let me ask it better.  When they took

5   you from county to interrogate you again, did they start

6   talking to you again about Brian Hampton, and your car,

7   and you taking people to the shootings?

8       A    Yes.

9       Q    Okay.  And what did you tell them?

10      A    The same thing I told them from the beginning,

11  about what happened and where I was at -- at the time,

12  you know.  If I recall -- I can't exactly remember.  I

13  was trying to explain to them, they were telling me that

14  the first statement that I gave them wasn't good enough,

15  you know.  I don't -- I don't remember exactly.  It's

16  been so long ago.  My head's so clogged up, I don't

17  remember exactly.  But I know I ended up giving them --

18  I gave another statement, you know.  Because they saying

19  -- they said that I was going to -- they said I was

20  going to be a witness or something like that there, if

21  I'm not mistaken.  They was going to use me as a

22  witness, you know.  I don't really know -- I don't

23  remember.  I was so young.  I don't know.  I can't

24  exactly remember everything that was said, so, you know,

25  I don't know.  I know they got me to the police station,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-06189-Document #: 327-3 Filed: 02/11/25 Page 13 of 94 PageID #:5671
The Deposition of NATHANIEL McGRONE, taken on February 08, 2020

39

1  and they started asking me about the case over and over

2  again, you know.  And I just was telling them things to,

3  you know, like -- just repeating what the last time I

4  had -- what I had told them last time, you know.

5      Q    And when they were repeating things or asking

6  things over and over again, were you trying to figure

7  out what you needed to add on to the story, to get a

8  statement that was good enough for them?

9      A    Right.  To -- so they can be satisfied with

10 what -- of what I was saying.

11     Q    Did anyone use any physical force on you

12 during that interrogation?

13     A    I think it was the -- I think it was the first

14 interrogation.  The first one, not the second one.  It

15 was the first one, I believe.

16     Q    Okay.  And do you know how long the second

17 interrogation, when they came and got you out of county,

18 how long that lasted?

19     A    Some -- maybe some hours, because I -- they

20 came and got me, it was in the daytime.  So when I got

21 back, it was nighttime.

22     Q    When they were questioning you repeatedly

23 about the same things, were they giving you names of

24 people that they said were involved?

25     A    Yes.  I --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-06189 Document #: 327-3 Filed: 02/11/25 Page 14 of 94 PageID #:5672
The Deposition of NATHANIEL MCGUIRE, taken on February 08, 2020

40

1      Q    And -- sorry, go ahead.

2      A    I was just feeding -- feeding off the

3  information that they give me, because I had not known

4  these guys.  I only knew their nickname, but I never

5  knew their last names.  I was scared -- you know, like I

6  said, I was scared.  I was young, you know,.  Thinking

7  back on it now, you know, I just -- I wish things

8  would've been -- you know, I wish I had just, you know

9  -- just continued to -- you know, but I was, like,

10  pressured -- I was pressured into this (inaudible).  As

11  a young kid, you know, pressured.  I just wish it never

12  happened.  I just wish, you know, the police would've

13  like -- I mean, they were so -- so quick, you know, to

14  charge somebody with this case -- or whatever, this and

15  that.  And I explained to them, I said -- I kind of

16  asked them a question.  I said, if I supposedly drove

17  some people over here to go shoot up some people, why

18  would I even -- after doing that, I would leave and go

19  somewhere else.  Why would I be even in the area, going

20  to my girlfriend's house?  And I supposedly just used

21  this blue Chevy to go -- to go over here and shoot

22  people up, and all this stuff here.  I said, it don't

23  add up.  And I said, you understand what I'm saying? You

24  know, I was kind of smart back then - you know, I was a

25  little bit smart.  Like to -- like, hold on.  If I just

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-06189-Document #: 327-3 Filed: 02/11/25 Page 15 of 94 PageID #:5673
The Deposition of NATHANIEL McGUINNESS, taken 02 February 08, 2023

41

1    did all this here, I'm not fixing to be over here in

2    this area, to go try to see my girlfriend.  But they

3    were just so -- so quick to charge somebody with this

4    case, you know.  And I was trying to protect myself as

5    far as -- they were telling me, you're going to go down

6    for murder.  As a young kid, you don't really want to --

7    you don't want to hear that, you know.  I had a daughter

8    -- I had a baby on the way.  My mother was pregnant, you

9    know, and I'd never been in that type of situation

10   before -- I'd never been in that situation before, you

11   know, where I'm facing murder charges, you know, for

12   something I didn't do, you know.

13       **Q     So was it your understanding that you needed**

14   **to give them a statement with the names and the facts**

15   **that they wanted, or you were going to get charged with**

16   **murder?**

17       A     Exactly.

18       **Q     Was it your understanding that if you gave**

19   **them the statement they wanted, you would receive a**

20   **lesser charge or you would be a witness?**

21       A     They told me that I would be a witness.

22       **Q     Okay.  Did they tell you that you needed to**

23   **say that you saw  J Dilla or JD with guns?**

24       A     Yes.  What kind of guns they had, you know. It

25   was just -- I made up something, you know -- made up

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-06189 Document #: 327-3 Filed: 02/11/25 Page 16 of 94 PageID #:5674
The Deposition of NATHANIEL McGRONE, taken on February 08, 2023

42

 1   something.  That's all.

 2       Q    At some point in the second interrogation, did

 3   they talk to you about Demond Weston?

 4       A    Demond -- they mentioned his name, Demond --

 5   they mentioned his name to me, and I had not known him.

 6   They mentioned his name to me.  I'd never seen him until

 7   I was in -- until we was all locked up in the Cook

 8   County.  That's my first time seeing him.  All I knew

 9   was his name.

10       Q    And did they tell you things about what Demond

11   had supposedly done in the shootings?

12       A    They didn't.  They said, that I supposedly

13   drove him and some other guys over there to go shoot up

14   somebody.

15       Q    And was it your understanding that you had to

16   include Demond in the story, in order for them to let

17   you go?

18       A    Exactly.

19       Q    And eventually, did you start saying the story

20   they wanted, with the details that they wanted?

21       A    Right.

22       Q    And eventually, did you agree to give a

23   statement with those -- with that story?

24       A    Yes.  Yes.

25       Q    Did someone hand write out that statement?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-06189 Document #: 327-3 Filed: 02/11/25 Page 17 of 94 PageID #:5675
The Deposition of NATHANIEL MCCURINE, taken 02 February 27 08,2020

43

1      A    Yes.

2      Q    And do you recall whether at some point a

3 prosecutor -- an assistant state's attorney, came to

4 talk to you about your statement?

5      A    I believe so.  Yeah.  I believe so.  Yes.

6      Q    Okay.  Do you know who physically wrote out

7 the statement?

8      A    I believe it was the detective that was

9 questioning me about it.  As I was talking, he was

10 writing.

11      Q    And were you able to read and write

12 proficiently in 1990?

13      A    No.  I -- no.

14      Q    Since that time, have you been able to improve

15 your reading and writing?

16      A    Yes.  I have.

17      Q    Okay.  At that time, were you able to sign

18 your own name?

19      A    Yes.

20      Q    And were you able to add your initials?

21      A    Yeah.  They made me add my initials, but I

22 didn't understand why.  I guess it was because of a

23 mistake that was made, and made me put N and then M.  I

24 didn't know.  I guess, it was a mistake that was made or

25 whatever.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-06189-Document #: 327-3 Filed: 02/11/25 Page 18 of 94 PageID #:5676
THE DEPOSITION OF NATHANIEL MCGRONE, taken on February 08, 2023

79

1   over 30-something years.  I don't remember their names

2   and stuff and all that.  If I seen them today, I

3   probably wouldn't even recognize them.

4        Q    All right.  So you would agree, you can't

5   identify any detective by name that you spoke to,

6   correct?

7        A    Correct.

8        Q    And you talked about being slapped?

9        A    Say it again.

10       Q    You talked about being slapped by a detective

11  during that very first interview; is that correct?

12       A    I believe that was the first one.  He slapped

13  me in the back of the head.

14       Q    And was it one slap?

15       A    Yeah.  It was just one slap back to the head,

16  and then a pound to the chest.

17       Q    And it was the same detective?

18       A    The same detective that hit me in the back of

19  the head, is the same one hit me in the chest.

20       Q    Describe that detective.

21       A    It's been so long, sir.  I can't even -- if he

22  walked in here right now, I couldn't even say if that

23  was him or not.  It's been over 30 years.  I was a kid

24  back then.  I'm 49 years old.  I can't remember that guy

25  back then.  I can't

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  committed an offense?

2          MS. KLEINHAUS:  Objection to form.

3      A    No.  I have not.

4      Q    Sir, you're a convicted murderer, true?

5      A    That's why I'm in here.

6          MS. KLEINHAUS:  Objection.  Argumentative.

7          MR. BAZAREK:  How is that argumentative?

8          MS. KLEINHAUS:  That's -- go ahead.

9          MR. BAZAREK:  Okay.

10 BY MR. BAZAREK:

11     Q    Sir, you're a convicted murderer, right?

12         MS. KLEINHAUS:  Objection.  Asked and answered.

13     Q    Go ahead.

14     A    Yes.

15     Q    Who did you murder?

16     A    No one.

17     Q    Do you even know the name of the person you

18 murdered?

19         MS. KLEINHAUS:  Objection.  He just said, he

20     didn't murder anybody.

21     A    I didn't murder anybody.

22     Q    But you pled guilty to murder?

23     A    The reason why I pled guilty to murder,

24 because at the time I was a young kid, facing a murder

25 charge for something I didn't do.  I was forced.  My --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-06189 Document #: 327-3 Filed: 02/11/25 Page 20 of 94 PageID #:5678
The Deposition of NATHANIEL MCGRONE, taken on February 08, 2023

90

```
 1   my -- defendant -- the co-defendant of one of mine went
 2   to trial and got 60 years.  In order for me -- my
 3   Counsel telling me that if I go to trial and the same
 4   thing happened to me, I'm going to get that same time.
 5   That scared the hell out me.  So instead, they offered
 6   me cop outs, something way less than 60 years.  I didn't
 7   want to go to trial, and get 60 years, and then I will
 8   be in a situation where I be -- had to try to appeal my
 9   case and get out for something that I didn't do.  I had
10   to sit in jail for a long period of time.  I done seen
11   it many times as being locked up.  People being
12   convicted of something they didn't do and you had to
13   spend 30, 40 years in jail to get yourself free for
14   something you didn't do, to prove your innocence.
15         MS. KLEINHAUS:  (Inaudible).
16    Q    What is the name of the person you were
17   convicted of murdering?
18    A    It's in the -- I don't know.  I never -- you
19   said, that I was convicted of murdering?  I never
20   murdered anybody.
21    Q    Sir, you were -- we've already -- do we agree
22   you're a convicted murderer?
23    A    I understand that.
24         MS. KLEINHAUS:  Objection.  Argumentative and
25      harassing.  We've already been through his
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-06189 Document #: 327-3 Filed: 02/11/25 Page 21 of 94 PageID #:5679
The Deposition of NATHANIEL McCURINE, taken on February 08, 2023

113

```
 1   beige -- yeah.  A white beige top.
 2        Q    Okay.  And that car, it had no license plates,
 3   right?
 4        A    It had license plates.
 5        Q    Okay.  What was your -- whose name was the
 6   Chevy -- strike that.  Who had title on the Chevy
 7   Caprice?
 8             MS. KLEINHAUS:  Objection to form.
 9        A    Brian Hampton.
10        Q    I didn't -- I didn't hear it over the
11   objection.  What'd you say?
12        A    Brian Hampton had the title to it.
13        Q    Okay.  So Hampton owned the car?
14        A    Yes.  But we bought it together.  We didn't
15   buy it from no lot or anything, we bought it from
16   another -- I bought it from another person that owned
17   the car, we bought it from him.  I had my half of the
18   money, he had his half of the money.
19        Q    Okay.  And then what -- would you share use of
20   the auto?
21        A    Yeah.  Well, we was always, like, together all
22   the time, so, you know, sometimes he might have, you
23   know, wanted to go hang out with his girl sometimes with
24   it, you know.  I never -- I didn't have any license, so
25   he was, kind of, like, skeptical of me driving it by
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-06189 Document #: 327-3 Filed: 02/11/25 Page 22 of 94 PageID #:5680
The Deposition of NATHANIEL McCURINE, taken on February 08, 2023
114

1  myself, but I didn't want to get pulled over.  I think I

2  did get pulled over before, and -- without no license,

3  and I think I got in trouble for that.  But they let me

4  right back out.

5      Q    So Biz had -- he did have a driver's license?

6      A    I don't know.  I don't -- I don't know.

7      Q    Okay.  So let me ask you this, at the time,

8  where was Biz and Lil D living, in relation to where you

9  resided?

10     A    I think Biz -- I don't know exactly where his

11 -- where he was -- he was somewhere -- everywhere.  I

12 don't know exactly where he lived -- laid his head at. I

13 don't know.  I can't recall.  Lil D, I think he stayed

14 with his mother, if I'm not mistaken.  But I don't know

15 exactly where -- where we used to, you know -- I never

16 went to his house that much.

17     Q    Did he -- did Lil D live in the area of

18 6005 South Paulina, if you know?

19     A    I believe so -- I believe so.  I think that's

20 where they -- where he did stay at.  I believe so.

21     Q    Okay.  And how was it arranged that you were

22 going to meet with them that day, and they were going to

23 arrive at your house to come get you?

24     A    You said, how was it arranged?

25     Q    Yeah.  how did that happen?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-06189-Document #: 327-3 Filed: 02/11/25 Page 23 of 94 PageID #:5681
The Deposition of NATHANIEL McGOWNIEL, taken on February 08, 2023
121

1  have a license.  I had already got pulled over by the

2  police before, I think.  So if I had to go somewhere, it

3  would be like a short distance, you know what I'm

4  saying?  From my girl's house, or -- you know, or to my

5  house, or something like that there.

6      Q      On May 29, 1990, were you ever alone in that

7  car and driving it?

8      A      Yes.  That's the time that I went -- I got

9  paged from my girl, and I went to go see her.

10     Q      You went to go see Monique, right?

11     A      Right.  Yeah.  Monique.  On 57th and

12  Winchester.

13     Q      What's Monique's last name?

14     A      Adams.

15     Q      Do you know where Monique Adams lives today?

16     A      No.  I lost contact with her back in like '16.

17     Q      In 2016?

18     A      Yeah.  Yeah.

19     Q      Do you have children with Monique Adams?

20     A      No.  I do not.

21     Q      And how -- what -- during what time period was

22  she your girlfriend?

23     A      Back in 1990.

24     Q      Until how long?

25     A      Until -- until the time when I was in the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-06189 Document #: 327-3 Filed: 02/11/25 Page 24 of 94 PageID #:5682
The Deposition of NATHANIEL McCURINE, taken on February 08, 2022
179

```
 1        is February 8, 2022, and the time is 1:50.
 2    BY MR. BAZAREK:
 3        Q    Mr. McCurine, I want to go back.  At any time
 4    on May 29, were you in a red Cadillac?
 5        A    A red Cadillac?
 6        Q    Yes.
 7        A    No.  I never was in a red -- a red Cadillac.
 8    No.
 9        Q    At any time on May 29, did you go to a hot dog
10    place called Duck's (phonetic)?
11        A    Not to my recollection.  I don't remember. No.
12        Q    Okay.  And at any time on May 29, 1990, were
13    you in the area of 56th and Wolcott?
14        A    I was on 57th and Winchester, in front of my
15    girlfriend's house.
16        Q    Right.  Well, your girlfriend lived at 5753
17    South Winchester, right?
18        A    Right.
19        Q    How far was that from 56th and Wolcott?
20        A    Two block -- a block over and two blocks down.
21        Q    Okay.  And 56th and Wolcott, is that an area
22    where Vice Lords would hang out?
23           MS. KLEINHAUS:  Objection.  Calls for
24       speculation.  You can answer, if you know.
25        A    Not to my knowledge.  I don't -- I don't
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

# Exhibit 22

Identify and describe all property or possible evidence recovered at the end of the Narrative in column form. Show exactly where found, when found, who found it and its description (include Property Inventory numbers). If property taken was scribed for Operation Identification, indicate I.D. number at end of Narrative. Offender's approximate description, if possible, should include: name if known, nickname, sex, race code, age, height, weight, color eyes & complexion, scars, marks, etc. If suspect is arrested, give name, sex, race, age, C.B. or I.R. number, if known, and state "In Custody."

## SUPPLEMENTARY REPORT
**CHICAGO POLICE – FOR USE BY B.I.S. PERSONNEL ONLY**

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

| 4. DATE OF ORIG. OCCURRENCE—TIME | | |
|---|---|---|
| DAY 29 | MO May | YR 90 | 2228 |

| 1. OFFENSE/CLASSIFICATION LAST PREVIOUS REPORT | I.UCR OFF CODE | 2. ADDRESS OF ORIG. INCIDENT/OFFENSE ☒1 VERIFIED ☐2 CORRECTED | 3. BEAT OF OCCUR. |
|---|---|---|---|
| HOMICIDE/MURDER 1st Degree | 0110 | 1904 W. 57th St. | 714 |

| 5. VICTIM'S NAME AS SHOWN ON CASE REPORT | CORRECT ☒1 YES ☐2 NO | IF NO, CORRECT ALL VICTIM INFORMATION IN BOXES 20 THROUGH 27 | 6. FIRE RELATED ☐1 YES ☒2 NO | 7. BEAT ASSIGNED |
|---|---|---|---|---|
| WATSON, Joseph | | | | 5312 |

| 8. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | LOCATION CODE | 9. NO. OF VICTIMS | 10. NO. OF OFFENDERS |
|---|---|---|---|
| Street | 304 | 1 | 5 |

| | 11. VERIFIED UPDATE TO | 12. OBJECT/WEAPON | 13. FIREARM FEATURES | 14. POINT/ENTRY | 15. POINT/EXIT | 16. BURGLAR ALARM | 17. SAFE BURGLARY METHOD | 18. IF RESIDENCE WHERE WERE OCCUP. |
|---|---|---|---|---|---|---|---|---|
| CIRCUMSTANCES 19 | CODE NOS. | CODE NO. | CODE NO. | CODE NO. | CODE NOS. | CODE NO. | CODE NO. | |

| PROPERTY | | DESCRIBE PROPERTY IN NARRATIVE — T = TAKEN   R = RECOVERED | | FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE ORIGINAL CASE REPORT OR THE LAST PREVIOUS SUPPLEMENTARY REPORT. | | |
|---|---|---|---|---|---|---|
| ☐ VERIFIED DNA. | 1 MONEY ☐ T $ ☐ R | 2 JEWELRY ☐ T $ ☐ R | 3 FURS ☐ T $ ☐ R | 4 CLOTHING ☐ T $ ☐ R | 7 OFFICE EQUIPMENT ☐ T $ ☐ R | 8 TV RADIO, STEREO ☐ T $ ☐ R |
| ☐ UPDATE TO | 9 HOUSEHOLD GOODS ☐ T $ ☐ R | 8 CONSUM GOODS ☐ T $ ☐ R | 1 FIREARMS ☐ T $ ☐ R | 6 NARC/DANGEROUS DRUGS ☐ T $ ☐ R | 5 OTHER ☐ T $ ☐ R | 6 NONE ☐ T $ ☐ R |

| | 20. NAME (LAST—FIRST—M.I.) | 21. I.UCR OFFENSE CODE | 22. HOME ADDRESS (NO. DIR. STREET APT. NO.) | 23. SEX-RACE-AGE CODE | 24. HOME PHONE | 25. BUSINESS PHONE | 26. INJURED YES NO | 27. VICTIM REL-CODE |
|---|---|---|---|---|---|---|---|---|
| VICTIMS UPDATE ONLY | 1. | | | | | | | |
| | 2. | | | | | | | |
| | 3. | | | | | | | |

| | 28. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 29. HOME ADDRESS | 30. SEX-RACE-AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. |
|---|---|---|---|---|---|---|---|---|
| OFFENDERS UPDATE ONLY | 1. | | | | | | | |
| | 2. | | | | | | | |

| | 31. C.B. NO | I.R. NO. Y.D. NO OR J.D.A NO | OFFENDER REL. CODE | C.B. NO | I.R. NO. Y.D. NO OR J.D.A NO | OFFENDER REL. CODE | 12. NO ARREST ARRES'D UNIT NO. |
|---|---|---|---|---|---|---|---|
| OFF. 1 | | | OFF. 2 | | | | |

| 33. OFF'S. VEHICLE | YEAR | MAKE | BODY STYLE | COLOR | V.I.N. | STATE LICENSE NO | STATE |
|---|---|---|---|---|---|---|---|
| ☐ INFO ☐ STOLEN | | | | | | | |

| 34. SERIAL NOS. OR IDENTIFICATION NOS ☒1 DNA ☐2 VERIFIED ☐3 CORRECTED | LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS OBTAINED IN NARRATIVE |
|---|---|

| 50. OFFENSE/CLASS. THIS DATE (IF SAME ENTER DNA) | REV CODE | 51. METHOD CODE | 52 METHOD ASSIGNED | UNIT NO. 53 STATUS |
|---|---|---|---|---|
| D.   N.   A. | | D.N.A. | ☒1 FIELD ☐2 SUMMARY | 632 |

| STATUS CONT'D | | | | | 54. IF CASE CLEARED, HOW CLEARED | | | | |
|---|---|---|---|---|---|---|---|---|---|
| ☐3 CLRD. CLOSED | ☐4 CLRD OPEN | ☐5 EXC CLRD. CLOSED | ☐6 EXC CLRD OPEN | ☐7 CLSD NON CRIM. | ☐1 ARREST & PROSEC. | ☐2 DIRECTED TO JUV CRT | ☐3 COMPL. RFUSD TO PROSECUTE | ☐4 COMMUNITY ADJUSTMENT | ☐5 OTHER EXCEPT |

☒2 IN PROGRESS   ☐1 SUSPENDED   ☐ FOUNDED   ☐1 JUV

55. FOR SUMMARY CASES ONLY – THE ORIGINAL CASE REPORT IS SUBSTANTIALLY CORRECT, AND CONTACT WITH THE VICTIM HAS DISCLOSED NO ADDITIONAL PERTINENT INFORMATION.

### 60. NARRATIVE

THIS IS A LINE-UP REPORT:

DATE, TIME, LOCATION OF LINE-UP:   30 May 90 (Wed.); 2245 hrs.; A/3 V/C Headquarters.

E.T. ASSIGNED:   Det. J. PALADINO#9938.

REFERENCE NUMBER:   N-242748.

PERSONS CONDUCTING LINE-UP:   Det's: t. MASLANKA#16161 & J. PALADINO#9938.

PERSONS VIEWING LINE-UP:   MONTAGUE, Solomon – 2245 hrs..

      HALE, James – 2250 hrs..

      NORWOOD, Reginald – 2340 hrs..

N-242748 90

| 90. EXTRA COPIES REQUIRED (NO. & RECIPIENT) | | 91. DATE THIS REPORT SUBMITTED | | | TIME | 92. SUPERVISOR APPROVING (PRINT NAME) |
|---|---|---|---|---|---|---|
| Normal | | DAY 10 | MO Jun | YR 90 | | Sgt. BENKA 2100 |

| 93. REPORTING OFFICER (PRINT NAME) | STAR NO | 94. REPORTING OFFICER (PRINT NAME) | STAR NO | SIGNATURE |
|---|---|---|---|---|
| Det. Tony MASLANKA #16161 | | Det. John PALADINO #9938 | | |
| SIGNATURE | | SIGNATURE | | 95. DATE APPROVED (DAY -MO - YR.) |
| Det. Tony Maslanka | | | | 10 Jun 90   2210 |

228

DETECTIVE DIVISION
AREA THREE VIOLENT CRIMES UNIT          - - - PAGE #2 -           10 Jun 90

Homicide/Murder 1st Degree                                    RD# N-242748
VICTIM: WATSON, Joseph                                        29 May 90

LINE-UP REPORT (Cont.):

PERSONS PARTICIPATING IN LINE-UP: (from left to right)

                          #1- HARRISON, Marcus, M/B/28 yrs.; CB#8559-296.
                          #2- LAWS, Darrin, M/B/19 yrs.; CB#-none.
                          #3- GARRETT, Terrell, M/B/21 yrs.; CB#8558-672.
                          #4- ROGERS, Damon, M/B/17 yrs.; CB#-none.
                          #5- BAYNES, Tony, M/B/19 yrs.; CB#8559-387.
                          #6- HAMPTON, Bryan, M/B/19 yrs.; CB#-none.

PERSON(s) IDENTIFIED IN LINE-UP:    #6- HAMPTON, Bryan.

HISTORY & INVESTIGATION:        The above line-up was conducted by the use of a one-way
                                mirror during which each participant chose his respective posi
tion on his own volition. during the line-up all participnts were first in a seated position with
each, individualy, standing and facing in all four directions of the compass. The witnesses/
victim then viewed same, seperately with both MONTAGUE and HALE identifiying subject#6, HAMPTON,
as the subject they had observed inside of and exiting an auto at 57th and Damen on the evening
of 29 may 90, along with several otherr male black subjects. They identified HAMPTON by his
physical appearance and hair style. NORWOOD could not make an identification.

                          - - - - - - - -
                              A/3 V/C

                  Det. Tony MASLANKA #16161

                  Det. John PALADINO #9938

N - 2 4 2 7 4 8

# Exhibit 23

**Deposition of Jeremiah Jerrod Smith**
**Taken: February 7, 2022**
**Role:  Witness**



# Transcript of Jeremiah Jerrod Smith

**Date:** February 7, 2022
**Case:** Weston -v- City of Chicago, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

1    California.  Well, when they grabbed me, my lawyer

2    told them -- he told me -- he said, man, they're

3    going to take you in.

4            And he told them, he said, now, okay, guys

5    I see how he looked, he looked healthy and

6    everything.  So they took me to 39th and

7    California.  They put me in a holding cell at 39th

8    and California where I waited for them to come

9    with -- with the questions.

10       Q  And I just didn't understand a word that

11   you said.  Your lawyer said, I see him, he looks

12   what?

13       A  He looks healthy.

14       Q  He looks healthy?

15       A  Right.

16       Q  And who was your attorney?

17       A  Klunk.  His last name was Klunk.  I can't

18   -- it was kind of sketchy on his first name now.

19   I knew him well then, but it's been so long.  But

20   his last name was Klunk --

21       Q  Okay.

22       A  -- and I'm pretty sure it's on record as

23   to him representing me on that -- on the other

24   charge.

1      Q   Okay.  How long were you in the holding

2   cell before the questioning started?

3      A   I sat in the -- and it wasn't so much of a

4   cell.  It was a room with -- with a little steel

5   thing on the wall where they handcuff you to the

6   wall.  I sat in there, let me say -- I say maybe

7   30 minutes to an hour --

8      Q   Okay.

9      A   -- because I remember -- I remember

10  putting -- I'm sorry -- I remember putting my head

11  down and kind of like, you know, I mean, I was

12  nervous.  I'm sitting back there trying to figure

13  out what's going on and what's going to end up

14  happening.  And I remember laying my head down,

15  and I think I kind of took a little -- a real

16  light nap.  And it was about an hour later when

17  they came into the room, about 30 minutes to an

18  hour.

19     Q   And who came into the room?

20     A   It was Michael J. Kill.

21     Q   And what happened next?

22     A   Well, he began to question me about a --

23  about a shooting that happened.  And the form of

24  questioning and all of that, it was -- I can't

1    specify at this point.  But it was -- he -- there

2    was accusations with it.  He was questioning me

3    about it but also accusing me at the same time.

4         And it was just like a -- well, yeah,

5    we've been looking -- we've been looking for you,

6    so you've been pretty busy lately and what you

7    know about this and the shooting that happened on

8    55th and 57th.  And I told them, I said, I don't

9    know nothing about none of it, period.  So he kept

10   asking me.  And that's when just the grilling

11   began.

12       Q  And who -- was anyone else present besides

13   you and Detective Kill?

14       A  Honestly, I can't recall who was there

15   present during his questions.  I'm pretty sure it

16   was Paladino and Cruz or -- or Cruz.  But it's

17   just happened so long ago.  But the reason why

18   Michael J. Kill stands out so strong is because of

19   his -- his demeanor and his menacing way -- the

20   way that he was with -- with me.  I can never

21   forget -- forget him.

22       Q  And was Detective Kill doing -- the one

23   asking you questions?

24       A  Yes.

1      Q  And was he asking you about specific

2   individuals?

3      A  Well, he asked me about -- after getting

4   into the questions about what happened over there,

5   he got to asking me about Biz and Nate and about

6   events that I knew nothing -- no part of -- I knew

7   nothing of.  Just asking me about my part in -- in

8   events.

9         And I just -- I was adamant about telling

10   them, man, I don't know nothing about none of

11   that.  I don't know.  I don't know.  I don't know.

12   And as the questions continued, Kill began to get

13   a little bit more and more hostile.  I don't know

14   exactly which one, but another one -- I took a

15   couple of slaps.

16         And I remember Michael J. Kill was smoking

17   a cigarette.  And he kind of put the cigarette in

18   -- in my face, kind of like, you know, real close

19   to my eyes.  You know, just -- I perceived it as a

20   lot of intimidation at that time.

21      Q  And you mentioned that you were asked

22   about Biz; is that a nickname?

23      A  Yeah.  That's a nickname of a guy that was

24   -- that's from the neighborhood.

1      Q   And do you know his government name?

2      A   Brian Hampton.

3      Q   And was he someone that you knew from the

4   neighborhood?

5      A   Yes.

6      Q   Was he a friend?

7      A   I used to consider him as a -- as a

8   friend.  Yeah, really, I did.  I used to consider

9   him as a friend.  And then this situation

10  happened.  And I became aware of false statements

11  that he was making to the police about me.  And

12  that pretty much ended our friendship there.

13     Q   You also mentioned Nate.  Who does that

14  refer to?

15     A   Yeah.  That's -- that was an associate

16  from the neighborhood.  He hung out with Biz a

17  lot.

18     Q   Okay.  And in June of -- or May and June

19  of 1990, did you consider Nate a friend?

20     A   I -- those -- well, not so much Nate, but,

21  yeah.  I guess you can say we was more close

22  associates or not more than -- me and Biz were

23  more closely associated than me and Nate.  But he

24  was -- he was -- I would consider him a friend at

1    that time.

2        Q   When Detective Kill was questioning you,

3    were you handcuffed?

4        A   Yes, I was.  I was always handcuffed.

5        Q   And did he make any -- did he do anything

6    with the handcuffs during the interrogation?

7        A   Squeezed the handcuffs and made them very,

8    very intensely tight.  You know, I'm -- I kind of

9    shrieked in pain a little bit.  But he -- he

10   squeezed it and you hear the clicking sound of the

11   handcuffs until the very -- until the force in the

12   last clicks.  And it was on my bones, so it was

13   hurting, but I just had to just take it.

14       Q   Okay.  You described that one of the

15   detectives slapped you during the interrogation;

16   is that right?  Sorry.  Could you hear me?

17       A   Yeah.

18       Q   Okay.  Sorry.

19       A   Yeah.  Yeah.  I heard you.

20       Q   How many times were you slapped?

21       A   During the duration of that interrogation,

22   there was -- I -- I took on a good -- maybe about

23   eight to ten slaps.

24       Q   Other than the slaps and the lit cigarette

1    and the tightening of the handcuffs, was there any

2    other force that was used against you?

3         A   No.  No.  Not that I remember.  But I -- I

4    remember a book hitting me on my shoulder, a big,

5    heavy book hitting me on my shoulder at one point.

6    But, yeah, that about sums up it.

7         Q   And do you know which detective hit you

8    with the book?

9         A   It's been so long, I really don't know.  I

10   can't pinpoint and say which one.

11        Q   In the course of the interrogation, did

12   the detectives tell you anything about what they

13   thought your role in the shooting -- the shootings

14   was?

15        A   Yeah.  After -- after questioning for so

16   long, they began to give me a narration of my part

17   and ended up telling me that, okay, well, you came

18   out the gangway.  And at some point, you came out

19   the gangway, and this is what we want you to say.

20   Tell them that you just -- because we're going --

21   you know, it's the bad cop, good cop role.  And

22   it's the more nicer tone.

23             And, okay, okay, J. Dilla, we're going to

24   let -- we're going to hurry up so we can go and

1   let you out of here and let you go home.  All we

2   just need for you to just say is that, man, you

3   came out the gangway.  By the time you came out

4   the gangway, they told you that the shooting was

5   done.  That -- I mean, that they did -- they took

6   care of the business already and it's time for

7   you to go ahead -- you can go home.

8          And I told them, I said, I can't say that,

9   because I wasn't even there.  I don't know nothing

10  about this whole incident, period.

11     Q  Did the police tell you anything about

12  what role they said John Walker had in the

13  shootings?

14     A  No.  That -- no.  My -- they was -- they

15  really didn't discuss to me too much about what

16  John Walker's role was.  The only thing they --

17  they said pretty much -- the only -- the most part

18  they spoke of him to me was about -- was about a

19  so-called meeting that they said alleged had took

20  place at Cornell Park that we were a part of.  And

21  I told them I don't know nothing about no meeting.

22         And when they mentioned something about

23  the Wrecking Crew and I told them I don't know

24  nothing about -- nothing about -- no participation

1  in none of that.  They might have mentioned

2  slightly just about a previous -- because we was

3  on a previous case, the case that I went to 11th

4  and State for, me and John were also codefendants

5  on that case as well.  So they kind of mentioned

6  us in -- and mentioned him to me about that as

7  well.

8      Q  Did they talk to you about Keith Jackson

9  at all?

10     A  Yeah.  Yeah.  Pretty -- yeah.  Pretty

11 much.  Because he was -- he was also a codefendant

12 with us too on that other case that we went to

13 court -- that I went to court for at 11th and

14 State.

15     Q  And what did they say Keith Jackson's role

16 in the May 29th shootings was?

17     A  You know, they -- they barely spoke of

18 him.  At some point, I think they just -- they

19 just -- they really didn't give no direct

20 assignment or something that he may have did or

21 may have not did.  They didn't -- he just was

22 lumped into the whole story of everything.

23     Q  Okay.  During the interrogation that took

24 place that day that you got apprehended at

1   I don't know -- at some point, I didn't know where

2   -- it was I'm tired, I'm frustrated, I'm scared.

3   I really should -- probably then took about two or

4   three.  I'm hungry.  I don't even remember eating

5   none in that time while I was there.

6         So, yeah, it was just -- it was -- it was

7   a while, but I don't -- I can't specify as to how

8   long, because it was off and on -- after the

9   second interrogation began, it was off and on

10  throughout -- throughout the day and throughout

11  the night, maybe, until their particular shift got

12  off of work.  That's the only time I knew that,

13  okay, I could probably -- I began to kind of time

14  things like that, because I knew I could probably

15  get some sleep without -- without being harassed.

16     Q  And then what -- what happened after that

17  second day of interrogation?

18     A  Well, after the second day of

19  interrogation, that's when they woke me up early

20  in the morning and told me I'm being charged with

21  first degree murder and transported me to 61st and

22  Racine.

23     Q  So, total, you were interrogated for two

24  days; is that right?

1        A   Yeah.   Two days to the -- to the third of

2   -- yeah.   Yeah.   Two days.   Yeah.

3        Q   And did you ever make a statement to

4   police saying that you or anyone you knew was

5   involved in the shootings on May 29th?

6        A   No.   Every statement I've ever made to the

7   police was in denial -- direct denial of all of --

8   everything that they was asking me about, that --

9   that incident.   Because I had no -- no knowledge

10  of it at all --

11       Q   At some point --

12       A   -- the only thing --

13       Q   -- sorry.

14       A   Excuse me.   The only thing that I -- I

15  ever did with them was give them my alibi to show

16  them where -- where I was at.   And when I saw that

17  they were trying to pick it apart and coming back

18  with -- when Sweetie lied about his statement

19  about me not being there and what he said, I

20  really didn't trust nothing no more, and I shut

21  down after that.

22       Q   At some point in June of 1990, did you

23  participate in a lineup related to the May 29th

24  shootings?

1      A   Yeah.  I remember, when I came in, I was

2   charged.  I was placed on a school wing in the

3   county jail in Division 6, D1.  I was there for a

4   while.  Then we had a continuance -- well, my

5   first -- well, not a continuance -- but it was my

6   first court date since being apprehended.

7           So when I went to court, that's when I

8   first -- I saw John Walker.  I saw Keith Jackson.

9   That's when I saw Demond and my first time meeting

10  him.  And I met him there.  And there was several

11  other guys from around the area that had cases

12  that was going to court at that time too.  So it

13  was -- it was just a bunch of us just going to

14  court.

15          And, from there, they took me -- we went

16  to court.  After we went to court, we got a

17  continuance.  After the continuance, there was a

18  day that they came and picked up me, Demond, John,

19  and Keith and took us back to 39th and California

20  for a lineup.

21          When we get into the lineup, we hear a

22  bunch of commotion in the back.  And all I hear --

23  I hear -- because little Tim -- little Timmy, his

24  sisters got very significant voices.  They very

1    loud.  So I heard the sister say -- Carla, she

2    say, you can't make him say it was him.  And

3    that's what made us kind of look at each other.

4         And I began to -- after the -- after the

5    lineup process -- because we was in -- I think we

6    was in about two or three different lineups.

7    After the lineup process, they kept us in a room

8    that was next to theirs.  And under the wall, we

9    were calling their names, like, man, Carla, man,

10   y'all see -- y'all see what's going on.  They

11   like, yeah, they trying to make him say it was

12   y'all.

13        You know, just -- we was going back and

14   forth like that.  So it was like, man, it was --

15   everyone was exasperated.  Then after -- after

16   that, we went -- they put us in another holding

17   room for a minute, brought us out for another

18   lineup.  And I assume this lineup was where Deneen

19   Coats was at -- was doing the viewing.

20        And so they did that lineup.  They brought

21   us all back.  And they walking around smiling,

22   walking back and forth smiling at us, and saying

23   little things.  And so -- because we -- I'm pretty

24   sure that, man, if we don't get picked out this

1  lineup, man, we should be able to, man, go home

2  soon.  This should be over with.

3      And they walking past smiling and then

4  they look and was like, well, look like John,

5  Jerrod, and Demond, you guys, you know, were

6  fingered or something like that they were saying.

7  And, man, at that point, I was so exasperated.  I

8  was ready to cry, because I was like, man, I don't

9  -- I don't get how this is -- how people is just

10  putting this whole story together.  And it's --

11  man, and it's so untrue.  So --

12      Q  So during the first lineup, you could hear

13  the voice of Carla, the sister of Tim Jones?

14      A  Mm-hmm.

15      Q  Is that -- I'm sorry.  Is that a yes?

16      A  Yes.  I'm sorry.

17      Q  And could you hear the voice of anyone

18  else besides Carla?

19      A  Yeah.  His other sister.  I think -- I

20  think all three of his sisters were there.  He has

21  an older sister named Trina.  Carla is the middle

22  sister.  And Jackie is the youngest sister.  But

23  all of them are grown.

24      Q  Okay.  And Jackie is the sister that you

1  just got slapped around a little bit.  He -- he

2  told me the same thing.  He says, well, it's Keith

3  Jackson.  Told me -- but the thing about it is, it

4  was so common -- every interaction that we've had

5  with them involved some kind of abuse.  So it was

6  nothing that was kind of shocking or -- or a shock

7  to our senses at all.  So, it came with the

8  territory, just put it like that.

9      Q  At some point, did you speak with Demond

10  about -- Demond Weston about his experience with

11  the police?

12      A  That came later -- later on, because I

13  didn't have no relationship at all with Demond for

14  a while.  Because, in the beginning, when we were

15  going to court, we barely talked to Demond.  We --

16  he was very quiet.  He was very aloof.  He sat in

17  the corner to himself a lot.

18          When we all got our discovery back and we

19  was able to start to read what statements were

20  made and what the evidence was that was against

21  us, that's when we was kind of like, oh, began to

22  understand what's going on.

23          So a dialogue began to open up later on in

24  the process of going back and forth to court with

1   me and Demond.  And it was just like, man -- man,

2   bro, how you doing, man.  And it was just like --

3   he just would open up a little bit and he'd just

4   be like, man, and he got tears in his eyes.  And

5   he'd be like, man -- man, they -- man, they beat

6   me up.  Man, I -- man -- he just was like he don't

7   understand how he can -- how he -- how he got put

8   in a position to make a statement.  And he was

9   just -- he was very -- he was hurt.

10       Q  You mentioned earlier that you had

11  encountered the three detectives in an earlier

12  case before the May 29th shootings --

13       A  Mm-hmm.

14       Q  -- how long before the May 29th shootings

15  had you had this encounter with the detectives?

16       A  You mean how far between my -- that other

17  case I had and with the case on May -- interaction

18  with them on May 29th or after May 29th?

19       Q  Let me just -- let me withdraw that.  Let

20  me ask it better.

21          What was the previous case you had where

22  you encountered detectives from 39th and

23  California?

24       A  It was a -- it was a shooting.  The

1    initial charge was a shooting.  It was attempted

2    murder and three UUWs, gun -- gun cases --

3        Q   And --

4        A   -- and if I'm not mistaken, I think that

5    happened in March -- March or April.

6        Q   And in that case, who were the detectives

7    that you dealt with?

8        A   I remember.  It was -- I definitely

9    remember Kill, Paladino, and Cruz.  Yeah.  I

10   remember those.

11       Q   And were you ever interrogated at 39th and

12   California related to that investigation?

13       A   Okay.  When they grabbed us, they took us

14   to 30 -- wait.  Let me see.  Let me try to collect

15   my thoughts on this, on the interrogation of that

16   case.

17           They took us straight to 30 -- actually,

18   they took us to 35th and Lowe.  I think we went to

19   39th and California, if I'm not mistaken, and then

20   they switched us and sent us to 35th and Lowe.

21   When we went to 35th and Lowe, we was in the

22   bullpens.

23           And they called each one of us out one at

24   a time.  And they called Keith Jackson out first,

1   had him out, questioned him for about ten minutes,

2   brought him back, came and got me, questioned me

3   for about ten minutes, brought me back to the

4   bullpen, took John Walker and kept him out for

5   about an hour and a half, almost two hours.  And

6   while he was gone, they were coming to question us

7   about things and saying things that John Walker

8   was allegedly saying, but we didn't -- we didn't

9   feed into none of that.

10          But they -- we sat at 35th and Lowe, and

11  then a friend of ours came and bonded us out.  Our

12  bond was $100 a piece.  And we bonded out at the

13  police station.

14      Q   So when you say we were at 35th and Lowe

15  in the bullpen, you mean you and Keith Jackson and

16  John Walker?

17      A   Yes.

18      Q   And when you say they were pulling you out

19  to ask you questions, you mean the detectives?

20      A   Yes.

21      Q   And what in that March -- in that -- we

22  think -- March 1990 shooting, do you know who was

23  allegedly the victim in that?

24      A   From what -- from -- after the fact, my

1    lawyer end up telling me -- I can't remember the

2    name of the -- his name.  But it was somebody that

3    was from the neighborhood.  I can't remember his

4    name exactly.  But it was somebody from the

5    neighborhood that got shot.  Because the lawyer --

6    our lawyer end up going to the -- to the hospital

7    where the young man was.  And he showed the young

8    man pictures of all of us and the young man made

9    statements --

10        Q   Sorry.  We lost you there, Mr. Smith.

11        A   Excuse me?

12        Q   The last thing -- we lost you there.  You

13   froze.  The last thing that I heard was the lawyer

14   showed pictures.

15        A   Yeah.  No.  My phone had just rung.  But

16   -- okay.

17            The lawyer showed pictures of us to the

18   young man.  And the young man knows us from the

19   neighborhood.  And he did not identify us as being

20   the perpetrator of the -- of that particular

21   incident.

22        Q   And who was your lawyer?

23        A   Klunk.

24        Q   And was that the case that you were at

1    11th and State on in June when you got arrested on

2    the May 29th shootings?

3        A   Yes, it was.

4        Q   Between the time that you were

5    interrogated at 35th and Lowe related to this

6    March incident --

7        A   Mm-hmm.

8        Q   -- between that and when you got -- when

9    you started hearing about the May 29th shooting,

10   did you have any encounters with those detectives?

11       A   Before the -- the -- before May 29th, we

12   were having -- we would be walking down the

13   street, us three and a couple of friends, we would

14   be walking down the street, and those detectives

15   would ride past and they would pull everybody over

16   and they would put everybody else on the car and

17   shake them down, but they would let us just stand

18   aloof.  And they would make statements like, oh,

19   those are our friends right there.  You know, we

20   -- just little smart remarks to where we knew that

21   they -- they had -- they was pinpointing us for

22   something.

23       Q   So you interpreted their remarks as

24   sarcastic?

# Exhibit 24

Identify and describe all property or possible evidence recovered at the end of the Narrative in column form. Show exactly where found, when found, who found it and its description (include Property Inventory numbers). If property taken was scribed for Operation Identification, indicate I.D. number at end of Narrative. Offender's approximate description, if possible, should include name if known, nickname, sex, race code, age, height, weight, color eyes & hair, complexion, scars, marks, etc. If suspect is arrested, give name, sex, race code, age, C.B. or I.R. number, if known, and state "In Custody."

# SUPPLEMENTARY REPORT
**CHICAGO POLICE – FOR USE BY B.I.S. PERSONNEL ONLY**

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

**4. DATE OF ORIG. OCCURRENCE - TIME**

| DAY | MO. | YR. | |
|---|---|---|---|
| 29 | May | 90 | 2228 |

| 1. OFFENSE/CLASSIFICATION LAST PREVIOUS REPORT | LUCR OFF. CODE | 2. ADDRESS OF ORIG. INCIDENT/OFFENSE ☒ VERIFIED ☐ 2 CORRECTED | 3. BEAT OF OCCUR. |
|---|---|---|---|
| Homicide/Murder 1st Degree | 0110 | 1904 W. 57th St. | 714 |

| 5. VICTIM'S NAME AS SHOWN ON CASE REPORT | CORRECT ☒1 YES ☐2 NO | IF NO, CORRECT ALL VICTIM INFORMATION IN BOXES 20 THROUGH 27. | 6. FIRE RELATED ☐1 YES ☒2 NO | 7. BEAT ASSIGNED |
|---|---|---|---|---|
| WATSON, Joseph W. | | | | 5314 |

| 8. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | LOCATION CODE | 9. NO. OF VICTIMS | 10. NO. OF OFFENDERS |
|---|---|---|---|
| Street | 304 | 2 | 4 |

| 11. ☒ VERIFIED ☐ UPDATE TO | 12. OBJECT/WEAPON | 13. FIREARM FEATURES | 14. POINT/ENTRY | 15. POINT/EXIT | 16. BURGLAR ALARM | 17. SAFE BURGLARY METHOD | 18. IF RESIDENCE WHERE WERE OCCUP. |
|---|---|---|---|---|---|---|---|
| | CODE NO. | CODE NO. | CODE NO. | CODE NO. | CODE NOS. | CODE NO. | CODE NO. |

**19.** DESCRIBE PROPERTY IN NARRATIVE. T = TAKEN. R = RECOVERED

FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE ORIGINAL CASE REPORT OR THE LAST PREVIOUS SUPPLEMENTARY REPORT

| PROPERTY | ☐ VERIFIED ☐ UPDATE | 1 MONEY ☐T $ ☐R | 2 JEWELRY ☐T $ ☐R | 3 FURS ☐T $ ☐R | 4 CLOTHING ☐T $ ☐R | 7 OFFICE EQUIPMENT ☐T $ ☐R | 8 TV, RADIO, STEREO ☐T $ ☐R |
|---|---|---|---|---|---|---|---|
| DNA | | 9 HOUSEHOLD GOODS ☐T $ ☐R | 0 CONSUM. GOODS ☐T $ ☐R | I FIREARMS ☐T $ ☐R | & NARC./DANGEROUS DRUGS ☐T $ ☐R | 5 OTHER ☐T $ ☐R | 6 NONE ☐T ☐R |

| VICTIMS UPDATE ONLY | 20. NAME (LAST—FIRST—M.I.) | 21. LUCR OFFENSE CODE | 22. HOME ADDRESS (NO., DIR., STREET, APT. NO.) | 23. SEX—RACE—AGE CODE | 24. HOME PHONE | 25. BUSINESS PHONE | 26. IN. AWRD | 27. VICTIM REL. CODE |
|---|---|---|---|---|---|---|---|---|
| | 1. | | | | | | | |
| | 2. | | | | | | | |
| | 3. | | | | | | | |

| OFFENDERS UPDATE ONLY | 28. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 29. HOME ADDRESS | 30. SEX—RACE—AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. |
|---|---|---|---|---|---|---|---|---|
| | 1. | | | | | | | |
| | 2. | | | | | | | |

**PERMANENT RETENTION FILE**

| | 31. C.B. NO. | I.R. NO., Y.D.NO. OR J.D.A. NO. | | | OR J.D.A. NO. | OFFENDER REL. CODE | 32. NO. ARRESTED | ARREST UNIT NO. |
|---|---|---|---|---|---|---|---|---|
| OFF. 1 | | | | | | | | |
| OFF. 2 | | | | | | | | |

| 33. OFF'S. VEHICLE ☐USED ☐STOLEN | YEAR | MAKE | BODY STYLE | COLOR | V.I.N. | | STATE LICENSE NO. | STATE |
|---|---|---|---|---|---|---|---|---|

| 34. SERIAL NOS. OR IDENTIFICATION NOS. ☐1 DNA ☐2 VERIFIED ☐3 CORRECTED | | | LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS. OBTAINED IN NARRATIVE |
|---|---|---|---|

| 50. OFFENSE/CLASS. THIS DATE (IF SAME ENTER DNA) | REV. CODE | 51. METHOD CODE | 52. METHOD ASSIGNED ☒1 FIELD ☐3 SUMMARY | UNIT NO. 163. STATUS | ☒4 PROGRESS | ☐1 SUSPENDED | ☐2 UNFOUNDED |
|---|---|---|---|---|---|---|---|
| DNA | | | 632 | | | | |

STATUS CONT'D.

| ☐3 CLRD. CLOSED | ☐4 CLRD. OPEN | 5 EXC. CLRD. CLOSED | 6 EXC. CLRD. OPEN | 7 CLSD. NON- CRIM. | 54. IF CASE CLEARED, HOW CLEARED ☐1 ARREST & PROSEC. | ☐2 DIRECTED TO JUV. CRT. | ☐3 COMPL. RFUSD. TO PROSECUTE | ☐4 COMMUNITY ADJUSTMENT | ☐5 OTHER EXCEPT. | ☐ADULT ☐JUV |
|---|---|---|---|---|---|---|---|---|---|---|

**55.** ☐ FOR SUMMARY CASES ONLY – THE ORIGINAL CASE REPORT IS SUBSTANTIALLY CORRECT, AND CONTACT WITH THE VICTIM HAS DISCLOSED NO ADDITIONAL PERTINENT INFORMATION.

**60. NARRATIVE**

EVIDENCE:

Crime Lab Inv.#773282-(2) 9 mm Win. luger cartridge case from sidewalk 5701 S. Wolcott- Ref. RD#N 242748 Homicide/Murder

(3) 9 mm Win. luger cartridge cases from SE corner 57th and Wolcott-Ref. RD#N 242748 Homicide/Murder

(1) 9 mm WCC luger cartridge case from NE corner 57th Wolcott Ref. RD#N 242748 Hom./Murder

Crime Lab Inv.#773283-(1) 9 mm WCC luger cartridge case front step 5759 Honore- Ref.RD#N 242763 Agg. Battery

*(right margin, vertical):* N 242 748 R.D. NO.

| 90. EXTRA COPIES REQUIRED (NO. & RECIPIENT) | 91. DATE THIS REPORT SUBMITTED – DAY MO. YR. | TIME | 92. SUPERVISOR APPROVING (PRINT NAME) | STAR NO. |
|---|---|---|---|---|
| Normal | 2 Jun. 90 | 1000 | Sgt. Benka | 7108 |

| 93. REPORTING OFFICER (PRINT NAME) | STAR NO. | 94. REPORTING OFFICER (PRINT NAME) | STAR NO. | SIGNATURE |
|---|---|---|---|---|
| Det. V. Breska | 5325 | Det. J. McCarthy | 12166 | |

| SIGNATURE | | SIGNATURE | | 95. DATE APPROVED (DAY - MO. - YR.) | TIME |
|---|---|---|---|---|---|
| | | | | 2 June 90 | 2000 |

CPD-11.411-B (Rev. 8/89)   *MUST BE COMPLETED IN ALL CASES*   CRC ☐ 228

PAGE #2

HOMICIDE/MURDER 1st DEGREE                                        29 May 1990
VICTIM:  WATSON, Joseph                                          RD#N 242748

EVIDENCE CON'TD:              Crime Lab Inv.#773283-(4) 9 mm WCC luger cartridge case
                                  on porch/vestibule 5759 S. Honore
                                  Ref.RD#N 242763 Agg. Battery

                              Crime Lab Inv.#773284-(1) 9 mm WCC luger cartridge case
                                  from street near curb 5530 S. Justine
                                  Ref.RD#N 242754 Agg. Battery

                              007 Dist. Inv.#781090-(1) Intratec 9 mm. luger Mod Tec 9
                                  Ser.#113804-recovered from Steven
                                  Bapttiste on 30 May 90 at 56th &
                                  Ada-Ref.RD#N 244482 U.U.W.

                              Crime Lab Inv.#773269-(2) 9 mm cartridge case from ground
                                  in alley at 732 W. 60th St.-Ref.
                                  RD#N 237726 Hom./Murder

INVESTIGATION:               On 1 Jun. 90 the R/D's were assigned to check with the
                             Firearms Unit of the Crime Lab, regarding the above
recovered evidence.  The R/D's learned from Tech. Ernie Watson that all of the above 9 mm
cartridge cases were fired from the same weapon, however none of the 9 mm cartridge cases
were fired from the above Intratec 9 mm (007 Inv.#781090).  Watson further related that
a .38 spcl. expended bullet recovered from the body of the victim Joseph Watson may or
may not be suitable for comparison, and a .22 cal. 8R which was also recovered from Watson
is suitable for comparison.

REPORT OF:                   Det. V. Breska #5325
                             Det. J. McCarthy #12166
                             Area 3 Violent Crimes

**PERMANENT RETENTION FILE**



RD# N 242 748

# Exhibit 25

**GENERAL PROGRESS REPORT**
DETECTIVE DIVISION/CHICAGO POLICE

| | DATE OF ORIG. CASE REPORT | | | DATE OF THIS REPORT | | | |
|---|---|---|---|---|---|---|---|
| | DAY | MONTH | YEAR | DAY | MONTH | YEAR | WATCH |
| | | | | 6 | Jun. 90 | | 3rd. |

| OFFENSE CLASSIFICATION–LAST PREVIOUS REPORT | VICTIM'S NAME AS SHOWN ON CASE REPORT | BEAT/UNIT ASSIGNED |
|---|---|---|
| Homicide | Watson, Joseph | 5312 |

This form is designed for recording handwritten notes and memoranda which are made during the conduct of investigations, including: inter-watch memoranda (handwritten or typewritten), witness and suspect interview notes, on-scene canvas notes, and any handwritten personal notes made by detectives during the field investigation of violent crimes which are used to prepare official Department case reports.

TO:         2nd. watch

FROM:       Paladino & Moser

SUBJECT:    WATSON Homicide

1. Re-interviewed Tim Jones, he is now home from the hospital. We wanted him to get the exact location where he was shot. He related that he was on his bicycle, north on Wolcott and was at the red and blue house about five houses north of his when the offenders came out of the gangway. He says that after the offendrs shot him they ran past him and towards another boy (WATSON) who was walking on the west side of the street. Jones also related that a friend of his sister found a 9MM casing in the gangway where he was shot. His sister still has the casing but wasn't home when we were there. We had Jones view the additional photos that we had, but he did not make any identification. He insists that he can identify the offender that who shot him. We then located the red and blue house as described by Jones and found it to be 5637 S. Wolcott. We searched the gangway and the gangway at 5641, for casings, but couldn't locate any. We interviewed Leona Buchanan, 5637 S. Wolcott, 7/29/58, phone# 436-4782. She stated that she heard somebody running through the gangway and then heard five or more shots. She stated that she was at home alone with her children and they all hit the floor after the shooting and didn't look out the window. We went to 5641 S. Wolcot and interviewed Brown, George, phone: 471-9403. he also related that he heard persons running throught the gangway and heard shots,but didn't look out the window.

2. We interviewed Helen by telephone and she denies being a witness. She states that she was in bed when she heard the shots and by the time she looked out the window all she saw was the victim laying on the street.

3. We went back to 53rd. Wood and played around there for some time and then located baldy( Servan Allen) and Nate, NATHANIEL McCURINE. We transported them to Area and they relate the following.

SERVAN ALLEN:    He was at home at 7310 S. Dante, at the time of the shooting. He dosen't know any of the players except Pope G, and J. Dilla and some other locals. ALLEN says that he was on 53rd. Wood earlier on the day of the shootings. He said that he left there at 1800-1830hrs. and went home by bus, and stayed there for the entire evening, getting home at 1900hrs. ALLEN says that the went out the next day and went back to 53rd. Wood and there he spoke to his friend(cousin) LAWRENCE GOWDY, who told him that the Police had picked him up earlier and questioned him about some shootings. ALLEN says that he saw the shootings on Television and thats the first time he learned about them. He says that he never been in BIz's car.

| REPORTING OFFICER'S SIGNATURE–STAR NO. | RECEIVED BY SUPERVISOR'S SIGNATURE - STAR NO. | DAY  MO.  YR.  + MH |
|---|---|---|

CPD-23.122 (Rev. 2/83)

CITY-DW-000277

**GENERAL PROGRESS REPORT**
**DETECTIVE DIVISION/CHICAGO POLICE**

| DATE OF ORIG. CASE REPORT | DATE OF THIS REPORT |
|---|---|
| DAY   MONTH   YEAR | DAY   MONTH   YEAR   WATCH |
| | 6   Jun   90   3rd. |

| OFFENSE CLASSIFICATION–LAST PREVIOUS REPORT | VICTIM'S NAME AS SHOWN ON CASE REPORT | BEAT/UNIT ASSIGNED |
|---|---|---|
| Homicide | Watson, Joseph | 5312 |

This form is designed for recording handwritten notes and memoranda which are made during the conduct of investigations, including: inter-watch memoranda (handwritten or typewritten), witness and suspect interview notes, on-scene canvas notes, and any handwritten personal notes made by detectives during the field investigation of violent crimes which are used to prepare official Department case reports.

MEMOR OF 6 Jun.90, 3rd. Watch, Paladino & Moser PAGE 2

NATHANIEL MCCURINE:        MCCURINE relates that he was with BIZ HAMPTON andDarrin LAWS earlier the day of the shooting and they were at 53rd. Wood and J.D. (WALKER) nad J. DILLA(Jerod SMITH) come up to their car and say they are getting a "Wrecking Crew" together and the reason being is that the Vice Lords was shot out the back window of J.D.'s car. J.D. told them that the Vice Lords were having a meeting that evening at 56th. Wolcott.

        McCurine says that they hung around 54th. Honore till about 2045hrs. and Biz went with Tracey and Maria, in their red cadillac, and said he was going to DUKs hot dogs at 63rd. Damen. McCurine says that he then got beeped by his girlfriend, Monique ADAMS, who lives at approximately 57523 S. Winchester. McCurine then leaves in BIz's car and goes to 56th. Damen, by the store, where he usually picks ump his girlfriend. She isn't the and he goes to 5753 Winchester and sees her. ON the way to her house from Damen he sees ambulares at 57th. Wolcott. He hhenm double parks his car on 57th. Winchester and talks to his girlfriend, she tells him that she heard a bunch of shots being fired. McCurine says he dosen't hear any shots.

        McCurine is told that BIZ put the shooting on him and used BIZ's car for the wrecking crew and he denies it. He says that on the way to his girlfriends he sees J.Dilla(Jerod Smith), J.D. Johnny Walker, and Kw#th Co#l, Kw#th Jackson, in J. Dilla OLds in the gas station at 55th. damen. McCurine stays with his story that he didn'y have anything to do with it but is wavering and might admit that he drove them or was a look-out. He added that on Tuesday, 5 Jun.90, he was at Cornell Park, 51st. Wood and was with BIZ, (Bryan Hampton) Stacey Webb, Joseph Metrix, and nelson Hannow( We have photos of all of these individuals. They see Keith Co#l(Ke#th Jackson, Johnny Walker and Gerod Smith. These three subjects then begin telling them about the shooting. They say how they went over 57 Wolcott and shot the fellows and chased some dudes into a hallway. Walker had the 9MM, J. Dilla had the 38#m cal. Ke#th Cool had another gun .

TO DO:        Talk to McCurine again.
        Try to find Hampton to verify the story of what took place at Cornell Park.  Try to locate the other individuals who were in the park
        If you have time box McCurine if you think its worth it.

REPORTING OFFICER'S SIGNATURE–STAR NO          RECEIVED BY SUPERVISOR'S SIGNATURE–STAR NO.  DAY–MO. YR   ' M#

CPD-23.122 (Rev. 2/83)

CITY-DW-000278

# Exhibit 26

**GENERAL PROGRESS REPORT**
**DETECTIVE DIVISION/CHICAGO POLICE**

| DATE OF ORIG. CASE REPORT | | | DATE OF THIS REPORT | | | |
|---|---|---|---|---|---|---|
| DAY | MONTH | YEAR | DAY | MONTH | YEAR | WATCH |
| 29 | MAY | 90 | 8 | JUN | 90 | 3 |

| OFFENSE CLASSIFICATION—LAST PREVIOUS REPORT | VICTIM'S NAME AS SHOWN ON CASE REPORT | BEAT/UNIT ASSIGNED |
|---|---|---|
| HOMICIDE/MURDER | WATSON, JOSEPH | 5312 |

This form is designed for recording handwritten notes and memoranda which are made during the conduct of investigations, including: inter-watch memoranda (handwritten or typewritten), witness and suspect interview notes, on-scene canvas notes, and any handwritten personal notes made by detectives during the field investigation of violent crimes which are used to prepare official Department case reports.

McCURINE, NATE:

24 MAY 90

EARLIER 3PM — WAS W BIZ+DARREN — J.D + J DILLA
SAID BIZ WAS NOMINATED TO DRIVE WRECKING CREW
BIZ CAME HED+ DROVE FROM 53ʳᵈ +WOOD — WE DROPPED
DARREN AT 60ᵀᴴ + PAULINA — ME+BIZ WENT TO MY
HS +DRANK BEER — WE WENT TO 55ᵀᴴ + KEDNIE, MY
C/R CLEED (FIX CARS) — MY GIRL MONIQUE BEEPED ME —
I TOOK BIZ'S CAR — LEFT BIZ W/ TRACY + MARIA IN
TRACY'S RED CADDY — I DROVE TO 53ʳᵈ + WOOD SAW
J.D., KEITH COOL + J DILLA GET OUT OF RED DELTA 88
STACEY WAS DRIVING IT — THEY WALKED TO MY CAR.
(21 Y5 HRS) — ASKED WHAT I WAS DOING — SAID FINDING
MONIQUE. ASKED ME TO DROP THEM OFF — THEY GOT
IN — I DROVE OFF TOWARDS DAMEN — J.D. HAD 9mm
(B/S TAPPED HANDLE)
+ J-DILLA HAD .38 DIDN'T SEE COOL'S GUN
(I DROVE — J.D. SAT FRNT. PASS — J DILLA SAT NEAR PASS —
KEITH COOL SAT BEHIND ME) THEY SAID TO DROP THEM
AT 56ᵀᴴ + SEELEY — I TOOK DAMEN + TURNED 56ᵀᴴ +
56ᵀᴴ
DAMEN TOWARDS SEELEY — I LET THEM OUT AT ALLEY
BEFORE SEELEY (SAYING GANG SLOGANS) — I WENT TO
MONIQUES (57ᵀᴴ + WINCHESTER) SHE TOLD ME SHE HAD
HEARD SHOTS — TALKED — I LEFT + DROVE BY WOLCOTT —

| REPORTING OFFICER'S SIGNATURE STAR NO. | RECEIVED BY—SUPERVISOR'S SIGNATURE—STAR NO. | DAY—MO.—YR. | TIME |
|---|---|---|---|
| Det. Marlowe #6161 | | | |

CPD-23.122 (Rev. 2/83)

OVER

CITY-DW-000127

SAW MANRAUCHACES WENT TO 53RD + HONORE (ED'S) - MET BIL +
TRAVI + MARIA - LEFT PICKED UP DARREN 60TH + PAULINA
(HIS HS) - BIL'S CAR - WENT TO 64TH + RACINE (MY HS) TO
GET MARISONAR- COULDN'T GET IT MY MOM- TOOK HS KEY
WENT TO 22ND + HARVARD- STATED TIME 2300-0100 +
I LEFT 15 min. GOT BACK + FOUND BIT ARRESTED +
HIS CAR GONE.

WE SAID TOLD ME, IN CAR, GETTING GUNS READY - <sup>THEY WERE</sup> GOING
TO TAKE CARE OF BUSINESS. SHOOT "HOOKS" (V.L.'s)
UP -

- COULDN'T SEE COOL'S GUN CAUSE HE SAT BEHIND ME. (HE HAD
ONE CAUSE HE WAS TALKING ABOUT IT)

- SAW J-DILLA, KEITH COOL, JD. + OTHER GD'S IN PARK 5TH WOOD. <sup>CORNELL</sup>
LAST TUE. (5 JUNE 90) W/ BIZ - HEARD CONVERSATION. J.D
SAID HE USED 9mm + MUST HAVE GOT 3 OF THEM -
COOL SAID HE HAD UZI + SPRAYED THEM. J-DILLA
SAID-ON KNEE JUST POPPING AT THEM. <sup>ONE</sup>

- ON DRIVE DOWN INNER WE SAW 4-5 V.L. IN REST. AT
55TH + DAMEN EATING- SAID "THERE'S SOME" - J-DILLA
SAID NO. "WE WANT ONES ON 56TH + WOLCOTT"

- ALL WERE WEARING BLACK STARTER JACKETS (SAME TYPE) W/ BLK + WH.
NIKE' GYM SHOES.

CITY-DW-000128

# Exhibit 27

# SUPPLEMENTARY REPORT
## CHICAGO POLICE – FOR USE BY B.I.S. PERSONNEL ONLY

All descriptions and statements this entire report are approximations or summarizations unless indicated otherwise.

4. DATE OF ORIG. OCCURRENCE–TIME: 8 June 1990 | 02:40

| 1. OFFENSE/CLASSIFICATION LAST PREVIOUS REPORT | 1 UCR OFF. CODE | 2. ADDRESS OF ORIG. INCIDENT/OFFENSE | VERIFIED | 2 CORRECTED | 3. BEAT OF OCCUR. |
|---|---|---|---|---|---|
| BATTERY/Aggravated | 041A | 5313 South Bishop | XX | | 934 |

| 5. VICTIM'S NAME AS SHOWN ON CASE REPORT | CORRECT XX YES ☐ NO | IF NO, CORRECT ALL VICTIM INFORMATION IN BOXES 20 THROUGH 27. | 6. FIRE RELATED ☐ YES XX NO | 7. BEAT ASSIGNED |
|---|---|---|---|---|
| SIMS, Curtis | | | | 5312 |

| 8. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | LOCATION CODE | 9. NO. OF VICTIMS | 10. NO. OF OFFENDERS |
|---|---|---|---|
| Front Porch | 289 | 1 | 3 |

| 28. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 29. HOME ADDRESS | 30. SEX–RACE–AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. |
|---|---|---|---|---|---|---|---|
| 1. BROWN, Cortez | 5701 South Hoyne | M 1 20 | 5'10 | 140 | Brn | Blk | Med |
| 2. MACKLIN, Dwayne | 5928 South Union | M 1 24 | 6'3 | 150 | Brn | Blk | Dk |

| 31. C.B. NO. | I.R. NO., Y.D. NO. | OFFENDER IREL. CODE | C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER REL. CODE | 32 NO ARREST ARRESTED UNIT NO |
|---|---|---|---|---|---|---|
| 856666 | 24 | OFF. 2 | 8567 797 | 676676 | 24 | 2 | 632 |

| 33. OFF'S. VEHICLE | YEAR | MAKE | BODY STYLE | COLOR | V.I.N. | STATE LICENSE NO. | |
|---|---|---|---|---|---|---|---|
| XX USED ☐ STOLEN | 85 | Ford | 4 dr | Grey | 2FABP22R6E201022 | DL669C | 11-90 |

| 50. OFFENSE/CLASS. THIS DATE (IF SAME ENTER DNA) | REV. CODE | 51. METHOD CODE | 52. METHOD ASSIGNED ☒ FIELD ☐ SUMMARY | UNIT NO. 632 | 53. STATUS ☐ O PROGRESS | ☐ I SUSPENDED |
|---|---|---|---|---|---|---|
| Homicide/Murder 1st Deg. | 0110 | | | | | |

STATUS CONT'D.

54. IF CASE CLEARED, HOW CLEARED

35. FOR SUMMARY CASES ONLY – THE ORIGINAL CASE REPORT IS SUBSTANTIALLY CORRECT, AND CONTACT WITH THE VICTIM HAS DISCLOSED NO ADDITIONAL PERTINENT INFORMATION

10. NARRATIVE

.....ARREST OF OFFENDERS........

VICTIM:              SIMS, Curtis male black 28 yrs old DOB 18Nov61

                     resided at 4640 South Langley phone 624-2420


OFFENDERS/IN CUSTODY:    MACKLIN, Dwayne male black 24yrs old DOB 27Dec65

                        resides at 5928 S Union-5543 S. May 6'3 150lbs'

                        CB Number 8567 797   IR Number 676676

                        Continued to page two......

| 90. EXTRA COPIES REQUIRED (NO. & RECIPIENT) | 91. DATE THIS REPORT SUBMITTED | | TIME | 92. SUPERVISOR APPROVING (PRINT NAME) | STAR NO. |
|---|---|---|---|---|---|
| Normal | 10 June 1990 | | 06:00 | Sgt Bonke 7108 | |

| 93. REPORTING OFFICER (PRINT NAME) | STAR NO. | 94. REPORTING OFFICER PRINT NAME | STAR NO. | SIGNATURE | 95. DATE APPROVED (DAY –MO.–YR.) TIME |
|---|---|---|---|---|---|
| Det Dan McWeeny | 14367 | Det. Micheal Kill 4123 Det. Andy Christophersen 13244 | | | 10 JUNE 90 | 1800 |

CPD-11-411.B (Rev. 3/85)           *MUST BE COMPLETED IN ALL CASES

ENTERED

CITY-DW-000370

AREA THREE VIOLENT CRIMES        -2-        10 June 1990
HOMICIDE/1st Degree Murder         RD Number N-258729

VICTIM: SIMS, Curtis.......

| | |
|---|---|
| OFFENDER/RELEASED: | WALKER, William aka CHILDS,William male black 16yrs old DOB 5 July73 resides at 644 W. 60th attends Tilden HS  YD Number-none 5'11 125 |
| OFFENDER/WANTED: | BROWN, Cortez aka MC GURDY, Victor aka SAFFORD, Victor male black 19yrs old DOB 3 Dec 1970 5'10 140lbs medium complexion. IR#856666 LKA 5701 South Hoyne, 5933 South Emerald. |
| ARRESTTED BY: | Det. Andy Christophersen Star 13244 Det. Micheal Kill Star 4123 Det. Dan McWeeny Star 14367 All assigned to Area Three Violent Crimes |
| DATE, TIME & LOCATION OF ARREST: | On 9 June 1990 at 5928 South Union at 1000hrs. |
| CHARGES COURT BRANCH & DATE: | MACKLIN-Murder, 1st Degree Branch 66 on 11 June 1990. |
| INJURIES: | Multiple gunshot wounds to abdomen, thigh and lower back. |
| TAKEN TO: | Cook County Hospital, treated in emergency room by Dr's Murphy & Kim. Pronounced dead of wounds on 9 June 1990 at 02:05 hrs by Dr. Huang. Transfered to Medical Examiners. |
| WEAPON: | 9MM Taurus Serial#PT92 Recovered Inv#757539 Automatic pistol large caliber-not recovered. |
| LOCATION: | On front porch at 5313 South Bishop. |
| DAY/DATE/TIME: | Friday, 8 June 1990 at 02:40hrs. |
| WEATHER/LIGHTING: | Cool, about 60° overcast, street lamps. |
| MANNER/MOTIVE: | Drive by, approach victims on foot, use automatic weapons and shoot victim at close range/Gang related retaliation. |
| VEHICLE USED: | 1984 Ford Taurus Lic#DL669C Vin 2FABP2?R6ED-201022, registered to T&J Motors 6401 South Cicero. |
| EVIDENCE: | Inventory 757539-Recovered weapon. Inventory 737198-6 CPD photos. Recovered vehicle towed to pond 1. Pictures of scene. Recovered shell casings recovered bullet's. Processed by Crime Lab. |
| NOTIFICATIONS: | M.E. Marconi Medical Examiner's Office Case June 171. A.S.A. Rodi Felony Review Unit. |
| PERSONNEL ASSIGNED: | Beat 932 Officers Jackson#8731 & Duewerth 4208 Beat 934 Officer Willaimson#12522 & Tralak13501 Arresting Detectives. |

Continued to page three........

CITY-DW-000371

AREA THREE VIOLENT CRIMES      -3-      10 June 1990
HOMICIDE/1st Degree Murder          RD Number N-258729

VICTIM: SIMS, Curtis........

WITNESSES:          POSEY, Christopher male black 31 12Jan59.
resides at 7216 South Jeffery ph 427-7575

Walker, William, male black male black 8Nov52
resides at 5435 West 63rd street ph284-6204
resides at 614 Dennis Winona Miss.
phone 601-283-4334. SS#████████

Officer James WILLIAMSON star 12522
assigned to 009th District hm#582-2163

Officer RObert Trlak star ~~13501~~ /5/03
assigned to 009th District/Training Academy

SMITH, Carol female black 26yrs 25Aug64
resides at 4640 S. Langley ph 624-2420

TAYLOR, Renee female black DOB 11Mar58
resides at 5313 South Bishop ph 776-2209

CRIMES LAB PERSONNEL:      Beat 9601 Tects DeMarco & Bachelor
Beat 9601 Tects Veneigh & Brasic

STATEMENTS:          Oral admissions made by Macklin to Dets
McWeeny, Kill and Christophersen at 5928 S.
Union.

Oral admissions made to ASA Rodi, witnessed
by Dets McWeeny and Kill at Area Three.(Macklin)

Court Reported Statement made to ASA Rodi
witnessed by Det Kill at Area Three (Macklin).

Oral statement made by Walker to Dets McWeeny,
Kill and CHristophersen at Area Three.

Oral and written statement made by Walker
to ASA Rodi and Det Kill.

INVESTIGATION:          Detective Dan McWeeny assigned the followup
investigation of this case by Sgt. White.
Detective McWeeny responded to 5313 South Bishop where the following investigation was
conducted. Observed that the scene was a two story house with a front wooden porch on a
residential street. Further observed a vacant lot to the south of building and a alley
directly behind the home. Blood was observed on the porch and in the front hallway. Spent
casings were observed directly in front of the house and apparant bullet holes in the front
facade of house. This scene was later processed by the Crime Lab. At the scene Det McWeeny
conducted serveral interviews and the following is a summary of those interviews.

POSEY, Christopher...........      stated he was a friend of the victim Curtis
Sims and he along with other were visiting
Reneee Taylor who resides at 5313 Soth Bishop. He added, he and Sims were on the porch when
suddenly two male black came from around the rear of house thru the vacant lot and with-
out warning or provacation began shooting at the porch and Sims with automatic weapons.
He stated he immediately took cover and remained in cover until the shooting stopped. He
then observed that Sims had been shot and gave assistance until arrival of medical and
police personnel. He could give no reason for the shooting and stated he would co-operate
with the investigation. He added that he had never seen either one of the offenders prior
to the shooting.

Continued to page four......

CITY-DW-000372

AREA THREE VIOLENT CRIMES        -4-        10 June 1990
HOMICIDE/1st Degree Murder      ●        ●    RD Number N-258729

VICTIM: SIMS, Curtis........

INVESTIGATION (CONT.):          Carol Smith and Renee Taylor were interview-
ed and in summary stated they were upstairs
at the time of the shooting and heard the shots but did not see the offenders and did
not know of any reason for the shooting.

OFFICERS WILLIAMSON & TRLAK........        stated they were assigned to Beat 932 on
1st watch and observed the recovered Ford
Taurus parked in area of the shooting. They approached vehicle to investigate and observ-
ed a male occupant. This occupant (William Walker) was questioned by the Officers when
suddenly they heard the shots being fired at 5313 South Bishop. The Officers then responded
to the scene of the shots and observed two male black fleeing the scene with weapons in
hands. WHen the offenders observed the Officers they fled in differant directions and
Officers Williamson and Tralak gave pursuit but offenders evaded capture by running thru
differant gangway's. The Officers then again observed 1984 Taurus, this time containing
one of the offenders they had seen fleeing the scene. They then gave pursuit of the
Taurus and chased it to 57th and Bishop where it was abandoned by the occupants. Another
foot chase ensued and again the offenders were able to escape capture by using gangways
in thier flight. The Officers stated they could identify all three of the offenders if
they saw them again. The Officers recovered the Taurus which registered to T&J Motors
and had it processed by the lab. In the vehicle a soda can and baseball cap were recovered
and these items were also processed by the lab.

SIMS, Curtis.......          was interviewed by Det McWeeny at Cook County
Hospital and stated bascally the facts of the
incident as had Christopher Posey. He also added he knew of no reason why he was shot and
that he had never seen either of the offenders on any prior occasion. Due to victim's
injuries and his obvious pain this interview was kept shrt and terminated.

         Detective McWeeny then began a investiga-
tion of the recovered Taurus and learned that
vehicle is used by Kerry Auto Body at 5435 W. 63rd as a loaner vehicle. Further learned
that the last person to pocess the vehicle was a employee named William Walker (no relation
to offender Walker). Mr. Walker was contacted and asked to Area Three for a interview.
Prior to interview with Mr. Walker it was learned that Curtis Sims had expired from his
wound's. The following is a summary of the interview with William Walker.

WALKER, William......:..          stated he was a employee of Kerry's Auto
and had in fact had the auto the night of the
shooting. From Mr Walker's appearance it was obviious he did not fit the description of
any of the offenders. He was asked if he loaned the vehicle to any other parties and at
first he was reluctant to inform but when told that the case was a homicide he agreed to
fully co-operate with the investigation. He stated that he had loaned the auto to a person
he knows as "Cup" at about midnight the night of the shooting. He added that "Cup" came
back some hours later and told him he lost the car because it was chased by the police.
Mr. Walker agreed to show the reporting detectives the house he knows "Cup" (Macklin)
occupy's and added that several other youths also frequent this house. He also added that
Macklin and these other youths are members of alocal street gang and sell narcotic's in
that area. Detectives Andy Christophersen and Micheal Kill were then also assigned to
the investigation and with the assistance of Mr. Walker we were directed to 5928 South
Union. The following is a summary of the investigation conducted at that location.

         The detectives knocked at the door of 5928
s. Union and thru a side window clearly ob-
served three youths in the living room of the house. Macklin in a loud voice answered
the knock by requesting "who thier". When we informed Macklin that we were police officers
all three youths immediately began running to rear of the house. It was observed that all

Continued to page five.....

RD NUMBER N-2 5 8 7 2 9

AREA THREE VIOLENT CRIMES                    -5-                    10 June 1990
HOMICIDE/1st Degree Murder                                         RD Number N-258729

VICTIM: SIMS, Curtis.......

INVESTIGATION (CONT.):                        three fit the description supplied by Officers
                                              Williamson and Tralak. The detectives continued
to knock on the door and announce our office. WHen there was no response the detectives
entered the house. As this occurred the youths then attempted to flee the house by way of
the roof. It was at this time all were apprehended and placed under arrest for investiga-
tion. All were advised of their rights and Dwayne Macklin identified himself by the nick-
name "Cup". At that time Macklin was interviewed separately from the other detainee's and
following is a summary of that interview.

MACKLIN, Dwayne........                        was asked about why he and the others attempt-
                                              ed to flee and stated he always runs from the'
the police. Macklin was then told about the 1984 Taurus and the reason for our investigation
and at this time Macklin stated he wanted to co-operate but stated he did not shoot Sims
and named a person he knows as Victor as the shooter. He was asked about the weapons used
and stated that the 9MM was hidden in a adbandoned auto across from the house on Union.
The reporting detectives then investigated that auto (64 Ford Lic #XDQ951) and after being
told by the owner she did not wish the auto called for a Crime Lab and subsequently recover-
ed a 9MM pistol from this auto. This weapon was later processed at firearms section of lab
and positively identified as weapon used at scene of homicide. Macklin was then taken to
Area Three where he gave a complete statement to the shooting of CUrtis Sims stated it was
gang and narcotic related drive by. He stated that "Victor" supplied the weapons and that
Willaim Walker who was also arrestted at 5928 South Union drove the auto recovered by 009th
District personnel. He admiited shooting at Sims but missing and that Victor used a "Uzi"
to shoot the victim. The site of the shooting was selected due to being on rival gang turf.
Macklin later gave a court reported statement to ASA Roti regarding his involement in the
shooting.

WALKER, William..........                     was advised of his rights and informed of the
                                              statements made by Macklin. He also stated he
would co-operate and gave basically the same account as had Macklin. He however stated that
he did not know they (Macklin & Victor) were going to shoot anyone. He added that he is a
gang member and is payed $200.00 a week to do various jobs. On night of·shooting he was
told to drive the recovered Taurus and as he normally does he obey's all gang directives.
He added that he first observed a weapon when "Victor" returned to the auto after the shootin
and he along with Macklin gave information that led to the positive identification of
"Victor" as Cortez Brown aka Victor Mc Gurdy.

                                              Attempts were made to locate Brown with nega-
                                              tive results. Officers Williamson and Tralak
were summoned to Area Three and they made identification on all three persons as the same
they observed at the scene of the shooting. Attempts were made to locate the "Uzi" with
negative results. A.S.A. Roti of Felony Review was summoned to Area Three and after re-
viewing the case recommended and approved that Macklin be charged with Murder 1st Degree
and a Murder 1st Degree warrant be obtained against Brown. She declined charges on Walker
due to his lesser role in the incident. Macklin was subsequently booked for Branch 66,
a murder warrant will be obtained against Brown and Walker released after the proper state-
ments were taken.

                                              Reporting Detectives due to the facts learned
                                              during this investigation and the arrest of
Macklin request this case Cleared by Arrest but remain Open pending the further investi-
gation of the wanted Cortez Brown.

REPORT OF:                                    Detective Dan McWeeny Star 14367
                                              Detective Micheal Kill Star 4123
                                              Detective Andy Christophersen Star 13244

CITY-DW-000374

# Exhibit 28

**Deposition of Dwayne Macklin**
**Taken: September 28, 2022**
**Role:  Witness**

LOUISVILLE    LEXINGTON    LONDON    FLORENCE    CINCINNATI    INDIANAPOLIS    ORLANDO    JACKSONVILLE    TAMPA



**KENTUCKIANA**
— COURT REPORTERS —

# CASE NO. 1:20-cv-06189

# DEMOND WESTON

# V.

# CITY OF CHICAGO, ET AL.

## DEPONENT:

## DWAYNE MACKLIN

## DATE:

## September 28, 2022



a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273

www.kentuckianareporters.com

Case: 1:20-cv-06189 Document #: 327-3 Filed: 02/11/25 Page 67 of 94 PageID #:5725
The Deposition of DWAYNE MACKLIN, taken on September 28, 2022

16

1    A    No, he wasn't.

2    Q    Did Mr. Weston ever have any nicknames in the

3 neighborhood?

4    A    No.  (Inaudible).

5    Q    And are you --

6         COURT REPORTER:  I'm sorry -- I'm sorry.  I

7    didn't mean to interrupt.  Would it be possible for

8    Mr. Macklin to maybe move closer to the speaker or

9    something?  It's a little bit hard to hear.

10        THE WITNESS:  Can -- can you hear me now?

11        MS. BITOY:  Yes, that's so much better.  Thank

12   you.

13        THE WITNESS:  All right.

14        MS. GARCIA:  Apologies.

15        MS. BITOY:  Okay.

16 BY MS. GARCIA:

17   Q    And -- but Mr. Weston was never known as

18 Boo-Man, correct?

19   A    No.

20   Q    Okay.  So I want to now turn to June 9, 1990,

21 when you're arrested.  So on June 9, 1990, were you

22 detained by the Chicago Police?

23   A    Yes, I was.

24   Q    Okay.  And what were you detained -- what was

25 the reason you were detained?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-06189 Document #: 327-3 Filed: 02/11/25 Page: 68 of 94 PageID #:5726
The Deposition of DONTAE JACKSON, taken on September 28, 2022

17

```
 1        A     For murder.

 2        Q     So, were -- would you then say you were

 3   detained during the investigation into a person's death?

 4        A     Yes.

 5        Q     Okay.  And when you were first detained,

 6   around what time did that occur?

 7        A     Maybe around 9:00, 10:00.

 8        Q     And where were you initially detained?

 9        A     You mean when I -- you mean, came to get me?

10        Q     Yeah.

11        A     I think 5928 South Union, you know, apartment

12   building.

13        Q     Okay.  So you were in 5928 South Union around

14   9:00 or 10:00?

15        A     Uh-huh.

16        Q     And who were you with?

17        A     Me, and Cortez Brown, and William Childs.

18        Q     Okay.  And around 9:00 or 10:00, the police

19   came to that house?

20        A     Uh-huh, 301.

21        Q     301.  Did they knock on the door?

22        A     No.

23        Q     How did they enter the room?

24        A     They just came in.

25        Q     They, you know, knocked down the door?  Did
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-06189 Document #: 327-3 Filed: 02/11/25 Page 69 of 94 PageID #:5727

```
 1   they come in the window?

 2       A    Yes, they just kicked the door in.

 3       Q    Okay.  So they kicked the door in.  And what

 4   happened then?

 5       A    They started looking for people, and when they

 6   came up there, I was up there and they showed me a

 7   picture of me.  They said they're looking for this guy,

 8   but all along, that was me they were looking for.  I

 9   said, "I don't know."  So, you know, they put me in

10   handcuffs, took me down to the car, whatever they did

11   with William Childs, Boo-Man -- took him too.

12       Q    I'm just going to pause for one second and

13   close this window because I think it might have some

14   feedback on your guys' end.  So just going back a

15   moment, they detained you and Boo-Man --

16       A    Yeah.

17       Q    -- what happened with Cortez Brown?

18       A    Oh, he jumped out the window, to another

19   apartment building.

20       Q    And you may not know this, but to the best of

21   your knowledge, did they find Mr. Brown on June 9th?

22       A    (No verbal response.)

23       Q    How many people, again, were -- entered the

24   house on Union, on that morning?

25       A    Just three of them.  Three old guys.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-06189 Document #: 327-3 Filed: 02/11/25 Page 70 of 94 PageID #:5728
The Deposition of DONTRAE HARRIS, taken on September 28, 2022

```
 1        Q        Were they --

 2        A        Detective Kill, I'll never forget him.

 3   Christopherson and the other guy, I forget him.

 4        Q        Were they wearing Chicago Police Department

 5   uniforms?

 6        A        No, they was plain-clothed, homicide.

 7        Q        Did they have badges on?

 8        A        Yeah.

 9        Q        Okay.  And you said that Mr. Kill was one of

10   the officers.

11        A        Yes.

12        Q        And Mr. Christopherson was another officer?

13        A        Yes.

14        Q        Was Mr. McWeeny also present?

15        A        Yeah, yeah.

16        Q        Did they put you in handcuffs while you were

17   still in the house?

18        A        Yes.

19        Q        And they've put Mr. Childs in handcuffs as

20   well?

21        A        Yes, they did.

22        Q        When you were put in handcuffs, did they tell

23   you that you were being placed under arrest?

24        A        They didn't tell me none of that at that time.

25   They just put the handcuffs on me and put me in the car.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-06189 Document #: 327-3 Filed: 02/11/25 Page 71 of 94 PageID #:5729
The Deposition of DWAYNE MCGEE, taken on September 18, 2022

20

```
 1        Q     Did they tell you where you were going?
 2        A     No.
 3        Q     Did they ask you if you wanted to go with
 4   them?
 5        A     No.
 6        Q     Are you familiar with the constitutional
 7   Miranda Rights?  The right --
 8        A     Yes.
 9        Q     -- to remain silent?  The right to an
10   attorney?
11        A     They never said none of that.
12        Q     Okay.  So they didn't read you your Miranda
13   Rights?
14        A     No.
15        Q     Okay.  So about how long was your interaction
16   with the officers in the -- was it an apartment or a
17   house?
18        A     Apartment.
19        Q     Okay.  How long was your interaction with the
20   officers in the apartment?
21        A     We were in there for like 20 minutes.
22        Q     20 minutes?
23        A     Yeah.
24        Q     And were they -- during that time, what were
25   they doing?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    Looking around, searching.

2    Q    And when they searched, did they find

3  anything?

4    A    No.

5    Q    Did they ask you any questions about what may

6  be in the house?

7    A    No, they just do what they do.

8    Q    Okay.  They asked you if you had any weapons

9  in your possession?

10    A    Yes.

11    Q    What did you say?

12    A    No.

13    Q    Did they ask if there're any weapons in the

14  apartment?

15    A    Uh-huh.

16    Q    What did you say?

17    A    "There's none in here."

18    Q    Did they find any weapons in the apartment?

19    A    No.

20    Q    Okay.  Did they ask you about the whereabouts

21  of Mr. Brown?

22    A    No, they did not.

23    Q    Okay.  After 20 minutes in the house --

24  actually strike that.  Did they put you in handcuffs

25  when they first came in, or did they put you in

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   handcuffs --
 2        A    They put me in handcuffs as soon as they got
 3   me out that closet.  It was a crawlspace, right.
 4        Q    Okay.  So --
 5        A    I wasn't in handcuffs.
 6        Q    Okay.  So the sequence of events that you're
 7   hiding from the closet when they knocked your door, they
 8   found you, and then they put you in handcuffs and asked
 9   you questions?
10        A    Uh-huh.
11        Q    Okay.  So after they searched the apartment
12   and they took you down to -- I assume they took you
13   outside?
14        A    Yes, they took me outside, put me in a squad
15   car.
16        Q    Did they put you in the squad car right away?
17        A    Yeah.
18        Q    Okay.  How long were you in the squad car
19   before you were either let out or you were taken to --
20        A    I was in the squad car for a while, because
21   they pulled off and they took me to the like -- I want
22   to say 57 Hoyne.  They went looking for Cortez Brown.
23        Q    Okay.  So, before you guys left the area to go
24   look for Cortez Brown, did they ask you any further
25   questions?
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-06189 Document #: 327-3 Filed: 02/11/25 Page 74 of 94 PageID #:5732

```
 1        A     Uh-uh.

 2        Q     Did they read you your Miranda Rights then?

 3        A     No.

 4        Q     Did they ask you about any weapons in the

 5   area?

 6        A     No.

 7        Q     Did they ask you if -- okay.  Was Mr. Childs

 8   with you when you were taken into the car?

 9        A     He wasn't in the car with me on the way.  They

10   took him too, because I hadn't seen him no more that

11   day.

12        Q     So you're put in the car, and then you drive

13   around for a bit, correct?

14        A     Yes, yes.

15        Q     And you said that you were driving around

16   looking for Cortez Brown, correct?

17        A     Yeah.  They went to a house on 57 Hoyne.

18        Q     Got you.  And did you know that house to be

19   Mr. Brown's?

20        A     No.

21        Q     Did they ask you if that house was

22   Mr. Brown's?

23        A     No.

24        Q     Did they tell you why you were driving around?

25        A     Uh-uh.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     How did you know they were looking for Cortez
 2   Brown as they were driving around?
 3        A     Huh?
 4        Q     How -- I mean --
 5        A     How did I know?
 6        Q     Yes.
 7        A     I don't know who they're looking for.  They
 8   got me.  They got William Childs he was the one with me
 9   when we did what we did.  I don't know who they're
10   looking for.  I just didn't ask.
11        Q     Did the officers talk amongst themselves?
12        A     Yes.
13        Q     They mentioned that you were looking for
14   Mr. Brown?
15        A     Whatever they were talking about, it was
16   outside at the car.
17        Q     Okay.
18        A     But I -- I knew they were looking for him
19   because I know his brother -- his brothers and sisters
20   came out.
21        Q     His brothers at the --
22        A     57 South Hoyne, yeah where they were looking
23   for him.  They never told me.
24        Q     When his -- when Mr. Brown's brothers and
25   sisters came out, did they -- did Officer Kill and
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-06189 Document #: 327-3 Filed: 02/11/25 Page 76 of 94 PageID #:5734
The Deposition of DWAYNE MacKLIN, taken on September 28, 2022

26

1    Officer Christopherson talk with them?

2        A    Yes.

3        Q    Could you hear what they were saying?

4        A    No, they had the window up.

5        Q    Did you say that you didn't see Cortez Brown

6    come out of that house?

7        A    Out the window.

8        Q    Okay.  So after you went to a house on South

9    Hoyne, what happened next?

10       A    Come back, pulling up on Union.  I see Demond

11   Weston was walking down the street as he normally do,

12   minding his business, and they just grabbed him.

13       Q    And when you saw Mr. Weston, Officer Kill or

14   Officer Christopherson say anything?

15       A    No.  They just grabbed him, and put him in

16   handcuffs, put him in the car.

17       Q    Did you say anything to them when you saw

18   Mr. Weston?

19       A    No, I did not.

20       Q    Did you ask them why they were pulling over

21   and coming?

22       A    They wouldn't tell me.  They wouldn't talk to

23   me.

24       Q    Okay.  When you were driving around after you

25   stopped at South Hoyne, were there many people who were

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Yes.

 2        Q    When Mr. Kill pulled over the car to interact

 3   with Mr. Weston, how many police cars were there?

 4        A    It was -- it was a couple of them, but when he

 5   jumped out the car, him and I -- the old guy, I'm going

 6   to call him old guy, they -- they dragged him up.

 7        Q    And was the old guy Mr. McWeeny or

 8   Mr. Christopherson?

 9        A    It was the guy named Christopherson.

10        Q    Okay.

11        A    I'll never forget him.

12        Q    Yeah.  So you pulled over, you see Mr. Weston,

13   and Mr. Kill, and Mr. Christopherson go to question him?

14        A    Uh-huh.

15        Q    Were there any other officers that joined

16   them?

17        A    They didn't join them, but they put him in a

18   different squad car.

19        Q    So they didn't put him in your squad car?

20        A    No.

21        Q    Did you hear what they were saying to

22   Mr. Weston?

23        A    No.  Once again, the windows was up, I

24   couldn't hear nothing.

25        Q    Okay.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   BY MS. GARCIA:
 2       Q    May 29, 1990.  Did Mr. Kill speak to you about
 3   the shootings on May 29, 1990?
 4       A    He said something like, did I know about the
 5   shootings on -- somewhere on Woods.
 6       Q    I believe they're around the 55th and 57th
 7   blocks of --
 8       A    Yeah.
 9       Q    -- Maplewood.
10       A    Yeah.  Yeah, like 50 something and Woods.  I
11   told him, "No".
12       Q    Okay.  And what did he say when you told him
13   you didn't have any knowledge?
14       A    No, he started hitting on me.
15       Q    Why did he hit you?  Did he say?
16       A    No, he just start -- shit.  Start hitting on
17   me, and I told him, "I don't know nothing about none of
18   that or whatever else you asking me.  I don't know
19   nothing about it."
20       Q    The entire time you talked with him, you said
21   you didn't have any knowledge about --
22       A    Yes.
23       Q    -- either the May 29th shooting --
24       A    That one.
25       Q    -- or the Curtis Sims murder.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-06189 Document #: 327-3 Filed: 02/11/25 Page 79 of 94 PageID #:5737
The Deposition of DWAYNE MACKLIN, taken on September 28, 2022

51

```
 1  statement that you were given to read.  Who gave you
 2  that statement?
 3       A    Ms. Rodi.
 4       Q    Ms. Rodi gave you that statement.
 5       A    The same thing that -- something that
 6  Detective Kill showed me earlier.
 7       Q    That Detective Kill had shown you -- right
 8  after.  Earlier?
 9       A    Yeah.
10       Q    And --
11       A    And he told me I was supposed to sign that in
12  that room.
13       Q    And that was the sign write up that Ms. Rodi
14  --
15       A    Yes.
16       Q    -- had in front of her?
17       A    Yes.
18       Q    And that she wanted to talk through with you?
19       A    Uh-huh.
20       Q    Okay.  For the record, going to pull up the
21  Court reported statement on June 9, 1990.  I'll pull it
22  up for you guys, and then I have a copy that I'm going
23  to hand to Mr. Macklin.  Just give me one second.  While
24  I'm doing that, Mr. Macklin, can you read and write
25  currently?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    No.

2    Q    Okay.  And again, this testimony that I read

3  for you, didn't occur as reported, correct?

4    A    No.

5    Q    You did not testify to this information?

6    A    No.

7    Q    And -- yeah.  Okay.  Going on to page 5 of the

8  first exhibit, the -- there is some questions and then

9  answers about whether or not you saw any of the folks

10  previously referenced with a nine-millimeter gun.  Do

11  you see that?

12    A    Yeah.

13    Q    Did you give testimony about whether or not

14  you saw those persons with a nine-millimeter gun?

15    A    No.

16    Q    Did you see Mr. Weston or Mr. Walker with a

17  nine-millimeter gun on May 29, 1990?

18    A    No.  I don't know nothing about no May 29th.

19  Or Mr. Weston or Walker.

20    Q    And then I wanted to go to the middle of the

21  page, where there's handwriting that says, "It was a

22  Mustang."  Do you know who wrote that?

23    A    Uh-uh.  It wasn't me.

24    Q    You didn't write it.

25    A    No.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-06189 Document #: 327-3 Filed: 02/11/25 Page 81 of 94 PageID #:5739
The Deposition of SHANTAE MARTIN, taken on September 13, 2022

69

1       Q    Set aside for now.  So after you were forced

2  to do initial and final statement, what happened then?

3       A    After that, they took me to another room.  They

4  put me in there for a minute.

5       Q    Okay.

6       A    It took them like maybe 10 minutes, and they

7  took me on to police station.

8       Q    And prior to --

9       A    Would've been on that morning.

10      Q    Sure.  So prior to being taken to the police

11  station, did you see Demond Weston.

12      A    I saw him, but I couldn't talk to him.  Had

13  him, get out, took him in, then they took me out, put me

14  under arrest.

15      Q    Okay.  When you saw Mr. Weston, what was his

16  appearance like?

17      A    He was beat up.

18      Q    Did he have bruising on his face?

19      A    Yeah.  I wanted to ask him what -- what

20  happened.  Like they got sides -- like the police

21  station you were outside waiting to be taken back.  So,

22  it's like, if I tried to holler for him, he wouldn't

23  hear me.

24      Q    When you were taken to the police station

25  after you were at 39th and California, around what time

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-06189 Document #: 327-3 Filed: 02/11/25 Page 82 of 94 PageID #:5740
The Deposition of DWAYNE MACKLIN, taken on September 28, 2022
125

```
 1      A    I can't -- I can't even tell you how he looks.
 2      Q    Okay.
 3      A    Haven't seen him.
 4      Q    When's the last time you spoke to Mr. Weston?
 5      A    Haven't.
 6      Q    And again, I'm talking about throughout the --
 7   even if it was 30 years ago or so, I'm just saying
 8   when's the last time you --
 9      A    That was -- that was -- that was -- that last
10   I talked to Mr. Weston, when we was out there on the
11   streets.
12      Q    Okay.  So would that time frame, again, have
13   been prior to 1990?
14      A    Uh-huh.
15      Q    Okay.  Okay.  I know that you stated that you
16   now go by Dwayne Dunbar.  Apart from that, have you used
17   any other names?
18      A    Dwayne Macklin.
19      Q    Right.  I'm sorry.  Yeah.  But besides Dwayne
20   Macklin and Dwayne Dunbar, have you ever gone by any
21   other name?
22      A    I go by a nickname Cup, used to be.
23      Q    That was going to be my next question.  So you
24   go by -- your nickname is Cup or Buttercup, do you go by
25   that as well?
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1      A    Yeah.

 2      Q    Okay.

 3      A    I don't go by that name no more.

 4      Q    Okay.

 5      A    All right.

 6      Q    And where are you living now, currently?

 7      A    5401 South Ellis.

 8      Q    South Ellis, is that what you said?

 9      A    Yes.

10      Q    Okay.  And who do you live at that address

11  with?

12      A    Live there with Nathaniel Muhammad.

13      Q    I'm sorry, I couldn't hear you.  What -- who

14  was it?

15      A    Nathaniel Muhammad.

16      Q    Okay.  And who is Nathaniel to you?  What --

17  what's the relation?

18      A    That's -- that used to be my sister's

19  boyfriend, but that's one of my best friends.

20      Q    Okay.  Apart -- so it's -- is it just you and

21  Nathaniel then who live at the house?

22      A    Yeah.

23      Q    Okay.  And how long have you lived at the

24  Ellis address for?

25      A    Since I've been home.  Since 2020.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-06189 Document #: 327-3 Filed: 02/11/25 Page 84 of 94 PageID #:5742
The Deposition of DONTRAIL MACK, TN, taken on September 28, 2022
188

1  see what I mean?

2      Q    What's your understanding -- how did you --

3  why is it your understanding that police were looking

4  for Cortez Brown?  Did they say that to you?

5      A    I already know who they looking for.  They

6  didn't have to say nothing to me.  I already knew who

7  they was looking for.  When they handed my picture, I

8  already knew what it was.  I already knew about the

9  dude, the make of the car.  Once they got William

10  Childs, they separated him from me.  I don't know where

11  they took him to.  I don't know where he went, but they

12  separated us from him.

13      Q    Okay.

14      A    Come to find out, he went home that night.

15  That's how I know who told that stuff.  I never told

16  them nothing.  Only reason I told you-all is because I

17  already did my time.  I pleaded guilty, so I'm not going

18  to sit here and deny and play with you.  I did what I

19  did and I paid for it, but I don't think I paid for it

20  enough.

21      Q    I understand.  I understand.  When the police

22  stopped -- so how many -- so you were in a squad car

23  with how many officers?

24      A    Yes.

25      Q    How many --



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-06189 Document #: 327-3 Filed: 02/11/25 Page 85 of 94 PageID #:5743
The Deposition of SHAMAR MACKLIN, taken on September 28, 2022
189

1    A    And I told you.  I was in a squad car with
2  Detective Kill.  I only know the squad car -- squad -- I
3  was in his car.
4    Q    Okay.
5    A    Him and McWeeny or Christopherson, whoever
6  they asked to -- to -- drove me in his and they put me
7  in cuffs and then took off.  So I just -- the blue and
8  whites was out there, so I don't know what they was
9  doing.  They just -- they took off, took me down, and I
10 didn't know that Cortez stayed over there on Horn until
11 I seen his brother come out Because I didn't know what
12 we was doing at that point.  So I seen his brother come
13 out, then I knew -- really, really, really knew they was
14 looking for Vic.
15   Q    Okay.
16   A    That's when I really knew.
17   Q    Okay.  And so after you left Cortez Brown's
18 house, what -- where did you go next?  Were you driving
19 back --
20   A    We was driving -- we were heading back towards
21 Union.
22   Q    Okay.
23   A    And we was coming and pulling up.  I see
24 Demond standing there, walking slow.  They pulled right
25 up, jump out the car, and grab him.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-06189 Document #: 327-3 Filed: 02/11/25 Page 86 of 94 PageID #:5744
The Deposition of DeWAYNE MacLIN, taken on September 28, 2022

190

1      Q    Did they put Demond then in the same car as

2  you, right next to you in the back?

3      A    So they wouldn't do none of that because, you

4  know, police ain't stupid.  They put him in the car, we

5  already know who they're talking at.  You know how that

6  goes.  No, they never put him in the car with me.

7      Q    So what car did he go into?  Was there another

8  police car --

9      A    They put him in a -- they put him in a -- they

10  put him in -- well, I don't know if they was blue and

11  whites back then, but they put him in a police -- a

12  regular police car.

13      Q    Okay.  Was that car driving, like, right in

14  front of you?  Is that how you were able to see this or

15  I mean, were the cars driving in a --

16      A    No, no, no, no.  When they pulled up, Demond's

17  standing right there.  Detective Kill then jumped out

18  and grabbed him.

19      Q    Okay.  They grabbed him and they put him in

20  another squad car?

21      A    Yeah, and they put him in -- someone put him

22  in his car.  Yeah.

23      Q    Okay.  Okay.

24      A    So I was thinking to myself -- I'm like,

25  "Damn, what did he do?"

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-06189 Document #: 327-3 Filed: 02/11/25 Page 87 of 94 PageID #:5745
The Deposition of DONALD MACKEY, taken on September 28, 2022

209

1    do that?  Was this after you had been beaten or do you

2    remember --

3         A    After -- after he told me that.  That -- that

4    was afterwards.  He talking about, "I'm going to take

5    the handcuffs off of you.  You can go."  All this kind

6    of stuff, you know, chit-chatting.  "No, I'm going to

7    sit right here man.  None of that."

8         Q    You said that the detectives had provided sort

9    of promises that you would get leniency on your case.

10   What -- how did that --

11        A    They didn't say -- I didn't say nothing to

12   them at all.  They was trying to connect me on two

13   murders and I don't know nothing about no second murder,

14   but I -- I -- I -- all I know is, I know about my

15   murder, but I wasn't telling them.  I didn't say nothing

16   to them, and they didn't have no witnesses.

17        Q    When they -- the detectives said that they --

18   so was it Detective Kill?  Who told you that you would

19   get leniency on your case if you --

20        A    Kill.  Kill and -- not Christopherson.  What's

21   the other one's name?  I forgot the other detective's

22   name.

23        Q    Would it --

24        A    He was the good cop.  He was the so-called

25   good guy.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-06189 Document #: 327-3 Filed: 02/11/25 Page 88 of 94 PageID #:5746
The Deposition of DWAYNE MACKIN, Taken on September 28, 2022
210

| | |
|---|---|
| 1 | Q    Would that have been Detective Christopherson |
| 2 | or Detective McWeeny?  Do -- |
| 3 | A    McWeeny. |
| 4 | Q    Okay. |
| 5 | A    The fat one. |
| 6 | Q    So Detective Kill and Detective McWeeny told |
| 7 | you that if you cooperated, you would get leniency on |
| 8 | your case? |
| 9 | A    Kill didn't tell me nothing.  McWeeny was |
| 10 | telling me that stuff and then, you know, he'd leave |
| 11 | after.  Detective Kill talking about that paper right |
| 12 | there.  "I was like I don't know what you're talking." |
| 13 | That's all I kept saying -- |
| 14 | Q    When -- |
| 15 | A    -- again and again. |
| 16 | Q    When you were told -- when Detective McWeeny |
| 17 | told you that you would get leniency on your case if you |
| 18 | cooperated, did you agree to cooperate? |
| 19 | A    No, I did not.  The only time I agreed, I told |
| 20 | the man I couldn't read and write.  That's just the only |
| 21 | thing that I signed.  I ain't seen none of this stuff. I |
| 22 | ain't seen none of this stuff. |
| 23 | Q    And -- |
| 24 | A    When I saw it, I -- |
| 25 | Q    You said -- |

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

# Exhibit 29

PRESS HARD — — This is a 6-part formset

PRINT CLEARLY — — This is the official Department record.

**CHICAGO POLICE**
# ARREST REPORT
CPD-11.420 (Rev. 5/88)

| MISDEM./ORDIN. COURT KEY | 1. NAME (LAST) | (FIRST) | (MIDDLE) | 2. SEX | 3. RACE | 4. DATE OF BIRTH |
| | MACKLIN, Dwayne | | | M | B | DAY 27 MONTH Dec YEAR 65 |

5. ADDRESS OF ARREST  5928 South Union  APT. NO. | 6. AGE 24 | 7. ALIAS (LAST) "CUP" (FIRST) (MIDDLE) | 8. C.B. NO. | 9. I.R. NO.

~~3300 South Caldxxxxaxxx~~

10. ENTER LOCATION CODE FOR NATURE OF PREMISES  ~~Police Station~~ House | 11. DIST./RES. 007 | 12. RESIDENCE ADDRESS 5928 S Union-5543 So May | 13. TIME PHOTO. | 14. R.D. NO. N-258729

15. RESISTED ARREST YES / NO X | 16. ASSAULTED OFFICER YES / NO X | 17. OFFICER INJURED YES / NO | 18. SOBRIETY SOBER XX | HBD | INTOX | 19. STATE/PLACE OF BIRTH Ill | DRIVERS LICENSE NO. | STATE | 20. I.D. NO. 676676

21. WEAPON  X PISTOL-REVOLVER | RIFLE | SHOT-GUN | KNIFE | OTHER (SPECIFY) 9MM | 22. HEIGHT 6'3" | 23. WEIGHT 150 | 24. EYES Brn | 25. HAIR Blk | 26. COMPLEXION Medium | 27. FINGERPRINT CLASSIFICATION

28. GLASSES YES / NO XX | 29. BUILD SLENDER XXX MEDIUM HEAVY | 30. MARKS, SCARS, DEFORMITIES, HANDICAPS, ETC. Tattoo 'Star left arm | 31. BEAT OF ARREST 911 | 32. DATE OF ARREST DAY 9 MONTH June YEAR 90 | TIME 1700 | 33. FINAL. CT. DATE & BRANCH

34. WHERE EMPLOYED  DNA | 1. 38-9-1a1 | 1. 1st Degree Murder | 1.
| 2. | 2. | 2.

35. OCCUPATION  DNA | 3. | 3. | 3.
| 4. | 4. | 4.

36. NO. ARRESTED 2 | 37. TIME FINGERPRINTED | 5. | 5. | 5.

38. REFERENCES (CHAPTER ARTICLE SECTION) | 39. OFFENSES | 40. DISPOSITIONS

41. PERSON IN INVESTIGATIVE UNIT NOTIFIED  Area Three VC Arrest | TIME | 42. INITIAL APPROVAL OF PROBABLE CAUSE | 43. DATE CHARGED: DAY MONTH YEAR | TIME | 44. APPROVAL OF CHARGES

45. VEHICLE OF ARRESTEE | YEAR 85 | MAKE Ford | STATE LICENSE NO. DL669C | DISPOSITION OF VEHICLE  Towed for Investigation

46. VICTIM-COMPLAINANT | NAME  Curtis SIMS (Deceased) Det. Dan McWeeny#14367 | SEX | RACE | HOME ADDRESS 3900 S. California | PHONE NO. 744-8281

47. ARRESTEE TRANSPORTED BY  Area 3 VC  Det Micheal Kill | STAR NO. 4123 | HOW TRANSPORTED Beat 5312 | 1600 | PROPERTY INVENTORY NO(S).

48. NARRATIVE  (The facts for probable cause include, but are not limited to, the following:) | DOES ARRESTEE HAVE DEPENDENT CHILDREN AT HOME ☐ YES ☐ NO | IF YES—NAME OF YOUTH DIV. MEMBER NOTIFIED 757539/757540

THIS IS A AREA THREE VIOLENT CRIMES ARREST

Above arrestted after investigation revealed that above was responsible along with co-offenders

for the shooting death of Curtis SIMS which occurred on 8 June 1990 at 5313 South Bishop at

02:40 hours. Victim shot with multiple weapons and multiple wounds.

Oral admission made to incident.

POSITIVE IDENTIFICATION.

CHARGES APPROVED  Luann ROTI

FIRST ARRESTING/APPEARING OFFICER'S SIGNATURE  I do solemnly, sincerely, and truly declare and affirm that the facts stated herein are accurate to the best of my knowledge. | DEPUTY CLERK

FOR NARCOTIC ARREST ☐ SUSPECT CANNABIS ☐ SUSPECT CONTROLLED SUBSTANCE | APPROX. WEIGHT/NO. PILLS | EST. STREET VALUE – CALL ORG. CRIME, Tax 0 662 | $ | TEL. NO. CALLED | TIME OF CALL | FOR COURT USE – COURT DOCKET NO.

49. VEHICLE ASSIGNED ☐ ONE ☒ TWO MAN 3 CAR ☐ SQUAD CAR OTHER | 50. DESIRED COURT DATE 11 June 1990 | BRANCH 66-2 | 51 COURT SGT. TO HANDLE ☐ YES ☒ NO | 52. DATE RECEIVED LOCKUP | TIME | 53. FINAL JUDGE'S NAME

55. FIRST ARRESTING/APPEARING OFFICER - PRINT  Det. Dan McWeeny | STAR NO. 14367 | UNIT 632 | BEAT NO. 5312 | D.O. GRP. 2 | SECOND ARRESTING OFFICER'S SIGNATURE  Andy CHRISTOPHERSEN  Det. Mike KILL | STAR NO. 13244 4123 | UNIT 632 | BEAT NO. 5313

56. BOOKING OFFICER | STAR NO. | UNIT | 57. PROPERTY RECEIPT NO. | 58. INITIAL COURT DATE | ROUGH

59. ARRESTEE SEARCHED BY | STAR NO. | UNIT | 60. BONDED DATE | TIME

CITY-DW-000418

# Exhibit 30

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CRIMINAL DIVISION

| | |
|---|---|
| DEMOND WESTON, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) |
| | ) Case No. 90-CR-16378, 91-CR-640 |
| PEOPLE OF THE STATE OF ILLINOIS | ) |
| | ) |
| Respondent | ) |

AFFIDAVIT

I, Orlandis McCurdy, hereby swear that the information herein is true, correct and complete.

1. My name is Orlandis McCurdy, and I was born on November 4, 1972.

2. In 1990, I lived with my family at 5701 S. Hoyne St. in Chicago, Illinois.

3. On June 9, 1990, while I was at home with my uncle and my younger brother, a number of Chicago police detectives barged into our house, looking for my brother Victor Safforld (also known as Cortez Brown). The police had their guns drawn.

4. The police took my brother, Christopher, and me out of the house and put us in the back of a police car. The police handcuffed us and shouted at us, demanding us to tell them where Victor was.

5. As the police led us from the house to the police car, my uncle asked if they had a warrant. One of the detectives raised his gun in the air and said, "This is my warrant."

6. I could see another police car near the car they put Christopher and me into, and I saw an individual known as "Cup" or "Buttercup" in the back seat.

7. We were unable to tell the police where Victor was, and eventually they released us there in front of our home.

8. This entire incident happened during the daytime on June 9, 1990. Later that day, after nightfall, Victor returned home.

9. Victor stayed home a very short while that night. Then he left, and I did not see him for months afterward.

I, the undersigned, certify under penalty of perjury that the statements in this instrument are true and correct.

_____
Affiant

STATE OF ILLINOIS, COUNTY OF COOK

Subscribed and sworn to me this 31st day of March 2014.

_____
Notary Public

My commission expires May 15, 2016



OFFICIAL SEAL
SUSAN SWANSON
NOTARY PUBLIC STATE OF ILLINOIS
My Commission expires: 5 2016