# Exhibit 51

**GENERAL PROGRESS REPORT**
DETECTIVE DIVISION/CHICAGO POLICE

| | DATE OF ORIG. CASE REPORT | | | DATE OF THIS REPORT | | | |
|---|---|---|---|---|---|---|---|
| | DAY | MONTH | YEAR | DAY | MONTH | YEAR | WATCH |
| | | | | 6 | Jun. | 90 | 3rd. |

| OFFENSE CLASSIFICATION–LAST PREVIOUS REPORT | VICTIM'S NAME AS SHOWN ON CASE REPORT | BEAT/UNIT ASSIGNED |
|---|---|---|
| Homicide | Watson, Joseph | 5312 |

This form is designed for recording handwritten notes and memoranda which are made during the conduct of investigations, including: inter-watch memoranda (handwritten or typewritten), witness and suspect interview notes, on-scene canvas notes, and any handwritten personal notes made by detectives during the field investigation of violent crimes which are used to prepare official Department case reports.

TO:        2nd. watch

FROM:      Paladino & Moser

SUBJECT:   WATSON Homicide

1. Re-interviewed Tim Jones, he is now home from the hospital. We wanted him to get the exact location where he was shot. He related that he was on his bicycle, north on Wolcott and was at the red and blue house about five houses north of his when the offenders came out of the gangway. He says that after the offendrs shot him they ran past him and towards another boy (WATSON) who was walking on the west side of the street. Jones also related that a friend of his sister found a 9MM casing in the gangway where he was shot. His sister still has the casing but wasn't home when we were there. We had Jones view the additional photos that we had, but he did not make any identification. He insists that he can identify the offender that who shot him. We then located the red and blue house as described by Jones and found it to be 5637 S. Wolcott. We searched the gangway and the gangway at 5641, for casings, but couldn't locate any. We interviewed Leona Buchanan, 5637 S. Wolcott, 7/29/58, phone# 436-4782. She stated that she heard somebody running through the gangway and then heard five or more shots. She stated that she was at home alone with her children and they all hit the flxoor after the shooting and didn't look out the window. We went to 5641 S. Wolcot and interviewed Brown, George, phone: 471-9403. he also related that he heard persons running throught the gangway and heard shots,but dxdn't look out the window.

2. We interviewed Helen by telephone and she denies being a witness. She states that she was in bed when she heard the shots and by the time she looked out the window all she saw was the victim laying on the street.

3. We went back to 53rd. Wood and played around there for some time and then located baldy( Servan Allen) and Nate, NATHANIEL McCURINE. We transported them to Area and they redate the following.

SERVAN ALLEN:  He was at home at 7310 S. Dante, at the time of the shooting. He dosen't know any of the players except Pope G, and J. Dilla and some other locals. ALLEN says that he was on 53rd. Wood earlier on the day of the shootings. He said that he left there at 1800-1830hrs. and went home by bus, and stayed there for the entire evening, getting home at 1900hrs. ALLEN says that xhe went out the next day and went back to 53rd. Wood and there he spoke to his friend(cousin) LAWRENCE GOWDY, who told him that the Police had picked him up earlier and questioned him about some shootings. ALLEN says that he saw the shootings on Television and thats the first time he learned about them. He says that he never been in BIz's car.

| REPORTING OFFICER'S SIGNATURE–STAR NO. | RECEIVED BY SUPERVISOR'S SIGNATURE - STAR NO. | DAY | MO. | YR | M/ |
|---|---|---|---|---|---|

CPD-23.122 (Rev. 2/83)

CITY-DW-000277

# Exhibit 52

**Deposition of Susan Swanson
Taken:  December 13, 2023**

**Role: Investigator**



Transcript of the Deposition of
**Susan I. Swanson**
**Case:** Demond Weston v. City of Chicago; et al.
**Taken On:** December 13, 2023

Royal Reporting Services, Inc.
Phone:312.361.8851
Email:info@royalreportingservices.com
Website: www.royalreportingservices.com

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 24

1    **that a witness tells you regardless of whether it**

2    **may or may not be harmful to a client?**

3        A.   You know, sometimes your voice cuts out,

4    and I miss the beginning of what you said.

5        **Q.   Sure.  I'm sorry about that.  I'll try to**

6    **keep my voice up.**

7            **Were you taught to gather all information**

8    **a witness tells you regardless of whether or not it**

9    **might be helpful or harmful to a client?**

10       A.   I believe so.  I believe I was taught to

11   gather all information, yes.

12       **Q.   Do you take down notes from a witness**

13   **interview in writing if that information may**

14   **potentially be harmful to a client?**

15           MS. HORN:  Object to form.

16           THE WITNESS:  Generally, I take down

17   everything, and I may not know at the time whether

18   it will be helpful or harmful.  And I was never

19   instructed in this case to avoid --

20           MS. HORN:  Susan --

21           THE WITNESS:  Oh, okay.

22           MS. HORN:  I mean, you can -- you've answered

23   it, so it's fine.  But we still have some privilege --

24           THE WITNESS:  Okay.

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 25

1      MS. HORN: -- associated with your work in

2    this case.  So unless she's specifically asking you

3    about this case where we can deal with privilege

4    objections as they come.  I think she's just asking

5    you generally.

6           THE WITNESS:  Okay.  I hope I answered your

7    question.

8    BY MS. BITOY:

9    **Q.   Yes.  So just to recap, you said that**

10   **generally, you do take down everything that a witness**

11   **tells you; is that fair?**

12   A.   Yes.

13   **Q.   Have you held any teaching positions related**

14   **to private investigation?**

15   A.   Not officially.  I've been asked to speak

16   to law students at Northwestern law school about

17   investigations, but that's about it.

18   **Q.   And when did you -- well, strike that.**

19   **Who asked you to speak at Northwestern**

20   **University?**

21   A.   Karen Daniel and Jane Raley asked me on

22   one occasion.

23   **Q.   Do you recall when that was?**

24   A.   No.

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 65

1    home.

2        Q.    Oh, okay.  So did you go back another time

3    to meet with her?

4        A.    No.  Her uncle or brother answered the door,

5    told us she was in the hospital.  And he said, just go

6    visit her in the hospital.  He told us where it was.

7    And I said, well, you know, do you want to call her

8    first?  He said no, just go on ahead.  I said, well,

9    please call her to let her know we're on the way.

10   And then we went to the hospital, and that was where

11   I had the only meeting I had with her.

12       Q.    Okay.  Understood.  So that was the same day,

13   though, Labor Day 2010.  Okay.

14       A.    Yeah.  Yeah.

15       Q.    Okay.  And what hospital was that, if you

16   recall?

17       A.    My recollection is it was in Hinsdale,

18   Illinois, and I don't recall the exact name of the

19   hospital.

20       Q.    And so yourself and Mr. Holland went to visit

21   Ms. Coats at the Hinsdale hospital; is that right?

22       A.    That's right.

23       Q.    How long did that meeting at the hospital

24   take place?

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 66

1    A.   My guess would be about an hour.  And it was

2  interrupted once or twice by a doctor coming in or

3  medical people, you know.

4    **Q.   And do you know why Ms. Coats was in the**

5  **hospital?**

6    A.   I think it had something to do with her

7  lungs, but I'm not sure.

8    **Q.   Was she under -- to your knowledge, was she**

9  **under any medications or anesthesia or anything like**

10  **that when you spoke to her?**

11    A.   My understanding is she was not under any

12  anesthesia and did not appear to be when I spoke to

13  her.

14    **Q.   Did you ask her whether she was on any**

15  **medication at the time you spoke to her?**

16    A.   I don't recall if I asked that or not.

17  I may have, because it was my understanding she was

18  not at that time.

19    **Q.   Did Ms. Coats appear to be in the right state**

20  **of mind to answer questions when you were interviewing**

21  **her on Labor Day 2010?**

22    A.   Yes.

23    **Q.   So what did you say to Ms. Coats, and what**

24  **did she say to you during this interview, generally?**

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 69

```
 1                    (Whereupon, a break was taken,

 2                     after which the following

 3                     proceedings were had:)

 4   BY MS. BITOY:

 5      Q.    So, Ms. Swanson, we have your handwritten

 6   notes from the interview that you took of Ms. Coats.

 7   And so I'd just like to kind of go through it and have

 8   you read it into the record.

 9           Are you able to see my screen okay?

10      A.    Yes.

11      Q.    Okay.  So it says, Deneen Coats, Labor Day

12   2010, 09/06/2010.

13           Does that seem about the date that you would

14   have met with Ms. Coats?

15      A.    Yes.

16      Q.    All right.  So if you could just please read

17   starting on page 1 here.

18      A.    I see the -- upper right corner of page 1,

19   it says, Reggie.  I'm not sure what the word after

20   that is.  But home from college.  Other guy, Ron, home

21   from college.  Apparently, Ron was from St. Louis.

22   There was an on-and-off relationship she had with Ron.

23   She said he was too in love.  Then it jumps to the

24   ambulance.  She said the ambulance took forever to
```

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 70

1    get there after the shooting.  She said that they
2    had been -- that they were inside the front porch.
3    She explained that there was a gate around the outside
4    of the yard -- her front yard.  And they had been
5    sitting on the front porch and looked down the block.
6    And to the right, they saw eight guys to the right of
7    her home on the corner.  Those eight guys walked to
8    the front of her house and suddenly started shooting
9    at them.  And then on page 2 --
10       Q.   Sorry.  I just might pause you -- no.
11   I -- it's my fault.  I might pause you after a page
12   just to ask a few follow-up questions.
13       A.   Okay.
14       Q.   Is Reggie -- is that Reginald Norwood?
15   Is that who she was referring to there?
16       A.   Yes.
17       Q.   And is Ron -- is that Ron Nesbit; do you
18   know?
19       A.   Yes.
20       Q.   Okay.  All right.  I'm sorry.  Please
21   continue on to page 2.
22       A.   Okay.  Ron and Reggie were inside -- they ran
23   inside the house.  She said, I was standing, shot in
24   the left femur.  She was the last of the three of them

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 71

1   to run inside.  And she was at the top of the stairs
2   when she was shot in the back with 9-millimeter
3   exploding bullets, she said.  She said her femur was
4   broke into pieces, and she was told she might never
5   walk.
6           Now, once they were inside, she said they had
7   cordless phones inside their house, and those cordless
8   phones had just come out.  And, you know, back in the
9   old days, you would pick up a phone and hear a dial
10  tone.  But with these -- at that time -- new cordless
11  phones, you wouldn't hear a dial tone.  And Reggie
12  didn't know how to use it.  That's what she refers to
13  there.
14          Then on page 3, she made it inside the front
15  porch.  She said the ambulance guys were joking about
16  her breast size.  She told Reggie, who didn't know how
17  to use the phone, to put the phone to her ear.  She
18  told him to push this button, that button, and that's
19  how she was able to call 911.  She said Ron held the
20  door shut with his foot.  They were still shooting.
21  He was shot in the foot while holding the door.
22          And then page 4, the ambulance guys said
23  they're taking her to Cook County Hospital.  She said,
24  I begged and pleaded no, go to Michael Reese.  And

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 72

1    then she said, but the County had the best doctors.

2    And so apparently, they took her to the County

3    Hospital.  And she said her house was shot up with

4    9-millimeter bullets.  She said her mom -- and she

5    really meant her grandmother, Dorothy -- was living

6    at the house at the time, but she was not home at the

7    time of the shooting.  So she came home after the

8    shooting, saw the light on the phone.  She said there

9    was an apartment in the basement, and her mom called

10   down -- called down into the basement.  I don't know

11   if she's referring to her mom went to the front porch.

12   Aunt Gwenn was in the back house, which is where the

13   garage used to be.  Her mom saw a towel on the floor

14   and one of Deneen's gym shoes.  I guess she said she

15   knew something was not right.  Then police rang the

16   doorbell, told mom, don't know if Deneen survived.

17            Next page.  I think it says, in a week, they

18   were pulling bullets from our house.  Not sure about

19   that wording or if I'm reading it right.  She said

20   when the guys were shooting, the two guys in front

21   had similar guns.  Behind them were two guys who had

22   smaller guns.  And at the time of the shooting, she

23   thought this can't be real.

24            Next page.  Police came to the hospital to

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 73

1   get Deneen.  Police asked her mom if she'd remember,

2   perhaps.  Reggie said, don't tell police anything.

3   Reggie has a lot of guilt.  She speculated that he

4   knew -- that Reggie knew more about them.  She said

5   before the shooting started, Reggie said to these

6   guys, what's up now, folks?  She said, I think he was

7   more of the intended target than me.  Deneen didn't

8   know "folks" referred to gangs back then.  She said

9   they all -- and I assume she means Reggie and Ron and

10  her -- all went to the same Catholic school, the same

11  high school.

12      **Q.   I'm just going to stop there and ask just**

13  **a few follow-up questions.**

14          **Did Ms. Coats ever tell you which police**

15  **officers came to speak to her?**

16      A.   She may have.  I know she said something

17  about how her grandfather had been killed when she

18  was 13 years old.  And there were police officers

19  coming to speak to her about that case, and there were

20  also police officers coming to her to speak about this

21  case, her shooting.  And if she named names, I don't

22  recall.  But I know she said there were two groups of

23  police officers about the two different cases.  And I

24  can't remember if she told me this or if I did some

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 74

1   research on it, but I think they all worked for Jon

2   Burge.  And it had to do with the time difference from

3   when her grandfather was shot and when she was shot.

4   During that time, I think Jon Burge transferred from

5   one police area to another.  And it's still a little

6   murky in my mind, but I think that because of that,

7   all of these detectives worked for Jon Burge.

8       Q.   Did Ms. Coats bring up the name Jon Burge

9   to you, or is that something you know from your own

10  independent research?

11      A.   I'm not sure.  I think it's from my

12  independent research, and I don't think she brought

13  up Jon Burge.

14      Q.   Did Ms. Coats tell you why she thought that

15  Reggie was potentially a target?

16      A.   Not really.  But the fact that he said

17  "what's up now, folks" had something to do with it,

18  apparently.

19      Q.   Okay.  All right.  Page 9.

20      A.   She was shot four times in the back, her

21  left femur exploding.  She said two, apparently,

22  bullets are still in me now, 9-millimeter bullets.

23  She said they went through the whole neighborhood

24  shooting.  She said there was another guy on the

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 75

1   street.  I don't know if that word is over with --
2   oh, no.  No.  She said, other guy on stretcher was
3   with her in the elevator at the hospital, and he died.
4   So in the hospital, she was on the elevator with
5   somebody next to her in a stretcher who died.  And his
6   dad -- the person on the stretcher's dad or something
7   was police.  And that victim apparently had been
8   coming home from a store.  She said Reggie may have
9   been trying to be in a gang.  He -- he was trying to
10  be slick.  This says, St. Ray - few, question mark,
11  59/60 to 61st.  I don't know what that's a reference
12  to.  The numbers might be street -- streets, but I
13  don't know St. Ray or what "few" refers to.
14      Q.    Did Ms. Coats indicate who the man in the
15  stretcher was?  Do you know if he was a victim of the
16  May 29, 1990 shooting as well?
17      A.    That seemed to be the implication.
18      Q.    Okay.
19      A.    40-ounce.  I don't know what that's a
20  reference to.  Drive to Sherman Park.  Something out.
21  I'm not sure what that says or means.  Apparently,
22  at the time, she was in college at Carthage, Western
23  Illinois in Macomb.  I think she's referring to
24  herself.  And she said she came home every weekend or

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 76

1    tried to.  She was about to pledge to Sigma.  And she
2    said her mom called and she had to talk to her family
3    every day.  I'm not sure.  And then she said she was a
4    business major.  She wanted to be a lawyer, but the
5    shooting changed that.  Set up hospital room in the
6    house.  To this day, if I see three or four black
7    guys, I'll walk the other way.  My family understand
8    or not.  She was talking about how the shooting
9    affected her.
10       Q.   Okay.
11       A.   And because of the shooting, this has to do
12   with where she chooses to live.  She said she will
13   move back to the city after this hospital stay and
14   will take -- help take care of her mom who will be
15   living with her.
16            And the next page, it says, mom equals
17   grandmother.  Clarence and Pearl are technically her
18   aunt and uncle.  She said her mother was age 13 when
19   Deneen was born, and that's why, in effect, her
20   grandmother acted as her mom and her aunt and uncle
21   acted more as siblings.  And they found her an
22   apartment in Chatham, 80s.
23       Q.   And just for the record, we're now on
24   page 15.

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 77

1    A.   Wood Dale, works there.  She was in the

2   hospital almost a month.  Detectives talked to her in

3   the hospital.  A few years after her dad got killed,

4   one set of police -- oh, regarding me getting shot.

5   And then B -- that was A.  B is another set of police

6   for my dad getting killed, meaning her grandfather,

7   when he was killed.  And then she said a crossover of

8   who was with who for what.  Detectives heard Coats

9   was here.  Once they -- not sure the next word --

10   something me to see the lineup.  Pardon?

11    **Q.   Sorry.  I thought it was "cleared," but I**

12   **could be reading that wrong.**

13    A.   Oh, yeah.  That is it.  Once they cleared me

14   to see the lineup, something asked if I could pick

15   them out.  And I don't know if that next word is year

16   or yeahs or what.  Not sure.

17    **Q.   And I just have a few follow-up questions**

18   **here where you -- you state that -- your notes state**

19   **that detectives talked to her in the hospital.**

20    **Did she give you any indication as to who**

21   **those detectives were?**

22    A.   I don't recall her saying names.  She could

23   have, but I don't recall that.  And if she did, I

24   think I would have written them down.  I just remember

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 78

1  the two groups of lawyers -- police regarding the two

2  different cases.

3      **Q.   And did Ms. Coats indicate to you that**

4  **detectives were speaking to her about both the**

5  **shooting and her father's case at the same time while**

6  **she was at Cook County?**

7      A.   I think she said -- when the police would

8  arrive, she said, I'd ask them, which case are you

9  here for?  You know, so I think they explained to her.

10  I don't think they asked her about both cases at once.

11  That was my impression.

12     **Q.   Okay.  And in your notes, you mentioned here**

13  **that she was cleared to go to a lineup.**

14         **Did you -- I guess did you bring up the**

15  **lineup to Ms. Coats, or did she sort of tell you in**

16  **sort of chronological order sort of what happened that**

17  **day?**

18         MS. HORN:  Object to form.

19  BY MS. BITOY:

20     **Q.   Not that day.  Strike that.**

21         **Did she bring up the lineup to you, or did**

22  **you bring up the lineup to her?**

23     A.   I don't recall.  What I try to do is ask,

24  what happened next?  You know, open-ended questions

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 79

1    like that.  And then if she hadn't brought up a

2    lineup, then I would have brought it up.  But in this

3    case, I don't think my notes show who brought it up.

4        **Q.    Okay.  All right.  We're on page 17.**

5        A.    Police station had no elevator.  Police

6    carried her up in a wheelchair.  The doctor cleared

7    her to go do that.  It was about a week after the

8    shooting.  And then the police told her, we think we

9    have the guys.  They shot up another -- looks like

10   P-O-N-D -- full of kids.  Another something full of

11   kids.  We have the one who killed the boy.  What does

12   this say?  We shot up another -- I don't know.  And we

13   have the -- but they told her, we have the one who

14   killed the boy.

15           And on the next page, she was asked, can you

16   pick him out?  Reggie told her not to pick anyone out.

17   He said they'll come after you.  This next word is me.

18   This is me, Susan, asking her a question.  How did you

19   see?  And she answered there was a streetlight in

20   front of her house.  Deneen's girlfriend's dad was

21   Roy.  And then this word looks like -- oh, he was gay,

22   and they were pushing him around.  And then she

23   brought up Dina.  And last name, she either didn't say

24   or I didn't get.  But she went on to talk about before

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 80

1    the shooting, she saw these guys, who turned out to be

2    the shooters, were pushing around this guy who was a

3    neighbor of his -- hers.

4       Q.   Did Ms. Coats ever indicate to you who the

5    police said they had in custody?

6            MS. HORN:  Can you say that again?  Sorry.

7    I missed the question.

8            MS. BITOY:  Sure.

9    BY MS. BITOY:

10      Q.   Did Ms. Coats ever indicate to you who the

11   police told her they had in custody in relation to

12   the shooting?

13           MS. HORN:  Object to form.

14           THE WITNESS:  Is that something I can answer

15   or --

16           MS. HORN:  Oh, yeah.  Yeah.  I'm just

17   objecting on form grounds.

18           THE WITNESS:  I don't know.  I don't recall

19   anything that would -- that she said that would answer

20   that question.

21   BY MS. BITOY:

22      Q.   Okay.  I'm going to move on to page 19 now.

23      A.   Deneen's nephew dates Dena -- who I think on

24   the previous page I spelled her name differently --

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 81

1   and she's Roy's daughter, I think, or a relative of

2   Roy.  She said Roy's house is directly in front of her

3   house.  They pushed Roy into his door right before the

4   shooting.

5            Next page.  One of the guy's mom at trial was

6   screaming at her.  Some other guy busted out window,

7   something, mistakenly shot her.  I don't recall this

8   part of the interview.  Two of them told on the other.

9   Now she's talking about -- if you could scroll up a

10  little bit -- police detectives told her before the

11  trial --

12      **Q.   Sorry.  What page were you -- are you**

13  **referring to now?**

14      A.   20.

15      **Q.   Oh, yes.  Okay.**

16      A.   Two of them told on the other.  The police

17  detectives told her before the trial at the lineup,

18  but -- I don't know what the next page says.

19      **Q.   And just to be clear -- I know it's not in**

20  **your notes here -- but did Ms. Coats give you any**

21  **indication as to who the police officers were that**

22  **told her that two of the guys had told on the other**

23  **before the lineup?**

24      A.   Only that they were the police assigned to

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 82

1    her shooting, not her grandfather's shooting.

2    But I don't think she told me names of police.

3    Not that I recall.

4        Q.    **Okay.**

5        A.    Oh, I think I asked her about the detectives.

6    She said they were two white guys not in uniform.

7    Detectives talked to her that night while doctors were

8    working on her.  She said it was crazy.  She said, my

9    little brother Pete -- who I think is her uncle -- was

10   an El Rukn.  And if you could scroll up a little bit.

11   There.  My little brother Pete was an El Rukn.  They

12   had a theory to put it on Pete, that they were looking

13   for Pete, meaning the shooters were looking for Pete.

14   And apparently, Pete lived at that address too with

15   Deneen or was connected to that address.

16           And then she wrote -- she said, I had to

17   think about it.  And maybe it was the next day in the

18   morning that the police showed her pictures of her

19   house and pictures of a gun.  And then she's referring

20   to -- she didn't use the term "photo array," but she

21   seemed to describe a photo array.  She said, I picked

22   out two of them in photos, two suspects who she

23   believed were shooting at her.  She said they had the

24   exact same -- well, I remember their faces.  I think

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 83

1   she started to say they were wearing the exact same

2   thing, and then she stopped and said, well, they --

3   she remembers their faces, and that's how she picked

4   out the two.

5       **Q.   Okay.  So based on your interview with**

6   **Ms. Coats, was it your understanding that she thought**

7   **that the shooting was gang related?**

8       A.   Well, she made the comment about -- I think

9   it was about Reggie maybe trying to join a gang.

10  And then she made the comment about Pete.  There was

11  this theory that Pete was the target.  There was this

12  theory that Reggie was the target.  So she never said,

13  I think it was gang related, but she made those two

14  comments.

15      **Q.   Okay.  And then in your notes, you have that**

16  **she told you that the police showed her pictures of a**

17  **gun and that she -- strike that.**

18           **In your notes, you stated that Ms. Coats**

19  **told you that she was able to pick out two photos of**

20  **perpetrators from the shooting that night; is that**

21  **accurate?**

22      A.   Yes.

23      **Q.   And she told you that she was able to see**

24  **the perpetrators' faces; is that accurate?**

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 84

1    A.    She said she saw -- I think she went on to
2  say she saw the faces of the first two guys who were
3  closest to her shooting at her.
4    **Q.    Did she give you any indication as to the**
5  **two individuals that she picked out of photographs?**
6    A.    You mean their name?
7    **Q.    Their name or any identifying**
8  **characteristics.**
9    A.    Not that I recall, not -- not names.
10  And I don't recall any identifying characteristics.
11    **Q.    Did you bring anything with you to your**
12  **meeting with Ms. Coats in terms of documents or**
13  **photographs, anything like that to show to her?**
14    A.    I'm pretty sure I did not.
15    **Q.    So you didn't have a photo of, for instance,**
16  **Mr. Weston or anything that you showed to her at this**
17  **meeting; is that accurate?**
18    A.    That's accurate.
19    **Q.    All right.    Page 23, please.**
20    A.    Okay.    I think she says, screaming mom.    He
21  got 25 years at sentencing.    He had the 9-millimeter,
22  proved that his gun killed the brother or son of the
23  police.    Paramedics were talking about her and the
24  dead guy.    At the lineup, the police said she saw

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 85

1  pictures of guns and picked out two -- I don't know

2  if that's guns, but it looks like guns -- and picked

3  out two of them as used on her.  I guess it is guns.

4  I don't actually remember this part, but -- and then

5  she had to think.  And she saw one guy per picture.

6  They showed her about 12 pictures and ultimately

7  picked four pictures, four people.  She went to

8  the lineup and picked out four guys.  That was her

9  recollection.  And first group of picks, that night

10  a few.  I think that's what that says.

11       Q.    Okay.  So based on your interview with

12  **Ms. Coats, it seems like a police officer showed her**

13  **a photo array at the hospital.**

14            **Is that where she stated that she viewed**

15  **the 12 pictures?**

16       A.    Yes.

17       Q.    **Did she give you any indication as to who**

18  **the officers were who showed her this photo array?**

19       A.    She just --

20            MS. HORN:  Object.  Beyond what she's

21  testified to?

22            MS. BITOY:  Yes.

23  BY MS. BITOY:

24       Q.    **I'm just trying to pin down if she gave you**

Royal Reporting Services, Inc.
312.361.8851

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 86

1    **any further indication when talking about viewing the**
2    **photo array and which officers were engaged in that.**
3         A.   No, just what I said earlier.
4         Q.   **Understood.  And Ms. Coats told you that she**
5    **picked out four individuals from the 12 photographs**
6    **who were involved in the shooting?**
7         A.   She said -- that's what it says here, but
8    what she told me eventually is she only picked out
9    two.  And then the police told her that those two guys
10   she picked out told the police who the other two guys
11   were.  And then the police actually picked -- showed
12   her who the third and fourth guys were.  So she really
13   only picked out two, and the police picked out a third
14   and a fourth person.  And those are the four people
15   she -- she kind of adopted that as her story and said
16   she picked out four.
17        Q.   **And I know that that's sort of referred to**
18   **later on in your notes, and we'll get to that.**
19             **But just in terms of what you have written**
20   **in your notes here, it says that she was showed 12**
21   **photographs and that she picked four photographs;**
22   **is that accurate?**
23        A.   That's what it says on this page.  But
24   earlier in my notes, there's a reference to two people

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 87

1    identifying two other people.  That was earlier that

2    we went over, I think.

3         **Q.    Okay.  All right.  Page 25, please.**

4         A.    Okay.  Second time showed her mugshots right

5    before the lineup in her hospital room.  Pages of

6    book.  I would say -- she would say to the police,

7    that looks like them, and they -- and what they would

8    do, she would point -- if you want me to read word for

9    word, I can tell you what I think this says, but I can

10   also paraphrase what she told me.  The word-for-word

11   part is they showed her bigger pictures, different

12   pictures of the same guy.  She picked four guys, four

13   larger pictures.

14            So what she told me is she would pick out

15   two -- she picked out a first individual.  And then

16   separately, they would have a larger photo of the same

17   guy she picked out.  And I said, was it the very same

18   photo, just larger, or was it just a photo of the same

19   guy but a different photo?  And she said it was a

20   photo of the same guy but a different photo.  You

21   know, like, he might be looking off in a different

22   direction or something.  And I said to her, are you

23   sure the larger photo was really the same person that

24   you picked up in the smaller photo?  And she said yes.

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 88

1          But that's how they did it.  So she picked

2     out a first guy, and they showed her a larger photo

3     of him, kind of set it down.  Then she picked out a

4     second guy from the photo array, and they showed her

5     a larger picture of that guy and set it down.  And

6     that's as many as she could pick out.  Then the police

7     told her, well, these two guys you picked out also

8     told us who the other two guys were, and here they

9     are.  And then the police showed her who the third

10    and fourth person were.

11        Q.   Okay.  So -- and I understand that, you

12    know, you're sort of elaborating on sort of your

13    independent recollection of things that Ms. Coats

14    told you.

15             But in terms of the notes that you have

16    written down on page 25, Ms. Swanson told you that

17    she was able to identify perpetrators -- or pick out

18    photographs of perpetrators from the May 29 shooting;

19    is that accurate?

20             MS. HORN:  Object to form.

21             THE WITNESS:  I'm not comfortable answering

22    that question if you ask me to take page 25 out of

23    context, really --

24    BY MS. BITOY:

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 89

1      **Q.   Just based on -- sorry.  Go ahead.  I didn't**
2   **mean to cut you off.  I'm sorry.**
3      A.   She did come forward to whoever, maybe to the
4   state's attorney's office, and say, yeah, these are
5   the four guys I picked out.  So maybe that was true.
6   But she came to pick out those four guys with the
7   input of the police on the third and fourth person.
8      **Q.   Right.  And I understand that that's your**
9   **contention based on, you know, what you're saying**
10  **your interview was with Ms. Coats.**
11         **I'm just saying, based on your notes and**
12  **specifically just based on page 25 where we're at**
13  **right now, Ms. Coats did tell you that she was able**
14  **to identify perpetrators from the May 29 shooting;**
15  **is that accurate?**
16         MS. HORN:  Object to form.  Object to the
17  extent you're asking her to take one page of a
18  30-plus-page exhibit out of context.
19         You can answer otherwise.
20         THE WITNESS:  Well, again, on an earlier
21  page, there's a reference to the two people she picked
22  telling the police who the other two people were.
23  And I just can't answer your question without
24  referring to that as well as page 25.

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 90

1    BY MS. BITOY:

2        **Q.   Understood.  I'm just saying Ms. Coats --**

3    **she was able to identify perpetrators.  I'm not saying**

4    **how many or under what circumstances, but she did tell**

5    **you that she was able to identify perpetrators.**

6            **What I'm just trying to get at is that she**

7    **never told you she had no idea who committed these**

8    **crimes; she was unable to identify who was involved;**

9    **is that accurate?**

10       A.   She told me --

11           MS. HORN:  Object to form.

12           THE WITNESS:  She told me she could pick out

13   two of the perpetrators, period.

14   BY MS. BITOY:

15       **Q.   All right.  And then page 26, please.**

16       A.   Police started -- I can't -- talking males or

17   taking males.  I'm not sure.  My little brother Pete

18   worked at a laundromat on Ashland.  I'm not sure what

19   that word beginning with F -- terrorized people on

20   Ashland.  Police work.  They would tear up Pete's

21   money after he got paid.  She remembers him taping

22   together the torn bills.

23           Next page.  Got jobs, shoe shop, candy

24   store, game room at laundry.  I'm not sure if she's

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 91

1  referring to Pete or herself.  And then I made a note

2  that Dana, at this point of the interview, told her

3  that he had been wrongfully convicted, and he told his

4  story.  He was exonerated by DNA evidence.  Then she

5  said Pete was an El Rukn.  She said he was not totally

6  innocent.  He was a good guy but worked his way up in

7  a drug gang.  Police caught someone who gave police

8  Pete -- gave police Pete's name.  Police got Pete,

9  threatened to lock him up with GDs in Cook County.

10  And --

11  **Q.   We're on page 29 now for the record.**

12  A.   Okay.  And she said that he would not live

13  one night -- I guess with the GDs in Cook County Jail.

14  And they forced him, she said, to confess to a federal

15  crime.  And she said Pete just got out of prison.

16  **Q.   Okay.  So it was your understanding, based**

17  **on your interview with Ms. Coats, that Pete was facing**

18  **a federal drug case?**

19  A.   Yes.

20  **Q.   I'm sorry.  We're now on page 30.**

21  A.   Okay.  Burge detectives threatened Pete.

22  One thing I knew was a lie is -- one thing I knew

23  was a lie is detective tried to convince me they were

24  coming after Pete.  Pete cried after she got shot and

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 92

1  said, sorry they did this.  I guess she said Pete is

2  6-foot, 4-inches tall.

3     **Q.    And I notice here that you have, Burge**

4  **detectives threatened Pete.  I think you've previously**

5  **testified that Ms. Coats didn't affirmatively know who**

6  **Burge was or didn't tell you that she knew who Burge**

7  **was.**

8         **So this part of the interview -- or your**

9  **notes, is that something that you sort of implemented**

10 **based on your own independent research and not based**

11 **on what Ms. Coats told you?**

12        MS. HORN:  Object to form.  Object,

13 mischaracterizes her testimony.

14        You can answer.

15        THE WITNESS:  Yeah.  I think she told me

16 Burge detectives threatened Pete.  I really didn't

17 recall that, but that wasn't based on my research.

18 BY MS. BITOY:

19    **Q.    So how did Ms. Coats identify -- or how did**

20 **Burge's name come up?  How did she say that she knew**

21 **who Jon Burge was?**

22        MS. HORN:  Object to form.

23        Go ahead.

24        THE WITNESS:  She just brought it up.

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 93

1   This whole thing really surprises me because Pete's
2   case was a federal case.  I don't know why she said
3   Burge detectives threatened Pete.
4   BY MS. BITOY:
5       Q.   Okay.  So it's your testimony then Ms. Coats
6   brought up the name Jon Burge specifically to you?
7       A.   That's what my notes seem to indicate,
8   but I really don't have an independent recollection
9   of that.
10      Q.   Okay.
11      A.   Like I said, just reviewing these notes all
12  these years later, this one part kind of surprises me.
13      Q.   Okay.  Down to page 31, please.
14      A.   Okay.  Then Deneen herself is 5-foot-4.
15  She said, my dad's case -- oh, my dad's case got
16  mixed with my case.  It was crossing at every chance.
17  I felt it was confusing.  She said, when it came to
18  my dad's case, it was a matter of catching the guy.
19  My dad had police on his payroll.  Her dad, who was
20  actually her grandfather, was murdered.  It was part
21  of a double murder.  But she's saying he had police on
22  his payroll.  Police are adamant about -- I'm not sure
23  what this next word is -- having somebody behind bars.
24  I forgot -- oh, Maurice.  Maurice was the suspect in

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 94

1  her grandfather's murder, or who she refers to as

2  her dad here.  Police are adamant about having

3  Maurice behind bars.  Something in Vegas.  I remember

4  Maurice -- whose name I -- last name I've forgotten

5  at the moment -- was in Las Vegas.  Mom and dad not

6  together -- I think long time before the shooting

7  or something.  I'm not sure what this says.

8  My handwriting isn't very good.

9       Q.   Okay.  So just a few questions here.

10           So Ms. Coats was telling you about her

11  father's -- or her father was murdered.  Is that what

12  your testimony is?  I'm sorry.  Was it her father or

13  her grandfather?

14      A.   She refers to him as her father, but he's

15  really her grandfather.

16      Q.   Okay.  And it's your testimony that Ms. Coats

17  told you that police were also investigating that case

18  at the same time that they were investigating the

19  May 29, 1990 shootings?

20      A.   That's correct.

21      Q.   But I think you testified earlier that it was

22  different police officers, correct, who were involved

23  in those investigations, based on what Ms. Coats told

24  you?

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 95

1      A.   That's right.  That seemed to be what she

2  said earlier.  That's why I had A and B, different

3  detectives on each case.  But here, she said -- later

4  in the interview, she said it was mixed, and it was --

5  she said, I felt it was confusing.

6      **Q.   Okay.  All right.  Page 33, please.**

7      A.   Well, here's Burge again.  It says, Pete did

8  two years with Burge detectives because my cousin Don

9  who did it.  I don't remember this, but that's what

10  she apparently said.  Don brought his Japanese friend

11  to stick up Pete.  Don told his dad it was Pete.

12  Burge police got Pete.  And police told her mom she

13  lied regarding alibi, Pete at home.  I don't know

14  this next word.  It looks like Quinn, but -- murder,

15  DNA got him out.  Don finally said, I lied on Pete.

16  So she's talking about Pete's case, which I wasn't as

17  interested in, but I took these notes on what she had

18  to say.

19      **Q.   Okay.  Page 35.**

20      A.   The hat.  Two front shooters had caps on.

21  She remembered the hat.  And that looks like page of

22  hats.  Oh, she apparently was showed a page of hats,

23  and she picked out the hat.  The police showed her

24  picture of one guy.  She said, yeah, that's him with

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 96

1    a hat.  When the state's attorney prepped her, at

2    least that one guy, I can close my eyes.  I think she

3    was saying I can close my eyes and picture him, but

4    the notes say, I can close my eyes.  Then she said,

5    I could say that about two of them.  The other two --

6    is there something above that, I could say about two

7    of them -- no?  I remember her saying she was

8    100 percent sure about two of them.  The other two,

9    80 percent.  But this just says, the other two,

10   80 percent.  The front two looking dead at me, such

11   a big gun.  Then she said yes.  And the detective --

12   the first two told the other ones.  So the first two

13   that she picked out, according to the police, told

14   the police who the other two culprits were.

15       Q.   And just for clarity, you're unaware

16   exactly who Ms. Coats identified in terms of the two

17   that she said that she was 100 percent sure of her

18   identification; you don't know who those two

19   individuals are; is that accurate?

20       A.   That's -- that's accurate.

21       Q.   But Ms. Coats also told you that she saw that

22   the shooters were wearing hats?

23       A.   She said the two front shooters had hats on.

24       Q.   Okay.  And she also told you that she --

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 97

1  prior to testifying at, I assume, Mr. Weston's

2  criminal trial, she had met with the state's attorney

3  who prepped her; is that accurate?

4      A.   That's what it looks like right here, yes.

5      Q.   And she told -- I was confused.  Did she tell

6  the state's attorney or she told you that at least one

7  guy she was able to see so clearly that if she closed

8  her eyes, she would still be able to identify him?

9      A.   Yeah.  I don't know if she told just me that

10 or if she was saying that's what she told the state's

11 attorney.  I just don't know.

12     Q.   Okay.  And she also told you that while she

13 was 100 percent sure that she could pick out two of

14 the perpetrators of the shooting, the other two that

15 she picked out, she was only 80 percent sure of;

16 is that correct?

17     A.   That's correct.

18     Q.   And she also told you that the front two

19 shooters locked eyes with her or they -- is that --

20 I'm sorry.  Is that accurate --

21     A.   She said, the front two were looking dead

22 at me.

23     Q.   Okay.  Okay.  Page 37.  I think we're almost

24 done.  So sorry.

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 98

1      A.   It looks like I wrote the word "confirm"

2   or "confess" with a question mark.  Then it says,

3   detectives said first two.  Police.  They implied --

4   underlined -- they confessed and told on the other

5   two.

6           So, again, here's where she's telling me the

7   police implied that the first two who she picked out

8   of the photo array confessed, and those two told the

9   police who the other two shooters were.

10          Next, it says, police had photos in front of

11  her, two photos Deneen picked.  Police said they --

12  those two told on the other two.  And then they showed

13  her, Deneen, meaning the other two photos.

14          And then on the next page, it says, he

15  got 25 years.  In the hospital when they thought I

16  wouldn't make it early on.  You told me you knew who

17  did it.  This boy died in the elevator with me.

18  That's what it says.  I'm trying to figure out who

19  "you" is.

20      Q.   Did Ms. Coats ever tell you that the two

21  individuals that she viewed in photos, that she saw

22  them -- those individuals again in a lineup that she

23  viewed?

24      A.   I don't know if she expressly stated that,

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 99

 1   but -- and she said she picked four people out of the

 2   lineup, which I don't think was corroborated with the

 3   police report.

 4       Q.   Did Ms. Coats tell you that police told her

 5   who to pick out of the lineup when she viewed the

 6   lineup at the police station?

 7       A.   I don't recall the answer to that, if she

 8   did or did not, but I don't think -- I don't recall

 9   her saying that.

10       Q.   And that's also not reflected in your notes,

11   at least thus far, correct?

12       A.   Correct.

13       Q.   Okay.  I'm sorry.  Did we go through -- okay.

14   We're now on page -- I think this is 39 and 40.

15       A.   Right.  It says, first group of photos.

16   Where?  Shown to her in the hospital.  When?  Early

17   on, meaning the same day as the shooting or the next

18   day.  She picked two -- this was the end of the

19   interview, and I was summing up with her, you know,

20   like, making sure I had everything accurate.

21   She picked two photos.  They were the two she was

22   100 percent sure of.  Question mark.  Something about

23   his cap and a bright -- oh, a bright neon-colored cap

24   and another one had a dark hat.  It says, front

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 100

1    shooters had -- had the hat.  And it says, next,

2    357 Magnum.  Then it says, second group of photos,

3    book of pages of small photos.  She was shown this

4    where?  In the hospital room a few days before the

5    lineup.  When?  I don't think I knew when.  She picked

6    two, and police showed her larger pics of the two.

7    Then police said those two implicated the other two

8    who were picked by the police.

9        Then the next page said, when did police

10   tell you they had the guys who shot officer's kin --

11   when did police tell you they had the guys when they

12   shot the officer's kin?  She said at the hospital the

13   next day after the shooting.  Police said he --

14   meaning the person who died, the victim who died --

15   was coming from the store.  And she said the police

16   did not want to tell her he died, but she already

17   knew because he was in the elevator with her and died

18   there.

19   Q.   Okay.  Thank you for reading that.  So it

20   sounds like Ms. Coats told you that she was shown two

21   groups of photographs.

22        Do you know if -- did she tell you that she

23   was shown those two groups at the same time, or were

24   these separate meetings with police?

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 149

1    Maurice McDonald for killing her father or

2    grandfather, who was a known drug dealer.  And it was

3    only after Deneen was shot that things started moving

4    along faster on the Maurice McDonald case.

5         **Q.   And you also say that the State withheld from**

6    **the defense important information about Deneen Coats.**

7              **Were you in possession of Mr. Katz's file?**

8         A.   He did provide to me what he called his file

9    on Demond's case, which I shared with -- I basically

10   was the messenger who picked it up from his home and

11   shared it with the attorneys representing Demond.

12        **Q.   And which attorneys did you share that with?**

13        A.   The McGuireWoods attorneys.

14        **Q.   So it's your testimony that you knew all**

15   **of the information that Mr. Katz had at the time of**

16   **Mr. Weston's criminal trial?**

17        A.   No.  I knew the information that Mr. Katz

18   provided, which was a small amount of information that

19   fit in a plastic grocery bag.

20        **Q.   I guess I'm just trying to understand, how**

21   **is it that you know that Mr. Katz was unaware about**

22   **these -- what you're claiming is key facts about**

23   **Ms. Coats?**

24        A.   Well, I think Demond Weston indicated he

Demond Weston v. City of Chicago; et al.
Deposition of Susan I. Swanson - Taken 12/13/2023

Page 150

1    knew nothing about it, and if his attorney had known

2    something about it, he would have shared that

3    information with him.

4        Q.   You also state a little bit further down

5    that you believed that Mr. McDonald could have been

6    an alternative suspect to the -- strike that.

7            You state that Mr. McDonald could have been

8    an alternative suspect to Ms. Coats' shooting; is that

9    accurate?

10       A.   Yes.

11       Q.   Have you ever interviewed Mr. McDonald?

12       A.   No.

13       Q.   And you also reiterated in your report a

14   little bit further down, as was reflected in your

15   notes, that Ms. Coats described the police officers

16   as superheroes to you --

17       A.   Yes.

18       Q.   So is it fair to say that during your

19   interview with Ms. Coats, she never voiced any

20   concerns about her dealings with detectives

21   investigating her shooting?

22       A.   Actually, she did.  She said at one time she

23   considered them superheroes.  Then she saw how they

24   treated her uncle, Pete, and she -- she had a

# Exhibit 53

Deneen Coats
Labor Day 2010
9-6-2010

Privileged
&
Confidential

Attorney Work Product

Exhibit 3

Swanson 004059

home from college    Reggie-door
Ambulance    at Reggie house
                    (from college
Took forever    ( Lst. house
                    on & off
                    he bag 100 = love

inside front porch
Gate around outside

looked down block
8 guys
                to far
right of her house on corner
walked to front of house
started shooting                    1

Ron & Reggie inside
    I was standing
    shot - l. femur

Top of stairs
    shot in back
    9 mm
exploding bullets
    femur broke to pin
told my ?? never walk

Cordless phones ?? came
Reggie not know how to
use it                    2

She made it inside front porch

Ambulance guys
    joking about my
    breast size.

Told Reggie to put
    phone to my ear, told
him to push this button,
    that button.
Ron held door shut
W/ his foot, they were
Shooting    shot in
foot holding door.        3

Ambulance guys said they take
her Cook County Hosp.
    I begged & pleaded
    no. Michael Reese
County head bed drs.
Keep    house shot up w/
    9 mm bullets.    actual
                        grenade
My mom (Dorothy)
was lying there. She
came home, seen light
on phone. Cept in basmt.
Mom called down.        4

Swanson 004060

Went to front porch
Aunt Gwenn
was in back house
(where garage wd be).

Mom saw towel on
floor & one of
Reeven's gym shoes.
Not right.

Police then rang
door bell. Told mom
don't know if Reeven
survived.                    5

A week they were
pulling bullets from
our house

2 guys in front had
similar guns
2 behind had
smaller guns

Thought - guns can't
be real.                    6

Police came to hospital
to get Deven.
Police
asked her mom
if she'd survive.

Reggie said, but
tell police anything -
Reggie lot of guilt -
Speculated he
knew more about
them. Before study
started, Reggie      7

said, "Wrap up
now, folks?"

I think he was more
of "intended target"
than me.
Deven didn't know
"folks" referred to
gangs ther.

All went to same Catholic
school, same H.S.      8

She was shot
4 x in back
left femur explod'g
2 still in me now.
9 mm bullets.

They went thru
whole neighborhood
shooting. Other
guy on stretcher w/
her in elevator.
He died. He's 9

dead or somth'g
was police.
He com'g from the
store.

Reggie may have
been try'g to be
in a gang. He
try'g to be slick.

St. Ray - few (?)
59/60 - 61 $\frac{1}{2}$ —

10

40 oz. drive to
Sherman Park, hey
out — college at
Cartnage Western
in Macombe, IL

came home evry wkd
or tried to.

Sigma... was abt
to pledge... mm call
I had to talk to my
family evryday.

11

Business major

Wanted to be
lawyer - Slowly
changed track

Set up hospital rm
in the house.
To display,
if I see 3-4 black
guys, I'll walk
the other way.

My family endishm'd
or not.

12

Has to do w/
where she chose
to live.

Will move back
to city after this
hospital stay.
Will help take

Mom lives w/her.

13

Mom = Grandma

Clarissa ) technically
Pearl ) aunt's mom

mom age 13 had
Dwam -
They found this an
Apt. in Chatham
80s

14

Wooddale - walks
from

in hosp almost a
month.
Dets. talked to her
in chospital.

A few years after my
dad got killed
(A) One set u me selting shit
(B) " " for my dad selting
with 15

A cross over of
who was w/ who
for what.

Dets. heard Cootz was
there.

Once they cleared me to
see the line up
I [?] asked y 1 col pick
them out. Yeah

16

Police station - no
elevator, Police
carried her up in
wheelchair.

Doctor cleared her to go
do that.

About a week after
shooting.

*Police told her:
We think we have
the guys. They shot
up another porch ~~but they~~
full of kids. ~~other~~ (17
We have the one who killed the boy.

---

the ~~boy~~. Can
you pick him out?

Reggie Trae. ~~Roo~~
~~Po~~ I told him
not to pick anyone
out - they'll come after u.
me: How did you see?
Street light in front
of her house. Dennis
guilt-dad was
Roy - say - they rush by
around. Dina — 18

---

*~~Dennis~~ nephew
dates ~~Rosa~~ ~~Dina~~
Dena

Roy's house directly
in front of her house
They pushed Roy
into his door. Right
before shooting.

19

---

Them guys home at
trial - screaming
at her ...

Some other guy busted
out window.

him
mistakenly shot her.

2 of them told on the other

*Police - dets told
her before the trial
at the lineup true
20

Defs = 2 White Guys
not uniform

Defs talked to her
that night while
doctors working on
her. Crazy

my little bro Pete was
an El Rukn
sorry to put up a
Pete, that they were
looking for Pete.     21

---

Had to think about
I...

Maybe next day a.m.
police showed
her pictures of her
house
Pictures of a gun
of

I picked out 2 of
them in photos.
They had on the exact
same — well, I
under their faces.     22

---

Scaring mom
He got 75 years at
Sentencing — He had
9 mm

Proud that his gun
killed bro/son of
police.

Paramedic talking about
her 'n dead guy

At lineup — police
said

She saw pictures of
guns & picked out 2
of them as used on her.     23

---

Had to think

One gun per picture.

Showed her about
12 pictures
& picked four pics.

Went to lineup's
picked out 4
guys.

1st group of pics — that was
a few.     24

Swanson 004065

2nd time showed her
mug shots
right before lineup
in her hosp. room.

pages of book —
I would say — that clothes
the guy                    too

They showed her
bygin picture
different picture
of same guy.
6 in picture
4 snip, 4 large picture /25

Police
started telling me
my little boy Pete
worked at
laundrymat
Ashland.
Freaky terrorize
people on Ashland
Police would
tear up Pete's
money after guy
paid. Tapes to the
other bills /26

Got job
shoe shop, candy store

Game room at
laundry.

— Dana told his story
———

Pete was an El Rukn
└ not totally innocent
└ a good guy but
worked his way
up to year in drug
gang

Police caught someone
who gave police Pete

Police got Pete, tried
to lock him up w/
GDs in Cook County 3/28

/27

Swanson 004066

not live / not —
must confess to
federal crim. Pete
just got out.

Dana — guy choked,
window, covered to
a cam.

/29

Broge detectives
threated Pete.

One thing I knew was
a lie — is detect
tried to convince me
they were cops after
Pete.
I cried, said
sorry they died this

6'4" = Pete

/30

Deneen — 5'4"

My dad's case got
mixed w/ my
case. It was
crazy at every chance.
I felt it was
coping.

When it came to my
dad's case, it
was a matter of

/31

catch the guy.
my dad
/ had police
on his payroll

police are adamant
about buggy maroui
behind bars. / death now
in Vegas

Mom & Dad not together
long time before this
/32

Pete did 2 years
w/ Burge detectev
cuz my crunkon
who died it

Ron bought his Javeine
fried to ____ of Pete.
Stitch

Told his dad it was Pete.
Burge police got Pete.

(33)

Rotie told her mom
she lie re alibi
(Pete at home)     murder
Quinn
         DNA got him
         out

Don finally said did
on Pete.

(34)

The hat
2 front shooters had
Caps on. Rember
hat
page of hatz
    L picked out hat

Showed her pic of one
guy. She said
yeah, him w/ hat.

When state Atty
prepped her, at least
that one guy. I can
close my eyes (35)

I col say that abot
too of them
the other too - 80%.

The front too
looking dead at
me. Such a big
gun.

yes. my det the front
two told on the
other ones

(36)

Swanson 004068

cntra⁷,
Rob said first
two
Robie,
They implied they
confessed & told on
other two.

Police had photos
in front of her
two photo Denver
parked. Police said
they (two) told on
other two, showing
her other
two photos / 37

He got 25 years

In hospital
when they thought
I want make it.

dug on.

You told me you knew how did
it. This boy did in
elevator w/ me.
/ 38

1st group of photos
when shown to her in hospital
early on (same/next day)
She picked 2 photos
where they this she was
100% sure of? (brite
front shooter — that his cap
next .351 magnum   9mm
2nd group of photos
book of pages of
small photos   days
hospital room after run
day she was taken to police
station to saline up
She picked 2 & police
showed her larger pix
of the two. Then
police - said those 2
implicated these other 2
(picked by police).

(who officers
When did police tell
you they had the guy?
- at hospital   right?
- just before
- other
· next day after
shooting
Police said
He was coming from
store. [Did not want
to tell her he died.]
But already knew
cuz she is elevator w/
him- he did tell.

9-15-10

Room 3406
Replen in

Swanson 004070

1985

nes I went to court on ~~whatever~~ off.
They got plea bargain.

They (AS) showed no remorse

She went to court twice).

2 guys ~~plea bargain~~
bench trial, no jury
both got 25 years

mom went off on her at sentencing.

Police helped her help them
She picked first two. They (cops)
helped her by telling her
the 3rd & 4th guys ~~~~
implicated by first two.

She felt like:
A friend who shot me.
U my super hero

A lot of therapy
into more of big shot

773-699-6066

Pearl Coats

Swanson 004073

# Privileged & Confidential
## Atty work
### product

Hospital phone
630-856-5402

1985

nes I went to court on ~~until~~ off.
They got plea bargains.
They (Δs) showed no remorse

She went to court twice.

2 guys ~~plea bargain~~
bench trial, no jury
both got 25 years

mom went off on her at sentencing.

Police helped her help her
She picked first two. They (cops)
helped her by telling her
the 3rd & 4th guys ~~had b~~
implicated my first two.

Ogden William
Denied father Ogden

Swanson 004074

She felt like:
A friend who shot me.
My super hero

A lot of therapy
into much of my stuff

773-099-6066

Pearl Coats

Swanson 004076



Deneen Cooks
Labor Day 2010
9-6-2010

Privileged
&
Confidential

Attorney Work Product

Swanson 004077

**1**

Reggie-door

home from college
off Reggie house
Ambulance (from college
took forever    Lst hour

on + off
phone
too in love

inside front porch
gate around outside

hooked down block
8 guys
together
right of her home in corner
walked to front of home
started shooting    1

**2**

Ron & Reggie inside
I was standing
shot - l. femur

top of stairs
shot in back
9 mm
exploding bullets
femur broken in pieces
told me never walk

Cordless phones just came
out
Reggie not know how to
use it.

**3**

Shenade I inside front porch

Ambulance guys
joking about my
breast size.

Told Reggie to put
phone to my ear, told
him to push this button,
that button.

Ron held door shut
w/ his foot, they were
shooting - shot a
foot to my down.

**4**

Ambulance guys said they take
her
to Cook County Hosp.

I begged & pleaded
no - Michael Reese

County head bullet drs.
Her femur shot up w/
9 mm bullets.    actually
grandmother

My mom (Dorothy)
was living there. She
came home, saw light
on phone. Can't in basmt.
mom called down.

Swanson 004078

Went to front porch
Aunt Gwenn
was in back house
(where garage sd be).

Mom saw towel on
floor & one of
Reeven's Sega shoes.
Not right.

Kolie then rang
door bell. Told mom
don't know if Reeven
survived.

5

A week they were
pulling bullets from
our house

2 guys in front had
similar guns
2 behind had
smaller guns

Thought - guns can't
be real.

6

Police came to hospital
to get Reeven.
Kolie asked her mom
if she'd survive.

Reggie said, but
tell police anything -
Reggie lot of guilt -
Speculated he
knew more about
them. Before study
started, Reggie

7

said, "Wrap up
now, folks?"

"I think he was more
of "intended target"
than me.

Reeven didn't know
"folks" referred to
gangs there.

All went to same Catholic
school, same H.S.

8

Swanson 004079

She was shot
4 x in back
left femur exploded
2 still in me now.
9 mm bullets.

They went thru
who a niggwood
shooting. Other
guy on stretcher w/
her in elevator.
He died. He's  9

dad or somthg
. was police.
He comg home fm
store.

Reggie may have
been tryg to be
in a gang. He
tryg to be slick.

St. Ray - fw (?)
59/60 - 61 st 1/2 —
10

40z. drove to
Sherman Park, hung
out
college at
Cartrage Westernllm
in macombe, IL

came home evry wkd
or tried to.

Sigma ... was abt
to pledg ... mm called
I had to talk to my
family evryday.
11

Busenes major

Wanted to be
lawyer - slowly
changd track

Set up hospital room
in the house.
To this day,
if I see 3-4 black
guys, ill walk
the other way.

My family endured
a riot.
12

Swanson 004080

Has to do w/
where one chose
to live -

Will move back
to city after this
hospital stay -
will help take

Mom lives w/ her.

13

---

Mom = glenda

Clarence ⟩ technically
Pearl ⟩ autism

mom age 13 had
Runs -
They found them an
Apt. in Chatham
80s

14

---

Wooddale - works
there

She hosp. almost a
month.
Dets. talked to her
in hospital.

A few years after my
dad got killed
(A) One set u me gultis [?] not .
(B) " " for my dad getting
killed 15

---

A cross over of
who was w/ who
for what.

Dets. Leard Colutz was
here.

Once they cleared me to
see the line up
I asked if I could pick
them out. Yeah

16

Swanson 004081

Polio station - no
elevator, Police
carried her up in
wheelchair.

Doctor cleared her to go
do front.

About a week after
shooting,
*Police told her:
We think we have
the guys. They shot
up another porch
full of kids. [17]
We have the one who killed the boy.

the boy. Can
you pick him out?

Reggie Tree.
I told her
not to pick anyone
out - they'll come after u.
me: How'd you see?
Streetlight in front
of her house. Dennis
girlfriend dad was
Roy - gay - they ran by
around. Dina — [18]

Dennis nephew
dates Dena
Dena

Roy's house directly
in front of her house
They pushed Roy
into his door. Right
before shooting.

19

They guys home at
trial - screaming
at her ...

Some other guy busted
out window.

high: mistakenly shot her

2 of them told on the other
*Police - dets told.
her before the trial
at the lineup too [20]

Swanson 004082

Defs = 2 white guys
not uniform

Defs talked to her
that night while
doctors working on
her. Crazy

my little bro Pete was
an El Rukn
Trying to put up a
fiete, that they were
looking for Pete. 21

---

Had to talk about
J...

Maybe next day a.m.
police showed
her pictures of her
house
Pictures of a gun
of

I picked out 2 of
them a photos.
They had on the exact
same — well, I
remember their faces. 22

---

Saving mom
He got 29 years at
Sentence — He had
9 mm

Proud that his gun
killed bro/son of
police.

Paramedic talking about
her & dead guy

At lineup — Police
said.

She saw pictures of
guns & picked out 2
of them as used on her. 23

---

Had to teach

One gun per picture.

Showed her about
1 dz pictures
& picked four pics.

Went for lineup's
picked out 4
guys.

1st group of pics — that was
a few.
24

Swanson 004083

3rd time showed her mug shots

right before leaving in her hosp. room.

pages of book —
I would say — that makes them

They showed her bigger picture different picture

of same guy.
8 in picture
4 small, 4 larger picture /25

Police
started telling me
my little boy Pete
worked at
laundrymat
Ashland.

Freaky terrorize
people in Ashland.
Police would
tear up Pete's
non gang stuff he
said. Taping to the
or other bills /26

Got into
Shoe store, candy store

Game room at
laundry.

— Dana told his story

27

Pete was an El Rukn
[ not totally innocent
[ a good guy but
worked his way
up to year in drug
gang

Police caught someone
who gave police Pete

Police got Pete, tried
to lock him up w/
GDs in Cook Cnty 3/28

Swanson 004084

not live / not —
must confess to
a federal crime. Pete
just got out.

Dana — guy choked,
window, extended to
a crime.

29

Bruge detectives
threatened Pete.

One thing I knew was
a lie is detect
tried to convince me
they were coming after
Pete.
I cried, said
sorry they did this

6'4" = Pete

30

Deneen — 5'4"

My dad's case got
mixed w/ my
case. It was
crazy at every chance.
I felt it was
coming.

When it came to my
dad's case, I
was a matter of

31

catch the guy.
my dad
/ had police
on his payroll

police are adamant
about having someone
behind bars. /
dead now
in Vegas

Mom & Dad not together
long time before thing

32

Swanson 004085

Pete did 2 years
w/ Burge detectives
cuz my crimton
who died it

Don't forget his Javence
fred to pent up Pete.
stich

told his dad it was Pete.
Burge police got Pete.

33

Robie told her mom
she lie re alibi
(Pete at home)
murder
Quin
DNA got him
out

Don finally said I did
on Pete.

34

The hat
2 front shooters had
caps on, Rember
hat
page of hats
L picked out hat

Showed her pic of me
guy. She said
yeah, him w/ hat.

When states Atty
prepped her, at least
that one guy. I can
close my eyes.

35

I cld say that abod
too of them
the othe too - 80%

The front too
looking dead at
me. Such a big
gun.

yes.
They did the front
two told for the
other ones

36

Swanson 004086

con't,

Rek said first two

Robis. They implied they

confessed & told on other two.

Police had photos in front of her in photo review two photo review pic'md. Police said they (two) told on the other two, showed her other two photos.

37

---

He got 25 years

The hospital when they brought it. I went neuter on

I stay on

you told me you knew how did it. This boy did it ofwater w/ me.

38

---

1st group of photos when shown to her in hospital when early on (same/next day)

She picked 2 photos (black hat) where they think she was 100% sure of? (brite men) front shots - his cap .357 magnum big gun 9mm

2nd group of photos book of pages of small photos where hospital room a few days when day she was taken to police station to saline up

She picked 2 & police showed her larger pix of the two. Then police - said those 2 implicated these other 2 (picked by police).

---

(was most officers kin)

When did police tell you they had the guys?

- at hospital the night?
- just before the up.
- other

· next day after shooting

Police said He was coming from store. (Did not want to tell her he died.)

But already knew cuz he is elevator w/ him - she did tru.

Pearl

2 days ago - operation

we feel so bad

my son - 1½

anything we c

Decners

630-856-
6185

Swanson 004088

-Pepper

was told

Not 80%
it got the wrong

Brother told his

Boss u can do this.

Swanson 004089

CP - School
CD ally
Erin & Luis
K bread > mom + Dad
Binefobu

Swanson 004090

Suddenly
Serious)

I document
lung disease
causes lung to
Collapse

bubbling in box —
one of my lungs has a
hole
take lung out, adhere
back w/dust

Swanson 004091

Dilatid

morphine

Step-down

Swanson 004092

*(circled)* Get Transcript of Perces →

- working for a Chgo law firm — McGuire Woods
- atty's there are looking into police practices used by Chgo police dept past years ago

— Particular police conduct of detectives reported to Commander Jon Burge

— Heard of Burge?

— Sorry to read that 20 years ago you were the victim of a shooting that took place on your front porch

— May we talk w you about what happened and how the detectives investigated that shooting? How police treated you, what transpired as police investigated the shooting

— Altho a number of people were charged w/ those shootings, we think one person they picked up was not involved. Police were looking for particular involved — and may have mistakenly picked up someone who — they asked him if he was Bw.

1. What happened May 29, 1990?

2. In what order did the three shooting occur? How do you know?

3. What did the police tell you regarding suspect ~~to most get~~ or ind. pursual.

4. Did they tell u anyone confess?

5. Did you view a line-up? How many?

6. How did police/ASA prepare u for line-up?

7. Trial – how did they prepare u for trial?

8. We also read that you testified in another case. Defendant Maurice McDonald was charged w/ murder your grandfather & another person.

9. Why did it take so long to bring that case to trial?

~~9. How did police Istate~~

10. Did your family have to prod the police/State to move forward in prosecuting McDonald?

Swanson 004094

11. Why was the McDonald trial after the trial about the 38 working?

12. Did police say they won't move forward w/ the prosecution of McDonald unless you testified the way they wanted it to in the Dennal Watson case?

Swanson 004095

# Exhibit 54

# SUSAN SWANSON
## Licensed Private Investigator

January 3, 2011

Ms. Deneen Coats
447 Colfax Avenue
Clarendon Hills, IL 60514

Dear Deneen,

I hope that in the past few months since we met that you have been having a good recovery from your surgery. I can only imagine the pain you've been going through.

Whenever you're feeling up to it, I would like to meet with you again and perhaps speak in more detail about the events of 1990-1992. Would you mind calling me or dropping me a line when you're feeling well enough?

As Dana and I have said before, we admire your openness and spirit of cooperation. I wish you good health in the new year.

Yours truly,


Susan Swanson


**Exhibit 4**

Swanson 017235

# SUSAN SWANSON

### Licensed Private Investigator

September 13, 2010

Ms. Deneen Coats
447 Colfax Avenue
Clarendon Hills, IL 60514

Dear Deneen,

It was a pleasure meeting you last Monday. As I mentioned on the phone yesterday, I am sending you some information about Demond Weston's attorneys at McGuire Woods. Their names are Luis Pinedo and Erin McAllister. Their bios are enclosed. Both of them graduated from Northwestern University School of Law, where they both worked for the Center on Wrongful Convictions.

Luis is the attorney who would like to meet with you this Friday, IF you are feeling up to it. Please do whatever is best for your recuperation.

I admire what you are doing, and I know that Dana feels the same way. By the way, I am enclosing a piece on Dana as well.

I thank you for all your efforts.

Yours truly,


Susan Swanson

Enclosures

Swanson 017236

# Exhibit 55

Affidavit of Lauren Lebata

I, Lauren Lebata, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746
the following:

1.  I am a paralegal at Loevy & Loevy.

2.  There are two police files that the City of Chicago produced in this litigation. One is
    bates stamped CITY-DW 71-310 and CITY-DW 9338-9350, and has been referred to as
    the Investigative File. The other police file that the City of Chicago produced in this
    litigation is bates stamped CITY-DW 11-70, and is referred to as the Permanent
    Retention File.

3.  I have reviewed the contents of the Investigative File and the Permanent Retention file.

4.  Detective Tovar authored a report documenting his evaluation of the June 4, 1990
    polygraph of Kavin McMorris (hereinafter referred to as the "McMorris Crime
    Laboratory Report"). The McMorris Crime Laboratory Report is attached hereto as
    Exhibit A. The McMorris Crime Laboratory Report is in the Investigative File and it is
    also in the Permanent Retention File.

5.  There are additional materials relating to the polygraph of Kavin McMorris that Detective
    Tovar created: the Polygraph Case Review, the Polygraph Examiner's Worksheet, and the
    Polygraph Subject Consent. Those additional materials are attached hereto as Exhibit B
    to this affidavit.

6.  None of the documents in Exhibit B are in the Investigative File. Additionally, none of
    the documents in Exhibit B are in the Permanent Retention File.

7.  There is no General Progress Report ("GPR") or other notes of an interview with Kavin
    McMorris in the Investigative File. There is also no General Progress Report ("GPR") or
    other notes of an interview with Kavin McMorris in the Permanent Retention file.

8.  There is no General Progress Report ("GPR") or other notes of an interview with
    "Shank" in the Investigative File. There is also no General Progress Report ("GPR") or
    other notes of an interview with "Shank" in the Permanent Retention file.

9.  There is no Supplemental Report or other police report documenting an interview
    with Kavin McMorris in the Investigative File. There is also no Supplemental Report or
    other police report documenting an interview with Kavin McMorris in the Permanent
    Retention file.

10. There is no Supplemental Report or other police report documenting an interview
    with "Shank" in the Investigative File. There is also no Supplemental Report or other
    police report documenting an interview with "Shank" in the Permanent Retention file.

11. The Cook County State's Attorney ("CCSAO") produced a file in this case for the prosecution of Plaintiff and his co-defendants (hereinafter referred to as the "CCSAO File"). The CCSAO File is bates stamped CCSAO 1-3641.

12. I have reviewed the contents of the CCSAO File.

13. There is no subpoena in any of the police files that I reviewed for the materials in Exhibit B. That is, there is no subpoena seeking Detective Tovar's Polygraph Case Review, Polygraph Examiner's Worksheet and Polygraph Subject Consent for the polygraph of Kavin McMorris in the Investigative File or the Permanent Retention File.

14. There is also no subpoena in the CCSAO file for the materials in Exhibit B. That is, there is no subpoena to the Crime Lab seeking the Polygraph Case Review, Polygraph Examiner's Worksheet and the Polygraph Subject Consent for the polygraph of Kavin McMorris. There is also no subpoena in the CCSAO File to the Crime Lab issued by Bernard Murray, the Assistant State's Attorney who prosecuted Demond Weston for the murder of Joseph Watson and attempt murder of Timothy Jones, Deneen Coats and Ronald Nesbitt.

15. Susan Swanson testified that Deneen Coats told her that prior to viewing the lineup, police officers showed her photographs of possible perpetrators. Swanson Dep. at 86:4-16, 100:19-101:3, . There is no documentation of that photo array in the Investigative File or the Permanent Retention File. There is also no documentation of that photo array in the CCSAO File.


Signature:  _____/s/Lauren Lebata_____


Date:  _____February 11, 2025_____

**CRIME LABORATORY REPORT**
CRIME LABORATORY DIVISION/CHICAGO POLICE

| INCIDENT/OFFENSE CLASSIFICATION | I-UCR OFF. CODE | RD NO. |
|---|---|---|
| HOMICIDE / MURDER | 0110 | N242748 |

| VICTIM'S NAME | DISTRICT | AREA | DATE OF THIS REPORT |
|---|---|---|---|
| JOSEPH WATSON | | | 08 Jun 1990 |

| DEFENDANT'S NAME | LABORATORY UNIT |
|---|---|
| | POLYGRAPH UNIT |

The following subject was scheduled for a polygraph examination
at the Crime Laboratory Division Polygraph Unit.

```
SUBJECT:        MCMORRIS, KAVIN.
DATE/TIME:      04-06-90  1705 hours
REQUESTED BY:   DET. PALADINO of Area 3 VC
CONDUCTED BY:   Robert Tovar  12847

RESULT:         DECEPTION INDICATED
```

Page 1 of 1

| EXTRA COPIES REQUIRED (NO. & RECIPIENT) | REPORTING MEMBER (PRINT NAME) Robert Tovar  12847 |
|---|---|
| 1 To   Area 3 VC | SIGNATURE |

CPD-33.110 (9/89)

**Weston, Demond v. City of Chicago, et al. - 20 C 06189, CCSAO_002392**

**Exh. A to Affidavit**

88 pm

| IN 1705 4 ~~XXXXXXX~~ 90 JUN | POLYGRAPH CASE REVIEW CRIME LABORATORY DIVISION CHICAGO POLICE DEPARTMENT | OUT 1820 4 JUN 90 |

| OFFENSE Homicide / Murder (0110) | RD NO. N 242 748 |
| VICTIM WATSON, Joseph | LOCATION ████████ |
| MANNER Multiple GSW | 29 May 90 |
| | DATE & TIME 2228 |

| SUBJECT | ADDRESS | SEX M F | RACE | AGE |
|---|---|---|---|---|
| 1) KAVIN, Mc Morris | | | | |
| | | | | |
| | | | | |

INVESTIGATOR Paledino Mosche   AGENCY A-3VC

REMARKS

Above S' alleged to be involved in shootings

Results: Deception Indicated S' Stated Fainen Dell told him he & six others involved in shooting - Fainer Dell said he shoot one in the head.

 **Weston, Demond v. City of Chicago, et al. - 20 C 06189, CCSAO_002394**

**Exh. B to Affidavit**

**POLYGRAPH EXAMINER'S WORKSHEET/** **CRIME LABORATORY DIVISION CHICAGO POLICE**

M/3/

SUBJECT'S NAME: KAVIN McMORRIS

DATE (DAY-MO-YR) 05-JUN 90

RD NO 242 748

7yrs   148 female   MED   Pills 2x Aday.

Emp: Switchy Car Wash   HOD   WED   NECK STIFF

School: 606 E Senior   Doc CLINIC 55/Hallsted

I₁ KAVIN (SHONK)   I 3   Ck ⊘   I 5   JACKET   (woke at senior Renove)   FEEL   I left pretty good

I₂ 16 ⊕   I 4   4 ✓⊕   I

R1 R u lyin about what u said about farmer Bell ⊝

R2 Du see anyone get shot around 35-58 Street ⊝

R3 Du helpin' the shooting around 55-58 Street ⊝

R4 Du shoot at anyone around 35-58 Street ⊝

R5 Du Kn any other names not now involved in the group around 55-58 Street ⊝

R Du kn people got shot the might it happened

R BS Being in ADA Du have the shot from anyplace else

C1 BS Traffic Hu done anything times ⊝

C2 BS Paul Du ever want to shoot u gun at anybody else ⊝

C3 Hu told me the complete truth but today ⊕

CPD-33 501 (REV. 8/89)

Weston, Demond v. City of Chicago, et al. - 20 C 06189, CCSAO_002395

**Exh. B to Affidavit**

3) Folks Ashlund
justins
→ about six wentaround shoti
Famer Dell —
found out next day

55 ğfestini = Damion he was
telly me obout A
when I was on Ad4 I heard
Sunshots shot guis to
heard Shot
gus Slatten
→ Farmer Dell
got Shot

Paul
Damich
on 20 ee
Brother
Thursday atSchool
They Ran up in this
Porch shot his
Brother →

Paul Cockhust
33 Cal
25 May 90
Still Got
9mm cousin shot
32

c/b

Exh. B to Affidavit

**POLYGRAPH EXAMINER'S WORKSHEET/** CRIME LABORATORY DIVISION
CHICAGO POLICE

SUBJECT'S NAME _Rauin_ _McMorris_ DATE (DAY-MO.-YR.) _Jun 90_ RD NO _N242741_

Weston, Demond v. City of Chicago, et al. - 20 C 06189, CCSAO_002397

CPD-33.501 (REV. 8/89)

Exh. B to Affidavit

3
4
5
6
7
8
9

## POLYGRAPH SUBJECT CONSENT

Name _____ Kavin Mc Morris _____

Date _____ 04 June 90 _____

at     **Chicago Police Crime Laboratory**
       **1121 South State Street, Chicago, Illinois**

This examination concerns the _____ SHOOTING _____

_____ OF OTHERS _____

which occurred on or about _____ WEST/58ᵗʰ STREET TO 55ᵗʰ STREET _____

_____ 29 May 90 _____

I understand I have the right to remain silent and that anything I say can be used against me in a court of law.

I understand that I have the right to talk to a lawyer and have him present with me during question-ing, and if I cannot afford to hire a lawyer, one will be appointed by the court to represent me before any questioning.

I understand that I have the right to stop the questioning at any time, or to stop the questioning for the purpose of consulting a lawyer.

1) I, _____ KAVIN Mc MORRIS _____, voluntarily agree to take a polygraph examination.

2) I further agree that the final results of this examination may be known and available to the proper person or persons requesting the examination.

3) I further do hereby release and forever hold harmless the City of Chicago, their agents, and/or employees, and affiliates.

4) I have the right, upon written request, to receive a copy of the results of my polygraph.

_____                    _____
SIGNATURE OF EXAMINER                       SIGNATURE OF EXAMINEE

R D NO

**Weston, Demond v. City of Chicago, et al. - 20 C 06189, CCSAO_002399**

**Exh. B to Affidavit**

# Exhibit 56

REPORT IN THE MATTER OF DEMOND WESTON V. CITY OF CHICAGO ET AL.

Brian L. Cutler, Ph.D.

**Professional Background**

1. For about 35 years I have held faculty and academic administrative positions at Florida International University, the University of North Carolina at Charlotte, the University of Ontario Institute of Technology, and, currently, Fielding Graduate University. In my roles as a university professor, I have taught a variety of psychology and criminology courses at the undergraduate and graduate levels and have supervised undergraduate, master's and doctoral students in research. I have also taught continuing legal education workshops. Since 1983, I have conducted research on various forensic and social psychology topics and have active research programs on eyewitness memory, interrogations, and police psychology, from social and cognitive psychological perspectives. I have held research grants from the National Science Foundation of the United States and Social Science & Humanities Research Council of Canada. I have authored or edited nine books, including: *The APA Handbook of Forensic Psychology*, the *Encyclopedia of Psychology and Law*, *Reform of Eyewitness Identification Procedures*, and *Conviction of the Innocent: Lessons from Psychological Research*. I have also authored more than 30 book chapters and 75 peer-reviewed articles in psychology, law, and interdisciplinary journals, 30 articles in professional newsletters and given more than 100 professional presentations at conferences and universities. I have been active in professional associations as well. I served as President of the American Psychology-Law Society (Division 41 of the American Psychological Association), Editor-in-Chief of the peer-reviewed journal *Law and Human Behavior*, as Division 41 Council Representative for the American Psychological Association and as an advisor to APA's Amicus Brief program. I am a Distinguished Member of the American Psychology-Law Society and Fellow of the Association for Psychological Science.

2. Demond Weston was convicted of the May, 29, 1990 shooting that wounded Ronald Nesbit and Deneen Coats. In the trial in which Weston was convicted, Coats identified Weston in court as one of the offenders. This in-court identification was preceded by a lineup identification of Weston and possibly by two photo identification procedures prior to the lineup and in-court identification. I have been asked by attorneys from Loevy & Loevy to review the documents in Appendix A and to prepare a report describing the risk factors for false identification of Weston by Coats.

3. I summarize and then explain my opinions below. I do not offer opinions about the credibility or accuracy of any witness in this case, for I understand that those are matters for factfinders, not expert witnesses. The purpose of my testimony is to inform the factfinder about the factors relevant or potentially relevant to this case and that may

Leo 2644

increase the risk of false identifications, as known in the psychological research on eyewitness identification.

## Opinions

I. **Scientific psychological research on eyewitness identification is well-established and well-accepted within the field of psychology.**

II. **Psychological research demonstrates that eyewitness identifications are based on some combination of memory searching and inference processes. The manner in which identification procedures are conducted can encourage or discourage identification by inference processes. In addition, certain identification procedures afford stronger or weaker protection to the suspect from identification by inference processes.**

III. **Deneen Coats, the sole eyewitness who identified Weston as one of the offenders, had characteristics that likely enhanced her susceptibility to influence by the investigators in this case.**

IV. **The conditions under which Coats viewed the offenders were impoverished and increased the risk of false identification. Impoverished viewing conditions also render eyewitnesses more susceptible to suggestive influence.**

V. **The lineup identification procedures used by detectives in this case were highly suggestive and enhanced the risk of false identification of Weston.**

**Opinion I: Scientific psychological research on eyewitness identification is well-established and well-accepted within the field of psychology.**

4. Psychological research on eyewitness memory (henceforth referred to as "eyewitness research") is well-accepted within the field of psychological science. Eyewitness research is regularly published in peer-reviewed journals such as *Law and Human Behavior*, *Applied Cognitive Psychology*, *Journal of Experimental Psychology: Applied*, *Legal and Criminological Psychology*, and *Psychology, Crime & Law*. Eyewitness research is regularly presented at annual conferences, most notably the meeting of the American Psychology-Law Society (Division 41, American Psychological Association), discussed in textbooks used in psychology courses (e.g., Introduction to Psychology, Cognitive Psychology, Social Psychology, Forensic Psychology) and is the subject of master's theses and doctoral dissertations. There are numerous scholarly books devoted entirely to eyewitness memory (e.g., Cutler, 2013; Lampinen, Neuschatz, & Cling, 2012; Lindsay, Ross, Read & Toglia, 2007; Smith, Toglia, & Lampinen, 2021; Toglia, Read, Ross & Lindsay, 2007).

5. Eyewitness research draws on cognitive psychological research on human memory and social psychological research on social influence. Cognitive psychology teaches us that memories of our experiences are called episodic memories – memories of the episodes in our lives. In order to create an episodic memory, we must perceive the event, encode the details of the event into our short-term memories, and transfer the details into our long-

term memories.  At some point later, we may retrieve the memories on our own initiative or in response to a test of recall or recognition.

6.  Personal and situational factors systematically influence the accuracy of our memories.  At the earlier stages of forming episodic memories, our attention constrains our abilities to perceive details in events, and divided attention further challenges our perceptual abilities.  We tend to focus on important details of events at the expense of peripheral details, especially in situations in which we are highly stressed or aroused (Easterbrook, 1959; Echterhoff & Wolf, 2012). Our attention tends to be goal-directed. Distracting noise and the distractions of our own thoughts and activities limit our abilities to attend to events in our environment.  There is data loss in the transfer of details from short-term to long-term memories, such as in the case of forgetting the name of someone with whom we are conversing within a minute of having been introduced (Brown, 1958).  Examples of personal and situational influences that can influence the accuracy of eyewitness memory include the opportunity to view the event (e.g., lighting, distance), the level of attention and distraction at the time of the event, and the amount of time that passed between the event and the eyewitness interview or identification test (Lampinen, Neuschatz, & Cling, 2012).

7.  Once episodic memory details are stored in our long-term memories, our long-term memories are not held static but rather are subject to erosion due to the passage of time (Ebbinghaus, 1964, 1885).  Furthermore, our memories may be updated by information we have since learned or inferred.  We often fill gaps in our memories with information that makes sense or that we learned from other sources (Neuschatz, et al., 2001).  For example, an eyewitness might remember that the perpetrator wore a tee shirt and might infer that the perpetrator was also wearing jeans. We then sometimes have difficulty discerning the information we actually encoded from information we have inferred or learned since the episode.  The manner in which we retrieve memories may also affect the completeness and accuracy of our memories.  When attempting to recall information, the completeness of our memories may be influenced by the degree of effort we devote to recall, the number of times we attempt recall, and the conduciveness of the environment to concentration (Fisher & Geiselman, 1992).  The manner in which eyewitness identification tests are conducted, such as the instructions given to an eyewitness, the selection of "fillers," and the manner in which lineup members are presented, influence the likelihood that eyewitnesses will correctly identify a perpetrator or falsely identify an innocent suspect (Cutler, 2013; Wells et al., 2020).

8.  Psychological research on eyewitness identification has been influential in the reforming of police procedures for interviewing eyewitnesses and conducting identification tests.  Eyewitness researchers participated together with police officers and attorneys in a technical working group convened by Attorney General Janet Reno with the objective of developing guidelines concerning the collection and preservation of eyewitness evidence.  The group produced the United States Department of Justice's 1999 publication *Eyewitness Evidence: A Guide for Law Enforcement* (Technical Working Group, 1999).  According to Wells et al. (2020), since that *Guide* was published, many states have required reforms to their eyewitness identification procedures in a manner consistent with the psychological research.  Within the remaining states, police departments in major urban centers have enacted such reform. On January 6, 2017, Attorney General Sally

Leo 2646

Yates issued new guidelines for conducting photo arrays, which reflected best practices in the field of eyewitness science. Eyewitness research has been the topic of at least nine amicus briefs submitted by the American Psychological Association and figured prominently in several state supreme court decisions (*Connecticut v. Harris*, 2018; *Massachusetts v. Gomes*, 2015; *New Jersey v. Henderson*, 2011; *Oregon v. Lawson*, 2002).

9. Research has also been devoted to the question of the role of mistaken eyewitness identification in conviction of the innocent. Although the work of the Innocence Project and the advocacy organizations associated with the Innocence Network has brought considerable recent attention to the problem of wrongful conviction, the problem is not new. Yale Law Professor Edwin Borchard documented 65 cases of wrongful conviction nearly 90 years ago (Borchard, 1932). Additional cases were documented in subsequent decades. The National Registry of Exonerations, which has recorded more than 3000 exonerations, both list mistaken identification as a prominent factor leading to wrongful conviction.

**Opinion II: Psychological research demonstrates that eyewitness identifications are based on some combination of memory searching and inference processes. The manner in which identification procedures are conducted can encourage or discourage identification by inference processes. In addition, certain identification procedures afford stronger or weaker protection to the suspect from identification by inference processes.**

10. I use the term "inference process" to refer to mental processes the eyewitness engages in when arriving at an eyewitness identification decision, such as deduction (*e.g.*, this one fits my description of the perpetrator, and the police think he is the perpetrator – so it must be him), process of elimination (*e.g.*, he is the only one that looks like the perpetrator), or relative-judgment processing (*e.g.*, he looks more like the perpetrator than do the others). As discussed below, the manner in which identification procedures are conducted can encourage or discourage identification by inference processes. In addition, certain identification procedures afford stronger or weaker protection to the suspect from identification by inference processes.

11. There are multiple reasons for which eyewitnesses identify suspects as perpetrators. The most desirable explanation for a suspect identification is that the eyewitness has a memorial image of the perpetrator suitable for identification and recognizes the suspect as the crime perpetrator. Alternatively, an eyewitness – even an eyewitness with a very weak memory for the perpetrator – may identify the suspect by inference processes. I use the term inference process to refer to extra-memorial mental processes that contribute to or result in an eyewitness identification. For example, an eyewitness shown a single suspect such as in a field identification test or showup might infer that police detained the right person and, on that basis, identify the suspect as the perpetrator (Dysart, Lindsay, & Dupuis, 2006). An eyewitness who remembers his or her description of the perpetrator might engage in a process of elimination that results in a positive identification. Another form of inference process can occur when the eyewitness picks up advertent or inadvertent cues from the investigator regarding the identity of the suspect in a lineup (Greathouse & Kovera, 2009; Kovera & Evelo, 2017, 2020). Yet another alternative

explanation for an eyewitness identification is contamination of the identification test from various sources. For example, an eyewitness may have seen a photo of the suspect or the suspect in person between the crime and the identification. Post-event viewing of the suspect makes it possible for the eyewitness to identify the suspect from the subsequent viewing rather than from memory for the incident in question (Berkowitz, Garrett, Fenn & Loftus, 2022; Cutler, 2017; Wells et al., 2020). Identification from memory, inference processes, and memory contamination from multiple exposures to the suspect are not mutually exclusive; an identification may be based on a combination of these phenomena.

12. Scientific research on eyewitness identification provides strong evidence that inference processes serve as the basis for identification in substantial numbers of cases. One source of evidence is the identification of fillers from photo arrays and lineups. Fillers are the individuals or photos selected for inclusion in lineups together with the suspect. Fillers are known innocents and are not suspects. If an eyewitness identifies a filler, we know that the identification is not based solely on memory for the perpetrator but must instead be based on some form of inference process. As reported in Wells et al. (2020), in 11 peer-reviewed field studies (6,374) lineups in total, nearly 25% of eyewitnesses identified fillers. Among the eyewitnesses who made identifications, 37% identified fillers.

13. The procedures used to procure an eyewitness identification can encourage or discourage identifications from inference processes and can provide more or less protections to the suspect from identification by inference processes. For example, as mentioned above, procedures in which the eyewitness is shown a single-suspect, such as a field show-up or an in-court identification, provide no protection for the suspect from identification by inference processes. An eyewitness who has no memory for the perpetrator may infer that the single person is the perpetrator and make a positive identification on that basis. Single-person identification tests are basically lineups without fillers and are regarded as inherently suggestive (Technical Working Group, 1999; Wells et al., 2020).

14. Certain identification procedures associated with lineups (photographic or live) more effectively discourage inference processes and make it more difficult for an eyewitness to make an identification by inference processes as compared to show-ups. Lineups contain fillers, or persons who are not suspects, and who can siphon off inferences from the suspect. Increasing the numbers of fillers decreases the likelihood that an eyewitness with a weak memory for the perpetrator and who is inclined to make an identification by inference will identify the suspect rather than a filler. For this reason, many guidelines for identification procedures include a minimum number of fillers (Wells et al., 2020). In a study of 13 sets of guidelines (Smith & Cutler, 2013), the minimum number of fillers ranged from 4 (for live lineups) to 9 (all procedures).

15. In addition to the number of fillers, the quality of fillers is important as well. A filler that cannot be reasonably mistaken for the perpetrator provides no protection for the suspect from identification by inference processes. For example, if the eyewitness described the perpetrator as an African American male and the photo array contains one African American suspect and five Caucasian fillers, the eyewitness can obviously infer which person in the photo array is the suspect. Fitzgerald et al. (2013) conducted a meta-analysis of 17 studies (6,650 witnesses) examining the role of filler quality on

Leo 2648

identifications. They found that low quality fillers led to more suspect identifications, regardless of whether or not the suspect was the perpetrator.

16. Generally, there are two different strategies for selecting fillers (Wells et al., 2020): the match-to-description method and the resemble suspect method. The match-to-description method involves selecting fillers who fit the general description of the perpetrator as provided by the eyewitness. Thus, if the eyewitness described the perpetrator as a White male, about 25 years old, thinning blond hair, and clean-shaven, the fillers should also meet this description, but they may vary on characteristics not mentioned by the eyewitness. For example, length of hair, eye color and size of nose and ears might vary. The match-to-description has several benefits. First, if the suspect and fillers match the description, the eyewitness cannot easily guess or deduce which one is the suspect and must therefore rely on memory for the perpetrator. Second, the match-to-description method avoids the situation of having lineup members who look too much alike (like clones). The resemble suspect method involves selecting fillers that look like the suspect. One problem with the resemble suspect method is that there are no guidelines for the extent to which the fillers should match the suspect's appearance; therefore, it is possible to assemble a photo array in which the fillers look so much like the suspect that even an eyewitness with a good memory for the perpetrator has difficulty selecting the suspect. For these reasons, and because the match-to-description compares favorably to the resemble suspect method with respect to producing accurate identifications and reducing false identifications, the match-to-description method is the preferred method (Wells et al., 2020).

17. Another principle regarding filler selection is that the suspect should not stand out from the fillers in a manner that draws the eyewitness's attention (Wells et al., 2020). For example, in a photo array, the use of a suspect's driver's license photo together with fillers' mugshot photos would make the suspect's photo stand out, draw the eyewitness's attention, provide a cue that the eyewitness can use to infer the suspect's identity, and increase the likelihood that the eyewitness would identify the suspect (Buckhout, Figueroa, & Hoff, 1975).

18. Whereas fillers provide protection from identification by inference processes, certain procedures can encourage or discourage inference processes. Instructing the eyewitness that the perpetrator may or may not be in the lineup discourages inference processes and decreases the risk of false identification as determined by a meta-analysis of 18 studies with nearly 2,600 eyewitnesses (Steblay, 1997). Accordingly, standardized instructions, including this admonition, are commonplace among guidelines for identification procedures (Smith & Cutler, 2013; Wells et al., 2020). The admonition, however, can be compromised. Referred to as "pre-admonition suggestion" (Quinlivan, Neuschatz et al., 2012; Quinlivan, Wells et al., 2017), comments such as "we know you had a good look at the perpetrator" or "we think we have the guy" can attenuate the prophylactic effects of the instruction on the risk of false identification.

19. One factor – double-blind administration (also referred to as Independent Administration) – can both discourage inference processes and protect the suspect from identification based on inference processes. Independent administration refers to having the lineup conducted by an official who does not know which member of the lineup or photo array is the suspect. When the administrator knows which member is the suspect, he or she

Leo 2649

may inadvertently provide verbal or nonverbal cues to the eyewitness who can then make an identification by inference processes (e.g., Greathouse & Kovera, 2009; Kovera & Evelo, 2017, 2020; Wells et al., 2020; Zimmerman et al., 2017). These cues can encourage the eyewitness to identify the person believed by the administrator to be the suspect – that is, by inference rather than memory. When double-blind administration is not used, there is no way to rule out the possibility of inadvertent influence by the administrator. The lack of double-blind administration also increases the risks of errors in reporting identifications by eyewitnesses (Kovera & Evelo, 2017, 2020; Wells et al., 2020). The lack of a double-blind administrator, therefore, fails to protect the suspect from identification by inference processes. Double-blind administration of lineups is a commonly used procedure in newer guidelines (Kovera & Evelo, 2020; Smith & Cuter, 2013; Wells et al., 2020).

20. Each identification procedure can be evaluated independently for its strengths and weaknesses. The combination of identification procedures presents yet additional risk factors. Eyewitnesses who identify suspects from one identification procedure tend to remain committed to their identifications, even when the original identifications are incorrect (Deffenbacher, Bornstein, & Penrod, & 2006). Accordingly, when multiple identification procedures are used, the first one contaminates the results of subsequent ones (Cutler, 2017; Wells et al., 2020; Wixted et al., 2021). For example, when an eyewitness identifies a suspect from a photo array and later from a live lineup, there is no way to know whether the lineup identification is a product of the eyewitness' memory for the perpetrator or her memory for the person she identified from the photo array. Likewise, when an out-of-court identification precedes in-court identification, there is no way to know whether the in-court identification is based on the eyewitness's memory for the perpetrator or his memory for the person identified in the out-of-court procedure. Innocent suspects identified from one procedure are therefore at higher risk for mistaken identification from subsequent procedures.

**Opinion III: Deneen Coats, the sole eyewitness who identified Weston as one of the offenders, had characteristics that likely enhanced her susceptibility to influence by the investigators in this case.**

21. At the time of the offenses, Coats was 20 years old. While the age of 18 means adulthood in the eyes of the law, in the eyes of psychology, there is no bright line between adolescence and adulthood. Psychological development, including cognitive, social, and emotional development is a gradual process that extends into the early and mid 20s (e.g., Fountain, Mikytyck & Woolard, 2021; Scott et al., 2016). Adolescents are known to be more suggestible and compliant to authority figures as compared to adults (Kassin et al., 2010). At age 20, Coats might be better classified as a young adult. According to Scott et al. (2016) "young adults occupy a transitional developmental space between adolescents and mature adults." In this transitional stage, Coats may have been vulnerable to social influence by authority figures and ultimately to false statements. As an example of Coats's perception of authority, according to investigator Swanson's deposition testimony, Coats referred to the police as "superheroes" who found the offender that shot her.

Leo 2650

22. Coats was also seriously injured during the offenses. She was shot in her leg and back. She spent about a month in the hospital before being released with crutches, according to her testimony. According to Swanson's deposition testimony, Coats maintained that she was visited by police while in the hospital, the day after the shooting, for the purpose of obtaining suspect identifications. Coats's physical condition likely rendered her vulnerable at this time. Coats also told Swanson (according to Swanson's deposition) that on the day of the lineup at the police department, she was in a wheelchair, and police had to carry her and her wheelchair up the stairs to view the lineup. Coats's physical condition likely continued to render her vulnerable at this time as well, and her view of the police as superheroes likely contributed their ability to influence her.

**Opinion IV: The conditions under which Coats viewed the offenders were impoverished and increased the risk of false identification. Impoverished viewing conditions also render eyewitnesses more susceptible to suggestive influence.**

23. A great deal of psychological research has been devoted to the conditions under which eyewitnesses view crimes and the impact of those conditions on the accuracy of eyewitness identification. Some of the conditions under which the crimes occurred are known in the research to interfere with face encoding and increase the risk of mistaken eyewitness identification.

24. Coats likely viewed the multiple offenders (whom she testified she had never seen before the shooting) for a brief period of time, at a (unknown) distance, under the ambient lighting of a street lamp. The offenders wore hats or caps and had, according to Coats statements to Swanson, 357 magnums. Once the shooting began, the event was likely stressful and chaotic. These conditions, or factors, when examined independently in psychological research, increase the risk of false identification, as follows.

   a. **Acquaintance Level**. Level of acquaintance is associated with accuracy of identification. Stranger identifications and identifications of minimally known others are most at risk for error, whereas identifications of moderately- or well-known others are less at risk for error (Vallano et al., 2019). Coats testified that she had never seen the offenders before the night of the shooting.

   b. **Lighting and Distance**. Face recognition is particularly important for eyewitness identification, as faces distinguish one another much more so than other physical features. Given that facial features are relatively small, even short viewing distance can have a detrimental effect on face recognition accuracy. Distance alone reduces identification accuracy (e.g., Loftus & Harley, 2005). The combination of distance and sub-optimal lighting is particularly detrimental to eyewitness identification (DeJong et al., 2005). Coats testified that the offenders were in the middle of the street, hanging around the house across the street.

   c. **Exposure Time**. Exposure time refers to the specific amount of time the eyewitness has to view the perpetrator's face. It should not be equated to the total amount of time that the crime. Shorter exposure durations are associated with greater risk of error in eyewitness identification (Bornstein et al., 2012). Further,

Leo 2651

people are known to over-estimate time durations, particularly when under stress (Loftus, Schooler, & Boone, 1987). Coats testified that the offenses unfolded as follows. She and two others were sitting in front of her house. A group of men were hanging out in the middle of the street, walking, and stopped in front of their house. They pulled out guns and started shooting. She was looking at their guns and saw their faces. She got shot in the leg. She turned around and tried to run up the stairs and was shot in the back. Based on this account, Coats's opportunity to see the faces of the perpetrators was likely brief.

d. **Disguise.** Eyewitnesses are more prone to mistakes when attempting to identify perpetrators who wore hats that covered their hair and hairline or tinted glasses that rendered their eyes not visible (Cutler, 2006; Mansour et al, 2020). Coats and other witnesses testified that the offenders were wearing hats and caps. Swanson also testified that Coats said the offenders wore hats.

e. **Stress.** High levels of stress impair encoding and subsequent eyewitness identification accuracy (Deffenbacher et al., 2004; Morgan et al., 2004). Under high levels of stress, witnesses report fewer correct descriptors of the perpetrator, more incorrect details, and making fewer correct identifications from lineups (Valentine & Mesout, 2009). Once the shooting occurred, the incident likely became very stressful for the eyewitnesses.

f. **Divided Attention.** Encoding a perpetrator's face requires attention to it. Attention, however, is not unlimited. Certain factors can distract a witness from viewing a perpetrator's face and thereby reduce the quality of reduce exposure and increase the risk of error. One such distraction is the visible presence of a weapon, which can create a "weapon focus" effect. The presence of a weapon tends to draw the attention of eyewitnesses, leaving less attention to deploy to the perpetrator's facial characteristic. Eyewitness identifications, therefore, tend to be less accurate when a weapon was visually present at the time of the crime (Fawcett et al., 2013). Coats testified specifically that she was looking at the guns and the offenders, a divided attention task. Swanson testified that Coats said that the offenders had 357 magnums, suggesting that she focused on the guns for at least some period of time. The presence of multiple offenders is a distraction. Eyewitness identifications are more at risk for error when there are two or more offenders as compared to a single offender (e.g., Megraya & Burton, 2006). Coats testified that she viewed a group of men.

25. In sum, Coats viewed the perpetrator under impoverished conditions – conditions known in the psychological research to impair eyewitness identification accuracy. The perpetrators were strangers to Coats. Once the shooting began, the events were likely highly stressful and chaotic. The perpetrators wore head coverings and were viewed under suboptimal lighting conditions, from a distance, and likely for a very short period of time before Coats turned to escape the danger. Distractions, such as weapon focus and the multiple perpetrators are also risk factors for false identifications. These factors independently increase the risk for false identification. In combination, these witnessing factors have additive or multiplicative effects, further raising the risk of false identification. Another eyewitness to the shooting, Ronald Nesbitt, was with Coats on the porch, was exposed to the same or very similar viewing conditions, and testified that

Leo 2652

he could not see the faces of the offenders. Eyewitnesses with weak memories are more susceptible to misleading information than eyewitnesses with stronger memories (Albright, 2017).

**Opinion V: The lineup identification procedures used by detectives in this case were highly suggestive and enhanced the risk of false identification of Weston.**

26. About 6 weeks after the offenses (July 17, 1990), Coats went to the police department and was shown a physical lineup. According to police reports, Detectives Paladino, Maslanka, Moser, and Kill conducted the lineup. The lineup shown to Coats and witness Norwood contained 5 suspects (Smith, Weston, Walker, Macklin, and Jackson) and 4 other Black males (Baxter, Powell, Bessent, and Robinson). Two Assistant Public Defenders and an Assistant States Attorney were also present at the lineup. Coats identified Smith, Weston, and Walker as offenders. Norwood identified none of the lineup members as offenders.

27. The records I reviewed suggest that the lineup from which Coats identified Weston was highly suggestive. The factors that made the procedure suggestive may have included a combination of inadequate fillers, no cautionary instructions, suggestive comments, and lack of double-blind (independent) administration. Evidence also suggests the presence of contamination from one or more prior photo identifications by Coats.

28. Some of the suggestive features of the lineup that I identify below may have been in keeping with CPD general orders in place at the time of the investigation. Double-blind (independent) administration, for example, most certainly, was not part of CPD general orders at the time. My purpose in including factors that were not part of the CPD general orders is to inform the factfinder about the factors that are known in the contemporary psychological science to make identification procedures suggestive and to increase the risk of false identification.

29. In the following subparagraphs I review the identification procedures used or potentially used and explain their psychological effects.

30. There is nothing in the materials I reviewed that suggests that cautionary instructions were used at the lineup. The five suspects were between 18 and 20 years old. One of the fillers was 30 years old, and another was 32 years old. This leaves only two fillers within the same age range as the five suspects. Independent administration was not used. Eyewitness science and modern identification procedures are clear that these procedures are problematic, as explained in the following subparagraphs.

   a. **Number of Suspects and Fillers in the Lineup**. Modern guidelines maintain that lineups should contain a single suspect and a set of fillers (Technical Working Group, 1998; Wells et al., 2020). A lineup with multiple suspects makes it much easier for an eyewitness to identify a suspect by guessing or inference. The lineup from which Coats identified Weston contained multiple suspects – more suspects (5) than fillers (4). This is highly problematic. The then-existing CPD general orders permitted the use of lineups with multiple suspects; but, "When more than one suspect is to be viewed, and great disparity is evidence between suspects in height, weight and skin color, separate lineups will be

Leo 2653

conducted and nonsuspects in each lineup will have the same general physical characteristics as suspects. Here, one of the suspects (Macklin) was 6'3"—substantially taller, for example, than the 5'8" Weston or the 5'7" Smith.

b. **Lineup Instructions.** Eyewitnesses are naturally motivated to positively identify a suspect when presented to them by an officer. Cautionary instructions, which explicitly inform the eyewitness that the suspect in an identification procedure might not be the perpetrator, have the psychological effect of reducing the pressure on the eyewitness to make a positive identification. Psychological research shows that cautionary instructions reduce the risk of false identification to innocent suspects (e.g., Steblay, 1997; Wells et al., 2020). Cautionary instructions, however, can be compromised by suggestive statements made by investigators prior to cautionary instructions (Quinlivan et al., 2012, 2017). For example, here, Coats reported to Swanson that the detectives told her prior to her photo identification that they had the perpetrators.

c. **Double-Blind Administration.** When the investigator conducting an identification test knows the identity of the suspect in the procedure, there is a risk that the investigator intentionally or inadvertently conveys the suspect's identity. Double-blind administration (sometimes referred to as independent administration) refers to procedures in which the investigator does not know the identity of the suspect in the identification procedure. When double-blind procedures are used, the investigator cannot inadvertently communicate the suspect's identity. When double-blind procedures are not used, the risk of false identification increases (e.g., Kovera & Evelo, 2020; Wells et al., 2020).

d. **Contamination**. Contamination can occur in several ways, one of which is prior exposure to a photograph of the suspect before a photo or physical lineup (Cutler, 2017; Deffenbacher et al., 2004; Wells et al., 2020). This contamination makes it impossible to know whether the subsequent lineup (or in-court) identification is based on the eyewitness's memory for the perpetrator or exposure to the suspect's photo. Further, an eyewitness who makes an identification from one procedure is likely to identify the same person in a subsequent procedure, regardless of whether the first identification is accurate (Deffenbacher et al., 2004; Wells et al., 2020). Swanson's deposition testimony, as reviewed above, indicates that Coats may have been exposed to Weston's photo, may have selected Weston's photo, or may have been told by investigators that Weston was identified by another suspect the day after the crime. If so, any of those scenarios would contaminate the subsequent identification procedures. According to Swanson's testimony Coats maintained that police showed her photos of suspects just prior to the lineup. Coats told Swanson that she identified two perpetrators and the police told her that those two perpetrators identified two other perpetrators, which the police then selected. If so, that would be another, highly suggestive procedure and would contaminate the physical lineup results. Last, the Coats's in-court identification was contaminated by at least the physical lineup and by the previous photo identifications (if they occurred).

Leo 2654

31. In sum, Weston was identified by Coats from a highly suggestive and potentially contaminated lineup by modern standards. The suggestive and potentially contaminated lineup procedures would create a high risk for false identification and false confidence.

## Summary

32. Deneen Coats was a bystander eyewitness to a shooting in which she was seriously wounded. The offenses occurred at night, under the ambient lighting of a streetlight, and at some distance from where she and others were sitting. The offenders were not known to Coats. The shooting appeared to unfold quickly and was likely a highly stressful event. Factors such as darkness, distance, head coverings worn by the offenders, the likely brief duration of the offenses, stress, and distraction caused by the visual presence of weapons, multiple perpetrators, and an attempt to escape the danger, are known in the research to interfere with the encoding of faces and subsequent eyewitness identification. Coats was subjected to at least two highly suggestive identification procedures: A physical lineup and an in-court identification, and possibly a highly suggestive photo lineup procedure the day after the shooting. The combination of these challenging eyewitnessing conditions and highly suggestive identification procedures put Weston at great risk for false identification.

Dated: January 22, 2024

_____

Brian L. Cutler, Ph.D.

Leo 2655

# References

Albright, T. D. (2017). When eyewitnesses fail. *Proceedings of the National Academy of Sciences*,114 (30) 7758-7764.

Berkowitz, S. R., Garrett, B. L., Fenn K. M., & Loftus, E. F. (2022) Convicting with confidence? Why we should not over-rely on eyewitness confidence. *Memory*, 30, 10-15.

Borchard, E. M. (1932). *Convicting the Innocent*. Garden City, NY: Garden City Publishing Company.

Bornstein, B. H., Deffenbacher, K. A., Penrod, S. D., & McGorty, E. K. (2012). Effects of exposure time and cognitive operations on facial identification accuracy: A meta-analysis of two variables associated with initial memory strength. *Psychology, Crime & Law*, *18*, 473-490.

Brown, J. (1958). Some tests of the decay theory of immediate memory. *Quarterly Journal of Experimental Psychology*, *10*, 12-21.

Buckhout, R., Figueroa, D., & Hoff, E. (1975). Eyewitness identification: Effects of suggestion and bias in identification from photographs. *Bulletin of the Psychonomic Society, 6*, 71-74.

*Connecticut v. Harris*, SC 19649 (2018).

Cutler, B. L. (2017). Sources of contamination in lineup identifications. *The Champion*, *May*, 16-22.

Cutler, B. L. (2013). *Reform of eyewitness identification procedures*. Washington DC: American Psychological Association Press.

Cutler, B. L. (2006). A sample of witness, crime, and perpetrator characteristics affecting eyewitness identification accuracy. *Cordozo Public Law, Policy & Ethics Journal*, *4*, 327-340.

Deffenbacher, K. A., Bornstein, B. H., & Penrod, S. D. (2006). Mugshot exposure effects: Retroactive interference, mugshot commitment, source confusion, and unconscious transference. *Law and Human Behavior*, *30*, 287–307.

Deffenbacher, K. A., Bornstein, B. H., Penrod, S. D., & McGorty, E. K. (2004). A meta-analytic review of the effects of high stress on eyewitness memory. *Law and Human Behavior*, *28*, 687–706.

Dysart, J. E., Lindsay, R. C. L., & Dupuis, P. R. (2006). Show-ups: The critical issue of clothing bias. *Applied Cognitive Psychology, 20*, 1009-1023.

Easterbrook, J. A. (1959). The effect of emotion on cue utilization and the organization of behavior. *Psychological Review, 66*, 183-201.

Leo 2656

Ebbinghaus, H. (1885). *Uber das Gedachtnis.* Leipzig: Duncker and Humbolt.

Ebbinghaus, H. (1964). *Memory: A contribution to experimental psychology.* New York, NY: Dover Publications.

Echterhoff, G. & Wolf, O. T. (2012). The stressed eyewitness: The interaction of thematic arousal and post-event stress in memory for central and peripheral event information. *Frontiers of Integrative Neuroscience, 6*(57), 1-12.

Fawcett, J. M., Russell, E. J., Peace, K. A., & Christie, J. (2013). Of guns and geese: A meta-analytic review of the 'weapon focus' literature, *Psychology, Crime, & Law, 19*, 33-66.

Fountain, E., Mikytuck, A., & Woolard, J. (2021). Treating emerging adults differently: How developmental science informs perceptions of justice policy. *Translational Issues in Psychological Science*, 7, 65–79.

Fisher, R. P., & Geiselman, R.E. (1992). *Memory enhancing techniques for investigative interviewing: The Cognitive Interview.* Springfield III: Charles C. Thomas.

Fitzgerald, R. J., Price, H. L., Oriet, C. & Charman, S. D. (2013). The effect of suspect-filler similarity on eyewitness identification decisions: A meta-   analysis. *Psychology, Public Policy, and Law, 19*, 151-164.

Greathouse, S. M., & Kovera, M. B. (2009). Instruction bias and lineup presentation moderate the effects of administrator knowledge on eyewitness identification. *Law and Human Behavior, 33*, 70-82.

Kassin, S. M., Drizin, S. A., Grisso, T., Gudjonsson, G. H., Leo, R. A., & Redlich, A. D. (2010). Police-induced confessions: Risk factors and recommendations. *Law and Human Behavior, 34*, 3–38.

Kovera, M. B., & Evelo, A. J. (2020). Improving eyewitness identification evidence through double-blind lineup administration. *Current Directions in Psychological Science, 29*, 1-6

Kovera, M. B., & Evelo, A. J. (2017). The case for double-blind lineup administration. *Psychology, Public Policy, and Law, 23*, 421-437.

Lampinen, J.M., Neuschatz, J.S., Cling, A. (2012). *The Psychology of Eyewitness Identification*. New York: Psychology Press.

Lindsay, R. C. L., Ross, D. F., Read, J. D., & Toglia, M. P. (Eds.), (2007). *Handbook of Eyewitness Psychology: Volume II: Memory for People.* Mahwah, NJ: Erlbaum Associates.

Loftus, E. F. (2003). Our changeable memories: Legal and practical implications.  *Nature Reviews/Neuroscience, 4*, 231-234.

Leo 2657

Loftus, E. F., & Pickrell, J. E. (1995). The formation of false memories. *Psychiatric Annals*, *25*, 720–725.

Loftus, E. F., Schooler, J. W., Boone, S. M., & Kline, D. (1987). Time went by so slowly: Overestimation of event duration by males and females. *Applied Cognitive Psychology,* 1, 3-13.

Loftus, G. R., & Harley, E. M. (2005). Why is it easier to identify someone close than far away? *Psychonomic Bulletin & Review*, *12*(1), 43-65.

Mansour, J. K., Beaudry, J. L., Bertrand, M. I., Kalmet, N., Melsom, E. I., & Lindsay, R. C. L. (2020). Impact of disguise on identification decisions and confidence with simultaneous and sequential lineups. *Law and Human Behavior*, *44*, 502-515.

*Massachusetts v. Gomes*, 470 Massachusetts 352 (2015)

Megreya, A. M., & Burton, A. M. (2006). Recognizing faces seen alone or with others: When two heads are worse than one. *Applied Cognitive Psychology*, 20, 957–972.

Morgan, C. A., Hazlett, G., Doran, A., Garrett, S., Hoyt, G., Thomas, P., et al. (2004). Accuracy of eyewitness memory for persons encountered during exposure to highly intense stress. *International Journal of Law and Psychiatry*, *27*, 265–279.

*New Jersey v. Henderson*, 27 A.3d 872 (2011).

Neuschatz, J. S., Payne, D. G., Lampinen, J. M., & Toglia, M. P. (2001). Assessing the effectiveness of warnings and the phenomenological characteristics of false memories. *Memory*, *9*(1), 53-71.

*Oregon v. Lawson*, 352 Or. 724, 291 P.3d 673 (2012).

Quinlivan, D. S., Neuschatz, J. S., Cutler, B. L., Wells, G. L., McClung, J., & Harker, D. L. (2012). Do pre-admonition suggestions moderate the effect of unbiased lineup instructions? *Legal and Criminological Psychology, 17*, 165-176.

Quinlivan, D. S., Wells, G. L., Neuschatz, J. S., Luecht, K. M., Cash, D. K., & Key, K. N. (2017). The effect of pre-admonition suggestions on eyewitnesses' choosing rates and retrospective identification judgments. *Journal of Police & Criminal Psychology*, *32*, 236-246.

Scott, E. S., Bonnie, R. J., & Steinberg, L. (2016). Young adulthood as a transitional legal category: Science, social change, and justice policy. *Fordham Law Review*, *85*, 641-666.

Smith, A. M., & Cutler, B. L. (2013). Identification test reforms. In B. L. Cutler (Ed.), *Reform of eyewitness identification procedures* (pp. 203-219). American Psychological Association Press.

Smith, A. M., Toglia, M. P., & Lampinen, J. M. (In Press). *Methods, Measures, and Theories in Eyewitness Identification Tasks*. Taylor & Francis.

Leo 2658

Steblay, N. M. (1997). Social influence in eyewitness recall: A meta-analytic review of lineup instruction effects. *Law and Human Behavior, 21*, 283-297.

Technical Working Group. (1999). *Eyewitness evidence: A guide for law enforcement.* (NCJ Publication No. 178240). Washington, D.C.: U.S. Government Printing Office.

Toglia, M. P., Read, J. D., Ross, D. F., & Lindsay, R. C. L. (Eds.), (2007) *Handbook of Eyewitness Psychology: Volume I: Memory for Events.* Mahwah, NJ: Erlbaum Associates.

Vallano, J. P., Slapinski, K. A., Steele, L. J., Briggs, A. P., & Pozzulo, J. D. (2019). Familiar eyewitness identifications: The current state of affairs. *Psychology, Public Policy, and Law*, *25*, 128-146.

Valentine, T., & Mesout, J. (2009). Eyewitness identification under stress in the London Dungeon. *Applied Cognitive Psychology: The Official Journal of the Society for Applied Research in Memory and Cognition*, *23*(2), 151-161.

Wells, G. L., Kovera, M. B., Douglass, A. B., Brewer, N., Meissner, C., & Wixted, J. T. (2020). Policy and procedure recommendations for the collection and preservation of eyewitness evidence. *Law and Human Behavior, 44*, 3-36.

Wixted, J. T., Wells, G. L., Loftus, E. F., & Garrett, B. L. (2021). Test a witness's memory of a suspect only once. *Psychological Science in the Public Interest*, *22*, 1-18.

Zimmerman, D. M., Chorn, J. A., Rhead, L. M., Evelo, A. J., & Kovera, M. B. (2017). Memory strength and lineup presentation moderate effects of administrator influence on mistaken identifications. *Journal of Experimental Psychology: Applied*, *23*, 460-473.

Leo 2659

## Appendix A: Materials Reviewed
## Weston v. Chicago, et al

- Complaint
- Watson Homicide File – CITY-DW 11-310
- Sims Homicide File – CITY-DW 311-477
- Keith Strong deposition
- Watson lineup report – IND DEF 336699-336700
- Coats lineup report – CCSAO 2455-2456
- Trial photo exhibits – CCSAO 2788-2922
- Coats trial testimony – CCSAO 431-492
- Nesbit trial testimony – CCSAO 493-508
- Photographs (CCSAO 2775, 2851, 2853, 2855, 2865, 2867, 2869, 2871, 2873, 2875, 2913, 2980, 2999, 3001)
- Susan Swanson deposition and exhibits
- CPD General Order 83-5 – CITY-DW 511-514
- 1988 SOP – CITY-DW 646-2514

Leo 2660

# Exhibit 57

**SUPPLEMENTARY REPORT**
CHICAGO POLICE – FOR USE BY B.I.S. PERSONNEL ONLY

All descriptions and statements in this entire report are approximations or summarizations unless stated otherwise.

4 DATE OF ORIG. OCCURRENCE-TIME
DAY MO YR
8 Jun. 90    0240

| 1 OFFENSE CLASSIFICATION LAST PREVIOUS REPORT | 1 UCR OFF CODE | 2 ADDRESS OF ORIG INCIDENT OFFENSE | 1 VERIFIED | 2 CORRECTED | 3 BEAT OF OCCUR |
|---|---|---|---|---|---|
| Homicide/Murder 1st Degree | :0110 | 5313 S. Bishop | XX | | 934 |

| 5 VICTIM NAME AS SHOWN ON CASE REPORT | CORRECT | IF NOT CORRECT ALL VICTIM INFORMATION, IN BOXES 20 THROUGH 27 | 6 FIRE RELATED | 7 BEAT ASSIGNED |
|---|---|---|---|---|
| SIMS, Curtis | XX | | ☐YES XX NO | 5318 |

| 8 TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | LOCATION CODE | 2 NO OF VICTIMS | 10. NO. OF OFFENDERS |
|---|---|---|---|
| Front Porch | 289 | 1 | 2 |

28 OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.)

| | 28 OFFENDER'S NAME | 29 HOME ADDRESS | 30. SEX-RACE-AGE | HEIGHT | WEIGHT | EYES | HAIR | COMP |
|---|---|---|---|---|---|---|---|---|
| 1 | BROWN, Cortez | 5701 S. Hoyne | M/1/19 | 5'8" | 140 | brn. | blk. | med.lt. |

| | 31 C.B. NO | I.R. NO., Y.D. NO. OR J.D.A. NO. | 1 OFFENDER REL. CODE | C.B NO | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER REL. CODE | 32 NO. ARREST-ARRESTED UNIT NO. |
|---|---|---|---|---|---|---|---|
| OFF 1 | 8654117 | 856666 | 024 | OFF 2 | | | 1 632 |

| 50. OFFENSE/CLASS. THIS DATE (IF SAME ENTER DNA) | REV. CODE | 52. METHOD ASSIGNED | UNIT NO. | 53 STATUS |
|---|---|---|---|---|
| dna | | dna | XX FIELD ☐3 SUMMARY | 632 |

**80. NARRATIVE**

ADDITIONAL ARREST TO A PREVIOUSLY CLEARED OPEN CASE;

IN CUSTODY:     BROWN, Cortez M/B , AKA McGURDY, Victor, AKA SAFFORD, Victor

19yrs., DOB: 3 Dec. 70, 5'8", 140lbs. med. lt. comp., 5701

S. Hoyne, & 5933 S. Emerald.  IR# 856666.

DATE,TIME & LOCATION:     21 Sep. 90, 0900hrs.

ARRESTING OFFICERS:     Det. J. Paladino #9938 , Det. T. Maslanka #16161

Det. J. O'Brien #8825, Det. M. Kill #4123, Det.

D. McWeeney #14367, Det. A. Christophersen #13244

| 90. EXTRA COPIES REQUIRED (NO. & RECIPIENT) | 91. DATE THIS REPORT SUBMITTED – DAY MO YR | TIME | 92. SUPERVISOR APPROVING (PRINT NAME) STAR NO. |
|---|---|---|---|
| | 22 Sep. 90 | 0100 | Sgt. R. PALMER - 1675 |

| 93. REPORTING OFFICER (PRINT NAME) | STAR NO. | 94. REPORTING OFFICER (PRINT NAME) | STAR NO. | 95. DATE APPROVED (DAY-MO-YR) | TIME |
|---|---|---|---|---|---|
| Det. J. Paladino | 9938 | Det. T. Maslanka | 16161 | 25 Sep 90 | 0835 |
| | | Det. J. O'Brien | 8825 | | |

ENTERED

Homicide /Murder 1st. Degree
SIMS, CURTIS                                                    22 Sep. 90
5313 S. Bishop                    PAGE 2                        RD# N 258729

ARRESTING OFFICERS, CONT.:        Area 3 Violent Crimes.
                                  Det. J. Romic #18170, & Det. D. Kutz #9287
                                  Area 1 Violent Crimes.

CHARGES, CT. BR. & DATE:          Murder Warrant CN 017600, Docket:90-104078,
                                  issued by Judge Miranda on 10 Jun.90, bond
                                  $500,000. Obtained by Dets. McWeeney and Det.
                                  Kill of Area 3 Violent Crimes.

NOTIFICATIONS:                    Felony Review A/S/A Studenroth arrived at Area
                                  3.

HISTORY:                          As per last Supplementary, submitted on 10 Jun.90,
                                  a warrant was obtained for wanted offender,
Cortez BROWN. On 21 Sep.90, BROWN was detained by Park Forest Police after a vehicle
he was driving crashed into a tree after being chased by the Officers. BROWN was
apprehended after a short foot chase. A check of the vechile showed that it was stolen, taken
in an Armed Robbery, Reference RD# N440891 in Area 1. BROWN was turned over to Dets.
Romic and Kutz from Area 1 Violent Crimes, who conducted the investigation relative the
Armed Robbery. Area 3 was then notified that BROWN had the outstanding Murder Warrant.

                                  BROWN was transported to Area 3 Violent Crimes.
BROWN was advised of his rights under Miranda, and after each right he related that he
understood. BROWN was also advised that he would be standing line-ups and that he had
a rig ht to have a lawyer present for the line-up. BROWN was asked about the shooting
that occurred on 8 Jun.90 at 5313 S. Bishop. He was informed that he had been implicated
by a Dwayne Maclin who had been arrested earlier. He was also informed that he had
been implicated by a Walker, William (Childs, William). BROWN then related the following,
which is a summary and not verbatim.

CORTEZ BROWN..................... BROWN stated that he didn't shoot nobody. He stated
                                  that ButterCup did the shooting. BROWN was asked
to identify BUTTERCUP nad he stated that his real name was dwayne Macklin. BROWN went on
to relate that MACKLIN rented a car from a hype, a FORD Tauras. He stated that he was
on Union and met up with MACKLIN and CHILDS. MACKLIN told CORTEZ that he wanted to go
to the area of 53rd. Bishop because he had a girlfriend on the block and everytime he want
to the area they would bother him. MACKLIN asked Brown to come with him and BROWN stated
that he went with MACKLIN to cover his back. BROWN stated that he had a 25 automatic
and MACKLIN had a 45 cal. UZZI. BROWN stated that they drove there in the FORD TAURAS
and CHILDS was driving. CHILDS let them out of the car and they walked up to the porch
where the victim was standing and MACKLIN took out the UZZI and sprayed the porch. BROWN
stated that he was standing right next to MACKLIN when the shooting happended and he ran
through the yards. BROWN stated that when he got to the alley he observed a Police car
and the Police began to chase him and he and MACKLIN split up. BROWN stated that he loaned
the gun, 25 cal. automatic, to a friend and never got it back. THis interview took place
at 1830hrs. in the rear interview room at Area 3. Present were Dets. Paladino , Maslanka
and O'Brien.

                                  The witnesses, the two Police Officers, Off. James
Williamson #12522 and Off. Robert Trlak# 15103, the two officers who chased the offenders
after the shooting were contacted and requested to view a line-up at Area 3. At 2100hrs.
they viewed a line-up and both identified Cortez BROWN. Felony review was contacted and
A/S/A Studenroth arrived at Area 3 . The A/S/A reviewed the case reports and then interview
the Officers. The A/S/A then interviewed the arrestee, Cortez BROWN.

Continued on page 3

CITY-DW-000350

Homicide/Murder 1st Degree
SIMMS, Curtis
5313 S. Bishop                           PAGE 3                        22 Sep 90
                                                                       RD# NP 258729

     BROWN was again advised of his rights by the A/S/A
and after each right BROWN related that he understood.  BROWN was again asked about the
shooting  that occurred on 8 Jun. 90 at 5313 S. Bishop and related basically the same
as he did previously to Reporting, but with more detail.  After the oral statement BROWN
was asked if he would give a Court Reported statement, and after the A/S/A explained what
a Court Reported statement was, BROWN agreed to give one.

     Court Reporter Annette Falkis- Moriarty arrived
at Area 3 and a statement was taken by her and then typewritten and after BROWN read the
statement and it was as he had related he signed it.  THis statement is part of this file.

     After reviewing the case A/S/A Studenroth approved
charges on BROWN.  Based on the abvoe Reporting requests this case Cleared/CLOSED.

Det. J. Paladino #9938
Det. T. Maslanka #16161
Det. J. O'Brien #8825
Det. M. Kill    #4123
Det. D. McWeeny  #14367
Det. A. Christophersen #13244

CITY-DW-000351

# Exhibit 58

**Deposition of Victor Safforld**
**Taken:  March 27, 2023**
**Role: Witness**



Transcript of the Deposition of
**Victor Safforld**

**Case:** Demond Weston v. City of Chicago; et al.
**Taken On:** March 27, 2023

Royal Reporting Services, Inc.
Phone:312.361.8851
Email:info@royalreportingservices.com
Website: www.royalreportingservices.com

Demond Weston v. City of Chicago; et al.
Deposition of Victor Safforld - Taken 3/27/2023

Page 208

1   **he was a GD?**

2       A.   I don't think so because he was, like, a

3   school boy.  Lame, if you would.

4       **Q.   What do you mean by "lame"?**

5       A.   I mean, he wasn't into, you know,

6   selling drugs or gangbanging and stuff like that,

7   you know.  I can't really speak on what he was, but

8   I could tell you that being in that neighborhood,

9   if you are from that neighborhood and you just look

10  at that group of guys over there, you just see some

11  people, you just automatically assume they be

12  either BD or GD or BGDN.  So it's kind of like the

13  same thing.

14      **Q.   But because he was lame, you don't think**

15  **he had anything to do with a gang?**

16      A.   No.  He was scary.

17      **Q.   He was scary?  Sorry?**

18      A.   He had, like, a scary look to him.

19      **Q.   Okay.  So he was scared of the -- it**

20  **seemed like he was scared of the gangs?**

21      MR. ZECCHIN:  Objection.  Objection,

22  foundation, form.

23      MS. CARBAJAL:  Sorry.  I'll strike that.

24  Strike that.

Demond Weston v. City of Chicago; et al.
Deposition of Victor Safforld - Taken 3/27/2023

Page 209

1    BY MS. CARBAJAL:

2        Q.    What do you mean by -- just what do you

3    mean by "scary"?

4        A.    You trying to get me to answer a

5    question about somebody that I really don't know

6    nothing about.

7        Q.    Okay.

8        A.    So I don't know what his affiliation

9    was.  He wasn't with me.

10       Q.    Okay.  Do you have any reason to believe

11   that Demond Weston was involved in a shooting on

12   May 29th?

13       A.    No.

14       Q.    And did you ever give Demond Weston a

15   gun?

16       A.    No.

17       Q.    And then just last two questions.  But

18   do you remember testifying earlier that you were

19   eventually given pop and hamburgers after you made

20   statements to the police?

21       A.    Yes.  I was hungry as hell.

22       Q.    Okay.  But just to clarify, those --

23   that food and drink were given to you after your

24   statement, correct?

Demond Weston v. City of Chicago; et al.
Deposition of Victor Safforld - Taken 3/27/2023

Page 210

1    A.    Correct.

2    MS. CARBAJAL:  All right.  That's all I have

3  for you today.  Thank you so much.

4                   FURTHER EXAMINATION

5  BY MR. ZECCHIN:

6    Q.    I actually do have a couple follow-up

7  questions, Mr. Safforld, but I promise I'll keep it

8  brief.

9             You were asked about when you were

10  checked into Cook County Jail in intake.

11             Did you ever request any medical

12  attention for any of the injuries you sustained?

13    A.    Well, this is how I remember it.  I had

14  just been through the time of my life.  It felt

15  like hell at the police station.  I been to three

16  police stations.  I finally get to the county jail.

17  It's packed like sardines, like a slave ship, and

18  all I wanted to do was hurry up and get out to the

19  deck where I could go to sleep and rest.

20             So I didn't -- I wasn't even in the

21  right mind to even be thinking about dealing with

22  no doctors and stuff like that.

23    Q.    Okay.

24    A.    I don't know if you understand.  It

Demond Weston v. City of Chicago; et al.
Deposition of Victor Safforld - Taken 3/27/2023

Page 211

1   might seem like that would have been the obvious

2   thing to do, but at that point, I just wanted to go

3   to sleep.  I had been for damn near three days.

4       **Q.    Did you seek any type of medical**

5   **attention after you got back and situated on the**

6   **deck?**

7       A.    No.  It was just bruises and stuff.

8       **Q.    Okay.**

9       A.    Getting beaten up by the police was damn

10  near a common practice.  You don't go to the

11  hospital every time they jumped out, punch you

12  around, and stuff like that and let you go.  So

13  hassling from the police was normal.

14      **Q.    Was this the first time you ever were in**

15  **contact with Detectives Paladino, Maslanka, and**

16  **O'Brien when you were in the custody on June 9, of**

17  **1990?**

18      A.    Yes.  I --

19      **Q.    Strike that.  It was September of 1990.**

20  **That was the first time you came in contact with**

21  **them, though?**

22      A.    Yeah, to my knowledge, I have never seen

23  them.

24      **Q.    Okay.**

Royal Reporting Services, Inc.
312.361.8851

Demond Weston v. City of Chicago; et al.
Deposition of Victor Safforld - Taken 3/27/2023

Page 212

1      A.     I have never had no dealings with them.

2      **Q.    Okay.  And you were asked about Demond**

3 **Weston, but earlier you had said that you really**

4 **didn't know him when you were back -- back in 1990.**

5           **So is it fair to say you don't know**

6 **really what he was into or what his personality was**

7 **like back in 1990?**

8      MS. CARBAJAL:  Objection to form.

9 BY THE WITNESS:

10     A.     Like I said, to my knowledge, he was a

11 square.

12 BY MR. ZECCHIN:

13     **Q.    But that's just what you heard?  You**

14 **didn't know him personally back in 1990.  So is it**

15 **fair to say you don't really know what he was like?**

16     MS. CARBAJAL:  Objection to form.

17 BY THE WITNESS:

18     A.     Yeah, that's true.  But I didn't never

19 see him in no street activity.

20 BY MR. ZECCHIN:

21     **Q.    Okay.  And just my final question is**

22 **have you ever heard the phrase "wrecking crew"?**

23     A.     Yeah, I heard that.

24     **Q.    Okay.  What is a wrecking crew?**

# Exhibit 59

Identify and describe all property or possible evidence recovered at the end of the Narrative in column form. Show exactly where, when found, who found it and its description (include Property Inventory numbers). If property taken was scribed for Operation Identification, indicate I.D. number at end of Narrative. Offender's approximate description, if possible, should include name if known, nickname, sex, race code, age, height, weight, color eyes & hair, complexion, scars, marks, etc. If suspect is arrested, give name, sex, race code, age, C.B. or I.R. number, if known, and state "In Custody."

# SUPPLEMENTARY REPORT
## CHICAGO POLICE – FOR USE BY B.I.S. PERSONNEL ONLY

All descriptions and statements in one/re report are approximations or summarizations unless indicated otherwise.

| 4. DATE OF ORIG. OCCURRENCE-TIME | | |
|---|---|---|
| DAY | MO. | YR. |
| 29 | May | 90 | 2228 |

| 1. OFFENSE/CLASSIFICATION LAST PREVIOUS REPORT | 1.UCR OFF. CODE | 2. ADDRESS OF ORIG. INCIDENT/OFFENSE ☒1 VERIFIED ☐2 CORRECTED | 3. BEAT OF OCCUR. |
|---|---|---|---|
| Homicide/Murder | 0110 | 1904 W. 57th St. | 714 |

| 5. VICTIM'S NAME AS SHOWN ON CASE REPORT | 1 CORRECT ☒1 YES ☐2 NO | IF NO, CORRECT ALL VICTIM INFOR-MATION IN BOXES 20 THROUGH 27. | 6. FIRE RELATED ☐1 YES ☒2 NO | 7. BEAT ASSIGNED |
|---|---|---|---|---|
| WATSON, Joseph | | | | 5312 |

| 8. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | LOCATION CODE | 9. NO. OF VICTIMS | 10. NO. OF OFFENDERS |
|---|---|---|---|
| Street | 304 | 1 | 6 |

| 28. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 29. HOME ADDRESS | 30. SEX-RACE AGE/CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. |
|---|---|---|---|---|---|---|---|
| 1. McCURINE, Nathaniel nmi | 6453 S. Racine, 1st Fl. | M-1-18 | 600 | 145 | Br | Bk | Md |

| 31. C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER REL. CODE | C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER REL. CODE | 32. NO. ARRESTED | ARREST UNIT NO. |
|---|---|---|---|---|---|---|---|
| 8691-767 | 930223 | 24 | | | | 1 | 632 |

PERMANENT RETENTION FILE

## 80. NARRATIVE

```
VICTIM:              WATSON, Joseph  M/B/19
                     6211 S. Wolcott, 264-5639

IN CUSTODY:          McCURINE, Nathaniel nmi M/B/18  DOB 3 May 72
                     6453 S. Racine
                     600  145
                     IR#930223   CB#8691-767

ARRESTING OFFICERS:  Bt. 5312, Det. O'Brien#8825
                     Det. Kelly#3644
                     Bt. 762D, P.O. Fidyk#17314
```

CONT on PAGE 2

| 90. EXTRA COPIES REQUIRED (NO. & RECIPIENT) | 91. DATE THIS REPORT SUBMITTED | | | TIME | 92. SUPERVISOR APPROVING (PRINT NAME) | STAR NO. |
|---|---|---|---|---|---|---|
| | DAY | MO. | YR. | | SGT. R. PALMER | 1075 |
| | 15 | Nov | 90 | 1700 | | |

| 93. REPORTING OFFICER (PRINT NAME) | STAR NO. | 94. REPORTING OFFICER (PRINT NAME) | STAR NO. | 95. DATE APPROVED (DAY-MO.-YR.) | TIME |
|---|---|---|---|---|---|
| Det. James O'Brien | 8825 | Det. William Kelly | 3644 | 19 Nov 90 | 2100 |

609

DETECTIVE DIVISION        Page 2        15 Nov 90
AREA 3 VIOLENT CRIMES                  WATSON, JOSEPH
HOMICIDE/MURDER                       N-242748

## PERMANENT RETENTION FILE

| | |
|---|---|
| DATE, TIME, LOCATION OF ARREST: | 8 Nov 90, 1315 hours at 6453 S. Racine, 1st Fl. |
| CHARGES, CT. BRANCH and DATE: | 1st Degree Murder, Br. 66 on 9 Nov 90 |
| NOTIFICATIONS: | Felony Review, ASA Rubin responded into Area 3 |
| PERSONELL ASSIGNED: | Bt. 5312, Det. James O'Brien#8825<br>           Det. William Foley#3644<br>Bt. 5318, Det. John Paladino#9938<br>           Det. William Moser#5056<br>           Det. Tony Maslanka#16161 |
| STATEMENTS: | Handwritten statement taken from In Custody offender McCurine on 14 Jul 90 by ASA George Andrews. |
| INVESTIGATION: | R/D's were contacted by ASA B. Murray of the Cook County States Attorney's Gang Prosecution Unit who advised R/D's to seek a Murder Warrant For McCURINE, Nathaniel based |

on the handwritten statement given by McCURINE to ASA ANDREWS on 14 Jul 90.
R/D's then proceeded to 26th and California and met with ASA PENA of Felony Review
who approved a warrant for the arrest of McCURINE for the murder of JOSEPH WATSON.
R/D's then had the warrant signed by Judge BASTONE, who set bond on the warrant at
100,000.00, Warrant#CN34443, Docket#90112850.

                 Armed with the warrant, R/D's along with P.O. Fidyk of the
007th District Tactical unit then went to the residence of
NATHANIEL McCURINE at 6453 S. Racine, 1st Fl., where the
wanted subject was located, placed under arrest, advised of his rights, and then
transported into Area 3 for processing.

                 Upon arrival in Area 3 R/D's then contacted Felony Review
and ASA RUBIN responded into Area 3. After a review of
the facts of the case ASA RUBIN approved the charge of
1st Degree MURDER against offender McCURINE.

                 Based on the above facts, R/D's request that this case remain
CLEARED by ARREST, and OPEN, pending further developments.

                 Report of .........Det. James O'Brien#8825
                                 Det. William Kelly#3644

(609)

# Exhibit 60

**GENERAL PROGRESS REPORT**
DETECTIVE DIVISION/CHICAGO POLICE

| DATE OF ORIG. CASE REPORT | DATE OF THIS REPORT |
| DAY    MONTH    YEAR | DAY   MONTH   YEAR   WATCH |

OFFENSE CLASSIFICATION–LAST PREVIOUS REPORT | VICTIM'S NAME AS SHOWN ON CASE REPORT | BEAT/UNIT ASSIGNED

This form is designed for recording handwritten notes and memoranda which are made during the conduct of investigations, including: inter-watch memoranda (handwritten or typewritten), witness and suspect interview notes, on-scene canvas notes, and any handwritten personal notes made by detectives during the field investigation of violent crimes which are used to prepare official Department case reports. *Washington, Sylvester*        *June 90*

saw "Shank" Thursday at 53rd & Wood
- "Shank's" car:
        - bullet hole in front windshield
        - 4 dr chev dark blue, like police car
        - black walls, no hubcaps
        - newer than Biz's
        - Shank lives near 57 & Ada
        - there was a guy with a patch over one eye with him

- Terrell knows who was shooting (lives 52 & Honore)
- Biz's girlfriend, Renee, stays at 53 & Wood
- Nate used to be on 54 & Union, but moved recently
- Baldy heard the planning of the shooting
- Sweetie (Christopher Dalton) stays out east on 77 & Kingston
        w/wife, Renee

Dan Vanna's boys not locked up w/them
- 46 & King, 58 & Wolcott/Winchester
        Killer Ed, Baby Midnite & Black Mike not there

REPORTING OFFICER'S SIGNATURE–STAR NO. | RECEIVED BY SUPERVISOR'S SIGNATURE–STAR NO. | DAY–MO.–YR.  TIME

CPD-23.122 (Rev. 2/83)

CITY-DW-000101