# Exhibit 81

PO-1

To:            Raymond Clark, Acting Chief
               Detective Division

From:          Sergeant Thomas Brady, #1764
               Field Group - South

               Sergeant John Tolley, #1955
               Field Group - North

Subject:       RECORDS SURVEY & RECOMMENDATIONS

               Based on two (2) recent studies, it has been determined
that the six (6) Detective Division Field Areas have the following similarities
in their administrative filing systems.

NUMERICAL SEQUENCE (R.D.) FILES

- Maintained by civilian or sworn personnel assigned to
  clerical duties

- Original Case and Supplementary Case Reports on all but
  Homicide; Original Case Report only on Homicide

- Retention schedule of six (6) months

- All six (6) Areas; Violent Crimes Unit

M.O. FILE

- Maintained by civilian or sworn personnel assigned to
  clerical duties

- Supplementary Case Reports only in Sex, Robbery, and
  Burglary categories

- Retention schedule of one (1) year

- All six (6) Areas

UNIT FILES (Open Homicides/Cleared Homicides)

- Maintained by sworn personnel assigned to clerical duties
  and closely supervised by Sergeants

- Contain only official documents, i.e., Case Reports,
  Supplementary Reports, Consent to Search Forms, Coroner's
  Protocol, Autopsy Report, Crime Lab reports, and copies
  of statements

EXHIBIT
2
7-29-74

EXHIBIT 1                                       continued...

Hampton v. City of Chicago                      RFC 1082
12 C 5640                                       P 2457

HOOD 040933
Weston 055950

Subject:          RECORDS SURVEY & RECOMMENDATIONS

- Open cases are kept indefinitely; closed cases are kept for one (1) year or until case has been disposed of in court

- All six (6) Areas; Violent Crimes Units

MEMO BOARD (Areas 2, 3, 5, and 6 only)

- Maintained in Areas 2, 5, an 6 by Supervising Sergeant and Detectives. Copies of Homicide Case Report, Supplementary Reports, and memos are kept on this board for ready reference while case is "hot". This board is also used to pass information on to other members of the Unit.

- A more formal "Hot Board" in Area 3 is maintained by the Sergeant only and contains the pink copy of Supplementary Reports; additional bits of information on individual cases are stapled to original report. This is a duplication of the "Street File"

- Areas 1 and 4 do not have a "Memo/Hot Board" of any type.

- Retention schedules vary on these boards and are dictated by space.

STREET FILES (Running File in Area 3; Unit File in Area 4)

- Utilized by each Area with the exception of Area 4

- Maintained by Detectives in each Area; passed from team to team by Supervisors in Areas 1 and 2. It is considered the property of the Detectives working on the case, but space is provided for storage either in filing cabinets or desk drawers.

- Areas using "Street Files" keep various notes, memos, and bits of information on the case in these files, which are used to communicate steps taken, steps to be taken, and personal opinions of one Detective to another.

- Maintained for life span of the investigation; disposed of by the Detective making the Cleared/Closing Report after an arrest.

- In Area 4, the "Unit File" serves as the "Street File", and is controlled by the Detective signing the C.O. Book when removing the file. Upon submission of a Closing/Supplementary Report, the Detective will purge all non-essential material from the "Unit File".

- Violent Crimes Units

continued...

Hampton v. City of Chicago
12 C 5640

RFC 1083
P 2458

HOOD 040934
Weston 055951

Subject:   RECORDS SURVEY & RECOMMENDATIONS

     COURT FILES (Area 1 Violent Crimes; Areas 5 and 6 Property Crimes)

    - Maintained by individual Officers in each Unit indicated above; kept by name of Detective. Unit merely provides space for storage.

## CAN THE DETECTIVE DIVISION DEVELOP A UNIFORM POLICY REGARDING "STREET FILES"?

    PROBLEM - At present, the main component of a "Street File" is the memorandum sheet or "memo", which often contains opinions, conclusions, and investigative direction of the Detectives assigned to the case. Additionally, the "Street Files" contain other Case and Supplementary Reports pertaining to non-related cases which are utilized in suspect elimination and identification. Detectives will also insert into the "Street File" victims' personal papers such as telephone books, Drivers License, or photos of the victim or suspects. Personal notes of the Detectives, used to compile the investigation, are also inserted into the "Street File".

    At present, these memos, notes, non-related Case Reports, and victims' personal papers are subject to disclosure to defense attorneys if they are maintained by the investigating Unit.

### ALTERNATIVE NO. 1

### ELIMINATE "STREET FILES"

    Maintain only a Unit File of the unsolved investigation which would contain only official Department reports.

    Such elimination of "Street Files" would require much more supervisorial management of the investigation of unsolved cases. The Sergeants or Lieutenants would requisitely engage in the course the investigation is taking and the passing of investigative steps accomplished and those to be taken from off-going Detectives to relieving personnel. Supervisors taking a more active part in the investigation would also be required to pass on and receive investigative case status with Unit Supervisors assigned to other Watches in order to maintain continuity and investigative direction.

### DETECTIVE RESPONSIBILITY

1. Document their investigative finding in the form of a formal Supplementary Report at the end of their tour of duty.

  A. Their Supplementary Report should contain only previously unreported investigative matters germane to that particular investigation only.

  B. Their Supplementary Report should not contain opinions, conclusions, or anything that cannot be substantiated as fact.

              continued...

Hampton v. City of Chicago     RFC 1084
12 C 5640        P 2459

HOOD 040935
Weston 055952

Subject:                    RECORDS SURVEY & RECOMMENDATIONS

    C.  Their Supplementary Report should reflect the professionalism of the investigation portion they conducted with no levity or unrelated remarks in the narrative.

    D.  Their Supplementary Report should be suitable for court case presentation and contain adequate information for them to testify if necessary.

    E.  The investigating Detectives would also be required to verbally brief the on-duty Watch Commander or Sergeant as to investigative steps taken, and those necessary, so that the Supervisor could uphold the continuity of the investigation by passing on that information.

    F.  At the conclusion of the investigation, with the charging of an offender(s), the Detectives assigned to submit the Cleared/Closing Report would document the entire investigation from start to finish, utilizing the Supplementary Reports of Detectives who supplied investigative information to compile a clear comprehensive Closing Report.

    G.  Detectives obtaining personal papers or photos that were the property of the victim would either inventory the items or return them to the victim's family.

    H.  Hand-written confessions or other evidentiary items, including Consent to Search Forms, Release of Medical Information Forms, etc., should be inventoried.

### SUPERVISORY RESPONSIBILITIES

    Supervisors would be required to be knowledgeable of any unsolved investigation and take a direct part in the direction of the investigation, constantly monitoring the progress and quality of investigative steps.

    Supervisors would confer with Detectives to determine what new information was obtained by them, ensure the information was documented in a Supplementary Report, and pass on the information and next investigative steps to be taken to the investigating Detectives on the next Watch. The Supervisor would also confer with the Supervisors on the preceding and following Watches regarding the investigation.

### ALTERNATIVE NO. 2

### MAINTAIN "STREET FILE" BUT ELIMINATE MEMORANDUM

    Another alternative would be to maintain "Street Files", inserting into them only Department reports and other documents that would identify or eliminate suspects. Detectives would still be required to document newly developed information in the form of a formal Supplementary Report. All steps regarding the submission of Supplementary Reports previously mentioned herein under the "Detective Responsibility" heading would be adhered to.

    The purpose of this "Street File" without memos or notes is not for duplicity, but to pass these official reports from one investigating team to another and to maintain continuity.

continued...

Hampton v. City of Chicago
12 C 5640

RFC 1085
P 2460

HOOD 040936
Weston 055953

Subject:               RECORDS SURVEY & RECOMMENDATIONS

It is the opinion of the Reporting Officers that the information contained in the Unit Files is of much more significance than that contained in the Department Records Section. The Unit File contains I.R. Sheets, Medical Examiners Protocol, photos of the scene, Crime Lab reports and comparisons, Inventory Sheets, and several other important documents that shed light on the particular investigation. These documents are all obtainable if the particular Section or Department is notified, however, the only place they are all together is in the Unit File.

It is recommended that at the closing of a case, i.e., when an arrest has been made, the Arrest and Clearing Report has been submitted, and the case is ready for court, the Unit File (Cleared Homicide) be sent to the Records Section. A comparison should then be made and any documents or report contained in the Unit File that is not in the Department Records Section could then be transferred, and duplicates could be disposed of at that time.

This procedure would render useless the subpoenaing of Area records and would ensure that the Department record is complete.

Information necessary to complete the Murder Analysis Report can be transmitted to the Crime Analysis Unit prior to sending the Unit File to the Records Section.

Sergeant Thomas Brady, #1764
Field Group - South

Sergeant John Tolley, #1955
Field Group - North

Hampton v. City of Chicago
12 C 5640

RFC 1086
P 2461

HOOD 040937
Weston 055954

# Exhibit 82

DETECTIVE DIVISION
Area 3

21 April 1982

TO:        Raymond Clark, Acting Chief
           Detective Division

FROM:      John T. Stibich, Commander
           Area 3 Detective Division

SUBJECT:   Working Files


DEFINITION:  A file containing all official reports, documents, memos, requests from one detective to another, crime scene photographs, and any other pertinent information necessary for a detective to possess while conducting an official investigation.  This file should be available to the detective(s) assigned, by a supervisor, to an investigation and should receive such file directly from the supervisor.  Detectives should be allowed to take this file on the street with them.  At the end of the tour of duty the file should be returned to the supervisor.

SHOULD WORKING FILES BE KEPT?

Yes, working files are necessary on major investigations (mainly Homicides) when there is more than one team of detectives working on same in a continuing investigation over all three watches. Detectives need this information available to them on the street.  It would not be advisable to allow a detective to take the only official file on the street for fear of loss.  It also serves as a means of communication from one detective to another when an official supplementary report is not prepared.  Below are listed some, but not all, additional reasons for maintaining a working file:

- For the purpose of Inter-office correspondence.

- A running account of things accomplished and future
  things to be done.

- As a protection of the confidentiality of sources of
  information.

- As a forum for different detectives to give their
  respective view points, opinions, conjectures,
  suppositions, and "gut feelings" regarding a specific
  investigation.

- A documentation of the creditability of witnesses and/
  or suspects.

- As a safeguard against duplication of information by
  other detectives involved in the investigation.

- As a guide for a detective entering the specific
  investigation whereby he can immediately be brought
  up to date as to the progress of the investigation.

EXHIBIT 5

Hampton v. City of
12 C 5640



EXHIBIT
6
7-19-14

RFC 1092
P 2455

HOOD 040942
Weston 055959

DETECTIVE DIVISION
Area 3                                    -2-                21 April 1982

-As a means of eliminating witnesses and/or suspects.

X -A listing of leads undertaken (sometimes false);
    (Not included in official reports).

-Used as a clearing house for all information received.

X -A listing of information which later proves to be
   erroneous or given to detectives for self-serving
   purposes.

X -A listing of information that later proves to be
   worthless and does not become an integral part of
   the investigation/court presentation.

## WHAT SHOULD BE INCLUDED IN THE WORKING FILES?

In addition to the above it should contain all reports
and documents exactly like the official file. When a supplementary
report is prepared, copies should be placed in both files. Original
documents should always be placed in the official file and copies in
the working file. Any memos from one detective to another suggesting
the next course of action or avenue of investigation should remain
intact in the working file. The supervising sergeant should assure
that these memos are acted on and when action is completed a
supplementary report should be prepared by the detective.

## WHAT SHOULD BE DONE WITH WORKING FILES?

Eventually the working files should be incorporated
with the official file. Each file should contain the exact same
documents. Any memos made by detectives should become a part of the
official file if they contain any information that is pertinent to
the investigation in question. Under no circumstances should detectives
be allowed to have and maintain their own files. THERE SHOULD ONLY BE
TWO FILES MAINTAINED, the official file and the working file. Both
should be KEPT AND MAINTAINED IN THE UNIT OFFICE and under STRICT
SUPERVISION OF DETECTIVE SERGEANTS. MORE RESPONSIBILITY AND ACCOUNT-
ABILITY MUST REST ON UNIT SERGEANTS. At the conclusion of the
investigation (Cleared/Closed/Arrest) all pertinent information and
documentation should be transferred to the official file and the
working file should then be discared.

John T. Stibich, Commander
Area 3 Detective Division

APPROVED:
Deputy Chief, Field Group South
Detective Division

Hampton v. City of Chicago
12 C 5640

RFC 1093
P 2456

HOOD 040943
Weston 055960

# Exhibit 83

Deposition of James Hickey in *Kluppenberg v. Burge, et al*

Taken:  July 29, 2014

Role: Witness Regarding City Filekeeping Practices

# Transcript of the Testimony of **James Hickey (pt1)**

**Date:** July 29, 2014


**Case:** James Kluppelberg v. Jon Burge, et al.



Printed On: October 17, 2014

Siebert and Associates Court Reporters, Inc.
Phone:773 851-7779
e-mail:cmsreporters@comcast.net

HOOD 040361
Weston 055378

1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

JAMES KLUPPELBERG              )
                                      )
        Plaintiff,      )
                                      )
 vs.                   )  No.13 CV 03963
                                      )
JON BURGE, LEONARD ROLSTON   )
#11935, JOHN SCHMITZ #14634,  )
WILLIAM FOLEY #8108, WILLIAM  )
KELLY #3644, DETECTIVE URBON   )
#15400, THOMAS PTAK #6029,     )
MICHAEL DUFFIN #13596, GEORGE  )
JENKINS #11828, DETECTIVE      )
NELSON #16164, DETECTIVE VEGA  )
#3464, DETECTIVE W. MICEK      )
#4645, DETECTIVE GUEST        )
#10600, DETECTIVE L. TUIDER   )
#5648, FRANCES BURNS, WILLIAM  )
ALLETTO, as-of-yet UNKNOWN     )
EMPLOYEES OF THE CITY OF       )
CHICAGO and THE CITY OF        )
CHICAGO,                     )
                                      )
        Defendants.     )

The deposition of JAMES HICKEY
taken under oath at 311 North Aberdeen Street,
Suite 100, Chicago, Illinois, at 11:50 a.m. on
Tuesday, July 29, 2014 pursuant to the Rules of
the United States District Court, Northern
District of Illinois, before Jamye Giamarusti,
C.S.R. No. 084.004183 in and for the County of
Cook and State of Illinois, pursuant to Notice.

HOOD 040362
Weston 055379

163

1  prepare Exhibit 9?

2      A.    I went to the areas and I looked at

3  those documents that I found that were called

4  running files, street files, working files and

5  saw that in some of these files, there was

6  miscellaneous documents, sometimes to-froms,

7  subject reports, that I know were not in the

8  Records Division file.

9      Q.    And you knew that because that

10  information was not in the supplementary

11  reports, correct?

12      A.    No.  The memos were never placed in

13  the Records Division file without even reading

14  the report; or the memo, I would know, it's not

15  the same.

16      Q.    Right.

17      A.    Now, did the substance of that get in

18  there?  I don't know.

19      Q.    I believe that you testified in Palmer

20  that one of the things that you observed in the

21  course of your work on this issue was that

22  information that was in a document in the

23  working files sometimes didn't make it into the

24  supplementary reports, even though that

HOOD 040524
Weston 055541

164

1  information was relevant, correct?

2         MR. PATTERSON:  Objection, improper

3  impeachment.

4  BY MS. KEEN:

5     Q.  I'm not attempting to impeach you.

6  I'm just asking you a question about whether

7  you recall giving that testimony.

8     A.  I believe my comment was oftentimes,

9  sometimes, substantive investigative activity

10  never made it into the official report.

11         For instance, the clearing of

12  suspect A and all the work that went in to even

13  find suspect A.

14         In some instances, there were

15  examples of two reports in a file; the original

16  and the closing arrest report.  And they're

17  separated by ten days.  And one wonders what

18  happened in that ten days.

19     Q.  Right.  And so you would see cases

20  where there was some documentation regarding

21  the work that had been done in the intervening

22  ten days that wasn't made part of the permanent

23  retention file, correct?  Or, the Records

24  Division file, I should call it.

HOOD 040525
Weston 055542

165

1      A.    Correct.

2      Q.    So, you became aware of a practice in

3  some instances of substantive information about

4  a case investigation not being put into the

5  supplemental report, correct?

6      A.    Correct.  It wasn't wrong in and of

7  itself but it also raised questions.  How did

8  you get to suspect B?  How did that story

9  develop?

10     Q.    So, let's take the example of the

11  suspect A being a suspect and then being

12  eliminated.

13     A.    Right.

14     Q.    Can you tell me -- I mean, how often

15  did you see something like that happening, if

16  you can recall?

17     A.    I have no idea to put it in terms of

18  numbers.  But genuine, substantive, good

19  detective efforts were going undocumented as

20  part of the investigative story line.

21     Q.    In that example, the identity of

22  another suspect that had been ruled out by that

23  detective was completely omitted from the

24  official police reports, correct?

HOOD 040526
Weston 055543

166

1  A. Correct.

2  Q. So, say, there was some evidence to

3 later rule that suspect back in, how would that

4 information -- let me re-ask the question.

5    Unless that suspect later

6 became -- unless the suspect who was ruled out

7 later became a suspect again, that suspect's

8 identity would never be disclosed via official

9 police reports for that investigation, correct?

10  A. Pre-1983, correct.

11  Q. After the special order 82-2 was

12 issued, did you do sampling of any kind on the

13 subject of files?

14  A. No. I had a lot of conversations, a

15 lot of meetings, but no complete effort to

16 sample again.

17  Q. Did anybody on behalf of the

18 department do any sampling of actual files

19 after the special order 82-2 came out?

20  A. I'm not aware of any.

21  Q. Is that something you would have been

22 aware of given your role in the project?

23  A. Had it been done at the direction of

24 the Chief, I would have heard about it, I would

HOOD 040527
Weston 055544

167

1  have known about it.  But there's nothing to

2  prohibit anyone below that to order one of

3  their subordinates to do further sampling, and

4  I would not have known about it.

5      Q.  Did the department take any steps to

6  find out if the working file practice had

7  actually stopped at any time after Special

8  Order 82-2 was issued?

9      A.  Well, we saw Deputy Chief Hinchy's

10  effort to reinforce the message.

11      Q.  That the day after the order, right?

12      A.  Right.  Right.

13      Q.  I'm just asking the question, because

14  I don't know the answer.

15          Did the City of Chicago Police

16  Department or anyone within the department take

17  any steps to determine whether the working

18  files practice had actually stopped as a result

19  of the efforts the department had taken to

20  issue a Special Order on the subject in '82?

21          MR. PATTERSON:  Objection, asked and

22  answered.

23          THE WITNESS:  All the files that were

24  intact should remain intact as of the temporary

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

HOOD 040528
Weston 055545

168

 1    restraining order.  And the issuance of an

 2    order by the superintendent.

 3              Then came the gray area.  What

 4    about my personal notes?  They don't mean that,

 5    do they?  Well, neither the temporary

 6    restraining order nor the superintendent's

 7    direction made mention of personal notes.

 8              And there was discussion -- well,

 9    it couldn't possibly mean notes, because they

10    didn't say notes.

11              They must be referring to those

12    memoranda and those to do lists.

13              We'll keep them, just as they

14    were.  But if there was a genuine, sincere,

15    what do you think he means, what do they mean

16    about notes?

17    BY MS. KEEN:

18        Q.  And so what was done about that

19    confusion?

20        A.  We had meetings and then we had -- oh,

21    then we went to court.  Milton Shader's

22    courtroom, and Superintendent Brzeczek

23    clarified his standing.  And he said anything

24    generated in the course of an investigation,

HOOD 040529
Weston 055546

169

1    notes, even if they're written on the back of a

2    notebook should be preserved.

3              Notes?  Yes, notes.  That was our

4    marching orders to change and clarify what to

5    do with personal notes.  They're the

6    work-product related to the investigation.

7         Q.   So, it sounds like in response to the

8    practice of working files and this Laverty memo

9    lawsuit, the department responded by issuing

10   its Special Order and then these substance

11   special orders regarding the use of

12   investigative files, correct?

13        A.   Well, the first one is 82-2,

14   Department Notice 82-2.  Preserve those things.

15   We still didn't have a name for them.  Preserve

16   them.  You know what I'm talking about.

17             Later, after the hearing in

18   federal court, it was clear that the

19   superintendent is announcing a new policy.

20        Q.   This is 83-1?

21        A.   83-1.

22        Q.   And then 83-1 spelled out the filing

23   system and created some names for the file and

24   associated ancillary documents, correct?

HOOD 040530
Weston 055547

170

1        A.    Correct.

2        Q.    And then there were some subsequent

3    orders, which I'll mark at this point, that

4    related to the same subject of investigative

5    files and those ancillary documents, correct?

6        A.    Correct.

7        Q.    And then the GPR form was created as

8    well, correct?

9        A.    As part and parcel of 83-1.

10       Q.    Did the department take any other

11   steps to ensure that all of the information in

12   working files was getting produced to -- let me

13   ask that question.

14              Other than the special orders

15   that I just talked about regarding

16   investigative files, did the department take

17   any steps to ensure that working files were

18   being kept intact and not being destroyed?

19       A.    We go back to the supervisory

20   responsibility.  The Superintendent of Police

21   has issued his policy.  The Chief of Detectives

22   has issued a division level order.  It's to be

23   followed.

24              Now, I'm not aware of what you're

HOOD 040531
Weston 055548

171

1    suggesting, what City-wide uniform action items

2    were there.  I imagine there was a lot of

3    action items done at the commander, lieutenant,

4    sergeant level.  Give me a general progress

5    report with your supp.

6              I know you didn't write that supp

7    using your imagination.  Really?  Yes.  We

8    never used to.  Right.  We never used to.  But

9    do it now.  It was a change of a mindset.

10        Q.    The mindset was that -- the earlier

11   mindset was this very familiar practice of not

12   turning over notes, right?

13        A.    Correct.

14        Q.    And keeping information working files

15   that didn't get made part of the Records

16   Division file, correct?

17        A.    Not keeping.  Okay.  There was no

18   uniform practice of getting rid of running

19   files, street files, working files.  Some might

20   just take the entire file and throw it in the

21   garbage.

22        Q.    Right.  I just mean of not submitting

23   information from the working files in the

24   permanent file, into the Records Division file,

HOOD 040532
Weston 055549

172

1    that was a mindset that existed before January

2    of '82, correct?

3         A.   Correct.  Before '83.

4         Q.   Before '83.

5              So, I guess all I'm asking is

6    other than direct supervisors to the extent

7    they may have taken steps that you're not

8    personally aware of, did the department

9    management or command staff take any steps to

10   determine whether the working file practice had

11   actually changed as a result of the Special

12   Orders?

13        A.   We had a training program.  There was

14   the 1986 Detective Division Special Order

15   issued by George McMahon, which for the first

16   time introduces the word in Section 6, I

17   believe, audit.

18              Exempt commanding officers will

19   audit these records, these investigative files.

20   But I think that is after the fact.

21              I'm not backing down from the

22   fact that supervisors made sure that the

23   Superintendent of Police's direction and the

24   Chief of Detective's direction were being

HOOD 040533
Weston 055550

173

1    followed.

2        Q.    I appreciate that.  I'm just trying to

3    understand if anything was done besides that.

4    And I think the answer is, there was some

5    initial training to explain the new rules of

6    83-1, correct?

7        A.    Correct.

8        Q.    And then there was a special order in

9    '86 correct?

10       A.    Correct.

11       Q.    Other than that, you're not aware of

12   any steps taken by anyone at the management

13   level in the department to make sure that the

14   working files practice had ceased, correct?

15       A.    Right.

16       Q.    Now, as far as whether sergeant

17   supervisors, in other words, front line or

18   first line supervisors, if you will, were

19   actually making sure that the Laverty problem

20   didn't happen again and that relevant

21   information wasn't being kept from the official

22   police reports, what steps are you aware of did

23   these front line supervisors take?

24       A.    The front line supervisor had to sign

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

HOOD 040534
Weston 055551

# Exhibit 84

**VERDICT FORM – Fields v. City of Chicago, et al., Case No. 10 C 1168**

We, the jury, find as follows on the claims of the plaintiff, Nathson Fields, against the

defendants, the City of Chicago, David O'Callaghan and Joseph Murphy:

**1.     First claim – violation of due process:**

(check one on each line)

| Name of defendant | For plaintiff | For defendant |
|---|---|---|
| David O'Callaghan | ✓ | _____ |
| Joseph Murphy | ✓ | _____ |

**2.     Second claim – agreement to violate due process rights:**

(check one on each line)

| Name of defendant | For plaintiff | For defendant |
|---|---|---|
| David O'Callaghan | _____ | ✓ |
| Joseph Murphy | _____ | ✓ |

**3.     Third claim – malicious prosecution:**

(check one on each line)

| Name of defendant | For plaintiff | For defendant |
|---|---|---|
| David O'Callaghan | _____ | ✓ |
| Joseph Murphy | _____ | ✓ |

**4.     Fourth claim – intentional infliction
of emotional distress:**

(check one on each line)

| Name of defendant | For plaintiff | For defendant |
|---|---|---|
| David O'Callaghan | ✓ | _____ |
| Joseph Murphy | _____ | ✓ |

**5.     Fifth claim – policy claim against City of Chicago:**

| Name of defendant | For plaintiff | For defendant |
|---|---|---|
| City of Chicago | ✓ | _____ |

25

**FILED**

DEC 1 5 2016

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**Exhibit F**

**Compensatory damages**
**(to be considered only if you have found**
**in favor of plaintiff on one or more of his**
**claims against one or more of the defendants)**

We, the jury, award the plaintiff, Nathson Fields, compensatory damages in the

amount of $ _22,000,000_ .

**Punitive damages**
**(to be considered regarding a particular defendant**
**only if you have found in favor of plaintiff against that**
**defendant on one or more of plaintiff's claims)**

We, the jury, award the plaintiff, Nathson Fields, punitive damages against David

O'Callaghan in the amount of $ _30,000_ .

We, the jury, award the plaintiff, Nathson Fields, punitive damages against Joseph

Murphy in the amount of $ _10,000_ .

**Please sign and date the form below:**

_____       _____
Presiding juror

_____       _____

_____       _____

_____       _____

_____       _____

_____       _____

Date: _12-15_____ , 2016

26

**Exhibit F**

**IN THE UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF ILLINOIS**

Nathson Fields,

Plaintiff(s),

v.

City of Chicago, et al.,

Defendant(s).

Case No.  10 C 1168
Judge Matthew F. Kennelly

## <u>JUDGMENT IN A CIVIL CASE</u>

Judgment is hereby entered (check appropriate box):

☐    in favor of plaintiff(s)
and against defendant(s)
in the amount of $     ,

       which ☐ includes     pre–judgment interest.
                   ☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☐    in favor of defendant(s)
and against plaintiff(s)

.

Defendant(s) shall recover costs from plaintiff(s).

---

☒    other: Judgment is hereby entered as follows:  On Count 1 of the third amended complaint, in favor of plaintiff and against defendants David O'Callaghan, Joseph Murphy, and the City of Chicago; on Count 3 of the third amended complaint, in favor of defendants David O'Callaghan and Joseph Murphy and against plaintiff; on Count 4 of the third amended complaint, in favor of defendants David O'Callaghan and Joseph Murphy and against plaintiff; on Count 5 of the third amended complaint, in favor of plaintiff and against defendant David O'Callaghan, and in favor of defendant Joseph Murphy and against plaintiff.  Counts 2 and 6 of the third amended complaint are dismissed.  Judgment on Counts 7 as to the City of Chicago corresponds to the judgments on Counts 4 and 5 regarding defendants David O'Callaghan and Joseph Murphy.  Judgment on Count 8 as to the City of Chicago corresponds to the judgments on Counts 1, 3, 4, and 5 regarding defendants David O'Callaghan and Joseph Murphy.  Compensatory damages are awarded to plaintiff Nathson Fields in the amount of $22,000,000.  Punitive damages are awarded to plaintiff Nathson Fields, against defendant David O'Callaghan in the amount of $30,000.  Punitive damages are awarded to plaintiff Nathson Fields against defendant Joseph Murphy in the amount of $10,000.

**Exhibit F**

Case: 1:10-cv-01168 Document #: 1175 Filed: 12/16/16 Page 2 of 2 PageID #:27212

This action was *(check one)*:

☒ tried by a jury with Judge Matthew F. Kennelly presiding, and the jury has rendered a verdict.
☐ tried by Judge        without a jury and the above decision was reached.
☐ decided by Judge        on a motion

Date:   12/16/2016                          Thomas G. Bruton, Clerk of Court

                                            Pamela J. Geringer, Deputy Clerk

**Exhibit F**

# Exhibit 85

*Michael Brasfield and Associates, Inc.*

641 Olele Point Road                          Phone: 360-301-4465
Port Ludlow, WA 98365                     E-mail: brasfield@commandscene.com

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

**Nathson E. Fields v. City of Chicago, et al.**
Cause: 1:10-cv-01168

**Report of Plaintiff's Expert – Michael D. Brasfield**

**March 15, 2016**

### Introduction

The law firm of Loevy & Loevy, representing the plaintiff in this matter, contacted me in December of 2015 to review the Chicago Police Department's (the "CPD") policies and practices related to the creation, maintenance, storage, preservation, and disclosure of investigative materials in homicide cases, as concerning the *Fields v. City of Chicago* case discussed below, and more broadly. To that end, I reviewed documents regarding CPD's policies and practices governing homicide investigative files. I also reviewed numerous files created by CPD detectives during homicide investigations and compared those files to defense attorneys' files to assess whether relevant investigative material was disclosed or withheld. I have concluded, to a reasonable degree of professional certainty, that the CPD's policies and practices related to the creation, maintenance, storage, preservation, and disclosure of investigative material deviated substantially from generally accepted police practices and resulted in the routine failure to disclose important investigative materials to criminal defendants.

Police departments have long recognized the need to ensure that information and evidence collected during a criminal investigation is properly documented, stored, and ultimately disclosed for use in the criminal trials. The standard practice is relatively straightforward, and consists of a few key components: (a) requiring investigating officers to document the information they learn during the course of an investigation; (b) collecting, inventorying, and maintaining all of the investigative materials and information, in one central location; (c) applying policies or guidelines to ensure that the investigative material in the central file is disclosed to prosecutors and criminal defendants in response to formal requests for information; and (d) administering training around all of these issues to ensure the policies are followed.

CPD did not comply with these standards, instead allowing detectives and other investigating officers to utilize multiple, parallel files for each investigation. The use of parallel files itself creates a significant risk that important investigative materials will not be disclosed, but that risk was exacerbated by the CPD's failure to provide any training or policies regarding proper response to subpoenas and discovery requests. The result is predictable: a routine failure to disclose all relevant investigative materials to criminal defendants.

1

CPD's problem of failing to turn over all relevant materials was brought to light by two federal cases in the early 1980s, but despite being acutely aware of the problem, CPD did little to address the practice. The policies it issued were a superficial attempt to resolve the problem and were deficient on their face – as they still allowed, and even required, multiple, parallel files to be created for each investigation. Moreover, CPD took almost no steps to train, supervise, or implement those policies. Finally, the policies did nothing to ensure that there was a system in place to properly respond to subpoenas and discovery requests.

I have reviewed numerous Chicago homicide files, including criminal defense files and corresponding police investigative files. My review confirmed that because of, the deficient policies and widespread practices described above, criminal defendants were routinely denied substantive and relevant investigative materials related to their criminal cases, and that the written policies did little to alter the ingrained practice of keeping clandestine, parallel files. Finally, I reviewed the files that were withheld from Mr. Fields during his criminal trial and concluded that those files were withheld as a result of the same set of practices and policies (or lack thereof), and contained relevant and important investigative materials that should have been disclosed under standard police procedures.

## Table of Contents

I.    Standard police practices for maintaining and disclosing investigative files requires a single, comprehensive file

II.   *Jones* and *Palmer* litigation highlight Chicago's "Street File" problem

III.  CPD personnel consistently use multiple files during a criminal investigation, and fail to disclose all relevant materials to criminal defendants.

    A.  Multiple files are created for a single investigation, creating a serious risk that investigative materials are not disclosed.

    B.  The CPD's *ad hoc* response to subpoenas exacerbates the problem

IV.   Criminal defense files show that important investigative materials are regularly withheld from criminal defendants

    A.  Background on the "basement files"

    B.  Criminal defense files are missing pages from the basement files

    C.  Issuing a subpoena does little to ensure disclosure of all relevant materials

    D.  The missing pages contain important and relevant information that should have been disclosed to criminal defendants

HOOD 038821
Weston 053838

V.    CPD's policies after *Jones* and *Palmer* don't ensure disclosure of all relevant investigative materials

    A.  The policies are insufficient to remedy the "street files" problem

    B.  The City failed to provide proper training and oversight to ensure compliance with its policies

VI.   The basement files show that the directives were not properly implemented

    A.  The basement files from the 1983-1989 time period show that CPD's policies were not followed

        1.  Handwritten notes, not on general progress reports, are still routinely used

        2.  To-from memos are still being used

        3.  All relevant information in unofficial documents is not transcribed in official reports

            a.  Review of Permanent Retention Files

        4.  Inventories are missing or incomplete

        5.  The basement files show that the "Investigative Files" did not serve as the central repository for investigative materials

    B.  The basement files from the 1999-2006 show that the policies were not followed and that the problem has continued unabated into the 2000s

    C.  The basement files confirm that there was no training, auditing, or oversight to ensure compliance with the policies

VII.  The failure to turn over files in Nathson Fields' criminal case was a direct result of these practices and inadequate policies

HOOD 038822
Weston 053839

## Expert Witness Qualifications

I began my 40-year law enforcement career in 1968 as a patrol officer with the City of Mercer Island, Washington. In 1969, I joined the Seattle Police Department and served Seattle as a police officer, detective, sergeant, lieutenant, captain, major, and assistant chief. In addition to uniformed patrol, my investigative assignments as a detective included traffic, homicide investigation, burglary and theft, and vice (gambling and prostitution). As a sergeant, I served in patrol, the tactical squad, and internal investigations. As a lieutenant, I served as a watch commander in charge of 50 patrol officers, and later as the commander of the Washington State Criminal Justice Training Commission's Basic Law Enforcement Academy for 2 years. This academy was responsible for developing and providing the initial law enforcement training for all commissioned law enforcement officers in Washington State. As a captain, I served as commander at both the downtown and north precincts, with responsibility for over 125 officers at each location. I also served as the commander of the Internal Investigations section of the Seattle Police Department for 2 years. I was the commander of the inspectional services division for 4 years. This division was responsible for developing, implementing, and monitoring departmental policies and procedures. This division was also responsible for developing and administering a budget in excess of $120 million. My last 5 years with the Seattle Police Department were served as assistant chief in command of the support services bureau. I was responsible for, and oversaw the activity of, nine uniquely different divisions including: internal investigations; training; personnel; intelligence; crime prevention; communications; records & evidence; data processing; and fiscal, property, & fleet management.  In this capacity I routinely served as Seattle's acting Chief of Police. I retired from that agency in 1995.

I was selected by the City of Fort Lauderdale as its Police Chief in 1995. The 33-square-mile city has a full time resident population of 165,000. An estimated additional 60,000 "snow bird" residents return to second homes in the city during the 6-month winter season. Fort Lauderdale serves as the seat of government for the county of 1.5 million and is in the heart of a diverse tri-county (Dade, Broward, and Palm Beach) population of 4 million. As one of the premier tourist destinations in South Florida, over 12 million passengers come through the airport each year. The ocean port handles the second largest number of cruise ship sailings in the world. Fort Lauderdale serves as the governmental and business hub of the County. The Fort Lauderdale Police Department had a budget of $60 million and consisted of 500 sworn positions and 300 civilian positions. In 2000, the department received 600,000 calls for service, dispatched over 200,000 of those calls, made over 20,000 arrests, and issued 65,000 traffic citations. The Department is now nationally recognized as an innovative leader in the field of community policing and was one of only a handful of cities nationwide to be selected as a Community Policing Demonstration Site by the Department of Justice. I oversaw the operation of the only municipal jail in the state of Florida. Under my tenure, Fort Lauderdale became the first major agency to obtain accreditation. After over 6 years as the police chief of Fort Lauderdale, I retired from law enforcement a second time and returned to the Seattle area in the fall of 2001.

After retiring as Chief of the Fort Lauderdale Police Department I returned to my retirement home in Washington State.  About a year later I chose to run for, and was elected to, the office of Jefferson County Sheriff. I served in that capacity for over 6 years, and retired from active-duty law enforcement for the third (and final) time in the spring of 2009.

HOOD 038823
Weston 053840

As both a Police Chief (6 years) and Sheriff (6 years), I have reviewed and approved policies and procedures of every kind. These included (but are not limited to) policies and procedures on criminal investigations, maintenance of police records, complaints against police officers, training, supervision, and discipline. I believe that of specific relevance to this case is that I was the chair of the Washington State Board on Law Enforcement Training, Standards, and Education. Through that position I regularly examined and reviewed issues and criteria that define standards and norms related to the practice and administration of law enforcement practices and operations. I also served 2 years as Commander of the Washington State Basic Law Enforcement Academy in Burien, Washington. In that position I was responsible for the administration of the training program provided to all Washington State Law Enforcement Officers. This was also my role as the Assistant Chief of the Seattle Police Department responsible for in-service and advanced training at the Academy over a subsequent 5-year period. Finally, for 6 years, I was the Commander of the Seattle Police Department's Inspectional Services Division and responsible for the development, formulation and updating all police policy and procedures, including those involved in proper investigation procedures.

As an independent consultant and sub-contractor, I have completed on-site visits to analyze 6 major U.S. city police agencies (Boston, Baltimore, Memphis, Oxnard, Cleveland & Seattle) to evaluate community policing in public housing. I have also served as a visiting management assessor for the cities of New Orleans (LA), Columbus (OR), Portland, (OR), San Francisco (CA), Bremerton (WA). Upon my return to Seattle in 2001, I provided contract professional services as a consultant and program director for the non-profit South Downtown Foundation. I had responsibility for administering several million dollars for improving public safety in the International District, SoDo, and Pioneer Square neighborhoods of Seattle. In this capacity I coordinated efforts with the City of Seattle, the Seattle Police Department, and various interest and civic groups in the area.

As Sheriff of Jefferson County, I held a gubernatorial appointment to the Washington State Sentencing Guidelines Commission, serving as the only law enforcement official on this body of judicial, legislative, and executive-branch representatives. I also chaired the Washington State Criminal Justice Training Commission's Board on Law Enforcement Training, Standards, and Education. Members of this board monitored and evaluated the training of police officers and participated in law enforcement decertification hearings.

Over the last 40 years I have received extensive, specialized professional training in nearly all areas of law enforcement. There has been particular emphasis in the areas of training, internal investigations, criminal investigations, traffic homicide investigations, use of force, ethics, and police liability. I was awarded "life member" status with the International Association of Chiefs of Police in 2005. I was also awarded "life member" status with the Washington Association of Sheriffs and Police Chiefs in 2009. I am also a "life member" of the National Sheriffs Association. I have also been a member of the Washington State Sheriffs Association and served on the executive board of that organization.

During my career, I have been required to investigate and/or review hundreds of internal investigations. I have supervised hundreds of officers, and have had to review their compliance

5

HOOD 038824
Weston 053841

with standards of behavior and integrity. As both a supervisor, and later a commander of internal investigations with the Seattle Police Department, I have reviewed and evaluated the thoroughness of well over hundreds of such investigations. As a police chief and as a sheriff, I have had the ultimate responsibility of passing judgment on such actions by law enforcement officers in situations ranging from traffic stops to fatal shootings.

I have had the opportunity to conduct audits and systematic reviews of police departments throughout my career. As the commander (Major) of the Seattle Police Department's Inspectional Services Division, I conducted both periodic performance inspections of various Departmental units, as well as special audits of high liability units, divisions and bureaus.

As a police practices expert, I was part of a team that performed audits of police department service delivery provided by municipal agencies in 6 major U.S. cities (Boston, Baltimore, Memphis, Oxnard, Cleveland & Seattle).

While working for the Seattle Police Department, I was part of a management assessment team for the cities of New Orleans (LA), Columbus (OH), Portland, (OR), San Francisco (CA), and Bremerton (WA).

As an appointed board member of the Washington State Attorney General's Homicide Investigation Tracking System (HITS), I participated in audits of ongoing and cold case homicide investigations throughout the State of Washington.

In addition, when appointed as the Police Chief in Fort Lauderdale (FL) and when elected Sheriff of Jefferson County (WA), I initiated and oversaw the audits of high risk units and functions within those agencies.

I received a Bachelor of Arts degree in Criminal Justice from the University of Washington in Seattle. I also am a graduate of the Senior Management Institute for Police (SMIP) of the Police Executive Research Forum.

I have been retained in over 65 lawsuits as a police practices expert witness - approximately 66% for law enforcement defendants and 33% for civil rights plaintiffs or individuals claiming injury by law enforcement officers. These include federal district courts in Illinois, Pennsylvania, Florida, Washington State, Idaho, Oregon, Colorado, and Louisiana, and state courts in Washington, Alaska, California, Oregon, Arizona, Pennsylvania, Florida, Wyoming, Texas, and Kentucky.

## I.      Standard Police Practices For Maintaining And Disclosing Investigative Files Requires A Single, Comprehensive File

Every police department in the country must address how to properly document their criminal investigations. All information and evidence from an investigation must be properly collected, documented and preserved so that it can be disclosed to prosecutors and criminal defendants for use in criminal trials.

HOOD 038825
Weston 053842

The standard police practice, across the country, is relatively straightforward: a lead detective is assigned to every major investigation, and that lead detective is in charge of compiling all investigative materials in a single centralized location. Although multiple detectives may work on an investigation, all information must be centralized and organized. These standards are in place to help police officers effectively solve crimes: they ensure that, during the investigation, information is not lost because it is dispersed among various detectives and that the information is organized and stored so that a supervisor or other detectives can locate and understand the evidence collected by their colleagues. This standard police practice also ensures that once charges are filed, everything that does exist from the investigation is complete, identifiable, inventoried, and maintained in its entirety in a central location. Whether it is referred to as an investigative file, a "murder book," a completed investigation, an open investigation, or something else, everything should be in one package that can be located and produced – for whatever reason it is needed.

Standard police practices also require the disclosure of all investigative material in the police file, whether centralized (standard, and preferable) or not. There should not be picking and choosing. Performing these disclosure requirement is not an informal practice; it is done pursuant to written policies and procedures, in conjunction with training on those policies and procedures, to ensure compliance to this crucial step in ensuring fair trials. As a practical matter, this disclosure for use in a criminal case usually occurs in one of two ways: either the police fulfill their obligations by disclosing their entire investigative file to the prosecutor (rather than picking and choosing which parts of a file to disclose), who in turn disclose it to the criminal defense attorney; or, in some cases, independently and as a safeguard, the criminal defendant or his counsel will subpoena the police investigative materials directly. In response to the subpoena, all investigative materials should be disclosed.

It is also standard police practice to keep and catalogue every document or piece of information pertaining to an investigation. The police investigative role is to search for and document facts – all facts regardless of where those facts fit into some pre-conceived theory of the investigation. Not all facts, information, or individuals will necessarily enhance the prosecution of an identified suspect. Nonetheless, those facts have to be included in the investigation– to help prevent tendencies like tunnel vision, and also in fairness to the victims, the prosecutor, the defense, the court, and the jury. The judge will eventually rule on what is relevant and admissible. And investigators routinely offer explanatory information that puts that information in perspective, or explains why the detectives gave it little weight. But based on my experience, police officers are expected to, and are specifically trained on the importance of preserving all investigative materials and including those materials in a centralized location. Police departments typically emphasize this point because, in order to meet the needs of police agencies and the courts, case files must be maintained in a manner that make them secure but accessible, and the case contents should be arranged in an orderly and consistent manner.

As a corollary, all of the information must be inventoried, indexed, or documented in such a manner as to be easily located and so that the content of the inventory is clearly understood. To that end, a copy of the investigative file inventory will typically be placed in an official police department file so that the department can maintain a single, accurate list of all

HOOD 038826
Weston 053843

available material, and that inventory is typically disclosed to prosecutors and criminal defendants so that they can ensure that they have everything. In this way, it serves not as a solution to the problem of ensuring that all investigative material is disclosed, but as a necessary backstop to try to prevent the possibility of non-disclosure despite the existence of other policies and procedures.

My knowledge of these standards is based on my extensive experience with police practices, including my familiarity with the policies used by other police departments nationwide, as well as industry standards established by organization like the International Association of Chiefs of Police. These standards have also been documented in homicide guides and reference materials for decades. For a summary of these texts, please see **Attachment E.**

## II.    *Jones* and *Palmer* litigation highlight Chicago's "Street File" problem

In the early 1980s, two federal court cases highlighted the fact that the Chicago Police Department had no systems in place to ensure that investigative materials were collected centrally and disclosed during criminal cases, and in fact important materials were consistently withheld from criminal defendants.

### A.  The George Jones Prosecution

In 1981, twelve-year-old Sheila Pointer was raped and bludgeoned to death; and her 10-year-old brother Purvy was beaten unconscious in their home.[1] George Jones – a senior at a nearby high school, who edited the school newspaper and was nicknamed "Bookworm" – was ultimately arrested and prosecuted for the crime. During the CPD investigation of the Pointer murder, detectives gathered evidence that undermined the witnesses who had implicated Jones, and which Jones could have used to help defend himself, but this information was placed "not in the police department's regular files but in its 'street files.' These were files that the police did not turn over to the state's attorney's office as they did with their regular investigative files."[2]

After George Jones had been charged, a detective, Frank Laverty, who was investigating the case interviewed the victim's brother, Purvy, who told Laverty that there were two assailants and both were wearing stocking masks. Laverty also documented other strong evidence that Jones was not the perpetrator.  That information was also placed in the street file.[3] Laverty was told that, in light of these facts, the prosecution of Jones had been abandoned. However, in the spring of 1992, Detective Laverty read in the newspaper that George Jones was on trial for the Pointer murder.[4]  Laverty went to his Commander to tell him that an innocent person was being prosecuted, but his Commander took no action. Laverty then went directly to Jones' criminal defense attorney and told the attorney about the information in the street file. After the court

---

[1] *Jones v. City of Chicago*, 856 F.2d 985, 988 (7th Circuit 1988)
[2] Ibid (at 988-991)
[3] Ibid (at 990-91)
[4] Ibid (at 991)

8

HOOD 038827
Weston 053844

declared a mistrial, the State's Attorney dropped all charges against Jones.[5]

The United States Court of Appeals for the Seventh Circuit described the CPD's reaction to these events as follows:

> Laverty should have been commended for his adherence to the principles of honesty, decency, and justice, instead the police department charged him with a disciplinary infraction for having failed to advise the state's attorney that he planned to testify for the defense in George Jones's criminal trial should that become necessary. He was also transferred out of the detective division, ostracized by his fellow officers, and assigned to a series of menial tasks culminating in the monitoring of police recruits giving urine samples. None of the defendants has been disciplined for misconduct in the arrest and prosecution of George Jones.[6]

After the charges against him were dismissed, Jones filed a civil lawsuit. He was awarded a substantial amount in damages for the violation of his rights. Notably, among other things, the jury found that the City was liable to Jones for its custom of maintaining "street files" that were withheld from the State's Attorney and therefore unavailable to Jones and the rest of the criminal justice system.[7] The Seventh Circuit explained that the practice of "retaining records in clandestine files deliberately concealed from prosecutors and defense counsel cannot be tolerated."[8]

### B. The Palmer Litigation

On April 16, 1982, shortly after Jones' prosecution, a class of plaintiffs filed a lawsuit in federal court to prevent the use of street files.[9] The plaintiffs immediately moved for a temporary restraining order (TRO). A TRO issued on April 20, 1982, and amended on September 24, 1982, required the CPD to preserve all street files and documents formerly placed in street files.[10] The TRO was amended because of allegations that detectives were continuing to keep investigative materials as their personal property and therefore not subject to CPD control.[11]

District Judge Milton Shadur oversaw the preliminary injunction hearing. Based on the evidence presented by the plaintiffs and by the City of Chicago, Judge Shadur found the following (among other things):

- The CPD does not provide its detectives or other personnel with guidelines as to the extent to which "official reports" (which Judge Shadur defined as case reports,

---

[5] Ibid. (at 991)

[6] Ibid. (at 991-92)

[7] Ibid. (at 995-96)

[8] Ibid. (at 995).

[9] *Palmer v. City of Chicago*, No. 82 C 2349

[10] Ibid (at NF-L 005606-07)

[11] Ibid (NF-L 005607)

HOOD 038828
Weston 053845

supplementary reports, closing reports, etc.) have to embody information in "unofficial reports" (defined as notes, witness interviews, worksheets, memoranda, etc.) In particular, Judge Shadur found that "Official Reports have sometimes been prepared from the perspective of what fits the preparer's concept of the crime, so they omit information that – though highly relevant and sometimes exculpatory of the defendant charged with the offense – the preparer does not deem 'pertinent.'"[12]

- The existence and use of unofficial reports is well known throughout CPD. Parallel files containing these reports are referred to as "street files," "running files," "office files" or "working files."

- Potentially relevant information contained among the CPD's various investigative files and materials for a particular crime is not necessarily included in official reports. There has been and is no police rule, regulation, procedure, or practice that requires all relevant information to be placed in official reports or to be transmitted to the CPD's Records Division for permanent retention.[13]

- the CPD responds to requests for documents as follows:
  - ° In response to a subpoena, CPD produces only official reports maintained at Records Division along with photographs and lab reports. CPD does not produce unofficial reports maintained at the Area or unofficial reports in the possession of individual detectives.[14]
  - ° In response to a defendant's discovery motion, Assistant State's Attorneys (ASAs) order official reports by phone. CPD Records Division employees respond to these requests by producing official reports and do not contact individual Areas or other units or divisions of the CPD for unofficial documents.[15]

Judge Shadur found that the exclusion of relevant information from official reports "was not random or infrequent."[16] In fact, by the City's admission, there were hundreds street files in active use during the *Palmer* litigation itself. In granting the injunction, Judge Shadur found that the use of street files created a "grave risk" of non-disclosure of exculpatory information, including information that could be used to impeach witnesses.

On appeal, the Seventh Circuit reversed Judge Shadur in part, although it did order the CPD to preserve and produce street files for those plaintiffs who had been convicted of felonies.[17] It vacated the preliminary injunction in all other respects because the court found that the plaintiffs either lacked standing or should have asked for relief in the state courts. It did not revisit the factual findings that Judge Shadur made.

### III. CPD personnel routinely use multiple, parallel files during a criminal investigation, and fail to disclose all relevant materials to criminal defendants.

---

[12] Ibid (NF-L 005609-10)
[13] Ibid (NF-L 005612)
[14] Ibid (NF-L 005614)
[15] Ibid (NF-L 005614)
[16] Ibid (NF-L 005615)
[17] *Palmer v. City of Chicago*, 755 F.2d 560 (7th Cir. 1985); CPD Special Order 83-2A.

HOOD 038829
Weston 053846

As the *Jones* and *Palmer* cases highlighted, the CPD has a long history of using multiple, parallel files during the course of a criminal investigation, which are frequently withheld from criminal defendants.

### A. Multiple Files Are Created For A Single Investigation, Creating A Serious Risk That Investigative Materials Are Not Disclosed.

From at least 1977[18] to as late as 2006, the Chicago Police Department has maintained multiple, parallel files relating to a single investigation and has had no system in place to ensure that all important investigative materials from these multiple files are collected and provided to the prosecutors and criminal defendants.

The only "centralized" repository of investigative information maintained by CPD is the "permanent retention file" maintained by the Records Division. But the CPD policy and practice is to only include the official reports in the permanent retention file.[19] This practice of having an "official" file that does not include all of the investigative notes, documents, and materials deviates from standard police practice, which would have one single repository with all the information.

Instead of utilizing the permanent retention file as the central repository of information, CPD practice is to use multiple, parallel files while an investigation is ongoing. These multiple, parallel files have been variously referred to at different times as "street files" "working files," "running files," "unit files," "Area files," or "investigative files," among other terms. These files are used by detectives and other investigating officers, while an investigation was ongoing to gather relevant investigative materials; to communicate steps taken and steps to be taken in an investigation; and to record the personal opinions of the officers investigating a crime. The files contained notes (sometimes handwritten on scraps of paper), memos, reports, photographs, and various other forms of information about the case that were developed as the investigation unfolded. Among other things, information in these various, parallel files included details about the crime and the physical evidence, information about the observations or statements of witnesses, identification of potential leads and suspects, and items obtained from victims or witnesses (*e.g.*, a victim's telephone book or a witness's telephone messages). The files also contained other criminal history information and police reports pertaining to other cases, which were utilized in suspect identification and elimination.

---

[18] The City's designated witness, in this and other cases involving the City's practice regarding maintenance and production of investigative files, James K. Hickey, testified that the practice of using street files started at least as early as 1977, when he arrived at Area 1 homicide. Similarly, during hearings on the use of street files in *Palmer v. City of Chicago*, John Stibich, a former commanding officer in Area 4 homicide, testified that during his time there, from December 1974 to December 1977, Area 4 homicide had a practice of using street files. Following Hickey's sampling of the various violent crimes units in 1982, Hickey determined that each of the Areas used street files.

[19] Hickey *Kluppelberg* Deposition [2015] 22-23, 95-96

HOOD 038830
Weston 053847

Detectives working a case necessarily take notes during witness interviews and must communicate that information to other detectives. That is an inevitable and important part of an investigation. The problem with the Chicago Police Department's practice is that these notes are stored across multiple files—both during and after an investigation—and are never consolidated into the official file which is permanently maintained by the CPD. Thus, even after an investigation concludes, there are still multiple files containing different sets of investigative materials scattered in various locations, and which are regularly withheld from criminal defendants.

There are a variety of reasons that multiple, parallel files are created within the CPD environment:

- Multiple detectives working on the same case, each take notes, resulting in multiple sets of investigative materials, but there is no formal place for detectives to keep these notes, and as a result they are kept on tables, coat racks, in cars, in filing cabinets, or desk drawers in the Areas and are never collected in a central repository.[20]
- In 1980, the CPD was re-organized, and the Detective Division was split into six geographical areas (Areas One through Six) and two subject matters (Violent Crimes and Property Crimes).[21] Detectives from different divisions or units of CPD often investigate a case together, but report to different supervisors, and work out of different units or Areas, resulting in multiple files kept at the different geographical locations throughout the City.
- In addition to detectives, there are many others involved in investigating major crimes such as homicides, including patrol officers as well as specialized unit officers like Gang Crimes and Bomb & Arson. No set of policies or practices governed the investigative practices of these additional investigators or required them to coordinate with the Detective Division, resulting in the creation of yet more files, unknown to and uncoordinated by CPD.
- There is no centralized log of the various parallel files created for each investigation, and thus no way to know how many files exist or where they are located.
- Files that are kept in an Area may be moved during CPD re-organization or are relocated to a storage warehouse. If multiple files for the same homicide are stored at an Area, they are not necessarily stored or moved together, and there is no system in place, or documentation, for tracking the movement of these files.[22]
- The documents in the files at the Area are never consolidated into the permanent, official files stored in CPD's centralized Records Division.
- Detectives also do not routinely not transcribe all information obtained during an investigation into an official report, resulting in different information maintained in the official and unofficial documents.
- The permanent file, kept in the Records Division, therefore, does not contain all the relevant and important investigative materials.

---

[20] *Palmer v. City of Chicago*, 562 F. Supp. 1067, 1071 (N.D. Ill. 1983).
[21] James K. Hickey Deposition in *Kluppelberg v. Burge* at 64 (NF-L 001004).
[22] Loughran Deposition 43-44.

HOOD 038831
Weston 053848

This practice of using of multiple, parallel files creates an unacceptable risks that information will not be discoverable in response to a subpoena and will, therefore, be withheld from prosecutors and defendants. Where detectives keep their own files, or files are kept at multiple areas or units throughout the City, there is no way for any detective or supervisor to know how many parallel files have been created for a particular case, or whether they have all been collected. This is why standard practice is to have a lead investigator responsible for keeping a single, known repository of information.

## B. The CPD's Ad Hoc Response To Subpoenas Exacerbates The Problem

In Chicago, the risks created by using multiple files are exacerbated by the fact that the CPD Subpoena Service Unit, which is responsible for responding to requests for records, is untrained and lacks any policies governing how it responds to subpoenas and requests for files.

According to Hickey, when a request for investigative documents is made to the Chicago Police Department, that request goes to the Records Division, Subpoena Service Unit.[23] A sergeant was in charge of the Subpoena Service Unit, and that sergeant reported to the assistant director and director of the Records Division.[24] It was the Record Division director's responsibility to set policy at the Subpoena Service Unit.[25]

The Chicago Police Department had no written policy that Hickey was aware of dictating how the Subpoena Service Unit should search for documents responsive to a subpoena or request for records.[26] In addition, there were no directives addressing "policies, safe checks, [or] procedures . . . to ensure that when a request came in either by a subpoena or by an informal request from and Assistant State's Attorney . . . that all of the necessary information including exculpatory information was provided by the subpoena services unit in response to that request."[27]

The subpoena service unit was staffed by non-sworn personnel with the title "clerk."[28] There was no formal training of personnel assigned to respond to subpoenas.[29] Whether all of the different units that worked on a given investigation were searched for documents responsive to a subpoena depended in large part on the discretion and experience of the personnel searching for the documents, such that a subpoena for all documents under a certain records number

---

[23] Hickey *Kluppelberg* Dep 358(NF-L 001299)
[24] Hickey, *Rivera v. Guevara, et al.*, No. 12 C 4428, pages 146-47 (NF-L 000312-13)
[25] Ibid, pages 159-60 (NF-L 000316)
[26] Ibid, pages 36-37 (NF-L 000273-74); City of Chicago's Amended Response to Plaintiff's Seventeenth Set of Requests to Produce Documents to the City of Chicago, p.2-3
[27] Ibid, page160 (NF-L 000316)
[28] Ibid, pages 147-48 (NF-L 000313)
[29] Ibid, page 39 (NF-L 000274)

13

HOOD 038832
Weston 053849

number[30] would not necessarily result in the production of all documents corresponding to that particular investigation.[31] Hickey described the Subpoena Service Unit's effort to respond to document requests as an "art."[32] He acknowledged that it is possible in a case with multiple units working on the same investigation that the subpoena could only go to one of those units.[33]

All of this was true as well with respect to requests for documents made by the Cook County State's Attorney's Office to the Chicago Police Department.[34] This system was in place before Mr. Fields' conviction and continued in force until 2009.[35] In fact, the City's expert on the CPD's policies in 2009 explained that, even if a subpoena is forwarded to an Area or unit, there is no system or procedure to follow up if the Area or unit fails to respond.[36]

This system, or lack thereof,[37] for responding to requests for documents and producing investigative materials, including important investigative information, is deficient. Because there are multiple files in multiple locations pursuant to the special orders and CPD's design, there is an acute need for policies, practices and training to ensure that all relevant information was produced to prosecutors and criminal defendants. The lack of such safeguards represents a significant departure from accepted police practices.

## IV. Criminal Defense Files Show That Important Investigative Materials Are Regularly Withheld From Criminal Defendants

From a police practices perspective, criminal defense attorney files contain all of the documents disclosed and made available to the attorneys that provided counsel to defendant(s) in the homicide cases that I reviewed. By standard police policy and practice, criminal defendants should get everything that was available from the police investigation to aid the defendant in presenting his or her defense at trial. It would be a dangerous departure from standard police policies to permit a practice of picking through police files to select which investigative materials to turn over.

As a practical matter, this disclosure of information usually occurs in one of two ways: either the police fulfill their obligations by disclosing their entire investigative file to the prosecutor (rather than picking and choosing which parts of a file to disclose), who in turn disclose it to the criminal defense attorney; or, in some cases, independently and as a safeguard,

---

[30] A Records Division number is a unique identifier assigned to a particular criminal investigation. The letters represent the year that the investigation began and investigations are assigned the numbers sequentially as they had.

[31] Ibid, pages 43-46 (NF-L 000275-76)

[32] Ibid, page 162 (NF-L 000316); Hickey *Kluppelberg* Deposition 362-63(NF-L 001303-04)

[33] Hickey *Kluppelberg* Deposition 362-63 (NF-L 001303-04)

[34] Hickey, *Rivera*, page 125(NF-L 000296); Loughran Deposition, page 50.

[35] Ibid, pages 151-53 (NF-L 000314); Loughran Deposition 14.

[36] Loughran Deposition 15.

[37] Hickey, *Rivera*, pages 36-37 (NF-L 000273-74); City of Chicago's Amended Response to Plaintiff's Seventeenth Set of Requests to Produce Documents to the City of Chicago, p.2-3.

HOOD 038833
Weston 053850

the criminal defendant or his counsel will subpoena the police investigative materials directly, rather than relying exclusively on what was provided by the prosecutor. In response to the subpoena, all investigative materials should be disclosed.

The basic principle is that a criminal defendant is not supposed to be tried in the dark. He is entitled to understand the full breadth of the evidence against him; and he is entitled to any evidence that may help him prove his innocence. As a matter of police practices, a well-trained detective would understand that information should be disclosed even if it is only supportive – but not conclusive - proof of innocence. As long as information known to the police or prosecution might contribute to doubt about the defendant's guilt in the mind of a reasonable person, it is relevant and must be disclosed.

Based on the criminal defense files reviewed in this case, as explained below, it is clear that these standard police practices are not followed in the Chicago Police Department, and as a result investigative materials that should be disclosed under normal police procedures are routinely withheld from criminal defendants. Moreover, these documents were withheld even where defendants issued subpoenas specifically requesting those documents. And finally, the material withheld was often relevant, exculpatory investigative information that should have been disclosed under generally accepted police practices. I discuss each conclusion in turn below.

### A. Background On The "Basement Files"

In 2011, years after Mr. Fields' criminal trials and multiple subpoenas by his trial and appellate attorneys for all files related to his case, the City of Chicago turned over during this civil case a new file to Mr. Fields for the first time. As discussed below, in Section VII, (pages 39-44) that file consisted of more than 100 pages of documents related to the police investigation into the crimes of which Mr. Fields was convicted, and it contained numerous highly relevant pieces of evidence, including witness statements and a number of alternate suspects.

Mr. Fields' attorneys then investigated the filing cabinets where the new file was found. They discovered that it contained hundreds of homicide files containing investigative material, from multiple Areas of the CPD, spanning several decades (hereinafter, the "basement files"). Mr. Fields' attorneys asked to investigate the other files in those cabinets, and they were given access to all of the "cleared" cases—that is, those where at least one individual had been charged with the homicide at issue—from 1979 through 2006.

For the purposes of this report, I was asked to focus on files from two time periods: First, files concerning homicides committed between 1983 and 1989, the period of three years before and after Mr. Fields' first criminal trial in 1986; and, second, files concerning homicides committed between 1999 and 2006, the set of basement files nearest in time to his 2009 re-trial.

15

HOOD 038834
Weston 053851

Mr. Fields' attorneys provided me with a spreadsheet that served as an index of basement files pertaining to those two time periods, which I reviewed and double-checked extensively. That spreadsheet is attached to this report as **Attachment G.**[38]

The basement files came from multiple Areas throughout the City of Chicago. Specifically, in the time period between 1983 and 1989, there were 89 files: 48 from Area One; one from Area Two; nine from Area Three; and 31 from Area Four. In time period between 1999 and 2006 there were 340 files: 308 from Area One; one from Area 2; 28 from Area Four; and three from unknown locations.

### B. Criminal Defense Files are Missing Pages from the Basement Files

I also had access to criminal defense attorney files that corresponded to certain of these basement files. Mr. Fields' attorneys attempted to locate defense attorney files for as many of these homicide investigations as possible. Through their efforts, they located 51 files for 50 different homicide investigations.[39] Each CPD homicide investigation is assigned a "Records Division" (RD) number that is used to identify materials corresponding to a particular investigation. I reviewed all of the criminal defense attorney files counsel was able to obtain; none were withheld from me.[40]

The 51 defense attorney files covered cases from both time periods: For the first group of basement files, in the time period from 1983 to 1989, I compared a total of 28 criminal defense files[41] to 27 corresponding basement files and 27 corresponding permanent retention files. For the second group of basement files, in the time period from 1999 to 2006, I compared a total of 23 criminal defense files to 23 basement files.[42]

I conducted a case-by-case analysis of what documents are included in basement files but are missing from criminal defense files. I did not make any inferences about what documents were turned over to criminal defendants – I based my conclusions on observations about actual differences between files. The results of my file-by-file comparison are contained in **Attachment F.**

---

[38] I intend to rely on the spreadsheet included as Attachment G at trial to help explain the differences between the particular files to the jury.

[39] Plaintiff located two defense attorney files for the 1985 investigation assigned RD G-468726, one for defendant Albert Spraggins, and one for defendant Maurice Spraggins

[40] In a few instances, there were sparse criminal defense attorney files indicating that the case had been turned over to another attorney. In those instances, the defense attorney file would almost certainly be missing substantial investigative material in the police file. Rather than count those cases against the City, they were excluded from the review.

[41] These 28 files concerned 27 separate cases. Plaintiff located two defense attorney files for the 1985 investigation assigned RD G-468726, one for defendant Albert Spraggins, and one for defendant Maurice Spraggins.

[42] There were no permanent retention files for the second timeframe, 1999-2006.

16

HOOD 038835
Weston 053852

My comparison of the Area 1[43] basement files to corresponding defense attorney files revealed that more than 90 percent of defense attorney files are missing investigative material that was contained in the basement file.

The documents missing from the defense attorney files are important investigative materials. For example, the following significant discoverable items were routinely absent, and are precisely the kinds of documents that should be routinely disclosed to a criminal defendant under normal police practices.

**Handwritten Notes:** More than 40 of the criminal defense files (or approximately 80%) reviewed above were missing handwritten notes that were present in the basement files (some Bates examples at 3844, 5024, 5572, 6053, 7160, 8992): These are often found on backs of official forms, on plain sheets of paper, on the margins of official forms, and on scraps of paper, none of which were the official GPRs on which such information was supposed to documented. There were hundreds of handwritten notes contained in the basement files reviewed that were not in criminal defense files. They are often not inventoried, or if they are, they lack any type of specificity to assist in investigation and discovery. They are documents recording the type of information– from alternative suspects, to witnesses, to vehicle information, to alternative theories of the crime – that should be disclosed to defendants under normal police practices.

**General Progress Reports**: Almost half (23 of the 51 files) were missing General Progress Reports that were present in the basement files. Like handwritten notes, GPRs contain the information regarding witness interviews that should be routinely disclosed to criminal defendants according to normal police practices.

**To-From Memos:** Approximately 20% of the criminal defense files were missing to-from memos that were present in the basement files: (see cases G-165272; G-215280; G-248336; G-321886; G-468726; G-032399; HH-749335; HK-416661; HK-470751; and HK-639684) Handwritten and typed to-from memos, not on GPRs, are another classic type of document typically contained in "street files" that were supposed to be prohibited during the relevant time period from 1983-1989 and 1999-2006. I saw numerous examples of to-from memos contained in the basement files that were not in the criminal defense attorney files. Like handwritten notes, they contain a wide range of information – from alternative suspects, to witnesses, to vehicles, to alternative theories of the crime.

**Investigative File inventories:** only 18/51 of the criminal defense files that I reviewed included any type of inventory to serve as an index of documents in the police investigative files.

As discussed above in Section I, pages 6-8, normal police practices and procedures require the creation and dissemination of an inventory that serves the purpose of providing a compilation of all of the investigative materials related to a criminal investigation. The inventory sheet was apparently designed to be used as an index of

---

[43] Area 1 became Area Central in 2012.

17

HOOD 038836
Weston 053853

documents in an Investigative File. Even when an inventory sheet is available, they were often incomplete (i.e., missing entries that were listed on the investigative file inventory or not listing handwritten notes or other documents) or were so generic as to be worthless (e.g., including overly generic entries, such as "GPR," with no date, number of pages, or author).

**Crime Laboratory Reports** (some Bates examples at 8941, 9007, 14792, 20830): These reports are of critical importance in the judicial process. They form objective analysis of everything from fingerprints, to blood, to ballistics. Over 15 defense attorney files were missing reports that were included in the defense attorney file. .

**Photographs:** Approximately half of the files are missing photographs, either crime scene photographs or identification photographs. Photographs are relevant investigative information that should always be disclosed to a criminal defendant. Particularly, whenever there is a dispute about identification, photographs of the suspect and alternate suspects are materials that are disclosed under normal police practices.

As discussed below in Section VII, (page 42), these same problems infected the Fields files as well.

### C. Issuing a subpoena does little to ensure disclosure of all relevant materials

Even in cases where a criminal defense attorney went out of his or her way to send a subpoena requesting the "investigative" or "street files," my analysis reveals that there was no guarantee that a defense attorney would receive all the relevant investigative materials beyond the official reports in the permanent retention file. In fact, in at least one case that I reviewed, (RD # E-010765, Defendant Cecil Robinson) the criminal defense attorney issued a subpoena for all investigative material other than official reports, asking the CPD to search all of the various locations and types of parallel files (including, as stated in the subpoena, "any and all police reports, notes and memoranda contained in the Chicago Police Department 'street files' also known as 'office, unit or working files or running files"). CRIM.DEF FILES - FIELDS 037044. The defense attorney's file contained a memo in response to the subpoena claiming that no investigative file or other investigative material existed, when in fact there was a basement file containing relevant investigative information. CRIM.DEF FILES - FIELDS 037110.

In many other instances, the defense attorney issued a subpoena specifically for "street files," and that subpoena appears in the basement file, but not all the documents in the basement file were disclosed in response to a subpoena: For example, subpoenas specifically for "street files" were issued by defense counsel in the following cases, but as described in **Attachment F,** not all the documents were turned over in response: **G-108642 (**subpoena at ACB 010444); **G-148403 (**subpoena at ACB 011197); **G-248336 (**subpoenas at ACB 014370, 014378, 014416); **G-321886** (subpoena at ACB 016656-57); **G-468276** (subpoena at ACB 20877-78); **G-159857** (subpoena at ACB 011767); **J-418229** (subpoena at ACB 047015); **M-690700** (subpoena at ACB 047759-60); **M-568343** (Subpoena at ACB 048117); **M-569727** (subpoena at ACB 048157); **M-580592** (subpoena at ACB 048240-243); **M-587998** (subpoena at ACB 048376-77, 048403-05); **G-570120** (subpoena at ACB 023352).

18

These subpoena responses suggest deficiencies with regard to the two most basic requirements of a process to ensure complete disclosures to defendants: (1) the City did not know what files it had and where (not centrally located or indexed); and (2) it did not have policies or procedures to ensure that whatever investigative material was found was turned over in its entirety. The latter finding is particularly troubling: it suggests that CPD personnel were picking and choosing which investigative materials in the files to turn over.

### D. The Missing Pages Contain Important And Relevant Information That Should Have Been Disclosed to Criminal Defendants

Finally, entirely consistent with the findings above, in the majority of cases I reviewed investigative material in the basement files was not disclosed to criminal defendants, included significant amounts of relevant information that would have aided the defendant and therefore should have been disclosed under standard police procedures. In my experience, given the volume of investigative material that was not disclosed, it was inevitable that relevant information helpful to a criminal defendant would be withheld. That is exactly what I found.

Below are some examples from the comparison of the defense attorney files and the corresponding basement files that demonstrate this problem:

**D-192218:** Dion Dorn and Steven Spears allegedly participated in the fatal shooting of Telly Howell, a stick-up man who had previously robbed their gang. Police were informed of Spears' and Dorn's participation in the incident by an anonymous caller. Spears, who was 16 at the time of the murder, pled guilty and was sentenced to 25 years. A GPR that is missing from the Public Defender's file contains names, contact information, and handwritten notes of past arrests and convictions for four individuals (John Barlett, Leola Barlett, Jamie Gordon, and Paul Lamont Jones) and whose connection to the case is unexplained. (ACB 003844)

**D-322218:** Rodolfo Garcia was convicted for the murder of Pablo Gomez. After his arrest, Garcia participated in a lineup and gave a videotaped statement. At trial and on appeal, Garcia moved to suppress the statement, alleging that he had asked for his attorney, GiGi Gilbert, who was at the police station shortly after his arrest, but was denied access. Garcia did not have any records to prove that he had actually retained Gilbert prior to his arrest, or that Gilbert was present at the police station, but the basement file contains a copy of Gilbert's business card, ARDC card, and Sheriff's ID card. (ACB 004441; 004504)

**D-579065:** Defendant Jimmy Velasquez allegedly fatally shot victim Raul Herrera after a drug deal went wrong. Officers arrived on the scene around 1:20 p.m. and eyewitnesses described the escape vehicle as a white 2-door car. The license plate from the white car was tracked to Velasquez's sister. At trial, there was a question about which car Velasquez drove. He testified that he had his own working car at the time of the incident, a blue Camaro. In the basement file, a handwritten note (not on a GPR form) documents the statement of Tamonie Bustamantez. (ACB 005024). She reported that around 2 pm the day of the shooting she saw Velasquez was with "another guy" in a 4-door blue car. The same page of handwritten notes also includes the name "Hector Gonzalez" with no additional explanation. Detectives recorded

19

a statement from Hector Gonzalez in a GPR that was also withheld from Velasquez (ACB 005022). That handwritten note corroborating Velasquez's testimony that he was driving his blue Camaro, and identifying potential alibi witnesses, was missing from the defense attorney's file.

**F-048933:** Christino Garcia was convicted of shooting and killing Carlos Vasquez after an argument in a bar on February 9, 1984. The officers listed a series of cars and license plates found at the scene on a GPR at CRIM.DEF FILES - FIELDS 038408, 038410, 038412. But in a handwritten note, not contained in the defense attorney file, there is a description of a "Yellow T-bird ZKW987." (ACB 006096). There is no mention of a Yellow T-Bird in the defense file.

**G-011889**: Earl Stademeyer and James Turner were arrested for beating and stabbing a man to death. Stademeyer was charged and Turner was released without charging. A Lab reports give serological analysis of the blood recovered at the scene. Given that there were two men arrested, the blood types of all those involved could have provided evidence about who was involved. (ACB 008941-942)

**G-014815**: Guy Johns was charged with the murder of Gregory Tucker on January 12, 1985. A Laboratory report documented serology tests on blood found on multiple exhibits that could have excluded Johns or implicated someone else. (ACB 00 9007-9009). This lab report was not included in the defense attorney's file.

**G-165272:** William Goodin was convicted of stabbing and killing his boyfriend Ronald Anderson. The defense attorney file contains only official police reports. It does not include any handwritten notes, GPRs, or to-from memos from the basement file. A to-from memo (ACB 089330-31) describes efforts to locate Goodin, and notes that a neighbor who was shown a picture of Goodin said she hadn't seen him around for some time. A Supplemental Report (ACB 089363-89365) was missing from the defense file. In that report, officers document an interview with Kim Lee Duckett, where she reported that "Frosty" was one of the offenders. A Supplemental Report that was not included in the PD file identifies a man named Tony Murray as "Frosty." (ACB 089411-089412, 089414). It also includes statements from individuals named Gene Pendleton, Robert Brown, and Jack Thomas, whose names and statements are not included in the file.

**G-257089:** Freddy Brown was charged with stabbing a man after an argument about a locked gangway gate. A GPR missing from the defense attorney's file states that 'a bunch of kids were down there by [illegible] stabbing" (ACB 014811). The kids are not referenced elsewhere and are significant because they are potential witnesses.

**G-267826:** James Walker was charged for shooting 4-year-old Angel Hendrix after Walker and Fred Williams allegedly got in a fight in front of his home. Three GPR contain information that was omitted from the defense attorney file. First, a GPR describing an interview with Fred Williams states that "He had an attitude" (ACB 015426). The substance of Williams' statement was present in the defense file, but not the officer's impression of Williams' "attitude." Another GPR lists the name "John Dawson" who reported hearing the arguments and someone say "kiss my ass." (ACB 015428) Only the witnesses that were near the shooting heard

20

this statement. But Dawson's name and contact information were not included in the defense attorney's file. Finally, another GPR lists a potential witness who was not disclosed (ACB 015421). That GPR lists the name "Hawkins, Jarita" contact information, and a note that states "went in car." As a potential witness, this name and contact information should have been disclosed.

**G-284291:** Lucille Pye was charged with stabbing and killing Lenita Williams with a fingernail file on July 24, 1985. Pye and Williams were fighting over a man, Michael Jeffery. Information from several witnesses was missing from the defense file: Officers described statements from John Jenkins and Denise Williams (ACB 16220-21), in a to-from memo and included contact information for both witnesses that does not appear in the defense attorney's file. Officers also wrote a handwritten note with the names Jean Jenkins, Debra Thomas, and Lucille Jeffery that was not included in the defense file. (ACB 16270)

**G-321886 –** James Crockett, Manuel Rios, and Willie Mullen were charged with murder. GPR list names and interview notes from potential witnesses that were not disclosed in the defense file. (ACB 16774-75; ACB 16836)

**G-326467:** George Frison, Edward Ware, and Anthony Mason allegedly shot and killed Kennedy Brooks. The basement file contains information regarding a potential witness, named Monique Kizer, who is not mentioned in the Public Defender's file. Handwritten notes at ACB 017185 include Kizer's name and contact information. Officers also investigated Kizer's arrest history, keeping a printout in the file. (ACB 017275).

**G-468726**: Albert Spraggins & Maurice Spraggins were charged with shooting and murdering Albert Black on November 22, 1985. Police relied on eye-witness testimony and the confession of Maurice Spraggins. Plaintiff's attorneys obtained copies of the defense attorney files for both Maurice and Albert. Neither file contained identification pictures of the defendants that were in the basement file (ACB 02865-02868, ACB 020914-020915

**G-570120:** Crisino and Filberto Bravo were charged for fatally shooting Juan Olmeda based on eyewitness identifications. The basement file also contains details about a possible alternate suspect. A handwritten GPR includes a statement from Antonio Vasquez, a witness to the shooting, that the shooter "looked like Spade." (ACB 23421). According to a Supplemental Report, contained only in the basement files, officers showed Vasquez photographs of men who use the nickname "Spade" and asked him to identify the man he saw shooting. Vasquez identified a man named Alonzo Velasco. (ACB 23456). Velasco was brought in and participated in a lineup, and Vasquez again identified Velasco. The defense attorney's file contains a report listing Velasco as a participant in a lineup, but it does not include the fact that Vasquez identified Velasco as "Spade." (*Id.*)

Police also recovered a gun and casings and submitted them for testing. The ISP Forensic Reports (ACB 023470-47) finding no latent fingerprints suitable for comparison on the gun or the casings were withheld from Crisino Bravo.

**G-705434:** Norman McIntosh allegedly killed Devon Hobson in a gang-related shooting and in retaliation for a robbery earlier that day. Hobson was with his brother, James, and his

HOOD 038840
Weston 053857

cousin Darius Thompson, and a friend Aaron Smith walking down the street. Police reports in the Public Defender's file state that Darius Thompson saw man in a gray car "driving slowly in their direction." McIntosh was identified by James Hobson and Darius Thompson. A GPR, at ACB 027247, however, records an interview with Thompson, suggests that the car was following them from behind, undermining the witnesses' accounts of what they saw.

**HH-175723:** Maurice Brown was charged for the fatal shooting of Antonio Willis. Police questioned Stanley Foots as an alternate suspect, but he was apparently ruled out because his girlfriend served as his alibi witness. (CRIM.DEF FILES - FIELDS 008064, 008118). A handwritten note that was withheld from Brown, however, states "Stanley confronted with Girlfriend's contradiction." (ACB 049385). There is no reference to a contradiction between Stanley and his girlfriend's statement in the Public Defender's file. The same note also identifies potential alternate suspects. The note states "Martez Haywood and Lil Arthur did it on 3519 S. Federal. White dude? found as well." (*Id.*) Neither name appears in the Public Defender's file.

**HH-358668:** Christopher Peoples, Marcel White, and James Mitchell, allegedly shot and killed Brian Campbell, the husband of Ninner Powers, during an attempt to forcefully collect on a debt Powers owed to White. Powers recognized and identified White and Mitchell, but she did not recognize the third offender. The basement file identifies possible alternate suspects in documents that are absent from the Public Defender's file. Lawrence Harper was an acquaintance and neighbor of Powers and the victim Campbell. According to supplemental reports, Harper was across the street at the time of the shooting, witnessed one man jump off the porch of the victim's home, and then went to the victim's home and stole a watch and ring from the victim's body. (ACB 031348; 031464-65). Harper also reported that the man he saw running from the porch may have been "Squirt" and, from photographs, identified two other individuals he knew with that nickname. (ACB 031465; 31491). It does not appear that Harper, or the two men he identified, are referenced in the Public Defender's file.

**HK-211174:** Lakesha Collins, Laquita Calhoun, Terrence Jones, and Jeanette Daniels were charged with the kidnapping and murder of Alonzo Jones. Jones was found in an alley and had apparently been beaten and run over by a car, apparently in retaliation for molesting Laquita Calhoun's children. Police reports indicate that several people beat Jones and put him in the trunk of a car, and but that at one point during the incident, Collins tried (unsuccessfully) to help Jones escape. In Collins' statement, she asserted that, though she got into the car, she got out before Jones was killed. Illinois State Police lab results included in the basement file, but which are absent from Lakesha Collins' Public Defender file, provide corroboration for that statement: those reports exclude, Collins as the source of DNA on several cigarette butts found on the scene. See ACB 038172-175 and ACB039216-217. ISP reports at ACB 038171 and 038232, which are again absent from the Public Defender's file, state the no latent fingerprints were found on a knife and other pieces of evidence. Finally, the basement file states that neighbors may have seen part of the brawl. A GPR states that "1st floor neighbors of Jeanette see dude hit victim cause they come out of Apt. Came home for 1/2 hour then left for work" (ACB038292), but the Supplemental Report corresponding to those notes, which is included in the Public Defenders' file, states that officers interviewed "1st floor residents about the beating and murder of Alonzo Jones. The occupants were highly intoxicated and uncooperative with the

HOOD 038841
Weston 053858

investigation. they denied all knowledge of any crimes and refused to give an person information" (ACB038265-86).

**J-418229:** Officers were investigating a shooting at a motel in room 114. There are a number of witnesses who heard the gunshots. A GPR lists the name "Andre Woods," a phone number, and the phrase 'out with P.O. Tuesday.' On the next page a handwritten note reads 'PO Keith Calloway 5256'- Neither Andre Woods or this officer are mentioned elsewhere. (ACB 046940-941). Two other witnesses are listed in GPRs in the basement file, but not in the supplemental reports in the defense attorney file. First, a note that "B.U. →I didn't see nothing/ I didn't hear nothing/ I didn't do nothing." The note includes a large red 'x' over it. (ACB 046944). Another witness named Russell Bolden, who "Heard Shot Saw Nothing" was omitted from the supplemental reports (ACB 046966). All potential witnesses should have been disclosed to the defense.

In several of these cases, there are handwritten notes, or GPRs that list names and contact information of individuals without additional context or explanation of their relationship to the investigation. In my experience, it is likely that these were individuals whose names came up during the investigation as possible suspects or witnesses that a detective would want to remember and follow up on. And in fact, as explained below, several similar notes in the Fields basement file listing names without any explanation, were in fact referring to important alternate suspects.[44] These examples emphasize how important it is to disclose all investigative materials, because the importance or relevance of certain pieces is not always apparent looking at a document in isolation.

Moreover, the fact that the relationship of various names is not explained elsewhere in the basement files is indicative of the practice of using multiple, parallel files for an investigation: there is no evidence that explains where the names came from, or evidence of any follow up to investigate those names. That suggests that detectives continued to store that information in separate files, that were not ultimately stored with the basement files.

### V. CPD's Policies after *Jones* and *Palmer* Don't Ensure Disclosure of All Relevant Investigative Materials

All police officials are aware of the challenges of ensuring that, over the course of an evolving criminal investigation involving multiple investigators developing evidence at different locations and times, that investigating officers document their findings and that such investigative material is collected, preserved, compiled and disclosed. In the CPD's case, it was acutely aware of these challenges since 1982, at the time of the *Jones* case, and the problems created by using multiple, parallel files. Yet, it has made only superficial attempts to resolve its "street files" problem. It issued written directives, but they were incomplete and insufficient in their scope, and beyond that they were not supplemented with the training, auditing and monitoring necessary to ensure that the necessary changes in practice occurred. Unsurprisingly, then, the street files problem continued.

---

[44] See Section VII, pages 42-43, describing CITY-NF-001062; CITY-NF-001076; CITY-NF-001085, which list names of alternate suspects without any additional information

HOOD 038842
Weston 053859

1. A department-wide teletype issued during the *Palmer* litigation;
2. Detective Division Notice 82-2 (Detective Division Notice - File Control);
3. Special Order 83-1 (Detective Division Special Order – File Control);
4. Special Order 83-2 (Detective Division Special Order – Investigative Files);
5. Special Order 86-3 (Detective Division Special Order – Investigative Files); and
6. Standard Operating Procedures (SOP) 1988

Instead of using the *Jones* and *Palmer* litigation as an opportunity to reform its practices and implement standard police procedure of creating one single, centralized file for each investigations, those directives actually instructed detectives to create multiple, parallel files, each with different information and did nothing to address the fundamental problems regarding: (1) allowing officers discretion about what to document in the official reports; and (2) the absence of any system or training for responding to subpoenas and ensuring complete disclosures of investigative material. Moreover, the CPD provided only minimal training on these orders, and failed to conduct any audit, supervision, or oversight to ensure that detectives were following these new directives.[45]

### A. The Policies are Insufficient to Remedy the "Street Files" Problem

#### 1. The Teletype and Detective Division Notice 82-2

In April 1982, after a Temporary Restraining Order was issued in the *Palmer* litigation, CPD issued two documents: (1) Detective Division Notice 82-2[46] and (2) a 1-paragraph teletype to commanding officers alerting them to the TRO.[47]  As Hickey explained, Notice 82-2 was "a quick and dirty document" designed to implement the TRO but was "not very workable."[48]

Notice 82-2 and the corresponding teletype were concerned only with preservation and were silent about procedures to collect or inventory their notes, memos, or other documents. Although it coined the term "Unit Investigative File," it did not require detectives to put notes or memos into Unit Investigative Files; and it did not specify whether detectives had to preserve notes or memos that were not in the file.[49]

Even with Notice 82-2's limited requirements and scope, the CPD showed little commitment to implementing that Notice. There is no evidence of training to implement the Notice, and six months after its implementation, Commander Stibich testified that it was still the prevailing view that if a detective kept his own personal notes or memos – or considered those to be his personal property – then Notice 82-2 did not require the detective to put those notes or

---

[45] Hickey *Fields* Dep. at 10, 43.
[46] NF-L 008751
[47] NF-L 008754; Hickey, *Kluppelberg* Deposition 201 (NF-L 001141)
[48] Hickey *Kluppelberg* Deposition 221-22, 224; (NF-L 001161-62, NF-L 001164); Brzezcek Test. NF-L 007517
[49] NF-L 008751-53; Hickey *Kluppelberg* Deposition 212-13 (NF-L 001152-53)

HOOD 038843
Weston 053860

memos in the file and detectives felt they could do whatever they wanted with those notes or memos, including destroying them.[50]

Based on this and other testimony, Judge Shadur found that Notice 82-2 responded to the TRO in "an improperly restrictive and grudging manner, under which detectives could consider their investigative writings as their personal property (and thus not 'under Detective Division control') and therefore outside the preservation requirements of Notice 82-2."[51] The comments of Commander Stibich and the findings of Judge Shadur make clear to me that the practice of keeping information in parallel files that were not shared with prosecutors or criminal defendants was an ingrained problem within the police department, and one that would require the sort of dramatic change in attitude and culture that could only be achieved through extensive training, monitoring, and discipline.

### 2. Special Order 83-1

On January 3, 1983, Detective Division Notice 82-2 was replaced by Special Order 83-1. Special Order 83-1 applied only to the field investigations of detectives assigned to Violent Crimes.[52] Special Order 83-1 defined certain terms and created procedures for documenting and preserving investigative documents. Special Order 83-1 defined the term "Investigative File" and created something called an Investigative File Case Folder to secure documents relating to a criminal investigation. According to the terms of Special Order 83-1, an Investigative File Case Folder was to be created either when certain categories of violent crimes occurred[53] or when a violent crime investigation resulted in an arrest and approval of felony charges.[54] Special Order 83-1 also created an "Investigative File inventory sheet," which was supposed to identify each document placed in the Investigative File.[55] The inventory sheet was to be forwarded to the Records Division anytime felony charges were lodged.[56] Finally, Special Order 83-1 created General Progress Reports ("GPRs").[57] The GPR forms were to be used by detectives whenever they were taking handwritten notes or writing memoranda to other detectives.

Unlike Notice 82-2, Special Order 83-1 created an affirmative obligation for detectives to submit handwritten GPRs or investigative materials for review and inclusion in the basement file. It also mandated that detectives transcribe relevant information previously recorded on a

---

[50] Stibich Test. (NF-L 007468-70)

[51] NF-L 005615-16

[52] NF-L 007223-27

[53] Those categories of violent crimes were identified in Special Order 83-1, V(A)(1): Homicides/Medical Examiner Cases; Police-related shooting incidents; Batteries likely to result in death; Rapes and Deviate Sexual Assaults, and Any other major violent crime field investigation that the unit supervisor deems appropriate.

[54] Special Order 83-1, V(A)(1) & (2)

[55] Special Order 83-1 IV(D)

[56] Special Order 83-1, IV(D)

[57] Special Order IV(E); Hickey *Kluppelberg* Deposition 170 (NF-L 001110)

25

HOOD 038844
Weston 053861

GPR or other miscellaneous documents on an official CPD case report form (general offense case reports, supplementary reports, etc.).[58]

In reviewing Special Order 83-1, Judge Shadur identified several deficiencies, including:

• Unless the crime being investigated fit one of the specified of violent crimes, there was no obligation to create an Investigative Case File Folder unless and until the offender was arrested and felony charges were approved. According to Judge Shadur, and in line with standard police practices, this continued to pose the same type of risk that information would not be retained and disclosed because there was nothing to prevent against selective retention while the case is investigated;[59]

• It only required detectives to include "relevant" information in the official reports and offered no guidance about what information a detective should deem "relevant," leaving discretion for detectives to withhold information based on their assessment that it was not relevant.[60]

• It did not include information to ensure that any detective who has or receives information relating to a violent crime field investigation not assigned to him will forward the information to the assigned detective for investigation and inclusion in the Investigative File Case Folder;[61] and

• It omits any provision defining how the CPD responds to a criminal subpoena or request by the State's Attorney to produce information relating to a criminal proceeding.[62]

Moreover, the training on 83-1 was inadequate. Hickey testified that he provided a one-time training to about 1,000 detectives.[63] He said each training session was done in groups of 30-40 people, and lasted approximately 3 hours.[64] During that three-hour training session, he went over Special Order 83- 1. One training session was wholly insufficient to try to change a decades-long practice, especially one so ingrained in the culture of the police department.

**3. Special Order 83-2**

On May 2, 1983, Special Order 83-2 was issued. Three of the changes in Special Order 83-2 were (1) a requirement that detectives create records reflecting all relevant information, V(B)(1); (2) a requirement that where a detective receives information about another crime, he or

---

[58] Special Order 83-1 V(B)(1) & (2), NF-L 008772-73

[59] NF-L 005620

[60] Special Order 83-1 V(B) (NF-L 005620); Hickey *Kluppelberg* Deposition 238; (NF-L 001178); Hickey *Kluppelberg* Deposition [2015] 20.

[61] NF-L 005621

[62] NF-L 005621

[63] Hickey *Kluppelberg* Deposition 308-309 (NF-L 001249-50); NF-L 008808

[64] Hickey *Kluppelberg* Deposition 309 (NF-L 001250); NF-L 008808

26

HOOD 038845
Weston 053862

she pass that information along to the detective investigating that other crime, V(B)(6); and (3) that a copy of the Investigative File Inventory Sheet will be transmitted to either the Office of Legal Affairs (in case of a subpoena from a criminal defendant) or the State's Attorney's Office (in case of a discovery motion) so that the inventory sheet is disclosed to defense counsel in a criminal case, V(B)(6).[65] Hickey also testified that Special Order 83-2 also created the Investigative File Control Card, IV(F).[66] This Control Card was supposed to act like a library card so that the Investigative File could be accounted for.

Despite these new requirements in 83-2, there is no evidence that CPD provided any additional training to update detectives on the differences between 83-1 and 83-2.

Moreover, even if detectives had been adequately trained on Special Order 83-2, it was still deficient. Here are some of the deficiencies that should have been apparent to CPD policymakers.

- **Special Order 83-2 still did not comply with standard police practice to require a single repository for all investigative information maintained by a lead investigator**.

- **Special Order 83-2 applied only to detectives**, and it explicitly excluded from its directives all other officers involved in investigating major crimes, such as gang crimes officers, officers from bomb and arson, and officers from patrol, among others.

- **Special Order 83-2 provided no guidance about what information a detective was required to include in a supplementary report beyond information deemed "relevant."[67]** Relevance is of course subjective and, as Commander Stibich testified, what is relevant to one detective may not be relevant to another.[68] In fact, Hickey testified that a detective would only have to put information in a supplemental report if the detective deemed it pertinent at the time that the detective wrote the supplemental report, regardless of whether the detective considered the information relevant when he or she received it.[69] For example, Hickey testified that CPD policy did not require suspects who had been eliminated through investigative activity to be documented in any way.[70] Based on my experience, this is inconsistent with standard police practices. Alternate suspect information, for example, is highly relevant information and its documentation and disclosure to criminal defendants is critical.[71]

---

[65] NF-L 008746-50

[66] Hickey *Kluppelberg* Deposition 228-29 (NF-L 001168-69)

[67] Hickey *Kluppelberg* Deposition 238; (NF-L 001178); Hickey *Kluppelberg* Deposition [2015] 20

[68] Stibich Test. NF-L 007474

[69] Hickey *Kluppelberg* Deposition [2015] 24-25, 33

[70] Hickey *Kluppelberg* Deposition 237-38 (NF-L 001177-78)

[71] This does not prevent an investigating officer from also documenting information explaining why the suspect was eliminated.

HOOD 038846
Weston 053863

- **Special Order 83-2 provided no guidance about how information should be communicated or documented among detectives,** for example when one detective learned something about a crime being investigated by another detective; or when one unit learned something about a crime that is also being investigated by another unit. While section V(B)(6) of Special Order 83-2 codifies the obligation to "forward" information about a crime to the assigned detective, it does not require either detective – the detective passing along information or the receiving detective – to document that information.[72] Similarly, even where the detective passing along the information may have created a document memorializing that information – *e.g.*, a memorandum or GPR – there is no requirement in Special Order 83-2 that the resulting memorandum or GPR be distributed to other detectives or units investigating that crime.[73]

- **Nowhere does Special Order 83-2 state that an investigative file should must be disclosed in response to a discovery motion or subpoena, or provide procedures for doing so.** Despite the underlying circumstances of *Jones* and Judge Shadur's admonishment about the failure to "defin[e] the CPD's duty or procedure in responding to a criminal subpoena or request by the State's Attorney to produce information relating to a criminal proceeding," Special Order 83-2 included absolutely no policy directive or procedure to ensure production of investigative files. This is a straightforward requirement of any policy regarding maintenance and disclosure of investigative materials, and, as explained above, standard practice is to simply provide the single investigative file to the prosecutor or directly to the defense attorney to ensure all documents are disclosed.

- **Special Order 83-2 relies on inventory sheets instead of actual disclosure of the files.** special orders 83-1 and 83-2 introduced the inventory sheet, which was apparently designed to be used as an index of investigative materials so that members of the CPD and other actors in the criminal justice system had a way to determine what information existed in police files. Special Order 83-2, required "whenever a subpoena or discovery motion is received in any case, two copies of the Investigative File Inventory Sheet will be forwarded to the Office of Legal Affairs . . . .so that one of such copies may be transmitted to the attorney for the defendant."[74] But the Order does not require that the actual documents in the file be disclosed, nor does is require that documents maintained in other units not covered by the Order (e.g. gang crimes unit) be turned over.

- **Inventory sheets are an inadequate mechanism for ensuring disclosure of documents generated during the police investigation.** While the investigative file inventory sheet is designed to be used as an index of documents in the file, there is no guidance about what level of detail is needed in the inventory sheet to ensure that it

---

[72] Hickey 236-37 *Kluppelberg* Deposition (NF-L 001176-77)
[73] Hickey *Kluppelberg* Deposition [2015] 39, 43, 46
[74] Special Order 83-2, V(B)(6), NF-L 008832

HOOD 038847
Weston 053864

serves its purpose. Indeed, my review of the records demonstrates that the inventories are largely useless because the entries are too general, often missing dates, descriptions and numbers of pages, such that one cannot tell whether they have the document referenced. In addition, that sheet is only distributed beyond the Area or investigating unit if felony charges are placed IV(D); V(B)(6). This creates multiple problems:

- o If an inventory only has to be filled out and sent at the issuance of charges – as opposed to filled out as the investigation proceeds – there is a risk that documents will be left off the inventories that the detective no longer deems relevant or that are potentially harmful to the prosecution's case. That leaves the individual detective far too much discretion about what to include on the inventory once charges are filed;
- o If any additional investigation is done after charges have been lodged (for example, if there are multiple offenders) there is no provision that requires anyone to fill out or distribute an updated inventory;
- o Inventories do not contain the substance of information obtained during an investigation;
- o It assumes that inventories would have to be complete, accurate, and consistently turned over; as discussed below, my review of files shows that this rarely occurred.

- **Finally, there is no provision in Special Order 83-2 requiring an audit or oversight to ensure compliance with the special orders.**

### 4. Special Order 86-3

On May 29, 1986, the CPD issued Special Order 86-3. Special Order 86-3 largely replicates its predecessor with some minor adjustments, most of which actually limited, rather than expanded, to policies governing disclosure of investigative materials to prosecutors and defense attorneys. For example, Special Order 86-3 more explicitly limits the creation of Investigative File Case Folders to homicides or felony investigations where charges have been approved, or an arrest warrant issued; it eliminates the requirement that the inventory sheet be forwarded when a criminal subpoena or discovery motion is received; it eliminates the requirement that handwritten notes or other investigative materials be submitted "promptly (normally at the end of each tour of duty)" and instead only states that such notes must be "submitted."

In these ways, Special Order 86-3 actually deviated further from standard police practices than the special orders that came before it:

- **It still did not comply with standard police practice to require a single repository for all investigative information maintained by a lead investigator**.

- **It permitted detectives to maintain their handwritten notes as personal files for longer periods of time,** by removing the requirement that they turn in the notes and investigative materials "promptly (normally at the end of each tour of duty)." Thus,

HOOD 038848
Weston 053865

even if detectives retained their handwritten notes on their person, or in their locker for extended periods of time, it would not clearly violate the Order.  In my experience, that level of discretion is a gross deviation from standard police practices, especially in light of the ingrained problem in CPD.

- **It still provided no guidance about what information a detective was required to include in a supplementary report beyond information deemed "relevant."**

- **Finally, it removed even the inadequate stop-gap measure of providing the inventory sheet to defense attorneys,** leaving defense attorneys with no mechanism to determine whether they had received all the relevant investigative materials.

Special Order 86-3 included a section VI, titled "Inspection." That section requires "[e]xempt members of the Detective Division" to "conduct periodic, unscheduled inspections of the subject files to ensure compliance." According to Stibich, however, he had no idea if, when, how often, or in what manner such inspections were conducted.[75] Likewise, the City has produced no documentation that any such inspections were ever conducted. Hickey testified that no audits were done subsequent to Special Order 82-2 and detectives were not routinely disciplined for failure to comply with the special orders.[76] Nor is there any evidence that detectives were trained on this new policy. In short, I have not been presented with any evidence that policymakers trained, reviewed, or supervised subordinates to ensure that Order 86-3 was implemented or followed.

### 5.  Standard Operating Procedures (SOP) 1988

In 1988, Chief of Detectives John Townsend wrote standard operating procedures to govern the work of detectives. Chapter 18 deals with investigative files. Chapter 18 contains "no substantive changes of any kind" from Special Order 86-3.[77]

### 6.  Summary

The policies implemented by the CPD were inadequate to remedy the "street files problem" and deviated from standard police practices regarding documenting and disclosing investigative materials.

First, none of the policies required a single repository for all investigative information maintained by a lead detectives. In fact, in reviewing the materials provided, I identified at least three different files that would be created relating to any criminal investigation pursuant to the special orders. First, there would be a permanent retention file in the Records Division, containing only supplementary reports, general offense case reports and the arrest report filed under the accompanying RD number.[78] Second, there would be a unit RD file: Hickey testified that this was a slim file kept in the homicide drawer at the Area to identify that there is a case

---

[76] Hickey *Fields* Dep. at 10, 43. Hickey *Kluppelberg* Deposition 213. (NF-L 001153)

[77] Hickey *Rivera* Deposition pages 250-51 (NF-L 000338-39)

[78] Hickey *Kluppelberg* Deposition [2015] 22-23, 95-96.

HOOD 038849
Weston 053866

open.[79]  Like the permanent retention file, it would contain all the known official police reports: original case offense report, supplementary reports, and reports sent to the investigative unit from support units.[80]  Third, there would be the investigative file maintained by the area or any specialized unit.[81]  This file would contain documents that individual detectives assigned to investigate the case have determined should be in there.[82]  As noted above, none of the files had to have the same documents in them: In fact, by design, they did not.[83]  Likewise, Hickey admitted that the files did not even necessarily have the same *information* in them.[84]

Moreover, additional files would also be created by other units of the Chicago Police Department, because the policies only applied to the Detective Division.  So, in addition to the multiple files above, Gang Crimes officers, other special unit investigators, and patrol officers, could each have additional sets of files related to a homicide investigation, and the special orders are silent as to those additional files.

This was an apparent omission. In fact, Hickey testified that he raised the fact that Special Order 83-1 was only addressed to the Detective Division and that the Department might want to look beyond the detective division to see if the problem extended to other units.[85]  And at some point, Hickey suggested that perhaps Research and Development and Auditing Internal Controls Division should get involved because there may be department-wide implications to the use of street files.[86] But there was no response from the chain of command to Hickey's concerns and CPD never looked to see if the problem of street files went beyond the Detective Division. This failure to look beyond the detectives – notwithstanding the fact that they worked closely with other units in investigating crimes – was deficient and allowed yet more parallel files to be created in other parts of the Department.

The problems created by such an unwieldy system are obvious: It creates the potential for information and documents to go missing because they are not centrally controlled. Moreover, because the files are designed to be different and to be retained in different locations, there is no way to ensure that the complete investigative file is produced during any criminal prosecution.

Second, the policies also left detectives with far too much discretion about what information to document in official reports and when to turn in investigative materials.  This is particularly true because the status quo had previously been not to record or document information – at least not on official documents that would be maintained by CPD and disclosed to the prosecution and defense. As a result, to overcome this culture – and this citywide practice

---

[79] Hickey *Kluppelberg* Deposition 115-16 (NF-L 001055-56)
[80] Hickey *Kluppelberg* Deposition 115-16 (NF-L 001055-56); S.O. 86-3
[81] Hickey *Kluppelberg* Deposition 297-300 (NF-L 001238-41)
[82] Hickey *Kluppelberg* Deposition 297-300 (NF-L 001238-41)
[83] See for examples Hickey *Kluppelberg* Deposition [2015] describing documents that would go in the investigative file but not in the permanent retention file at 71-72, 81, 91, 94, 100, 103, 105, 108-110
[84] Hickey *Kluppelberg* Deposition [2015] at 100
[85] Hickey *Kluppelberg* Deposition 207-208 (NF-L 001147-48)
[86] Hickey *Kluppelberg* Deposition 208 (NF-L 001148)

HOOD 038850
Weston 053867

– CPD had to be explicit in its requirements and provide direct guidance about what did or did not have to be documented; it is not enough to leave it up to the individual officer.

The most egregious example of the problems of officer discretion relate to the lack of a requirement to document elimination of suspect. Indeed, Hickey testified that it was not the policy of the CPD to require detectives to document suspects who were eliminated.[87] To the contrary, it was permissible and consistent with the special orders not to document the identity or investigative steps taken to eliminate a suspect if a detective did not think that information was relevant or if the detective discounted it for some reason.[88] This is a significant departure from standard police practice, which calls for officers to err on the side of documentation and disclosure of such information, which is often crucial to other investigators on a case and highly likely to contain exculpatory information.

## B. The City failed to provide proper training and oversight to ensure compliance with the special orders

On a department-wide scale, there was no action taken whatsoever to ensure that the special orders were being followed. The only training provided was one three-hour session after 83-1 was issued. But, as explained above, one three-hour training session was wholly insufficient to try to change a decades-long practice. In fact, Hickey testified that the years after Special Order 83-1, he learned that unit detectives were reverting back to carrying their own files on the street separate and apart from the file maintained by CPD.[89] Nothing, however, was done about this.

Hickey also explained that although he did a sampling prior to the special orders being issued, he did not do one at any time after Notice 82-2 and was not aware of anyone else conducting such an audit.[90] On a more individual scale, Hickey testified that members of the police department were supposed to conduct inspections pursuant to Special Order 83-2 but Hickey could not identify any instances of audits or investigations.[91] Similarly, Commander Stibich testified that supervisors were supposed to review files but he had no idea how often, when or the manner in which that review was conducted.[92]

In fact, it appears that there was no oversight to ensure that the special orders were being enforced and that the street files practice was eliminated. This is particularly troubling given the importance and scope of the problem and is certainly deficient. You cannot expect a department-wide, decades-long practice to be eliminated by simply issuing an order that was read at roll call a few times. Based on my experience, this requires extensive and ongoing training (not a one-time session of a couple of hours), careful auditing and monitoring, and meaningful discipline

---

[87] Hickey *Kluppelberg* Deposition 237-38 (NF-L 001177-78)
[88] Hickey *Kluppelberg* Deposition 339 (NF-L 001280); Hickey *Kluppelberg* Deposition [2015] at 66-67.
[89] Hickey *Kluppelberg* Deposition 321, 327 (NF-L 001262, NF-L 001268)
[90] Hickey *Kluppelberg* Deposition 160-61, 166, 167 (NF-L 001100-01, NF-L 001106-07)
[91] Hickey *Kluppelberg* Deposition 375-76 (NF-L 001316-17)
[92] Stibich Testimony NF-L 007461-62

HOOD 038851
Weston 053868

when the new special orders were not followed. Based on my review of the record, almost none of this occurred. Accordingly, CPD leadership either knew or was deliberately ignorant of the fact that the street files problem continued unabated after issuance of the special orders.

## VI.    The Basement files show that the directives were not properly implemented

### A.    The basement files from the 1983-1989 time period show that the special orders were not followed

I reviewed the 89 basement files from 1983-1989 to evaluate whether the basement files, standing on their own (i.e. without comparing to a permanent retention file or defense file) demonstrated compliance with the 1982, 1983, and 1986 special orders. The files show that the special orders were not followed in several ways:

#### 1.    Handwritten notes, not on General Progress Reports, are still routinely used

As discussed above, the special orders directed officers to use GPRs to take notes, and were intended to eliminate the use of handwritten notes on loose sheets of paper without any context of who wrote the note and when.  Reviewing the 89 basement files from 1983-1989 demonstrates that detectives consistently used handwritten notes despite the direction in the special orders. 73 out of the 89 contained handwritten notes not on GPRs**.**

#### 2.    To-From memos are still being used

As discussed above, the special orders also directed officers to stop using to-from memos to communicate investigative information, and to instead include that information in GPRs and Supplemental Reports.  The 89 basement files from 1983-1989, however, show that detectives continued using to-from memos: 38 out of the 89 files contained to-from memos not on official police forms.

#### 3.    All relevant information in unofficial documents is not transcribed in official reports

The special orders state that all relevant information must be transcribed into an official report, in an effort to ensure that the permanent retention file, which contains only official reports, provides a complete picture of the investigation.

But, the case files I reviewed are replete with examples of handwritten pages and informal memos between detectives containing potentially exculpatory information. These handwritten notes contained critical investigative information, including: 1) Leads on different or additional avenues of investigation or suspects (Bates 048422); 2) Names or descriptions of additional witnesses found in at least 50% of the basement files); 3) References to other CPD or outside law enforcement involvement in the investigation (Bates 06139-41; 011669); and 4) Handwritten diagrams, scene and area maps, evidence locations (Bates 020928; 016773; 015652; 031512). These citations are examples only, and not an exhaustive list of instances where these trends were seen.

In the vast majority of the cases that I reviewed, there is no companion entry on official

HOOD 038852
Weston 053869

CPD forms that documents this critical information, leaving this potentially exculpatory information solely in handwritten notes or in informal memos contained in the Investigative Files. By not transcribing it into an official report, it is less likely to get into the permanent retention file, and as observed above, to criminal defendants. Some examples of these omissions include:

- In custody detention log (G-266841A – Bates 05194-95) shows suspect detained in stationhouse from 6/27/01 @ 3:00 PM until 6/28/01 @ 10:55 PM – nearly 32 hours (time of last entry – nothing to show when he was booked or released). Log is written on a GPR – all in the same hand and appears to be done after the fact, all entries made at one time.

- In handwritten note (M-587998 – Bates 48422) on a plain piece of paper provided by CPD Officer William Freeman on 1/9/90 @ 1930 hours, is the following:

> *To whom this may concern Dalmar Milton in 141 N. Wolcott #301*
> *Andrew in 141 N. Wolcott #305*
> *an (sic) another boy that lives in 1850 #603*
> *Killed Fat Ed behine (sic) the boys club on Christmas night they beat him to death with a golf club. Someone saw it but they are afraid to come fort (sic).*
> *Thank you*
> *?  ?  ?*

The permanent retention files that I reviewed similarly demonstrate that the official reports that become part of the Permanent Retention File provide an incomplete picture of an investigation.

If the special orders were being followed, this should not happen. Under the special orders, all relevant information learned during the investigation is supposed to be transcribed into an official report, and so the official reports contained in the permanent retention file should for all intents and purposes contain all of the same information (although not necessarily all of the same document) about the investigation, including any exculpatory and impeaching information developed during the investigation.

### a. Review of Permanent Retention Files

I reviewed the investigative and permanent retention files (permanent retention files) for the years 1983-1989 and intends to rely on all the permanent retention files produced in that period to demonstrate the City's failure to train, follow, or implement its special orders.

I was provided with digital copies of 27 permanent retention files, corresponding to 27 basement files from the time period 1983 - 1989. I examined, compared and contrasted the 27 permanent retention files with their corresponding basement files (IF). **See Attachment F**

34

Although all of the basement files had the required inventory sheet, only approximately 15% of the permanent retention files contained the required copy, a violation of the special orders.

In addition, for the 15% of cases where inventory sheets were included in the permanent retention files, they were often incomplete or the description of the documents were so generic or general so as to be unusable. Items in the Investigative File routinely missing from the permanent retention file version of the Investigative File inventory sheets included:

Handwritten names, addresses, vehicle license plates, phone numbers, physical descriptions, dates, unknown abbreviations, symbols, other case numbers, and miscellaneous notes found throughout most of the Investigative Files. These types of items were found written across official forms, on plain paper, and on file folder covers. Most were not referenced or located in any permanent retention file inventories, and may have had value for discovery purposes.

### 4. Inventories are Missing or Incomplete

I also noted that documents were often added to the inventory sheet long after they were initially created. In some instances, some inventory sheet entries were not created until after an offender had been charged. In other files, the dates are either illegible, or do not appear at all. In other instances, there are stamped dates, but nothing shown as entered. In other instances, an item is shown as entered, but not date or individual entering. In other instances, a large quantity of GPRs and supplemental reports were entered all on the same date. Some limited examples:

D-1922128
F-048933
F-380662
M-587998
G-268444

The delay in creating an inventory sheet reveals three problems. One, it again demonstrates the amount of discretion that officers could exercise when deciding what to put into an Investigative File: if an inventory sheet is only created after an individual is charged, detectives can exercise discretion over what they deem relevant at the end of an investigation. Second, if the documents are not logged on the inventory sheet until after the charges are brought, that indicates that documents are being stored in other, undisclosed locations during the course of the investigations, which was precisely the problem the special orders should have addressed. Finally, if detectives obtain additional information after charges are brought, there is no mechanism in place to update the inventory sheet in the Records Division, or in the inventory sheet disclosed (albeit rarely) to criminal defendants.

### 5. The basement files show that the "Investigative Files" did not serve as the central repository for investigative materials

The files I reviewed demonstrate that the basement files were not the central repository

35

HOOD 038854
Weston 053871

for information. My review of the files revealed numerous cases where information that should be included was absent from the basement file, suggesting that it may have been lost or stored in separate files. Examples of such missing information include:

- No explanation on photographs, such as when or where the photo was taken, who/what is depicted in the photograph or why the detectives believe it is relevant to the investigation. (e.g. Bates 07182; 006121; 008989; 011312; 046887-91). The missing information suggests that the paperwork, notes, or other investigative materials that led to the photograph were maintained separately from the basement files.

- Missing reports including ballistic reports, AFIS reports, crime lab reports, CAD and 911 reports. In some basement files there are reports indicating that the lab was unable to find evidence (i.e., fingerprints) that would tie the suspect to the murder (Bates 0000047); or notations that the case has been cleared – do not resubmit (Bates 0000046); or no comparisons (Bates 006082).

- Missing forms, such as missing property inventories and Major Crime Worksheets. For example, M-566742 contains no Major Crimes Worksheet and is representative of many of the basement files

- Other missing forms or documents including missing medical records, missing property inventory forms, or missing search warrant affidavits, and missing search warrant returns. (e.g. F-229039; G-165272; G-176242; G-259321)

- Some cases have investigatory computer generated phone records (Bates 006142-47), in others they are hand written by an unknown investigator but not included in official reports, suggesting that the original source for the phone records was stored separately or not properly retained.

- Blank or missing chain of command homicide review forms (e.g., Bates 211174; 065188)

- Many basement files are missing crime scene photos, suggesting that the reports from Crime Scene technicians were not included in the basement file. For example, the investigation under M-566742 includes an Evidence Report at Bates 047630 that documents many different photographs taken of the crime scene. Those photographs do not appear in the basement file.

In some instances, the basement file specifically referenced a piece of evidence, a statement, or other information, but the corresponding evidence or statement was not documented in the file.

- References in handwritten notes or documents in file as to the involvement of other units or outside agencies, but not included in official reports, and involvement not described (e.g. FBI business card – Bates 006149; Letter (in Spanish) from Mexican Consulate – Bates 06139-41; Assistant U.S. Attorney business card – Bates 011669)

36

HOOD 038855
Weston 053872

- No live lineup photos, where there are lineup reports. For example, at Bates 027279-027281, lineup documents indicate 3 separate lineups 3 separate witnesses for the investigation under G-705434, but there are no photographs in the basement file. In another case, G-570120, there are lineup photos at Bates 023000-07, but no lineup documents appear in the basement file.

- Reference to other units or outside agencies processing evidence, but no documentation in official reports, no results, and no chain of custody.

- Cryptic handwritten notes with no explanations as to source, relevance, or why included. Notes such as "50,000.00 checking acct." (e.g. Bates 0000091; 2 paragraphs 0000059) referring to individuals that may/may not have relevant information. Similarly, descriptions of vehicles (Bates 006096).

- Numerous Xeroxed handwritten spacer/filler pages with A/4-VC; A/1-VC; A/3-VC which would indicate other sources for relevant documents that may, or may not, have been included (Bates 0000044; 020156; 011326; 011688). Other examples include listing detective's names and unit numbers on Plain pages – or officers from other agencies - suggesting that information is coming from other, unidentified sources. (Bates 005586; 005630; 005701; 006051; 006106).

The basement files contain only a portion of the investigative materials that, based on my experience would typically be included in a comprehensive homicide investigation file.[93] And, as the examples above demonstrate, in many instances, documents in these basement files make explicit reference to documents, notes, or information that are not included in the basement files.

This is evidence that parallel files related to these investigations were maintained and contained additional investigative materials, regardless of what terminology is used to describe the files: If the City contends that the basement files are supposed to be Investigative Files as defined under the special orders, then, the files demonstrate that other, parallel files were maintained containing additional investigative material. If the City contends they are not Investigative Files as defined under the special orders, then the basement files are themselves examples showing that the parallel file system continued unabated after issuance of the special orders.

Finally, these repeated and consistent failures to properly document and include all investigative information within the basement files, demonstrates the CPD's top down pattern and practice of failing to seriously try to correct bad practices or overcome the harmful outcomes shown in prior relevant successful litigation against CPD.

---

[93] **Attachment E** provides background materials regarding what kinds of investigative documents should appear in a homicide investigation, including examples of checklists used during criminal investigations.

HOOD 038856
Weston 053873

**B. The basement files from the 1999-2006 show that the special orders were not followed and that the problem has continued unabated into the 2000s**

According to the spreadsheet provided by Plaintiff's counsel, there were 340 files in the Area 1 Basement filing cabinets from the time period 1999-2006. Based on the spreadsheet, the same problems that I observed in the 1980s files were present in this second group of files.

1. Handwritten notes not on GPRs: 209/340 (approximately 61%) files contained handwritten notes, not on GPRs, and without any context about who wrote the note and when, which was prohibited by the special orders
2. To-from memos: 59/340 (approximately 17%) of the Investigative Files from this time period contain to-from memos, which were likewise prohibited by the special orders
3. Inventories: 334/340 (approximately 98%) of the Investigative Files contained incomplete or missing inventories.

Unsurprisingly, the street files problem did not solve itself. The City's failure to meaningfully address the problem in the 1980s allowed it to continue unabated into the 2000s. And as described above, in Section IV(D), pages 19-23, the continued use of parallel files and failures to follow CPD policy resulted in repeated failures to disclose important and relevant information to criminal defendants throughout the 2000s.

**C. The basement files confirm that there was no training, auditing, or oversight to ensure compliance with CPD's policies**

These consistent failures to follow the requirements of the special orders reveal that detectives were not properly trained on the special orders and that there was no proper supervision or oversight to ensure that these special orders were followed.[94]

Had there been any systematic audit or review of these files, these trends would be immediately apparent.[95] But a review of the 89 basement files from 1983-1989 also shows no signs of an audit or review. Though the CPD had forms designed to facilitate oversight and supervision, those forms were routinely missing or blank in the files I examined:

**Homicide File (Chain of Command) Review** (some Bates examples at 15511, 41049, 49240, 65188)**:** This form is designed to document that the chain of command responsible for overseeing the investigation and compliance with relevant departmental policies and procedures has actually done so. Most of the files that I reviewed either were missing the form, had only a single signature, or in the example had no signatures as all. That is, there is essentially no documentation of supervisory review in the basement files. This demonstrates a willful disregard among supervisors for ensuring that detectives were following the policies.

---

[94] See Section V(B) above, page 32
[95] See Section VI(A)-(B) above, pages 33-38

HOOD 038857
Weston 053874

**Investigative Case File Control** (some Bates examples at 5756, 6214, 8990, 1539): Over 35 of these are missing from criminal defense files. This form is designed to maintain case integrity and chain of custody of investigative files. It is common during an investigation for a file to be routinely removed for a multitude of legitimate reasons (crime lab, consultation with other units, review by prosecutor, court appearances, etc.) The case file control form documents the file's movements so that it is clear whether and when information may have been copied or removed. In most of the cases that I reviewed they are either missing, have so few entries as to be unbelievable, or have not entries at all – an impossibility. This is another critically important form for discovery purposes because it should reveal all the individuals that may have contributed to the file, including from other divisions or units. The failure to systematically utilize them properly, and the concurrent institutional failure to enforce compliance, indicates a pattern and practice of indifference to the policies for maintaining Investigative Files.

**Detective Division Personnel Form**: This sheet is designed to quickly track and identify detective division employees, where they are assigned, working hours, and equipment. It does not necessarily account for officers from other units. Regardless, in the majority of the cases reviewed, this form is missing altogether.

**Case Assignment Slip** (some Bates examples at 5573, 7077, 16653, 20863): The Case Assignment Slip is designed to document initial detective(s) assigned and conclusion status. These are key individuals to seek out in discovery for depositions. Again, enough of these forms are missing to demonstrate a clear pattern and practice of disregard for the policy.

As discussed above, without ongoing monitoring through audits and other means to ensure that the new special orders were being followed and that prosecutors and criminal defendants were receiving complete disclosures, it was almost certain that the ingrained practice of using street files would continue.

My review of records in this case and others shows that the continuation of the practice, including the failure to follow the special orders, was so rampant that it would have been confirmed through even a cursory auditing of files. As discussed above, 100% of the Investigative Files I reviewed contained evidence that the special orders were not being followed, and 90% of defense attorney files were missing information from the Investigative File; even superficial audits of small samples of records would have revealed these problems.

The failure to audit or discipline for non-compliance with the policies signals that the old ways – the ways of "street files" that the CPD should have been trying to correct – are acceptable. It is not only that best practices require enforcement of special orders to give them teeth, but also, in my experience with Internal Affairs, given the circumstances here, strict adherence was necessary to create a new culture and practice so that detectives would not continue with the ingrained practice of keeping parallel files.

HOOD 038858
Weston 053875

VII.    **The failure to turn over files in Nathson Fields' case was a direct result of these practices and inadequate policies**

Nathson Fields was convicted of the double murder of Jerome Smith and Talman Hickman in 1986. Fields' conviction was thrown out after a court granted his petition for post-conviction relief, but he was re-tried in 2009 and acquitted. He then filed a civil rights lawsuit against the City of Chicago in 2010, and during discovery for the civil lawsuit, a file "of over a hundred pages of police reports concerning the Smith/Hickman murders were located in a nondescript file cabinet at the Area 1 police station, along with files relating to other murders."[96]

The original arrest, trial, conviction, appeals, re-trial, and eventual exoneration of Nathson Fields spans a 30-year time period. The volume of police reports, criminal and civil court records, and litigation filings pertaining to the matter form tens of thousands of pages. For my purposes, it is best summarized by the following:

*Nathson Fields and Earl Hawkins were convicted at a 1986 bench trial before Cook County Circuit Court Judge Thomas J. Maloney of the murders two years earlier of Jerome Smith and Talman Hickman, members of the Goon Squad, an offshoot of the Black Gangster Disciples street gang.[97] Fields and Hawkins requested a jury at the sentencing hearing.[98] At the sentencing hearing, prosecution witness Randy Langston recanted his trial testimony and admitted that he never saw the faces of the shooters.[99] The jury concluded that both men were eligible for the death penalty and Maloney sentenced them to death.[100]*

*A year later, a federal prosecutor negotiated a deal under which Hawkins would be removed from death row in exchange for testifying against other gang members in unrelated cases.[101] Fields remained on death row. Then, in 1993, Judge Maloney was convicted on federal charges of, among other things, accepting a $10,000 bribe from a corrupt lawyer named William Swano to acquit Hawkins of murdering Smith and Hickman.[102] When Maloney learned that he was under investigation by the FBI, he returned the money to Swano and proceeded to convict Hawkins, as well as his co-defendant Fields.[103]*

*In light of Maloney's conviction, a state court judge ordered a new trial for Fields in 1996.[104] While the retrial was pending, a second key witness in the case named Gerald Morris recanted. Along with Randy Langston, Morris had testified at the 1986 trial that he had seen Fields and Hawkins shoot Smith and Hickman outside a public housing project on April 28, 1984. But in their new affidavits Morris and Langston stated that police and prosecutors had*

---

[96] Fields v. City of Chicago, Memorandum Opinion and Order, [Document # 483] page 2
[97] Ibid. p. 2-3
[98] Ibid p. 3-4
[99] Ibid p. 4
[100] Ibid p. 4
[101] Ibid p. 4-5
[102] Ibid p. 3
[103] Ibid p. 4
[104] Ibid p. 5

40

HOOD 038859
Weston 053876

*coerced them to falsely identify Fields and Hawkins. According to the affidavits, Morris and Langston had no idea who killed Smith and Hickman because the killers had worn masks.*

*Despite the recantations, rather than dropping the charges prosecutors made a deal with Hawkins under which he would testify against his former co-defendant. got Randy Langston and Gerald Morris[105] to recant their recantations. Fields remained in custody until 2003 when he was released on bond.[106]*

*On-going appeals by the prosecution delayed the Fields retrial another six years,[107] but when it finally occurred Judge Gaughan found Hawkins and the two other witnesses unworthy of belief. Fields was acquitted.[108]*

I have familiarized myself with the underlying facts in the *Fields* case, and have reviewed the various sets of police files produced to Mr. Fields at different times during his criminal case and during this civil litigation, including (a) the permanent retention file (CITY-NF-07531-07558), and the two new files disclosed to Mr. Fields in 2011 during this litigation: (b) the file produced by the City, which was located in a CPD warehouse (CITY-NF-07559-07652) (hereinafter the "warehouse file"), and (c) a file found in the filing cabinet in the basement of Area 1 (CITY-NF-001023-CITY-NF-001117) (hereinafter the "basement file").

The City has admitted that it "does not know where the [basement file] was maintained after June 1984 until it was located in Area 1 after the filing of this case in 2010."[109] In fact, Mr. Fields filed an earlier lawsuit in 1988 looking for additional files related to the Hickman/Smith murders, and the Chicago Police Department opened an internal investigation.[110] But the investigator assigned to the case wrote a memorandum stating that, although he received the "complete investigative package which was recorded under RD number F-151922 which concerns the Talman HICKMAN and Jerome SMITH Homicides . . . it was noted that the 'Street Files' were not included in the investigative file."[111] Ultimately, this CPD investigation was "unable to establish the existence of any 'Street Files' connected with the HICKMAN & SMITH homicides."[112]

Then, in response to a 1991 subpoena requesting all documents related to the Smith/Hickman murders, Fred Miller, Commander of Area 1 stated 'There are no documents on file at Detective Division One pertaining to the above subject."[113]

Nonetheless, over 100 pages were located in 2011 in the basement file found at Area 1.

---

[105] Morris later recanted yet a third time and provided an extensive affidavit outlining the years of coercion by police and prosecutors to obtain his cooperation in testifying against Fields.
[106] Fields v. City of Chicago, Memorandum Opinion and Order, [Document # 483] page 5
[107] Ibid.
[108] Ibid p. 6
[109] City's Third Amended Answer to Interrogatories 4 and 5, page 2.
[110] City's Third Amended Answer to Interrogatories 4 and 5, page 8-9.
[111] City's Third Amended Answer to Interrogatories 4 and 5, page 9.
[112] City's Third Amended Answer to Interrogatories 4 and 5, page 9.
[113] City's Third Amended Answer to Interrogatories 4 and 5, page 8.

HOOD 038860
Weston 053877

Those files were disclosed to Mr. Fields for the first time in this litigation.[114] It is clear, then, that the undisclosed Fields basement file is caused by, and additional evidence of, the street files problem, that is, a parallel file unaccounted for by CPD and not disclosed despite repeated, specific requests.

The documents newly produced in the basement file, which were not contained in any of the earlier files, include handwritten notes, memos, and other documents identifying multiple alternate suspects and potential leads demonstrating that Nathson Fields was not involved in the Hickman and Smith homicides. In fact Nathson Fields name was never mentioned as a possible suspect in any of these documents. Below are some examples of documents in the basement file, which were withheld from Mr. Fields and which contained relevant investigative information:

- CITY-NF-000972-1027: Identification photographs of alternate suspects and witnesses, with handwritten notes identifying the pictures
- CITY-NF-001029: Undated handwritten notes regarding a check for a 9 mm handgun related to other homicides
- CITY-NF-001030: Undated handwritten note regarding the wife of Talman Hickman, Margot Hickman
- CITY-NF-001035; 001037: Undated handwritten notes regarding what appear to be descriptions of the perpetrators
- CITY-NF-001038: Request for identification photos of three possible suspects
- CITY-NF-001039-40: Undated handwritten note related to Lawrence and Marshall Edwards, possible alternate suspects, including a statement that a witness heard them talking about "killing Fuddy" because of a previous shooting. The notes also state that a witness saw them at about 9:00 in the morning talking, and Lawrence said he'd get a gun, and they would put on masks, and he wouldn't live through the night, and then he "won't be jumping on you anymore."
- CITY-NF-001041: Undated handwritten note regarding an anonymous call reporting that "Ronald" and "Donald," who were "Stones" were the driver and passenger of the vehicle used to commit the crime
- CITY-NF-001042: Undated handwritten note regarding comparisons of all 9mm guns that are suitable for comparison to identify the gun used during the shooting
- CITY-NF-001043: Undated handwritten note referencing "Delbert Edwards" and his IR number (which is used to locate an individual's criminal history) with no additional context. A criminal history report for Delbert Edwards is also included in the file at CITY-NF-001067. According to a Supplemental Report, Delbert Edwards was also shot at by members of the Goon Squad, and would have had a motive to retaliate, but officers claimed to have verified his alibi with his family members. (CITY-NF-001050-51) (See also, CITY-NF-001086-88 arrest report from the shooting at Edwards the night prior to the H/S homicides and the arrests of two Goon Squad members).
- CITY-NF-001052: Notes from an anonymous tip that "Black P Stones" gang was involved in the crime which also provided a description and information regarding a suspect. A handwritten note states "Steve, need report by 11Jun84"
- CITY-NF-001053- 001059: Report and rap sheet for an individual arrested with drugs

---

[114] Fields v. City of Chicago, Memorandum Opinion and Order, page 2.

HOOD 038861
Weston 053878

within a few days of the homicide in the area of the homicide and in a similar car as the getaway car

- CITY-NF-001061: Undated handwritten note regarding Simeon Johnson, aka Cameo, Joseph Fritz, and John Rogers, with contact information and identifying features. The note does not provide any additional context for how these individual relate to the investigation, but an April 29, 1984 General Progress Report appears to describe interviews of Fritz and Rogers, in which Fritz reported that a man named Simeon owns a blue Cadillac, similar to the one used in the crime. Fritz also reported that he "heard that stones wearing masks killed some goons." (CITY-NF-001113). Officers apparently asked Rogers about his whereabouts the night of the murder, and Rogers reported visiting various family members. (CITY-NF-001113).
- CITY-NF-001062: Undated handwritten note regarding mother of Ricky Baldwin, a man who was killed by a member of the Goon Squad (Jimmie Greene) in a previous shooting. The note suggests a possible motive for Hickman and Smith murders: namely that another Baldwin was seeking reprisal for Ricky Baldwin's death. The note also references "Chico" and "Cameo" without further description. Several criminal histories and arrest reports related to various members of the Baldwin family appear throughout the file: CITY-NF-001065-66 (Paul Baldwin); CITY-NF-001071 (Shawn Baldwin); CITY-NF-001073 (Timothy Baldwin); Greg (aka Chico) cousin of Ricky Baldwin with description of Greg (CITY-NF-001108).
- CITY-NF-001069-70: April 29, 1984 General Progress Report describes an anonymous call implicating Rodell Banks in the shooting; and an arrest card for Rodell Banks is also included in the file.
- CITY-NF-001075: Undated to-from memo between detectives describing an interview with 14-year-old James Langston, who was playing ball across the street and said offenders were wearing skullcaps to conceal their identities. Identifies Ricky Baldwin as a passenger in the car used to carry out the killings. The memo also discusses an interview with Sandra Langston who described both offenders as having a light complexion.
- CITY-NF-001076: Undated handwritten note regarding Carlos Willis and John "Bay Rogers" without additional context or explanation of their connection to the investigation.
- CITY-NF-001077: Typed to-from memo between detectives describing anonymous call implicating Edward Stewart as the driver of the vehicle used in the murder, and stating that Stewart was with "Chico" and Darryl Baldwin. The memo also describes detectives' efforts to locate Edward Stewart and Chico, and to identify Chico's real name.
- CITY-NF-001085: Undated handwritten note referencing "Chico" and "Poncho" and possible addresses, with no additional context or description.
- CITY-NF-001100-06: photos of possible suspect Edward Stewart, arrest report showing an inquiry issued on day of H/S homicides, arrests reports and rap sheets.
- CITY-NF-001107-09: Efforts to identify individuals with the name of "Chico." Arrest cards list Damien Prince and Martel Ray (or "Mertel Rey"). A handwritten note states that "Chico" = Greg, cousin to a Baldwin
- CITY-NF-001112: May 1, handwritten General Progress Report referencing Clifford Marshall and Lawrence Edwards, as possible suspects and discussing the Edwards' brothers possible alibis. Also references Darryl Baldwin with "Chico" and efforts to verify their alibi.

43

HOOD 038862

Weston 053879

- CITY-NF-001113: April 29, 1984.handwritten General Progress Report from Detective Minogue discussing what appears to be an interview of a possible witnesses or suspects Joseph Fritz and John Rogers.
- CITY-NF-001114: arrest report for individual who associated with Martel Ray.
- CITY-NF-001116: Undated handwritten note regarding an anonymous tip that said Edward Stewart was the driver of the vehicle used in the commission of the murders and that Darryl Baldwin and Chico were with him. Contact information for girlfriend of Baldwin- Olivia Wallace. (The basement file contains other information regarding Wallace, including her rap sheet CITY-NF-001109-001110)
- CITY-NF-001117: Undated printout related to a Mark Brown with no additional context. His name also appears on pages CITY-NF-001063-64.

As the list above reveals, the basement file demonstrates the same problems observed in the set of 89 basement files. There are numerous handwritten notes, not on GPRs, which are undated, unsigned, and provide no context. As these notes demonstrate, detectives often wrote names of alternate suspects or important witnesses on blank pages, with no additional context. Detectives also communicated important information about witnesses and alternate suspects in to-from memos between detectives. This information was not transcribed into the official reports. Finally, the basement file contains no inventory sheet.

The basement file is not the only file that was not turned over to Mr. Fields. As explained above, the City also produced for the first time a file containing investigative materials related to the Smith and Hickman murders that was located in the warehouse. Notably, this file did not include any of the handwritten notes or to-from memos between detectives. This is a prime example of the use of multiple, parallel files, in addition to the permanent retention file, which are stored separately, and make no reference to one another.

This file, too, suffers from the same systemic problems observed in the basement files as a whole: Although there is an inventory sheet in the warehouse file, it is incomplete. (CITY-NF-7560-61). It lists only 8 pages of GPRs and makes no reference of the 100 pages that were in the basement file and in any event was not contained in any of the defense attorneys' files or the permanent retention file. The warehouse file also includes relevant investigative information. There is a criminal history report for Henry Adams, who was potentially also involved in the murder (CITY-NF-07632), and a handwritten note documenting negative results from a request to compare the gun used in the Smith and Hickman homicide against a firearm used in another homicide. (CITY-NF-07613).

The documents in the basement and warehouse files are highly relevant to the investigation, implicate multiple alternate suspects, and suggest potential witnesses, vehicles used in the crime, and items of physical evidence. These documents should have been produced to Mr. Fields before his original criminal trial in 1986 (and at every other point at which he engaged with the criminal justice system after that). These documents would have been produced under generally accepted police practices related to creating, retaining, and disclosing investigative materials.

Finally, these files suggest that there may be yet more investigative materials that have

HOOD 038863
Weston 053880

not been disclosed. For example, in the to-from memo relating to the interview with James Langston (CITY-NF 001075) the memo says "see our notes for more details." Those notes do not appear in the files that have been disclosed to Mr. Fields. Similarly, a report of an anonymous tip includes a statement "Steve, need report by 11Jun84," (CITY-NF-001052) but there is no report corresponding to that request in the files. The files that have now been located and disclosed provide no indication of how many additional files may exist, or where to locate them. This inability to determine where all relevant materials are stored is a direct result of the failure to follow standard police practice of creating a single, comprehensive file for an investigation.

## Concluding Statement

I have provided my opinions based upon my training, experience, and after a careful evaluation of the totality of circumstances in this matter. I utilized all of the facts and data known to me, and applied generally accepted police management principles and methods. I have concluded that CPD had deficient policies related to creating, maintaining, and disclosing investigative materials, and further that there was a widespread practices of keeping multiple, parallel files for single investigation. As a result of those deficient policies and widespread practice, criminal defendants were routinely denied substantive and relevant investigative materials related to their criminal cases. The files withheld from Mr. Fields during his criminal trial were withheld as a result of the same set of practices and policies (or lack thereof), and contained relevant and important investigative materials that should have been disclosed under standard police procedures.

In sum, it is my professional opinion to a reasonable degree of professional certainty in the law enforcement community, and based on longstanding and well-accepted law enforcement practices, that the defendants engaged in a pattern and practice of routinely failing to disclose material in criminal cases to defendants that should have been disclosed, These failures to disclose exculpatory and impeachable information was well outside the norm that law enforcement officials and institutions know needs to be disclosed.

I reserve the right to supplement or modify this report and my opinions expressed in the report to the extent that additional information is presented to me and to the extent permitted by rules.

Pursuant to 28 U.S.C Section 1746, I declare under penalty of perjury that the foregoing is true and correct.

Michael D. Brasfield

45

HOOD 038864
Weston 053881

*Michael Brasfield and Associates, Inc.*

641 Olele Point Road                    Phone: 360-301-4465
Port Ludlow, WA 98365                   E-mail: brasfield@commandscene.com

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

**Nathson E. Fields v. City of Chicago, et al.**
Cause: 1:10-cv-01168

# ATTACHMENT A

HOOD 038865
Weston 053882

**Attachment A - Court Experience**

Report of Plaintiff's Expert – Michael D. Brasfield

**Nathson E. Fields v. City of Chicago, et al.**
Cause: 1:10-cv-01168

**Compliance with Federal Rule of Procedure 26 (a) (2) (B)**
**Testimony at Trial or Deposition for Preceding Four Years**

I have either testified at trial or deposition as an expert witness equally for defendants and plaintiffs in Federal, State, and Local Courts. These appearances have been in both civil and criminal matters. I have appeared in Federal District Courts in Fort Lauderdale, Miami, Seattle, Tacoma, Spokane, and Chicago. I have also appeared in State Courts in Florida, Pennsylvania, Arizona, Alaska, and Washington. These civil litigation cases have involved all types of police procedures and practices and have included the use of force; police pursuits; deadly force; in-custody deaths, negligent selection, training, and retention; as well as class action and Federal "1983" civil rights cases.

Under Federal Rule of Civil Procedure 26, I have listed the following specific cases that I have provided testimony at deposition or trial as an expert witness in the last four years:

- In the United States District Court (Northern District of Illinois, Eastern Division) – James Kluppelberg v. City of Chicago – Cause No. 13-CV-3963 – For Plaintiff – 42 USC, 1983 – Wrongful Conviction.
- In the United States District Court (Eastern District of Washington) – Goehring v. City of Kennewick – Cause No. 4:14-CV-5104-RMP – For Defendant – Violation of Civil Rights.
- In the United States District Court (Northern District of Illinois, Eastern Division) – Deon Patrick v. City of Chicago – Cause No. 14C-3658 – For Plaintiff – 42 USC, 1983 – Wrongful Conviction.
- In the United States District Court (Northern District of Illinois, Eastern Division) – Percy Coleman v. City of Chicago – Cause No. 12C-10061 – For Plaintiff – 42 USC, 1983 – Wrongful Death.
- In the Superior Court for the State of Alaska (Anchorage) – Boshears v. State of Alaska – Cause No. 3AN-13-07970CI – For Plaintiff – Negligence of Duty.
- In the Court of Common Pleas of Allegheny County, Pennsylvania – Commonwealth of Pennsylvania v. Leon Ford – Cause No. CC201303273 – For Defendant - Multiple criminal charges.
- In the United States District Court (Western District of Washington) – Theoharis v. Rongen – Cause No. 2:13-cv-01345-RAJ – For Plaintiff – 42 USC, 1983 – Excessive and Unreasonable Force and Unreasonable Search and Seizure.
- In the United States District Court (Eastern District of Washington) - Thoma v. City of Spokane – Cause No. CV-12-156-EFS – For Defendant – 42 U.S.C. – 1983.
- In the United States District Court (Eastern District of Washington) – Duncan v. Liberty Lake – Cause No. 2:2012cv00219 – For Defendant – Violation of Civil Rights.

1

HOOD 038866
Weston 053883

- In the United States District Court (Northern District of Illinois, Eastern Division) – April Ortiz v. City of Chicago – Cause No. 04-CV-7423 – For Plaintiff – 42 USC, 1983 - Denial of Medical Care.
- In the Superior Court of the State of Washington (Spokane County) – Glidden v. City of Spokane Valley, et al. – Cause No. 11-2-04437-2 – For Defendant – Police Shooting - Negligent training, supervision, retention.
- In the United States District Court (Eastern District of Washington) – Creach v. Spokane County, et al. – Cause No. 2:2011cv00432 – For Defendant – 42:1983 Civil Rights Act. - Fatal shooting by police officer.

In addition, I have provided my expert opinion, reviewed, consulted, or been retained in civil litigation related matters for plaintiffs and defense attorneys or governmental entities over 50 times in the last 10 years in Riverside County (CA), Trinity County (CA), Prescott County (AZ), Chicago (IL), Garland (TX), Bradley County (TN), Hazard (KY), Clallam County (WA), Franklin County (WA), Reno (NV), Unalakleet (AK), Whatcom County (WA), Albany (OR), Jackson (MS), Seattle (WA), Columbia (SC), and Sweetwater County (WY).

HOOD 038867
Weston 053884

*Michael Brasfield and Associates, Inc.*

641 Olele Point Road                          Phone: 360-301-4465
Port Ludlow, WA 98365                         E-mail: brasfield@commandscene.com

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

**Nathson E. Fields v. City of Chicago, et al.**
Cause: 1:10-cv-01168

# ATTACHMENT B

HOOD 038868
Weston 053885

**Attachment B - Report of Material Reviewed**

Report of Plaintiff's Expert – Michael D. Brasfield

**Nathson E. Fields v. City of Chicago, et al.**
Cause: 1:10-cv-01168


I have been provided and reviewed the following documents and materials concerning this case:

***General Case Material***

- 437. Plaintiff's Local Rule 56.1 Statement of Facts.pdf
- 483. Memorandum Opinion and Order on Summary Judgment.pdf
- 812. Memorandum Opinion and Order granting new tiral.pdf
- City's Third Amended Answer to Interrogatories 4 and 5.pdf
- CITY-NF-000972-001117 Fields Street File produced 2011.pdf
- City-NF-07531-07558 - Fields permanent retention file.pdf
- City-NF-07559-07652 - Fields Area File.pdf
- Letter from City re Production of permanent retention file and Area File.pdf
- 2016.01.26 Document Production.pdf
- 2016.01.29 Plaintiff's Supplemental Monell Disclosures.pdf
- AUSA discovery letter - Fields 01289-01296.pdf
- Page from G483470 Michael McMillan [Crim.Def Files – Fields 044680-045057].pdf
- Chicago Police Department Special Orders
  - Chicago Police Department Teletype
  - Detective Division Notice 82-2
  - Special Order 83-1
  - Special Order 83-2
  - Special Order 86-3
  - Standard Operating Procedure 1988
- *Jones v. City of Chicago*, 856 F.2d 985, 988 (7th Circuit 1988)
- *Palmer v. City of Chicago,* Case No. 82C 2349
- James Hickey deposition, Rivera v. Guevara (5/6/14)
- James Hickey deposition, Rivera v. Guevara (6/10/14)
- James Hickey deposition, Kluppelberg – Part 1 (7/29/2014)
- James Hickey deposition, Kluppelberg – Part 2 (7/31/2014)
- James Hickey deposition, Kluppelberg (6/9/2015)
- Kathleen Loughran deposition (6/6/2012)
- Fields Spreadsheet.xlsx (spreadsheet)

1

HOOD 038869
Weston 053886

### Basement Files (1983-1989)

- E-010765 (SSN only).pdf (95 pages) – Cecil Robinson
- E-399564 (SSN only).pdf (207 pages) - Serafin Flores
- F-048933 (SSN only).pdf (129 pages) - Christino Garcia
- F-380662 (SSN only).pdf (123 pages) - Lindsey Cannon
- G-011889 (SSN only).pdf (75 pages) - Earl Stademeyer
- G-014815 (SSN only).pdf (128 pages) - Guy Johns
- G-108642 (SSN only).pdf (122 pages) - Roscoe Evans
- G-148403 (SSN only).pdf (187 pages) - Derrick Johnson
- G-159857 (SSN only).pdf (351 pages) - Jeffrey Boyd
- G-165272.pdf (156 pages) - William Goodin
- G-215280 (ACB 090389-090455) received 9.21.15.pdf (67 pages) - Maurice Green
  - G-215280 (SSN only).pdf (132 pages) - Maurice Green
  - G-215280A (SSN only).pdf (71 pages) - Maurice Green
- G-248336 (SSN only).pdf (167 pages) - Ruben Avilez
- G-257089 (SSN only).pdf (50 pages) - Freddy Brown
- G-267826 (SSN only).pdf (115 pages) - James Walker
- G-284291 (SSN only).pdf (90 pages) - Lucille Pye
- G-321886 (SSN only).pdf (159 pages) - James Crockett
- G-446754 (SSN only).pdf (48 pages) - Edward Terrett
- G-456900 (SSN only).pdf (51 pages) - Larry Buchanan
- G-468726 (SSN only).pdf (148 pages) - Albert Spraggins
- J-381525 (redacted).pdf (85 pages) - Albert Buckles
- J-418229 (redacted).pdf (204 pages) - Mervyn Wright
- M-566742 (redacted).pdf (52 pages) - Fredy Roberson
- M-568-343 (redacted).pdf (85 pages) - Steve Jones
- M-569-727 (redacted).pdf (38 pages) - John Avery
- M-580-592(redacted).pdf (147 pages) - David Duarte
- M-587998(redacted).pdf (96 pages) - Tony Allen
- M-590700 (SSN only).pdf (95 pages) - Ricky Icenberg
- E-026792.pdf (142 pages)
- E-221919 (SSN only).pdf (38 pages)
- E-277036 (SSN only).pdf  (122 pages)
- E-348611(SSN only).pdf (41 pages)
- E-395970 (SSN only).pdf (166 pages)
- E-442815 (SSN only).pdf (153 pages)
- E-475100 (SSN only).pdf  (105 pages)
- F-172852 (SSN only).pdf (46 pages)
- F-177096 (SSN only).pdf (81 pages)
- F-229020 (ACB 090456-090615).pdf (160 pages)
- F-229039 (SSN only).pdf (26 pages)

2

- F-277122 (SSN only).pdf (193 pages)
- F-299912 (SSN only)-.pdf (100 pages)
- F-308281 (SSN only).pdf (68 pages)
- F-336114 (SSN only).pdf (156 pages)
- F-430186 (SSN only).pdf (50 pages)
- F-445484 (SSN only).pdf (93 pages)
- F-492465 (SSN only).pdf (225 pages)
- G-011265 (SSN only).pdf (82 pages)
- G-027619 (SSN only).pdf (60 pages)
- G-032161 (SSN only).pdf (35 pages)
- G-049257 (SSN only).pdf (22 pages)
- G-051225 (SSN only).pdf (70 pages)
- G-056199 (SSN only).pdf (31 pages)
- G-087375 (SSN only).pdf (428 pages)
- G-106586 (SSN only).pdf (99 pages)
- G-156178 (SSN only).pdf (72 pages)
- G-176242 (SSN only).pdf (82 pages)
- G-192900 (SSN Only).pdf (75 pages)
- G-230261 (SSN only).pdf (91 pages)
- G-235180 (SSN only).pdf (42 pages)
- G-245282 (SSN only).pdf (90 pages)
- G-265171 (SSN only).pdf (58 pages)
- G-267631 (SSN only).pdf (49 pages)
- G-267820 (SSN only).pdf (31 pages)
- G-278643 (SSN only).pdf (115 pages)
- G-283147 (SSN only).pdf (72 pages)
- G-289217 (SSN only).pdf (40 pages)
- G-303402 (SSN only).pdf (75 pages)
- G-322101 (SSN Only).pdf (74 pages)
- G-331216 (SSN only)-.pdf (93 pages)
- G-354748 (SSN only).pdf (78 pages)
- G-356930 (SSN only).pdf (88 pages)
- G-385135 (SSN only).pdf (76 pages)
- G-401782 (SSN only).pdf (59 pages)
- G-405711 (SSN only).pdf (4 pages)
- G-482955 (SSN only).pdf (296 pages)
- G-483470 (SSN Only).pdf (109 pages)
- G-501974 (SSN only).pdf (38 pages)

3

HOOD 038871
Weston 053888

- H-024109 (SSN only).pdf (126 pages)
- H-024109A (SSN only).pdf (163 pages)
- H-349049 (SSN only).pdf (63 pages)
- H-435581 (SSN only).pdf (35 pages)
- H-465-163 (SSN only).pdf (324 pages)
- J-486857 (redacted).pdf (53 pages)
- J-510242 (redacted).pdf (147 pages)
- K-300724 (redacted).pdf (84 pages)
- K-562024 (redacted).pdf (189 pages)
- M-139566 (redacted).pdf (68 pages)
- M-510-728 (redacted).pdf (49 pages)
- M-534-290 (redacted).pdf (136 pages)
- M-539-997 (redacted).pdf (64 pages)
- M-544-975 (redacted).pdf (36 pages)

### *Criminal Defense Files (1983 – 1989)*

- E010765 Cecil Robinson [Criminal Defense Files- Fields 037006-037317].pdf (312 pages)
- E399564 Serafin Flores [Criminal Defense Files - Fields 037318-038152].pdf (835 pages)
- F048933 Christino Garcia [Criminal Defense Files - Fields 038153-038760].pdf (608 pages)
- F380662 Lindsey Cannon [Criminal Defense Files - Fields 038761-040854].pdf (2094 pages)
- G011889 Earl Stademeyer [Criminal Defense Files - Fields 040855-041128].pdf (274 pages)
- G014815 Guy Johns [Criminal Defense Files- Fields 047420-048462].pdf (1043 pages)
- G108642 Roscoe Evans [Criminal Defense Files - Fields 041244-041624].pdf (381 pages)
- G148403 Derrick Johnson [Criminal Defense Files - Fields 041625-042235].pdf (611 pages)
- G159857 Jeffrey Boyd [Criminal Defense Files-Fields 017841-025177].pdf (7337 pages)
- G165272 William Goodin [Criminal Defense Files – Fields 042341-042438].pdf (98 pages)
- G215280 Maurice Green [Criminal Defense Files - Fields 042439-042974].pdf (536 pages)
- G248336 Ruben Avilez [Criminal Defense Files - Fields 042975-043172].pdf (198 pages)
- G257089 Freddy Brown [Crim. Def Files - Fields 043173-043273].pdf (101 pages)
- G267826 James Walker [Criminal Defense Files - Fields 042236-042340].pdf (105 pages)

4

HOOD 038872
Weston 053889

- G284291 Lucille Pye [Criminal Defense Files - Fields 043274-043381].pdf (108 pages)
- G321886 James Crockett [Criminal Defense Files - Fields 043388-043654].pdf (267 pages)
- G446754 Edward Terrett [Criminal Defense Files - Fields 043655-043867].pdf (213 pages)
- G456900 Larry Buchanan [Criminal Defense Files - Fields 043868-044026].pdf (159 pages)
- G468726 Albert Spraggins [Criminal Defense Files - Fields 044027-044386].pdf (360 pages)
    - G468726 Maurice Spraggins [Criminal Defense Files - Fields 044387-044679].pdf (293
    - pages)
- J381525 Albert Buckles [Criminal Defense Files - Fields 045066-045473].pdf (408 pages)
- J418229 Mervyn Wright [Criminal Defense Files - Fields 048463-049562].pdf (1100 pages)
- M566742 Fredy Roberson [Criminal Defense Files - Fields 045589-045823].pdf (235
- M568343 Steve Jones [Criminal Defense Files - Fields 049563-050435].pdf (873 pages)
- M569727 John Avery [Criminal Defense Files - Fields 045824-046184].pdf (361 pages)
- M580592 David Duarte [Criminal Defense Files - Fields 050436-051863].pdf (1428 pages)
- M587998 Tony Allen [Criminal Defense Files - Fields 046185-047419].pdf (1235 pages)
- M590700 Ricky Icenberg [Criminal Defense Files - Fields 051864-052616].pdf (753 pages)
- 

### *Permanent Retention Files (1983-1989)*

- E010765 CITY-permanent retention file-00472.pdf (41 pages) - Cecil Robinson
- E399564 CITY-permanent retention file-00720.pdf (69 pages) - Serafin Flores
- F048933 CITY-permanent retention file-00856.pdf (30 pages) - Christino Garcia
- F380662 CITY-permanent retention file-01040.pdf (40 pages) - Lindsey Cannon
- G011889 CITY-permanent retention file-01212.pdf (27 pages) - Earl Stademeyer
- G014815 CITY-permanent retention file-01239.pdf (51 pages) - Guy Johns
- G108642 CITY-permanent retention file-01412.pdf (39 pages) - Roscoe Evans
- G148403 CITY-permanent retention file-01452.pdf (40 pages) - Derrick Johnson
- G159857 CITY-permanent retention file-01514.pdf (89 pages) - Jeffrey Boyd
- G159857.pdf (62 pages) / CITY-NF-001682 - Jeffrey Boyd
- G215280 CITY-permanent retention file-01706.pdf (41 pages) - Maurice Green
- G248336 and G248696 CITY-permanent retention file-01846.pdf (48 pages) - Ruben Avilez
- G257089 CITY-permanent retention file-01895.pdf (15 pages) - Freddy Brown
- G267826 CITY-permanent retention file-01962.pdf (25 pages) - James Walker
- G284291 CITY-permanent retention file-02017.pdf (21 pages) - Lucille Pye

5

HOOD 038873
Weston 053890

- G321886 CITY-permanent retention file-02079.pdf (50 pages) - James Crockett
- G446754 CITY-permanent retention file-02317.pdf (17 pages) - Edward Terrett
- G456900 CITY-permanent retention file-02335.pdf (11 pages) - Larry Buchanan
- G468726 CITY-permanent retention file-02346.pdf (40 pages) - Albert Spraggins
  - G468726 CITY-permanent retention file-02386.pdf (2 pages) - Albert Spraggins
- J381525 CITY-permanent retention file-02914.pdf (27 pages) - Albert Buckles
- J418229 CITY-permanent retention file-02941.pdf (34 pages) - Mervyn Wright
- M566742 CITY-permanent retention file-03327.pdf (20 pages) - Fredy Roberson
- M568343 CITY-permanent retention file-03347.pdf (45 pages) - Steve Jones
- M569727 CITY-permanent retention file-03392.pdf (18 pages) - John Avery
- M580592 CITY-permanent retention file-03410.pdf (57 pages) - David Duarte
- M587998 CITY-permanent retention file-04100.pdf (50 pages) - Tony Allen
- M590700 CITY-permanent retention file-03467.pdf (48 pages) - Ricky Icenberg

### *Basement Files (1999-2006)*

- D-192218 (SSN only).pdf (205 pages) - Steven Spears
- D-579065 (SSN only).pdf (121 pages) -  Jimmy Velasquez
- G-032399 (SSN only).pdf (213 pages) - Diante Wiley
- G-259321 (SSN only).pdf (86 pages) - Kevin Jackson
- G-266841 (SSN only).pdf (24 pages) - Timothy Malone
  - G-266841A (SSN only) 2.pdf (125 pages) - Timothy Malone
- G-268444 (SSN only).pdf (254 pages) - Isaiah Brady
- G-326467 (SSN only).pdf (309 pages) - George Frison
- G-406405 (SSN only).pdf (290 pages) - Santana McCree
- G-570120 (SSN only).pdf (210 pages) - Crisino Bravo
- G-705434 (SSN only).pdf (236 pages) - Norman McIntosh
- HH-175723 (abc).pdf (169 pages) - Maurice Brown
- HH-358668 (SSN only).pdf (288 pages) - Christopher Peoples
- HH-749335 (abc).pdf (180 pages) - Devon Terrell
- HJ-102484 (SSN only).pdf (273 pages) - Anthony Houston
- HJ-366143 (abc).pdf (227 pages) - Leviante Adams
- HJ-492443.pdf (def).pdf (453 pages) - Octavia Anima
- HK-211174 (SSN only) .pdf (176 pages) - Lakesha Collins
- HK-406407 (SSN only).pdf (207 pages) - Delvie Turpin
- HK-416661 (SSN only).pdf (195 pages) - Donell Johnson
- HK-449083 (SSN only).pdf (272 pages) - Jamell Murphy
- HK-470751 (abc).pdf (235 pages) - Verna Colbert
- HK-593970 (abc).pdf (277 pages) - Tharine Partee
- HK-639684 (abc).pdf (350 pages) - Devon Terrell

HOOD 038874
Weston 053891

### Criminal Defense Attorney Files (1999 - 2006)

- D192218 Steven Spears [Criminal Defense Files - Fields 000001-0000421] Redacted.pdf (421 pages)
- D579065 Jimmy Velasquez [Criminal Defense Files - Fields 000422-001231] Redacted.pdf (810 pages)
- G032399 Diante Wiley [Criminal Defense Files - Fields 001232-002099] Redacted.pdf (868 pages)
- G259321 Kevin Jackson [Criminal Defense Files - Fields 002100-004383] Redacted.pdf (2284 pages)
- G266841 Timothy Malone [Criminal Defense Files - Fields 004384-005802].pdf (1419 pages)
- G268444 Isaiah Brady [Criminal Defense Files - Fields 025178-027518].pdf (2341 pages)
- G326467 George Frison [Criminal Defense Files - Fields 005803-006593] Redacted.pdf (791 pages)
- G406405 Santana McCree [Criminal Defense Files - Fields 006594-007411] Redacted.pdf (818 pages)
- G570120 Crisino Bravo [Criminal Defense Files - Fields 027519-027637].pdf (119 pages)
- G705434 Norman McIntosh [Criminal Defense Files - Fields 007412-008058] Redacted.pdf (647 pages)
- HH175723 Maurice Brown [Criminal Defense Files - Fields 008059-008565] Redacted.pdf (507 pages)
- HH358668 Christopher Peoples [Criminal Defense Files - Fields 008566-008893] Redacted.pdf (328 pages)
- HH749335 Devon Terrell [Criminal Defense Files - Fields 008894-009730] Redacted.pdf (837 pages)
- HJ102484 Anthony Houston [Criminal Defense Files - Fields 027638-029307].pdf (1670 pages)
- HJ366143 Leviante Adams [Criminal Defense Files – Fields 009731-010034] Redacted.pdf (304 pages)
- HJ492443 Octavia Anima [Criminal Defense Files - Fields 010035-013762] Redacted.pdf (3728 pages)
- HK211174 Lakesha Collins [Criminal Defense Files - Fields 013763-014757] Redacted.pdf (995 pages)
- HK406407 Delvie Turpin [Criminal Defense Files - Fields 029337-029344].pdf (8 pages)
- HK416661 Donell Johnson [Criminal Defense Files - Fields 014758-015021] Redacted.pdf (264 pages)
- HK449083 Jamell Murphy [Criminal Defense Files - Fields 052617-057745].pdf (5129 pages)
- HK470751 Verna Colbert [Criminal Defense Files - Fields 029345-036948].pdf (7604 pages)
- HK593970 Tharine Partee [Criminal Defense Files - Fields 015022-015371] Redacted.pdf (350 pages)
- HK639684 Devon Terrell [Criminal Defense Files - Fields 015372-017742] Redacted.pdf (2371 pages)

HOOD 038875
Weston 053892

***Michael Brasfield and Associates, Inc.***

641 Olele Point Road                              Phone: 360-301-4465
Port Ludlow, WA 98365                       E-mail: brasfield@commandscene.com

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

**Nathson E. Fields v. City of Chicago, et al.**
Cause: 1:10-cv-01168

# ATTACHMENT C

HOOD 038876
Weston 053893

**Attachment C - Compensation**

Report of Plaintiff's Expert – Michael D. Brasfield

**<u>Nathson E. Fields v. City of Chicago, et al.</u>**
Cause: 1:10-cv-01168

My compensation for work related to this case is $300 per hour, with a four-hour minimum. Deposition and trial testimony is billed at a flat rate of $1200 for up to four hours. After four hours, the hourly rate of $300 is charged. Time spent traveling and waiting to testify is considered billable time. Reasonable expenses may be charged with prior approval.

HOOD 038877

Weston 053894

*Michael Brasfield and Associates, Inc.*

641 Olele Point Road
Port Ludlow, WA 98365

Phone: 360-301-4465
E-mail: brasfield@commandscene.com

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

**Nathson E. Fields v. City of Chicago, et al.**
Cause: 1:10-cv-01168

# ATTACHMENT D

HOOD 038878
Weston 053895

**Attachment D - Resume**

Report of Plaintiff's Expert – Michael D. Brasfield

**Nathson E. Fields v. City of Chicago, et al.**
Cause: 1:10-cv-01168

**Education:**
Bachelor of Arts, Police Administration - University of Washington, Seattle, WA
Senior Management Institute for Police - Police Executive Research Forum, Washington, D.C.

**Professional Experience:**

**2003-2009     Elected Sheriff of Jefferson County, Washington**

After retiring for a second time, and returning to the small rural county that I had chosen as my permanent retirement home, I ran for public office. This 1,815 square mile, predominantly rural, county has a full time resident population of only 26,000. The Jefferson County Sheriff's Office, established in 1853, is one of the oldest law enforcement organizations in the state of Washington. The Sheriff's Office budget for fiscal year 2008 was $4.5 million. The Office has 50 employees and a large network of volunteers and reserve deputies. I was re-elected to a 2nd term which began on January 1, 2007 by an 80% majority. I retired from this office in March 2009.

**2001 – 2003     Consultant and Program Director - South Downtown Foundation**

Responsibility for administering several million dollars for improving public safety in the International District, SoDo, and Pioneer Square neighborhoods of Seattle. Coordinated efforts with the City of Seattle, the Seattle Police Department and various interest and civic groups in the area.

**1995-2001     Police Chief of Fort Lauderdale, Florida**

The 33 square mile city has a full time resident population of 165,000. An estimated additional 60,000 "snow bird" residents return to second homes in the city during the 6-month winter season. Fort Lauderdale serves as the seat of government for a county of 1.5 million and is in the heart of a diverse tri-county (Dade, Broward, and Palm Beach) population of 4 million. As one of the premier tourist destinations in South Florida, over 12 million passengers come through the airport each year. The ocean port handles the second largest number of cruise ship sailings in the world. Fort Lauderdale serves as the governmental and business hub of the County.

The City employed a workforce of 2,600 employees and operated with a budget of over $334 million. IAFF, FOP, and AFSCME Unions represent the fire, police, and general employees, respectively. The Fort Lauderdale Police Department had a budget of $60

1

HOOD 038879
Weston 053896

million and consisted of 500 sworn positions and 300 civilian positions. In 2000 the department received 600,000 calls for service, dispatched over 200,000 of those calls, made over 20,000 arrests, and issued over 65,000 traffic citations. The Department is now nationally recognized as an innovative leader in the field of community policing and was one of only a handful of cities nationwide to be selected as a Community Policing Demonstration Site by the Department of Justice. Oversaw and operated the only municipal jail in the state of Florida.

A small sampling of initiatives undertaken over the 6 years includes:
- First large municipal police agency in Florida to receive accreditation
- Automobile anti-theft tactics that have reduced auto thefts by nearly 35% in one year
- Aggressive property crime reduction efforts in the area of strengthened pawn shop record sharing and accountability
- Partnerships with State Probation and Parole staff in "Ride Along Programs" with our patrol officers to remove violators from the community
- Establishment of "Citizens on Patrol" in specially marked vehicles to enhance public safety
- Aggressive enforcement of traffic and "quality of life" ordinances to help neighborhoods
- Establishment of a Nuisance Abatement Board to address drug and prostitution activity
- Significant reduction in alarm false dispatches to allow increased proactive patrol
- Innovative anti-prostitution and anti-gang programs
- Federal "Weed & Seed" designation, which has allowed us to partner with a wide range of community and governmental entities
- Thirteen sessions of the Citizen Police Academy - a 3 month, 35-hour program
- Summer COPJAM activities for at risk youth
- Truancy and curfew programs which have dramatically reduced the rate of property crimes

In 1997 undertook a city financed $10 million technology enhancement initiative for the Department. Half of it was for a new state of the art Computer Aided Dispatch (CAD) and Record Management System (RMS), and the other half for network servers, individual personal computers, Geographical Information System (GIS), Automated Fingerprint Identification System (AFIS), internet access, bar coding for property control and evidence, and the largest law enforcement deployment of handheld, pen based, Motorola Forte' computers for patrol officers.

During my 6-year tenure, we successfully competed and received nearly $8 million in Federal and State grants. More than forty percent of the grant funds have gone into non-traditional community and social service support programs, in lieu of police personnel and hardware.

During my tenure there was a dramatic improvement in the relationship between our unions and management. We successfully negotiated two (3 year) contracts without

HOOD 038880
Weston 053897

incident or rancor.  Although there has been an increase in professional expectations of accountability for our employees, disciplinary appeals to arbitration had been all but eliminated.

### 1990-1995        Assistant Chief - Seattle Police Department

An appointive, exempt position reporting directly to the Chief of Police - acted as the Executive Assistant Chief of the Department and commanded the Support Bureau.  The Police Department employed over 1,875 personnel and had an annual budget of $120 million.

Responsible for and oversaw the activity of nine uniquely different divisions including: Training; Internal Investigations; Crime Prevention: Intelligence; Communications; Personnel; Records & Evidence; Data Processing; and Fiscal, Property, & Fleet Management.  As the Executive Assistant Chief, was responsible for the day-to-day operation of the agency including authority for hiring, discipline, and administrative decisions.  In addition, acted as primary management labor relations and contract negotiator with 12 labor unions.  This bureau employed approximately 100 sworn and 450 civilians.  Served as the Seattle Police Department's jail liaison executive, as well as jail contract negotiator.   Routinely served as acting Chief of Police.

### 1986-1990        Major

An appointive, exempt position - command of SPD Inspectional Services Division, reported directly to the Chief of Police.  Coordinated and implemented strategic planning for the entire Department and conducted periodic performance inspections of Departmental units.  Oversaw the preparation of the Department's budget, as well as the formulation of departmental rules, policies, and procedures.  Acted as liaison with elected officials and community groups.

### 1984-1985        Captain

Command of SPD North Precinct.  Responsible for Patrol operations in an area of the city that encompassed a population of 200,000 people and a uniformed force of 130 officers.  The precinct contained over a dozen unique communities including the University of Washington.  Routinely served as acting Patrol Major overseeing all four patrol precincts - 550 sworn personnel.

### 1982-1983        Captain

Command of SPD Internal Investigations Section, reported directly to the Chief of Police.  Responsible for overseeing the investigation of alleged misconduct of nearly 2,000 sworn and civilian members of the Department.

### 1980-1981        Captain

3

HOOD 038881
Weston 053898

Command of SPD West Precinct. Responsible for Patrol Operations in the downtown core of the city. Major league sports facilities, waterfront maritime industries, transportation, and financial, retail and business headquarters serving a daytime population of 300,000 -command of 150 sworn officers.

**1978-1979     Lieutenant**

Commander of Basic Recruit Training. Responsible for the operation and administration of the recruit training for SPD as well as the contract recruit training with the Washington State Criminal Justice Training Commission for over 100 law enforcement agencies state-wide. Average recruit population on campus of 140 in 4 concurrent classes, as well as a multi-agency training staff. Also served for a brief period as a downtown watch commander in the downtown business area.

**1975 – 1978     Sergeant**

Served as supervisor in the following: Patrol - uniformed patrol operations; Internal Investigations Section - investigation of citizen, departmental, and criminal allegations of police misconduct; Special Patrol Unit - plain clothes tactical response to priority crime problems, deployment at unusual occurrences, dignitary protection.

**1972 – 1975     Detective**

Served in the following: Accident Investigation Section - plain clothes follow-up investigation of hit-run, serious injury and fatality motor vehicle accidents; Burglary Section - investigated serious crimes directed against property; Vice Section - investigated organized crime, prostitution, pornography, liquor, and gambling activities, and engaged in extended undercover assignments.

**1968-1971     Patrol Officer**

Started with Mercer Island (WA) P.D. in 1968, and then began career with Seattle P.D. in 1969.

**Training (small sampling):**

- Police Liability and the Management of Police Discipline - Americans for Effective Law Enforcement
- Police Technology and Efficiency - International Association of Chiefs of Police
- Total Quality Management - The Institute for Quality Service
- Assessment Center Operations and Management - Federal Bureau of Investigation
- Executive Development - Federal Bureau of Investigation
- Incident Command System – National Incident Management System – Through Level 4
- Gambling Enforcement and Supervision - Washington State Gambling Commission

4

- Labor Relations and Negotiations - Federal Bureau of Investigation and Washington Association of Cities
- Hazardous Materials Incident Management - National Highway Transportation Safety Board
- Dignitary Protection Management and Supervision - U.S. Secret Service
- Supervision of Auto Theft Investigation - National Auto Theft Bureau
- Police Traffic Supervision - Northwestern Traffic Institute
- Municipal Budget Management - Office of Management and Budget
- Training for Trainers - Washington State Criminal Justice Training Commission
- Managing Computer Operations - Department of Administrative Services
- Investment in Excellence - The Pacific Institute
- Organized and White Collar Crime - The University of Washington
- Management of Computer Fraud Investigations – USWEST
- National Center for Missing and Exploited Children - Alexandria, VA

## Law Enforcement Committees & Membership:

**National:**
- International Association of Chiefs of Police – Honorary Life Member
- Police Executive Research Forum – Subscribing Member
- National Sheriffs' Association – Life Member
- American Bar Association – Associate Member
- American Correctional Association – Member
- American Jail Association – Member
- Crisis Intervention Team International – Member

**State:**
- Appointed by the Governor and served as the only law enforcement member of the Washington State Sentencing Guidelines Commission (August 2003 – 2008)
- Appointed to, and served as the chair of the Washington State Board on Law Enforcement Training Standards and Education (March 2003 – 2008)
- Homicide Investigation Tracking System (HITS) Advisory Board (May 2003 – 2006)
- Executive Board member of the Washington State Sheriffs' Association (May 2006 – 2008)
- Washington Association of Sheriffs and Police Chiefs – Honorary Life Member

**Local:**
- Past chair of Jefferson County Domestic Violence/Sexual Assault Program
- Member of the Peninsula College Criminal Education Program Board
- Executive Board of Olympic Peninsula Narcotics Enforcement Task Force
- Executive Board of JeffCom 911 Communications System
- Jefferson County Law & Justice Council
- Olympic Law Enforcement Executives Association

5

HOOD 038883
Weston 053900

**Achievements (sampling):**

- Past Co-Chair of Private Sector Liaison Committee - International Association of Chiefs of Police
- Coordinator for successful federal grant application on Community Policing Program (N.I.J.)
- National Institute of Justice Symposium on Closed Circuit Television for deterrence and investigation of crime - Washington, DC
- National Institute of Justice Symposium on Metro Area Drug Strategies - Washington, DC
- Coordinator for federal grant application on Narcotics Strategies in Public Housing
- Coordinator for federal grant application on Targeting Young Adult Gang Leaders
- Federal Bureau of Investigation - National Law Enforcement Budget Advisory Group - Appointed by the Director of the F.B.I.
- Broward County Chiefs' Association - President and Steering & Training Committees
- Southeast Florida Drug Task Force - Board of Directors
- Metropolitan Broward County Organized Crime Intelligence Unit - Board of Directors
- Florida Police Chiefs' Association - Ethics Committee
- Visiting management assessor for cities of New Orleans (LA), Columbus (OH), Portland, (OR), San Francisco (CA), Bremerton (WA)
- Contract consultant (KOBA Associates) for peer review of NIJ grant work on the establishment of Computer Crimes Units
- Contract consultant (Federal Housing & Urban Development Grant) to visit and analyze 6 major U.S. cities (Boston, Baltimore, Memphis, Oxnard, Cleveland & Seattle) police agencies and community policing in public housing
- Subject matter and best practices expert on law enforcement personnel selection, screening, and back grounding – USIS Investigative Solutions Conference
- Developed statewide law enforcement employment screening and back grounding model for the Washington Association of Sheriffs and Police Chiefs
- Oversight responsibility for acquisition of Computer Aided Dispatch and Mobile Digital Terminal System
- Oversight responsibility for acquisition of Comprehensive Shared Records Management System
- Oversight responsibility for acquisition of Jail Booking Video Imaging System
- Oversight responsibility for management of computerized Patrol Deployment Model
- Responsibility for design and construction oversight, acceptance and start-up of new police precinct facility
- Evaluation of Detective Decentralization Program and Detective Case Management System
- Acquisition of Geo-based Automated Mapping System

HOOD 038884
Weston 053901

**Selected Publications:**

- Contributor - National Institute of Justice - Off-Duty Police Employment Practices
- Citation - Federal Bureau of Investigation article on joint Police-Community Partnerships
- Author of national and state articles - alarm reduction issues and strategies
- Author of several historical articles - homicides of police officers

**Prior Law Enforcement & Community Service:**

- Major City Chiefs - Human Resources sub-committee
- Washington State Chiefs & Sheriffs - Information Technology sub-committee
- Mayor's Task Force on Street People and the Homeless
- Selection and oversight committee for Police Department Management Study consultant contract
- Selection and oversight committee for Police-Citizen Complaint Process consultant contract
- Executive Member - South Florida Regional Law, Safety, and Justice Committee
- Automated Fingerprint Identification System / Jails - On-site benchmark testing & nationwide visitation team
- Health Service and Police Community Based Alcohol Triage Program
- King County Executive - Jail Advisory Committee (JCWG)
- City of Seattle - Deferred Compensation Plan provider selection and oversight
- Evaluation and Selection Committee - RFP responses for design of new municipal campus
- Seattle Police Department - reorganization committee that resulted in Departmental restructuring
- Explorer Scout Law Enforcement Program
- United Way of Broward County - Board of Directors
- Broward County Commission on Substance Abuse - Chair, Board of Directors
- Broward County Juvenile Justice Advisory Board
- Broward County Substance Abuse Policy Advisory Board
- Broward Workshop - Criminal Justice Committee
- Florida Department of Law Enforcement - UCR Advisory Committee
- Alarm Association of Florida / Law Enforcement - Board of Directors (1996-1997)

HOOD 038885
Weston 053902

***Michael Brasfield and Associates, Inc.***

641 Olele Point Road          Phone: 360-301-4465
Port Ludlow, WA 98365       E-mail: brasfield@commandscene.com

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

**Nathson E. Fields v. City of Chicago, et al.**
Cause: 1:10-cv-01168

# ATTACHMENT E

HOOD 038886
Weston 053903

**Attachment E**
**Bibliography of Background Source Materials**

Following is a list of source materials that describe generally accepted policing practices, including at the relevant time period. The practices described include but are not limited to record-keeping, file maintenance, report writing, conducting homicide investigations, witness interrogations, supervision, etc.

This list of reference materials is not intended to be exhaustive and is supplemented by my extensive experience with police practices, including my familiarity with the policies used by other police departments nationwide, as well as industry standards established by organizations like the International Association of Chiefs of Police.

### *Reference Materials Generally*

Death Investigation: A Guide for the Scene Investigator
U.S. Department of Justice /Office of Justice Programs / National Institute of Justice

Crime Scene Investigation: A Guide for Law Enforcement
U.S. Department of Justice /Office of Justice Programs / National Institute of Justice

Homicide Guide
International Association of Chiefs of Police

Promoting Effective Homicide Investigations
Police Executive Research Foundation

Homicide Investigation Standard Operating Procedures
John M. Howell – Police Executive Forum

Homicide Process Mapping – Best Practices for Increasing Homicide Clearances : A Project of the U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Assistance

Practical Homicide Investigation Checklist and Field Guide, Second Edition
Vernon J. Geberth

Techniques of Crime Scene Investigation (now in 8th edition)
Barry A.J. Fisher

1

HOOD 038887
Weston 053904

Homicide investigation; practical information for coroners, police officers, and other investigators
Snyder, LeMoyne

Practical Cold Case Homicide Investigations Procedural Manual
Richard H. Walton

Death Investigation: Systems and Procedures
Randy Hanzlick

Forensic Pathology – Practical Aspects of Criminal and Forensic Investigations
Dominick DiMaio & Vincent J. M. DiMaio

Death Scene Investigation: A Field Guide
Scott A. Wagner

Death Investigator's Handbook – Volumes 1 & 2
Louis N. Eliopulos

Cold Case Homicides: Practical Investigative Techniques
Richard H. Walton

Homicide Scene Investigation – A Manual For Public Prosecutors
http://www.justiceacademy.org/iShare/Library-Training/Homicide-Scene-Manual.pdf

Death Scene Checklist Sheet
http://www.insidethetape.com/Jan-2011-EATH%20SCENE%20CHECKLIST%20SHEET.PDF

HOOD 038888
Weston 053905

*References that pre-date the implementation of CPD's policies*

Dr. Henry Faulds (1843-1930). A towering figure in the history of forensic sciences, it was Faulds who first recognized the value of fingerprints to criminal identification. The Faulds scrapbooks include research notes, original drawings and studies of fingerprint patterns and typology, as well as correspondence with individuals and crime fighting organizations around the world, dating from the (late 1870's) until shortly before the doctor's death in 1930.
International Association for Identification (www.theiai.org) founded in the (1915).

- *Sparks from the Anvil* 1933-1937
- IAI Newsletter 1940-1951
- ID News Aug 1951 - 1987
- *Journal of Forensic Identification* (JFI) 1988 - 2013

Locard, E. L'Enquete Criminelle et les Methodes Scientifique. Paris: Ernest Flammarion, (1920).

Homicide investigation; Frankel, Harold A. (1931)

Criminology – Robert H. Gault Northwestern University (1932)

La police scientifique. les homicides.--Les vols.--Les incendies criminels.--Les faux.--La fausse monnaie. Bischoff, Marc (1938)
Homicide investigation; practical information for coroners, police officers, and other investigators, by Snyder, LeMoyne (1944, 1950, 1959, 1967, 1977)

Law of Belligerent Occupation - The Judge Advocate General's School (1945)

Techniques of Crime Scene Investigation (now in 8th edition) originally published in (1949)

Techniques of Crime Scene Investigation is a classic book on how to use forensic science to investigate crimes. The text was first published in Swedish in 1949 by Chief Superintendent Arne Svensson, director of the Laboratory, Criminal Investigation Department, and Superintendent Otto Wendel, Criminal Investigation Department, Stockholm, Sweden. In 1955 it was printed in English as Crime Detection and then revised into a second, expanded American Edition under the title Techniques of Crime Scene Investigation in 1965. In 1981 I was invited to revise it in a third edition and subsequently into fourth, fifth, sixth, seventh and eighth editions.

Kirk, P. L. *Crime Investigation*. New York: Interscience, John Wiley & Sons (1953).

The detection of secret homicide; a study of the medico-legal system of investigation of sudden and unexplained deaths. Havard, John D. J. (1960)

HOOD 038889
Weston 053906

Institute on Homicide Investigation Techniques / presented by the Southwestern Law Enforcement Institute, Dallas, Texas; general editor: Robert A. Wilson. (1961)

Practical homicide investigation. With an introd. by William P. Maheady. (1961)
> "We have learned the lesson of history, ancient and modern, that a system of criminal law enforcement which comes to depend on the 'confession' will, in the long run, be less reliable and more subject to abuses than a system which depends on extrinsic evidence independently secured through skillful investigation." *Escobedo v. Illinois*, 378 U.S. 478, 488–489 (1964)

Thorwald, J. Crime and Science. Harcourrt, Brace & World, Inc.: New York, [LC Cat. no. 67-20323]. (1966)

Police Detective Function (W.S.U.) by V. A. Leonard (1970)

Murder investigation. Oughton, Frederick (1971)

Fox, Richard H. and Carl L. Cunningham. Crime Scene Search and Physical Evidence Handbook.
Washington, D.C.: U.S. Department of Justice, National Institute of Justice, (1973).

Homicide: investigative techniques, by Daniel J. Hughes. (1974)

Kirk, P.L. *Crime Investigation*, *2nd Edition*. New York: John Wiley & Sons, (1974).

Police: the investigation of violence / Keith Simpson (1978)
Smyth, F. *Cause of Death: The Story of Forensic Science*. Van Nostrand Rheinhold Company: New York, [ISBN 0-442-20041-2]. (1980)

Zonderman, J. Beyond the Crime Lab: The New Science of Investigation. John Wiley & Sons: New York, [ISBN 0-471-62296-6]. (1980)

Homicide investigation standards textbook / Joseph C. DeLadurantey, Daniel R. Sullivan. (1980)

Saferstein, *R. Forensic Science Handbook, Volumes I, II, III*. Englewood Cliffs, N.J.: Prentice-Hall, (1982/1988/1993).

DeForest, P.R., R.E. Gaensslen, and H.C. Lee. *Forensic Science: An Introduction to Criminalistics*. New York: McGraw-Hill, Inc., (1983).

4

HOOD 038890
Weston 053907

Rosenfield, I.; Ziff, E. van Loon, B. DNA for Beginners. Writers and Readers Publishing, Inc. [ISBN 0-86316-023-9, pkb.]. (1983)

Practical homicide investigation: tactics, procedures, and forensic techniques / Vernon J. Geberth. (1983)

HOOD 038891
Weston 053908

*Michael Brasfield and Associates, Inc.*

641 Olele Point Road                           Phone: 360-301-4465
Port Ludlow, WA 98365                          E-mail: brasfield@commandscene.com

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

**Nathson E. Fields v. City of Chicago, et al.**
Cause: 1:10-cv-01168

# ATTACHMENT F

HOOD 038892
Weston 053909

**Attachment F**

For the first group of basement files, in the time period from 1983 to 1989, I compared a total of 28 criminal defense files[1] to 27 corresponding basement files and 27 corresponding permanent retention files. For the second group of basement files, in the time period from 1999 to 2006, I compared a total of 23 criminal defense files to 23 basement files.[2]

The following listing provides a case-by-case account of what documents are included in basement files but are missing from criminal defense files. I did not make any inferences about what documents were turned over to criminal defendants – I based my conclusions on observations about actual differences between files. For each homicide investigation, each set of files—whether the basement file, the criminal defense file, or the permanent retention file is labeled with a CPD Records Division ("RD") Number and a criminal defendant's name.

---

[1] These 28 files concerned 27 separate cases. Plaintiff located two defense attorney files for the 1985 investigation assigned RD G-468726, one for defendant Albert Spraggins, and one for defendant Maurice Spraggins

[2] There were no permanent retention files for the second timeframe, 1999-2006

1

HOOD 038893
Weston 053910

## Table of Contents

### Group One / 1983-1989 Files

Cecil Robinson (RD# E-010765 / IF Bates ACB 0000001-95) ................................................ 4

Serafin Flores (RD# E-399564 / IF Bates ACB 005572-005778) ........................................... 4

Christino Garcia (RD# F-048933 / IF Bates ACB 006037-006165) ...................................... 4

Lindsey Cannon (RD# F-380662 / IF Bates ACB 007074-007196) ...................................... 5

Earl Stademeyer (RD# G-011889 / IF Bates ACB 008910-008984) ................................... 5

Guy Johns (RD# G-014815 / IF Bates ACB 008985-009112) .............................................. 5

Roscoe Evans (RD# G-108642 / IF Bates ACB 010440-010561) ......................................... 5

Derrick Johnson (RD# G-148403 / IF Bates ACB 011173-011359) ..................................... 6

James Walker (RD# G-159857 / IF Bates ACB 011627-011977) ......................................... 6

William Goodin (RD# G-165272 / IF Bates ACB 089308-089463) ...................................... 7

Maurice Green (RD# G-215280 & G-215280A / IF Bates ACB 090389-090455 & 013368-013499 & 013500-013570) ................................................................................................................. 7

Ruben Avilez (RD# G-248336 & G-248696 (PR) / IF Bates ACB 014301-014467) ................ 8

Freddy Brown (RD# G-257089 / IF Bates ACB 014789-014838) ....................................... 8

James Walker (RD# G-267826 / IF Bates ACB 015390-01544) .......................................... 9

Lucille Pye (RD# G-284291 / IF Bates ACB 016197-016286) ........................................... 9

James Crockett (RD# G-321886 / IF Bates ACB 016649-016807) ..................................... 10

Edward Terrett (RD# G-446754 / IF Bates ACB 020109-020156) ...................................... 10

Larry Buchanan (RD# G-456900 / IF Bates ACB 020809-020859) .................................... 10

Albert & Maurice Spraggins (RD# G-468726 / IF Bates ACB 020860-021007) .................. 11

Albert Buckles (RD# J-381525 / IF Bates ACB 046796-046880) ....................................... 11

Mervyn Wright (RD# J-418229 / IF Bates ACB 046881-047084) ...................................... 12

Fredy Roberson (RD# M-566742 / IF Bates ACB 047626-047677) .................................... 12

Steve Jones (RD# M-568343 / IF Bates ACB 048058-048142) .......................................... 12

John Avery (RD# M-569727 / IF Bates ACB 048143-048180) ........................................... 12

David Duarte (RD# M-580592 / IF Bates ACB 048181-048327) ........................................ 13

Tony Allen (RD# M-587998 / IF Bates ACB 048328-048423) ........................................... 13

Ricky Icenberg (RD# M-590700 / IF Bates ACB 047678-047772) ..................................... 13

HOOD 038894
Weston 053911

**Group Two / 1999 – 2006 Files**

Steven Spears (RD# D-192218 / IF Bates ACB 003679-003883) ............................................................. 14

Jimmy Velasquez (RD# D-579065 / IF Bates ACB 004922-005042) ....................................................... 14

Diante Wiley (RD# G-032399 / IF Bates ACB 009208-009420) .............................................................. 14

Kevin Jackson (RD# G-259321 / IF Bates ACB 014839-014924) ........................................................... 14

Timothy Malone (RD# G-266841 & G-266841A / IF Bates ACB 015161-015184 & 015185-015309) .. 14

Isaiah Brady (RD# G-268444 / IF Bates ACB 015505-015758) .............................................................. 15

George Frison (RD# G-326467 / IF Bates ACB 017072-017380) ............................................................ 15

Santana McCree (RD# G-406405 / IF Bates ACB 018900-019189) ........................................................ 15

Crisino Bravo (RD# G-570120 / IF Bates ACB 023263-023472) ........................................................... 16

Norman McIntosh (RD# G-705434 / IF Bates ACB 027079-027314) ..................................................... 16

Maurice Brown (RD# HH-175723 / IF Bates ACB 049234-049402) ...................................................... 16

Christopher Peoples (RD# HH-358668 / IF Bates ACB 031268-031555) ............................................... 17

Devon Terrell (RD# HH-749335 / IF Bates ACB 056505-056684) ........................................................ 17

Anthony Houston (RD# HJ-102484 / IF Bates ACB 031556-031828) .................................................... 17

Leviante Adams (RD# HJ-366143 / IF Bates ACB 060612-060838) ...................................................... 18

Octavia Anima (RD# HJ-492443 / IF Bates ACB 081966-082418) ........................................................ 18

Lakesha Collins (RD# HK-211174 / IF Bates ACB 038163-038338) ..................................................... 18

Delvie Turpin (RD# HK-406407 / IF Bates ACB 040843-041049) ........................................................ 19

Donell Johnson (RD# HK-416661 / IF Bates ACB 041050-041244) ...................................................... 19

Jamell Murphy (RD# HK-449083 / IF Bates ACB 041754-042025) ...................................................... 19

Verna Colbert (RD# HK-470751 / IF Bates ACB 062432-062666) ........................................................ 20

Tharine Partee (RD# HK-593970 / IF Bates ACB 063855-064131) ....................................................... 20

Devon Terrell (RD# HK-639684 / IF Bates ACB 064839-065188) ........................................................ 20

HOOD 038895
Weston 053912

**Group One / 1983-1989 Files**
**Examination – Comparison – Contrasting of 27 Homicide Case Records**
**(27 Basement Files / 28 Criminal Defense Files / 27 Permanent Retention Files)**

Cecil Robinson (RD# E-010765 / IF Bates ACB 0000001-95)
- Basement File – 95 pages
- Missing from Criminal Defense File – Handwritten note (0002); Investigative file inventory (0003-4); Arrest report (0038-39); Handwritten note (0044); General offense case report (0057-58); Handwritten notes (0059); General offense case report (0060-61); Handwritten note (0076); Letter from an attorney with handwritten note on it (0082); Handwritten notes, business cards, booking photo (0091-95)
- Missing from 41-page Permanent Retention File – Investigative file inventory (0003-04); Handwritten notes (0002, 0044, 0059,0071, 0076,0079, 0091); To-from memos (0063 & 0081)

Serafin Flores (RD# E-399564 / IF Bates ACB 005572-005778)
- Basement File – 207 pages
- Missing from Criminal Defense File – Handwritten notes (5572); Case assignment slip (5573); Subpoena duces tecum (5578); Felony minute sheet (5581); Handwritten note (5586); Court attendance reports (5589-90 & 93); Prisoner hold with handwritten information (5599); SRs-Felony minutes- Handwritten note-Court attendance report (5601-11); Supplemental Report (5618-19); Court attendance report (5622); Handwritten note (5627); Handwritten/Stamped wanted notice (5633); Arrest & disposition forms (5636 & 44); Supplemental Reports (5656-63); Handwritten duplicate note (5664); Investigative file control card & envelope (5756-57); Supplemental Report (5675-84); Handwritten note (5686); Supplemental Report (5693-99); Supplemental Report (5709-19); Individual photos with typed and handwritten information (5759-78)
- Missing from 69-page Permanent Retention File – Handwritten notes (5586, 5608, 5623, 5650-5652, 5664, 5686, 5759, 5765-5776); To-from memo (5599)

Christino Garcia (RD# F-048933 / IF Bates ACB 006037-006165)
- Basement File – 129 pages
- Missing from Criminal Defense File – Handwritten note (6051); Handwritten note (6053); Daily hot sheet (6078); Xerox copy of greeting card (6118-19); Photos (6120-21); Driver's license (6122); Attorney's name and address (6123); Investigative file control cards (6124-25); Computer printout related to vehicle (6126-38); Envelope & letter from Mexican consulate (6139-41); Phone records (6142-47); Handwritten note, FBI business card, typewritten note (6148-50); Miscellaneous vehicle documents (6151-64); Investigative file control card (6165)
- Missing from 30-page Permanent Retention File – Investigative file inventory (6038-39); Handwritten notes (6051, 6083, 6085, 6096, 6115); To-from memos (6072; 6150)

4

Lindsey Cannon (RD# F-380662 / IF Bates ACB 007074-007196)

- Basement File – 123 pages
- Missing from Criminal Defense File – Investigative file inventory (7075-76); Case assignment slip (7077); Back of property inventory (7087); Receipt for exhibits (7123); Arrest report (7137); Arrest report (7141); Criminal arrests (7142); General offense report (7143-44); Portion of report form (7158); Plain page with handwritten notes (7160); Criminal arrests (7171-7172); Arrest reports (7173-78); GPRs (7179-80); Blank printed envelope (7181); Photos & ID notes (7182-95); Investigative control card (7196)
- Missing from 40-page Permanent Retention File – Investigative file inventory (7075); Handwritten notes (7135 & 7160); GPRs (7114-15, 7146, 7179-80)

Earl Stademeyer (RD# G-011889 / IF Bates ACB 008910-008984)

- Basement File – 75 pages
- Missing from Criminal Defense File – Investigative file inventory (8911-12); Investigative file control card (8913); Lab report (8941-42); Handwritten notes (8952); Property inventory sheets (8971-78)
- Missing from 27-page Permanent Retention File – Investigative file inventory (8911-12); Handwritten notes ()8917 & 8952); To-from memos (8951, 8953, 8968, 8969); GPRs (8925-26 & 8962); Supplemental Report (8963)

Guy Johns (RD# G-014815 / IF Bates ACB 008985-009112)

- Basement File – 128 pages
- Missing from Criminal Defense File – Investigative file inventory (8986-87); Photograph (8989); Investigative file control card (8990); Handwritten note (8992); Lab report (9007-09); Handwritten note (9067 & 9091); Autopsy diagrams (9092-93)
- Missing from 51-page Permanent Retention File – Investigative file inventory (8986-87); Handwritten notes (9006, 9065, 9067, 9089, 9091, 9101, 9103, 9105); GPRs (9064, 9081, 9083, 9104)

Roscoe Evans (RD# G-108642 / IF Bates ACB 010440-010561)

- Basement File – 122 pages
- Missing from Criminal Defense File – Investigative file inventory (10441-42); Investigative file control card (10443); Court attendance report (10453); Latent fingerprint form (10459); Request for ballistics exam (10462-63); Crime lab receipt for exhibits (10464); Evidence report (10465 & 69); Receipt for exhibits (10471 & 73); Autopsy diagram (10486); Handwritten note (10499); Handwritten note (10529 & 37)
- Missing from 39-page Permanent Retention File – Investigative file inventory (10441-42); Handwritten notes (10446, 10470, 10475, 10494-97, 10529, 10537, 10548-55); To-from memos (10462, 10463, 10493); GPRs (10507 & 10510)

HOOD 038897
Weston 053914

Derrick Johnson (RD# G-148403 / IF Bates ACB 011173-011359)
- Basement File – 187 pages
- Missing from Criminal Defense File – Handwritten notes (11174); Investigative file inventory (11177); Latent fingerprint request (11248 & 259 & 281 & 294 & 324 & 327 & 330); Handwritten notes (11258 & 276 & 290 & 326 & 334 & 348); Photos (11312); ID section arrest sheet (11347); Photos (11356-59);
- Missing from 40-page Permanent Retention File – Investigative file inventory (11177-79); Handwritten notes (11174, 11176, 11192, 11208, 11210, 11212, 11234, 11244, 11246, 11253, 11256, 11258, 11268, 11278, 11283, 11287, 11290, 11293, 11304, 11309, 11322, 11326, 11332, 11334, 11348); To-from memo (11292)

James Walker (RD# G-159857 / IF Bates ACB 011627-011977)
- Basement File – 351 pages
- Missing from Criminal Defense File – Photos & ID information (11630-640); Photos & ID information (11645-651); Photo (11654); Handwritten note (11657-58); Handwritten notes on backs of various forms, such as case assignment sheets, AUSA business card, field contact cards, and police reports (11660-79 and 680-84); Handwritten notes (11686); Evidence report (11687); Handwritten notes (11689-90); Vehicle evidence photo (11719); Arrest report (11728); Investigative file inventory (11731 & 11734); Handwritten note (11749); GPRs (11750-51); GPR handwritten (11758-59); Latent fingerprint request & handwritten note (11765-66); Page with official stamp "Issued on Inquiry – Name Check Only" and date (11777); Cook county court complaint (11780-81); Arrest report (11782-84); Handwritten note (11785); Arrest report (11786-89); Property inventory sheets (11804-10); Search warrant inventory sheet (11811); Crime lab evidence report (11812); Case report (11816-18); Supplemental Report (11829); Latent fingerprint request (11830); Offense reports (11831-32); Juvenile crimes arrest report (11834-35); Inventory sheets (11837-38); Offense report (11847-48); Inventory sheet (11850); Supplemental Report (11874); GPR handwritten (11879); GPRs with scattered handwritten notes (11905); Detective watch assignment sheets (11913 & 915 & 917); GPRs with scattered handwritten notes (11935-37); GPRs with scattered handwritten notes (11939-43); GPR with scattered handwritten notes (11945-50); GPRs with scattered handwritten notes including on back (11953-61); GPR with scattered handwritten notes including on back (11963-67); GPR with scattered handwritten notes (11969-70)
- Missing from 151-page (89+62) Permanent Retention Files – GPRs (15413-15432); handwritten notes (ACB 015424; ACB 015481); Inv. File Control (15393); Body Diagram (15405); Witness Statements (15450-15468); Form 101 (15469); Wanted Card (15480); Release of Person in Custody (15484); Complaint (15485); Arrest Report (15486-15487); Copy of Envelope (15492); Request for ID Photos (15504); photographs (15397-15401; 15394-15396; 15408-15410; 15470-15476; 15493-15503); 15477-15479; 15482-15483)

HOOD 038898
Weston 053915

William Goodin (RD# G-165272 / IF Bates ACB 089308-089463)
- Basement File – 156 pages
- Missing from 98-page Criminal Defense File – Handwritten GPR (89326-28); To-from typewritten memo, with handwritten note (89330-31); Medical eligibility record (89332); To-from memo requesting telephone records (89333); Printout of telephone records (89334-52); Felony minute sheet (89353); Arrest warrant (89359); Handwritten GPR, apparently with 2 authors (89362): Multiple copies of same CPD daily bulletin (89368-81); Supplemental Reports (89382-87); Material submitted for daily bulletin (89388); Multiple Supplemental Reports (89389-405); Supplemental Report (89411-12); Partial Supplemental Report (89414); Handwritten GPR (89417-20); Supplemental Reports (89426-28); Hospitalization report (89429); Autopsy diagram (89435); Property inventory sheet (89445); Handwritten notes on plain sheet of paper (89452); Handwritten GPRs with numerous scattered notes (89453-89455); Arrest report (89456); Investigative file inventory (89462); Front of case investigative file folder (89463)
- Permanent Retention File – None provided

Maurice Green (RD# G-215280 & G-215280A / IF Bates ACB 090389-090455 & 013368-013499 & 013500-013570)
- Basement (3) Files – 270 pages (67 + 132 + 71)
- Missing from Criminal Defense File – Felony minute sheet (13390); Phone message, 2 sides (13391-92); Arrest information card (13393); Property inventory sheet (13396); Arrest information card, 2 sides (13398-99); Grand jury material (13400-03); GPRs with scattered handwritten notes (13404-06); GPR with 2 handwritten names and info (13408); To-from handwritten note (13414); Handwritten note (13501); Investigative file inventory (13502-03); Investigative file control card (13504); Handwritten note (13546)
- Missing from 41-page Permanent Retention File – Investigative file inventory (13502-03); Handwritten notes (13391-92, 13405-06, 13501); To-from memos (13399, 13414, 13533)

HOOD 038899
Weston 053916

Ruben Avilez (RD# G-248336 & G-248696 (PR) / IF Bates ACB 014301-014467)

- Basement File – 167 pages
- Missing from Criminal Defense File – Handwritten notes (14302 & 05); Hold prisoner past court call (14303); Arrest report (14304); To-from and handwritten note (14306-07); LEADS & DL print outs & handwritten telephone number (14308-17); Request for ID records (14318); Arrest records (14319); LEADS & name search print outs (14320-14332); To-from memo and handwritten note (14333-14334); To-from memo (14359); Computer screen shot (14360); Supplemental Report (14367-68); To-from memo (14379); Hold prisoner past court call (14380); Arrest report (14381); Supplemental Report (14413-14); Handwritten notes (14425); Hand drawn scene (14427); LEADS print out with handwritten notes (14428-14429); Computer screen shot with handwritten note (14430); Arrest report with handwritten note (14431); Computer print outs and screen shot (14432-14434); Arrest Report (14435); Computer print outs (14436-38); Handwritten note (14441); Hold prisoner past court roll call (14444); Arrest records (14445); Handwritten notes (14446); Deceptive practice report (14453-54); Arrest records, page stamped 'Wanted', handwritten and typed notes; computer screen shots (14455-60); Arrest report (14461); Arrest records (14462); Page stamped 'Wanted' (14463); Photo (14464); Arrest report (14467)
- Missing from 48-page Permanent Retention File – Handwritten notes (14302, 14334, 14425, 14441, 14446, 14457); To-from memos (14303, 14305, 14306-07, 14333, 14359, 14379-80, 14444)

Freddy Brown (RD# G-257089 / IF Bates ACB 014789-014838)

- Basement File – 50 pages
- Missing from Criminal Defense File – Investigative file inventory (14790); Investigative file control card (14791); Crime lab report (14792-93); Evidence report (14796); Arrest report (14797-98); Autopsy diagram (14802); Crime lab evidence report (14804); GPR handwritten with additional side notes throughout (14806-19); Evidence inventory (14838)
- Missing from 15-page Permanent Retention File – Investigative file inventory (14790)

HOOD 038900
Weston 053917

James Walker (RD# G-267826 / IF Bates ACB 015390-01544)
- Basement File – 115 pages
- Missing from Criminal Defense File – Folder with Case info (15390); Investigative file inventory (15391-92); Investigative file control card (15393); Property inventory sheet (15394 & 96); Post-mortem exam report & toxicology report (15397-401); Autopsy diagram (15405); Property inventory sheets (15408-09); GPR handwritten with numerous side notes (15413-424); GPR handwritten with numerous side notes (15425-432); Felony minute sheet (15469); Evidence report (15470); Property inventory sheet (15471); Property inventory sheets (15473-74); Arrest reports sheet (15477-80); Handwritten note (15481); Teletype print outs (15482-83); Release of person in custody (15484); Cook county court complaint (15485); Arrest report (15486-87); Intra-department mail tracking envelope (15492); Xerox copy of handwritten name (15496); Photos (15497-503); Request for ID photos (15504);
- Missing from 25-page Permanent Retention File – Investigative file inventory (15391-92); Handwritten notes (15424 & 15481)

Lucille Pye (RD# G-284291 / IF Bates ACB 016197-016286)
- Basement File – 90 pages
- Missing from Criminal Defense File – Investigative file inventory (16198-99); Investigative file control card (16200); Arrest records report (16206); Property inventory sheets (16207-09); Autopsy diagram (16218); GPRs handwritten with notes (16220-23); Felony minute sheet (16224); Photo and id note (16242-43); ID section sheet (16246); Arrest report (16247); Release of person in custody (16249); Photo with id note (16250-51); Arrest report (16253-56); Photo with id note (16257-58); GPR handwritten with notes (16259-62); Arrest records report (16263-67); Arrest report (16268-69); Handwritten notes (16270); Handwritten note (16272); GPR (16274); Supplemental Report (16275-76); GPR (16283-84); General offense report (16285-86)
- Missing from 21-page Permanent Retention File – Investigative file inventory (16198-99); Handwritten notes (16270)

HOOD 038901
Weston 053918

James Crockett (RD# G-321886 / IF Bates ACB 016649-016807)
- Basement File – 159 pages
- Missing from Criminal Defense File – Folder cover with numerous stamps and handwritten notes (16649); Investigative file inventory (16650-52); Case assignment slip (16653); Arrest record report (16654); Post-mortem report & toxicology report (16658-62); Fingerprint examination report (16663); Towed vehicle report (16664); To-from memo (16667); Supplemental Report (16668-70); Supplemental Report (16675-77); Supplemental Report (16682-83); Juvenile information summary (16684-85); GPR (16686); Nickname index card and handwritten note (16723-24); GPR handwritten with numerous side notes (16726); Autopsy diagram (16727); Crime lab evidence report with handwritten note (16728-29); Crime lab evidence report (16730); General offense report (16732-33); GPRs (16734-40); Supplemental Reports (16741-49); GPRs (16750-53); Supplemental Reports (16754-57); Property inventory sheets & handwritten notes (16758-61); Supplemental Report (16762-66); Arrest information cards (16767-68); General offense report (16769-70); GPRs with notes and drawings (16771-76); Investigative file control card (16777); Blank printed envelope (16778); Photos and handwritten notes (16779-97); Material submitted for use in daily bulletin (16799-16804); Stop orders (16805-07)
- Missing from 50-page Permanent Retention File – Investigative file inventory 16650-52); Handwritten notes (16724, 16740, 16751, 16753, 16780-97); To-from memo (16667)

Edward Terrett (RD# G-446754 / IF Bates ACB 020109-020156)
- Basement File – 48 pages
- Missing from Criminal Defense File – Investigative file inventory (20110); Investigative file control card (20111); Arrest information card (20113); General offense report (20114-15); Supplemental Reports (20118-23); General offense report (20126-27); Property inventory sheet (20132); Autopsy diagram (20147); Handwritten note (20156)
- Missing from 17-page Permanent Retention File – Investigative file inventory (20110); Handwritten notes (20136 & 20156)

Larry Buchanan (RD# G-456900 / IF Bates ACB 020809-020859)
- Basement File – 51 pages
- Missing from Criminal Defense File – Investigative file inventory (20810); Crime lab receipt for evidence (20814); Handwritten note (20815); Crime lab evidence report & handwritten note (20820-21); Crime lab report (20830-31); Autopsy diagram (20832); Property inventory sheets (20835-36); Copy of 'Miranda warnings' along with numerous handwritten notes (20837); Crime lab evidence report (20853); Felony minute sheet (20855); Crime scene evidence inventory (20855); GPRs with scattered handwritten notes (20856-58); Investigative file control card (20859)
- Missing from 11-page Permanent Retention File – Investigative file inventory (20810); Handwritten notes (20815 & 20837)

10

HOOD 038902
Weston 053919

Albert & Maurice Spraggins (RD# G-468726 / IF Bates ACB 020860-021007)
- Basement File – 148 pages
- Missing from Criminal Defense File – Handwritten notes (20861 & 20864); Investigative file inventory (20862); Case assignment slip (20863); Photos & handwritten notes (20865-68); Investigative file control card (20869); Court attendance reports (20870-72); Computer criminal history report with numerous handwritten notes (20873); Supplemental Report (20874-75); Court attendance report (20876); Supplemental Reports (20879-83); ASA form with typed info (20884); Arrest report (20886); Arrest records report (20887); Arrest control set slip (20888); Computer print outs with handwritten notes (20889-91); Arrest info card (20892); Supplemental Report (20893-94); LEADS request and teletype to LASO (20895); Handwritten note (20896); LEADS request and teletype to LAPD (20897); Handwritten note (20898); To-from memo for all CPD watches (20899); Supplemental Report (20900-901); Crime lab evidence report (20902); Property inventory sheets (20904-06); Telephone message slip with handwritten notes (20907); Handwritten notes (20908-10); Arrest report with handwritten notes (20911-13); Photo & handwritten note (2014-15); To-from memo for all CPD watches (20916); Arrest report (20918); LEADS request to Davenport PD (20919); Handwritten note (20920); Crime lab evidence report (20921); Arrest records report (20922); To-from memo with handwritten notes (20924); GPRs with numerous scattered handwritten notes and diagrams (20925-37); Post-mortem & toxicology report (20938-42); Autopsy diagram (20965); GPRs with numerous scattered handwritten notes (20966-67); Supplemental Report (20981-82); Crime lab evidence report (21004); Property inventory sheet (21005-06);
- Missing from 42-page Permanent Retention File – Investigative file inventory (20862-64); Handwritten notes (20861, 20866, 20868, 20896, 20898, 20907-09, 20920, 20928); To-from memos (20899, 20916, 20924)

Albert Buckles (RD# J-381525 / IF Bates ACB 046796-046880)
- Basement File – 85 pages
- Missing from Criminal Defense File – Investigative file inventory (46797); Property inventory sheet (46837); GPR handwritten notes (46839-42); Handwritten crime scene drawing (46843); Firearms receipt & worksheet (46844); Plain page with handwritten number (46845); Autopsy diagram (46846); Preliminary fired evidence report (46847); Plain page with handwritten information (46848); Property inventory sheet (46849-51); Plain page with handwritten number (46853); Plain page with handwritten information (46855); Blank printed letterhead/envelope (46856); CHESS to-from memo (46857); Case supplementary report (46858-65); CHESS to-from memo (46866); Original case incident report (46867-68); Case supplementary report (46869-74); GPR (46875-77); Case supplementary report (46878-80)
- Files missing from 27-page Permanent Retention File – Investigative file inventory (46797); Handwritten notes (46798-802)

HOOD 038903
Weston 053920

Mervyn Wright (RD# J-418229 / IF Bates ACB 046881-047084)
- Basement File – 204 pages
- Missing from Criminal Defense File – Investigative file inventory (46883-85); Plain page with handwritten number (46886); Photos (46887-91); First page of post-mortem report (46920); Request for latent fingerprint comparison (46926); Arrest records report (46932-33); GPR (46934); Illegible photo & handwritten name (46935-36); Investigative handwritten notes on plain paper (46937); Illegible pages from address book (46938-39); GPR with handwritten notes (46940); Plain page with handwritten note (46941); GPRs with handwritten notes, some unsigned (46942-45); Plain page with handwritten notes (46946); Field contact card (46949); Plain page with handwritten notes (46950); Field contact care (46951); Plain page with handwritten notes (46952); GPRs (46954-55); Bio-Science lab report on GSupplemental Report (47012); Plain page with handwritten number (47013); Criminal records (47058-59)
- Missing from 34-page Permanent Retention File – Investigative file inventory (46883-85); Handwritten notes (46882, 46886, 46927, 46931, 46937-39, 46950, 46952, 46973, 47013, 47053); To-from memos (46948, 47049, 47051)

Fredy Roberson (RD# M-566742 / IF Bates ACB 047626-047677)
- Basement File – 52 pages
- Missing from Criminal Defense File – Investigative file inventory (47627); Subpoena duces tecum (47628); Part of general offense report (47632); Arrest records report (47660); Plain page with handwritten notes (47662); Plain page with hand drawn crime scene (47666); Crime lab report (47673); Blank printed envelope (47677);
- Missing from 20-page Permanent Retention File – Investigative file inventory (047627); Handwritten notes (47662 & 47666)

Steve Jones (RD# M-568343 / IF Bates ACB 048058-048142)
- Basement File – 85 pages
- Missing from Criminal Defense File – Investigative file inventory (48059-60); Supplemental Report (48130-31); General offense report (48132-33); Arrest records report (48135); Photos with handwritten notes (48137-42)
- Missing from 45-page Permanent Retention File – Investigative file inventory (48059-60); Handwritten notes (48062, 48064, 48140, 48142)

John Avery (RD# M-569727 / IF Bates ACB 048143-048180)
- Basement File – 38 pages
- Missing from Criminal Defense File – Investigative file inventory (48144); Crime lab evidence report (48145); Property inventory sheet (48146 & 48149); Request for firearm examination (48159); Arrest records report (48179); Blank printed envelope (48180)
- Missing from 18-page Permanent Retention File – Investigative file inventory (48144); To-from memos (48159, 48167, 48176)

HOOD 038904
Weston 053921

David Duarte (RD# M-580592 / IF Bates ACB 048181-048327)
- Basement File – 147 pages
- Missing from Criminal Defense File – Plain page with hand drawn crime scene (48204); Plain page with handwritten names and other information (48216); Blank printed envelope (48316); Photos and handwritten notes (48317-20); CB & Soundex records printouts (48321-22); Plain page with handwritten note (48323); DMV printout (48324); Soundex records printouts (48325-26); Plain page with handwritten notes (48327)
- Missing from 57-page Permanent Retention File – Investigative file inventory (48182-83); Handwritten notes (48204, 48216, 48233, 48235, 48237, 48323, 48327); To-from memo (48187)

Tony Allen (RD# M-587998 / IF Bates ACB 048328-048423)
- Basement File – 96 pages
- Missing from Criminal Defense File – Investigative file inventory (48329-30); Part of general offense report (48333); Plain page with numerous handwritten notes (48345); Plain page with numerous handwritten notes (48364); Plain page with handwritten name & address (48386); Subpoena duces tecum (48406-07); Illinois ID card, front & back (48419-48420); Plain page with typewritten note (48421); Plain page with handwritten note that id's killers other than man charged (48422)
- Missing from 50-page Permanent Retention File – Investigative file inventory (48329); Handwritten notes (48345, 48364, 48386, 48422); To-from memo (48388)

Ricky Icenberg (RD# M-590700 / IF Bates ACB 047678-047772)
- Basement File – 95 pages
- Missing from Criminal Defense File – Investigative file inventory (47679-80); Handwritten notes (47694); Handwritten note (47696); Handwritten notes (47751); Subpoena duces tecum (47765); Photos and handwritten notes (47767-72)
- Missing from 48-page Permanent Retention File – Investigative file inventory (47679-80); Handwritten notes (47694, 47696, 47698, 47751, 47768); To-from memo (47681)

HOOD 038905
Weston 053922

**Group Two / 1999 – 2006 Files**
**Examination – Comparison – Contrasting of 23 Homicide Case Records**
**(23** Basement Files **/ 23 Criminal Defense)**

Steven Spears (RD# D-192218 / IF Bates ACB 003679-003883)
- Basement File – 205 pages
- Missing from Criminal Defense File – Investigative file inventory (3680), Arrest records (3740-54), Booking photo (3768), Handwritten note (3844), Central booking & Criminal history (3842-43), Law Enforcement Agencies Data System LEADS printout (3848-51), Evidence identification photos (3859-83)

Jimmy Velasquez (RD# D-579065 / IF Bates ACB 004922-005042)
- Basement File – 121 pages
- Missing from Criminal Defense File – Investigative file inventory (4923-25), Property inventory/Search warrant sheets (4931-38), Crime scene drawing (5007), Handwritten notes (5009-10), Handwritten notes & LEADS (5022-25)

Diante Wiley (RD# G-032399 / IF Bates ACB 009208-009420)
- Basement File – 213 pages
- Missing from Criminal Defense File – Investigative file inventory (9209-9210); Investigative file control card (9215); Photos (9216-19); Daily major incident log (9220); Death of child to-from memo (9264); Report of post-mortem (9265-9277); ID section page (9282); Circuit court complaint (9283); Juvenile summary report (9284-86 & 88); Various ID section reports (9289-9296); Recorded voice transmission request (9297); Event history log (9298-302); Felony minute sheet (9333); ID section report (9334); Juvenile summary report (9365-66); Juvenile summary report (9369); Juvenile summary reports (9409-13)

Kevin Jackson (RD# G-259321 / IF Bates ACB 014839-014924)
- Basement File – 86 pages
- Missing from Criminal Defense File – Just a few administrative documents

Timothy Malone (RD# G-266841 & G-266841A / IF Bates ACB 015161-015184 & 015185-015309)
- Basement (2) Files – 149 pages (24 + 125)
- Missing from Criminal Defense File – Inventory file (15162-64); GPR with multiple scattered handwritten notes (15179-80); Supplemental Report (15183-84); Inventory file (15186); Information submitted for daily bulletin (15191-92); Xeroxed copies of id cards & handwritten notes (15193); GPR with numerous handwritten notes (15194-95); Crime scene processing report & handwritten note (15199-200); Handwritten note (15263); GPR with handwritten notes & questions (15268); Handwritten note (15270); GPR and handwritten side notes (15281)

HOOD 038906
Weston 053923

Isaiah Brady (RD# G-268444 / IF Bates ACB 015505-015758)
- Basement File – 254 pages
- Missing from Criminal Defense File – Inventory file (15506); Homicide file review form (15511); Investigative file control form (15584); Daily major incident log (15585); Computer screen shots with multiple handwritten notes (15591-92);GPRs with handwritten notes (15601 & 603); Property inventory sheets (15606-09); Case supplementary report (15623); Case name check report (15641); GPRs with handwritten notes & scene drawings (15642-671); Computer screen shots (15672-74); Criminal history report (15675-79); Name check query & report (15686-87); Computer screen shot with hand written notes (15688); LEADS reports with handwritten note (15689-700); Computer screen shots (15701-02); Birth certificates (15703-04); Property inventory sheets (15728-35 & 15740)

George Frison (RD# G-326467 / IF Bates ACB 017072-017380)
- Basement File – 309 pages
- Missing from Criminal Defense File – Inventory file (17073-75); Investigative file control card (17077); Crime scene photos (17079-116); Crime scene photos (17118-51); Request for evidence id photos (17152); Crime scene processing report (17153); Handwritten notes (17154-55); Case supplementary report (17157-61); Felony minute sheet (17178); Computer screen shot (17182); Name search result (17183); Case inquiry (17184); Handwritten notes (17185); Computer screen shots (17186-87); Felony minute sheet (17195); Computer screen shot (17198); Arrest report (17201); Crime scene processing report (17232); Property inventory sheets (17241 & 17256); Crime scene processing report (17265); State crime evidence report (17266); Computer screen shots & handwritten notes (17267-17275); Xerox copy of auto service invoice (17277); Illinois state evidence submittal sheet (17278); Wisconsin DOC travel permit (17279-81); Consent to search (17282); GPRs (17300-302); GPR (17317-18); GPR (1736061); Handwritten note (17374); Xerox copy of auto service receipt (17376)

Santana McCree (RD# G-406405 / IF Bates ACB 018900-019189)
- Basement File – 290 pages
- Missing from Criminal Defense File – Page from inventory file (18902); Crime scene photos identification packet label (18942); Investigative file control card (19026); Legal affairs records request (19028); Illinois torture inquiry and relief commission Subpoena Duces Tecum (19029-30); Vehicle tow report (19051-52)

HOOD 038907
Weston 053924

Crisino Bravo (RD# G-570120 / IF Bates ACB 023263-023472)
- Basement File – 210 pages
- Missing from Criminal Defense File – Investigative file inventory (23264); Crime scene photos (23268-99); Lineup photos (23300-07); Crime scene photos (23309-2336); Lineup photos (23337-46); Crime scene photos (23347-49); Daily major incident log (23350); Investigative file control card (23351); Felony minute sheet (23366); Arrest report (23369); Handwritten note (23370); Crime scene processing report (23379); Property inventory sheet (23382); Illinois state police evidence submission (23386-87); Property inventory sheet (23388 & 92); GPR (23402); GPRs with numerous scattered handwritten notes (23412-17); GPR with numerous handwritten notes (23421); GPR with numerous handwritten notes (23427-28); GPR with numerous handwritten notes (23432); General offense report (23446-47); Case supplementary report (23456); Case supplementary report (23460-66); Property inventory sheet (23467); Supplemental Report (23468); Crime scene processing report (23469); Illinois state police crime lab inventory (23470-71)

Norman McIntosh (RD# G-705434 / IF Bates ACB 027079-027314)
- Basement File – 236 pages
- Missing from Criminal Defense File – Investigative file inventory (207080-82); Crime scene photos (27085-104); Crime scene photos (27106-132); Major incident log (27133-34); Investigative file control card (27135); Computer screen shots with handwritten note (27135-37); Illinois state police crime lab findings (27139-48); Case supplementary reports (27149-77); Case supplementary report (27183-87); Case supplementary report (27193-97); General offense report with handwritten note (27204-05); Handwritten note (27222); GPRs with numerous scattered handwritten notes (27231-33); GPRs with handwritten notes (27246-47); Felony minute sheet (27250); Xerox copy of state id card (27255); Computer screen shots (27256-57); Lineup worksheet with numerous handwritten notes (27280); Circuit juvenile court lineup authorization (27283); CPD letter of sympathy (27284)

Maurice Brown (RD# HH-175723 / IF Bates ACB 049234-049402)
- Basement File – 169 pages
- Missing from Criminal Defense File – Investigative file inventory (49235-236); Homicide file review card (49240); Investigative file control card (49243); Crime scene polaroid (49245); Crime photo packet label – duplicate (49264); Daily major incident log (49266-67); Illinois state police crime lab evidence & findings (49306-07); Computer screen shot (49308); Arrest report (49350); Handwritten notes (49385 & 87); Property inventory sheet (49394-95); Property inventory sheets (49397 & 99)

16

HOOD 038908
Weston 053925

Christopher Peoples (RD# HH-358668 / IF Bates ACB 031268-031555)
- Basement File – 288 pages
- Missing from Criminal Defense File – Crime scene photos (31270-93); Legal affairs subpoena (31294-95); Investigative file inventory (31307-09); Case supplementary report (31311-22); Xerox copy of register receipts and numerous handwritten notes (31325-26); Page of handwritten notes (31327); Computer screen shot (31328); GPR (31329); Handwritten notes (31330); Xerox copy of attorney's business card (31331); Xerox copy of front and back of attorney's id card and handwritten notes (31332); Criminal history report (31333-38); Arrest report (31339); Felony minute sheet (31340); Case supplementary report (31342-56); Supplemental Report (31357); GPRs with scattered handwritten notes (31358-61); Fugitive poster (31362); Warrant documents (31363-31364); Court complaint transmittal (31365); Minneapolis PD criminal history records (31366-72); Illinois DOC records (31373); Xerox copy of attorney id (31374); Computer screen shot (31375); Criminal history report (31376-81); Pawn shop receipt (31382); Blank property inventory sheets (31383-86); Handwritten statement (31387-90); Typed statement (31391); LEADS responses (31394-97); LEADS responses (31399-405); Felony minutes (31406); Arrest report (31407); Computer screen shots with handwritten note (31408-09); Criminal history report (31410-18); GPRs with numerous handwritten notes (31419-27); Crime scene processing report (31428); GPR (31429); Case supplementary reports (31430-53); Supplementary report (31455); Case supplementary reports (31456-81); General offense report (31482-83); Computer screen shot with handwritten notes (31484); Arrest report (31485-87); Computer screen shot (31488); Felony minute sheet (31489); GPRs with numerous scattered handwritten notes, Xerox copies of attorney id, photo (31491-99); GPRs with numerous scattered handwritten notes and drawings (31500-17); Handwritten statement (31518-24); Photos & handwritten notes (31525-29); Handwritten statement (31530-35); Photos & handwritten notes (31536-38); Property inventory sheets (31539-52); Crime scene processing report (31553-54); Blank homicide file review form with handwritten notes at margin (31555)

Devon Terrell (RD# HH-749335 / IF Bates ACB 056505-056684)
- Basement File – 180 pages
- Missing from Criminal Defense File – Investigative file control card (56507); Daily major incident log (56508); Handwritten note (56509); Investigative file inventory (56510); Telephone calls records (56512-17); Computer printout pages (56518-19); Telephone invoice (56520-23); Illinois state police lab report (56524); To-from memo (56532); To-from memo (56546); Handwritten note (56564); Computer screen shot (56579); Crime scene processing report (56580); To-from memo with handwritten notes (56581); Handwritten note (56610); Supervisors report of medical absence form (56616)

Anthony Houston (RD# HJ-102484 / IF Bates ACB 031556-031828)
- Basement File – 273 pages
- Missing from Criminal Defense File – Just a few administrative items

HOOD 038909
Weston 053926

Leviante Adams (RD# HJ-366143 / IF Bates ACB 060612-060838)
- Basement File – 227 pages
- Missing from Criminal Defense File – Subject & crime scene photos (60615-61); Investigative file control card (60662); Investigative file inventory (60663-64); Drawing and numerous handwritten notes (60702); Handwritten statement (60720-23); Event history printout (60733-38); Handwritten notes (60764); GPR with numerous handwritten notes (60765); ID photo (60803); Criminal history report (60804-05); LEADS report (60806-07); Computer screen shot with handwritten note (60808); LEADS reports (60809-20); Computer screen shot with handwritten note (60821-22); Computer records printouts (60823-32)

Octavia Anima (RD# HJ-492443 / IF Bates ACB 081966-082418)
- Basement File – 453 pages
- Missing from Criminal Defense File – Investigative file control card (81968); FOIA request (81991-92); Daily major incident log (81993-96); Handwritten note (82052); Criminal history report (82173-77); LEADS report (82178-81); Arrest report (82182); Computer screen shot (82183); Criminal history report (82184-88); LEADS report (82189-91) Arrest report (82192); Computer screen shot (82193); Criminal history report (82194); LEADS report (82195-96); Handwritten statement (82197-201); Photos & handwritten notes (82202-06); Handwritten statement (82207-12); Photos & handwritten notes (82213-17); Handwritten statement (82218-25); Photos & handwritten notes (82226-30); Computer screen shot (82231); Criminal history report (82232-33); LEADS report (82234-47); Handwritten statement (82248-53); Photos & handwritten notes (82254-64); Handwritten statement (82265-69); Photos & handwritten notes (82270-77)

Lakesha Collins (RD# HK-211174 / IF Bates ACB 038163-038338)
- Basement File – 176 pages
- Missing from Criminal Defense File – Investigative file control card (38165); Investigative file inventory (38166-67); Illinois state police lab report (38171-75); GPRs with numerous scattered handwritten notes & Xerox of food receipt (38177-89); GPRs with numerous scattered handwritten notes & drawing (38202-14); Illinois state police supplemental lab report (38216-17); Request for info – office of legal affairs (38219); Illinois state police lab report (38232); Case supplementary report (38265-86)

HOOD 038910
Weston 053927

Delvie Turpin (RD# HK-406407 / IF Bates ACB 040843-041049)
- Basement File – 207 pages
- Missing from Criminal Defense File – Crime scene photos (40847-82); Daily major incident log (40883-85); Investigative file inventory (40886-87); Illinois state police lab report (40888-89); Subpoena duces tecum (40890-91); Case supplementary report (40892-98); Felony minutes form (40899); Arrest report (40900); Photo with signatures (40905); Photo with signatures (40910); Photo with signatures (40918); Photo with signatures (40923); Xerox copy of id card with handwritten notes (40928); Crime scene processing report (40929-30); Crime scene processing report (40956); Post-mortem & toxicology report (40962-68); GPRs with numerous scattered handwritten notes (40992-41005); Computer screen shots (41006-07); Criminal history report (41008-16); Material submitted for daily bulletin (41017); Arrest report (41018); LEADS report with handwritten notes (41019); CLEAR gang arrest report (41020-22); Illinois state police evidence submission report (41023-24); Major crime scene report (41025-28); Illinois state police lab report (41029); Crime scene processing report (41030); Autopsy diagram (41031); Neighborhood crime scene drawing (41032); GPR empty, but signed (41033); Blank property inventory form (41034 & 36 & 38 & 40); CPD daily bulletin (41041-43); Supplementary report (41044); General offense reports (41045-48); Homicide file review form, blank but with handwriting around outside (41049)

Donell Johnson (RD# HK-416661 / IF Bates ACB 041050-041244)
- Basement File – 195 pages
- Missing from Criminal Defense File – Investigative file control card (41052); Crime scene photos (41055-98); Felony minutes form (41106); Handwritten note (41140); Handwritten note (41188); Pages from post-mortem report (41199-100); To-from memos, with handwritten note & reference to "our friend's name" (41237-44)

Jamell Murphy (RD# HK-449083 / IF Bates ACB 041754-042025)
- Basement File – 272 pages
- Missing from Criminal Defense File – Investigative file control card (41755); Photo form (41756); Crime scene photo series label (41763); Major incident notification (41767-69); Daily major incident log (41770-71); Investigative file inventory (41773-74); Lineup check list (41777); Photos with initials & signatures (41799-800); Photos with initials & signatures (41812-16); Photos (41854-56); Law enforcement report (41876-81); DL name search (41882); Felony screening (41883-88); Felony minutes form (41922); Moving of arrestee (41924); Supplemental Report (41928-29); GPR (42002); Homicide file review form, blank (42025)

HOOD 038911
Weston 053928

Verna Colbert (RD# HK-470751 / IF Bates ACB 062432-062666)
- Basement File – 235 pages
- Missing from Criminal Defense File – Investigative file control card (62434); To-from memo with handwritten notes (62436); Handwritten note (62437); To-from memo (62438); Daily major incident log (62439-40); Investigative file inventory (62441-43); Illinois state police crime lab report (62444-45); To-from memo (62446); Illinois state police crime lab report (62447-49); Subpoena duces tecum (62450); Illinois state police crime lab report (62451); Criminal history report (62563-64); Portion of criminal history report (62572); Portion of criminal history report (62598); Homicide file review form, blank (62639)

Tharine Partee (RD# HK-593970 / IF Bates ACB 063855-064131)
- Basement File – 277 pages
- Missing from Criminal Defense File – Daily major incident log (63941-42); Investigative file inventory (63944-45)

Devon Terrell (RD# HK-639684 / IF Bates ACB 064839-065188)
- Basement File – 350 pages
- Missing from Criminal Defense File – Investigative file control form (64841); Computer screen shots (64932-37); Major incident notification detail (64941-43); Criminal history report (64952-58); Criminal history report (64959-61); Arrest report (64962); Investigative file inventory (64980-82); To-from memos (64983-84); Original case incident report (64985-87); Arrest report (65007); Felony minute sheet (65077); LEADS report (65080-81); CLEAR etrack report (65082-85); LEADS report (65086-87); Photo with handwritten note (65093); LEADS report (65094)

HOOD 038912
Weston 053929

*Michael Brasfield and Associates, Inc.*

641 Olele Point Road                    Phone: 360-301-4465
Port Ludlow, WA 98365                   E-mail: brasfield@commandscene.com

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

**Nathson E. Fields v. City of Chicago, et al.**
Cause: 1:10-cv-01168

# ATTACHMENT G

HOOD 038913
Weston 053930

**Table of Contents**

Row 1    RD# E-010765    (Year 1983)    (Area 4)..................................................1-2
Row 2    RD# E-026792    (Year 1983)    (Area 1)..................................................1-2
Row 3    RD# E-221919    (Year 1983)    (Area 1)..................................................1-2
Row 4    RD# E-277036    (Year 1983)    (Area 4)..................................................1-2
Row 5    RD# E-348611    (Year 1983)    (Area 4)..................................................1-2
Row 6    RD# E-395970    (Year 1983)    (Area 4)..................................................1-2
Row 7    RD# E-399564    (Year 1983)    (Area 4)..................................................1-2
Row 8    RD# E-442815    (Year 1983)    (Area 1)..................................................3-4
Row 9    RD# E-475100    (Year 1983)    (Area 1)..................................................3-4
Row 10   RD# F-048933    (Year 1984)    (Area 4)..................................................3-4
Row 11   RD# F-172852    (Year 1984)    (Area 3)..................................................3-4
Row 12   RD# F-177096    (Year 1984)    (Area 4)..................................................3-4
Row 13   RD# F-229020    (Year 1984)    (Area 3)..................................................3-4
Row 14   RD# F-229039    (Year 1984)    (Area 1)..................................................3-4
Row 15   RD# F-277122    (Year 1984)    (Area 1)..................................................5-6
Row 16   RD# F-299912    (Year 1984)    (Area 3)..................................................5-6
Row 17   RD# F-308281    (Year 1984)    (Area 3)..................................................5-6
Row 18   RD# F-336114    (Year 1984)    (Area 3)..................................................5-6
Row 19   RD# F-380662    (Year 1984)    (Area 4)..................................................5-6
Row 20   RD# F-430186    (Year 1984)    (Area 1)..................................................5-6
Row 21   RD# F-445484    (Year 1984)    (Area 4)..................................................7-8
Row 22   RD# F-492465    (Year 1984)    (Area 3)..................................................7-8
Row 23   RD# G-011265    (Year 1985)    (Area 1)..................................................7-8
Row 24   RD# G-011889    (Year 1985)    (Area 1)..................................................7-8
Row 25   RD# G-014815    (Year 1985)    (Area 1)..................................................7-8
Row 26   RD# G-027619    (Year 1985)    (Area 1)..................................................7-8
Row 27   RD# G-032161    (Year 1985)    (Area 1)..................................................7-8
Row 28   RD# G-049257    (Year 1985)    (Area 1)..................................................7-8
Row 29   RD# G-051225    (Year 1985)    (Area 1)..................................................9-10
Row 30   RD# G-056199    (Year 1985)    (Area 1)..................................................9-10
Row 31   RD# G-087375    (Year 1985)    (Area 1)..................................................9-10
Row 32   RD# G-106586    (Year 1985)    (Area 1)..................................................9-10
Row 33   RD# G-108642    (Year 1985)    (Area 1)..................................................9-10
Row 34   RD# G-148403    (Year 1985)    (Area 1)................................................11-12
Row 35   RD# G-156178    (Year 1985)    (Area 1)................................................11-12
Row 36   RD# G-159857    (Year 1985)    (Area 3)................................................11-12
Row 37   RD# G-165272    (Year 1985)    (Area 1)................................................11-12
Row 38   RD# G-176242    (Year 1985)    (Area 1)................................................11-12
Row 39   RD# G-192900    (Year 1985)    (Area 1)................................................13-14
Row 40   RD# G-215280    (Year 1985)    (Area 1)................................................13-14
Row 41   RD# G-230261    (Year 1985)    (Area 1)................................................13-14
Row 42   RD# G-235180    (Year 1985)    (Area 1)................................................13-14
Row 43   RD# G-245282    (Year 1985)    (Area 1)................................................13-14
Row 44   RD# G-248336    (Year 1985)    (Area 4)................................................13-14

HOOD 038914
Weston 053931

Row 45    RD# G-257089    (Year 1985)    (Area 1)................13-14
Row 46    RD# G-265171    (Year 1985)    (Area 1)................13-14
Row 47    RD# G-267631    (Year 1985)    (Area 3)................13-14
Row 48    RD# G-267820    (Year 1985)    (Area 1)................13-14
Row 49    RD# G-267826    (Year 1985)    (Area 1)................15-16
Row 50    RD# G-278643    (Year 1985)    (Area 1)................15-16
Row 51    RD# G-283147    (Year 1985)    (Area 4)................15-16
Row 52    RD# G-284291    (Year 1985)    (Area 1)................15-16
Row 53    RD# G-289217    (Year 1985)    (Area 1)................15-16
Row 54    RD# G-303402    (Year 1985)    (Area 1)................15-16
Row 55    RD# G-321886    (Year 1985)    (Area 4)................15-16
Row 56    RD# G-322101    (Year 1985)    (Area 1)................15-16
Row 57    RD# G-331216    (Year 1985)    (Area 1)................15-16
Row 58    RD# G-354748    (Year 1985)    (Area 1)................15-16
Row 59    RD# G-356930    (Year 1985)    (Area 1)................15-16
Row 60    RD# G-385135    (Year 1985)    (Area 1)................17-18
Row 61    RD# G-401782    (Year 1985)    (Area 1)................17-18
Row 62    RD# G-405711    (Year 1985)    (Area 1)................17-18
Row 63    RD# G-446754    (Year 1985)    (Area 1)................17-18
Row 64    RD# G-456900    (Year 1985)    (Area 1)................17-18
Row 65    RD# G-468726    (Year 1985)    (Area 1)................17-18
Row 80    RD# G-468726    (Year 1985)    (Area 1)................17-18
Row 66    RD# G-482955    (Year 1985)    (Area 3)................19-20
Row 67    RD# G-483470    (Year 1985)    (Area 1)................19-20
Row 68    RD# G-501974    (Year 1985)    (Area 1)................19-20
Row 69    RD# H-024109    (Year 1986)    (Area 4)................19-20
Row 70    RD# H-349049    (Year 1986)    (Area 4)................19-20
Row 71    RD# H-435581    (Year 1986)    (Area 4)................19-20
Row 72    RD# H-465163    (Year 1986)    (Area 2)................21-22
Row 73    RD# J-381525    (Year 1987)    (Area 4)................21-22
Row 74    RD# J-418229    (Year 1987)    (Area 1)................21-22
Row 75    RD# J-486857    (Year 1987)    (Area 4)................21-22
Row 76    RD# J-510242    (Year 1987)    (Area 4)................21-22
Row 77    RD# K-300724    (Year 1988)    (Area 4)................21-22
Row 78    RD# K-562024    (Year 1988)    (Area 4)................23-24
Row 79    RD# M-139566    (Year 1989)    (Area 4)................23-24
Row 80    RD# M-510728    (Year 1989)    (Area 4)................25-26
Row 81    RD# M-534290    (Year 1989)    (Area 4)................25-26
Row 82    RD# M-539997    (Year 1989)    (Area 4)................27-28
Row 83    RD# M-544975    (Year 1989)    (Area 4)................27-28
Row 84    RD# M-566742    (Year 1989)    (Area 4)................27-28
Row 85    RD# M-568343    (Year 1989)    (Area 4)................27-28
Row 86    RD# M-569727    (Year 1989)    (Area 4)................29-30
Row 87    RD# M-580592    (Year 1989)    (Area 4)................29-30
Row 88    RD# M-587998    (Year 1989)    (Area 4)................29-30
Row 89    RD# M-590700    (Year 1989)    (Area 4)................29-30

HOOD 038915
Weston 053932

| Row 90 | RD# D-322218 | (Year 1999) | (Area 4) | 29-30 |
| Row 91 | RD# D-192218 | (Year 1999) | (Area 4) | 29-30 |
| Row 92 | RD# D-579065 | (Year 1999) | (Area 4) | 29-30 |
| Row 93 | RD# D-131199 | (Year 1999) | (Area 4) | 29-30 |
| Row 94 | RD# D-145734 | (Year 1999) | (Area 4) | 29-30 |
| Row 95 | RD# D-146057 | (Year 1999) | (Area 4) | 29-30 |
| Row 96 | RD# D-454658 | (Year 1999) | (Area 4) | 29-30 |
| Row 97 | RD# D-724882 | (Year 1999) | (Area 4) | 29-30 |
| Row 98 | RD# F-475-960 | (Year 2000) | (Area 4) | 29-30 |
| Row 99 | RD# F-405-633 | (Year 2000) | (Area 4) | 29-30 |
| Row 100 | RD# F-731010 | (Year 2000) | (Area 4) | 31-32 |
| Row 101 | RD# F-746059 | (Year 2000) | (Area 1) | 31-32 |
| Row 102 | RD# G-032399 | (Year 2001) | (Area 1) | 31-32 |
| Row 103 | RD# G-082465 | (Year 2001) | (Area 1) | 31-32 |
| Row 104 | RD# G-108432 | (Year 2001) | (Area 1) | 31-32 |
| Row 105 | RD# G-118582 | (Year 2001) | (Area 1) | 31-32 |
| Row 106 | RD# G-128509 | (Year 2001) | (Area 1) | 31-32 |
| Row 107 | RD# G-142325 | (Year 2001) | (Area 4) | 31-32 |
| Row 108 | RD# G-152113 | (Year 2001) | (Area 1) | 31-32 |
| Row 109 | RD# G-168213 | (Year 2001) | (Area 1) | 31-32 |
| Row 110 | RD# G-187460 | (Year 2001) | (Area 4) | 31-32 |
| Row 111 | RD# G-188311 | (Year 2001) | (Area 1) | 31-32 |
| Row 112 | RD# G-188820 | (Year 2001) | (Area 1) | 31-32 |
| Row 113 | RD# G-190057 | (Year 2001) | (Area 1) | 31-32 |
| Row 114 | RD# G-221780 | (Year 2001) | (Area 1) | 31-32 |
| Row 115 | RD# G-226841 | (Year 2001) | (Area 1) | 31-32 |
| Row 116 | RD# G-248938 | (Year 2001) | (Area 1) | 31-32 |
| Row 117 | RD# G-259321 | (Year 2001) | (Area 1) | 31-32 |
| Row 118 | RD# G-261213 | (Year 2001) | (Area 1) | 31-32 |
| Row 119 | RD# G-266841 | (Year 2001) | (Area 1) | 31-32 |
| Row 120 | RD# G-268444 | (Year 2001) | (Area 1) | 31-32 |
| Row 121 | RD# G-276602 | (Year 2001) | (Area 1) | 31-32 |
| Row 122 | RD# G-311269 | (Year 2001) | (Area 1) | 31-32 |
| Row 123 | RD# G-322669 | (Year 2001) | (Area 1) | 31-32 |
| Row 124 | RD# G-326467 | (Year 2001) | (Area 1) | 33-34 |
| Row 125 | RD# G-330755 | (Year 2001) | (Area 1) | 33-34 |
| Row 126 | RD# G-356804 | (Year 2001) | (Area 1) | 33-34 |
| Row 127 | RD# G-380402 | (Year 2001) | (Area 4) | 33-34 |
| Row 128 | RD# G-389122 | (Year 2001) | (Area 1) | 33-34 |
| Row 129 | RD# G-390651 | (Year 2001) | (Area 1) | 33-34 |
| Row 130 | RD# G-397986 | (Year 2001) | (Area 1) | 33-34 |
| Row 131 | RD# G-399481 | (Year 2001) | (Area 1) | 33-34 |
| Row 132 | RD# G-406405 | (Year 2001) | (Area 1) | 33-34 |
| Row 133 | RD# G-419125 | (Year 2001) | (Area 1) | 33-34 |
| Row 134 | RD# G-425608 | (Year 2001) | (Area 1) | 33-34 |
| Row 135 | RD# G-434632 | (Year 2001) | (Area 1) | 33-34 |

HOOD 038916
Weston 053933

Row 136    RD# G-443474    (Year 2001)    (Area 4)................................................33-34
Row 137    RD# G-447444    (Year 2001)    (Area 1)................................................33-34
Row 138    RD# G-450601    (Year 2001)    (Area 1)................................................33-34
Row 139    RD# G-451387    (Year 2001)    (Area 1)................................................33-34
Row 140    RD# G-456492    (Year 2001)    (Area 1)................................................33-34
Row 141    RD# G-491442    (Year 2001)    (Area 1)................................................33-34
Row 142    RD# G-497018    (Year 2001)    (Area 1)................................................33-34
Row 143    RD# G-506663    (Year 2001)    (Area 4)................................................33-34
Row 144    RD# G-541859    (Year 2001)    (Area 1)................................................33-34
Row 145    RD# G-543889    (Year 2001)    (Area 1)................................................33-34
Row 146    RD# G-547890    (Year 2001)    (Area 1)................................................33-34
Row 147    RD# G-554146    (Year 2001)    (Area 1)................................................33-34
Row 148    RD# G-556311    (Year 2001)    (Area 4)................................................33-34
Row 149    RD# G-567131    (Year 2001)    (Area 1)................................................33-34
Row 150    RD# G-570120    (Year 2001)    (Area 1)................................................35-36
Row 151    RD# G-575283    (Year 2001)    (Area 1)................................................35-36
Row 152    RD# G-578724    (Year 2001)    (Area 1)................................................35-36
Row 153    RD# G-592219    (Year 2001)    (Area 1)................................................35-36
Row 154    RD# G-602617    (Year 2001)    (Area 1)................................................35-36
Row 155    RD# G-630073    (Year 2001)    (Area 1)................................................35-36
Row 156    RD# G-630295    (Year 2001)    (Area 1)................................................35-36
Row 157    RD# G-632707    (Year 2001)    (Area 1)................................................35-36
Row 158    RD# G-648246    (Year 2001)    (Area 1)................................................35-36
Row 159    RD# G-655145    (Year 2001)    (Area 1)................................................35-36
Row 160    RD# G-656885    (Year 2001)    (Area 1)................................................35-36
Row 161    RD# G-670379    (Year 2001)    (Area 1)................................................35-36
Row 162    RD# G-678089    (Year 2001)    (Area 1)................................................35-36
Row 163    RD# G-686446    (Year 2001)    (Area 1)................................................35-36
Row 164    RD# G-688481    (Year 2001)    (Area 1)................................................35-36
Row 165    RD# G-691809    (Year 2001)    (Area 1)................................................35-36
Row 166    RD# G-694725    (Year 2001)    (Area 4)................................................35-36
Row 167    RD# G-694885    (Year 2001)    (Area 1)................................................35-36
Row 168    RD# G-701363    (Year 2001)    (Area 4)................................................35-36
Row 169    RD# G-705434    (Year 2001)    (Area 1)................................................35-36
Row 170    RD# G-708133    (Year 2001)    (Area 1)................................................35-36
Row 171    RD# G-722334    (Year 2001)    (Area 1)................................................35-36
Row 172    RD# G-751124    (Year 2001)    (Area 1)................................................35-36
Row 173    RD# G-759169    (Year 2001)    (Area 1)................................................35-36
Row 174    RD# G-763-171   (Year 2001)    (Area 4)................................................37-38
Row 175    RD# G-776686    (Year 2001)    (Area 1)................................................37-38
Row 176    RD# HH-101153   (Year 2002)    (Area 1)................................................37-38
Row 177    RD# HH-105486   (Year 2002)    (Area 1)................................................37-38
Row 178    RD# HH-112360   (Year 2002)    (Area Unknown)................................37-38
Row 179    RD# HH-112848   (Year 2002)    (Area 1)................................................37-38
Row 180    RD# HH-123814   (Year 2002)    (Area 1)................................................37-38
Row 181    RD# HH-131667   (Year 2002)    (Area 1)................................................37-38

4

HOOD 038917
Weston 053934

| Row 182 | RD# HH-138499 | (Year 2002) | (Area 1) | 37-38 |
| Row 183 | RD# HH-154152 | (Year 2002) | (Area 1) | 37-38 |
| Row 184 | RD# HH-158954 | (Year 2002) | (Area 1) | 37-38 |
| Row 185 | RD# HH-175723 | (Year 2002) | (Area 1) | 37-38 |
| Row 186 | RD# HH-249096 | (Year 2002) | (Area 1) | 37-38 |
| Row 187 | RD# HH-257532 | (Year 2002) | (Area 1) | 39-40 |
| Row 188 | RD# HH-263021 | (Year 2002) | (Area 1) | 39-40 |
| Row 189 | RD# HH-270572 | (Year 2002) | (Area 1) | 39-40 |
| Row 190 | RD# HH-279592 | (Year 2002) | (Area 1) | 39-40 |
| Row 191 | RD# HH-280024 | (Year 2002) | (Area 1) | 39-40 |
| Row 192 | RD# HH-280696 | (Year 2002) | (Area 1) | 39-40 |
| Row 193 | RD# HH-285733 | (Year 2002) | (Area 1) | 39-40 |
| Row 194 | RD# HH-296357 | (Year 2002) | (Area 1) | 39-40 |
| Row 195 | RD# HH-301377 | (Year 2002) | (Area 1) | 39-40 |
| Row 196 | RD# HH-316330 | (Year 2002) | (Area 1) | 39-40 |
| Row 197 | RD# HH-321998 | (Year 2002) | (Area 1) | 39-40 |
| Row 198 | RD# HH-347787 | (Year 2002) | (Area 1) | 39-40 |
| Row 199 | RD# HH-358668 | (Year 2002) | (Area 1) | 39-40 |
| Row 200 | RD# HH-361418 | (Year 2002) | (Area 1) | 41-42 |
| Row 201 | RD# HH-367441 | (Year 2002) | (Area 1) | 41-42 |
| Row 202 | RD# HH-367666 | (Year 2002) | (Area 1) | 41-42 |
| Row 203 | RD# HH-377524 | (Year 2002) | (Area 1) | 41-42 |
| Row 204 | RD# HH-414131 | (Year 2002) | (Area 1) | 41-42 |
| Row 205 | RD# HH-447119 | (Year 2002) | (Area 1) | 41-42 |
| Row 206 | RD# HH-447396 | (Year 2002) | (Area 1) | 41-42 |
| Row 207 | RD# HH-500856 | (Year 2002) | (Area 4) | 41-42 |
| Row 208 | RD# HH-505945 | (Year 2002) | (Area 1) | 41-42 |
| Row 209 | RD# HH-522403 | (Year 2002) | (Area 1) | 41-42 |
| Row 210 | RD# HH-524796 | (Year 2002) | (Area 1) | 41-42 |
| Row 211 | RD# HH-525230 | (Year 2002) | (Area 1) | 41-42 |
| Row 212 | RD# HH-529070 | (Year 2002) | (Area 1) | 41-42 |
| Row 213 | RD# HH-546846 | (Year 2002) | (Area 1) | 41-42 |
| Row 214 | RD# HH-551686 | (Year 2002) | (Area 1) | 41-42 |
| Row 215 | RD# HH-572150 | (Year 2002) | (Area 1) | 41-42 |
| Row 216 | RD# HH-576930 | (Year 2002) | (Area 1) | 41-42 |
| Row 217 | RD# HH-609705 | (Year 2002) | (Area 1) | 41-42 |
| Row 218 | RD# HH-614198 | (Year 2002) | (Area 1) | 41-42 |
| Row 219 | RD# HH-617694 | (Year 2002) | (Area 1) | 41-42 |
| Row 220 | RD# HH-618363 | (Year 2002) | (Area 1) | 43-44 |
| Row 221 | RD# HH-635313 | (Year 2002) | (Area 1) | 43-44 |
| Row 222 | RD# HH-660094 | (Year 2002) | (Area 1) | 43-44 |
| Row 223 | RD# HH-690739 | (Year 2002) | (Area 1) | 43-44 |
| Row 224 | RD# HH-749335 | (Year 2002) | (Area 1) | 43-44 |
| Row 225 | RD# HH-767627 | (Year 2002) | (Area 1) | 43-44 |
| Row 226 | RD# HH-783159 | (Year 2002) | (Area Unknown) | 43-44 |
| Row 227 | RD# HH-811146 | (Year 2002) | (Area 1) | 43-44 |

5

HOOD 038918
Weston 053935

| | | | | |
|---|---|---|---|---|
| Row 228 | RD# HH-818229 | (Year 2002) | (Area 1) | 43-44 |
| Row 229 | RD# HH-823907 | (Year 2002) | (Area 1) | 43-44 |
| Row 230 | RD# HH-842054 | (Year 2002) | (Area 1) | 43-44 |
| Row 231 | RD# HH-844492 | (Year 2002) | (Area 1) | 43-44 |
| Row 232 | RD# HH-858534 | (Year 2002) | (Area 1) | 43-44 |
| Row 233 | RD# HH-858682 | (Year 2002) | (Area 1) | 43-44 |
| Row 234 | RD# HH-860642 | (Year 2002) | (Area 1) | 43-44 |
| Row 235 | RD# HH-860835 | (Year 2002) | (Area 1) | 43-44 |
| Row 236 | RD# HJ-102484 | (Year 2002) | (Area 1) | 43-44 |
| Row 237 | RD# HJ-117531 | (Year 2003) | (Area 1) | 43-44 |
| Row 238 | RD# HJ-117559 | (Year 2003) | (Area 1) | 43-44 |
| Row 239 | RD# HJ-143625 | (Year 2003) | (Area 1) | 43-44 |
| Row 240 | RD# HJ-145451 | (Year 2003) | (Area 1) | 43-44 |
| Row 241 | RD# HJ-158056 | (Year 2003) | (Area 1) | 43-44 |
| Row 242 | RD# HJ-169496 | (Year 2003) | (Area 1) | 43-44 |
| Row 243 | RD# HJ-211373 | (Year 2003) | (Area 1) | 43-44 |
| Row 244 | RD# HJ-211691 | (Year 2003) | (Area 1) | 45-46 |
| Row 245 | RD# HJ-228346 | (Year 2003) | (Area 1) | 45-46 |
| Row 246 | RD# HJ-239255 | (Year 2003) | (Area 1) | 45-46 |
| Row 247 | RD# HJ-243231 | (Year 2003) | (Area 1) | 45-46 |
| Row 248 | RD# HJ-256409 | (Year 2003) | (Area 1) | 45-46 |
| Row 249 | RD# HJ-257094 | (Year 2003) | (Area 1) | 45-46 |
| Row 250 | RD# HJ-274500 | (Year 2003) | (Area 4) | 45-46 |
| Row 251 | RD# HJ-284434 | (Year 2003) | (Area 1) | 45-46 |
| Row 252 | RD# HJ-307187 | (Year 2003) | (Area 1) | 45-46 |
| Row 253 | RD# HJ-307851 | (Year 2003) | (Area 1) | 45-46 |
| Row 254 | RD# HJ-310383 | (Year 2003) | (Area 1) | 45-46 |
| Row 255 | RD# HJ-320635 | (Year 2003) | (Area 1) | 45-46 |
| Row 256 | RD# HJ-324514 | (Year 2003) | (Area 1) | 45-46 |
| Row 257 | RD# HJ-366143 | (Year 2003) | (Area 1) | 45-46 |
| Row 258 | RD# HJ-376892 | (Year 2003) | (Area 1) | 45-46 |
| Row 259 | RD# HJ-399272 | (Year 2003) | (Area 1) | 45-46 |
| Row 260 | RD# HJ-400029 | (Year 2003) | (Area 1) | 45-46 |
| Row 261 | RD# HJ-410134 | (Year 2003) | (Area 1) | 45-46 |
| Row 262 | RD# HJ-440488 | (Year 2003) | (Area 1) | 45-46 |
| Row 263 | RD# HJ-492443 | (Year 2003) | (Area 1) | 45-46 |
| Row 264 | RD# HJ-499310 | (Year 2003) | (Area 4) | 47-48 |
| Row 265 | RD# HJ-505759 | (Year 2003) | (Area 1) | 47-48 |
| Row 266 | RD# HJ-518923 | (Year 2003) | (Area 1) | 47-48 |
| Row 267 | RD# HJ-527506 | (Year 2003) | (Area 1) | 47-48 |
| Row 268 | RD# HJ-545448 | (Year 2003) | (Area 1) | 47-48 |
| Row 269 | RD# HJ-547936 | (Year 2003) | (Area 1) | 47-48 |
| Row 270 | RD# HJ-591782 | (Year 2003) | (Area 1) | 47-48 |
| Row 271 | RD# HJ-623228 | (Year 2003) | (Area 1) | 47-48 |
| Row 272 | RD# HJ-640575 | (Year 2003) | (Area 1) | 47-48 |
| Row 273 | RD# HJ-647205 | (Year 2003) | (Area 1) | 47-48 |

HOOD 038919
Weston 053936

Row 274    RD# HJ-661717    (Year 2003)    (Area 1)..........................................47-48
Row 275    RD# HJ-664136    (Year 2003)    (Area 1)..........................................47-48
Row 276    RD# HJ-664232    (Year 2003)    (Area 1)..........................................47-48
Row 277    RD# HJ-671123    (Year 2003)    (Area Unknown)...........................47-48
Row 278    RD# HJ-673789    (Year 2003)    (Area 1)..........................................47-48
Row 279    RD# HJ-676387    (Year 2003)    (Area 1)..........................................47-48
Row 280    RD# HJ-678090    (Year 2003)    (Area 1)..........................................47-48
Row 281    RD# HJ-687964    (Year 2003)    (Area 1)..........................................47-48
Row 282    RD# HJ-689560    (Year 2003)    (Area 1)..........................................47-48
Row 283    RD# HJ-733462    (Year 2003)    (Area 1)..........................................47-48
Row 284    RD# HJ-734895    (Year 2003)    (Area 1)..........................................47-48
Row 285    RD# HJ-737306    (Year 2003)    (Area 1)..........................................47-48
Row 286    RD# HJ-745468    (Year 2003)    (Area 1)..........................................47-48
Row 287    RD# HJ-757826    (Year 2003)    (Area 4)..........................................47-48
Row 288    RD# HJ-776575    (Year 2003)    (Area 1)..........................................49-50
Row 289    RD# HJ-793204    (Year 2003)    (Area 1)..........................................49-50
Row 290    RD# HJ-795462    (Year 2003)    (Area 1)..........................................49-50
Row 291    RD# HJ-796729    (Year 2003)    (Area 1)..........................................49-50
Row 292    RD# HJ-831700    (Year 2003)    (Area 1)..........................................49-50
Row 293    RD# HJ-834810    (Year 2003)    (Area 2)..........................................49-50
Row 294    RD# HJ-845688    (Year 2003)    (Area 4)..........................................49-50
Row 295    RD# HK-000106    (Year 2004)    (Area 1)..........................................49-50
Row 296    RD# HK-106793    (Year 2004)    (Area 1)..........................................49-50
Row 297    RD# HK-142414    (Year 2004)    (Area 1)..........................................49-50
Row 298    RD# HK-148852    (Year 2004)    (Area 1)..........................................49-50
Row 299    RD# HK-158502    (Year 2004)    (Area 1)..........................................49-50
Row 300    RD# HK-165467    (Year 2004)    (Area 1)..........................................49-50
Row 301    RD# HK-195199    (Year 2004)    (Area 1)..........................................49-50
Row 302    RD# HK-196935    (Year 2004)    (Area 1)..........................................49-50
Row 303    RD# HK-211174    (Year 2004)    (Area 1)..........................................49-50
Row 304    RD# HK-222787    (Year 2004)    (Area 1)..........................................49-50
Row 305    RD# HK-223040    (Year 2004)    (Area 1)..........................................49-50
Row 306    RD# HK-224777    (Year 2004)    (Area 1)..........................................49-50
Row 307    RD# HK-238041    (Year 2004)    (Area 1)..........................................49-50
Row 308    RD# HK-238478    (Year 2004)    (Area 1)..........................................49-50
Row 309    RD# HK-245772    (Year 2004)    (Area 1)..........................................49-50
Row 310    RD# HK-253794    (Year 2004)    (Area 1)..........................................49-50
Row 311    RD# HK-284640    (Year 2004)    (Area 1)..........................................49-50
Row 312    RD# HK-316879    (Year 2004)    (Area 1)..........................................49-50
Row 313    RD# HK-359543    (Year 2004)    (Area 1)..........................................49-50
Row 314    RD# HK-377605    (Year 2004)    (Area 1)..........................................49-50
Row 315    RD# HK-378604    (Year 2005)    (Area 1)..........................................49-50
Row 316    RD# HK-404487    (Year 2004)    (Area 1)..........................................51-52
Row 317    RD# HK406407     (Year 2004)    (Area 1)..........................................51-52
Row 318    RD# HK416661     (Year 2004)    (Area 1)..........................................51-52
Row 319    RD# HK431410     (Year 2004)    (Area 1)..........................................51-52

HOOD 038920
Weston 053937

Row 320   RD# HK440539   (Year 2004)   (Area 1)............................51-52
Row 321   RD# HK-449083   (Year 2004)   (Area 1)............................51-52
Row 322   RD# HK-457513   (Year 2004)   (Area 1)............................51-52
Row 323   RD# HK-457942   (Year 2004)   (Area 1)............................51-52
Row 324   RD# HK-459545   (Year 2004)   (Area 1)............................51-52
Row 325   RD# HK-465885   (Year 2004)   (Area 1)............................51-52
Row 326   RD# HK-470751   (Year 2004)   (Area 1)............................51-52
Row 327   RD# HK-479167   (Year 2004)   (Area 1)............................51-52
Row 328   RD# HK-483176   (Year 2004)   (Area 1)............................51-52
Row 329   RD# HK-487688   (Year 2004)   (Area 1)............................51-52
Row 330   RD# HK-500451   (Year 2004)   (Area 1)............................51-52
Row 331   RD# HK-526394   (Year 2004)   (Area 1)............................51-52
Row 332   RD# HK-526818   (Year 2004)   (Area 1)............................51-52
Row 333   RD# HK-528598   (Year 2004)   (Area 1)............................51-52
Row 334   RD# HK-539094   (Year 2004)   (Area 1)............................51-52
Row 335   RD# HK-558373   (Year 2004)   (Area 1)............................51-52
Row 336   RD# HK-564062   (Year 2004)   (Area 1)............................51-52
Row 337   RD# HK-564454   (Year 2004)   (Area 1)............................51-52
Row 338   RD# HK-593970   (Year 2004)   (Area 1)............................51-52
Row 339   RD# HK-598867   (Year 2004)   (Area 1)............................51-52
Row 340   RD# HK-628944   (Year 2004)   (Area 1)............................51-52
Row 341   RD# HK-639684   (Year 2004)   (Area 1)............................53-54
Row 342   RD# HK-647145   (Year 2004)   (Area 1)............................53-54
Row 343   RD# HK-663121   (Year 2004)   (Area 1)............................53-54
Row 344   RD# HK-669797   (Year 2004)   (Area 1)............................53-54
Row 345   RD# HK-683108   (Year 2004)   (Area 1)............................53-54
Row 346   RD# HK-701076   (Year 2004)   (Area 1)............................53-54
Row 347   RD# HK-746784   (Year 2004)   (Area 1)............................53-54
Row 348   RD# HK-763869   (Year 2004)   (Area 1)............................53-54
Row 349   RD# HK-776079   (Year 2004)   (Area 1)............................53-54
Row 350   RD# HK-788723   (Year 2004)   (Area 1)............................53-54
Row 351   RD# HK-792194   (Year 2004)   (Area 1)............................53-54
Row 352   RD# HK-798753   (Year 2004)   (Area 1)............................53-54
Row 353   RD# HK-811031   (Year 2004)   (Area 1)............................53-54
Row 354   RD# HK-811135   (Year 2004)   (Area 1)............................53-54
Row 355   RD# HK-823687   (Year 2004)   (Area 4)............................53-54
Row 356   RD# HL-202732   (Year 2005)   (Area 1)............................53-54
Row 357   RD# HL-219488   (Year 2005)   (Area 1)............................53-54
Row 358   RD# HL-227322   (Year 2005)   (Area 1)............................53-54
Row 359   RD# HL-236577   (Year 2005)   (Area 1)............................53-54
Row 360   RD# HL-242938   (Year 2005)   (Area 1)............................53-54
Row 361   RD# HL-260858   (Year 2005)   (Area 1)............................53-54
Row 362   RD# HL-291491   (Year 2005)   (Area 1)............................53-54
Row 363   RD# HL-307618   (Year 2005)   (Area 1)............................53-54
Row 364   RD# HL-326591   (Year 2005)   (Area 1)............................53-54
Row 365   RD# HL-336784   (Year 2005)   (Area 1)............................53-54

HOOD 038921
Weston 053938

| | | | |
|---|---|---|---|
| Row 366 | RD# HL-355032 | (Year 2005) | (Area 1).................................... 53-54 |
| Row 367 | RD# HL-361793 | (Year 2005) | (Area 1).................................... 55-56 |
| Row 368 | RD# HL-370043 | (Year 2005) | (Area 1).................................... 55-56 |
| Row 369 | RD# HL-371164 | (Year 2005) | (Area 1).................................... 55-56 |
| Row 370 | RD# HL-373670 | (Year 2005) | (Area 1).................................... 55-56 |
| Row 371 | RD# HL-385610 | (Year 2005) | (Area 1).................................... 55-56 |
| Row 372 | RD# HL-387017 | (Year 2005) | (Area 1).................................... 55-56 |
| Row 373 | RD# HL-393632 | (Year 2005) | (Area 1).................................... 55-56 |
| Row 374 | RD# HL-399677 | (Year 2005) | (Area 1).................................... 55-56 |
| Row 375 | RD# HL-407548 | (Year 2005) | (Area 1).................................... 55-56 |
| Row 376 | RD# HL-448514 | (Year 2005) | (Area 1).................................... 55-56 |
| Row 377 | RD# HL-484055 | (Year 2005) | (Area 1).................................... 55-56 |
| Row 378 | RD# HL-484812 | (Year 2005) | (Area 1).................................... 55-56 |
| Row 379 | RD# HL-486965 | (Year 2005) | (Area 1).................................... 55-56 |
| Row 380 | RD# HL-489874 | (Year 2005) | (Area 1).................................... 55-56 |
| Row 381 | RD# HL-504078 | (Year 2005) | (Area 1).................................... 55-56 |
| Row 382 | RD# HL-509628 | (Year 2005) | (Area 1).................................... 55-56 |
| Row 383 | RD# HL-516150 | (Year 2005) | (Area 1).................................... 55-56 |
| Row 384 | RD# HL-519786 | (Year 2005) | (Area 1).................................... 55-56 |
| Row 385 | RD# HL-526827 | (Year 2005) | (Area 1).................................... 55-56 |
| Row 386 | RD# HL-527629 | (Year 2005) | (Area 1).................................... 55-56 |
| Row 387 | RD# HL-534365 | (Year 2005) | (Area 1).................................... 57-58 |
| Row 388 | RD# HL-543584 | (Year 2005) | (Area 1).................................... 57-58 |
| Row 389 | RD# HL-543691 | (Year 2005) | (Area 1).................................... 57-58 |
| Row 390 | RD# HL-555606 | (Year 2005) | (Area 1).................................... 57-58 |
| Row 391 | RD# HL-567137 | (Year 2005) | (Area 1).................................... 57-58 |
| Row 392 | RD# HL-573690 | (Year 2005) | (Area 1).................................... 57-58 |
| Row 393 | RD# HL-604727 | (Year 2005) | (Area 1).................................... 57-58 |
| Row 394 | RD# HL-612170 | (Year 2005) | (Area 1).................................... 57-58 |
| Row 395 | RD# HL-617116 | (Year 2005) | (Area 4).................................... 57-58 |
| Row 396 | RD# HL-619201 | (Year 2005) | (Area 4).................................... 57-58 |
| Row 397 | RD# HL-628024 | (Year 2005) | (Area 1).................................... 57-58 |
| Row 398 | RD# HL-641342 | (Year 2005) | (Area 1).................................... 57-58 |
| Row 399 | RD# HL-656289 | (Year 2005) | (Area 1).................................... 57-58 |
| Row 400 | RD# HL-662200 | (Year 2005) | (Area 1).................................... 57-58 |
| Row 401 | RD# HL-669557 | (Year 2005) | (Area 1).................................... 57-58 |
| Row 402 | RD# HL-673823 | (Year 2005) | (Area 1).................................... 57-58 |
| Row 403 | RD# HL-710670 | (Year 2005) | (Area 1).................................... 57-58 |
| Row 404 | RD# HL-722490 | (Year 2005) | (Area 1).................................... 57-58 |
| Row 405 | RD# HL-808159 | (Year 2005) | (Area 1).................................... 59-60 |
| Row 406 | RD# HM-100890 | (Year 2006) | (Area 1).................................... 59-60 |
| Row 407 | RD# HM-148888 | (Year 2006) | (Area 1).................................... 59-60 |
| Row 408 | RD# HM-182777 | (Year 2006) | (Area 1).................................... 59-60 |
| Row 409 | RD# HM-199438 | (Year 2006) | (Area 1).................................... 59-60 |
| Row 410 | RD# HM-208287 | (Year 2006) | (Area 1).................................... 59-60 |
| Row 411 | RD# HM-231046 | (Year 2006) | (Area 1).................................... 59-60 |

HOOD 038922
Weston 053939

| | | | | |
|---|---|---|---|---|
| Row 412 | RD# HM-232296 | (Year 2006) | (Area 1) | 59-60 |
| Row 413 | RD# HM-264904 | (Year 2006) | (Area 1) | 59-60 |
| Row 414 | RD# HM-278309 | (Year 2006) | (Area 1) | 59-60 |
| Row 415 | RD# HM-304212 | (Year 2006) | (Area 1) | 59-60 |
| Row 416 | RD# HM-307550 | (Year 2006) | (Area 1) | 59-60 |
| Row 417 | RD# HM-318752 | (Year 2006) | (Area 1) | 59-60 |
| Row 418 | RD# HM-341097 | (Year 2006) | (Area 1) | 61-62 |
| Row 419 | RD# HM-353304 | (Year 2006) | (Area 1) | 61-62 |
| Row 420 | RD# HM-366735 | (Year 2006) | (Area 1) | 61-62 |
| Row 421 | RD# HM-367019 | (Year 2006) | (Area 1) | 61-62 |
| Row 422 | RD# HM-372012 | (Year 2006) | (Area 1) | 61-62 |
| Row 423 | RD# HM-414793 | (Year 2006) | (Area 1) | 61-62 |
| Row 424 | RD# HM-419168 | (Year 2006) | (Area 1) | 61-62 |
| Row 425 | RD# HM-445290 | (Year 2006) | (Area 1) | 61-62 |
| Row 426 | RD# HM-449389 | (Year 2006) | (Area 1) | 61-62 |
| Row 427 | RD# HM-478600 | (Year 2006) | (Area 1) | 61-62 |
| Row 428 | RD# HM-492478 | (Year 2006) | (Area 1) | 61-62 |
| Row 429 | RD# HM-501773 | (Year 2006) | (Area 1) | 61-62 |

HOOD 038923
Weston 053940

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| # | RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS CRIMINAL DEFENSE ATTORNEY FILE BEEN PRODUCED? | ARE INVESTIGATIVE MATERIALS MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING INVESTIGATIVE MATERIALS | DOES THE DEFENSE ATTORNEY FILE CONTAIN AN INVENTORY SHEET? | DOES THE INVENTORY SHEET IN THE DEFENSE ATTORNEY FILE MATCH THE INVENTORY SHEET IN THE BASEMENT FILE? | ARE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | DOES THE BASEMENT FILE INCLUDE AN INVENTORY? | BATES NUMBER FOR INVENTORY | IS THE INVENTORY COMPLETE? | EXAMPLES OF ITEMS MISSING FROM INVENTORY | ARE THERE HANDWRITTEN NOTES IN THE FILE? | BATES NUMBERS FOR HANDWRITTEN NOTES | ARE THERE TO-FROM MEMOS IN THE FILE? | BATES NUMBERS FOR TO-FROM MEMOS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | E-010765 | 1983 | 4 | Cecil Robinson | YES | YES | Area Central Basement 000000002-04; Area Central Basement 00000038-39 Area Central Basement 000000044; Area Central Basement 000000056; Area Central Basement 000000076; Area Central Basement 000000082 Area Central Basement 000000091-95 | NO | N/A | NO | N/A | YES | Area Central Basement 0000002; Area Central Basement 0000044; Area Central Basement 0000059; Area Central Basement 0000071; Area Central Basement 0000076; Area Central Basement 0000079; Area Central Basement 0000091 | NO | N/A | YES | Area Central Basement 0000003-04 | NO | 9 Handwritten notes in file, 0 listed on inventory | YES | Area Central Basement 0000002; Area Central Basement 0000044; Area Central Basement 0000059; Area Central Basement 0000071; Area Central Basement 0000076; Area Central Basement 0000079; Area Central Basement 0000091 | YES | Area Central Basement 0000081 |
| 2 | E-026792 | 1983 | 1 | Derrick Kees, William Doyle, JL Houston, Edgar Cooksey, Jackie Clay | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | CITY-NF-13115-13117 | NO | 14 Handwritten notes in file, 2 listed on Inventory; 17 To-from memos in file, 5 listed on Inventory | YES | CITY-NF-13114; CITY-NF-13120-13121; CITY-NF-13126; CITY-NF-13128; CITY-NF-13130; CITY-NF-13132; CITY-NF-13135; CITY-NF-13136; CITY-NF-13178; CITY-NF01191-13193; CITY-NF-13195; CITY-NF-13211 | YES | CITY-NF-13129; CITY-NF-13131; CITY-NF-13133; 13156; CITY-NF-13161-13164; CITY-NF-13170; CITY-NF-13171; CITY-NF-13184-13189; CITY-NF-13202; CITY-NF-13218; CITY-NF-13229; CITY-NF-13223-13225 |
| 3 | E-221919 | 1983 | 1 | Peter Saunders | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | NO | N/A | N/A | N/A | YES | ACB 005210; ACB 005215; ACB 005230; ACB 005222; ACB 005224 | YES | ACB 005214; ACB 005218-5219; ACB 005225-5226 |
| 4 | E-277036 | 1983 | 4 | Ramiro Rodriguez | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 005244-5245 | NO | 7 Handwritten notes in file, 0 listed on Inventory | YES | ACB 005307; ACB 005339-5340; ACB 005346-5352; ACB 005354; ACB 005356-5358 | YES | ACB 005309 |
| 5 | E-348611 | 1983 | 4 | George Davis | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 005404-5405 | NO | Supp Report/Line Up Report (ACB 005307-5368) | NO | N/A | NO | N/A |
| 6 | E-393970 | 1983 | 4 | Edwardo Celedon | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 005408-5409 | NO | 14 GPRs in file, 4 listed on Inventory; 13 Handwritten notes in file, 0 listed on Inventory; 3 To-from memos, 1 listed on inventory | YES | ACB 005442-5443; ACB 005455; ACB 005460-5461; ACB 005525-5526; ACB 005552; ACB 005559-5560 | YES | ACB 005410; ACB 005414; ACB 005463; ACB 005474; ACB 005527; ACB 005554; ACB 005557; ACB 005562 |
| 7 | E-399564 | 1983 | 4 | Serafin Flores, Rafael Rodriguez | YES | YES | ACB 005572-73; ACB 005578; ACB 005581; ACB 005586; ACB 005589-90; ACB 005593; ACB 005595; ACB 005601-11; ACB 005618-19; ACB 005622; ACB 005627; ACB 005635; ACB 005644; ACB 005656; ACB 005656-57; ACB 005656-563; ACB 005675-84; ACB 005693-699; ACB 005693-699; ACB 005759-719; ACB 005759-78; ACB 005686 | YES | YES | NO | N/A | YES | *ACB 005586 *ACB 005808 *ACB 005527 *ACB 005686 | NO | N/A | YES | ACB 005574-77 | NO | 23 GPRs in file, 19 listed on inventory; 9 Handwritten notes in file, 0 listed on Inventory; 1 To-from memo, 0 listed on Inventory | YES | ACB 005586; ACB 005608; ACB 005623; ACB 00 5650-5652; ACB 005666; ACB 005686; ACB 005599; ACB 005765-5776 | YES | ACB 005599 |

1 of 62

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| IDENTIFYING INFORMATION | | | | PERMANENT RETENTION FILE COMPARISON — Items in the Investigative File missing from the Permanent Retention File | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS A PERMANENT RETENTION FILE BEEN PRODUCED? | IS THE INVESTIGATIVE FILE INVENTORY IN THE PERMANENT RETENTION FILE? | DOES THE INVENTORY IN THE PERMANENT RETENTION FILE MATCH THE INVENTORY IN THE BASEMENT FILE? | ARE THE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS TO-FROM MEMOS | OTHER INVESTIGATIVE MATERIAL FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE |
| 1 | E-010765 | 1983 | 4 | Cecil Robinson | YES | NO | N/A | YES | Area Central Basement 0000065; Area Central Basement 0000069-70; Area Central Basement 0000078 | YES | Area Central Basement 0000067; Area Central Basement 0000069; Area Central Basement 0000070; Area Central Basement 0000071; Area Central Basement 0000076; Area Central Basement 0000078; Area Central Basement 0000091 | YES | Area Central Basement 0000063; Area Central Basement 0000081 | Area Central Basement 0000050-54; Area Central Basement 0000059; Area Central Basement 0000086-89; Area Central Basement 0000066; Area Central Basement 0000073; Area Central Basement 0000064; Area Central Basement 0000094-95; Area Central Basement 0000067; Body Diagram (Area Central Basement 0000026); Arrest Report (Area Central Basement 0000039; Area Central Basement 0000040); Area Central Basement 0000084; Issued Stamp (Area Central Basement 0000039); Witness Statement (Area Central Basement 0000041-42); Request for Latent Fingerprint Comparison (Area Central Basement 0000084; Area Central Basement 0000072); Fingerprint Result (Area Central Basement 0000074); Lab Report (Area Central Basement 0000048; Area Central Basement 0000049-56); Latent Fingerprint Exam. Report (Area Central Basement 0000049; Area Central Basement 0000077); Case Report (Area Central Basement 0000057-58; Area Central Basement 0000060-61); Major Crime Worksheet (Area Central Basement 0000082); Attorney Letter (Area Central Basement 0000082); Business Card (Area Central Basement 0000092-93) |
| 2 | E-026792 | 1983 | 1 | Derrick Kees; William Doyle; JL Houston; Edgar Cooksey; Jackie Clay | YES | NO | N/A | YES | CITY-NF-13125-13127; CITY-NF-13167-13168; CITY-NF-13172-13208-13210; CITY-NF-13216-13219 | YES | CITY-NF-13129; CITY-NF-13130-13131; CITY-NF-13155-13156; CITY-NF-11152; CITY-NF-11155; CITY-NF-11157-11158; CITY-NF-11176; CITY-NF-11178; CITY-NF01191-13193; CITY-NF-13195; CITY-NF-13211 | YES | CITY-NF-13228-13229; CITY-NF-13128-13129; CITY-NF-13130-13131; CITY-NF-11155; CITY-NF-13161-13164; CITY-NF-13170; CITY-NF-13184-13189; CITY-NF-13202; CITY-NF-13218; CITY-NF-13220; CITY-NF-13223-13225 | CITY-NF-13196-13201; CITY-NF-13228-13229; CITY-NF-13206-13207; CITY-NF-13232; CITY-NF-13231; CITY-NF-13232; Inv. File Control (CITY-NF-13119); Form 101 (CITY-NF-11133; CITY-NF-13227); Major Crime Worksheet (CITY-NF-13134; CITY-NF-13204-13205); Case Report (CITY-NF-13136; CITY-NF-13138-13141; CITY-NF-13147-13149; CITY-NF-13152-13153); Supp Report (CITY-NF-13142-13146; CITY-NF-13150-13151); Grand Jury Subp (CITY-NF-13154; CITY-NF-13226); Major Gang Incident Report (CITY-NF-13157-13158; CITY-NF-13221-13222); Shoo/Serious Incident Report (CITY-NF-13159-13160); Secretary of State Letter (CITY-NF-13165-13166); Polygraph Case Report (CITY-NF-13190); Release of Person in Custody (CITY-NF-13213) |
| 3 | E-221919 | 1983 | 1 | Peter Saunders | YES | N/A | N/A | YES | ACB 005217 | YES | ACB 005210; ACB 005215; ACB 005220; ACB 005222; ACB 005224 | YES | ACB 005214; ACB 005218-5219; ACB 005225-5226 | ACB 005207; ACB 005208; ACB 005209; ACB 005221; ACB 005223; Copy of Envelope (ACB 005206); Business Card (ACB 005211-5212); Inv. File Control (ACB 005213); Chicago Patrolmen's Assoc. (ACB 005216; ACB 005238-5239); Supp Report (ACB 005240-5242) |
| 4 | E-277036 | 1983 | 4 | Ramiro Rodriguez | YES | NO | N/A | YES | ACB 005317-5338 | YES | ACB 005307; ACB 005336-5340; ACB 005346-5352; ACB 005354; ACB 005356-5358 | YES | ACB 005309 | ACB 005287-5292; ACB 005311; ACB 005353; ACB 005338-5340; ACB 005345-5352; ACB 005355-5358; ACB 005360; ACB 005309-5296; ACB 005302-5366; ACB 005385-5388; ACB 005293-5296; ACB 005303-5305; ACB 005363; Supp Report (ACB 005341-5355; ACB 005274-5277); Case Report with Handwritten notes (ACB 005278-5279); Letter to FBI (ACB 005281-5282); Daily Major Incident Log (ACB 005283-5284); Stop Order (ACB 005286); Arrest Report (ACB 005297); Form 101 (ACB 005298); Fingerprint Sheet (ACB 005299-5301; ACB 005310); Commanding Officer Notice Form (ACB 005308); Clear Data Warehouse (ACB 005312); Witness Statement (ACB 005313-5316); Copy of Envelope (ACB 005344); Business Card (ACB 005355) |
| 5 | E-348611 | 1983 | 4 | George Davis | YES | YES | YES | NO | N/A | NO | N/A | NO | N/A | Form 101 (ACB 005366); Supp Reports (ACB 005367-5368) |
| 6 | E-395970 | 1983 | 4 | Edwardo Caledon | YES | NO | N/A | YES | ACB 005415; ACB 005441; ACB 005442-5453; ACB 005457-5459; ACB 005525-5526; ACB 005549-5550; ACB 005556-5558 | YES | ACB 005442-5443; ACB 005455; ACB 005460-5461; ACB 005552; ACB 005559-5560 | YES | ACB 005410; ACB 005414; ACB 005474; ACB 005527; ACB 005554; ACB 005563 | ACB 005430-5435; ACB 005507-5512; ACB 005447; ACB 005451; ACB 005534; ACB 005547-5548; ACB 005448; ACB 005528; ACB 005555-5557; ACB 005456; ACB 005498-5499; ACB 005505; ACB 005574; Case Assignment Slip (ACB 005407); Arrest Report (ACB 005412); ACB 005570; Form 101 (ACB 005413; ACB 005429; ACB 005419; ACB 005471); ACB 005494-5495; ACB 005497; ACB 005555; ACB 005536; ACB 005529; ACB 005567; ACB 005540-5545; ACB 005476; ACB 005489-5493; ACB 005539; AT&T Bill (ACB 005417-5424); Stop Order (ACB 005425-5428; ACB 005430; ACB 005546); ACB 005502-5505; ACB 005513; ACB 005546); Grand Jury Subp (ACB 005436; ACB 005496); Material Submitted for Daily Bulletin (ACB 005438; ACB 005517); Arrest Warrant (ACB 005439; ACB 005512); Latent Fingerprint Exam. Report (ACB 005444; ACB 005470); ACB 005511; Body Diagram (ACB 005449; ACB 005545); Arrest Information Card (ACB 005454; ACB 005551); Major Crime Worksheet (ACB 005462; ACB 005555; ACB 005561); Emergency Room Record (ACB 005464; ACB 005563); Illinois Bell Records (ACB 005482-5495); Wasted Card (ACB 005499); Inv. File Control (ACB 005571) |
| 7 | E-399564 | 1983 | 4 | Serafin Flores; Rafael Rodriguez | YES | YES | YES | YES | ACB 005652; ACB 005594-5598; ACB 005665-5669; ACB 005701-5705; ACB 005748-5755 | YES | ACB 005586; ACB 005623; ACB 005650; ACB 005652; ACB 005666; ACB 005686; ACB 005729; ACB 005765-5776 | YES | ACB 005599 | ACB 005612-5617; ACB 005629-5630; ACB 005647-5649; ACB 005653-5655; ACB 005712-5734; ACB 005600; ACB 005620-5621; ACB 005670-5671; ACB 005738-5770; ACB 005597; ACB 005612; ACB 005612; ACB 005646; ACB 005537; Case Assignment Slip (ACB 005575); Form 101 (ACB 005581; ACB 005605); Fingerprint Sheet (ACB 005583-5584; ACB 005636); Towed Vehicle Disposition (ACB 005587-5588; ACB 005591); Latent Fingerprint Exam. Report (ACB 005592; ACB 005628); Stop Order (ACB 005624-5627; ACB 005611; ACB 005672-5674; ACB 005733; ACB 005746); Wasted Card (ACB 005633); Arrest Warrant (ACB 005605; ACB 005687; ACB 005689-5690); Complaint (ACB 005606); Vehicle Tow Report (ACB 005708); Body Diagram (ACB 005704); Report (car call) (ACB 005707); Arrest Report (ACB 005720-5731; ACB 005736; ACB 005747); Inv. File Control (ACB 005706) |

HOOD 038925
Weston 053942

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| IDENTIFYING INFORMATION | | | | CRIMINAL DEFENSE ATTORNEY FILE COMPARISON — Items in the Investigative File missing from the Criminal Defense Attorney File | | | | | | | | | | | INVESTIGATIVE FILE INFORMATION | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS CRIMINAL DEFENSE ATTORNEY FILE BEEN PRODUCED? | ARE INVESTIGATIVE MATERIALS MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING INVESTIGATIVE MATERIALS | DOES THE DEFENSE ATTORNEY FILE CONTAIN AN INVENTORY SHEET? | DOES THE INVENTORY SHEET IN THE DEFENSE ATTORNEY FILE MATCH THE INVENTORY SHEET IN THE BASEMENT FILE? | ARE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | DOES THE BASEMENT FILE INCLUDE AN INVENTORY? | BATES NUMBER FOR INVENTORY | IS THE INVENTORY COMPLETE? | EXAMPLES OF ITEMS MISSING FROM INVENTORY | ARE THERE HANDWRITTEN NOTES IN THE FILE? | BATES NUMBERS FOR HANDWRITTEN NOTES | ARE THERE TO-FROM MEMOS IN THE FILE? | BATES NUMBERS FOR TO-FROM MEMOS |
| 8 | E-442815 | 1983 | 1 | Kevin Truitt | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | NO | N/A | N/A | N/A | YES | ACB 005798; ACB 005852-5855; ACB 005887-5892; ACB 005910-5924 | YES | ACB 005838-5839; ACB 005880; ACB 005925 |
| 9 | E-475100 | 1983 | 1 | Joseph Walker | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | NO | N/A | N/A | N/A | YES | ACB 005948-5963; ACB 005967; ACB 005976-5977; ACB 005980; ACB 005986-5988; ACB 006003; ACB 006007; ACB 006010; ACB 006015; ACB 006017; ACB 006021 | YES | ACB 005989-5997; ACB 006000; ACB 006004-6005; ACB 006009; ACB 006011; ACB 006023; ACB 006027; ACB 006029 |
| 10 | F-048933 | 1984 | 4 | Christino Garcia | YES | YES | ACB 006051; ACB 006055; ACB 00607(ACB 006118-19; ACB 006122-25; ACB 006083; ACB 006096; ACB 006115; ACB 006120-21; ACB 006126-65; | YES | YES | NO | | YES | ACB 006051; ACB 006055; ACB 006083; ACB 006096; ACB 006115; ACB 006148 | YES | ACB 006150 | YES | ACB 006038 -6039 | NO | 6 Handwritten notes in file, 0 listed on Inventory; 2 To-from memos in file, 0 listed on Inventory | YES | ACB 006051; ACB 006083; ACB 006085; ACB 006096; ACB 006115 | YES | ACB 006072; 006150 |
| 11 | F-173852 | 1984 | 3 | Jose Rodriguez | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 006168 | NO | Arrest Info Card (6186); 3 Court Attendance sheets in file, 1 listed on Inventory | YES | ACB 006206-08 | NO | N/A |
| 12 | F-177096 | 1984 | 4 | Byron Hammons | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 006213 | NO | 19 pages of GPRs/Handwritten notes in file, 13 pages of Notes/GPRs on Inventory | YES | ACB 006222; ACB 006253; ACB 006255; ACB 006284 | NO | N/A |
| 13 | F-229020 | 1984 | 3 | James Grant | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 090457 - 90459 | NO | 18 GPRs in file, 17 listed on Inventory; 21 Handwritten notes in file, 14 listed on Inventory; 2 To-from memos in file, 0 listed on Inventory | YES | ACB 090482-90483; ACB 090491; ACB 090506; ACB 090517; ACB 090545-90548; ACB 090550-90553; ACB 090571-90573; ACB 090579-90580; ACB 090588; ACB 090590; ACB 090592; ACB 090598; ACB 090614-90615 | YES | ACB 090595 |
| 14 | F-229039 | 1984 | 1 | Richard Phillips | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | NO | N/A | N/A | N/A | NO | N/A | NO | N/A |

HOOD 038926
Weston 053943

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| | | | | IDENTIFYING INFORMATION | | PERMANENT RETENTION FILE COMPARISON | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **Items in the Investigative File missing from the Permanent Retention File** | | | | | | |
| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS A PERMANENT RETENTION FILE BEEN PRODUCED? | IS THE INVESTIGATIVE FILE INVENTORY IN THE PERMANENT RETENTION FILE? | DOES THE INVENTORY IN THE PERMANENT RETENTION FILE MATCH THE INVENTORY IN THE INVESTIGATIVE FILE? | ARE THE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | OTHER INVESTIGATIVE MATERIAL FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE |
| 8 | 1983 | 1 | Kevin Trusit | YES | N/A | N/A | NO | N/A | YES | ACB 005798; ACB 005852-5855; ACB 005887-5892; ACB 005910-5924 | YES | ACB 005838-5839; ACB 005880; ACB 005925 | ACB 005879; ACB 005933-5896; ACB 005900-5925; ACB 005863; ACB 005865-5867; ACB 005885 <br> Grand Jury Subp (ACB 005840-5843; ACB 005872) <br> Form 101 (ACB 005844-5848; ACB 005870-5871) <br> Phone Records (ACB 005849-5851) <br> Vehicle Tow Report (ACB 005859-5860; ACB 005861-5884) <br> Teletype Message (ACB 005861-5862) <br> Stop Order (ACB 005864; ACB 005886) <br> Latent Fingerprint Exam Report (ACB 005868-5869) <br> Daily Bulletin (ACB 005873-5878) <br> Crime Analysis Pattern (ACB 005891) <br> Copy of Envelope (ACB 005898-5899) <br> Case Report (ACB 005926-5927) <br> Supp Report (ACB 005928-5931) |
| 9 | 1983 | 1 | Joseph Walker | YES | N/A | N/A | YES | ACB 005973; ACB 005979-5984; ACB 005994; ACB 005998-6002; ACB 006014-6020 | YES | ACB 005948-5963; ACB 005967; ACB 005970-5977; ACB 005980; ACB 005986-5988; ACB 006003; ACB 006007; ACB 006013; ACB 006015; ACB 006021 | YES | ACB 005989-5997; ACB 006000; ACB 006004-6005; ACB 006009; ACB 006011; ACB 006023; ACB 006027; ACB 006028 | ACB 005933-5934; ACB 005960-5966; ACB 005966; ACB 005974-5975; ACB 006022 <br> ID Cards (ACB 005935-5942) <br> Bank cards (ACB 005943-5946) <br> Business card (ACB 005947) <br> Supp Report (ACB 005968-5969; ACB 005971-5972) <br> Case Report (ACB 005970) <br> Release of Person in Custody (ACB 005978) <br> Major Crime Worksheet (ACB 005985; ACB 006028) <br> Calendar (ACB 006012-6013) |
| 10 | 1984 | 4 | Christine Garcia | NO | N/A | N/A | YES | ACB 006080; ACB 006106 – 6114; ACB 006116 | YES | ACB 006051; ACB 006083; ACB 006096; ACB 006115 | YES | ACB 006072 | ACB 006065 – 6069; ACB 006052 - 6053; ACB 006056; ACB 006090; ACB 006130 - 6121 <br> ACB 006118 - 6119; ACB 006050; ACB 006095; General Offense Case Report; ACB 006040; Supplementary Report - ACB 006042-6043; ACB 006045 – 6048; ACB 006062; Request for Latent Fingerprint Comparison: ACB 006069; Typed Record: ACB 006064; 101's; ACB 006071; ACB 006075; Grand Jury Subpoena: ACB 006074; Daily bulletin: ACB 006077; Daily fact sheet: ACB 006078; Latent Fingerprint Examination Report: ACB 006081; Request for Fingerprint Comparison: ACB 006082; Material Submitted for use in the daily bulletin: ACB 006084; Stop Order Cancellation Request: ACB 006086 – 6087; Body Diagram: ACB 006098; City of Chicago, Department of Police envelope: ACB 006117; Illinois Driver's license: ACB 006122; Typed attorney contact information: ACB 006123; Investigative File Control: ACB 006124 – 6125; ACB 006165; Vehicle status record: ACB 006126 - 6130; Secretaria De Relaciones Exteriores Envelope and letter: ACB 006139 – 6141; Phone service and equipment print out: ACB 006142 - 6147; Business Card: ACB 006148 – 6149; Typed Memo: ACB 006150; Forensic invoice: ACB 006151 - 6152; State of Illinois office of the Secretary of State certificate: ACB 006153; Vehicle certificate of title: ACB 006154; ACB 006157 - 6159; Affidavit: ACB 006155; Certified copy of title history covering: ACB 006160 - 6164 |
| 11 | 1984 | 3 | Jose Rodriguez | YES | N/A | N/A | YES | ACB 006200 – 6205; ACB 006209 – 6211 | YES | ACB 006206-08 | NO | N/A | ACB 006180 – 6184; ACB 006191 – 6193; ACB 006196; ACB 006197 - 6198; Major Crime Worksheet; ACB 006199 <br> Investigation File Control; ACB 006170 <br> Court Attendance Report: ACB 006179; ACB 006185; ACB 006188 <br> Arrest Information: ACB 006186 <br> Arrest Report: ACB 006189 <br> 101s: ACB 006190 <br> Latent Fingerprint Exhibit: ACB 006194 – 6195 |
| 12 | 1984 | 4 | Byron Hammons | YES | NO | N/A | YES | ACB 006232; ACB 006244; ACB 006254; ACB 006270; ACB 006281 – 6283; ACB 006285 – 6291 | YES | ACB 006222; ACB 006253; ACB 006255; ACB 006284 | NO | N/A | ACB 006216 – 6220; ACB 006275; ACB 006276; ACB 006251; ACB 006272; ACB 006273 – 6274; ACB 006268 - 6269; ACB 006221; ACB 006233; ACB 006246; ACB 006271; <br> Supplementary Report: ACB 006259 <br> CPD report: ACB 006227 <br> Court Attendance Report: ACB 006228 <br> Body Diagram: ACB 006231 <br> Statement: ACB 006242 – 6243 <br> Arrest Warrant: ACB 006245 <br> 301s: ACB 006277 <br> Arrest Report: ACB 006278 <br> Statement: ACB 006279 – 6280 <br> Investigative File Control: ACB 006292 |
| 13 | 1984 | 3 | James Grant | YES | NO | N/A | YES | ACB 090475 – 90481; ACB 090484; ACB 090544; ACB 090554; ACB 090574 – 90577; ACB 090581; ACB 090586 | YES | ACB 090482-90483; ACB 090491; ACB 090506; ACB 090517; ACB 090545-90553; 90548; ACB 090565-90553; 90565; ACB 090566-90565; 90568; ACB 090579-90580; ACB 090588; ACB 090596; ACB 090592; ACB 090595; 090614-90615 | YES | ACB 090595 | ACB 090496 – 90501; ACB 090473; ACB 090474; ACB 090495; ACB 090509 – 90510; ACB 090513 – 90514; ACB 090558; ACB 090603 – 90613; ACB 090560; ACB 090570; ACB 090582 – 90585; ACB 090594; ACB 090584; ACB 090556; ACB 090580; <br> ACB 090562; ACB 090561; ACB 090558; ACB 090585 <br> Case Assignment Slip: ACB 090460 <br> Arrest Report: ACB 090485; ACB 090486; ACB 090487; ACB 090508; ACB 090594 <br> Arrest Information/Chicago Police: ACB 090489; ACB 090570 <br> Latent Fingerprint Examination Report: ACB 090492 <br> Stop Order or Cancellation Request: ACB 090502 – 90505 <br> Court Attendance Report: ACB 090507; ACB 090571-00718; 90508 <br> Receipt for Exhibits: ACB 090515; ACB 090516 <br> Permit Items Slip: ACB 090518 <br> CPD form: ACB 090521; ACB 090525 <br> Case Report: ACB 090527; ACB 090528; ACB 090529 – 90530 <br> Misdemeanor Complaint: ACB 090549 <br> Major Crime Worksheet: ACB 090578 <br> Typed Memo: ACB 090590; ACB 090600 <br> Identification Index: ACB 090593 <br> Response to Defendant's Memo to Dismiss: ACB 090596 <br> Chicago Police Intra-Departmental Mail Envelope: ACB 090602 |
| 14 | 1984 | 1 | Richard Phillips | YES | N/A | N/A | YES | ACB 006316 | NO | N/A | NO | N/A | Arrest Report: ACB 006313; ACB 006314 <br> 101's: ACB 006315 <br> General Offense Case Report: ACB 006317 |

4 of 82 <br> HOOD 038927 <br> Weston 053944

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS CRIMINAL DEFENSE ATTORNEY FILE BEEN PRODUCED? | ARE INVESTIGATIVE MATERIALS MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING INVESTIGATIVE MATERIALS | DOES THE DEFENSE ATTORNEY FILE CONTAIN AN INVENTORY SHEET? | DOES THE INVENTORY SHEET IN THE DEFENSE ATTORNEY FILE MATCH THE INVENTORY SHEET IN THE BASEMENT FILE? | ARE GENERAL PROGRESS REPORTS FROM THE BASEMENT DEFENSE FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | DOES THE BASEMENT FILE INCLUDE AN INVENTORY? | BATES NUMBER FOR INVENTORY | IS THE INVENTORY COMPLETE? | EXAMPLES OF ITEMS MISSING FROM INVENTORY | ARE THERE HANDWRITTEN NOTES IN THE FILE? | BATES NUMBERS FOR HANDWRITTEN NOTES | ARE THERE TO-FROM MEMOS IN THE FILE? | BATES NUMBERS FOR TO-FROM MEMOS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 15 | F-277122 | 1984 | 1 | Robert Davis Darryll Reid | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 006321 – 6323; ACB 006466 -6467 | NO | 14 GPRs in file, 12 listed on inventory; 6 Handwritten notes in file, 0 listed on inventory | YES | ACB 006347; ACB 006349; ACB 006350; ACB 006368; ACB 006407 | NO | N/A |
| 16 | F-299912 | 1984 | 3 | Armando Valdez, Javier Garcia | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 006514 | NO | 6 Handwritten notes in file, 3 listed on inventory | YES | ACB 006576; ACB 006580; ACB 006585-87; ACB 006589; ACB 006595 | NO | N/A |
| 17 | F-308281 | 1984 | 3 | Joe Menoxen | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 006614-6615 | NO | 14 GPRs in file, 13 listed on inventory; 4 Handwritten notes in file, 3 listed on inventory | YES | ACB 006639; ACB 006658 | NO | N/A |
| 18 | F-336114 | 1984 | 3 | Elroy Morgan | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 006919-6921 | NO | 19 Handwritten notes in file, 13 listed on inventory | YES | ACB 006922-23; ACB 006952-53; ACB 006959; ACB 006992; ACB 006996; ACB 007003-05; ACB 007007; ACB 007009-10; ACB 007022; ACB 007033 | YES | ACB 006986 |
| 19 | F-380662 | 1984 | 4 | Lindsay Cannon | YES | YES | ACB 007075-77; ACB 007087; ACB 007123; ACB 007137; ACB 007141-44; ACB 007158; ACB 007171-96 | NO | N/A | YES | ACB 00 7179 - 7180 | NO | N/A | NO | N/A | YES | ACB 007075 | NO | 6 Handwritten notes in file, 0 listed on inventory | YES | ACB 007135; ACB 007140 | NO | N/A |
| 20 | F-430186 | 1984 | 1 | Terrance Brown | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | NO | N/A | N/A | N/A | YES | ACB 007310; ACB 007312; ACB 007328; ACB 007330 | YES | ACB 007307 |

HOOD 038928
Weston 053945

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| | IDENTIFYING INFORMATION | | | | PERMANENT RETENTION FILE COMPARISON *Items in the Investigative File missing from the Permanent Retention File* | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS A PERMANENT RETENTION FILE BEEN PRODUCED? | IS THE INVESTIGATIVE FILE INVENTORY IN THE PERMANENT RETENTION FILE? | DOES THE INVENTORY IN THE PERMANENT RETENTION FILE MATCH THE INVENTORY IN THE BASEMENT FILE? | ARE THE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | OTHER INVESTIGATIVE MATERIAL FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE |
| 15 | F-277122 | 1984 | 1 | Robert Davis Darryll Reid | YES | NO | N/A | YES | ACB 006360 - 6367; ACB 006369 - 6372; ACB 006398; ACB 006403 | YES | ACB 006547; ACB 006549; ACB 006556; ACB 006566; ACB 006407 | NO | N/A | ACB 006329 - 6334; ACB 006489; ACB 006402; ACB 006408; ACB 006409 - 6410; ACB 006411; ACB 006412; ACB 006413; ACB 006414; ACB 006416; ACB 006415; ACB 006401; ACB 006541; ACB 006542; ACB 006544; ACB 006557; ACB 006405; ACB 006406; ACB 006417; ACB 006469 - 6473; ACB 006475 - 6481; ACB 006489 - 6493; ACB 006494 - 6496; ACB 006496; ACB 006497 - 6519; ACB 006345; Court Attendance Report: ACB 006324 - 6328; ACB 006335 - 6339; ACB 006356; ACB 006359 Investigative Request to the Chicago Police Department Crime Lab: ACB 006340 Firearms work sheet: ACB 006343 Request for Latent Fingerprint Comparison: ACB 006346 Firearms Receipt & Worksheet: ACB 006348 Latent Fingerprint Examination Report: ACB 006352; ACB 006353 Statement: ACB 006361 - 6397; ACB 006408 - 6429; ACB 006430 - 6431; ACB 006432; ACB 006433 - 6445; ACB 006446 - 6447; ACB 006448 - 6449 Stop Order/Missing Person pinout: ACB 006390; ACB 006404 Juvenile Field Arrest Report: ACB 006450 Arrest Report: ACB 006451 General offense case report: ACB 006452 - 6453 Chicago Police Item Departmental Mail Envelope: ACB 006468 Envelope: ACB 006474; ACB 006482; ACB 006492 |
| 16 | F-299912 | 1984 | 3 | Armando Valdez, Javier Garcia | YES | NO | N/A | YES | ACB 006590 - 6594 | YES | ACB 006576; ACB 006580; ACB 006586-87; ACB 006589; ACB 006595 | NO | N/A | ACB 006578; ACB 006583; ACB 006544; ACB 006579; ACB 006584; ACB 006561X - 6524; ACB 006611 ACB 006597 - 6610; ACB 006523; ACB 006581; Major Crime Worksheet: ACB 006588 Investigative File Control: ACB 006558 Court Attendance Report: ACB 006526 - 6527; ACB 006540 - 6941 Order: ACB 006557 Statement: ACB 006567 - 6556; ACB 006557 - 6568 Latent Fingerprint Examination Report: ACB 006569; ACB 006571 Case Assignment Slip: ACB 006570 Arrest Report: ACB 006572 - 6573 Vehicle Tow Report: ACB 006574 Criminal Investigation Division form: ACB 006577 Receipt for Exhibit: ACB 006581 - 6582 Chicago Police Intra-Departmental Mail Envelope: ACB 006596 |
| 17 | F-308281 | 1984 | 3 | Joe Metoxen | YES | YES | YES | YES | ACB 006656 - 6657; ACB 006659 - 6661; ACB 006664 - 6665; ACB 006667 - 6669; ACB 006672 - 6675 | YES | ACB 006639; ACB 006658 | NO | N/A | ACB 006670 - 6671; ACB 006654; ACB 006640; ACB 006666; ACB 006619; ACB 006635; ACB 006635; ACB 006638 Case Assignment Slip: ACB 006617 Investigative File Control: ACB 006618 Court Attendance Report: ACB 006664 - 6665; ACB 006672 - 6675 Report: ACB 006630 - 6631; ACB 006642 - 6633 Latent Fingerprint Examination Report: ACB 006637 Statement: ACB 006642 - 6655 Vehicle Tow Report: ACB 006662 |
| 18 | F-336114 | 1984 | 3 | Elroy Morgan | YES | YES | YES | YES | ACB 006987 - 6991; ACB 006993 - 6995; ACB 006997 - 7002 | YES | ACB 006922-23; ACB 006952-53; ACB 006959; ACB 006992; ACB 006996; ACB 007003-05; ACB 007007; ACB 007009-19; ACB 007022; ACB 007033 | YES | ACB 006986 | ACB 006933 - 6936; ACB 007020 - 7021; ACB 006958; ACB 006984; ACB 006985; ACB 006937; ACB 006968; ACB 006974; ACB 006975 - 6976; ACB 007038 - 7051; ACB 007054 - 7064; ACB 007072 ACB 007065 - 7071; AB 006938; ACB 006971; ACB 006973; ACB 006976; ACB 006981; ACB 007054 - 7064; AB 007024; ACB 007025 Investigative File Control: ACB 006924 Major Crime Worksheet: ACB 006960 Arrest Report: ACB 006969; ACB 007026; ACB 007027 Arrest Information: ACB 006970; ACB 006973; ACB 006977; ACB 006962; ACB 007028 30('s): ACB 006972 Supplementary Report: ACB 007006; ACB 007008; ACB 007023 Court Attendance Report: ACB 007019 Fingerprint form: ACB 007029 - 7032 Chicago Police Intra-Departmental Mail Envelope: ACB 007034 Envelope: ACB 007035 - 7036 Business Card: ACB 007037 Driver's License: ACB 007052 - 7053 Soundex Page Response: ACB 007073 |
| 19 | F-380662 | 1984 | 4 | Lindsey Cannon | YES | NO | N/A | YES | ACB 007106 - 7118; ACB 007145 - 7146; ACB 007152 - 7156; ACB 007167; ACB 007179 - 7180 | YES | ACB 007135; ACB 007160 | NO | N/A | ACB 007088 - 7092; ACB 007105; ACB 007096; ACB 007147; ACB 007119; ACB 007120; ACB 007161 - 7162; ACB 007087; ACB 007121; ACB 007122; ACB 007103 - 7195; ACB 007182; ACB 007142; ACB 007171; ACB 007172 Receipt for Exhibit: ACB 007123 Statement: ACB 007124 - 7134 Arrest Report: ACB 007136; ACB 007137; ACB 007138; ACB 007141; ACB 007173; ACB 007174; ACB 007175; ACB 007176; ACB 007177; ACB 007178; ACB 007179 General Offense Case Report: ACB 007143 - 7144 Arrest Card: ACB 007143 - 7144 Body Diagram: ACB 007170 City of Chicago Envelope: ACB 007181 Investigative File Control: ACB 007166 |
| 20 | F-430186 | 1984 | 1 | Terrance Brown | YES | N/A | N/A | YES | ACB 007308; ACB 007309; ACB 007311; ACB 007319; ACB 007320 | YES | ACB 007310; ACB 007312; ACB 007328; ACB 007330 | YES | ACB 007307 | ACB 007315; ACB 007313; ACB 007316; ACB 007317 Arrest Report: ACB 007314 Arrest Information: ACB 007315 Field Inquiry Sheet: ACB 007327 Body Diagram: ACB 007315 - 7344 |

HOOD 038929
Weston 053946

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| | | | | HAS CRIMINAL DEFENSE ATTORNEY FILE BEEN PRODUCED? | ARE INVESTIGATIVE MATERIALS MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING INVESTIGATIVE MATERIALS | DOES THE DEFENSE ATTORNEY FILE CONTAIN AN INVENTORY SHEET? | DOES THE INVENTORY SHEET IN THE DEFENSE ATTORNEY FILE MATCH THE INVENTORY SHEET IN THE BASEMENT FILE? | ARE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | DOES THE BASEMENT FILE INCLUDE AN INVENTORY? | BATES NUMBER FOR INVENTORY | IS THE INVENTORY COMPLETE? | EXAMPLES OF ITEMS MISSING FROM INVENTORY | ARE THERE HANDWRITTEN NOTES IN THE FILE? | BATES NUMBERS FOR HANDWRITTEN NOTES | ARE THERE TO-FROM MEMOS IN THE FILE? | BATES NUMBERS FOR TO-FROM MEMOS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | | | | | | | | | | | | | | | | | | |
| 21 | F-445484 | 1984 | 4 | Louis Foster | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 007358 – 7359 | NO | 2 Handwritten notes in file, 0 listed on inventory; 1 To-from memo in file, 0 listed on inventory | YES | ACB 007361; ACB 007389; ACB 007391; ACB 007448 | NO | N/A |
| 22 | F-492465 | 1984 | 3 | Jose Estrada | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 007565-7567 | NO | 37 GPRs in file, 36 listed on inventory; 22 Handwritten notes in file, 20 listed on Inventory; 6 To-from memos in file, 0 listed on Inventory | YES | ACB 007624; ACB 007645; ACB 007651; ACB 007685; ACB 007715; ACB 007718-7720; ACB 007727-7731; ACB 007747 | YES | ACB 007625; ACB 007635-7656; ACB 007686 |
| 23 | G-011265 | 1985 | 1 | Leonard Williams | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 008829 | NO | 9 Handwritten notes in file, 1 listed on Inventory | YES | ACB 008849; ACB 008877; ACB 008888; ACB 008894; ACB 008896; ACB 008898; ACB 008900-008903; ACB 008904 | NO | N/A |
| 24 | G-011889 | 1985 | 1 | Earl Stademeyer | YES | YES | ACB 008911; ACB 008913; ACB 008941-42; ACB 008952; ACB 008971-78 | YES | NO - additional entries after 6/28/1985 (ACB 008911 in Inv. file; CRIM.DEF FILES - FIELDS 041036-41037 in PD file) | NO | N/A | YES | *ACB 008952 | YES | N/A | YES | ACB 008911 - 8912 | NO | 13 GPRs in file, 12 on inventory; 2 Handwritten notes in file, 0 listed on inventory; 4 To-from memos in file, 2 listed on inventory | YES | ACB 008917; ACB 008952 | YES | ACB 008951; ACB 008955; ACB 008968; ACB 008969 |
| 25 | G-014815 | 1985 | 1 | Guy Johns | YES | YES | ACB 008987; ACB 008989-90; ACB 008992; ACB 009007-09; ACB 009067; ACB 009091-93 | YES | NO - additional entries after 7/5/1985 (ACB 008986-8987 in Inv. file; CRIM.DEF FILE-FIELDS 047677-47678 in PD file) | NO | N/A | YES | ACB 008992; ACB 009067; ACB 009091 | NO | N/A | YES | ACB 008986 -8987 | NO | 19 GPRs in file, 12 listed on file; 7 Handwritten notes in file, 0 listed on inventory | YES | ACB 009006; ACB 009063; ACB 009067; ACB 009089; ACB 009091; ACB 009101; ACB 009103; ACB 009105 | NO | N/A |
| 26 | G-027619 | 1985 | 1 | Decco Brown | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 009114 | NO | 11 GPRs in file, 2 listed on file; 5 Handwritten notes in file, 0 listed on Inventory; 1 To-from memo in file, 0 listed on inventory | YES | ACB 009134; ACB 009136; ACB 009144; ACB 009166; ACB 009168; ACB 009170; ACB 009172 | YES | ACB 009128 |
| 27 | G-032161 | 1985 | 1 | Jerome Jackson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 009174 | NO | 1 Handwritten note in file, 0 listed on Inventory | YES | ACB 009207 | NO | N/A |
| 28 | G-049257 | 1985 | 1 | Joe Brooks | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 009422 | YES | N/A | NO | N/A | NO | N/A |

HOOD 038930
Weston 053947

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| | IDENTIFYING INFORMATION | | | PERMANENT RETENTION FILE COMPARISON — Items in the Investigative File missing from the Permanent Retention File | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS A PERMANENT RETENTION FILE BEEN PRODUCED? | IS THE INVESTIGATIVE FILE INVENTORY IN THE PERMANENT RETENTION FILE? | DOES THE INVENTORY IN THE PERMANENT RETENTION FILE MATCH THE INVENTORY IN THE BASEMENT FILE? | ARE THE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | OTHER INVESTIGATIVE MATERIAL FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE |
| 21 | F-445484 | 1984 | 4 | Louis Foster | YES | NO | N/A | YES | ACB 007386 – 7388; ACB 007390; ACB 007392 – 7394 | YES | ACB 007381; ACB 007391; ACB 007448 | NO | N/A | ACB 007362 – 7366; ACB 007370 – 7371; ACB 007410 – 7413; ACB 007420 - 7423; ACB 007372; ACB 007374; ACB 007368; ACB 007373; ACB 007380; Investigative File Control: ACB 007357; ACB 007425; Receipt for Exhibits: ACB 007367; Latent Fingerprint Examination Report: ACB 007369; Body Diagram: ACB 007379; Chem Memo: ACB 007395; ACB 007405; Original Case Incident Report: ACB 007396 – 7399; Case Supplementary Report: ACB 007399 – 7400; ACB 007403 – 7404; ACB 007406 – 7409; ACB 007414 – 7419; Envelope: ACB 007424; Saint Charles Youth Center: ACB 007426; Social Security Card: ACB 007427 – 7428; Talisman Manifaki card: ACB 007429 – 7430; Lottery Card: ACB 007431 – 7440; Delivery Reminder or Receipt: ACB 007441 – 7442; Business Card: ACB 007443; Chicago Boys Clubs membership card: ACB 007444 – 7449; Armando's card: ACB 007446; Taste of Chicago 50 cent value: ACB 007447 – 7449 |
| 22 | F-492465 | 1984 | 3 | Jose Estrada | YES | NO | N/A | YES | ACB 007623; 7676 – 7677; 7678 – 7679; 7680 – 7681; 7682; 7683; 7684; 7687 – 7688; 7689; 7690 – 7691; 7692 – 7693; 7694; 7695 – 7696; 7697; 7698; 7699; 7700; 7701; 7702; 7704; 7705; 7706; 7707; 7708; 7709; 7710; 7711; 7712; 7713; 7714; 7716; 7717; 7732; 7733; 7734 | YES | ACB 007624; ACB 007645; ACB 007651; ACB 007685; ACB 007715; ACB 007718 – 7720; ACB 007723 – 7731; ACB 007747 | YES | ACB 07625; ACB 07635 – 7636; ACB 07686 | Inventory Number 140820: ACB 007656; Inventory Number 150881 7681; Inventory Number 151602; 7662 – 7663; Inventory of things listed in Search form: 7664; ACB 007616 – 7617; 7657 – 7659; 7660; Person: ACB 007751 – 7764; 7766 – 7770; 7784; Scene: 7775 – 7783; ACB 007560 – 7570; 7650; 7665; 7738; 7739; Supplementary report: 7722 – 7724; 7725; 7735 – 7736; 7737; Case Assignment Slip: 7562; Inventory File Control: 7563 – 7567; Major Crime Worksheet: 7615; 7721; Statement: 7620 – 7622; 7646 – 7647; 7648; 7652 – 7654; 7669; 7623; 7628 – 7629; 7630 – 7631; 7632 – 7633; 7634; Illinois Vehicle Registration: 7645; Arrest Warrant: 7649; Fingerprints: 7642; 7671 – 7672; 7675; 7743 – 7746; Illinois Certificate of title of a vehicle: 7643 – 7644; Illinois Vehicle Registration: 7668; Orange-County Jail Pre Booking Record: 7689; 7673; Bica Police Department Certificate of Release: 7670; 7674; Arrest Report: 7740; 7741; Arrest Information: 7742; Chicago Police Intra-Departmental Mail: 7748; Envelope: 7749; Card: 7750; Illinois Driver's License: 7785; Soundex Page Response: 7785 |
| 23 | G-011265 | 1985 | 1 | Leonard Williams | YES | NO | N/A | YES | ACB 008887; ACB 008889; ACB 008890; ACB 008891; ACB 008892; ACB 008893; ACB 008895; ACB 008897; ACB 008899; ACB 008901 | YES | ACB 008909; ACB 008877; ACB 008888; ACB 008894; ACB 008896; ACB 008898; ACB 008900; ACB 008902; ACB 008904 | NO | N/A | Property Inventory #161750: 8847; Property Inventory #161755: 8848; Property Inventory #151274: 8861; Property Inventory #151275: 8862; Property Inventory #151274: 8863; Property Inventory #148620: 8905; 8930; 8864; 8906; Person/People: 8830; 8874; Investigative File Control: 8831; Court Attendance Report: 8832; Body Diagram: 8833; 8867; Statement: 8853 – 8860; 8868 – 8875; 101's: 8905; Vehicle Tow Report: 8909 |
| 24 | G-011889 | 1985 | 1 | Earl Stademeyer | YES | NO | N/A | YES | ACB 008915 – 8916; ACB 008918 – 8928 | YES | ACB 008917; ACB 008932 | YES | ACB 008951; ACB 008953; ACB 008968; ACB 008969 | 8929 – 89 42; Property Inventory #151278: 8971; Property Inventory #151280: 8972; Property Inventory #151281: 8973; Property Inventory #151283: 8974; Property Inventory #148621: 8975; Property Inventory #148622: 8970; Property Inventory #148623: 8977; Investigative File Control: 8913; Court Attendance Report: 8914; 8943; 8944; Release of Person in Custody: 8970; 101's: 8981; Search consent: 8982 |
| 25 | G-014813 | 1985 | 1 | Guy Johns | YES | NO | N/A | YES | ACB 009026 – 9030; ACB 009063 – 9064; ACB 009080 – 9087; ACB 009097; ACB 009100; ACB 009102; ACB 009104 | YES | ACB 009066; ACB 009065; ACB 009067; ACB 009069; ACB 009091; ACB 009099; ACB 009101; ACB 009103; ACB 009105 | NO | N/A | 9007 – 9009; 9041; Property Inventory #161748: 9066; Property Inventory #158040: 9094; Property Inventory #158041: 9095; Property Inventory #158042: 9096; 9025; 9050; 9090; Chicago Police Intra-Departmental Mail envelope: 8988; Investigative File Control: 8990; Latent Fingerprint Examination Report: 9010; 9035; Body Diagram: 9038 – 9040; 9092 – 9093; Receipt for Exhibits: 9088; Arrest Information: 9098 – 9099; 9112; Court Attendance Report: 9008 |
| 26 | G-027619 | 1985 | 1 | Decco Brown | YES | NO | N/A | YES | ACB 009133 – 9137; ACB 009163; ACB 009165; ACB 009167; ACB 009169; ACB 009171 | YES | ACB 009134; ACB 009138; ACB 009164; ACB 009166; ACB 009168; ACB 009172 | YES | ACB 009128 | 9119 – 9125; Property Inventory #165289: 9153; 9116; 9158; 9117; 9118; 9129; Investigative File Control: 9115; Court Attendance Report: 9141; Identification Check Procedure Control: 9127; To-From; Complaint for Preliminary Examination: 9150; Diagram: 9156 – 9157; Statement: 9161 – 9162 |
| 27 | G-032161 | 1985 | 1 | Jerome Jackson | YES | NO | N/A | NO | N/A | YES | ACB 009207 | NO | N/A | 9176 – 9181; Property Inventory #16482: 9205; Investigative File Control: 9175; Statement: 9205 – 9206; 101's: 9204 |
| 28 | G-049257 | 1985 | 1 | Joe Brooks | YES | NO | N/A | NO | N/A | NO | N/A | NO | N/A | 9426 – 9432; Property Inventory #167719: 9439; Investigative File Control: 9423; Court Attendance Report: 9425; Body Diagram: 9435 |

HOOD 038931
Weston 053948

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| IDENTIFYING INFORMATION | | | | CRIMINAL DEFENSE ATTORNEY FILE COMPARISON — Items in the Investigative File missing from the Criminal Defense Attorney File | | | | | | | | | | | INVESTIGATIVE FILE INFORMATION | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS CRIMINAL DEFENSE ATTORNEY FILE BEEN PRODUCED? | ARE INVESTIGATIVE MATERIALS MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING INVESTIGATIVE MATERIALS | DOES THE DEFENSE ATTORNEY FILE CONTAIN AN INVENTORY SHEET? | DOES THE INVENTORY SHEET IN THE DEFENSE ATTORNEY FILE MATCH THE INVENTORY SHEET IN THE BASEMENT FILE? | ARE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | DOES THE BASEMENT FILE INCLUDE AN INVENTORY? | BATES NUMBER FOR INVENTORY | IS THE INVENTORY COMPLETE? | EXAMPLES OF ITEMS MISSING FROM INVENTORY | ARE THERE HANDWRITTEN NOTES IN THE FILE? | BATES NUMBERS FOR HANDWRITTEN NOTES | ARE THERE TO-FROM MEMOS IN THE FILE? | BATES NUMBERS FOR TO-FROM MEMOS |
| 29 | G-051225 | 1985 | 1 | Jerry Mooden | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 009444 | NO | 12 GPRs in file, 1 listed on Inventory; 8 Handwritten notes in file, 0 listed on Inventory | YES | ACB 009467; ACB 009469; ACB 009471; ACB 009483; ACB 009485; ACB 009507 | NO | N/A |
| 30 | G-056199 | 1985 | 1 | Maria Martin | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 009514 | NO | 10 GPRs in file, 9 listed on Inventory | NO | N/A | NO | N/A |
| 31 | G-087375 | 1985 | 1 | Ronald Jones | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 009669 - 9671 | NO | 27 GPRs in file, 22 listed on Inventory; 23 Handwritten notes in file, 1 listed on Inventory; 6 To-from memos in file, 0 listed on Inventory | YES | ACB 009676; ACB 009683-85; ACB 009687; ACB 009694-95; ACB 009699; ACB 009701; ACB 009708-09; ACB 009713; ACB 009715; ACB 009723; ACB 009727-9728; ACB 009730; ACB 009743-43; ACB 009746; ACB 009748; ACB 009756-57; ACB 009768-69; ACB 009781-81; ACB 009787-92; ACB 009796; ACB 009799-800; ACB 009820-22; ACB 009824-25; ACB 009831; ACB 009869-50; ACB 009867; ACB 009877; ACB 009886; ACB 009889-91; ACB 009896; ACB 009896-99; ACB 009906-07; ACB 009927-33; ACB 009949; ACB 009959; ACB 0010007; ACB 0010061; ACB 0010072; ACB 0010085; ACB 0010087 | Yes | ACB 0010053 |
| 32 | G-106586 | 1985 | 1 | Alice Hamilton | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 010097 - 10098 | NO | 13 GPRs in file, 5 listed on Inventory; 2 To-from memos in file, 1 listed on Inventory | YES | ACB 010124; ACB 010127; ACB 010175 | YES | ACB 010108 |
| 33 | G-108642 | 1985 | 1 | Roscoe Evans | YES | YES | ACB10441-43; ACB10453; ACB10459; ACB10462-65; ACB10469; ACB10471; ACB10473; ACB10486; ACB10499; ACB10529; ACB10537 | NO | N/A | NO | N/A | YES | ACB 010499; ACB 010529; ACB 010537 | YES | ACB 010462; ACB 010463 | YES | ACB 010441 - 10442 | NO | 21 Handwritten notes in file, 8 listed on Inventory; 3 To-from memos in file, 0 listed on Inventory | YES | ACB 010446; ACB 010470; ACB 010475; ACB 010494-97; ACB 010529; ACB 010537; ACB 010548-55 | YES | ACB 010462; ACB 010493; ACB 010463 |

HOOD 038932
Weston 053949

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| IDENTIFYING INFORMATION | | | | PERMANENT RETENTION FILE COMPARISON — Items in the Investigative File missing from the Permanent Retention File | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS A PERMANENT RETENTION FILE BEEN PRODUCED? | IS THE INVESTIGATIVE FILE INVENTORY IN THE PERMANENT RETENTION FILE? | DOES THE INVENTORY IN THE PERMANENT RETENTION FILE MATCH THE INVENTORY IN THE BASEMENT FILE? | ARE THE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | OTHER INVESTIGATIVE MATERIAL FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 29 | G-051225 | 1985 | I | Jerry Monden | YES | NO | N/A | YES | ACB 009482; ACB 009484; ACB 009486 – ACB 009495 | YES | ACB 009467; ACB 009469 – ACB 009473; ACB 009483; ACB 009485; ACB 009507 | NO | N/A | 9449 - 9454; Property Inventory #168434; 9466; Property Inventory #168453; 9468; Property Inventory #169250; 9474; Property Inventory #149899; 9504; 9443; 9472; 9446; 9496; 9497; Court Attendance Report: 9448; Body Diagram: 9470; Statement: 9498 - 9500; 9501 - 9503; Release of Person in Custody: 9505; Arrest Report: 9506; Case Report: 9508; Major Crime Worksheet: 9509; Memo: 9510 |
| 30 | G-056199 | 1985 | I | Maria Martin | YES | NO | N/A | YES | ACB 009534 – 9543 | NO | N/A | NO | N/A | Property Inventory #167794; 9522; 9523; Investigative File Control: 9515; Court Attendance Report: 9516 – 9517; 9521; Diagram: 9520; Statement: 9530 - 9533 |
| 31 | G-087375 | 1985 | I | Ronald Jones | YES | NO | N/A | YES | ACB 009948; ACB 009998 – 10002; ACB 010004 – 10005; ACB 010010; ACB 010036 – 10044; ACB 010058 – 10059; ACB 010060 – 10071; ACB 010073 – 10076; ACB 010077; ACB 010084; ACB 010086; ACB 010088; ACB 010089 | YES | ACB 009676; ACB 009683-85; ACB 009687; ACB 009689; ACB 009694-95; ACB 009699; ACB 009701; ACB 009708-09; ACB 009713; ACB 009715; ACB 009723; ACB 009725-9726; ACB 009730; ACB 009734-43; ACB 009746; ACB 009748; ACB 009756-57; ACB 009768-09; ACB 009778-81; ACB 009782; ACB 009790; ACB 009799-800; ACB 009820-22; ACB 009824-25; ACB 009831; ACB 009842; ACB 009849-50; ACB 009867; ACB 009877; ACB 009886; ACB 009889-91; ACB 009896; ACB 009898-99; ACB 009900-07; ACB 009920 – 27; ACB 009969; ACB 0010007; ACB 0010063; ACB 0010065; ACB 0010012; ACB 0010085; ACB 0010087 | YES | ACB 0010051 | 9954 – 9957; 10009; 10017 – 10021; Property Inventory #174352; 9920; Property Inventory #228040; 9969; Property Inventory #174354: 10064; Property Inventory #174353: 10094; 10040; 10062 – 10063; Passau: 9911 – 9912; 9914; 9917 – 9918; Scene: 9908 – 9910; 9913 – 9916; 9970 – 9971; Sheff Jones Company telephone book: 9672 – 9909; Envelope: 9906 – 9907; Investigative File Control: 9919; Court Attendance: 9921 – 9926; 9934; 9938 – 9941; 9943; 9945-9946; 9960; 9968; City of Chicago Police Mail envelope: 9953; Request for Latent Fingerprint Comparison: 9958; 9961; Supplemental: 9972 – 9979; Arrest Report: 10003; Request for Latent Fingerprint Comparison: 10006; 10008; Supplementary Report: 10022 – 10023; 10028 – 10029; Illinois State Police Division of Forensic Services: 10045 – 10048; 10091; Latent Fingerprint Examination Report: 10051; Diagram: 10056; 10057; 10090; Major Crime Worksheet: 10080 – 10081; 10082 – 10083; Police form: 10091; Crime Laboratory Report: 10092 – 10093; City of Chicago, Department of Police envelope: 10095 |
| 32 | G-100586 | 1985 | I | Alice Hamilton | YES | NO | N/A | YES | ACB 010115 – 10116; ACB 010155; ACB 010158 – 10159; ACB 010163; ACB 010171 – 10172; ACB 010184 – 10194 | YES | ACB 010124; ACB 010127; ACB 010175 | YES | ACB 010008 | 10150 – 10154; Property Inventory #182422; 10125; Property Inventory #182421; 10126; Property Inventory #165135; 10181; 10163; Inventory of things seized in search: 10182; 10173; 10174; Investigative File Control: 10099; Court Attendance Report: 10100 – 10104; 10106 – 10107; Waiver of Extradition: 10117; Body Diagram: 10140; 10121 |
| 33 | G-108642 | 1985 | I | Roscoe Evans | YES | NO | N/A | YES | ACB 010497 – 10517; ACB 010551 – 10552 | YES | ACB 010446; ACB 010470; ACB 010475; ACB 010494-97; ACB 010529; ACB 010537; ACB 010548-55 | YES | ACB 010462; ACB 010493 | Property Inventory #165200; 10456 – 10457; Property Inventory #174387; 10524; Property Inventory #174386; 10525; Property Inventory #165239; 10527; Property Inventory #174385; 10526; Property Inventory #165137; 10530; Property Inventory #165138; 10531; Property Inventory #174387; 10518; Property Inventory #165167; 10532; Property Inventory #174386; 10533; Property Inventory #174384; 10535; Property Inventory #174383; 10537; Property Inventory #165137; 10556 – 10557; Property Inventory #165136; 10558 – 10559; 10443; 10448; 10460 – 10461; 10465; 10467; 10469; 10472; 10474; 10518; 10520; 10526; Investigative File Control: 10443; Latent Fingerprint Examination Report: 10445; 10459; Court Attendance Report: 10453; 10487; Memo: 10463; Receipt for Exhibits: 10464; 10471; 10472; 10536; Body Diagram: 10486; 101's: 10490 |

HOOD 038933
Weston 053950

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| | | | | CRIMINAL DEFENSE ATTORNEY FILE COMPARISON — Items in the Investigative File missing from the Criminal Defense Attorney File | | | | | | | | | | | INVESTIGATIVE FILE INFORMATION | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS CRIMINAL DEFENSE ATTORNEY FILE BEEN PRODUCED? | ARE INVESTIGATIVE MATERIALS MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING INVESTIGATIVE MATERIALS | DOES THE DEFENSE ATTORNEY FILE CONTAIN AN INVENTORY SHEET? | DOES THE INVENTORY SHEET IN THE DEFENSE ATTORNEY FILE MATCH THE INVENTORY SHEET IN THE BASEMENT FILE? | ARE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | DOES THE BASEMENT FILE INCLUDE AN INVENTORY? | BATES NUMBER FOR INVENTORY | IS THE INVENTORY COMPLETE? | EXAMPLES OF ITEMS MISSING FROM INVENTORY | ARE THERE HANDWRITTEN NOTES IN THE FILE? | BATES NUMBERS FOR HANDWRITTEN NOTES | ARE THERE TO-FROM MEMOS IN THE FILE? | BATES NUMBERS FOR TO-FROM MEMOS |
| 34 | G-148403 | 1985 | 1 | Derrick Johnson | YES | YES | ACB011174; ACB011177; ACB011258; ACB011276; ACB011290; ACB011326; ACB011348; ACB011352; ACB011356-59; ACB011347; ACB011248; ACB011299; ACB011281; ACB011294; ACB011324; ACB011327; ACB011330; ACB011334; | NO | N/A | NO | N/A | YES | ACB 011174; ACB 011258; ACB 011276; ACB 011290; ACB 011326; ACB 011348 | NO | N/A | YES | ACB 011177-11179 | NO | 29 GPRs in file, 19 listed on Inventory / 26 Handwritten notes in file, 0 listed on Inventory / 2 To-from memos in file, 0 listed on Inventory | YES | ACB 011174; ACB 011176; ACB 011192; ACB 011208; ACB 011210; ACB 011212; ACB 011234; ACB 011244; ACB 011246; ACB 011253; ACB 011256; ACB 011258; ACB 011268; ACB 011276; ACB 011278; ACB 011287; ACB 011290; ACB 011293; ACB 011304; ACB 011309; ACB 011322; ACB 011326; ACB 011332; ACB 011334; ACB 011348 | YES | ACB 011292 |
| 35 | G-150178 | 1985 | 1 | William Talkowski | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 011556 | NO | 11 GPRs in file, 5 listed on Inventory / 1 Handwritten note in file, 0 listed on Inventory / 2 To-from memos in file, 0 listed on Inventory | NO | N/A | NO | N/A |
| 36 | G-159857 | 1985 | 3 | Stanley Hugler James Walker Jeffrey Boyd Carl Pollard | YES | YES | ACB 011630-643; ACB 011645-51; ACB 011654; ACB011657-59; ACB 011660-78; ACB 011680-84; ACB 011686-87; ACB 011689-90; ACB 011719; ACB 011728; ACB 011731; ACB 011734; ACB 011749-51; ACB 011758-59; ACB 011765-66; ACB 011777; ACB 011780-789; ACB 011804-812; ACB 011816-818; ACB 011829-32; ACB 011834-35; ACB 011837-38; ACB 011847-848; ACB 011850; ACB 011856; ACB 011876; ACB 011905; ACB 011915; ACB 011917; ACB 011937; ACB 011939-943; ACB 011949-950; ACB 011955-961; ACB 011963-67; ACB 011969-970 | | NO - entries added after Aug. 24, 1985. also, the PD file contains inventory sheets that are missing from the Inv. File (ACB 011732-11734 in Inv. File; CRIM.DEF FILES - FIELDS 019401-19413 in PD file) | YES | N/A | YES | *ACB 011627, *ACB 011653, *ACB 011655-658, *ACB 011660, *ACB 011662, *ACB 011664, *ACB 011666-668, *ACB 011670-671, *ACB 011673, *ACB 011676-678, *ACB 011680-682, *ACB 011684, *ACB 011686, *ACB 011689-690, ACB 011749, *ACB 011766, *ACB 011785 *ACB 011964, *ACB 011966 | NO | N/A | NO | ACB 011731-34 | NO | 36 GPRs in file, 35 listed on Inventory / 80 Handwritten notes in file, 54 listed on Inventory / 24 To-from memos in file, 10 listed on Inventory | YES | ACB 011657-59; ACB 011660; ACB 011662; ACB 011664; ACB 011666-68; ACB 011670-71; ACB 011676-78; ACB 011680-82; ACB 011684; ACB 011686; ACB 011689-90; ACB 011719; ACB 011765-66; ACB 011791-92; ACB 011803; ACB 011891-902; ACB 011906; ACB 011906-10; ACB 011932; ACB 011914; ACB 011916; ACB 011918-34; ACB 011939; ACB 011944; ACB 011951; ACB 011960; ACB 011962; ACB 011968 | YES | ACB 011752-57; ACB 011760; ACB 011886-90; ACB 011971-77 |
| 37 | G-165272 | 1985 | 1 | Williams Goodin | YES | YES | ACB 089326-28; ACB 089330-33; ACB 089359; ACB 089362; ACB 089368-409; ACB 089414-12; ACB 089417-20; ACB 089426-29; ACB 089435-36; ACB 089445; ACB 089452-56; ACB 09362-65; | NO | N/A | YES | ACB 089326-89328, ACB 089362, ACB 089417-89420, ACB 089453-89455 | YES | ACB 089452 | YES | ACB 089330-89331, ACB 089333 | NO | N/A | N/A | N/A | Yes | ACB 012306-12311; ACB 012320-12334; ACB 012353; ACB 012368; ACB 012354 | No | N/A |
| 38 | G-176242 | 1985 | 1 | William Grant | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | NO | N/A | N/A | N/A | YES | N/A | NO | N/A |

11 of 62

HOOD 038934
Weston 053951

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| IDENTIFYING INFORMATION | | | | PERMANENT RETENTION FILE COMPARISON *Items in the Investigative File missing from the Permanent Retention File* | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS A PERMANENT RETENTION FILE BEEN PRODUCED? | IS THE INVESTIGATIVE FILE INVENTORY IN THE PERMANENT RETENTION FILE? | DOES THE INVENTORY IN THE PERMANENT RETENTION FILE MATCH THE INVENTORY IN THE BASEMENT FILE? | ARE THE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FROM MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | OTHER INVESTIGATIVE MATERIAL FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE |
| 34 | G-148403 | 1985 | 1 | Derrick Johnson | YES | NO | N/A | YES | ACB 011186-11194; ACB 011203-11211; ACB 011255; ACB 011271-11274; ACB 011279; ACB 011282; ACB 011286-11291; ACB 011303-11308 | YES | ACB 011174; ACB 011176; ACB 011192; ACB 011208; ACB 011210; ACB 011212; ACB 011234; ACB 011244; ACB 011246; ACB 011253; ACB 011256; ACB 011270; ACB 011276; ACB 011288; ACB 011289; ACB 011290; ACB 011299; ACB 011304; ACB 011309; ACB 011322; ACB 011334; ACB 011348 | YES | ACB 011292 | 11260-11266; 11333; 11349-11351; Fingerpalmprints (11275-11276); Crime Scene Evidence & Fingerprints (11301; 11346); Person (11312; 11356-11359; 11299; 11347; Request for Latent Fingerprint Comparison (11175; 11233; 11243; 11245; 11248; 11250-11252; 11254; 11257; 11259; 11263; 11280-11281; 11294-11296; 11319-11327; 11330); Fingerprint Results (11242); Receipt for Exhibits (11277; 11331); Form 101 (11345) |
| 35 | G-156178 | 1985 | 1 | William Talkowski | YES | NO | N/A | YES | ACB 011607 – 11608; ACB 011611-11620 | NO | N/A | NO | N/A | Property Inventory #191319; 11609; Property Inventory #191367; 11610; Property Inventory #176116; 11621; 11623; Inventory of Things Seized in Search; 11622; 11598 - 11604; 11605; 11606; Bureau of Detectives Memo; 11557; FOIA Request To-From; 11558; Law office o H. Candace Gorman letter; 11559; Body diagram; 11624; Investigative File Control; 11625 - 11626 |
| 36 | G-159857 | 1985 | 3 | Stanley Hugler James Walker Jeffrey Boyd Carl Pollard | YES | YES | NO - there are additional pages and items on the inventory in the PRF [Investigative file: ACB 011751-34; PRF: CITY-PRF-01589-94, CITY-PRF 01598] | YES | ACB 011738; ACB 011750-751; ACB 011758-759; ACB 011878-879; ACB 011905; ACB 011935-970 | YES | ACB 011658; ACB 011660; ACB 011662; ACB 011664; ACB 011666-668; ACB 011674; ACB 011670-671; ACB 011673; ACB 011676-678; ACB 011680-682; ACB 011684; ACB 011686; ACB 011689-690; ACB 011710-711; ACB 011750-764; ACB 011790; 792; ACB 011803; ACB 011881; ACB 011885; ACB 011901-902; ACB 011904; ACB 011906-912; ACB 011914; ACB 011916-919; ACB 011934; ACB 011938; ACB 011944; ACB 011951; ACB 011960; ACB 011962; ACB 011964; ACB 011966; ACB 011968 | YES | ACB 011752-757; ACB 011760; ACB 011861; ACB 011880; ACB 011882; ACB 011884-890; ACB 011971-977 | CPD Intra-Departmental Mail Envelope - ACB 011628; Copy of Envelope - ACB 011629; 011691; Photos-with handwritten identification notes on the back - ACB 011630-657; Phone memo sheet (blank) - ACB 011659; Watch Assignment Sheet - ACB 011663; 011665; 011672; 011674; 011683; 011913; 011915; 011927; Portion of Case Report - ACB 011665; Attorney Business Card - ACB 011669; Field Contact Card - ACB 011675; Portion of Supp Report - ACB 011679; Arrest Information Card - ACB 011685; 011760-761; 011794-797; 011846; 011851-855; 011903; Evidence Report - ACB 011687; 011888; 011812; Photos - ACB 011692-721; Inv. File Control - ACB 011722; Major Crime Worksheet - ACB 011723-724; 011815-810; Criminal History - ACB 011727; 011737; 011708-779; Arrest Report - ACB 011728; 011736; 011782-789; 011827; 011856-858; Final page of Supp Report w/ Handwritten note - ACB 011768; Request for Latent Fingerprint Comparison - ACB 011765; 011830; Felony Complaint - ACB 011780-781; Evidence Identification No. - ACB 011793; Arrest Warrant - ACB 011798-799; Vehicle Tow Report - ACB 011802; 011814; Property Inventory Sheets - ACB 011804-811; 011837-839; 011850; Daily Bulletin - ACB 011813; Case Report - ACB 011817-819; 011831-836; 011847-849; Lost & Found Case Report - ACB 011826; Supp Report - ACB 011829; Nickname Index Cards - ACB 011840-845; FBI Letter - ACB 011859-860; Body Diagram - ACB 011871-873 |
| 37 | G-165272 | 1985 | 1 | Williams Goodin | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 38 | G-176242 | 1985 | 1 | William Grant | YES | N/A | N/A | YES | ACB 012317-12333; ACB 012347-12356; ACB 012367; ACB 012379 | YES | ACB 012306-12311; ACB 012320-12334; ACB 012353; ACB 012369; ACB 012368; ACB 012374 | NO | N/A | 12335-12340; 12345; Copy of Envelope (12299; 12312); Arrest Cards (12300-12303); Funeral Card (12363-12316); Arrest Report (12341-12346; 12355); Major Crime Worksheet (12377-12378) |

HOOD 038935
Weston 053952

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| # | RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS CRIMINAL DEFENSE ATTORNEY FILE BEEN PRODUCED? | ARE INVESTIGATIVE MATERIALS MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING INVESTIGATIVE MATERIALS | DOES THE DEFENSE FILE CONTAIN AN INVENTORY SHEET? | DOES THE INVENTORY SHEET IN THE DEFENSE ATTORNEY FILE MATCH THE INVENTORY SHEET IN THE BASEMENT FILE? | ARE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | DOES THE BASEMENT FILE INCLUDE AN INVENTORY? | BATES NUMBER FOR INVENTORY | IS THE INVENTORY COMPLETE? | EXAMPLES OF ITEMS MISSING FROM INVENTORY | ARE THERE HANDWRITTEN NOTES IN THE FILE? | BATES NUMBERS FOR HANDWRITTEN NOTES | ARE THERE TO-FROM MEMOS IN THE FILE? | BATES NUMBERS FOR TO-FROM MEMOS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 39 | G-192900 | 1985 | 1 | Maria Everton | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 013237-38 | NO | 12 GPRs in file, 1 listed on inventory; 3 Handwritten notes in file, 1 listed on inventory | YES | ACB 013276-13278; | NO | N/A |
| 40 | G-215280 | 1985 | 1 | Maurice Green | YES | YES | ACB 013390-93; ACB 013396; ACB 013398-99; ACB 013400-06; ACB 013408; ACB 013414; ACB 013501-04; ACB 013546 | NO | N/A | YES | ACB 013404; ACB 013408 | YES | ACB 013391-13392; ACB 013405-13406; ACB 013414; ACB 013501; ACB 013546 | NO | N/A | YES | ACB 013502-13503 | NO | 3 additional GPRs not in G-215280A; 5 Handwritten notes in file, 0 listed on inventory; 1 To-from memo in files, 0 listed on inventory | YES | ACB 013391-13392; ACB 013405-13406; ACB 013501 | YES | ACB 013399; ACB 013414; ACB 013513 |
| 41 | G-230261 | 1985 | 1 | Michael Thompson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 014079-14080 | NO | 11 GPRs in file, 1 listed on inventory; 8 Handwritten notes in file, 0 listed on inventory | YES | ACB 014148; ACB 014151-14159; ACB 014168 | NO | N/A |
| 42 | G-235180 | 1985 | 1 | Willie Pizza | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | NO | N/A | N/A | N/A | YES | ACB 014189; ACB 014196-14197; ACB 014202-14203; ACB 014206-14207 | YES | ACB 014208 |
| 43 | G-245282 | 1985 | 1 | Eddie Robinson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 014212-13 | NO | 3 Handwritten notes in file, 0 listed on inventory | NO | N/A | NO | N/A |
| 44 | G-248336 | 1985 | 4 | Ruben Avilez | YES | YES | ACB 014302-54; ACB 014359-60; ACB 014367-14368; ACB 014379-81; ACB 014413-14414; ACB 014425; ACB 014427-14439; ACB 014441; ACB 014444-46; ACB 014456-64; ACB 014467 | YES | YES | YES | ACB 014427 | YES | ACB 014302; ACB 014334; ACB 014336; ACB 014425; ACB 014446; ACB 014457 | YES | ACB 014303; ACB 014305-14307; ACB 014333; ACB 014379; ACB 014380; ACB 014444 | YES | ACB 014371-72; ACB 014417-18 | NO | 2 GPRs in file, 1 listed on inventory; 7 Handwritten notes in file, 1 listed on inventory; 9 To-from memos in file, 0 listed on inventory | YES | ACB 014302; ACB 014334; ACB 014425; ACB 014446; ACB 014457 | YES | ACB 014303; ACB 014305; ACB 014306-14307; ACB 014333; ACB 014379-14380; ACB 014444 |
| 45 | G-257089 | 1985 | 1 | Freddie Brown | YES | YES | ACB 014790-93; ACB 014796-98; ACB 014802; ACB 014804; ACB 014806-09; ACB 014836 | NO | N/A | YES | *ACB 014806-819 | NO | N/A | NO | N/A | YES | ACB 014790 | YES | N/A | NO | N/A | NO | N/A |
| 46 | G-265171 | 1985 | 1 | Nidal Haddad | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 015104 | NO | 5 Handwritten notes in file, 3 listed on inventory | YES | ACB 015138-15140; ACB 015140 | NO | N/A |
| 47 | G-267631 | 1985 | 3 | Fred Daniels | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 015313 | NO | 1 To-from memo in file, 0 listed on inventory | NO | N/A | YES | ACB 015356 |
| 48 | G-267820 | 1985 | 1 | Patricia Williams | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 015360 | YES | N/A | NO | N/A | NO | N/A |

**IDENTIFYING INFORMATION** | **CRIMINAL DEFENSE ATTORNEY FILE COMPARISON** — *Items in the Investigative File missing from the Criminal Defense Attorney File* | **INVESTIGATIVE FILE INFORMATION**

HOOD 038936
Weston 053953

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| | RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS A PERMANENT RETENTION FILE BEEN PRODUCED? | IS THE INVESTIGATIVE FILE INVENTORY IN THE PERMANENT RETENTION FILE? | DOES THE INVENTORY IN THE PERMANENT RETENTION FILES MATCH THE INVENTORY IN THE BASEMENT FILE? | ARE THE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | OTHER INVESTIGATIVE MATERIAL FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 39 | G-192900 | 1985 | 1 | Maria Everton | YES | NO | N/A | YES | ACB 013253-13264 | YES | ACB 013270-13278; | NO | N/A | Latent Fingerprint Exam. Report (13266-13247); Arrest Info (13265); Arrest Report (13266); Arrest Warrant (13268); Complaint (13269); Stop Order (13270-13271); Will Call Sales Check (13272); Sign-in Sheet (13273-13275); Sketch (13277); Witness Statement (13307-13310); 13259-13243; 13279-13292; 13295-13296; Scene photos, physical evidence and ridge impressions (13251-13252); Finger and Palmprint (13293-13294); 13267 |
| 40 | G-215280 | 1985 | 1 | Maurice Green | YES | NO | N/A | YES | ACB 013404; ACB 013407-13408; ACB 013560-13566 | YES | ACB 013591-13592; ACB 013405-13406; ACB 013501 | NO | ACB 013599; ACB 013414; ACB 013533 | (13569-13513); 13564-13566; 13554; 13545; 13553; Photos, Impressions & Blood Sample (13565; 13543); Rape Kit (13535); 13496-13499; 13506; Picture of Cassette (13560); Form 101 (13390); Arrest Info (13595; 13398); Arrest Report (13597; 13422; 13432; 13485-13499; 13552); Grand Jury Subp (13400-13403); Witness Statement (13410-13413); Information Report (13423; 13433; 13474-13484; 13551); Inv. File Control (13504); Lab Report (13507-13508; 13514-13515); Body Diagram (13530); Firearms Receipt & Worksheet (13531); Receipt for Exhibits (13543); HBT Incident Personnel Control Log (13554) |
| 41 | G-230261 | 1985 | 1 | Michael Thompson | YES | NO | N/A | YES | ACB 014109; ACB 014144-14158 | YES | ACB 014149; ACB 014159; ACB 014168 | NO | N/A | 14082-14085; 14133-14139; 14141; Photos (14129); Cartridge/Cartridge Case (14142-14143); 14118-14119; Inv. File Control (14081); Body Diagram (14088); Form 101 (14110); Complaint (14117); Witness Statement (14120-14122); Gang Specialist Daily Activity Summary (14140); Report w/ Handwritten note (14166-14167) |
| 42 | G-235180 | 1985 | 1 | Willie Pizza | YES | N/A | N/A | YES | ACB 014181; ACB 014210 | YES | ACB 014189; ACB 014196-14197; ACB 014202-14203; ACB 014206-14207 | YES | ACB 014208 | 14173-14174; 14177; Inv. File Control (14170); Arrest Warrant (14171); Complaint (14172); Arrest Report (14178-14180); Illinois Department of Public Aid (14190-14191); Change Report Form (14192-14195); State of Illinois Department of Employment Security (14198-14201); State of Illinois Department of Public Aid (14204-14205); Victim Information (14209) |
| 43 | G-245282 | 1985 | 1 | Eddie Robinson | YES | NO | N/A | YES | ACB 014275-14276 | NO | N/A | NO | N/A | 14241-14245; 14281-14282; 14288-14291; Blood Sample (14219; 14279-14280); Safety Helmet (14215-14216); Auto Used in Homicide (14231-14232); 14220; Copy of Envelope (14214); Inv. File Control (14217); Form 101 (14277); Arrest Report (14238); Body Diagram (14230); Receipt for Exhibits (14253-14256); Case Report (14299-14300) |
| 44 | G-248336 | 1985 | 4 | Ruben Avilez | YES | YES | YES | YES | ACB 014426-14427 | YES | ACB 014302; ACB 014334; ACB 014425; ACB 014446; ACB 014457 | YES | ACB 014303; ACB 014305; ACB 014306-14307; ACB 014433; ACB 014359; ACB 014376-14380; ACB 014444 | Person (14464); 14308-14317; 14319-14332; 14428-14429; 14445; 14455; 14462; Arrest Report (14304; 14360; 14381; 14411; 14429; 14461; 14465); Request for ID Records (14318); Arrestee History (14439; 14434; 14459-14460); Offenders General Information (14432); Name Check Report (14415; 14436; 14438); Daily Bulletin (14448-14452); Deceptive Practice Report (14453-14454); Wanted Card (14456; 14463); Typed Message (14458); Stop Order (14465-14466) |
| 45 | G-257089 | 1985 | 1 | Freddie Brown | YES | NO | N/A | YES | ACB 014806-14819 | NO | N/A | NO | N/A | 14838; Photos & Blood Sample (14796; 14804); 14797-14799; Inv. File Control (14791); Lab Report (14792-14793); Body Diagram (14802); Witness Statement (14825-14835); Case Report w/ additional note (14837) |
| 46 | G-265171 | 1985 | 1 | Nidal Haddad | YES | NO | N/A | YES | ACB 015150-15159 | YES | ACB 015138-15140; ACB 015149 | NO | N/A | 15115-15119; 15144-15147; IDPA Identification (15105-15106); Inv. File Control (15107); Firearms Receipt (15123); Arrest Report (15143); Body Diagram (15148); Form 11 (15160) |
| 47 | G-267631 | 1985 | 3 | Fred Daniels | YES | YES | YES | NO | N/A | NO | N/A | YES | ACB 015356 | 13326-15330; 15322-15324; 15344-15354; Case Assignment Slip (15311); Inv. File Control (15312); Receipt for Exhibits (15331); Witness Statement (15332-15338); Body Diagram (15339); Lab Report (15340-15341); Major Crime Worksheet (15355) |
| 48 | G-267820 | 1985 | 1 | Patricia Williams | YES | NO | N/A | YES | ACB 015379-15384 | NO | N/A | NO | N/A | 15368-15371; 15364-15367; 15387-15389; Photos (15362); Inv. File Control (15361); Body Diagram (15372); Case Report w/ additional note (15386); 15363 |

HOOD 038937
Weston 053954

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| IDENTIFYING INFORMATION | | | | CRIMINAL DEFENSE ATTORNEY FILE COMPARISON — Items in the Investigative File missing from the Criminal Defense Attorney File | | | | | | | | | | | INVESTIGATIVE FILE INFORMATION | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS CRIMINAL DEFENSE ATTORNEY FILE BEEN PRODUCED? | ARE INVESTIGATIVE MATERIALS MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING INVESTIGATIVE MATERIALS | DOES THE DEFENSE ATTORNEY FILE CONTAIN AN INVENTORY SHEET? | DOES THE INVENTORY SHEET IN THE DEFENSE ATTORNEY FILE MATCH THE INVENTORY SHEET IN THE BASEMENT FILE? | ARE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | DOES THE BASEMENT FILE INCLUDE AN INVENTORY? | BATES NUMBER FOR INVENTORY | IS THE INVENTORY COMPLETE? | EXAMPLES OF ITEMS MISSING FROM INVENTORY | ARE THERE HANDWRITTEN NOTES IN THE FILE? | BATES NUMBERS FOR HANDWRITTEN NOTES | ARE THERE TO-FROM MEMOS IN THE FILE? | BATES NUMBERS FOR TO-FROM MEMOS |
| 49 | G-267826 | 1985 | 1 | James Walker | YES | YES | ACB 015390-394; ACB 015396-401; ACB 015405; ACB 015408-09; ACB 015413-424; ACB 015425-432; ACB 015469-71; ACB 015473-74; ACB 015477-87; ACB 015492; ACB 015496-504; ACB 015493-495 | NO | N/A | YES | *ACB 015413-423, ACB 015425-432 | YES | *ACB 015481 *ACB 015424 | NO | N/A | YES | ACB 015391-15392 | NO | 3 Handwritten notes in file, 0 listed on inventory | YES | ACB 015424; ACB 015481 | NO | N/A |
| 50 | G-278643 | 1985 | 1 | Claude Lewis | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 016011-16012 | NO | 23 GPRs in file, 7 listed on inventory; 8 Handwritten notes in file, 0 listed on inventory | YES | ACB 016046; ACB 016072; ACB 016075; ACB 016098; ACB 016103; ACB 016105-16106; ACB 016108 | NO | N/A |
| 51 | G-283147 | 1985 | 4 | James Willingham | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 016126-16127 | NO | Photos (16189-16196) | NO | N/A | NO | N/A |
| 52 | G-284291 | 1985 | 1 | Lucille Pye | YES | YES | ACB 016198-200; ACB 016206-09; ACB 016218; ACB 016220-24; ACB 016242-43; ACB 016244-47; ACB 016249-51; ACB 016253-70; ACB 016272; ACB 016274-76; ACB 016283-86 | NO | N/A | YES | ACB 016220-16223; ACB 016255-16256; ACB 016259-16262; ACB 016274; ACB 016283-16284 | YES | ACB 016270; ACB 016272 | NO | N/A | YES | ACB 016198-16199 | NO | 2 Handwritten notes in file, 0 listed on inventory; 5 To-from memos in file, 0 listed on inventory | YES | ACB 016270 | NO | N/A |
| 53 | G-289217 | 1985 | 1 | Delinda Dillard | YES | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 016288 | NO | 1 Handwritten note in file, 0 listed on inventory | YES | ACB 016526 | NO | N/A |
| 54 | G-303402 | 1985 | 1 | Nancy West | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 016328 | NO | 5 GPRs in file, 0 listed on inventory | YES | ACB 016401 | NO | N/A |
| 55 | G-321886 | 1985 | 4 | Manuel Rios, Willie Mullen, James Crockett | YES | YES | ACB 016649-54; ACB 016658-64; ACB 016667-70; ACB 016675-77; ACB 016683-86; ACB 016723-24; ACB 016726-30; ACB 016732-97; ACB 016799- 807 | NO | N/A | YES | ACB 016686; ACB 016726; ACB 016734-16739; ACB 016740; ACB 016751-16753; ACB 016771-16776 | YES | ACB 016669; ACB 016724; ACB 016729; ACB 016761; ACB 016759; ACB 016780; ACB 016784; ACB 016794; ACB 016796; ACB 016797 | YES | ACB 016667 | YES | ACB 016650-16652 | NO | 16 GPRs in file, 14 listed on inventory; 8 Handwritten notes in file, 0 listed on inventory; 1 To-from memo in file, 0 listed on inventory | YES | ACB 016724; ACB 016740; ACB 016751; ACB 016753; ACB 016780-97 | YES | ACB 016667 |
| 56 | G-322101 | 1985 | 1 | James Baker | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 016809-16810 | NO | 6 Handwritten notes in file, 0 listed on inventory | YES | ACB 016863-72 | NO | N/A |
| 57 | G-331216 | 1985 | 1 | Maurice McCants | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 017595-17596 | NO | 12 GPRs in file, 1 listed on inventory; 5 Handwritten notes in file, 0 listed on inventory | YES | ACB 017642; ACB 017684; ACB 017686 | NO | N/A |
| 58 | G-354748 | 1985 | 1 | Byron Lawrence | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 017689-17690 | NO | 5 Handwritten notes in file, 0 listed on inventory | YES | ACB 017709; ACB 017712; ACB 017736; ACB 017750; ACB 017761 | NO | N/A |
| 59 | G-356930 | 1985 | 1 | Alonzo Jordan | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 017899-17900 | NO | 1 Handwritten note in file, 0 listed on inventory | YES | ACB 017923; ACB 017984 | NO | N/A |

HOOD 038938
Weston 053955

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| | IDENTIFYING INFORMATION | | | PERMANENT RETENTION FILE COMPARISON — Items in the Investigative File missing from the Permanent Retention File | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS A PERMANENT RETENTION FILE BEEN PRODUCED? | IS THE INVESTIGATIVE FILE INVENTORY IN THE PERMANENT RETENTION FILE? | DOES THE INVENTORY IN THE PERMANENT RETENTION FILE MATCH THE INVENTORY IN THE BASEMENT FILE? | ARE THE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | OTHER INVESTIGATIVE MATERIAL FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE |
| 49 | G-267826 | 1985 | | James Walker | YES | NO | N/A | YES | ACB 015413-15432 | YES | ACB 015424; ACB 015481 | NO | N/A | 15397-15401; 15394-15396; 15408-15410; 15471-15474; Line-up Photos (15470); Person (15493-15502); 15477-15479; 15482-15483; Inv. File Control (15395); Body Diagram (15405); Witness Statement (15450-15468); Form 101 (15469); Wanted Card (15480); Release of Person in Custody (15484); Complaint (15485); Arrest Report (15486-15487); Copy of Envelope (15492); Request for ID Photos (15504) |
| 50 | G-278643 | 1985 | | Claude Lewis | YES | NO | N/A | YES | ACB 016036-16049; ACB 016056-16060; ACB 016071-16076; ACB 016102-16107 | YES | ACB 016046; ACB 016072; ACB 016079; ACB 016098; ACB 016103; ACB 016105; 16106; ACB 016108 | NO | N/A | 16021-16024; 16068-16070; 16094-16095; Photos (16015; 16108-16110; 16016); Lab Report (16015-16016; 16019-16020); Supp Report (4th page missing - 16028,16067; 2nd page missing - 10035; 16054-16057); Receipt for Exhibits (16050-16051); Body Diagram (16053); Witness Witness Statement (16061-16062); Witness Statement (16079-16089; 16060-16063); Arrest Report (16093); Gang Arrest Information (16099-16101); Release of Person in Custody (16111); Case Report (16123-16124) |
| 51 | G-283147 | 1985 | 4 | James Willingham | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 52 | G-284291 | 1985 | 1 | Lucille Pye | YES | NO | N/A | YES | ACB 016220-16223; ACB 016255-16256; ACB 016259-16262; ACB 016274; ACB 016283-16284 | YES | ACB 016270 | NO | N/A | 16281-16284; 16207-16209; Victim fingerprints & photos (16200; 16213-16272); Person (16242-16243; 16250-16251; 16257-16258); 16206; 16244-16246; 16252; 16265-16269; Inv. File Control (16208); Body Diagram (16218); Form 101 (16224); Witness Statement (16232-16241); Arrest Report (16247-16248; 16253-16254; 16268-16269); Release of Person in Custody (16249); Supp Report (16275-16276); Case Report w/ missing note (16286) |
| 53 | G-289217 | 1985 | 1 | Delanda Dillard | YES | NO | N/A | NO | N/A | YES | ACB 016326 | NO | N/A | 16298-16301; 16303-16305; 16295-16297; 16312; 16324; Victim fingerprints & photos (16313-16314); Plastic Bag containing rifle (16325); Inv. File Control (16299); Lab Report (16291); Case Assignment Slip (16302); Body Diagram (16306) |
| 54 | G-303402 | 1985 | 1 | Nancy West | YES | NO | N/A | YES | ACB 016389-16393; ACB 016397-16398 | YES | ACB 016401 | NO | N/A | 16340-16344; 16336-16339; 16374-16378; 16395-16396; Victim photos & physical evidence (16333); 16354-16355; Inv. File Control (16329); Lab Report (16331); Witness Statement (16369-16370); Stop Order (16371); Complaint (16372); Arrest Warrant (16373); Body Diagram (16379) |
| 55 | G-321886 | 1985 | 4 | Manuel Rios / Willie Mullen / James Crockett | YES | NO | N/A | YES | ACB 016680; ACB 016726; ACB 016734-16739; ACB 016780; ACB 016752; ACB 016771-16776 | YES | ACB 016724; ACB 016749; ACB 016751; ACB 016753; ACB 016780-97 | YES | ACB 016667 | 16658-16662; 16758-16761; Photos (16728-16729); Vehicle Evidence (16730-16731); Person (16779-16797); 16654-16684-16805; Case Assignment Slip (16653); Latent Fingerprint Exam. Report (16663); Towed Vehicle Disposition (16664); Witness Statement (16687-16722); Nickname Index (16723); Body Diagram (16727); Arrest Info (16747-16798); Inv. File Control (16777); Material Submitted for Daily Bulletin (16799-16804); Stop Order (16805-16807) |
| 56 | G-322101 | 1985 | 1 | James Baker | YES | NO | N/A | YES | ACB 016864-16871 | YES | ACB 016863-16872 | NO | N/A | 16818-16826; 16833-16834; 16849-16847; Clothing seized from Baker, James (16827-16828); Request to pick up clothes (16835-16836); Victim Evidence (16876-16877); Weapon (16881); Inv. File Control (16811); Lab Report (16837-16817; 16829; 16875); Latent Fingerprint Exam. Report (16832); Request for Exhibits (16837-16838); Witness Statement (16840-16859); Body Diagram (16860-16862) |
| 57 | G-331216 | 1985 | 1 | Maurice McCants | YES | NO | N/A | YES | ACB 017634-17640; ACB 017643-17647 | YES | ACB 017642; ACB 017684; ACB 017686 | NO | N/A | 17602-17606; 17630-17633; 17651-17655; 17678; Crime Scene & Victim Evidence (17598; 17650); 17599; 17677; Inv. File Control (17597); Case Assignment Slip (17601); Body Diagram (17609); Court Notification (Blank - 17641); Lab Report (17648-17649); Witness Statement (17663-17676); Form 101 (17679); Complaint (17680-17681); Arrest Report (17682); Case Report w/ additional note (17683) |
| 58 | G-354748 | 1985 | 1 | Byron Lawrence | YES | NO | N/A | YES | ACB 017708; ACB 017710-17711; ACB 017709; ACB 017762 | YES | ACB 017730; ACB 017712; ACB 017736; ACB 017750; ACB 017761 | NO | N/A | 17697-17700; 17756-17758; Photos (17733-17734); Rifle Evidence (17747-17748; 17759); Inv. File Control (17688); Firearms Receipt & Worksheet (17725); Receipt for Exhibits (17735; 17749); Body Diagram (17743) |
| 59 | G-356930 | 1985 | 1 | Alonzo Jordon | YES | NO | N/A | YES | ACB 017965-17979 | YES | ACB 017923; ACB 017984 | NO | N/A | 17917-17921; 17944; 17949-17950; Photos & Blood Sample (17947-17948); Inv. File Control (17901); Case Assignment Slip (17912); Receipt for Exhibits (17922); Supp Report (17936); Witness Statement (17951-17963) |

HOOD 038939
Weston 053956

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| IDENTIFYING INFORMATION | | | | CRIMINAL DEFENSE ATTORNEY FILE COMPARISON — Items in the Investigative File missing from the Criminal Defense Attorney File | | | | | | | | | | | INVESTIGATIVE FILE INFORMATION | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS CRIMINAL DEFENSE ATTORNEY FILE BEEN PRODUCED? | ARE INVESTIGATIVE MATERIALS MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING INVESTIGATIVE MATERIALS | DOES THE DEFENSE ATTORNEY FILE CONTAIN AN INVENTORY SHEET? | DOES THE INVENTORY SHEET IN THE DEFENSE ATTORNEY FILE MATCH THE INVENTORY SHEET IN THE BASEMENT FILE? | ARE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | DOES THE BASEMENT FILE INCLUDE AN INVENTORY? | BATES NUMBER FOR INVENTORY | IS THE INVENTORY COMPLETE? | EXAMPLES OF ITEMS MISSING FROM INVENTORY | ARE THERE HANDWRITTEN NOTES IN THE FILE? | BATES NUMBERS FOR HANDWRITTEN NOTES | ARE THERE TO-FROM MEMOS IN THE FILE? | BATES NUMBERS FOR TO-FROM MEMOS |
| 60 | G-385135 | 1985 | 1 | Earlin Turner | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 018147-18148 | NO | 1 Handwritten note in file, 0 listed on Inventory | YES | ACB 018161 | NO | N/A |
| 61 | G-401782 | 1985 | 1 | Dwayne Cheers | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 018838-18839 | NO | 6 GPRs in file, 5 listed on Inventory; 9 Handwritten notes in file, 5 listed on Inventory | YES | ACB 018851; ACB 018872-75; ACB 018882; ACB 018885 | NO | N/A |
| 62 | G-405711 | 1985 | 1 | Wardell Gates | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | NO | N/A | N/A | N/A | NO | N/A | NO | N/A |
| 63 | G-446754 | 1985 | 1 | Edward Terrett | YES | YES | ACB 020110-11; ACB 020115-15; ACB 020116-23; ACB 020126-27; ACB 020132; ACB 020147; ACB 020156; | YES | NO - additional entries after 11/24/1985 (ACB 020110 in Inv. File; CRIM DEF FILES - FIELDS 042192 in PD file) | NO | | YES | ACB 020156 | NO | N/A | YES | ACB 020110 | NO | 2 Handwritten notes in file, 0 listed on Inventory | YES | ACB 020136; ACB 020156 | NO | N/A |
| 64 | G-456900 | 1985 | 1 | Larry Buchanan | YES | YES | ACB 020610; ACB 020614-15; ACB 020626-31; ACB 020630-32; ACB 020835-37; ACB 020853; ACB 020855-99; | NO | | YES | ACB 020857 - 20858 | YES | ACB 020815; ACB 020821; ACB 020837 | NO | N/A | YES | ACB 020810 | NO | 2 GPRs in file, 1 listed on Inventory; 2 Handwritten notes in file, 0 listed on Inventory | YES | ACB 020815; ACB 020837 | NO | N/A |
| 65 | G-468726 | 1985 | 1 | Albert Spraggins | YES | YES | ACB 020861-76; ACB 020879-84; ACB 020886-902; ACB 020904-16; ACB 020918-22; ACB 020924-42; ACB 020945-67; ACB 020981-82; ACB 021004-06 | YES | NO - additional entries after 2/7/1986 (ACB 020864 in Inv. File; CRIM DEF FILES - FIELDS 044380 in PD file) | YES | ACB 020966-20967 | YES | ACB 020861; ACB 020896; ACB 020898; ACB 020908 | NO | N/A | YES | ACB 020862-20864 | NO | 15 GPRs in file, 14 listed on Inventory; 7 Handwritten notes in file, 6 listed on Inventory; 3 To-from memos in file, 2 listed on Inventory | | ACB 020861; ACB 020866; ACB 020868; (ACB 020896; ACB 020898; ACB 020907-09; ACB 020928 | YES | ACB 020899; ACB 020916; ACB 020924 |
| 80 | G-468726 | 1985 | 1 | Maurice Spraggins | YES | YES | ACB 020861-76; ACB 020879-84; ACB 020886-902; ACB 020904-16; ACB 020918-22; ACB 020924-42; ACB 020945-67; ACB 020981-82; ACB 021004-06 | YES | NO - additional entries after 2/9/1986 (ACB 020864 in Inv. File; CRIM DEF FILES - FIELDS 044567 in PD file) | YES | ACB 020925-20937 | YES | ACB 020861; ACB 020896; ACB 020897; ACB 020908; ACB 020909; ACB 020920; ACB 020928 | YES | ACB 020899; ACB 020916; ACB 020924 | YES | ACB 020862-20864 | NO | 24 Handwritten notes in file, 14 listed on Inventory; 3 To-from memos in file, 2 listed on Inventory | YES | ACB 020861; ACB 020866; ACB 020868; ACB 020896; ACB 020898; ACB 020907-09; ACB 020928 | YES | ACB 020899; ACB 020916; ACB 020924 |

HOOD 038940
Weston 053957

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| IDENTIFYING INFORMATION | | | | PERMANENT RETENTION FILE COMPARISON *Items in the Investigative File missing from the Permanent Retention File* | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS A PERMANENT RETENTION FILE BEEN PRODUCED? | IS THE INVESTIGATIVE FILE INVENTORY IN THE PERMANENT RETENTION FILE? | DOES THE INVENTORY IN THE PERMANENT RETENTION FILE MATCH THE INVENTORY IN THE BASEMENT FILE? | ARE THE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | OTHER INVESTIGATIVE MATERIAL FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE |
| 60 | G-385135 | 1985 | 1 | Earlin Turner | YES | NO | N/A | YES | ACB 018163; ACB 018174; ACB 018191; ACB 018196-18207 | YES | ACB 018161 | NO | N/A | 18152-18156; 18157; 18188-18189; 18193-18194; Photos, Black Cap, and GSR kit (18187); Person (18195); 18160; 18162; 18173; Case Assignment Slip (18146) Lab Report (18150-18151) Recovered Property Disposition Tracer (18159) Waiver of Extradition (18167) Form 101 (18168) Body Diagram (18190) Inv. File Control (18192) Arrest Warrant (18210) Complaint (18210) |
| 61 | G-401782 | 1985 | 1 | Dwayne Cheers | YES | NO | N/A | YES | ACB 018871; ACB 018881-18887 | YES | ACB 018851; ACB 018872-75; ACB 018882; ACB 018883 | NO | N/A | 18855-18856; 18876-18880; Crime Scene Photos & Physical Evidence (18840; 18876-18877) Brown Handled Butcher Knife (18844-18843) Fingerprints (18853-18854); 18841; Lab Report (18842-18843; 18846) Body Diagram (18850) Witness Statement (18863-18867) Complaint (18868) Arrest Report (18869) Form 101 (18870) Inv. File Control (18888) Copy of Envelope (18891) State of IL ID (18892-18893) Identification (18894) Food Stamp Issuance Doc. (18895) |
| 62 | G-405711 | 1985 | 1 | Wardell Gates | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 63 | G-446754 | 1985 | 1 | Edward Torrent | YES | NO | N/A | YES | ACB 020135-20137; ACB 020148 | YES | ACB 020136; ACB 020156 | NO | N/A | 20132-20134; Photos (20155); Inv. File Control (20111) Arrest Information (20113) Supp Report COD (20120-20121) Mail (20130-20131) Witness Statement (20138-20146) Body Diagram (20147) |
| 64 | G-456900 | 1985 | 1 | Larry Buchanan | YES | NO | N/A | YES | ACB 020857-20858 | YES | ACB 020815; ACB 020837 | NO | N/A | 20823-20829; 20835-20836; Photos & Crime Scene Evidence (20820-20821; 20856) Photos (20893-20854); Receipt for Exhibits (20814) Lab Report (20830-20831) Body Diagram (20832) Witness Statement (20838-20847) Form 101 (20855) Inv. File Control (20859); 20811-20812 |
| 65 | G-468726 | 1985 | 1 | Albert Spraggins | YES | NO | N/A | YES | ACB 020925-20937; ACB 020966-20967; ACB 020977 | YES | ACB 020861; ACB 020866; ACB 020868; ACB 020896; ACB 020907-09; ACB 020920; ACB 020928 | YES | ACB 020899; ACB 020916; ACB 020924 | 20938-20942; 20964-20966; 20978; 21003; 21005; Photos (20902; 20970) Photos & Cardboard Wadding (20921; 21004) Printed & Photographed (21006); Person (20865-20867; 20914-20915); 20887; 20889; 20891; 20895; 20897; 20919; 20922; Case Assignment Slip (20863) Inv. File Control (20869) FBI Identification Record (20873; 20890) Form 101 (20884) Arrest Report (20886; 20911-20913; 20918) Arrest Control Set (20888) Arrest Info (20892) Campaign Poster (20910) Arrest Warrant (20945) Complaint (20946) Body Diagram (20965) Witness Statement (20983-21005) |
| 80 | G-468726 | 1985 | 1 | Maurice Spraggins | YES | NO | N/A | YES | ACB 020925-20937; ACB 020966-20967; ACB 020977 | YES | ACB 020861; ACB 020866; ACB 020868; ACB 020896; ACB 020907-09; ACB 020920; ACB 020928 | YES | ACB 020899; ACB 020916; ACB 020924 | 20938-20942; 20964-20966; 20978; 21003; 21005; Photos (20902; 20970) Photos & Cardboard Wadding (20921; 21004) Printed & Photographed (21006); Person (20865-20867; 20914-20915); 20887; 20889; 20891; 20895; 20897; 20919; 20922; Case Assignment Slip (20863) Inv. File Control (20869) FBI Identification Record (20873; 20890) Form 101 (20884) Arrest Report (20886; 20911-20913; 20918) Arrest Control Set (20888) Arrest Info (20892) Campaign Poster (20910) Arrest Warrant (20945) Complaint (20946) Body Diagram (20965) Witness Statement (20983-21005) |

HOOD 038941
Weston 053958

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| IDENTIFYING INFORMATION | | | | CRIMINAL DEFENSE ATTORNEY FILE COMPARISON — Items in the Investigative File missing from the Criminal Defense Attorney File | | | | | | | | | | | INVESTIGATIVE FILE INFORMATION | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS CRIMINAL DEFENSE ATTORNEY FILE BEEN PRODUCED? | ARE INVESTIGATIVE MATERIALS MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING INVESTIGATIVE MATERIALS | DOES THE DEFENSE ATTORNEY FILE CONTAIN AN INVENTORY SHEET? | DOES THE INVENTORY SHEET IN THE DEFENSE ATTORNEY FILE MATCH THE INVENTORY SHEET IN THE BASEMENT FILE? | ARE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | DOES THE BASEMENT FILE INCLUDE AN INVENTORY? | BATES NUMBER FOR INVENTORY | IS THE INVENTORY COMPLETE? | EXAMPLES OF ITEMS MISSING FROM INVENTORY | ARE THERE HANDWRITTEN NOTES IN THE FILE? | BATES NUMBERS FOR HANDWRITTEN NOTES | ARE THERE TO-FROM MEMOS IN THE FILE? | BATES NUMBERS FOR TO-FROM MEMOS |
| 66 | G-482955 | 1985 | 3 | Howard Wiley | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 021018-21023 | NO | 24 Handwritten notes in file, 14 listed on Inventory; 3 To-from memos in file, 2 listed on Inventory | YES | ACB 021155; ACB 021157; ACB 021206; ACB 021245-21263; ACB 021272; ACB 021389 | YES | ACB 021075; ACB 021188; ACB 021190 |
| 67 | G-483470 | 1985 | 1 | Michael McMillan | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 021311; ACB 021313 | NO | 3 Handwritten notes in file, 0 listed on Inventory | YES | ACB 021373 | YES | ACB 021349; ACB 021402 |
| 68 | G-501974 | 1985 | 1 | Willie Cunningham | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 021770 | NO | 2 Handwritten notes in file, 0 listed on Inventory | YES | ACB 021787; ACB 021790 | NO | N/A |
| 69 | H-024109 | 1986 | 4 | Sidney Hines Sammy Walker Arthur Alexander | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 028493 - 28494; ACB 028481 -28483 | NO | 11 Handwritten notes in file, 1 listed on Inventory; 1 To-from memo in file, 0 listed on Inventory | YES | ACB 028369; ACB 028412; ACB 028418; ACB 028435; ACB 028442; ACB 028444; ACB 028492; ACB 028506; ACB 028526; ACB 028565; ACB 028581; ACB 028583; ACB 028602 | YES | ACB 028403 |
| 70 | H-349049 | 1986 | 4 | Jesse Avery Robert Divine | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 028655 - 28656 | NO | 13 GPRs in file, 12 on inventory | NO | N/A | NO | N/A |
| 71 | H-435581 | 1986 | 4 | Jettie Williams | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 028718 | YES | N/A | NO | N/A | NO | N/A |

HOOD 038942
Weston 053959

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| | IDENTIFYING INFORMATION | | | PERMANENT RETENTION FILE COMPARISON — Items in the Investigative File missing from the Permanent Retention File | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS A PERMANENT RETENTION FILE BEEN PRODUCED? | IS THE INVESTIGATIVE FILE INVENTORY IN THE PERMANENT RETENTION FILE? | DOES THE INVENTORY IN THE PERMANENT RETENTION FILE MATCH THE INVENTORY IN THE BASEMENT FILE? | ARE THE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | OTHER INVESTIGATIVE MATERIAL FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE |
| 66 | G-482955 | 1985 | 3 | Howard Wiley | YES | NO | N/A | YES | ACB 021264-21307 | YES | ACB 021155; ACB 021157; ACB 021266; ACB 021245-21265; ACB 021272; ACB 021289 | YES | ACB 021075; ACB 021188; ACB 021190 | 21084-21097; 21229-21243; Elimination Prints (21109; 21164) / Manila Envelope (21116) / Photos (21225; 21228) / Crime Scene Physical Evidence (21227); Poison (21033-21049) / Crime Scene (21051-21073); 21110; 21152-21154; 21202-21205; 21207-21213; Case Assignment Slip (21015-21017); / Inv. File Control (21024) / Envelope (21025) / Cook County Hospital Card (21026-21027) / Business Card (21028) / IL Driver's License (21029-21031) / Photo No. (21050) / Bureau of Detectives Memo (21074) / IL Torture Inquiry & Relief Commission Subp. (21076-21077) / Lab Report (21079-21080; 21099-21100; 21114-21115; 21136-21139; 21176-21177) / Arrest Info (21101; 21214-21215; 21220-21223; 21257) / Supp Report (21102-21104; 21112-21113; 21140-21142; 21186-21187) / Major Crime Workshort (21107-21108; 21178-21179) / Latent Fingerprint Exam. Report (21117-21118) / Body Diagram (21145; 21148; 21151; 21193-21201) / Receipt for Exhibits (21116; 21165; 21222-21223) / Witness Statement (21167-21175) / Continuation of Narrative w/ additional notes (21182) / Arrest Report (21189; 21244) / Gun Report (21191-21192) / Fingerprints (21217-21218) / Rifling Class Characteristics (21224) |
| 67 | G-483470 | 1985 | 1 | Michael McMillian | YES | NO | N/A | YES | ACB 021347-21346; ACB 021396-21401 | NO | N/A | YES | ACB 021349; ACB 021402 | 21324-21331; 21336-21344; 21386-21386; 21407-21409; Photos & Crime Scene Evidence (21325-21372) / Photos of Vehicle (21411-21412); 21321-21322; 21345; 21350-21358; 21377-21385; Case Assignment Slip (21312) / Consent to Search (21346; 21391) / Body Diagram (21363) / Diagram (21373) / Arrest Info (21361) / Witness Statement (21389-21390) / Vehicle Tow Report (21392) / Major Crime Workshort (21394-21395; 21416-21417) / Form 101 (21403) / Inv. File Control (21418) |
| 68 | G-501974 | 1985 | 1 | Willie Cunningham | YES | NO | N/A | YES | ACB 021782-21791 | YES | ACB 021787; ACB 021790 | NO | N/A | 21776-21779; 21781; Photos & Crime Scene Evidence (21773; 21792); 21774; Body Diagram (21780) / Inv. File Control (21806) |
| 69 | H-024109 | 1986 | 4 | Sidney Hines / Sammy Walker / Arthur Alexander | YES | NO | N/A | YES | ACB 028378 – 28380; ACB 028429; ACB 028443; ACB 028457 – 28465; ACB 028519; ACB 028529; ACB 028527 – 28529; ACB 028540 – 28542; ACB 028585 – 28593; ACB 028603 – 28617; ACB 028624 – 28642 | YES | ACB 028565; ACB 028411; ACB 028416; ACB 028435; ACB 028442; ACB 028444; ACB 028492; ACB 028506; ACB 028565; ACB 028581; ACB 028583; ACB 028602 | YES | ACB 028403 | Inventory # 260873: 28544; Inventory # 249759: 28595 ; Inventory # 271180: 28624; Inventory # 271112: 28430; Inventory # 271101: 28452; Inventory # 271103: 28453; Inventory of Things Seized in Search: 28596; 28598; 28375 – 28376; 28521; 28611; Person: 28486 – 28490; 28605; 28652 – 28653 / Scene: 28485; 28647 – 28601; 28423; 28428; 28431 – 28432; 28604; 28556; 28557 – 28559; 28561; 28563; 28564; 28566; 28600 – 28601; 28612; Court Attendance Report: 28369 – 28372; 28394; 28397 – 28403; 28600; 28607 / Request for Identification Photos: 28527 – 28528 / Name Card: 28504 / Latent Fingerprint Examination Report: 28505 / Request for Latent Fingerprint Comparison: 28367 – 28368; 28377; 28404; 28441 / Case control slip: 28506 / Missing Found Person Case Report: 28507 -28516 / Arrest Report: 28387; 28433 – 28434; 28451; 28388; 28396; 28500; 28562; 28567; 28590 / Court Complaint Transmittal Listing: 28531 / Release of Person in Custody: 28543 / Form 101: 28392; 28492; 28552 – 28553 / Statement: 28466 – 28679; 28568 – 28579 / Arrest Information: 28445; 28456; 28580; 28582 – 28583; 28594 / Body Diagram: 28584 / Gang Arrest Information: 28593 / Case Assignment Slip: 28566 / To-/From: 28403 / Chicago Daily Bulletin: 28413 – 28514; 28419 – 28422 / Arrest Warrant: 28417 / Stop Order or Cancellation Request: 28427 / Material Submitted for Use in the Daily Bulletin: 28440 / Fingerprint Check Only: 28455 / Investigative File Control: 28484 |
| 70 | H-349049 | 1986 | 4 | Jesse Avery / Robert Divine | YES | NO | N/A | YES | ACB 028703 - 28714 | YES | N/A | N/A | | 28658 – 28661; Investigative File Control: 28657; 28716 / Court Attendance Report: 28662 / Arrest Information Slip: 28682 / Arrest Report: 28685 – 28686 / Statement: 28687 – 28702 / Envelope: 28715 |
| 71 | H-435581 | 1986 | 4 | Jettie Williams | YES | NO | N/A | NO | N/A | NO | N/A | NO | N/A | Inventory # 1299985: 28728 / Inventory # 1299980: 28730 / Inventory of things seized in search: 28729; 28731; Arrest Report: 28720- 28721 / Identification Check Procedure: 28723 / Crime Scene Processing Report: 28732 / Crime Laboratory Report: 28733 / Hospitalization Case Report: 28734 / Supplementary Report: 28735 – 28742 |

HOOD 038943
Weston 053960

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS CRIMINAL DEFENSE ATTORNEY FILE BEEN PRODUCED? | ARE INVESTIGATIVE MATERIALS MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING INVESTIGATIVE MATERIALS | DOES THE DEFENSE ATTORNEY FILE CONTAIN AN INVENTORY SHEET? | DOES THE INVENTORY SHEET IN THE DEFENSE ATTORNEY FILE MATCH THE INVENTORY SHEET IN THE BASEMENT FILE? | ARE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | DOES THE BASEMENT FILE INCLUDE AN INVENTORY? | BATES NUMBER FOR INVENTORY | IS THE INVENTORY COMPLETE? | EXAMPLES OF ITEMS MISSING FROM INVENTORY | ARE THERE HANDWRITTEN NOTES IN THE FILE? | BATES NUMBERS FOR HANDWRITTEN NOTES | ARE THERE TO-FROM MEMOS IN THE FILE? | BATES NUMBERS FOR TO-FROM MEMOS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 72 | H-465163 | 1986 | 2 | Omar Saunders Bradford Marcellinus Duane Roach Eddie Harris | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 028043 – 47 | NO | 41 To-from memos in file, 0 listed on Inventory | YES | ACB 028241 | NO | ACB 028214; ACB 028242 – 28245; ACB 028255 – 28256; ACB 028266 – 28268; ACB 028286 – 28287; ACB 028290 – 28291; ACB 028293; ACB 028305 – 28306; ACB 028314 – 28315; ACB 028318 – 28319; ACB 028326 – 28330; ACB 028333 – 28336; ACB 028349 – 28351; ACB 028357 |
| 73 | J-381525 | 1987 | 4 | Albert Buckles | YES | YES | ACB 046797; ACB 046837; ACB 046839 –51; ACB 046853; ACB 046855-30; | NO | N/A | YES | ACB 046839 – 46842; ACB 046875 – 46877 | YES | ACB 046843; ACB 046845; ACB 046848; ACB 046855; ACB 046855 | NO | N/A | YES | ACB 046797 | NO | 7 GPRs in file, 4 listed on Inventory; 5 Handwritten notes in file, 0 listed on Inventory | YES | ACB 046843 | NO | N/A |
| 74 | J-418229 | 1987 | 1 | Mervyn Wright | YES | YES | ACB 046883-91; ACB 046920; ACB 046926; ACB 046932-46; ACB 046949-52; ACB 046954-75; ACB 047012-13; ACB 047058-59 | NO | N/A | YES | *ACB 046934 *ACB 046940 *ACB 046942-945 *ACB 046954-956 *ACB 046958-959 *ACB 046961-968 *ACB 046970 *ACB 046974-975 | YES | *ACB 046886 *ACB 046936-937 *ACB 046941 *ACB 046944 *ACB 046950 *ACB 046952 *ACB 046957 *ACB 046960 *ACB 046969 *ACB 046973 *ACB 047013 | NO | N/A | YES | ACB 046883 - 46885 | NO | 22 GPRs in file, 3 listed on Inventory; 15 Handwritten notes in file, 0 listed on Inventory | YES | ACB 046882; ACB 046886; ACB 046927; ACB 046931; ACB 046937-39; ACB 046950; ACB 046952; ACB 046973; ACB 047013; ACB 047053 | YES | ACB 046948; ACB 047049; ACB 047051 |
| 75 | J-486857 | 1987 | 4 | Kevin Murray Tyrone Washington | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 047135-47137 | UNKNOWN | Cover of file states "Duplicate file, can't find original." Appears to be a copy of the Permanent Retention File, so unable to evaluate whether inventory is complete, because most items on the inventory are not in the file | NO | N/A | NO | N/A |
| 76 | J-510242 | 1987 | 4 | Juan Maldonado | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 047141-47142 | NO | 8 Handwritten notes in file, 0 listed on Inventory | YES | ACB 0 47139-40; ACB 0 47147; ACB 0 47207; ACB 0 47209; ACB 0 47214 | YES | ACB 0 47187 |
| 77 | K-300724 | 1988 | 4 | Alex Aleman | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 047286-47287 | NO | 4 Handwritten notes in file, 0 listed on Inventory | YES | ACB 047289; ACB 047291; ACB 047303; ACB 047356 | NO | N/A |

HOOD 038944
Weston 053961

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| IDENTIFYING INFORMATION | | | | PERMANENT RETENTION FILE COMPARISON *Items in the Investigative File missing from the Permanent Retention File* | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS A PERMANENT RETENTION FILE BEEN PRODUCED? | IS THE INVESTIGATIVE FILE INVENTORY IN THE PERMANENT RETENTION FILE? | DOES THE INVENTORY IN THE PERMANENT RETENTION FILE MATCH THE INVENTORY IN THE BASEMENT FILE? | ARE THE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | OTHER INVESTIGATIVE MATERIAL FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE |
| 72 | H-465163 | 1986 | 2 | Omar Saunders Bradford Marcellous Diane Roach Eddie Harris | YES | NO | N/A | YES | ACB 028140 – 28169; ACB 028181; ACB 028289 | YES | ACB 028261 | YES | ACB 028214; ACB 028242 – 28245; ACB 028255 – 26256; ACB 028266 – 28268; ACB 028286 – 28287; ACB 028290 – 28291; ACB 028293; ACB 028305 – 028314 – 28313; ACB 028318 – 28319; ACB 028326 – 28330; ACB 028333 – 28335; ACB 028336 – 28349; ACB 028351; ACB 028357 | 28078 – 28087; 28091 – 28099; 28177 – 28178; Supp Reports (28048-28076); Arrest Report (28077; 28088; 28090; 28122 – 28123; 28179 – 28180; 28182 – 28186); Moving of Antonio out of & into arrest (28089); Illinois State Police Division of Forensic Science (28300 – 28129; 28307 – 28312); Form 101 (28121); Lab Corporation of America (28124; 28131); Grand Jury Subpoena (28125); Daily Major Incident Log (28126 – 28127); Consenting Party (28128; 28153); Affidavit (28129 – 28130); Forensic Identity Testing (28132); Order for use of an eavesdropping device (28134); Matter of judicial approval form (28135); Consent to collect biological and/or hair standards (28136 – 28138; 28193 – 28194; 28200 – 28210); To-from Memo Central Homicide (28170 – 28172; 28187 – 28192; 28197; 28212 – 28213; 28215 – 28240); Chicago Police Department Name Check Report (28173 – 28174); Arrestee History (28175-28176); Case Fact Sheet (28198 – 28202); List Recent PowerPoint (28203 – 28211); Police Narrative (28246 – 28254; 28257 – 28265); Cook County Jail Visitor Records (28269 – 28285); Person Locator (28292); Subpoena (28316; ACB 028313 – 28284); Cellmark Diagnostics (28295 – 28304; 28315; 28392; 28364); Newspaper Article (28313 – 28320); Chicago Tribune Article (28316 – 28317); Circuit Court of Cook County Criminal Division Fax Cover (28322; 28353; 28358s; Agreed Order (28323 – 28325; 28354 – 28356; 28359 – 28361); Department of Police Letter (28351); City of Dallas letter (28332); Arrest Information (28348) ; HUB travel Center booking locator (28362); City of Chicago Letter (28363) |
| 73 | J-381525 | 1987 | 4 | Albert Buckles | YES | NO | N/A | YES | ACB 046839-46842; ACB 046875-46877 | YES | ACB 046848 | NO | N/A | 46798-46802; 46837-46838; 46849-46851; Fingerprints on survival knife (46805) Photos & Blood Sample (46852) Photos (46854); Lab Reports (46803-46804) Form 101 (46821) Witness Statement (46822-46836) Diagram (46843) Firearms Receipt & Worksheet (46844) Body Diagram (46846) Fired Evidence Report (46847) CHESS Memo (46857) Supp Reports (46858-46874; 46878-46800) |
| 74 | J-418229 | 1987 | 1 | Mervyn Wright | YES | NO | N/A | YES | ACB 046934; ACB 046940 – 46946; ACB 046954 – 46970; ACB 046974 – 46975 | YES | ACB 046882; ACB 046886; ACB 046957; ACB 046951; ACB 046937-39; ACB 046950; ACB 046948; ACB 046972; ACB 046973; ACB 047015; ACB 047053 | YES | ACB 046948; ACB 047049; ACB 047051 | Inventory # 420962; 48976; Inventory # 420962; 46976; Inventory # 420945; 46979; 46991; Inventory # 420960; 46982; 46984; Inventory # 420959; 46985; 46987; Inventory # 420958; 46980; 46990; Inventory # 420953; 46991; 46993; Inventory # 420957; 46994; 46996; Inventory # 440052; 46977; 46999; Inventory # 440678; 47000; 47001; Inventory # 435676; 47070; 47001; Inventory # 435675; 47078; 47080; 47081; Inventory # 430922; 47002; 47004; Inventory of things seized in search; 46977; 46980; 46983; 46888; 46889; 46992; 46999; 46998; 47002; 47075; 47079; 47083; 46909 – 46910; 46918 – 46923; 47012; 47014; 47072 – 47073; Scene: 46887 – 46891 Subpoena: 46904 – 46905; 46929 Arrest Information: 46906; 46949; 46951; 46971 Request for Latent Fingerprint Comparison: 46926; 46947; 47050 The University of Chicago Hospitals map: 46930 Arrest Report: 46953; 47052; 47055 Statement: 47003 – 47011; 47031 – 47048 Body diagram: 47029; 47070 Patient Record: 47054 Release of Person in Custody: 47056 – 47057 |
| 75 | J-486857 | 1987 | 4 | Kevin Murray Tyrone Washington | YES | YES | YES | NO | N/A | NO | N/A | NO | N/A | |
| 76 | J-510242 | 1987 | 4 | Juan Maldonado | YES | NO | N/A | YES | ACB 047198-47213; ACB 047230; ACB 047237-47241 | YES | ACB 0 47139-40; ACB 0 47147; ACB 0 47207; ACB 0 47209; ACB 0 47214 | YES | ACB 0 47187 | 47171-47186; 47190; 47227-47229; Fingerprints (47123) Photos (47225); 47195; Arrest Information (47180) Request for Ballistics Comparison (47198-47199) Traffic Accident Report (47190-47191) Vehicle Tow Report (47192) Arrest Report (47193) Cable Communications Inc. Bill (47197) Release of Person In Custody (47215) Preliminary Fired Evidence Report (47216) Line-Up Report (47217) Body Diagram (47235) |
| 77 | K-300724 | 1988 | 4 | Alex Aleman | YES | NO | N/A | YES | ACB 047293-47302; ACB 047324; ACB 047335; ACB 047338 | YES | ACB 047289; ACB 047291; ACB 047303; ACB 047356 | NO | N/A | 47339-47345; 47320-47321; 47327; 47350; Photos; Blood Samples (47304); 47353; 47365; Inv File Control (47288) Watch Assignment Sheet (47290) Form 101 (47292) Body Diagram (47317) Arrest Warrant (47346-47347) Arrest Report (47351) Supp Report (47354-47355) Copy of Attorney Business Card (47363) Copy of Request to stop questioning until lawyer present (47364) |

HOOD 038945
Weston 053962

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| | | | | | CRIMINAL DEFENSE ATTORNEY FILE COMPARISON Items in the Investigative File missing from the Criminal Defense Attorney File | | | | | | | | | | | | INVESTIGATIVE FILE INFORMATION | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **IDENTIFYING INFORMATION** | | | | | | | | | | | | | | | | | | | | | | | | | |
| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS CRIMINAL DEFENSE ATTORNEY FILE BEEN PRODUCED? | ARE INVESTIGATIVE MATERIALS MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING INVESTIGATIVE MATERIALS | DOES THE DEFENSE ATTORNEY FILE CONTAIN AN INVENTORY SHEET? | DOES THE INVENTORY SHEET IN THE DEFENSE ATTORNEY FILE MATCH THE INVENTORY SHEET IN THE BASEMENT FILE? | ARE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | DOES THE BASEMENT FILE INCLUDE AN INVENTORY? | BATES NUMBER FOR INVENTORY | IS THE INVENTORY COMPLETE? | EXAMPLES OF ITEMS MISSING FROM INVENTORY | ARE THERE HANDWRITTEN NOTES IN THE FILE? | BATES NUMBERS FOR HANDWRITTEN NOTES | ARE THERE TO-FROM MEMOS IN THE FILE? | BATES NUMBERS FOR TO-FROM MEMOS |
| 78 | K-562024 | 1988 | 4 | Robert McAllister Joseph Bravieri Richard Zuniga | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 047370-74732 | NO | 24 GPRs in file, 19 listed on Inventory 10 Handwritten notes in file, 0 listed on Inventory | YES | ACB 047377; ACB 047380; ACB 047401-09; ACB 047437; ACB 047536; ACB 047555 | YES | ACB 047473 |
| 79 | M-139566 | 1989 | 4 | Miller Holston | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 047559 | NO | 2 Handwritten notes in file, 0 listed on Inventory | YES | ACB 047563; ACB 047566 | NO | N/A |

HOOD 038946
Weston 053963

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| IDENTIFYING INFORMATION | | | | PERMANENT RETENTION FILE COMPARISON | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | *Items in the Investigative File missing from the Permanent Retention File* | | | | | | | | |
| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS A PERMANENT RETENTION FILE BEEN PRODUCED? | IS THE INVESTIGATIVE FILE INVENTORY IN THE PERMANENT RETENTION FILE? | DOES THE INVENTORY IN THE PERMANENT RETENTION FILE MATCH THE INVENTORY IN THE BASEMENT FILE? | ARE THE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | OTHER INVESTIGATIVE MATERIAL FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE |
| 78 | K-562024 | 1988 | 4 | Robert McAllister Joseph Braxvieri Richard Zuniga | YES | YES | No • CITY-PRF-03100 -- ACB 047370 except PRF only has 3 entries instead of the ACB 15. PRF ends with "Copy to Unit 164" on 1/4/89; • Entries from 1/5/89 to 8/22/89 are missing from PRF file. Unlisted Entries in PRF: • Evidence Report (Date of Entry (DOE) 1/5/89 – Report Date 12/28/88), • Crime Lab Photos (DOE 1/13/89), • GOCR (DOE 1/26/89 – Report Date 12/18/88), • Request for Analysis (DOE 1/30/85 – Report Date 1/9/89), • Supp. Report (DOE 2/23/89 – Report Date 2/10/89), • Property Inventory and Xerox Prop. Inventory w/corrections (DOE 6/4/89 - Report Date 6/5/89), • Receipt for Exhibit (DOE 6/4/89), • Postmortem (DOE 6/27/89), • Postmortem (DOE 7/13/89 – Tox. Report Date 12/26/88), • Supp. Crime Lab (DOE 8/22/89 – Report Date 8/15/89), • Supp. Crime Lab (DOE – None) | YES | ACB 047373-47579; ACB 047433-47438; ACB 047442-47455 | YES | ACB 047377; ACB 047396; ACB 047403-09; ACB 047455; ACB 047536; ACB 047555 | YES | ACB 047473 | 47416-47452; 47440-47441; 47463; 47476-47477; 47534-47535; 47539-47550; Permanent Physical Evidence (47561); Photos & Blood Vial (47395-47382) Cards (47388-47390) Fingerprints & Shotgun (47521); Person (47554); 47456; 47508-47512; 47553; Arrest Information (47379-47380) Arrest Report (47391-47397) Complaint for Search Warrant (47398-47408) Search Warrant (47410-47415) Request for Analysis (47464; 47474-47475; 47518; 47531; 47551) Witness Statement (47468-47472; 47513-47517) Body Diagram (47488-47490; 47495) Address Book Copy (47556-47557) |
| 79 | M-139566 | 1989 | 4 | Miller Holston | YES | NO | No • CITY-PRF-03272 -- ACB 047823 except PRF has 6 entries instead of the ACB 13 entries • PRF Inventory ends with "Copy to Unit 164" on 11/29/89; • Entries from 12/1/90 to 6/10/90 are missing. Unlisted Entries in PRF • GOCR (DOE 12/1/90 – Report Date 11/18/90) • Property Inventory (DOE 12/1/90) • Postmortem (DOE 1/10/90 – Report Date 12/7/89 Tox. Report Date 12/6/89) • Subpoena (DOE 2/13/90 – Subpoena Date 1/16/90) • Subpoena (DOE 2/8/90 – Subpoena Date 2/6/90) • Crime Lab Report (DOE 2/8/90 – Report Date 2/5/90) • Subpoena (DOE 6/10/90 – Subpoena Date 6/1/90) | YES | ACB 047560-47562 | YES | ACB 047563; ACB 047566 | NO | N/A | 47616-47621; 47571-47582; 47610-47611; Photo ID (47568) Photos & Paper Bag with Victim belongings (47569) Photos & Sealed Envelope (47570); Person (47623-47625); 47564-47590;Arrest Report (47567) Form 101 (47583) Body Diagram (47586) Witness Statement (47597-47599) Lab Report (47612-47614) |

HOOD 038947
Weston 053964

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| | | | | CRIMINAL DEFENSE ATTORNEY FILE COMPARISON — Items in the Investigative File missing from the Criminal Defense Attorney File | | | | | | | | | | | INVESTIGATIVE FILE INFORMATION | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **IDENTIFYING INFORMATION** | | | | | | | | | | | | | | | | | | | | | | |
| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS CRIMINAL DEFENSE ATTORNEY FILE BEEN PRODUCED? | ARE INVESTIGATIVE MATERIALS MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING INVESTIGATIVE MATERIALS | DOES THE DEFENSE ATTORNEY FILE CONTAIN AN INVENTORY SHEET? | DOES THE INVENTORY SHEET IN THE DEFENSE ATTORNEY FILE MATCH THE INVENTORY SHEET IN THE BASEMENT FILE? | ARE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | DOES THE BASEMENT FILE INCLUDE AN INVENTORY? | BATES NUMBER FOR INVENTORY | IS THE INVENTORY COMPLETE? | EXAMPLES OF ITEMS MISSING FROM INVENTORY | ARE THERE HANDWRITTEN NOTES IN THE FILE? | BATES NUMBERS FOR HANDWRITTEN NOTES | ARE THERE TO-FROM MEMOS IN THE FILE? | BATES NUMBERS FOR TO-FROM MEMOS |
| 80 | M-510728 | 1989 | 4 | Leroy Lyons | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 047780 | NO | 4 To-from memos in file, 3 listed on Inventory | NO | N/A | YES | ACB 047781; ACB 047786; ACB 047809; ACB 047812 |
| 81 | M-534290 | 1989 | 4 | Gerardo Degollado David Estrada Juan Portillo | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 047823-24784 | NO | 4 Handwritten notes in file, 0 listed on Inventory | YES | ACB 047826; ACB 047828; ACB 047852; ACB 047856; ACB 047858; ACB 047860; ACB 047889; ACB 047891; ACB 047889; ACB 047901; ACB 047889; ACB 047922; ACB 047956 | NO | N/A |

HOOD 038948
Weston 053965

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| IDENTIFYING INFORMATION | | | | PERMANENT RETENTION FILE COMPARISON *Items in the Investigative File missing from the Permanent Retention File* | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS A PERMANENT RETENTION FILE BEEN PRODUCED? | IS THE INVESTIGATIVE FILE INVENTORY IN THE PERMANENT RETENTION FILE? | DOES THE INVENTORY IN THE PERMANENT RETENTION FILE MATCH THE INVENTORY IN THE BASEMENT FILE? | ARE THE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | OTHER INVESTIGATIVE MATERIAL FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE |
| 80 | M-510728 | 1989 | 4 | Leroy Lyons | YES | NO | No • CITY-PRF-01539 – ACB 047627 except PRF has 15 entries instead of the ACB 20 entries; PRF ends with GOCR on 12/19/85 • Entries from 2/2/90 to 3/21/90 are missing from PRF file: Unlisted Entries in PRF? • Postmortem (Date of Entry (DOE) 2/2/90 – Report Date 1/9/90) • ASA Subpoena (DOE 2/13/90 – Subpoena Date 1/24/90) • Subpoena (DOE 3/12/90 – Supoena Date 3/1/90) • Receipt for Analysis (DOE 3/21/90 – "Date Turner Over" 12/8/89 – Result date 3/7/90) • Lab Report (DOE 3/21/90 – Report Date 3/8/90) | YES | ACB 047818-47819 | NO | N-A | YES | ACB 047781; ACB 047786; ACB 047809; ACB 047811 | 47812-47817; 47805-47806; 47810; Illinois Bell Records (47774-47778; 47782-47785; 47808) Court Notification (47779) Form 101 (47787) Arrest Report (47788) Body Diagram (47804) Court Complaint Transmittal (47807) |
| 81 | M-534290 | 1989 | 4 | Gerardo Degollado David Estrada Juan Portillo | YES | YES | No • CITY-PRF-03272 – ACB 047823 except PRF has 6 entries instead of the ACB 13 entries • PRF Inventory ends with "Copy to Unit 164" on 11/29/89 • Entries from 12/1/90 to 6/10/90 are missing: • GOCR (DOE 12/1/90 – Report Date 11/18/90) • Property Inventory (DOE 12/1/90) • Postmortem (DOE 1:10/90 – Report Date 12/7/89 Trs. Report Date 12/6/89) • Subpoena (DOE 1/23/90 – Subpoena Date 1/16/90) • Subpoena (DOE 2/8/90 – Subpoena Date 2/6/90) • Crime Lab Report (DOE 2/8/90 – Report Date 2/5/90) • Subpoena (DOE 6/10/90 – Subpoena Date 6/1/90) | YES | ACB 047842-47846; ACB 047929-47938 | YES | ACB 047826; ACB 047828; ACB 047832; ACB 047856; ACB 047858; ACB 047869; ACB 047889; ACB 047891; ACB 047893; ACB 047922; ACB 047956 | NO | N-A | 47844-47849; 47830; 47872; 47941-47942; 47851; 47855; 47857; Release of Prison in Custody (47827; 47861) Body Diagram (47832; 47904) Form 101 (47847) Arrest Report (47848-47850; 47853-47854; 47859) Witness Statement (47862-47870) Vehicle Tow Report (47871) ID Record Request (47921) |

HOOD 038949
Weston 053966

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS CRIMINAL DEFENSE ATTORNEY FILE BEEN PRODUCED? | ARE INVESTIGATIVE MATERIALS MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING INVESTIGATIVE MATERIALS | DOES THE DEFENSE ATTORNEY FILE CONTAIN AN INVENTORY SHEET? | DOES THE INVENTORY SHEET IN THE DEFENSE ATTORNEY FILE MATCH THE INVENTORY SHEET IN THE BASEMENT FILE? | ARE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | DOES THE BASEMENT FILE INCLUDE AN INVENTORY? | BATES NUMBER FOR INVENTORY | IS THE INVENTORY COMPLETE? | EXAMPLES OF ITEMS MISSING FROM INVENTORY | ARE THERE HANDWRITTEN NOTES IN THE FILE? | BATES NUMBERS FOR HANDWRITTEN NOTES | ARE THERE TO-FROM MEMOS IN THE FILE? | BATES NUMBERS FOR TO-FROM MEMOS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 82 | M-539997 | 1989 | 4 | Peter Guzaldo | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 047959-47960 | NO | 4 Handwritten notes in file, 0 listed on Inventory | YES | ACB 047972; ACB 047982; ACB 047992 | NO | N/A |
| 83 | M-544975 | 1989 | 4 | Liddale Jones | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 048023 | NO | 2 Handwritten notes in file, 0 listed on Inventory | YES | ACB 048028 | NO | N/A |
| 84 | M-566742 | 1989 | 4 | Fredy Roberson | YES | YES | ACB 047627-28; ACB 047632; ACB 047660; ACB 047662; ACB 047666; ACB 047673; ACB 047677 | NO | N/A | NO | N/A | YES | *ACB 047662 *ACB 047666 | NO | N/A | YES | ACB 047627 | NO | 2 Handwritten notes in file, 0 listed on Inventory | YES | ACB 047662; ACB 047666 | NO | N/A |
| 85 | M-568343 | 1989 | 4 | Steve Jones Perry Lewis | YES | YES | ACB 048059-60; ACB 048130-33; ACB 048135; ACB 048137-42 | YES | NO - additional entries after 8/8/1990 (ACB 048059-48060 in Inv. File; CRM.DEF FILES - FIELDS 050064, CRM.DEF FILES - FIELDS 050212 in PD file) | NO | N/A | NO | N/A | NO | N/A | YES | ACB 048059-60 | NO | 2 Handwritten notes in file, 0 listed on Inventory | YES | ACB 048062; ACB 048064; ACB 048140; ACB 048142 | NO | N/A |

HOOD 038950
Weston 053967

| IDENTIFYING INFORMATION | | | | | PERMANENT RETENTION FILE COMPARISON | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | Items in the Investigative File missing from the Permanent Retention File | | | | | | |
| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS A PERMANENT RETENTION FILE BEEN PRODUCED? | IS THE INVESTIGATIVE FILE INVENTORY IN THE PERMANENT RETENTION FILE? | DOES THE INVENTORY IN THE PERMANENT RETENTION FILE MATCH THE INVENTORY IN THE BASEMENT FILE? | ARE THE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | OTHER INVESTIGATIVE MATERIAL FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE |
| 82 | M-539997 | 1989 | 4 | Peter Guzaldo | YES | NO | No. • CITY-PRF-03404 = ACB 048144 except PRF has 8 entries instead of the ACB 16 entries. PRF ends with Subpoena on 12/19/89 • Entries from 12/26/89 to 3/9/91 are missing from PRF file Unlisted Entries in PRF: • GOCR (Date of Entry (DOE) 12/26/89 – Report Date 12/10/89) • To-From Request for Ballistics (DOE 12/26/89 – Report Date 12/20/89) • Property Inventories (DOE 12/26/89) • Postmortem (DOE 1/10/90 – Report Date 1/2/90 – Tox. Report Date is 12/27/89) • Request for Ballistics Comparison (DOE 1/26/90 – Report Date 12/20/89) • ASA Subpoena (DOE 2/13/90 – Subpoena Date 2/6/90) • Subpoena (DOE 6/15/90 – Subpoena Date 6/8/90) • IR Sheet (DOE 3/9/91) | YES | ACB 047971–47981 | YES | ACB 047972; ACB 047982; ACB 047992 | NO | N/A | 48012-48014; 47985-47988; 47999-48001; 47989-47991; 47995; Form 101 (47983; 48007) Arrest Report (47993; 48006) Request for Analysis (48011) |
| 83 | M-544975 | 1989 | 4 | Liddale Jones | YES | NO | N/A | YES | ACB 048036-048037 | YES | ACB 048028 | NO | N/A | 48049-48054; 48033-48035; 48040; Request for Analysis (48031) Form 101 (48038; 48046) Arrest Report (48039) Supp Report (48042) Defendant Release Order (48045) |
| 84 | M-566742 | 1989 | 4 | Fredy Roberson | YES | YES | No. • CITY-PRF-03339 = ACB 047627 except PRF has 15 entries instead of the ACB 20 entries. PRF ends with GOCR on 12/19/85 • Entries from 2/2/90 to 3/21/90 are missing from PRF file Unlisted Entries in PRF: • Postmortem (Date of Entry (DOE) 2/2/90 – Report Date 1/9/90) • ASA Subpoena (DOE 2/13/90 – Subpoena Date 1/24/90) • Subpoena (DOE 3/12/90 – Subpoena Date 3/1/90) • Receipt for Analysis (DOE 3/21/90 – "Date Turnec Over" 12/8/89 – Result date 3/7/90) • Lab Report (DOE 3/21/90 – Report Date 3/8/90) | YES | ACB 047661-47670 | YES | ACB 047662; ACB 047666 | NO | N/A | 47634-47637; 47671; 47638-47641; 47651-47653; 47660; Body Diagram (47649) Form 101 (47654) Complaint (47655) Arrest Report (47656) Witness Statement (47657-47658) Recording Tape Hold Request (47659) Request for Analysis (47673) Lab Report (47675-47676) |
| 85 | M-568343 | 1989 | 4 | Steve Jones Perry Lewis | YES | YES | No. • 2nd Page of Inventory (4 entries) Missing from PRF File (ACB 048059) • PRF Inventory Ends with subpoena on 12/21/89 • Entries from 12/21/89 to 3/9/91 missing from PRF file Unlisted Entries in PRF: • 2 GPRs (Date of Entry (DOE) 12/21/89 – Supervisor Approval 12/19/89) • Supp. Reports (DOE 12/21/89 – Supervisor Approval 12/19/89) • Postmortem (DOE 2/2/90 – Report Date 12/30/89 – Tox. Report Date 12/27/89) • Subpoena (DOE 2/6/90 – Subpoena Date 1/29/90) • Supp. Report (DOE 8/9/90 – Report Date 7/26/90) • GOCR (DOE 8/27/90 – Report Date 8/22/90) • IR Sheet (DOE 3/9/91) | YES | ACB 048061-48067; ACB 048118-48119 | YES | ACB 048062; ACB 048084; ACB 048140; ACB 048142 | NO | N/A | 48123-48128; 48068-48072; 48087-48089; 48134; Person (48127-48141); 48090-48091; 48135; Body Diagram (48094) Form 101 (48109-48110) Arrest Report (48113; 48115) Supp Report (48114; 48120-48122; 48130) Case Report (48132-48133) |

HOOD 038951
Weston 053968

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| | | | | | | CRIMINAL DEFENSE ATTORNEY FILE COMPARISON — Items in the Investigative File missing from the Criminal Defense Attorney File | | | | | | | | | INVESTIGATIVE FILE INFORMATION | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS CRIMINAL DEFENSE ATTORNEY FILE BEEN PRODUCED? | ARE INVESTIGATIVE MATERIALS MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING INVESTIGATIVE MATERIALS | DOES THE DEFENSE ATTORNEY FILE CONTAIN AN INVENTORY SHEET? | DOES THE INVENTORY SHEET IN THE DEFENSE ATTORNEY FILE MATCH THE INVENTORY SHEET IN THE BASEMENT FILE? | ARE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | DOES THE BASEMENT FILE INCLUDE AN INVENTORY? | BATES NUMBER FOR INVENTORY | IS THE INVENTORY COMPLETE? | EXAMPLES OF ITEMS MISSING FROM INVENTORY | ARE THERE HANDWRITTEN NOTES IN THE FILE? | BATES NUMBERS FOR HANDWRITTEN NOTES | ARE THERE TO-FROM MEMOS IN THE FILE? | BATES NUMBERS FOR TO-FROM MEMOS |
| 86 | M-569727 | 1989 | 4 | John Avery | YES | YES | ACB 048144-46; ACB 048149; ACB 048159; ACB 048179-80 | YES | NO - additional entries after 12/26/1989 (ACB 048144 in Invest. File; CRIM.DEF FILES - FIELDS 045941 in PD File) | NO | N/A | NO | N/A | NO | N/A | YES | ACB 048144 | NO | 1 To-from memo/request for ballistics in file, 2 listed on Inventory; Medical Examiner Report | NO | N/A | | ACB 048159; ACB 048167; ACB 048176 |
| 87 | M-580592 | 1989 | 4 | Elmer Carrillo David Duarte | YES | YES | ACB 048204; ACB 048216; ACB 048316-27 | YES | NO - additional entries after 1/9/1990 (ACB 048182-48183 in Inv. File; CRIM.DEF FILES FIELDS 051064-51065 in PD file) | NO | N/A | YES | *ACB 048204 *ACB 048216 *ACB 048323 *ACB 048327 | NO | N/A | YES | ACB 048182-48183 | NO | 11 Handwritten notes in file, 0 listed on Inventory | YES | ACB 048204; ACB 048216; ACB 048223; ACB 048239; ACB 048237; ACB 048323; 48327 | YES | ACB 048167 |
| 88 | M-587998 | 1989 | 4 | Darryl Milton Tony Allen Cleve Jackson Robert Brown Tyrone Brown Darryl Milton | YES | YES | ACB 048329-30; ACB 048333; ACB 048345; ACB 048364; ACB 048386; ACB 048406-07; ACB 048419-22 | NO | N/A | NO | N/A | YES | ACB 048345; ACB 048364; ACB 048386; ACB 048422 | NO | N/A | YES | ACB 048329 | NO | 4 Handwritten notes in file, 1 listed on Inventory | YES | ACB 048345; ACB 048364; ACB 048386; ACB 048422 | YES | ACB 048388 |
| 89 | M-590700 | 1989 | 4 | Ricky Icenberg | YES | YES | ACB 047679-80; ACB 047694; ACB 047696; ACB 047751; ACB 047765; ACB 047767-72 | NO | NO - additional entries after 4/11/1990 (ACB 047679-47680 in Inv. File; CRIM.DEF FILES - FIELDS 052463-52464 in PD file) | NO | N/A | YES | ACB 047694; ACB 047696; ACB 047751 | NO | N/A | YES | ACB 047679-80 | NO | 4 Handwritten notes in file, 0 listed on Inventory | YES | ACB 047694; ACB 047696; ACB 047751; ACB 047768 | YES | ACB 047681 |
| 90 | D-322218 | 1999 | 4 | Rodolfo Garcia Robert Salinas Sergio Ledesma Monico Orozco Philip Dozvilla | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 004143-145 | NO | Subpoenas - Streetfiles; Handwritten Statements; Handwritten Notes; Photos - Person | YES | ACB 004497; ACB 004502; ACB 004247; ACB 004249; ACB 004251-252; ACB 004256; ACB 004272; ACB 004276; ACB 004456; ACB 004457; ACB 004461 | NO | N/A |
| 91 | D-192218 | 1999 | 4 | Steven Spears Dion Dorn | YES | YES | ACB 003680; ACB 003740-54; ACB 003768; ACB 003842-43; ACB 003844-51; ACB 003809-83 | NO | N/A | YES | ACB 003844 | YES | ACB 003695; | YES | N/A | YES | ACB 003680 | NO | Search Consent; General Offense Case Report; Subpoena – Streetfiles; Sup. Report; Crime Scene Proc. Reports; Property Inventories; GPRs; Body Diagrams; Photos – Scene/Body | NO | N/A | NO | N/A |
| 92 | D-579065 | 1999 | 4 | Jimmy Velasquez | YES | YES | ACB 004023-25; ACB 004931-38; ACB 005007; ACB 005023; ACB 005007-10; ACB 005025 | YES | N/A | YES | ACB 005009-10; ACB 005007; ACB 005023; ACB 005022-24 | YES | ACB 004930; ACB 004941; ACB 004975; ACB 004984; ACB 004922; ACB 005056; | | N/A | YES | ACB 004823-924 | NO | Handwritten Notes; Subpoena Streetfiles; Property Inventories | YES | ACB 005036; ACB 005024; ACB 005007 | NO | N/A |
| 93 | D-131199 | 1999 | 4 | Juan Mendez | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 002998-999 | NO | Subpoena - Streetfiles | NO | N/A | NO | N/A |
| 94 | D-145734 | 1999 | 4 | Refugio Gomez | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 003118-120 | NO | Subpoena - Streetfiles; Bio Card; Handwritten Notes | YES | ACB 003139; ACB 003147; ACB 003165 | NO | N/A |
| 95 | D-146057 | 1999 | 4 | Hector Medina | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 003575-579 | NO | Subpoena - Streetfiles; To-from Memo; Photos – Scene/Body | YES | ACB 003573; ACB 003575; ACB 003577-578 | YES | ACB 003574 |
| 96 | D-454658 | 1999 | 4 | Raymond Vera Ricardo Raygoza Francisco Rodriguez Frank Arenibar | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 004732-734 | NO | Subpoena Streetfiles; Request for Evidence ID Photographs | NO | N/A | NO | N/A |
| 97 | D-724882 | 1999 | 4 | Tanya McWilliams | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 005044 | NO | Subpoenas - Streetfiles | YES | ACB 005069 | NO | N/A |
| 98 | F-475-960 | 2000 | 4 | Juan Cordova | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 007450-451 | NO | Subpoenas - Streetfiles | NO | N/A | NO | N/A |
| 99 | F-405-633 | 2000 | 4 | Joe Jackson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 007198-199 | NO | Subpoenas - Streetfiles; Handwritten Notes | YES | ACB 007218-219 | NO | N/A |

HOOD 038952
Weston 053969

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| IDENTIFYING INFORMATION | | | | PERMANENT RETENTION FILE COMPARISON — Items in the Investigative File missing from the Permanent Retention File | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS A PERMANENT RETENTION FILE BEEN PRODUCED? | IS THE INVESTIGATIVE FILE INVENTORY IN THE PERMANENT RETENTION FILE? | DOES THE INVENTORY IN THE PERMANENT RETENTION FILE MATCH THE INVENTORY IN THE BASEMENT FILE? | ARE THE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | OTHER INVESTIGATIVE MATERIAL FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE |
| 86 | M-509727 | 1989 | 4 | John Avery | YES | YES | No • CITY-PRF-05404 = ACB 048144 except PRF has 8 entries instead of the ACB 16 entries. PRF ends with Subpoena on 12/19/89 • Entries from 12/26/89 to 3/9/91 are missing from PRF file Unlisted Entries in PRF: • GOCR (Date of Entry (DOE) 12/26/89 – Report Date 12/10/89) • To-From Request for Ballistics (DOE 12/26/89 – Report Date 12/20/89) • Property Inventories (DOE 12/26/89) • Promotions (DOE 1/10/90 – Report Date 1/2/90 – Tox. Report Date is 12/27/89) • Request for Ballistics Comparison (DOE 1/26/90 – Report Date 12/20/89) • ASA Subpoena (DOE 2/13/90 – Subpoena Date 2/6/90) • Subpoena (DOE 6/19/90 – Subpoena Date 6/8/90) • IR Sheet (DOE 3/9/91) | NO | N/A | NO | N/A | | YES | ACB 048159; ACB 048167; ACB 048170 | 48171-48175; 48146; 48149; 48160-48170; 48179; Body Diagram (48156) Case Report pages 1 & 2 (48161-48162) |
| 87 | M-580592 | 1989 | 4 | Elmer Carrillo David Duarte | YES | NO | N/A | YES | ACB 048192; ACB 048198-48205; ACB 048211-48220; ACB 048222-48236 | YES | ACB 048204; ACB 048216; ACB 048233; ACB 048235; ACB 048237; ACB 048323; 48327 | | YES | ACB 048187 | 48312-48314; 48188-48191; 48209-48210; Person (48317-48320); 48184-48185; 48197; 48221; 48311; 48321-48326; Arrest Info (48186) Form 101 (48208) Release of Person in Custody (48238) Body Diagram (48327) Witness Statement (48276-48291) Arrest Report (48292-48293) |
| 88 | M-587998 | 1989 | 4 | Darryl Milton Tony Allen Cleve Jackson Robert Brown Tyrone Brown Darryl Milton | YES | NO | N/A | YES | ACB 048331; ACB 048344; ACB 048362-48365; ACB 048369; ACB 048379-48381 | YES | ACB 048345; ACB 048364; ACB 048366; ACB 048422 | | YES | ACB 048388 | 48408-48415; 48338-48340; 48349; 48369-48390; 48423; Body Diagram (48342); Line-Up Info (48516); Form 101 (48350; 48371; 48382); Arrest Report (48352-48353; 48370; 48383; 48385); Request for Analysis (48378); Permission to Search (48384; 48387); Witness Statement (48391-48396); Lab Report (48414-48415); ID Card (48419-48420); Typed Note (48421) |
| 89 | M-590700 | 1989 | 4 | Ricky Iceinberg | YES | NO | N/A | YES | ACB 047689-47697; ACB 047716-47722 | YES | ACB 047694; ACB 047696; ACB 047698; ACB 047751; ACB 047768 | | YES | ACB 047681 | 47761-47764; 47682-47684; 47680; Person (47767-47772); Body Diagram (47680); Witness Statement (47733-47735); Form 101 (47743; 47756); Arrest Warrant (47744-47745; 47757-47758); Complaint (47746-47748); Consent to Search (47749); Arrest Report (47750; 47754) |
| 90 | D-322218 | 1999 | 4 | Rodolfo Garcia Robert Salinas Sergio Ledesma Monico Orozco Philip Dravilla | NO | N/A | N/A | N/A | N/A | N/A | N/A | | N/A | N/A | N/A |
| 91 | D-192218 | 1999 | 4 | Steven Spears Dion Dorn | NO | N/A | N/A | N/A | N/A | N/A | N/A | | N/A | N/A | N/A |
| 92 | D-579065 | 1999 | 4 | Jimmy Velasquez | NO | N/A | N/A | N/A | N/A | N/A | N/A | | N/A | N/A | N/A |
| 93 | D-131199 | 1999 | 4 | Juan Mendez | NO | N/A | N/A | N/A | N/A | N/A | N/A | | N/A | N/A | N/A |
| 94 | D-145734 | 1999 | 4 | Refugio Gomez | NO | N/A | N/A | N/A | N/A | N/A | N/A | | N/A | N/A | N/A |
| 95 | D-146057 | 1999 | 4 | Hector Medina | NO | N/A | N/A | N/A | N/A | N/A | N/A | | N/A | N/A | N/A |
| 96 | D-454658 | 1999 | 4 | Raymond Vera Ricardo Raygoza Francisco Rodriguez Frank Arenibar | NO | N/A | N/A | N/A | N/A | N/A | N/A | | N/A | N/A | N/A |
| 97 | D-724882 | 1999 | 4 | Tanya McWilliams | NO | N/A | N/A | N/A | N/A | N/A | N/A | | N/A | N/A | N/A |
| 98 | F-475-960 | 2000 | 4 | Juan Cordova | NO | N/A | N/A | N/A | N/A | N/A | N/A | | N/A | N/A | N/A |
| 99 | F-405-633 | 2000 | 4 | Joe Jackson | NO | N/A | N/A | N/A | N/A | N/A | N/A | | N/A | N/A | N/A |

HOOD 038953
Weston 053970

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS CRIMINAL DEFENSE ATTORNEY FILE BEEN PRODUCED? | ARE INVESTIGATIVE MATERIALS MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING INVESTIGATIVE MATERIALS | DOES THE DEFENSE ATTORNEY FILE CONTAIN AN INVENTORY SHEET? | DOES THE INVENTORY SHEET IN THE DEFENSE ATTORNEY FILE MATCH THE INVENTORY SHEET IN THE BASEMENT FILE? | ARE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | DOES THE BASEMENT FILE INCLUDE AN INVENTORY? | BATES NUMBER FOR INVENTORY | IS THE INVENTORY COMPLETE? | EXAMPLES OF ITEMS MISSING FROM INVENTORY | ARE THERE HANDWRITTEN NOTES IN THE FILE? | BATES NUMBERS FOR HANDWRITTEN NOTES | ARE THERE TO-FROM MEMOS IN THE FILE? | BATES NUMBERS FOR TO-FROM MEMOS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 100 | F-731010 | 2000 | 4 | Eric Brocks Johnny Sims | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 007787 | YES | N/A | NO | N/A | NO | N/A |
| 101 | F-746059 | 2000 | 1 | Jermaine Washington | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 007831 | NO | Photos – Scene/Body | NO | N/A | NO | N/A |
| 102 | G-032399 | 2001 | 1 | Latoya Jones Diante Wiley | YES | YES | ACB 009209-10; ACB 009215-20; ACB 009264-77; ACB 009282-86; ACB 009288-302; ACB 009333-34; ACB 009362-63; ACB 009365-66; ACB 009369; ACB 009409-13 | NO | N/A | NO | N/A | NO | N/A | NO | N/A | YES | ACB 009209-9210 | NO | Photos – Person / Daily Major Incident Log / Felony Minutes– Form 101 / Child Abuse Investigation/Placement Report / Consent to Search Form | NO | N/A | YES | ACB 009264 |
| 103 | G-082465 | 2001 | 1 | Andre Richardson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 009545-9546 | YES | N/A | NO | N/A | NO | N/A |
| 104 | G-108432 | 2001 | 1 | Rasson Davis Gregory Brown | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 010196-10197 | NO | Handwritten note (10286-10288; 10300) | YES | ACB 010287-10289; ACB 010300; ACB 010339 | NO | N/A |
| 105 | G-118582 | 2001 | 1 | Stanton Adams | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 010563 | NO | Handwritten notes (10715-10717; 10725-10727) | YES | ACB 010686, 0638; 010715-10717; ACB 010721-10722, ACB 010734 | NO | N/A |
| 106 | G-128509 | 2001 | 1 | Leonard Suggs | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 010777-10779 | NO | Handwritten notes (10851-10854; 10867; 10869; 10882-10887; 10889-10892) | YES | ACB 010851-10852, ACB 010854, ACB 010858, ACB 010867, ACB 010869, 0609, ACB 010881, 10887, ACB 010889, 10892, ACB 010917 | YES | ACB 010855, ACB 010906-10915 |
| 107 | G-142325 | 2001 | 4 | Brian Robinson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 010999-11000 | NO | Handwritten notes (11005; 11051); Subpoena (11001) | YES | ACB 011051; ACB 011148 | NO | N/A |
| 108 | G-152113 | 2001 | 1 | Terrill Marshall Aaron Givens | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 011361-11362 | NO | Handwritten notes (11529); Crime Scene Photos (11366-11406) | NO | N/A | NO | N/A |
| 109 | G-168213 | 2001 | 1 | Shakima Feazell Dion Banks | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 011979-11981 | NO | Handwritten notes (12064; 12067) Subpoena (11202; 12203) | YES | ACB 012155-12156 | YES | ACB 012178 |
| 110 | G-187460 | 2001 | 4 | Arnold Paru | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 012381-12382 | NO | GPR (12383) | NO | N/A | NO | N/A |
| 111 | G-188311 | 2001 | 1 | Donny McGee | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 012525-12528 | NO | Handwritten note (12681; 12735; 12779) GPR (12706) | YES | ACB 012681, ACB 012735, ACB 012739, ACB 012779, ACB 012794 | NO | N/A |
| 112 | G-188820 | 2001 | 1 | Tyrone Sanders | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 012881-12883 | NO | GPRs (13038-13063) | YES | ACB 012972, ACB 012976, ACB 012973, ACB 013002, ACB 013061-13062, ACB 013064-13065, ACB 013102 | NO | N/A |
| 113 | G-190057 | 2001 | 1 | Donald Mann | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 013146 | NO | To-from Memo (13173-13174) | NO | N/A | YES | ACB 013173-13174 |
| 114 | G-221780 | 2001 | 1 | Maurice Forest | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 013372-13373 | NO | Handwritten note (13609; 13644; 13723-13724) | YES | ACB 013608, ACB 013609, ACB 013644, ACB 013723-13724, ACB 013726 | NO | N/A |
| 115 | G-226841 | 2001 | 1 | Carl Jones Andre Jackson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 013742-13743 | NO | Handwritten note (13981; 14005; 14054); 63 GPRs inventoried, 71 in the file. | YES | ACB 014005 | NO | N/A |
| 116 | G-248938 | 2001 | 1 | Jeffery Hester | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 014409-14471 | NO | To-from Memo (14541); Handwritten note (14688) | YES | ACB 014599-14599; ACB 014688 | YES | ACB 014541 |
| 117 | G-259321 | 2001 | 1 | Kevin Jackson | YES | NO | N/A | YES | YES | N/A | N/A | N/A | N/A | N/A | N/A | NO | N/A | | | | | | |
| 118 | G-261213 | 2001 | 1 | Samer Itani | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 014926-14927 | NO | Handwritten note (15026; 15039) | NO | N/A | NO | N/A |
| 119 | G-266841 | 2001 | 1 | Timothy Malone | YES | YES | ACB 15162-15164; ACB 15179-15180 ACB 015186; 15183-15184; ACB 15191-95; ACB 015199-200; ACB 015263; ACB 015268; ACB 015281 | NO | N/A | YES | *ACB 015194-195 *ACB 015268 *ACB 015281 | YES | *ACB 015263 *ACB 015270 | YES | ACB 015192 | YES | ACB 015162 | NO | Photo- Person | NO | N/A | NO | N/A |
| 120 | G-268444 | 2001 | 1 | Isaiah Brady | YES | YES | ACB 015506; ACB 015661; ACB 015670; ACB 015691; ACB 015603; ACB 015642-71; ACB 015728-35; ACB 015740; ACB 015673-79; ACB 015699-700; ACB 015511; ACB 015564-85; ACB 015591-92; ACB 015701-02; ACB 015623; ACB 015641; ACB 015672-74; ACB 015686-87; ACB 015700; ACB 015703-15766 | YES | NO - additional entries after 1/10/2002 (PD file - CRIM.DEF FILES - FIELDS 015609-10; Inv. File - 15506-15507) | YES | ACB 015601; ACB 015603; ACB 015642-15671 | YES | ACB 015661; ACB 015670 | NO | N/A | YES | ACB 015506-15507 | NO | Handwritten notes (15661; 15670) | YES | ACB 015591, ACB 015661, ACB 015670 | NO | N/A |
| 121 | G-276002 | 2001 | 1 | Thomas Reese | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 015763-15764 | NO | Handwritten note (15994) To-from Memo w/ handwritten note (16000) | YES | ACB 015994; ACB 015998, ACB 016002 | YES | ACB 016000-16001 |
| 122 | G-311269 | 2001 | 1 | Tracy Williams | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 016402-16403 | NO | Case Report (16542-16543) | NO | N/A | NO | N/A |
| 123 | G-322669 | 2001 | 1 | Carlos Corona | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 016883-16884 | NO | Handwritten note (16996) | YES | ACB 016996, ACB 017000, ACB 017029, ACB 017038, ACB 017042 | NO | N/A |

HOOD 038954
Weston 053971

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| IDENTIFYING INFORMATION | | | | PERMANENT RETENTION FILE COMPARISON *Items in the Investigative File missing from the Permanent Retention File* | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS A PERMANENT RETENTION FILE BEEN PRODUCED? | IS THE INVESTIGATIVE FILE INVENTORY IN THE PERMANENT RETENTION FILE? | DOES THE INVENTORY IN THE PERMANENT RETENTION FILE MATCH THE INVENTORY IN THE INVESTIGATIVE FILE? | ARE THE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | OTHER INVESTIGATIVE MATERIAL FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE |
| 100 | F-731010 | 2000 | 4 | Eric Brocks Johnny Sims | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 101 | F-746059 | 2000 | 1 | Jermaine Washington | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 102 | G-032399 | 2001 | 1 | Latoya Jones Diante Wiley | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 103 | G-082465 | 2001 | 1 | Andre Richardson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 104 | G-108432 | 2001 | 1 | Rasson Davis Gregory Brown | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 105 | G-118582 | 2001 | 1 | Stanton Adams | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 106 | G-128509 | 2001 | 1 | Leonard Suggs | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 107 | G-142325 | 2001 | 4 | Brian Robinson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 108 | G-152113 | 2001 | 1 | Tirrell Marshall Aaron Givens | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 109 | G-168213 | 2001 | 1 | Shakina Feazell Dion Banks | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 110 | G-187460 | 2001 | 4 | Arnold Paris | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 111 | G-188311 | 2001 | 1 | Donny McGee | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 112 | G-188820 | 2001 | 1 | Tyrone Sanders | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 113 | G-190057 | 2001 | 1 | Donald Mann | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 114 | G-221780 | 2001 | 1 | Maurice Forest | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 115 | G-226841 | 2001 | 1 | Carl Jones Andre Jackson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 116 | G-248938 | 2001 | 1 | Jeffery Hester | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 117 | G-259321 | 2001 | 1 | Kevin Jackson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 118 | G-261213 | 2001 | 1 | Samer Itani | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 119 | G-266841 | 2001 | 1 | Timothy Malone | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 120 | G-268444 | 2001 | 1 | Isaiah Brady | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 121 | G-276602 | 2001 | 1 | Thomas Reese | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 122 | G-311269 | 2001 | 1 | Tracy Williams | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 123 | G-322669 | 2001 | 1 | Carlos Corona | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

HOOD 038955
Weston 053972

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS CRIMINAL DEFENSE ATTORNEY FILE BEEN PRODUCED? | ARE INVESTIGATIVE MATERIALS MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING INVESTIGATIVE MATERIALS | DOES THE DEFENSE ATTORNEY FILE CONTAIN AN INVENTORY SHEET? | DOES THE INVENTORY SHEET IN THE DEFENSE ATTORNEY FILE MATCH THE INVENTORY SHEET IN THE BASEMENT FILE? | ARE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | DOES THE BASEMENT FILE INCLUDE AN INVENTORY? | BATES NUMBER FOR INVENTORY | IS THE INVENTORY COMPLETE? | EXAMPLES OF ITEMS MISSING FROM INVENTORY | ARE THERE HANDWRITTEN NOTES IN THE FILE? | BATES NUMBERS FOR HANDWRITTEN NOTES | ARE THERE TO-FROM MEMOS IN THE FILE? | BATES NUMBERS FOR TO-FROM MEMOS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 124 | G-326467 | 2001 | 1 | Anthony Mason; Edward Ware; George Frison; Eddie Baker | YES | YES | ACB 017073-075; ACB 017077; ACB 017079-116; ACB 017118-55; ACB 017157-161; ACB 017178; ACB 017182-87; ACB 017195; ACB 017198; ACB 017200; ACB 017232; ACB 017241; ACB 017256; ACB 017265; ACB 017266-275; ACB 017277-82; ACB 017300-302; ACB 017317; ACB 017360-361; ACB 017361; ACB 017374; ACB 017376 | NO | N/A | YES | ACB017300-302, ACB017517-318, ACB017360-361 | YES | ACB017154-155, ACB017185, ACB017374 | NO | N/A | YES | ACB 017073-075 | NO | Complaints for Preliminary Examination, Handwritten Notes, Criminal History, ISP Submission, Photos - Scene/Body, Request for Evidence Identification, Photographs | YES | ACB 017154-155, ACB 017185, ACB 017370-371 | NO | N/A |
| 125 | G-330755 | 2001 | 1 | Pyrrone Waller; Jermaine Robertson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 017382-17383 | NO | To-From Memo (17452) | YES | ACB 017548, ACB 017552 | YES | ACB 017452-17453 |
| 126 | G-356804 | 2001 | 1 | James House | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 017766-17767 | NO | Supp Report, July 14, 01 (17841-17842) | NO | N/A | NO | N/A |
| 127 | G-380402 | 2001 | 4 | Jose Jimenez | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 017987-17988 | NO | Handwritten note (18046) | YES | ACB 018015-18016, ACB 018046-18047 | NO | N/A |
| 128 | G-389122 | 2001 | 1 | Kenneth Gayden | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 018226-18227 | NO | Daily Major Incident Logs (18346-18347) | NO | N/A | NO | N/A |
| 129 | G-390651 | 2001 | 1 | Francisco Rodriguez; Julio Camacho | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 018350-18351 | NO | Handwritten notes (18407-18410) | YES | ACB 018407-18410, ACB 018409 | YES | ACB 018470-18473 |
| 130 | G-397986 | 2001 | 1 | Stacy Samuels | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 018314 | NO | Daily Major Incident Log (18514), Request for Evidence (18519-18520) | NO | N/A | NO | N/A |
| 131 | G-399481 | 2001 | 1 | Desmond Vinson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 018559-18561 | NO | Handwritten note (18770) | YES | ACB 018529, ACB 018770 | YES | ACB 018782 |
| 132 | G-406405 | 2001 | 1 | Santana McCree | YES | YES | ACB 019002; ACB 019002; ACB 019026-30; ACB 019051-052 | YES | NO - additional entries after 1/14/2002 (ACB019002 in Inv. File; CRIM DEF FILES - FIELDS 007060 in PD file) | NO | N/A | YES | ACB 019146 | YES | ACB019024, ACB019028 | YES | ACB 019001-902 | NO | Hospitalization Case Report, Handwritten Note, IL Torture Commission Files, Photos- Scene/Body, Photos-Person | YES | ACB 019084 | NO | N/A |
| 133 | G-419125 | 2001 | 1 | Francisco Gutierrez | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 019191-19193 | NO | Handwritten note of crime scene diagram (19353) | YES | ACB 019328, ACB 019351, ACB 019381 | NO | N/A |
| 134 | G-425608 | 2001 | 1 | Ernest Montes | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 019458-19460 | NO | Handwritten note (19630, 19632; 19716), Photocopies (19665-19667) | YES | ACB 019633, ACB 019716 | NO | N/A |
| 135 | G-434632 | 2001 | 1 | Barabara Rolark | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 019725-19726 | NO | Typed Memo (19813-19818), Subpoena (19874) | NO | N/A | NO | N/A |
| 136 | G-443474 | 2001 | 4 | Salvador Rico | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 019876-19877 | NO | Handwritten note (20030; 20032) | NO | N/A | NO | N/A |
| 137 | G-447444 | 2001 | 1 | Derrick Crawford | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 020158 | NO | Daily Major Incident Log (20257), Handwritten note (20240, 20321), Supp Report CC (20241-20250) | YES | ACB 020021 | NO | N/A |
| 138 | G-450601 | 2001 | 1 | Margaret Thomas | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 020327-20328 | NO | Daily Major Incident Log (20561), Handwritten note (20408) | NO | N/A | NO | N/A |
| 139 | G-451387 | 2001 | 1 | Ubex Lopez; Richard Gacho | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 020455-20456 | NO | Handwritten note (20541) | YES | ACB 020460, ACB 020463, ACB 020541 | NO | N/A |
| 140 | G-456492 | 2001 | 1 | Fillmon Resendez | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 020565-20566 | NO | Handwritten note (20620; 20688; 20692; 20721; 20723; 20731-20736; 20742; 20764; 20767; 20776-20780), To-from Memo (20683-20699; 20710-20713) | YES | ACB 020620, ACB 020653-20621, ACB 020632, ACB 020671, ACB 020713-20716, ACB 020730, ACB 020742, ACB 020756, ACB 020767, ACB 020764, ACB 020781, ACB 020783-20789 | YES | ACB 020648, ACB 020683-20687, ACB 020689-20690, ACB 020710-20713 |
| 141 | G-491442 | 2001 | 1 | Edward Pleasant | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 021420-21421 | NO | Daily Major Incident Log (21573-21575) | NO | N/A | NO | N/A |
| 142 | G-497018 | 2001 | 1 | Gerald Henry | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 021577-21578 | NO | Case Report (21649-21650) | NO | N/A | NO | N/A |
| 143 | G-506663 | 2001 | 4 | Miguel Garcia | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 021808-21811 | NO | Handwritten note (21858; 21864; 22064-22065; 21880, ACB 021896, ACB 021880-22083), To-from Memo w/ photo of pros. Offender (22066) | YES | ACB 021858, ACB 021864, ACB 021868, ACB 021875-21880, ACB 021896, ACB 022064-22065, ACB 022067, ACB 022074-22075, ACB 022078-22079, ACB 022083 | NO | N/A |
| 144 | G-541859 | 2001 | 1 | Alan Coleman | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 022239 | NO | Witness Statements (22206-22234) | NO | N/A | NO | N/A |
| 145 | G-543889 | 2001 | 1 | Bennie Teague | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 022261-22262 | NO | Daily Major Incident Log (22230-22331), Body Diagram (22384) | YES | ACB 022370-22376 | NO | N/A |
| 146 | G-547890 | 2001 | 1 | Juan Macias; Sergio Jimenez; Christopher Kuhar | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 022495 | NO | Handwritten note (22652; 22652), Inv. Alerts (22620; 22621) | YES | ACB 022632 | NO | N/A |
| 147 | G-554146 | 2001 | 1 | Leroy Washington | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 022656-22657 | NO | To-from Memo (22747; 22748; 22762), Handwritten note (22831) | YES | ACB 022742, ACB 022755-22757, ACB 022762 | YES | ACB 022751-22754, ACB 022756-22764 |
| 148 | G-556511 | 2001 | 1 | Roberto Barrera | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 022824-22825 | NO | Handwritten note (22831), ISP Criminal History Record Info (22827; 22829) | NO | N/A | NO | N/A |
| 149 | G-567131 | 2001 | 1 | Charles Walker; Michael Harris | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 022950-22951 | NO | Handwritten note (23130; 23178; 23188; 23216), Daily Major Incident Log (23028-23090) | YES | ACB 023134, ACB 023178, ACB 023226 | NO | N/A |

HOOD 038956
Weston 053973

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| | RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS A PERMANENT RETENTION FILE BEEN PRODUCED? | IS THE INVESTIGATIVE FILE INVENTORY IN THE PERMANENT RETENTION FILE? | DOES THE INVENTORY IN THE PERMANENT RETENTION FILE MATCH THE INVENTORY IN THE BASEMENT FILE? | ARE THE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | OTHER INVESTIGATIVE MATERIAL FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 124 | G-326467 | 2001 | 1 | Anthony Mason, Edward Ware, George Frison, Eddie Baker | NO | N/A | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 125 | G-330755 | 2001 | 1 | Pyreese Waller, Jermaine Roberson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 126 | G-356804 | 2001 | 1 | James House | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 127 | G-380402 | 2001 | 4 | Jose Jimenez | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 128 | G-389122 | 2001 | 1 | Kenneth Gayden | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 129 | G-390651 | 2001 | 1 | Francisco Rodriguez, Julio Camacho | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 130 | G-397986 | 2001 | 1 | Stacy Samuels | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 131 | G-399481 | 2001 | 1 | Desmond Vinson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 132 | G-406405 | 2001 | 1 | Santana McCrea | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 133 | G-410125 | 2001 | 1 | Francisco Gutierrez | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 134 | G-425608 | 2001 | 1 | Ernest Motes | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 135 | G-434632 | 2001 | 1 | Barabara Rolark | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 136 | G-443474 | 2001 | 4 | Salvador Rico | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 137 | G-447444 | 2001 | 1 | Derrick Crawford | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 138 | G-450601 | 2001 | 1 | Margaret Thomas | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 139 | G-451387 | 2001 | 1 | Ubex Lopez, Richard Gacho | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 140 | G-456492 | 2001 | 1 | Filimon Resendez | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 141 | G-491442 | 2001 | 1 | Edward Pleasant | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 142 | G-497018 | 2001 | 1 | Gerald Henry | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 143 | G-506663 | 2001 | 4 | Miguel Garcia | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 144 | G-541859 | 2001 | 1 | Alan Coleman | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 145 | G-543889 | 2001 | 1 | Bennie Teague | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 146 | G-547890 | 2001 | 1 | Juan Macias, Sergio Jimenez, Christopher Kubar | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 147 | G-554146 | 2001 | 1 | Leroy Washington | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 148 | G-556311 | 2001 | 4 | Roberto Barrera | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 149 | G-567131 | 2001 | 1 | Charles Walker, Michael Harris | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

HOOD 038957
Weston 053974

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| # | RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS CRIMINAL DEFENSE ATTORNEY FILE BEEN PRODUCED? | ARE INVESTIGATIVE MATERIALS MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING INVESTIGATIVE MATERIALS | DOES THE DEFENSE ATTORNEY FILE CONTAIN AN INVENTORY SHEET? | DOES THE INVENTORY SHEET IN THE DEFENSE ATTORNEY FILE MATCH THE INVENTORY SHEET IN THE BASEMENT FILE? | ARE GENERAL PROGRESS REPORTS FROM BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | DOES THE BASEMENT FILE INCLUDE AN INVENTORY? | BATES NUMBER FOR INVENTORY | IS THE INVENTORY COMPLETE? | EXAMPLES OF ITEMS MISSING FROM INVENTORY | ARE THERE HANDWRITTEN NOTES IN THE FILE? | BATES NUMBERS FOR HANDWRITTEN NOTES | ARE THERE TO-FROM MEMOS IN THE FILE? | BATES NUMBERS FOR TO-FROM MEMOS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 150 | G-570120 | 2001 | 1 | Crisino Bravo / Filiberto Bravo | YES | YES | ACB 023264; ACB 023268-307, ACB 023309-351; ACB 023366, ACB 023369-70; ACB 023379, ACB 023382; ACB 023386-388; ACB 023393; ACB 023402; ACB 023412-417, ACB 023421; ACB 023425-29; ACB 023432; ACB 023446-447, ACB 23456; ACB 023460-468; ACB 023469-71 | NO | N/A | YES | *ACB 023402 *ACB 023412-417 *ACB 023421 *ACB 023432 *ACB 023438 *ACB 023427 | YES | ACB 023370 | NO | N/A | YES | ACB 023264 | NO | Photos – Person; Photos – Scene/Body; Biz. Card; Handwritten Note; Subpoena –Defense; Daily Major Incident Log | YES | ACB 023370 | NO | N/A |
| 151 | G-575283 | 2001 | 1 | Andrzej Konopacki | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 023474 | NO | Daily Major Incident Log (23477; 23536); Handwritten note (23516; 23559) | NO | N/A | NO | N/A |
| 152 | G-578724 | 2001 | 1 | Teamul Foreman | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 023608-23610 | NO | Handwritten note (23614; 23751) | YES | ACB 023696, ACB 023751; ACB 023760 | NO | N/A |
| 153 | G-592219 | 2001 | 1 | Raul Lemus | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 023801-23803 | NO | Handwritten note (23878; 23934-23936) | YES | ACB 023934-23936 | NO | N/A |
| 154 | G-602617 | 2001 | 1 | Kimberley Hood | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 024047 | NO | 5 to-from memos are listed and there are 4 in the file. (24062; 24106-24108) | NO | N/A | YES | ACB 024062, ACB 024106-24108 |
| 155 | G-630073 | 2001 | 1 | Iran Thomas | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 024118-24119 | NO | GPRs - 2 are listed and there are 25 in the file. (24267-24295); Handwritten note (24270; 24272; 24296; 24318) | YES | ACB 024270, ACB 024296, ACB 024318 | NO | N/A |
| 156 | G-630295 | 2001 | 1 | Terry Thomas | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 024369-24374 | NO | 2 Handwritten notes listed, 4 in file (24439; 24486-24667; 24737) | YES | ACB 024439, ACB 024666, ACB 024737 | NO | N/A |
| 157 | G-632707 | 2001 | 1 | Baruch Shaw | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 024743-24745 | NO | 0 GPRs listed in the inventory, 55 in the file (24771-24818); Handwritten note (24751) | YES | ACB 024834, ACB 024836, ACB 024840 | YES | ACB 024912, ACB 024842-24845 |
| 158 | G-648246 | 2001 | 1 | Helen Kos | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 024984-24986 | NO | Handwritten note (25089; 25091; 25093; 25127) | YES | ACB 025091, ACB 025093, ACB 025127 | NO | N/A |
| 159 | G-655145 | 2001 | 1 | Earl Herron | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 025261-25282 | NO | Inv. File Control (25285) | NO | N/A | NO | N/A |
| 160 | G-656885 | 2001 | 1 | Larry Simpson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 025601, ACB 025607 | NO | Handwritten/inven sketch (25603; 25607) | YES | ACB 025603, ACB 025607 | NO | N/A |
| 161 | G-670379 | 2001 | 1 | Devale Holman / Sandy Williams / Ebonie Gadison | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 025617-25619 | NO | Handwritten note (25741; 25788) | YES | ACB 025687, ACB 025788 | NO | N/A |
| 162 | G-678089 | 2001 | 1 | Omarr Teague | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 025963-25964 | NO | Inv. File Control (26034); 64 Photos (25969-26033); Handwritten note (26139) | NO | N/A | NO | N/A |
| 163 | G-686446 | 2001 | 1 | Jason Davis / Mario Garcia / Hector Flores | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 026145-26147 | NO | 10 Handwritten notes in file, 2 listed on Inventory | YES | ACB 026226, ACB 026252, ACB 026271, ACB 026311, ACB 026396, ACB 026423, ACB 026434, ACB 026446, ACB 026478, ACB 026440, ACB 026483 | NO | N/A |
| 164 | G-688481 | 2001 | 1 | Terry Powe | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 026524-26525 | NO | Inv. File Control (26611); Photos (26530-26546); Community Alert Flyer (26611) | YES | ACB 026610 | NO | N/A |
| 165 | G-691809 | 2001 | 1 | Johnnie Hill | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 026747-26748 | NO | 2 Handwritten notes in file, 0 listed on Inventory | YES | ACB 026832, ACB 026895 | NO | N/A |
| 166 | G-694725 | 2001 | 4 | Jermaine Jackson / Peter Lawrence / Byron Jones | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 007899-7901 | NO | To-from Memo (7902; 8047); Typed Witness List with Handwritten notes (7904); Handwritten map (8081) | YES | ACB 007902-7904, ACB 008081 | YES | ACB 008047 |
| 167 | G-694885 | 2001 | 1 | William Lyles | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 026934-26935 | NO | Inv. File Control (26966); Photos (26939-26965) | NO | N/A | NO | N/A |
| 168 | G-701363 | 2001 | 4 | Erik Argueta | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 008168-8170 | NO | Inv. File Control (8266); Attorney Business Card (8303); (Note: it appears something on line 23, page 8170 was whited-out.) | NO | N/A | NO | N/A |
| 169 | G-705434 | 2001 | 1 | Norman McIntosh | YES | YES | ACB 027080-082; ACB 027085-104; ACB 027106-135; ACB 027116-17; ACB 027139-77; ACB 027183-187; ACB 027193-197; ACB 027204-205; ACB 027222; ACB 027231-233; ACB 027246-47; ACB 027250; ACB 027255-257; ACB 027280; ACB 027283-84 | NO | N/A | YES | ACB027231-233, ACB027246-247 | YES | ACB 027222 | NO | N/A | YES | ACB 027080-082 | NO | Outreach Ministry Card; Handwritten Note; Photos – Person; Photos – Scene/Body; Daily Major Incident Log | YES | ACB 027222 | NO | N/A |
| 170 | G-708133 | 2001 | 1 | Kevin McGraw | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 027316-27317 | NO | Miranda Warning with Handwritten note (27432) | NO | N/A | NO | N/A |
| 171 | G-722334 | 2001 | 1 | Renetta Braboy | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 027436 | NO | To-from Memo with Handwritten note (27490); 3 Handwritten notes in file, 0 listed on Inventory | NO | N/A | NO | N/A |
| 172 | G-751124 | 2001 | 1 | Jorge Mendez | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 027627 | NO | State's Ex. 1 Photo (27658); 1 Handwritten note in file, 0 listed on Inventory | NO | N/A | NO | N/A |
| 173 | G-759169 | 2001 | 1 | Arthur Shanklin | YES | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 027720-27722 | NO | 53 GPRs in file, 32 listed on inventory; 1 Handwritten note in file, 0 listed on Inventory | YES | ACB 027879 | NO | N/A |

HOOD 038958
Weston 053975

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| | RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS A PERMANENT RETENTION FILE BEEN PRODUCED? | IS THE INVESTIGATIVE FILE INVENTORY IN THE PERMANENT RETENTION FILE? | DOES THE INVENTORY IN THE PERMANENT RETENTION FILE MATCH THE INVENTORY IN THE BASEMENT FILE? | ARE THE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | OTHER INVESTIGATIVE MATERIAL FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 150 | G-570120 | 2001 | 1 | Crisino Bravo Filiberto Bravo | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 151 | G-575283 | 2001 | 1 | Andrzej Konopacki | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 152 | G-578724 | 2001 | 1 | Tramel Foreman | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 153 | G-592219 | 2001 | 1 | Raul Lemus | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 154 | G-602617 | 2001 | 1 | Kimberley Hood | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 155 | G-630073 | 2001 | 1 | Iran Thomas | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 156 | G-630295 | 2001 | 1 | Terry Thomas | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 157 | G-632707 | 2001 | 1 | Baruch Shaw | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 158 | G-648246 | 2001 | 1 | Helen Kos | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 159 | G-655145 | 2001 | 1 | Earl Herron | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 160 | G-656885 | 2001 | 1 | Larry Simpson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 161 | G-670179 | 2001 | 1 | Devale Holman Sandy Williams Ebonie Gadison | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 162 | G-678089 | 2001 | 1 | Omarr Teague | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 163 | G-686446 | 2001 | 1 | Jason Davis Mario Garcia Hector Flores | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 164 | G-688481 | 2001 | 1 | Terry Powe | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 165 | G-691809 | 2001 | 1 | Johnnie Hill | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 166 | G-694725 | 2001 | 4 | Jermaine Jackson Peter Lawrence Byron Jones | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 167 | G-694885 | 2001 | 1 | William Lyles | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 168 | G-701363 | 2001 | 4 | Erik Argueta | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 169 | G-705434 | 2001 | 1 | Norman McIntosh | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 170 | G-708133 | 2001 | 1 | Kevin McGraw | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 171 | G-722334 | 2001 | 1 | Renetta Braboy | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 172 | G-751124 | 2001 | 1 | Jorge Mendez | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 173 | G-759169 | 2001 | 1 | Arthur Shanklin | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

### IDENTIFYING INFORMATION

### PERMANENT RETENTION FILE COMPARISON
*Items in the Investigative File missing from the Permanent Retention File*

HOOD 038959
Weston 053976

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS CRIMINAL DEFENSE ATTORNEY FILE BEEN PRODUCED? | ARE INVESTIGATIVE MATERIALS MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING INVESTIGATIVE MATERIALS | DOES THE DEFENSE ATTORNEY FILE CONTAIN AN INVENTORY SHEET? | DOES THE INVENTORY SHEET IN THE DEFENSE ATTORNEY FILE MATCH THE INVENTORY SHEET IN THE BASEMENT FILE? | ARE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | DOES THE BASEMENT FILE INCLUDE AN INVENTORY? | BATES NUMBER FOR INVENTORY | IS THE INVENTORY COMPLETE? | EXAMPLES OF ITEMS MISSING FROM INVENTORY | ARE THERE HANDWRITTEN NOTES IN THE FILE? | BATES NUMBERS FOR HANDWRITTEN NOTES | ARE THERE TO-FROM MEMOS IN THE FILE? | BATES NUMBERS FOR TO-FROM MEMOS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 174 | G-763-171 | 2001 | 4 | Andres Martinez / William Pelmer | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 008362-8365 | NO | 64 GPRs in file, 62 listed on inventory 2 To-from memos in file, 0 listed on Inventory | YES | ACB 008440-8444, ACB 008759 | YES | ACB 008451-8456 |
| 175 | G-776686 | 2001 | 1 | LaTonya Starnes | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 027956 | NO | Inv. File Control (27961) 2 Hospitalization Case Reports in file, 1 listed on Inventory Photos (28032-28040) | NO | N/A | NO | N/A |
| 176 | HH-101153 | 2002 | 1 | Henry Ingram | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 028753-28754 | NO | ACB 028752: Folder Cover; ACB 028756: Homicide File Review; ACB 028758-762: Crime History Snactky; ACB 028766-767: Lab Report; ACB 028768-69: ISP to front; ACB 028770: Investigative File Control; ACB 028781: Biz Card; ACB 028811-812, ACB 028829, ACB 028834, ACB 028922, ACB 028948, ACB 028974: Handwritten notes; ACB 028855-56 Tow Vehicle Report; ACB 028866-67: Firearm Recovery Report, ACB 028977, ACB 028978-015, ACB 029018-038, ACB 029040-046: Photos Scene; ACB 029017, ACB 029039: Photo Scene Card | YES | ACB 028811-28812 ACB 028869 ACB 048894 ACB 048900 | YES | 028868 (ACB 028870) |
| 177 | HH-105486 | 2002 | 1 | Marcus Robinson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 029048-29049 | NO | No Not Listed: ACB 029047: Folder Cover ACB 029050: Homicide File Review ACB 029051: Investigative File Control ACB 029052: Daily Major Incident Log ACB 029093: Handwritten note | YES | ACB 029130 | YES | ACB 029128-29129 ACB 029155 |
| 178 | HH-112360 | 2002 | UNK | Lawrence Bradley / Iran Thomas / Byron Nelson / Corey Hodges / Jerome Weathers | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | NO | N/A | NO | N/A | NO | N/A | NO | N/A |
| 179 | HH-112848 | 2002 | 1 | Montreis Hinton | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 029287-29289 | NO | ACB 029286: Folder Cover ACB 029290: Homicide File Review ACB 029291: Envelope ACB 029292-306: Scene/Body Photo ACB 029307: Scene Card Photo ACB 029308: Investigative File Control ACB 029310, ACB 029314: Daily Major Incident Note ACB 029499: Handwritten Note | NO | N/A | YES | ACB 029312-29313 |
| 180 | HH-123814 | 2002 | 1 | Ardell McNeal / Roderick Smith | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 029542-29544 | NO | ACB 029541: Folder Cover ACB 029545: Homicide File Review ACB 029546: Envelope ACB 029547-570: Scene/Body Photo ACB 029571: Investigative File Control ACB 029575, ACB 029577, ACB 029581, ACB 029583: Moving of Antoine ACB 029627-628: Crime Scene Processing Report and copy (only one listed in inventory) | NO | N/A | NO | N/A |
| 181 | HH-131667 | 2002 | 1 | Antoine Sanders | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 029768-29770 | NO | Handwritten Notes Photos- Scene/Body | YES | ACB 029847 ACB 029866-887 | NO | N/A |
| 182 | HH-138499 | 2002 | 1 | Reginald Flemister | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 029976-29978 | NO | Daily Major Incident Log Photos | NO | N/A | NO | N/A |
| 183 | HH-154152 | 2002 | 1 | Eric Nichols | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 030243-245 | NO | ACB 030242: Folder ACB 030246: Homicide File Review ACB 030247, ACB 030421: Envelope ACB 030248-250, ACB 030252-265: Scene/Body Photo ACB 030251: Scene Card Photo ACB 030266: Investigative File Control ACB 030411: Moving of Antoine ACB 030432-435: Major Crime Worksheet ACB 030444-445, ACB 030447-448: Investigative Alerts ACB 030302, ACB 030304, ACB 030306, ACB 030315, ACB 030322, ACB 030345, ACB 030354, ACB 030397, ACB 030408, ACB 030415: Handwritten Notes | YES | ACB 030302 ACB 030304 ACB 030306 ACB 030315 ACB 030323 | NO | N/A |
| 184 | HH-158954 | 2002 | 1 | Victor Wright | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 048948-950 | NO | To-From memo Daily Major Incident Log | YES | ACB 049154 | NO | N/A |
| 185 | HH-175723 | 2002 | 1 | Maurice Brown | YES | YES | ACB 049235-236; ACB 049240; ACB 049243; ACB 049245; ACB 049264; ACB 049266-267; ACB 049306-308; ACB 049250; ACB 049385; ACB 049394-95; ACB 049293; ACB 049399 | NO | N/A | NO | N/A | YES | ACB049383, ACB049385, ACB049387 | NO | N/A | YES | ACB 049236-237 | NO | GPR Handwritten Note Photos – Scene/Body Daily Major Incident Log | YES | ACB 049387 ACB 049385 | NO | N/A |
| 186 | HH-249096 | 2002 | 1 | Armando Cruz | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 049404-49406 | NO | Daily Major Incident Felony Minutes 101s Photos- Scene/Body Arrest Report | YES | N/A | NO | N/A |

HOOD 038960
Weston 053977

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| IDENTIFYING INFORMATION | | | | PERMANENT RETENTION FILE COMPARISON<br>*Items in the Investigative File missing from the Permanent Retention File* | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS A PERMANENT RETENTION FILE BEEN PRODUCED? | IS THE INVESTIGATIVE FILE INVENTORY IN THE PERMANENT RETENTION FILE? | DOES THE INVENTORY IN THE PERMANENT RETENTION FILE MATCH THE INVENTORY IN THE BASEMENT FILE? | ARE THE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | OTHER INVESTIGATIVE MATERIAL FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE |
| 174 | G-763-171 | 2001 | 4 | Andres Martinez<br>William Peltner | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 175 | G-776686 | 2001 | 1 | LaTonya Starnes | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 176 | HH-101153 | 2002 | 1 | Henry Ingram | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 177 | HH-105486 | 2002 | 1 | Marcus Robinson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 178 | HH-112360 | UNK | | Lawrence Bradley<br>Ivan Thomas<br>Byron Nelson<br>Corey Hodges<br>Jerome Weathers | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 179 | HH-112848 | 2002 | 1 | Montreis Hinton | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 180 | HH-123814 | 2002 | 1 | Ardell McNeal<br>Roderick Smith | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 181 | HH-131667 | 2002 | 1 | Antoine Sanders | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 182 | HH-138499 | 2002 | 1 | Reginald Flemister | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 183 | HH-154152 | 2002 | 1 | Eric Nichols | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 184 | HH-158954 | 2002 | 1 | Victor Wright | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 185 | HH-175723 | 2002 | 1 | Maurice Brown | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 186 | HH-249096 | 2002 | 1 | Armando Cruz | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

HOOD 038961
Weston 053978

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| Records Division Number | Year | Area | Defendant(s) | Has Criminal Defense Attorney File Been Produced? | Are Investigative Materials Missing From The Defense Attorney File? | Bates Numbers For Missing Investigative Materials | Does The Defense Attorney File Contain An Inventory Sheet? | Does The Inventory Sheet In The Defense Attorney File Match The Inventory Sheet In The Basement File? | Are General Progress Reports From The Basement File Missing From The Defense Attorney File? | Bates Numbers For Missing General Progress Reports | Are Handwritten Notes From The Basement File Missing From The Defense Attorney File? | Bates Numbers For Missing Handwritten Notes | Are To-From Memos From The Basement File Missing From The Defense Attorney File? | Bates Numbers For Missing To-From Memos | Does The Basement File Include An Inventory? | Bates Number For Inventory | Is The Inventory Complete? | Examples Of Items Missing From Inventory | Are There Handwritten Notes In The File? | Bates Numbers For Handwritten Notes | Are There To-From Memos In The File? | Bates Numbers For To-From Memos |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 187 | HH-257532 | 2002 | 1 | Curtis Baldwin | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 049738-49740 | NO | ACB 049737: Folder Cover; ACB 049741: Homicide File Review; ACB 049742: Investigative File Control; ACB 049743: Scene/Body Photos; ACB 049744-770, ACB 049773-792: Scene/Body Photo; ACB 049771-772: Scene Card Photo; ACB 049793-794: Daily Major Incident Log; ACB 049807; ACB 049906: Handwritten Note; ACB 049923: Moving of Arrestee; ACB 049878: License Plate; ACB 049897: Arrest Report; ACB 049844-845 and ACB 049824-825: ISP forensic report and copy of report, only listed once in inventory | YES | ACB 049906 | NO | N/A |
| 188 | HH-263021 | 2002 | 1 | Joseph Murchison Steven Brandon | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 050033-50034 | NO | Clear Data Inventory Recovered Reports; Daily Major Incident Log; Photos- Scene/Body | NO | N/A | NO | N/A |
| 189 | HH-270572 | 2002 | 1 | Ernesto Flores Rogelio Guerra | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 050135-50137 | NO | ACB 050134: Folder Cover; ACB 050138: Homicide File Review; ACB 050139-142: Daily Major Incident Log; ACB 050144-145, 050319: Handwritten Note; ACB 050144-145: Investigative File Control; ACB 050225: Biz Card; ACB 050320, ACB 050261: Envelope; ACB 050321; ACB 050331, ACB 050337-338, ACB 050362, ACB 050368, ACB 050379, ACB 050390-391: Scene Card Photo; ACB 050322-330, ACB 050363-367, ACB 050369-378, ACB 050380-389, ACB 050392-395: Photos- Photo; ACB 050332-336, ACB 050339-500: Scene/Body Photo; ACB 050400-401: Crime Scene Proc. Report and copy (only listed | YES | ACB 050143 | NO | N/A |
| 190 | HH-279592 | 2002 | 1 | Ron Turner Jarmichael Williams | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 050510-50511 | NO | ACB 050425-426: Folder Cover; ACB 050560: Envelope; ACB 050428, ACB 050429-439, ACB 050461-492, ACB 050494-496: Scene Card Photos; ACB 050429-439 Scene/Body Photos (only 4 crime scene photos listed but 63 Scene photos present); ACB 050497: Investigative File Control; ACB 050498-500: Daily Major Incident Log; ACB 050501-504, ACB 050506-559: To-From Memo; ACB 050505, ACB 050508, ACB 050620, ACB 050626: I-Can Photo Smith (only 1 listed but 2 present); ACB 050575-576, ACB 050932: Arrestee History Photo; ACB 050584, ACB 050605: Photo Person; ACB 050591: Investigative Alert | YES | ACB 050595 ACB 050588 ACB 050626 | YES | ACB 050501 ACB 050502 ACB 050503 ACB 050506 ACB 050507-569 |
| 191 | HH-280024 | 2002 | 1 | Andrew Robinson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 050660-50662 | NO | Handwritten Notes | YES | ACB 050907-908 | NO | N/A |
| 192 | HH-280696 | 2002 | 1 | Willie Murray John Murray | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 030468-30469 | NO | Photos- Body; Daily Major Incident Log; Handwritten Notes; Nano Check Report; Moving of Arrestee | YES | ACB 030509 ACB 030520 ACB 030575 | NO | N/A |
| 193 | HH-285733 | 2002 | 1 | DeShanta Young | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 050933-50935 | NO | Daily Major Incident; Photos- Scene/Body; ISP Forensics Report | YES | ACB 051100 ACB 051105 | NO | N/A |
| 194 | HH-296357 | 2002 | 1 | Jesus Munoz-Padilla | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 051188-51190 | NO | Daily Major Incident; Photos- Scene/Body; Handwritten Notes; Property Inventory; Felony Minutes- 101 | YES | ACB 051424 ACB 051440-447 | NO | N/A |
| 195 | HH-301377 | 2002 | 1 | Jermaine Evans | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 030616-30617 | NO | Daily Major Incident Log; Lost and Found Case Report | NO | N/A | NO | N/A |
| 196 | HH-316330 | 2002 | 1 | Victor Rivera | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB030795-30796 | NO | Photos, Photo Array, SOS Search, Leads Responses | YES | ACB 030987 ACB 031052 ACB 031054 ACB 031055 |  |  |
| 197 | HH-321998 | 2002 | 1 | Michael Wordlow | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 031073 | NO | Daily Major Incident Log; Photos- Scene/Body; Handwritten Note; Biz Cards | YES | ACB 031140 ACB 031153 |  |  |
| 198 | HH-347787 | 2002 | 1 | Kendrick Jackson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 031210 | NO | Daily Major Incident Log; Photos- Scene/Body; Written Statements; Handwritten Notes; GPRs; Supp. Report | YES | ACB 031243 | N/A | N/A |
| 199 | HH-358668 | 2002 | 1 | James Mitchell Marcel White Christopher Peoples Lawrence Harper | YES | YES | ACB 031250-295; ACB 031307-309; ACB 031311-322; ACB 031325-49, 031342-82, 031387-91, 031394; 031399-453; ACB 031455-489, 031491-499; ACB 031500-538; 031530-55, 031383-86 | NO | N/A | YES | *ACB 031329, *ACB 031358-361, *ACB 031419-427, *ACB 031429, *ACB 031491-495, *ACB 031497, *ACB 031500-511, *ACB 031513-517 | YES | *ACB 031327, *ACB 031330, *ACB 031496, *ACB 031512, *ACB 031484 (on an investigative alert) | YES | ACB 031294, ACB 031295 | NO | ACB 031307-309 | NO | Photos - Scene/Body; Daily Major Incident Log; IL Torture Inquiry Documents; Handwritten Notes | YES | ACB 031330 ACB 031327 ACB 031512 | NO | N/A |

HOOD 038962
Weston 053979

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| | RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS A PERMANENT RETENTION FILE BEEN PRODUCED? | IS THE INVESTIGATIVE FILE INVENTORY IN THE PERMANENT RETENTION FILE? | DOES THE INVENTORY IN THE PERMANENT RETENTION FILE MATCH THE INVENTORY IN THE BASEMENT FILE? | ARE THE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | OTHER INVESTIGATIVE MATERIAL FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 187 | HH-257532 | 2002 | 1 | Curtis Baldwin | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 188 | HH-263021 | 2002 | 1 | Josheph Murchison Steven Brandon | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 189 | HH-270572 | 2002 | 1 | Ernesto Flores Rogelio Guerra | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 190 | HH-279592 | 2002 | 1 | Ron Turner Jarmichael Williams | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 191 | HH-280024 | 2002 | 1 | Andrew Robinson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 192 | HH-280696 | 2002 | 1 | Willie Murray John Murray | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 193 | HH-285733 | 2002 | 1 | DeShanta Young | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 194 | HH-296357 | 2002 | 1 | Jesus Munoz-Padilla | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 195 | HH-301377 | 2002 | 1 | Jermaine Evans | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 196 | HH-316330 | 2002 | 1 | Victor Rivera | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 197 | HH-321998 | 2002 | 1 | Michael Wordlow | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 198 | HH-347787 | 2002 | 1 | Kendrick Jackson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 199 | HH-358668 | 2002 | 1 | James Mitchell Marcel White Christopher Peoples Lawrence Harper | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

**IDENTIFYING INFORMATION**

**PERMANENT RETENTION FILE COMPARISON**
*Items in the Investigative File missing from the Permanent Retention File*

HOOD 038963
Weston 053980

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| | RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS CRIMINAL DEFENSE ATTORNEY FILE BEEN PRODUCED? | ARE INVESTIGATIVE MATERIALS MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING INVESTIGATIVE MATERIALS | DOES THE DEFENSE ATTORNEY FILE CONTAIN AN INVENTORY SHEET? | DOES THE INVENTORY SHEET IN THE DEFENSE ATTORNEY FILE MATCH THE INVENTORY SHEET IN THE BASEMENT FILE? | ARE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | DOES THE BASEMENT FILE INCLUDE AN INVENTORY? | BATES NUMBER FOR INVENTORY | IS THE INVENTORY COMPLETE? | EXAMPLES OF ITEMS MISSING FROM INVENTORY | ARE THERE HANDWRITTEN NOTES IN THE FILE? | BATES NUMBERS FOR HANDWRITTEN NOTES | ARE THERE TO-FROM MEMOS IN THE FILE? | BATES NUMBERS FOR TO-FROM MEMOS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 200 | HH-361418 | 2002 | 1 | Michael Smith | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 051605 | NO | BP Forensics Lab Report; Handwritten Note; Daily Major Incident Log; Photos- Scene/Body; Supp. Reports; GPRs; Photos- Person; Criminal History Reports; Written Statements; Investigative Alerts; Arrest Report; Subpoenas | YES | ACB 051601 | NO | N/A |
| 201 | HH-367441 | 2002 | 1 | Hannniah Dukes / Larry Williams / Damien Braboy | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 051831-51832 | NO | Daily Major Incident Log; Photos- Scene/Body; Handwritten notes | YES | ACB 051887 | NO | N/A |
| 202 | HH-367666 | 2002 | 1 | Terrance Edwards | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 052085-52087 | NO | Daily Major Incident Log; Photos- Scene/Body | NO | N/A | NO | N/A |
| 203 | HH-377524 | 2002 | 1 | el Lateef Mannie | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 052317 | NO | Daily Major Incident Log; Photos- Scene/Body | NO | N/A | NO | N/A |
| 204 | HH-414131 | 2002 | 1 | Robert Paschall | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 052389-52390 | NO | Moving of Arrestee; Photos- Person; Supp. Report; Daily Major Incident Log | YES | ACB 052391-392 | NO | N/A |
| 205 | HH-447119 | 2002 | 1 | Kevin Frazier | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 052580 | NO | Supp. Report; GPR; Photos- Scene/Body | NO | N/A | NO | N/A |
| 206 | HH-447396 | 2002 | 1 | Bernard Allen | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 052694-52695 | NO | Handwritten Notes; GPRs (inventory has it listed but they left a range for # of GPRs); Daily Major Incident Log | YES | ACB 052770 / ACB 052772 | NO | N/A |
| 207 | HH-500856 | 2002 | 4 | James Hardy | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 052794-52797 | NO | Photos- Tapes; GPRs; Body Diagram | NO | N/A | NO | N/A |
| 208 | HH-505945 | 2002 | 1 | Maurice McGee | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 053150 | NO | Daily Major Incident Log; Photos- Person; Memo | NO | N/A | NO | N/A |
| 209 | HH-522403 | 2002 | 1 | Emil Lee | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 053307 | NO | Handwritten Notes; Daily Major Incident Log; Photos- Scene | YES | ACB 053342 / ACB 053344 / ACB 053346 | NO | N/A |
| 210 | HH-524796 | 2002 | 1 | Marcus Cureton | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 053427-428 | NO | Photos- Scene/Body; Daily Major Incident Log | NO | N/A | NO | N/A |
| 211 | HH-525230 | 2002 | 1 | Shonita Roach | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 053585 | NO | Daily Major Incident Log; GPR | NO | N/A | NO | N/A |
| 212 | HH-529070 | 2002 | 1 | Douglas Bowman / Dwon Alexander | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 053654-53655 | NO | Photos- Scene/Body | YES | ACB 053785 | NO | N/A |
| 213 | HH-546846 | 2002 | 1 | Antonio Fort / Robert Tucker / Roosevelt Lawrence / James Onoley / Lamont Motes / Ricky Lawson / Henry Lawrence | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 053789-53791; ACB 054195-197 | NO | Photos- Scene/Body; Photos- Person; Handwritten Note; Form 101; Property Inventory 10009628; Handwritten Notes (2); Memo; Major Crime Worksheet; Daily Major Incident Report | YES | ACB 054228 / ACB 054277 / ACB 054354 / ACB 054389 | NO | N/A |
| 214 | HH-551686 | 2002 | 1 | Romelle Jones | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 054570-54571 | NO | Photos- Scene/Body; Daily Major Incident Log; Property Inventory; Handwritten Note | NO | N/A | NO | N/A |
| 215 | HH-572150 | 2002 | 1 | Rafel Baltazar / Jesus Zaragoza | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 054664-54665 | NO | Photos- Scene/Body; Daily Major Incident Log | NO | N/A | NO | N/A |
| 216 | HH-576930 | 2002 | 1 | Sedronio Alonzo / Celestino Chavez / Urbano Perez / Juan Alverez | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 054934-54935 | NO | Photos - Scene/Body; GPRs; Handwritten Notes | YES | ACB 055009 | NO | N/A |
| 217 | HH-609705 | 2002 | 1 | Jose Luera / Pierre Montanez | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 055236 | NO | Daily Major Incident Log; Arrestee History/ Mugshot; Leads Reports; Notice of Disclosure; Request for Non-Published Telephone Information; Felony Minute Sheet- Form 101; ID Card; Criminal History; GPRs; Supp. Reports | NO | N/A | NO | N/A |
| 218 | HH-614198 | 2002 | 1 | Larry Monroe / Otis Blackmon | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 055313-55315 | NO | Bio Cards; Handwritten notes; Daily Major Incident Log; Felony Minute Sheet -Form 101 | YES | ACB 055392 / ACB 055426 | NO | N/A |
| 219 | HH-617694 | 2002 | 1 | Ronald Funches | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 055500-55501 | NO | Photos- Scene/Body; Handwritten Notes; To-From Memo; Daily Major Incident Log | YES | ACB 055499 / ACB 055559-542 / ACB 055564-565 | YES | ACB 055497-498 |

HOOD 038964
Weston 053981

| | | | | IDENTIFYING INFORMATION | | | PERMANENT RETENTION FILE COMPARISON — Items in the Investigative File missing from the Permanent Retention File | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS A PERMANENT RETENTION FILE BEEN PRODUCED? | IS THE INVESTIGATIVE FILE INVENTORY IN THE PERMANENT RETENTION FILE? | DOES THE INVENTORY IN THE PERMANENT RETENTION FILE MATCH THE INVENTORY IN THE BASEMENT FILE? | ARE THE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | OTHER INVESTIGATIVE MATERIAL FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE |
| 200 | HH-361418 | 2002 | 1 | Michael Smith | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 201 | HH-367441 | 2002 | 1 | Hananiah Dukes / Larry Williams / Damien Braboy | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 202 | HH-367666 | 2002 | 1 | Terrance Edwards | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 203 | HH-377524 | 2002 | 1 | el Lateef Mannie | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 204 | HH-414131 | 2002 | 1 | Robert Paschall | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 205 | HH-447119 | 2002 | 1 | Kevin Frazier | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 206 | HH-447396 | 2002 | 1 | Bernard Allen | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 207 | HH-500856 | 2002 | 4 | James Hardy | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 208 | HH-505945 | 2002 | 1 | Maurice McGee | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 209 | HH-522403 | 2002 | 1 | Emil Lee | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 210 | HH-524796 | 2002 | 1 | Marcus Cureton | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 211 | HH-525230 | 2002 | 1 | Shonita Roach | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 212 | HH-529070 | 2002 | 1 | Douglas Bowman / Dwon Alexander | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 213 | HH-546846 | 2002 | 1 | Antonio Fort / Robert Tucker / Roosevelt Lawrence / James Ousley / Lamont Motes / Ricky Lawson / Henry Lawrence | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 214 | HH-551686 | 2002 | 1 | Romelle Jones | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 215 | HH-572150 | 2002 | 1 | Rafel Baltazar / Jesus Zaragoza | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 216 | HH-576930 | 2002 | 1 | Sedronio Alonso / Celestino Chavez / Urbano Perez / Juan Alvorez | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 217 | HH-609705 | 2002 | 1 | Jose Laera / Pierre Montanez | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 218 | HH-614198 | 2002 | 1 | Larry Monroe / Otis Blackmun | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 219 | HH-617694 | 2002 | 1 | Ronald Funches | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

HOOD 038965
Weston 053982

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS CRIMINAL DEFENSE ATTORNEY FILE BEEN PRODUCED? | ARE INVESTIGATIVE MATERIALS MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING INVESTIGATIVE MATERIALS | DOES THE DEFENSE ATTORNEY FILE CONTAIN AN INVENTORY SHEET? | DOES THE INVENTORY SHEET IN THE DEFENSE ATTORNEY FILE MATCH THE INVENTORY SHEET IN THE BASEMENT FILE? | ARE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | DOES THE BASEMENT FILE INCLUDE AN INVENTORY? | BATES NUMBER FOR INVENTORY | IS THE INVENTORY COMPLETE? | EXAMPLES OF ITEMS MISSING FROM INVENTORY | ARE THERE HANDWRITTEN NOTES IN THE FILE? | BATES NUMBERS FOR HANDWRITTEN NOTES | ARE THERE TO-FROM MEMOS IN THE FILE? | BATES NUMBERS FOR TO-FROM MEMOS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 220 | HH-618363 | 2002 | I | Darketh Travis | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 055649-55650 | NO | Photos- Scene/Body, Handwritten Note, Daily Major Incident Log | YES | ACB 055734 | NO | N/A |
| 221 | HH-635313 | 2002 | I | Joseph Booker | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 056062-56063 | NO | Photos- Scene/Body, Handwritten Note, Daily Major Incident Log | NO | N/A | NO | N/A |
| 222 | HH-660094 | 2002 | I | Janene Clay | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 056255 | NO | Daily Major Incident Log, Photos- Scene/Body | NO | ACB 056544 | NO | N/A |
| 223 | HH-690739 | 2002 | I | Scott Aramian | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 056385-56386 | NO | Daily Major Incident Log, Photos- Scene/Body | NO | N/A | NO | N/A |
| 224 | HH-749335 | 2002 | I | Devon Terrell | YES | YES | ACB 056507-10; ACB 056512-524; ACB 056532, ACB 056540, ACB 056564, ACB 056579-81; ACB 056610; ACB 056615 | NO | NO | N/A | YES | ACB056599, ACB056564, ACB056610 | NO | N/A | YES | ACB 056510 | NO | Handwritten notes, Daily Major Incident Log | YES | ACB 056615, ACB 056610 ACB 056564-567 | NO | N/A |
| 225 | HH-767627 | 2002 | I | Jaber Ahmad | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 056690-56691 | NO | Photos- Scene/Body, Report of Postmortem Examination | NO | N/A | NO | N/A |
| 226 | HH-783159 | 2002 | UNK | Neptali Perdomo | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 056878-56879 | NO | Photos- Scene/Body, Supp. Report | NO | N/A | NO | N/A |
| 227 | HH-811146 | 2002 | I | Antonio Richmond | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB07055-56056 | NO | Handwritten Notes, Photos- Scene/Body, Daily Major Incident Log | YES | ACB 057093 | NO | N/A |
| 228 | HH-818229 | 2002 | I | Christian Dalton | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 057186 | NO | Photos- Scene, Photos-Person, Daily Major Incident Log, Handwritten Note | YES | ACB 057269 | NO | N/A |
| 229 | HH-823907 | 2002 | I | Jajuan Hale | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 057348-57350 | NO | Photos- Scene, Handwritten Notes | YES | ACB 057435 | NO | N/A |
| 230 | HH-842054 | 2002 | I | Xavier Edwards | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 057631-57632 | NO | Photos- Scene/Body, School Schedule | YES | ACB 057638 | NO | N/A |
| 231 | HH-844492 | 2002 | I | Gregory Minniefield | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 057865-57866 | NO | Photos- Scene/Body, Timeline ASA Work Product, Daily Minute | YES | ACB 057973 | NO | N/A |
| 232 | HH-858534 | 2002 | I | Choice Enge / Jerome Howard | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 058054-58056 | YES | N/A | NO | N/A | NO | N/A |
| 233 | HH-859682 | 2002 | I | David Hernandez | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 058339-58340 | NO | Handwritten Notes, Photos- Person | YES | ACB 058408 | NO | N/A |
| 234 | HH-860642 | 2002 | I | Shellie Pakula | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 058549-58550 | NO | Photos- Scene/Body, Lab Report, Handwritten Note | YES | ACB 058603 | NO | N/A |
| 235 | HH-860835 | 2002 | I | James Freeman | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 089966-59969 | NO | Supp. Report, Investigative Alert, POLA Request, To-From Memos | YES | ACB 090016-017 ACB 090155 ACB 090211 ACB 090260 ACB 090261 ACB 090319-321 ACB 090330-332 | YES | N/A |
| 236 | HJ-102484 | 2002 | I | Anthony Houston / Jimmie Walls | YES | NO | | YES | YES | NO | | NO | | NO | | YES | ACB 031564-31566 | NO | Invest. Alerts, Complaint for Prelim. Examination, Felony Minutes, Photos- Scene/Body, Warrant, Daily Major Incident Log | NO | N/A | NO | N/A |
| 237 | HJ-117531 | 2003 | A/1 | Jane Ashby | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 031834 - 31835 | NO | 7 property inventory items on inventory, 0 in file | YES | ACB 031899 | NO | N/A |
| 238 | HJ-117559 | 2003 | A/1 | Onecirion Guereca / Jose Melgoza / Oscar Corral / Jose Nieves | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 032085 - 32086 | NO | 6 handwritten notes on inventory, 6 handwritten notes in file | YES | ACB 032083 ACB 032104 | NO | N/A |
| 239 | HJ-143625 | 2003 | I | David Gioconda Sr | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 032237 - 32239 | NO | 3 Detective Notes on inventory, 11 handwritten notes in file | YES | ACB 032236 ACB 032542 - 32544 ACB 032546 | YES | ACB 032379 - 32380 |
| 240 | HJ-145451 | 2003 | I | Charles Harper | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 032658 - 32659 | NO | 0 handwritten notes on inventory, 1 handwritten note in file, 0 Request for Temporary Release of Inmate on inventory, 1 Request for Temporary Release of Inmate in file | YES | ACB 032687 | NO | N/A |
| 241 | HJ-150056 | 2003 | I | Gabriel Stephens / Neysa Benning | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 032841 - 32842 | NO | 20 GPRS on inventory, 17 in the file, 0 handwritten notes on the inventory, 2 in the file, 0 To-From Memos on the inventory, 6 in the file | YES | ACB 032866 ACB 032880 ACB 032882 | YES | ACB 032829 - 32835 |
| 242 | HJ-169496 | 2003 | I | Bee Pittman | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 032986 - 32987 | NO | 0 handwritten notes on inventory, 5 in file. File indicated "problem loading this page" for pages 184-205 in pdf | YES | ACB 033035 ACB 033047 ACB 033097 ACB 033103 ACB 033111 | NO | N/A |
| 243 | HJ-211373 | 2003 | I | Telvin Shaw | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 033216 - 33217 | NO | 0 handwritten notes on inventory, 3 handwritten notes in file | YES | ACB 033359 ACB 033341 ACB 033154 - 33355 | NO | N/A |

HOOD 038966
Weston 053983

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| | IDENTIFYING INFORMATION | | | | PERMANENT RETENTION FILE COMPARISON | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Items in the Investigative File missing from the Permanent Retention File | | | | | | | |
| | RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS A PERMANENT RETENTION FILE BEEN PRODUCED? | IS THE INVESTIGATIVE FILE INVENTORY IN THE PERMANENT RETENTION FILE? | DOES THE INVENTORY IN THE PERMANENT RETENTION FILE MATCH THE INVENTORY IN THE BASEMENT FILE? | ARE THE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | OTHER INVESTIGATIVE MATERIAL FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE |
| 220 | HH-618363 | 2002 | 1 | Darketth Travis | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 221 | HH-635513 | 2002 | 1 | Joseph Booker | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 222 | HH-660094 | 2002 | 1 | Janene Clay | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 223 | HH-690739 | 2002 | 1 | Scott Aramian | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 224 | HH-749335 | 2002 | 1 | Devon Terrell | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 225 | HH-767627 | 2002 | 1 | Jaber Ahmad | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 226 | HH-783159 | 2002 | UNK | Neptali Perdomo | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 227 | HH-811146 | 2002 | 1 | Antonio Richmond | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 228 | HH-818229 | 2002 | 1 | Christhan Dalton | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 229 | HH-823907 | 2002 | 1 | Jajuan Hale | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 230 | HH-842054 | 2002 | 1 | Xavier Edwards | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 231 | HH-844492 | 2002 | 1 | Gregory Minniefield | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 232 | HH-858534 | 2002 | 1 | Choice Enge Jerome Howard | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 233 | HH-858682 | 2002 | 1 | David Hernandez | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 234 | HH-860642 | 2002 | 1 | Shellie Pakula | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 235 | HH-860835 | 2002 | 1 | James Freeman | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 236 | HJ-102484 | 2002 | 1 | Anthony Houston Jamnie Walls | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 237 | HJ-117531 | 2003 | A/1 | Jane Ashby | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 238 | HJ-117559 | 2003 | A/1 | Onecimo Guereca Jose Melgoza Oscar Corral Jose Nieves | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 239 | HJ-143625 | 2003 | 1 | David Giocondi Sr | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 240 | HJ-145451 | 2003 | 1 | Charles Harper | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 241 | HJ-158056 | 2003 | 1 | Gabriel Stephens Neysa Benning | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 242 | HJ-169496 | 2003 | 1 | Bee Pittman | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 243 | HJ-211373 | 2003 | 1 | Telvin Shaw | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

HOOD 038967
Weston 053984

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| IDENTIFYING INFORMATION | | | | CRIMINAL DEFENSE ATTORNEY FILE COMPARISON — Items in the Investigative File missing from the Criminal Defense Attorney File | | | | | | | | | | | INVESTIGATIVE FILE INFORMATION | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS CRIMINAL DEFENSE ATTORNEY FILE BEEN PRODUCED? | ARE INVESTIGATIVE MATERIALS MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING INVESTIGATIVE MATERIALS | DOES THE DEFENSE ATTORNEY FILE CONTAIN AN INVENTORY SHEET? | DOES THE INVENTORY SHEET IN THE DEFENSE ATTORNEY FILE MATCH THE INVENTORY SHEET IN THE BASEMENT FILE? | ARE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | DOES THE BASEMENT FILE INCLUDE AN INVENTORY? | BATES NUMBER FOR INVENTORY | IS THE INVENTORY COMPLETE? | EXAMPLES OF ITEMS MISSING FROM INVENTORY | ARE THERE HANDWRITTEN NOTES IN THE FILE? | BATES NUMBERS FOR HANDWRITTEN NOTES | ARE THERE TO-FROM MEMOS IN THE FILE? | BATES NUMBERS FOR TO-FROM MEMOS |
| 244 | HJ-21691 | 2003 | 1 | Frederick Smith | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 033423 | NO | 19 GPRs on inventory, 8 in the file | YES | ACB 033339 / ACB 033341 / ACB 033354 - 33355 | NO | N/A |
| 245 | HJ-228346 | 2003 | 1 | Antonio Shaw, Anthony Mitchell, John Fulton | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 033496 - 33497 | NO | 0 To-From Memos on inventory, 4 in the file / 0 Handwritten Notes on inventory, 2 in file | YES | ACB 033404 - 33405 | NO | N/A |
| 246 | HJ-239255 | 2003 | 1 | Dominique Johnson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 033664 - 33665 | NO | 0 Daily Major Incident Log on inventory, 2 in file | YES | ACB 033604 - 33605 | NO | N/A |
| 247 | HJ-243231 | 2003 | 1 | Lee Murphy | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 033834 - 33837 | NO | 126 GPRs on inventory, 119 in file | YES | ACB 033920 / ACB 033926 / ACB 033978 - 33979 / ACB 034007 / ACB 034010 - 34172 / ACB 034189 | YES | ACB 034082 |
| 248 | HJ-256409 | 2003 | 1 | Cedric House | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 058690 - 58691 | NO | 24 GPRs listed on inventory, 22 in file (unless two pages of handwritten notes in between the GPRs are counted as GPRs) / 0 Handwritten notes on inventory, 2 in file / 9 Supplementary Reports listed on inventory, 11 in file | YES | ACB 058757 / ACB 058759 | NO | N/A |
| 249 | HJ-257094 | 2003 | 1 | Charnell Woods, Otha Woods | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 058955 - 58956 | NO | 0 Handwritten Notes on inventory, 4 in file | YES | ACB 059078 / ACB 059093 / ACB 059095 | NO | N/A |
| 250 | HJ-274500 | 2003 | 4 | Roger Padilla | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 059154 - 59155 | NO | 14 Handwritten Notes on inventory, 1 in file | YES | ACB 059162 | NO | N/A |
| 251 | HJ-284434 | 2003 | 1 | Donnell Bolden, Christopher Bates, Darryl Grayson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 059422 - 59424 | NO | 0 Handwritten Notes on inventory, 2 in file | YES | ACB 059488 | NO | N/A |
| 252 | HJ-307187 | 2003 | 1 | Jessie Williams, Perry Higgins, Eric Williams | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 059670 - 59671 | NO | 34 GPRs on inventory, 33 in file (final page with act of GPRs is a handwritten note; inventory may have added handwritten note as a GPR. If so, 34 GPRs, if not 33 GPRs) / 0 Handwritten notes on inventory, 1 in file (or count assumption in first bullet point) / 0 Daily Major Incident Log on inventory, 1 in file | YES | ACB 059726 | NO | N/A |
| 253 | HJ-307851 | 2003 | 1 | Michael Warfield | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 059861 - 59862 | NO | 0 Handwritten Notes on inventory, 1 in file / 3 property inventory on inventory, 1 in file | YES | ACB 059893 | NO | N/A |
| 254 | HJ-310383 | 2003 | 1 | Lessie Shields | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 059984 - 59985 | NO | 0 To-From Memos on inventory, 2 in file | NO | N/A | YES | ACB 059998 - 59999 |
| 255 | HJ-320635 | 2003 | 1 | Anthony Pitchford | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 060122 - 60123 | NO | 22 GPRs on inventory, 19 in file (final 3 pages with the act of GPRs is a handwritten note; inventory may have added handwritten notes as a GPR. If so, 22 GPRs, if not 19 GPRs) / 0 Handwritten notes on inventory, 3 in file (see assumption in first bullet point) / 0 Daily Major Incident Log on inventory, 1 in file | YES | ACB 060199 - 60201 / ACB 060226 | NO | N/A |
| 256 | HJ-324514 | 2003 | 1 | Cleodis Bassett, George Anderson, Leon Brown | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | Yes | ACB 060323 - 60325 | NO | 0 To-From Memos on inventory, 3 in file / 0 Handwritten notes on inventory, 13 in file | YES | ACB 060322 / ACB 060361 - 662 / ACB 060366 / ACB 060387 - 60389 / ACB 060394 - 60395 / ACB 060396 / ACB 060420 / ACB 060452 | YES | ACB 060517 - 60521 |
| 257 | HJ-366143 | 2003 | 1 | Leivante Adams | YES | YES | ACB 060615-64; ACB 060702; ACB 060720-723; ACB 060733-738; ACB 060764-65; ACB 060803-832 | NO | N/A | NO | N/A | YES | *ACB 060702 *ACB 060764 -765 | NO | N/A | YES | ACB 060323 - 60325 | NO | 0 Handwritten notes on inventory, 5 in file | YES | ACB 060702 / ACB 060726 - 60728 / ACB 060764 / ACB 060802 | NO | N/A |
| 258 | HJ-376892 | 2003 | 1 | Dexter Bailey, Samuel Frieson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 080830 - 80831 | NO | 0 Daily Major Incident Log on inventory, 1 in file / 0 Handwritten notes on inventory, 8 in file | YES | ACB 080980 | NO | N/A |
| 259 | HJ-399272 | 2003 | 1 | Eddie Mosley | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 081026 - 81027 | YES | N/A | YES | ACB 081116 | NO | N/A |
| 260 | HJ-400029 | 2003 | 1 | Larry Gilbert | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 081245 - 81248 | NO | 8 property inventory reports on inventory, 2 in file / 55 GPRs on inventory, 54 in file (final page with the act of GPRs is a handwritten note; inventory may have added handwritten note as a GPR. If so, 55 GPRs, if not 54 GPRs) / 0 Handwritten notes on inventory, 31 in file (see assumption in previous bullet point) | YES | ACB 081293 | NO | N/A |
| 261 | HJ-410134 | 2003 | 1 | Jian Tan | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 081531 - 81532 | NO | 0 Photographs on inventory, 118 in file | NO | N/A | NO | N/A |
| 262 | HJ-440488 | 2003 | 1 | Frank Quiroz, Lazaro Zapata | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 081777 - 81778 | NO | 0 Major Incident Report Log on inventory, 1 in file / 0 Scene photos on inventory, 15 in file | YES | ACB 081822 | NO | N/A |
| 263 | HJ-492443 | 2003 | 1 | Natalio Ramirez, Daniel Aguirre, Octavia Anima, Jesus Sanchez, Miguel Nunez, Pablo Aguilar | YES | YES | ACB 081968; ACB 081991-92; ACB 081993-996; ACB 082052; ACB 082173-277 | YES | YES | NO | N/A | YES | ACB 082052 | YES | ACB 081991 | YES | ACB 081997-001 | NO | FOIA Request / Supp. Report / Photos- Person / Daily Major Incident Log / Handwritten Notes | No | N/A | YES | 82492 |

HOOD 038968
Weston 053985

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| IDENTIFYING INFORMATION | | | | PERMANENT RETENTION FILE COMPARISON | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Items in the Investigative File missing from the Permanent Retention File | | | | | | | | |
| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS A PERMANENT RETENTION FILE BEEN PRODUCED? | IS THE INVESTIGATIVE FILE INVENTORY IN THE PERMANENT RETENTION FILE? | DOES THE INVENTORY IN THE PERMANENT RETENTION FILE MATCH THE INVENTORY IN THE BASEMENT FILE? | ARE THE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | OTHER INVESTIGATIVE MATERIAL FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE |
| 244 | HJ-211601 | 2003 | 1 | Frederick Smith | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 245 | HJ-228346 | 2003 | 1 | Antonio Shaw Anthony Mitchell John Fulton | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 246 | HJ-239255 | 2003 | 1 | Dominique Johnson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 247 | HJ-243231 | 2003 | 1 | Lee Murphy | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 248 | HJ-256409 | 2003 | 1 | Cedric House | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 249 | HJ-257094 | 2003 | 1 | Charnell Woods Otha Woods | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 250 | HJ-274500 | 2003 | 4 | Roger Padilla | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 251 | HJ-284434 | 2003 | 1 | Donnell Bolden Christopher Bates Darryl Grayson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 252 | HJ-307187 | 2003 | 1 | Jessie Williams Perry Higgins Eric Williams | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 253 | HJ-307851 | 2003 | 1 | Michael Warfield | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 254 | HJ-310383 | 2003 | 1 | Lessie Shields | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 255 | HJ-320635 | 2003 | 1 | Anthony Pitchford | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 256 | HJ-324514 | 2003 | 1 | Claudia Bassett George Anderson Leon Brown | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 257 | HJ-366143 | 2003 | 1 | Leivante Adams | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 258 | HJ-376892 | 2003 | 1 | Dexter Bailey Samuel Frieson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 259 | HJ-399272 | 2003 | 1 | Eddie Mosley | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 260 | HJ-400029 | 2003 | 1 | Larry Gilbert | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 261 | HJ-410134 | 2003 | 1 | Jian Tan | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 262 | HJ-440488 | 2003 | 1 | Frank Quiroz Lazaro Zapata | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 263 | HJ-492443 | 2003 | 1 | Natalio Ramirez Daniel Aguirre Octavia Anima Jesus Sanchez Miguel Nunez Pablo Aguilar | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

HOOD 038969
Weston 053986

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| | | | | HAS CRIMINAL DEFENSE ATTORNEY FILE BEEN PRODUCED? | ARE INVESTIGATIVE MATERIALS MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING INVESTIGATIVE MATERIALS | DOES THE DEFENSE ATTORNEY FILE CONTAIN AN INVENTORY SHEET? | DOES THE INVENTORY SHEET IN THE DEFENSE ATTORNEY FILE MATCH THE INVENTORY SHEET IN THE BASEMENT FILE? | ARE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | DOES THE BASEMENT FILE INCLUDE AN INVENTORY? | BATES NUMBER FOR INVENTORY | IS THE INVENTORY COMPLETE? | EXAMPLES OF ITEMS MISSING FROM INVENTORY | ARE THERE HANDWRITTEN NOTES IN THE FILE? | BATES NUMBERS FOR HANDWRITTEN NOTES | ARE THERE TO-FROM MEMOS IN THE FILE? | BATES NUMBERS FOR TO-FROM MEMOS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **IDENTIFYING INFORMATION** | | | | **CRIMINAL DEFENSE ATTORNEY FILE COMPARISON** *Items in the Investigative File missing from the Criminal Defense Attorney File* | | | | | | | | | | | **INVESTIGATIVE FILE INFORMATION** | | | | | | |
| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | | | | | | | | | | | | | | | | | | | |
| 264 | 2003 | 4 | Randy Allen Derrick Thomas | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 082421 - 82424 | NO | 52 pages of Handwritten Notes on inventory, 49 pages in file | NO | N/A | YES | ACB 082492 |
| 265 | 2003 | 1 | Mark Scott | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 082701 - 82702 | NO | 0 Crime Scene Photos on inventory, 63 in file | NO | ACB 082698 ACB 082748 ACB 082757 - 82758 | NO | N/A |
| 266 | 2003 | 1 | James Wheeler | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 082874 - 82875 | NO | 0 Crime Scene Photos on inventory, 29 in file | NO | N/A | NO | N/A |
| 267 | 2003 | 1 | Edwin Harris Milton Love Goran Kotur | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 083016 - 83017 | NO | 0 Handwritten Notes on inventory, 1 in file 0 Daily Major Incident Log, 1 in file | YES | ACB 083102 | NO | N/A |
| 268 | 2003 | 1 | Antonio Thomas Toney Cole Timothy Fulton | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 083209 - 83211 | NO | 45 GPRs on inventory, 44 in file 0 handwritten notes on inventory, 3 in file 0 photos on inventory, 8 in file | YES | ACB 083384 ACB 083303 ACB 083385 | NO | N/A |
| 269 | 2003 | 1 | Edward Maholmes | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 083482 - 83483 | NO | 32 GPRs on inventory, 29 in file 0 handwritten notes on inventory, 1 in file 0 Daily Major Incident Log on inventory, 1 in file | YES | ACB 083538 - 83540 | YES | ACB 083616 |
| 270 | 2003 | 1 | Gregory Carr Frederick Bagley | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 083646 - 83650 | NO | 39 GPRs on inventory, 38 in file 0 Handwritten notes on inventory, 4 in file 0 Daily Major Incident Log on inventory, 3 in file | YES | ACB 083808 | NO | N/A |
| 271 | 2003 | 1 | Jose Echevarria | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 084079 - 84080 | NO | 29 GPRs on inventory, 28 in file 0 Handwritten Notes on inventory, 2 in file | YES | ACB 084122 - 84123 ACB 084122 - 84123 | NO | N/A |
| 272 | 2003 | 1 | Sergio Trintzrun | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 084207 - 84208 | NO | 28 GPRs on inventory, 17 in file 0 Handwritten Notes on inventory, 12 in file 0 Daily Major Inventory File 9in inventory, 0 in inventory | YES | ACB 084272 ACB 084276 - 84278 ACB 084284 ACB 084286 ACB 084290 - 84292 ACB 084292 - 84294 ACB 084296 ACB 084301 | NO | N/A |
| 273 | 2003 | 1 | Arthur Foote Derrick Hatchett | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 084406 - 84410 | NO | 53 GPRs on inventory, 52 in file 0 Handwritten Notes on inventory, 1 in file 0 photos on inventory, 9 in inventory 0 To-From Memos on inventory, 1 in file | YES | ACB 084559 | YES | ACB 084406 - 84407 ACB 084593 ACB 084616 ACB 084621 |
| 274 | 2003 | 1 | Sandra Stowers | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 034312 - 34313 | NO | 0 Daily Major Incident Log on inventory, 1 in file | NO | N/A | NO | N/A |
| 275 | 2003 | 1 | Johnny Mozee | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 034397 - 34398 | NO | 0 Handwritten Notes on inventory, 2 in file 0 Daily Major Incident Log on inventory, 1 in file | YES | ACB 034444 ACB 034472 | NO | N/A |
| 276 | 2003 | 1 | Anthony Jackson Clayton Sims | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 084757 - 84758 | NO | 51 GPRs on inventory, 49 in file 0 Handwritten Notes on inventory, 2 in file 0 Daily Major Log on inventory, 1 in file | YES | ACB 084890 - 84891 ACB 084893 ACB 084918 | YES | ACB 084752 - 84754 |
| 277 | 2003 | UNK | Timothy Thomas | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | NO | N/A | N/A | N/A | NO | N/A | NO | N/A |
| 278 | 2003 | 1 | Markeith Jenkins | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 060904 | NO | 19 GPRs on inventory, 29 in file 0 To-From Memos on inventory, 2 in file | YES | ACB 060997 | YES | ACB 060902 60903 |
| 279 | 2003 | 1 | Albert Domagala | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 084982 - 84983 | NO | 0 Handwritten Notes on inventory, 2 in file | YES | ACB 085017 - 85018 | NO | N/A |
| 280 | 2003 | 1 | Dante Brown Dwight Allen | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 085061 - 85063 | NO | 47 GPRs on inventory, 41 in file 0 Handwritten Notes on inventory, 8 in file 0 Daily Major Log on inventory, 1 in file | YES | ACB 085039 - 85112 ACB 085114 ACB 085116 ACB 085209 | YES | ACB 085052 ACB 085162 ACB 085164 |
| 281 | 2003 | 1 | Gena O'Shaughnessy James Gusich | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 085305 - 85307 | NO | N/A | YES | ACB 085407 085516 | NO | N/A |
| 282 | 2003 | 1 | Charles Rice | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 085621 - 85622 | YES | N/A | NO | N/A | NO | N/A |
| 283 | 2003 | 1 | Rosendo Ruiz Lazaro Gutierrez | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 085729 | NO | 0 Daily Major Incident Log on inventory, 1 in file 9 Cook County Sheriff's Incident Reports on inventory, 1 in file | YES | ACB 085727 ACB 085844 | NO | N/A |
| 284 | 2003 | 1 | Kedrick Gray | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 085884 | NO | 0 Daily Major Incident Log on inventory, 1 in file 0 Crime Scene Photos on inventory, 27 in file | YES | N/A | NO | N/A |
| 285 | 2003 | 1 | Israel Ramirez Jose L Gonzalez Salvador Contreras | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 086049 - 86052 | NO | 42 GPRs on inventory, 41 in file 0 Handwritten notes on inventory, 8 in file | YES | ACB 086066 ACB 086091 - 86092 ACB 086091 - 86092 ACB 086099 ACB 086106 ACB 086123 ACB 086157 ACB 086160 ACB 086268 | NO | N/A |
| 286 | 2003 | 1 | Valerie Padin Joseph Martinez | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 086408 - 86409 | NO | 47 GPRs on inventory, 32 in file 0 Handwritten Notes on inventory, 8 in file | YES | ACB 086451 ACB 086544 - 86549 | NO | N/A |
| 287 | 2003 | 4 | Mahendra Anderson Micah Anderson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 034571 - 34572 | NO | 53 GPRs on inventory, 32 in file 0 Handwritten Notes on inventory, 1 in file | YES | ACB 034617 ACB 034625 | NO | N/A |

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS A PERMANENT RETENTION FILE BEEN PRODUCED? | IS THE INVESTIGATIVE FILE INVENTORY IN THE PERMANENT RETENTION FILE? | DOES THE INVENTORY IN THE PERMANENT RETENTION FILE MATCH THE INVENTORY IN THE BASEMENT FILE? | ARE THE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | OTHER INVESTIGATIVE MATERIAL FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 264 | HJ-499310 | 2003 | 4 | Randy Allen Derrick Thomas | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 265 | HJ-505759 | 2003 | 1 | Mark Scott | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 266 | HJ-518923 | 2003 | 1 | James Wheeler | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 267 | HJ-527506 | 2003 | 1 | Edwin Harris Milton Love Goran Konar | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 268 | HJ-545448 | 2003 | 1 | Antonio Thomas Toney Cole Timothy Fulton | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 269 | HJ-547936 | 2003 | 1 | Edward Maholmes | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 270 | HJ-591782 | 2003 | 1 | Gregory Carr Frederick Bagley | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 271 | HJ-623228 | 2003 | 1 | Jose Echevarria | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 272 | HJ-640575 | 2003 | 1 | Sergio Tzintzun | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 273 | HJ-647205 | 2003 | 1 | Arthur Foote Derrick Hatchett | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 274 | HJ-661717 | 2003 | 1 | Sandra Stowers | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 275 | HJ-664136 | 2003 | 1 | Johnny Moore | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 276 | HJ-664232 | 2003 | 1 | Anthony Jackson Clayton Sims | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 277 | HJ-671123 | 2003 | UNK | Timothy Thomas | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 278 | HJ-673789 | 2003 | 1 | Markeith Jenkins | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 279 | HJ-676387 | 2003 | 1 | Albert Domagala | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 280 | HJ-678000 | 2003 | 1 | Dante Brown Dwight Allen | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 281 | HJ-687964 | 2003 | 1 | Gena O'Shaughnessy James Gusich | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 282 | HJ-689560 | 2003 | 1 | Charles Rice | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 283 | HJ-733462 | 2003 | 1 | Rosendo Ruiz Lazaro Gutierrez | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 284 | HJ-734895 | 2003 | 1 | Kendrick Gray | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 285 | HJ-737306 | 2003 | 1 | Israel Ramirez Jose L Gonzalez Salvador Contreras | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 286 | HJ-745468 | 2003 | 1 | Valerie Padin Joseph Martinez | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 287 | HJ-757826 | 2003 | 4 | Mahendra Anderson Micah Anderson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

48 of 62
HOOD 038971
Weston 053988

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS CRIMINAL DEFENSE ATTORNEY FILE BEEN PRODUCED? | ARE INVESTIGATIVE MATERIALS MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING INVESTIGATIVE MATERIALS | DOES THE DEFENSE ATTORNEY FILE CONTAIN AN INVENTORY SHEET? | DOES THE INVENTORY SHEET IN THE DEFENSE ATTORNEY FILE MATCH THE INVENTORY SHEET IN THE BASEMENT FILE? | ARE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | DOES THE BASEMENT FILE INCLUDE AN INVENTORY? | BATES NUMBER FOR INVENTORY | IS THE INVENTORY COMPLETE? | EXAMPLES OF ITEMS MISSING FROM INVENTORY | ARE THERE HANDWRITTEN NOTES IN THE FILE? | BATES NUMBERS FOR HANDWRITTEN NOTES | ARE THERE TO-FROM MEMOS IN THE FILE? | BATES NUMBERS FOR TO-FROM MEMOS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 288 | HJ-776575 | 2003 | 1 | Lamont Douglas | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 061092-61093 | NO | 49 GPRs on inventory, 58 in file; 0 Handwritten Notes on inventory, 4 in file | YES | ACB 061157 / ACB 061162 / ACB 061158 / ACB 061241 | YES | ACB 061119 |
| 289 | HJ-793204 | 2003 | 1 | Darren Johnson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 061327 - 61328 | NO | 0 Daily Major Incident Logs on inventory, 1 in file | NO | N/A | NO | N/A |
| 290 | HJ-795462 | 2003 | 1 | Michael Williams | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 061496 | NO | 0 Daily Major Incident Log on inventory, 1 in file | NO | N/A | NO | N/A |
| 291 | HJ-796729 | 2003 | 1 | Juan Boone | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 061663 - 61665 | NO | 44 GPRs on inventory, 43 in file; 0 Handwritten Notes on inventory, 2 in file; 14 inventory reports on inventory, 3 in file; 0 Daily Major Incident Log on inventory, 1 in file | YES | ACB 061790 / ACB 061799 | YES | ACB 061736 |
| 292 | HJ-831700 | 2003 | 1 | Santiago Torres | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 061876 - 61878 | NO | 0 Handwritten Notes on inventory, 3 in file | YES | ACB 061993 / ACB 062022 / ACB 062023 | NO | N/A |
| 293 | HJ-834810 | 2003 | 2 | Mickey Mason / Renwick Wells | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 034751 - 34752 | NO | 0 Clear Data Warehouse Arrestee History on inventory, 1 in file | YES | ACB 034786 / ACB 034804 | NO | N/A |
| 294 | HJ-845688 | 2003 | 4 | David Washington / Kenya Henry | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 034920 - 34921 | NO | 0 Handwritten Notes on inventory, 1 in file; 0 Detective Division Progress Report on inventory, 1 in file; 0 Investigative Alerts on inventory, 1 in file; 0 Major Crime Scene Report on inventory, 1 in file | YES | ACB 034961 | NO | N/A |
| 295 | HK-000106 | 2004 | 1 | Daniel Bowen / Dennis McArdle | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 037325-37326 | NO | Handwritten notes (37370, 37387, 37463, 37483, 37490) | YES | ACB 037383, ACB 037386-37387, ACB 037463, ACB 037490, ACB 037513 | NO | N/A |
| 296 | HK-106793 | 2004 | 1 | Phillip Hartsfield / Mohammed Abukhdeir | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 035124-35125 | NO | Copy of Receipt & handwritten notes (35169) Handwritten note (35226) | YES | ACB 035169, ACB 035194-35196, ACB 035217-35218, ACB 035226-35227, ACB 035235-35236 | NO | N/A |
| 297 | HK-142414 | 2004 | 1 | Anthony Evans | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 035272-25273 | NO | Inv. File Control (35267) Daily Major Incident Log (35268-35270) | NO | N/A | NO | N/A |
| 298 | HK-148852 | 2004 | 1 | Steven Myers / Timothy Brewer | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 035439-35440 | NO | Inv. File Control (35437) Daily Major Incident Log (35438) | YES | ACB 035488-35489, ACB 035567 | NO | ACB 035531-35532 |
| 299 | HK-158502 | 2004 | 1 | Oliver Crawford | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 037577-37580 | NO | 2 Handwritten notes in file, 0 listed on inventory (37744, 37867) | YES | ACB 037744, ACB 037759-37760, ACB 037798, ACB 037815-37816, ACB 037825-37826, ACB 037827, ACB 037840, ACB 037848 | NO | N/A |
| 300 | HK-165467 | 2004 | 1 | Dominique Dennis | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 035622-35625 | NO | 1 Handwritten notes in file, 0 listed on inventory (35681) | YES | ACB 035681, ACB 035700, ACB 035703, ACB 035708, ACB 035810, ACB 035815, ACB 035819 - 35820, ACB 035824, ACB 035825, ACB 035828, ACB 035883, ACB 035885, ACB 035868-35904 | NO | N/A |
| 301 | HK-195199 | 2004 | 1 | Morris Hawkins | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 037911-37912 | NO | 2 To-from memos in file, 0 listed on inventory | NO | N/A | NO | N/A |
| 302 | HK-196935 | 2004 | 1 | Juvenal Reyes | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 038094 | NO | Inv. File Control (38089) Daily Major Incident Log (38090-38093) | NO | N/A | NO | N/A |
| 303 | HK-211174 | 2004 | 1 | Navon Foster / Laquita Calhoun / Katherine Calhoun / Terence Jones / Lakesha Collins / Jeanette Daniels | YES | YES | ACB 038165; ACB 038166-167; ACB 038171-175; ACB 038177-188; ACB 038189; ACB 038202-214; ACB 038216-217; ACB 038219; ACB 038202-86 | NO | N/A | YES | ACB038202-214, ACB038189, ACB038177-188 | YES | ACB038298 | YES | ACB038219 | YES | ACB 038166-38167 | NO | N/A | Yes | 38376, 38457-38459, 38487, 38490-38491, 38541-38542, 38549-38552, 38554 | | n/a |
| 304 | HK-222787 | 2004 | 1 | Jerry Cooks | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 038356-38359 | NO | 3 Handwritten notes in file, 0 listed on inventory (38490, 38541, 38554) | YES | ACB 038376, ACB 038457-38459, ACB 038487, ACB 038490-38491, ACB 038540-38541, ACB 038549-38552, ACB 038554 | NO | N/A |
| 305 | HK-223040 | 2004 | 1 | Dennis Edwards | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 038611-38612 | NO | Major Crime Scene Reports (38701-38704) | YES | ACB 038672-38674 | NO | N/A |
| 306 | HK-224777 | 2004 | 1 | Juan Pena | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 038795-38796 | NO | Inv. File Control (38738) Daily Major Incident Log (38778-38780) | NO | N/A | NO | N/A |
| 307 | HK-238041 | 2004 | 1 | Glenn Miles | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 038917-38918 | NO | 3 Handwritten notes in file, 0 listed on inventory (38963, 39011, 39012) | YES | ACB 038963, ACB 039011-39012 | NO | N/A |
| 308 | HK-238478 | 2004 | 1 | Tybia Thigpen / Jamal White | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 039134-39175 | NO | Request for Evidence ID Photos (39167) | YES | ACB 039172-39173, ACB 039233 | NO | N/A |
| 309 | HK-245772 | 2004 | 1 | Thomas Flowers | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 039445-39446 | NO | 1 To-from memo in file, 0 listed on inventory (39444) | NO | N/A | YES | ACB 039444 |
| 310 | HK-253704 | 2004 | 1 | Malvin Washington | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 039599-39601 | NO | Inv. File Control (39596) Major Crime Scene Reports (39752-39755) | NO | N/A | NO | N/A |
| 311 | HK-284640 | 2004 | 1 | Lamont Griffin | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 035980 | NO | Inv. File Control (35976) ISP Submission (35988) | NO | N/A | NO | N/A |
| 312 | HK-316879 | 2004 | 1 | Sergio Williams | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 039886-39887 | NO | Crime Scene Photos (39799-39884) Inv. File Control (39885) | NO | N/A | NO | N/A |
| 313 | HK-359543 | 2004 | 1 | Dorial Valentine | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 039989-39990 | NO | Inv. File Control (39987) Daily Major Incident Log (39988) | NO | N/A | NO | N/A |
| 314 | HK-370400 | 2004 | 1 | Marcelo Gonzaga / Elijah Santiago | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 040236-40240 | NO | 10 To-from memos in file, 0 listed on inventory (40175-40180) | NO | N/A | YES | ACB 040247, ACB 040095 |
| 315 | HK-378604 | 2005 | 1 | Ronnie Carpenter | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 040578, ACB 040582; ACB 040587; ACB 040601; ACB 040612 | NO | Homicide Case Folder Table of Contents Major Incident Notification Detail | NO | N/A | YES | ACB 040177-40189 |

HOOD 038972
Weston 053989

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| | RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS A PERMANENT RETENTION FILE BEEN PRODUCED? | IS THE INVESTIGATIVE FILE INVENTORY IN THE PERMANENT RETENTION FILE? | DOES THE INVENTORY IN THE PERMANENT RETENTION FILE MATCH THE INVENTORY IN THE BASEMENT FILE? | ARE THE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | OTHER INVESTIGATIVE MATERIAL FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 288 | HJ-776575 | 2003 | 1 | Lamont Douglas | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 289 | HJ-793204 | 2003 | 1 | Darren Johnson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 290 | HJ-795462 | 2003 | 1 | Michael Williams | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 291 | HJ-796729 | 2003 | 1 | Juan Boone | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 292 | HJ-831700 | 2003 | 1 | Santiago Torres | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 293 | HJ-834810 | 2003 | 2 | Mickey Mason Renwick Wells | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 294 | HJ-845688 | 2003 | 4 | David Washington Kenya Henry | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 295 | HK-000106 | 2004 | 1 | Daniel Bowen Dennis McArdle | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 296 | HK-106793 | 2004 | 1 | Phillip Hartsfield Mohammed Abukhdeir | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 297 | HK-142414 | 2004 | 1 | Anthony Evans | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 298 | HK-148852 | 2004 | 1 | Steven Myers Timothy Brewer | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 299 | HK-158502 | 2004 | 1 | Oliver Crawford | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 300 | HK-165467 | 2004 | 1 | Dominique Dennis | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 301 | HK-195199 | 2004 | 1 | Morris Hawkins | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 302 | HK-196935 | 2004 | 1 | Juvenal Reyes | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 303 | HK-211174 | 2004 | 1 | Navon Foster Laquita Calhoun Katherine Calhoun Terence Jones Lakesha Collins Jeanette Daniels | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 304 | HK-222787 | 2004 | 1 | Jerry Cooks | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 305 | HK-223040 | 2004 | 1 | Dennis Edwards | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 306 | HK-224777 | 2004 | 1 | Juan Pena | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 307 | HK-238041 | 2004 | 1 | Glenn Miles | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 308 | HK-238478 | 2004 | 1 | Tythia Thigpen Jamal White | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 309 | HK-245772 | 2004 | 1 | Thomas Flowers | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 310 | HK-253794 | 2004 | 1 | Malvin Washington | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 311 | HK-284640 | 2004 | 1 | Lamont Griffin | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 312 | HK-316879 | 2004 | 1 | Sergio Williams | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 313 | HK-359543 | 2004 | 1 | Dorial Valentine | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 314 | HK-377605 | 2004 | 1 | Marcelo Gonzaga Elijah Santiago | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 315 | HK-378604 | 2005 | 1 | Ronnie Carpenter | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

IDENTIFYING INFORMATION

PERMANENT RETENTION FILE COMPARISON
Items in the Investigative File missing from the Permanent Retention File

50 of 62

HOOD 038973
Weston 053990

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| Records Division Number | Year | Area | Defendant(s) | Has Criminal Defense Attorney File Been Produced? | Are Investigative Materials Missing From the Defense Attorney File? | Bates Numbers for Missing Investigative Materials | Does the Defense Attorney File Contain an Inventory Sheet? | Does the Inventory Sheet in the Defense Attorney File Match the Inventory Sheet in the Basement File? | Are General Progress Reports From the Basement File Missing From the Defense Attorney File? | Bates Numbers for Missing General Progress Reports | Are Handwritten Notes From the Basement File Missing From the Defense Attorney File? | Bates Numbers for Missing Handwritten Notes | Are To-From Memos From the Basement File Missing From the Defense Attorney File? | Bates Numbers for Missing To-From Memos | Does the Basement File Include an Inventory? | Is the Inventory Complete? | Bates Number for Inventory | Examples of Items Missing From Inventory | Are There Handwritten Notes in the File? | Bates Numbers for Handwritten Notes | Are There To-From Memos in the File? | Bates Numbers for To-From Memos |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 316 | HK-404487 | I | RL Brooks | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | NO | ACB 040746-40747 | Daily Major Incident Log (40742-40745); 1 To-from memo in file, 0 listed on Inventory (40813) | NO | N/A | NO | N/A |
| 317 | HK-406407 | I | Delvie Turpin | YES | YES | ACB 040847-900; ACB 040905; ACB 040918; ACB 040923; ACB 040928-930; ACB 040950; ACB 040962-968; ACB 040992-016; ACB 041017-034; ACB 041036; ACB 041038; ACB 041040; ACB 041042-49 | NO | N/A | YES | *ACB 040992-005 *ACB 041033 | YES | ACB 041032 | NO | N/A | YES | NO | ACB 040886-887 | Handwritten Note; Photos – Scene/Body; Daily Major Incident Log | YES | ACB 041032 | NO | N/A |
| 318 | HK-416661 | I | Donnell Johnson | YES | YES | ACB 041052; ACB 041055-98; ACB 041106; ACB 041109-100; ACB 041140; ACB 041108; ACB 041237-44 | NO | N/A | NO | N/A | YES | ACB041140, ACB051188 | YES | ACB041237-244 | YES | NO | ACB 041099-041100 | To-From Memos; Major Incident Notification Detail | NO | N/A | YES | ACB 041237-244 |
| 319 | HK-431410 | I | William Hall | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | NO | ACB 041283-41284 | 7 Handwritten notes in file, 0 listed on Inventory (41367, 41370-41372, 41374, 41380, 41405) | YES | ACB 041367, ACB 041370-41372, ACB 041374, ACB 041380 | NO | ACB 041285 |
| 320 | HK-440539 | I | Tyrone Gill | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | NO | ACB 041573-41575 | Handwritten note (41746) | YES | ACB 041690, ACB 041746 | NO | N/A |
| 321 | HK-449083 | I | Jamell Murphy, Melvin Williams, Noah Wilson | YES | YES | ACB 041773-74; ACB 042002; ACB 041755; ACB 041702a; ACB 041876; ACB 041883-88; ACB 041883; ACB 041882; ACB 041777 | NO | N/A | YES | *ACB 041777 | N/A | N/A | N/A | N/A | YES | NO | ACB 041773-41774 | Inv. File Control (41755); Daily Major Incident Log (41767-41771) | YES | ACB 041857 | NO | N/A |
| 322 | HK-457513 | I | Juan Rodriguez | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | NO | ACB 042029-42031 | Handwritten note (42082) | NO | N/A | NO | N/A |
| 323 | HK-457942 | I | Vincent Hudson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | NO | ACB 062065-62066 | Inv. File Control (62062); Daily Major Incident Log (62063-62064) | NO | N/A | NO | N/A |
| 324 | HK-459545 | I | Somalfa Green | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | NO | ACB 062212 | Inv. File Control (62130); Daily Major Incident Log (62209-62211) | NO | N/A | NO | N/A |
| 325 | HK-465885 | I | Cuahtemoc Padilla | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | NO | ACB 062345 | Handwritten note (62373) | YES | ACB 062373 | NO | N/A |
| 326 | HK-470751 | I | Verna Colbert | YES | YES | ACB 062434; ACB 062436; ACB 062437; ACB 062438; ACB 062439-46; ACB 062439-40; ACB 062441-43; ACB 062444-45; ACB 062446; ACB 062447-ACB 062446; ACB 062447; ACB 062449; ACB 062450; ACB 062451; ACB 062563-64; ACB 062572; ACB 062598; ACB 062639 | NO | N/A | NO | N/A | YES | ACB 062437 | YES | ACB 062458, ACB 062446 | YES | NO | ACB 062441-443 | Photos – Scene/Body; Daily Major Incident Log; To-from Memo; Subpoena – Defense | NO | N/A | YES | ACB 062436 |
| 327 | HK-479167 | I | William Smith, James Massey, Deandre Gene, Samuel Dupree | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | NO | ACB 062696-62697, ACB 062700 | Handwritten notes (62987, 63003) | YES | ACB 063003 | NO | N/A |
| 328 | HK-483176 | I | Arthur Dent, Ronnelle Coleman, Ashley Miller | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | NO | ACB 063058-63059 | To-from memos (63054, 63055, 63057); Handwritten notes (63126-63131, 63170, 63213, 63215) | YES | ACB 063126-63131, ACB 063213-63215 | YES | ACB 063054-63057 |
| 329 | HK-487688 | I | Daniel Bradford | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | NO | ACB 036059-36060 | Inv. File Control (36054); Daily Major Incident Log (36055-36058) | NO | N/A | NO | N/A |
| 330 | HK-500451 | I | Tenaro Williams, Virgil Daniel | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | NO | ACB 036186-36187 | 27 GPRs in file, 26 listed on inventory | NO | N/A | NO | N/A |
| 331 | HK-526394 | I | Sheona Rucker | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | NO | ACB 036407-36410 | Handwritten note (36556, 36721); To-from memos (36657) | YES | ACB 036721 | NO | N/A |
| 332 | HK-526818 | I | Juan Munoz | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | NO | ACB 036905 | Handwritten note (36965, 36971, 36980, 36990, 36996, 36997, 37015) | YES | ACB 036965, ACB 036971, ACB 036980, ACB 036990, ACB 036996, ACB 036997, ACB 037015 | NO | N/A |
| 333 | HK-528598 | I | Anthony Burns | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | NO | ACB 037029-37030 | Inv. File Control (37028); Request for Evidence ID Photos (37027) | NO | N/A | NO | N/A |
| 334 | HK-539094 | I | Antoine Ford | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | NO | ACB 037208-37209 | Handwritten note (37247) | YES | ACB 037247 | NO | N/A |
| 335 | HK-558373 | I | Brandyn Anderson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | NO | ACB 063253-63254 | Handwritten note (63274) | YES | ACB 063274, ACB 063284 | YES | ACB 063273, ACB 063284-63286 |
| 336 | HK-564062 | I | Troy Frisson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | NO | ACB 063406-63407 | Property Inv. No. 10423200 (63560) | NO | N/A | NO | N/A |
| 337 | HK-564454 | I | Kimothy Randall, Russell Arnfield, Tyrone Nelson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | NO | ACB 063622-63624 | To-from memo (63625); Handwritten note (63678) | YES | ACB 063665 | YES | ACB 063625, ACB 063678 |
| 338 | HK-593970 | I | Tharise Partee | YES | YES | ACB 063941-942; ACB 063944-945 | NO | N/A | YES | ACB064104 | NO | N/A | NO | N/A | YES | No | ACB 063944-63945 | Handwritten Note; Daily Major Incident Log | YES | ACB 064103 | YES | N/A |
| 339 | HK-598867 | I | Elliot Herron, Joe Cobbins | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | NO | ACB 064220-64224 | Handwritten notes (64289, 64291, 64311) | YES | ACB 064289, ACB 064311 | NO | N/A |
| 340 | HK-623944 | I | Rayvonne Wilson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | NO | ACB 064691-64692 | To-from memos (64690) | NO | N/A | YES | ACB 064682-64690 |

HOOD 038974
Weston 053991

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| | IDENTIFYING INFORMATION | | | | PERMANENT RETENTION FILE COMPARISON *Items in the Investigative File missing from the Permanent Retention File* | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS A PERMANENT RETENTION FILE BEEN PRODUCED? | IS THE INVESTIGATIVE FILE INVENTORY IN THE PERMANENT RETENTION FILE? | DOES THE INVENTORY IN THE PERMANENT RETENTION FILE MATCH THE INVENTORY IN THE BASEMENT FILE? | ARE THE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | OTHER INVESTIGATIVE MATERIAL FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 316 | HK-404487 | 2004 | 1 | RL Brooks | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 317 | HK406407 | 2004 | 1 | Delvie Turpin | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 318 | HK416661 | 2004 | 1 | Donnell Johnson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 319 | HK431410 | 2004 | 1 | William Hull | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 320 | HK440539 | 2004 | 1 | Tyrone Gill | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 321 | HK-449083 | 2004 | 1 | Jarrell Murphy Melvin Williams Noah Wilson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 322 | HK-457513 | 2004 | 1 | Juan Rodriguez | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 323 | HK-457942 | 2004 | 1 | Vincent Hudson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 324 | HK-459545 | 2004 | 1 | Somailla Green | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 325 | HK-465885 | 2004 | 1 | Cuahtemoc Padilla | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 326 | HK-470751 | 2004 | 1 | Verna Colbert | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 327 | HK-479167 | 2004 | 1 | William Smith James Massey Deandre Greer Samuel Dupree | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 328 | HK-483176 | 2004 | 1 | Arthur Dent Romelle Coleman Ashley Miller | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 329 | HK-487688 | 2004 | 1 | Daniel Bradford | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 330 | HK-500451 | 2004 | 1 | Tenaro Williams Virgil Daniel | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 331 | HK-526394 | 2004 | 1 | Sheena Rucker | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 332 | HK-526818 | 2004 | 1 | Juan Munoz | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 333 | HK-528598 | 2004 | 1 | Anthony Burns | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 334 | HK-539094 | 2004 | 1 | Antoine Ford | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 335 | HK-558373 | 2004 | 1 | Brandyn Anderson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 336 | HK-564062 | 2004 | 1 | Troy Frieson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 337 | HK-564454 | 2004 | 1 | Kimothy Randall Russell Armfield Tyrone Nelson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 338 | HK-593970 | 2004 | 1 | Tharine Partee | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 339 | HK-598867 | 2004 | 1 | Elliot Herron Joe Cobbins | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 340 | HK-628944 | 2004 | 1 | Rayvonne Wilson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

HOOD 038975
Weston 053992

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS CRIMINAL DEFENSE ATTORNEY FILE BEEN PRODUCED? | ARE INVESTIGATIVE MATERIALS MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING INVESTIGATIVE MATERIALS | DOES THE DEFENSE ATTORNEY FILE CONTAIN AN INVENTORY SHEET? | DOES THE INVENTORY SHEET IN THE DEFENSE ATTORNEY FILE MATCH THE INVENTORY SHEET IN THE BASEMENT FILE? | ARE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | DOES THE BASEMENT FILE INCLUDE AN INVENTORY? | BATES NUMBER FOR INVENTORY | IS THE INVENTORY COMPLETE? | EXAMPLES OF ITEMS MISSING FROM INVENTORY | ARE THERE HANDWRITTEN NOTES IN THE FILE? | BATES NUMBERS FOR HANDWRITTEN NOTES | ARE THERE TO-FROM MEMOS IN THE FILE? | BATES NUMBERS FOR TO-FROM MEMOS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 341 | HK-639684 | 2004 | 1 | Christopher Walton, Michael Walton, Devon Terrell | YES | YES | ACB 064841; ACB 064932-937; ACB 064941-968; ACB 064952-958; ACB 064959-961; ACB 064962; ACB 064980-982; ACB 064983-84; ACB 064985-987; ACB 065007; ACB 065007-001; ACB 065080-081; ACB 065082-585; ACB 065086-087; ACB 065093; ACB 065094 | NO | N/A | NO | N/A | NO | N/A | YES | ACB064980-982 | YES | ACB 064980-64982 | NO | Original Case Incident Report; Major Incident Notification Detail; Court Complaint; Photos - Scene Body | NO | N/A | NO | N/A |
| 342 | HK-647145 | 2004 | 1 | Markiesha Wells | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 065193 | NO | Inv. File Control (65191); Daily Major Incident Log (65192) | NO | N/A | NO | N/A |
| 343 | HK-663121 | 2004 | 1 | Antoine Burton | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 065334-65335 | NO | Handwritten note (65424) | YES | ACB 065361, ACB 065424 | NO | N/A |
| 344 | HK-669797 | 2004 | 1 | Morrell Steele, Larry Steele | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 065515-65516 | NO | Inv. File Control (65511) | YES | ACB 065512-65514 | NO | N/A |
| 345 | HK-683108 | 2004 | 1 | Robert Curry | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 065645-65646 | NO | 25 GPRs in file, 24 listed on Inventory | NO | N/A | NO | N/A |
| 346 | HK-701076 | 2004 | 1 | Harold Ivey | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 065848-65850 | NO | Handwritten note (65889) | YES | ACB 065889, ACB 065993, ACB 065994 | NO | N/A |
| 347 | HK-746784 | 2004 | 1 | Andrew Binion | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 066139-66141 | NO | Inv. File Control (66137); Daily Major Incident Log (66138) | NO | N/A | NO | N/A |
| 348 | HK-763869 | 2004 | 1 | Anthony Riley | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 066556-66558 | NO | Inv. File Control (66353); Daily Major Incident Log (66554-66555) | YES | ACB 066465 | NO | N/A |
| 349 | HK-776079 | 2004 | 1 | Shevona Thomas | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 066683-66684 | NO | Handwritten note (66713); To-from memo (66814) | YES | ACB 066712-66713, ACB 066774 | NO | N/A |
| 350 | HK-788723 | 2004 | 1 | Juan Delatorre, Steven Nevarez, Alejandro Mota, Jerry Robeles, Antonio Rincon | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 067024-67027 | NO | To-from memos (67022-67023); Handwritten note (67176, 67245) | YES | ACB 067176, ACB 067245 | YES | ACB 067022-67023 |
| 351 | HK-792194 | 2004 | 1 | Iesha Walker | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 067461-67462 | NO | Inv. File Control (67587); Daily Major Incident Log (67610) | NO | N/A | NO | N/A |
| 352 | HK-798753 | 2004 | 1 | Dantray R. Chamblis | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 067810-67813 | NO | Handwritten notes (67871-67874, 68059, 68070, 68079) | Yes | ACB 067871-67874, ACB 068059, ACB 068070, ACB 068079, ACB 068118, ACB 068119, ACB 068120, ACB 068142 | YES | ACB 067984-67985, ACB 068156 |
| 353 | HK-811031 | 2004 | 1 | Max McCoy | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 068220-68221 | NO | Inv. File Control (68159); Daily Major Incident Log (68217-68219) | NO | N/A | NO | N/A |
| 354 | HK-811135 | 2004 | 1 | Darryl Conway | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 068377 | NO | Inv. File Control (68344); Daily Major Incident Log (68375-68376) | NO | N/A | YES | ACB 068222 |
| 355 | HK-823687 | 2004 | 4 | Fernando Noguez | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 068449 | NO | Homicide File Supervisor's Check List (68448); Inv. File Control (68450); Subpoenas (68451-68454) | NO | N/A | NO | N/A |
| 356 | HL-202732 | 2005 | 1 | Curtis Vivorette | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 042238-42239 | NO | Major Incident Notification Detail; Handwritten Note | YES | ACB 042327 | NO | N/A |
| 357 | HL-219488 | 2005 | 1 | Muhammad Faheem | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 042490-42492 | NO | Bio Card; To-From Memos; Scene/Body Photos | NO | N/A | YES | ACB 042490-491, ACB 042482, ACB 042483, ACB 042484 |
| 358 | HL-227322 | 2005 | 1 | Patrice Black | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 042800 | NO | Major Incident Notification Detail; Photos - Scene/Body | YES | ACB 042799, ACB 042837, ACB 042838 | NO | N/A |
| 359 | HL-236577 | 2005 | 1 | John Smarlo | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 042952-42953 | NO | Major Incident Notification Detail; Photos - Scene/Body; Daily Major Incident Log | NO | N/A | NO | N/A |
| 360 | HL-242938 | 2005 | 1 | Daniel Olivares | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 043151-43153 | NO | Photos – Persons; Photos - Scene/Body; Major Incident Notification Detail; Handwritten Notes; ISP Forensics Lab Report; GPRs; Supp. Report | YES | ACB 043287, ACB 043357, ACB 043358, ACB 043379, ACB 043382 | NO | N/A |
| 361 | HL-260858 | 2005 | 1 | Edwain Foster, Marshall Simmons | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 068553-68555 | NO | Handwritten Notes; Supp. Report; Daily Major Incident Log; Photos - Scene/Body | YES | ACB 068680, ACB 068757, ACB 068761, ACB 068764, ACB 068765 | NO | N/A |
| 362 | HL-291491 | 2005 | 1 | Michael Parish | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 068935-68936 | NO | Handwritten Notes; Major Incident Notification Detail; Photos - Scene/Body; 2nd GOCR same except Data Enter DD Area 1 stamp | YES | ACB 068978 | NO | N/A |
| 363 | HL-307618 | 2005 | 1 | Christopher Butler, Robert Kennedy | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 069142-69144 | NO | Receipt; Major Incident Notification Detail | YES | No # | NO | N/A |
| 364 | HL-326591 | 2005 | 1 | Brian Weston, Travis Weston | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 069434-69439 | NO | Handwritten note; Major Incident Notification Detail; Photos - Scene/Body | YES | ACB 069537, ACB 069611, ACB 069642, ACB 069736, ACB 069773 | NO | N/A |
| 365 | HL-336784 | 2005 | 1 | Leroy Wilson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 069909-69972 | NO | Handwritten note; Moving of Arrestee; Major Incident Notification Detail; Photos - Scene/Body | YES | ACB 070014, ACB 070113, ACB 070205, ACB 070206, ACB 070229 | NO | N/A |
| 366 | HL-355032 | 2005 | 1 | Antwan Rogers | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 066596-66597 | NO | Major Incident Notification Detail; Photos - Scene/Body | YES | | | |

HOOD 038976
Weston 053993

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| IDENTIFYING INFORMATION | | | | PERMANENT RETENTION FILE COMPARISON — Items in the Investigative File missing from the Permanent Retention File | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS A PERMANENT RETENTION FILE BEEN PRODUCED? | IS THE INVESTIGATIVE FILE INVENTORY IN THE PERMANENT RETENTION FILE? | DOES THE INVENTORY IN THE PERMANENT RETENTION FILE MATCH THE INVENTORY IN THE BASEMENT FILE? | ARE THE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE THE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | OTHER INVESTIGATIVE MATERIAL FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE |
| 341 | HK-639684 | 2004 | 1 | Christopher Walton Michael Walton Devon Terrell | NO | | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 342 | HK-647145 | 2004 | 1 | Markiesha Wells | NO | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 343 | HK-663121 | 2004 | 1 | Antoine Burton | NO | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 344 | HK-669797 | 2004 | 1 | Morrell Steele Larry Steele | NO | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 345 | HK-683108 | 2004 | 1 | Robert Curry | NO | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 346 | HK-701076 | 2004 | 1 | Harold Ivey | NO | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 347 | HK-746784 | 2004 | 1 | Andrew Binion | NO | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 348 | HK-763869 | 2004 | 1 | Anthony Riley | NO | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 349 | HK-776079 | 2004 | 1 | Shevona Thomas | NO | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 350 | HK-788723 | 2004 | 1 | Juan Delatorre Steven Nevarez Alejandro Mota Jerry Rebeles Antonio Rincon | NO | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 351 | HK-792194 | 2004 | 1 | Iesha Walker | NO | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 352 | HK-798753 | 2004 | 1 | Damsey R. Chamblis | NO | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 353 | HK-811031 | 2004 | 1 | Max McCoy | NO | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 354 | HK-811135 | 2004 | 1 | Darryl Conway | NO | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 355 | HK-823687 | 2004 | 4 | Fernando Noguez | NO | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 356 | HL-202732 | 2005 | 1 | Curtis Vivorette | NO | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 357 | HL-219488 | 2005 | 1 | Muhammad Faheem | NO | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 358 | HL-227322 | 2005 | 1 | Patrice Black | NO | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 359 | HL-236577 | 2005 | 1 | John Smerlo | NO | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 360 | HL-242938 | 2005 | 1 | Daniel Olivares | NO | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 361 | HL-260858 | 2005 | 1 | Edsain Foster Marshall Simmons | NO | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 362 | HL-291491 | 2005 | 1 | Michael Parish | NO | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 363 | HL-307618 | 2005 | 1 | Christopher Butler Robert Kennedy | NO | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 364 | HL-326591 | 2005 | 1 | Brian Weston Travis Weston | NO | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 365 | HL-336784 | 2005 | 1 | Leroy Wilson | NO | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 366 | HL-355032 | 2005 | 1 | Antwan Rogers | NO | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

HOOD 038977
Weston 053994

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS CRIMINAL DEFENSE ATTORNEY FILE BEEN PRODUCED? | ARE INVESTIGATIVE MATERIALS MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING INVESTIGATIVE MATERIALS | DOES THE DEFENSE ATTORNEY FILE CONTAIN AN INVENTORY SHEET? | DOES THE INVENTORY SHEET IN THE DEFENSE ATTORNEY FILE MATCH THE INVENTORY SHEET IN THE BASEMENT FILE? | ARE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | DOES THE BASEMENT FILE INCLUDE AN INVENTORY? | BATES NUMBER FOR INVENTORY | IS THE INVENTORY COMPLETE? | EXAMPLES OF ITEMS MISSING FROM INVENTORY | ARE THERE HANDWRITTEN NOTES IN THE FILE? | BATES NUMBERS FOR HANDWRITTEN NOTES | ARE THERE TO-FROM MEMOS IN THE FILE? | BATES NUMBERS FOR TO-FROM MEMOS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 367 | HL-361793 | 2005 | 1 | Kevin Smith | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 086725-86726 | NO | Major Incident Notification Detail / Photos- Scene/Body | YES | ACB 086783 | NO | N/A |
| 368 | HL-370043 | 2005 | 1 | Levester Hill | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 086982-86984 | NO | Major Incident Notification Detail / Photos- Scene/Body / Biz. Card / Handwritten Notes / Subpoena (copy but with different handwritten notes) / To-From Memos / Release of Liability | YES | ACB 087039 / ACB 087041 / ACB 087044 | YES | ACB 086979 / ACB 086983 |
| 369 | HL-371164 | 2005 | 1 | Arnon Bailey | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 087227-87229 | NO | Major Incident Notification Detail / Receipt / Subpoena (copy but with different handwritten notes) | NO | N/A | NO | N/A |
| 370 | HL-373670 | 2005 | 1 | Milton Howard | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 087431 | NO | Major Incident Notification Detail / Body, Report / Supp. Report | NO | N/A | NO | N/A |
| 371 | HL-385610 | 2005 | 1 | Charles Littlejohn | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 070320-70321 | NO | Major Incident Notification Detail / Handwritten Note / Machinist Lodge Schedule | YES | ACB 070167 | NO | N/A |
| 372 | HL-387017 | 2005 | 1 | Brian Fields / Carl Warren | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 070529-70530 | NO | Moving of Arrestee / Photos- Scene | NO | N/A | NO | N/A |
| 373 | HL-393632 | 2005 | 1 | Larry Carter | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 070708 | NO | Subpoena (Copy of one in file with different handwritten notes) / Major Incident Notification Detail | NO | N/A | NO | N/A |
| 374 | HL-399677 | 2005 | 1 | Louis Lashley | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 070875-70876 | NO | Handwritten Note / Photos – Scene/Body / Original Case Incident Report / To-From Memo / Major Incident Notification Detail | NO | N/A | NO | N/A |
| 375 | HL-407548 | 2005 | 1 | Antoine Evans | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 071050-71053 | NO | Photos- Scene/Body | YES | ACB 071346 | YES | ACB 071068 / ACB 071069 / ACB 071070 |
| 376 | HL-448514 | 2005 | 1 | Jarrell Brown | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 071417; ACB 071422; ACB 071438; ACB 071449; ACB 071455; ACB 071459; ACB 071462; ACB 071481 | NO | Supervisory Homicide Audit / Photos-Scene / Major Incident Notification Detail / Homicide Case Folder Table of Contents | NO | N/A | NO | N/A |
| 377 | HL-484055 | 2005 | 1 | Raul Lopez / Michael Nieto | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 071541; ACB 071551; ACB 071575; ACB 071584; ACB 071604; ACB 071608; ACB 071625; ACB 071640; ACB 071699; ACB 071707; ACB 071765; ACB 071780 | NO | Major Incident Notification Detail / Homicide Case Folder Table of Contents / Crime Scene Processing Report / Handwritten Notes / Property Inventory | YES | ACB 071741 / ACB 071751 | NO | N/A |
| 378 | HL-484812 | 2005 | 1 | Francisco Quezada | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 072201; ACB 072213; ACB 072229; ACB 072244; ACB 072253; ACB 072281; ACB 072288 | NO | Photos – Scene/Body / Major Incident Notification Detail / Homicide Case Folder Table of Contents / CPD Criminal Histories / Supervisory Homicide Audit Review | NO | N/A | NO | N/A |
| 379 | HL-486965 | 2005 | 1 | Jeremiah Fulton | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 072372; ACB 072377; ACB 072420; ACB 072459; ACB 072462; ACB 072470; ACB 072476; ACB 072517; ACB 072540; ACB 072548; ACB 072553; ACB 072554 | NO | Major Incident Notification Detail / Homicide Case Folder Table of Contents / Photos- Scene/Body / Supervisory Homicide Audit Review | NO | N/A | NO | N/A |
| 380 | HL-489874 | 2005 | 1 | Sergio Mendoza / Jesus Mendoza | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 087533; ACB 087538; ACB 087638; ACB 087650; ACB 087662; ACB 087666; ACB 087670; ACB 087687; ACB 087717; ACB 087765; ACB 087771; ACB 087775; ACB 087787; ACB 087830; ACB 087841; ACB 087895; ACB 087919; ACB 087961; ACB 087998; ACB 088019; ACB 088023; ACB 088047 | NO | Major Incident Notification Detail / Homicide Case Folder Table of Contents / Photos- Scene/Body / Supervisory Homicide Audit Review / Handwritten notes | YES | ACB 087814 / ACB 087818 | NO | N/A |
| 381 | HL-504078 | 2005 | 1 | Julio Guerrero | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 088074; ACB 088099; ACB 088113; ACB 088121; ACB 088131; ACB 088136; ACB 088145; ACB 088190 | NO | Major Incident Notification Detail / Homicide Case Folder Table of Contents / Biz. Card / Supervisory Homicide Audit Review / Photos – Scene/Body | NO | N/A | NO | N/A |
| 382 | HL-509628 | 2005 | 1 | Reginald Webb | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 072627; ACB 072636; ACB 072653; ACB 072660; ACB 072697; ACB 072711; ACB 072724; ACB 072752 | NO | Major Incident Notification Detail / Biz. Card / Photos – Scene/Body / Supervisory Homicide Audit Review | NO | N/A | NO | N/A |
| 383 | HL-516150 | 2005 | 1 | Tony Moore | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 072899; ACB 072905; ACB 072920; ACB 072933; ACB 072947; ACB 072952; ACB 072955; ACB 072971; ACB 072982 | NO | Supp. Reports / Major Incident Notification Detail / Homicide Case Folder Table of Contents / Photos – Scene/Body / Supervisory Homicide Audit Review | YES | ACB 072990-004 | NO | N/A |
| 384 | HL-519786 | 2005 | 1 | Marcos Garcia | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 073056; ACB 073085; ACB 073096; ACB 073123; ACB 073131; ACB 073134; ACB 073141; ACB 073175; ACB 073185; ACB 073192; ACB 073207; ACB 073213 | NO | Major Incident Notification Detail / Homicide Case Folder Table of Contents / General Offense Case Report / Photos – Scene/Body | NO | N/A | NO | N/A |
| 385 | HL-526827 | 2005 | 1 | Deangelo Norwood | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 073355; ACB 073362; ACB 073470; ACB 073483; ACB 073491; ACB 073499; ACB 073505; ACB 073517; ACB 073525; ACB 073530; ACB 073566 | NO | Major Incident Notification Detail / Homicide Case Folder Table of Contents / Receipt / Supervisory Homicide Audit Review | YES | ACB 073536 / ACB 073547 | NO | N/A |
| 386 | HL-527629 | 2005 | 1 | Timothy Fountain | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 073651; ACB 073660; ACB 073717; ACB 073772; ACB 073817-73818; ACB 073850; ACB 073864; ACB 073909; ACB 073914 | NO | Major Incident Notification Detail / Homicide Case Folder Table of Contents / Photos – Scene/Body / Handwritten Note / ID Card | YES | ACB 073866 / ACB 073868 | YES | ACB 073893 / ACB 073896 / ACB 073897 |

HOOD 038978
Weston 053995

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| | IDENTIFYING INFORMATION | | | | PERMANENT RETENTION FILE COMPARISON | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Items in the Investigative File missing from the Permanent Retention File | | | | | | | |
| | RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS A PERMANENT RETENTION FILE BEEN PRODUCED? | IS THE INVESTIGATIVE FILE INVENTORY IN THE PERMANENT RETENTION FILE? | DOES THE INVENTORY IN THE PERMANENT RETENTION FILE MATCH THE INVENTORY IN THE BASEMENT FILE? | ARE THE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | OTHER INVESTIGATIVE MATERIAL FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE |
| 367 | HL-361793 | 2005 | 1 | Kevin Smith | NO | N/A | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 368 | HL-370043 | 2005 | 1 | Levester Hill | NO | N/A | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 369 | HL-371164 | 2005 | 1 | Armon Bailey | NO | N/A | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 370 | HL-373670 | 2005 | 1 | Milton Howard | NO | N/A | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 371 | HL-385610 | 2005 | 1 | Charles Littlejohn | NO | N/A | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 372 | HL-387017 | 2005 | 1 | Brian Fields Carl Warren | NO | N/A | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 373 | HL-393632 | 2005 | 1 | Larry Carter | NO | N/A | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 374 | HL-399677 | 2005 | 1 | Louis Lashley | NO | N/A | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 375 | HL-407548 | 2005 | 1 | Antoine Evans | NO | N/A | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 376 | HL-448514 | 2005 | 1 | Jarrell Brown | NO | N/A | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 377 | HL-484055 | 2005 | 1 | Raul Lopez Michael Nieto | NO | N/A | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 378 | HL-484812 | 2005 | 1 | Francisco Quezada | NO | N/A | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 379 | HL-486965 | 2005 | 1 | Jeremiah Fulton | NO | N/A | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 380 | HL-489874 | 2005 | 1 | Sergio Mendoza Jesus Mendoza | NO | N/A | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 381 | HL-504078 | 2005 | 1 | Julio Guerrero | NO | N/A | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 382 | HL-509628 | 2005 | 1 | Reginald Webb | NO | N/A | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 383 | HL-516150 | 2005 | 1 | Tony Moore | NO | N/A | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 384 | HL-519786 | 2005 | 1 | Marcos Garcia | NO | N/A | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 385 | HL-526827 | 2005 | 1 | Deangelo Norwood | NO | N/A | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 386 | HL-527629 | 2005 | 1 | Timothy Fountain | NO | N/A | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

HOOD 038979
Weston 053996

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| IDENTIFYING INFORMATION | | | | CRIMINAL DEFENSE ATTORNEY FILE COMPARISON — Items in the Investigative File missing from the Criminal Defense Attorney File | | | | | | | | | | INVESTIGATIVE FILE INFORMATION | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS CRIMINAL DEFENSE ATTORNEY FILE BEEN PRODUCED? | ARE INVESTIGATIVE MATERIALS MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING INVESTIGATIVE MATERIALS | DOES THE DEFENSE ATTORNEY FILE CONTAIN AN INVENTORY SHEET? | DOES THE INVENTORY SHEET IN THE DEFENSE ATTORNEY FILE MATCH THE INVENTORY SHEET IN THE BASEMENT FILE? | ARE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | DOES THE BASEMENT FILE INCLUDE AN INVENTORY? | BATES NUMBER FOR INVENTORY | IS THE INVENTORY COMPLETE? | EXAMPLES OF ITEMS MISSING FROM INVENTORY | ARE THERE HANDWRITTEN NOTES IN THE FILE? | BATES NUMBERS FOR HANDWRITTEN NOTES | ARE THERE TO-FROM MEMOS IN THE FILE? | BATES NUMBERS FOR TO-FROM MEMOS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 387 | HL-534365 | 2005 | 1 | Michael Thorpe | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 077946; ACB 077953; ACB 077973; ACB 077979; ACB 077984; ACB 077988; ACB 077998; ACB 078048; ACB 074052; ACB 074055; ACB 074095; ACB 074108; ACB 074149; ACB 074148 | | Major Incident Notification Detail Homicide Case Folder Table of Contents Supervisory Homicide Audit Review Photos - Scene Photos - Person | NO | N/A | NO | N/A |
| 388 | HL-543584 | 2005 | 1 | Clara Taylor | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 074217; ACB 074231; ACB 074242; ACB 074249; ACB 074256; ACB 074260; ACB 074270; ACB 074277; ACB 074311 | | To-From Memos Major Incident Notification Detail Homicide Case Folder Table of Contents Handwritten Notes Photos - Scene/Body | YES | ACB 074281-284 ACB 074293 ACB 074294 ACB 074297 ACB 074299 ACB 074301-305 ACB 074313 | YES | ACB 074212 ACB 074213 ACB 074214 |
| 389 | HL-543691 | 2005 | 1 | Enedino Callegos | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 043642; ACB 043650; ACB 043494; ACB 043507; ACB 043508; ACB 043548; ACB 043563; ACB 043568; ACB 043580; ACB 043609; ACB 043613; ACB 043617; ACB 043624; ACB 043663 | | Request for Identification of Photos Major Incident Notification Detail Homicide Case Folder Table of Contents Supervisory Homicide Audit Review | YES | ACB 043628 ACB 043655 | NO | N/A |
| 390 | HL-555606 | 2005 | 1 | Jamaal Collier | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 043691; ACB 043696; ACB 043729; ACB 043742; ACB 043750; ACB 043757; ACB 043764; ACB 043785; ACB 043812; ACB 043849 | | Major Incident Notification Detail Homicide Case Folder Table of Contents Handwritten Notes Supervisory Homicide Audit Review Photos - Scene/Body | YES | ACB 043833 | NO | N/A |
| 391 | HL-567137 | 2005 | 1 | St Patrick Trusty | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 043908; ACB 043922; ACB 043942; ACB 043952; ACB 043963; ACB 043970; ACB 043975; ACB 043984; ACB 043988; ACB 044019 | | Major Incident Notification Detail Homicide Case Folder Table of Contents Photos - Person Photos - Scene/Body | NO | ACB 044012 | NO | N/A |
| 392 | HL-573690 | 2005 | 1 | Darrell Crume Thomas Curtis John Shields Marvin Stone | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 044105; ACB 044118; ACB 044160; ACB 044171; ACB 044178; ACB 044183; ACB 044218; ACB 044238; ACB 044252; ACB 044258; ACB 044266; ACB 044314 | | Major Incident Notification Detail Homicide Case Folder Table of Contents Photos - Scene/Body | NO | ACB 044240 ACB 044294 | NO | N/A |
| 393 | HL-604727 | 2005 | 1 | Justin Love | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 074364; ACB 074371; ACB 074403; ACB 074408; ACB 074419; ACB 074427; ACB 074435; ACB 074439; ACB 074476; ACB 074483; ACB 074507 | | Major Incident Notification Detail Homicide Case Folder Table of Contents Supervisory Homicide Audit Review | NO | N/A | NO | N/A |
| 394 | HL-612170 | 2005 | 1 | Jose Elizondo | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 074612; ACB 074624; ACB 074658; ACB 074664; ACB 074697; ACB 074705; ACB 074710; ACB 074736; ACB 074801; ACB 074813; ACB 074819; ACB 074822; ACB 074871 | | Major Incident Notification Detail Homicide Case Folder Table of Contents Supervisory Homicide Audit Review To-From Memo Handwritten Notes | YES | ACB 074837-838 ACB 074841 ACB 074848-849 ACB 074855 ACB 074865 | YES | ACB 074604 |
| 395 | HL-617116 | 2005 | 4 | Apolinar Hernandez | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | Area Central Basement 0000003 | | Homicide File Supervisor's Check List GPRs General Offense Case Report | NO | N/A | NO | N/A |
| 396 | HL-619201 | 2005 | 4 | Andres Rojas | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | Area Central Basement 0000002; Area Central Basement 0000004 | | Homicide File Supervisor's Check List Subpoena APD and ASA Handwritten Notes Photos - Scene/Body Photos - Person | YES | Area Central Basement 0000099 | NO | N/A |
| 397 | HL-628024 | 2005 | 1 | Wardell Negen | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 074896; ACB 074899; ACB 074916; ACB 074921; ACB 074931; ACB 074939; ACB 074949; ACB 074953 | | Major Incident Notification Detail Homicide Case Folder Table of Contents Supervisory Homicide Audit Review | NO | N/A | NO | N/A |
| 398 | HL-641342 | 2005 | 1 | Jose Salcedo | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 075025; ACB 075031; ACB 075059; ACB 075062; ACB 075086; ACB 075098; ACB 075101; ACB 075119; ACB 075127; ACB 075133; ACB 075136; ACB 075157 | | Major Incident Notification Detail Homicide Case Folder Table of Contents Photos - Video Stills Supervisory Homicide Audit Review | NO | N/A | NO | N/A |
| 399 | HL-656289 | 2005 | 1 | Brian Goolsby | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 075221; ACB 075227; ACB 075282; ACB 075297; ACB 075316; ACB 075327; ACB 075330; ACB 075348; ACB 075356 | | Major Incident Notification Detail Homicide Case Folder Table of Contents Handwritten Notes Aerial Map Supervisory Homicide Audit Review Photos - Scene/Body | YES | ACB 075377 | NO | N/A |
| 400 | HL-662200 | 2005 | 1 | Raul Gomez | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 075496; ACB 075502; ACB 075529; ACB 075556; ACB 075614; ACB 075630; ACB 075626; ACB 075649; ACB 075656; ACB 075713 | | Major Incident Notification Detail Homicide Case Folder Table of Contents Photos - Scene/Body Photos - Person Supervisory Homicide Audit Review | YES | ACB 075663-664 ACB 075751-755 | NO | N/A |
| 401 | HL-669557 | 2005 | 1 | Emil Kozeluh Christopher Kronenberger | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 075891-75894 | | Personal Court Notification Details Major Incident Notification Detail Handwritten Notes | YES | ACB 075973 ACB 076102-103 ACB 076107 ACB 076115 | YES | ACB 075911 ACB 075929 |
| 402 | HL-672823 | 2005 | 1 | Dasmen Thomas | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 076310; ACB 076320; ACB 076363; ACB 076370; ACB 076393; ACB 076406; ACB 076421; ACB 076442; ACB 076462; ACB 076471; ACB 076475; ACB 076486; ACB 076510 | | Major Incident Notification Detail Homicide Case Folder Table of Contents Court Complaint Transmittal Listing Handwritten Notes | NO | N/A | NO | N/A |
| 403 | HL-710670 | 2005 | 1 | Daniel Zavala Alfonso Ochoa Jesus Sandoval | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 076641; ACB 076649-76650; ACB 076817; ACB 076832; ACB 076842; ACB 076809; ACB 076876; ACB 076914; ACB 076892; ACB 076914; ACB 076923; ACB 076942 | | Major Incident Notification Detail Homicide Case Folder Table of Contents Supervisory Homicide Audit Review | NO | N/A | NO | N/A |
| 404 | HL-722490 | 2005 | 1 | Jonathan Brooks | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 077003; ACB 077047; ACB 077058; ACB 077071; ACB 077080; ACB 077087; ACB 077093 | | Major Incident Notification Detail Homicide Case Folder Table of Contents To-From Memo Photos - Scene Photos - Person Photos - Scene/Body | NO | N/A | YES | ACB 076998-999 |

HOOD 038980
Weston 053997

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| IDENTIFYING INFORMATION | | | | PERMANENT RETENTION FILE COMPARISON | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Items in the Investigative File missing from the Permanent Retention File | | | | | |
| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS A PERMANENT RETENTION FILE BEEN PRODUCED? | IS THE INVESTIGATIVE FILE INVENTORY IN THE PERMANENT RETENTION FILE? | DOES THE INVENTORY IN THE PERMANENT RETENTION FILE MATCH THE INVENTORY IN THE BASEMENT FILE? | ARE THE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | OTHER INVESTIGATIVE MATERIAL FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE |
| 387 | HL-534365 | 2005 | 1 | Michael Thorpe | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 388 | HL-543584 | 2005 | 1 | Clara Taylor | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 389 | HL-543691 | 2005 | 1 | Enedino Callegos | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 390 | HL-555606 | 2005 | 1 | Jamaal Collier | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 391 | HL-567137 | 2005 | 1 | St Patrick Trusty | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 392 | HL-573690 | 2005 | 1 | Darnell Crume Thomas Curtis John Shields Marvin Stone | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 393 | HL-604727 | 2005 | 1 | Justin Love | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 394 | HL-612170 | 2005 | 1 | Jose Elizondo | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 395 | HL-617116 | 2005 | 4 | Apolinar Hernandez | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 396 | HL-619201 | 2005 | 4 | Andres Rojas | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 397 | HL-628024 | 2005 | 1 | Wardell Nugen | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 398 | HL-641342 | 2005 | 1 | Jose Salcedo | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 399 | HL-656289 | 2005 | 1 | Brian Goolsby | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 400 | HL-662200 | 2005 | 1 | Raul Gomez | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 401 | HL-669557 | 2005 | 1 | Emil Kozeluh Christopher Kronenberger | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 402 | HL-673823 | 2005 | 1 | Dasmen Thomas | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 403 | HL-710670 | 2005 | 1 | Daniel Zavala Alfonso Ochoa Jesus Sandoval | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 404 | HL-722490 | 2005 | 1 | Jonathan Brooks | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

HOOD 038981
Weston 053998

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| IDENTIFYING INFORMATION | | | | CRIMINAL DEFENSE ATTORNEY FILE COMPARISON — Items in the Investigative File missing from the Criminal Defense Attorney File | | | | | | | | | | INVESTIGATIVE FILE INFORMATION | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS CRIMINAL DEFENSE ATTORNEY FILE BEEN PRODUCED? | ARE INVESTIGATIVE MATERIALS MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING INVESTIGATIVE MATERIALS | DOES THE DEFENSE ATTORNEY FILE CONTAIN AN INVENTORY SHEET? | DOES THE INVENTORY SHEET IN THE DEFENSE ATTORNEY FILE MATCH THE INVENTORY SHEET IN THE BASEMENT FILE? | ARE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | DOES THE BASEMENT FILE INCLUDE AN INVENTORY? | BATES NUMBER FOR INVENTORY | EXAMPLES OF ITEMS MISSING FROM INVENTORY | ARE THERE HANDWRITTEN NOTES IN THE FILE? | BATES NUMBERS FOR HANDWRITTEN NOTES | ARE THERE TO-FROM MEMOS IN THE FILE? | BATES NUMBERS FOR TO-FROM MEMOS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 405 | HL-808159 | 2005 | 1 | Michael Nieto | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 088300; ACB 088304; ACB 088321; ACB 088332; ACB 088340; ACB 088345; ACB 088363; ACB 088378; ACB 088386 | Major Incident Notification Detail, Handwritten Notes, Supervisory Homicide Audit Review | YES | ACB 088408-413 | NO | N/A |
| 406 | HM-100890 | 2006 | 1 | Lonnell Payne | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 077215-77233; ACB 077298; ACB 077303; ACB 077325; ACB 077332; ACB 077401; ACB 077426; ACB 077433; ACB 077447; ACB 077450; ACB 077498; ACB 077551 | Photos – Scene/Body, Major Incident Notification Detail, Homicide Case Folder Table of Contents, Receipt, Supervisory Homicide Audit Review | YES | ACB 077354, ACB 077494, ACB 077513-520, ACB 077544, ACB 077545 | NO | N/A |
| 407 | HM-148888 | 2006 | 1 | Nicholas Izguerra | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 077647; ACB 077656; ACB 077683; ACB 077693; ACB 077711; ACB 077716; ACB 077736; ACB 077754; ACB 077775 | Photos – Scene/Body, Photos – Persons, Major Incident Notification Detail, Homicide Case Folder Table of Contents, Supervisory Homicide Audit Review | NO | N/A | NO | N/A |
| 408 | HM-182777 | 2006 | 1 | Ariel Bueno | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 077817; ACB 077825; ACB 077842; ACB 077846; ACB 077862; ACB 077866; ACB 077873; ACB 077881; ACB 077886; ACB 077991 | Criminal History, Investigative Alert, Photos – Person, Photo – Scene, Major Incident Notification Detail, Homicide Case Folder Table of Contents, Supervisory Homicide Audit Review | NO | N/A | NO | N/A |
| 409 | HM-199438 | 2006 | 1 | Christopher Sodaro | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 088477; ACB 088487; ACB 088517; ACB 088522; ACB 088530; ACB 088542; ACB 088545; ACB 088565; ACB 088613; ACB 088626; ACB 088635 | Supplement Report, Photos – Person, Major Incident Notification Detail, Homicide Case Folder Table of Contents, Handwritten Notes | YES | ACB 088562; ACB 088596; ACB 088638; ACB 088649; ACB 088665; ACB 088669-655; ACB 088673; ACB 088681; ACB 088686-687; ACB 088691-694 | NO | N/A |
| 410 | HM-208287 | 2006 | 1 | Derrick Lemon | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 088787; ACB 088796; ACB 088832; ACB 088846; ACB 088858; ACB 088864; ACB 088872; ACB 088909; ACB 088915; ACB 088916; ACB 088921; ACB 088948; ACB 088957 | Photos – Scene/Body, Major Incident Notification Detail, Homicide Case Folder Table of Contents | NO | N/A | NO | N/A |
| 411 | HM-231046 | 2006 | 1 | Jennifer Reeves | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 089046; ACB 089053; ACB 089098; ACB 089123; ACB 089130; ACB 089149; ACB 089164; ACB 089174; ACB 089180; ACB 089195; ACB 089198; ACB 089264; ACB 089290 | Photos– Scene/Body, Polygraph DVD, Digital Recording of DVD Receipt, Major Incident Notification Detail, Homicide Case Folder Table of Contents, Supervisory Homicide Audit Review | YES | ACB 089209 | NO | N/A |
| 412 | HM-232296 | 2006 | 1 | Martin Garner Frederick Deese | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 077964; ACB 077974; ACB 077995; ACB 078001; ACB 078015; ACB 078027; ACB 078060; ACB 078071; ACB 078080; ACB 078127 | Facsimile Message, SOS Search, Court Notification Summary Report, Major Incident Notification Detail, Homicide Case Folder Table of Contents, Supervisory Homicide Audit Review, Photos – Person | YES | ACB 078097, ACB 078101, ACB 078102 | YES | ACB 078115, ACB 078116, ACB 078117, ACB 078118 |
| 413 | HM-264904 | 2006 | 1 | Eddie Fenton Tytiyana Underwood Jumeilah Williams | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 078151; ACB 078164; ACB 078182; ACB 078203; ACB 078291; ACB 078357; ACB 078428; ACB 078432; ACB 078436; ACB 078443; ACB 078513; ACB 078523; ACB 078596; ACB 078608-609 | IDOC Inmate Searches, Bureau of Invest. Services Deployment Operations Center, Criminal Histories, Clear Data Warehouse Charges & Photos, DL/ID Image Retrieval, Arrest Report, Investigative Alerts, Photos – Person, Handwritten Note, CCDOC Inmate Report, CHESS Memo, Memo, Photos – Scene, Major Incident Notification Detail, Homicide Case Folder Table of Contents | YES | ACB 078310, ACB 078460 | NO | N/A |
| 414 | HM-278309 | 2006 | 1 | Bruce Ervin | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 078885; ACB 078901; ACB 078929; ACB 078938; ACB 078961; ACB 078973; ACB 078909; ACB 079025; ACB 079029; ACB 079032; ACB 079038; ACB 079104 | Handwritten Notes, Photos – Scene/Body, Major Incident Notification Detail, Homicide Case Folder Table of Contents, Supervisory Homicide Audit Review | YES | ACB 078897, ACB 079060 | NO | N/A |
| 415 | HM-304212 | 2006 | 1 | Ariel Bueno | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 079191; ACB 079195; ACB 079221; ACB 079229; ACB 079281; ACB 079287; ACB 079291; ACB 079299; ACB 079306; ACB 079337 | Photos – Scene/Body, Photos – Person, Major Incident Notification Detail, Homicide Case Folder Table of Contents, Supervisory Homicide Audit Review | NO | N/A | NO | N/A |
| 416 | HM-307550 | 2006 | 1 | Jorge Flores | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 079407; ACB 079419; ACB 079440; ACB 079453; ACB 079470; ACB 079487; ACB 079496; ACB 079503; ACB 079511 | Photos – Person, Photos – Scene/Body, Major Incident Notification Detail, Homicide Case Folder Table of Contents, Supervisory Homicide Audit Review | NO | N/A | NO | N/A |
| 417 | HM-318752 | 2006 | 1 | David Aguilera | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 079623; ACB 079634; ACB 079663; ACB 079667; ACB 079677; ACB 079683; ACB 079690; ACB 079699; ACB 079715; ACB 079732; ACB 079738; ACB 079775 | Request for Evidence from ERPS, Attorney Cards, Photos – Scene/Body, Major Incident Notification Detail, Homicide Case Folder Table of Contents, Supervisory Homicide Audit Review | NO | N/A | NO | N/A |

HOOD 038982
Weston 053999

| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS A PERMANENT RETENTION FILE BEEN PRODUCED? | IS THE INVESTIGATIVE FILE INVENTORY IN THE PERMANENT RETENTION FILE? | DOES THE INVENTORY IN THE PERMANENT RETENTION FILE MATCH THE INVENTORY IN THE BASEMENT FILE? | ARE THE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | OTHER INVESTIGATIVE MATERIAL FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HL-808159 | 2005 | 1 | Michael Nieto | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| HM-100890 | 2006 | 1 | Lonnell Payne | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| HM-148888 | 2006 | 1 | Nicholas Irguerra | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| HM-182777 | 2006 | 1 | Ariel Bueno | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| HM-199438 | 2006 | 1 | Christopher Soduro | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| HM-208287 | 2006 | 1 | Derrick Lemon | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| HM-231046 | 2006 | 1 | Jennifer Reeves | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| HM-232296 | 2006 | 1 | Marlin Garner Frederick Deese | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| HM-264904 | 2006 | 1 | Eddie Fenton Tytyuna Underwood Jameelah Williams | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| HM-278309 | 2006 | 1 | Bruce Ervin | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| HM-304212 | 2006 | 1 | Ariel Bueno | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| HM-307550 | 2006 | 1 | Jorge Flores | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| HM-318752 | 2006 | 1 | David Aguilera | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

HOOD 038983
Weston 054000

Fields v. City of Chicago, Index of Basement Files, 1983-1989, 1999-2006

| RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS CRIMINAL DEFENSE ATTORNEY FILE BEEN PRODUCED? | ARE INVESTIGATIVE MATERIALS MISSING FROM THE DEFENSE ATTORNEY FILE? | RATES NUMBERS FOR MISSING INVESTIGATIVE MATERIALS | DOES THE DEFENSE ATTORNEY FILE CONTAIN AN INVENTORY SHEET? | DOES THE INVENTORY SHEET IN THE DEFENSE ATTORNEY FILE MATCH THE INVENTORY SHEET IN THE BASEMENT FILE? | ARE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | RATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE DEFENSE ATTORNEY FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | DOES THE BASEMENT FILE INCLUDE AN INVENTORY? | BATES NUMBER FOR INVENTORY | IS THE INVENTORY COMPLETE? | EXAMPLES OF ITEMS MISSING FROM INVENTORY | ARE THERE HANDWRITTEN NOTES IN THE FILE? | BATES NUMBERS FOR HANDWRITTEN NOTES | ARE THERE TO-FROM MEMOS IN THE FILE? | BATES NUMBERS FOR TO-FROM MEMOS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 418 | HM-341097 | 2006 | 1 | Prince Ford / Antonio Rush / Bruce Garrett / Juan Booker | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 079663; ACB 079873; ACB 079910; ACB 079915; ACB 079952; ACB 079970; ACB 079982; ACB 079999; ACB 080009; ACB 080110; ACB 080120; ACB 080157 | | •Investigative Alert, Criminal History, Handwritten Note, ISP Forensics Lab Reports, Memos, Photos – Scene/Body, Homicide Case Folder Table of Contents, Supervisory Homicide Audit Review | YES | ACB 080057 | NO | N/A |
| 419 | HM-353304 | 2006 | 1 | Ronald Livingston | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 080265; ACB 080271; ACB 080171; ACB 080378; ACB 080415; ACB 080444; ACB 080448; ACB 080466; ACB 080466; ACB 080497; ACB 080526; ACB 080542 | | ASA Subpoena for Streetfiles, Copy Request Inventory Disk, Photos – Scene/Body, ISP Laboratory Report, Major Incident Notification Detail, Supervisory Homicide Audit Review | No | N/A | NO | N/A |
| 420 | HM-366735 | 2006 | 1 | Benjamin Cooley | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 080620; ACB 080629; ACB 080678; ACB 080683; ACB 080701; ACB 080713; ACB 080735; ACB 080744; ACB 080755; ACB 080769; ACB 080785 | | Handwritten Notes, Supervisory Homicide Audit Review, Major Incident Notification Detail, Homicide Case Folder Table of Contents, Photos – Scene/Body | Yes | ACB 080617; ACB 080755; ACB 080769 | NO | N/A |
| 421 | HM-367019 | 2006 | 1 | Lewis Robinson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 044429; ACB 044437; ACB 044461; ACB 044464; ACB 044475; ACB 044484; ACB 044499; ACB 044507 | | Supervisory Homicide Audit Review, Major Incident Notification Detail, Homicide Case Folder Table of Contents, Photos – Scene/Body | No | N/A | NO | N/A |
| 422 | HM-372012 | 2006 | 1 | Daniel Avitia | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 044590; ACB 044600; ACB 044625; ACB 044632; ACB 044609; ACB 044676; ACB 044685; ACB 044721; ACB 044751; ACB 044762; ACB 044812 | | Photos – Scene/Body, Major Incident Notification Detail, Homicide Case Folder Table of Contents, Handwritten Note | Yes | ACB 044779 | NO | N/A |
| 423 | HM-414793 | 2006 | 1 | Lorenzo Wilson / Paris Gosha / Erika Ray | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 044937; ACB 044928; ACB 044979; ACB 045005; ACB 045018; ACB 045027; ACB 045040; ACB 045050; ACB 045060; ACB 045073; ACB 045118; ACB 045124; ACB 045130 | | Major Incident Notification Detail, Homicide Case Folder Table of Contents, Photos – Scene/Body, Supp Report | NO | N/A | NO | N/A |
| 424 | HM-419168 | 2006 | 1 | Edwon Carter | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 045187; ACB 045203; ACB 045260; ACB 045265; ACB 045301; ACB 045317; ACB 045346; ACB 045349; ACB 045374; ACB 045322; ACB 045382 | | •Handwritten Notes, Receipts, Photos – Scene/Body, Major Incident Notification Detail, Homicide Case Folder Table of Contents, Supervisory Homicide Audit Review | YES | ACB 045387; ACB 045388; ACB 045447; ACB 045448 | NO | N/A |
| 425 | HM-445290 | 2006 | 1 | Clarence Mosely | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 045500; ACB 045512; ACB 045543; ACB 045559; ACB 045619; ACB 045626; ACB 045640; ACB 045654; ACB 045696; ACB 045711; ACB 045717; ACB 045733 | | •Handwritten Notes, Photos – Scene, Major Incident Notification Detail, Homicide Case Folder Table of Contents, Supervisory Homicide Audit Review | NO | N/A | NO | N/A |
| 426 | HM-449389 | 2006 | 1 | Darrell Lane | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 045819; ACB 045830; ACB 045868; ACB 045905; ACB 045919; ACB 045936; ACB 045969; ACB 045973; ACB 045979; ACB 046022 | | •Handwritten Notes, Photos – Scene/Body, DVD, Major Incident Notification Detail, Homicide Case Folder Table of Contents, Supervisory Homicide Audit Review | YES | ACB 045983; ACB 045996; ACB 045998 | NO | N/A |
| 427 | HM-478600 | 2006 | 1 | Jose Soto | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 046117; ACB 046125; ACB 046151; ACB 046177; ACB 046191; ACB 046222; ACB 046249; ACB 046255; ACB 046263 | | Photos – Persons, Photos – Scene/Body, Major Incident Notification Detail, Homicide Case Folder Table of Contents, Supervisory Homicide Audit Review | YES | ACB 046275; ACB 046276 | NO | N/A |
| 428 | HM-492478 | 2006 | 1 | Jermaine Lewis | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 046430; ACB 046445; ACB 046471; ACB 046476; ACB 046492; ACB 046503 | | Crime Scene Processing Report, Towed Vehicle Disposition, ISP Telephone Conversation Record, Handwritten Notes, GPRs, Line Up Sheets, Attorney ID Cards, Photos – Persons, Photos – Scene/Body, Major Incident Notification Detail, Homicide Case Folder Table of Contents, Supervisory Homicide Audit Review | YES | ACB 046525; ACB 046540; ACB 046559 | NO | N/A |
| 429 | HM-501775 | 2006 | 1 | Carlos Rivera | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | YES | ACB 046640; ACB 046646; ACB 046685; ACB 046691; ACB 046708; ACB 046733; ACB 046724; ACB 046736; ACB 046743; ACB 046782 | | Photos – Persons, Major Incident Notification Detail, Homicide Case Folder Table of Contents, Supervisory Homicide Audit Review | NO | N/A | NO | N/A |

HOOD 038984
Weston 054001

| | IDENTIFYING INFORMATION | | | | PERMANENT RETENTION FILE COMPARISON | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Items in the Investigative File missing from the Permanent Retention File | | | | | | | | | |
| | RECORDS DIVISION NUMBER | YEAR | AREA | DEFENDANT(S) | HAS A PERMANENT RETENTION FILE BEEN PRODUCED? | IS THE INVESTIGATIVE FILE INVENTORY IN THE PERMANENT RETENTION FILE? | DOES THE INVENTORY IN THE PERMANENT RETENTION FILE MATCH THE INVENTORY IN THE BASEMENT FILE? | ARE THE GENERAL PROGRESS REPORTS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING GENERAL PROGRESS REPORTS | ARE HANDWRITTEN NOTES FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING HANDWRITTEN NOTES | ARE TO-FROM MEMOS FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE? | BATES NUMBERS FOR MISSING TO-FROM MEMOS | OTHER INVESTIGATIVE MATERIAL FROM THE BASEMENT FILE MISSING FROM THE PERMANENT RETENTION FILE |
| 418 | HM-341097 | 2006 | 1 | Prince Ford Antonio Rush Bruce Garrett Juan Booker | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 419 | HM-353304 | 2006 | 1 | Ronald Livingston | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 420 | HM-366735 | 2006 | 1 | Benjamin Cooley | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 421 | HM-367019 | 2006 | 1 | Lewis Robinson | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 422 | HM-372012 | 2006 | 1 | Daniel Avitia | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 423 | HM-414793 | 2006 | 1 | Lorenzo Wilson Paris Gosha Erika Ray | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 424 | HM-419168 | 2006 | 1 | Edwon Carter | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 425 | HM-445290 | 2006 | 1 | Clarence Mosely | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 426 | HM-449389 | 2006 | 1 | Darnell Lane | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 427 | HM-478600 | 2006 | 1 | Jose Soto | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 428 | HM-492478 | 2006 | 1 | Jermaine Lewis | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 429 | HM-501773 | 2006 | 1 | Carlos Rivera | NO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

HOOD 038985
Weston 054002

# Exhibit 86

Brasfield - direct

2485

1        THE COURT:  All right.  Everybody can have a seat.

2    The next witness is on his way up.

3      (Witness sworn.)

4        THE COURT:  All right.  Mr. Loevy, you can go ahead.

5                            - - -

6        MICHAEL DAVID BRASFIELD, DIRECT EXAMINATION

7    BY MR. LOEVY:

8    Q.  Sir, if you'd state your name for the record, please.

9    A.  Michael David Brasfield.

10   Q.  And what is your profession?

11   A.  I am retired from law enforcement after about 40 years,

12   and I occasionally do expert witness and consulting work.

13   Q.  Let's focus on your law enforcement career.  Tell the jury

14   a little bit about your history.

15   A.  As briefly as I can, I started in law enforcement with a

16   small agency in Washington state in 1968.  After a year there,

17   I transferred to the Seattle Police Department on January --

18   in January of 1969.  I stayed with the Seattle Police

19   Department until my retirement in January of 1995, about 26

20   years.

21        While I was with the Seattle Police Department, I

22   served as a patrol officer, took an exam, and eventually

23   became a detective, served in a number of investigative units

24   within the police department.

25        I then was promoted to sergeant.  I served in a

1   number of positions as a sergeant, including internal affairs

2   and vice and prostitution enforcement.

3          I was eventually promoted in 1978 to lieutenant, and

4   I was assigned at the time the City of Seattle had a contract

5   to provide all law enforcement training statewide in the

6   statewide police academy, and I became a commander of that.

7   We train law enforcement officers from approximately 130

8   different agencies, provided them with the basic tools to

9   become police officers.

10          I was promoted to captain in 1980.  I was in command

11  of both the downtown commercial and waterfront business

12  precinct.  I was then transferred to the command of the

13  internal investigation section, and I held that position for a

14  couple of years, investigated everything from officer-involved

15  shootings to police misconduct, including felony accusations

16  and allegations against officers.

17          After the two years there, I was requested and was

18  assigned to be the commander of the university district where

19  the University of Washington and a number of other

20  universities were, and I stayed there for the two years.

21          I was then -- in the City of Seattle, a captain is

22  the highest civil service rank .  I was tapped to become a

23  major and was put in charge of the inspectional service

24  division.  And in the inspectional services definition, among

25  many other things, we reviewed, wrote, modified policies and

Brasfield - direct

2487

1  procedures throughout the department, including homicides,

2  homicide investigations.  We also conducted audits and

3  inspections of units throughout the police department.

4  Q.  Let me slow you down there for a second.

5  A.  Yes, sir.

6  Q.  You were talking about your ranks.  Did you achieve ranks

7  all the way up to assistant chief of police and chief?

8  A.  Yes.

9  Q.  Tell the jury about that.

10 A.  After I served as commander of the inspector services

11 division, I was promoted to assistant chief, which is one step

12 below the chief of police, and my responsibilities were as

13 assistant chief with the administrative services, and that

14 included the records bureau, the maintenance of the subpoena

15 services, and a number of other units, including 911 dispatch

16 services.

17 Q.  All right.  Did you eventually become a police chief?

18 A.  I did.  After retiring in January of '95, I was contacted

19 by the City of Fort Lauderdale, Florida, and in June or July

20 of 1995, I was selected to be the police chief there, and I

21 served in that capacity until I decided it was time for a

22 second retirement, and I left as chief of police in Fort

23 Lauderdale in 2001.

24 Q.  After that?

25 A.  I returned to Washington state.  I kind of sat in the

Brasfield - direct

2488

1  retirement cabin for a little while and got bored, and there

2  was an upcoming election for sheriff of Jefferson County,

3  Washington, predominantly a rural area.  I had never been

4  involved officially in politics and decided to run for

5  sheriff.  I was elected.  I completed my first term, ran for

6  reelection, was successful, and started grooming a

7  replacement.  And about halfway through my second four-year

8  term, I decided to retire, and my successor was appointed to

9  fill that position.

10 Q.  Now, you have some associations and memberships.  Can you

11 just summarize that?

12 A.  I was granted life membership with the International

13 Association of Chiefs of Police, life membership with the

14 Police Executive Research Forum, life membership with the

15 National Sheriffs' Association, as well as a number of state

16 organizations.

17 Q.  And in that capacity, do you have the ability or the

18 opportunity to interact with other agencies and become

19 familiar with other police departments' policies and

20 practices?

21 A.  Yes, both in the process of writing policies and

22 procedures and implementing them and monitoring them in the

23 city of Seattle, as well as a chief and as a sheriff, I have

24 regular and significant interaction with other agencies.

25 Q.  And you mentioned audits, and I cut you off at audits.

1  Briefly, did that give you experience and opportunity to learn
2  about other police departments too?
3  A.  Yes.  I was -- while on active duty, I participated in a
4  federal grant to inspect and provide audit information on the
5  delivery of police services to a number of cities nationwide
6  on the delivery of police services in public housing, and that
7  process, my portion of the team was to look at their
8  records-keeping and their delivery of information to outside
9  requesters.
10 Q.  So that was actually the area of your expertise was
11 record-keeping, documentation, and transmitting that stuff to
12 outside --
13 A.  In that particular project, yes.
14 Q.  You also mentioned training.  Did that also -- in your
15 training capacity, did that give you experience with other
16 departments too?
17 A.  Yes.  One of the processes with training both at the entry
18 level police officer deputy training is to look at their
19 policies and procedures.  You have an academy class -- three
20 academy classes at one time with officers from multiple
21 agencies.  You have to become familiar with their policies and
22 procedures and tailor the training to reflect what they need
23 to do in theirs.  In that process, you're looking at their
24 policies and procedures.  And there's not too many agencies
25 that I am aware of when you're doing policies like when I was

Brasfield - direct

2490

1  at inspection services or the chief or the sheriff.  You are
2  not always hoping to reinvent the wheel.  You want to go and
3  see what some of the other agencies are doing nationwide.
4  Q.  All right.  And then you said you actually worked in
5  records division for a time, correct, where you --
6  A.  As an assistant chief, I absorbed that division, yes.
7  Q.  Supervising and --
8  A.  Yes.
9  Q.  And that would include homicide files as well, right?
10  A.  Yes.
11  Q.  All right.  And when you were the chief in Fort
12  Lauderdale, did that give you jurisdiction over the policies
13  and practices including what you've called high-risk policies
14  and practices?
15  A.  Yes.  When I describe high-risk policies, things such
16  as -- that have the opportunity or the potential for
17  significant impact either budgetarily or legal liability, and
18  in some instances with police pursuits and use of deadly
19  force, that either citizens' or officers' lives are in danger.
20  Q.  All right.  Were you a detective -- did you have
21  supervision over detectives over the course of your career?
22  A.  Yes.  I had that opportunity both as a sergeant and as a
23  captain and as a chief and as a sheriff.
24  Q.  Have you investigated as a detective homicides?
25  A.  I have investigated traffic homicides, traffic fatalities

Brasfield - direct

2491

1  for hit-and-runs.  You have situations where you have a fatal

2  crash, you may or may not have a suspect at the scene, you

3  have to assemble the files.

4  Q.  All right.  And as a sergeant in charge of internal

5  investigations and the assistant chief in Seattle, did you

6  regularly oversee and review detectives doing homicide

7  investigations?

8  A.  Yes.

9  Q.  Is that a subject about which you have great familiarity?

10  A.  I am.

11  Q.  All right.  Let's talk about this -- real briefly, the

12  Washington State Attorney General Homicide Investigation

13  Tracking System.

14  A.  The Washington State Attorney General instituted --

15  because of dissatisfaction statewide with clearances of

16  homicide investigations and inconsistent procedures for

17  homicide investigations, created a -- what the acronym was,

18  HITS, homicide investigation tracking system.  It consisted

19  of 10 or 12 practitioners, the number varied from time to

20  time, including what we call in Washington state prosecuting

21  attorneys, police investigators, and we would review

22  problematic homicide cases from around the state that were

23  either coming to a dead end or not seeming to have a

24  coordination in the investigation.

25  Q.  All right.  In summary then, is the subject of policies

Brasfield - direct

2492

1  and practices about documenting and disclosing investigation

2  materials, is that something you have expertise in, sir?

3  A.  Yes, sir.

4  Q.  All right.  Since you've retired, have you -- you

5  mentioned you do some expert witness stuff --

6  A.  Yes.

7  Q.  -- some consulting.

8         About how many cases have you been involved with?

9  A.  I have actually been retained somewhere between 120

10 or 130.  However, the distinction is how many I have been

11 deposed or gone to trial on, and --

12 Q.  So let's break that down.  Sometimes you get retained, and

13 then you get a fee to review material?

14 A.  Correct.  That's correct.

15 Q.  And then what's your first step when you get retained?

16 A.  I ask for copies of certain documents relative to the

17 litigation, whether it is the criminal -- or the civil

18 complaint, any depositions that have already been taken, any

19 statements, any police reports, that type of thing, and review

20 them.

21 Q.  And then you do a review?

22 A.  Yes.

23 Q.  Does it matter who hires you as far as your opinion and

24 the money?  Can you explain?

25 A.  No.  I looked recently.  About 60 to 66 percent of the

Brasfield - direct

2493

1  cases I have handled have been for governmental entities, for
2  cities, counties, state agencies, police departments.  The
3  other 40 have been for plaintiffs' cases where someone is
4  suing the agencies.
5  Q.  If a lawyer calls you and says they want you to review the
6  facts of the case, does that mean you automatically are going
7  to take their side or testify for them?
8  A.  No.  Depending on whether I had experience with the
9  attorney or the law firm in the past, I may agree to take a
10  quick look at some material to see if it's something that I
11  thought I could honestly be engaged in.  Oftentimes, I'll look
12  at the material and indicate that, you know, I appreciate what
13  you're trying to do here, but I am not going to be a very good
14  witness for you because I don't feel that what was done was
15  correct.
16  Q.  All right.  So you'll only do the cases where you believe
17  it was correct?
18  A.  Yes.
19  Q.  And do you generally charge an hourly rate to review
20  materials in these cases?
21  A.  I do.
22  Q.  So you get paid that rate either way, regardless of
23  whether you have good news or bad news for the attorney?
24  A.  That's correct.
25  Q.  All right .  In this case, you did a lot of work, did you

Brasfield - direct

2494

1   not?

2   A.  I did.  This was one of the most time-consuming.

3   Q.  How many hours would you say you've spent in this case?

4   A.  Somewhere between 100 and 150, perhaps.

5   Q.  Hours?

6   A.  Yes.

7   Q.  And what is your hourly rate?

8   A.  $300 an hour.

9   Q.  Is that commensurate with the hourly rate of people in

10  your industry?

11  A.  Yes, it is.

12  Q.  Has your rate stayed the same or gone up over time?

13  A.  I initially started out probably eight or nine years ago

14  at $250 an hour, and four or five years ago I raised it to 3,

15  but it's been that way since.

16  Q.  In addition to this case with the 100 to 150 hours you've

17  spent, have you had other cases where you had opportunities to

18  study the policies and practices of the Chicago Police

19  Department?

20  A.  I have.

21          MR. NOLAND:  Objection.

22          THE COURT:  I need to ask you about this at sidebar.

23    (The following proceedings were had at sidebar outside the

24  hearing of the jury:)

25          THE COURT:  Where are you going with this?  Is it

Brasfield - direct

2495

 1   just yes or no, or are you going to ask him details?

 2          MR. LOEVY:  I was going to ask him, have you spent --

 3   how many hours, and he, I believe, would say 4 to 500 hours

 4   looking at the Chicago Police Department's policies and

 5   practices.  Your Honor and I had a little discussion about

 6   what this opens to and how far.  If they want to say, isn't it

 7   true you did a bunch of cases against Chicago, we are going to

 8   say, you know, well, those cases say this and that.  I just

 9   had talked about, hey, I spent 4 to 500 hours looking at the

10   City's policies and practices --

11          THE COURT:  I understand.

12          Articulate the objection, Mr. Noland.

13          MR. NOLAND:  The objection is that that would, I

14   think, be a not disclosed opinion as to us, which is things he

15   relied on in the Fields case and what's in the Fields report.

16   I did talk about this.  I told Mr. Loevy it was unlikely I

17   would be asking him about other cases that Mr. Loevy's firm

18   has hired Mr. Brasfield on relative to the City of Chicago.

19          THE COURT:  Okay.  I am going to exclude it at this

20   point.  If you think that there's something that's covered on

21   cross that opens the door, then you'll tell me before the

22   redirect.

23          MR. LOEVY:  Got it.

24     (The following proceedings were had in open court in the

25   presence and hearing of the jury:)

HOOD 035531
Weston 050548

Brasfield - direct

2496

1    THE COURT:  Okay.  You can proceed.

2  BY MR. LOEVY:

3  Q.  All right.  Let's turn to your role in this case.  What

4  did you review as part of forming opinions?

5  A.  I looked at the depositions of the City's representative,

6  Mr. Hickey.  I've looked at policies and procedures of the

7  Chicago Police Department.  I've looked at records that have

8  been found or located or retained in the Chicago Police

9  Department.  I've reviewed other depositions and other court

10  material.

11  Q.  All right.  Let's focus on the files that got found.  Can

12  you tell the jury what your understanding is what the files

13  were?

14  A.  Well, which files?

15  Q.  The files from the basement.

16  A.  Okay.  What are commonly referred to as the basement

17  files.  You want me to give the background?

18  Q.  Yes, please.

19  A.  There were literally hundreds of files that were located

20  in the basement of I believe Area 1 pertaining to homicide

21  investigations.  They ranged in time period from I believe as

22  early as the 1940s up through 2000s.  They were files that had

23  not previously been disclosed.

24    MR. NOLAND:  Objection, your Honor.  Move to strike.

25    THE COURT:  Well, the last sentence I am going to

Brasfield - direct

2497

1   strike not because it's right or wrong but because it's not
2   responsive to the question.
3           MR. LOEVY:  All right.
4           THE COURT:  Let's proceed on a question-by-question
5   basis.
6   BY MR. LOEVY:
7   Q.  Your undertaking, part of it was to examine some of those
8   files, correct?
9   A.  That's correct.
10  Q.  All right.  Of those files from the basement, how did you
11  determine your sample?  Tell the jury what your sample was.
12  A.  Well, the first -- the case in point here was one of the
13  driving with Mr. Fields' case, but also to pick out two groups
14  of files:  a group of files that would represent a time period
15  roughly three years before and after Mr. Fields' first trial,
16  and a second group of files that would as closely as possible
17  correspond to his second trial.  That time period -- the first
18  time period was from 1983 to 1986.  The second time period was
19  from 1999, I believe, to 2006, somewhere in there.
20  Q.  All right.  Well, it was on both sides of both criminal
21  trials, right?
22  A.  Yes.
23  Q.  Six-year time period?
24  A.  Yes, six and seven.
25  Q.  Just to lead you through it, it was your understanding

Brasfield - direct

2498

1  that the Fields file was disclosed many years after the fact,

2  the Fields investigative file, correct?

3  A.  That's correct.

4  Q.  And the Fields file was among some file cabinets that had

5  other files, correct?

6  A.  Yes.

7  Q.  And then one of the questions was whether the materials in

8  these investigative files had been disclosed to the criminal

9  justice system; that was one of the things you looked at?

10  A.  That's correct.

11  Q.  Did you analyze those files, the sample you just told us

12  about?

13  A.  Yes, I did.

14  Q.  And that was part of your opinions in this case, correct?

15  A.  Yes.

16  Q.  All right.  Let's back up and tell the jury, turning to

17  your opinions, do police departments have systems, are they

18  supposed to have systems, for turning over exculpatory

19  evidence, and can you explain?

20  A.  Yes.  What's commonly referred to as Brady, Brady v.

21  Maryland, which -- back, I believe, in 1963, but the process

22  that officers learn and, more importantly, commanders and

23  administrative police agencies and sheriff's office, develop

24  systems so that they have a -- as much as possible a

25  consistent foolproof process of delivering information, all

1  information pertaining -- that could be potentially useful to

2  the prosecutor in determining whether -- or the state's

3  attorney in determining whether they want to file charges and

4  to the -- eventually, if charges are filed, to the criminal

5  defense attorney.

6  Q.  In your experience, do all modern police departments have

7  a responsibility to create such systems that work?

8  A.  Yes.

9  Q.  And you said documenting information.  Are detectives

10  supposed to document all potentially relevant information?

11  A.  Yes.

12  Q.  Can you explain?

13  A.  When a detective is developing leads, developing

14  information, whether it's in the field, on the phone,

15  face-to-face interviews, they gather, as you can well imagine,

16  all sorts of information.  Oftentimes, you don't know the

17  relevance of that information at the time.

18          So when someone tells you that they were either in a

19  place or not in a place at a certain time, that's the kind of

20  information you want to document.  If they give you

21  information about physical evidence, a description of a car, a

22  description of an individual, information about something they

23  observed, all of those kinds of things, as well as physical

24  evidence, obviously, should be documented.

25  Q.  Why is it important or necessary to document seemingly

Brasfield - direct

2500

1   benign details?

2   A.  Because if you -- it's much like if you picked up a who

3   done it novel, you don't know until you get towards the end

4   what the eventual solution is, if you will, or the outcome,

5   and, oftentimes -- in fact, the times I'm familiar with -- if

6   you picked up what's commonly referred to in police parlance

7   as a murder book, you see a number of different investigative

8   tracks or leads.  They go off in different directions.

9   Q.  All right.  So it is important to document everything?

10  A.  Yes.

11  Q.  Is that universal and throughout the country?

12  A.  In any that I have been familiar with, it is, with perhaps

13  one exception.

14  Q.  And who does that -- and what's that one exception?

15  A.  Chicago Police Department.

16  Q.  Does Chicago stand out as an aberration, in your review,

17  for how well or poorly they do that job?

18  A.  They --

19          MR. NOLAND:  Objection, your Honor, foundation.

20          THE COURT:  Overruled.

21          THE WITNESS:  In my opinion, based on the material

22  that I have had access to and reviewed, they have done a very,

23  very poor job of doing it through the years.

24  BY MR. LOEVY:

25  Q.  I'm saying compared to other departments?

1  A.  Compared to others, in not only my personal experience but

2  in my reading and in my visits and my audits of other agencies

3  and all over the 40-year period of time, the best way of doing

4  that is a centralized file, centralized records system.  As

5  soon as you split that off, then you start getting more and

6  more information in different units, in different fields, in

7  different files, and it becomes harder.

8  Q.  Let me break in there.

9      So is it a standard in modern police departments to

10 have a single centralized place?

11 A.  That's correct.

12 Q.  And you started to explain why that's important.

13     By the way, single centralized place where stuff

14 relating to homicide investigations is kept, correct?

15 A.  Right.

16 Q.  Explain why that's important.

17 A.  Well, your technical term of "stuff" is as good as any.

18 You need to be able for a half a dozen reasons.  One is the

19 integrity of the investigation.  Everything has to be in one

20 location.  You're likely to have numerous detectives or

21 specialty lab individuals, gang squad, bomb and arson, they're

22 all under different chains of command, oftentimes in different

23 agencies.  All that information has to come to a central

24 point.

25     From a purely administrative standpoint, it's

Brasfield - direct

2502

1  critical because you have to be able to have a supervisor and
2  a chain of command all the way up to the superintendent or the
3  chief knowing that the investigation is thorough and complete,
4  and you can't do that by sending for records here or sending
5  for records there.
6         Very important is for the discovery process to be
7  able -- let me back up one -- is to present to a prosecutor or
8  a state's attorney a complete and thorough investigation, not
9  one that just says this person did it, this is the evidence we
10 have, we'd like to see charges on it.  There has to be an
11 opportunity for the prosecutor, the state's attorney to look
12 at all of the other things.
13 Q.  And is that -- is one way modern police departments do
14 that is to keep everything in one place?
15 A.  Yes.
16 Q.  All right.  How about an index; is that a necessary part
17 of a functioning process?
18 A.  Absolutely.  It becomes even more critical if an agency
19 should choose not to have centralized records.  Then it is
20 very important, but there has to be a central index too.
21 Q.  All right.  And then as far as training for subpoenaed
22 processing and stuff like that, is that important and
23 expected?
24 A.  Yes.
25 Q.  All right.  Let's talk about the early '80s in the city of

1  Chicago.  Is it your understanding that the City of Chicago
2  was put on notice for lack of a better word that there was a
3  problem in the early '80s?
4  A.  Yes, they were.
5  Q.  Can you summarize for the jury?
6  A.  There were a couple of lawsuits that had allegations
7  contained in them that the -- from the superintendent on down
8  were aware of that indicated that there were separate street
9  files and that the information was not being shared.
10 Q.  All right.  Let me focus you on April 1982 and a boy named
11 George Jones.  Can you briefly summarize what that was?
12 A.  Yes.  There was, I believe, a 12-year-old girl who was
13 murdered.  Her brother was also assaulted in the attack --
14 Q.  Well, without getting the facts of the murder, how did
15 that put the City on notice that there was a street file
16 problem?
17 A.  That information was -- there were representatives of the
18 police department, high-level command officials in the police
19 department, that participated in the litigation, and ignoring
20 for a moment just the news media, but the formal notification
21 of the process in the legal system.
22 Q.  And in that Jones case, how was it that it came to the
23 City's attention that there was a problem?  There was a
24 detective named Laverty, and what did he disclose?
25 A.  Detective Laverty discovered or unearthed in the course of

Brasfield - direct

2504

1  his investigation information that would have cleared or

2  seriously impeded any decision to prosecute young Mr. George

3  Jones, and he wrote it up in an informal process that ended up

4  in an investigative file.  That investigative file, the

5  contents of what Detective Laverty put in there that would

6  have cleared George Jones, was never disclosed to the defense

7  attorney.

8  Q.  And then did Laverty do something in response?

9  A.  When he -- he had -- when he completed his information and

10 submitted it, he had been -- received some reassurances that

11 the prosecution -- the information would get to the state's

12 attorney --

13 Q.  Did he then inform the process, the justice system

14 participant?

15 A.  Yes, he did.

16 Q.  What did he inform them?

17 A.  He went to the -- he saw in the paper that the

18 prosecution, in fact, was proceeding, and he went to the

19 public -- or the criminal defense attorney and shared with him

20 or her the information about George Jones.

21 Q.  And about the street file practice?

22 A.  And the street file practice.

23 Q.  And then was there some litigation in '82 and '83 alleging

24 a policy and practice of suppressing investigative materials

25 in street files?

HOOD 035540
Weston 050557

Brasfield - direct

2505

1   A.  There was a case referred to as the Palmer case where a

2   group of people alleged in court that there was a practice

3   within the Chicago police of doing just what had happened with

4   the George Jones case, and that became part of a legal suit.

5   Q.  All right.  And then on April 20th, 1982, shortly after

6   that lawsuit was filed, did a federal judge enter any orders?

7   A.  Yes.

8   Q.  Tell the jury about that.

9   A.  There was a direction -- order from the court that all

10  documents would be maintained and retained.

11  Q.  All right.  And was there a reason from the Jones case to

12  conclude that the policymakers had notice and participated in

13  the lawsuit, the City's policymakers?

14  A.  Yes.  They were called upon to testify and gave testimony

15  and were very officially and clearly put on notice.

16  Q.  And then just to draw your attention to a finding in

17  February 3rd, 1983, did the judge make a ruling that -- by the

18  way, did the City enter a special -- or create a special order

19  in response to this litigation?

20  A.  Yes.

21  Q.  What was that special order?

22  A.  82 -1, that they would preserve --

23          THE COURT:  82-1?

24          MR. LOEVY:  82-1, was the first one which they

25  preserved stuff.

Brasfield - direct

2506

1  BY MR. LOEVY:

2  Q.  And then?

3  A.  And then the subsequent one.

4  Q.  Which was --

5  A.  Which was to retain and not dispose of and make available

6  investigative files.

7          THE COURT:  Just put numbers on these.

8          MR. LOEVY:  The second one was 83-1, correct.

9          THE WITNESS:  83-1, yes.

10 BY MR. LOEVY:

11 Q.  All right.  Did the judge make a finding that 83-1 was

12 insufficient to accord criminal defendants the full rights to

13 which they were entitled?

14 A.  Yes.

15         THE COURT:  As we discussed, you need to put the date

16 on that.  It was a couple of questions ago.

17         THE WITNESS:  I'm sorry.

18 BY MR. LOEVY:

19 Q.  Do you have the date there before you, sir?

20 A.  I don't have it right in front of me, no.

21 Q.  It looks like the lawsuit was filed on April --

22         THE COURT:  You can ask a leading question on the

23 date of the judge's order.

24 BY MR. LOEVY:

25 Q.  February 3rd, 1983.

Brasfield - direct

2507

1  A.  I believe that's correct.

2  Q.  4/20/82 was the --

3  A.  April 20th, 1982.

4        THE COURT:  Was what?

5        MR. LOEVY:  When was the judge's order?

6        MR. SWAMINATHAN:  The judge's order was the same

7  date.

8  BY MR. LOEVY:

9  Q.  4/20/82.  All right.

10  A.  Yes.

11        THE COURT:  It needs to be testimony, not just --

12        THE WITNESS:  It was --

13        THE COURT:  Excuse me.

14        Ask a question, please.

15  BY MR. LOEVY:

16  Q.  What was the date of the order?

17  A.  The date of the order was April 20th, 1982.

18  Q.  All right.  After the order of the court was entered to

19  improve the system and the City enacted these policies, did

20  you see evidence that the problem persisted?

21  A.  Yes, I did.

22  Q.  And let's focus, for example, on the investigative file in

23  this case.  Did you review the investigative file that was not

24  disclosed to Mr. Fields in this case?

25  A.  I did.

Brasfield - direct

2508

1   Q.  And was that evidence that the problem continued, and can

2   you explain, please?

3   A.  Yes.  Over the course of two criminal trials and appeals,

4   there were at least six or seven formal either subpoenas or

5   written requests for disclosure of investigative file in the

6   Fields case.  And each time, the City or the police

7   department's response was that there was no such material

8   available.  And, in fact, the City at one point initiated an

9   internal investigation to determine if there was an

10  investigative file, and they produced a document, a written

11  conclusion, that there was no investigative file.

12  Q.  What were the hallmarks of this investigative file, the

13  Fields investigative file -- well, actually, it was the

14  Smith/Hickman investigative file --

15  A.  Right.

16  Q.  -- that suggested it was outside the protocol set up by

17  the general orders?

18  A.  It contained -- when it was eventually discovered in 2010

19  or '11, that it contained specific types of documents that

20  were -- that were described in the litigation as not to have

21  been in that format.

22  Q.  What kind of documents were those?

23  A.  They were to and from memos between detectives and between

24  chain of command.  There were -- sorry.

25  Q.  Well, were notes --

Brasfield - direct

2509

1  A.  Yeah, handwritten notes were contained in it, notes were

2  not put onto official format, and those documents -- those --

3  even where they were were not submitted.

4  Q.  How about inventories or lack thereof and things not in

5  supp reports?

6  A.  The inventory were required by the general orders, and the

7  supplemental reports were not as required by the policies.

8  Q.  All right.  Did you see evidence when you reviewed that

9  sample of files from the basement that the Smith/Hickman file

10  was typical or atypical of other investigative files?

11  A.  In my review of the portions of the basement files, as I

12  previously described, I found them to be consistent with or

13  the Hickman/Smith discovery files were similar.

14  Q.  And the same kinds of things you just talked about were

15  evident in the other files as well?

16  A.  Yes.

17  Q.  All right.  You did analyze those files, correct?

18  A.  I did.

19  Q.  And tell the jury how exhaustive your analysis of those

20  files was.

21  A.  Do you want me to describe the total number of files?

22  Q.  However you want to describe what you did when you got

23  those files.

24  A.  I mentioned earlier and discussed the fact that I took a

25  sample from the six-year time period, '83 to '89, and the

Brasfield - direct

2510

1   second year time period, from 1999 to 2006, pulled out all of

2   the ones -- the homicide investigation files for that time

3   period, then looked at the investigative file itself to

4   determine what it contained, what it did not contain.  I

5   looked at the permanent retention files that the City used or

6   supposedly used to provide discovery --

7   Q.  So let me make sure I understand.  You had a basement file

8   that referred to an investigation, and then you had also the

9   corresponding official file, right?

10  A.  That's correct.

11  Q.  All right.  Then continue.

12  A.  And that I would refer to and the City does as a permanent

13  retention file that supposedly has everything about the

14  homicide case, but only if it's on an official supplementary

15  report, an arrest report, a lab report, that type of thing.

16  But permanent retention file after review, I can go into that,

17  if you want, later, but --

18  Q.  Well, we're going to talk about your review.

19          But you basically -- you described you did a

20  standalone of the investigative file?

21  A.  Yes.

22  Q.  And then you did a comparison with the permanent retention

23  files?

24  A.  I looked at the permanent retention files by themselves.

25  Q.  Okay.

Brasfield - direct

2511

1  A.  So I looked at the investigative files, I looked at the

2  permanent retention files, and then I looked and compared --

3  Q.  So that's a third thing?

4  A.  -- the permanent retention files as to what was -- what

5  they had in them that were reflected -- did they reflect what

6  was of substantive value in the investigative file.

7  Q.  So the third thing then was a comparison between the

8  investigative files and the permanent retention files?

9  A.  Yes.

10 Q.  Was there a fourth analysis you did?

11 A.  Yes.

12 Q.  Tell us about that.

13 A.  Also, through material provided to me, the criminal

14 defense files that corresponded with -- where there were

15 criminal defense files that corresponded with the

16 investigative files and the permanent retention files.  So I

17 looked at those as a standalone process to see what was in

18 there from -- as it pertained to what was actually in the

19 investigation and in the permanent retention files.

20          And then, finally, the fifth step was to compare what

21 was in the criminal defense files and the permanent retention

22 files.

23 Q.  All right.  Based on that review, did you make any

24 findings about whether the practice that was supposed to have

25 stopped with the Palmer/Jones litigation persisted through and

Brasfield - direct

2512

1  continuing through Mr. Fields' criminal trial?

2  A.  Yes.

3  Q.  What was that finding?

4  A.  Finding I, in my professional opinion, that the practices

5  that were the City of Chicago and the Chicago Police

6  Department and its command staff was aware of in as early

7  as 1982 but should have been much earlier than that was

8  continuing and no substantive changes, and, in fact, evidence

9  that there was no change at all.

10  Q.  In your last answer, you said that the command and the

11  policymakers should have been aware before the Jones

12  litigation in '82.  Can you explain?

13           MR. NOLAND:  Objection.

14           THE COURT:  Sustained.

15           MR. LOEVY:  All right.  At this time, your Honor,

16  plaintiff would move to introduce Plaintiff's Exhibit 307,

17  which is his summary chart of the basis of his opinion.

18           THE COURT:  It's a demonstrative?

19           MR. LOEVY:  Yes, your Honor.

20           THE COURT:  Okay.  Go show it to him.

21           MR. NOLAND:  I'm sorry?

22           THE COURT:  Yeah.  That's fine.

23           MR. NOLAND:  Subject to our prior -- the Court's

24  ruling.

25           THE COURT:  Okay.  So if I already ruled, I already

Brasfield - direct

2513

1 ruled.

2       Okay.  This is -- you've heard me use the word

3 "demonstrative."  It's a big legal word.  What it means is

4 this is used to illustrate testimony.  It's not part of the

5 evidence.  You're not going to actually have it back there.

6 It's used to illustrate testimony.  So if you want to take

7 notes on it, do that because you won't actually have --

8       MR. LOEVY:  Actually, your Honor, after he lays the

9 foundation, we intend to --

10       THE COURT:  Well, I might make a ruling later, but

11 for now, it's a demonstrative exhibit.

12       MR. LOEVY:  Okay.  Because we do intend to move it

13 into evidence after he lays the foundation for it.

14       THE COURT:  We will worry about that when we have to

15 worry about it.

16       MR. LOEVY:  Can we ask Mr. Brasfield to come down and

17 explain it?

18       THE COURT:  That's fine.  So the deal is he needs to

19 keep his voice up.

20       Which side are you going to have him stand on?  Right

21 here?

22       MR. LOEVY:  What do you prefer?

23       THE COURT:  You stand here so you are closer to the

24 mic.  And counsel can move over there if you need to in order

25 to see.

Brasfield - direct

2514

1    MR. NOLAND:  Thank you, your Honor.

2  BY MR. LOEVY:

3  Q.  Let's start with the middle column.  Can you explain to

4  the jury what we're looking at?

5    MR. LOEVY:  And, your Honor, maybe we put it on the

6  ELMO too?

7    THE COURT:  Either way.  I don't care.

8    MR. LOEVY:  The computer, your Honor.

9    THE COURT:  Computer.

10    THE WITNESS:  This rainbow effect here, this blue

11  section here that has a number of columns in it, are the

12  investigative file information.  And some of it is -- it's

13  just housekeeping, referring to what the lawyers call Bates

14  numbers that are stamped on the bottom of pages to identify

15  things.

16    But one of the first things they did, does the

17  basement file contain an inventory as required by policy --

18  BY MR. LOEVY:

19  Q.  So that's a yes/no, question?

20  A.  That's a simple yes/no.  And as I said, that's Bates

21  numbers.  If it did not, there's reference to that.

22    Is the inventory complete?  If there is an inventory

23  in the investigative file, I mean, that's good in and of

24  itself, but does the inventory actually reflect what is there,

25  what should be there?

Brasfield - direct

2515

1       Then we have the examples of items that were missing
2   from the inventory, so as I'm looking at that and making notes
3   to myself as to whether, okay, is this item in there?  If it's
4   not in there, what is it?  Put a list on that.

5       Are there handwritten notes in the file?  The
6   handwritten notes themselves may or may not be important as to
7   their actual content, but what is very important is are they
8   supposed to be in there as handwritten notes?  That's a
9   violation of policy as to how they're in there.

10      So it's two-fold.  One is the substantive value, if
11  you will, of the material, but also demonstrating adherence to
12  a policy.  And then I gave examples of specifics so that you
13  can look those up.

14      Are there to/from memos.  This is, again, the same
15  thing; the policies and procedures indicate that they are not
16  supposed to be in there.

17      Were there to and from memos in there?  Yes, no.  If
18  yes, what were they?  And it gave, again, the Bates numbers of
19  reference so that with the sheer volume of this, being able to
20  go back, look through, and identify them.
21  BY MR. LOEVY:
22  Q.  If you could return to the stand then.
23  A.  Thank you.
24  Q.  All right.  Now, when you did the analysis in the blue
25  column there, you weren't actually comparing the investigative

Brasfield - direct

2516

1  files to any other files, correct?

2  A.  No.

3  Q.  Just looking at them themselves?

4  A.  As a standalone.

5  Q.  All right.  Did you draw any conclusions about the

6  investigative files?

7  A.  I did.

8  Q.  And tell the jury what your findings were?

9  A.  That the information that I was seeing in these basement

10  files, particularly investigative files, were a -- in my mind

11  from a professional standpoint, evidence that the things that

12  were supposed to have changed that should have been done and

13  accomplished after the City was put on notice were continuing.

14  Q.  Let's talk about the example you gave about handwritten

15  notes.  Now, they're supposed to take notes, but they're

16  supposed to be on GPRs, correct?

17  A.  General progress reports, yes.

18  Q.  The jury has already heard testimony about what a GPR is,

19  but that's basically where -- just real quickly?

20  A.  Just that your information that you made, heaven forbid,

21  written on the back of a business card or a McDonald's order

22  slip is put into a general progress report so that it's

23  formalized.

24  Q.  All right.  And was there evidence, based on your review

25  that the department's rule change that all notes had to be

Brasfield - direct

2517

1 | taken on general progress reports, was that being followed?

2 | A.  No, it was not, based on the material I looked at.

3 | Q.  What was the statistical analysis for the period '83

4 | to '89?  In what proportion of the cases was that policy not

5 | being followed?

6 | A.  I found that 82 percent of the cases that I looked at,

7 | they were not being followed.

8 | Q.  And then for the later time period?

9 | A.  From the 1999 to 2006, 61 percent.

10 | Q.  How about the existence of to/from memos; those were memos

11 | that were not on official supp reports, correct?

12 | A.  That is correct.

13 | Q.  And that policy too was supposed to change with the policy

14 | change, right?

15 | A.  That's correct.

16 | Q.  Did you see evidence that it did change?  Did or didn't?

17 | A.  I can -- it did not.

18 | Q.  All right.  Tell the jury.

19 | A.  The initial period from 1983 to 1989, 43 percent of the

20 | files that I reviewed continued to show unofficial informal

21 | memorandums, and that the 1999 to 2006 time period, that 17

22 | percent of the files continued to show these supposedly not to

23 | occur, to/from memos.

24 | Q.  Does that suggest to you whether the system was or wasn't

25 | working from a supervisory perspective?

HOOD 035553
Weston 050570

Brasfield - direct

2518

1  A.  From a supervisory, either a first line supervisor or as

2  an auditor within the department or as the superintendent, it

3  would give me a clear indication that it just wasn't working.

4  Q.  All right.  Have you seen that level of failure at other

5  departments around the country?

6  A.  No, I have not.

7  Q.  All right.  What percentage of the basement files had

8  evidence of violations of the policies and the special orders

9  that were put into place?

10  A.  100 percent.

11  Q.  All right.

12      MR. LOEVY:  Your Honor, if I could have the witness

13  step down again to talk about the next column.

14      THE COURT:  That's fine.

15  BY MR. LOEVY:

16  Q.  Tell us about the purple and what this represents.

17  A.  The City of Chicago Police Department has a -- or had a

18  permanent retention file that was supposed to be the go-to.

19  This is where if you want to know what happened in a

20  particular homicide and you want it for discovery purposes,

21  this is where it's going to be.  It's in the permanent

22  retention file.

23      And so as I looked at that as a standalone process

24  with the -- looking for the same types of things, whether

25  there were inventory sheet as required, what types of

Brasfield - direct

2519

1  documents that were supposedly in there, were or were not, and

2  also, regardless of how the City of Chicago interpreted

3  permanent retention file, were there actually substantive

4  information in the investigative file that was not getting

5  into the permanent retention file.

6  Q.  Well, before we talk about the comparison, let's talk

7  about just the purple.

8  A.  Yes.

9  Q.  Okay?  So tell the jury what the fields were.

10  A.  We have, again, does the permanent retention file have an

11  inventory?  Are the investigative file inventory complete?

12  Does it have items missing?  We have -- and I'm sorry to block

13  your view; you can't probably see it anyway -- but, again, I

14  talked about the Bates numbers.  Are there general progress

15  reports from the basement files in the permanent retention

16  files?  And, again, I have to acknowledge that the City of

17  Chicago didn't feel that it was necessary, but they weren't in

18  there, and I made a note of it.

19        And are there handwritten notes in the permanent

20  retention file?  If so, and then describe what they were and

21  where they were.  Are there to/from memos in the basement

22  files that are in the permanent retention files?  And yes or

23  no and, where appropriate, identify those.  And then in

24  general, observations about some of those individual permanent

25  retention files.

HOOD 035555
Weston 050572

Brasfield - direct

2520

1  Q.  All right.  Would you resume the stand, please.

2  A.  Yes.

3  Q.  All right.  Did you reach any conclusions analyzing this

4  whole series of permanent retention files?

5  A.  Yes.

6  Q.  How many permanent retention files did you look at?

7  A.  There were a total of -- there were a total of 429 files

8  overall, and as far as the permanent retention files, they

9  were on the light number.

10  Q.  All right.  And did you form any conclusions about the

11  City's policies and practices after you analyzed -- performed

12  the analysis you just described to the permanent retention

13  file?

14  A.  I did.

15  Q.  Can you describe to the jury what those were?

16  A.  First and foremost, if the City of Chicago Police

17  Department is going to use the permanent retention file as a

18  representation of the homicide investigation, it failed

19  miserably.  What I found in there is a single story line.

20  It's what I would refer to as a charging document, that after

21  a detective or detectives have completed a homicide

22  investigation, they have gone down their various paths and

23  looked at all the various possibilities and eliminated

24  suspects and so forth, they just have a clean copy.  It's not

25  the murder book that you would expect to find that would show

Brasfield - direct

2521

1  that an anonymous caller said Bob Smith did it, but we

2  interviewed witnesses and determined that he had an alibi and

3  so on and so forth.  All the permanent retention file is, this

4  is the arrest report, this is some lab reports, this is --

5  Q.  Why we think this guy did it?

6  A.  Yes.

7  Q.  And is that aberrational, different, unlike other cities

8  that you have reviewed and audited?

9  A.  Yes.

10  Q.  How does it work in places that are functioning

11  legitimately?

12        MR. NOLAND:  Objection, argumentative.

13        THE COURT:  Overruled.

14        THE WITNESS:  You go into any homicide investigative

15  file either cold, just by looking at the book, or physically

16  into various agencies.  You see a document that starts out

17  with the call from 911 or the discovery of whatever the

18  gathering of information.  Inevitably -- not inevitably -- but

19  quite often in homicide initial investigations, there might be

20  multiple suspects, and somebody thinks, well, this person had

21  a domestic problem or the person was -- had a bad debt or

22  problems with the neighbor, and so you have all of these

23  various avenues that you have to investigate.  And then you

24  either eliminate them and document why they were eliminated,

25  and there's other information that you're developing.

Brasfield - direct

2522

1    Oftentimes, again, as I said earlier, that initially
2  may not seem like it's important at all, but you have to
3  document it and put it in the file.  And this is obviously for
4  a number of reasons, as I said before.  You have detectives or
5  individuals from throughout the police department that may
6  have worked on a case, and they have to go to a central
7  location, to a central document to be able to see what's been
8  done and what hasn't been done and what needs to be done.
9  BY MR. LOEVY:
10 Q.  You mentioned in your analogy you used a little bit ago
11 about a novel.  Would a plot twist fit in your analogy on a
12 way an investigation is supposed to be documented in a
13 permanent retention file?
14    MR. NOLAND:  Judge, I object based on foundation and
15 not disclosed.
16    THE COURT:  Rephrase the question, please.
17 BY MR. LOEVY:
18 Q.  All right.  In the investigative files you're talking
19 about from other jurisdictions, is it always linear, start to
20 finish?
21    THE COURT:  Sorry.  Something happened here.
22    THE WITNESS:  No, it's not.
23 BY MR. LOEVY:
24 Q.  Can you explain?
25 A.  It can go off on tangents.  I have seen investigations

HOOD 035558
Weston 050575

1   where literally weeks, if not months, can go into what in good

2   faith was thought to be a legitimate line of investigation,

3   only determined, for whatever reason, that the individual that

4   was thought to be the best suspect was, in fact, not.

5   Q.  And in other jurisdictions, is all that stuff in the

6   permanent file?

7   A.  Yes.

8   Q.  And is that true in Chicago?

9   A.  No.

10          MR. NOLAND:  Judge, objection.

11          THE COURT:  Let me see the lawyers at sidebar,

12  please.

13    (The following proceedings were had at sidebar outside the

14  hearing of the jury:)

15          THE COURT:  So while we are at it, I am holding

16  myself in contempt for my cell phone going off when I fine

17  myself some later to-be-determined amount of money.

18          What's the issue, Mr. Noland?

19          MR. NOLAND:  I was hoping to wait until lunch, but I

20  think he's gone well beyond on the permanent retention file

21  discussion from his report where he said 34 and 35 where he is

22  talking about perform rather than this whole issue we just

23  talked about for the last several paragraphs as far as the

24  investigation and a study of the permanent retention files.

25          THE COURT:  So you want -- let me just -- is it, A,

Brasfield - direct

2524

1  starting on page 34?

2       MR. SWAMINATHAN:  Judge, this is also part of it.

3       THE COURT:  Okay.  Let me just look at it.

4       I think this is fairly within the scope of the two

5  paragraphs that precede the letter that had an A on

6  paragraph 34.  I mean, essentially, what he's saying is -- the

7  way I'm getting it, at least, is what he's saying is that what

8  he saw is that the permanent retention file basically tended

9  to contain information that supported the conclusion of the

10 investigation, and it's supposed to include more than that,

11 and I think that's essentially what these two paragraphs say.

12      So I overrule the objection.

13    (The following proceedings were had in open court in the

14 presence and hearing of the jury:)

15      THE COURT:  Okay.  The objection is overruled.  You

16 can proceed.

17 BY MR. LOEVY:

18 Q.  Do you remember the question?

19 A.  No.

20 Q.  You were saying in other jurisdictions and the plot twist

21 thing.

22 A.  Yes.  As I described or paraphrased --

23      THE COURT:  Let me be more specific.  The two

24 preceding questions were, In other jurisdictions, is all that

25 stuff in the permanent file?  You said yes.  And then there

Brasfield - direct

2525

1   was a question, Is that true in Chicago?  Answer, no.  And

2   then I think he was then going to ask you to explain.

3   BY MR. LOEVY:

4   Q.  All right.  Can you explain now?

5   A.  The structure and the practice, based on the material that

6   I have reviewed here, is that there is an eventual

7   determination of who the police feel is the person that did

8   the crime.  And, oftentimes, there is a reverse engineering of

9   the plot.

10          MR. NOLAND:  Objection.

11          THE COURT:  Yeah, let's get more directly to the

12  point here.

13  BY MR. LOEVY:

14  Q.  All right.

15          THE COURT:  Ask a more leading question, if you

16  would.  You understand from the sidebar where we're going

17  here, Mr. Loevy?

18          MR. LOEVY:  I think it's been covered too.

19          THE COURT:  Okay.  Fair enough.

20  BY MR. LOEVY:

21  Q.  Who does that protect if you do it the proper way and

22  document everything?

23  A.  Well, it protects the integrity of the criminal justice

24  system as a whole.  It protects the -- it provides legal

25  protection for the individual who is eventually charged so

1  that the criminal defense attorney has a fair opportunity to

2  provide and mount a defense, and it provides, I think, in

3  fairness to the victims.

4  Q.  Is that something that other jurisdictions take seriously

5  and do effectively?

6  A.  Yes.

7  Q.  Does Chicago meet up to that standard?

8  A.  No, in my opinion.

9        THE COURT:  Are you changing topics?

10        MR. LOEVY:  Yes.

11        THE COURT:  We are going to stop for lunch here.

12        I have one very short case at 1:30.  We should be

13  able to start within a couple minutes of 1:30.  So just be

14  ready to go.

15        I will take the jury out.

16    (The jury leaves the courtroom.)

17        THE COURT:  Okay.  Anything we need to discuss?

18        MR. LOEVY:  Your Honor, we had some issues whenever

19  your Honor is ready to talk about them.  We still have the

20  intimidation issue that's hanging out there.  We have a couple

21  of new issues too.  I don't know if --

22        THE COURT:  Just tell me what they are, and -- we are

23  not going to talk about them now.  Just tell me what they are.

24        MR. LOEVY:  All right.  The first issue is you

25  ordered the discovery on Mr. Kees' deal, and you ordered them

2527

1    to give us their emails and such.  We have written them an

2    email saying we think there are some gaps and deficiencies,

3    and to my knowledge, they haven't yet responded.

4              Is that correct?  They haven't yet responded?

5              MR. ART:  That's correct.

6              MR. LOEVY:  So at some point, we are going to want to

7    raise with the Court -- you know, there are some holes in the

8    production, and we want to talk about that with your Honor.

9              THE COURT:  Kees is testifying tomorrow, right?

10             MR. LOEVY:  Correct.

11             THE COURT:  We will talk about that at the end of the

12   day.  Just be prepared to talk about that at the end of the

13   day.

14             MR. LOEVY:  All right.  Another issue, your Honor, is

15   yesterday, a photograph was put on the screen by Mr. Kulwin

16   that was not in the pretrial order --

17             MR. ART:  By Mr. Burns.

18             MR. LOEVY:  Oh, I'm sorry.  Well, I cannot tell these

19   two apart.  But somebody on the defense side --

20             MR. KULWIN:  He can't tell me and Mr. Burns apart.

21             MR. LOEVY:  I mean, I keep saying "defense counsel."

22             THE COURT:  But you mistook me for John Wayne this

23   morning, so, you know.

24             MR. KULWIN:  But you do look like John Wayne.

25             THE COURT:  There, you did it again.

2528

1      MR. LOEVY:  There was a photograph that is not in the

2   pretrial order that we didn't have and that there --

3      THE COURT:  What was the photo?

4      MR. LOEVY:  There was a photo with some initials on

5   it of where Mr. Hawkins was and where Mr. Langston was.

6      MR. SWAMINATHAN:  It's Defendants' Exhibit 384.

7      MR. LOEVY:  Well, the new exhibit number is 384.  It

8   was not an original exhibit.

9      And we also don't think we got it in discovery.  We

10  are still checking that.  But we would ask -- I don't know if

11  you want to talk about the issues now, but we want no more new

12  exhibits and no more new photographs because it's late, it's

13  not fair, and there's some prejudice there.

14      THE COURT:  So why don't you just sort of run down --

15  go ahead, Mr. Noland.  That's fine.

16      MR. NOLAND:  If you like now --

17      THE COURT:  On this point.  It looks like you have

18  something you want to --

19      MR. NOLAND:  We had told the plaintiffs that those

20  exhibits were actually just the copies of the Plaintiff's

21  Exhibit 219, so our 388 through 391 are Plaintiff's

22  Exhibits -- a part of Plaintiff's Exhibits 219.  They have

23  them.

24      THE COURT:  I think he said this was 384, though.

25      MR. NOLAND:  I don't think it was.

2529

1           THE COURT:  It wasn't 384, you don't think?

2           MR. NOLAND:  384 is a photo that was used at the

3   certificate of innocence proceeding with the plaintiff's

4   counsel, and so all the photos -- they were parties to that

5   proceeding.

6           MR. LOEVY:  Parties to the proceeding, but it wasn't

7   on the pretrial order, your Honor, so we were was surprised by

8   it.  I didn't --

9           THE COURT:  How are you harmed?  That's the question.

10          MR. LOEVY:  We want it to stop, though, or at least

11  if they're going to show something that's not in the pretrial

12  order, show me before they put it on the screen.  That's all

13  I'm asking.

14          THE COURT:  Okay.  That doesn't sound all that

15  unreasonable.

16          MR. NOLAND:  Absolutely, Judge.

17          MR. LOEVY:  All right.  The next thing is we've been

18  working together on stipulations, your Honor.  We haven't

19  quite got there.  There's a Buckles police report and the

20  Murphy GPR that are not in the Chicago Police Department's

21  files, and we're hopeful and remain hopeful we are going to

22  come to a stipulation, but if we don't, we have asked the City

23  to bring a record-keeper here tomorrow who can talk

24  knowledgeably about those topics, so we don't want there to be

25  any surprise that we do need a record-keeper who can say that

2530

1    they've looked and these things are not in the files.

2           THE COURT:  Okay.

3           MR. LOEVY:  And then there's the intimidation issue.

4           THE COURT:  And that's it?

5           MR. LOEVY:  Yep.  That's it.  That's my issue.

6           MR. KULWIN:  I don't understand.

7           THE COURT:  It's the same issue that I've put off

8    several times, and I talked about it several times.  There may

9    not be much more to talk about.

10          Who is up after this witness?

11          MR. LOEVY:  Is Mr. Wharrie the next witness?

12          MR. ART:  No.

13          MR. LOEVY:  Is Ms. -- who is the next witness?

14          MR. ART:  Lyon or --

15          MR. LOEVY:  Oh, Lyon, Andrea Lyon.

16          THE COURT:  So we are going to close out the

17   intimidation issue to the extent that there's anything more to

18   talk about at the end of the day.  We will deal with this Kees

19   issue that you mentioned at the end of the day.  The photo

20   thing, I've dealt with.  The stipulations, you'll tell me when

21   you have something for me to talk about.

22          MR. LOEVY:  Very good.

23          MR. ART:  A juror left his notebook in the front row.

24          THE COURT:  I'll get it.  Thanks.

25          MR. MICHALIK:  Judge, we just had an issue with

2531

1  respect to Andrea Lyon.  They let us know a couple days ago

2  that they were intending to call her, and to be honest, we're

3  sort of uncertain as to the basis for which they're doing so.

4          To our knowledge --

5          THE COURT:  I'm listening.

6          MR. MICHALIK:  Okay.  To our knowledge, she was

7  disclosed as someone who would testify about one of the

8  files --

9          THE COURT:  Go ahead.

10          MR. MICHALIK:  She was identified as a witness

11  regarding --

12          THE COURT:  Did she testify at the other trial?

13          MR. MICHALIK:  No.

14          THE COURT:  I don't remember.  Okay.

15          MR. MICHALIK:  She was identified as a witness who

16  was going to testify about the People v. Fuller (sic)

17  matter --

18          THE COURT:  People v.?

19          MR. MICHALIK:  People v. Fuller, which was one of

20  the -- Fulton, I'm sorry, F-u-l-t-o-n, and that was one of the

21  basement files that Mr. Brasfield has not relied upon.  So

22  that's the only basis that we can think of that she would

23  testify about.

24          THE COURT:  What's she going to testify about?

25          MR. SWAMINATHAN:  She's going to testify about the

2532

1   Fulton case.  She was disclosed to testify about the Fulton

2   case.  She's essentially one of our Monell witnesses.  The

3   Fulton file is one of the files, Mr. Brasfield --

4          THE COURT:  In other words, she is going to say, I

5   was his lawyer -- I was this person's lawyer, I didn't get the

6   stuff, something like that?

7          MR. SWAMINATHAN:  We identified specific pages for

8   them that she says she did not receive.  She is going to

9   testify about her case, what those pages were she hadn't

10  received, that type of thing.

11         MR. KULWIN:  I guess the question is --

12         MR. MICHALIK:  Our understanding is that she was

13  post-conviction counsel on that case, so I don't know how she

14  could testify as to what was or was not in the criminal

15  defense file.

16         MR. SWAMINATHAN:  She will be able to lay a

17  foundation for all of that.  She --

18         THE COURT:  So if she can't lay the foundation, you

19  will make the proper objection at the proper time, and I will

20  rule on it.  I mean, I can conjure in my own mind what it is

21  that she's likely to say, and you will argue it to me at the

22  appropriate time.

23         MR. MICHALIK:  Thank you.

24         THE COURT:  All right.  See you at 1:30.

25    (The trial was adjourned at 12:35 p.m. until 1:30 p.m. of
    this same day and date.)

2533

```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3

 4   NATHSON E. FIELDS,              )   Docket No. 10 C 1168
                                     )
 5                  Plaintiff,       )
                                     )
 6           vs.                     )
                                     )
 7   CITY OF CHICAGO, et al.,        )   Chicago, Illinois
                                     )   November 29, 2016
 8                  Defendants.      )   9:30 o'clock p.m.

 9
                   TRIAL TRANSCRIPT OF PROCEEDINGS
10         BEFORE THE HONORABLE MATTHEW F. KENNELLY
                         VOLUME 9-B
11
     APPEARANCES:
12

13
     For the Plaintiff:    LAW OFFICE OF H. CANDACE GORMAN
14                         BY:  MS. H. CANDACE GORMAN
                           220 South Halsted Street, Suite 200
15                         Chicago, IL  60661
                           (312) 441-0919
16

17                         LOEVY & LOEVY
                           BY:  MR. JONATHAN I. LOEVY
18                              MR. STEVEN EDWARDS ART
                               MR. ANAND SWAMINATHAN
19                         311 North Aberdeen Street, 3rd Floor
                           Chicago, IL  60607
20                         (312) 243-5900

21

22
     Court Reporter:       MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
23                         Official Court Reporter
                           219 S. Dearborn Street, Suite 2102
24                         Chicago, Illinois  60604
                           (312) 435-5639
25
```

HOOD 035569
Weston 050586

2534

```
1   APPEARANCES CONTINUED:

2   For Defendant
    City of Chicago:          DYKEMA GOSSETT PLLC
3                             BY:  MR. TERRENCE MICHAEL BURNS
                                   MR. DANIEL MATTHEW NOLAND
4                                  MR. PAUL A. MICHALIK
                              10 South Wacker Drive, Suite 2300
5                             Chicago, IL  60606
                              (312) 627-2100
6

7

8   For Defendant            KULWIN, MASCIOPINTO & KULWIN, LLP
    David O'Callaghan:        BY:  MR. SHELLY BYRON KULWIN
9                                  MS. RACHEL ANNE KATZ
                              161 North Clark Street, Suite 2500
10                            Chicago, IL  60601
                              (312) 641-0300
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

2535

1    (The following proceedings were had in open court outside

2    the presence and hearing of the jury:)

3         THE CLERK:  Case No. 10 C 1168, Fields v. City of

4    Chicago.

5         THE COURT:  All right.  Is everybody good to go?

6         MR. LOEVY:  We are, your Honor.

7         THE COURT:  You can get the witness back on the

8    stand.  You can bring the jury in.

9         MR. LOEVY:  Could we get clarification if

10   Mr. O'Callaghan is going to cross-examine on the Monell?

11        THE COURT:  I don't think that Mr. O'Callaghan would

12   be doing anything.  It would be Mr. Kulwin.

13        MR. KULWIN:  Good catch, Judge.

14        THE COURT:  I am as sharp as a tack.

15        MR. KULWIN:  I may have a few questions, yes, Judge.

16        MR. LOEVY:  We object to the tag team.

17        THE COURT:  Well, but, I mean, you asked

18   Mr. O'Callaghan a whole bunch of questions about

19   record-keeping practices, so -- I mean, you know, the

20   testimony is -- I mean, it's primarily obviously directed

21   towards the Monell claim, but there's certainly things that he

22   says and issues about record-keeping that might be pertinent

23   to the claim against Mr. O'Callaghan too.

24        So, I mean, the whole non-duplication thing applies

25   as it always does, but I am not going to preclude somebody

1    from cross-examination.

2              MR. LOEVY:  Thank you, your Honor.

3              MR. KULWIN:  Judge, I have an emergency phone call

4    that I have to take.  Go ahead and start without me.

5              THE COURT:  Seriously?  Okay.

6              MR. KULWIN:  It will only take two minutes.  Go

7    ahead.  Literally two minutes.

8       (The jury enters the courtroom.)

9              THE COURT:  Do you understand you are still under

10   oath?

11             THE WITNESS:  Yes, sir.

12             THE COURT:  All right.  Give it one second for

13   everybody to get situated.

14             All right.  Mr. Loevy, you can go ahead.

15                              - - -

16      MICHAEL DAVID BRASFIELD, DIRECT EXAMINATION CONTINUED

17   BY MR. LOEVY:

18   Q.  All right.  Mr. Brasfield, to orient you, you told us

19   about the analysis you did of just looking at the

20   investigative files themselves to see if they complied with

21   the policy, right?

22   A.  Yes.

23   Q.  And you also told us about your analysis of the permanent

24   retention files themselves to make observations about whether

25   they were the way you thought they were supposed to look,

Brasfield - direct

2537

1   right?

2   A.  Yes.

3   Q.  I want to ask you now about a third area of analysis.  Did

4   you do any comparison between these files that were found in

5   the basement and their corresponding permanent retention

6   files?

7   A.  Yes, I did.

8   Q.  Okay.  Tell the jury about that.

9   A.  Again, looking at the material that was in the basement

10  file, there were a lot of unofficial reports that were not

11  getting on to official forms and, consequently, not getting

12  into the permanent retention files.  And roughly somewhere --

13  50 percent of those 89 files from the '80s did show the

14  relevant information, the unofficial notes not going into the

15  official reports.

16  Q.  And how many basement files did you say you had?

17  A.  The ones that I actually had to be able to compare to were

18  only found in the first time period, so there were 27 in

19  the --

20  Q.  Twenty-seven corresponding permanent retention files?

21  A.  Yes.

22  Q.  So there were 400-some basement files?

23  A.  429 in the -- if you want to call it a universe.

24  Q.  Yeah, that's what I'm getting at.

25  A.  Yes.

Brasfield - direct

2538

1   Q.  Then you found --
2   A.  Twenty-three in the first group, and 27 in the second
3   group.
4   Q.  All right.  Was that significant to you, that fully 50
5   percent of the permanent retention official files were missing
6   materials from the investigative files?
7   A.  Yes.  I would expect there to be near 100 percent
8   compliance.
9   Q.  And is that consistent with your experience in other
10  places?  Is that an unfair and unrealistic expectation?
11  A.  That is -- I don't feel it is -- in my experience at
12  looking at other homicide files and homicide investigations,
13  that I would expect that high of a deficiency.
14  Q.  Fifty percent struck you as an aberration?
15  A.  Yes.
16  Q.  Have you ever worked with or audited a department that
17  performed that poorly?
18  A.  Not in the case of homicide files, no.
19  Q.  All right.  Did you do the first line work to fill out the
20  boxes, whether it was an inventory, non-inventory, et cetera?
21  A.  No, I did not.
22  Q.  Tell the jury who you relied on to do that.
23  A.  Because of the sheer volume, and I don't want to do that
24  kind of stuff, the initial material review -- not review --
25  the material that was listed and documented and put in the

Brasfield - direct

2539

1  spreadsheet was done by people from your office.

2  Q.  Staff hired by us, correct?

3  A.  Yes.

4  Q.  And did you then review the work that they had done to

5  compile the checks -- you know, the box?

6  A.  Yes, the discussion initially was, is the best utilization

7  of my time, because I value it, is that that initial work

8  would be done, and then I would have the Bates numbers and the

9  file numbers to go back and check and verify that that's the

10 way they were.

11 Q.  And you also charged $300 an hour, right?

12 A.  That's correct.

13 Q.  So that is probably not the most efficient use of your

14 time?

15 A.  It's not the most efficient and it's not the most

16 enjoyable.

17 Q.  All right.  Did you spend a lot of hours making sure it

18 was accurate?

19 A.  I did.

20 Q.  Tell the jury approximately, you know, what you did to do

21 that and how long it took.

22 A.  Once the material was provided to me in electronic format,

23 I went through the files, looked at the corresponding Bates

24 numbers, and if anything, it errs on the side of the City

25 because I looked at -- to verify when it said that things were

Brasfield - direct

2540

1   either to/from memos or handwritten notes or material that

2   should have been in a permanent retention file, I verified

3   that, in fact, what people that you had hired found was

4   correct.  I did not go a further step and see if I could find

5   some more errors.

6   Q.  So you only caught errors going against you?

7   A.  Yes.

8   Q.  All right.  Is it acceptable in your field and in your

9   industry to rely on other people to do the -- you know, some

10  of the data entry in this kind of work?

11  A.  Yes.

12  Q.  All right.  I want to talk about your fourth analysis, and

13  that involves the criminal defense class, correct?

14  A.  Yes.

15  Q.  Tell the jury what your fourth layer of analysis was.

16  A.  Well, part of the underlying issue here was whether

17  material was getting discovered, if it was going to go to the

18  criminal defense attorney.  And the most obvious way to

19  determine that is to see how many criminal defense files were

20  available that correlated with information that was in

21  basement files and that were in permanent retention files.

22          And so, again, people that were hired by you sought

23  out the criminal defense attorneys and were able to eventually

24  receive criminal defense attorney files for 27 cases in the

25  first time period and -- or 23 in the first time period and 27

Brasfield - direct

2541

1  in the second.

2  Q.  All right.  So it was your understanding that as many

3  criminal defense files as possible were located to compare

4  with the basement files, correct?

5  A.  Yes.

6       MR. LOEVY:  And by the way, your Honor, at this time,

7  we do move Plaintiff's Exhibit 307 into evidence under --

8       THE COURT:  1006.

9       MR. LOEVY:  Yeah, 1006.

10      THE COURT:  We will talk about that at the end of the

11  direct.  Let's just -- we will do a sidebar at the end of the

12  direct to talk about it.

13  BY MR. LOEVY:

14  Q.  All right.  When you did this analysis of comparing the

15  available criminal defense files to the basement files, what

16  was your findings?

17  A.  Well, in 90 percent of the time, out of the 50 cases, 45

18  of them, there were investigating materials that were missing,

19  approximately 80 percent --

20  Q.  Well, before we leave that, I want to make sure I

21  understand.  So in the basement files, 90 percent of the time,

22  criminal defense attorneys' files did not have all the

23  materials in the basement files?

24  A.  That's correct.

25  Q.  All right.  Did you say -- what was the next number that

Brasfield - direct

2542

1  you --

2  A.  Approximately 80 percent, 40 of the 50, were missing --

3  the criminal defense files were missing handwritten notes that

4  were present in the basement files that detectives or others

5  had written down.

6  Q.  How about GPRs and to/from memos?

7  A.  Approximately 46 percent of the criminal defense files

8  were missing general progress reports that could be found in

9  the basement files.

10  Q.  And how many of the criminal defense attorneys' files

11  showed evidence of having received the inventory?

12  A.  There were 36 percent of the cases of the criminal defense

13  attorneys even received an inventory.

14       And I might also mention that only 20 -- or 20

15  percent were missing to/from memos that were in the basement

16  files too.

17  Q.  Now, you just said whether the criminal defense attorneys

18  received it, but you don't actually know what they got and

19  what they didn't get?

20  A.  No.  In my report, I made very clear, I had no firsthand

21  knowledge of what the criminal defense attorney received or

22  when it was received.

23  Q.  You had to use as a proxy their file, correct?

24  A.  That's correct.

25  Q.  And you don't claim -- do you claim that this would be a

HOOD 035578
Weston 050595

Brasfield - direct

2543

1  perfect and, you know, unchallengeable procedure to guarantee

2  exactly every document they did and didn't have?

3  A.  No.

4  Q.  All right.  Overall, though, did you see evidence of a

5  problem?

6  A.  I did.  There was a consistent pattern, the material that

7  I reviewed, that would show the types of things that were in

8  the investigative file were not making it into criminal

9  defense files.

10  Q.  All right.  You're familiar with the defense hired an

11  expert named Mr. Murray, correct?

12  A.  Yes.

13  Q.  And he spent quite a few hours going over the same

14  material, correct?

15  A.  That's my understanding.

16  Q.  All right.  And there is a -- it was detected that there

17  was a problem with your analysis of the Octavia Anima file,

18  was there not?

19  A.  Yes.

20  Q.  Tell the jury what the problem was.

21  A.  In the spreadsheet that you see enlarged there, I made

22  reference to Bates numbers, and in one of the -- in a

23  particular case, there was a range of pages where a digit was

24  transcribed, and, for example -- in fact, as an example, I can

25  give you the exact number.  But in any event, it was a

Brasfield - direct

2544

1  typographical error, and it should have been -- what was a 1

2  should have been a 2 or a 2 should have been a 1 so that the

3  range, instead of having a hundred-and-some pages missing,

4  there were only seven or eight pages missing.

5  Q.  All right.  How many page document is your spreadsheet,

6  sir?  About 15?

7  A.  It covers 439 different cases, so I don't know exactly how

8  many pages there are.

9  Q.  All right.  You're not claiming it is completely free of

10  all typos, are you?

11  A.  No.  It was an effort to impartially examine what was

12  available.

13  Q.  All right.  Who is that on, the typo?  Was that on you or

14  somebody else?  Who takes responsibility on that?

15  A.  It's both on the initial typist, but it's also clearly on

16  me, so...

17  Q.  All right.  Does that change your opinions at all that you

18  were wrong about this Bates range?

19  A.  No.  In fact, even if -- two possible things.  Even if you

20  completely removed that Octavia Anima case, it doesn't change

21  the overall pattern of everything that I looked at.

22          Secondly, there were things missing regardless of

23  that one particular typographical --

24  Q.  So notwithstanding the typo, there still were --

25  A.  Yes.

Brasfield - direct

2545

1 Q. All right. How about the Christopher Peoples file? This

2 is the one with the 150 pages from the criminal defense

3 lawyer. Do you want to give some context there?

4 A. That very clearly, out of the 50, was one that should not

5 have been included in the material for me to look at. It

6 didn't represent any criminal defense file. There were

7 documents there. But I didn't feel it would be fair to either

8 side to say, oh, well, this one, I don't like this one, I'm

9 taking it out. I mean, it was there, I looked at it, I did my

10 process.

11 Q. Has the defense or anybody else brought to your attention

12 any other significant errors that you're aware of?

13 A. No.

14 Q. All right. Does the fact that that mistake was made, does

15 that change any of your overall opinions?

16 A. No, it does not.

17 Q. Does it affect anything about your analysis of the blue

18 column, the purple column, the blue versus purple columns?

19 A. No, it does not.

20 Q. All right. Now, the defense expert also said that some of

21 the documents that were missing from the criminal defense

22 files were things like court attendance sheets, notes like VIN

23 records, stuff that was administrative. Did that -- what's

24 your opinion of that criticism?

25 A. I don't think that is an accurate or fair explanation. As

                    Brasfield - direct
                                                        2546

 1   I testified to before, you never know --
 2               MR. NOLAND:  Judge?
 3               THE WITNESS:  -- what is going to be --
 4               MR. LOEVY:  Mr. Brasfield, if you could hold on.  I
 5   think there is an objection.
 6               THE COURT:  I didn't hear it.
 7               MR. NOLAND:  Non-disclosed.
 8               THE COURT:  Let me see the lawyers at sidebar.  Bring
 9   the report.
10     (The following proceedings were had at sidebar outside the
11   hearing of the jury:)
12               THE COURT:  The question on the table has to do with
13   material missing from criminal defense files?
14               MR. KULWIN:  It was actually the reason I -- he was
15   talking about his review of Mr. Murray, our expert's, report.
16   They haven't disclosed any rebuttal from him with respect to
17   any review --
18               THE COURT:  Well, actually, it was in the question.
19   It was in the question.  So why don't you word the questions
20   in a different way.
21               MR. LOEVY:  I would be happy to stay away from it if
22   they don't want to get into it.  If it's a disclosure issue,
23   fine.  But if they're going to do it on cross, I'd like to
24   front it.
25               So I'd be happy to stay away from the subject.

Brasfield - direct

2547

1      MR. NOLAND:  We're certainly going to ask him if he
2  didn't review the prosecutor's files and show him some of
3  those things, but they didn't -- he's had that report for
4  months and hasn't done any type of rebuttal.
5      THE COURT:  Basically, what you're saying is that he
6  can't comment on the other side's criticism of his report?  I
7  don't think I agree with that.
8      MR. NOLAND:  He didn't submit a rebuttal is all I'm
9  saying, your Honor.  Yes.  I mean --
10     THE COURT:  Well, when was his dep taken?  In terms
11 of the sequence between plaintiff's report, defendants'
12 report, deposition, where did it fall in the --
13     MR. NOLAND:  We took his deposition before we
14 disclosed our report.
15     THE COURT:  Okay.
16     MR. LOEVY:  I will stay away from it if they are not
17 going to bring it up.  The criticism I thought they were going
18 to do on cross is some of this stuff is benign.  If they are
19 not going there, I'm done with it.
20     THE COURT:  Well, I think you can probably word the
21 questions in a way that doesn't say, well --
22     MR. LOEVY:  All right.
23     THE COURT:  -- the defendants' expert says this.  I
24 mean, because part of the -- I suppose in theory -- I am not
25 sure it's going to happen here, but I suppose in theory,

1    somebody could say, you did such a great job on cross of this

2    guy, we are not going to need to call this person.

3            MR. LOEVY:  Okay.

4      (The following proceedings were had in open court in the

5    presence and hearing of the jury:)

6            THE COURT:  Okay.  You can proceed.

7    BY MR. LOEVY:

8    Q.  Some of the materials in the investigative files that were

9    not evidenced in the criminal defense attorneys' files was

10   more significant than other materials, right?

11   A.  That is correct.

12   Q.  All right.  As far as any criticism that who cares if some

13   of this stuff was left out of the criminal defense attorneys'

14   files, can you speak to that?  What I'm talking about is

15   administrative documents, notes about a VIN number on a car,

16   that kind of stuff.

17   A.  As I had previously testified to, oftentimes, you don't

18   know what is important or what may have value either to

19   prosecution or defense.  Administrative things such as who

20   appeared in court, you may discover later that the key part of

21   a prosecution is that an officer was on the street and saw

22   something, but in reality, you have the administrative

23   document that said they were in court on that day.  I mean,

24   that's just an off-the-cuff example.

25           But the administrative-type material can be

1  important.  Oftentimes, it is not.  But until you have it or
2  don't have it, you're in a quandary.
3  Q.  All right.  When you did your analysis, some of the
4  materials that you listed as undisclosed were probably truly
5  benign, correct?
6  A.  That's correct.  Absolutely.
7  Q.  You didn't attempt to go through and sort like, oh, this
8  page is blank, or, you know, this page is not exculpatory,
9  page by page, right?
10  A.  I tried to be as objective and just put down what the
11  facts were.
12  Q.  All right.  Let's change topics then, sir.
13        Do you have any problem as a police practices expert
14  with police officers having a policy of destruction of notes,
15  and can you explain?
16  A.  I don't have a problem.  In fact, in my own career, I have
17  shredded, for lack of a better word, notes, but it's in the
18  context of having taken a two- or three-word or two- or
19  three-line note that I may have scratched in the field and
20  elaborated that on an official document when I am back in the
21  office.  If I happen to go out to a bodega and talk to Sam
22  Smith at the bodega, that just may be a penciled note.  But
23  when I come back in, it is on such-and-such a date at
24  such-and-such a time and such-and-such a location, I
25  interviewed Mr. or Mrs. or whoever and this is the context of

Brasfield - direct

2550

1  what I learned while it's fresh in my mind.  That is the

2  official document.  That reflects what was actually done.

3  That scrap of paper then the agency would feel is not

4  important.

5  Q.  So is there a national norm then that as long as you take

6  the information and put it in a report, you don't have to

7  preserve the notes?  Would you agree or disagree with that?

8  A.  It could be either way.  The key issue is, is the

9  information that was garnered put into a form that is

10  available for either review or discovery later?

11  Q.  Which means in the official file, correct?

12  A.  Yes, in the official file.

13  Q.  So would you have a problem with a policy that allowed you

14  to either discard or destroy or withhold notes if it didn't go

15  into an official report?

16  A.  Absolutely.

17  Q.  And would that be an aberration?

18  A.  It would.

19  Q.  All right.  You were asked some questions previously about

20  show me a specific policy that -- you know, from another city.

21  Do you remember being asked those questions?

22  A.  During a deposition, yes.

23  Q.  All right.  Do you have the Tallahassee policy from 1982?

24  A.  No, I do not.

25  Q.  Do you have the El Paso policy from 1984?

HOOD 035586
Weston 050603

Brasfield - direct

2551

1  A.  I have no files that contain historic policies and
2  procedures from other jurisdictions.
3  Q.  All right.  But do you nonetheless have a familiarity with
4  other cities' policies during this time period, and can you
5  explain?
6  A.  Yes.  From the start of my college education in science
7  and the studying of policies of procedures and investigations
8  and then, more importantly, through my professional practice
9  of developing -- not to go over the same ground -- but I have
10  visited other police departments, I have audited other police
11  departments, I have reviewed their policies, I have looked in
12  the popular literature at the time and of those eras, and I
13  actually was a commander in those eras, and I am familiar with
14  what was the way things were written.
15  Q.  All right.  Back quickly to the comparison you did between
16  the criminal defense files and the basement files, why did you
17  choose -- well, first of all, you have an understanding that
18  the defense attorney did a different comparison, correct?
19  A.  Yes.
20  Q.  I'm sorry.  The defense attorney hired an expert.
21          And what did the defense expert, Mr. Murray, compare
22  the investigative files to?
23          MR. NOLAND:  Objection, your Honor.
24          THE COURT:  Same basis as the previous one?
25          MR. NOLAND:  Yes, Judge.

Brasfield - direct

2552

1    THE COURT:  All right.  Again, I need to see the

2  lawyers at sidebar, please.  Bring the report.

3    (The following proceedings were had at sidebar outside the

4  hearing of the jury:)

5    THE COURT:  You did what I told you not to do.  The

6  defense expert did this, the defense expert did that.  I told

7  you not to word questions that way.

8    MR. LOEVY:  I apologize.

9    THE COURT:  But here's the deal.  I mean, I don't

10 think that there's anything inappropriate or beyond -- or

11 outside the scope of Rule 26(a)(2) and the part of Rule 37

12 that goes along with it for him to be able to respond to

13 criticism by a defense expert.  So either he gets to do it

14 now, or he is going to get to bring him back on later.

15    So do you have a preference?

16    MR. LOEVY:  We do.

17    THE COURT:  I'm asking you.

18    MR. NOLAND:  Back later, you mean --

19    THE COURT:  Put him on in rebuttal to comment on what

20 your guy said about him.

21    MR. NOLAND:  If that would be the ruling --

22    THE COURT:  That's going to be the ruling.

23    MR. NOLAND:  -- then I would rather have him do it

24 now.

25    THE COURT:  Then let's do it now.

1    (The following proceedings were had in open court in the

2   presence and hearing of the jury:)

3        THE COURT:  Okay.  The objection is overruled.  You

4   can proceed.

5   BY MR. LOEVY:

6   Q.  All right.  Just as foundation, what is your understanding

7   of the analysis that the defense expert undertook?

8   A.  It is my understanding from reading his report and

9   deposition that he looked at --

10  Q.  Same basement files, right?

11  A.  Same basement files.

12  Q.  And what did he compare them to?

13  A.  He compared them to State's Attorney's Office files.

14  Q.  So in other words, you compared the same basement files to

15  the criminal defense, and then they compared them to the

16  state's attorney's files, right?

17  A.  That's correct.

18  Q.  And neither of one of you did what the other one did?

19  A.  That's correct.

20  Q.  Why did you choose to compare the basement files to the

21  criminal defense files to determine what the criminal defense

22  attorneys had?

23  A.  I tried to keep it as straightforward as possible.  The

24  issue that I was asked to look at was material relevant to the

25  investigation of homicides being given and made available to

Brasfield - direct

2554

1  the criminal defense attorney.  And the most straightforward

2  way to do that is to look at the criminal defense attorney's

3  files.

4  Q.  All right.  You've already testified that 90 percent of

5  the criminal defense attorneys' files were missing some

6  materials from the basement file.  Do you have any knowledge

7  as to what was in or wasn't in the state's attorney's files?

8  A.  No, I do not.

9  Q.  All right.  Let's talk about a few more areas.

10            You talked before lunch about why it's important to

11  have policies governing the subpoena unit and the subpoena

12  response unit.  Did the City of Chicago, after they enacted

13  the changes we talked about this morning, did they fix the

14  subpoena unit problems?

15  A.  No, they did not.

16  Q.  Can you explain?

17  A.  The policies that were promulgated did nothing to

18  establish guidelines or policies and procedures or training or

19  follow-up auditing or, in worst case scenario, discipline for

20  the successful operation of the subpoena services unit.

21            There was no checklist; if you did a subpoena from

22  the State's Attorney's Office, you do this, this, and this.

23  It becomes even more critically important to have that when

24  you have a police department with a culture of parallel files

25  of different sources of files.  You get a subpoena, and the

Brasfield - direct

2555

1  staff with no training is supposed to determine, well, how do

2  I respond to this?  Do I send something in writing over to the

3  gang squad because the gang squad may have had involvement in

4  this but their records aren't included in the investigative

5  file?  Do I send for things from the photo lab or from the

6  crime lab?

7            You can say that an experienced employee would know

8  that, but given the turnover and the fact that there is

9  absolutely no evidence that I have seen of any type of

10  guideline, of any training on any policy or procedure as to

11  how they will respond or what sources that they will examine

12  to get the material.

13  Q.  All right.  Did you review testimony by Mr. Hickey that

14  provided insight into this problem?

15  A.  A great deal of testimony from Mr. Hickey, yes.

16  Q.  And what did you conclude based on that?

17  A.  That he acknowledged as the City's expert in that field

18  that what I had just testified to was the case; that there was

19  no training, there were no guidelines.  And in fact, material

20  that I reviewed, that there were instances where there was

21  confusion or question among staff as to what should be turned

22  over or what shouldn't be turned over, and that none of that

23  questioning was ever resolved or sent up the chain of command

24  to decide what to do.

25  Q.  All right.  In addition to the lack of -- basically, did

1  any of the new policies that got passed, did they govern the

2  subpoena unit?

3  A.  No.

4  Q.  Was there a lack of policies there?

5  A.  There was a lack of policy.

6  Q.  All right.  Let's talk about the policies that were

7  passed.  Did those solve the problem for the decentralized

8  divisions you've just described?

9  A.  No, they did not address anything about a centralized

10  record system process.

11        And I might add, the larger the organization gets,

12  the more critically important it is to have a centralized

13  record system.

14  Q.  How out of the norm is Chicago's deficiency in that

15  regard?

16  A.  As I have said on several occasions, it is totally alien

17  to my experience that the City of Chicago Police Department

18  would have that type of system.

19  Q.  Did the policies leave too much or too little discretion

20  to detectives as far as what to make into official files?

21  A.  Well, they used the term "relevant."  And one of the

22  depositions that I reviewed, I believe it was from a gentleman

23  by the name of Stibich, indicated that what might be important

24  or relevant --

25        MR. NOLAND:  Objection, your Honor.  I believe that's

Brasfield - direct

2557

1   the subject of the discussion before the testimony.

2           THE COURT:  Okay.  Well, the last part of the answer

3   was not responsive, so I am going to strike the last part.

4           In fact, why don't you -- I am going to strike the

5   whole answer.  Why don't you put the question again.  The

6   answer really wasn't responsive.

7   BY MR. LOEVY:

8   Q.  All right.  Did you see any evidence either way whether

9   the system in Chicago left too much discretion to police

10  officers to decide what to put in the official file?

11          THE COURT:  That's just a yes or no.

12          THE WITNESS:  Yes.

13  BY MR. LOEVY:

14  Q.  Can you explain?

15          THE COURT:  So is this the issue where there's an

16  objection?

17          MR. NOLAND:  Yes, the reference to a particular name.

18          THE COURT:  Okay.  Bring the -- again, I need to talk

19  to the lawyers at sidebar.  Bring the relevant ruling.

20    (The following proceedings were had at sidebar outside the

21  hearing of the jury:)

22          THE COURT:  Is this my ruling?

23          Oh, you're talking about --

24          MR. NOLAND:  The proffer.

25          THE COURT:  You are talking about the proffer.  This

Brasfield - direct

2558

1   is not Jones/Palmer.

2           MR. SWAMINATHAN:  No one knows that his reference to

3   Stibich testifying is him testifying in Jones and Palmer.

4   He's just saying a guy name Stibich who is a commander said

5   certain things.

6           MR. LOEVY:  In other words, that would have been

7   outside the Jones proffer, but we are not offering it for the

8   Jones proffer.  This has nothing to do with the Jones proffer.

9   He's just said, I looked at Stibich's testimony --

10          THE COURT:  Who is Stibich?

11          MR. SWAMINATHAN:  He is a commander for the City who

12  testified about --

13          THE COURT:  Testified in the Palmer case?

14          MR. SWAMINATHAN:  It was in the Palmer case.

15          MR. NOLAND:  It's the pre-'83 policy, yes.

16          THE COURT:  Okay.  And what do you expect his

17  testimony to be on this?

18          MR. LOEVY:  Just what he said.

19          THE COURT:  Well, say it again.

20          MR. LOEVY:  That there was too much discretion left

21  to the detectives about deciding what's in and what's out.

22          THE COURT:  And the problem with that is?

23          MR. NOLAND:  It was the pre-'83 policy.  That was a

24  decision to change the policy.  So he's talking about a

25  different era before 83-1.

HOOD 035594
Weston 050611

Brasfield - direct

2559

1    MR. LOEVY:  That sounds like --

2    MR. MICHALIK:  It's misleading to suggest that that

3  was his testimony after 83-1 comes out.

4    THE COURT:  Well, reword the question so it doesn't

5  do that.

6    (The following proceedings were had in open court in the

7  presence and hearing of the jury:)

8    THE COURT:  Okay.  The question is going to be

9  rephrased.

10  BY MR. LOEVY:

11  Q.  All right.  You looked at what happened in the City of

12  Chicago after they tried to solve the problem of the

13  Jones/Palmer era, correct?

14  A.  That's correct.

15  Q.  And I believe you told us you think they did an inadequate

16  job of solving that problem, right?

17  A.  Yes.

18  Q.  Did they solve the problem of having too much or too

19  little discretion to detectives to decide what to memorialize?

20  A.  No, they did not.

21  Q.  They did not solve that problem?

22  A.  No.

23  Q.  And if you could explain a little bit without reference to

24  Mr. Stibich?

25  A.  They used what I would consider vague terminology and left

Brasfield - direct

2560

1  it up to individual detectives to determine what was relevant

2  and what they did with the information that they thought was

3  relevant.

4  Q.  And that's not the norm in police practices?

5  A.  No.

6  Q.  You talked a little bit about training, and just a few

7  more questions, really.  But when they did these new policies

8  and these new practices, did they do the kind of training that

9  would be expected in your industry?

10 A.  Not for a significant policy such as discovery in

11 constitutional safeguards for individuals.  That, and as

12 evidenced by the information I had available to me, that was a

13 inbreded (sic) cultural problem that needed very significant

14 training, planning for the training in advance, training

15 presented by high-level commanders, perhaps even with an

16 introduction by the superintendent, that it encompass everyone

17 that would have their hands on an investigation, not just the

18 major crimes detectives, as I mentioned before.  They should

19 include bomb and arson, gang squad, anyone that has an

20 investigative responsibility, and to a lesser extreme, the

21 patrol officers.

22         And it should not be a one-time deal.  People

23 transfer in and out.  There are going to be questions that

24 arise in time.  You have a major significant change in the

25 culture as to, well, does this mean this or does that mean

1  that.  There needs to be, and often is, additional follow-up

2  training.

3  Q.  As a 40-year law enforcement person, do you regard this as

4  a significant change in the way of doing business?

5  A.  Yes.

6  Q.  Is a one three-hour training of the detectives sufficient?

7  A.  No.

8  Q.  And the last question then, you described the culture as

9  ingrained.  Can you explain from a police practices standpoint

10  how an organization can have culture resistance to change?

11          MR. NOLAND:  Objection, Judge, relevance.

12          THE COURT:  Overruled.

13          THE WITNESS:  For instance, when -- the requirement

14  to read suspects their rights, which goes back decades and

15  decades and decades, that was not what police were used to

16  doing and thought that it was going to let the bad guys get

17  away.  It's a cultural thing that had to be totally turned

18  around 180 degrees.

19          The same is true about, for instance, warning shots,

20  what I'll -- anyway, warning shots --

21          MR. KULWIN:  I'll object.

22          THE COURT:  Sustained.

23          MR. KULWIN:  I ask that it be stricken.

24          MR. LOEVY:  I have no further --

25          THE COURT:  That comment is stricken.

1      I'm sorry.  What did you say?

2          MR. LOEVY:  I'm finished.

3          THE COURT:  You're finished.  Okay.

4          MR. LOEVY:  Thank you, Mr. Brasfield.

5          THE COURT:  Mr. Noland.

6                          - - -

7      MICHAEL DAVID BRASFIELD, CROSS-EXAMINATION

8  BY MR. NOLAND:

9  Q.  All right.  Now, Mr. Brasfield, before lunch, you talked a

10 lot about notes and that in the files you reviewed, you saw

11 notes that were not on general progress report forms.  Do you

12 remember that testimony?

13 A.  Yes, I do.

14 Q.  And sometimes you might see it on the back of a piece of

15 paper or something not on the official general progress report

16 form, correct?

17 A.  That's not what I testified to this morning, but, yes, I

18 agree.

19 Q.  All right.  And, now, just recently, after lunch, you've

20 acknowledged that you would shred your own notes as a police

21 officer after completing a report; isn't that true?

22 A.  That's correct.

23 Q.  And to you, that's a perfectly acceptable practice, right?

24 A.  In the context of my explanation of transferring the

25 information in full onto official forms.

Brasfield - cross by Mr. Noland

2563

1   Q.  So you would not give your notes to the criminal defense

2   attorney so he would have those notes in the courtroom in

3   order to cross-examine you with what you wrote

4   contemporaneously with your interview of somebody, correct?

5   Yes or no?

6   A.  Yes.

7   Q.  And you would not give those notes to the prosecutor so he

8   could see what you wrote -- he or she could see what you wrote

9   down contemporaneously with your investigation; isn't that

10  true?

11  A.  That's true.

12  Q.  And you have talked about a lot of criticism of Chicago's

13  policy.  We just heard that, correct?

14  A.  Yes.

15  Q.  Wouldn't you agree, sir, that, in fact, keeping notes,

16  retaining notes permanently so that they're available in the

17  criminal process is a better policy than your very own

18  personal policy of shredding your notes?  Isn't that true?

19  A.  No, it is not.

20  Q.  Now, Mr. Brasfield, you were never personally assigned as

21  a homicide detective; is that true?

22  A.  That's true.

23  Q.  But you're aware that in the Seattle Police Department, as

24  with your practice, the Seattle police officers would shred

25  their notes after completing a report, right?

Brasfield - cross by Mr. Noland

2564

1  A.  In that era --

2  Q.  Is that true?

3  A.  That's true.

4  Q.  And, Mr. Brasfield, isn't it true that in all your time in

5  Seattle, all those 20-plus years, you never did anything to

6  change that policy; isn't that true?

7  A.  No, that's not true.

8  Q.  Isn't it true, Mr. Brasfield, that you didn't do anything

9  to change the policy at Seattle of detectives who threw their

10  notes away?  Isn't that true?

11  A.  That's not true.

12  Q.  Well, Mr. Brasfield, you were the chief of police in Fort

13  Lauderdale; is that right?

14  A.  That's correct.

15  Q.  And you don't even know what the policy was in Fort

16  Lauderdale with respect to whether or not detectives could

17  destroy their notes after completing a report; isn't that

18  true?

19  A.  That's not entirely true, no.

20  Q.  Well, at your deposition, you told us you didn't know one

21  way or the other what the policy in Fort Lauderdale was; isn't

22  that right?

23         MR. LOEVY:  Objection.  Page and line?

24         THE COURT:  Sustained.  That's not the proper way to

25  do it.

HOOD 035600
Weston 050617

Brasfield - cross by Mr. Noland

2565

1  BY MR. NOLAND:

2  Q.  Page 327, line 10.  Isn't it true that you were asked

3  these questions with respect to the Fort Lauderdale policy and

4  gave the following answers:

5       "QUESTION:  So" --

6       MR. LOEVY:  Objection to the characterization with

7  respect to the policies.  Just the question and the answer.

8       THE COURT:  Ask the questions -- read the questions

9  and answers, leave out the commentary.

10 BY MR. NOLAND:

11 Q.  "QUESTION:  But what did they do with the actual notes?

12 Did they throw them away?

13      "ANSWER:  They were transcribed, and the notes -- I

14 don't have an independent recollection right now what they

15 were, what was done with them.  So it's possible they were

16 just thrown away.  The information would have been contained

17 in the file.  It's possible.  I said I have no independent

18 recollection.

19      "So the question is, so it's possible that the notes in

20 Fort Lauderdale that the detectives took after they either

21 electronically called them in and had them transcribed or

22 typed them or did whatever that they did with them and put

23 them in the file could have been thrown away?

24      "ANSWER:  That could have been."

25 A.  That's correct.

HOOD 035601
Weston 050618

1      MR. LOEVY:  Objection, not impeaching.

2      THE COURT:  I am going to overrule the objection.

3  But when you read the things, say "question" and "answer."

4  You are not going to do it again, but when you do it, say

5  "question" and "answer" so the jury understands what's being

6  read.

7      I am overruling the objection because it's a matter

8  of weight.

9      MR. NOLAND:  Thank you, Judge.

10  BY MR. NOLAND:

11  Q.  And isn't it true that as the chief of police, you didn't

12  have a policy one way or the other with respect to the

13  retention of notes at Fort Lauderdale?

14  A.  The policy was --

15  Q.  Isn't that true, sir?

16      MR. LOEVY:  Objection.

17      THE COURT:  So the question is did you have a policy?

18      THE WITNESS:  We had a policy.

19  BY MR. NOLAND:

20  Q.  Page 328, line 1.  Isn't it true you were asked this

21  question and gave this answer:

22      "QUESTION:  And as chief of police, you didn't have a

23  policy one way or the other?

24      "ANSWER:  I don't recall what the policy.  I don't have

25  it in front of me now."

Brasfield - cross by Mr. Noland

2567

1         Isn't it true that that question was asked --

2         MR. LOEVY:  Objection, your Honor.

3         THE COURT:  The objection is sustained.  Not

4    impeaching.  The jury is instructed to disregard it.

5    BY MR. NOLAND:

6    Q.  Now, Mr. Brasfield, you acknowledged after lunch here that

7    the key in all of this with respect to the review that you've

8    done and your testimony here today is that the information is

9    provided in the criminal justice process so that the

10   prosecutors get the information and the information will be

11   tendered to the criminal defense attorney; is that fair?

12   A.  The information that the police have are supposed to give

13   to the prosecutor or the State's Attorney's Office, yes.

14   Q.  And it's true, isn't it, that if the police -- when the

15   police provide the information to the prosecutor, the police

16   have fulfilled their duty to disclose under generally accepted

17   police practices; isn't that true?

18   A.  If they disclosed everything that they have, yes.

19   Q.  Yet, Mr. Brasfield, in this review you talked about with

20   plaintiff's counsel, you did not even look at the prosecutor's

21   files in comparison to the 50 investigative files from the

22   basement, did you?

23   A.  That's correct.

24   Q.  Now, Mr. Brasfield, you've talked about -- a lot about

25   permanent retention files.  Do you remember that testimony?

Brasfield - cross by Mr. Noland

2568

1  A.  Yes.

2  Q.  Now, Mr. Brasfield, you understand that at the Chicago

3  Police Department, there's a permanent retention file that has

4  the supplementary reports and the case reports.  That's

5  correct?

6  A.  That's correct.

7  Q.  And there's also the investigative file that is maintained

8  at the area while the investigation is ongoing; isn't that

9  true?

10  A.  That's one of the other files, yes.

11  Q.  And the investigative files are available to get requested

12  and subpoenaed in the criminal process by the prosecutors and

13  the criminal defense attorneys; isn't that true?

14  A.  There is no policy or practice that would indicate how

15  it's supposed to operate.

16  Q.  Well, it's supposed to operate in that the detectives --

17  the special order requires that detectives submit their

18  information that they generated or received in an

19  investigation into that investigative file for preservation;

20  isn't that what it says?  Isn't that what it says, yes or no?

21  A.  That's what it says.

22  Q.  Thank you.

23         And in this case, there is about 450 investigative

24  files that are listed on this table that the plaintiff's

25  attorneys gave you, right?

Brasfield - cross by Mr. Noland

2569

1  A.  429, yes.

2  Q.  And by the way, you didn't prepare this.  They prepared it

3  and provided it to you, correct?

4  A.  That's correct.

5  Q.  And but only on 50 of those 429 cases did they provide you

6  with any criminal defense file; is that true?

7  A.  That's true.

8  Q.  And on those criminal defense attorneys' files, there

9  were -- almost all of them, general progress reports and other

10  notes that were contained in those criminal defense attorneys

11  files, true?

12  A.  Those criminal defense --

13  Q.  Is that true or not, sir?

14  A.  No.

15  Q.  Okay.  But you are aware that information from the

16  investigative files was produced in the criminal process,

17  correct?

18  A.  You'll have to rephrase that.

19  Q.  Okay.  There are -- you came across dozens and dozens and

20  dozens of general progress reports that were in these criminal

21  defense attorneys' files that you reviewed; isn't that true?

22  A.  There were general progress reports in some of the files

23  that I looked at, yes.

24  Q.  So that was evidence that attorneys were getting material

25  from the investigative files, correct?

1   A.  In some instances, yes.

2   Q.  And, in fact, it's your understanding that the practice at

3   Chicago or the policy is that the general progress reports do

4   not go into the permanent retention file, they go into the

5   investigative file, correct?

6   A.  That's correct.

7   Q.  Now, with respect to these 50 or so criminal defense

8   attorneys' files that were provided to you, you didn't

9   personally do anything to independently verify that they were

10  complete or incomplete; is that right?

11  A.  I verified --

12  Q.  Sir, is that right?

13  A.  I received --

14  Q.  Sir, is that right?

15  A.  Please ask the question again.

16  Q.  Isn't it true, sir, that of the 50 criminal defense

17  attorneys' files that were provided to you by the plaintiff's

18  counsel, you did nothing to independently verify that they

19  were complete or incomplete?  Isn't that true?

20  A.  I took them at face value.

21  Q.  And you don't know how many times those files changed

22  hands from one attorney to another attorney to another

23  attorney over the years, true?

24  A.  That's true.

25  Q.  And most of these files were between 15 and some in excess

1  of 30 years old; isn't that right?

2  A.  That's possible.

3  Q.  And you don't know how many of these files were given to

4  appellate lawyers, right?

5  A.  That's correct.

6  Q.  You don't know how many were given to -- how many

7  post-conviction lawyers took those files, correct?

8  A.  All I know is they came from criminal defense attorneys.

9  Q.  And you didn't talk to any criminal defense attorneys and

10  say, hey, is this file complete, true?

11  A.  That's true.

12  Q.  Mr. Loevy brought up with you the Christopher Peoples

13  case, right?  That was a case --

14  A.  Yes.

15  Q.  -- we talked about at your deposition?

16  A.  Yes.

17  Q.  And that was a file that was provided to you by the

18  plaintiff's counsel, right?

19  A.  That's correct.

20  Q.  I'm going to show you what the plaintiffs have marked as

21  Plaintiff's Exhibit 383.  That is the criminal defense

22  attorney's file that the plaintiff's attorneys provided to

23  you; isn't that true?

24  A.  I believe so.

25           THE COURT:  Can you spell Peoples?

Brasfield - cross by Mr. Noland

2572

1   MR. NOLAND:  It is P-e-o-p-l-e-s.

2   THE COURT:  Thanks.

3   BY MR. NOLAND:

4   Q.  And, sir --

5   MR. NOLAND:  Judge, could we have the computer?

6   Laura, if we could have Plaintiff's Exhibit 306-018.

7   THE COURT:  Is this in evidence?

8   MR. NOLAND:  This is Plaintiff's Exhibit --

9   THE COURT:  I understand.  That's not my question.

10  Just focus on my question.  Is it in evidence?

11  Let me ask it a different way.  Is there an

12  objection?

13  MR. LOEVY:  We do not object.

14  THE COURT:  Okay, fine.  Then the jury will be able

15  to see it.

16  306-10- --

17  MR. NOLAND:  018, your Honor.

18  BY MR. NOLAND:

19  Q.  Sir, while Laura is pulling that up, the first page of

20  that document has got the name of the criminal defense

21  attorney for Christopher Peoples.  His name is Gary Stanton;

22  is that true?

23  A.  That's correct.

24  THE COURT:  I did it again.  There's two defense

25  tables.  I put it on the wrong one.  My mistake.  Sorry about

1  that.  There you go.

2  BY MR. NOLAND:

3  Q.  Mr. Brasfield, on the screen in front of you, that is

4  page 17 of your attachment F to your report; is that true?

5  A.  That's correct.

6  Q.  And you prepared this page 17, correct?

7  A.  I did.

8  Q.  And this was initially based upon your review of the --

9  this spreadsheet on the demonstrative exhibit that plaintiff's

10  counsel gave you, right?

11  A.  Yes.

12  Q.  And then you took that and did a file-by-file comparison

13  of the documents that were in the investigative files from the

14  police and the criminal defense attorneys' files given to you,

15  right?

16  A.  That's correct.

17        MR. NOLAND:  Laura, can you highlight the entire

18  paragraph missing from criminal defense files.

19  BY MR. NOLAND:

20  Q.  And there's actually 288 pages in that Chicago Police

21  Department file, correct, that you noted on attachment F?

22  A.  Yes.

23  Q.  And I have added them up beforehand.  I think we talked

24  about it at your deposition.  The documents you said were

25  missing from the criminal defense attorneys' files were about

Brasfield - cross by Mr. Noland

2574

1  250 pages or 257 pages; is that true?

2  A.  I don't recall.

3  Q.  Okay.  But it was somewhere in that ballpark?  Does that

4  sound about right?

5  A.  I would say that's fair.

6         MR. NOLAND:  Laura, if you could pull up Plaintiff's

7  Exhibit 383, pages --

8         THE COURT:  Is there any objection to this one?

9         MR. LOEVY:  What is it, your Honor?

10        THE COURT:  383.

11        MR. LOEVY:  Is it a file?

12        MR. NOLAND:  It's the file that's in front of him

13  that I --

14        MR. LOEVY:  No objection.

15        THE COURT:  Okay.  Fine.  So the 306 was -- 306 dot

16  whatever was the page from the report.  The 383 is the Peoples

17  file.

18        MR. NOLAND:  Thank you, Judge.

19        And this would be Bates stamp pages 8651-52.

20  BY MR. NOLAND:

21  Q.  So, sir, on the copy in front of you and on the screen, in

22  the middle of the document, there is a reference to the RD

23  number for this case.  That's the records division number; is

24  that right?

25  A.  Yes.

Brasfield - cross by Mr. Noland

2575

1  Q.  And that would be HH358668.  That's the records division

2  number relative to the homicide at issue for this Christopher

3  Peoples case, right?

4  A.  That's correct.

5  Q.  And that's one page.

6        MR. NOLAND:  Can you go to the next page.  Can you go

7  back to the other one, Laura?  Under the subject line, Laura,

8  could you highlight that.

9  BY MR. NOLAND:

10  Q.  This is a request for prisoner to be held past next

11  scheduled court call, right?

12  A.  Yes.

13        MR. NOLAND:  Laura, could you go to the next page.

14  BY MR. NOLAND:

15  Q.  Again, the subject of this document is request for

16  prisoner to be held past court call, correct?

17  A.  Yes.

18        MR. NOLAND:  And, Laura, could you pull up that RD

19  number -- there you go.

20  BY MR. NOLAND:

21  Q.  And, again, it's the same RD number that we just read,

22  correct?

23  A.  Correct.

24  Q.  Now, isn't it true, Mr. Brasfield, that there isn't any

25  other police report in that file, the criminal defense file

Brasfield - cross by Mr. Noland

2576

1  that the plaintiff's attorneys gave you, that has the records

2  division number for the homicide at issue in that case?

3  A.  I don't independently recall, but if that's what you

4  indicated, yes.

5  Q.  I'll represent to you that that is the case.

6  A.  Fine.

7  Q.  So when you received this file and you did your

8  file-by-file comparison, you wrote down all those documents as

9  missing from the criminal defense files that were in the

10 basement file, true?

11 A.  That's correct.

12 Q.  So you accepted at that time when you issued your report

13 that this was a complete criminal defense file that the

14 plaintiff's attorneys were supplying to you, right?

15 A.  That's correct.

16 Q.  And you didn't notice at all, even though there's only two

17 pages of requests to hold over a prisoner in that file, that,

18 say, hey, wait a minute, this file is incomplete?  You didn't

19 notice that?

20 A.  No, I've acknowledge that that was in error.

21          MR. NOLAND:  Laura, could you pull up Defense 245,

22 page 270.

23          And, Judge, this is -- Jon, this is from the

24 prosecutor's file.

25          THE COURT:  Is there any objection to this?

Brasfield - cross by Mr. Noland

2577

1      MR. LOEVY:  No, your Honor.

2      THE COURT:  Okay.

3      MR. NOLAND:  Can you highlight the discovery receipt

4  part, Laura?  Thank you.

5  BY MR. NOLAND:

6  Q.  So, Mr. Brasfield, you understand this document -- and

7  it's signed at the bottom by Gary Stanton; is that right?

8  A.  The attorney -- the public defender in this case, yes.

9  Q.  Mr. Stanton was the public defender for Christopher

10  Peoples, right?

11  A.  That's correct.

12  Q.  And you understand this document that he signed to be

13  acknowledging receipt of materials from the State's Attorney's

14  Office, true?

15  A.  That's true.

16  Q.  And the first line says, RD, two pages, right?

17  A.  Yes.

18  Q.  Now, that would be the case report for the case where the

19  initial beat officers respond to the scene and report on what

20  they saw, right?

21  A.  It may.

22  Q.  You don't know it?  You don't know what the RD is?

23  A.  I know what an RD is, yes, of course.

24  Q.  Is it or is it not the case report that the beat officers

25  did?

Brasfield - cross by Mr. Noland

2578

1   A.  It may be, yes.

2   Q.  And then the next line has supp report that's a page.

3   Then if we go down, there's one, two, three, four, five -- six

4   supplemental reports, and they have the pages, there's three

5   pages and two pages and three pages and three and 14 and 14,

6   correct?

7   A.  That's correct.

8   Q.  Are any of those supplementary reports in that file in

9   front of you, sir?

10  A.  I would have to look through them.  I --

11  Q.  I will represent to you that they are not in there.

12  A.  If you represent that, I will accept that.

13          MR. NOLAND:  Laura, can you go to the next page.

14  BY MR. NOLAND:

15  Q.  And the next page of this document, page No. 271,

16  Defendants' 245, again, has eight more supplementary reports

17  with the pages listed on them, correct?

18  A.  That's correct.

19  Q.  And, again, it's signed by Gary Stanton as receiving them,

20  right?

21  A.  That's correct.

22          MR. NOLAND:  Can you go to the next page, Laura.

23  BY MR. NOLAND:

24  Q.  Even more supplementary reports produced to Mr. Stanton,

25  right, that aren't in that file?

1  A.  That's correct.

2  Q.  Do you see the CSPR about four lines down?  Do you know

3  what that is?

4  A.  I don't recall right off the top of my head the CSPR.

5  Q.  Isn't it true it's the crime scene processing report, sir?

6  A.  Yeah.

7  Q.  Do you know what that is in the Chicago Police Department?

8  A.  Yeah, I am aware of what that is.  I was not aware that --

9       MR. NOLAND:  Laura, could you go to page 253, please.

10  Could you highlight the GPRs 73.

11  BY MR. NOLAND:

12  Q.  What does this signify, Mr. Brasfield?

13  A.  That the public defender, Mr. Stanton, received 73 pages

14  of GPRs.

15  Q.  And you didn't notice at all when you were preparing your

16  report and reviewing the spreadsheet that all of these

17  documents that had been provided to Mr. Stanton, the public

18  defender, were missing from his file; is that true?

19       MR. LOEVY:  Objection.  There's no foundation.  He

20  didn't have this document.  No foundation.

21       THE COURT:  Rephrase the question.

22  BY MR. NOLAND:

23  Q.  Wouldn't you have liked to have had this discovery receipt

24  before you made the representation in your report that the

25  Chicago Police Department withheld all of these documents from

1  Mr. Stanton?  Wouldn't you have liked to have had that?

2  A.  It certainly would have been helpful.

3  Q.  You wouldn't have made that mistake, would you, of missing

4  dozens and dozens of pages in your report, wouldn't you?

5  A.  I acknowledged that this particular --

6  Q.  Sir, would you have made that mistake?

7  A.  I would not have made that mistake.

8  Q.  Would that mistake have been made on this spreadsheet that

9  was provided to you by plaintiff's counsel if you had had this

10  discovery receipt?

11  A.  No.

12  Q.  Sir, it was incumbent upon you as an expert before you

13  came in here and gave testimony to look at those prosecutors'

14  files before making any type of claim of what the Chicago

15  Police Department did or did not produce in any of these

16  cases; isn't that true?

17  A.  No, it is not.

18        MR. NOLAND:  Laura, can you pull up Plaintiff's

19  Exhibit 306-011.

20  BY MR. NOLAND:

21  Q.  Now, Mr. Brasfield, referring your attention to another

22  case, you looked at a case called People v. James Crockett; is

23  that true?

24  A.  Yes, I did.

25  Q.  And this is a document you prepared as attachment F to

1   your report with respect to the allegedly missing from

2   criminal defense file pages, true?

3   A.  That's correct.

4   Q.  And this file had a hundred and -- this investigative file

5   had 159 pages, right?

6   A.  That's correct.

7   Q.  And by the way, Mr. Brasfield, you refer to these as the

8   basement files, correct?

9   A.  Street files, basement files.

10  Q.  Mr. Brasfield, isn't it true that these files were put

11  into the Chicago Police Department, a basement for storage

12  purposes, in the year 2012 when the CPD reorganized its areas

13  from Areas 1, 2, 3, 4, and 5 to Areas North, Central, and

14  South, right?

15  A.  I have no personal knowledge as to how they were moved or

16  who moved them or why they were moved.

17  Q.  And, Mr. Brasfield, I'll represent to you that in the

18  missing from criminal defense file section of your report

19  here, that there's approximately 107 pages that you contend

20  are missing, right?

21  A.  I haven't added them up, but that looks to be a fair

22  amount.

23  Q.  And included in this list of documents you say are missing

24  are supplementary reports, all of the general progress

25  reports, correct?

1   A.  I'm sorry.  Would you ask the question again?

2   Q.  Sure.

3         Included in the documents you say are missing are a

4   number of supplementary reports and a number of general

5   progress reports, right?

6   A.  That's correct.

7   Q.  And, Mr. Brasfield, I'm going to show you Plaintiff's

8   Exhibit 359, which is the criminal defense file that

9   plaintiff's counsel provided to you for this case that brought

10  you here.

11        And, Mr. Brasfield, I put flags on that exhibit which

12  I provided to you which identified a couple of police reports

13  that are in this file.

14  A.  All right.

15  Q.  And if I could point you out the pages.  The first page is

16  Bates stamped 43388.  And then the next one, the next report,

17  would be 43392.  And then there's also an arrest report for

18  Mr. Crockett at 43416.

19        Now, in reference to those pages, Mr. Brasfield,

20  isn't it true that there aren't any other Chicago Police

21  Department supplementary reports or arrest reports in that

22  particular file in front of you?

23  A.  Without going through the several hundred pages, I had no

24  way of telling.

25  Q.  Okay.

1    MR. NOLAND:  Laura, could you pull up
2  Plaintiff's 359, page 43647.
3  BY MR. NOLAND:
4  Q.  Now, Mr. Brasfield, this was the State -- the People of
5  the State of Illinois' answer to discovery in this Crockett
6  case that was provided to you, true?
7  A.  I'm having difficulty answering some of your questions
8  here.  I'm taking you at your word and what you are putting in
9  front of me, but I don't specifically recall this document as
10  we're speaking.  It seems to be argumentative, but...
11  Q.  Sir, if you don't understand one of my questions or if you
12  think I'm being too argumentative, please let me know, and
13  I'll rephrase it.
14  A.  No.  Just ask your question for me, please, again.
15    MR. NOLAND:  Laura, can you just show Mr. Brasfield
16  the whole document so he can see.
17  BY MR. NOLAND:
18  Q.  Do you know what this -- first of all, this page, this
19  document, was given to you, right?
20  A.  It may have been, yes.
21  Q.  Well, in the bottom right-hand corner here, you have the
22  Bates range of the criminal defense files, and this page
23  starts with 43647.  This was in a Bates range that you
24  represented in your report that you had received, true?
25  A.  Yes, yes.

Brasfield - cross by Mr. Noland

2584

1  Q.  Okay.

2         MR. NOLAND:  All right, Laura.  Can you go back to

3  the whole document so Mr. Brasfield can see it.

4  BY MR. NOLAND:

5  Q.  Mr. Brasfield, do you know what this document is?

6  A.  It's labeled an answer to discovery from the -- it's the

7  People of the State of Illinois, begins, and then three

8  defendants here.

9  Q.  Do you know what the significance of this document is in

10  the criminal courts here in Cook County?

11  A.  It would be a -- probably an appeal situation.

12  Q.  Appeals?

13  A.  I don't know.

14  Q.  You don't know what this document is.

15         Sir, I'll represent to you that this document -- and

16  you let me know if you disagree -- that the People, the

17  prosecutors in the case, are required during the case to

18  identify their witnesses and other information on the answer

19  to discovery to provide that to the criminal defense attorney

20  in advance of the trial?

21  A.  Yes, I understand.

22  Q.  Is your recollection refreshed?

23  A.  Yes.

24  Q.  Thank you.

25         And, sir, your understanding is that the names of the

1   witnesses -- civilian witnesses and police officers that the

2   prosecutors get and put in these answers to discovery are

3   based upon the police reports that are supplied to them by the

4   police department?

5   A.  That would be one source, yes.

6   Q.  First of all, we have several witnesses:  Kevin McElroy,

7   Heywood Bobo, and Tyrone Carr on the first page.  Do you see

8   that?

9   A.  Yes.

10          MR. NOLAND:  Can you go to the next page, Laura.  And

11  can you highlight -- just pull out the whole page.

12  BY MR. NOLAND:

13  Q.  So, Mr. Brasfield, I'm going to represent to you that

14  those couple of police reports in the file, the criminal

15  defense file that's in front of you right now, that if you get

16  all the names of witnesses and police officers in those

17  reports, the only ones that could be found are the highlighted

18  names on this answer to discovery.  Okay?  I'm just going to

19  represent that to you.  I know you had -- you didn't do this

20  analysis, did you?

21  A.  I'm sorry.  You got two questions going on here.

22  Q.  Okay.  Sorry.

23          MR. LOEVY:  Your Honor, we accept the representation.

24          THE COURT:  Ask another question.

25  BY MR. NOLAND:

1  Q.  Did you conduct any analysis of the answer to discovery on

2  this Crockett case to see whether all the names in here could

3  have been derived from the police reports that are in the

4  criminal defense file provided to you?

5  A.  No.  As I testified, I have looked at what material was --

6  the pages that were in the criminal defense files.

7  Q.  Mr. Brasfield, assume hypothetically that these names that

8  I have highlighted are the only names that are found in that

9  criminal defense file that show up on this answer to discovery

10  that the People filled out and gave to the criminal defense

11  attorney --

12         MR. LOEVY:  Your Honor, we do object to the

13  assumption.  It hasn't been supplied -- we have no way to

14  check it.

15         THE COURT:  Finish the question.

16  BY MR. NOLAND:

17  Q.  Accepting that -- I'm asking you to accept that

18  hypothetical.  Okay?  And that the other names that are not

19  highlighted on this document are found nowhere in that

20  criminal defense file in front of you.  Okay?  Those are the

21  hypothetical facts I'd like you to assume.

22  A.  All right.

23  Q.  Isn't it true, sir, that this would be evidence that the

24  criminal defense file supplied to you by the plaintiff's

25  counsel is incomplete because the state's attorneys clearly

1  would have gotten these names from police reports supplied to
2  them by the police department?
3          MR. LOEVY:  Objection --
4          THE COURT:  Is this going to be connected up with
5  another witness?  That's my question to you.
6          MR. NOLAND:  It would be through our expert.
7          THE COURT:  Okay.  Then I'll overrule the objection.
8          I will just remind the jury that a question is not
9  evidence.
10         All right.  Go ahead and answer.
11         THE WITNESS:  That your hypothetical, I would assume
12  that because there are names here, they must have come from an
13  investigative file.  Is that your question?
14  BY MR. NOLAND:
15  Q.  That's the point.  Would you agree with that?
16  A.  In your hypothetical, yes.
17  Q.  Thank you.
18         Because the prosecutors aren't -- I mean, in your
19  experience, they're not just making up names out of whole
20  cloth as having relevant information to an investigation and
21  supplying it to the criminal defense attorney, correct?
22         MR. LOEVY:  Objection, your Honor.
23         THE COURT:  What's the basis for the objection?
24         MR. LOEVY:  Form of the question and foundation and
25  argumentative.

1          THE COURT:  Sustained.

2    BY MR. NOLAND:

3    Q.  So presuming my hypothetical is true, Mr. Brasfield, which

4    you just acknowledged, that would mean that the information on

5    this chart that was supplied to you and on your attachment F

6    that you typed out would be inaccurate because the criminal

7    defense attorney actually had other police reports that are

8    not in that file in front of you, correct?

9    A.  You would have to have the state's attorney's file to

10   determine that.

11   Q.  Okay.

12          MR. NOLAND:  Judge, could I switch to the ELMO,

13   please?

14          THE COURT:  Sure.  There you go.

15   BY MR. NOLAND:

16   Q.  I'm showing the witness what's been marked as Defense

17   Exhibit 203, page 7.

18          What is this document, Mr. Brasfield?

19   A.  A subpoena duces tecum.

20          MR. LOEVY:  Your Honor, we do object to this state's

21   attorney's file that he hasn't seen.  No foundation for this

22   witness, if that's what this is.

23          THE COURT:  Well, I don't know what it is, and I'll

24   wait until I get a question.

25   BY MR. NOLAND:

Brasfield - cross by Mr. Noland

2589

1  Q.  Actually --

2          THE COURT:  Go ahead.  Just ask a question.

3  BY MR. NOLAND:

4  Q.  Sir, this is a document from the investigative files that

5  plaintiff's counsel supplied to you, correct?

6          MR. LOEVY:  Then I stand corrected, your Honor.

7          THE COURT:  Okay.  There you go.

8          MR. LOEVY:  Thank you.

9  BY MR. NOLAND:

10  Q.  And, Mr. Brasfield, isn't this a document that you said

11  was missing from the criminal defense attorneys' files that

12  were given to you?

13  A.  Given the volume of material here, I would have to take

14  the time to look and cross-check.

15          If -- again, to move things, if you're telling me

16  that that's what's in there, then I'll accept it as an honest

17  question.

18  Q.  I appreciate that for all of us, Mr. Brasfield.

19          Sir, this is a subpoena from the --

20          MR. NOLAND:  Laura -- I'll just point it right here.

21  BY MR. NOLAND:

22  Q.  -- from a man named John Dillon of the State's Attorney's

23  Office, correct?

24  A.  Yes.

25  Q.  And this is a document that on this spreadsheet here that

1  the plaintiff's counsel told you was missing or -- and you

2  accepted was missing investigative material, correct?

3  A.  That's -- yes, I assume that's correct.

4  Q.  Mr. Brasfield, a subpoena at the Cook County State's

5  Attorney's Office that they created can't be missing

6  investigative material that the police department withheld

7  from the State's Attorney's Office, correct?

8  A.  I'm sorry.  You'll have to ask that again.

9  Q.  A subpoena that the State's Attorney's Office prepared

10 themselves is not investigative material of the police

11 department; isn't that true?

12 A.  That would be -- normally, that would be the case.

13 Q.  Under what -- and the police department can't withhold

14 from the prosecutor a document that the prosecutor created,

15 correct?

16 A.  If a police agency receives copies of legal documents,

17 including subpoena duces tecum or arrest warrants or whatever,

18 those are generally included in the investigative file, in my

19 experience.

20 Q.  And the prosecutor has a copy -- in your experience, the

21 prosecutor has a copy of the subpoena that he wrote and sent

22 to the police department, right?

23 A.  You would hope so.

24 Q.  And I'll show you another one of these pages, or another

25 subpoena.

HOOD 035626
Weston 050643

Brasfield - cross by Mr. Noland

2591

1  A.  I recognize the name there.

2  Q.  I didn't even catch that.

3        THE COURT:  Different Nolan, right?

4        MR. NOLAND:  That's a different Nolan, yeah.

5        THE COURT:  Yours has a D.

6        THE WITNESS:  Sorry about that.

7  BY MR. NOLAND:

8  Q.  I'm showing you what's been marked as Defense Exhibit

9  287079.  This is another page, and I'll represent to you that

10  it's on this spreadsheet that plaintiff's attorneys and

11  yourself says is missing investigative material from the

12  police department.  Okay?

13  A.  Yes.

14  Q.  So this subpoena here from my namesake Daniel Nolan,

15  assistant public defender, on behalf of the defendant, Tyrone

16  Brown, is a subpoena from the public defender to the police

17  department, correct?

18  A.  Yes.

19  Q.  And, once again, a subpoena created by the public defender

20  is not investigative material of the police department, true?

21  A.  I found a number of these types of documents in the

22  basement files.

23  Q.  And you included them on this spreadsheet, or you and the

24  plaintiff's counsel, as missing investigative material of the

25  police department, isn't that true, what's on this

HOOD 035627
Weston 050644

1  spreadsheet?

2  A.  That's correct.

3  Q.  And I've got several more subpoenas, and there are a bunch

4  of subpoenas that you included just like these ones on this

5  chart, correct?

6  A.  That's correct.

7           MR. LOEVY:  Object to relevance, your Honor.

8           THE COURT:  Overruled.

9  BY MR. NOLAND:

10  Q.  Mr. Brasfield, some more documents you include on your

11  chart are a series of Illinois State Crime Lab reports from

12  several of the files; is that true?

13  A.  Yes.

14  Q.  In this exhibit I'm showing you on the ELMO, it is marked

15  Defendants' 246, page 20.  And there is a cc in the bottom

16  left of this document, correct?

17  A.  Yes.

18  Q.  And who is the cc to?

19  A.  Assistant State's Attorney David Winter.

20  Q.  And there are -- I have several pages, approximately 10

21  or 15 of similar Illinois State Police reports in my hand.

22  You would agree that there's several Illinois State Police

23  reports with cc's to the prosecutors that you've included on

24  this table as missing investigative material of the Chicago

25  Police Department, true?

Brasfield - cross by Mr. Noland

2593

1    A.  That's correct.

2    Q.  Mr. Brasfield, what's a cc mean?

3    A.  In the old days, a carbon copy; but a copy.

4    Q.  That means that a copy of this report is being supplied to

5    the assistant state's attorneys --

6    A.  It was intended to be routed there, yes, that's correct.

7    Q.  And isn't it true, Mr. Brasfield, you don't have any

8    knowledge that the Illinois State Police -- and by the way, is

9    the Illinois State Police the same thing as the Chicago Police

10   Department?

11   A.  No.

12   Q.  The Illinois State Police has a crime lab is your

13   understanding, right?

14   A.  That's correct.

15   Q.  And in Chicago, at least as of 1995 and onward, Illinois

16   State Police handles the forensic -- most of the forensic

17   responsibilities for crimes occurring in Chicago, right?

18   A.  That's my understanding.

19   Q.  And do you have any evidence, Mr. Brasfield, that the

20   Illinois State Police scientists, when they say that they're

21   cc'ing a prosecutor, are lying?

22   A.  No.  It would be my belief and understanding that if it

23   said that it's been routed there, that's where it would be

24   routed.

25   Q.  But, again, these are materials that you were saying --

HOOD 035629
Weston 050646

2594

1          MR. LOEVY:  Objection, your Honor, asked and

2    answered.

3          THE COURT:  Sustained.

4    BY MR. NOLAND:

5    Q.  Showing you the next group of documents, Mr. Brasfield.

6    This would be Exhibit 266, page 130.  And it's a several-page

7    document.  I'm just showing the first page.

8          Mr. Brasfield, isn't it true that this document I am

9    showing you is a felony review blue back from the State's

10   Attorney's Office?

11   A.  I think that's the common terminology they use.

12   Q.  And, once again, Mr. Brasfield, I'll represent to you that

13   this document is on the spreadsheet that the plaintiff's

14   attorneys provided, gave to you, and that you guys identified

15   as missing investigative material.  Okay?

16   A.  Yes.

17   Q.  As with the subpoena, Mr. Brasfield, the Chicago Police

18   Department can't withhold documents from the State's

19   Attorney's Office that the State's Attorney's Office actually

20   created, right?

21   A.  They can withhold documents.

22   Q.  So you're saying this document --

23         THE COURT:  I think it was an issue with the phrasing

24   of your question.

25         MR. NOLAND:  Thanks, Judge.

1  BY MR. NOLAND:

2  Q.  Isn't it true that the prosecutors would be in possession

3  of their own felony review blue back, right?

4  A.  I would agree with that, yes.

5  Q.  And so this isn't a document that the police department

6  could be withholding from the prosecutors because the

7  prosecutors have it, right?

8  A.  From the prosecutors.  But if it's subpoenaed from another

9  source, then that would be a different matter.

10  Q.  You have no evidence with respect to that particular

11  document that the prosecutors withheld it from the criminal

12  defense attorney, do you?

13  A.  No, I do not.

14  Q.  And you don't have any evidence that there was some

15  subpoena that the police department didn't comply with and not

16  provide that particular document to the criminal defense

17  attorney, do you?

18  A.  Not in this particular case, no.

19  Q.  Thank you.

20        Now, Mr. Brasfield, I'm going to show you another

21  document, a representative document.  This one has got the

22  Bates stamp, but Defendants' 244, page 120.  This is a

23  statement of Jerome Holmes, correct?

24  A.  Yes.

25  Q.  And, Mr. Brasfield, there are dozens and dozens of pages

Brasfield - cross by Mr. Noland

2596

1  in the criminal defense attorneys' files that have been

2  identified -- strike that.

3          There's dozens and dozens of pages from the

4  investigative files that you and the plaintiff's counsel have

5  identified as missing investigative material on this

6  spreadsheet, correct?

7  A.  Yes.

8  Q.  And these -- this page in front of you that's up on the

9  screen in front of jury and similar documents, this is a

10  document created by the assistant state's attorney from felony

11  review who goes to the police department and takes statements

12  from witnesses; isn't that true?

13          MR. LOEVY:  Objection, foundation.

14          THE WITNESS:  That's correct.

15          THE COURT:  Overruled.

16          THE WITNESS:  Correct.

17          THE COURT:  The answer can stand.

18  BY MR. NOLAND:

19  Q.  And isn't it true, Mr. Brasfield, that the prosecutor --

20  the assistant felony review prosecutor who goes out to the

21  police department and takes statements like these brings the

22  originals of those statements back to his or her office after

23  taking them, correct?

24  A.  I have no independent knowledge of how that works.

25  Q.  Okay.  But if -- assuming hypothetically that is the way

HOOD 035632
Weston 050649

1  it works, then the prosecutors would be in possession of all

2  of these documents as well, any --

3          MR. LOEVY:  Objection to the relevance, your Honor.

4  Every document is handled that way?

5          THE COURT:  When you say "all of these," you need to

6  specify what "all of these" are.

7          MR. NOLAND:  Thank you, Judge.

8          THE COURT:  You mean similar types of documents like

9  this one?

10          MR. NOLAND:  Yes.  The Court phrased it a lot better

11  than I did.

12          THE WITNESS:  That if it is the practice of the

13  state's attorney or the prosecutor that generates these

14  documents and they take them back to their office, they would

15  be in possession of them, if that's your question.

16  BY MR. NOLAND:

17  Q.  That is my question.

18          So, once again, these wouldn't be documents that the

19  police department withheld from the prosecutors because the

20  prosecutors created them and have them, right?

21  A.  I can't agree with that.

22  Q.  It's the prosecutor's duty in the criminal justice system

23  to provide the materials the prosecutor receives from the

24  police on the case to the criminal defense attorney, right?

25  A.  That's correct.

HOOD 035633
Weston 050650

Brasfield - cross by Mr. Noland

2598

1  Q.  So if the prosecutors had these statements, it was

2  incumbent upon -- strike that.

3        If the prosecutors had these statements that the

4  prosecutor -- like these felony review statements that the

5  prosecutor prepared, it would be the prosecutor's duty to

6  provide that to the criminal defense attorney, right?

7  A.  I have to answer that question in the context of what I

8  examined in that if a centralized homicide investigation --

9        MR. NOLAND:  Judge.

10       THE WITNESS:  -- contains documents --

11       THE COURT:  You have to cut him off at the beginning.

12       Finish the answer.

13 BY MR. NOLAND:

14 Q.  Please, Mr. Brasfield.

15       THE COURT:  You can finish the answer.

16       THE WITNESS:  The police department should turn over

17 everything that they have to the State's Attorney's Office.

18 There will be duplicative items in there.  There may be

19 material that the state's attorney already has, but if you get

20 to a system where you have to pick and choose, well, I think

21 the prosecutor already has this so I don't need to send it,

22 the next step is, well, they probably have this, but I don't

23 need to send it.

24       The simple -- keep-it-simple process is send

25 everything that you have in your files to the prosecutor.

Brasfield - cross by Mr. Noland

2599

```
 1  BY MR. NOLAND:
 2  Q.  Mr. Brasfield, the point is that it's the duty of the
 3  prosecutor to provide it to the criminal defense attorney,
 4  correct?
 5  A.  Yes.
 6          MR. LOEVY:  Objection, asked and answered, your
 7  Honor.
 8          THE COURT:  Overruled.  He can answer.
 9  BY MR. NOLAND:
10  Q.  So this would be evidence that the criminal defense files
11  you were supplied are incomplete because you didn't find these
12  felony review state's attorney's documents in those criminal
13  defense files; isn't that fair?  Yes or no?
14  A.  I --
15  Q.  Yes or no, sir?
16  A.  Ask me the question once more, please.
17  Q.  Isn't it fair that if the -- these documents -- these
18  felony review witness statements that we're talking about,
19  you're saying that some of them are -- you didn't find them in
20  the criminal defense files, right?
21  A.  That's correct.
22  Q.  So isn't it, in fact, true, sir, that that would be some
23  evidence that the criminal defense files supplied to you are
24  incomplete because it's the prosecutor's responsibility to
25  provide those statements in the prosecutor's possession to the
```

Brasfield - cross by Mr. Noland

2600

1   criminal defense attorney?  Isn't that fair?

2   A.  As I testified --

3   Q.  Isn't that fair?

4   A.  Yes.

5   Q.  Thank you.

6          Showing the witness Exhibit Defense 210, page 58.

7   Mr. Brasfield, this is another document -- strike that.

8          What is this document?

9   A.  It's a post mortem examination report.

10  Q.  It's the autopsy?

11  A.  It's the autopsy report.

12  Q.  The autopsy of the murder victim in this particular case,

13  right?

14  A.  Yes.

15  Q.  And there's a number of post mortems that you identify on

16  this table and on -- as missing investigative material from

17  the Chicago Police Department, right?

18  A.  Yes.

19  Q.  And are there -- are Chicago police officers doing the

20  post mortem?

21  A.  They should be attending them.

22  Q.  Okay.  Are Chicago police officers writing these reports?

23  A.  No.

24  Q.  These reports are done by the coroner, right?

25  A.  That's correct.

Brasfield - cross by Mr. Noland

2601

1  Q.  And, Mr. Brasfield, wouldn't you expect that in any murder

2  case, that a minimally competent criminal defense attorney

3  would make sure to have the post mortem report on the cause of

4  death before that criminal defense attorney defended their

5  client in the courtroom?  Wouldn't you expect that?

6  A.  I would expect that.

7  Q.  And if they didn't have that post mortem, wouldn't you

8  expect that they would try to get it?  True?

9  A.  I would expect that to be the case.

10         MR. LOEVY:  Objection to relevance, your Honor.

11         THE COURT:  Overruled.  It goes to weight.

12  BY MR. NOLAND:

13  Q.  I'm not going to put these on the screen because they are

14  crime scene photographs that you have contended are missing

15  from the criminal defense attorney files.  Just as a

16  representative sample, I'm showing you a stack that's about 3

17  or 4 inches thick, and I'll represent to you that these are

18  crime scene photographs on this table that you and the

19  plaintiff's attorneys have prepared and suggested is missing

20  investigative material.  Okay?

21  A.  Yes.

22  Q.  Do you accept that representation?

23  A.  Yes.

24  Q.  Same question on the crime scene photographs, sir.

25  Wouldn't you expect that a criminal defense attorney,

1  minimally competent, would obtain crime scene photographs of

2  the dead bodies and the crime scene before they're going to

3  march into a courtroom before a jury and try to defend that

4  case?  Wouldn't you expect that?

5  A.  I would --

6  Q.  Yes or no?  Yes or no, sir?

7  A.  Yes, with an explanation.

8  Q.  And wouldn't you expect that the prosecutor needs to

9  prove -- one of the things a prosecutor needs to prove is that

10  somebody -- in a homicide case, somebody was killed, right?

11          MR. LOEVY:  Objection to relevance, your Honor.

12          THE WITNESS:  Yes.

13          THE COURT:  Overruled.

14  BY MR. NOLAND:

15  Q.  And wouldn't the way to do that, you don't bring the body

16  in -- the dead body into the courtroom, do you, sir?

17  A.  Not under normal circumstances, no.

18  Q.  And so the way it's done is that photographs of the

19  victims are shown to the jury, just like this jury has seen in

20  this case, right?

21  A.  Depending on the judge's ruling, yes.

22  Q.  Well, the judge might exclude them in case they're too

23  gruesome, right?

24  A.  That's one possibility, yes.

25  Q.  But the point is is that the prosecutor has to get these

1  crime scene photographs before the trial on a murder case in

2  order to prove their case in court; isn't that fair?

3  A.  That would be part of a criminal defense attorney's

4  process, I would think.

5  Q.  And the prosecutor, right?

6  A.  I would hope.

7  Q.  May I have them?

8  A.  Please.

9  Q.  But, again, you're contending that all these pages are

10  missing investigative materials from the criminal defense

11  files, right?

12  A.  I'm contending that they were not in the criminal defense

13  files that I looked at.

14  Q.  And that's it, right?  That's all you're doing is that you

15  had a criminal defense attorney file on the one hand, you had

16  a police investigative file on the other, and all you're

17  saying is, well, this piece of paper is not in this piece of

18  paper, so I'll put it on this chart, right?

19  A.  That's correct.

20  Q.  And you're making some type of -- really not thinking at

21  all of whether or not that document in 99.9 percent likelihood

22  was in the possession of that prosecutor at the time of the

23  trial.  You didn't take that into account at all, did you?

24      MR. LOEVY:  Objection to the suggestion that 99

25  percent, your Honor.  We have been accepting the

1   representations, but we don't accept that one.

2            THE COURT:  Okay.  I understand the objection.

3            Sustained as to the form of the question.

4   BY MR. NOLAND:

5   Q.  Moving on, Mr. Brasfield, Mr. Loevy talked to you about --

6   and I think you characterized it as a mistake with respect to

7   the Anima case.  Do you remember that?

8   A.  Yes.

9            THE COURT:  Let's pause.  Let's take our

10  mid-afternoon break right here.  We are going to break for 10

11  minutes.  I will be right back out.

12     (The jury leaves the courtroom.)

13            THE COURT:  So since you are being questioned by the

14  other side's lawyer, you can't discuss your testimony, but you

15  can take a break.

16            THE WITNESS:  Thank you, sir.

17     (Short break.)

18     (The jury enters the courtroom.)

19            THE COURT:  Okay.  Everybody can have a seat.

20            Mr. Noland, you can go ahead.

21            MR. NOLAND:  Thank you, your Honor.

22  BY MR. NOLAND:

23  Q.  Mr. Brasfield, to pick up what we were talking about, you

24  did a side-by-side comparison of the police investigative file

25  on the one hand and then the criminal defense attorney's file,

Brasfield - cross by Mr. Noland

2605

1  and then the documents that were not from the investigative

2  file that were not in the criminal defense file were labeled

3  as missing investigatory --

4  A.  That's correct.

5  Q.  So the point I was making, you weren't doing any

6  qualitative analysis of the documents to think, you know what?

7  This document more than likely would have been in the criminal

8  defense attorney's files so that the criminal defense

9  attorneys' files were given to me have to be complete.  You

10  weren't making that analysis, correct?

11  A.  No.

12  Q.  Mr. Brasfield, I'd like to talk to you about the Anima

13  case that Mr. Loevy brought up with you.

14        MR. NOLAND:  Laura, can you bring up Plaintiff's

15  Exhibit 306, page 19.

16        Thank you, Judge.

17  BY MR. NOLAND:

18  Q.  Mr. Brasfield, I'm showing you the portion of the Anima

19  file that I showed you at your deposition when I brought this

20  issue to your attention.  Do you remember that?

21  A.  Yes, I do.

22  Q.  And what we had talked about at the deposition is that you

23  were contending in your report that there were 110 pages from

24  the police investigative file that were not in the criminal

25  defense attorney's file, right?

1  A.  As reflected in the spreadsheet, yes.

2  Q.  And that we had actually found in there that about a

3  hundred of those pages actually were in the criminal defense

4  attorney's files and you guys had missed it, right?

5  A.  That there was a typographical error in the spreadsheet.

6  Q.  And so you testified that that was a typographical error.

7  I'm showing you Plaintiff's Exhibit 306, page 19, up on the

8  screen.  And this is the document that is attachment F to your

9  report, right?

10  A.  Yes.

11  Q.  And you typed up this report personally, right?

12  A.  I did.

13  Q.  And it was while you were doing the file-by-file

14  comparison, right?

15  A.  Yes.

16  Q.  And I've highlighted for you that I'll represent to you

17  the pages that you said were not in the criminal defense

18  attorney's file that, in fact, were and that the typographical

19  error -- mistake had been made.  Okay?

20  A.  That's correct.

21  Q.  You typed in Lee's report, page 82189-91, correct?

22  A.  Correct.

23  Q.  And that's under the phrase missing from criminal defense

24  attorney file.

25           MR. NOLAND:  Could you highlight that one too?

1      THE WITNESS:  That's correct.

2   BY MR. NOLAND:

3   Q.  And then you typed in arrest report 82192, correct?

4   A.  Correct.

5   Q.  And then you typed in computer screenshot, correct?

6   A.  Yes.

7   Q.  And then you typed in criminal history report, and you

8   gave the number 82194, right?

9   A.  I typed all of those.

10  Q.  And that number, 82194, is the number of the basement file

11  that you couldn't find in the criminal defense attorney's

12  file, right?

13  A.  That was not on the spreadsheet, yes.

14  Q.  And so what you -- and you said that you were conducting a

15  case-by-case comparison yourself, right?

16  A.  Yes.

17  Q.  Now, Mr. Brasfield, what's up on the screen before the

18  jury, that's quite a long typo, isn't it?

19  A.  Well, the typo represents, as I've said, on the

20  spreadsheet itself, I had that it was missing Bates pages 173

21  to 2-something, and, in fact, it should have been 2-something

22  to 2-something.  But it's --

23  Q.  The typo was on the spreadsheet, right?

24  A.  It is an error.  I readily admit that.

25  Q.  The typo was on the spreadsheet, correct?

Brasfield - cross by Mr. Noland

2608

1  A.  Yes.

2  Q.  And when you were doing your case-by-case analysis then

3  and you typed in LEADS report 82189 and so on and so on, you

4  were representing that you were looking at those two files

5  side by side and you were confirming that those pages were not

6  in the Anima file, right?

7  A.  That's what I should have been doing, yes.

8  Q.  But for this particular case, it's pretty evident,

9  Mr. Brasfield, you didn't do that case-by-case analysis at

10 all, did you?

11 A.  That's not correct.  I did.

12 Q.  Mr. Brasfield, if you did a case-by-case analysis yourself

13 of this Anima case, how could you possibly have included all

14 of the information that's highlighted on the jury that's in

15 front of them?  How could that have happened?

16 A.  I hate to admit it, but I made a mistake.

17 Q.  So you thought that you saw a LEADS report in the criminal

18 defense file, right?  And you typed that in?

19 A.  I typed it in.  This is my magic fingers on the computer.

20 I did it.

21 Q.  And then you thought that you saw that arrest report 82192

22 in that file, and you typed it in, right?

23 A.  That's correct.

24 Q.  And you thought that you saw that computer screenshot in

25 that criminal defense file, and you typed that one in?

HOOD 035644
Weston 050661

1  A.  To each and every one of those, yes.

2  Q.  So on each and every one of those, as you're sitting there

3  just comparing the files, one next to the other --

4          MR. LOEVY:  Judge, asked and answered, your Honor.

5          THE COURT:  Sustained.

6  BY MR. NOLAND:

7  Q.  Mr. Brasfield, isn't it, in fact, true that you didn't do

8  any case-by-case comparison of any of these cases.  You just

9  accepted this spreadsheet that the plaintiff's attorneys gave

10 to you and regurgitated it onto your paper?

11 A.  That is not correct.

12         MR. NOLAND:  Judge, if I may go back the ELMO,

13 please?

14         THE COURT:  Okay.

15 BY MR. NOLAND:

16 Q.  Mr. Loevy had talked to you about something called a court

17 attendance report, and you acknowledged with Mr. Loevy that

18 you included on this table and the plaintiff's attorneys did a

19 number of these court attendance sheets as missing

20 investigative material, right?

21 A.  That's correct.

22 Q.  And just at the top, that's a court attendance report for

23 a Detective Harrington, who was required to show up in court

24 for this particular case, right?

25 A.  That's correct.

Brasfield - cross by Mr. Noland

2610

1  Q.  And I think you acknowledged that this is a purely

2  administrative document that is not investigative in nature,

3  correct?

4  A.  No, I think what I said was is that it's intended as an

5  administrative document but could be used of some

6  investigative value to establish either a lead as to who might

7  have been possibly involved in the case that was not disclosed

8  or to either provide an alibi or discredit an alibi.

9  Q.  Mr. Brasfield, I just highlighted what it states on there.

10  It says, Trial in progress, correct?

11  A.  Yes.

12  Q.  So this is a detective actually showing up in court while

13  the trial is proceeding.  That's what it appears to be, right?

14  A.  Yes.

15  Q.  And so is it your testimony that you want the Chicago

16  Police Department detectives and officers when they show up in

17  court and do their paperwork proving that, that they're

18  supposed to fill out a court attendance report and turn it

19  into their supervisors, right, so they can get paid?

20  A.  That's correct.

21  Q.  And then you want them to also walk over to the criminal

22  defense attorneys and say, hey, by the way, I know you saw me

23  in court, but here's a document showing that, yeah, that was

24  me?  Is that what you're saying?

25  A.  No, that's not what I'm saying.  I'm saying --

Brasfield - cross by Mr. Noland

2611

1  Q.  All right.  Thank you.

2  A.  -- it should be included in the investigative --

3  centralized investigative file.

4  Q.  But the point is it's not created until the time of trial,

5  so it couldn't have been produced to the criminal defense

6  attorney because they're at trial, it's created at trial,

7  right?

8  A.  It's part of the record.

9  Q.  Mr. Brasfield, I'm showing you a packet of documents from

10 the -- relative to the murder of Melvin Rodriguez, which is

11 one of the cases.  This is a document in a series of documents

12 you stated are missing investigative material.  The Bates

13 number is D-221-003.  And I'm going to show you the date of

14 this document, May 2000.  And I'm going to represent to you

15 that -- and I'll show it to you, if you'd like -- that this

16 packet all deals with investigation of a particular homicide

17 in the year 2000.

18        Do you want to take a look at that?

19 A.  I have done a quick scan of it, yes.

20 Q.  Okay.  And on the first page, does that indicate when the

21 homicide occurred?

22 A.  I don't see it.  On the first page, right?

23 Q.  I thought I saw it on there.  If I could take a look at

24 it?

25 A.  It may be.  I just...

1  Q.  Just right here, the above-named prisoner is wanted for

2  the investigation of a homicide from 1 July 1985.  Do you see

3  that?

4  A.  Well, I see that.  I don't -- I'm not arguing with it.  It

5  just says, Investigation of a homicide from 1 July 1985.  If

6  that means that's when a homicide occurred.

7  Q.  Okay.  I'll represent to you, Mr. Brasfield, that this is

8  the Ruben Avalez -- I don't know if you remember that name --

9  the Ruben Avalez criminal defense attorney's file that the

10  plaintiff's counsel gave you and you put on your spreadsheet?

11  Do you remember that name?

12  A.  It's possible.  There were a lot of names.

13  Q.  Now, isn't it true, Mr. Brasfield, that the criminal

14  defense attorneys (sic) that the plaintiff's attorneys

15  supplied to you was relative to a trial of Mr. Ruben Avalez

16  that occurred in the mid-1980s?  Do you remember that?

17  A.  I would have to look at my documents; but, again, if what

18  you're telling me is correct, then I'll just say yes.

19  Q.  Okay.

20  A.  Otherwise, if this was a criminal trial, I would be

21  saying, I have to look at my records.

22  Q.  I think we all appreciate that.  Thank you.

23  A.  All right.

24  Q.  And the point I'm making is that the file given to you was

25  from a criminal prosecution in the mid-1980s and the packet of

Brasfield - cross by Mr. Noland

2613

1   documents in front of you which you state are missing from the

2   criminal defense attorney's file were created about 15 years

3   later.  Okay?

4   A.  All right.

5   Q.  Do you have that?

6           Mr. Brasfield, isn't it true that documents

7   created 15 years after the fact couldn't have been withheld

8   from a criminal defense attorney 15 years before in 1987?

9   A.  Sure.

10  Q.  So if you had thought about it at all before putting it on

11  this spreadsheet in your report, you would have said, wait a

12  minute, these documents were created after the fact, so

13  there's no way they could have been in the criminal defense

14  attorney's file, correct?

15  A.  No, that's not correct.  What I tried to do here with this

16  spreadsheet is to provide information that both sides can take

17  a look at, and you can weigh the value, you can evaluate what

18  you want with it.

19          I strictly looked at what was in the investigative

20  file and what was in the criminal defense file.  That's just

21  the objective process.

22  Q.  Thank you.

23          Without any thought one way or the other of whether

24  or not the stuff, in fact, was withheld by the police from the

25  criminal defense, right?  Am I correct?

1       I'm sorry.  I didn't get the answer.

2   A.  I'm sorry.  Ask me the question once more.

3   Q.  And that is without any thought whatsoever before stating

4   that it's missing investigative material in your report that,

5   in fact, it was withheld from the police department from the

6   criminal defense attorney, correct, without thinking about

7   that at all?

8   A.  That's correct.

9   Q.  Thank you.

10      In fact, you don't have any personal knowledge on any

11  of these 50 cases at issue that any of the documents were

12  withheld from the Chicago Police Department from these

13  criminal defense counsel, correct?

14  A.  I can draw some generalized inferences, which I did.

15  Q.  I'm asking you, you said you don't have any specific

16  knowledge that any specific piece of paper in any of these 50

17  or 51 cases was actually withheld by the police department

18  from anybody in the criminal process, true?

19  A.  And I stated --

20  Q.  That's it.  Yes or no, sir?

21  A.  Yes.  I've stated that in my report.

22  Q.  I'm sorry.  Did you say yes?

23          THE COURT:  Okay.  Enough.  Next question.

24          MR. NOLAND:  Thanks, Judge.

25  BY MR. NOLAND:

Brasfield - cross by Mr. Noland

2615

1  Q.  Mr. Brasfield, you've talked about to/from memoranda?

2  A.  Yes.

3  Q.  And you identified some to/from memoranda in your report

4  as missing from the file -- files.

5          Showing you a series of these.  One is Exhibit

6  D230-129.  And you will see this is a September 23rd, 2014,

7  subpoena in this particular case; is that right?

8  A.  Yes.

9  Q.  And so similar to my last question, Mr. Brasfield, and

10  there is a packet of these, these documents that were created

11  well after the criminal defense attorney's files -- or well

12  after the criminal trials could not have been in the criminal

13  defense attorney's files at the time of the criminal

14  prosecutions, correct?

15  A.  But they also represent --

16  Q.  Is that true, sir?

17  A.  To your specific question, which is -- yes.

18  Q.  But another specific question, you put them on the table

19  and in your report as missing investigative material, correct?

20  A.  That's correct.

21  Q.  Now, Mr. Brasfield, you talked about the Jones and Palmer

22  case a little bit with Mr. Loevy, correct?

23  A.  Yes.

24  Q.  And you talked about the process by which special

25  order 83-1 went into place in about January 1983, correct?

Brasfield - cross by Mr. Noland

2616

1   A.  Yes.

2   Q.  And you talked about how then with the Court and the

3   plaintiff's attorneys, the special order was revised pursuant

4   to some of the Court's comments, and that was done four months

5   later in May of 1983 by the police department, correct?

6   A.  That's correct.

7   Q.  Mr. Brasfield, you've also talked about -- I think you

8   referenced something called a murder book, right?

9   A.  Yes.

10  Q.  So you've seen or at least in Seattle or some other

11  jurisdictions that investigative detectives would have a

12  murder book on a particular homicide, right?

13  A.  Yes.

14  Q.  Now, a murder book is simply another way of saying the

15  file on that case in that particular jurisdiction, right?

16  A.  That's police parlance, generally speaking, for that.

17  Q.  And certainly in that murder book, there could be

18  documents such as a crime lab-type document, they might have a

19  DNA analysis in the recent times, not in the old times, or

20  some type of other document that might have some source

21  documents elsewhere, correct?

22  A.  That's correct.

23  Q.  But if it was in the murder book and referenced in the

24  murder book, that the prosecutors and the criminal defense

25  attorneys would know, oh, hey, the crime lab did a report on

1  this case, it's right here in the file.  You know, maybe they

2  have some additional source documents I might want to get.

3  Correct?

4  A.  No, that's not correct.  My response to your original

5  question was physical evidence.  Obviously, you're not going

6  to have shells from a gun or blood spatter, clothing, but

7  you'll actually have a report from the crime lab.

8  Q.  Sir, in fact, if you had an example of, say, if the marine

9  patrol unit was involved in a particular case and there was a

10 reference to it in the murder book, that the prosecutor would

11 know, hey, you know, there could be some other documents over

12 at the marine patrol unit that I might want to grab; isn't

13 that true?

14 A.  Not in the types of murder investigations that I'm

15 familiar with.

16 Q.  Mr. Brasfield, at your deposition at page 201, line 9,

17 isn't it true that you were asked this question and gave this

18 answer:

19      "QUESTION:  So that the prosecutor would be able to

20 read that in the murder book, and then they could also contact

21 the marine patrol unit to see if they had any additional

22 documentation; is that correct?

23      "ANSWER:  That would be how -- that would be how it

24 would normally work."

25      MR. LOEVY:  Objection.

HOOD 035653
Weston 050670

Brasfield - cross by Mr. Noland

2618

1  BY MR. NOLAND:

2  Q.  That question was asked and that answer was given?

3  A.  I --

4          MR. LOEVY:  We object, your Honor.  It's not

5  impeaching.

6          THE COURT:  It's a question.  The objection is

7  overruled.

8          THE WITNESS:  I would have to see it in the context

9  of --

10         MR. NOLAND:  Sir --

11         THE COURT:  I overruled the objection.  He said he

12  would have to see it in the context.

13  BY MR. NOLAND:

14  Q.  The question was that question was asked --

15         THE COURT:  I am going to make you show it to him

16  because there is a potential Rule 106 issue.

17         MR. NOLAND:  Okay.

18         THE WITNESS:  This section here?

19  BY MR. NOLAND:

20  Q.  Yeah.  I read from you beginning at line 9 to 13.  That's

21  what I just read to you.

22  A.  That would be an accurate recounting of what I said in

23  that part of the deposition in the context of the entire

24  deposition.

25  Q.  Thank you, sir.

Brasfield - cross by Mr. Kulwin

2619

1    Just one question.  Did you rely -- I'm going to show
2  you Exhibit F of your report.  Is there a case in here called
3  Fulton?
4  A.  In the attachment F, which is the investigative base?
5  Q.  I'm showing you, yes, attachment F, where you list on
6  pages 2 and 3, that's where you list the table of contents of
7  the 50 or so files that you compared?
8  A.  And the name you were asking?
9  Q.  Fulton.
10 A.  I don't see it initially.
11 Q.  Thank you.
12    MR. NOLAND:  If I may have a moment, your Honor?
13    THE COURT:  Sure.
14   (Brief pause.)
15    MR. NOLAND:  Thank you, Mr. Brasfield.
16    Thank you, your Honor.
17    THE COURT:  Mr. Kulwin.
18                 - - -
19     MICHAEL DAVID BRASFIELD, CROSS-EXAMINATION
20 BY MR. KULWIN:
21 Q.  Mr. Brasfield, a detective conducting a homicide
22 investigation isn't required to take notes in your opinion?
23    MR. LOEVY:  Objection, your Honor.  That subject was
24 covered.
25    MR. KULWIN:  No, Judge.

1        MR. LOEVY:  Notes was covered.

2        THE COURT:  The objection is overruled to this

3   particular question.  The rule of duplication applies.  I'll

4   see where it goes.

5   BY MR. KULWIN:

6   Q.  Let me start over.

7        Mr. Brasfield, a detective in a homicide

8   investigation isn't required to take notes as he gathers

9   information, correct?

10  A.  It depends upon the agency.

11  Q.  Okay.  But you agree that some detectives have super

12  memories and they can remember stuff.  It locks in their mind

13  and then they can keep it in their mind until they write a

14  written report, right?

15  A.  It's theoretically possible, yes.

16  Q.  And you actually believe that yourself; isn't that true?

17  A.  I don't think it's the best practice.

18  Q.  But you agree it can be done, right?

19  A.  It can be done.

20  Q.  Okay.  And, in fact, isn't it true that, at times, when a

21  detective is talking to somebody, if someone says during the

22  course of their statement that they happen to remember seeing

23  such-and-such standing on a corner, they would lock it into

24  their memory -- "they" being the detective -- and by the time

25  they left to do a follow-up report if they were going to do

1  one, they would have that, correct?

2  A.  If they did a follow-up report in a timely manner, within

3  a short period of time.

4  Q.  Right.

5       So the answer is, yes, you don't have a problem with

6  a detective talking to a witness --

7       MR. LOEVY:  Objection, asked and answered, your

8  Honor.

9       THE COURT:  Sustained.

10 BY MR. KULWIN:

11 Q.  Now, did I hear you correctly that you said you spent 150

12 hours preparing your report?

13 A.  Somewhere in that -- not preparing the report, but in

14 reviewing the material.

15 Q.  So you spent 150 hours in reviewing the material and then

16 writing the report?

17 A.  I billed, if I recall, somewhere in that area.

18 Q.  I just want to get the time right.

19      Are you saying that between the time you first got

20 the assignment from the plaintiff's lawyers until the time you

21 reviewed everything and wrote the report, it was 150 hours?

22 A.  I was contacted by the attorney's office sometime in

23 December, and I believe the date of my report is March 15th,

24 so I spent the time looking at material and writing my report.

25 Q.  All right.  And that was 150 hours; is that your

1  testimony?

2  A.  Billable hours.  I am pretty sure I spent a lot more time

3  on it than that, but...

4  Q.  Okay.  Well, do you remember giving a deposition in this

5  case in June of this year and being asked these questions and

6  giving these answers?

7           MR. LOEVY:  Page?

8           MR. KULWIN:  Page 265, line 13.

9  BY MR. KULWIN:

10 Q.     "QUESTION:  And so you had to squeeze it in, right?

11         "THE WITNESS:  I indicated that I spent approximately

12 60 hours on the case."

13         Go to the next page, page 266.

14         "QUESTION:  Now, the 60 hours that you spent, how many

15 of the hours did you spend actually reviewing the file before

16 you reached your conclusion?

17         "ANSWER:  I can't give you a breakdown of how much it

18 was because the work was simultaneously -- I was looking at

19 the files and working on my report, so I can't give you how

20 much of it was this and how much of it was that."

21         Were those questions asked and did you give those

22 answers?

23 A.  Yes.

24 Q.  All right.  Now, did I hear you correctly, sir, that part

25 of the basis for your opinions about what other police -- that

Brasfield - cross by Mr. Kulwin

2623

1  Chicago is so different from other police reports is that in

2  your career, you've audited police departments?

3  A.  That's correct.

4  Q.  But the fact of the matter is, sir, I don't believe --

5  you've never audited any police department on the issue of

6  whether they're -- how they're properly maintaining their

7  files and disclosing it in criminal cases; isn't that true?

8  A.  That's correct.

9  Q.  The only audits --

10 A.  I misunderstood your question.  I thought you asked did I

11 testify in a criminal case on that.  No, I have reviewed

12 procedures and processes and discoveries in various cities.

13 Q.  My question -- maybe we're ships passing in the wind here.

14       Let me be clear.  You've told the jury that part of

15 the basis of your opinion here is the auditing work you've

16 done, right?

17 A.  Yes.

18 Q.  But the fact of the matter is, sir, that you have never --

19 you've never conducted any independent audit of any police

20 department on the issue of their disclosure of information in

21 criminal cases; isn't that true?

22 A.  I'll refer back to my testimony.  I have visited and

23 audited, engaged to look at the delivery of police services

24 which included record-keeping and discovery processes.

25 Q.  All right.  Going back to your deposition of June of this

Brasfield - cross by Mr. Kulwin

2624

1  year, starting at page 319, line 24:

2        "QUESTION:  Okay.  And I want to be clear.  Your

3  testimony is that those other major cities, though, the way

4  they do it is every piece of information they get during a

5  homicide investigation is documented, put in a file, and

6  turned over to either the defense attorneys directly or to the

7  prosecutor.  Do I understand that correctly?

8        "ANSWER:  I'm saying that is the general practice.

9        "QUESTION:  Was that what was going on in New York and

10  Baltimore and all the places you did audits of?

11        "ANSWER:  My familiarity with the way it was done is

12  that" -- I'm sorry.  "My familiarity with the way it was done

13  is that was the desire.  Whether it occurred on each, I did

14  not do and have not done an independent audit of the New York

15  Police Department's homicide unit."

16        Then it goes on.

17        MR. LOEVY:  Your Honor, that's not impeaching.

18        MR. KULWIN:  I'm not done.

19        THE COURT:  I am going to wait until he is done.

20  BY MR. KULWIN:

21  Q.  "Well, okay.  So you say in your résumé I think you did

22  some auditing, right?  You did auditing of police

23  departments?"  "Yes."  "Was it Baltimore or Oxnard?"

24        THE COURT:  Say the question, say answer.

25        MR. KULWIN:  Oh, I'm sorry.  I apologize, Judge.

HOOD 035660
Weston 050677

Brasfield - cross by Mr. Kulwin

2625

1  BY MR. KULWIN:

2  Q.    "ANSWER:  Yes.

3        "QUESTION:  Wasn't it Baltimore or Oxnard?  Where else?

4        "ANSWER:  I think there were six cities.

5        "QUESTION:  Yeah, Baltimore, Oxnard.  Can you tell me,

6  it would help me out, besides Baltimore and Oxnard."

7           THE COURT:  Oxnard?

8           MR. KULWIN:  Oxnard.  Right.  Sorry, Judge.

9  BY MR. KULWIN:

10 Q.    "ANSWER:  Seattle, Memphis, I believe it was Memphis,

11 Oxnard, Baltimore, a city in Ohio.  I'll have to find it in

12 here.  It goes on.

13       "QUESTION:  We'll get back to it, but just let's stick

14 with Baltimore, Oxnard, Seattle, a city in Mississippi.  Where

15 is Oxnard?  Is that Mississippi?

16       "ANSWER:  It's Oxnard, California.

17       "QUESTION:  Oh, California.  I'm sorry.  I'm confused.

18       "ANSWER:  An area outside of Los Angeles.

19       "QUESTION:  How big is Oxnard?

20       "ANSWER:  As I recall at the time, it was maybe in the

21 couple hundred thousand.

22       "QUESTION:  All right.  All right.  Now, I want to be

23 clear.  You were asked to audit these cities' police

24 departments, like in --

25       "ANSWER:  It was part of a federal grant process to

HOOD 035661
Weston 050678

Brasfield - cross by Mr. Kulwin

2626

1   examine the delivery of police services.  And so part of that,

2   as part of the team, we would meet with the chief of police,

3   we would meet with community leaders, we would look at the

4   functioning and organization and staffing levels and budgetary

5   appropriations for the organization.

6       "QUESTION:  In any of these cities, do you

7   investigate -- did you investigate or audit their disclosure

8   of information in criminal cases?

9       "ANSWER:  No."

10       MR. LOEVY:  Objection, your Honor.  Not impeaching.

11   That's a discrete number of cities.

12       THE COURT:  Sustained.

13   BY MR. NOLAND:

14   Q.  In any of these -- in any of these investigations, did

15   you --

16       THE COURT:  Sustained.  I want to say, given your

17   facial reaction, given the question you asked at 3:39 in the

18   afternoon, that is not impeaching.

19       The jury is directed to disregard the reading from

20   the deposition.

21       MR. KULWIN:  I'll ask a different question.

22   BY MR. KULWIN:

23   Q.  In any of these investigations that you did, any audits

24   that you did, in any audits that you've done in your career

25   that you're referencing, did you look at or audit or try to

HOOD 035662
Weston 050679

1  analyze whether they were fulfilling -- these cities were

2  fulfilling their disclosure obligations in homicides or other

3  criminal cases?

4  A.  That was part of what my duties and responsibilities as a

5  specialist in records and discovery to look at that.  But it

6  was a minor -- the overall was the delivery of police services

7  in public housing, which included that process.

8  Q.  All right.  Now going back to your deposition, page 322,

9  line 5:

10       "QUESTION:  In any of these investigations, did you

11  look at or audit or try to analyze whether they were

12  fulfilling their disclosure obligations in homicide or other

13  criminal cases?

14       "ANSWER:  No, that was not part of the mandate."

15       MR. LOEVY:  Objection, your Honor.  The mandate is

16  talking about the federal mandate.

17       THE COURT:  Overruled.

18  BY MR. KULWIN:

19  Q.  Is that your testimony, sir?

20       THE COURT:  Did he read that particular question and

21  answer correctly?

22       THE WITNESS:  Yes.

23  BY MR. KULWIN:

24  Q.  Now, if I understand it correctly, one of the ways that --

25  there are two legs to the information that you've employed in

Brasfield - cross by Mr. Kulwin

2628

1    determining that Chicago is an anomaly in how they handle
2    their information and gather it and disclose it to criminal --
3    in criminal cases; do I have that right?  Two legs, right?
4    A.  Which two lines?
5    Q.  Well, one is you go to a bunch of conferences that you
6    attend with other police chiefs, right?  That was one of the
7    legs, right, that you told me about?
8         THE COURT:  He thinks you're saying "line."  You're
9    saying "legs," right?
10   BY MR. KULWIN:
11   Q.  Oh, sorry.  Legs.
12   A.  Oh, I'm sorry.
13   Q.  Let me do it again.  My fault.
14        As I understand it from earlier testimony you've
15   given, there are two legs that you rely on in determining that
16   Chicago was an anomaly vis-à-vis production of information to
17   criminal defendants than other cities?
18        MR. LOEVY:  Objection, your Honor.  Given the entire
19   testimony, it's improper.  He's got to show him --
20        THE COURT:  I think that question can be answered, so
21   the objection is overruled.
22   BY MR. KULWIN:
23   Q.  Mr. Brasfield, do I have it?
24   A.  I'm sorry.  You're losing me here.
25   Q.  Okay.  As I understand it -- let me see if I can help you

HOOD 035664
Weston 050681

Brasfield - cross by Mr. Kulwin

2629

1   out.

2          You attend certain conferences of police chiefs,

3   right?

4   A.  I have over the years.

5   Q.  And that's one of the ways that you've concluded how other

6   police departments handle their -- that's one of the ways on

7   which -- that you've articulated in your report the standard

8   is of how they handle their disclosure of information,

9   correct?

10  A.  I don't believe that's in my report.

11  Q.  Well, I guess maybe I'm not asking the question

12  accurately.  Let me see if I can try it again.

13         You went to a bunch of conferences in which police

14  chiefs talked about best practices, including the chief of

15  police of Chicago, and you're basing your knowledge here in

16  part that all major police departments fulfill your

17  professional standard that you've articulated in your report

18  based on what you've learned in those conferences; isn't that

19  right?

20             MR. LOEVY:  Objection, compound, your Honor.

21             THE COURT:  Overruled.

22             THE WITNESS:  I think that's entirely a

23  misrepresentation of my testimony --

24  BY MR. KULWIN:

25  Q.  Okay.

Brasfield - cross by Mr. Kulwin

2630

1   A.  -- or in my deposition.  I described --

2        THE COURT:  I think you have answered the question.

3        Ask another one.

4   BY MR. KULWIN:

5   Q.  Let me go back to your deposition, and I'll ask you this

6   question.

7        MR. LOEVY:  Line and page number?

8        MR. KULWIN:  I'm getting there.  Line 4, page 336.

9   BY MR. KULWIN:

10  Q.    "QUESTION:  I understand that, and I'm going to leave

11  this topic and go on to another topic.  Same topic but another

12  area.  But all I'm trying to get at, sir, is, you know, you

13  went to a bunch of conferences in which police chiefs talked

14  about best practice, including the chief of police of the City

15  of Chicago, and you're basing your knowledge in part that all

16  major police departments fulfill your professional standard

17  that you've articulated in this report based in part on what

18  you've learned at those conferences about best practices?

19        "ANSWER:  That was a leg of it."

20  A.  That was a leg of it.

21  Q.  Right.  That's what I asked you.  It's a leg of it, right?

22  A.  The statement was yours, but the leg of it was mine.

23  Q.  Right.  Now, the fact is, though, sir, when you went to

24  these conferences that you're talking about that you're basing

25  your conclusions that this is how all these other cities do

1  it, you don't have any written material from any of those
2  conferences that substantiate your view; isn't that right?
3  A.  You're totally misrepresenting my testimony.
4  Q.  Sir, can you answer my question?  Do you have any written
5  material from any of those conferences that you attended that
6  substantiate that they told you that these are the best
7  practices at those conferences?  Do you have anything like
8  that?
9  A.  I indicated that I had gone to conferences in response to
10 a question of how I formed my opinion.  That was an
11 insignificant portion of it.
12       No, I don't have any documents from that.
13 Q.  Right.  And you can't name one police chief as you're
14 sitting there today from any major city who stood up and said,
15 yeah, we produce a hundred percent of everything that we get
16 in a criminal investigation.  We turn it over to the criminal
17 defendants?
18       MR. LOEVY:  Objection to the question, your Honor.
19 Relevance.
20       THE COURT:  Overruled.
21       MR. LOEVY:  Same with the hundred percent.
22       THE COURT:  Overruled.  Goes to weight.
23       THE WITNESS:  You're talking about a very minor
24 portion of what I based my opinion on.  I've said in my
25 deposition that among dozens of things, I also go to

1   conferences and talk to police chiefs informally, discuss

2   various issues that are on the front burner at the time,

3   whether they're use of force, police pursuits, whatever.

4   BY MR. KULWIN:

5   Q.  Sir, the question is at these conferences that you went

6   to, no police chief that you can name as you're sitting there

7   today said, yeah, we do a hundred percent disclosure?  You

8   can't name one, can you?

9   A.  When we -- I would not -- I would not name one.

10  Q.  Sir, the question was can you?

11  A.  I would not.

12  Q.  Can you is the question?

13  A.  I will not.

14  Q.  Not will you not.  You couldn't; isn't that true?  You

15  couldn't name one particular one; isn't that true?

16  A.  That's not true.

17  Q.  Okay.  Do you remember this question.  Page 332 at line 14

18  -- at line 24.

19          "No, no, no, first answer my question.  Did anyone

20  say" -- I'm sorry.  Line 14, page 332.

21          "QUESTION:  I'm going to get to the rest of the

22  information, but I'm focusing on these conferences.  In these

23  conferences --

24          "ANSWER:  Okay.

25          "QUESTION:  -- nobody that you can identify, not one

1   chief of police that you can identify, stood up and said, this

2   is how we're dealing with disclosure of investigative

3   information in criminal cases.  We do it X, Y, and Z, and we

4   have 100 percent compliance rate.  Nobody said that, correct?

5           "ANSWER:  What was the discussion?

6           "QUESTION:  No, no, no.  First answer my question.  Did

7   anyone say that?

8           "ANSWER:  I can't give you names of particular

9   individuals, but because it was such a hot topic of court

10  cases and disclosure, that was an item of discussion.  And we

11  would -- people would give their horror stories of what

12  happened when they failed to do it and why it was so important

13  that we all as a professional group changed our ways."

14          MR. LOEVY:  Objection --

15  BY MR. KULWIN:

16  Q.  That was the question and that was your answer; isn't that

17  true?

18          MR. LOEVY:  Objection, your Honor.

19          THE COURT:  Overruled.

20          THE WITNESS:  Yes.

21  BY MR. KULWIN:

22  Q.  And, in fact, what they were telling you, what you were

23  hearing at these conferences from these police chiefs, was,

24  look, we've got successes, we've got failures.  We're doing

25  our best.  That's what you heard.  You didn't hear a hundred

Brasfield - cross by Mr. Kulwin

2634

1  percent, right?

2  A.  That's not what I stated.

3        MR. LOEVY:  Objection --

4  BY MR. KULWIN:

5  Q.  I'm sorry?

6  A.  That's not what I stated.

7        THE COURT:  The answer can stand.

8  BY MR. KULWIN:

9  Q.  So you never heard a hundred percent, right?

10  A.  I answered the question the best I can.

11  Q.  Now, another one of the legs, another one of the legs that

12  you relied on for your basis for your conclusion that Chicago

13  is an anomaly on how major cities disclose information that

14  they gather in criminal cases is the federal government's

15  funding of various institutions; isn't that right?

16  Information you get from that; isn't that true?

17  A.  The information I get from literature either produced by

18  the federal government or funded by the federal government.  I

19  think that that was the context of my answer.

20  Q.  All right.  So another leg is the federal government has

21  expended a tremendous amount of money, the National Institute

22  of Justice, the Bureau of Justice Statistics, the Bureau of

23  Justice Administration (sic), the FBI, the whole alphabet soup

24  of agencies and universities, to examine the rise of violent

25  crime and strategies to address it.  You look at that

1 │ literature, right?

2 │ A.  Yes.

3 │ Q.  And that's one of the bases for your conclusion, that

4 │ literature, that Chicago is an anomaly in how they deal with

5 │ their disclosure of information, right?

6 │ A.  I'm sorry.  You are losing me.  My statement in my

7 │ deposition is what it was.

8 │ Q.  I know that.  But my question is -- my question is is that

9 │ one of the things that you say that you rely on in your report

10 │ to reach the conclusion that you've given the jury that

11 │ Chicago is an anomaly are these statistics and things of that

12 │ nature from all these different federal agencies, right?

13 │ A.  That it forms a basis of knowledge about how things are

14 │ done in the United States in police agencies.

15 │ Q.  All right.  But you're not saying that this work by the

16 │ Department of Justice substantiates your standard of a hundred

17 │ percent disclosure of all information gathered in a homicide

18 │ investigation.  Those agencies' research doesn't substantiate

19 │ that at all, does it?

20 │ A.  In the context of the question that I was asked during the

21 │ deposition as to what I form my opinion on was how other law

22 │ enforcement agencies respond to discovery requests and that it

23 │ was based on centralized records-keeping, accurate indexing,

24 │ and full disclosure, all of which was not the case that I had

25 │ seen in Chicago.

Brasfield - cross by Mr. Kulwin

2636

1  Q.  Right.  And my question to you, sir, is one of the bases
2  for that opinion is all this information from these federal
3  agencies, and you don't have any information from those
4  agencies that substantiates that conclusion; isn't that right?
5  A.  I disagree with how you're presenting that.
6  Q.  All right.  Here's the question from your deposition.
7          MR. LOEVY:  Page?
8          MR. KULWIN:  Page 338.
9  BY MR. NOLAND:
10  Q.      "QUESTION:  You just said, you just said that a key leg
11  of your conclusion was that the Department of Justice was
12  doing all these investigations about violent crimes and police
13  chiefs all over the country were aware of it.  Okay?  But
14  there were -- there's no -- but you're not saying that any of
15  these -- that this work by the Department of Justice
16  substantiates your standard that it's a hundred percent
17  disclosure of a hundred percent of all the information?
18          "ANSWER:  That's the goal, and that -- that's --
19          "QUESTION:  That's the goal?
20          "ANSWER:  And that --
21          "QUESTION:  That's the goal?
22          "ANSWER:  Close from a practical standpoint that your
23  cases and the way you operate will be conducted in that
24  manner."
25          It's a goal, right?

HOOD 035672
Weston 050689

Brasfield - cross by Mr. Kulwin

2637

1      MR. LOEVY:  Objection, your Honor.  That's an

2 unintelligible question.

3      THE COURT:  Sustained.

4 BY MR. KULWIN:

5 Q.  As you sit there today, sir, okay, can you name any

6 departments, any police departments, that you gleaned from

7 looking at this Department of Justice information that reaps

8 this hundred percent full disclosure rule?

9      MR. LOEVY:  Objection, your Honor, the relevance to a

10 hundred percent.  This was the subject of a motion in limine.

11      THE COURT:  Sustained.  You can't word the question

12 that way.

13      MR. KULWIN:  Sure.

14 BY MR. KULWIN:

15 Q.  Sir, if I understand it -- if I understand it, sir, in

16 your professional opinion, the issue in this case is that

17 Chicago doesn't maintain their records appropriately, and as a

18 result of that, that leads to failure to disclose everything,

19 which leads to problems.  That's what we're talking about,

20 right?

21 A.  That's a major portion of it, yes.

22 Q.  Okay.  And as you said before, you think it's an anomaly

23 to other cities doing that same stuff, right?

24 A.  That's what I've stated.

25 Q.  Okay.  But you haven't done an analysis or a comparison of

HOOD 035673
Weston 050690

Brasfield - cross by Mr. Kulwin

2638

1  any major city with a similar -- similar in size of population

2  and the number of homicides as Chicago that were occurring

3  between 1983 and 2006 to come to that conclusion, correct?

4  A.  That I haven't done a study?

5  Q.  Yeah.  You have not done any study of any major city of

6  similar size as Chicago with the same type of number of

7  homicides between 1983 and 2006, you have done no comparison

8  between Chicago and those cities on that issue, have you?

9  A.  Well, I testified to the fact that during the time period

10  that we're discussing here, for both time periods, I was aware

11  of and familiar with policies and procedures in other states,

12  other cities, in large cities included.

13  Q.  But you've done no such analysis; isn't that true?

14  A.  I was not hired to do an analysis, and I did not do an

15  analysis, but I can very comfortably and faithfully say that I

16  am familiar with the policies and procedures of those

17  jurisdictions and that they are not consistent with the way

18  the city of Chicago does it.

19  Q.  Let me break that down.  Now, I don't care about just what

20  you were retained for here.  Never in your entire --

21        MR. LOEVY:  Objection, your Honor.  Asked and

22  answered.

23        MR. KULWIN:  Sorry, Judge.

24        THE COURT:  Yeah, if you want to go beyond the

25  report --

1        MR. KULWIN:  No, I'm not --

2        THE COURT:  Well, no, because you just are about to.

3   That's the way your question is being worded.

4        MR. KULWIN:  Sorry, Judge.

5        THE COURT:  I will read back to you what you said.

6        MR. KULWIN:  No, I got it.

7        THE COURT:  Let me break that down.  I don't care

8   just about what you were retained for here.  Never in your

9   entire, dot, dot, dot.

10  BY MR. KULWIN:

11  Q.  Okay.  Sir, you've not done an analysis of any comparison

12  that's similar in size of population and similar in the number

13  of homicides that were occurring from 1983 to 2006 that you've

14  compared to Chicago to come to the conclusion that Chicago is

15  an anomaly on that issue?

16       MR. LOEVY:  Same objection, your Honor.

17       THE COURT:  Can I see the lawyers at sidebar, please?

18    (The following proceedings were had at sidebar outside the

19  hearing of the jury:)

20       THE COURT:  The way you worded the question, it's a

21  universe of one.  City of similar population with a similar

22  number of homicides during the period of 1983 to 2006 means

23  it's a universe of one.  What would the other city be?

24       MR. KULWIN:  I don't know.  New York?

25       THE COURT:  No.

HOOD 035675
Weston 050692

Brasfield - cross by Mr. Kulwin

2640

1     MR. KULWIN:  Los Angeles.

2     THE COURT:  Much bigger population, much smaller

3  number of homicides in the first one.  Much smaller number of

4  homicides in the second one.

5     So it's a universe of one.  So I am going to sustain

6  the objection.

7   (The following proceedings were had in open court in the

8  presence and hearing of the jury:)

9     THE COURT:  The objection is sustained.

10  BY MR. KULWIN:

11  Q.  Sir, in the city where you were chief of police, Seattle,

12  they had a about, what, 55 homicides a year?

13  A.  I was not the chief of police in Seattle.  I was the

14  assistant chief in Seattle.  I was the chief of police in Fort

15  Lauderdale, Florida.

16  Q.  Okay.  So when you were assistant chief of Seattle, they

17  had, what, about 55 homicides a year?

18  A.  I think the all-time record might have been pushing 100,

19  but on average, somewhere -- I haven't looked at it recently,

20  but that's probably a ballpark figure.

21  Q.  Ballpark?  Well, as of June of 2016, isn't that what you

22  thought it was, 50, 55?

23  A.  I believe that's what I testified to.

24  Q.  Okay.  And Fort Lauderdale -- and I think that Fort

25  Lauderdale you thought maybe had 10 or 20?

1   A.  They were -- I have gone back and checked, and probably

2   closer to the 20, 25 range.

3   Q.  Okay.  And when you were the sheriff, maybe one in a bad

4   year?

5   A.  Yeah, that's true.

6   Q.  And the Seattle detectives while you were out there, each

7   detective was handling maybe two or three homicides per year,

8   correct?

9   A.  No.  It was a much smaller homicide unit, so they were

10  carrying a larger caseload than that.

11  Q.  Remember this question, page 317:

12          "QUESTION:  Okay.  But in the city that has an average

13  50 to 55" -- line 17.  We were talking about Seattle.

14          "QUESTION:  Okay.  But in a city that has about an

15  average 50 to 55, so you're talking about assigned, you got

16  like maybe two or three homicides per detective, right?

17          "ANSWER:  On average perhaps, active cases, two or

18  three."

19  A.  Active cases, yes.

20          MR. LOEVY:  Your honor --

21          THE COURT:  The objection is overruled.

22  BY MR. KULWIN:

23  Q.  Active cases.

24          And you don't even recall the number of detectives --

25  homicide detectives you had in Fort Lauderdale, right?

Brasfield - cross by Mr. Kulwin

2642

1  A.  I don't recall what my answer was in the deposition.

2  Q.  Do you recall now what -- you don't recall.  Do you recall

3  now --

4  A.  No.  There are probably 10 or 12.

5  Q.  Okay.  So they were handling maybe one or two per year of

6  homicides, right?

7  A.  Not -- they were handling more than that.

8  Q.  Well, if you had 10 or 12 and you only had 20 to 25

9  homicides per year that are active cases per year, maybe one

10  or two?

11  A.  As a group.  I won't argue the point with you.

12  Q.  Finally, sir, you were asked some questions about, you

13  know, how an investigation goes, and I think you referred to

14  some novelist, Barrett (phonetic) or something.  It's like a

15  novel.  You never know how it's going to end, right?  Wasn't

16  that your analogy?

17  A.  That was an analogy, yes.

18  Q.  Okay.  So one question I have for you is when you were

19  reviewing all these files, you didn't take any notes, right?

20  A.  I took -- I think I testified in the deposition that as I

21  did any of my cases, I do my work on a computer, I maintain

22  what I am doing there, and it is a living, if you will,

23  document.

24  Q.  But the living document is actually the report that you're

25  writing.  That's the living document, the novel in this case,

1  right?

2  A.  Yes.

3  Q.  So you've got all these investigative reports, you've got

4  your, okay, report to plaintiff's counsel on Fields v. City of

5  Chicago, you've got it in your report format, you're starting

6  with that, right?

7  A.  Yes.

8  Q.  Okay.  Then you've got all the files that you're looking

9  at.  And what you're doing is you're not going through the

10  files and going, oh, this one or that one.  You're just typing

11  into the report, right?

12          MR. LOEVY:  Objection to the form of the question.

13          MR. KULWIN:  I will rephrase it if you want, Judge.

14          MR. LOEVY:  I will withdraw the objection.

15          THE COURT:  Okay.

16  BY MR. KULWIN:

17  Q.  You're not actually creating a document that just analyzes

18  what's in what, right?

19  A.  I'm looking at the electronic versions on the split screen

20  of the material that I've -- depending on the case that I'm

21  looking at, and then I'm typing in whatever is relevant at the

22  time.

23  Q.  Right into what's going to be the final report, correct?

24  A.  If I understand your question, yes.

25  Q.  And the last point on that, sir, on this novel idea, you

Brasfield - cross by Mr. Kulwin

2644

1  agree, sir, that criminal investigations take twists and

2  turns, right?

3  A.  Yes.

4  Q.  And it's easy to look back as a detective to another

5  detective's work and go, wow, he should have done this, and he

6  should have done that, and why didn't he see this, and why

7  didn't he see that.  Hindsight is 20/20, isn't it sir?

8  A.  That's not what I testified to.

9  Q.  I'm not asking what you testified to.  I'm asking, you're

10  an expert, isn't that true?

11  A.  That hindsight is 20/20?

12  Q.  Yeah.

13  A.  On anything.

14  Q.  Right.  Any detective or any expert or any lawyer can look

15  back at what a detective did 30 years ago and say, he made

16  this mistake, that mistake, and this mistake; isn't that

17  right?

18  A.  Individually, that's certainly true.  As an aggregate when

19  you look at dozens of cases or hundreds of cases, that's a

20  different matter with different detectives.

21        MR. KULWIN:  If I may have a second.

22    (Brief pause.)

23        MR. KULWIN:  Nothing else, your Honor.  Thank you.

24        THE COURT:  Redirect.

25        MR. LOEVY:  Thank you, your Honor.

Brasfield - redirect

2645

1                    - - -

2        MICHAEL DAVID BRASFIELD, REDIRECT EXAMINATION

3   BY MR. LOEVY:

4   Q.  You were just asked if it's easy to look back and look at

5   a detective's work and say, they should have done this, they

6   should have done that.

7        My question to you, sir, is are you able to look back

8   at detectives and say, they should have done this and they

9   should have done that if they don't document and memorialize

10  things?

11  A.  Well, it makes it extremely difficult, if not impossible.

12  Q.  You were asked if being -- having a high homicide load

13  creates problems.  Is that a valid excuse not to document

14  things?

15        MR. KULWIN:  Objection, Judge.  I didn't ask him

16  that.

17        THE COURT:  Overruled.

18        MR. LOEVY:  Let me pose the question.

19  BY MR. LOEVY:

20  Q.  Is it a valid excuse not to document things if you have a

21  caseload of homicides that --

22  A.  No.

23  Q.  Is that too much to expect from a municipality with a high

24  level of homicides, that they document things?

25  A.  They would -- I would -- as I've said before, it becomes

Brasfield - redirect

2646

1  even more critically important that procedures and processes
2  are in place and centralized record-keeping.
3  Q.  You were asked about your report being a living document.
4  Are police reports supposed to be living documents that can be
5  edited as the facts come in, or are they supposed to be set,
6  finalized, and submitted?
7  A.  They are not supposed to be manipulated, if I understand
8  your question correctly.
9  Q.  In other words, let's say you have an event that happens
10 on Monday, and you have another event that happens on Thursday
11 and another happens on next Tuesday.  Are you allowed to keep
12 your report unwritten as a living document until you see where
13 it's going, or are you supposed to submit at each event?
14        MR. KULWIN:  Leading and argumentative.
15        THE COURT:  Overruled.
16        THE WITNESS:  You're supposed to put the information
17 as close to the time that you gathered it or learned of it,
18 and then you put it in there.
19 BY MR. LOEVY:
20 Q.  You were asked about some detectives might have super
21 memories.  Is there an exemption to the need to document
22 things for detectives who believe that they, themselves, can
23 remember things?
24 A.  No, absolutely not.
25 Q.  Can you explain?

HOOD 035682
Weston 050699

1  A.  You're not -- no one has an infallible memory.  And even

2  if one had Carnac the Magnificent and was able to absolutely

3  recall things, they have to document to put in the report so

4  that it's available for others to see it any time.  It's --

5  and I'm sorry about the poor analogy, but the detective can

6  get hit by a bus, and if he's got three weeks' worth of

7  information in his wonderful memory, it does no one any good.

8  Q.  And memories do fade, do they not?

9  A.  Yes.

10         MR. KULWIN:  Objection, Judge.  He's not an expert on

11  this.

12         THE COURT:  Overruled.  As it pertains to what he's

13  talking about.

14         MR. LOEVY:  All right.  If I can have the ELMO?

15  BY MR. LOEVY:

16  Q.  Showing you page --

17         THE COURT:  You've got it.

18  BY MR. LOEVY:

19  Q.  -- 8625.  This is a police report for Nathson Fields dated

20  June the 17th and then submitted July the 7 --

21         MR. KULWIN:  Objection, Judge, to the premise.

22  That's inaccurate.  It's a misstatement of the evidence.

23         THE COURT:  Just ask the question.

24         MR. LOEVY:  All right.

25  BY MR. LOEVY:

1  Q.  If a police officer does an interview on June 13th of an

2  important witness, a suspect in a homicide case, is it

3  consistent or inconsistent with police practices to rely on

4  your memory and not create the police report until four days

5  later with no notes?

6  A.  I would expect the report to be done the same day, and

7  even if it entailed unpaid overtime, that before they went

8  home for the night, that would be written up.

9  Q.  How universal is that expectation?

10 A.  That's an expectation on the front line supervisors,

11 sergeants, lieutenants, captains, commanders.  It's --

12 Q.  I mean how universal in the country as a law enforcement

13 expert.  Is that --

14 A.  That's common practice.  That's my experience.

15 Q.  All right.  You were asked about -- you said you spent a

16 range of 100 to 150 hours on the case, correct?

17 A.  Yes.

18 Q.  And how many -- of that 100 and 150 hours on the case, you

19 did things other than review the file, right?

20 A.  Yes.

21 Q.  Tell the jury what else you did besides review the files

22 with that 100 to 150 hours.

23 A.  I reviewed at least, I believe, three or four portions

24 of -- because sometimes the depositions, for instance, with

25 Mr. Hickey, were done over several days, and so there were

Brasfield - redirect

2649

1  hours' and hours' worth of transcribed depositions that I
2  reviewed, the policies and procedures that I have reviewed,
3  case --
4  Q.  Drafting the report as well?
5  A.  Drafting the report, yes.
6  Q.  All right.  You estimated you spent about 60 hours on the
7  files.  Was that a sufficient amount of time to accomplish the
8  project that you accomplished?
9  A.  In the parameters that I had, yes.
10 Q.  All right.  Returning to Mr. Noland's questions, if there
11 were 57,745 criminal defense file pages and 88,290 basement
12 file pages, for a total of about 140,000 pages, I'll ask you
13 to assume that, did you do a page-by-page audit of all 140,000
14 pages?
15 A.  No.
16 Q.  How much would that have cost for you to look through
17 every page and see if it should be in or out and putting
18 thought into every page?
19 A.  I can't even begin to imagine how many weeks or months
20 that would have taken.
21 Q.  All right.  You have come to learn that the defendant
22 spent quite a bit of time and money doing that audit, correct?
23 A.  Yes.
24 Q.  And they have confronted you with some of the mistakes you
25 made, correct?

HOOD 035685
Weston 050702

Brasfield - redirect

2650

1  A.  Yes.

2  Q.  All right.  After having been confronted with those pages

3  that should have been on one side of the line and you put them

4  on the other side of the line, does that change anything about

5  your opinions?

6  A.  No, it does not.

7  Q.  In fact, several hundred pages out of a sample size that

8  bad, is that a terrible rate of error?

9          MR. KULWIN:  Objection, leading.

10         THE COURT:  Overruled.

11         THE WITNESS:  Well, I would prefer to have no errors,

12 obviously, but it's not significant in the pattern that I was

13 observing.

14 BY MR. LOEVY:

15 Q.  Talk about that for a minute, if you would, sir.  I mean,

16 we -- they showed you examples of specific pages that

17 shouldn't have been on.  Tell me about the broader patterns

18 you saw.

19 A.  In the individual cases that I looked at, there were very

20 specific listing of individuals who were identified as

21 possible suspects or alternative suspects in the

22 investigation, that there were witnesses that had information

23 that was not followed up on, or that there was contradictory

24 information, for instance, a witness seeing someone but was

25 too far away to identify them or they were wearing masks.

Brasfield - redirect

2651

1  Q.  All right.  That kind of pattern, was that evident

2  notwithstanding the fact that some of the court records should

3  have been listed as produced and not produced?

4      MR. NOLAND:  Objection, argumentative.

5      THE COURT:  Sustained.

6  BY MR. LOEVY:

7  Q.  All right.  Mr. Noland asked you if you were lying about

8  having performed the case-by-case analysis.  Do you remember

9  that question?

10  A.  Yes, I do.

11  Q.  Were you lying, sir?

12  A.  No.

13  Q.  Tell the jury what you did to do that review, sir, where

14  you were; provide some context.

15  A.  I have a home office set up with a couple of computers and

16  an iPad.  And as I have the material electronically, I open up

17  the files, I look at them, I -- as thoroughly as I try to be,

18  I put that material there, I'll start a spreadsheet, I'll

19  start a list of material reviewed, I'll start a list of

20  bibliography.  And as I am getting more information -- and

21  it's kind of like a homicide investigation.  As you're getting

22  more information, you're adding to it, and you eventually

23  finish and develop your product.  That's the way I do it.

24  Q.  All right.  You said this morning that you started at 90

25  percent of the investigative files were missing -- or the

1  criminal defense files were missing investigative materials?

2  Did I get that right?

3  A.  Yes.

4  Q.  All right.  Even after the examples that they pointed out

5  at your deposition, what is the number of criminal defense

6  files that were missing investigative material, what

7  percentage?

8  A.  100 percent.

9  Q.  So the fact that they were able to provide you some

10  examples of files -- of documents that you thought were

11  missing but weren't missing, did that change the overall

12  number of files that were missing documents?

13  A.  No.  When you're looking at all of these files and you

14  take out either, you know, one and -- for instance, in Anima,

15  there were still pages that were missing.  But you can even

16  say, okay, I'm going to give the City the absolute benefit of

17  the doubt and just throw the whole case away.  It doesn't

18  change anything, my opinion.

19  Q.  All right.  You did the 60-hour job, which was obviously a

20  rough way of doing it, right?

21  A.  Yes.

22         MR. KULWIN:  Objection.  Objection, argumentative.

23         THE COURT:  Sustained.

24  BY MR. LOEVY:

25  Q.  If I understood your answers to Mr. Kulwin and Mr. Noland,

1  you were saying you weren't actually considering each page and

2  say, was -- you know, let me look at the context of a page.

3  It was just, yes or no?  Is it in one file, is it in the other

4  file?  Is that a fair summary?

5  A.  That's fair.

6  Q.  All right.  Even though you did it in that very rough form

7  and didn't analyze the particular page, was it still a useful

8  exercise?

9  A.  Yes, it was.

10  Q.  All right.  You were asked about the 50 criminal defense

11  attorneys' files.  And those were the files that could be

12  located, correct?

13  A.  Yes.

14  Q.  If more could have been located, would you have analyzed

15  more?

16  A.  Yes, I would have.

17        MR. NOLAND:  Objection, Judge, foundation as to that

18  last statement.

19        THE COURT:  Overruled.

20  BY MR. LOEVY:

21  Q.  Is your understanding there was any cherry-picking at all

22  as far as criminal defense files weren't given to you?  If

23  they were located, you were supposed to get them, correct?

24        MR. NOLAND:  Objection, Judge.

25        THE COURT:  Overruled.

Brasfield - redirect

2654

1   THE WITNESS:  Yes.
2   BY MR. LOEVY:
3   Q.  All right.  You admitted you didn't interview defense
4   attorneys.  You did not interview these 50 defense attorneys,
5   right?
6   A.  That's right.
7   Q.  All right.  You were asked if a document that was
8   created 15 years later could have been withheld.  Do you
9   remember that question?
10  A.  I believe so.
11  Q.  All right.  Of course, in Mr. Fields' case, if he was
12  convicted in '86 and he had a retrial in 2009, a document that
13  was created 15 years later very well could have been withheld
14  and been material, correct?
15  A.  Yes.
16  Q.  You don't know going into an investigation what's going to
17  be material and what's not, right?
18  A.  That's correct.
19  Q.  And that's why you need processes that work?
20  A.  Yes.
21  Q.  All right.  You were asked about -- Mr. Noland put on the
22  screen, there was a bunch of names, and he asked you, isn't it
23  true some of these names were in the police reports.  Do you
24  remember that question?
25  A.  Yes.

1  Q.  You did not analyze all the police reports and all the
2  names in these 140,000 files (sic), correct?
3  A.  No, I did not.
4  Q.  And you never purported to, correct?
5  A.  No.
6  Q.  The fact that a name is in a police report, does that mean
7  that all the exculpatory information relating to the name
8  that's also in the investigative file has been given to the
9  criminal defendant?
10 A.  No, absolutely not.
11         THE COURT:  Hang on.
12         MR. NOLAND:  Objection, argumentative.  It
13 mischaracterizes the question.
14         THE COURT:  Everybody was talking at the same time.
15 I'll just look at what you said.
16         Overruled.  It wasn't attempting to characterize a
17 question.
18 BY MR. LOEVY:
19 Q.  Now, for example, page -- document No. 8609 has a
20 reference to a Delbert Edwards, correct?
21 A.  Yes.
22 Q.  And the jury has seen these documents.  But just because
23 Delbert Edwards is in the official file does not mean that
24 they've seen a copy -- the defense attorney is getting a copy
25 of plaintiff's 1-69 from the investigative file with

1   additional information, correct?

2   A.  That's absolutely correct.

3   Q.  So is it sufficient just to put a name in a police report?

4   A.  No.

5   Q.  Now, you were asked about court attendance sheets.  And

6   you were asked, isn't it true some of them might not be

7   helpful, right?

8   A.  Yes.

9   Q.  You were also asked, isn't it true that if it happened in

10  court, it couldn't possibly be exculpatory?  Do you remember

11  that?

12  A.  Yes.

13  Q.  Let me give you a hypothetical.  Let's say in Nate Fields'

14  case in 1986, there was a court attendance sheet that showed

15  O'Callaghan was present in court on a day he wasn't scheduled

16  to be there but Randy Langston was there?

17          MR. KULWIN:  I'm going to object to the question,

18  Judge.  There is no basis for that question --

19          THE COURT:  I am going to say it's beyond the scope

20  of the report.  So you'll argue it later.

21  BY MR. LOEVY:

22  Q.  May I ask then, there are ways in which even

23  administrative documents might turn out to be exculpatory,

24  right?

25  A.  Absolutely.

1  Q.  And that's why everything should be turned over?

2  A.  Yes.

3  Q.  All right.  You were asked about the Crockett file.  Do

4  you remember those questions?

5  A.  Yes.

6  Q.  I am going to move to the end here.

7        You were asked about criminal defense attorney files

8  having subpoenas.  Do you remember those questions?

9  A.  Yes.

10  Q.  Does the fact that the Chicago Police Department has

11  documents that are in the state's attorney's file mean that

12  they're not withholding anything?

13  A.  Would you rephrase?  I'm sorry.  Say that again.

14  Q.  I'm going to show you Plaintiff's Exhibit 312105.  This is

15  from the Cecil Robinson file?

16  A.  Yes.

17  Q.  Do you remember there were examples where criminal

18  defendants sent subpoenas directly to the Chicago Police

19  Department?

20  A.  Yes.

21        MR. KULWIN:  Judge, I'm going to object here for a

22  second on this particular document and ask to take it off the

23  ELMO and ask to be heard.

24        MR. LOEVY:  Your Honor, I will withdraw it.  I don't

25  want to waste any more time.

Brasfield - redirect

2658

1  THE COURT: Fine.

2  BY MR. LOEVY:

3  Q. All right. Now, you were asked a lot of questions about

4  your comparison between blue and green, which is the

5  investigative files and the criminal defense files, right?

6  A. That's correct.

7  Q. Let's say you got everything wrong on the comparison

8  between the criminal defense files and the investigative

9  files. Do you understand my hypothetical?

10 A. Yes, I do.

11 Q. Does that have anything to do with all the opinions you

12 gave that the blue column, all the problems about the

13 investigative files as a standalone problem, does that have

14 any effect on that at all?

15 A. Absolutely none.

16 Q. How about your analysis on the permanent retention files;

17 do any of the typos and missing documents that they pointed

18 out have any effect on any of the opinions you've given here

19 in court about the problems with the permanent retention

20 files?

21 A. No, they do not.

22 Q. Does it have anything to do with the problem that the

23 stuff in the investigative files wasn't getting into the

24 permanent retention files?

25 A. It has absolutely no effect on it.

Brasfield - recross by Mr. Noland

2659

1  Q.  And as far as the problems they showed you that some of
2  the documents that you thought had been withheld from the
3  criminal defense attorneys' files weren't, you understand that
4  the state's attorney -- they have done a similar review of the
5  state's attorney's documents, correct?
6  A.  I'm aware of that.
7  Q.  If 60 percent of the files from the State's Attorney's
8  Office did not have material from the basement files, is that
9  an acceptable percentage?
10 A.  No, it's not.
11 Q.  Okay.
12         MR. LOEVY:  Let me confer for a moment?
13   (Brief pause.)
14         MR. LOEVY:  Your Honor, we would want to admit 307,
15 if there's any additional foundation from the witness while
16 he's still here.
17         THE COURT:  No.
18         MR. LOEVY:  Okay.
19         THE COURT:  It's not a foundational --
20         MR. LOEVY:  All right.
21         Thank you.  No further questions, Judge.
22         MR. COURT:  Anything else, Mr. Noland?
23         MR. NOLAND:  Just quickly, Judge.
24                     - - -
25    MICHAEL DAVID BRASFIELD, RECROSS-EXAMINATION

Brasfield - recross by Mr. Noland

2660

1    BY MR. NOLAND:

2    Q.  Mr. Loevy was just asking you about a color, I think he

3    said blue, the blue color thing dealing with the permanent

4    retention files and your opinions --

5    A.  The blue was the investigative files.

6    Q.  Okay.  And the investigative files about whether or not

7    there are notes not on a GPR form in those type of files, is

8    that the blue section?

9    A.  I'm sorry.  Say that again.

10   Q.  What is the blue section?

11   A.  The blue section is the investigative files.

12   Q.  But those -- you're not saying --

13   A.  The basement files.  I mischaracterized.  Basement files.

14   Q.  That wasn't the section dealing with the comparison with

15   the criminal defense files, correct?

16   A.  I'm sorry.  Say that again?

17   Q.  I'm sorry.  I was confused with -- the question with

18   plaintiff's counsel, and probably my fault.

19          What I'm asking you is that the comparison with

20   the -- the only comparison you made with respect to whether or

21   not documents were missing from criminal defense files were on

22   those 50 cases that you and I spent some time with, right?

23   A.  Yes.

24   Q.  So all the other opinions you've given with respect to

25   permanent retention files and anything else and investigative

Brasfield - recross by Mr. Noland

2661

1  files, you're not offering any opinion that anything from

2  those files were withheld in those criminal cases; am I

3  correct?  You're just giving an opinion about the compliance

4  or non-compliance with the special order, right?

5  A.  I've testified -- what I testified to, the material, when

6  we were looking at the criminal -- when I was looking at the

7  criminal defense files, whether they contained or did not

8  contain documents.

9        I also testified that I looked at the investigative

10  files as a standalone process, what was in it, what wasn't in

11  it, I looked at the permanent retention files, what was in it,

12  what weren't in it, and then a comparison between the

13  investigative file and the basement file to the permanent

14  retention file.

15  Q.  And my question was that the only aspect of your review

16  related to what the CPD produced or didn't produce had to do

17  with the comparison with those 50 criminal defense files,

18  correct?

19  A.  Not entirely.

20  Q.  Isn't it true that you had no basis to say that in any of

21  those -- nothing to evaluate with with any of the files other

22  than those 50 files, you have the 400 that is or so --

23        MR. LOEVY:  Objection, scope, your Honor.

24        THE COURT:  Hang on a second.  Let me hear the whole

25  question.

Brasfield - recross by Mr. Noland

2662

1  BY MR. NOLAND:

2  Q.  -- that anything was withheld from criminal defense

3  attorneys in those cases?

4          THE COURT:  Hang on a second.

5          I am going to sustain the objection under Rule 403.

6          MR. NOLAND:  Nothing else.  Thanks, Judge.

7          THE WITNESS:  Thank you.

8          MR. KULWIN:  Nothing else, Judge.

9          MR. LOEVY:  We could try to call the next witness,

10  your Honor.

11          THE COURT:  Well, do you have any more questions

12  based on the redirect?

13          MR. LOEVY:  No.

14          THE COURT:  Do any of the jurors have any questions?

15          Well, we are definitely going to start with the next

16  witness.

17          Let me see the lawyers at sidebar.

18    (The following proceedings were had at sidebar outside the

19  hearing of the jury:)

20          THE COURT:  Okay.  I am going to read these.  What

21  did you mean by this -- the early part of his testimony, What

22  did you mean by, This case here with Mr. Fields was the

23  driving file?  And the word is "driving."  I honestly don't

24  remember it.

25          MR. LOEVY:  I didn't understand the question.

1        THE COURT:  You referred to the -- the juror thought

2   he said something along the lines of, This case here with

3   Mr. Fields was the driving file.  I really don't --

4        MR. BURNS:  Early on when you were identifying

5   Fields, you talked about Fields first --

6        MR. LOEVY:  Yeah, I was trying to say was it typical

7   of the others?  Do they mean like running file?

8        MR. KULWIN:  No, I think -- the way I take it, what I

9   heard was that it was like the driving thing that led to his

10  retention and why he was --

11       THE COURT:  Yeah.  Maybe I'll just ask him a leading

12  question about that.

13       The second question, Were the other files that he --

14  the basement files that he looked at, were they all homicide

15  files?

16       Anybody have a problem with that?

17       MR. NOLAND:  No.

18       THE COURT:  You stated that there was not enough

19  police training for constitutional safeguards for individuals.

20  Will you elaborate on constitutional safeguards for

21  individuals?  What individuals?

22       MR. KULWIN:  Can I have that one again, Judge?

23       THE COURT:  Just look at it.

24       MR. KULWIN:  There was not enough police training for

25  constitutional safeguards for individuals.  Will you elaborate

1    on constitutional safeguards -- what individuals?

2            Yeah, you can ask that, Judge.

3            THE COURT:  Okay.  Fine.

4            Who is the next witness?

5            MR. LOEVY:  Andrea Lyon, the Monell.

6            MR. NOLAND:  The only point I was trying to make at

7    the end, I don't want to go back, but the last objection you

8    sustained, I think it had to do with -- what I was trying to

9    get at was a motion in limine, I can't find it now, about he

10   couldn't say anything other than the criminal defense files

11   and those other 400 or so that he looked at that anything was

12   withheld from the criminal defense attorney.  We had a motion

13   in limine on that.

14           THE COURT:  It wasn't what it sounded like to me, so

15   I overruled it.

16     (The following proceedings were had in open court in the

17   presence and hearing of the jury:)

18           THE COURT:  I think it was somewhere early in your

19   direct examination, I think a question may have been asked

20   that referred to the Fields' case as kind of the driving file.

21   Is it fair to say that what prompted you to be retained in

22   this case was the Fields matter?

23           THE WITNESS:  Yes.

24           THE COURT:  Okay.  The other basement files that you

25   looked at, were they all homicide cases?

Lyon - direct

2665

1    THE WITNESS:  Yes.

2    THE COURT:  Okay.  And then the last question is you

3  made -- you gave some testimony along the lines of there

4  wasn't enough training involving constitutional safeguards for

5  individuals.  And the question is who are the individuals you

6  are talking about?  Are you talking about defendants in

7  criminal cases?

8    THE WITNESS:  That would be part of the group, yes.

9    THE COURT:  Okay.  Follow-up based on that,

10 Mr. Loevy?

11   MR. LOEVY:  No, your Honor.

12   THE COURT:  Anybody else?

13   MR. NOLAND:  No, your Honor.

14   THE COURT:  You are excused.

15   THE WITNESS:  Thank you, your Honor.

16  (Witness excused.)

17   THE COURT:  Please call the next witness.

18   MR. SWAMINATHAN:  Plaintiff calls Andrea Lyon.

19   THE COURT:  Come on up.

20  (Witness sworn.)

21                        - - -

22            ANDREA LYON, DIRECT EXAMINATION

23 BY MR. SWAMINATHAN:

24 Q.  Good afternoon.  Could you please state your name.

25 A.  My name is Andrea Lyon, L-y-o-n.

# Exhibit 87

## UNITED STATES DISTRICT COURT
### FOR THE Northern District of Illinois − CM/ECF LIVE, Ver 6.2.2
### Eastern Division

Jacques Rivera

                        Plaintiff,

v.                                     Case No.: 1:12−cv−04428
                                     Honorable Joan B. Gottschall

Reynaldo Guevara, et al.

                        Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Friday, June 29, 2018:

    MINUTE entry before the Honorable Joan B. Gottschall: Jury trial held. Jury deliberations began and concluded. The jury returns its verdict in favor of the plaintiff and against the defendants Reynaldo Guevara, Steve Gawrys, Edward Mingey, and the City of Chicago in the amount of $17,000,000.00 for compensatory damages on all five claims; $75,000.00 in punitive damages against Reynaldo Guevara; $25,000.00 in punitive damages against Steve Gawrys; and $75,000.00 in punitive damages against Edward Mingey. The jury returned a verdict for defendant Gillian McLaughlin and against plaintiff on all claims against her. Mailed notice(mjc, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

Plaintiffs' Exhibit IIIII

# Exhibit 88



**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JACQUES RIVERA,                    )
                                   )        No. 12 C 4428
    *Plaintiff,*                )
                                   )        Hon. Joan B. Gottschall,
    *v.*                       )        District Judge
                                   )
REYNALDO GUEVARA, *et al.,*        )
                                   )
    *Defendants.*              )
                                   )        JURY TRIAL DEMANDED


<u>**JURY INSTRUCTIONS**</u>


Plaintiffs' Exhibit JJJJJ

1

## FUNCTIONS OF THE COURT AND THE JURY

Members of the jury, you have seen and heard all the evidence and arguments of the attorneys. Now I will instruct you on the law.

You have two duties as a jury. Your first duty is to decide the facts from the evidence in the case. This is your job, and yours alone.

Your second duty is to apply the law that I give you to the facts. You must follow these instructions, even if you disagree with them. Each of the instructions is important, and you must follow all of them.

Perform these duties fairly and impartially. Do not allow sympathy, prejudice, fear, or public opinion to influence you. You should not be influenced by any person's race, color, religion, national ancestry, or sex.

Nothing I say now, and nothing I said or did during the trial, is meant to indicate any opinion on my part about what the facts are or about what your verdict should be.

**ALL LITIGANTS EQUAL BEFORE THE LAW**

In this case, one of the Defendants, City of Chicago, is a municipal corporation. All parties are equal before the law. A municipal corporation is entitled to the same fair consideration that you would give any individual person.

## EVIDENCE

The evidence consists of the testimony of the witnesses, the exhibits admitted in evidence, and stipulations.

A stipulation is an agreement between both sides that certain facts are true or that a person would have given certain testimony.

## DEPOSITION TESTIMONY

During the trial, certain testimony was presented to you by the reading of depositions and by video. You should give this testimony the same consideration you would give it had the witnesses appeared and testified here in court.

## WHAT IS NOT EVIDENCE

Certain things are not to be considered as evidence. I will list them for you:

First, if I told you to disregard any testimony or exhibits or struck any testimony or exhibits from the record, such testimony or exhibits are not evidence and must not be considered.

Second, anything that you may have seen or heard outside the courtroom is not evidence and must be entirely disregarded. This includes any press, radio, Internet, or television reports you may have seen or heard. Such reports are not evidence and your verdict must not be influenced in any way by such publicity.

Third, questions and objections or comments by the lawyers are not evidence. Lawyers have a duty to object when they believe a question is improper. You should not be influenced by any objection, and you should not infer from my rulings that I have any view as to how you should decide the case.

Fourth, the lawyers' opening statements and closing arguments to you are not evidence. Their purpose is to discuss the issues and the evidence. If the evidence as you remember it differs from what the lawyers said, your memory is what counts.

## NOTE-TAKING

Any notes you have taken during this trial are only aids to your memory. The notes are not evidence. If you have not taken notes, you should rely on your independent recollection of the evidence and not be unduly influenced by the notes of other jurors. Notes are not entitled to any greater weight than the recollections or impressions of each juror about the testimony.

## CONSIDERATION OF ALL EVIDENCE REGARDLESS OF WHO PRODUCED

In determining whether any fact has been proved, you should consider all of the evidence bearing on the question regardless of who introduced it.

## LIMITED PURPOSE OF EVIDENCE

You will recall that during the course of this trial I instructed you that I admitted certain evidence for a limited purpose. You must consider this evidence only for the limited purpose for which it was admitted.

## WEIGHING THE EVIDENCE

You should use common sense in weighing the evidence and consider the evidence in light of your own observations in life.

In our lives, we often look at one fact and conclude from it that another fact exists. In law we call this "inference." A jury is allowed to make reasonable inferences. Any inference you make must be reasonable and must be based on the evidence in the case.

## DEFINITION OF "DIRECT" AND "CIRCUMSTANTIAL" EVIDENCE

You may have heard the phrases "direct evidence" and "circumstantial evidence." Direct evidence is proof that does not require an inference, such as the testimony of someone who claims to have personal knowledge of a fact. Circumstantial evidence is proof of a fact, or a series of facts, that tends to show that some other fact is true.

As an example, <u>direct evidence</u> that it is raining is testimony from a witness who says, "I was outside a minute ago and I saw it raining." <u>Circumstantial evidence</u> that it is raining is the observation of someone entering a room carrying a wet umbrella.

The law makes no distinction between the weight to be given to either direct or circumstantial evidence. You should decide how much weight to give to any evidence. In reaching your verdict, you should consider all the evidence in the case, including the circumstantial evidence.

## TESTIMONY OF WITNESSES (DECIDING WHAT TO BELIEVE)

You must decide whether the testimony of each of the witnesses is truthful and accurate, in part, in whole, or not at all. You also must decide what weight, if any, you give to the testimony of each witness.

In evaluating the testimony of any witness, including any party to the case, you may consider, among other things:

- the ability and opportunity the witness had to see, hear, or know the things that the witness testified about;

- the witness's memory;

- any interest, bias, or prejudice the witness may have;

- the witness's intelligence;

- the witness's age;

- the manner of the witness while testifying;

- and the reasonableness of the witness's testimony in light of all the evidence in the case.

12

## PRIOR INCONSISTENT STATEMENTS

You may consider statements given by a party before trial as evidence of the truth of what he or she said in the earlier statements, as well as in deciding what weight to give his or her testimony.

You may also consider statements given by a witness under oath before trial as evidence of the truth of what that witness said in the earlier statements, as well as in deciding what weight to give his or her testimony.

With respect to statements given by a witness before trial that were not given under oath, the law is different. If you decide that, before the trial, a witness made a statement that is inconsistent with his or her testimony here in court, you may consider the earlier statement only in deciding whether the witness's testimony here in court was true and what weight to give his or her testimony.

In considering a prior inconsistent statement, you should consider whether it was simply an innocent error or an intentional falsehood and whether it concerns an important fact or an unimportant detail.

## LAWYER INTERVIEWING WITNESS

It is proper for a lawyer to meet with any witness in preparation for trial.

## NUMBER OF WITNESSES

You may find the testimony of one witness or a few witnesses more persuasive than the testimony of a larger number. You need not accept the testimony of the larger number of witnesses.

## ABSENCE OF EVIDENCE

The law does not require any party to call as a witness every person who might have knowledge of the facts related to this trial. Similarly, the law does not require any party to present as exhibits all papers and things mentioned during this trial.

## EXPERT WITNESSES

You have heard witnesses give opinions about matters requiring special knowledge or skill. You should judge this testimony in the same way that you judge the testimony of any other witness. The fact that such person has given an opinion does not mean that you are required to accept it. Give the testimony whatever weight you think it deserves, considering the reasons given for the opinion, the witness's qualifications and all other evidence in the case.

## DEMONSTRATIVE EXHIBITS

Certain charts, maps, timelines, and summaries have been shown to you. Those demonstrative exhibits are used for convenience and to help explain the facts of the case. They are not themselves evidence or proof of any facts.

## MULTIPLE CLAIMS; MULTIPLE DEFENDANTS

You must give separate consideration to each claim and each party in this case. Although there are 4 police officer defendants, it does not necessarily follow that if one is liable, any of the others is also liable.

## BURDEN OF PROOF

When I say a particular party must prove something by "a preponderance of the evidence," or when I use the expression "if you find," or "if you decide," this is what I mean: When you have considered all the evidence in the case, you must be persuaded that it is more probably true than not true.

## THE DEFENDANTS' ASSERTIONS OF THE FIFTH AMENDMENT

In response to questions here, defendants Guevara and Mingey have asserted their Fifth Amendment right not to incriminate themselves.

You may draw an inference against defendants Guevara and Mingey as a result of their decision to invoke their Fifth Amendment right instead of testifying, and you may assume that any response that they might have given to the questions asked would have been unfavorable to them, but you may not find a defendant liable on the basis of silence alone.

## THE PARTIES AND THE CLAIMS

The plaintiff in this case is Jacques Rivera. I will refer to him as the plaintiff.

The defendants in this case are Reynaldo Guevara, Steve Gawrys, Edward Mingey, Gillian McLaughlin, and the City of Chicago. I will refer to them as the defendants.

The plaintiff claims that defendants Guevara, Gawrys, Mingey, and McLaughlin violated his civil rights and entered into an agreement to violate his rights. The plaintiff also claims that defendant Guevara intentionally inflicted emotional distress on him.

As to the City of Chicago, the plaintiff contends that an official policy or widespread practice of the City caused a violation of his civil rights.

The defendants deny each of the plaintiff's claims.

## FIRST CLAIM—VIOLATION OF DUE PROCESS

The plaintiff's first claim is that defendants Guevara, Gawrys, Mingey, and McLaughlin violated his constitutional right to due process of law.

To succeed on this claim as to the particular defendant you are considering, the plaintiff must prove each of the following things by a preponderance of the evidence:

1. The defendant:

   a. knowingly concealed exculpatory and/or impeachment evidence, and the evidence was not otherwise available to the plaintiff, through the exercise of reasonable diligence, to make use of at his criminal trial;

      and/or

   b. knowingly fabricated or participated in the fabrication of evidence.

2. The evidence was material.

3. The plaintiff was damaged as a result.

I will now define some of the terms that I have just used.

"Exculpatory evidence" is evidence that would tend to show that the accused is not guilty of the crime charged.

"Impeachment evidence" is evidence that would undermine the credibility of a prosecution witness.

Evidence is considered "material" if it would have had a reasonable likelihood of affecting the outcome of the criminal case.

## SECOND CLAIM—CONSPIRACY TO VIOLATE CONSTITUTIONAL RIGHTS

The plaintiff's second claim is that defendants Guevara, Gawrys, Mingey, and McLaughlin conspired to deprive him of his constitutional rights.

A conspiracy is an agreement to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.

To succeed on his conspiracy claim as to the specific defendant you are considering, the plaintiff must prove each of the following things by a preponderance of the evidence:

1. The defendant joined an agreement between two or more persons to violate the plaintiff's due process right to a fair trial.

2. The defendant knowingly became a member of the agreement with the intention to carry it out.

3. One or more of the participants committed an act in an effort to carry out the agreement.

4. As a result, the plaintiff's constitutional rights were violated.

In order to show that the defendant joined an agreement, the plaintiff must prove that the participants shared a common purpose. The plaintiff does not have to prove that there was a formal agreement or plan in which all involved met together and worked out the details. He also does not have to prove that each participant knew all the details of the agreement or the identity of all the participants.

## THIRD CLAIM—FAILURE TO INTERVENE

The plaintiff's third claim is that defendants Guevara, Gawrys, Mingey, and McLaughlin failed to intervene to stop the violation of his constitutional right to due process.

To succeed on this claim as to the particular defendant you are considering, the plaintiff must prove each of the following things by a preponderance of the evidence:

1. The plaintiff's constitutional rights were violated.

2. The defendant knew that the plaintiff's constitutional rights were being violated or would be violated.

3. The defendant had a realistic opportunity to prevent harm from occurring.

4. The defendant failed to take reasonable steps to prevent harm from occurring.

5. The defendant's failure to act caused the plaintiff to suffer harm.

## FOURTH CLAIM—POLICY CLAIM AGAINST THE CITY OF CHICAGO

The plaintiff's fourth claim is that the City of Chicago had a policy or widespread practice that caused a violation of his constitutional rights

To succeed on this claim, the plaintiff must prove each of the following things by a preponderance of the evidence:

1. The plaintiff's constitutional rights were violated as defined in these instructions.

2. The City of Chicago had a policy of concealing material exculpatory and/or impeachment evidence. The term "policy" means:

    a. An express policy.

    or

    b. A widespread practice that is so permanent and well-settled that it constitutes a custom. A widespread practice may be a custom even if the City of Chicago has not formally approved it, so long as the plaintiff proves that the City of Chicago knew of the practice and allowed it to continue. This includes a situation where the City of Chicago must have known about a subordinate's actions or failure to act.

    or

    c. A decision or policy statement, including a decision not to adopt a needed policy, made by the City of Chicago.

    or

    d. A practice of failing to train employees of the City of Chicago or the Chicago Police Department.

3. The policy as described in paragraph 2 caused the violation of the plaintiff's constitutional rights.

## DEFINITION OF "FAILURE TO TRAIN"

To succeed on his claim against defendant City of Chicago for a policy of failure to train employees of the Chicago Police Department, the plaintiff must prove each of the following things by a preponderance of the evidence:

1. That the City of Chicago's training program was not adequate to train its officers to properly handle recurring situations;

2. The City of Chicago knew that exculpatory or impeachment information would not be disclosed because there was a pattern of similar constitutional violations <u>or</u> because it was highly predictable even without a pattern of similar constitutional violations.

3. The City of Chicago's failure to provide adequate training caused the violation of the plaintiff's constitutional rights.

## FIFTH CLAIM—INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

The plaintiff's fifth claim is that defendant Guevara intentionally caused him emotional distress.

To succeed on his claim, the plaintiff must prove the following by a preponderance of the evidence:

1. The conduct of the defendant was extreme or outrageous.

2. The defendant intended to inflict emotional distress on the plaintiff or knew that there was a high probability that his conduct would cause emotional distress.

3. The defendant's conduct caused plaintiff severe emotional distress.

## JUDGE'S COMMENTS TO LAWYER

I have a duty to caution or warn an attorney who does something that I believe is not in keeping with the rules of evidence or procedure. You are not to draw any inference against the side whom I cautioned or warned during the trial.

## EVIDENCE OF OTHER ACTS BY DEFENDANT GUEVARA

You have heard evidence in the form of testimony from witnesses that defendant Reynaldo Guevara committed acts other than the ones alleged in this lawsuit. You must first decide whether it is more likely than not that defendant Reynaldo Guevara performed the unrelated acts as alleged by the witnesses. If you decide that he did commit the unrelated acts alleged by the witnesses, then you may consider this evidence only to help you decide defendant Reynaldo Guevara's intent, absence of mistake, opportunity, plan, or knowledge regarding Orlando Lopez's false identification of Jacques Rivera.

You may not consider the alleged acts for any other purpose. Keep in mind that defendant Reynaldo Guevara is on trial here only for allegations in this lawsuit, not for any other alleged acts that may have occurred at some other time or in some other context.

## CHICAGO POLICE DEPARTMENT REGULATIONS

You have heard evidence about whether Chicago Police Department regulations were complied with. You may consider this evidence in your deliberations. But remember that the ultimate question you must decide is whether the plaintiff has proven the claims as I have described them in the preceding instructions, not whether Police Department regulations may have been violated.

## LIMITING INSTRUCTION ON POST-CONVICTION RULING

You have heard evidence about Plaintiff's post-conviction proceeding. Plaintiff was granted post-conviction relief and a new trial on the basis of evidence of his actual innocence. The State decided not to retry Plaintiff.

The issues for you to decide in this case were not decided during the post-conviction proceeding.

## DAMAGES

The plaintiff is requesting compensatory damages and punitive damages.

If you find in favor of the plaintiff against one or more of the defendants on one or more of the plaintiff's claims, then you will go on to consider the question of damages.

If you find in favor of all of the defendants on all of the plaintiff's claims, then you will not consider the question of damages.

## COMPENSATORY DAMAGES

You are to determine the amount of money that will fairly compensate the plaintiff for any injury that you find he sustained and is reasonably certain to sustain in the future as a result of the defendants' wrongful conduct.

The plaintiff must prove his damages by a preponderance of the evidence. Your award must be based on evidence and not speculation or guesswork. This does not mean, however, that compensatory damages are restricted to the actual loss of money; they include both the physical and mental aspects of injury, even if they are not easy to measure.

You should consider the following types of compensatory damages:

1.      The physical, mental, and emotional pain and suffering that the plaintiff has experienced in the past and is reasonably certain to experience in the future.

2.      The loss of normal life that the plaintiff has experienced in the past and is reasonably certain to experience in the future.

No evidence of the dollar value of physical, mental, or emotional pain and suffering or loss of a normal life has been or needs to be introduced. There is no exact standard for setting the damages to be awarded on account of these factors. You are to determine an amount that will fairly compensate the plaintiff for the injury he has sustained.

## PUNITIVE DAMAGES

If you find for the plaintiff, you may, but are not required to, assess punitive damages against an individual defendant who you find liable. Punitive damages are not available against the municipal defendant, City of Chicago. The purposes of punitive damages are to punish a defendant for his conduct and to serve as an example or warning to the defendant and others not to engage in similar conduct in the future.

The plaintiff must prove by a preponderance of the evidence that punitive damages should be assessed against a defendant. You may assess punitive damages only if you find that his conduct was malicious or in reckless disregard of the plaintiff's rights. Conduct is malicious if it is accompanied by ill will or spite, or is done for the purpose of injuring the plaintiff. Conduct is in reckless disregard of the plaintiff's rights if, under the circumstances, a defendant simply did not care about the plaintiff's rights.

If you find that punitive damages are appropriate, then you must use sound reason in setting the amount of those damages. Punitive damages, if any, should be in an amount sufficient to fulfill the purposes that I have described to you, but should not reflect bias, prejudice, or sympathy toward any party. In determining the amount of any punitive damages, you should consider the following factors:

- the reprehensibility of that defendant's conduct;

- the impact of that defendant's conduct on the plaintiff;

- the relationship between the plaintiff and that defendant;

- the likelihood that defendant would repeat the conduct if an award of punitive damages is not made;

- the relationship of any award of punitive damages to the amount of actual harm the plaintiff suffered.

35

## SELECTION OF PRESIDING JUROR;
## GENERAL VERDICT

Upon retiring to the jury room, you must select a presiding juror. The presiding juror will preside over your deliberations and will be your representative here in court.

Forms of verdict have been prepared for you.

[Forms of verdict read.]

Take these forms to the jury room, and when you have reached unanimous agreement on the verdict, your presiding juror will fill in and date the appropriate form, and all of you will sign it.

## COMMUNICATION WITH COURT

I do not anticipate that you will need to communicate with me. If you do need to communicate with me, the only proper way is in writing. The writing must be signed by the presiding juror, or, if he or she is unwilling to do so, by some other juror. The writing should be given to the marshal, who will give it to me. I will respond either in writing or by having you return to the courtroom so that I can respond orally.

If you do communicate with me, you should not indicate in your note what your numerical division is, if any.

## DISAGREEMENT AMONG JURORS

The verdict must represent the considered judgment of each juror. Your verdict, whether for or against the parties, must be unanimous.

You should make every reasonable effort to reach a verdict. In doing so, you should consult with one another, express your own views, and listen to the opinions of your fellow jurors. Discuss your differences with an open mind. Do not hesitate to reexamine your own views and change your opinion if you come to believe it is wrong. But you should not surrender your honest beliefs about the weight or effect of evidence solely because of the opinions of other jurors or for the purpose of returning a unanimous verdict.

All of you should give fair and equal consideration to all the evidence and deliberate with the goal of reaching an agreement that is consistent with the individual judgment of each juror. You are impartial judges of the facts.

# Exhibit 89

*Michael Brasfield and Associates, Inc.*

641 Olele Point Road                    Phone: 360-301-4465
Port Ludlow, WA 98365                   E-mail: brasfield@commandscene.com

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

**Jacques Rivera v. Guevara, et al.**
No. 12 CV 4428

**Report of Plaintiff's Expert – Michael D. Brasfield**

**December 30, 2016**

**INTRODUCTION**

Anand Swaminathan with the law firm of Loevy & Loevy, representing the plaintiff in this matter, contacted and retained me more than a year ago to assess whether there were any deviations from generally accepted police practices in the actions of numerous employees of the Chicago Police Department ("CPD"), specifically as they relate to matters stemming from the arrest and eventual incarceration of Jacques Rivera for his alleged murder of Felix Valentin. These events occurred over more than a 20 year period – beginning in 1988 and ending in 2011. Jacques Rivera spent more than 20 years in a maximum security prison as the result of the actions of the defendants. As a result of my review of the materials provided to me, I have concluded to a reasonable degree of professional certainty that the defendants and the CPD failed to conduct even a cursory investigation of the facts and that they intentionally and willfully manufactured and falsified evidence, manipulated witnesses, and withheld critically relevant information from the defendant and his attorneys. I have also concluded that the defendants and the CPD had a widespread practice or custom of acting in the same manner in similar cases for many years. In my opinion, there were numerous departures from generally accepted police practices in the Felix Valentin homicide investigation; and, the CPD, through its policies, practices, commissions and omissions created an environment where officers could routinely ignore city policies and the law with impunity and that such behavior was not only tolerated, but encouraged. Despite the City's formal written policies related to investigations and accountability, the evidence demonstrates that as a matter of unofficial policy or widespread practice, police officers routinely violated common and accepted police investigative practices.

I have also reviewed the CPD's policies and practices related to the creation, maintenance, storage, preservation, and disclosure of investigative materials in homicide cases, as concerning the *Rivera v. City of Chicago* case discussed below, and more broadly. To that end, I reviewed documents regarding CPD's policies and practices governing homicide investigative files. I also reviewed numerous files created by CPD detectives during homicide investigations and compared those files to defense attorneys' files to assess whether relevant investigative material was disclosed or withheld. I have also relied upon the substantial

1

knowledge and experience I have gained from reviewing hundreds of CPD homicide investigation files and tens of thousands of pages of material in other cases involving the withholding of exculpatory information in so-called street files, including *Fields v. City of Chicago* and *Kluppelberg v. City of Chicago*. Through those cases and this one, I have reviewed hundreds of homicide files across different detective areas of the city, and maintained and stored in different locations. Based on my review, I have concluded to a reasonable degree of professional certainty that the CPD's policies and practices related to the creation, maintenance, storage, preservation, and disclosure of investigative material deviated substantially from generally accepted police practices and resulted in the routine failure to disclose important investigative materials to criminal defendants.

My opinions and the facts upon which I base my opinions are discussed in greater detail below.

I have been an active-duty municipal and/or county law enforcement official for approximately 39 years. I retired from active governmental service in 2009. I have served as the Chief of Police of the Fort Lauderdale Police Department, the Assistant Chief of the Seattle Police Department, and the elected Sheriff of Jefferson County, Washington. Over the last 20 years I have also been actively engaged as a consultant, trainer, case reviewer and expert witness in law enforcement related matters. An overview of my qualifications follows in Section I.A. As a police practices expert, I have testified in state and federal courts for both plaintiffs and defendants.

A list of cases will be found in Attachment A; material reviewed for this case is in Attachment B; my rate of compensation in Attachment C; and a complete and detailed resume in Attachment D; a list of reference materials in Attachment E; summary of my file-by-file comparisons in Attachment F; a spreadsheet of my data analysis in Attachment G; a copy of my expert report in *Fields v. City of Chicago* in Attachment H; and a copy of my expert report in *Kluppelberg v. City of Chicago* in Attachment I.

I reserve the right to alter my opinions and/or form additional opinions regarding this case upon disclosure to me of further information or documentation related to this case.

HOOD 039027
Weston 054044

## <u>TABLE OF CONTENTS</u>

I.      Background

        A.  Expert Witness Qualifications

        B.  Materials and Other Information Reviewed and Used in Forming Opinions

II.     Summary of Relevant Facts

III.    Deviations from professional homicide investigation standards in Felix Valentin homicide investigation

IV.     Failures in CPD's internal investigation and disciplinary processes allowed Defendant Reynaldo Guevara to engage in the sort of investigative misconduct alleged here

V.      The CPD's policies and practices related to the creation, maintenance, storage, preservation, and disclosure of investigative material deviated substantially from generally accepted police practices

        A.  Standard police practices for maintaining and disclosing investigative files requires a single, comprehensive file

        B.  *Jones* and *Palmer* litigation highlight Chicago's "Street File" problem

        C.  CPD personnel consistently use multiple files during a criminal investigation, and fail to disclose all relevant materials to criminal defendants.

            1.  Multiple files are created for a single investigation, creating a serious risk that investigative materials are not disclosed.

            2.  The CPD's *ad hoc* response to subpoenas exacerbates the problem

        D.  Criminal defense files show that important investigative materials are regularly withheld from criminal defendants

            1.  Background on the Area North investigative files and my file review in this case

            2.  Criminal defense files are missing pages from the police investigative files

            3.  Issuing a subpoena does little to ensure disclosure of all relevant materials

            4.  The missing pages contain important and relevant information that should have been disclosed to criminal defendants

HOOD 039028
Weston 054045

E. CPD's policies after *Jones* and *Palmer* don't ensure disclosure of all relevant investigative materials

    1. The policies are insufficient to remedy the "street files" problem

    2. The City failed to provide proper training and oversight to ensure compliance with the special orders

F. The police investigative files show that the directives were not properly implemented

    1. The police files from the 1985 to 1989 time period show that CPD's policies were not followed

        a. Handwritten notes, not on general progress reports, are still routinely used

        b. To-from memos are still being used

        c. Review of permanent retention files: all relevant information in unofficial documents is not transcribed in official reports

        d. Inventories are missing or incomplete

    2. The investigative files confirm that there was no training, auditing, or oversight to ensure compliance with the policies

G. There is strong evidence in the police investigative files, the Valentin investigation itself, and other CPD street file cases that there are yet other investigative files and documents that are unaccounted for by CPD and inaccessible to the prosecutors and criminal defendants

    1. My analysis of hundreds of files indicates that investigative information is being kept in other repositories or being destroyed

    2. The documents and testimony from this case provide further evidence of the existence of additional files and the failure to preserve investigative information.

    3. Kluppelberg and Fields are additional examples of cases in which previously missing street files containing highly exculpatory information were discovered in civil litigation decades after the original criminal trials

        a. Fields v. City of Chicago

        b. Kluppelberg v. City of Chicago

4

HOOD 039029
Weston 054046

H.  The failure to turn over files in Jacques Rivera's case was a direct result of these
practices and inadequate policies

HOOD 039030
Weston 054047

I. **Background**

A. **Expert Witness Qualifications**

I began my 41-year law enforcement career in 1968 as a patrol officer with the City of Mercer Island, Washington. In 1969, I joined the Seattle Police Department and served Seattle as a police officer, detective, sergeant, lieutenant, captain, major, and assistant chief. In addition to uniformed patrol, my investigative assignments as a detective included traffic homicide investigation, burglary and theft, and vice (gambling and prostitution). As a sergeant, I served in patrol, the tactical squad, and internal investigations. As a lieutenant, I served as a watch commander in charge of 50 patrol officers, and later as the commander of the Washington State Criminal Justice Training Commission's Basic Law Enforcement Academy for 2 years. This academy was responsible for developing and providing the initial law enforcement training for all commissioned law enforcement officers in Washington State. As a captain, I served as commander at both the downtown and north precincts, with responsibility for over 125 officers at each location. I also served as the commander of the Internal Investigations section of the Seattle Police Department for 2 years. I was the major in command of the inspectional services division for 4 years. This division was responsible for developing, implementing, and monitoring departmental policies and procedures. This division was also responsible for developing and administering a budget in excess of $120 million. My last 5 years with the Seattle Police Department were served as assistant chief in command of the support services bureau. I was responsible for, and oversaw the activity of, nine uniquely different divisions including: internal investigations; training; personnel, intelligence; crime prevention; communications; records & evidence, which included the maintenance and control of homicide files; data processing; and fiscal, property, & fleet management. In this capacity I routinely served as the acting Chief of Police. I retired from the agency in 1995.

I was selected by the City of Fort Lauderdale as their Police Chief in 1995. The 33 square mile city has a full time resident population of 165,000. An estimated additional 60,000 "snow bird" residents return to second homes in the city during the 6-month winter season. Fort Lauderdale serves as the seat of government for the county of 1.5 million and is in the heart of a diverse tri-county (Dade, Broward, and the Palm Beach) population of 4 million. As one of the premier tourist destinations in South Florida, over 12 million passengers come through the airport each year. The ocean port handles the second largest number of cruise ship sailings in the world. Fort Lauderdale serves as the governmental and business hub of the County. The Fort Lauderdale Police Department had a budget of $60 million and consisted of 500 sworn positions and 300 civilian positions. In 2000, the department received 600,000 calls for service, dispatched over 200,000 of those calls, made over 20,000 arrests, and issued 65,000 traffic citations. The Department is now nationally recognized as an innovative leader in the field of community policing and was one of only a handful of cities nationwide to be selected as a Community Policing Demonstration Site by the Department of Justice. I oversaw the operation of the only municipal jail in the state of Florida. Under my tenure, Fort Lauderdale became the first major agency to obtain accreditation. After over 6 years as the police chief of Fort Lauderdale, I retired from law enforcement a second time and returned to the Seattle area in the fall of 2001.

HOOD 039031
Weston 054048

After retiring as Chief of the Fort Lauderdale Police Department I returned to my retirement home in Washington State. After a year and a half, I chose to run for, and was elected to, the office of Jefferson County Sheriff. I served in that capacity for over 6 years, and retired for the third (and final) time in the spring of 2009.

As both a Police Chief (6 years) and Sheriff (6 years), I have reviewed and approved policy and procedures of every kind. These included (but not limited to) criminal investigations, maintenance of police records, complaints against police officers, training, supervision and discipline.

Of specific relevance to this case - During my 4 years as a supervisor and commander of the Internal Investigation Section of the Seattle Police Department I was directly involved with thousands of investigations of allegations of employee misconduct, including failure to adhere to rules and regulations. These included criminal investigations, up to and including evidence and witness tampering, burglary, robbery, sexual assault, and homicide investigations in officer involved shootings.

Of specific relevance to this case - During my 31 years in a supervisory and management capacity as a Sergeant, Lieutenant, Captain, Major, Assistant Chief, Chief of Police, and Sheriff, I have been responsible for the review and processing of hundreds of disciplinary actions up to and including termination.

Of specific relevance to this case - I am the past chair of the Washington State Board on Law Enforcement Training, Standards, and Education. As such we regularly examined and reviewed issues and criteria that define standards and norms related to the practice and administration of law enforcement practices and operations.

Of specific relevance to this case - Since the enactment of legislation establishing the Washington Peace Officer Certification Revocation Hearing process, I participated as a member of that panel in more Revocation Hearings than any other sworn law enforcement officer to date.

Of specific relevance to this case – During my 2 years as Commander of the Washington State Basic Law Enforcement Academy in Burien, I was responsible for the administration of the training program provided to all Washington State Law Enforcement Officers. This was also my role as the Assistant Chief of the Seattle Police Department responsible for in-service and advanced training at the Academy over a subsequent 5 year period.

Of specific relevance to this case - I have been responsible for the development, formulation and updating of police policy and procedures as the Commander (6 years) of the Seattle Police Department's Inspectional Services Division.

As an independent consultant and sub-contractor, I have completed on-site visits to analyze 6 major U.S. City (Boston, Baltimore, Memphis, Oxnard, Cleveland & Seattle) police agencies to evaluate community policing in public housing. I have also served as a visiting management assessor for the cities of New Orleans (LA), Columbus (OH), Portland, (OR), San Francisco (CA), Bremerton (WA). Upon my return to Seattle in 2001, I provided contract

HOOD 039032
Weston 054049

professional services as a consultant and program director for the non-profit South Downtown Foundation. I had responsibility for administering several million dollars for improving public safety in the International District, SoDo, and Pioneer Square neighborhoods of Seattle. In this capacity I coordinated efforts with the City of Seattle, the Seattle Police Department and various interest and civic groups in the area.

In 2002, I became a candidate for the Sheriff of Jefferson County, Washington. I was successful and assumed that office on January 1, 2003. I successfully ran for re-election in 2006 and was returned to office with 80% of the popular vote. I held a gubernatorial appointment to the Washington State Sentencing Guidelines Commission, serving as the only law enforcement official on this body of judicial, legislative and governmental representatives. I chaired the Washington State Criminal Justice Training Commission's Board on Law Enforcement Training, Standards, and Education. Members of this board monitor and evaluate the training of police officers and participate in law enforcement decertification hearings.

Over the last 40 years I have received extensive, specialized professional training in nearly all areas of law enforcement. There has been particular emphasis in the areas of training, internal investigations, accident investigation, use of force, ethics and police liability. I was awarded "life member" status with the International Association of Chiefs of Police in 2005. I was also awarded "life member" status with the Washington Association of Sheriffs and Police Chiefs in 2009. I am also a "life member" of the National Sheriffs Association. I have also been a member of the Washington State Sheriff's Association and served on the executive board of that organization.

During my career, I have been required to investigate and/or review hundreds of internal investigations. I have supervised hundreds of officers, and have had to review their compliance with standards of behavior and truthfulness. As both a supervisor, and later a commander of internal investigations with the Seattle Police Department, I have reviewed and evaluated the thoroughness of well over hundreds of such investigations. As a police chief and as a sheriff, I have had the ultimate responsibility of passing judgment on such actions by law enforcement officers in situations ranging from traffic stops to fatal shootings.

I received a Bachelor of Arts degree in Criminal Justice from the University of Washington in Seattle. I also am a graduate of the Senior Management Institute for Police (SMIP) of the Police Executive Research Forum. A copy of my Curriculum Vitae is attached as Appendix A.

### B. Materials and Other Information Reviewed and Used in Forming Opinions

The following opinions are based upon my four decades of knowledge, education, training, and experience as a police officer, detective, police supervisor, commander, police chief, and sheriff. In particular, they are based on my lengthy experience with the law enforcement specialties of inspections, training, policy development, accreditation, jail operations and police internal investigations. My opinions are also based on the extensive materials I have been provided by counsel. I have attached a list of those documents as Attachment B. I have formed the following opinions based on a reasonable degree of certainty within the field of law enforcement practices and procedures. It is my practice to evaluate the reasonableness of police policies, practices, and

HOOD 039033
Weston 054050

procedures on a case-by-case basis from the perspective of a police reviewing authority. My experience and qualifications are briefly outlined above and documented in my complete resume in Attachment D of this document.

II. **Summary of Relevant Facts**

On Saturday afternoon, the 27th of August 1988, Israel Valentin (age 22) and his younger brother Felix Valentin (age 16) drove to an apartment building located at 3324 West Cortland Street in the City of Chicago, Illinois. Israel exited their car and went inside the building to pick up his girlfriend, Marilyn Lopez, to attend a wedding. While Israel was in the building, Felix waited in the driver's seat of their car. An individual approached the car and shot Felix multiple times, then jumped into a waiting car driven by another individual and fled the scene. Shortly thereafter, Israel returned to the vehicle and discovered his younger brother seriously wounded. Police communications received the call at 3:39 pm. Israel took Felix to Norwegian Hospital and he was eventually transferred to Cook County Hospital.

Felix succumbed to his wounds nearly 3 weeks later on 9/14/1988. Felix's hospital treatment is related in the deposition of Dr. Arthur Sharkey. Felix suffered from multiple gunshot wounds and was treated in the intensive care unit over a period of nearly 3 weeks. Police reports document his poor condition and inability to interact with officers (Wron 00031- 00036). As of 9/9/1988, Valentin was not responsive to painful or verbal stimuli, his pupils did not react to light, he was on a ventilator and a moving bed, he was not breathing on his own, he was on medication to paralyze him, and he was suffering from a major infection. According to Dr. Sharkey, there is no indication in the medical records that Valentin regained responsiveness between 9/9/1988 and his death on 9/14/1988.

On 8/27/1988, responding police units who arrived at Norwegian Hospital were furnished with descriptions of the suspect and his "getaway" driver. The victim Felix described both subjects as Hispanic males between the ages of 16-18 driving an older brown vehicle – possibly a Toyota hatchback (Hickey 00002). Responding police units reported also that Felix related that the suspect had been wearing a yellow baseball hat and was of light to medium complexion (Hickey 00004).

Detectives McLaughlin and Leonard responded to the hospital at 5:15 p.m. 8/27/1988 to interview Felix and Israel. Detectives created a general progress report and police report reflecting the interview. The general progress report relates Israel's description of the events surrounding the shooting. It does not contain a description of the suspect and getaway driver. In addition, the general progress report contains information that Marilyn Lopez's younger brother, Orlando "Macho" Lopez (age 12) may have observed some portion of the shooting but had not been interviewed (Wron 00069). The police report (Wron 00031-Wrong 00033) contains a description of the suspect – Hispanic male between the ages of 18-22 with brown eyes, dark hair, a black jean jacket, dark pants, and gym shoes – and getaway driver – Hispanic male between the ages of 18-22. The description is not attributed to any person and the report does not describe the origin of the description. In addition, the description does not appear in the general progress report and is different than the description reported by responding police units. The police report omits any reference to Orlando Lopez.

HOOD 039034
Weston 054051

Additional detectives Letrich and Moriarty interviewed Felix Valentin at the hospital on 8/30/1988 (Wron 00039). Felix stated that the two suspects were members of the "Imperial Gangsters". Detectives presented an Imperial Gangster photo album ("gang book") to Felix. Felix identified the shooter as Jose Antonio "Chequin" Rodriguez, and the driver of the getaway car as Phillip Nieves. Based on the identification provided by the shooting victim, Rodriguez was arrested just 3 blocks from the scene of the shooting at 1 a.m. on 8/31/1988 by Officers Moriarity, Vergara and Wojcik (at the request of Letrich) as the suspect in the shooting (Wron 00058). A hold dated 8/31/1988 was placed on Rodriguez that stated that officers expected to charge him with aggravated assault on Felix Valentin by 1 a.m. on 9/2/1988 (Wron 00059). The hold also stated that a line-up was to be viewed by the witness in the case. A release form dated 8/31/1988 states that the victim was unable to identify the defendant, due to being heavily sedated for pain (Wron 0063).

A photograph of Rodriguez was provided to me during my review of the case (RFC 1420) as part of a set of six photographs (RFC 1415-1420). These photographs are not part of the police, prosecutor, or criminal defense files provided to me. The numbered photographs appear to correspond to detective Leonard's general progress report dated 8/31/1988 (Wron 0064), and to the photograph evidence form dated 8/31/1988 11:45 p.m. (Wron 0062).

Gang Specialists Guevara and Gawrys reported on 9/16/1988 that they showed photographs of Rodriguez and Nieves to Orlando Lopez following a physical lineup on 9/15/1988. The report states that Lopez denied that Rodriguez and Nieves were involved in the shooting of Felix Valentin (Wron 00010). There is no photo of Nieves in the file.

With the exception of the above, there is no further reference to Rodriguez or to Nieves in the material.

Detectives McLaughlin and Leonard reported that on 8/29/1988 they interviewed Orlando Lopez. The report states (Wron 00030):

LOPEZ was coming from the store at corner of Kimball and Cortland. LOPEZ observed a copper colored GM-type car coming out of the alley, traveling northbound at approximately 3319 W. Cortland. LOPEZ indicated that said vehicle contained 2 M/WH's one of whom exited from the passenger's side of the vehicle and began to walk toward 3320 W. Cortland where the victim was seated behind the wheel of his vehicle. Suddenly, the M/WH began to run toward vehicle and LOPEZ noticed a gun in M/WH's hand. LOPEZ believed he heard three (3) shots but indicated that they were not very loud. LOPEZ indicated that LOPEZ saw the victim lean forward and to the right in the vehicle which victim had been seated.

LOPEZ informed R/D's that LOPEZ could identify the shooter because LOPEZ recognized the shooter as a M/WH who played baseball at Humboldt Park and LOPEZ had observed him there on a few occasions. LOPEZ did not know shooters name but was aware that shooter was affiliated with the Latin Kings. LOPEZ then viewed books and made an identification of one RIOS, Jose (16-D LATIN KING Page 40D) as the M/WH

HOOD 039035
Weston 054052

who exited the copper car and shot the victim. At this time there is no identification of the driver.

On 9/16/1988, Gang Specialists Guevara and Gawrys also reported that Orlando Lopez was located and brought to Gang Crimes North on 8/29/1988, at which point he looked at photo books and selected a picture of Rivera (Wron 00009-00010). No photo albums were preserved or inventoried as evidence.

A police report of Detectives McLaughlin and Leonard dated 9/1/1988 (Wron 00035) states that attempts were made to have Lopez view a physical lineup including Rivera and Rodriguez on 8/31/1988 or 9/1/1988 but Lopez's parents would not allow him to participate at night and Lopez could not be located.

On 8/30/1988, Gang Specialist Reynaldo Guevara and other defendants arrested 22 year old Jacques Rivera (Wron 00056). Guevara claims to have based the arrest solely on an alleged identification of Rivera by 12 year old Orlando Lopez on 8/29/1988. However, a rap sheet of Rivera was requested on the day of the shooting on 8/27/1988 (Wron 00055). The arrest report states that hold papers were submitted "due to the fact that the witness is not available to view a physical line-up which will be held on 31 Aug. 88" (Wron 00056). A hold dated 8/30/1988 was placed on Rivera that stated that officers expected to charge him with aggravated battery on Felix Valentin by 7 p.m. on 8/31/1988 (Wron 00057). The hold also stated "the witness to this case will not be available until tomorrows date, and Felony review will not approve charges until they can interview the witness." On 8/31/1988 or 9/1/1988, Rivera was released without charges.

Rivera was steadily employed at the Humboldt Park Institute. He was living with his spouse and children; was 4 to 6 years older than the descriptions of the suspects; had no known connection to the victim; and lacked identifying physical characteristics contained in the description of the suspects. Guevara had no physical evidence to support the arrest of Rivera.

Following the death of Felix Valentin on 9/14/1988, reports indicate that Orlando Lopez viewed a physical lineup at Area Five on 9/15/1988 and identified Rivera. Photographs were taken of the lineup and inventoried.

Lopez has testified numerous times that during the 9/15/1988 lineup he told police that Jacques Rivera was not the person who shot Felix Valentin, and that the police responded that he should not be afraid to make an identification (Lopez Dep., Lopez Hearing and Trial Testimony). Lopez testified that this conversation occurred with a detective with an afro, a mustache, and glasses and a woman with blond or white hair. I have been provided with photographs of Reynaldo Guevara, which show him with an afro, mustache, and glasses.

Lopez has also testified numerous times that there were actually 2 separate physical lineups that he viewed. Lopez testified that the first lineup was conducted within a few days of the shooting of Valentin. The same detective with an afro, a mustache, and glasses accompanied Lopez to the first lineup. In Lopez's view, he (Lopez) selected Rivera from the first lineup as well. Following the first lineup, Lopez saw the person who had shot Felix Valentin on the street. The person was an Imperial Gangster and was not Jacques Rivera.

11

Jacques Rivera has also testified that there were actually 2 separate physical lineups. Rivera testified that Guevara asked him to be a filler in a lineup, after which he was held for a period of time and then placed in a lineup. Rivera testified that he was not told during the first lineup what crime he was standing in a lineup for or who was viewing the lineup. Rivera testified that he was released after the first lineup.

The testimony of Lopez and Rivera on this point directly contradicts the "official" record produced by the defendants. The police reports produced by the defendants do not contain any report of a physical lineup before 9/15/1988. A report of McLaughlin and Leonard describes a failed attempt to conduct a physical lineup with Lopez on 9/1/1988, after which they report they attempted to show photos to Felix Valentin at the hospital (Wron 00034-00035).

Documents in the investigative file support Lopez and Rivera's testimony that there were actually 2 physical lineups. As I discuss above, arrest reports, hold reports, and release reports state that on 8/31/1988 and/or 9/1/1988 both Rivera and Jose Rodriguez were being held to participate in a physical lineup with a witness. A general progress report written by Leonard on 8/31/1988 lists the names of Rivera and Rodriguez, along with four other individuals acting as fillers – Villafane, Olivero, Ruiz, Ramon Lopez. Photographs of all six individuals, apparently taken at the same time against the same backdrop, were submitted into evidence on 8/31/1988 (RFC 1415-1420, Wron 00062, 00064).

Testimony from Villafane, Olivero, and Ruiz also supports Orlando Lopez and Rivera's testimony that there were actually 2 physical lineups. Villafane testified that he only once participated in a lineup in his life in the summer of 1988 (Villafane Dep, pp. 13-14). Olivero also testified that he participated in a lineup for a shooting in the summer of 1988 (Olivero Dep, pp. 13-14). Ruiz testified that he had been in a lineup for the shooting of Felix Valentin, who was a friend of Ruiz (Ruiz Dep, pp. 26-27).

Taken together, there is strong evidence supporting Lopez and Rivera's testimony that there were 2 physical lineups.

Following the second physical lineup on 9/15/1988, Reynaldo Guevara and other defendants arrested Jacques Rivera for murder (Wron 00051). Later on the same night, Guevara and Gawrys submitted a supplementary report (Wron 00009), which states that Lopez identified Rivera in a photo album on 8/29/1988 and at a physical lineup on 9/15/1988. The report states further that Lopez was shown photos of Rodriguez and Nieves after the 9/15/1988 physical lineup and stated that they were not involved in shooting Felix Valentin (Wron 00010). Lopez testified that he was not shown photographs other than the photo albums (Lopez Dep, p. 177). Finally, the report states that on 9/10/1988, Guevara and Gawrys showed the victim Felix Valentin a photo album at the hospital and that Valentin identified Jacques Rivera as the person who had shot him (Wron 00010). Such an identification would have been impossible given the course of Felix Valentin's medical treatment described above. Dr. Sharkey testified on 9/10/1988, Valentin could not reasonably have spoken to another person, he could not have looked through a photo album, and he could not even have communicated with his eyes (Sharkey Dep., pp. 55-56).

HOOD 039037

Weston 054054

In spite of numerous intentional malicious acts by Guevara and others of omission and/or commission; witness manipulation; false testimony and reporting; withholding of evidence; etc., murder charges were successfully filed against Jacques Rivera.

Rivera was convicted in July 1990 for the murder of Felix Valentin, based on the testimony and in-court identification of then 13-year-old juvenile, Orlando Lopez, and the testimony of Reynaldo Guevara. Lopez's testimony was the only evidence of Rivera's guilt presented at Rivera's criminal trial. Investigative materials in the possession of the Chicago Police Department were not provided to Mr. Rivera and his attorney, Judge Wadas, as described in detail below. Rivera was sentenced to 80 years in state prison and incarcerated for over 20 years.

Rivera represented himself *pro se* in parts of his post-conviction case and attempted to use FOIA to obtain documents from the Chicago Police Department relating to a physical lineup conducted on or about 8/31/1988. Later, Rivera was represented in his post-conviction case by the Center on Wrongful Convictions at Northwestern University.

In September 23, 2011, the Circuit Court of Cook County granted Rivera a new trial based on the conclusion that there was sufficient evidence of his innocence. Cook County prosecutors elected in October of 2011 not to retry Rivera and dropped the charges against him. In September 2012, the Circuit Court of Cook County granted Rivera a certificate of innocence.

## III. Deviations from professional homicide investigation standards in Felix Valentin homicide investigation

Homicide cases and investigations in police agencies across the United States are given priority and resources not normally provided to other types of investigations. More experienced, trained and knowledgeable detectives are assigned. Their investigations result in detailed documentation, commonly referred to as "murder books" in some jurisdictions. These investigative records provide a step by step record of all evidence gathered, all witnesses interviewed, statements taken, leads followed (whether productive or not), medical records, autopsy photographs and reports, photographs of the crime scene, wound descriptions, weapon (gun, bullet, shell, knife, vehicle, objects, etc.) analysis, chain of custody and evidence logs, vehicle impounds, search warrant applications and returns. It is not uncommon for a typical murder investigation to contain hundreds (and often times thousands) of pages – even if there is thought to be a "known" suspect. There are well-established criteria and a broad range of literature for these practices. In fact, Det. Anthony Wronkowski ("Homicide Coordinator") stated that there should be 22 specific parts of an on-going and completed Chicago Police Department homicide investigation book.

Experienced homicide detectives are familiar with the difficulties posed by relying entirely on a single "eyewitness" as a basis for police presenting a charge of homicide and they were aware of these difficulties in 1988. According to the American Judicature Society, misidentification by eyewitnesses was the leading cause of wrongful conviction in more than 75 percent of the first 183 DNA exonerations in the United States. The presence of a weapon during an incident can draw visual attention away from other things, such as the perpetrator's

13

HOOD 039038
Weston 054055

face, and thus affect an eyewitness's ability to identify the holder of the weapon. This is further aggravated when the lineup does not contain the offender. In that situation young children and the elderly commit mistaken identifications at a rate higher than young adults.

Professional investigation and documentation are critically important for a number of reasons, some of which include but are not limited to:

- Case integrity
- Continuity of investigation
- Supervisory oversight
- Facilitation of case management
- Inclusion of investigative notes and investigators actions
- Insuring thoroughness of the investigation
- Allowing other investigators to assist or replace initial investigators
- Providing a "paper trail" of what steps were taken (or not taken)
- Focusing on important aspects of the case
- Identifying what remains to be done and what has already been done and by whom
- Eliminating suspicion from some possible initial suspects
- Providing sufficient information to identify and arrest a suspect
- Providing insight for prosecutors considering charges
- Providing an objective basis for charging and trying the suspect
- Providing an objective basis for the court to determine challenges
- To have a single document for discovery and disclosure (Brady rule)

Individual, Supervisory & Institutional Failures in Felix Valentin Homicide Investigation

Officers' liabilities in this investigation include, but are not limited to:

- Problematic reports
- Intentional and willful actions
- Intentional and willful omissions
- Fabrication of evidence
- Destruction, suppression, failure to preserve evidence and investigative materials
- Bogus documentation and failure to provide documentation
- Improper and manipulative juvenile procedures
- Improper lineup and photo array identification procedures
- Criminal conspiracy

This so-called "investigation" into the homicide of Felix Valentin by the Chicago Police Department, Reynaldo Guevara, and various police officers and supervisors employed by the City was 1) intentionally and blatantly calculated to wrongfully focus on, arrest, charge and convict Jacques Rivera; and/or 2) was conducted in a manner as to be considered so sloppy and unprofessional as to insure the same outcomes.

14

HOOD 039039
Weston 054056

Even by the most forgiving of standards, practice and criteria, the investigative documents of the Chicago Police Department in this matter were lacking any semblance of a professional and thorough investigation.

Before describing specific failures in the Valentin investigation, I must note that it is unusual that an investigating officer in a criminal investigation would refuse to answer questions about that investigation under oath. On the advice of his attorneys and apparently concerned about incriminating himself, Reynaldo Guevara refused in his deposition in this case to answer a single substantive question about the Valentin investigation or the prosecution of Mr. Rivera during his deposition in this case. This refusal extended to all aspects of the case, including the fabrication and suppression of evidence, manipulation of witnesses, including Orlando Lopez, physical and photo identification procedures used, exclusion of alternative perpetrators, testimony at Mr. Rivera's criminal trial, related misconduct in other cases, etc. It is a duty of a police officer to testify truthfully about investigations in which he is and was involved and a refusal to adhere faithfully to that duty is a departure from accepted police practices. I infer from Guevara's silence that there are no ready explanations for the serious holes in the Valentin homicide investigative, and that if Guevara were to testify, his statements would not exonerate him.

Some specific and important examples and issues of the failure to conduct a thorough and professional investigation to either bolster or eliminate suspects include, but are not limited to:

- **Maintenance of parallel investigative files some of which are not provided to the criminal justice system.** As explained in greater detail below, important investigative materials created during CPD investigation were not provided to Mr. Rivera, his criminal defense attorney, Judge Wadas, or the state prosecutors charged with approving charges and prosecuting the criminal case. Some of these investigative materials have gone missing or were destroyed. Other investigative materials were withheld and produced decades after Mr. Rivera's conviction. Those investigative materials recently produced have strong investigative value and should have been provided to participants so that they could conduct additional investigation to demonstrate Mr. Rivera's innocence, the unreliability of eyewitness Lopez, and to bring the perpetrator to justice. The multiple files in this case demonstrates a lack of file integrity and security, an insufficient or non-existent chain of evidence and/or custody, and willful failure to disclose and produced (Brady rule) all records to prosecutors, defense attorneys, and the court, not only in the initial process and trial, but also later in appeals and civil litigation.

- **Investigative "tunnel vision" by Reynaldo Guevara and the other defendants**. Responding officers investigating crimes have an obligation under accepted practices to follow all leads to bring the true perpetrator to justice. It is not an acceptable practice to focus on a suspect while developing evidence that implicates that suspect and excluding evidence that implicates other suspects ("tunnel vision" or confirmation bias). Tunnel vision is apparent in the investigative materials. The following four examples are the chief evidence of tunnel vision in the investigation of the Valentin homicide and the prosecution of Mr. Rivera for that crime:

15

HOOD 039040
Weston 054057

o **A rap sheet of in the investigative file, which was not given to Mr. Rivera or his attorney Judge Wadas, shows an issued on inquiry date stamp of 8/27/1988.** Based on my experience in other cases involving the Chicago Police Department, that date stamp was placed on the rap sheet when it was requested by investigators working the Valentin investigation and was issued by the records division. The date stamp of 8/27/1988 is the same day as the Valentin shooting and is a full two days before 8/29/1988, the date on which police report the first mention of Mr. Rivera being implicated as having anything to do with this crime. Selecting a suspect without evidence and then pursuing evidence to connect that suspect to the crime in question is in serious conflict with accepted police practices. If Mr. Rivera was a suspect before the only evidence tying him to the crime was developed—the eyewitness identification of Lopez—that represents a gross violation of accepted police practices and egregious misconduct.

o **A physical lineup viewed by Lopez on 8/31/1988 or 9/1/1988 did not result in an identification of Mr. Rivera and was suppressed.** Evidence discussed above supports the conclusion that an initial physical lineup procedure was performed on 8/31/1988 or 9/1/1988 that included Orlando Lopez as the witness and Mr. Rivera as a suspect, during which Mr. Rivera was not identified and after which Mr. Rivera was released from custody. Investigative materials concerning that physical lineup procedure were not provided in advance of Mr. Rivera's criminal trial to Mr. Rivera or to his attorney as described in Section V.H below. A failure by the sole eyewitness Lopez to make an identification of Mr. Rivera is evidence that he did not commit the crime. In addition, it is evidence that critically undermines Lopez's 9/15/1988 supposed identification of Mr. Rivera, and it is evidence that prosecutors and criminal defense attorneys would have used to evaluate the prosecution and defense of the case. Failure to document Lopez's non-identification of Mr. Rivera during the 8/31/1988 or 9/1/1988 physical lineup is additional evidence of "tunnel vision" and another gross violation of accepted police practices.

o **Failure to pursue perpetrators Rodriguez and Nieves, identified by the victim, and failure to document investigation, exclusion, or alibis of alternative perpetrators.** Shortly after the crime, the victim Felix Valentin stated to investigators that the person who had shot him was a member of the gang called the Imperial Gangsters, after which investigators provided a photo album of know Imperial Gangsters, from which Felix Valentin selected a photograph of Jose Rodriguez as the shooting perpetrator and Felipe Nieves as the driver of the getaway car. Rodriguez was arrested in close proximity to the crime scene, held, and participated in a physical lineup, as described above, but he was released according to reporting on or about 9/1/1988 with the only stated reason being that the victim had not identified him. Lopez testified that shortly after the first physical lineup he saw the perpetrator of the Valentin shooting on the street and recognized that the perpetrator was a member of the Imperial Gangsters street gang. The investigative files do not document any investigation of Rodriguez or Nieves other than the above, even though these individuals were identified by the

16

victim of the crime, who was the person in closest proximity to the shooter. The investigative files do not reflect or document an effort to determine whether Rodriguez or Nieves had an alibi for the date and time of the shooting of Felix Valentin, and they do not reflect or document the process by which Rodriguez or Nieves were excluded as suspects in this crime. The only exception is the report by Guevara and Gawrys described above, which states, contrary to Lopez's testimony, that Lopez was shown photographs of Rodriguez and Nieves following his supposed identification of Mr. Rivera on 9/15/1988, at which point Lopez supposedly excluded Rodriguez and Nieves. Established police practices require investigation of perpetrators of crimes identified by the victims of those crimes, including careful documentation of the investigation of such individuals and the process by which such individuals are excluded as suspects.

o **False reporting of an identification of Mr. Rivera by the victim Felix Valentin**. Reporting detectives Guevara and Gawrys stated in a police report written on 9/16/1988, after Mr. Rivera's arrest, that the victim Felix Valentin a week before on 9/10/1988 had identified Mr. Rivera as the perpetrator in a photograph. The failure to contemporaneously document this purported identification and the physical impossibility of such an identification being made by a victim who on 9/10/1988 was unresponsive, could not breath, had unreactive pupils, was paralyzed with medication, and who could not have made an identification according to the doctors treating him, demonstrates that the information about an identification of Mr. Rivera by Valentin is false. This false information is likely included in the police report produced after Mr. Rivera's arrest by police officers suffering from "tunnel vision" in order to eliminate the significant obstacle to Mr. Rivera's arrest and prosecution that is caused by the fact that shortly after the crime the victim Felix Valentin identified individuals as perpetrators who were not Mr. Rivera. Inserting false information into a police report is an additional gross deviation from acceptable police practices during a homicide investigation, as is attributing to the victim of a crime an identification that did not occur.[1]

• **Improper conduct of and failure to document physical and photographic lineup and showup procedures**. In addition to the failure to document a filler identification and/or non-identification of Rivera taking place during an initial physical lineup on 8/31/1988 or

---

[1] Additional departures from accepted police practices concerning the supposed 9/10/1988 identification of Mr. Rivera by Felix Valentin include 1) the fact that information about the identification was first inserted into a report 6 days later on 9/16/1988, after Lopez had selected Mr. Rivera in a 9/15/1988 physical lineup, leaving no contemporaneous documentation of the identification in the investigative record, 2) the lack of documentation regarding how the identification procedure was employed, including any deviations from standard practice, such as using signals rather than speech to indicate identification, or any modifications to allow Felix to view the photographs while his bed was in constant motion from side to side, 3) the lack of any audio recording, video recording, or other documentation of the identification procedure, 4) failure to preserve the photograph identified, 5) failure to document the physical and mental condition of the witness, given his serious injuries, during the identification procedure and interaction with the witness apart from the identification procedure.

17

HOOD 039042
Weston 054059

9/1/1988, discussed above, investigating defendants also departed from accepted police practices in their conduct and documentation of physical and photographic lineups conducted during the course of the Valentin investigation as follows:

o **Failure to document the circumstances of Lopez's purported identification of Mr. Rivera in a photo album**. There are conflicting reports and testimony about where the identification occurred and who was present and procured said identification. There is no documentation of the number of photographs shown to Lopez, what photo albums were shown to Lopez, who was present (both civilian and police officers) what Lopez said/what was said to him before and after the identification procedure, Lopez's reaction to various pictures as he reviewed the photo books, how long the procedure lasted, or the contents of Lopez's statement when he supposedly picked Jacques Rivera's photograph, including his level of certainty. The photograph and the photo book were not preserved or inventoried as evidence. In related fashion, there is an absence of explanation in the police documents as to why investigators provided Lopez solely with a Latin Kings photo album, rather than showing him multiple albums, such as the Imperial Gangster albums.

o **Failure to document the circumstances of other identifications from photo albums**. There are similarly no records documenting the identifications supposedly made by Felix Valentin from photo albums and those photographs and photo albums were not preserved or inventoried as evidence.

o **Failure to use fillers independent of the investigation**. Individuals present in a physical or photographic lineup procedures as fillers must not be known to witnesses viewing those procedures. For obvious reasons, use of a filler known to the witness increases the possibility of mistaken/improper identification because the person is known by the witness and thus is not a filler. George Ruiz (or a photo of him, if the defendants are believed) was used in a lineup procedure on or about 8/31/1988 or 9/1/1988. Ruiz was a friend of Felix Valentin's and was known to him. He was likely known by Lopez (at least in appearance) as well. Using Ruiz and others known to witnesses undermines the reliability of those identification procedures.

o **Failure to document use of photos**. The investigative materials reflect photos, including photos of Mr. Rivera, without documentation of individuals to whom those photos were shown or even whether those photos were used during the investigation.

o **Failure to include Jose Rodriguez in 9/15/1988 lineup.** Without any explanation in the police record, Jose Rodriguez was not presented in a physical lineup to Lopez on 9/15/1988. Rodriguez had been identified by the victim himself and was arrested in close proximity to the crime scene. Not permitting Lopez to observe the potential actual perpetrator dramatically increases the chance of a mistaken identification of an innocent person. Relatedly, the chance

18

HOOD 039043
Weston 054060

of a mistaken identification is increased when two lineups are shown to a witness that only have a single suspect in common.

o **Failure to accept and suppression of non-identification**. According to Lopez, at the 9/15/1988 physical lineup, he (Lopez) stated that Mr. Rivera was not the person who committed the shooting. Rather than accepting his statement, defendants had Lopez proceed with the identification of Rivera and then suppressed the true circumstances of the identification. In addition, defendants improperly suggested to Lopez that he should continue with his identification of a particular participant (Mr. Rivera). This is an obvious and knowing suppression of highly exculpatory evidence, and it represents a blatant manipulation of a child witness (see below). In addition, it runs contrary to accepted police practices, established in 1988, which required investigators not to suggest to witnesses anything about who should or should not be selected during a lineup procedure.

o **Improper photo lineup with unresponsive witness**. As discussed elsewhere, Valentin was not in physical shape to participate in any lineup procedure or to respond to officers as of 9/10/1988, nonetheless Guevara/Gawrys presented him a lineup on that date. A lineup should not be shown to witnesses who are in a comatose state. The condition or a witness and any changes to a lineup procedure as a result of the witness's condition must be carefully documented.

o **Improper photo lineup with Orlando Lopez following live lineup and failure to document photo lineup**. Though Lopez denies being shown photographs of Rodriguez and Nieves after his 9/15/1988 lineup with Mr. Rivera, even accepting Guevara/Gawrys's account that he was shown such photographs, that was not the proper procedure. Rodriguez and/or Nieves should have been included in a live or photographic lineup, including fillers, if they were to be excluded. In addition, the photos shown to Lopez should have been preserved and inventoried as evidence, and the procedure used to show those photos to Lopez should have been documented.

**The departures from standard police practices regarding lineup procedures discussed above were in part a result of the written policies of the Chicago Police Department governing lineups**. Hickey testified that GO 83-5, effective at all dates in the Valentin investigation, did not require a photographic record to be made of a lineup in which a filler was selected (Hickey Dep., pp. 260-267). The written policies did not provide guidance on what had to be reported in the event of a lineup procedure in which a filler was selected. In addition, police were permitted to confirm to a person viewing a lineup that they had picked the correct person during the lineup procedure. There appear to be no written policies in effect in 1988 that governed the conduct of photographic lineups. Photographic procedures appear in 2003 amendments to GO 88-18.

- **Failure to document and transmit investigative information**. The investigative file reflects a pronounced failure by defendants to document investigative information. Oral communication of information during a homicide investigation is insufficient. A written

19

record is necessary to communicate relevant information among investigating personnel in order to identify suspects and develop evidence leading to the apprehension of the true perpetrator of the crime. All potentially pertinent information must be recorded because the investigator will not know at the time information is received that it is or is not important to the ultimate case. Contemporaneous documentation is critical to ensure that information is accurately recorded and communicated. Finally, the requirement of disclosure of investigative materials to the criminal defendant and criminal defense attorney (Brady rule) requires documentation of investigative information. A lack of documentation suggests a departure from standard police practices, a failure to investigate, a suppression of evidence, or a combination of these things. The following were not produced in the investigative files I have reviewed:

- o **Withheld notes, GPRs, investigative reports and activity forms of Gang Crimes Officers involved in the investigation**. As explained below, any investigative materials in the investigative file produced by the Gang Crimes Specialists involved in the Valentin investigation were never produced, with the exception of a couple of reports by Guevara. Investigative activities of gang crimes officers should have been reported to superiors and the criminal justice system.

- o **Withheld documentation of investigation between 9/2/1988 and 9/14/1988**. Virtually no chronological documentation of investigative steps taken between 9/2/1988 and 9/14/1988 was produced as part of the investigative file. Based upon the material made available by the defendants, the investigation was "shut down" on or about 8/31/1988 when it appeared that Felix Valentin would survive. Only after his death on 9/14/1988 were events and documents generated to belatedly make it appear that officers had actually been conducting a real investigation. There is no documentation of investigative steps taken during the 2 weeks that the investigation was dormant. There is no explanation or justification for the lack of continuity in this homicide investigation. Detectives McLaughlin and Leonard began the investigation, but it was soon taken over by gang specialists who should have only been providing assistance regardless of whether Valentin survived. There is no record of any meaningful supervisory oversight apparent from my review of the materials, other than signing documents.

- o **Withheld documentation of steps to locate Orlando Lopez**. The defendants state in various police reports that they were having trouble locating Orlando Lopez, but no documents were produced to reflect investigative steps undertaken by defendant investigators to locate Lopez between 8/30/1988 and 9/15/1988. In an investigation such as this one, investigators would have been making efforts to contact Lopez, and the results of that search are relevant to the investigation as a whole (for example, if Lopez was actively evading contact with the police, his status as a reluctant witness may be pertinent to the prosecutor or criminal defendant).

HOOD 039045
Weston 054062

o **Withheld documentation of the reasons that Rodriguez and Nieves were excluded as suspects**. As discussed, no investigative materials were produced that reflect any reason that Rodriguez and Nieves were excluded as suspects. There are similarly no materials in the investigative files showing that either individual's alibi was checked or confirmed. There are no materials reflecting any interview or police interaction with Rodriguez or Nieves, with the exception of Rodriguez's 8/31/1988 arrest. A decision to stop pursing a suspected perpetrator must be documented in the homicide file. In fact, there is very little documentation anywhere in the file about the apparent parallel investigation into Rodriguez and Nieves. Based on my experience, I would expect that investigators would have documented the reasons that Rodriguez and Nieves were excluded as suspects.

o **Withheld documentation or recordings of interviews with or statements of witnesses and the victim**. No documents or recordings of interviews or statements of individuals relevant to the investigation have been produced as part of the investigative file, including Mr. Rivera's family, employer, and co-workers (regarding his alibi, work schedule, relationship with the victim and witnesses), individuals frequenting the Humboldt Park baseball fields, Marilyn Lopez (Israel Valentin's girlfriend), Orlando Lopez's friends, family, teachers, or others who might have shed light on his reliability as a child witness (see below), interviews with Israel Valentin or Felix Valentin after 9/1/1988 (with the exception of Guevara/Gawrys's purported 9/10/1988 photo identification), the corner store clerk to whom Lopez ran during the shooting, the driver who took Felix and Israel to the hospital, hospital staff, and family and friends of Felix Valentin. These interviews would be a starting point in a homicide investigation and I expect that they would have both occurred and been documented by the assigned personnel.

o **Withheld reports of tips and leads**. A typical homicide investigation will contain numerous tips that should be investigated. There are notably few tips documented in the investigative files in this case.

• **Improper use, interaction, and influence of juvenile witness**. The sole eyewitness and only evidence connecting Mr. Rivera to the murder of Felix Valentin was 12-13 year old Orlando Lopez. As discussed, relying on a single child eyewitness in support of a homicide charge, under the circumstances presented here, is unprofessional absent corroborating evidence. Established police practices dictate that juvenile witnesses should be treated with extreme care. There is no evidence that such steps were undertaken in the Valentin investigation regarding Lopez.

o **Vulnerability/susceptibility of juvenile witness**. Lopez was 12 years old at the time of the investigation and 13 years old at the time of trial, making him less reliable, and also susceptible to manipulation and suggestion. As discussed, mistaken identifications occur at a higher rate with juvenile witnesses. All interviews and identification procedures performed with juvenile witnesses must occur in a non-leading format with results carefully documented. As discussed, in

21

this case, Lopez testified that he stated to police at a physical lineup that Mr. Rivera was not the perpetrator after identifying Mr. Rivera in a photograph. That information should have been documented and Lopez should not have been compelled to make an identification following that statement.

o **Presence of parent/guardian**. There is no documentation of the presence or absence of a parent at any of the police interactions with Lopez. Absent such documentation, we must assume that there was no parent present at any of his numerous interactions with police.

o **Initial statement and subsequent statements of juvenile witness**. Lopez's statements and testimony about his observation of Felix Valentin's shooting have changed over time. It is especially important in the case of a juvenile witness to document carefully, preferably by recording audio/visual, all statements of a juvenile witness about the nature of a crime, particularly the initial statement. For example, 11 shots were fired at Valentin in rapid succession, but Lopez has testified that he was able to observe the beginning and the end of the shooting, while running to a corner store to tell a clerk to call the police as the shooting was occurring. This is an unreliable account on its face. It also contradicts the police record described above. In a case where an eyewitness is the only evidence connecting a perpetrator to a crime, all descriptive statements given by that eyewitness of the perpetrator must be completely and accurately reported, particular in the case of a juvenile witness. Inconsistencies in child statements should not be ignored; rather, discrepancies must be explored with witnesses, and the results of that follow-up investigation carefully documented.

Additional examples and issues of the failure to conduct a thorough and professional investigation to either bolster or eliminate suspects include, but are not limited to:

- Street nomenclature (North vs. West)
- Family relationships (Israel referred to as father rather than brother at one point)
- Orlando Lopez identified at one point as Orlando Rivera
- Corruption of physical evidence (shell casings (5) co-mingled and placed in single bag, bullets recovered at autopsy co-mingled and placed in single bag)
- Ballistic analysis missing or not done (no comparison of ballistic evidence with known weapons, no comparison with open or closed Chicago cases, no comparison with regional, state, or federal data bases)
- Failure to process and document crime scene, vehicle, and clothing (no documentation of Rivera's, Rodriguez's, or Nieves's owned or accessible vehicles, although autopsy found 11 wounds, only 5 shells recovered from scene, failure to examine, document, and photograph "line of sight" positions and angles)
- No attempt to locate suspect vehicle (stolen/missing vehicles, impounded vehicles, similar vehicle description in other similar or nearby crimes, area accident reports, investigation of incorrect vehicle, failure to include traffic accident/collision report #K875-233)

HOOD 039047
Weston 054064

- No review or retention of incoming 911 call recording(s) or dispatch or responding unit call recordings
- Utilization of silencer suggested, but no follow-up
- Reason for Felix and Israel Valentin's visit was supposed to be to pick up Israel's girlfriend. Why didn't she come downstairs with Israel since no shots were heard? If she did, what did she see?
- Missing and merging of investigative dialogue often precludes ability to actually know which officer (who) did what, when, where, how and why
- Partial documents (blank "Inventory of Things Seized in Search" (warrant return), no "Search Warrant" in files)
- No attempt to address the classic "motive-means-opportunity" criteria.
  - Did the suspect have any animosity towards, or confrontational history (motive) with, Felix Valentin?
  - Did the suspect own or have easy access (means) to the murder weapon, or own or have access to the type of vehicle used in the shooting?
  - Did the suspect have a witness, or witnesses that would place him elsewhere (lack of opportunity) at the time of the shooting?

Nowhere in the investigation did officers inquire into, or establish and/or address any of these basic items.

The defendants in this lawsuit will undoubtedly claim that any "minor" oversights, inconsistencies, or mistakes were unimportant. The record does not support any of those conclusions and instead demonstrates ample departures from standard and accepted police practices. Any reviewing supervisor should have immediately noted the telltale signs of such.

As initially stated, there exists a broad range of literature, accepted policies and practices, and professional references that accentuate many of these shortcomings.

## IV. **Failures in CPD's internal investigation and disciplinary processes allowed Defendant Reynaldo Guevara to engage in the sort of investigative misconduct alleged here**

As described in detail below, Defendant Guevara's misconduct in the Jacques Rivera case and all other cases is a direct result of the CPD's failure to meaningfully investigate, supervise, or discipline him.

The community policing philosophy depends on the integrity of the police department. If the public lacks confidence in the agency's ability and commitment to investigate and prosecute officer misconduct, there is little hope for successful partnerships and problem-solving.

Police departments must walk a delicate balance when supervising their officers. On the one hand, police officers must employ great authority and a fair amount of autonomy to effectively carry out their duties. On the other hand, every police department understands that autonomy plus authority, absent sufficient supervision, will generate abuse of that power,

HOOD 039048
Weston 054065

ultimately leading to violations of civilians' constitutional rights. This is a fundamental concept of policing – that a healthy police department will always deploy resources to supervising police officers to prevent abuse of police powers.

That supervision can be carried out in a variety of ways, including an active and efficient internal affairs department, direct supervision by superiors, and reviews of both of these systems by the department and/or municipal authorities and/or agencies to ensure that the supervision is effective. A breakdown in the oversight by the department not only fails to deter the unsupervised officer from committing misconduct, it also sends a message to all other officers and detectives that they will be provided similarly lax oversight, emboldening those officers to believe if they abuse citizens they will not face meaningful discipline from the department.

How police officers are disciplined for acts of misconduct affects the culture of policing within the police department and among police officers. An agency that implements or in practice demonstrates substandard mechanisms for police supervision and/or discipline invites a culture in the department where officers know that they cannot or will not be held to accepted standards in the event of oversights or misconduct in investigation and the performance of other job duties. That culture in turn may lead to circumstances where there is little incentive for sworn officers in the department to report or to attempt to address problems with police officers within the department. Once a culture of relative lawlessness or non-reporting is established and entrenched within a police department, a concerted effort will be necessary to reform that culture.

Moreover, how police officers are disciplined for acts of misconduct affects how the community views the police and how the police view their job. An agency or individual that routinely fails to take proper action when discovering that its officers have committed acts of misconduct will eventually lose its credibility in the community. Intuitively we can see why. If officers feel that the discipline system gives them no reason to obey the rules, some of them will not obey the rules. The public may see the results in more acts of police misconduct. Likewise, if officers view the agency's discipline as capricious or oppressive, they will often avoid the work that generates the most complaints: citizen contacts. (Community Policing Dispatch – August 2008)

In the case of Detective Guevara, both the Department's dedicated internal affairs system and his direct supervisors failed for decades to meaningfully investigate or discipline Guevara's pattern of gross misconduct in violating numerous citizens' constitutional rights, including Jacques Rivera's. Any worthwhile investigation would have uncovered widespread abuses, particularly given that Detective Guevara is refusing to testify about any of the over one hundred documented allegations of misconduct, for fear that truthful responses would implicate him criminally. While invoking silence may not be admissible at a criminal proceeding (and I offer no opinion on that), silence certainly can be an indicator of wrongdoing during internal investigations.

As far back as April 1986, Detective Guevara was accused of punching a civilian, threatening him, and using racial slurs in front of two witnesses. CR # C150473. After conducting an investigation, the complaint against Guevara was sustained, but inexplicably, the

HOOD 039049
Weston 054066

Superintendent altered the result to "not sustained" for no apparent reason. If an investigation yields evidence that misconduct occurred, as in this case, discipline must be imposed. If new evidence comes to light that warrants reversing the initial decision to impose discipline, then the new evidence, or at least the reason for departing from the decision to impose discipline, must be documented. It almost goes without saying that when a police officer is caught committing misconduct but suffers no consequences, the effect on the officer is even worse than if the officer had not been apprehended in the first place – the officer learns that the internal affairs system has no teeth, and the system fails to serve as a deterrent regarding future misconduct.

Again in 1986, Guevara arrested a man for narcotics possession, released him for some unknown reason, and was accused of striking him in the head several times. CR #C152902. Guevara received a 2 day suspension for failing to fill out a battery report and releasing someone who had committed a crime. (These circumstances are similar to reports about Guevara in the FBI 302, discussed in detail below). Although this internal investigation occurred weeks after Guevara was accused of striking a different arrestee and of improper use of a weapon, very serious allegations themselves, and months after the April 1986 allegations, the internal investigation does not reference the repeated allegations against Guevara. CR #C152612. The failure to take into account prior similar incidents of misconduct when conducting an internal affairs investigation is a recipe for disaster. One of the initial steps any qualified detective takes when conducting a criminal investigation is to check the criminal history of a suspect, including not only convictions but also arrests as well, to determine whether a pattern of behavior is indicated. The same is true for any competent internal affairs investigation. But the CPD's internal affairs department, as a matter of policy (Klimas Dep, pp. 90-91, 93), did not consider other complaints when determining if a particular citizen's complaint of misconduct had merit.

Also in the early 1980s, Annie and Bernard Turner alleged that Guevara used excessive force against them for smoking on a city bus (CR #124631). Although medical evidence supported the Turners' allegations, the officers present denied misconduct, claiming that Annie Turner resisted arrest and was injured as a result. According to the records, however, Annie Turner was never charged with resisting arrest or anything other than smoking on a city bus. This discrepancy is not noted by the internal affairs investigators. Despite credible evidence supporting the Turners' claim, the complaint was not sustained.[2] The message that is sent by not disciplining police officers caught violating citizens' rights is that they are free to offend again without fear of reprisal.[3]

Similarly, in 1982, complainant Almarie Lloyd stated that Guevara and two other officers entered her home without a warrant (CR #125360). Although three witnesses apparently corroborated this version of events, there is no record that I have been provided that Guevara received any discipline whatsoever for his conduct.

---

[2] Investigators treated allegations brought by a police officer against Guevara differently than complaints by civilians, so long as the complaint did not criticize Guevara's on-duty actions. In CR # C251502, Guevara was suspended 20 days for threatening to harm a police sergeant who ticketed Guevara's car.

[3] CPD's internal affairs sustained rate of 2-3% is extremely low (Klimas Dep., p. 64), and supports the conclusion that Guevara was emboldened to commit misconduct by CPD's refusal to provide supervision and discipline.

HOOD 039050
Weston 054067

Further, Guevara was the subject of two complaints of domestic violence, both in 1996 and 1998. CR #C223928 and #C248946. The way the CPD handled these complaints is instructive. In both incidents, Guevara was accused of physically striking members of his household. One of the allegations was sustained, the other was not. These are criminal acts, and should have been referred to the prosecutor for potential prosecution. Instead, Guevara simply received a 3 day suspension. Favorable treatment by the CPD of criminal acts committed by Guevara furthers the impression that Guevara was led to believe that he could break the law and not face consequences for his actions.

I find further support for the lack of investigation and/or supervision/discipline of Guevara in the FBI 302 report of Mohammed Omar produced by the FBI during the investigation of CPD Gang Crimes Specialist Joseph Miedzianowski (JR-L 44169-41183). In that report, witnessed by a member of the CPD's internal affairs division, Omar reported that he knew Guevara, and that Guevara's "policy" was to catch a person with drugs or guns, but let them buy their way out of trouble. Further, Omar reported that Guevara "accepted bribes to change positive or negative identifications during line-ups for murder cases." Omar provided a specific example of two cases where Guevara was implicated in fixing the cases in conjunction with an attorney Boyke, whom Omar said was a friend of Guevara's. Omar's information about Boyke's relationship to Guevara appears to be accurate, and his detailing of the criminal enterprise run by himself and Miedzianowski is supported by their federal convictions for the same (Beuke Dep., pp. 44, 66-67, 68-69, 69, 73-74) (Complaint, *Maysonet v. Beuke*, Bates No. JR-L 040987-040999, ¶ 3-4, 6, 28, 30, 46). Nonetheless, the record presented to me is devoid of any follow-up investigation of Omar's report (Klimas Dep., pp. 6, 12-13). There is no indication that Guevara was questioned, that IAD tried to question Boyke or find the two people specifically mentioned as having cases that were fixed by Guevara. These are the most fundamental steps that must be taken in any internal investigation, let alone one where the accusations are so serious. If true, what Omar is alleging is not only a terminable offense, it is also criminal. Nevertheless, it is not acceptable for a department to abdicate investigative authority to a prosecuting agency. Prosecutors seeking criminal charges have an entirely different standard of proof and purpose than a police agency looking to ensure that its police officers are not victimizing its citizenry. Regarding the suggestion that no follow-up was conducted because Omar was deemed not credible (Klimas Dep, pp. 6, 12-13), I find that suggestion contraindicated by the 16-page detailed report created by the FBI as a result of the interview with Omar, in which Omar freely details his own criminal involvement as well as those of Miedzianowski, Guevara, other civilians and other Chicago police officers. To discount wholesale a witness's account of such extreme police misconduct without conducting any follow-up investigation is wholly unacceptable by reference to accepted police practices and administration standards. Furthermore, if an investigation was not conducted because the complainant was not credible, that determination itself should be documented so that there is a record for any future inquiry as to why no investigation was undertaken. The lack of a documented explanation for why no investigation was conducted into these serious allegations suggests that no explanation exists to justify not investigating Omar's allegations.

The CPD's refusal to investigate, supervise, and/or investigate Guevara is apparent in relation to State Representative Delgado's April 2001 formal complaint with CPD regarding seventeen cases in which Guevara was alleged to have provided false testimony in court (CR

HOOD 039051
Weston 054068

#C270916). The CPD conducted no investigation. The CPD did not even bother to record the names or case numbers of the seventeen cases. CPD's only response to Representative Delgado's complaint was to wait for the State's Attorney's Office to conduct its own review of the seventeen cases. A single ASA claimed to have reviewed fourteen of the seventeen cases less than two months later and reported finding no improprieties. There is no record of what that assistant state's attorney did to determine whether any improprieties occurred. Further, there is no record that the remaining three cases were ever reviewed; the only reference to those cases is that the assistant state's attorney could not find the records for those cases. No record of the state's attorney's investigation was ever obtained by the CPD. Guevara was never questioned about the seventeen cases by the CPD, which is a departure from accepted practices. As stated above, it is wholly unacceptable to abdicate responsibility for investigating misconduct by a Chicago police officer to another agency.

The CPD's lack of response to Representative Delgado's complaint is troubling in a number of respects, not the least of which is that the complaint was pending at the very same time that Omar provided his similar allegations of gross misconduct by Guevara. The fact that CPD refused to even so much as begin an investigation into contemporaneous serious complaints against Guevara coming from such diverse sources as a State Representative and a cooperating federal informant, indicates that the CPD was actively avoiding any investigation that might reveal misconduct by Guevara. Coupled with the CPD's refusal to investigate Hunt's allegations (see below), Dorsch's allegations (see below), and overturning a sustained finding against Guevara for no apparent reason, I find that the CPD evinced a long-standing refusal to investigate or discipline Guevara in any meaningful respect, that began in the mid-1980s and continued until his retirement in 2005.

The systemic lack of investigation and/or supervision/discipline is also present in the City's failure to investigate Leshurn Hunt's civil lawsuit against Guevara, filed in 1985. Hunt claimed he suffered excessive force and other civil rights violations committed by Guevara and other officers during his arrest and interrogation. Hunt sustained injuries and his confession was suppressed by the criminal court. In that lawsuit, according to the court, Hunt "identifies five recent occasions on which the police defendants in this case were accused of undertaking warrantless home searches, and nine recent occasions on which they were accused of using excessive force during arrests and interrogations." *Hunt v. Jaglowski*, 85 C 1976, 665 F.Supp. 681 (July 21, 1987). I see no indication that the CPD conducted investigation of the allegations raised, despite a lawsuit being filed against Guevara and a number of court opinions regarding the case being published. This is unacceptable under any standard of internal affairs investigations.

I find further support for the lack of investigation and/or supervision/discipline in both the sheer number of similar allegations lodged against Guevara as well as the confirmed acts of misconduct he committed. For a police detective to have one confirmed case of framing an innocent man is abhorrent; for it to occur repeatedly, it is evidence of a complete failure of supervision and that fellow officers turned a blind eye or condoned the misconduct.

Specifically, in 1989, Guevara framed Juan and Henry Johnson for murder by inducing one man to get other men to falsely implicate the Johnson brothers in the murder. The circuit

27

court eventually overturned Juan Johnson's conviction and he sued (Complaint, *Johnson v. Guevara*, case no. 05 C 1042). Guevara was found liable for framing Juan Johnson and ordered to pay $21,000,000 as compensation to Johnson. (Verdict Form, *Johnson v. Guevara*, case no. 05 C 1042)

In or around 1988-1990, CPD detective William Dorsch alleges that he witnessed Guevara tell a juvenile witness whom to select from a photo array (Dorsch Dep., pp. 320-360). Recognizing the obvious impropriety in Guevara's misconduct, Dorsch brought the incident to his supervisors' attention. Instead of disciplining Guevara (intentionally interfering in an identification procedure in a murder case could justify termination), the supervisors covered up the wrongdoing by instructing Dorsch to classify the case as cleared/closed, so that no further investigation would be conducted. There is no record of any follow-up investigation conducted by any supervisor or member of the internal affairs division to determine if Guevara in fact interfered in an identification procedure conducted during a homicide investigation.

The City of Chicago has also determined that, in 1993, Guevara was responsible for obtaining the convictions of Jose Montanez and Armando Serrano for murder, despite their innocence. According to the report issued by former Federal Prosecutor Scott Lassar of the law firm Sidley Austin, which was retained by the City of Chicago after the filing of this lawsuit to conduct an investigation of Guevara in order to examine its liability, among other things,[4] Guevara induced a man facing several serious felony crimes to falsely implicate Montanez and Serrano, causing them to spend over twenty years incarcerated for crimes they did not commit (Lassar Report regarding Montanez and Serrano, Bates No. CCSAO 46099-46156).[5] Subsequently, the appellate court reinstated Montanez and Serrano's case, and then both Montanez and Serrano were granted certificates of innocence (*People v. Montanez*, Ill. App. 2d. (1st Dist. 2016); Orders Granting Certificates of Innocence, *People v. Serrano* and *People v. Montanez*).

The City of Chicago has determined that in 1994 Guevara also caused Roberto Almodovar to be wrongfully convicted of murder as an innocent man. In the Almodovar case, Guevara was again accused of inducing witnesses to falsely implicate Almodovar and his co-defendant, William Negron. Guevara's explanation for how he came to suspect Almodovar– that Guevara thought Almodovar's photograph appeared similar to a description of the shooter that was not provided until *after* Guevara made Almodovar a suspect defies common sense. I am not making a credibility determination here; rather, I note that a police officer cannot claim that a photograph matches a description that does not exist at the time the photograph was selected as the suspect. I further note that, when questioned about this case at his deposition, Guevara took the Fifth rather than respond to questions about his alleged misconduct, lending further support for the opinion that Guevara's conduct in that investigation contradicted accepted police practices (Lassar Report on Almodovar, Bates No. CCSAO 43718-43732).

---

[4] The City's efforts to investigate Guevara, through Scott Lassar, did not come until long after Guevara retired and had no effect on preventing Guevara from victimizing other people.

[5] In a similarity to the Rivera case, detectives in the Montanez/Serrano case, investigated by Guevara, pulled the rap sheets for all three of the men eventually charged in the murder – Montanez, Serrano, and Pacheco – on May 25, 1993, although no one implicated them in the murder (or any other crime) until June 2, 1993. Like the Rivera case, this is shown by issued on inquiry date stamps on the rap sheets.

HOOD 039053
Weston 054070

The City of Chicago determined that in May 1993 Guevara caused Robert Bouto to be wrongfully convicted of murder. In that case, Guevara is alleged to have induced several witnesses to falsely identify Bouto as the shooter. Although Bouto's alibi witnesses have consistently maintained that he was not present at the shooting, from the time of his trial to the present, all of the witnesses selected Bouto at line-ups conducted by Guevara. Those witnesses maintain that Guevara allowed them to see Bouto at the police station before the line-up was conducted, negating the neutrality of the line-up (Lassar Report on Robert Bouto, Bates No. CCSAO 30301-30344).

The City of Chicago also determined that in April 1998 Guevara used physical force to coerce Arturo Reyes and Gabriel Solache to involuntary confess to murder (Lassar Report on Reyes and Solache, Bates No. CCSAO 43655-43673).[6] Based on evidence of Guevara's misconduct, Solache and Reyes have been granted a new suppression hearing by the criminal court (Order in *People v. Reyes* dated June 29, 2016).

In 1996, the appellate court overturned the conviction of Xavier Arcos in a published opinion. That opinion reported that, in 1991, a witness was induced to falsely implicate Arcos by Guevara, who was alleged to have fed him details about the crime in order to frame Arcos. *People v. Arcos*, 282 Ill. App. 3d 870, 873-74 (1st Dist. 1996). I see no record that Guevara was ever questioned or investigated despite the courts overturning a murder conviction on grounds that he fed false information to the witness, which is a grave departure from accepted practices.

The fact that Guevara committed so many repeated serious transgressions during homicide investigations, resulting in the wrongful prosecution and conviction of innocence individuals, indicates to me that his supervising and fellow officers turned a blind eye to his misconduct. This evidence is consistent with the existence of a code of silence within the Chicago police department, dating back to the Jacques Rivera investigation in 1988, and continuing at least until 2007, when a federal jury determined that the CPD had a code of silence, wherein police officers would not report misconduct committed by fellow police officers. *Obrycka v. City of Chicago*, 913 F. Supp. 2d 598, 603-04 (N.D. Ill. 2012). In addition, these repeated serious transgressions – discovered apparently without much investigative effort during an investigation performed recently by Lassar at the City of Chicago's request – demonstrate that the City of Chicago and the Chicago Police Department, including its IAD and other supervisory agencies, failed to adequately investigate, supervise, and/or discipline Guevara over the course of his career.

Conversely, I find no support for the proposition that Guevara was receiving appropriate supervision or discipline. The failure to even question Guevara about the allegations listed above, including allegations from Omar, Hunt, and Representative Delgado, but also the various other cases where citizens accused Guevara of misconduct, is even more pronounced given Guevara's refusal to testify about these incidents on grounds that truthful responses might subject him to criminal liability (Guevara Dep.). When he was a police officer, the CPD could

---

[6] Lassar reached this conclusion despite drawing no inference from Guevara and another officer's refusal to speak about their activities as Chicago police officers and their interrogations of Reyes and Solache (Lassar report on Reyes and Solache, footnote 1).

HOOD 039054

Weston 054071

have forced him to provide truthful responses under Garrity, and, given his invocation of the Fifth Amendment, it is likely those responses would have uncovered Guevara's misconduct. But by not even questioning Guevara in so many of these cases, the CPD failed to even begin the process of ferreting out Guevara's wrongdoing and, by extension, allowed it to perpetuate for decades.

Supervision of Guevara was hampered by the CPD's refusal to implement any type of early warning system (Klimas Dep., p. 76). The need for an early warning system to alert a police department to problem officers before they violate citizens' rights was well-established in policing long before 1988. An effective early warning system would have tracked Guevara's serious allegations of misconduct lodged against him prior to 1988, and would have required supervisors to consider the allegations against him in conjunction with each other, rather than as separate and discreet acts. An effective early warning system in place prior to 1988 would have communicated to Guevara, and all other police officers in Area 5, that transgressions would be exposed and responded to harshly, in effect deterring Guevara from committing the misconduct that marked his career from 1988 onward. Indeed, a federal jury found that the CPD had a widespread practice of not supervising or disciplining police officers as late as 2007. *Obrycka v. City of Chicago*, 913 F. Supp. 2d 598, 603-04 (N.D. Ill. 2012). The record before me is consistent with that verdict, and I have seen nothing to suggest that CPD maintained an effective disciplinary or supervisory system from 1982 onwards.

## V. **The CPD's policies and practices related to the creation, maintenance, storage, preservation, and disclosure of investigative material deviated substantially from generally accepted police practices**

Police departments have long recognized the need to ensure that information and evidence collected during a criminal investigation is properly documented, stored, and ultimately disclosed for use in the criminal trials. The standard practice is relatively straightforward, and consists of a few key components: (a) requiring investigating officers to document the information they learn during the course of an investigation; (b) collecting, inventorying, and maintaining all of the investigative materials and information, in one central location; (c) applying policies or guidelines to ensure that the investigative material in the central file is disclosed to prosecutors and criminal defendants in response to formal requests for information; and (d) administering training and monitoring around all of these issues to ensure the policies are followed.

CPD did not comply with these standards, instead allowing detectives and other investigating officers like gang crimes officers to utilize multiple, parallel files for each investigation. The use of parallel files itself creates a significant risk that important investigative materials will not be disclosed, but that risk was exacerbated by the CPD's failure to provide any training or policies regarding proper response to subpoenas and discovery requests. The result is predictable: a routine failure to disclose all relevant investigative materials to criminal defendants.

CPD's problem of failing to turn over all relevant materials was brought to light by two federal cases in the early 1980s, but despite being acutely aware of the problem, CPD did little to

30

HOOD 039055
Weston 054072

address the practice. The policies it issued were a superficial attempt to resolve the problem and were deficient on their face – as they still allowed, and even required, multiple, parallel files to be created for each investigation. Moreover, CPD took almost no steps to train, supervise, or implement those policies. Finally, the policies did nothing to ensure that there was a system in place to properly respond to subpoenas and discovery requests.

I have reviewed numerous Chicago homicide files, including police investigative files and corresponding criminal defense files and permanent retention files. This includes such files produced in this case, as well as other cases against the City of Chicago (*e.g.*, *Fields v. City of Chicago*, *Kluppelberg v. City of Chicago*).[7] My review has confirmed that because of the deficient policies and widespread practices described above, criminal defendants were routinely denied substantive and relevant investigative materials related to their criminal cases, and that the written policies did little to alter the ingrained practice of keeping clandestine, parallel files.

Finally, I reviewed the material that was withheld from Mr. Rivera during his criminal trial and concluded that the information was withheld as a result of the same set of practices and policies (or lack thereof), and contained relevant and important investigative materials that should have been disclosed under standard police procedures.

### A. Standard police practices for maintaining and disclosing investigative files requires a single, comprehensive file

Every police department in the country must address how to properly document their criminal investigations. All information and evidence from an investigation must be properly collected, documented and preserved so that it can be disclosed to prosecutors and criminal defendants for use in criminal trials.

The standard police practice, across the country, is relatively straightforward: a lead detective is assigned to every major investigation, and that lead detective is in charge of compiling all investigative materials in a single centralized location. This includes investigative material generated by investigators in specialized units like gang crimes, bomb and arson and others. Although multiple detectives and specialized investigators may work on an investigation, all information must be centralized and organized. These standards are in place to help police officers effectively solve crimes: they ensure that, during the investigation, information is not lost because it is dispersed among various investigators and that the information is organized and stored so that a supervisor or other investigators can locate and understand the evidence collected by their colleagues. This standard police practice also ensures that once charges are filed, everything that does exist from the investigation is complete, identifiable, inventoried, and

---

[7] In both *Fields* and *Kluppelberg*, I examined investigative files maintained in the Chicago police department to evaluate the written policies and practices of the Chicago of Chicago, and in *Fields* I compared those investigative files to criminal defense attorney files to evaluate what materials were disclosed by the Chicago Police Department in the course of criminal investigations and prosecutions. I rely on those file examinations and comparisons in this report, and I intend to opine in this case about my findings in both *Fields* and *Kluppelberg*. The expert reports submitted in both cases are included as Attachment H and I, along with their respective attachments setting out the results of my examination and comparison.

HOOD 039056
Weston 054073

maintained in its entirety in a central location. Whether it is referred to as an investigative file, a "murder book," a completed investigation, an open investigation, or something else, everything should be in one package that can be located and produced – for whatever reason it is needed.

Standard police practices also require the disclosure of all investigative material in the police file, whether centralized (standard, and preferable) or not. There should not be picking and choosing. Performing these disclosure requirements is not an informal practice; it is done pursuant to written policies and procedures, in conjunction with training on those policies and procedures, to ensure compliance to this crucial step in ensuring fair trials. As a practical matter, this disclosure for use in a criminal case usually occurs in one of two ways: either the police fulfill their obligations by disclosing their entire investigative file to the prosecutor (rather than picking and choosing which parts of a file to disclose), who in turn disclose it to the criminal defense attorney; or, in some cases, independently and as a safeguard, the criminal defendant or his counsel will subpoena the police investigative materials directly. In response to the subpoena, all investigative materials should be disclosed.

It is also standard police practice to keep and catalogue every document or piece of information pertaining to an investigation. The police investigative role is to search for and document facts – all facts regardless of where those facts fit into some pre-conceived theory of the investigation. Not all facts, information, or individuals will necessarily enhance the prosecution of an identified suspect. Nonetheless, those facts have to be included in the investigation– to help prevent tendencies like tunnel vision, and also in fairness to the victims, the prosecutor, the defense, the court, and the jury. The judge will eventually rule on what is relevant and admissible. And investigators routinely offer explanatory information that puts that information in perspective, or explains why the detectives gave it little weight. But based on my experience, police officers are expected to, and are specifically trained on the importance of preserving all investigative materials and including those materials in a centralized location. Police departments typically emphasize this point because, in order to meet the needs of police agencies and the courts, case files must be maintained in a manner that make them secure but accessible, and the case contents should be arranged in an orderly and consistent manner.

As a corollary, all of the information must be inventoried, indexed, or documented in such a manner as to be easily located and so that the content of the inventory is clearly understood. To that end, a copy of the investigative file inventory will typically be placed in an official police department file so that the department can maintain a single, accurate list of all available material, and that inventory is typically disclosed to prosecutors and criminal defendants so that they can ensure that they have everything. In this way, it serves not as a solution to the problem of ensuring that all investigative material is disclosed, but as a necessary backstop to try to prevent the possibility of non-disclosure despite the existence of other policies and procedures.

My knowledge of these standards is based on my extensive experience with police practices. This includes my own experience as a detective and supervisor in multiple police agencies; my familiarity with the policies used by police departments nationwide, developed in the course of my own efforts to improve policies in police agencies in which I worked, as well as in the course of my work as an independent consultant and auditor reviewing policies and

HOOD 039057
Weston 054074

practices of police departments around the country; and my knowledge of industry standards established by organization like the International Association of Chiefs of Police. These standards have also been documented in homicide guides and reference materials for decades. In addition to my own extensive experience, for a summary of some relevant texts please see **Attachment E**.

### B. *Jones* and *Palmer* litigation highlight Chicago's "Street File" problem

In the early 1980s, two federal court cases highlighted the fact that the Chicago Police Department had no systems in place to ensure that investigative materials were collected centrally and disclosed during criminal cases, and in fact important materials were consistently withheld from criminal defendants.

### 1. The George Jones Prosecution

In 1981, twelve-year-old Sheila Pointer was raped and bludgeoned to death; and her 10-year-old brother Purvy was beaten unconscious in their home.[8] George Jones – a senior at a nearby high school, who edited the school newspaper and was nicknamed "Bookworm" – was ultimately arrested and prosecuted for the crime. During the CPD investigation of the Pointer murder, detectives gathered evidence that undermined the witnesses who had implicated Jones, and which Jones could have used to help defend himself, but this information was placed "not in the police department's regular files but in its 'street files.' These were files that the police did not turn over to the state's attorney's office as they did with their regular investigative files."[9]

After George Jones had been charged, a detective, Frank Laverty, who was investigating the case interviewed the victim's brother, Purvy, who told Laverty that there were two assailants and both were wearing stocking masks. Laverty also documented other strong evidence that Jones was not the perpetrator. That information was also placed in the street file.[10] Laverty was told that, in light of these facts, the prosecution of Jones had been abandoned. However, in the spring of 1992, Detective Laverty read in the newspaper that George Jones was on trial for the Pointer murder.[11] Laverty went to his Commander to tell him that an innocent person was being prosecuted, but his Commander took no action. Laverty then went directly to Jones' criminal defense attorney and told the attorney about the information in the street file. After the court declared a mistrial, the State's Attorney dropped all charges against Jones.[12]

After the charges against him were dismissed, Jones filed a civil lawsuit. He was awarded a substantial amount in damages for the violation of his rights. Notably, among other things, the jury found that the City was liable to Jones for its custom of maintaining "street files" that were withheld from the State's Attorney and therefore unavailable to Jones and the rest of the criminal justice system.[13] The Seventh Circuit explained that the practice of "retaining records in

---

[8] *Jones v. City of Chicago*, 856 F.2d 985, 988 (7th Circuit 1988)
[9] Ibid (at 988-991)
[10] Ibid (at 990-91)
[11] Ibid (at 991)
[12] Ibid. (at 991)
[13] Ibid. (at 995-96)

HOOD 039058
Weston 054075

clandestine files deliberately concealed from prosecutors and defense counsel cannot be tolerated."[14]

### 2. The Palmer Litigation

On April 16, 1982, shortly after Jones' prosecution, a class of plaintiffs filed a lawsuit in federal court to prevent the use of street files.[15] The plaintiffs immediately moved for a temporary restraining order (TRO). A TRO issued on April 20, 1982, and amended on September 24, 1982, required the CPD to preserve all street files and documents formerly placed in street files.[16] The TRO was amended because of allegations that detectives were continuing to keep investigative materials as their personal property and therefore not subject to CPD control.[17]

District Judge Milton Shadur oversaw the preliminary injunction hearing. Based on the evidence presented by the plaintiffs and by the City of Chicago, Judge Shadur found the following (among other things):

- The CPD does not provide its detectives or other personnel with guidelines as to the extent to which "official reports" (which Judge Shadur defined as case reports, supplementary reports, closing reports, etc.) have to embody information in "unofficial reports" (defined as notes, witness interviews, worksheets, memoranda, etc.) In particular, Judge Shadur found that "Official Reports have sometimes been prepared from the perspective of what fits the preparer's concept of the crime, so they omit information that – though highly relevant and sometimes exculpatory of the defendant charged with the offense – the preparer does not deem 'pertinent.'"[18]
- The existence and use of unofficial reports is well known throughout CPD. Parallel files containing these reports are referred to as "street files," "running files," "office files" or "working files."
- Potentially relevant information contained among the CPD's various investigative files and materials for a particular crime is not necessarily included in official reports. There has been and is no police rule, regulation, procedure, or practice that requires all relevant information to be placed in official reports or to be transmitted to the CPD's Records Division for permanent retention.[19]
- the CPD responds to requests for documents as follows:
  - In response to a subpoena, CPD produces only official reports maintained at Records Division along with photographs and lab reports. CPD does not produce unofficial reports maintained at the Area or unofficial reports in the possession of individual detectives.[20]
  - In response to a defendant's discovery motion, Assistant State's Attorneys

---

[14] Ibid. (at 995).
[15] *Palmer v. City of Chicago*, No. 82 C 2349
[16] Ibid (at NF-L 005606-07)
[17] Ibid (NF-L 005607)
[18] Ibid (NF-L 005609-10)
[19] Ibid (NF-L 005612)
[20] Ibid (NF-L 005614)

34

HOOD 039059
Weston 054076

(ASAs) order official reports by phone. CPD Records Division employees respond to these requests by producing official reports and do not contact individual Areas or other units or divisions of the CPD for unofficial documents.[21]

Judge Shadur found that the exclusion of relevant information from official reports "was not random or infrequent."[22] In fact, by the City's admission, there were hundreds street files in active use during the *Palmer* litigation itself. In granting the injunction, Judge Shadur found that the use of street files created a "grave risk" of non-disclosure of exculpatory information, including information that could be used to impeach witnesses.

On appeal, the Seventh Circuit reversed Judge Shadur in part, although it did order the CPD to preserve and produce street files for those plaintiffs who had been convicted of felonies.[23] It vacated the preliminary injunction in all other respects because the court found that the plaintiffs either lacked standing or should have asked for relief in the state courts. It did not revisit the factual findings that Judge Shadur made.

### 3. The 1988 *Jones* Appeal

After the *Palmer* litigation concluded, the Seventh Circuit issued an opinion in 1988, *Jones v. City of Chicago*, 856 F. 2d 985 (7th Cir. 1988), in which Judge Posner affirmed liability against Chicago police officers for the withholding of evidence from Mr. Jones and affirmed liability against the City of Chicago for maintaining a street files practice.

Among other things, the appellate decision noted as follows: (a) the case disclosed "frightening abuse of power by members of the Chicago police force and unlawful conduct by the City itself"; (b) Laverty was charged with a disciplinary infraction, "transferred out of the detective division, ostracized by his fellow officers, and assigned to a series of menial tasks culminating in the monitoring of police recruits giving urine samples" while "none of the defendants has been disciplined for misconduct"; (c) there was "enough evidence to enable the jury to infer that [a Chicago Police Department Commander, Lieutenant and Sergeant] had known . . . [and] had approved every false step"; and (d) there was sufficient evidence against the City that the street files practice existed, caused Jones injuries, and was "consciously approved at the highest policy-making level."[24]

The Seventh Circuit's decision also specifically highlighted the failure of CPD's leadership, which allowed Detective Laverty to be punished for coming forward while allowing those who actively attempted to thwart Laverty's efforts to reveal the truth to go without discipline or reprimand. Indeed, the United States Court of Appeals for the Seventh Circuit described the CPD's reaction to these events as follows:

Laverty should have been commended for his adherence to the principles of

---

[21] Ibid (NF-L 005614)
[22] Ibid (NF-L 005615)
[23] *Palmer v. City of Chicago*, 755 F.2d 560 (7th Cir. 1985); CPD Special Order 83-2A.
[24] *Id.* at 988, 991-92, 993, 995-996.

HOOD 039060
Weston 054077

honesty, decency, and justice, instead the police department charged him with a disciplinary infraction for having failed to advise the state's attorney that he planned to testify for the defense in George Jones's criminal trial should that become necessary. He was also transferred out of the detective division, ostracized by his fellow officers, and assigned to a series of menial tasks culminating in the monitoring of police recruits giving urine samples. None of the defendants has been disciplined for misconduct in the arrest and prosecution of George Jones.[25]

These actions in effect condoned the misconduct, and sent an unmistakable message to CPD personnel that the priority was not solving the street file problem, but instead was dissuading whistleblowers from coming forward.

Based on my experience, strong and unequivocal management commitment is needed to successfully achieve the sort of shift in culture that was necessary in the wake of the *Jones* and *Palmer* revelations; CPD leadership's response was the opposite. I would expect, therefore, that the improper street files practice would continue. As discussed below, my review of hundreds of homicide files in this case and others (*e.g.*, Fields and Kluppelberg) confirms exactly that: the street files practice continued unabated.

### C. CPD personnel consistently use multiple files during a criminal investigation, and fail to disclose all relevant materials to criminal defendants.

As the *Jones* and *Palmer* cases highlighted, the CPD has a long history of using multiple, parallel files during the course of a criminal investigation, which are frequently withheld from criminal defendants.

#### 1. Multiple files are created for a single investigation, creating a serious risk that investigative materials are not disclosed.

From at the latest in 1977[26] until at least 2009,[27] the Chicago Police Department has maintained multiple, parallel files relating to a single investigation and has had no system in place to ensure that all important investigative materials from these multiple files are collected and provided to the prosecutors and criminal defendants.

The only "centralized" repository of investigative information maintained by CPD is the "permanent retention file" maintained by the Records Division. But the CPD policy and practice

---

[25] *Jones*, at 991-92.

[26] The City's designated witness, in this and other cases involving the City's practice regarding maintenance and production of investigative files, James K. Hickey, testified that the practice of using street files started at least as early as 1977, when he arrived at Area 1 homicide. Similarly, during hearings on the use of street files in Palmer v. City of Chicago, John Stibich, a former commanding officer in Area 4 homicide, testified that during his time there, from December 1974 to December 1977, Area 4 homicide had a practice of using street files. Following Hickey's sampling of the various violent crimes units in 1982, Hickey determined that each of the Areas used street files.

[27] See Attachment H, Expert Report in Fields v. City of Chicago

HOOD 039061
Weston 054078

is to only include the official reports in the permanent retention file.[28] This practice of having an "official" file that does not include all of the investigative notes, documents, and materials deviates from standard police practice, which would have one single repository with all the information.

Instead of utilizing the permanent retention file as the central repository of information, CPD practice is to use multiple, parallel files while an investigation is ongoing. These multiple, parallel files have been variously referred to at different times as "street files" "working files," "running files," "unit files," "Area files," or "investigative files," among other terms. These files are used by detectives and other investigating officers, while an investigation was ongoing to gather relevant investigative materials; to communicate steps taken and steps to be taken in an investigation; and to record the personal opinions of the officers investigating a crime. The files contained notes (sometimes handwritten on scraps of paper), memos, reports, photographs, and various other forms of information about the case that were developed as the investigation unfolded. Among other things, information in these various, parallel files included details about the crime and the physical evidence, information about the observations or statements of witnesses, identification of potential leads and suspects, and items obtained from victims or witnesses (*e.g.*, a victim's telephone book or a witness's telephone messages). The files also contained other criminal history information and police reports pertaining to other cases, which were utilized in suspect identification and elimination.

Detectives working a case necessarily take notes during witness interviews and must communicate that information to other detectives. That is an inevitable and important part of an investigation.[29] The problem with the Chicago Police Department's practice is that these notes are stored across multiple files—both during and after an investigation—and are never consolidated into the official file which is permanently maintained by the CPD. Thus, even after an investigation concludes, there are still multiple files containing different sets of investigative materials scattered in various locations, and which are regularly withheld from criminal defendants.

There are a variety of reasons that multiple, parallel files are created within the CPD environment:

- Multiple detectives working on the same case, each take notes, resulting in multiple sets of investigative materials, but there is no formal place for detectives to keep these notes, and as a result they are kept on tables, coat racks, in cars, in filing cabinets, or desk drawers in the Areas and are not collected in a central repository.[30]
- In 1980, the CPD was re-organized, and the Detective Division was split into six geographical areas (Areas One through Six) and two subject matters (Violent Crimes

---

[28] Hickey *Kluppelberg* Deposition [2015] 22-23, 95-96
[29] Hickey himself confirms this. Hickey April 2014 Fields Trial Testimony, at 2060:16-21 ("It is just common sense that you do write things down because you can't remember, you know, who said what, who said what when.") Hickey November 2016 Fields Trial Testimony, at 11/23/16 PM, at 14-15 ("Taking notes is terribly important.")
[30] *Palmer v. City of Chicago*, 562 F. Supp. 1067, 1071 (N.D. Ill. 1983).

HOOD 039062
Weston 054079

and Property Crimes).[31]   Detectives from different divisions or units of CPD often investigate a case together, but report to different supervisors, and work out of different units or Areas, resulting in multiple files kept at the different geographical locations throughout the City.

- In addition to detectives, there are many others involved in investigating major crimes such as homicides, including patrol officers as well as specialized unit officers like Gang Crimes and Bomb & Arson. Indeed, Gang Crimes Officers were heavily involved in the investigation in this case.  Yet, no set of policies or practices governed the investigative practices of these additional investigators or required them to coordinate with the Detective Division. As a result, those investigators had their own sets of notes and yet more files, unknown to and uncoordinated by CPD.

- There is no centralized log of the various parallel files created for each investigation, and thus no way to know how many files exist or where they are located.

- Files that are kept in an Area may be moved during CPD re-organization or are relocated to a storage warehouse.  If multiple files for the same homicide are stored at an Area, they are not necessarily stored or moved together, and there is no system in place, or documentation, for tracking the movement of these files.[32]

- The documents in the files at the Area are never consolidated into the permanent, official files stored in CPD's centralized Records Division.

- Detectives also do not routinely transcribe all information obtained during an investigation into an official report, resulting in different information maintained in the official and unofficial documents.

- The permanent file, kept in the Records Division, therefore, does not contain all the relevant and important investigative materials.

This practice of using of multiple, parallel files creates an unacceptable risk that information will not be discoverable in response to a subpoena and will, therefore, be withheld from prosecutors and defendants.  Where detectives keep their own files, or files are kept at multiple areas or units throughout the City, there is no way for any detective or supervisor to know how many parallel files have been created for a particular case, or whether they have all been collected.  This is why standard police practice around the country is to have a lead investigator responsible for keeping a single, known repository of information.

### 2.   The CPD's *ad hoc* response to subpoenas exacerbates the problem

In Chicago, the risks created by using multiple files are exacerbated by the fact that the CPD Subpoena Service Unit, which is responsible for responding to requests for records, is untrained and lacks any policies governing how it responds to subpoenas and requests for files.

According to Hickey, when a request for investigative documents is made to the Chicago Police Department, that request goes to the Records Division, Subpoena Service Unit.[33]  A sergeant was in charge of the Subpoena Service Unit, and that sergeant reported to the assistant

---

[31] James K. Hickey Deposition in *Kluppelberg v. Burge* at 64 (NF-L 001004).
[32] Loughran Deposition 43-44.
[33] Hickey *Kluppelberg* Dep 358(NF-L 001299)

HOOD 039063
Weston 054080

director and director of the Records Division.[34] It was the Record Division director's responsibility to set policy at the Subpoena Service Unit.[35]

The Chicago Police Department had no written policy that Hickey was aware of dictating how the Subpoena Service Unit should search for documents responsive to a subpoena or request for records.[36] In addition, there were no directives addressing "policies, safe checks, [or] procedures . . . to ensure that when a request came in either by a subpoena or by an informal request from and Assistant State's Attorney . . . that all of the necessary information including exculpatory information was provided by the subpoena services unit in response to that request."[37]

The subpoena service unit was staffed by non-sworn personnel with the title "clerk."[38] There was no formal training of personnel assigned to respond to subpoenas,[39] and there is no rule, policy, procedure, directive or any other document that guides the clerks in the subpoena unit to ensure that all documents are retrieved from all possible locations and disclosed, or any training to that effect.[40] Whether all of the different units that worked on a given investigation were searched for documents responsive to a subpoena depended in large part on the discretion and experience of the personnel searching for the documents, such that a subpoena for all documents under a certain records number[41] would not necessarily result in the production of all documents corresponding to that particular investigation.[42] Hickey described the Subpoena Service Unit's effort to respond to document requests as an "art."[43] He acknowledged that it is possible in a case with multiple units working on the same investigation that the subpoena could only go to one of those units.[44]

All of this was true as well with respect to requests for documents made by the Cook County State's Attorney's Office to the Chicago Police Department.[45] This system was in place before Mr. Rivera's conviction and well into the 2000s.[46] In fact, the City's expert on the CPD's policies in 2009 explained that, even if a subpoena is forwarded to an Area or unit, there is no system or procedure to follow up if the Area or unit fails to respond.[47]

---

[34] Hickey, *Rivera v. Guevara, et al.*, No. 12 C 4428, pages 146-47 (NF-L 000312-13)

[35] Ibid, pages 159-60 (NF-L 000316)

[36] Ibid, pages 36-37 (NF-L 000273-74); City of Chicago's Amended Response to Plaintiff's Seventeenth Set of Requests to Produce Documents to the City of Chicago, p.2-3

[37] Ibid, page160 (NF-L 000316)

[38] Ibid, pages 147-48 (NF-L 000313)

[39] Ibid, page 39 (NF-L 000274)

[40] Hickey *Rivera* Deposition 36, 185-87; City of Chicago's Amended Response to Plaintiff's Seventeenth Set of Requests to Produce Documents to the City of Chicago, p.2-3.

[41] A Records Division number is a unique identifier assigned to a particular criminal investigation. The letters represent the year that the investigation began and investigations are assigned the numbers sequentially as they had.

[42] Ibid, pages 43-46 (NF-L 000275-76)

[43] Ibid, page 162 (NF-L 000316); Hickey *Kluppelberg* Deposition 362-63(NF-L 001303-04)

[44] Hickey *Kluppelberg* Deposition 362-63 (NF-L 001303-04)

[45] Hickey, *Rivera*, page 125(NF-L 000296); Loughran Deposition, page 50.

[46] Ibid, pages 151-53 (NF-L 000314); Loughran Deposition 14.

[47] Loughran Deposition 15.

39

HOOD 039064
Weston 054081

This system, or lack thereof,[48] for responding to requests for documents and producing investigative materials, including important investigative information, is deficient. Because there are multiple files in multiple locations pursuant to the special orders and CPD's design, there is an acute need for policies, practices and training to ensure that all relevant information was produced to prosecutors and criminal defendants. The lack of such safeguards represents a significant departure from accepted police practices.

### D. Criminal defense files show that important investigative materials are regularly withheld from criminal defendants

From a police practices perspective, criminal defense attorney files contain all of the documents disclosed and made available to the attorneys that provided counsel to defendant(s) in the homicide cases that I reviewed. By standard police policy and practice, criminal defendants should get everything that was available from the police investigation to aid the defendant in presenting his or her defense at trial. It would be a dangerous departure from standard police policies to permit a practice of picking through police files to select which investigative materials to turn over.

As a practical matter, this disclosure of information usually occurs in one of two ways: either the police fulfill their obligations by disclosing their entire investigative file to the prosecutor (rather than picking and choosing which parts of a file to disclose), who in turn disclose it to the criminal defense attorney; or, in some cases, independently and as a safeguard, the criminal defendant or his counsel will subpoena the police investigative materials directly, rather than relying exclusively on what was provided by the prosecutor. In response to the subpoena, all investigative materials should be disclosed.

The basic principle is that a criminal defendant is not supposed to be tried in the dark. He is entitled to understand the full breadth of the evidence against him; and he is entitled to any evidence that may help him prove his innocence. As a matter of police practices, a well-trained detective would understand that information should be disclosed even if it is only supportive – but not conclusive – proof of innocence. As long as information known to the police or prosecution might contribute to doubt about the defendant's guilt, it is relevant and must be disclosed.

Based on the criminal defense files reviewed in this case, and others, as explained below, it is clear that these standard police practices are not followed in the Chicago Police Department, and as a result investigative materials that should be disclosed under normal police procedures are routinely withheld from criminal defendants. Moreover, these documents were withheld even where defendants issued subpoenas specifically requesting those documents. And finally, the material withheld was often relevant, exculpatory investigative information that should have been disclosed under generally accepted police practices. I discuss each conclusion in turn below.

---

[48] Hickey, *Rivera*, pages 36-37 (NF-L 000273-74); City of Chicago's Amended Response to Plaintiff's Seventeenth Set of Requests to Produce Documents to the City of Chicago, p.2-3.

HOOD 039065

Weston 054082

**1. Background on the Area North investigative files and my file review**

For purposes of my analysis of Area North files, I reviewed investigative files for the period from 1985-1991 (the three years around the 1988 homicide investigation), collected from two locations.

1. In 2011, during post-conviction proceedings in Mr. Rivera's criminal case and decades after Mr. Rivera's criminal trial, the City of Chicago located an investigative file related to Mr. Rivera's case. Portions of that file appear to have been provided to the CCSAO during Mr. Rivera's post-conviction proceedings. That complete file was not turned over to Plaintiff when this civil lawsuit was filed in 2012, and instead documents Bates-stamped CPD 1-55 were produced and identified as the "Area File." In April 2014, during the deposition of Anthony Wronkowski, the City produced for the first time a copy of the so-called Investigative File for the Valentin homicide, Bates-stamped as Wron 1-69. As discussed below, in Section V.H, that file contained numerous pages of documents related to the police investigation into the Valentin homicide that had not been previously produced and were relevant evidence.

Based on further investigation, it was learned that the investigative file had been stored at some point in time in the 45 file cabinets at Area North, containing primarily open investigative files from 1961 to the present. Based on Court rulings, Plaintiff was then given limited access to a sample of two file cabinet drawers from the period of 1985-1991, and all investigative files in those two drawers were copied and produced. That set of 52 files, classified as the Area North Inspection Files, forms one of the two sets of investigative files I reviewed.

2. Pursuant to CPD policy, closed homicide investigative files are supposed to be sent to the CPD records warehouse for storage. For purposes of another aspect of Plaintiff's case, the parties reviewed 435 investigative files stored at the records warehouse that were represented to comprise all Area Five homicide investigations from 1985-1991. By agreement of the parties those files are a representative sample for purposes of assessing CPD's policies and practices. The parties then identified and copied 138 of the 435 files that contained any evidence of a lineup having been conducted, and that set of 138 homicide files was used for purposes of my analysis.

Mr. Rivera's attorneys provided me with a spreadsheet that served as an index of the 190 police investigative files pertaining to the two sets of investigative files for the time period from 1985-1991, as described above.[49] I reviewed and double-checked the spreadsheet extensively. That spreadsheet is attached to this report as **Attachment G.**[50]

Attachment G also contains additional information reflecting my comparison of the investigative files to criminal defense files and permanent retention files (discussed further

---

[49] The spreadsheet contains 194 rows, rather than 190, because there were several cases in which there were multiple criminal defendants, and so multiple criminal defense files corresponding to a single investigative file. Each criminal defense files is given its own row, but for purposes of calculating statistics related to the investigative files, the rows are considered as one file.

[50] I intend to rely on the spreadsheet included as Attachment G at trial to help explain the differences between the particular files to the jury.

HOOD 039066
Weston 054083

below). For all of the investigative files found at the CPD warehouse, Plaintiff's counsel issued subpoenas for any corresponding criminal defense files, and was able to obtain 48 criminal defense files corresponding to 44 investigative files (there were several cases with multiple defendants, so multiple criminal defense files for a single investigative file). Plaintiff also obtained 132 permanent retention files, which included files for 43 of those 44 investigative files. In some cases, the City of Chicago redacted substantial information from the criminal defense files and the permanent retention files in a way that made it impossible to conduct a comparison, as noted in Attachment G.

Finally, I gave the City the benefit of the doubt for purposes of my analysis of criminal defense files as compared to investigative files. To that end, I excluded from my analysis criminal defense files in which it appears that the case was transferred to private counsel, and so the criminal defense file may or may not be complete (10 criminal defense files). Those files contain a strikethrough in Attachment G. I also gave the City the benefit of the doubt in my comparison to criminal defense files by assuming that all material in the criminal defense file had been there at the time of the original criminal trial (even if it might have been added subsequently, for example, as part of appeals or post-conviction proceedings).

## 2. Criminal defense files are missing pages from the police investigative files

I also had access to criminal defense attorney files that corresponded to certain of these investigative files. Mr. Rivera's attorneys attempted to locate defense attorney files for as many of these homicide investigations as possible. As discussed above, through their efforts they located 48 criminal defense files for 44 different homicide investigations. Each CPD homicide investigation is assigned a "Records Division" (RD) number that is used to identify materials corresponding to a particular investigation. I reviewed all of the criminal defense attorney files counsel was able to obtain; none were withheld from me.

I conducted a case-by-case analysis of what documents are included in the police investigative files but are missing from criminal defense files. I did not make any inferences about what documents were turned over to criminal defendants – my comparison exercise was objective in nature rather than subjective. I then analyzed the types of documents withheld across the files, focusing in particular on whether there were the types of documents withheld that could and would be important to disclose to prosecutors and criminal defendants. My observations and conclusions flow from this analysis, which is contained in **Attachments F and G.**

Of course, not all of the material withheld is of equal importance. Some of the documents not turned over to criminal defendants were administrative in nature and not crucial evidence (although I note that administrative records like inventories can be important evidence to disclose); while other records were highly relevant investigative material. But any withheld pages, regardless of their importance, are evidence that there was not a policy of copying all police files in their entirety. Moreover, the inconsistent nature of what was withheld or disclosed is concerning, (i.e. the same category of document is sometimes disclosed and sometimes withheld). That variation suggests that individual officers are making ad hoc decisions about what to disclose from each file. Picking and choosing what materials to produce, or failing to have a procedure to ensure complete production of all material in all police investigation files, are both egregious departures from generally accepted police practices.

HOOD 039067
Weston 054084

My comparison of the investigative files to corresponding defense attorney files revealed that well over 90 percent (37 of 38 criminal defense files[51]) of defense attorney files are missing documents that were contained in the corresponding police investigative files.

The documents missing from the defense attorney files are important investigative materials. For example, the following significant discoverable items were routinely absent, and are precisely the kinds of documents that should be routinely disclosed to a criminal defendant under normal police practices.

**Handwritten Notes and General Progress Reports:** More than 20 out of 27 of the criminal defense files (or approximately 74%) reviewed above were missing unofficial handwritten notes that were present in the investigative files (see Row L of Attachment G). Another 10% of criminal defense files were missing GPRs that were present in the investigative files. The handwritten notes are often found on plain sheets of paper, on the margins of official forms, and on scraps of paper, none of which were the official GPRs on which such information was supposed to documented. There were hundreds of handwritten notes contained in the police files reviewed that were not in criminal defense files. They are often not inventoried, or the inventory lacks any type of specificity to assist in investigation and discovery. They are documents recording the type of information– from alternative suspects, to witnesses, to vehicle information, to alternative theories of the crime – that should be disclosed to defendants under normal police practices.

**To-From Memos:** Approximately 17% of the criminal defense files were missing to-from memos that were present in the investigative files: (see Row N of Attachment G) Handwritten and typed to-from memos, not on GPRs, are another classic type of document typically contained in "street files" that were supposed to be prohibited during the relevant time period from 1985-1991. Like handwritten notes, they contain a wide range of information – from alternative suspects, to witnesses, to vehicles, to alternative theories of the crime.[52]

**Investigative File inventories:** Only 3 of the criminal defense files that I reviewed had an inventory to serve as an index of documents in the police investigative files.

As discussed above, normal police practices and procedures require the creation and dissemination of an inventory that serves the purpose of providing a compilation of all of the investigative materials related to a criminal investigation. The inventory sheet was apparently designed to be used as an index of documents in an Investigative File. Even when an inventory sheet is available, they were often incomplete (i.e., missing entries that were listed on the investigative file inventory or not listing handwritten notes or other

---

[51] Again, 10 of the 48 were excluded to give CPD the benefit of the doubt.

[52] Notably, in only six of the more than 40 cases in which I conducted a comparison of criminal defense files to investigative files were there even to-from memos. This strongly suggests that there are additional investigative files in addition to the ones the City produced, as set forth in Section VII, below. Defendants in this case testified that they routinely used memos to communicate between shifts, which is consistent with my findings in reviewing investigative files in Fields and Kluppelberg.

HOOD 039068
Weston 054085

documents) or were so generic as to be worthless (e.g., including overly generic entries, such as "GPR," with no date, number of pages, or author).

Other types of important investigative material often missing from the criminal defense files included photographs, lab reports, evidence reports, hold requests and release of person in custody reports, and arrest reports. See Attachment F.

As discussed below in Sections V.G and V.H, these same problems infected the Rivera files as well.

### 3. Issuing a subpoena does little to ensure disclosure of all relevant materials

Even in cases where a criminal defense attorney went out of his or her way to send a subpoena requesting the "investigative" or "street files," my analysis reveals that there was no guarantee that a defense attorney would receive all the relevant investigative materials beyond the official reports in the permanent retention file. In many instances, the defense attorney issued a subpoena specifically for "street files," and that subpoena appears in the investigative file, but not all the documents in the investigative file were disclosed in response to a subpoena. For example, subpoenas specifically for "street files" were issued by defense counsel in the following cases, but as described in Attachment F, not all the documents were turned over in response: G235351 (subpoena at RFC 2922); J052070 (subpoenas at RFC 5250-52); J080925 (subpoena at RFC 5987); J209456 (subpoenas at RFC 6333, 6335-36); J215119 (subpoena at 6498); K417078 (subpoena at RFC 8181-82); K455932 (subpoena at RFC 8393); K530917 (subpoena at RFC 8783-85); M184949 (subpoena at RFC 9653); M287641 (subpoena at RFC 10192); M579697 (subpoena at RFC 10784); N028256 (subpoena at RFC 11332); N262285 (subpoenas at RFC 12628-29, 12702-03); N475910 (subpoena at RFC 13121-22); N581836 (subpoena at RFC 13575-76); P049272 (subpoena at RFC 13944-45); P060434 (subpoena at RFC 14475-76); P128067 (subpoenas at RFC 14647-49); P526822 (subpoena at RFC 16315-16).

These problems with CPD's responses to subpoenas and file requests persisted regardless of who sent the request. In fact in one case that I reviewed, an Assistant State's Attorney described the difficulties obtaining the complete set of investigative materials from CPD. In 1987, Sherman Addison was and convicted of the 1985 murder of Helen Smith. The case was sent back for a retrial, and in 1994, during a court hearing about discovery an Assistant State's Attorney explained that "usually there is an investigative file. We never had that, never had it for the first trial." JR-L 214518. He also reported to the Court that even though the prosecutor met with Detective Jedlowski, the lead detective in the case, before the first trial:

> [a]ll he had was the typed police report which is the normal police report that is always issued in cases, the non-investigative type police report. No notes, no GPRs, and that is what she [the prosecutor] was shown by him. She noted that he didn't have a copy of the street file or the investigator file so that is why she then subpoenaed the investigative file but she was not tendered anything by Detective Jedlowski and, in fact, Detective Jedlowski happened to be in the building yesterday so I spoke with him also and he verified the fact that all he had was just the typed police reports, supplementary reports

44

HOOD 039069
Weston 054086

JR-L 214520-21. In fact, the lead detective made multiple representations to the prosecutors that he had provided the "complete set" of police files.

These subpoena responses suggest deficiencies with regard to the two most basic requirements of a process to ensure complete disclosures to defendants: (1) the City did not know what files it had and where (not centrally located or indexed); and (2) it did not have policies or procedures to ensure that whatever investigative material was found was turned over in its entirety. The latter finding is particularly troubling: it suggests that CPD personnel were picking and choosing which investigative materials in the files to turn over.

### 4. The missing pages contain important and relevant information that should have been disclosed to criminal defendants

Finally, entirely consistent with the findings above, in the majority of cases I reviewed there were significant amounts of relevant information that would have aided the defendant and therefore should have been disclosed under standard police procedures. In my experience, given the volume of investigative material that was not disclosed, it was inevitable that relevant information helpful to a criminal defendant would be withheld. That is exactly what I found.

Below are some examples from the comparison of the defense attorney files and the corresponding police investigative files that demonstrate this problem:

**J209456 – David Quinones, Bruce Andras, Marc Johnson**

Quinones, Andras and Johnson were charged with the May 19, 1987 murder of Eddie Mercado, and attempted murder of Nicky Lanzarin and Luis Rodriguez. Andras reportedly told police that he was shot at the week prior by members of a rival gang, and the drive-by shooting in this case was allegedly planned in retaliation.

Among the documents missing from the criminal defense files are a request for identification photos (RFC 6443) of three men: (a) criminal defendant Bruce Andras, (b) Santiago Chacon, and (c) a man named Mickey Harris, whose name does not appear elsewhere in the investigative materials and whose connection is otherwise unexplained. The fact that police were interested in obtaining identification photos for Mickey Harris suggests he may have been an alternate suspect, and information that led police to pursue this lead should have been disclosed. Moreover, the fact that there is no information on who Mickey Harris is, or how police obtained this name, or why detectives thought his photos would be relevant to the investigation, suggests that additional investigative materials created during this investigation, are missing from this file.

Handwritten notes elsewhere in the investigative files were also withheld. A handwritten note at RFC 6334 lists a criminal case number (94CR0105701), the significance of which is not explained. This page is missing from both Quinones and Johnson's defense attorneys' files. The number 87117788701 is likewise handwritten on a blank page at RFC 6332, and is not included

HOOD 039070
Weston 054087

or otherwise explained in any official reports. RFC 6332 is missing from both Andras and Johnsons' defense attorneys' files.[53]

**P526822 - Miguel Borrotto**

Miguel Borrotto was charged with first degree murder and aggravated battery with a firearm after he allegedly shot Fulgencio Torres and Angel Sotos in a bar fight on October 26, 1991.

A supplementary report at RFC 16300 notes that an Illinois vehicle registration card was found in the pocket of the shooter's jacket, which he took off and left behind after fleeing the bar. The card from the shooter's jacket was for a Nissan with the license plate ZZ1384. However, two documents which are missing from the defense attorney's file (a vehicle search printout at RFC 16394 and a receipt for the purchase of the vehicle at RFC 16401) show that the defendant owned a Nissan with a license plate number YVK670, not ZZ1384.

Also missing from the defense attorney's file is a page of handwritten notes (RFC 16397) on which the names Eduardo Castro and Karl Lugo are written. These names are not included in supplementary reports or mentioned elsewhere in the investigative file. The presence of unexplained names in the file suggests that there are other investigative materials for this case (for instance, that explain the source of the names and their relevance) that are now missing from this particular file.

**J080925 – Samuel Slack**

Samuel Slack was charged in July 1987 with the February 1987 armed robbery and murder of Estella Winburn.

Two fingerprint comparison reports are missing from the defense attorney's file. The report at RFC 5984 notes that the victim's prints were compared for elimination purposes. The report at RFC 5982 requested that the defendant's prints be compared to "all unidentified latent prints," but no results are listed in the report.

Five photographs at RFC 6074-79 were also withheld from the defendant. These photos are labeled with the names Jeffery Johnson, Christopher Morrow, Fines Gerard Savage, Clarence Parker, and Carl Harrington. A supplementary report at RFC 6007 notes that five photographs were shown to eyewitness Alvin Robles, and Robles "tentatively identified" the photo of defendant Slack. In fact, Robles first identified Johnson as the shooter in a photo lineup in February 1987 (RFC 6017-19), but Johnson was released when Robles failed to identify him in a live lineup (RFC 6014). Slack was not identified in a live lineup by Robles until five months later, in July 1987 (supp report at RFC 6005-06). The arrest reports for two of the men in these photos, Savage and Johnson, were also withheld from the defense attorney (RFC 6042, 6056).

---

[53] An additional file for this case was found in the two drawers that Plaintiff was given access to from Area North, and that file contains information pointing to an alternate suspect that also was not produced to the criminal defendant. The existence of a separate file, with different documents and information, stored in another location, demonstrates the risks of maintaining a parallel file system.

HOOD 039071
Weston 054088

Given the fact that the same eyewitness who implicated Slack in the shooting previously identified another suspect, exactly which photos were used in the lineup could have been an important part of Slack's defense.

**N028256 – Jesse Swanigan**

Defendant Jesse Swanigan was charged with the January 1990 murder of Roy Stolle. Swanigan was ultimately found not guilty of the murder charge but was sentenced to 7 years on the theft and possession of a stolen motor vehicle. Swanigan claimed to have run across the real perpetrator of the burglary, saw him loading two TVs into his car, yelled "police" to scare him off, and drove off in the car. The TVs were later determined to have been stolen from the victim's home during the burglary and murder. Swanigan denied any involvement in the burglary and admitted only to stealing the car with the TVs inside, and to later attempting to sell the TVs to a friend named Benny Buford.

Several mug shot photographs from the investigative file (RFC 11300-09) were withheld. The men's names are written on the back of most of the photos along with the note "filler" on several. Two of the photos, however, also have a note stating, "unidentified…misidentified as Swanigan, Jessie." No names are listed on these two photos.

A handwritten phone message (RFC 11324) was also withheld from the criminal defendant. The phone message appears to be from a John Reed, and on the back are details regarding Reed's contact information and place of employment. Reed's name does not appear anywhere else in the file and there is no indication whether detectives ever followed up with Reed or what information he may have provided.

**M258570 – Curtis Kirkland**

Curtis Kirkland was charged with first-degree murder in January 1991. Victim Stanley Moody was chased and beaten by several men in June 1989 and eventually died from his injuries. Kirkland and another man, Michael Sargent, were both charged with murder after eyewitnesses identified them in lineups. Sargent was found not guilty (RFC 9920), but Kirkland was convicted and sentenced to 38 years in prison (RFC 9919).

Several pages of handwritten notes (RFC 9984, 9987, 9989-90) contain names not included in supplementary reports – Carmen Tate, Eddie Richardson, Ernest Roberts, Carl Evans. These names are mentioned in the investigative file only in a GPR at 10081. A handwritten note at RFC 9989 contains potentially important information tying Ernest Roberts and Carmen Tate to the crime, apparently provided by an anonymous source: "Ernest …V with Joe…Michael has baseball bat…Carmen had rock[?]…all people in liquor store saw it…would you like to remain anonymous??...YES."

A memo in the defense attorney's file (JR-L 223955) indicates that a witness named Avory Moore volunteered these names to Kirkland's defense attorney nearly two years after the crime and several months after Kirkland was charged. Police interviewed a possibly related witness named Courtney Moore (see canvass report at RFC 9959), who owned a nearby

HOOD 039072
Weston 054089

laundromat, but supposedly saw nothing and could provide no information. Avory Moore's memo reads "I was working at the Laundromat…across the street from where this guy was beat up and killed…Curtis was not 1 of the 8 guys that was involved in this incident. I know they (sic) guy who had the stone was called Carmen, and the man who had the 2x4 was called Ernest."

This highly exculpatory information was clearly known to detectives early on in the investigation, based on the notes at RFC 9989, but was only uncovered independently by the defense attorney, and then only partially – it is not clear that the defense attorney uncovered the names or significance of Eddie Richardson, or Carl Evans.

## N162782 – Tomas Nieves

Tomas Nieves was charged with the April 11, 1990 murder of Benedicta Gonzalez, who fell or was pushed out the window of an apartment building during an argument and died of her injuries.

The investigating detectives appear to have considered several male acquaintances of Gonzalez as potential suspects before eventually arresting and charging Nieves. Gonzalez was a known drug dealer, and had related dealings with these various men. Gonzalez's daughters told police that a man they knew as "Mike" was with their mother that day, and initially identified a John Lowden in a photo array (see supplementary report at 11924), but one of the girls later changed her identification (RFC 11932). Other witnesses identified Mike as Mike Amidei. Amidei had an alibi for his whereabouts that day, but cooperated with police and identified Jose Montero in a live lineup in May 1990 (RFC 11945). Amidei told police that he had seen Montero at Gonzalez's apartment when he himself went there to buy drugs on April 11, 1990.

It is not clear from the investigative file how police identified Nieves as a suspect. A supplementary report dated October 28, 1990 (RFC 11949), six months after the murder, notes that "the reporting detectives developed information that a male white Hispanic known as Tomas Nieves was involved with the deceased in a failed relationship." After Nieves was brought in for questioning, detectives had Mike Amidei (who previously gave a definitive identification of Jose Montero) view another lineup (see RFC 11943). Amidei changed his story and identified Nieves as the man he saw at Gonzalez's apartment the day of her murder.

A number of photos relevant to the investigation were withheld from Nieves's defense attorney, including polaroid photos (RFC 11956-66) of the various men who were considered as alternate suspects, and polaroid photos taken at the crime scene (RFC 11955). These crime scene photos included a photo of a pair of glasses found at the scene, which police used to track down Nieves and tie him to the crime. Moreover, the fact that there is no information about how Nieves was identified as a suspect suggests that there is additional investigative material that once existed but is no longer included in this file.

## P272087 – Demetrius Johnson

In connection with this investigation, Demetrius Johnson was charged with the murder of Fred Erwin and was convicted on June 12, 1991. The investigative file contains documentation of an in-person lineup, in which a witness positively identified an alternative suspect named Bryan Johns. See Bates No. RFC 15470-71. The report of this lineup and all references to this

HOOD 039073
Weston 054090

lineup occurring are omitted from the permanent retention file and were not provided to Erwin or his criminal defense attorneys and are also missing from the CCSAO file. Instead, typed police reports included in the permanent retention file state that Bryan Johns appeared in a lineup that resulted in no positive identification (see supplementary report at RFC 15480).[54] I note, in relation to my other opinions in this case, that this is an investigation in which Defendant Guevara was actively involved.

*        *        *

I received copies of the Cook County State's Attorney's Office files for each of the examples above, and in each case the material identified as withheld from the criminal defendant was also withheld from the State's Attorney's Office.

In several of these cases, and many others identified in Attachment F and G, there are handwritten notes, or GPRs that list names and contact information of individuals without additional context or explanation of their relationship to the investigation. In my experience, it is likely that these were individuals whose names came up during the investigation as possible suspects or witnesses that a detective would want to remember and follow up on. That is exactly what I found in my review of the undisclosed street file in Fields; it contained handwritten notes listing names without any explanation, which were in fact referring to important alternate suspects.[55] These examples emphasize how important it is to disclose all investigative materials, because the importance or relevance of certain pieces is not always apparent looking at a document in isolation.

Moreover, the fact that the relationship of various names is not explained elsewhere in the investigative files produced in this case is indicative of the practice of using multiple, parallel files for an investigation: there is no evidence that explains where the names came from, or evidence of any follow up to investigate those names. That suggests that detectives continued to store that information in separate files, that were not ultimately stored with the investigative files produced in this case. One example of this are the photos, from what appear to be an August 31, 1988 lineup, that were produced from ERPS for the first time in this civil case in 2013 (see Section V.H, below).

### E. CPD's policies after *Jones* and *Palmer* don't ensure disclosure of all relevant investigative materials

All police officials are aware of the challenges of ensuring that, over the course of an evolving criminal investigation involving multiple investigators developing evidence at different locations and times, that investigating officers document their findings and that such investigative material is collected, preserved, compiled and disclosed. In the CPD's case, it was acutely aware of these challenges since 1982, at the time of the *Jones* case, and the problems created by using multiple, parallel files. Yet, it has made only superficial attempts to resolve its

---

[54] The withheld lineup information is also missing from the CCSAO file for this case. While there is some possibility that this criminal defense file was transferred and could be incomplete, that is unlikely to explain the omission since the information is also missing from the CCSAO file.

[55] See CITY-NF-001062; CITY-NF-001076; CITY-NF-001085, which list names of alternate suspects without any additional information.

HOOD 039074
Weston 054091

"street files" problem. It issued written directives, but they were incomplete and insufficient in their scope, and beyond that they were not supplemented with the training, auditing and monitoring necessary to ensure that the necessary changes in practice occurred. Unsurprisingly, then, the street files problem continued.

1. A department-wide teletype issued during the *Palmer* litigation;
2. Detective Division Notice 82-2 (Detective Division Notice - File Control);
3. Special Order 83-1 (Detective Division Special Order – File Control);
4. Special Order 83-2 (Detective Division Special Order – Investigative Files);
5. Special Order 86-3 (Detective Division Special Order – Investigative Files); and
6. Standard Operating Procedures (SOP) 1988

Instead of using the *Jones* and *Palmer* litigation as an opportunity to reform its practices and implement standard police procedure of creating one single, centralized file for each investigations, those directives actually instructed detectives to create multiple, parallel files, each with different information and did nothing to address the fundamental problems regarding: (1) allowing officers discretion about what to document in the official reports; and (2) the absence of any system or training for responding to subpoenas and ensuring complete disclosures of investigative material. Moreover, the CPD provided only minimal training on these orders, and failed to conduct any audit, supervision, or oversight to ensure that detectives were following these new directives.[56]

### 1. The policies are insufficient to remedy the "street files" problem

### a. The Teletype and Detective Division Notice 82-2

In April 1982, after a Temporary Restraining Order was issued in the *Palmer* litigation, CPD issued two documents: (1) Detective Division Notice 82-2[57] and (2) a 1-paragraph teletype to commanding officers alerting them to the TRO.[58]  As Hickey explained, Notice 82-2 was "a quick and dirty document" designed to implement the TRO but was "not very workable."[59]

Notice 82-2 and the corresponding teletype were concerned only with preservation and were silent about procedures to collect or inventory their notes, memos, or other documents. Although it coined the term "Unit Investigative File," it did not require detectives to put notes or memos into Unit Investigative Files; and it did not specify whether detectives had to preserve notes or memos that were not in the file.[60]

Even with Notice 82-2's limited requirements and scope, the CPD showed little commitment to implementing that Notice. There is no evidence of training to implement the Notice, and six months after its implementation, Commander Stibich testified that it was still the

---

[56] Hickey *Fields* Dep. at 10, 43.
[57] NF-L 008751
[58] NF-L 008754; Hickey, *Kluppelberg* Deposition 201 (NF-L 001141)
[59] Hickey *Kluppelberg* Deposition 221-22, 224; (NF-L 001161-62, NF-L 001164); Brzezcek Test. NF-L 007517
[60] NF-L 008751-53; Hickey *Kluppelberg* Deposition 212-13 (NF-L 001152-53)

HOOD 039075
Weston 054092

prevailing view that if a detective kept his own personal notes or memos – or considered those to be his personal property – then Notice 82-2 did not require the detective to put those notes or memos in the file and detectives felt they could do whatever they wanted with those notes or memos, including destroying them.[61]

Based on this and other testimony, Judge Shadur found that Notice 82-2 responded to the TRO in "an improperly restrictive and grudging manner, under which detectives could consider their investigative writings as their personal property (and thus not 'under Detective Division control') and therefore outside the preservation requirements of Notice 82-2."[62] The comments of Commander Stibich and the findings of Judge Shadur make clear to me that the practice of keeping information in parallel files that were not shared with prosecutors or criminal defendants was an ingrained problem within the police department, and one that would require the sort of dramatic change in attitude and culture that could only be achieved through extensive training, monitoring, and discipline.

### b. Special Order 83-1

On January 3, 1983, Detective Division Notice 82-2 was replaced by Special Order 83-1. Special Order 83-1 applied only to the field investigations of detectives assigned to Violent Crimes.[63] Special Order 83-1 defined certain terms and created procedures for documenting and preserving investigative documents. Special Order 83-1 defined the term "Investigative File" and created something called an Investigative File Case Folder to secure documents relating to a criminal investigation. According to the terms of Special Order 83-1, an Investigative File Case Folder was to be created either when certain categories of violent crimes occurred[64] or when a violent crime investigation resulted in an arrest and approval of felony charges.[65] Special Order 83-1 also created an "Investigative File inventory sheet," which was supposed to identify each document placed in the Investigative File.[66] The inventory sheet was to be forwarded to the Records Division anytime felony charges were lodged.[67] Finally, Special Order 83-1 created General Progress Reports ("GPRs").[68] The GPR forms were to be used by detectives whenever they were taking handwritten notes or writing memoranda to other detectives.

Unlike Notice 82-2, Special Order 83-1 created an affirmative obligation for detectives to submit handwritten GPRs or investigative materials for review and inclusion in the investigative file. It also mandated that detectives transcribe relevant information previously recorded on a

---

[61] Stibich Test. (NF-L 007468-70)

[62] NF-L 005615-16

[63] NF-L 007223-27

[64] Those categories of violent crimes were identified in Special Order 83-1, V(A)(1): Homicides/Medical Examiner Cases; Police-related shooting incidents; Batteries likely to result in death; Rapes and Deviate Sexual Assaults, and Any other major violent crime field investigation that the unit supervisor deems appropriate.

[65] Special Order 83-1, V(A)(1) & (2)

[66] Special Order 83-1 IV(D)

[67] Special Order 83-1, IV(D)

[68] Special Order IV(E); Hickey *Kluppelberg* Deposition 170 (NF-L 001110)

HOOD 039076
Weston 054093

GPR or other miscellaneous documents on an official CPD case report form (general offense case reports, supplementary reports, etc.).[69]

In reviewing Special Order 83-1, Judge Shadur identified several deficiencies, including:

- Unless the crime being investigated fit one of the specified of violent crimes, there was no obligation to create an Investigative Case File Folder unless and until the offender was arrested and felony charges were approved. According to Judge Shadur, and in line with standard police practices, this continued to pose the same type of risk that information would not be retained and disclosed because there was nothing to prevent against selective retention while the case is investigated;[70]

- It only required detectives to include "relevant" information in the official reports and offered no guidance about what information a detective should deem "relevant," leaving discretion for detectives to withhold information based on their assessment that it was not relevant.[71]

- It did not include information to ensure that any detective who has or receives information relating to a violent crime field investigation not assigned to him will forward the information to the assigned detective for investigation and inclusion in the Investigative File Case Folder;[72] and

- It omits any provision defining how the CPD responds to a criminal subpoena or request by the State's Attorney to produce information relating to a criminal proceeding.[73]

Moreover, the training on 83-1 was inadequate. Hickey testified that he provided a one-time training to about 1,000 detectives.[74] He said each training session was done in groups of 30-40 people, and lasted approximately 3 hours.[75] During that three-hour training session, he went over Special Order 83-1. One training session was wholly insufficient to try to change a decades-long practice, especially one so ingrained in the culture of the police department.

### c. Special Order 83-2

On May 2, 1983, Special Order 83-2 was issued. Three of the changes in Special Order 83-2 were (1) a requirement that detectives create records reflecting all relevant information, V(B)(1); (2) a requirement that where a detective receives information about another crime, he or she pass that information along to the detective investigating that other crime, V(B)(6); and (3)

---

[69] Special Order 83-1 V(B)(1) & (2), NF-L 008772-73
[70] NF-L 005620
[71] Special Order 83-1 V(B) (NF-L 005620); Hickey *Kluppelberg* Deposition 238; (NF-L 001178); Hickey *Kluppelberg* Deposition [2015] 20.
[72] NF-L 005621
[73] NF-L 005621
[74] Hickey *Kluppelberg* Deposition 308-309 (NF-L 001249-50); NF-L 008808
[75] Hickey *Kluppelberg* Deposition 309 (NF-L 001250); NF-L 008808

HOOD 039077
Weston 054094

that a copy of the Investigative File Inventory Sheet will be transmitted to either the Office of Legal Affairs (in case of a subpoena from a criminal defendant) or the State's Attorney's Office (in case of a discovery motion) so that the inventory sheet is disclosed to defense counsel in a criminal case, V(B)(6).[76] Hickey also testified that Special Order 83-2 also created the Investigative File Control Card, IV(F).[77] This Control Card was supposed to act like a library card so that the Investigative File could be accounted for.

Despite these new requirements in 83-2, there is no evidence that CPD provided any additional training to update detectives on the differences between 83-1 and 83-2.

Moreover, even if detectives had been adequately trained on Special Order 83-2, it was still deficient. Here are some of the deficiencies that should have been apparent to CPD policymakers.

- **Special Order 83-2 still did not comply with standard police practice to require a single repository for all investigative information maintained by a lead investigator**.

- **Special Order 83-2 applied only to detectives**, and it explicitly excluded from its directives all other officers involved in investigating major crimes, such as gang crimes officers, officers from bomb and arson, and officers from patrol, among others. The failure to include gang crimes officers is particularly egregious: it was well understood within CPD leadership that gang crimes officers participated in homicide investigations,[78] and the Valentin investigation at issue in this case is an obvious example of the intimate involvement of gang crimes officers in homicide investigations. Yet, there was no training or other effort to ensure that gang crimes officers were preserving their notes in the wake of *Jones* or otherwise.[79]

- **Special Order 83-2 provided no guidance about what information a detective was required to include in a supplementary report beyond information deemed "relevant."**[80] Relevance is of course subjective and, as Commander Stibich testified, what is relevant to one detective may not be relevant to another.[81] In fact, Hickey testified that a detective would only have to put information in a supplemental report if the detective deemed it pertinent at the time that the detective wrote the supplemental report, regardless of whether the detective considered the information relevant when he or she received it.[82] For example, Hickey testified that CPD policy did not require suspects who had been eliminated through investigative activity to be documented in any way.[83] Based on my experience, this is inconsistent with standard

---

[76] NF-L 008746-50
[77] Hickey *Kluppelberg* Deposition 228-29 (NF-L 001168-69)
[78] Hickey *Rivera* Deposition 229-32.
[79] Hickey *Rivera* Deposition 55, 87-88.
[80] Hickey *Kluppelberg* Deposition 238; (NF-L 001178); Hickey *Kluppelberg* Deposition [2015] 20
[81] Stibich Test. NF-L 007474
[82] Hickey *Kluppelberg* Deposition [2015] 24-25, 33
[83] Hickey *Kluppelberg* Deposition 237-38 (NF-L 001177-78)

HOOD 039078
Weston 054095

police practices. Alternate suspect information, for example, is highly relevant information and its documentation and disclosure to criminal defendants is critical.[84]

- **Special Order 83-2 provided no guidance about how information should be communicated or documented among detectives**, for example when one detective learned something about a crime being investigated by another detective; or when one unit learned something about a crime that is also being investigated by another unit. While section V(B)(6) of Special Order 83-2 codifies the obligation to "forward" information about a crime to the assigned detective, it does not require either detective – the detective passing along information or the receiving detective – to document that information.[85] Similarly, even where the detective passing along the information may have created a document memorializing that information – *e.g.*, a memorandum or GPR – there is no requirement in Special Order 83-2 that the resulting memorandum or GPR be distributed to other detectives or units investigating that crime.[86]

- **Nowhere does Special Order 83-2 state that the entire investigative file should must be disclosed in response to a discovery motion or subpoena, or provide procedures for doing so.** Despite the underlying circumstances of *Jones* and Judge Shadur's admonishment about the failure to "defin[e] the CPD's duty or procedure in responding to a criminal subpoena or request by the State's Attorney to produce information relating to a criminal proceeding," Special Order 83-2 included absolutely no policy directive or procedure to ensure production of investigative files. Although the City claims in this litigation that its practice was to disclose the entire investigative file, such a directive is conspicuously absent from the Special Orders. Instead, the Special Order contains an instruction to forward a copy of the inventory to the Records division to be forwarded to the defense attorney. This might imply that in fact the policy was not to copy and disclose the entire investigative file, but just the inventory. In addition, there is no rule, policy, procedure, directive or any other document that guides the clerks in the subpoena unit to ensure that all documents are retrieved from all possible locations and disclosed, or any training to that effect.[87] The CPD's lack of clear policy guidance, as well as the lack of any guidelines or instructions to ensure retrieval and disclosure of all investigative material, are each egregious violations of generally accepted police practices. Indeed, these are both straightforward requirements of any policy regarding maintenance and disclosure of investigative materials, and, as explained above, standard practice is to keep a single investigative file and to have a clear policy requiring that the single investigative file be copied in its entirety and disclosed to the prosecutor or directly to the defense attorney. The result within CPD was entirely predictable: confusion among detectives

---

[84] This does not prevent an investigating officer from also documenting information explaining why the suspect was eliminated.

[85] Hickey 236-37 *Kluppelberg* Deposition (NF-L 001176-77)

[86] Hickey *Kluppelberg* Deposition [2015] 39, 43, 46

[87] Hickey *Rivera* Deposition 36, 185-87; City of Chicago's Amended Response to Plaintiff's Seventeenth Set of Requests to Produce Documents to the City of Chicago, p.2-3 (no guidelines or instructions and no training).

HOOD 039079
Weston 054096

and subpoena personnel about their disclosure obligations, as acknowledged by Hickey.[88]

- **Inventory sheets are an inadequate mechanism for ensuring disclosure of documents generated during the police investigation.** While the investigative file inventory sheet is designed to be used as an index of documents in the file, there is no guidance about what level of detail is needed in the inventory sheet to ensure that it serves its purpose. Indeed, my review of the records demonstrates that the inventories are largely useless because the entries are too general, often missing dates, descriptions and numbers of pages, such that one cannot tell whether they have the document referenced. In addition, that sheet is only distributed beyond the Area or investigating unit if felony charges are placed IV(D); V(B)(6).

- **Finally, there is no provision in Special Order 83-2 requiring an audit or oversight to ensure compliance with the special orders.**

### d. Special Order 86-3

On May 29, 1986, the CPD issued Special Order 86-3. Special Order 86-3 largely replicates its predecessor with some minor adjustments, most of which actually limited, rather than expanded, to policies governing disclosure of investigative materials to prosecutors and defense attorneys. For example, Special Order 86-3 more explicitly limits the creation of Investigative File Case Folders to homicides or felony investigations where charges have been approved, or an arrest warrant issued; it eliminates the requirement that the inventory sheet be forwarded when a criminal subpoena or discovery motion is received; it eliminates the requirement that handwritten notes or other investigative materials be submitted "promptly (normally at the end of each tour of duty)" and instead only states that such notes must be "submitted."

In these ways, Special Order 86-3 actually deviated further from standard police practices than the special orders that came before it:

- **It still did not comply with standard police practice to require a single repository for all investigative information maintained by a lead investigator**.

- **It permitted detectives to maintain their handwritten notes as personal files for longer periods of time,** by removing the requirement that they turn in the notes and investigative materials "promptly (normally at the end of each tour of duty)." Thus, even if detectives retained their handwritten notes on their person, or in their locker for extended periods of time, it would not clearly violate the Order. In my experience, that level of discretion is a gross deviation from standard police practices, especially in light of the ingrained problem in CPD.

---

[88] Hickey Rivera Deposition at 253-54. He testified to remembering conversations when he was in charge of records division in which there were questions from subpoena clerks and detectives about what they were required to produce in response to subpoenas, including whether the entire investigative files had to be turned over.

HOOD 039080
Weston 054097

- **It still provided no guidance about what information a detective was required to include in a supplementary report beyond information deemed "relevant."**

- **Finally, it removed even the inadequate stop-gap measure of providing the inventory sheet to defense attorneys**, leaving defense attorneys with no mechanism to determine whether they had received all the relevant investigative materials.

Special Order 86-3 included a section VI, titled "Inspection." That section requires "[e]xempt members of the Detective Division" to "conduct periodic, unscheduled inspections of the subject files to ensure compliance." According to Stibich, however, he had no idea if, when, how often, or in what manner such inspections were conducted.[89] Hickey, too, does not know of any such auditing ever occurring.[90] Nor is there any evidence that detectives were trained on this new policy.

### e. Standard Operating Procedures (SOP) 1988

In 1988, Chief of Detectives John Townsend wrote standard operating procedures to govern the work of detectives. Chapter 18 deals with investigative files. Chapter 18 contains "no substantive changes of any kind" from Special Order 86-3.[91]

### f. Summary

The policies implemented by the CPD were inadequate to remedy the "street files problem" and deviated from standard police practices regarding documenting and disclosing investigative materials.

*Continued use of parallel files*. None of the policies required a single repository for all investigative information maintained by a lead detectives. In fact, in reviewing the materials provided, I identified *at least* three different files that would be created relating to any criminal investigation pursuant to the special orders. First, there would be a permanent retention file in the Records Division, containing only supplementary reports, general offense case reports and the arrest report filed under the accompanying RD number.[92] Second, there would be a unit RD file: Hickey testified that this was a slim file kept in the homicide drawer at the Area to identify that there is a case open.[93] Like the permanent retention file, it would contain all the known official police reports: original case offense report, supplementary reports, lab reports and other documents sent to the investigative unit from support units.[94] Third, there would be the investigative file maintained by the detective area.[95] This file would contain documents that

---

[90] Hickey *Rivera* Deposition 244, 249.
[91] Hickey *Rivera* Deposition pages 250-51.
[92] Hickey *Kluppelberg* Deposition 22-23, 95-96.
[93] Hickey *Kluppelberg* Deposition 115-16, 299-300.
[94] Hickey *Kluppelberg* Deposition 115-16, 299-300; S.O. 86-3
[95] Hickey *Kluppelberg* Deposition 297-300 (NF-L 001238-41)

HOOD 039081

Weston 054098

individual detectives assigned to investigate the case have determined should be in there.[96] As noted above, none of the files had to have the same documents in them: In fact, by design, they did not.[97] Likewise, Hickey admitted that the files did not even necessarily have the same *information* in them.[98]

But in addition to these files, investigative material could also be kept in the Evidence and Recovered Property Section (like the photos produced in this case in 2013), arrest reports could be kept at the Identification section, and individual detectives could each keep their own running/working files during an investigation.[99] Defendant detectives in this case have also admitted to documenting investigative information in unofficial documents, like Serafini Reports, that never become part of the official file.[100]

Moreover, additional files were also created by other units of the Chicago Police Department, because the policies only applied to the Detective Division. So, in addition to the multiple files above, gang crimes officers, other special unit investigators, and patrol officers, could each have additional sets of files related to a homicide investigation, and the special orders are silent as to those additional files, if and how they are to be preserved and maintained, and whether they are to be disclosed to prosecutors and criminal defendants. This case is an example of the problem: despite intimate involvement of gang crimes officers in the homicide investigation, no gang crimes notes, memos or daily activity summaries have ever been produced. Yet, like any investigators, gang crimes officers would have had a need to take notes, and indeed many of them in this case admitted that they kept such notes and documentation.[101]

This was an obvious omission. In fact, Hickey testified that he raised the fact that Special Order 83-1 was only addressed to the Detective Division and that the Department might want to look beyond the detective division to see if the problem extended to other units.[102] And at some point, Hickey suggested that perhaps Research and Development and Auditing Internal Controls Division should get involved because there may be department-wide implications to the use of street files.[103] But there was no response from the chain of command to Hickey's concerns and CPD never looked to see if the problem of street files went beyond the Detective Division. This failure to look beyond the detectives – notwithstanding the fact that they worked closely with other units in investigating crimes – was deficient and allowed yet more parallel files to be created in other parts of the Department.

---

[96] Hickey *Kluppelberg* Deposition 297-300 (NF-L 001238-41)

[97] See for examples Hickey *Kluppelberg* Deposition [2015] describing documents that would go in the investigative file but not in the permanent retention file at 71-72, 81, 91, 94, 100, 103, 105, 108-110

[98] Hickey *Kluppelberg* Deposition at 100.

[99] Hickey *Kluppelberg* Deposition at 295-96; Hickey *Fields* April 2014 Trial Testimony at 2069.

[100] Rinaldi Deposition at 28, 34 (detectives prepared what he called "Serafini reports" for open cases, which comprised leads and investigative results that were passed from one shift of detectives to the next to update the investigation's progress; but these Serafini reports were never made part of the official file).

[101] Hickey April 2014 Fields Trial Testimony, at 2060:16-21); Hickey November 2016 Fields Trial Testimony, at 11/23/16 PM, at 14-15; Zacharias Deposition at 183-84, 193-96, 200, 203-06; Fallon Deposition at 60-62, 145; Gawrys Deposition at 187-88, 218.

[102] Hickey *Kluppelberg* Deposition 207-208 (NF-L 001147-48)

[103] Hickey *Kluppelberg* Deposition 208 (NF-L 001148)

HOOD 039082
Weston 054099

The problems created by such an unwieldy system are obvious: It creates the potential for information and documents to go missing because they are not centrally controlled. Moreover, because the files are designed to be different and to be retained in different locations, there is no way to ensure that the complete investigative file is produced during any criminal prosecution.

*Discretion to determine what is relevant and needs to be documented and disclosed.* Second, the policies also left detectives with far too much discretion about what information to document in official reports and when to turn in investigative materials. This is particularly true because the status quo had previously been not to record or document information – at least not on official documents that would be maintained by CPD and disclosed to the prosecution and defense. As a result, to overcome this culture – and this citywide practice – CPD had to be explicit in its requirements and provide direct guidance about what did or did not have to be documented; it is not enough to leave it up to the individual officer.

An egregious example of the problems of officer discretion relate to the lack of a requirement to document elimination of suspect. Indeed, Hickey testified that it was not the policy of the CPD to require detectives to document suspects who were eliminated.[104] To the contrary, it was permissible and consistent with the special orders not to document the identity or investigative steps taken to eliminate a suspect if a detective did not think that information was relevant or if the detective discounted it for some reason.[105] This is a significant departure from standard police practice, which calls for officers to err on the side of documentation and disclosure of such information, which is often crucial to other investigators on a case and highly likely to contain exculpatory information.

## 2. The City failed to provide proper training and oversight to ensure compliance with the special orders

On a department-wide scale, there was no action taken whatsoever to ensure that the special orders were being followed. The only training provided was one three-hour session after 83-1 was issued. But some of the Defendant detectives in this case deny receiving any such training; Defendant Rinaldi, for example, testified that in the period around Plaintiff's prosecution in 1988 and 1989, Area 5 detectives had been given no instructions about whether they could keep their own files, or given requirements for doing so; and accordingly there was no effort to ensure that all exculpatory information in investigative notes were preserved or tendered for inclusion in the official file. In other words, training or no training, he was oblivious to the requirements of the special orders.[106]

This is because, even if it did occur, one three-hour training session on just the first iteration of the policy change was wholly insufficient to try to change a decades-long practice. In fact, Hickey testified that the years after Special Order 83-1, he learned that unit detectives were reverting back to carrying their own files on the street separate and apart from the file maintained by CPD.[107] Nothing, however, was done about this.

---

[104] Hickey *Kluppelberg* Deposition 237-38 (NF-L 001177-78)
[105] Hickey *Kluppelberg* Deposition 339 (NF-L 001280); Hickey *Kluppelberg* Deposition [2015] at 66-67.
[106] Rinaldi Deposition at 50-54.
[107] Hickey *Kluppelberg* Deposition 321, 327 (NF-L 001262, NF-L 001268)

HOOD 039083
Weston 054100

Hickey also explained that although he did a sampling prior to the special orders being issued, he did not do one at any time after Notice 82-2 and was not aware of anyone else conducting such an audit.[108] Hickey testified that members of the police department were supposed to conduct inspections pursuant to Special Order 83-2 and 86-3 but Hickey could not identify any instances of audits or investigations.[109] Likewise, the City has produced no documentation that any such inspections were ever conducted. Hickey also testified that detectives were not disciplined for failure to comply with the Special Orders.[110] Similarly, Commander Stibich testified that supervisors were supposed to review files but he had no idea how often, when or the manner in which that review was conducted.[111] Put simply, policymakers failed to train, review, or supervise subordinates to ensure that the Special Orders were followed.

In fact, it appears that there was no oversight to ensure that the special orders were being enforced and that the street files practice was eliminated. This is particularly troubling given the importance and scope of the problem and is certainly deficient. You cannot expect a department-wide, decades-long practice to be eliminated by simply issuing an order that was read at roll call a few times. Based on my experience, this requires extensive and ongoing training (not a one-time session of a couple of hours), careful auditing and monitoring, and meaningful discipline when the new special orders were not followed. Based on my review of the record, almost none of this occurred. Accordingly, CPD leadership either knew or was deliberately ignorant of the fact that the street files problem continued unabated after issuance of the special orders

## F. The police investigative files show that the directives were not properly implemented

### 1. The police files from the 1985 to 1989 time period show that CPD's policies were not followed

I reviewed 180 of the 190 total investigative files from 1985-1991,[112] excluding those that appeared to be incomplete. I reviewed them to evaluate whether the files, standing on their own (i.e. without comparing to a permanent retention file or defense file) demonstrated compliance with the 1982, 1983, and 1986 special orders, or if the practices that led to the wrongful prosecution of George Jones continued, like the use of informal street files and the failure to tell the complete story of the investigation in official reports (and instead typing up official reports for only the part of the investigation that led to the person charged). The files show that the special orders were not followed in a number of ways (which would have been obvious in any reasonable file audit):

---

[108] Hickey *Kluppelberg* Deposition 160-61, 166, 167 (NF-L 001100-01, NF-L 001106-07)
[109] Hickey *Kluppelberg* Deposition 375-76; Hickey *Rivera* Deposition 244, 249.
[110] Hickey *Fields* Dep. at 10, 43. Hickey *Kluppelberg* Deposition 213.
[111] Stibich Testimony NF-L 007461-62
[112] As set forth earlier in my report, these 180 investigative files take up 184 rows, because several contain multiple criminal defense files. The multiple rows for a single investigative file are italicized, and counted only once toward the statistics below.

59

HOOD 039084
Weston 054101

### a. Handwritten notes, not on general progress reports, are still routinely used

As discussed above, the special orders directed officers to use GPRs to take notes, and were intended to eliminate the use of handwritten notes on loose sheets of paper without any context of who wrote the note and when. I found that detectives consistently used handwritten notes despite the direction in the special orders. 110 of the 180 files I reviewed, or approximately 61%, contained handwritten notes not on GPRs.

### b. To-from memos are still being used

As discussed above, the special orders also directed officers to stop using to-from memos to communicate investigative information, and to instead include that information in GPRs and Supplemental Reports. However, I found that detectives continued using to-from memos: 36 of the files, or approximately 20%, contained to-from memos not on official police forms.

### c. Review of permanent retention files: all relevant information in unofficial documents is not transcribed in official reports

The special orders state that all relevant information must be transcribed into an official report, in an effort to ensure that the permanent retention file, which contains only official reports, provides a complete picture of the investigation. The special orders also require that inventories be sent to the permanent retention file for distribution to prosecutors and criminal defendants (as discussed above, an indication that CPD contemplated that it would only initially produce permanent retention files). These requirements were routinely flouted.

I was provided with copies of 138 permanent retention files, 43 of which corresponded to investigative files from the time period 1985 – 1991 (for one of the 44 investigative files, the permanent retention file was not located), and intend to rely on them to demonstrate the City's failure to train, follow, or implement its special orders. **See Attachments F and G**.

First, I examined the permanent retention files, standing alone, to assess whether they communicated a complete picture of the investigation. My finding is that the permanent retention files in CPD are different in kind from those I've seen in other police departments around the country. Usually, an official file reads like a novel: it tells a story, with twists and turns in the plot and characters whose importance waxes and wanes. CPD's permanent retention files routinely lack this texture; they read like a single (often final) chapter of the novel – the one that explains the information that led to charges against the person ultimately charged. Put another way, in most departments, in addition to the various strands of the investigation, there is a charging memo in the official file that explains the basis for charges; CPD's entire official file is a charging document (or file).[113]

Second, I compared and contrasted the 43 permanent retention files with their corresponding investigative files. **See Attachments F and G.**

---

[113] In my review of permanent retention files in Fields, which I also rely on here, I made the same observation and reached the same conclusion.

HOOD 039085
Weston 054102

The case files I reviewed are replete with examples where information on handwritten pages (whether on scraps of paper or GPRs) and informal memos between investigators, is not transferred into official reports. In many cases, the information is potentially exculpatory. By not transcribing the information into an official report, it is less likely to get into the permanent retention file, and as observed above, to criminal defendants. I have provided a number of such examples in Section V.D.4. Other examples include RFC 4873-75,[114] RFC 11711-17,[115] RFC 10701,[116] RFC 6379, RFC 16395, RFC 8213, RFC 8388, RFC 8438, RFC 11324, RFC 14712, and RFC 14761.

In numerous cases, including some of the example pages cited in the paragraph above, I found handwritten notes containing cryptic notations on a page, without context: a name, a phone number, an address, a license plate number, etc. By not transcribing information into official reports, all of the context related to a given note is lost, both to other investigators on the case and to prosecutors and defense attorneys. Who said it? When? Why did the detective consider the particular notation important enough to jot down? Because the information is not typed into an official report, these questions cannot be answered. In my experience, it is typical to see notes like this in a file, and often it is critical information (a new witness previously unknown, contact information for someone who couldn't be located, a piece of information that credits or discredits a witness or suspect, etc.). An investigator cannot write down everything a witness is telling them, and so they jot down the key information so that they can remember it and accurately convey it later in an official report, with the full context of its relevance to the investigation. But in my review of hundreds of CPD files in this case (as well as Fields and Kluppelberg), this final step is too often not done. The result is a violation of the Special Orders, which require relevant information to be written down and transferred into official reports, as well as a failure to disclose important information to prosecutors and criminal defendants.

Finally, many of the investigative files produced in this case are lacking inventories (itself a violation of policy). In addition, more than 50% of the permanent retention files do not contain a copy of the inventory, also a violation of the special orders. And for the cases where inventory sheets were included in the permanent retention files, they were often incomplete or the description of the documents were so generic or general so as to be unusable

### d. Inventories are missing or incomplete

I also noted that documents were often added to the inventory sheet long after they were initially created. In some instances, some inventory sheet entries were not created until after an offender had been charged. In other files, the dates are either illegible, or do not appear at all. In other instances, there are stamped dates, but nothing shown as entered. In other instances, an item is shown as entered, but not date or individual entering. In other instances, a large quantity

---

[114] An anonymous note in the investigative file provides the name and description of a single offender who allegedly committed the crime along with information about where he could be found.
[115] Notation that Arron Thomas was a purported eyewitness to the crime and that, on the day after the crime, Thomas was arrested in connection with an armed robbery and participated in a lineup.
[116] A GPR instructing someone to bring a blue knit hat for the lineup. The offender had worn a similar hat, and the defendant reports that he was made to wear this hat at the lineup, years after the crime.

HOOD 039086
Weston 054103

of GPRs and supplemental reports were entered all on the same date. Some limited examples:

> J-409858
> M-079435
> M-127008

The delay in creating an inventory sheet reveals three problems. One, it again demonstrates the amount of discretion that officers could exercise when deciding what to put into an Investigative File: if an inventory sheet is only created after an individual is charged, detectives can exercise discretion over what they deem relevant at the end of an investigation. Second, if the documents are not logged on the inventory sheet until after the charges are brought, that indicates that documents are being stored in other, undisclosed locations during the course of the investigations, which was precisely the problem the special orders should have addressed. Finally, if detectives obtain additional information after charges are brought, there is no mechanism in place to update the inventory sheet in the Records Division, or in the inventory sheet disclosed (albeit rarely) to criminal defendants.

### 2. The investigative files confirm that there was no training, auditing, or oversight to ensure compliance with the policies

These consistent failures to follow the requirements of the special orders reveal that detectives were not properly trained on the special orders and that there was no proper supervision or oversight to ensure that these special orders were followed.

Had there been any systematic audit or review of these files, these trends would be immediately apparent. But my review of the files shows no signs of an audit or review. Though the CPD had forms designed to facilitate oversight and supervision, those forms were routinely missing or blank in the files I examined. This includes the following:

**Homicide File (Chain of Command) Review:** This form is designed to document that the chain of command responsible for overseeing the investigation and compliance with relevant departmental policies and procedures has actually done so. Many of the files that I reviewed either were missing the form, had only a single signature, or had no signatures as all. That is, there is essentially no documentation of supervisory review in the investigative files. This demonstrates a willful disregard among supervisors for ensuring that detectives were following the policies.

**Investigative Case File Control**: Many of these are missing. This form is designed to maintain case integrity and chain of custody of investigative files. It is common during an investigation for a file to be routinely removed for a multitude of legitimate reasons (crime lab, consultation with other units, review by prosecutor, court appearances, etc.) The case file control form documents the file's movements so that it is clear whether and when information may have been copied or removed. In most of the cases that I reviewed they are either missing, have so few entries as to be unbelievable, or have not entries at all – an impossibility. This is another important form for discovery purposes because it should reveal all the individuals that may have contributed to the file, including from

HOOD 039087
Weston 054104

other divisions or units. The failure to systematically utilize them properly, and the concurrent institutional failure to enforce compliance, indicates a pattern and practice of indifference to the policies for maintaining investigative files.

**Detective Division Personnel Form**: This sheet is designed to quickly track and identify detective division employees, where they are assigned, working hours, and equipment. It does not necessarily account for officers from other units. Regardless, in the majority of the cases reviewed, this form is missing altogether.

**Case Assignment Slip**: The Case Assignment Slip is designed to document initial detective(s) assigned and conclusion status. These are key individuals to seek out in discovery for documents, depositions or testimony. Again, enough of these forms are missing to demonstrate a clear pattern and practice of disregard for the policy.

As discussed above, without ongoing monitoring through audits and other means to ensure that the new special orders were being followed and that prosecutors and criminal defendants were receiving complete disclosures, it was almost certain that the ingrained practice of using street files would continue.

My review of records in this case and others shows that the continuation of the street files practice, including the failure to follow the special orders, was so rampant that it would have been confirmed through even a cursory auditing of files. As discussed above, 100% of the Investigative Files I reviewed contained evidence that the special orders were not being followed – they were either lacking inventories, had incomplete inventories, had handwritten notes not on GPRs, or had to-from memos not on GPRs; and most often, some combination of these things – and more than 90% of defense attorney files were missing information from the Investigative File; even superficial audits of small samples of records would have revealed these problems.

The failure to audit or discipline for non-compliance with the policies (see Sections IV, V.E.2) signals that the old ways – the ways of "street files" that the CPD should have been trying to correct – are acceptable. It is not only that best practices require enforcement of special orders to give them teeth, but also, in my experience with Internal Affairs, given the circumstances here strict adherence was necessary to create a new culture and practice so that detectives would not continue with the ingrained practice of keeping undisclosed parallel files

> **G. There is strong evidence in the police investigative files, the Valentin investigation itself, and other CPD street file cases that there are yet other investigative files and documents that are unaccounted for by CPD and inaccessible to the prosecutors and criminal defendants**

>> **1. My analysis of hundreds of files indicates that investigative information is being kept in other repositories or being destroyed**

The files I reviewed demonstrate that the investigative files were not the central repository for information. My review of the files revealed cases where information that should be included was absent from the investigative file, as well as instances when the investigative

HOOD 039088
Weston 054105

files specifically reference a piece of information, but the corresponding information is not documented in the file. This suggests that the missing information was stored in separate files, or otherwise destroyed. Examples of such missing information include:

- No explanation on photographs, such as when or where the photo was taken, who/what is depicted in the photograph or why the detectives believe it is relevant to the investigation. The missing information suggests that the paperwork, notes, or other investigative materials that led to the photograph were maintained separately from the investigative files produced in this case.

- Missing forms, such as missing inventories, inventory control cards, property inventories, Major Crime Worksheets, Gang Crimes Daily Activity Summaries, etc.

- Other missing forms or documents including missing medical records, missing property inventory forms, or missing search warrant affidavits, and missing search warrant returns.

- No live lineup photos, where there are lineup reports.

- Reference to other units or outside agencies processing evidence, but no documentation in official reports, no results, and no chain of custody.

- Cryptic handwritten notes with no explanations as to source, relevance, or why included.

- Numerous Xeroxed handwritten spacer/filler pages with A/4-VC; A/1-VC; A/3-VC which would indicate other sources for relevant documents that may, or may not, have been. Other examples include listing detective's names and unit numbers on Plain pages – or officers from other agencies - suggesting that information is coming from other, unidentified sources.

Using the example of missing inventories above, they are missing in approximately 37% of the investigative files the City disclosed. Likewise, I identified ten investigative files produced by the City that contain no GPRs or handwritten notes at all.[117] In my career, I am aware of no other instance in which a homicide investigation was conducted in which no notes were taken at all, and a number of the defendants in this case admit that they took notes as part of their investigative practices. The most likely explanation for each of the findings above is that there are yet other files for each of these ten homicides that contain additional investigative material and inventories.[118] Indeed, among the files I reviewed, there are nine cases in which two

---

[117] G-063126, G-129819 , G-256674, H-167635, J-423347, K-575912, M-020288, M-381429, M-538914, N-133637.

[118] This is true regardless of what terminology is used to describe the files: If the City contends that the files produced in this case are supposed to be Investigative Files as defined under the special orders, then, the files demonstrate that other, parallel files were maintained containing additional investigative material. If the City contends they are not Investigative Files as defined under the special orders, then the files produced are themselves examples showing that the parallel file system continued unabated after issuance of the special orders.

HOOD 039089
Weston 054106

investigative files were produced – one that was found in the warehouse (where investigative files for closed cases and open cases older than ten years are supposed to go, pursuant to the special orders), and one that was found in the two drawers of file cabinets to which Plaintiff's counsel in this case was given access.[119] These cases, which suggest that there are many other examples among the other 45 file cabinets of drawers, are strong evidence of a continued street files practice in which multiple repositories are kept, each with different information; and in which some or all of these repositories exist outside of official channels, and are therefore unknown or unaccounted for by the subpoena service unit and unavailable to prosecutors and criminal defendants.

> **2. The documents and testimony from this case provide further evidence of the existence of additional files and the failure to preserve investigative information.**

In addition to the evidence above, the evidence in this case provides strong evidence that additional repositories of investigative information exist in unofficial and undisclosed forms.

Detectives routinely prepared an investigative document called a Serafini report. Detectives prepared "Serafini reports" for open cases, which comprised leads and investigative developments that were passed from one shift of detectives to the next to update the investigation's progress.[120] The Serafini reports were not unique to Area 5; their use actually began in Area 4.[121] Hickey, the City's own designee, acknowledged the use of Serafini Reports.[122] *However, these Serafini reports – full of highly relevant and potentially exculpatory information - were never made part of the official file.*[123] Indeed, there are no Serafini reports in any of the Valentin homicide files produced in Mr. Rivera's criminal case or this civil case; and I did not see a single such document in the hundreds of investigative files I reviewed in this case, or other CPD cases like Fields and Kluppelberg.

Gang crimes investigators, too, had special investigative documents they created that were never made part of the official files, called daily activity reports or "humper" reports.[124] Defendant Fallon, a gang crimes investigator assigned to the Valentin homicide investigation, testified that gang crimes specialists filled out a daily activity report at the end of every shift. These daily reports listed investigative actions taken during the shift and leads that required follow-up by the next shift; this included highly relevant information like details of witness identifications of suspects from gangbooks, witness names and contact information, and so on.[125] The specialists paired each activity with a Record Division number, thus permitting the activity to be linked to a particular investigation.[126] The daily activity reports were stored at the gang

---

[119]  G-235351, J-209456, J-215119, K-530917, K-466033, N-475910, M-541953, M-556260, P-129569.
[120]  Rinaldi Deposition at 28-29, 34, 100-101.
[121]  Rinaldi Deposition at 100-101.
[122]  Hickey Rivera Deposition at 291-93.
[123]  Rinaldi Deposition at 34. "[W]hen I'd read the official file, I wouldn't see those notes and stuff in there."
[124]  Hickey *Rivera* Deposition at 134-35,138-39; Fallon Deposition at 50, 73-74.
[125]  Fallon Deposition at 50, 73-74, 145.
[126]  Fallon Deposition at 50-51.

HOOD 039090
Weston 054107

crimes office.[127] Yet, no such documents were produced in any of the Valentin homicide files produced in Mr. Rivera's criminal case or this civil case; and I did not see a single such document in the hundreds of investigative files I reviewed in this case, or other CPD cases like Fields and Kluppelberg.

Also missing from the files produced before Mr. Rivera's criminal case, and the files produced more recently, are any gang crimes notes, either on official forms like GPRs or in unofficial forms. The files are completely devoid of such notes, despite the involvement of eight gang crimes investigators in the Valentin homicide investigation (Guevara, Gawrys, Noon, Guzman, Sparks, Zacharias, Fallon, and Sparks). And again, there is a dearth of such notes in the hundreds of other investigative files I also reviewed.

This is entirely consistent with the testimony of the Defendant gang crimes investigators in this case, who testified in effect that gang crimes officers operated entirely outside the system. As discussed at length above, they were not subject to the Special Orders, or any other set of requirements to ensure that they preserved and disclosed investigative material.[128] Accordingly, gang crimes specialists admitted that the gang crimes officers maintained their own parallel file, kept by individually and in the gang crimes offices.[129] Indeed, it was well known that gang crimes officers participated in homicide investigations, and like any other investigators created notes.[130] Yet, those documents were not subject to preservation and disclosure requirements.[131] Defendant Zacharias, for example, testified that he never recalled giving his notes to a detective for inclusion in an official file, or recalled seeing any of his fellow gang crimes officers do so; he does not know of any gang crimes officer that would produce street files in discovery; and prior to 1993, he cannot remember ever seeing an official file that contained gang crimes specialists' notes.[132] Defendant Gawrys, another gang crimes specialist, admitted that gang crimes notes and humper reports created to alert other detectives about what investigation needed to be completed were removed from the official file before the file was readied to go to storage.[133] At least some gang crimes officers destroyed those notes as a matter of practice, with the blessing of their supervisors.[134]

Notably, it appears that gang crimes files all went missing at some point after the gang crimes specialists were consolidated at offices on Maxwell street. File cabinets with their case files were moved from the various gang crimes offices to the consolidated office on Maxwell Street in 1993, but it is unknown where those files are currently.[135] The lack of tracking and

---

[127] Fallon Deposition at 68.

[128] Hickey Rivera Deposition at 87-88, 231-33; Fallon Deposition at 60-66; Gawrys Deposition at 37-38, 188, 190.

[129] Zacharias Deposition at 183-84; Fallon Deposition at 67-71; Gawrys Deposition at 37-38, 188; Spratte Deposition at 379.

[130] Hickey *Rivera* Deposition at 229, 275-76; Gawrys Deposition at 187-88, 190, 218; Fallon Deposition at 60-66.

[131] Spratte Deposition at 264-65, 379

[132] Zacharias Deposition at 193, 195-96, 200, 203-04, 206.

[133] Gawrys Deposition at 213-14.

[134] Fallon Deposition at 60-62, 63-66; Gawrys Deposition at 37-38, 188, 190, 209-210; Spratte Deposition at 379.

[135] Spratte Deposition at 37, 97-99, 339, 378.

66

accountability for large numbers of investigative files is an egregious departure from police standards.

As discussed above, the failure to put in place policies that covered gang crimes was an egregious omission, and one that was obvious and predictable. Indeed, as set forth in Section V.E.1 above (pp. 53, 56-58), the need for department-wide changes was raised with CPD top brass (rather than just detective division), but rejected.

In sum, the investigative files contain only a portion of the investigative materials that, based on my experience would typically be included in a comprehensive homicide investigation file.[136] This indicates that other parallel repositories of investigative information exist or that information that is supposed to be preserved is being destroyed

### 3. Kluppelberg and Fields are additional examples of cases in which previously missing street files containing highly exculpatory information were discovered in civil litigation decades after the original criminal trials

This case has remarkable similarities to the facts and circumstances of other CPD cases that I've examined extensively. In particular, both Fields v. City of Chicago and Kluppelberg v. City of Chicago, two other wrongful conviction cases from the 1980s, present additional examples of what the City had already learned in Jones and Palmer: that the failure to effectively and properly maintain, track and disclose investigative material, there is a grave risk of withholding exculpatory information, and in turn, of wrongful prosecutions and convictions. After Jones and Palmer, Fields and Kluppelberg are additional examples of cases in which clearly exculpatory information was buried in a street file that was not disclosed until civil discovery in their civil rights lawsuits, decades too late. A brief summary of each of those cases is provided below, and further information is contained in **Attachments H and I**.

### a. Fields v. City of Chicago

Nathson Fields was convicted in 1986 of the 1984double murder of Jerome Smith and Talman Hickman. Fields' conviction was thrown out after a court granted his petition for post-conviction relief, but he was re-tried in 2009 and acquitted. He then filed a civil rights lawsuit against the City of Chicago in 2010, and during discovery for the civil lawsuit, a street file of over a hundred pages of police reports and notes concerning the Smith/Hickman murders were located in a file cabinet at Area Central, along with files relating to other murders. The City admitted that the file had not been previously disclosed to Mr. Fields or to prosecutors.

The documents newly produced in the street file, which were not contained in any of the earlier files, include handwritten notes, memos, and other documents identifying multiple alternate suspects and potential leads demonstrating that Nathson Fields was not involved in the Hickman and Smith homicides. Notably, it also included a previously undisclosed rap sheet for an alternate suspect with an issued on inquiry date stamp that undermined the prosecution's theory of the case. Nathson Fields name, meanwhile, was never mentioned as a possible suspect

---

[136] **Attachment E** provides background materials regarding what kinds of investigative documents should appear in a homicide investigation, including examples of checklists used during criminal investigations.

HOOD 039092
Weston 054109

in any of these documents.

In December 2016, a jury found that the failure to disclose the street file to Mr. Fields was the result of a pattern and practice of CPD, and awarded Mr. Fields compensatory damages of $22 million.

### b. Kluppelberg v. City of Chicago

James Kluppelberg was convicted for a 1984 fire that killed six people. In 1984 the fire was investigated by CPD's Bomb and Arson division and Area Three Violent Crimes. Bomb and Arson investigators could not determine the origin of the fire and Area Three detectives closed the case as accidental. But the case was re-opened in 1988. During the 1988 investigation, Area Three detectives found new fire investigators to rule the case an arson, and James Kluppelberg was coerced into confessing to the crime. At his 1988 criminal trial, Kluppelberg only had the documents from the 1988 Area Three investigation. The 1984 Area 3 and Bomb and Arson files were withheld.

Following his exoneration, Kluppelberg filed a civil case. In 2014, during the civil case, a new file was discovered that had never been disclosed in the criminal proceedings. That file contained investigative materials from the 1984 Area Three investigation, and included critical exculpatory information. Specifically, it included handwritten notes that a neighbor had reported there was loose and dangerous wiring in the basement that got wet sometimes -- undermining the arson determination and supporting the evidence that the fire was accidental. It contained numerous references to individuals who had had arguments or fights with the victims. And the file also contained a memo between detectives that recounted a statement from an alternate suspect named Isabel Ramos who had started another porch fire in a building nearby and just hours before the fire for which Kluppelberg was convicted. Moreover, Ramos reported that she had been intoxicated at the time, could not remember what she had done, but thought she perhaps set other fires.

The file was found on a pallet among other Area 3 files at the records warehouse, and it appears it was packed up in 1991 when Area 3 was relocated. Neither of the Bomb and Arson files (from 1984 or the reinvestigation in 1988) has been located, much like the gang crimes documents in this case.

In both of these cases, the undisclosed documents should have been produced to Mr. Fields and Mr. Kluppelberg before their original criminal trials in 1986 and 1988 (and at numerous points after that). These documents should have been produced under generally accepted police practices related to creating, retaining, and disclosing investigative materials.

### H. The failure to turn over crucial documents in Jacques Rivera's criminal case was a direct result of these practices and inadequate policies

I have familiarized myself with the underlying facts in Mr. Rivera's case, including those facts set out above in Section II above, and have reviewed the various sets of police files produced to Mr. Rivera at the time of his criminal trial, at later dates during his criminal case, and during this civil litigation, including (a) the permanent retention file (Hickey 1-33); (b) the

HOOD 039093
Weston 054110

investigative file produced to Mr. Rivera in April 2014 during this litigation (Wron 1-69); (c) the file produced by Mr. Rivera's criminal defense attorney, Judge Wadas (RFC 469-810); (d) a set of photos produced to Mr. Rivera in March 2013 during this litigation from the Evidence and Recovered Property Section (the "ERPS file"); (e) the file produced by the Cook County State's Attorney's Office ("CCSAO file") (SAO 1-820).

What is clear from my review is that the file Judge Wadas (Mr. Rivera's criminal attorney during his original criminal trial in 1990) received was nothing more than official police reports later designated as the permanent retention file. When official reports are received by the records division as an investigation is ongoing, those reports are stamped with a date and time of receipt.[137] A comparison of the Valentin permanent retention file and the police reports present in Judge Wadas's file reveal that both sets of pages have the exact same date and time stamps, in the exact same location on the page, each of which were placed on the police reports when they were received by the records division. In other words, the police reports in Judge Wadas's file came from the permanent retention file at records division.[138] It is also notable that, much like the permanent retention file, Judge Wadas's file contains no GPRs or handwritten notes of any kind. In addition, Judge Wadas testified that the file he produced in this case contained everything he ever received.[139]

The investigative file (Wron 1-69) was not produced to Judge Wadas before the criminal trial. It contains approximately 30 pages of investigative material that were not disclosed until decades later. At earliest, these pages of investigative materials we disclosed during Mr. Rivera's post-conviction proceedings, close in time to CCSAO ASA Darren O'Brien beginning to work on the case. For years, that file was unaccounted for: the City's employee responsible for investigative files at Area North, Mr. Wronkowski, has testified that he did not know where the investigative file had been between the time of Mr. Rivera's criminal trial in 1990 and Mr. Wronkowski's search in 2011.[140] There is no investigative file control card documenting chain of custody for the file.

It is also apparent that the investigative file (Wron 1-69) was not produced to the CCSAO at the time of Mr. Rivera's criminal trial. The CCSAO file from the time of trial is gone. The State's Attorney working on Mr. Rivera's post-conviction case, ASA O'Brien, sought to reconstruct the file when he started work on the post-conviction case. O'Brien had the CPD provide him missing police reports. The CCSAO file contains an inter-office mail from Gillian

---

[137] Later, after it is determined whether the particular investigation is one that must be permanently retained in the records division, the records division adds a second, "PERMANENT RETENTION" stamp.

[138] There are a few police reports in Judge Wadas's files that don't have the time and date stamps from the records division. The first report is the original case incident report (RFC 532-535), and it doesn't have time and date stamps in the permanent retention file either (HICKEY 3-6). The second is page 3 of a 27 August 1988 supp report (RFC 509), which like the original case report isn't stamped in the permanent retention file either (HICKEY 9). That leaves a single police report that is included in Judge Wadas's files without a time and date stamp: the September 15, 1988 Arrest Report for Jacques Rivera. That report is not in the permanent retention file at all.

[139] Wadas Deposition at 51.

[140] Wronkowski Deposition 86, 65-66.

HOOD 039094
Weston 054111

McLaughlin to O'Brien's investigator McGreal; that inter-office mail envelope is in the CCSAO file right before the police reports produced from Area Five. In other words, it is likely that part of the investigative file (Wron 1-69) were produced to the CCSAO after ASA O'Brien began to work on the post-conviction proceedings in 2009 or later. Still later, the whole file was produced in the midst of this civil litigation. Further supporting this conclusion, Judge Wadas testified that he had everything in his file that the prosecutors had because they showed him their file at the time of Mr. Rivera's criminal trial.[141]

The documents newly produced in the investigative file include handwritten notes and other investigative material that undermine the prosecution's theory of the case, contain potential investigative leads, suggest investigative misconduct and demonstrate Mr. Rivera's innocence. For example, the investigative file contains the rap sheet for Mr. Rivera, discussed above, that shows an issued on inquiry date stamp of 8/27/1988. Based on my experience in other cases involving the Chicago Police Department, that date stamp was placed on the rap sheet when it was requested by investigators working the Valentin investigation and was issued by the records division. The date stamp of 8/27/1988 is the same day as the Valentin shooting and is a full two days before 8/29/1988, the date on which police report that Orlando Lopez identified Mr. Rivera in a photo album. This document is contained only the investigative file – it is excluded from the permanent retention file, the CCSAO file, and Judge Wadas's file. It is highly exculpatory because it establishes that the defendants deemed Mr. Rivera a suspect before the sole eyewitness supposedly identified him. This fact could have been used to impeach all of the State's witnesses at trial.

Other documents in the investigative file containing relevant investigative material not produced to Judge Wadas are WRON 0001-0008, 0011-0014, 0018-0021, 0037-0038, 0042, 0045-0048, 0052-0069. They include:

- As a general matter, all GPRs created and preserved in connection with the Valentin investigation are excluded from Judge Wadas's file. In addition:
- WRON 0002-0003: the investigative file inventory, which is supposed to list all of the investigative materials created during the course of the investigation. Without the investigative file inventory, it is impossible to know what documents should be contained in a police investigative file and when they were placed in that file.
- WRON 0012: a handwritten report documents that Felix Valentin died on September 14, 1988, after contracting a bacterial infection earlier in his hospital treatment.
- WRON 0037: a photograph of Jacques Rivera taken either after or before the second lineup.
- WRON 0045: an evidence report on the photographs taken of the second lineup.
- WRON 0047-0048: the criminal complaint.
- WRON 0056: an arrest report, showing that Mr. Rivera was arrested on 8/30/1988 at 11 p.m. in connection with the Valentin shooting and relating that hold papers were submitted "due to the fact that the witness is not available to view a physical lineup which will be held on August 31, 1988," which is evidence that Mr. Rivera was placed in

---

[141] Wadas Deposition at 86-87.

HOOD 039095
Weston 054112

a physical lineup in this case prior to 9/15/1988.

- WRON 0057: a hold form, showing that Mr. Rivera needs to be held at the department because "the witness to this case [Lopez] will not be available until tomorrow's date," further evidence of a first physical lineup. The hold sheet notes that there is an expectation that Jacques will be charged with the Valentin shooting at 7 p.m. on 8/31/1988.
- WRON 0058: an arrest report, showing that Jose Rodriguez is arrested on 8/31/1988 at 1 a.m. for the Valentin shooting. The report states that Rodriguez was identified by the victim.
- WRON 0059: a hold form for Mr. Rodriguez, dated 8/31/1988, stating that "a lineup must be viewed by the witness in this case" and noting that there is an expectation that Rodriguez will be charged with the Valentin shooting at 1 a.m. on September 2, 1988. Again, this is further evidence of an earlier physical lineup.
- WRON 0064: a GPR listing the six participants in the earlier physical lineup, with their biographical information and addresses.
- WRON 0062: an evidence form, dated 8/31/1988, documenting the placement into evidence of 6 photographs corresponding to the six individuals participating in the 8/31/1988 or 9/1/1988 physical lineup. This is further evidence of a first physical lineup. The submission of this evidence form and accompanying photos late on the evening of 8/31/1988 contradicts the official police account that the photos were used in a photo array procedure with the victim Felix Valentin on 9/1/1988.
- WRON 0052: a form to release Mr. Rivera from custody after the first lineup.
- WRON 0063: the form to release Mr. Rodriguez from custody after the first lineup.
- WRON 0060-61, 0065: reports about the 5 cartridge cases recovered at the scene.
- WRON 0055, 0067: rap sheets for Mr. Rivera. Neither of the rap sheets in Judge Wadas's files matches these rap sheets in the investigative file.
- WRON 0053: McLaughlin GPR dated 8/27/1988, 8/28/1988, or 8/29/1988, containing the original description purportedly given by Orlando Lopez.
- WRON 0054: Leonard GPR containing the canvass of nearby buildings.
- WRON 0069: McLaughlin GPR dated 8/27/1988, the date of the shooting, reflecting the hospital interview of Israel Lopez. After Israel's description of what he saw and did, it states, "Girlfriend's brother – [Orlando] Macho Lopez – 13 yo saw incident – has not been interviewed – Kings."

In addition to all of this, the ERPS file, which was not produced to Mr. Rivera until 2013 during this lawsuit, contains six photographs that appear to be of individuals participating in the first physical lineup. Those photos also would have shown that Mr. Rivera was placed in an initial lineup on 8/31/1988 or 9/1/1988.

All evidence regarding the earlier physical lineup not produced to the CCSAO, to Mr. Wadas, or to Mr. Rivera would have permitted attorneys in the criminal justice system to conduct a contemporaneous investigation to determine if Mr. Rivera had stood in a physical lineup before the 9/15/1988 in which he was supposedly identified, who had viewed the lineup, and who had been selected in the lineup. There is no documentation of a first physical lineup in the police file. According to Lopez, he viewed such a lineup and picked Mr. Rivera. According to Mr. Rivera and others, they stood in such a lineup. Mr. Rivera was released following that

71

lineup, suggesting strongly that he was not identified and instead Lopez identified another participant in that lineup. The defendants' entire case against Mr. Rivera rested on Lopez, the sole eyewitness, and if he had failed to pick Mr. Rivera in an initial lineup, that would have been highly exculpatory evidence.

The investigative files in Valentin investigation suffer from the same systemic problems observed in the investigative files I reviewed as a whole, from this case and others such as Fields and Kluppelberg. In sum, the documents in the investigative files are highly relevant to the investigation, and should have been produced to Mr. Rivera before his original criminal trial in 1990 (and at every other point at which he engaged with the criminal justice system after that). These documents would have been produced under generally accepted police practices related to creating, retaining, and disclosing investigative materials.

## CONCLUDING STATEMENT

I have provided my opinions based upon my training, experience, and after a careful evaluation of the totality of the materials and circumstances in this matter. I utilized all of the facts and data known to me, and applied generally accepted police management principles and methods. I hold the opinions set forth above to a reasonable degree of professional certainty in the law enforcement community, and based on longstanding and well-accepted law enforcement practices.

I reserve the right to supplement or modify this report and my opinions expressed in the report to the extent that additional information is presented to me and to the extent permitted by rules.

Pursuant to 28 U.S.C Section 1746, I declare under penalty of perjury that the foregoing is true and correct.

Michael D. Brasfield

72

HOOD 039097
Weston 054114

# Exhibit 90

STATE OF ILLINOIS)



) SS.

COUNTY OF COOK )

APR 18 1991

AURELIA PUCINSKI

IN THE CIRCUIT COURT OF COOK COUNTYCLERK OF THE CIRCUIT COURT
COUNTY DEPARTMENT, CRIMINAL DIVISION    CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS    )
                                   )
                    vs.            )    91-640
                                   )
JERROD SMITH AKA: "J. DILLA"       )
JOHN WALKER AKA: "J.D."            )
DEMOND WESTON AKA: "BOO-MAN"       )

### ANSWER TO DISCOVERY

TO: Attorney of Record

Now come the PEOPLE OF THE STATE OF ILLINOIS, by their
Attorney, JACK O'MALLEY, State's Attorney of Cook County, Illinois,
through his Assistant, Bernard Murray, and answer the defendant's
motion for pre-trial discovery as follows:

1.  (a) Bill of Particulars:

        Date:    On or about May 29, 1990

        Time:    At approximately 10:35 p.m.

        Location: At or near

    (b) The physical description of the location of the
        occurrence is contained in the police reports tendered to
        the defense in open court.

2.  (a) The people may or may not call the following persons as
        witnesses to the trial of this cause:

        Mimi Williams
        Phillip McKiner
        Charles Maxey
        Samuel Brown
        Timothy Jones
        Bryan Hampton
        James Hale
        Soloman Montague
        Maria Johnson
        Nathaniel McCurine
        Anita Gladney
        Jacob Lee

**Weston, Demond v. City of Chicago, et al. - 20 C 06189, CCSAO_003302**

Darrin Laws
John Mahan
Allen Servan
Tony Miller
Nelson Hannon
Eddie birk
Ronnie Balck
Mike Jenkins
Solamon Pierre
Reginald Norwood
Renee Taylor
Christopher Dalton
Lawrence Gowdy
Sylvester Washington
Leona Bochanan
George Brown
Stacey Webb
Willaby Hutchins
Cassandra Taylor
Jeretta King
Antonio Harris
Derrick Mason
J.D. Lee
Griffin
Treena Jones
Deneen Coats
Tanya Bonner
Sereta Mason
Dorothy Washington
Barbara Coats
Damon Rogers
Ronald Nesbitt
Reginald Norwood
Polygraph - Tovar
Firearms - Warner
Dr. Ernst - Cook County Hospital
M.E. Turner - Chicago Wyler's
Dr. Quinlan - Children's Hospital
Dr. Jones - Pathologist
Nancy Jones M.D. - Medical Examiner
Dr. Huana - Cook County Hospital
Dr. Cay - St. Bernard's Hospital
CHICAGO POLICE DEPARTMENT
M. Hartfield 317990
L. Edwards #15387
N. Harvey #6690
J. Battaglia #13486
J. O'Brian #3966
J. Foley #8825
N. Panek #14027
Sgt. J. Byrne #1454
Det. T. Maslanka #16161
Det. J. Paladino #9938
Det. W. Moser #5056

CHICAGO POLICE DEPARTMENT
Det. T. Lazar #5355
Sgt. R. Palmer #1075
Det. W. Drish #13301
Det. F. Connolly #4209
Sgt. Bonkie #2108
Det. V. Breska #5325
Det. J. McCarthy #12166
Det. M. Kill #4123
Det. D. McWeeny #14367
Det. J. Rusnak #11162
Det. A. Christopherson #13244
Hull #8809
Perkins #17723
S. Worsham #15831
P. Cruz #3305
T. Passantino #7468
Sgt. C. Ednefield #1989
J. Moran #7073
A. Klaeser #5529
Dubin #9117
Craig #7175
J. White #7749
Robinson #692652
C. Brasic #10201
W. O'Connor
Off. C. Thompson #16529
Off. McLaughlin #17837
Sgt. Whelehan #1786

Personnel from Crime Lab, any person named in police reports, arrest reports, inventory sheets, medical reports, laboratory reports, Preliminary Hearing or Grand Jury transcripts, evidence reports, or any other document tendered to or available to the defense.

Any witness needed to establish the chain of custody for physical evidence sought to be introduced at trial.

(b)  The following witnesses made written statements:

See police reports

Written statements of witnesses, if any, have been tendered to the defense in open court.

(c)  All memoranda reporting or summarizing oral statements made by witnesses are contained in the police reports tendered to the defense in open court.

3.  The People may or may not call any or all persons listed in 2

(a) as occurrence witnesses at the scene of the offense or at the time of arrest.

4.          (a)  Written or recorded statements of the defendant or co-defendant(s), if any, have been tendered to the defense in open court.  The date, time, and place of such statement(s), the circumstances under which it was made and the witnesses to the making or acknowledgment of the statement(s), are contained in the police reports tendered to the defense in open court.

            (b)  Summaries of oral statement(s) of the defendant or co-defendant(s), if any, the date, time, and place of such statement(s), the circumstances under which the statement(s) were made, and the witnesses present are contained in the police reports tendered to the defense in open court.

                 See plice reports

5.   The transcript of the Grand Jury minutes and/or Preliminary Hearing, if any, will be made available to the defense for inspection and copying upon being received by the People.

6.   (a)  The following articles, if any, may or may not be offered into evidence by the People at the time of the trial of this cause:

          Any and all evidence listed under numbers:
          773235 - Blood vial; 784073 - Cartridge; 757526 - Cartridge; 784127-Cartridge; 773217 -44 Cartridge; 773134- Photo; 773236- Bullet in envelope; 773235 - Bullet in envelope; 773282 - 773283 - Cartridge; 77284 - Cartridge; 781090 - 9mm. Luger; 773269 - Cartridge; 737200 - Photos; 772206 - Casing; See police reports

          Photographs, plats, charts, diagrams, illustrations, maps, any property inventoried by the Chicago Police Department and reflected in inventory receipts, copies of which are contained in the court file and also available for inspection and copying, certified copies of convictions and certified copies of auto records.

          Any and all other property mentioned in the police reports, arrest reports, medical reports, laboratory reports, Preliminary Hearing or Grand Jury transcripts or any other document tendered to or available to the defense in open court.

     (b)  The date, time and place of acquisition, the persons involved in the acquisition and the circumstances of the acquisition of the articles are contained in the police reports tendered to the defense in open court.

(c)  The people will comply with all reasonable requests for inspection by the defense.

7.  Reports of experts, if any, made in connection with this particular case, including the results of physical or mental examinations, scientific tests, examinations, and comparisons, will be tendered to the defense upon being received by the People.

8.  Please see 6 (a) for any books, documents, photographs, and tangible objects obtained from or which belonged to the defendant which the People may or may not use at the trial of this cause.

9.  The People have no knowledge at this time that any of its potential witnesses have any criminal convictions.

10.  The People intend to use certified copies of all convictions of the defendant, if any exist, for purposes of impeachment during the trial of this cause.  The record of these convictions is available for inspection.

11.  The People may or may not rely on the following prior acts or convictions of the defendant of a similar nature for proof of knowledge, intent, motive, scheme, or design:

Prior RD numbers: N-258729, N-009248, N-242763, also 90-16376, See polce reports

12.  The dates, times, places, circumstances, results, and persons present at any identification confrontations involved in this cause are contained in the police reports tendered to the defense in open court.

Any photographs available to the People which were used in connection with any photographic identification will be made available for inspection.

Any lineup photographs available to the People will be made available for inspection.

13.  No electronic surveillance was employed in connection with this cause.

14.  Any evidence which was acquired by the execution of any legal process, whether a search warrant, arrest warrant or other process or court order, is listed in 6 (a) and in the police reports and other documents tendered to the defense in open court, if such process was used.

A copy of any legal process executed in connection with this cause will be available for inspection and copy if a copy is not in the court file.

15. No informant that the People intend to call as a witness in the trial of this cause exists.

16. The People are unaware of any evidence or witnesses which may be favorable to the defense in this cause.

17. The People will comply with lawful orders of Court in this cause.

JACK O'MALLEY, 10295
State's Attorney of Cook County

By:

Bernard Murray
Assistant State's Attorney
2650 South California Avenue
Chicago, Illinois    60608