**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

DEMOND WESTON,

               Plaintiff,

     v.

CITY OF CHICAGO, et al.

Defendants.

Case No. 20-cv-6189

Hon. Lashonda A. Hunt

Mag. Holleb Hotaling

**PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS
IN OPPOSITION TO SUMMARY JUDGMENT**

**Plaintiff Demond Weston**

1.      Plaintiff Demond Weston spent nearly 30 years imprisoned for crimes he did not commit. He has always maintained his innocence. Ex. 1, Weston Affidavit at ¶3; Ex. 2, Weston Trial Testimony at G206-253, G215:7-216:4; Ex. 3, Weston Dep. at 153:14-20. Ex. 4, Order Vacating Conviction, at IND DEF 362573.

2.      During his imprisonment, Mr. Weston suffered tremendously and continues to suffer the mental health consequences of his wrongful conviction. Ex. 5, Weston Interrogatory Response to Breska at 8-9.

3.      At the time of his arrest, Demond Weston was 17 years old. Ex. 1, Weston Affidavit at ¶2. He lived with his mother, grandmother, and sisters. Ex. 1, Weston Affidavit at ¶4. He worked from time to time at his father's upholstery shop. Ex. 3, Weston Dep. at 73:15-17;  84:2-8.

4.     In December 2019, the Cook County State's Attorney's Office agreed to vacate Mr. Weston conviction. Ex. 6, Trans. Of Proceedings Dec. 18, 2019, at IND DEF362727-38

### The Three May 29, 1990 Shootings

#### *Joseph Watson and Tim Jones Shooting*

5.     On May 29, 1990, at approximately 10:28 p.m., Joseph Watson was shot and killed near 57th and Wolcott in the city of Chicago. Ex. 7, May 29, 1990 Police Report. Timothy Jones was also wounded in this shooting. Ex. 7. May 29, 1990 Police Report.

6.     According to police reports, Jones stated there were four offenders approximately 18-19 years old and that they yelled "G.D.," a slogan for the "Gangster Disciples" street gang. Ex. 7, May 29, 1990 Police Report. Jones later explained that the shooters stepped out of a gangway. Ex. 8, Watson Closing Supp. Report at 8.

#### *Deneen Coats and Ronald Nesbitt Shooting*

7.     Between 10 and 10:30 p.m. on May 29, 1990, Deneen Coats and Ronald Nesbitt were shot at 5530 S. Justine, a little over half a mile away from the 57th and Wolcott shooting. Ex. 9, Coats Testimony, at E237:9-238:19; Ex. 10, Allio Report at 3 (distance from the first shooting).

8.     Deneen Coats was related to several Vice Lords, some of whom lived at the same residence. Ex. 11, Washington GPR, City-DW-112 ("Pete Coats Vice Lord grandson lives in the basement sometimes;" "Barbara Coats V's aunt member of vice lords").

9.     According to police reports, Reginald Norwood, a witness to the shooting, saw seven people walk up to the address where he and Deneen were talking. Ex. 12, Norwood GPR, City-DW-113. One of them pulled out a gun and started shooting. *Id.*

10.     The police reported that Coats saw ten or more individuals. Ex. 13, Coats GPR, City-DW-114. Ronald Nesbitt described "five to ten guys." Ex. 14, Nesbitt Testimony, E266-E281, at 268:3-5.

11.     According to the General Progress Report ("GPR"), Coats stated she had never seen the guys before but "Reggie knew them." *Id.* When Deneen asked Reggie, Reggie told her the names of offenders. *Id.* The police file does not demonstrate any follow up investigation with Reginald Norwood as to the names of offenders he identified to Deneen Coats. Ex. 10, Allio Report, at 4.

### *JD Lee/Pierre Solomon/Derek Mason Shooting*

12.     Around 10:30 p.m. on May 29, 1990, JD Lee, Pierre Solomon, and Derek Mason were shot at 5759 S. Honore, about .7 miles from the Justine shooting. Ex. 15, Solomon Trial Testimony E. 135-169 at E135:23-136:9, 137:1-12 Ex. 10, Allio Report, at 4 (distance from Justine shooting). Mason reported seeing 6-7 people, around 17-18 years old some of whom were dressed in all black with hoods. Ex. 16, Mason GPR, at City-DW-119.

13.     Cartridges from a .9 mm gun were found at each of the three May 29, 1990 shootings. Ex. 17, Supp. Report on Firearms Evidence, at City-DW-25-26.

14.     Defendants Maslanka, Paladino, and Moser were assigned to investigate the Watson homicide. Ex. 7 May 29, 1990 Report, at 2.

### Police Begin Interviewing and Coercing
### Young Black Men From the 56th and Wolcott Area

15.     Within hours of the shootings, James Hale (identified as a Vice Lord) and Solomon Montague said they had seen a blue Chevy near the shooting at 57th & Wolcott and that four "Cottage Boys" (members of the "Black Disciples") including "Johnny Walker" and "C.C.", got out of the vehicle." Ex. 8, Watson Closing Supp. Report, at 4-5; Ex. 18, Hale and

Montague GPR at City-DW-95. Hale walked down the block and heard gunshots. Hale later saw the same car "traveling at a high rate of speed." *Id.*

16.     Based on the lead regarding a blue Chevy near the scene, police officers located a blue Chevy and determined that Bryan Hampton was the owner. *Id.* at 5. Within hours of the shootings, they brought Hampton to the police station for questioning. *Id.* Police towed the vehicle and tested it for fingerprints. *Id.* Ex. 19, Hampton Dep. at 60:18-61:4; Ex. 20, Hampton May 29, 1990 GRP, City-DW-92.

17.     Hampton's nickname was "Biz." Ex. 8, Watson Closing Supp. Report at 3. According to Bryan Hampton and Nate McCurine, they shared the blue Chevy. Ex. 19, Hampton Dep. at 43:4-16; Ex. 21, McCurine Dep. at 113:5-114:4. McCurine had taken the vehicle near 57th and Wolcott on May 29, 1990 to see a girlfriend who lived near there. Ex. 19, Hampton Dep. at 51:9-52:10; Ex. 21, McCurine Dep. at 121:6-12; 179:14-18.92.

18.     Hampton did not know anything about the shootings on May 29, 1990. Ex. 19, Hampton Dep. at 73:9-19. Hampton told police he didn't know anything about the shootings, but they refused to believe him. *Id*. at 79:11-80:21. Police slapped him, pulled his hair, and detained him for a period of three days. *Id.* at 79:11-81:8.

19.     Hampton testified that the detectives told Hampton what he was supposed to say, and he ultimately provided that same fabricated account to the grand jury. Ex. 19, Hampton Dep. at 86:10-19 ("Like he asked me a question, and then if I said no, then he would do something to me; but if I agreed with him, it was like, okay, then what else happened? So that was kind of the routine. He was starting to, you know -- you know, a pattern was starting to come about with me talking to him was basically like if I didn't agree with them, then I would get hit. If I did agree with them, I wouldn't. So I learned to agree with him."); *id*. at 87:8-18 ("And I remember

specifically when he left one time from slapping me, then I was kind of, like, you know, crying and, like, didn't understand what was going to go on. And another officer come in, and he was like, just, you know, tell him what you know and you gonna go home, and this and that.  And I was like -- and he was like, I'm gonna go get him. I was like no, no, no, I'll talk to you. Because I didn't want to talk to the other officer because obviously he was -- you know, he was hitting me. I don't want to be punched."); *id*. at 109:17-24 (describing how officers provided the details of his statement to him); *id*. at 150:19-151:9 (the version of events in his statement came from the police); *id*. at 120:14-121:2 (officer told him he was not "out of the hot box" until he repeated the same narrative to the grand jury).

20.     Hampton testified that the two officers that took him to a lineup were the same two officers who interrogated him and were involved with him the whole time. *Id*. at 114:6-10. Maslanka and Paladino took Hampton to a lineup. Ex. 22, May 30, 1990 Lineup, at City-DW-185-186. Hampton testified that one detective took notes and the other detective beat him. Ex. 19, Hampton Dep. at 151:24-152:6. Per the General Progress Report, Maslanka took notes on the interview with Hampton. Ex. 20, Hampton May 29 GPR, at City-DW-90-91.

21.     The police fabricated the following narrative and had Hampton repeat it: Hampton, Darrin Laws, and McCurine met up with Jerrod Smith ("J. Dilla") and John Walker; Walker and Smith talked about putting a "wrecking crew" together "because the Vice Lords had been shooting at them recently," and "Walker's rear window had been shot out;" J. Dilla wanted use of Hampton's car because "Walker's front passenger door was broken;" Hampton gave his car to McCurine for the "wrecking crew;" McCurine later told Hampton that he picked up Jerrod Smith, John Walker, and Servan Allen, and dropped them off at 57th and Wolcott, he heard gun shots, and then Smith, Walker, and Allen got back in the car and said they had "done their

5

business." Ex. 8, Watson Closing Supp. Report at 6; Ex. 19 Hampton Dep. at 150:19-151:15. There is no mention of Demond Weston in this account. Ex. 8, Watson Closing Supp. Report at 6.

22.     Smith, Jackson, and Walker had had a previous negative encounter with Area Three Detectives, including Defendants Kill and Paladino. Ex. 23, Smith Dep. at 52:10-57:9. Specifically, a few months before the May 29, 1990 shootings, they reported that they were interrogated about another shooting and were let go because the victim of that shooting did not identify them. *Id.* Subsequently (and before the May 29, 1990 shootings), detectives would harass them and make sarcastic comments to them in the neighborhood. *Id.*

23.     After Hampton provided his coerced statement, McCurine, Jackson, and Walker were questioned by police about the May 29, 1990 shootings. Ex. 8, Watson Closing Supp. Report at 7-8.

## Firearms Evidence

24.     On June 1, 1990, police determined that the same gun had fired .9 mm cartridges found at each of the three scenes of the May 29 shootings. Ex. 24, June 2, 1990 Supp. Report at 2, City-DW-25-26. On June 2, 1990, police learned that bullets from a .38 mm and .22 mm were found in the body of Joseph Watson. *Id.*

## Defendants' First Two Interrogations of McCurine Involve Coercion, But Weston Is Not Yet Part of Their Narrative

25.     On June 6, 1990, Nathaniel McCurine was interviewed. The police reports state that McCurine only admitted to discussing a "wrecking crew" with Walker and Smith and that Walker's car windows had been shot out. Ex. 25, McCurine June 6, 1990 GPR at 2, City-DW 277-278.

26.     Per the police reports, Paladino and Moser conducted the June 6, 1990

interrogation of McCurine and they believed he was "wavering" and "might admit that he drove

them or was a look-out." *Id*.

27.     According to the police reports, on June 8, 1990, Defendant Maslanka

interviewed McCurine and he said that he saw Jerrod Smith, John Walker, and Keith Jackson the

night of the shooting and that later Jackson, Smith, and Walker admitted to being involved in the

shootings, that Smith was armed with a .38 caliber handgun and Walker had a .9 mm semi-

automatic pistol, and said he had driven Jackson, Smith, and Walker on the night of the shooting.

Ex. 26, McCurine June 8, 1990 GPR at City-DW-127-128.

28.     Neither the June 6, 1990 nor the June 8, 1990 McCurine GPRs mention Demond

Weston. Ex. 25, June 6 McCurine GPR; Ex. 26, June 8 McCurine GPR.

29.     McCurine testified at his deposition that during his interrogations in June 1990,

the police officers repeatedly told him what to say. Ex. 21 McCurine Dep. at 27:21-28:9 ("They

started pressuring me a little bit more about what happened over there. Then they saying that Biz

said that I used his car, I supposedly took two guys over there to go shoot up some people. And I

kept telling them, I know that's a lie. Biz had never told you that. Because I with Biz before I

even went down that area to go see my girlfriend. Well, he's saying that, well, that's what Biz

said. That you used his car to take some guys down there, to go shoot up some people. And after

that, I kept denying it and denying it, and it kept going on and on. They feed me -- they telling

me, that I'm not going to leave until I tell the truth.· And I told them -- I said, officer, I told you

the truth already."); *id*. at 30:11-20 (police would not accept his truthful statement that he didn't

know about the shootings, they kept naming names to him); *id.* at 31:4-32:6 (McCurine asked for

his mother and the police continued to pressure him telling him he was "going down" for murder until he started saying back to them some of the things they told him).

30.     McCurine described being physically abused, including being slapped, during his interrogation in the police station. Ex. 21, McCurine Dep. at 25:3-7, 32:18-33:6, 39:11-15, 79:10-16. He was not arrested after those interrogations. Ex. 8, Watson Closing Supp. Report.

### The Murder of Curtis Sims

31.     On June 8, 1990, Curtis Sims was shot and killed. Ex. 27, Sims Supp. Report. Chicago Police Department ("CPD") detectives developed suspects in the Sims murder. *Id.* The suspects were identified as Dwayne Macklin, William Childs, and "Cortez Brown" (an alias used by Victor Safford) also known as "Vic." *Id.*

### The Arrest of Dwayne Macklin and the Search for Vic Brown

32.     On June 9, 1990, at approximately 10 a.m. police came to 5928 S. Union Street and arrested Dwayne Macklin for the murder of Curtis Sims. Ex. 28, Macklin Dep. at 16:20-18:11; Ex. 27, Sims Supp. Report at 2, 4. Brown was with Macklin at 5928 S. Union, but jumped out a window and fled when the police arrived. Ex. 28, Macklin Dep. at 18:12-19.

33.     Defendants Kill, Christopherson, and McWeeny participated in the arrest of Macklin. Ex. 28, Macklin Dep. at 18:20-19:15. Macklin was arrested at 11:00 a.m. Ex. 29, Macklin Arrest Report.

34.     Macklin spoke with the officers for approximately twenty minutes as they searched his apartment. Macklin then sat for a period of time in the squad car, after which the officers set out to look for Brown. Ex. 28, Macklin Dep. at 20:19-22:22.

35.     The officers drove around with Macklin for a bit and went to a house on 57th & Hoyne. *Id.* at 23:12-17.

36.     The house at 57th and Hoyne was Brown's family home. Ex. 30, Orlandis McCurdy Affidavit at ¶¶1, 6-7; Ex. 27, Sims Supp. Report at 2 (Brown residence listed as 5701 South Hoyne); Ex. 28, Macklin Dep. at 25:18-26:2. Police arrived there on the morning of June 9, 1990 and asked about Brown, handcuffed Brown's brothers and put them in the back of a squad car for a period of time. Ex. 30, Orlandis McCurdy Affidavit at ¶¶2-5.

37.     Brown's brother, Orlandis McCurdy, saw someone he knew as "Cup," or "Buttercup" in the back of a squad car nearby. *Id*. at 6. "Cup" or "Buttercup" is the nickname for Dwayne Macklin. Ex. 28, Macklin Dep. at 125:19-126:1; Ex. 8, Watson Closing Supp. Report at 4.

### The Search For Vic Brown Results In the False Arrest of Demond Weston

38.     Weston was on his way to the neighborhood corner store when he was arrested. Ex. 1, Weston Affidavit at ¶4. Macklin was in the back of a police car at about 12:00 p.m. when Detective Kill seized Weston on the street at 5926 S. Union, next door to the location where Defendants had arrested Macklin and from which Brown had escaped earlier that morning. Ex 28, Macklin Dep. at 26:8-12; Ex. 1, Weston Affidavit at ¶¶4, 6-9; Ex. 8, Watson Closing Supp. Report at 2 (Weston arrested at 5926 S. Union).

39.     Kill asked Weston more than once if he was "Vic." Weston said "no." Ex. 1, Weston Affidavit at ¶7. Michael Covington, who was sitting on the porch in the yard where Weston was arrested and witnessed the arrest, also testified in his deposition that he remembered a remark to that effect. Ex. 31, Covington Dep., at 36:23-37:4. Covington also asked Kill why he was arresting Plaintiff because Plaintiff didn't do anything. *Id*. at 22:25-25:1 (Covington told Kill he had the wrong person because Plaintiff was "too scared to throw rice at a wedding.").

40.     Defendant Kill handcuffed Plaintiff and put him in Kill's vehicle. Defendant Kill and the other squad car then drove to a vacant lot. Ex. 1, Weston Affidavit, at ¶9. The police cars parked side by side. *Id.* Kill shouted at Macklin, then came to Weston and said "you're not Vic Brown?" and Weston said no. *Id.* Macklin also told Kill that Weston was not Vic Brown. *Id.* Defendant Kill said that Weston "would do." Ex. 1, Weston Affidavit, at ¶9

41.     Macklin testified that the officers with Kill at the time Kill seized Weston were Defendants Christopherson and McWeeny. Ex. 28, Macklin Dep. at 28:2-14, 188:21-190:22.

42.     According to Defendant Kill's testimony, the two officers with Kill were Defendants Rusnak and Breska. Ex. 32, Kill Pretrial Hearing Testimony, A14-A43, at A21:19-20. Rusnak and Breska agree that they assisted with Weston's arrest. Ex. 33, Rusnak Dep. at 12:15-13:12 (Rusnak recalls going with Defendant Kill to "look for a witness"); Ex. 34, Breska Dep. at 111:3-114:19 (Breska's only reason to dispute Kill is that there is no report listing Breska as an arresting officer for Weston, otherwise he does not dispute Kill's testimony).

43.     Defendant Kill falsely testified that Macklin had implicated Weston in the May 29, 1990 shootings before Weston was arrested. Ex. 32, Kill Pretrial Hearing Testimony, A14-A43, at A18:24-A22:21. Contrary to Defendant Kill's account, Macklin had not implicated Weston in anything. Ex. 35, Macklin 2019 Affidavit at ¶¶9-11.

44.     Defendant Kill never documented the conversation in which Kill claimed that Macklin implicated Weston or an arrest report for Demond Weston reflecting the probable cause for the arrest (or any other police reports). Ex. 32, Kill Pretrial Hearing Testimony, A14-A43, at A28:14-A29:14. The June 10, 1990 "closing report" for the May 29, 1990 murder of Joseph Watson lists Rusnak, Breska, Christopherson, and McWeeny as having participated in the investigation. Ex. 8, Watson Closing Supp. Report, at 13.

**Defendants Learn that the Sims Gun Matches the May 29, 1990 Shootings**

45.     At approximately 11:40 a.m. on June 9, 1990, police seized a .9 mm gun believed to be used in the Sims shooting. Ex. 27, Sims Supp. Report at 5; Ex. 36, Sims Evidence Report.

46.     At some point on June 9, 1990, Defendant Kill learned that the .9 mm gun recovered in the Sims case had also been used in the May 29, 1990 shootings. Ex. 37, Crime Lab Report re 9 mm; Ex. 8, Watson Closing Supp. Report, at 2 (weapon recovered by Detective Michael Kill).

47.     In 2009, it came to light that the gun had been purchased by Pamela McCurdy, the mother of Vic Brown, on May 14, 1990. Ex. 10, Allio Report, at 8.

**The Interrogation and Coercion of Dwayne Macklin**

48.     Defendants Kill, Christopherson, and McWeeny participated in the interrogation of Dwayne Macklin. Ex. 35, Macklin 2019 Affidavit at ¶8; Ex. 28, Macklin Dep. at 209:8-210:22. Defendants physically abused and threatened Macklin during his interrogation. Ex. 35, Macklin Affidavit at ¶¶12-13. Defendant Kill hit Macklin several times (including with something akin to a phone book). Ex. 28, Macklin Dep. at 40:12-42:22. Defendant Kill also showed Macklin a gun with rubber bands on it, explaining that they represented "[n words] I shot." *Id.* Defendant Kill told Macklin what to say in his statement against Demon Weston. *Id*. at ¶14. Macklin had nothing to do with the May 29, 1990 shootings and had no idea who committed them. Ex. 28, Macklin Dep. at 40:1-19, 51-4, 64:16-19. Macklin's court reported statement began at 10:47 p.m. on June 9, 1990. Ex. 38, Macklin Statement, at City-DW-281-288.

**The Interrogation and Coercion of Demond Weston**

49. During the drive to the Area Three police station (at 39th and California), Detective Kill told Weston he hoped he would spend the rest of his life in jail getting raped and would be given the death penalty. Ex. 1, Weston Affidavit at ¶¶9-10.

50. At the police station, Defendant Kill put Weston in a room on the third floor and handcuffed his right arm to the back of a chair. *Id.* at ¶10. Defendant Kill said that Weston had been arrested "for killing Curtis." Ex. 1, Weston Affidavit at ¶12.

51. Several hours after Weston arrived at the station, Defendant Moser and Defendant Maslanka began interrogating Weston. *Id.* at ¶14; Ex. 3, Weston Dep. at 210:9-212:6. They showed him photographs of people he did not know. *Id.* They told Weston that police had his prints on a gun and the two witnesses in the photos had implicated him. *Id.*

52. Weston told them he did not know what they were talking about and asked them to call his mother. *Id.* at ¶15. Moser and Maslanka told Weston to stop crying and stop "playing stupid." *Id.*

53. At some point, Defendant Moser lifted Weston out of his chair by his shirt and told Weston he knew he had done "it." *Id.* at ¶16. Moser slapped him across the face and said they were "trying to be nice," but if he wouldn't cooperate and stop crying they were going to "make [him] talk." *Id.* Moser continued to hit Weston and threaten him. *Id.*

54. Defendant Maslanka told Weston "niggers don't have any rights" and he did not care if Weston "shit his pants" he wasn't getting out of the chair until he started saying what they wanted to hear. *Id.* at ¶17. Moser explained that no one knew where Weston was so they could do whatever they wanted to him. *Id.* Moser continued to slap him. *Id.*

55. Defendant Kill returned and asked "Did you break him yet?" and Moser and Maslanka told Kill that Weston was "playing stupid." *Id.* at ¶18.

56.     Defendant Kill returned again later and told Defendants Moser and Maslanka that Weston was not "Vic Brown." *Id.* at ¶19. The defendants left the room. *Id.* at ¶21. Defendant Moser returned to the room and told Weston they had a gun with his fingerprints on it from a shooting at 57th and Wolcott, and Macklin and the two other witnesses they had shown him had said Weston was involved. *Id.* at ¶22.

57.     Defendant Moser told Weston that, even though they had his fingerprints, Moser could "help" Weston because Macklin had said that "Vic Brown" killed "Joseph." Moser said that he would let Weston call his mother and go home within a few hours if Weston would say that he saw Brown shoot "Joseph" and said that the two people in the photographs were at the scene of the shooting. *Id.* at ¶23.

58.     Weston was confused and asked which person was shot, Curtis or Joseph, because earlier the cop had said "Curtis." *Id.* at ¶24.

59.     Defendant Moser told Weston he was" playing stupid" and slapped him several more times. *Id.* at ¶25. He said if Weston wanted to make it home at all, he should take the offer to cooperate. *Id.* Moser then left the room. *Id.*

60.     Defendants Moser and Maslanka returned to the interview room with several other officers. *Id.* at ¶26. Defendant Maslanka said "you know we can kill you right now, right? We should take you out back and string you up and make you beg for your life like Joseph did." *Id.*

61.     Defendant Maslanka placed Weston in a chokehold and began to choke him until he passed out. *Id.* at ¶27. Weston defecated himself. *Id.* at ¶29.

62.     Officers told Weston to stand up and then sit down because they wanted to see a "nigger stew in his own shit." They laughed about how bad "nigger shit" smelled. *Id.*

63.     Defendant Moser "drilled" Weston on what to say to the prosecutor who would take his statement. *Id.* at ¶35. This included showing him Macklin's statement, telling him about a meeting of Gangster Disciples, a "mission" for the gang, and Vic Brown carrying a .9 mm gun. *Id.* Moser told Weston that he (Weston) used a .22 derringer and that since "Joseph" was not killed with a .22, Weston would be free to go home. *Id.*

64.     Moser coached Weston throughout his court-reported statement. *Id.* at ¶36. When he was interviewed by the state's attorney with the court reporter, Defendant Moser would motion by nodding up or down for yes and no questions. *Id.* If it was a longer answer that Weston needed help with the facts the attorney and reporter would leave the room so Detective Moser could tell Weston what to say. *Id.*

65.     The court reported statement of Demond Weston does not include any questions related to the Justine or Honore shootings. Ex. 39, Court Reported Statement of Weston at City-DW-289-303.

66.     Ultimately Weston falsely confessed to the murder of Joseph Watson. Ex. 39, Court Reported Statement of Weston at City-DW-289-303. Weston's court reported statement began at 1:10 a.m. on June 10, 1990. *Id.* It discusses a group of young men—including Jackson, Walker, Macklin, Brown, and Weston—seeking revenge on the Vice Lords. *Id*

67.     Keith Jackson, John Walker, and Dwayne Macklin saw Demond Weston at the police station after Weston was arrested. Ex. 40, Strong Dep. at 32:9-11; Ex. 41, Walker Dep. at 19:15-22:1; Ex. 28, Macklin Dep. at 69:15-17. Jackson explained that "[W]hen [Weston] first came in, he looked normal. He looked puzzled, but he looked normal. And when he went in that room, throughout the ordeal in that room, I'm hearing things roughing up.· I'm hearing him screaming, yelling. I mean, I never heard no one -- honestly, I never heard no one scream like

that, not a guy." Ex. 40, Strong Dep. at 33:2-8. Jackson testified that Weston screamed "like someone in a lot of pain, like someone fitting to die." *Id*. at 33:18-21. After his interrogation, Weston looked disheveled and like he was in shock. *Id*. at 34:22-36:10. Walker saw police hit Weston and heard Weston scream in pain several times. Ex. 41, Walker Dep. at 19:15-22:1. Macklin observed that Weston looked "beat up." Ex. 28, Macklin Dep. at 69:15-17.

68.     All of the information recorded in Weston's confession was known by CPD detectives prior to his interview. Ex. 10, Allio Report at 12.

69.     Demond Weston told his family members about the torture. Ex. 42, McIntosh Dep. at 60:13-18, 69:3-7. He later told his attorney and his codefendants about how he was abused as well. Ex. 1, Weston Affidavit, at ¶40. Ex. 40, Strong. Dep. at 43:17-23.

### Keith Jackson's Account

70.     According to police reports, Keith Jackson was interviewed on June 7, 1990, but he was not arrested until days later on June 9, 1990 Ex. 43, Jackson GPR, City-DW-124 (Maslanka's GPR).

71.     Keith Jackson (now known as Keith Strong; Ex. 40, Strong Dep. at 9:17-21) was interrogated over the course of 36 to 72 hours. Ex. 40, Strong Dep. at 28:11-17. Jackson testified that during that time the police used physical force (choking, hitting with a phone book, using a sharp object) and verbal abuse (using racial and gender slurs) during a lengthy interrogation and tried to lead him into a fabricated story about the shootings. Ex. 40, Strong Dep. at 20:11:-24:22. Specifically, the detectives wanted him to say that he and his friends had met in a park and decided to commit crimes on behalf of their gang and that it was as retaliation for car windows being shot. Ex. 40, Strong Dep. at 24:23-25:7. The Defendants' story was not true. Id. at 25:8-26:20.

15

72.     Jackson remembered Defendant Kill's involvement in the physical abuse. Ex. 40, Strong Dep. at 22:18-22. Maslanka's name is on the GPR. Ex. 43, Jackson GPR City-DW-124. The officer that choked him was not Defendant Kill. Ex. 40, Strong Dep. at 133:8-10.  Jackson did not make a statement implicating anyone in the shootings. Ex. 8, Watson Closing Supp. Report at 8.

73.     Jackson testified he had nothing to do with the shootings. Ex. 40, Strong Dep. at 14:16-18. Jackson testified that he knew Tim Jones because he was dating Tim's sister. *Id*. at 12:1-13. He also knew JD Lee and considered him a friend. *Id*. at 12:21-13:7. He also knew Pierre Solomon and Derek Mason and knew their families. *Id*. at 13:17-14:11. He had no desire to shoot any of the victims of the May 29, 1990 shooting. *Id*. at 14:19-15:4. He also knew that Jones, Lee, Solomon, or Mason would easily have been able to identify him if he had ever wanted to hurt them or tried to hurt them. *Id*. at 16:5-16:21.

**John Walker's Account**

74.     Police first interviewed John Walker on June 7, 1990, and gave him a polygraph on June 8, 1990, but they did not arrest him until June 9, 1990. Ex. 44, Walker GPR, City-DW-129; Ex. 8, Watson Closing Supp. Report at 9-10.

75.     According to police reports, John Walker denied all involvement in the shootings. Ex. 8, Watson Closing Supp. Report at 8.

76.     At his deposition, he testified that police arrested him and he truthfully denied involvement with the shootings. Ex. 41, Walker Dep. at 14:12-16:15. The police used physical force on him during a lengthy interrogation, including choking him, slapping him, hitting him with a flashlight, and putting a cigarette out in his face. *Id.* Walker testified that his car had not

suffered any damage. *Id*. at 12:20-25. Walker testified that he had never been in Hampton's car. *Id*. at 18:4-6. Walker never made a statement. *Id*. at 19:2-5.

### The Arrest & Interrogation of Jerrod Smith

77.     On June 19, 1990, Jerrod Smith ("J. Dilla" who now goes by the name Jeremiah Smith) was later arrested. Ex. 45, Smith Arrest Report, at City-DW-48-51. He testified at his deposition that he was interrogated by Detective Kill along with other detectives. Ex. 23, Smith Dep. at 19:19-10:21. He was physically abused by detectives in the course of the interrogation. *Id* at 21:1-20; 23:2-24:6 (slapped, cigarette put out in his face, hit with a phonebook).

78.     Despite the fact that he had no knowledge of the May 29, 1990 shootings and told the detectives that, the police told him a "narration" of what his part in the May 29, 1990 shootings supposedly was. *Id*. at 24:11-25:10. Smith did not make a statement. *Id*. at 43:3-21.

### McCurine's Statement Implicating Weston

79.     On July 14, 1990 Defendants removed McCurine from the county jail (where he was being held on another charge) and  began interrogating him again about the May 29, 1990 shootings. Ex. 21, McCurine Dep. at 37:1-4, 38:4-39:10. McCurine understood that he would be charged with the murder unless he gave the police the story they wanted and if he said what they wanted, he would be a witness. *Id*. at 39:22-42:21. He understood he had to use the story they had given him previously in the hopes that they would be satisfied. *Id*. at 38:4-39:10.

80.     McCurine's July 14, 1990 statement implicates Demond Weston. Ex. 46, July 14, 1990 Statement of Nathaniel McCurine at City-DW-217-22. It also implicates Dwayne Macklin ("Cup") and "Vic Brown," neither of which were in his June 6 and June 8 statements. *Id;* Ex. 25, McCurine June 6, 1990 GPR; Ex. 26, McCurine June 8, 1990 GPR.

81. McCurine had never heard of Weston before his July interrogation and included Weston's name in the statement because the police told him to do so. Ex. 21, McCurine Dep. at 42:2-24.

82. McCurine was not able to read or write proficiently at the time of his July 1990 statement implicating Demond Weston. *Id*. at 43:6-13.

83. Defendants Moser and Kill were present for McCurine's July 14, 1990 statement. Ex. 46, July 1990 Statement of Nathaniel McCurine at City-DW-217-222.

**Weston's Codefendants Did Not Know Him**

84. Hampton, Walker, Jackson, and McCurine all testified that they never knew Demond Weston before they were ultimately charged together for the May 29, 1990 shootings. Ex. 41, Walker Dep. at 18:7-11; Ex. 40, Strong Dep. at 27:16-18; Ex. 23, Smith Dep. at 27:3-10; Ex. 21, McCurine Dep. at 12:18-22. They considered Demond to be from a completely different neighborhood. Ex. 40, Strong. Dep. at 27:16-28:10, 70:15-18; Ex. 41, Walker Dep. at 100:21-101:2. Weston is not mentioned in the police summary of their interviews or in the interviews of several other witnesses. Ex. 8, Watson Closing Supp. Report. at 1-10.

**The Lineups**

85. Defendants Paladino and Maslanka visited Coats at the hospital within a day of the shootings. Ex. 47, Maslanka Testimony in Defense Case, at G143:23-G144:12.

86. On July 17, 1990, Timothy Jones, Deneen Coats, and Derek Mason viewed lineups. Ex. 48, Jones Lineup; Ex. 49, Coats Lineup; Ex. 50, Mason Lineup.

87. Timothy Jones said he would be able to identify the offenders. Ex. 51, Jones GPR at City-DW-277. He viewed a lineup that included Demond Weston and did not select him. Ex. 48, Jones Lineup Report.

88. Jackson testified that after the lineups, the Jones family informed him that police showed the family photos before a lineup. Ex. 40, Strong Dep. at 39:3-23.

89. Smith testified that when he participated in a line-up he heard Tim Jones's sister saying to police "you can't make him say it was him." Ex. 23, Smith Dep. at 43:22-47:10.

90. There were nine people in the Coats lineup, including five suspects: Jerrod Smith, Demond Weston, Dwayne Macklin, John Walker and Keith Jackson. Ex. 49, Coats Lineup Report. Coats selected three people from this lineup: Smith, Weston and Jackson. *Id.*

91. Defendants Paladino and Maslanka administered the Coats lineup. *Id.*

92. Coats later reported to investigator Susan Swanson that about a week after the shooting, the police told her that they had the people who committed the shooting. Ex. 52, Swanson Dep. at 79:7-9. The police showed her photographs of possible perpetrators on at least two occasions. Ex. 52, Swanson Dep. at 82:5-88:10.

93. Coats picked out two photographs of individuals from a photo array and then police showed her two pictures of other individuals that they said were involved. Ex. 52, Swanson Dep. at 85:11-86:16.

94. Swanson's interview with Coats lasted approximately one hour. Ex. 52, Swanson Dep. at 65:23-66:3 Swanson took approximately forty pages of notes during the interview. Ex. 53, Swanson's Coats Interview Notes, at Swanson Dep. Ex. 3. Swanson's practice was to take notes on everything a witness told her, not just the things she thought would serve her client. Ex. 52, Swanson Dep. at 24:12-25:12

95. Swanson followed up with Coats on at least two occasions via letter to discuss another interview and a meeting with Plaintiff's post-conviction attorneys. Ex. 54, Swanson Correspondence, Swanson Dep. Ex.4

96.      Swanson was deposed at length, reading her notes into the record. Ex. 52,
Swanson Dep. at 69:18-100:18.

97.      The photo array procedure that Coats described is not documented in the Watson
homicide file or the CCSAO file. Ex. 55, Lebata Affidavit at ¶15.

**The Opinions of Plaintiff's Eyewitness Identification Expert**

98.      Plaintiff's eyewitness expert, Dr. Brian Cutler, opined that there were
characteristics of Coats that made her more susceptible to influence by the police. Ex. 56, Cutler
Report at ¶¶ 21-22. First, Coats was only 20 years old at the time of the events. As Dr. Cutler
explained, that would make Coats a young adult, who "occup[ies] a transitional developmental
space between adolescents and mature adults." *Id*. at ¶ 21. In this transitional stage, "Coats may
have been vulnerable to social influence by authority figures and ultimately to false statements."
*Id*. For example, Coats referred to the police as "superheroes." *Id*. Second, Coats was seriously
injured during the offenses: She was shot in her leg and back and spent about a month in the
hospital before being released. *Id*.at ¶ 22. "Coats's physical condition likely rendered her
vulnerable" if police visited her in the hospital to discuss the shooting and/or show her
photographs of possible offenders. *Id*.

99.      In addition, the conditions under which Coats viewed the offenders were
"impoverished and increased the risk of false identification." *Id*. at Opinion IV. Coats viewed
multiple offenders who she testified she had never seen before for a brief period of time at a
distance under ambient street lighting. The offenders wore hats or caps and had guns. *Id*. ¶ 24.
Each of the following conditions increased the likelihood of misidentification: (a) that she had
not seen the offenders before the shooting; (b) the combination of distance from her house and
lack of lighting, which would have particularly inhibited her ability to distinguish faces; (c)

minimal exposure time to view the offenders; (d) the fact that the offenders wore hats; (e) the high level of stress that Coats was under; and (f) the presence of weapons. *Id*. ¶ 24.

100.     As Dr. Cutler explains, the lineup identification procedures used by the Defendants "were highly suggestive and enhanced the risk of false identification of Weston." *Id*. at Opinion V. According to Dr. Cutler, the procedure used for that lineup was "highly suggestive" because of "a combination of inadequate fillers, no cautionary instructions, suggestive comments, and lack of double-blind (independent) administration." *Id*. ¶ 27. The lineup consisted of five suspects, each of whom were between 18 and 20 years old, and four fillers—two of those fillers were 30 years old and 32 years old respectively. That was insufficient. *Id*.

101.     Finally, Dr. Cutler opined that Swanson's testimony suggested that there was contamination of the lineup in this case. *Id*. at ¶ 30. To that end, "Coats may have been exposed to Weston's photo, may have selected Weston's photo or may have been told by investigators that Weston was identified by another suspect the day after the crime. If so, any of those scenarios would contaminate the subsequent identification procedures." *Id*.

**Additional Arrests**

102.     On September 22, 1990 Vic Brown (also known as Victor Safforld and Cortez Brown) was eventually arrested and charged with the Sims murder. Ex. 57, Brown Arrest Report, at City-DW-349-351. He testified at deposition that he only knew Demond Weston as a "school boy" who was "lame," "a square," and that he never gave Weston a gun. Ex. 58, Safforld Dep. at 208:2-3; 209:10-16; 212:2-19.

103.     On November 8, 1990 McCurine was arrested based on his July 1990 statement. Ex. 59, McCurine Arrest Report, at City-DW-54-55.

**Alternative Suspects Not Properly Investigated, Documented, or Disclosed**

104.    On June 1, 1990, detectives spoke with Sylvester Washington who reported that a "Shank" had a four-door blue Chevy that was "newer than Biz's." Ex. 60, Sylvester Washington GPR Part 1, City-DW-101. "Shank" had a .9 mm gun. Ex. 61, Sylvester Washington GPR Part 2, City-DW-106. "Shank's" car had a bullet hole in the front window. Ex. 60, Sylvester Washington GPR Part 1.

105.    "Shank" is not identified by his proper name in the police file. Ex. 10, Allio Report, at 6.

106.    Defendants Paladino and Moser sent Kavin McMorris to be polygraphed by Detective Tovar on June 4, 1990. Tovar created several documents in conjunction with that polygraph: a Crime Lab Report, Polygraph Case Review, Polygraph Examination Worksheet and Polygraph Subject Consent. Ex. 62, McMorris Crime Lab Report at CCSAO 2392; Ex. 68, Polygraph Case Review at CCSAO 2394; Ex. 63, Polygraph Examiner's Worksheet at CCSAO 2395-98; Ex. 93, Polygraph Subject Consent at CCSAO 2399; Ex. 64, Tovar Dep at 112:4-22.

107.    On June 4, 1990, a "Kavin McMorris" was given a polygraph exam. Ex. 62, McMorris Crime Lab Report at CCSAO 2392. Nothing in the homicide file identifies who Mr. McMorris is or why he was interviewed. Ex. 10, Allio Report at 7. However, the prosecutor's file–first disclosed in discovery in this case– contains polygraph notes that state that Mr. McMorris's nickname was "Shank." Ex. 63, Polygraph Examiner's Worksheet, CCSAO 2395-98.

108.    The McMorris Crime Laboratory Report that states that  "deception [was] indicated" is in the investigative file. Ex. 62 Crime Lab Report at CCSAO 2392; Ex. 64, Tovar Dep at 113:4-23; Ex. 55, Lebata Affidavit at ¶4. The remainder of materials that Tovar created

for the McMorris polygraph--the Polygraph Case Review, the Polygraph Examiner's Worksheet, and the Polygraph Subject Consent (hereinafter "McMorris Polygraph Documents")—are not in the homicide file. Ex. 55, Lebata Affidavit at ¶¶5-6. Those materials were not disclosed to the prosecutor, Bernard Murray, prior to Plaintiff's trial. *See* PSOAF ¶¶ 110-112.

109.    Tovar testified that he would only disclose the Crime Lab Report that he created unless the Crime Lab was specifically subpoenaed for his Polygraph Case Review, Polygraph Examiner's Worksheet, notes or Consent form. Ex. 64, Tovar Dep. at 99:12-22. Tovar testified that if the Crime Lab were subpoenaed, he would place the subpoena in the Crime Lab file. Ex. 64 Tovar Dep. at 99:23-102:10. There is no such subpoena in the files that were disclosed for Watson homicide. Ex. 55, Lebata Affidavit at ¶¶13-14.

110.    Murray testified that he believed he received the McMorris Polygraph Documents pursuant to a subpoena. Ex. 65, Murray Dep. at 70:22-71:6. The only subpoena that Murray issued was to the Chicago Police Department—and not to the Crime Lab—and it was for "lab reports"— not for the specific materials Tovar created Ex. 66, subpoena at CCSAO 190; Ex. 65, Murray Dep. at 59:18-24 (would have used this subpoena to get polygraph documents). Although the McMorris Polygraph Documents appear in the current version of the CCSAO file, Murray testified that he was not involved in creating that version of the CCSAO file and he has no knowledge of how documents were placed in the file. Ex. 65, Murray Dep. at 41:10-43:15.

111.    Additionally, Murray agreed that the McMorris Polygraph Documents could be Brady material and that he took his Brady obligations seriously. Ex. 65, Murray Dep. at 19:7-20:9, 69:9-70:11. During his criminal proceedings, Plaintiff sought discovery from the prosecution, including evidence that tended to exculpate him. .Ex. 65, Murray Dep. at 23:9-19; Ex. 67, Defendant's Discovery Request at CCSAO 2122. Murray indicated that no such evidence

existed. Ex. 65, Murray Dep. at 92:1-14 (did not withhold any exculpatory evidence); Ex. 90, People's Answer at ¶ 16.

### McMorris Documents Were Exculpatory

112.    The polygraph notes indicate that McMorris was polygraphed because he was a suspect in the crime. Ex. 68, McMorris Polygraph Report at CCSAO 2394; Ex. 64, Tovar Dep. at 112:23-25. McMorris failed the polygraph. Ex. 68, McMorris Polygraph Case Review at CCSAO 2394; Ex. 64, Tovar Dep. at 113:4-9. In speaking with the polygrapher after he was polygraphed, McMorris "stated Farmer Dell told him he and six others involved in shooting. Farmer Dell said he sho[]t on in the head." Ex. 63, Polygraph Examiner's Worksheet at CCSAO 2395-97; Ex. 64, Tovar Dep. at 113:6-14, 134:16-21.

113.    None of this information appears in the homicide file. Ex. 55, Lebata Affidavit at ¶¶5-10. Tovar testified that it was his practice to share any information a polygraph subject gave him with the detectives. Ex. 64, Tovar Dep. at 134:3-24. For his part, Defendant Moser admitted that he would have interviewed McMorris before sending him to be polygraphed. Ex. 69, Moser Dep. at 125:23-126:14. Paladino also admitted that he should have created a GPR and/or supplemental report of that conversation. Ex. 70, Paladino Dep. at 169:1-170:7. Neither notes of an interview nor a supplemental report about McMorris are in the homicide file. Ex. 55, Lebata Affidavit at ¶¶7-10.

114.    Paul Katz, Plaintiff's criminal defense attorney, testified that he would use evidence of an alternative suspect—he would introduce the evidence or try to question a witness about it. Ex. 71, Katz Dep. at 108:15-109:16. Katz did not introduce evidence relating to

Kavin McMorris at Plaintiff's criminal trial (or at any time during his criminal proceedings). *See generally*, Trial Transcripts, *People v. Weston*, No. 90 CR 16376[1].

### Court Proceedings

115.    At no time prior to Plaintiff's trial did the Defendants disclose the coercion they used to induce the false statements from Macklin, McCurine or Hampton. Ex. 90, People's Answer to Discovery at ¶16; Ex. 65, Murray Dep. at 45:23-48:16. The statements by the prosecutor (Assistant State's Attorney Lambur) to support probable cause relied on the fabricated statements from Hampton, Macklin and Plaintiff, and do not acknowledge any coercion. Defs. Ex. 21; Ex. 8, Watson Closing Supp. Report.

116.    Weston told his attorney about the torture, but his attorney said no one would believe him. His attorney filed a motion to quash arrest and to suppress the statement, but when the attorney presented Demond's testimony at the hearing, he did not ask Weston any questions about how he was treated during the interrogation. Ex. 72, Weston Pretrial Hearing Testimony, A3-A13. Indeed, Weston's testimony was presented as part of the "motion to quash arrest" not the "motion to suppress." Ex. 73, Index of Pretrial Testimony, Weston 33127; Ex. 32, Kill Pretrial Hearing Testimony, A14-43, at A43 (attorney saying the previous witnesses were related to the motion to quash). Both motions were denied. Ex. 74, Report of Proceedings on August 27, 1991 (A57:4-7), April 13, 1992 (C24:1-9).

117.    At trial, Weston testified that he was innocent and answered a limited series of questions about the physical abuse. Ex. 2, Weston Trial Testimony, G206-G253, at G219:2-G222:22. Weston's attorney said it would be hard for a judge to believe him and not to offer

---

[1] Because the trial transcripts are voluminous, and because the Defendants already have a copy of the transcripts, Plaintiff does not attach them here. If the Court would like a copy, Plaintiff is happy to provide one.

details of the abuse or elaborate. Ex. 1, Weston Affidavit at ¶¶40-41 Weston followed those instructions. *Id*

118.    The evidence against Weston at trial consisted of: the testimony of Brian Hampton–which included the false narrative that Defendants had fed to Hampton to explain the purported motive for the shootings–but did not mention Weston (Ex. 75, Hampton Testimony, F130-F175) at F132:5-F150:13); the testimony of Deneen Coats identifying Weston for the second shooting (Ex. 76, Coats Testimony, E.204-E265, at E225:7-19; and Weston's coerced confession as evidence against him for the first shooting (murder of Watson and attempted murder of Jones) (Ex. 77, Sabin Testimony, G40-G92 at G60:22-G82:5).

119.    At trial, Defendant Kill asserted for the first time that Weston had made an oral admission to him. Ex. 78, Kill Trial Testimony at F.194:11-16, F.208:5-15. That supposed admission is not documented anywhere in the police file. Ex. 10, Allio Report at 25; Ex. 79, Maslanka Trial Testimony G12-G39, at G39:11-16.

120.    At trial, Coats testified that she recognized the three people she selected from the lineup before she communicated with police officers (Ex. 9, Coats Trial Testimony, E204-E264 at E236:2-10) and claimed to have recognized Plaintiff from the crowd of people who approached her porch (E254:6-13).

121.    Weston was found guilty of the murder of Joseph Watson and the attempted murders of Tim Jones, Deneen Coats, and Ronald Nesbitt. Ex. 74, Report of Proceedings at 3H-4H.

122.    Keith Jackson was acquitted of the attempted murder of Deneen Coats. Ex. 40, Strong Dep. at 46:11-47:21. Walker elected a bench trial and was found not guilty of the murder of Watson, but guilty of the attempted murder of Deneen Coats. Ex. 41, Walker Dep. at 28:1-4.

McCurine pled guilty to avoid the lengthy sentence that Weston received. Ex. 21, McCurine Dep. at 89:23-90:14.

## Weston's Criminal Convictions Are Vacated

123.    On December 18, 2019, Plaintiff's convictions were vacated. Ex. 4, Order Vacating Convictions. The special prosecutor acknowledged on the record that the State could not meet its burden. Ex. 6, Trans. of Proceedings Dec. 18, 2019, at IND DEF362727-38, at 9:7-10.

## Defendant Paladino's Invocation of his Fifth Amendment Rights

124.    Defendant Paladino testified that he does not have any independent recollection of his participation the May 29, 1990 shooting investigation. Ex. 70, Paladino Dep. at 59:13-16.

125.    Defendant Paladino invoked his Fifth Amendment right against self-incrimination when asked whether in the course of his career as a detective he fabricated evidence (*id.* at 127:14-128:2), whether he fed facts to suspects (*id.* at 128:3-16), whether he coerced witnesses into making statements (*id.* at 128:17-129:6), whether he failed to turn over exculpatory evidence (*id*. at 129:2-130:11), and whether he placed exculpatory evidence in a street file (*id*. at 130:12-25).

126.    Defendant Paladino also invoked his Fifth Amendment right against self-incrimination with regard to dozens of young Black men who have claimed they were tortured in police custody. *Id*. at 114:7-126:23

127.    Defendant Paladino invoked his Fifth Amendment right against self-incrimination when asked what he did differently in his interview with Brian Hampton than what he did with Marcus Wiggins. *Id*. at 134:2-22.

128.     Defendant Paladino asserted his Fifth Amendment rights when asked if he commonly used a tactic of lying to suspects and claiming that someone else had implicated them in the crime. *Id*. at 194:5-195:11.

129.     Defendant Paladino was asked about the GPR where he described McCurine as "wavering" and "might admit he drove them or was a lookout." *Id*. at 195:12-17. When asked what tactics he would use when a suspect was "wavering," he invoked his Fifth Amendment rights. *Id*. at 195:18-196:8

130.     When asked whether he ever told a witness who to select from a lineup, about any instructions he would give witnesses lineups, how many lineups he conducted in his career, and whether he was trained not to put more than one suspect in a lineup, Defendant Paladino invoked his Fifth Amendment rights. *Id* at 126:24-127:13, 135:13-25, 136:17-137:19.

131.     When asked whether it was his practice to show photos of suspects to victims before a victim viewed a lineup including those suspects, Defendant Paladino asserted his Fifth Amendment rights. *Id*. at 178:22-179:14. When asked whether he interviewed witnesses before they viewed a lineup, Paladino asserted his Fifth Amendment rights. *Id*. at 180:10-24.

132.     When asked whether he has ever covered up the misconduct of Defendants Moser and Maslanka towards Weston, Paladino invoked his Fifth Amendment rights. *Id*. at 185:4-17.

133.     When asked whether he ever failed to document an interview with a suspect, Defendant Paladino invoked his Fifth Amendment rights. *Id*. at 146:15-147:4. When asked under what circumstances he would send a suspect to be polygraphed, whether he would always interview a suspect before sending the suspect to be polygraphed, whether he would write down information from a suspect before sending the suspect to be polygraphed, and whether he ever had conversations with polygraph examiners about what to ask a suspect during the polygraph

interview, he invoked his Fifth Amendment rights. *Id*. at 153:17-155:11; 163:7-21). When asked whether he would put a report about an interview in a street file, Paladino invoked his Fifth Amendment rights. *Id*. at 164:22-165:11.

### The City's "Street Files" Practice

134.    "Street Files" were files that detectives kept that had investigative information that did not always make it into official reports. Ex. 80, Hickey Trial Test. *Fields* at 2014:8-2017:4, 2017:8-24; Ex. 81, Brady Memo at Weston 55950-54; Ex. 82, Stibich Memo at Weston 55959-60. Information about alternative suspects was the kind of information that was kept in the street file. Ex. 80, Hickey Trial Test. *Fields* at 2012:6-2013:14; Ex. 81, Brady Memo at Weston 55952 ("the 'Street Files' contain other Case and Supplementary Reports pertaining to non-related cases which are utilized in suspect elimination and identification"); Ex. 83, Hickey Dep. *Kluppelberg* at 163-173; *id.* at 164 ("oftentimes, sometimes, substantive investigative activity never made it into the official report. For instance, the clearing of suspect A and all the work that went in to even find suspect A…").

135.    The City was notified of its street file problem in 1982 when an officer came forward reported that there were investigative reports about an alternative suspect that was in the street file that had never made it into an official report and disclosed to the criminal defendant. Ex. 80, Hickey Trial Test. *Fields* at 2012:6-2014:7.

136.    In 1987, a jury returned a *Monell* verdict against the City in George Jones's case for its street file practice that caused the withholding of exculpatory information, including exculpatory information pointing to an alternative suspect. *Jones v. City of Chicago*, 856 F.2d 985, 959-96 (7th Cir. 1988).

137. On December 15, 2016, the jury in *Fields v. City of Chicago*, No. 10 C 1168 found that the City had a street file practice in 1983-1989 and 1999-2006. Ex. 84, *Fields* Verdict & Judgment; *Fields v. City of Chicago*, 981 F.3d 534, 563 (7th Cir. 2020), *rehearing and hearing en banc denied* (Jan. 25, 2021); Ex. 85, Brasfield *Fields* Report at Weston 53851-52; Ex. 86, Brasfield Trial Test. *Fields* at 2509:17-2510:6.

138. Similarly, in June 2018, the jury again found that the City had a street file practice that caused exculpatory information to be withheld from the plaintiff in *Rivera v. Guevarra*, No. 12 cv 04428. The homicide investigation at issue in *Rivera* occurred in 1988 and the *Monell* timeframe included from 1985 to 1991. Ex. 87, 6/29/2018 Order Entering Verdict; Ex. 88, *Rivera* Jury Instructions at 26 (instruction on claim 4 for City's policy); Ex. 89, Brasfield *Rivera* Report at Weston 54083.

139. There was a "street file" in the Watson homicide investigation. Defs. Ex. 34, Stipulations, *People v. Walker* at ¶ 21 (explaining that statements were "recorded in the street files"). Indeed, Defendant Moser testified that he kept street files when he was a detective. Ex. 69, Moser Dep. at 32:2-16.

### The Defendants' History of Misconduct

140. Between 1980-1998 at least 59 citizen complaints were filed against Defendants Maslanka, Moser, and Kill, including numerous cases of physical abuse, with suspects being struck, kicked, choked, knocked to the ground, struck with nightsticks, metal clubs, flashlights, and phonebooks. Ex. 10, Allio Report at 20.

141. For example, Defendant Maslanka beat Alfonso Pinex severely during the course of Pinex's interrogation, causing him to defecate on himself. The special prosecutor investigating allegations of torture by CPD detectives concluded that there was sufficient evidence to seek an

30

indictment against Maslanka for aggravated battery, perjury, and obstruction of justice. Ex. 91, Special Prosecutor Report on Pinex at 16

142.    Prior to his death, Defendant Kill testified that he obtained confessions in 90% of the homicide cases that he worked on, for a total of about 1,500 confessions, and of those 1,500, there were allegations of use of physical force in 90% of the cases. Ex. 92, Kill Dep. *Wiggins* at 45:23-50:7.

143.    In 1988, then-Commander Jon Burge, Defendant Kill, and others beat Ronald Kitchen into confessing to a quintuple murder he did not commit, including by hitting him in the face, chest, back and groin. Ex. 94, Kitchen Testimony in *People v. Kitchen.* Kitchen was exonerated and granted a Certificate of Innocence. Ex. 95, Kitchen Certificate of Innocence.

Respectfully submitted,

**Demond Weston**

By: /s/  Theresa Kleinhaus
*One of Plaintiff's Attorneys*

Jon Loevy
Gayle Horn
Theresa Kleinhaus
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
Tess@loevy.com

## CERTIFICATE OF SERVICE

I, Theresa Kleinhaus, an attorney, hereby certify that on February 11, 2025, I caused the foregoing to be filed using the Court's CM/ECF system, thereby effecting service on all counsel of record in this case.

<u>/s/Theresa Kleinhaus</u>
*One of Plaintiff's Attorneys*