**INTRODUCTON**

Plaintiff alleges that he was wrongfully convicted of murder and attempt murder. The story of why Plaintiff spent decades in prison for crimes he did not commit starts and stops with Defendants. Among other things, Plaintiff alleges that Defendants viciously beat a confession from him, which was false and fabricated, and also coerced and fabricated witness statements and an attendant identification of him. Defendants failed to disclose any of this misconduct to the prosecutor, who blindly moved forward with Plaintiff's prosecution.

Defendants move for summary judgment on every claim as to every Defendant. In doing so, Defendants rely largely on their own say-so that they did nothing wrong, citing their own police reports and testimony. Defendants may certainly present this version of the facts at trial, but it has no place at summary judgment. Instead, well-settled law requires Defendants to present the facts in the light most favorable to Plaintiff and draw all inferences in his favor. Defendants fail to follow this basic edict, choosing to ignore Plaintiff's evidence disputing their accounts of the criminal investigation, including Plaintiff's testimony and the testimony of others. When credited, that evidence demonstrates that Defendants' conduct crossed a constitutional line. The failure of Defendants to even engage in the process required by Federal Rule of Civil Procedure ("Rule") 56 warrants denying summary judgment on its own. But regardless, as the record set forth below shows, there are genuine disputes of fact warranting a trial in this case.

**SUMMARY OF FACTS**

There were multiple shootings on May 29, 1990, all within a relatively narrow timeframe and location, including the shooting of Timothy Jones and Joseph Watson, which resulted in Watson's death, and of Deneen Coats and Ronald Nesbitt, who survived. PSOAF[1]¶¶5-13.

---

[1] "PSOAF" indicates Plaintiff's Statement of Additional Facts.

1

Investigating police quickly decided that the shootings must be related. PSOAF¶ 13. A little over a week later, on June 8, 1990, there was yet another shooting, causing Curtis Sims' death. PSOAF¶ 31. Demond Weston was not involved in any of the shootings; he is absolutely innocent of them all. PSOAF¶1. Weston nonetheless came to be falsely charged with and falsely convicted of Watson's murder and the attempt murder of Jones, Coats and Nesbitt. Plaintiff summarizes below the pertinent facts—namely, Defendants' misconduct—which led to Plaintiff's decades-long incarceration for crimes he did not commit.

### The May 29, 1990, Shootings

Three shootings occurred on May 29, 1990, within close time and geographic proximity: At 57th and Wolcott, a group of young men shot Joseph Watson and Tim Jones, a 14-year-old child on a bicycle. PSOAF¶¶5, 7, 12. Watson died shortly thereafter. PSOAF¶5. At 5530 Justine, a group of young men shot a young woman named Deneen Coats and her friend Ronald Nesbitt. PSOAF¶¶7, 10. At 5759 Honore, a group of young men shot Derek Mason, Pierre Solomon, and J.D. Lee. PSOAF¶12. Defendants Moser, Maslanka, and Paladino were assigned to the May 29 shootings. PSOAF¶14. Police believed the three shootings were related and committed by the same offenders. PSOAF¶ 13.

The witnesses described from four to ten young men in their late teens, wearing all black with hoods and yelling gang slogan for the Gangster Disciples. PSOAF¶¶ 6, 10, 12. Cartridges from a .9 mm gun were found at each of the locations. PSOAF ¶ 13.

### Defendants Begin Fabricating Evidence

Rather than conduct a legitimate investigation, Defendants almost immediately zeroed in on three young men–John Walker, Keith Jackson, and Jerrod Smith–who Defendants Kill and Paladino knew from a previous investigation. PSOAF¶ 22. The three young men had been

briefly accused of a crime, but the victim affirmatively explained they weren't the perpetrators. *Id.* Detectives from Area Three continued to harass the young men in the following months. *Id.*

Defendants learned that a Blue Chevrolet had been seen near 57th and Wolcott close in time to the shootings. PSOAF¶15. They determined that Bryan Hampton owned a car fitting that description. PSOAF¶ 16

Defendants Paladino and Maslanka coerced Hampton into making a fabricated statement implicating Walker, Jackson, and Smith in the Watson/Jones shooting. PSOAF¶¶ 18-21. They kept Hampton at the police station for three days, pulling his hair, slapping him, and hitting him. PSOAF¶ 18. Defendants persisted questioning Hampton even though he insisted he knew nothing about the May 29, 1990, shootings. *Id.* Defendants Paladino and Maslanka asked Hampton questions and if he gave the "wrong" response, they hit him. . PSOAF¶ 19. If he gave the response they wanted to hear, he was not hit. *Id.* Hampton began giving the narrative that Defendants wanted to hear which was: Walker and Smith began telling him, McCurine, and others that they were putting together a "wrecking crew," to get revenge on a rival gang, the Vice Lords, because the Vice Lords had shot out the window of John Walker's car. McCurine later told Hampton he picked up Smith and Walker in the Blue Chevy, dropped them off at 57th and Wolcott, heard gunshots, and then they got back in the car and said they had "done their business." PSOAF¶ 21. Weston was not mentioned in this false and fabricated narrative. *Id.* Additionally, none of the coercion that was used to secure Hampton's false and fabricated statement was ever disclosed to the prosecutor. PSOAF¶ 115.

Defendant Paladino testified that he does not recall the May 29, 1990, shooting investigation. PSOAF¶ 123. When asked whether it was his practice to coerce witnesses,

fabricate evidence, feed facts to witnesses, Paladino invoked his Fifth Amendment right against self-incrimination. PSOAF¶ 124.

On June 6, Defendants Paladino and Moser interrogated McCurine. PSOAF¶ Just as Paladino and Maslanka did with Hampton, they used physical force to try to elicit a narrative matching what Hampton had provided. PSOAF¶¶ 27, 29, 30. After the first interrogation, Paladino wrote in a police memo that McCurine was "wavering," and "might admit he was driving or a look-out." PSOAF¶ 26. When asked at deposition whether he would physically coerce and abuse arrestees when they were "wavering," Defendant Paladino invoked his Fifth Amendment right against self-incrimination. PSOAF¶ 129.

### The Murder of Curtis Sims

Defendants had not made any arrests in the May 29 shootings as of June 8, 1990, when Curtis Sims was killed. PSOAF¶ 31. Police quickly got a tip that Dwayne Macklin and "Vic Brown" (aka "Cortez Brown" or "Victor Safford") were responsible for the murder. *Id.* On the morning of June 9, 1990, Defendants Kill, Christopherson, and McWeeny went to 5928 S. Union to arrest Macklin and Brown. PSOAF¶ 32. Defendants were able to arrest Macklin, but Brown jumped out a back window and evaded police. *Id.* Defendants Kill, Christopherson, and McWeeny then went searching for Brown in the neighborhood. PSOAF¶ 35. They went to 57th and Hoyne, the Brown family home, and handcuffed Brown's brothers in the back of a squad car for a period of time. PSOAF¶¶36, 37.

### Defendants Seize Weston

On the same day, June 9, 1990, Demond Weston was walking to a corner store in his neighborhood when Defendant Kill suddenly snatched him off the street. PSOAF¶¶ 38-40 Weston was 17 years old at the time, living with his mother, grandmother, and sisters. PSOAF¶

4

3. As soon as Defendant Kill targeted Weston, a neighbor on a nearby porch protested that they must have the wrong person. PSOAF¶ 39. Defendant Kill asked Weston if he was "Vic Brown," and Weston said he was not. Defendant Kill was undeterred. *Id.* Defendant Kill, accompanied by Defendants Rusnak and Breska in a different vehicle[2], took Plaintiff to a nearby vacant lot where Kill again asked Weston if he was "Vic Brown"—the suspect in the Sims murder—who had escaped approximately an hour before at almost exactly the same location where Kill seized Weston off the street. PSOAF¶¶ 32, 38, 40. Weston said he was not "Vic Brown," and witness Dwayne Macklin, who was in the back of the other police car in the lot, confirmed that Weston was not Brown. PSOAF¶ 40.

### Defendants Torture Weston

Undeterred by the facts, Defendants Kill, Rusnak, and Breska took Weston and Macklin to the Area Three police station. PSOAF¶¶ 42, 49. On the way, Defendant Kill told Weston he hoped Weston would get the death penalty and be raped in prison. PSOAF¶ 49.

At the police station at 39th and California (also known as Area Three), Defendant Kill said Weston was under arrest "for Killing Curtis." PSOAF¶50. Defendant Kill placed Weston in an interrogation room and handcuffed him to a chair. *Id.*

Several hours after Weston arrived at the police station, Defendants Moser and Maslanka interrogated Weston. PSOAF¶ 51. Defendants Moser and Maslanka showed Weston photographs of people he did not know and told him the two individuals in the photograph had implicated him in a murder. *Id.* Weston repeatedly explained that he had no idea what the officers were talking about and asked to call his mother. PSOAF¶ 52.

---

[2] According to Dwayne Macklin, it was Defendants Christopherson and McWeeny.

At some point in the questioning, Defendant Moser grabbed Weston by the shirt and pulled him off the chair saying he knew Weston had done "it." PSOAF¶ 53. Moser hit Weston several times and threatened to hit him further. *Id.* During questioning, Weston was threatened and called the "n word" and told that officers could do whatever they wanted to Plaintiff because no one knew where Weston was. PSOAF¶¶ 54, 60. Witnesses heard Weston screaming in distress "like he was fitting to die." PSOAF¶ 67. Defendant Kill asked Moser and Maslanka if they had "broken" Weston yet. PSOAF¶ 55.

Even after Defendant Kill was convinced that Weston was not "Vic Brown," the abuse continued. PSOAF¶ 56. Defendant Moser repeatedly slapped Weston and Defendant Maslanka choked him until he passed out. PSOAF¶ 59, 61 Weston defecated on himself and the officers reveled in his humiliation. PSOAF¶¶ 61, 62.

At some point during Weston's interrogation, Defendants learned that the gun used in the Sims' homicide matched the gun used in the May 29 shootings. PSOAF¶ 46 Weston testified that Defendants began questioning him about the May 29 shootings—yet another crime that he knew nothing about. As a result, Defendants Moser and Maslanka provided him with information about the May 29 shooting of Joseph Watson. PSOAF¶¶ 57, 63, 64. This included showing Weston Macklin's statement, telling him about a meeting of Gangster Disciples, a "mission" for the gang, and Vic Brown carrying a .9 mm gun. PSOAF¶ 63. Moser told Weston that he (Weston) used a .22 derringer and that since "Joseph" was not killed with a .22, Weston would be free to go home. *Id.*

**Weston's False Confession**

After many hours of intense physical and psychological abuse, Weston agreed to make the statement that Moser and Maslanka had been feeding to him. Defendant Moser "drilled"

Weston on the facts before Weston's court-reported statement and even took breaks during the statement to ensure that Weston got the "facts" right. PSOAF¶ 63, 64. Defendants Moser and Maslanka's fabricated statement from Weston fit into the Hampton narrative–a group of young men including Walker and Jackson were seeking revenge against Vice Lords. Defendants Moser and Maslanka told Weston to say he had a .22 caliber weapon. PSOAF¶ 66. The court-reported statement does not reflect any questions about the Justine or Honore shootings. PSOAF¶ 65. Weston was told he would go home after that statement, but that was not the case. PSOAF¶ 57.

### Defendants' Long History of Misconduct

Demond Weston's torture was not the only time these Defendants would use coercion to elicit a false statement. Between 1980-98 at least 59 citizen filed complaints against Defendants Maslanka, Moser, and Kill, including numerous cases of physical abuse, *e.g.*, being kicked, choked, knocked to the ground, struck with nightsticks, metal clubs, flashlights, and phonebooks. PSOAF¶140.

For example, Defendant Maslanka beat Alfonso Pinex severely during his interrogation, causing Pinex to defecate on himself. PSOAF¶ 141. The special prosecutor investigating allegations of torture by CPD detectives found sufficient evidence to indict Maslanka for aggravated battery, perjury, and obstruction of justice. *Id.* For his part, Defendant Kill testified that he obtained confessions in 90% of his homicide cases, totaling about 1,500 confessions, and of those 1,500, there were allegations of use of physical force in 90% of the cases. PSOAF¶ 142. Ronald Kitchen was one example: In 1988, then-Commander Jon Burge, Defendant Kill, and others beat Kitchen into falsely confessing to a quintuple murder, hitting him in the face, chest, back and groin. PSOAF¶ 143.Kitchen was exonerated and granted a Certificates of Innocence. *Id.*

7

**The Fabricated Statement of Dwayne Macklin**

On June 9, 1990, while Defendants Moser and Maslanka were fabricating the statement of Demond Weston, Defendants Kill, Christopherson, and McWeeny interrogated Dwayne Macklin. PSOAF¶ 48, 66, Defendant Kill hit Macklin several times (including with something akin to a phone book). PSOAF¶ 48. Defendant Kill also showed Macklin a gun with rubber bands on it, explaining that they represented "[n words] I shot." *Id.* Defendant Kill told him exactly what to say to implicate Demond Weston in the May 29 shootings. *Id.* Macklin did not know anything about the shootings and had no idea who committed them. *Id.* After being abused, Macklin provided the statement implicating Weston that Defendant Kill had told to him. *Id.* None of the coercion that was used to induce Macklin into making a false and fabricated statement was ever disclosed to the prosecutor. PSOAF¶ 115.

**The Fabricated Statement of Nathaniel McCurine**

On July 14, 1990, Defendants Moser and Kill brought Nathaniel McCurine back to the police station and began re-interrogating him about the May 29 shootings. PSOAF¶ 79. Defendants told McCurine he would be charged with the murder unless he gave the police the story they wanted, and if he said what they wanted, he would be a witness. *Id.* He had never heard of Weston before and could not read or write at the time. PSOAF¶ 81. He signed a statement implicating Weston. PSOAF¶ 80. He also implicated Dwayne Macklin and "Vic Brown" for the first time. *Id.* McCurine never knew who committed the May 29 shootings and simply said what he was told to say. PSOAF¶ 29. Defendants' coercion of McCurine—both on June 6 and again on June 14—was never disclosed to the prosecutor. PSOAF¶ 115.

Hampton, Walker, Jackson, and McCurine never knew Weston before they were charged with him for the May 29 shootings. PSOAF¶ 84. They considered him to be from a completely

8

different neighborhood. *Id.* Weston is not mentioned in the summaries of any police interviews before he was seized on June 9, 1990. *Id.*

**The Fabricated Lineup Identification from Deneen Coats**

Deneen Coats survived the May 29 shooting, but lingered in the hospital for several weeks. PSOAF¶ 85. About a week after the shooting, police officers told her they had found the perpetrators. PSOAF¶ 92. They showed Coats photo arrays on at least two occasions. Coats picked out two photographs of individuals from a photo array and then police showed her two pictures of other individuals that they said were involved. PSOAF¶ 93. Neither photo array that Coats viewed is documented in any of the discovery in this case. PSOAF¶ 97. Nor were they otherwise disclosed to the prosecutor. *Id.*

On July 17, 1990, Deneen Coats viewed a lineup including nine individuals, five of whom were suspects in the May 29, 1990 shootings. Coats selected Weston, Smith, and Jackson. PSOAF¶ 86.

Plaintiff's eyewitness identification expert, Dr. Brian Cutler, opined that the conditions under which Coats viewed the offenders were "impoverished and increased the risk of false identification" and that the lineup identification procedures used by Defendants "were highly suggestive and enhanced the risk of false identification of Weston." PSOAF¶¶ 99, 100. For example, the lineup consisted of five suspects, each of whom were between 18 and 20 years old, and four fillers—two of those fillers were 30 years old and 32 years old respectively. PSOAF¶ 100. Coats also had not been provided any cautionary instruction before the lineup. *Id.* And, as explained above, Coats had previously been shown a photo array including suspects who later appeared in the lineup, which was highly suggestive. PSOAF ¶ 101. Indeed, doing so was Defendant Paladino's practice. PSOAF¶ 131. He invoked his Fifth Amendment right against

self-incrimination when asked whether he would show photos of suspects to victims before having victims view a lineup including the suspects. PSOAF¶ 130, 132. He also invoked his Fifth Amendment rights when he was asked if he would cover up the misconduct of Defendants Maslanka and Moser. PSOAF¶ 132.

**Evidence of an Alternative Suspect Was Withheld**

Early in the investigation, Defendants identified "Kavin McMorris" as a suspect. PSOAF ¶ 104, 112. On June 4, Defendants Paladino and Moser sent McMorris to be polygraphed by Detective Tovar (PSOAF ¶ 106); McMorris was listed as a "suspect." PSOAF¶ 112. Moser testified that before sending McMorris to be polygraphed, he would have interviewed and investigated him to develop some basis for his involvement in the crime. PSOAF¶ 113   Moser further testified that he would have memorialized that interview and investigation—either in a supplementary report or General Progress Report ("GPR"). *Id.* There is no documentation in the Investigative File about Kavin McMorris. *Id.* Indeed, the only mention of him is in the Crime Laboratory Report indicating that he failed Detective Tovar's polygraph. *Id.*

And that is not the only information that Defendants had about McMorris. After polygraphing McMorris, Detective Tovar interviewed him. PSOAF ¶112 PSOF During that interview, McMorris told Tovar that a man nicknamed "Farmer Dell" confessed to committing the Watson homicide. *Id.* In particular, Farmer Dell confessed that he had shot Watson in the head. *Id.* For his part, Detective Tovar testified that he would have shared that information with Defendant Moser—who sent McMorris for the polygraph—but there is no documentation of it in the Investigative File. PSOAF¶ 113.

Moreover, Tovar learned from McMorris that his nickname was "Shank." PSOAF¶ 107. This, too, was withheld from the Investigative File. *Id.* That nickname was important because a

separate witness had implicated "Shank"—along with Hampton, McCurine and Darin Laws—in the crime. PSOAF ¶ 104. By Defendants' own admission, that information was recorded in a "street file." Defs SOF ¶101.

"Street Files" were files the detectives kept for investigative information that did not always make it into official reports. PSOAF¶¶ 134, 135. Information about alternative suspects was the kind of information that was kept in the street file. PSOAF¶ 134.

The City was notified of its street file problem in 1982 when an officer reported that there were investigative reports about an alternative suspect that was in the street file that had never made it into an official report and disclosed to the criminal defendant. PSOAF¶ 135. In 1987, a jury returned a *Monell* verdict against the City in George Jones's case for its street file practice that caused the withholding of exculpatory information, including exculpatory information pointing to an alternative suspect. *Jones v. City of Chicago*, 856 F.2d 985, 959-96 (7th Cir. 1988). While the City subsequently took measures to try to eliminate its street file practice, that practice continued. *See, e.g., Fields v. City of Chicago*, No. 10 C 1168 (jury finding that the City had a street file practice in 1983-1989 and 1999-2006 or 2009); *Fields v. City of Chicago*, 981 F.3d 534, 563 (7th Cir. 2020); PSOAF¶¶ 137, 138.

### Court Proceedings

Weston told his criminal defense attorney about the abuse and that his statement was false. PSOAF¶ 116. But Weston's attorney told him that the judge would not believe the extent of the abuse Weston described. *Id.* His attorney filed a motion to quash arrest and suppress the statement, but at the hearing only asked Weston about the circumstance of the arrest. *Id.* At trial, Weston testified that he was innocent. PSOAF¶ 117.  He answered a few questions about how he

11

was treated by the detectives, but his attorney told him not to elaborate or offer details, and he followed his attorney's advice. *Id.*

The evidence against Weston relied on Hampton's testimony, which tracked Defendants' false story about the "wrecking crew." PSOAF¶ 118. In addition, the prosecution used Weston's fabricated statement inculpating himself in the Watson shooting. *Id.* Finally, the prosecution also introduced Coats' testimony. *Id.* Coats not only identified Plaintiff as one of the shooters but also testified that she selected him before ever speaking to Defendants about the lineup. PSOAF¶ 120. She likewise omitted that she had ever been shown a photo array and claimed to have recognized Plaintiff from the crowd of people who approached her porch, again with no reference to the photo array. PSOAF¶ 120.

### Plaintiff's Conviction Is Vacated

Never giving up hope on proving his innocence, on December 18, 2019, Plaintiff's conviction was vacated. PSOAF¶ 123. The special prosecutor appointed to the case acknowledged that the State would not be able to meet its burden if the case were retried. *Id.*

### LEGAL STANDARD

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Under familiar principles, the Court adjudicating a summary judgment motion views the evidence and draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On summary judgment, the Court may not make credibility determinations, weigh the

12

evidence, or decide which inference to draw from the facts; those are jobs for a factfinder.

*Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (citation omitted).

**ARGUMENT**

**I.      The Testimony of Susan Swanson is Admissible**

As an initial matter, Defendants argue throughout their brief that Plaintiff cannot rely on Susan Swanson's testimony to rebut the propriety of Coats' identification of Plaintiff. Coats' identification is flawed irrespective of Swanson's testimony: as described above, even on paper, the lineup was improperly suggestive because it included five suspects, and Coats was given no admonishments. But Swanson's testimony further undermines its reliability: Coats described to Swanson being shown photographs multiple times prior to viewing a lineup (with no attendant documentation) and being told by Defendants two of the offenders that she should pick. PSOF ¶¶ 92, 93, 97. That testimony torpedoes the lineup.

As a result, Defendants are seeking to bar Swanson's testimony on this score, claiming that it is inadmissible hearsay. However, it falls under at least two exceptions to hearsay. First, Coats's statements to Swanson fall under Federal Rule of Evidence ("FRE") 804(b)(3) because they were against Coats' interest, potentially exposing her to perjury charges. Second, Coats' statements are admissible under Rule 807 because they are supported by sufficient guarantees of trustworthiness and are more probative than any other evidence on this score.

**A.      Swanson's Testimony is Admissible Under FRE 804(b)(3)**

Coats' description of Defendants' manipulation of her identification satisfies FRE 804(b). Under this hearsay exception, the proponent of the evidence must demonstrate that: 1) the declarant is unavailable to testify (FED. R. EVID. 804 (a)); and 2) the statement is one that "a reasonable person in the declarant's position would have made only if the person believed it to

be true because, when made, it . . . had so great a tendency to invalidate the declarant's claim against someone else or expose the declarant to . . . criminal liability." FRE 804(b)(3). *See Whitlock v. Brueggmann*, 682 F.3d 567, 575 (7th Cir. 2012) (noting that witness Herrington's "out-of-court statement[]" recanting his trial testimony "would be admissible . . . because his death makes him unavailable, Fed. R. Evid. 804(a)(4), and his recantation is a statement that exposes him to perjury charges . . . .").

The exception applies to Deneen Coats who, in providing a statement recanting her trial testimony, exposed herself to criminal liability for perjury.  720 ILCS § 5/32-2 (West 2021) (perjury statute). Coats' statements to Swanson directly cast doubt on her testimony at Plaintiff's criminal trial that she recognized Plaintiff from seeing him the night of the incident (versus because Defendants had pointed his picture out to her) and that she did not "communicate" with police officers before she made her identifications. PSOAF¶ 120.

*Hampton v. City of Chicago*, No. 12-CV-5650, 2017 WL 2985743(N.D. Ill. July 13, 2017), is instructive here. In *Hampton*, a young woman was attacked at a concert and later made identifications from a photo array and lineup. The parties disputed whether the woman had identified the plaintiff based on her own observation or as a result of the Area Three detective's use of suggestive techniques during a photo array. *Id.*, at *4. At the motion to suppress and trial, the woman testified to her identification (*id.* at 7-8), but years later when she was interviewed by a prosecutor preparing for a retrial, she described the detectives' use of suggestive techniques and was not sure of her identification. *Id.* at 10. By the time of the civil suit, the witness no longer remembered being subjected to manipulative identification techniques in the photo array, and did not believe she had been pressured, but didn't deny making statements about it to the prosecutor. *Id.* at 12. The court considered whether the statements that the witness had made to

14

the prosecutor preparing for retrial, which had been reduced to a report, were an exception to hearsay as against her penal interest. *Id.* The court concluded that the witness' statements were against penal interest because she could have been exposed to perjury charges for her identification of the plaintiff at his criminal trial and for her testimony at the motion to suppress that the police officer had not said anything to her during the photo array. *Id.* at 13.

The same circumstances apply here: Coats made a statement to an investigator many years after the crime and criminal proceedings suggesting she was subject to manipulative tactics from a detective who both showed her photographs before the lineup and told her two of the offenders to pick. PSOAF¶¶ 92, 93. Like the witness in *Hampton,* Coats' statements about who shot her were certainly material to the case. She specifically identified Plaintiff as someone she recalled seeing in the crowd of shooters and testified that she made her identification from the lineup before communicating with police. PSOAF¶¶ 120. That testimony is obviously misleading and false if, as she told Swanson, she had actually communicated with Defendants Paladino and Maslanka in advance of the lineup and was shown two individuals that Defendants claimed were responsible. PSOAF¶¶ 92, 93

Nothing in *Brown v. City of Chicago*, 633 F. Supp. 3d 1122, 1162 (N.D. Ill. 2022), changes that calculus. *Brown* held that the requirements of Rule 804 (3)(b) had not been met because the statute of limitations on perjury charges for the trial testimony had run by the time the declarant made his statement. *Id*. However, that case ignored that a declarant could be charged with perjury not for the trial testimony years before–a prosecuting authority is unlikely to prosecute someone for the very testimony the State presented decades earlier–but for the recanting statement.[3] The declarant's fear of being charged with perjury for the recantation is

---

[3] *See, e.g., Former Judges, Ex-Prosecutors Urge Alvarez to Drop Perjury Case,* May 5, 2014 *https://www.cbsnews.com/chicago/news/former-judges-ex-prosecutors-urge-alvarez-to-drop-*

what the Seventh Circuit noted in *Whitlock*, 682 F.3d at 575. Moreover, the rationale behind the rule is that the statement is considered trustworthy because the declarant fears prosecution, not whether the declarant is correct about nuances like a statute of limitations. *See United States v. Battiste*, 834 F. Supp. 995, 1006 (N.D. Ill. 1993) (the element of risk to the declarant is the rationale behind the reliability of declaration against penal interest). Because Coats had reason to fear prosecution when she made her statements, her statements were against her penal interests.

Defendants may argue that since Coats' statement to Swanson was not under oath, she need not have feared perjury charges. That argument is a nonstarter as courts have repeatedly held that it need not be present to satisfy FRE 804(b)(3). *See, e.g., Hampton*, 2017 WL 2985743, at *10 (victim's statement nearly two decades after her initial testimony was made during unsworn interview with a prosecutor); *Ott v. City of Milwaukee*, No. 09-C-870, 2015 WL 1219587, at *4 (E.D. Wis. Mar. 17, 2015) (court found statements that a prosecution witness made to his sister prior to his death to satisfy FRE 804(b)(3)).

While FRE 804(b)(3)(B), which requires corroborating circumstances supportive of trustworthiness, applies only to criminal cases, it is noteworthy that there is ample corroboration for Coats' statement. Investigator Swanson took detailed notes of her conversation with Coats, recording everything, regardless of whether it was positive or negative for her client. PSOAF¶ 94. Swanson was also deposed and read through the notes line by line and answered questions about the circumstances of the statement. PSOAF¶ 96. Accordingly, the circumstances support trustworthiness.

Furthermore, there is independent evidence supporting the statement. Defendant Paladino invoked his Fifth Amendment rights against self-incrimination when asked whether he would

---

*perjury-case/.* (last accessed Feb. 4, 2025) (describing a witness who recanted his previous identification and was promptly charged with perjury).

show victims photo arrays of suspects before showing them a lineup containing those suspects and whether he did so as a matter of practice. PSOAF¶ 131. A jury could infer that he followed his general practice in this case and told Coats whom to select. *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 835 (7th Cir. 2016) (adverse inference instructions permitted).

Finally, all the other fabrications of evidence in this case corroborate Coats' statement. Defendants had already fabricated statements from Hampton, Macklin, Weston, and McCurine (PSOAF¶¶ 18-21, 29-30, 48, 63-68) but did not have any statements directly describing the second or third shootings in the series (*id.)*, so tainting Coats' identification is hardly far-fetched.

**B.      Swanson's Testimony is Admissible Under FRE 807**

Even if Coats's statements are not considered "against her interest," her statements are admissible under Rule 807. To qualify under the residual exception to the hearsay rule, the statement must "be supported by sufficient guarantees of trustworthiness," be "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts," and the proponent must provide the other side with notice of his intent to use the hearsay statement. FRE 807; *United States v. Ochoa*, 229 F.3d 631, 638-39 (7th Cir. 2000). Each of these criteria are easily satisfied.

First, the same "trustworthiness" inquiry that guides the FRE 804 analysis guides the FRE 807 analysis; and therefore, a hearsay statement that satisfies Rule 804(b)(3)'s trustworthiness criteria also satisfies Rule 807. *See Ochoa*, 229 F.3d at 638-39. As such, for the reasons identified above, Coats' statements to Swanson were trustworthy.

Second, the statements are indisputably material; whether Coats' identification was untainted (as she testified to at Plaintiff's criminal trial) or the product of police manipulation (as

she told Swanson) is hotly contested. Resolution of that issue determines whether her identification was fabricated and whether Defendants failed to disclose the means by which they got Coats to finger Plaintiff as the perpetrator. *See Dexia Credit Local v. Regan*, No. 02 C 8288, 2009 WL 10736163, at *2 (N.D. Ill. May 26, 2002) (probative where statement from participant in events in question). Moreover, the admission would also be in the interests of justice because Coats' death means that Plaintiff has no other way to prove this claim. *Id*. (in interests of justice where witness otherwise unavailable to testify). *See Harris v. City of Chicago*, 327 F.R.D. 199, 203 (N.D. Ill. 2018) (finding decedent-plaintiff's statement more probative than other evidence where it was the only evidence of the excessive force used); *United States v. Solomon*, No. 01-4121, 24 F. App'x 148, 152 (4th Cir. 2001) (considering need). Without Coats' statements to Swanson, Plaintiff is unfairly hampered in proving his case—inviting a windfall for Defendants, potentially insulating them from liability for their due process violations. *See Ott*, 2015 WL 1219587, at *5 ("Without some testimony about how Gwin's police statement was allegedly procured, the jury will be left with an incomplete view of Gwin's statement and testimony."); *see also Fox v. Hayes*, 600 F.3d 819, 840 (7th Cir. 2010).

Third, Plaintiff is giving notice by filing this motion (as he did by listing Swanson as a witness and disclosing documents in her possession) that he intends to use this evidence.

## II. Summary Judgment on Plaintiff's Coerced Confession Claim is Not Warranted

Defendants move for summary judgment as to Plaintiff's Fifth Amendment coerced confession claim. Defendants make four barebones arguments, with little to no citation to any case law—likely because there is none supporting them.

First, Defendants argue that because Plaintiff included the word "fabricated" to describe his confession in his Complaint, he has somehow turned his Fifth Amendment coerced

18

confession claim into a Fourteenth Amendment fabrication claim. Defendants do not dispute that Plaintiff properly pled that his confession was involuntary and used against him at trial; only that Plaintiff also stated that the confession was fabricated by Defendants. This argument has no merit: a confession can be both involuntary and fabricated. *See*, *e.g.*, *Hernandez v. Guevara*, No. 23 CV 15375, 2024 WL 4299046, at *10 (N.D. Ill. Sept. 26, 2024) ("Hernandez has stated coerced confession and fabricated evidence claims against McGuire.").

Second, Defendants argue that Plaintiff can only receive nominal damages for his Fifth Amendment claim because its introduction was purportedly harmless. Apart from citing *Arizona v. Fulminante*, 499 U.S. 279 (1991), for the proposition that the introduction of a coerced confession at trial is subject to harmless error review, Defendants do not elaborate on how the introduction of Plaintiff's coerced confession fits this standard. Any argument on that has therefore been waived. *Tuduj v. Newbold*, 958 F.3d 576, 579 (7th Cir. 2000) ("arguments not raised in an opening brief are waived"). Regardless, as described above, the introduction of Plaintiff's confession was not harmless and the damages to him are not nominal.

Third, Defendants argue that the Fifth Amendment coerced confession claim is duplicative of Plaintiff's fabrication claim, but their argument is unclear. To the extent they are arguing that the claims are the same, even a cursory analysis of the elements of each claim belies such an argument. *See*, *e.g.*, *Hernandez*, 2024 WL 4299046, at *8 (describing the different elements of fabrication, coerced confession and substantive due process claims). To the extent that Defendants are arguing that because Plaintiff cannot recover twice for the same injury—his wrongful incarceration—that uncontroversial proposition does not mean that Plaintiff cannot bring multiple claims. Indeed, Defendants cite absolutely no law for such a claim.

19

Fourth, and finally, in a single sentence and without a single citation, Defendants argue that the prosecutor's decision to introduce Plaintiff's confession at trial breaks the causal chain. *See United Central Bank v. Davenport Estate LLC*, 815 F.3d 315, 318 (7th Cir. 2016) (failure to "cite any applicable legal authority or provide support" results in waiver). The only way Defendants could have broken the causal chain here was if they disclosed their coercion to the prosecutor. *See Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001) ("If *officers* are not candid with prosecutors, then the prosecutor's decisions—although vital to the causal chain in a but-for sense—are not the important locus of action.") (emphasis added); *Jones*, 856 F.2d at 993 ("[T]he jury could find that Defendants systematically concealed from the prosecutors, and misrepresented to them, facts highly material—that is, facts likely to influence the decision whether to prosecute Jones and whether . . . to continue prosecuting him . . . ."). Defendants did not do so, and therefore, cannot escape liability here.

## III. A Jury Must Decide Plaintiff's Substantive Due Process Claim

Defendants also seek summary judgment on Plaintiff's substantive due process claim. Defendants do not challenge the substance of Plaintiff's claim; that is, that Plaintiff's allegations, if credited, set forth conduct that violates Plaintiff's substantive due process rights. Any argument on that score has been waived. *See Tuduj*, 958 F.3d at 579. Instead, Defendants argue that a substantive due process claim is not cognizable because the conduct about which Plaintiff complains arises under the Fourth—not Fourteenth—Amendment and is time barred. Neither argument has merit.

### A. The Supreme Court Has Recognized a Fourteenth Amendment Substantive Due Process Claim

To start, Defendants argue that "redress is in the Fourth Amendment"—not the Fourteenth—citing *Graham v. Connor*, 490 U.S. 386 (1989). Dkt. 289-2 at 31-32. This argument

strains any credible reading of the Supreme Court's decision in *Chavez v. Martinez*, 538 U.S. 760 (2003), and the courts' subsequent interpretation of it. To that end, Defendants quote from Justice Souter's concurring opinion in *Chavez* stating that a claim challenging the police officers' use of certain interrogation tactics "if it is to be recognized as a constitutional one that may be raised in an action under § 1983, must sound in substantive due process." *Id*. at 779; *see* Dkt. 289-2 at 33. Defendants then argue that this concurrence invites the courts to consider whether the "claim is cognizable under" other legal theories, including the Fourth Amendment. *Id*. This is nonsensical. The plain language that Defendants quote explains that such a claim "must sound in substantive due process." *Chavez*, 538 U.S. at 773.

On that score, a majority of the Court appears to agree. Justice Thomas' plurality opinion (joined in relevant part by Justices Rehnquist, O'Connor and Scalia) states the same. That opinion indicates that the Court's views on the proper scope of the Fifth Amendment's Self-Incrimination Clause do not render police torture or abuses causing a confession constitutionally permissible so long as the statements are not used at trial; it simply means that the Fourteenth Amendment's Due Process Clause, rather than the Fifth Amendment's Self-Incrimination Clause governs the inquiry in those cases and provides appropriate relief. *Id*. at 773.

Indeed, for that reason, the Court remanded the case, holding that "[w]hether [the plaintiff] may pursue a claim of liability for a substantive due process violation is thus an issue that should be addressed on remand, along with the scope and merits of any such action that may be found open to him. *Id*. at 779-80 (Souter, J. announcing the opinion of the Court). On remand, the Ninth Circuit found that the plaintiff's allegations—that he was "brutally and incessantly questioned" after being "shot in the face, back and leg" and defendants "interfered with his medical treatment while he was screaming in pain . . . and going in and out of consciousness"—

set forth a substantive due process claim. *Martinez v. City of Oxnard*, 337 F.3d 1091, 1092 (9th Cir. 2003) (internal quotations omitted); *see also id.* (finding that interrogation tactics violated plaintiff's clearly established substantive due process rights under the Fourteenth Amendment).

Since *Chavez*, the courts have consistently treated a claim challenging the interrogation tactics as one that arises under the substantive due process clause of the Fourteenth Amendment, including in this Circuit. As the Seventh Circuit held, "we have acknowledged that a free-standing due process claim may succeed in a situation involving conscience-shocking interrogation tactics." *Fox*, 600 F.3d at 841 (citing *Wallace v. City of Chicago*, 440 F.3d 421, 429 (7th Cir. 2006)); *see also Cooper v. Dubnik*, 963 F.2d 1220, 1223 (9th Cir. 1992) (finding police violated suspect's substantive due process rights when they "ignored Cooper's repeated requests to speak with an attorney, deliberately infringed on his constitutional right to remain silent, and relentlessly interrogated him in an attempt to extract a confession"); *Harris v. Bornhorst*, No. 5:03-CV-1827, 2014 WL 7340519, at *16 (N.D. Ohio Aug. 13, 2014) (finding substantive due process violation where interrogation involved deception, fabrication of evidence, false promises of leniency and suspect was fed information about crime); *Hall v. Idaho Dep't of Fish & Game*, No. 2:11-CV-0062, 2013 WL 2458537, at *12 (D. Idaho June 6, 2013) ("An interrogation which shocks the conscience typically involves physical or psychological abuse."). Defendants' argument requires this Court to ignore this well-settled law and therefore should be rejected.

**B.     Plaintiff's Claim is Timely**

In the alternative, Defendants argue that Plaintiff's substantive due process claim is time barred. Citing to *Moore v. Burge*, 771 F.3d 444 (7th Cir. 2014), and *Johnson v. Winstead*, 900 F.3d 428 (7th Cir. 2018), Defendants argue that because Plaintiff's substantive due process claim is akin to an excessive force claim under the Fourth Amendment, he could have sued as soon as

22

the torture was complete—back in 1990. That argument, however, ignores the ways in which the torture, if proven, would have invalidated Plaintiff's conviction and the guidance in analyzing whether a claim is *Heck*-barred provided in *McDonough v. Smith*, 588 U.S. 109 (2019). Indeed, this Court questioned whether *Moore* and *Johnson* could survive *McDonough*, as have other courts in this district. *Weston*, 2021 WL 2156459 at *4-5; *Savory v. Cannon*, 532 F. Supp. 3d 628, 635-36 (N.D. Ill. 2021); *see also Brown v. City of Chicago*, No. 18 C 7064, 2019 WL 4694685, at *5 (N.D. Ill. Sept. 26, 2019) (reasoning that *Johnson* was "in tension" with *McDonough* and the cases "cannot readily be reconciled" so *Johnson* must give way). The answer, as described more fully below, is no.

### 1. Plaintiff's Allegations, if Proven, Would Impugn the Validity of His Conviction

Under *Heck v. Humphrey*, "in order to recover damages for allegedly unconstitutional conviction or imprisonment," a plaintiff has to prove that his conviction has been invalidated. 512 U.S. 477, 486 (1994). This favorable termination requirement applies "whenever a judgment in favor of the plaintiff would necessarily imply" that his prior conviction was invalid. *Id*. at 487. If it would, then accrual of the claim is deferred until favorable termination of those proceedings. *McDonough*, 588 U.S. at 117-18. This is a case-specific inquiry governed by the particular facts and claims in the case. *Okoro v. Callaghan*, 324 F.3d 488, 490 (7th Cir. 2003).

Here, Plaintiff's substantive due process claim revolves around allegations that he was tortured: he was physically abused, including being hit in the body, slapped in the face and choked to the point of unconsciousness after which he defecated on himself; he was threatened, including Defendants telling him that no one knew where Plaintiff was so they could do whatever they wanted, including "kill [him]," and he was repeatedly fed information about the crime. PSOAF ¶¶ 49-67. If those allegations were proven true, there is no serious doubt that

23

Plaintiff's confession—the lynchpin of the State's case against him—would have been suppressed. *Fulminante*, 499 U.S. at 288 (physical abuse and psychological threats are coercive). "A confession is like no other evidence. Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." *Id.* at 292 (internal quotations and citation omitted). As such, that suppression—particularly given the extreme misconduct by Defendants—would have impugned the validity of Plaintiff's conviction.

The only evidence used to convict Plaintiff of the Watson homicide was his false confession and Hampton's coerced and fabricated statements. PSOAF¶ 118 In other words, Plaintiff could not have brought this claim before his conviction was vacated. *McDonough*, 588 U.S. at 117-18; *see also Gonzalez v. City of Waukegan*, 220 F. Supp. 3d 876, 886-87 (N.D. Ill. 2016) (finding *Heck* barred coerced confession claim until conviction was overturned where plaintiff was convicted on confession plus an eyewitness identification); *Patterson v. Burge*, 328 F. Supp. 2d 878, 896-97 (N.D. Ill. 2004) (explaining that since the plaintiff's conviction rested on his involuntary confession and the "coerced testimony of a 16 year old girl, the court concludes that Patterson could not have challenged defendants' act of torturing and fabricating his confession without necessarily implying the invalidity of his conviction"); *Howard v. City of Chicago*, No. 03 C 8481, 2004 WL 2397281, at *7 (N.D. Ill. Oct. 25, 2004) ("Since Howard's conviction rested almost entirely on his involuntary confession plus the alleged coerced witness testimony, we conclude that Howard could not have challenged Defendants' acts of torturing him and fabricating his confession without necessarily implying the invalidity of his conviction").

### 2. Defendants' Arguments Are Meritless

Nothing in Defendants' brief changes this calculus. First, to the extent Defendants are arguing that Plaintiff could have brought his substantive due process claim earlier because it is

akin to a Fourth Amendment claim, that contention falls flat. There is no bright line rule that excessive force claims can co-exist with an extant conviction. To the contrary, the Seventh Circuit has repeatedly found that plaintiffs are *Heck*-barred from bringing excessive force claims because their associated convictions have not been overturned. *See*, *e.g.*, *Helman v. Duhaime*, 742 F.3d 760, 763 (7th Cir. 2014); *Evans v. Poskon*, 603 F.3d 362, 364 (7th Cir. 2010); *Okoro*, 324 F.3d at 490.

Second, nothing in *Johnson* or *Moore* warrants finding that Plaintiff's substantive due process claim is time barred. In *Johnson*, the plaintiff sued two police officers alleging that his Fifth Amendment rights were violated when Defendants failed to give him *Miranda* warnings. *Johnson*, 900 F.3d at 431. The plaintiff was twice tried; the first trial was reversed by the appellate court on an instructional error and the second was reversed for insufficient evidence. *Id*. *Johnson* held that claims for violation of the Fifth Amendment from the first trial were time-barred because more than two years had passed since the appellate court reversed that conviction; claims for the same misconduct at the second trial, however, were timely. *Id*. at 432.

Numerous courts in this district have held that *Johnson* is in direct tension with and therefore was overruled by *McDonough*. *See Dukes v. Washburn*, 600 F. Supp. 3d 885, 896 (N.D. Ill. 2022); *Savory*, 532 F. Supp. 3d at 635; *Ochoa v. Lopez*, No. 20-cv-02977 2021 WL 4439426, at *4 (N.D. Ill. Sept. 28, 2021) (agreeing that "*Johnson* cannot be reconciled with *McDonough*"); *Brown*, 2019 WL 4694685, at *5 (same).

Nor are Defendants on any firmer footing with *Moore.* In *Moore*, individuals who were still incarcerated and serving sentences for convictions they alleged were obtained by torture sought to avoid the *Heck* bar by arguing that misconduct and attendant injuries occurred "before

judicial proceedings began." *Id*. at 446. Notwithstanding its recitation of *Heck*'s deferral rule, *Moore* found that plaintiffs' physical abuse claims accrued at the time of plaintiffs' abuse. *Id*.

*McDonough* put to rest whatever force *Moore* might have had. In *McDonough*, the plaintiff alleged that Defendants fabricated evidence and used that evidence against him in two separate trials; the first resulted in a mistrial and the second in an acquittal. *McDonough*, 580 U.S. at 113. The Supreme Court held that the plaintiff's fabricated-evidence claim did not accrue "prior to favorable termination of his prosecution." *Id*. at 117. The Court's decision was based on many of the same pragmatic considerations that animated the *Heck* doctrine, including: the risk of "conflicting civil and criminal judgments" and "collateral attacks on criminal judgments through civil litigation." *Id*. at 117-18. Additionally, *McDonough* explained that a contrary approach requiring plaintiff to sue as soon as he learned of the fabrication would "create practical problems" by imposing on criminal defendants an "untenable choice between (1) letting their claims expire and (2) filing a civil suit against the very person who is in the midst of prosecuting them." *Id*. at 120.

*Moore* did not anticipate any of *McDonough*'s concerns, let alone explain how the misconduct at issue there did not imply the invalidity of a conviction beyond stating that "the misconduct is actionable whether or not a suspect confesses, and whether or not any statement is used in trial." *Moore*, 771 F.3d at 446. That may be true, but it of course does not answer the question in a particular case where the confession was used; or account for the ramifications of a separate civil lawsuit when such a statement is taken and introduced in criminal proceedings. On that score, *McDonough* clearly holds that the claim does not accrue until favorable termination.

      **C.**      **Moser, Maslanka and Kill Personally Participated in the Coercion**

Defendants concede that Moser, Maslanka and Kill each participated in coercing Plaintiff's confession. Plaintiff pursues his substantive due process claim only against these three Defendants, mooting Defendants' argument that he cannot sue others. Doc. 289-2 at 35.

## IV. A Jury Must Decide Plaintiff's Fourteenth Amendment Due Process Claim

Plaintiff has alleged a single due process violation: he can prevail under either a theory that Defendants fabricated evidence or suppressed exculpatory and/or impeachment evidence in violation of *Brady. See Goudy v. Cummings*, 922 F.3d 834, 838 (7th Cir. 2019) (various theories support single claim that plaintiff received unfair trial in violation of his due process rights). The Seventh Circuit instructs that once it is established at summary judgment that a trial is required on due process theories, the court "need not and do[es] not address [the plaintiff's] allegation that the alleged [additional theory of liability] independently constituted a basis for liability"). *Id.* at 844; *see also Camm v. Faith*, 937 F.3d at 1108-09 (single *Brady* claim alleging suppression of three categories of evidence). Accordingly, once Plaintiff has prevailed on one of his due process theories at this stage, the Court need not parse out the separate sub-theories to determine if his right to fair trial claim must proceed to trial.

### A. Plaintiff's Fabrication of Evidence Theory Must Proceed to Trial

The Supreme Court and Seventh Circuit "have consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty in some way." *Avery v. Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017) (citation omitted); *Whitlock*, 682 F.3d at 580. Plaintiff has adduced several fabricated pieces of evidence used to deprive him of his liberty including the fabricated statements of Hampton, Macklin, and McCurine and Plaintiff's fabricated confession.

1. **There is No Requirement to Show the Prosecutor "Knowingly" Introduced False Evidence**

27

Defendants argue that Weston's fabrication theory fails because "Weston cannot show that the prosecutor knowingly introduced false evidence at trial" (Dkt. 289-2), but there is absolutely no law in the Seventh Circuit (or anywhere else) requiring a Plaintiff to show that the prosecutor "knowingly" introduced false evidence in order to prevail on a due process claim against police officers. Defendants cite *Petition of Sawyer*, 229 F.2d 805, 809 (7th Cir. 1956). Dkt. 289-2 at 14-15. That case does not concern violations of constitutional rights by police officers, nor does it impose on Plaintiff some additional burden in this case to show that the prosecutor knew Defendants fabricated evidence. It is entirely irrelevant.

### 2. A Jury Could Find Defendants Paladino and Kill Fabricated Hampton's Statement

Defendants do not even address the fabrication of Hampton's statement, notwithstanding the fact that Plaintiff has maintained throughout discovery that fabrication of police reports and witness statements were part of the fabrication of evidence in this case. Any contention otherwise, therefore, has been waived. Regardless, Hampton's fabricated statement provided the context and background necessary to explain the supposed motive for the May 29 shootings. PSOAF ¶¶ 18-23, 29, 66. Defendants do not contest, nor could they, that there is evidence that Hampton's statement was fabricated. Dkt. 289-2. Nor can there be any dispute that Hampton's fabricated statements, which were memorialized in Defendants' reports, were a centerpiece of the evidence presented against Weston at trial. PSOF ¶ 118.[4]. Accordingly, a jury could find that in fabricating Hampton's statement, Defendants Paladino and Kill deprived Plaintiff of his right to a fair trial.

---

[4] Plaintiff's interrogatory responses, included as Defendants Ex. 55, make clear that Plaintiff has maintained throughout discovery that fabrication of police reports and witness statements were part of the fabrication of evidence in this case.

28

### 3. A Jury Could Find Defendants Kill, Christopherson, and McWeeny Fabricated Macklin's Statement

Defendants Kill, Christopherson, and McWeeny fabricated the statements attributed to Macklin. PSOAF ¶48. Macklin's court reported statement set forth a number of the facts which ASA Lambur then recited to the judge in order to obtain the signed criminal complaint for the murder of Joseph Watson. Def. Ex. 23. Defendant Kill testified about Macklin's statements at the motion to quash arrest. PSOAF ¶43. Defendants argue that Maklin's and McCurine's fabricated statements do not support a due process claim because they were not used against Plaintiff at trial. Dkt. 289-2 at 12. Not so. The Seventh Circuit has rejected the argument that evidence needs to be admitted in a proceeding to state a due process fabrication claim, finding it sufficient that the evidence "furthered the prosecution" or deprived the plaintiff of liberty "in some way." *See Anderson v. City of Rockford*, 932 F.3d 494, 510 (7th Cir. 2019) (for fabrication "plaintiffs must demonstrate not only that defendant officers created evidence that they knew to be false, but also that the evidence was used *in some way* to deprive them of liberty") (emphasis added, internal quotations and citations omitted); *Hurt v. Wise*, 880 F.3d 831, 843 (7th Cir. 2018), *partially abrogated on other grounds* by *Lewis v. City of Chicago*, 914 F.3d 472, 475 (7th Cir. 2019) (if a plaintiff "can show that the fabricated police reports furthered the prosecution, they have done enough."); *Avery*, 847 F.3d at 439; *Whitlock*, 682 F.3d at 580 ("officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in *some way*") (emphasis added).

Macklin's fabricated statement, and the police report repeating that fabrication, "furthered" the prosecution and deprived Plaintiff of his liberty "in some way" because it was one of the principle bases for Weston's indictment. *Fields v. Wharrie*, 740 F.3d 1107, 1112 (7th Cir. 2014) ("Fields II") ("[T]he fabrication of evidence harmed the defendant before and not just

29

during the trial, because it was used to help indict him."); *Julian v. Hanna*, 732 F.3d 842, 847

(7th Cir. 2013) (fabrications of evidence affect liberty interests both before and after conviction);

*Jones*, 856 F.2d at 993-94 (police officers can be liable when they "deliberately supplied

misleading information that influenced the decision" of the prosecutor to pursue the case); *see*

*also Halsey v. Pfeiffer*, 750 F.3d 273, 289, 294 n.19 (3d Cir. 2014) (defendant has suffered an

injury when fabricated evidence is used to initiate a prosecution or obtain criminal charges);

*Gregory v. City of Louisville*, 444 F.3d 725, 741 (6th Cir. 2006) (officer's investigatory notes

"were the result of pretrial fabrication efforts by [the officers]," and "comprise[d] part of the

documentary record before the prosecution and defense and affected the course of the criminal

proceedings independent of any testimony to the notes' contents…. Their very existence, even if

not introduced as evidence at trial, affected Plaintiff's criminal prosecution independent of the

officers' testimony."); *Patrick v. City of Chicago*, 2018 WL 3438942, at *8 (N.D. Ill. July 17,

2018) (finding "Defendants' contention that the fabricated evidence must be used at trial in order

to establish a constitutional violation . . . unpersuasive"). Accordingly, Plaintiff can prevail on

their fabrication claim if the evidence "furthered" their prosecution in some way. *Whitlock*, 682

F.3d at 582; *Id*.

Nothing in Defendants' citation to *Moran v. Calumet City*, 54 F.4th 483 (7th Cir. 2022)

or *Patrick v. City of Chicago*, 974 F.3d 824 (7th Cir. 2020), changes this calculus. *Moran* is

largely devoid of analysis on the operative issue; in two-sentences, it disposed of the plaintiff's

fabrication claim, citing *Patrick* and finding that because a particular piece of fabricated

evidence was not introduced at trial, it was not material. *Moran*, 54 F.4th at 499.

Regardless, Defendants' argument has no merit. Before *Patrick*, the Seventh Circuit

decided *Whitlock*, *Avery*, *Hurt*, and *Anderson*, all of which held that "a police officer who

30

manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in *some way*." *Whitlock*, 682 F.3d at 580 (emphasis added); *See also Anderson*, 932 F.3d at 510; *Hurt*, 880 F.3d at 843; *Avery*, 847 F.3d at 439. *Patrick* did not address that "consistently-held" line of cases, nor did it change or overrule them. Instead, without mentioning any of them, *Patrick* held that the jury instruction in *Patrick* was incomplete (but ultimately harmless error) because it did not include a requirement that the fabricated evidence be material and be introduced in the criminal trial. *Patrick*, 974 F.3d at 835. The sole citation *Patrick* offered for that ruling was the Seventh Circuit Pattern Instruction 7.14, which notably itself does not require that evidence be introduced in a criminal trial: it can also simply be introduced *in a criminal case*. Seventh Circuit Pattern Inst. 7.14.

It is well settled that one panel of the Seventh Circuit (*Patrick*) cannot overrule another panel, let alone four such panels (*Whitlock*, *Avery*, *Hurt* and *Anderson*).[5] *See Williams v. Chrans*, 50 F.3d 1356, 1368 (7th Cir. 1995); *Brooks v. Walls*, 279 F.3d 518, 522 (7th Cir. 2002). *Patrick* did not propose to overrule any decision (nor did *Moran*), and the *Patrick* panel did not circulate its opinion to the full court before release. *Id*. So *Whitlock*, *Avery*, *Hurt* and *Anderson* remain the law of this Circuit—and they are incompatible with Defendants' claim that fabricated evidence must be used in the criminal trial to be actionable. Stated differently, "[a] fair reading of Seventh Circuit fabricated evidence jurisprudence from *Whitlock* to *Patrick*, reveals that the due process violation occurs once the material fabricated evidence is introduced 'in some way'—or more precisely, 'in his criminal case'—that results in the criminal defendant's conviction and

---

[5] Indeed, a recent trial before Judge Chang used a fabrication jury instruction with the *Whitlock*, *Avery* and *Anderson* formulation: "introduced against Plaintiff in his criminal case." *Gray v. City of Chicago, et al.*, No. 18-cv-2624 (N.D. Ill.), Doc. 535 at 29.

31

ultimately deprives him of liberty." *In re Watts Coordinated Pretrial Proc.*, No. 19-CV-1717, 2022 WL 9468206, at *6-7 (N.D. Ill. Oct. 14, 2022).

### 4. A Jury Could Find Paladino, Maslanka, and Moser Fabricated McCurine's Statement

The fabrication of McCurine's statement likewise "furthered the prosecution," because it ensured that Plaintiff could not call McCurine as a witness in his own case. *Fields II*, at 1112 (evidence used to "further" the prosecution is sufficient to show a due process violation). Defendants already had statements from McCurine by June 8, 1990, that implicated Walker, Jackson, and Smith. PSOAF¶¶ 25-29. But then they coerced Weston's statement on June 9, 1990. PSOAF ¶66. They then fabricated McCurine's July statement to make it include Weston (and Vic Brown) and, importantly for advancing the prosecution, they ensured Weston could not call McCurine to show his own confession was false. PSOAF¶¶ 79-83. Fabricating a co-defendant's confession can form the basis for a fabrication of evidence claim. *Saunders v. City of Chicago*, No. 12-CV-09158, 2014 WL 3535723, at *4 (N.D. Ill. July 11, 2014).

### 5. A Jury Could Find Kill, Moser, and Maslanka Fabricated Plaintiff's Statement

A jury could also find that Defendants knowingly fabricated Weston's false confession implicating himself in the Watson murder and attempted murder of Jones. Defendants knew that Plaintiff had consistently denied any knowledge of the May 29 shootings and that they had to supply him with all the information for his statements to the prosecutor. PSOAF¶¶ 49-68. Defendant Moser had to "drill" Plaintiff on the facts and take breaks in the statement so that Weston could get the "facts" right. PSOAF¶¶ 63, 64.

Defendants argue that since Weston and McCurine testified that they said the words attributed to them in their statements, those statements were not fabricated. But those words and

32

all the substance behind was fed by Defendants. Dkt. 289-2 at 12 ("Weston admits that the court reported statement contains his words, so the fact that Weston made the statement was not false."). This is just one more instance where Defendants fail to take the facts in the light most favorable to Plaintiff as required at summary judgment. Moreover, fact-feeding is sufficient to support a fabrication theory. *See e.g., Patrick v. City of Chicago*, 213 F. Supp. 3d 1033, 1050 (N.D. Ill. 2016) (where plaintiff and codefendants testified that they did not take part in the crimes alleged and defendants fed them details about the crimes and forced them to confess according to that narrative summary judgment on the fabrication theory was denied); *see also Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014) ("Fabricated testimony is testimony that is made up; it is invariably false. False testimony is the equivalent; it is testimony known to be untrue by the witness and by whoever cajoled or coerced the witness to give it.").

6. **Defendants Knew that the Statements From Hampton, Macklin, McCurine, Coats, and Weston were Fabricated**

Defendants contend that Weston cannot prove that Defendants "knew, with certainty" that the fabricated evidence was false. Dkt. 289-2 at 12. Proof of a defendant's intent to fabricate evidence "rarely" exists in the form of direct evidence; "knowledge and intent must often by proven by circumstantial evidence." *See, e.g., Stinson v. Gauger*, 868 F.3d 516, 527 (7th Cir. 2015) (quotation omitted); *Anderson*, 932 F.3d at 511 ("admissions of wrongdoing" are "not an everyday occurrence"). Plaintiff does not need "a smoking gun or an admission to prove knowledge." *Gray v. City of Chicago*, No. 18 C 2624, 2022 WL 910601, at *10 (N.D. Ill. Mar. 29, 2022). Rather, Plaintiff "only needs to offer sufficient evidence from which a reasonable jury could find that the Individual Defendants knew the evidence they were eliciting was false." *Id.*

*Stinson*, 868 F.3d at 527; *Winslow v. Smith*, 696 F.3d 716, 732-33 (8th Cir. 2012) (evidence that defendants systematically coached witnesses to give an account that matched the police narrative was sufficient to allow an inference that defendants manufactured false evidence).

There is ample evidence that Defendants knew they were eliciting false statements, given the coercive and violent circumstances required to do it. For example, Hampton testified that Defendants asked a question and if he gave the "wrong" answer he would be hit, but if he gave them the story they wanted, he would not be hit. PSOAF ¶19. A reasonable jury could conclude that Defendants knew the statements they were eliciting were false under these circumstances. Furthermore, the statements of Macklin, McCurine, and Weston all provide interlocking narratives to match Hampton's. PSOAF ¶¶25-29, 48, 66. The systematic use of violence and fact feeding could allow a jury to conclude that Defendants were "knew, with certainty" that they were manufacturing false evidence. *Phillips v. City of Chicago,* No. 14 C 9372, 2018 WL 1309881, at \*26 (N.D. Ill. Mar. 13, 2018) ("Gardner has testified, moreover, that Defendants told the court reporter to stop typing when Gardner gave the "wrong answer" to certain questions. This suggests something beyond mere coercion. It suggests a calculated effort to weave a complex narrative out of whole cloth. Plaintiffs' testimony, if believed, could lead a reasonable jury to infer that Defendants *knew* the confessions were false.") (emphasis in original).

Defendants make a half-hearted effort to argue that Plaintiff only alleges "coercion" of witnesses rather than "fabrication." Dkt. 289-2 at 13. But Hampton, Macklin, McCurine, and Weston were unequivocal that they knew nothing about the May 29 shootings, that they told Defendants that they knew nothing about the May 29 shootings, and that whatever information they included in their statement was a result of Defendants' fact-feeding. PSOAF ¶¶19, 25-29, 48, 49-66. Plaintiff's claim is not that it was a violation of his rights for the witnesses to be

34

coerced, but rather that the coercion was used to fabricate evidence, which did violate his rights. *See Fields*, 740 F.3d at 1112 ("The point is not that coercion is legally irrelevant; far from it—coercion (which in an extreme case could amount to torture) may be an essential tool in 'persuading; a witness to fabricate testimony."); *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (*en banc*) (explaining that "[f]abrication can also be proven circumstantially" including by defendants' use of coercion); *Serrano v. Guevara*, No. 17 CV 2869, 2020 WL 3000284, at *15 (N.D. Ill. June 4, 2020) (in denying summary judgment on a fabricated evidence claim, the court reasoned, "[a]lthough Wilda was not forced to pick a particular car, plaintiffs have some evidence that the detectives used suggestive techniques to obtain Wilda's identification of Montanez's car."); *see also White v. Smith*, 696 F.3d 740, 757 (8th Cir. 2012) (allowing a § 1983 fabrication claim to proceed when evidence demonstrated "that Defendants coached and manipulated" witnesses "into adopting Defendants' theory of the case"); *Osborne v. Georgiades*, No. CV RDB-14-182, 2015 WL 6447503, at *4 (D. Md. Oct. 23, 2015), aff'd, 679 F. App'x. 234 (4th Cir. 2017) (finding that allegations that the defendant exerted pressure on victim that resulted in the fabrication of evidence against plaintiff set forth a fabrication claim particularly where the "contents of the conversations . . . are not disclosed" contrary to what one would expect). Indeed, the Seventh Circuit has made clear that in the context of fabrication claims, "[k]nowledge and intent must often be proven by circumstantial evidence." *Stinson*, 868 F.3d at 527. Plaintiff's claim of fabrication is not undermined by the evidence of coercion, and evidence of coercion does not convert his claim into one of coercion of witness, but rather explains how Defendants succeeded in getting different witnesses to say the same thing. *Washington v. Boudreau*, No. 16-CV-01893, 2022 WL 4599708, at *20 (N.D. Ill. Sept. 30, 2022)

35

("[W]hether Defendants merely coerced, and did not fabricate, evidence against Plaintiffs is ultimately a question of fact not properly resolved on the present motion.").[6]

### 7. Defendants Are Not Entitled to Qualified Immunity

Defendants raise a defense of qualified immunity, which fails. Dkt. 289-2 at 14-15. To defeat qualified immunity, plaintiff must show that the facts alleged describe violation of a protected right that was clearly established at the time of the misconduct. *Mordi v. Zeigler*, 770 F.3d 1161, 1164 (7th Cir. 2014). As set forth above, Plaintiff sets forth a violation of his right to a trial free from fabricated evidence. That right was clearly established long before 1990. *See, e.g., Whitlock*, 682 F.3d at 580; *Fields II*, 740 F.3d at 1114.

Defendants argue that "because the prosecution's unknowing introduction of false evidence is not a constitutional violation, the law did not clearly establish that Weston's rights were violated at all." Dkt. 289-2 at 14-15. Defendants are mistaken. *See, e.g., Whitlock*, *Fields II*.

### B. Plaintiff's *Brady* Due Process Theory Must be Tried

Misapprehending the scope of Plaintiff's *Brady* claim and the applicable law, Defendants argue that they had no obligation to disclose the coercion that they used to induce Hampton, Macklin, and McCurine into providing false statements and Coats into falsely identifying Plaintiff; or the evidence they developed inculpating McMorris in the crime. As to the former, Defendants argue that they did not have to disclose this evidence either because the Constitution does not require them to admit when and how they manipulated witnesses or because they never memorialized that misconduct. Longstanding Seventh Circuit case law, however, belies this

---

[6] Defendants contend that Weston may not hold Defendants liable for their trial testimony. Dkt. 292-2 at 14. That is true, but none of Plaintiffs' claims arise solely from Defendants' testimony during Plaintiffs' criminal court proceedings. Rather, Defendants are accountable for their fabrication and withholding of evidence, coercion of Plaintiff's confession, conspiracy to frame him, failure to intervene, and intentional infliction of emotional distress, all of which are discussed more fully herein.

claim. As to the latter, Defendants argue that their disclosure of McMorris's name without any context, or their disclosure of different evidence that does not mention McMorris to a different criminal defendant absolves them of liability. That too does not pass muster.

### 1. Summary of Evidence Withheld by Defendants

Plaintiff can show that Defendants withheld numerous pieces of evidence. First, Plaintiff has evidence that Defendants withheld the coercion used to induce Hampton, Macklin and McCurine to give false and fabricated statements implicating a "wrecking crew" in Watson's murder, and for Macklin and McCurine, specifically implicating Plaintiff in that "wrecking crew" and homicide. PSOAF¶ 115. Second, the summary judgment record demonstrates that Defendants withheld how they induced Coats to identify Plaintiff. PSOAF¶¶ 92, 93, 97. Third, Plaintiff has evidence demonstrating that Defendants withheld the McMorris Evidence; that is, the information in the Polygraph Case Review, Polygraph Examiner's Worksheet, Polygraph Subject Consent and the notes made by Tovar during McMorris' polygraph and attendant interrogation. PSOAF¶¶ 108, 109. Fourth, and finally, Plaintiff has evidence that Defendants withheld the street file from the prosecutor, which would have included information about the case, including about McMorris. PSOAF¶¶ 110, 111.

### 2. Defendants Withheld the Street File

Defendants do not challenge on any basis Plaintiff's claim that the street file was withheld in violation of *Brady*, forfeiting any such argument. *Tuduj*, 958 F.3d at 579. To the extent that Defendants' position is that such a file does not exist, that fails for two reasons.

First, Defendants' own submission proves that the street file existed—at least at the time of Walker's prosecution in August 1992. Any argument that its existence then demonstrates that it was turned over previously, however, fails. As the Seventh Circuit has explained, "*Brady* does

not exempt a prosecutor from disclosure when the prosecutor has given evidence to a co-defendant . . . ." *Socha v. Richardson*, 874 F.3d 983, 988-89 (7th Cir. 2017).

Second, there is evidence that even Defendants concede is missing in this case relating to McMorris—an alternative offender. That includes any documentation whatsoever of Defendant Moser's interview of him, which led Moser to send McMorris to be polygraphed as a "suspect" in this case. PSOAF ¶¶ 113. That is exactly the type of evidence that would be placed in a street file and not disclosed to the prosecutor. PSOAF¶ 134. Yet, as the prosecutor conceded at his deposition, had he had evidence relating to McMorris, he would have disclosed it as possible *Brady* material. PSOAF¶¶ 111. Indeed, evidence that someone else committed the crime—like the evidence in the street file here—is classic *Brady* material. *See Beaman v. Freesmeyer*, 776 F.3d 500, 509–10 (7th Cir. 2015) ("evidence inculpating another suspect [i]s *Brady* material."); *Andersen v. City of Chicago*, No. 16 C 1963, 2019 WL 6327226, at \*8 (N.D. Ill. Nov. 26, 2019) (suppressed information about alternative suspect was exculpatory and material).

That Defendants cannot now find the street file that once existed also does not doom Plaintiff's street file claim. It would be perverse if Plaintiff could not bring a street file claim because Defendants were so successful at burying that file (and its contents) that no one can find it. *Cf. Fields II*, 740 F.3d at 1113 (prosecutor cannot immunize himself from liability by using fabricated evidence at trial and then claiming absolute immunity). Indeed, that is not the law: A claim like this can be proven via circumstantial evidence *Washington v. Boudreau*, No. 16 CV 1893, 2022 WL 4599708 at \*22 (N.D. Ill. Sept. 30, 2022) (finding circumstantial evidence sufficient to demonstrate existence of street file where file was not produced during the litigation); *Cf. Urban v. United States*, No. 03 C 6630, 2005 WL 1819954, at \*2-3 (N.D. Ill. June 9, 2005) ("Unless someone can testify that they destroyed a specific document, proof that

38

a document is lost or destroyed will ordinarily take the form of circumstantial evidence"). There is ample such evidence in the record.

To that end, the City had a street file policy and practice during the operative time frame. *See Kluppelberg v. Burge*, 276 F. Supp. 3d 773, 777-79 (N.D. Ill. 2017) (estopping the City "from arguing that it did not have a policy or practice of withholding material exculpatory and/or impeachment evidence contained in street files . . . ."). The verdicts in *Fields* and *Rivera* establish that the street file policy, which was acknowledged back in the 1980s, continued well into the 1990s and beyond. PSOAF¶¶ 136-138.

Indeed, not only does the evidence above demonstrate that a street file existed for this case, but Defendants testified that they kept street files during this time period. PSOAF¶ 139. Accordingly, any argument that Defendants failed to disclose their street file fails.

### 3. Defendants Withheld Their Coercion

As to the coercion used to induce the false statements from Hampton, Macklin and McCurine, and the false identification by Coats, Defendants argue that they were not required to disclose it, arguing that it is irrelevant because *Brady* does not impose a duty on them to tell the truth. Doc. 289-2 at 18. That may be so, but that is not the basis for Plaintiff's *Brady* theory and not a basis on which to grant summary judgment.

### a. Defendants Misinterpret the Law

Taking a step back, relying on *Saunders-El v. Rhode*, 778 F.3d 556 (7th Cir. 2015), Defendants argue that they were not required to disclose the fact of their coercion to the prosecution. Defendants made this same argument at the motion to dismiss stage, and the Court rejected it then—as it should again here. As this Court explained, *Saunders-El* and the cases on which Defendants and *Saunders-El* rely—*Gauger v. Hendle*, 349 F.3d 354 (7th Cir. 2003),

*Sornberger v. City of Knoxville*, 434 F.3d 1006 (7th Cir. 2006), and *Harris v. Kuba*, 486 F.3d 1010 (7th Cir. 2007)—are distinguishable because "the evidence that was suppressed in those cases was already known to the plaintiff or, in the case of *Harris* [and *Saunders-El*], the claim was simply that the "officer did not admit to falsifying his report." *Weston v. City of Chicago*, No. 20 C 6189, 2021 WL 2156459, at *6 (N.D. Ill. May 27, 2021); *Gauger*, 349 F.3d at 360 ("the duty to disclose falls out because Gauger knew what he had said at the interrogation"); *Sornberger*, 424 F.3d at 1029 (explaining that the plaintiff "knew herself what occurred during the interrogation" and so the police had no obligation to "tell her again that they coerced her into confessing"); *Harris*, 486 F.3d at 1017 ("Like Gauger, Harris knew about his relationship, or lack thereof, with Davis" and therefore was "fully capable of challenging" the government's contention to the contrary); *see also Jackson v. City of Cleveland*, 925 F.3d 793, 824-25 (6th Cir. 2019) (distinguishing *Saunders-El* because the plaintiff "did not know that [the witness's] statement had been coerced" whereas the plaintiff in *Saunders-El* knew that "the government ha[d] fabricated evidence"). As the *Avery* court explained:

> In *Gauger*, *Petty*, and *Sornberger*, the criminal defendants were already aware . . . that the testimony in question was coerced. In *Harris*[,] the criminal defendant was just complaining that the officer didn't admit to falsifying his report. Here, in contrast, Avery knew that the informants' statements were false, but he did *not* know about the pressure tactics and inducements the detectives used to obtain them.

847 F.3d 433, 443 (7th Cir. 2017) (emphasis in original).

So too here. Plaintiff's complaint is not that Defendants did not tell the prosecutor that their police reports memorializing the statements of Macklin, McCurine and Hampton, and the identification of Coats were false; rather, he is complaining that Defendants failed to disclose "the pressure tactics . . . the detectives used to obtain" Macklin's, McCurine's and Hampton's statements, and "the means [Defendants] used to influence [Coats's] identification." *Avery*, 847

40

F.3d at 443; *Newsome v. McCabe*, 256 F.3d 747, 751-52 (7th Cir. 2001), *abrogated in part by Manuel v. City of Joliet*, 580 U.S. 357 (2001) (hereinafter "*Newsome I*"); *see also Newsome v. McCabe*, 319 F.3d 301, 304-05 (7th Cir. 2003) (hereinafter "*Newsome II*") ("their liability is under the due process clause because they concealed exculpatory evidence—the details of how they induced the witnesses to finger Newsome").

Courts have repeatedly held that that claim is actionable under *Brady*—even after *Saunders-El. See Avery*, 847 F.3d at 443; *Anderson*, 932 F.3d at 507-08; *Gibson v. City of Chicago*, No. 19 C 4152, 2020 WL 4349855 at *9 (N.D. Ill. July 29, 2020) ("Gibson may proceed on a *Brady* claim based on the Defendant Officers' and Burge's alleged failure to disclose the threats and coercion used to obtain Johnson, Smith and Webb's statements . . . ."); *Humphrey v. City of Anderson*, No. 119CV00764JRSTAB, 2020 WL 3060363, at *11 (S.D. Ind. June 8, 2020) ("Humphrey has alleged a due process claim based on a *Brady* violation in the failure to disclose the coercion of witnesses."). For example, in *Anderson*, the Seventh Circuit held that "the district court erred by granting summary judgment on th[e] alleged *Brady* violation" where it was "undisputed that Defendants failed to disclose the coercive tactics used to obtain [the witness's] statement." 932 F.3d at 507-08.

Defendants argue that later cases, such as *Avery* and *Anderson*, cannot overrule *Saunders-El* but Defendants have it backward. Long before *Saunders-El*, the Seventh Circuit held that the failure to disclose the manipulation or coercion used to induce a witness to give a statement or identification violated *Brady. See Newsome I*, 256 F.3d at 751-52; *Newsome II*, 319 F.3d at 304-05. That principle was reaffirmed by the Seventh Circuit before *Saunders-El* in *Manning v. Miller*, 355 F.3d 1028, 1033, 1034 (7th Cir. 2004), and *Engel v. Buchan*, 710 F.3d 698, 708-09 (7th Cir. 2013).

41

It is well settled that one panel of the Seventh Circuit (*Saunders-El*) cannot overrule another panel, let alone four (*Newsome I, Newsome II, Manning*, and *Engel*). *See Williams*, 50 F.3d at 1368 ("[T]he members of this panel are precluded by the doctrines of stare decisis and precedent from taking a position different from that articulated by [other] panels."). Rather, "[o]verruling requires recognition of the decision to be undone and circulation to the full court under Circuit Rule 40(e)." *Brooks*, 279 F.3d at 522. So, *Newsome* remains the law of the Circuit, and for that reason, *Avery* and *Anderson* followed its dictates even after *Saunders-El* was issued. And *Newsome* is incompatible with Defendants' claim that they were not obligated to disclose the manner in which they induced witnesses into making false statements and identifications.

Even if that were not the case, which it is, *Saunders-El* is inapplicable for yet another reason: In *Saunders-El*, "the plaintiff was acquitted at trial and the court noted that while it had not definitively decided that an acquittal can never produce a valid *Brady* claim, it has expressed doubt such a claim is possible." *Casciaro v. Von Allmen*, No. 17 C 50094, 2017 WL 5626200 at *3 (N.D. Ill. Nov. 22, 2017); *see also Blackmon v. City of Chicago*, 700 F. Supp. 3d 617, 639 (N.D. Ill. 2023) (explaining that *Saunders-El* was "distinguishable" because "[t]here, the defendant was acquitted, so there could have been no violation of the right to a fair trial"). Here, Plaintiff was tried and convicted, so there is no doubt that *Brady* applied.

**b. Defendants' Repurposed Argument That They Do Not Have to Disclose Evidence That They Do Not Write Down is Not The Law**

In the alternative, again citing *Saunders-El*, Defendants argue that Plaintiff's *Brady* claim relating to the manipulation of Macklin, McCurine, Hampton and Coats fails because it required Defendants to create evidence that did not otherwise exist. Stated differently, Defendants apparently believe that if they do not record exculpatory information on paper, they do not have to disclose it. This Court rejected that argument when Defendants made it in their motion to

dismiss, and the Court should reject it again here. *See Weston*, 2021 WL 2156459, at *7. As this Court explained previously, there is no basis in the law for such a rule: "In *Avery* and *Anderson*, in particular, the *Brady* claims were based, at least in part, on alleged omissions to disclose or include in contemporaneous reports that witnesses had made certain statements due to police 'pressure and inducements.'" *Weston*, 2021 WL 2156459 at *7. *See* also *Avery*, 847 F.3d at 439 (*Brady* violation can exist where police fail "to disclose facts about the coercive tactics used to obtain" a false witness statement); *Fields II*, 740 F.3d at 1123 (Sykes, J., concurring in part and dissenting in part) ("[I]f the police officers . . . withhold exculpatory information about coerced or fabricated evidence, the aggrieved defendant will have a good § 1983 claim against the officers for violation of Brady."); *Casciaro*, 2017 WL 5626200 at *3 (rejecting this argument).

Whether or not Defendants wrote the *Brady* evidence down is irrelevant; they were required to disclose the *information* itself. Defendants' argument turns *Brady* on its head—they propose a rule that police officers can easily avoid complying with *Brady* by not writing down the exculpatory/impeachment information that they possess. *Saunders-El* creates no such loophole, nor does any other case.

### c. Qualified Immunity Does Not Protect Defendants

Alternatively, Defendants argue they are entitled to qualified immunity as to Plaintiff's claims of undisclosed coercion. According to Defendants, in 1990, "the law at most required police officers to turn over existing exculpatory evidence." Dkt. 289-2 at 19. The problem for Defendants is two-fold. First, they have improperly characterized the *Brady* evidence at issue. The evidence of their coercion was "existing" at the time of the trial even if it was not documented. *Weston*, 2021 WL 2156459 at *7. Second, there is ample caselaw demonstrating that it was clearly established in 1990 that police officers had to disclose exculpatory and

43

impeachment evidence, including any coercion used to induce a witness statement and/or identification. *See Manning*, 355 F.3d at 1033; *Engel*, 710 F.3d at 708-09.

For example, in *Manning*, the plaintiff alleged that he was wrongfully convicted of the 1984 kidnapping of two drug dealers, and the 1990 murder of James Pellegrino. 355 F.3d at 1030. In his civil suit, the plaintiff alleged, among other things, that the FBI defendants "induced a witness to falsely identify Manning in a line-up, select[ed] Dye to be the jailhouse informant and induced Dye to create a false story" and that the FBI defendants "failed to tell prosecutors that they had done these things." *Id*. at 1033. The Seventh Circuit held that the plaintiff's "constitutional due process right was 'clearly established' at the time he asserts it was violated" because it was "well established" that Defendants could not withhold such evidence. *Id*. at 1034. Indeed, "[i]t is beyond dispute that the *Brady* right was well established at the time of the events set forth in [Plaintiff's] complaint." *Engel*, 710 F.3d at 708-09; *see id*. at 698-99 (explaining that the plaintiff, who was convicted in 1991 for drug-related kidnapping, and had his conviction overturned where the State failed to disclose that the police investigator induced a key witness to testify by paying him); *see also Giglio v. United States*, 405 U.S. 150, 154 (1972) (finding that "promise, reward or inducement" to government witness in a criminal case must be disclosed).

### 4. The Evidence Was Suppressed

Defendants also argue that the coercion and McMorris evidence was not suppressed. That argument, however, stretches the *Brady* line of cases well beyond their breaking point.

### a. The Manipulation Used on Hampton, Macklin, McCurine and Coats Was Suppressed

Defendants' primary argument is that because they disclosed the names of Hampton, Macklin, McCurine and Coats to the prosecutor, and because Plaintiff was aware of their identities, nothing was suppressed. As Defendants would have it, Plaintiff could have used due

diligence to speak to each of these witnesses and find out about the coercive circumstances that Defendants withheld. But "[a] rule declaring '[police] may hide, defendant must seek' is not tenable in a system constitutionally bound to accord [criminal] defendants due process." *Banks v. Dretke*, 540 U.S. 668, 696 (2004).

As the Seventh Circuit has held "it is simply not true that a reasonably diligent defense counsel will always be able to extract all the favorable evidence a defense witness possesses," including because the witness "may be uncooperative or reluctant," or "forgotten or inadvertently omitted some important piece of evidence previously related to the prosecution or law enforcement." *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001). "These concerns have even more weight in a case, like this one, involving information possessed by [ ] *prosecution* witness[es]" like Hampton and Coats or witnesses who are unavailable due to their own pending prosecution like Macklin and McCurine. *Hampton v. City of Chicago*, No. 12-CV-5650, 2017 WL 2985743, at *22 (N.D. Ill. July 13, 2017) (emphasis in original); *see also Phillips v. City of Chicago*, No. 14 C 9372, 2015 WL 5675529 at *5 (N.D. Ill. Sept. 24, 2015) ("defense attorneys routinely advise their clients not talk to their co-defendants . . . ."). Indeed,

> Defendants argument seems to assume the existence of a *Perry Mason*-like world in which prosecution witnesses readily give up impeaching information when interviewed or questioned by defense counsel. Real life does not work that way, or at least the governing legal rule cannot realistically be premised on the assumption that it always works that way. Witnesses coerced or persuaded to testify in a particular way often tend to identify with, and to ally themselves with, their persuaders. A legal rule that assumes that such a witness will readily describe the circumstances of the coercion or persuasion simply because the other side's lawyer asks the witness the right question would defy common sense.

*Jimenez v. City of Chicago*, 830 F. Supp. 2d 432, 444-45 (N.D. Ill. 2011); *see also Hampton*, 2017 WL 2985743 at *22. As such, the mere fact that Defendants disclosed the identity of the

45

witnesses and their (fabricated) statements and identifications is not a substitute for disclosing the manner in which those (fabricated) statements were created.

"Because mind-reading is beyond the abilities of even the most diligent attorney," "*Brady* material contained in a witness's head" "cannot be considered available in the same way as a document." *Boss*, 263 F.3d at 741. Defendants cannot absolve themselves of their duty to disclose their manipulation of the witnesses by claiming that defense counsel would have uncovered the same thing had he been more diligent. *See id.*; *see also Rios v. Guevara*, No. 22 CV 3973, 2024 WL 5119954, at *6 (N.D. Ill. Dec. 16, 2024); *Camm v. Faith*, 937 F.3d 1096, 1109 (7th Cir. 2019) ("hesitant to say that 'material contained in a witness's head' is available to a criminal defendant for *Brady* purposes"); *Taylor v. City of Chicago*, No. 14 C 737, 2019 WL 4597383, at *14 (N.D. Ill. Sept. 23, 2019) ("[A] reasonable jury could find that [Taylor] could not have obtained information about the Officer Defendants' alleged coercion of Grimes through reasonable diligence.").

No case Defendants cite warrants a contrary finding. Indeed, most of the cases cited did not even rise or fall on "due diligence," instead turning on whether the police ever possessed the alleged *Brady* material or even whether the material was impeaching or exculpatory. *See, e.g., Holland v. City of Chicago*, 643 F.3d 248, 256 (7th Cir. 2011) ("no evidence that either officer[] coerced [the victim] to lie or were otherwise withholding exculpatory evidence on this point from the defense . . . ."); *United States v. Hepner*, 519 F.3d 744, 750 (8th Cir. 2008) (*Brady* claim failed because "Appellants had not shown that the government possessed the newspaper information about Oliver or was even aware of it prior to or during trial"); *United States v. Hamilton*, 107 F.3d 499, 509-10 (7th Cir. 1997) where claim turned on the mere possibility of a description, "Again, a *Brady* violation does not arise due to nothing more than a possibility that

46

the undisclosed item might have helped the defense."). The closest case that Defendants raise is the district court's opinion in *Patrick v. City of Chicago*, but all that *Patrick* stands for is that reasonable diligence "entails asking *available* witnesses what they saw." 103 F. Supp. 3d 907, 916 (N.D. Ill. 2015) (emphasis added). As noted above, neither prosecution witnesses nor co-defendants are "available" to a criminal defendant. *Jimenez*, 830 F. Supp. 2d at 444-45; *see also Hampton*, 2017 WL 2985743 at *22; *Phillips*, 2015 WL 5675529 at *5. Nor can a district court decision overturn or overrule the Seventh Circuit's opinions in *Boss* and *Camm*.

### b. The McMorris Evidence Was Suppressed

Defendants also argue that the evidence relating to Kavin McMorris was not suppressed. According to Defendants, the McMorris Evidence was not suppressed because it was located in the current version of the prosecution file that was produced to the parties decades after Plaintiff was convicted. The problem with this argument is that it ignores evidence that demonstrates that the prosecutor did not have the documents prior to Plaintiff's trial and fails to take that evidence in the light most favorable to the Plaintiff, as required at summary judgment.

### i. Murray's Testimony at Most Creates a Dispute of Fact

Taking a step back, it is true that the McMorris Evidence is in the current version of the Cook County State's Attorney's Office ("CCSAO") file for the Weston prosecution that was produced to the parties in this litigation. It is also true that Bernard Murray, the ASA who prosecuted Plaintiff, testified that he had the McMorris Evidence prior to Plaintiff's trial. But Plaintiff's *Brady* claim remains viable regardless.

Starting with Murray's testimony, Murray testified that he "receive[d] these documents pursuant to subpoena." PSOAF¶ 110. But the summary judgment record does not bear that out. Detective Tovar, the polygrapher who polygraphed McMorris (and others) in this case, testified

47

that he would only disclose the Crime Lab Report that he created for a given polygraph unless the Crime Lab was specifically subpoenaed for the additional documents that he would create during a polygraph—the Polygraph Case Review, Examiner's Worksheet, Subject Consent, and any related notes. PSOAF¶ 109. Tovar further testified that if the Crime Lab were subpoenaed, he would place the original subpoena in the Crime Lab file for their records. *Id*. There is no such subpoena in the Crime Lab file for the Watson homicide. *Id*.

Indeed, the only subpoena in the CCSAO file that Murray issued on this topic is not directed to the Crime Lab, but instead to the Chicago Police Department ("CPD"). PSOAF¶ 110. Issued on September 6, 1990, that subpoena does not request the Polygraph Case Review, Examiner's Worksheet, Subject Consent, or any notes. Instead, it seeks only "lab reports." *Id*.

Nor is there any other reason to believe that Murray had the McMorris Evidence prior to Plaintiff's criminal trial. Murray testified that he understood his *Brady* obligations and that he took them seriously. PSOAF¶ 111. Murray testified that if he had received the McMorris Evidence prior to Plaintiff's criminal trial he would have turned it over. *Id*. Plaintiff filed a discovery a motion in criminal court prior to his trial and Murray responded that he was unaware of any favorable evidence. *Id*. In other words, Murray did not have the McMorris Evidence because it was never disclosed to him.

And as a result, Murray could not disclose it to Plaintiff. Paul Katz, Plaintiff's criminal defense attorney, testified that he would use evidence of an alternative suspect--he would introduce the evidence or try to question a witness about it. PSOAF ¶114. Katz did not introduce evidence relating to McMorris at Plaintiff's criminal trial (or at any time during his criminal proceedings) supporting the inference that he did not possess it. *Id.*

Indeed, the McMorris Evidence is not in the Investigative File for the Watson homicide. PSOAF¶¶ 107, 108. Nor are there any other reports or notes in that File that discuss McMorris or the information that he provided to Tovar during his polygraph. PSOAF¶¶ 107, 108, 112. That is notwithstanding the fact that Defendant Moser testified he would have interviewed McMorris and undertaken some investigation before having McMorris polygraphed and communicating to Tovar that McMorris was "alleged to be involved in shootings." PSOAF¶¶ 112, 113. That information should have been memorialized on a GPR or supplementary report. PSOAF ¶ 113.

Finally, the mere fact that the McMorris Evidence is in the current version of the prosecutor's file is of no moment. Murray testified that he was not involved in creating that version of the CCSAO file and he has no knowledge of how documents were placed in the file. PSOAF ¶110. It is undisputed that Plaintiff filed more than one post-conviction petition during his decades-long incarceration, which the CCSAO responded to. DSOF¶ 195. As such, the McMorris Evidence could have been placed in the file at any time during that window.

When the facts and all inferences are taken in the light most favorable to Plaintiff—as they must be at summary judgment—Murray's testimony and the fact that the McMorris Evidence is in the current CCSAO file at most creates a dispute of fact about whether the McMorris Evidence was suppressed. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (court "may not make credibility determinations, weigh the evidence or decide which inferences to draw from the facts"); *Nesbitt v. Villanueva*, No. 09 C 6080, 2012 WL 14350, at *4 (N.D. Ill. Jan. 4, 2012) (same). It is up to a jury to decide whose set of facts to credit.

### ii. The Polygraph Report is Not Sufficient

In the alternative, Defendants argue that they had no duty to disclose the McMorris Evidence because Kavin McMorris's name appears on a Polygraph Case Report in the

Investigative File. That argument fails for all the reasons discussed above. Indeed, such a finding is particularly appropriate because the Polygraph Case Report provides no information or context about why McMorris was even being polygraphed or interviewed, and there is no other document in the Investigative File that even mentions the name McMorris. Devoid of any context, the Polygraph Case Report has little meaning and cannot absolve Defendants of their constitutional obligations. *See Carriger v. Stewart*, 132 F.3d 463, 481 (9th Cir. 1997) (defendants "cannot satisfy [their] Brady obligations to disclose exculpatory evidence by making some evidence available and claiming the rest would be cumulative"); *see also Walker v. Kelly*, 195 F. App'x 169, 173-74 (4th Cir. 2005) (finding *Brady* violated notwithstanding prosecution's argument that the "the autopsy and presentence reports, both of which were provided to Walker, contain the same information found in the withheld reports" because "the availability of the autopsy and pre-sentence reports does not satisfy the prosecutor's duty to disclose other *Brady* material to Waler"); *see also Gonzalez v. Wong*, 667 F.3d 965, 984 (9th Cir. 2011) (finding failure to turn over psychology reports violated *Brady* because the reports provided additional impeachment evidence).

On that score, *Socha v. Richardson* is instructive. 874 F.3d at 988-89. Habeas petitioner Socha alleged that the government's failure to turn over the transcript and recording of an April 11, 2002, interview of Roy Swanson, the cellmate of the State's key witness Victor Holm, constituted a *Brady* violation. During that interview, Swanson told the police about various statements Holm had made about the murder for which Socha was charged and ultimately convicted. *Id.* at 986. Socha knew about the existence of Swanson—he "had received a police report vaguely mentioning a separate interview of Swanson on a different date." *Id*. at 988-89. Nonetheless, because the record was "devoid of evidence that [the petitioner] knew about

50

Swanson's April 11 statements to Holm," the Seventh Circuit found that the transcript and recording of the interview were suppressed. *Id*. at 989.

So too here. Plaintiff knew that there was a person named Kavin McMorris who was polygraphed on June 4, 1990, in connection with the Watson homicide investigation. But he had no knowledge—nor any reason to have knowledge—about the evidence that led Moser to describe McMorris as a "suspect" nor the statements McMorris made to Tovar about "Farmer Dell" admitting to committing the homicide. PSOAF¶¶112, 113. "[I]t is unrealistic to expect defense counsel to ask for [documents] he knows nothing about." *Socha*, 874 F.3d at 988.

### iii.    A Stipulation in a Co-Defendant's Case Proves Nothing

Finally, Defendants argue that the McMorris Evidence was not suppressed because Plaintiff's co-defendant, John Walker, stipulated to the content of a police report implicating "Shank" in August 1992, four months after Plaintiff was convicted. Doc. 289-2 at 22. That argument too fails.

As an initial matter, the Seventh Circuit has held that "*Brady* does not exempt a prosecutor from disclosure when the prosecutor has given evidence to a co-defendant . . . ." *Socha*, 874 F.3d at 988. That principle applies here. Moreover, the stipulation is different and not a substitute for the McMorris Evidence. The name McMorris does not appear anywhere in the stipulation. DSOF ¶101. The only way for Plaintiff—or Walker or the prosecutor—to have known that "Shank" was a nickname for McMorris was if they had the McMorris Evidence. *Id*. PSOAF¶¶ 104, 105, 107, 112. Furthermore, the stipulation does not contain a confession to the crime; only that certain people were near the location where the May 29 shootings occurred. DSOF ¶ 101. By contrast, the McMorris Evidence includes a third party confession. According

51

to Tovar, McMorris stated, "Farmer Dell told [McMorris that] he and six others [were] involved in the shooting. Farmer Dell said he sho[]t one in the head." PSOAF¶ 112.

### 5. The Withheld Evidence was Material

In their final at bat, Defendants argue that the suppressed evidence was not material. This too is a reboot of an argument that Defendants made—but lost—at the pleadings stage. *See Weston*, 2021 WL 2156459, at *6-7. There is no reason to revisit this Court's prior ruling.

To start, Defendants' argument suffers a fatal flaw insofar as it evaluates the materiality of each piece of withheld evidence separately. *See Wearry v. Cain*, 577 U.S. 385, 394 (2016) ("materiality must be evaluated based on the cumulative effect of all suppressed evidence and not in isolation."). The Seventh Circuit has expressly rejected the tactic Defendants attempt here, treating "each piece of suppressed evidence in seriatim, rather than assessing its cumulative effect as required by *Kyles*." *Goudy v. Basinger* ("*Goudy I*"), 604 F.3d 394, 400 (7th Cir. 2010). Doing so "suggest [s] that cumulative materiality is not the touchstone," when it is. *Id.* Only by considering the suppressed evidence as a whole can the "full exculpatory value of this evidence" be assessed. *Id.* at 401. And once that is done, it is clear that the evidence was material.

### a. Defendants' Coercion was Material

With regard to the coercion, Defendants do not even address Hampton and so any argument on that score has been waived. *See Tuduj*, 958 F.3d at 579. Moreover, even if that were not the case, the coercion used to induce Hampton into making a false statement could have been used to impeach Hampton's testimony at trial and undermine the prosecution's theory that the crime was committed by a "wrecking crew." PSOAF¶¶ 18, 19, 21.

As to Macklin and McCurine, Defendants argue that neither Macklin nor McCurine testified at Plaintiff's criminal trial so the coercion used to procure their false statements cannot be material. Such an argument flies in the face of well-settled law.

In *Kyles*, the Supreme Court held that the prosecution should have disclosed certain conflicting statements of a non-testifying witness who was key to the investigation along with other details of his interactions with police. *Kyles v. Whitley,* 514 U.S. 419, 445 (1995). As the Court explained, such evidence would have "raised opportunities to attack . . . the thoroughness and even the good faith of the investigation." *Id*.; *see also id.* at 446, citing *Bowen v. Maynard*, 799 F.2d 593, 613 (10th Cir. 1986) ("A common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant, and we may consider such use in assessing a possible *Brady* violation.") and *Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985) (awarding new trial because withheld *Brady* evidence "carried with it the potential . . . for the discrediting . . . of the police methods employed in assembling the case") (had withheld evidence of favors given to witnesses come out it prosecution's case might have "collapsed *entirely*").

So too here. The coercion of Macklin, McCurine, Hampton and Coats undermines the integrity of the investigation. It "discredit[s] . . . the police methods employed in assembling the case" and the "caliber of the investigation." *King*, 769 F.2d at 1042; *Bowen*, 799 F.2d at 613. Indeed, had all the evidence of coercion been disclosed it would have cast doubt not only on the "reliability of these witnesses," but also on the integrity of the investigation itself. *United States v. Boyd*, 55 F.3d 239, 246 (7th Cir. 1995). The totality of the withheld evidence might have resulted in the "prosecution's case . . . collaps[ing] *entirely*." *Id*. (emphasis in original). For example, Macklin was the first person to put Plaintiff's name into the mix (PSOAF ¶48); had a

53

prosecutor known that Macklin did not know anything about the May 29 shootings (*id.*), let alone Plaintiff being purportedly involved in them (which he was not), but only stated as much because Defendant Kill physically abused him and fabricated this evidence for him (*id.*), a prosecutor might not have brought charges in the first instance. *See Bowen*, 799 F.2d at 613; *see also Weston*, 2021 WL 2156459 at *6 ("[E]vidence of what happened in defendants' interrogation of Macklin could have cast doubt on the integrity of defendants' investigation").

Additionally, "in *Anderson*, the Seventh Circuit recognized that police misconduct in procuring a false statement from a potential witness who did not testify against the plaintiff could still support a *Brady* claim [where] the false statement . . . 'neutralize[d]' a witness who might otherwise have been called to testify for the plaintiffs." *Weston*, 2021 WL 2156459, at *6 McCurine and Hampton could have been called to testify that they did not know Plaintiff and that they had never seen him before the criminal proceedings. PSOAF¶ 84. That would have effectively torpedoed the State's argument that Plaintiff committed the crime as part of the "wrecking crew." Macklin could have further testified about the circumstances of Plaintiff's arrest—and Kill's misconduct in connection with it. PSOAF ¶¶ 38-43, 48. Yet, because of Defendants' coercion—and the fact that such coercion was withheld—Plaintiff could not risk calling any of these witnesses, effectively denying him a fair trial.

### b. The Withheld Evidence Relating to Coats was Material

For Coats, Defendants do not dispute that the withheld evidence was material: Like Hampton, Coats testified and the evidence that she was manipulated into identifying two suspects could have been used to impeach her testimony (and undermine the investigation). *See Avery*, 847 F.3d at 443-44 (withheld evidence material because plaintiff needed it to "prove that

54

the informants' statements were false"). Instead, Defendants argue that there is no admissible evidence of the coercion. For all the reasons stated in Section I *supra*, that argument fails.

### c. McMorris Evidence was Material

Finally, as to the McMorris Evidence, Defendants argue that the Evidence is not exculpatory because McMorris did not allege that he was the shooter and was likely an "additional" but not "alternative" perpetrator. That argument does not pass muster.

It is axiomatic that a criminal defendant can put on evidence that someone else committed the crime for which he is being prosecuted. *See Beaman v. Freesmeyer*, 776 F.3d 500, 509-10 (7th Cir. 2015) ("evidence inculpating another suspect [i]s *Brady* material."); *Andersen v. City of Chicago*, No. 16 C 1963, 2019 WL 6327226, at *8 (N.D. Ill. Nov. 26, 2019) (suppressed information about alternative suspect was exculpatory and material). For that reason, the trial prosecutor admitted that he would have disclosed the McMorris Evidence as "possible *Brady*." PSOAF¶ 111. And for his part, Plaintiff's counsel testified that he would have used it if he had it. PSOAF¶ 114.

It is not just that there is evidence that someone else may have committed the crime, but also that Defendants suspected him of having done so. PSOAF¶¶ 112, 113. As Moser explained, he would not have sent McMorris to be polygraphed without interviewing and investigating him. PSOAF¶ 113. Once he did, Moser sent McMorris for a polygraph because he was a "suspect" in the Watson homicide. *Id*. Consistent with that role in the crime, Tovar asked McMorris questions about his culpability, and he reported that McMorris failed the polygraph. PSOAF¶ 112 . McMorris then provided information to Tovar about someone who confessed to committing the crime to him. *Id*.

In addition to being able to present this alternative suspect evidence to a jury, "the knowledge the police were investigating [McMorris] would arguably carry significant weight with the [factfinder] in and of itself." *Smith v. Sec. of New Mexico Dep't of Corrections*, 50 F.3d 801, 830 (10th Cir. 1995).

### d.   The Street File

Finally, the withholding of the street file not only demonstrates that Defendants were investigating an alternative offender, but also places the entire investigation in a new light. If the jury were made aware that Defendants were continuing to withhold evidence in street files, after a judicial finding that it was not permitted to in *Palmer v. City of Chicago*, 562 F. Supp. 1067, 1076-83 (N.D. Ill. 1983), that would place the entire investigation in a new light. Indeed, it also would impact the credibility of Defendants in a case involving significant he-said, he-said about the coercion used to falsely inculpate the Plaintiff, including between Defendants' testimony about their interrogation of Plaintiff versus Plaintiff's testimony regarding the same. *Cf. United States v. Boyd*, 55 F.3d 239, 246 (7th Cir. 1995) (evidence of misconduct can cast doubt on integrity of investigation). For that reason too, suppression of the street file was material.

*      *      *      *      *

Taken together, all of the withheld evidence is indisputably material. It not only casts doubt on the veracity of the police investigation and the decision to charge Plaintiff, but also suggests an alternative offender or offenders that Defendants were investigating for this crime.

### V.   Plaintiff's Federal and State Malicious Prosecution Claims Must be Tried

Plaintiff brings claims for malicious prosecution under the Fourth Amendment (Count IV) and state law (Count VI). Fourth Amendment claims for malicious prosecution require (1) a suit or proceeding instituted without probable cause, (2) malicious motive in instituting the suit,

56

often defined as a case brought without probable cause and for a purpose other than bringing the accused to justice, and (3) favorable termination of the prosecution. *Thompson v. Clark*, 596 U.S. 36, 44, (2022); *Evans v. Matson*, No. 23-2954, 2024 WL 2206638, at *2 (7th Cir. 2024). A malicious prosecution claim under Illinois law has these same requirements plus a requirement that the proceedings terminated in favor of plaintiff, an element that Defendants do not dispute. *Beaman v. Freesmeyer*, 2019 IL 122654, ¶ 26, 131 N.E.3d 488, 495; Dkt. 289-2 at 39-40.

### A. Proceedings Were Initiated in the Absence of Probable Cause

The criminal proceedings against Plaintiff were initiated in the absence of probable cause. Officers have probable cause when "the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). The probable cause standard is objective and based on the facts known to the officers. *Fox*, 600 F.3d at 833. When the facts underlying probable cause are disputed, a jury must decide probable cause. *Maxwell v. City of Indianapolis,* 998 F.2d 431, 434 (7th Cir. 1993); *Williams v. City of Chicago*, 733 F.3d at 757 (7th Cir. 2013).

It is well-settled that Defendants cannot rely on fabricated evidence and false statements to establish probable cause. *Alexander v. United States,* 721 F.3d 418, 423 (7th Cir. 2013) ("Knowingly false statements by the affiant cannot support a finding of probable cause"); *Lawson v. Veruchi*, 637 F.3d 699, 704 (7th Cir. 2011) (analyzing whether probable cause existed by setting aside purportedly fabricated or manipulated evidence); *Kuri v. City of Chicago*, 2017 WL 4882338, at *7 (N.D. Ill. Oct. 30, 2017) ("Defendants cannot manufacture their own probable cause by fabricating evidence.").

Weston was arrested and indicted for the murder of Joseph Watson based on the false and fabricated statements of Hampton and Macklin, and his own false and fabricated confession. Def. Ex. 23 (describing basis for indictment); PSOAF ¶¶ 19-21 (Hampton fabricated statement); PSOAF ¶48 (describing Macklin fabricated statement). As to the former, both Hampton and Macklin have explained in affidavits and deposition testimony that their statements about the May 29, 1990 shootings (Hampton) and statement specifically implicating Weston in the shootings (Macklin) were a result of Defendants' abusive interrogation tactics and concurrent feeding them information about the crime to incorporate into their statements. PSOAF ¶¶ 19-21, 48. Under these circumstances, summary judgment is not available and a jury must decide whether probable cause existed. *Phillips v. City of Chicago*, No. 14 C 9372, 2018 WL 1309881, at *27 (N.D. Ill. Mar. 13, 2018) (a reasonable jury could conclude that a person of ordinary care and prudence who was aware of the circumstances in which coerced statements were made would not have honestly believed that such evidence reliably indicated that plaintiff committed the offense charged).

The same result obtains for Weston's arrest and indictment for the attempt murder of Coats. To start, the only evidence implicating Weston in that crime was the statement and attendant identification of Coats. PSOAF¶ 118. As Swanson explained, however, that identification was the by-product of police misconduct and is wholly unreliable. PSOAF¶¶ 92, 93. *See Phillips*, 2018 WL 1309881 at *1; *see also Beauchamp v. City of Noblesville*, 320 F.3d 733, 743 (7th Cir. 2003) (explaining that complaint of single witness is sufficient but only if the complaint would not "lead a reasonable officer to be suspicious, in which case the officer has a further duty to investigate").

58

Even without Swanson's testimony, however, Coats's identification would not be sufficient given the investigation. On that score, at the time of Coats's identification, the only people who had implicated Plaintiff in any of the May 29, 1990 shootings had been coerced into doing so and that Defendants had fabricated their statements. PSOAF ¶¶ 19, 21, 25-30, 48, 49-66. Weston's name had not come up in the early investigation into the May 29, 1990 shooting—nor for that matter, Macklin's. PSOAF ¶¶ 21, 28. Instead, Defendants learned (but suppressed) that McMorris and "Farmer Dell" were likely culprits. PSOAF ¶¶107, 108, 112. Moreover, the identification procedure used with Coats was highly flawed—and highly suggestive. PSOAF ¶¶ 98-101. Given those circumstances, Defendants could not reasonably rely on Coats's identification for Plaintiff's arrest and prosecution for her attempt murder. *See Beauchamp*, 320 F.3d at 743; *see also Hebron v. Touhy*, 18 F.3d 421, 422-23 (7th Cir. 1994).

On that score, *Hebron v. Touhy* is instructive. In *Hebron*, the Seventh Circuit found that complaints from "two persons (the tenants) who depicted themselves as victims of crimes) were insufficient to establish probable cause. 18 F.3d at 422. That was because the police defendants "knew that the tenants were being evicted, and the significant chance that they bore a grudge against their landlords would have made it unreasonable—and therefore unconstitutional—to arrest the landlords on the tenants' mere say so." *Id*. at 423.

So too here: Defendants could not reasonably rely on Coats's identification because it was of "questionable reliability" given the unduly suggestive procedure used to procure it and because its only "corroboration" came from statements that were coerced and fabricated. *Id*.

Finally, it is noteworthy that even if the Court found probable cause for Plaintiff's prosecution for Coats's attempt murder, which there is not for all the reasons identified above, that would not sound the death knell for Plaintiff's malicious prosecution claim. That is because

59

the Supreme Court very recently explained that "if an invalid charge—say, one fabricated by police officers—causes a detention either to start or continue, then the Fourth Amendment is violated. And that is so even when a valid charge has been brought . . . ." *Chiaverini v. City of Napoleon*, 602 U.S. 556, 562-63 (2024). In other words, even if Defendants had probable cause to initiate charges for the attempt murder of Coats, they did not have probable cause to initiate charges for the Watson homicide—which alone violates the Fourth Amendment. *Id*.

**B.      The Judicial Finding of Probable Cause was Improperly Obtained**

Contrary to Defendants' assertions (Dkt. 289-2 at 25-28), the judicial determination of probable cause by the criminal court does not doom Plaintiff's malicious prosecution claims because the determination was obtained "through improper or fraudulent means." *Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 351 (7th Cir. 2019); *Washington v. City of Chicago*, 98 F.4th 860, 863 (7th Cir. 2024). While there is generally a presumption that a legal determination of probable cause establishes that probable cause existed, that presumption assumes that there was a *truthful* showing of probable cause. *Washington,* at 870; *Whitlock v. Brown*, 596 F.3d 406, 410 (7th Cir. 2010). For the reasons stated above, that inquiry fails.

Here, Brian Hampton has testified that his statements to the police and grand jury were entirely the result of Defendants feeding him facts. PSOAF¶ 18, 19, 21. Macklin has explained several times that any statements he made implicating Weston were the result of coercion and fact feeding by Defendants Kill, Christopherson, and McWeeny. PSOAF¶ 48. And Plaintiff himself has testified at length to the coercion and fabrication of his confession. PSOAF¶¶ 49-66 Accordingly, Plaintiff has demonstrated that he can rebut the presumption that probable cause existed as a matter of law. *Manuel v. City of Joliet, Ill.*, 580 U.S. 357, 369 (2017) ("[I]f the proceeding is tainted—as here, by fabricated evidence—and the result is that probable cause is

60

lacking, then the ensuing pretrial detention violates the confined person's Fourth Amendment rights"); *Tully v. Del Re,* 2002 WL 31175983, at *5 (N.D. Ill. Oct. 1, 2002) (probable cause was a jury question where defendants "implicitly importuned witness to manufacture a basis for charges" and "thus could not reasonably have relied on what [the witness] told them").

The same result obtains for the Coats attempt murder. On that score, Defendants never revealed to prosecutors or the judge that they had shown Coats photographs on multiple occasions prior to the lineup, and even told her two of the people that she should pick. PSOAF¶¶ 92, 93, 97. Nor did Defendant Paladino and Maslanka explain that the lineup itself was highly suggestive: it contained multiple suspects and insufficient fillers, and they gave her no cautionary instructions prior to it. PSOAF ¶¶ 100. Instead, Coats—who thought of the police as superheroes and who witnessed the crime under extremely impoverished conditions— conveniently identified Plaintiff—Defendants' suspect who ultimately is innocent of this crime. PSOAF¶¶ 98-100 *See Patrick*, 213 F. Supp. 3d at 1058 (explaining that "the only way to get eight people to confess (separately) to witnessing an impossible event" would be through a conspiracy with the police). The only way that Coats could have identified Plaintiff—who was innocent of the crime—was either through innocent misidentification or Defendants placing their thumb on the scale. At summary judgment, Plaintiff is entitled to the inference that it is the latter. *See id*.

### C.     Defendants Initiated the Prosecution

Defendants contend that Weston cannot show that a defendant improperly "influenced the prosecutor's decision to indict." Dkt. 289-2 at 26. That is easily shown here because the *only* information available on which to indict were the statements fabricated by Defendants; all the "evidence" that ASA Lambur repeated about the "wrecking crew" and motive for the crimes, the

61

participants in the crimes and their individual roles, were all made up by Defendants and then repeated by the prosecutor to the judge. Def. Ex. 21; PSOAF¶ 115. Defendant Kill repeated Macklin's fabricated statement in order to justify probable cause. PSOAF¶ 43. *Jones*, 856 F.2d at 993-94 (police officers can be liable when they "deliberately supplied misleading information that influenced the decision" of the prosecutor to pursue the case); *Beaman v. Freesmeyer*, 183 N.E.3d 767, 782 (Ill. 2021) (liability extends to all who played a significant role in causing prosecution). Because Defendants provided fabricated evidence to the prosecutor, the police officers misled and improperly influenced the prosecutor.

Defendants make a weak argument that because ASA Sabin was at the police station and said Plaintiff should "cooperate" so he could "go home sooner," and took breaks while taking Plaintiff's statement, somehow all of Defendants' fabrications up to that point did not influence the decision to charge Plaintiff. Dkt. 289-2 at 20-30. As an initial matter, this description of Sabin's conduct does not include any knowing participation fabrication whatsoever, let alone that Defendants disclosed to Sabin that the entire police narrative was a fabrication. *Beaman v. Freesmeyer*, 2021 IL 125617, ¶ 84, ("Where…an investigative team conducts a bad-faith and incomplete investigation—designed to implicate a particular individual regardless of the evidence—the prosecutor is effectively prevented from fully exercising that independent judgment"). Even if Sabin had been somehow conspiring with Defendants and participating in the fabrication (no evidence of that here), that still would not discharge Defendants' duty to provide accurate information to the prosecutor making charging decisions. *Whitlock*, 682 F.3d at 576 ("The police defendants suggest that the fact that State's Attorney McFatridge was aware of this conduct would have discharged their *Brady* obligations. But police must disclose exculpatory evidence to a 'competent authority.' It is not likely that the police may take shelter

62

behind a prosecutor who is conspiring with them to fabricate false evidence against innocent suspects."). The presence of the felony review prosecutor at the police station for Weston's court reported statement does not break the chain of causation which began with Defendants' fabrications.

### D.      Defendants' Reliance on Fabricated Evidence Constitutes Malice

Remarkably, and in total disregard of the summary judgment standard, Defendants argue that Weston cannot show that Defendants acted with malice. Dkt. 289-2 at 38. Defendants cite to *Welton v. Anderson* for the proposition that "Malice may be shown by evidence of personal animosity or inferred from a complete lack of probable cause or a failure to conduct an adequate investigation under the circumstances." Dkt. 289-2 at 38 citing*, 770 F.3d 670, 674 (7th Cir. 2014). A jury could easily conclude that there was a complete lack of probable cause as explained above. That is all that Weston needs in order to show malice, but Weston could also easily demonstrate Defendants' personal animus towards him: several white middle-aged men with guns ganged up on him, a 17 year old Black teenager (PSOAF¶3) , shouted racial slurs at him (PSOAF¶¶ 52, 62), slapped him (PSOAF¶¶ 53, 59), and choked him until he passed out and defecated on himself (PSOAF¶ 61); they fabricated his confession to violent, despicable crimes (PSOAF¶¶ 63, 64, 66), and fabricated interlocking statements to corroborate that false confession (PSOAF¶¶ 19, 21, 25-19, 48). The level of suffering and humiliation inflicted on Weston would allow a reasonable jury to conclude Defendants harbored some personal animosity towards him.

### E.      Defendants Are Not Entitled to Qualified Immunity

Qualified immunity is not available to Defendants on the Fourth Amendment claim. When qualified immunity is asserted as to probable cause, the relevant question is whether a reasonable officer could have believed that probable cause existed to make the arrest." *Hunter v.*

*Bryant*, 502 U.S. 224, 227 (1991). Indeed, the Supreme Court held unambiguously in *Malley v. Briggs* that an officer is not entitled to qualified immunity when a reasonable official in his position would have known that the facts did not establish probable cause. 475 U.S. 335, 345 (1986). Defendants claim this right was not clearly established in 1990 (Dkt 289-2 at 30-31), but that is obviously wrong. *See, e.g. Beck v. Ohio,* 379 U.S. 89 (1964); *Franks v. Delaware,* 438 U.S. 154 (1978).

Defendants argue that they are entitled to qualified immunity because they had arguable probable cause– a "reasonable but mistaken" belief that probable cause existed. Dkt. 289-2 at 31. But the Seventh Circuit holds that, in evaluating at summary judgment whether an officer is entitled to immunity from a Fourth Amendment claim, there is "substantial, if not complete, overlap of the issue of immunity and the principal issue on the merits." *Maxwell v. Indianapolis*, 998 F.2d 431, 435-36 (7th Cir. 1993); see also id. ("The . . . officers attempt to draw a distinction by contending that the relevant inquiry is into 'arguable probable cause,' which is another way of asking whether they had probable cause to think they had probable cause.").

Defendants try to confuse the standard by framing it as whether a "reasonable police officer could have believed that, under the facts of this case, probable cause existed based on a prosecutor's review and approval of felony charges." Dkt. 289-2 at 31. That is not the law; Defendants cannot hoodwink the prosecutor by withholding their misconduct and then try to rely on that prosecutor's uninformed decision making. *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988) (if police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him. They cannot hide behind the officials whom

64

they have defrauded). What matters is whether–knowing they had fabricated all the evidence undergirding probable cause–they could have believed there was probable cause. *Malley*, at 345.

Taking the facts and inferences in Plaintiff's favor, a jury could find that Defendants could not have mistakenly believed they had probable cause to arrest Plaintiff because they knew that they fed facts to Hampton, Macklin, and McCurine and they knew that they had shown Coats whom to identify in the lineup. PSOAF¶¶ 19, 21, 25-30, 48, 92, 93. *Hammond v. Kunard*, 148 F.3d 692, 697 (7th Cir. 1998) (where officers knowingly fabricate witness statement there is no way an officer could reasonably believe that he was not violating constitutional rights); *Hunter,* 502 U.S. at 229. Defendants are not entitled to immunity.

**F.      Criminal Proceedings Terminated in Plaintiff's Favor**

Plaintiff can demonstrate that the criminal proceedings terminated in his favor because the State conceded in open court that it could not meet its burden of proof and dismissed the charges. Defendants. PSOAF¶ 123; *Thompson* at 49 (a Fourth Amendment claim for malicious prosecution does not require the plaintiff to show that the criminal prosecution ended with some affirmative indication of innocence; a plaintiff need only show that the criminal prosecution ended without a conviction); *Adams v. Sussman & Hertzberg, Ltd.*, 292 Ill. App. 3d 30, 42, 684 N.E.2d 935, 944 (1997) (a dismissal because the State cannot meet its burden is a termination indicating innocence for an Illinois malicious prosecution claim); *Rich v. Baldwin*, 133 Ill. App. 3d 712, 716 (1985) (dismissal of a charge on other than purely technical grounds, such as lack of jurisdiction or defective pleading, may be said to form a basis for a malicious prosecution action); *Beaman v. Freesmeyer*, 2021 IL 125617, ¶ 110 (declining to retry plaintiff supported an inference that there existed a lack of reasonable grounds to pursue the criminal prosecution).

Defendants contend that because Plaintiff agreed not to pursue a certificate of innocence, the criminal proceedings did not terminate in his favor. Dkt. 289-2 at 40 *citing Swick v. Liautaud,* 662 N.E.2d 1238, 1243 (1996)*.* Defendants point to language from *Swick*, indicating that where there is any "compromise" or "agreement" as part of the termination of criminal proceedings, that means that the termination was not "favorable," as a matter of law. *Id*. Not so. The "compromise" mentioned in *Swick* refers to circumstances where the plaintiff admitted guilt in some way, not a circumstance in which he gave up his right to a remedy. *Rich*, at 715, 718 (collecting cases where "compromise" occurred such as an agreement that the plaintiff pay restitution, or complete probation, or complete a pretrial intervention program, or otherwise admitted guilt). Plaintiff's agreement not to pursue a certificate of innocence was not an admission of guilt; it was an agreement not to pursue a statutory right in a collateral proceeding.

The prosecutor's insistence that Plaintiff give up his right to pursue a certificate of innocence may indicate that the prosecutor did not believe in Plaintiff's innocence, but his belief is irrelevant. *See, e.g.*, *Padilla v. City of Chicago*, 932 F. Supp. 2d 907, 927-30 (N.D. Ill. 2013) (evidence of the State's inability to carry its burden is indicative of innocence regardless of whether prosecutor personally believed that plaintiff was innocent); *Harris v. United States*, 2017 WL 770969, at *5 (N.D. Ill. Feb. 28, 2017) (prosecution account of why it dismissed charges contradicted by circumstantial facts, precluding summary judgment). Acquittals, for example, are "clearly sufficient to show favorable termination" under Illinois law, *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 926 (7th Cir. 2001), despite the fact that prosecutors often continue to believe in defendants' guilt after a jury acquits (and, indeed, must have believed the defendant guilty beyond a reasonable doubt when choosing to present the case to a jury). And in

Plaintiff's case, the State's concession that it could not meet its burden amounts to a concession that Plaintiff would be acquitted in any retrial. PSOAF¶ 123.

Even if the State had not conceded its inability to meet its burden as it did here, a rule accepting at face value the State's declared reasons for abandoning a prosecution would improperly empower the State's Attorney's Office to nullify malicious prosecution liability, including for its own prosecutors. *See, e.g.*, *Fields v. City of Chicago*, 2014 WL 477394 (N.D. Ill. Feb. 6, 2014) ("the fact that the State's Attorney's Office does not want Fields to be declared innocent—a determination in which that office has a direct interest, because it could well have an unfavorable impact on the claims against the former prosecutors sued in the present case—does not suffice to eliminate a genuine factual dispute").

Plaintiff has adduced more than sufficient evidence–in the form of the prosecutor's own admission that the State could not meet its burden–to prove favorable termination.

**VI.    A Jury Must Decide Plaintiff's Federal and State Conspiracy Claims**

A jury could conclude that all of the individual defendants participated in a conspiracy to deprive him of his constitutional rights. A conspiracy claim under 42 U.S.C. § 1983 is established by evidence showing two or more individuals agreed to deprive a person of their constitutional rights and then took an overt act in furtherance of that agreement. *Fulton v. Bartik*, 547 F. Supp. 3d 799, 817 (N.D. Ill. 2021), *citing Daugherty* v. *Page*, 906 F.3d 606, 612 (7th Cir. 2018); *see also Beaman*, 776 F.3d at 510. Similarly, a civil conspiracy claim under Illinois law requires that a plaintiff allege facts establishing "'(1) the existence of an agreement between two or more persons (2) to participate in an unlawful act or a lawful act in an unlawful manner, (3) that an overt act was performed by one of the parties pursuant to and in furtherance of a common scheme, and (4) an injury caused by the unlawful overt act.'" *Fulton*, 547 F. Supp. 3d at 823,

67

*quoting Lewis* v. *Lead Indus. Ass'n*, 2020 IL 124107, ¶20, 178 N.E.3d 1046 (Ill. 2020). The participants in the conspiracy need not "know all the details of the plan designed to achieve the objective or have the same motives for desiring the intended conspiratorial result." *Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir. 1979), *rev'd in part on other grounds*, 100 S. Ct. 1987 (1980). All that is required is for each defendant to "understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do [their] part to further them." *Jones*, 856 F.2d at 992.

### A. There is Sufficient Circumstantial Evidence of a Conspiracy

Circumstantial evidence abounds that Defendants conspired to violate Plaintiff's rights. *See Beaman*, 776 F.3d at 511 ("Because conspiracies are often carried out clandestinely and direct evidence is rarely available, plaintiffs can use circumstantial evidence to establish a conspiracy . . . ."); *see also McClure v. Owens Corning Fiberglass Corp.,* 188 Ill. 2d 102, 134 (1999) ("A conspiracy is almost never susceptible to direct proof. Usually, it must be established from circumstantial evidence and inferences drawn from evidence, coupled with common-sense knowledge of the behavior of persons in similar circumstances.") (internal quotation marks omitted) (citation omitted).

First, the numerous pieces of fabricated evidence, which correspond to each other to create a false narrative, would allow a jury to infer that Defendants had reached an agreement to violate Plaintiff's rights. PSOAF¶¶ 19, 21, 25-29, 48, 66, 90, 92, 93. *Serrano v. Guevara*, 2020 WL 3000284, at *15 (N.D. Ill. June 4, 2020) (jury could infer defendants knew evidence was false because it corresponded with other statements from other witnesses they knew were false); *Hill v. Chicago*, 2009 WL 174994, at *10 (N.D. Ill. Jan. 26, 2009) (allowing claim alleging conspiracy to frame two individuals to proceed where the confessions were "strikingly similar"

68

and there was evidence that at least one of the two did not commit the crime); *Phillips v. Chicago*, 2018 WL 1309881, at *26 (N.D. Ill. Mar. 13, 2018) (finding that each defendant "was undoubtedly aware of the [coercive] tactics he himself used," and also that "the officers were aware of the tactics used by their colleagues" since suspects "were interrogated at the same building during overlapping time periods"). Defendants Paladino and Maslanka fabricated Hampton's statements and those statement included a number of details–the "wrecking crew," motive, participants, and use of the Blue Chevy (PSOAF¶¶ 19, 21)–which later appeared in the Macklin and Weston statements (PSOAF¶ 66); Defendants Kill, McWeeny, and Christopherson fabricated a statement from Macklin which implicated Weston in the May 29, 1990 shootings and fit into the Hampton storyline (PSOAF¶ 48); Defendants Moser and Maslanka fabricated a statement from Plaintiff–during the same time period that Macklin was being interrogated– which matched "facts" from Macklin and Hampton's statements (PSOAF¶¶ 48, 66); some weeks later, Defendants Paladino and Maslanka showed Coats pictures of their suspects and told her who the "correct" selections were before the lineup which resulted in the selection of Plaintiff to tie him to the second shooting (PSOAF¶¶ 92, 93). Plaintiff's evidence is circumstantial, but "oh what circumstances." *Branion v. Gramly,* 855 F.2d 1256 (7th Cir. 1988). *See also Michalic v. Cleveland Tankers, Inc.,* 364 U.S. 325, 330 (1960) (circumstantial evidence can be more certain, satisfying, and persuasive than direct evidence). The alternate explanation—that these events occurred without a conspiracy—is highly improbable, if not impossible. In that scenario, each Defendant police officer worked independently to frame Plaintiff, coercing coincidentally interlocking statements from different witnesses at different times. A jury could reject that puzzling coincidence.

Second, the jury will have ample evidence that each Defendant was aware of the constitutional violations of other Defendants and did nothing to stop it. For example, after Defendant Kill snatched Plaintiff off the street, perhaps believing or hoping that he was Vic Brown, he drove with Plaintiff to an empty lot. PSOAF¶¶ 38-40. Another police car–which included either Defendants Rusnak and Breska (per Defendant Kill) or Defendants McWeeny and Christopherson (per Macklin)--brought Macklin to the same lot. PSOAF¶¶ 41, 42. Defendant Kill opened the doors of both vehicles and both Macklin and Weston stated that Weston was not "Vic Brown." PSOAF¶ 40. Defendant Kill replied that Weston "would do," and proceeded to take Weston to the police station. *Id.* Defendants Rusnak and Breska or McWeeny and Christopherson witnessed Kill being told that he was not arresting Vic Brown, and was instead arresting an innocent teenager. PSOAF ¶¶ 40-42. Yet they did nothing to intervene or interrupt that misconduct.

Furthermore, once Weston was at the station and in the interrogation room, John Walker and Keith Jackson could hear him screaming as a result of Defendants Moser and Maslanka's abuse, which suggests that Defendants McWeeny and Christopherson or Rusnak and Breska could have heard the same and put a stop to the torture. PSOAF¶ 67. *Phillips,* at *26-27 (when codefendants abused in the same police station could hear one another's cries of distress, jury could infer that defendants heard the same and did nothing). A jury could conclude that Defendants did not intervene to stop these horrific events precisely because they have reached an agreement to violate Plaintiff's right. *See generally Gentry v. Duckworth,* 65 F.3d 555, 561 (7th Cir.1995) (official may be "personally responsible" and therefore liable for constitutional deprivation if he knew about the conduct and facilitated, approved, condoned, or turned a blind

70

eye to it, or if the deprivation occurred with his knowledge and consent); *Yang v. Hardin,* 37 F.3d 282, 285 (7th Cir.1994) ("[o]missions as well as actions may violate civil rights" )

Third, Defendant Paladino's invocation of his Fifth Amendment rights could persuade a jury that he conspired with his colleagues. In addition to invoking his Fifth Amendment rights when asked about his practice of fabricating evidence (PSOAF¶ 125), coercing witnesses (*id.*), and telling witnesses which suspect to select from a lineup (PSOAF¶ 130), Paladino also invoked his Fifth Amendment rights when asked about covering up the misconduct of Maslanka and Moser (PSOAF¶ 132). Accordingly, a jury could draw an adverse inference from that invocation to conclude that Paladino did cover up misconduct from Maslanka and Moser on a regular basis, and in this case as well. Viewing all of this evidence in Plaintiff's favor, a reasonable jury could infer that Defendants conspired to violate Plaintiff's due process rights and to violate Plaintiff's rights to be free from forced self-incrimination, detention without probable cause, and malicious prosecution.

### B.    The "Intra-Corporate Conspiracy Doctrine" Does Not Apply

Defendants argue that the so-called "intra-corporate conspiracy doctrine" shields them from liability for conspiracy, but Defendants misunderstand the law. Dkt. 289-2 at 38. Defendants are wrong. The Supreme Court considered the intra-corporate conspiracy doctrine in the context of section 1985 actions. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017). Under *Ziglar*, the doctrine concerns "an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy." *Id*. The Court reasoned that when two agents of the same legal entity make an agreement in the course of their official duties, as a practical and legal matter their acts are attributed to their principal. *Id.* And it then follows that there has not been an agreement between two or more separate people. *Id.*

71

As stated, the doctrine applies to claims under section 1985. *Travis v. Gary Community Mental Health Center, Inc.*, 921 F.2d 108, 110 (7th Cir. 1990). The Seventh Circuit has not recognized the doctrine in section 1983 cases. To the contrary, the Seventh Circuit has routinely recognized that actionable conspiracies under section 1983 include agreements by employees of the same municipal corporation to violate constitutional rights. *See, e.g.*, *Geinosky v. City of Chicago*, 675 F.3d 743, 749 (7th Cir. 2012) (reinstating conspiracy claim against "several members of the same police unit [who] allegedly acted in the same inexplicable way against a plaintiff on many different occasions"); *Jones*, 856 F.2d at 992 (conspiracy among supervisory officers); *Bell v. City of Milwaukee*, 746 F.2d 1205, 1253–61 (7th Cir. 1984) (upholding punitive damages for conspiracy among members of the Milwaukee Police Department).

That is for good reason. As the Supreme Court noted in *Ziglar*, the logical foundation of the intra-corporate conspiracy doctrine is that agents of a corporate entity act on behalf of their principal. That premise does not apply in the context of claims under section 1983, where *Monell* and all subsequent jurisprudence have conclusively held that the actions of municipal employees *cannot* be imputed to the municipality. *Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978). To hold that the intra-corporate conspiracy doctrine shields the Individual Defendants from liability would be to hold, in effect, that the City of Chicago is vicariously responsible for their conduct. This result is impossible to square with *Monell* and logically forecloses applying the doctrine in this case.

### C. The Illinois Tort Immunity Act Does Not Shield Defendants From Liability

Defendants argue briefly that Plaintiff's Illinois conspiracy claim fails because the Tort Immunity Act (ITIA) does not allow liability for the act or omission of another employee. Dkt. 292-at 41 *citing* 745 ILCS 5/2-204. Defendants then claim, "A conspiracy claim, by definition,

seeks to hold an individual liable for the wrongful acts of others." *Id.* Defendants do not cite any authority for this sweeping proposition. Simply put, a conspiracy claim does not hold a defendant liable for the act or omission of another, it holds the defendant liable for coordinating his own misconduct with the misconduct of others. *Small v. Sussman*, 306 Ill. App. 3d 639, 647, 713 N.E.2d 1216, 1222 (1999); *Fulton*, 547 F. Supp. 3d at 823. The ITIA does not shield Defendants from liability for conspiracy under Illinois law.

## VII.   A Jury Must Decide Plaintiff's Failure to Intervene Claim

Defendants also contend that Plaintiff's failure to intervene claims should not proceed to trial. A defendant is liable for failure to intervene under Section 1983 if they "knew that a constitutional violation was committed and had a realistic opportunity to prevent it" but did not. *Fulton*, 547 F. Supp. 3d at 816, citing *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017). "Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Lanigan v. Vill. of E. Hazel Crest, Ill.*, 110 F.3d 467, 478 (7th Cir. 199.7)

Defendants point to a concurrence from a Seventh Circuit case a few years ago to suggest that failure to intervene claims–which have been alleged and proven routinely in civil rights cases for decades—may not have survived the Supreme Court decisions in *Iqbal* or *Vance.* Dkt. 289-2 at 38-39. Concurrences, however, do not have the force of law. *See Herhold v. City of Chicago*, 723 F. Supp. 20, 33 (N.D. Ill. 1989) (concurrence "cannot be accepted as the law").

Defendants argue that there is no evidence Defendants Rusnak, Breska, Christopherson or McWeeny witnessed any of the constitutional violations Plaintiff alleges. Dkt. 289-2 at 39. Not so. Rusnak and Breska were present when Defendant Kill set the conspiracy in motion–

73

yanking Plaintiff off the street over the protests of bystanders and driving him to a vacant lot

where Macklin (who was in the backseat of the vehicle driven by Rusnak and Breska) said that

Plaintiff was not "Vic Brown," and Weston confirmed he was not "Vic Brown"-- the murder

suspect in the Sims murder and the actual target of Kill's search. (PSOAF¶ 40-42; 31-37).

Defendant Kill ignored this information, and Rusnak and Breska facilitated Weston being

brought to Area Three, where witnesses heard his screams from torture. (PSOAF¶¶ 40, 49, 67).

Under these circumstances, a jury could find that Rusnak and Breska had an opportunity to

intervene and prevent the constitutional violation, but did not. *Heidelberg* v. *Manias*, 1:18-cv-

01161-SLD-JEH, 2019 WL 4862069, at *19 (C.D. Ill. Mar. 26, 2019) (defendant officer who

was "aware [plaintiff] was being detained and prosecuted unlawfully and did nothing to prevent

it" could be liable for failure to intervene); *White v. City of Chicago*, No. 17-CV-02877, 2018

WL 1702950, at *5 (N.D. Ill. Mar. 31, 2018) (officers that could have intervened to tell the truth

about plaintiff's false arrest could be liable for conspiracy).

As to Christopherson and McWeeny, Macklin explained that *they* were the ones present

when Defendant Kill pulled Weston off the street (Kill is the one who claims it was Rusnak and

Breska) and witnessed the exact same misconduct described above. PSOAF¶ 40-42. Whether it

was Rusnak and Breska or Christopherson and McWeeny who saw Defendant Kill knowingly

arrest the wrong person is for the jury to decide. Even if Christopherson and McWeeny weren't

present for Defendant Kill's back ally questioning of Macklin and Weston, Macklin testified that

Christopherson and McWeeny participated in fabricating his statement along with Kill. PSOAF¶

41. Accordingly, they could have intervened to stop the fabrication of Macklin's statement and

the coercion Kill used to obtain Macklin's cooperation.

Finally, Defendants echo their qualified immunity arguments once again, but for all the reasons previously stated, qualified immunity is not available.

## VIII. Plaintiff's Intentional Inflict of Emotional Distress (IIED) Claim Must be Tried

In order to prevail on an IIED claim, Plaintiff must show: (1) that the defendant's conduct was extreme and outrageous, (2) that the defendant knew that there was a high probability that his conduct would cause severe emotional distress, and (3) that the defendant's conduct did in fact cause plaintiff severe emotional distress. *Fox*, 600 F.3d at 819. For conduct to be extreme and outrageous it must go "beyond all bounds of decency and be considered intolerable in a civilized community." *Velez v. City of Chicago*, 2023 WL 6388231, at *13 (N.D. Ill. Sept. 30, 2023). Courts also examine the "degree of power or authority the defendant holds over the plaintiff." *Cairel v. Alderden*, 821 F.3d 823, 835 (7th Cir. 2016). Framing an innocent person fits this tort perfectly. *Carroccia v. Anderson*, 249 F. Supp. 2d 1016, 1028 (N.D. Ill. 2003) (fabricating false or misleading evidence of guilt or concealing exculpatory evidence from prosecutors is sufficiently outrageous to state a claim for IIED). Defendants do not argue otherwise. Dkt. 289-2 at 41.

### A. Plaintiff's IIED claim is Not Barred by the Tort Immunity Act

Defendants make a weak attempt to argue that Plaintiff's IIED and conspiracy claims are barred by the Illinois Tort Immunity Act (ITIA) section related to instituting charges, before admitting that such immunity does not apply where Plaintiff can show the absence of probable cause . Dkt. 289-2 at 41 citing 745 ILCS 10/2-208. Under 2-208, a public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, *unless he acts maliciously and without probable cause.*

Plaintiff has presented sufficient evidence of a malicious prosecution claim, as explained supra and therefore Defendants are not entitled to immunity.

**B.      Plaintiff's IIED Claim is not Time Barred**

Defendants argue that Plaintiff's IIED claim is untimely. Dkt. 289-2 at 41. IIED claims based on facts alleged in parallel claims for malicious prosecution accrue only when state criminal proceedings are terminated. *Carroccia*, 249 F. Supp. 2d at 1028; *Washington*, 2022 WL 4599708, at *25; *Lieberman v. Liberty Healthcare Corp.*, 948 N.E.2d 1100, 1108 (Ill. Ct. App. 2011) (extending the *Heck* doctrine to state law tort claims that, if successful, would be inconsistent with ongoing criminal proceedings or an existing conviction). Plaintiff's conviction was vacated on December 18, 2019. PSOAF ¶ 123. He filed suit within one year so his claims are timely. Dkt 1.

Defendants cite to *Bridewell*, for the proposition that IIED claims based on "arrest and prosecution" accrue within one year of the wrongful arrest. Dkt. 289-2 at 41 *citing Bridewell v. Eberle,* 730 F.3d 672, 678 (7th Cir. 2013). But unlike the plaintiff *Bridewell*, Plaintiff does not base his IIED claim on his mere arrest and prosecution. Rather, Plaintiff alleges that Defendants intentionally inflicted emotional distress by fabricating evidence and withholding exculpatory evidence, causing his wrongful conviction. Because the facts alleged in support of Plaintiff's IIED claim "directly attack the validity of the conviction," Plaintiff could not have brought such an IIED claim until his conviction was overturned. *Parish v. City of Elkhart*, 614 F.3d 677 (7th Cir. 2010) (addressing an identical situation by applying Indiana's adoption of *Heck*).

## CONCLUSION

For all the foregoing reasons, summary judgment should be denied.

Respectfully sumbitted,

**Demond Weston**

By: /s/    Theresa Kleinhaus
*One of Plaintiff's Attorneys*
Arthur Loevy
Jon Loevy
Gayle Horn
Theresa Kleinhaus
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
Tess@loevy.com

**CERTIFICATE OF SERVICE**

I, Theresa Kleinhaus, an attorney, hereby certify that on February 11, 2025, I caused the foregoing to be filed using the Court's CM/ECF system, thereby effecting service on all counsel of record.

/s/Theresa Kleinhaus
*One of Plaintiff's attorneys*