# Exhibit A

**Case Review and Analysis**

January 22, 2024

To: Theresa Kleinhaus

From: Joseph Allio

Subject: Demond Weston v City of Chicago

**Purpose:**

This review was conducted at the request of Theresa Kleinhaus of Loevy & Loevy regarding the lawsuit, Demond Weston v. City of Chicago. The purpose of this review is to analyze the investigation leading to the arrest and conviction of Demond Weston with an emphasis on the investigative process and procedures. Specifically, the assessment will examine the quality and content of this investigation.

**Subject Matter Expertise:**

As the reviewer of this case, I have more than 30 years of municipal law enforcement experience. I began my career in 1984 and most recently served as an interim police chief in 2022, a career span of 38 years.

As a California Police Officer, I attended more than 2,300 hours of training certified by the California Commission on Peace Officer Standards and Training (POST). I obtained all POST certifications from Basic POST through the completion of the Executive Certification. Relevant to this case review are the following POST training courses:

• Basic POST course; covering basic crime scene response, neighborhood canvassing, report writing, evidence documentation, collection, interviewing, and suspect identification (580Hrs)
● Homicide and Violent Crime Investigation (36Hrs)
● Search and Arrest Warrant Course (28Hrs)
● Supervisory Course (80Hrs)
● Leadership and Accountability Course (16Hrs)
● Critical Incident Response for Supervisor (32Hrs)
● Management Course (104Hrs)

1

Additionally, I am also a member of the International Association of Chiefs of Police and have attended training conferences in furtherance of my criminal justice and leadership career. Relevant to this case, I have served as a violent crime detective. In this role, I worked homicide cases for nearly five years, including during the 1990s. I then supervised and managed violent crime/homicide investigations throughout my role in police leadership.

I have served as police chief in three Northern California cities: the cities of Fairfield, Vacaville, and Vallejo.

As the interim police chief for the City of Vallejo, I facilitated a comprehensive audit of all areas of law enforcement in that city. I worked closely with the designated OIR Group from Southern California with an overarching goal of providing 100% accessibility within the police department. A key achievement was opening a line of communication for internal information needed to accurately audit policing in the city.

When I completed my term as the interim police chief for the City of Vallejo, the law firm Sloan Sakai Yeung & Wang LLP hired me as a subject matter expert to develop an implementation plan for the City of Vallejo, based on the OIR Group's audit and recommendations. After completing the implementation plan, the City of Vallejo approached and offered me the position of assistant police chief to make the recommendations operational.

The audit review was broad-based, and the completed audit's majority focus was on officer-involved shootings, use-of-force incidents, training, and community engagement. Relevant to this review, however, was the additional focus on accountability across multiple areas of the department. The lack of appropriate supervision within the organization led to a lack of accountability within the police department.

During this assignment, the California Department of Justice entered into an overview agreement with the Vallejo Police Department. The Justice Department contracted with Hillard Heintze of Chicago to facilitate the Vallejo oversight and implement the audit recommendations. By the conclusion of the assignment, I had worked effectively with both the Justice Department, the Hillard Heintze group, and the City of Vallejo work group and initiated the necessary reforms that had been designated as priorities for the City's police department.

Most recently, between 2021 and 2022, I served as interim police chief for the City of Vacaville. They asked me to review areas of needed reform within the police

department and to hire an outside firm to conduct an audit of police activity within the department's jurisdiction. By the conclusion of the assignment in January 2022, I had selected an audit firm and also accomplished a number of high-priority reforms that were identified.

**Approach:**

I have reviewed the documents listed in the attached Appendix, provided to me by Loevy & Loevy and I have also completed a review of the criminal investigation's source material. I have applied my knowledge of police procedure and investigative practices, based on my training, education, and experience, to the facts and allegations in this case in order to render my opinions.

The conclusion and opinions drawn within this report are based on my examination of all the information available at the time of the review. Those same conclusions and opinions rely upon my knowledge and expertise, drawn from 30-plus years of service.

**Criminal Investigations Source Material:**

*Practical Homicide Investigation; Vernon J. Gerberth (Fifth Edition) O'Hara's*

*Fundamentals of Criminal Investigation; DeVere D. Woods, Jr. 2019 US*

*Scientific American Magazine; Hal Arkowitz, January 1, 2010*

**Review: Factual Background on the Investigation of the May 29, 1990 Shootings and the June 8, 1990 Murder of Curtis Sims**

**A. Investigation May 29, 1990-June 9, 1990**

**1. Evidence at the Scenes**

On May 29, 1990, at approximately 10:28 pm, Joseph Watson was shot and killed near 57th and Wolcott in the city of Chicago. Timothy Jones was also wounded in this shooting. Watson and Jones were only 19 and 14 respectively.

After the shooting, Timothy Jones stated he could identify the suspects who shot him. According to police reports, Jones stated there were four offenders approximately

18-19 years old and that they yelled "G.D.," a slogan for the "Gangster Disciples" street gang. Jones later explained that the shooters stepped out of a gangway.

Two other shootings with multiple shooting victims occurred close in time and location to the murder of Watson:

Between 10 and 10:30 on May 29, 1990, Deneen Coats and Ronald Nesbitt were shot at 5530 S. Justine, a little over half a mile away from the 57th and Wolcott shooting. According to police reports, Reginald Norwood, a witness to the shooting, saw seven people walk up to the address where he and Deneen were talking. One of them pulled out a gun and started shooting.

According to the police reports, Coats saw ten or more individuals. According to the General Progress Report (GPR), Coats stated she had never seen the guys before but "Reggie knew them." When Deneen asked Reggie, Reggie told her the names of offenders. The police file does not demonstrate any follow up investigation with Reginald Norwood as to the names of offenders he identified to Deneen Coats.

Ronald Nesbitt described "five to ten guys" and thought that Reginald Norwood may have said something to them before they shot. Ronald Nesbitt, who was next to Coats on the porch, testified that he could not see the faces of the offenders because it was dark outside.

Between 10:30 and 10:40 on May 29, 1990, JD Lee and Pierre Solomon were shot at 5759 S. Honore, about .7 miles from the Justine shooting. A witness reported seeing 6-7 people, around 17-18 years old some of whom were dressed in all black with hoods.

Cartridges from a .9 mm gun were found at each scene.

### 2. Initial Description of a Car Near One of the Scenes and Interrogation of Hampton

Two witnesses, James Hale (identified as a Vice Lord) and Solomon Montague said they had seen a Blue Chevy near the shooting at 57th & Wolcott and that four "Cottage Boys" (members of the "Black Disciples") including "Johnny Walker" and "C.C.[1], got out of the vehicle." Hale walked down the block and heard gunshots. Hale later saw the same car "traveling at a high rate of speed."

---

[1] "C.C." was never identified or attempted to be identified in the investigation. No witness or suspect was ever identified as a member of the "Black Disciples."

Shortly thereafter, detectives located a Blue Chevy and determined that Bryan Hampton was the owner. Hampton's nickname was "Biz." They brought Hampton to the police station for questioning. Police towed the vehicle and tested it for fingerprints.

According to Bryan Hampton and Nate McCurine, they shared the Blue Chevy and McCurine had taken the vehicle near 57th and Wolcott on May 29, 1990 to see a girlfriend who lived near there. Hampton testified at deposition that he did not know anything about the shootings on May 29, 1990. He told this to the police, but they refused to accept his account. He reports being detained by police for nearly three days where he was coerced by officers who used physical force and threatened him into giving a fabricated account of the shootings, fed to him by police. He testified that police later pressured him to give the same account to the grand jury.

According to police, Hampton gave the following narrative: He, Darrin Laws, and McCurine met up with Jerrod Smith ("J. Dilla") and John Walker; Walker and Smith talked about putting a "wrecking crew" together "because the Vice Lords had been shooting at them recently," and "Walker's rear window had been shot out;" J. Dilla wanted use of Hampton's car because "Walker's front passenger door was broken;" Hampton gave his car to McCurine for the "wrecking crew;" McCurine later told Hampton that he picked up Jerrod Smith, John Walker, and Servan Allen, and dropped them off at 57th and Wolcott, he heard gun shots, and then Smith, Walker, and Allen[2] got back in the car and said they had "done their business." Hampton never mentioned Demond Weston.

### 3.  Smith, Jackson, and Walker were known to police prior to May 29, 1990.

Smith, Jackson, and Walker had had a previous negative encounter with Area Three Detectives, including Defendants Kill and Paladino. Specifically, a few months before the May 29, 1990 shootings, they reported that they were interrogated related to another shooting and were let go because the victim of that shooting did not identify them. Subsequently (and before the May 29, 1990 shootings), detectives would harass them and make sarcastic comments to them in the neighborhood.

### 4.  Interrogations of McCurine, Jackson, & Walker

McCurine, Jackson, and Walker were questioned by police about the May 29, 1990 shootings. According to the police reports, McCurine gave an evolving account where at first he only admitted to discussing a "wrecking crew" with Walker and Smith, then later "admits" that he saw Jerrod Smith, John Walker, and Keith Jackson the night

---

[2] The police reports state that Allen denied any involvement in the shootings.

of the shooting and that later Jackson, Smith, and Walker admitted to being involved in the shootings and that "Smith was armed with a .38 caliber handgun and Walker had a .9 mm semi-automatic pistol. Jackson had some sort of semi-automatic pistol," then later "admitted" to driving Jackson, Smith, and Walker on the night of the shooting. As explained below, McCurine testified this was part of a false narrative fed to him by police. He never mentioned Demond Weston.

According to police, Keith Jackson denied involvement with the shootings; he didn't know who "Biz" was; he "knew John Walker and Walker had had his window shot out by Vice Lords."  Keith Jackson (now known as Keith Strong) testified at his deposition that he knew Tim Jones, JD Lee, Pierre Solomon, and Derek Mason (all victims in the shootings) at the time of the shootings. He was not involved in the shootings and would never have shot those individuals. He testified that police used physical force and verbal abuse during a lengthy interrogation and tried to lead him into a fabricated story about the shootings.

According to police reports, John Walker denied all involvement in the shootings. At his deposition, he testified that police arrested him and he truthfully denied involvement with the shootings. The police used physical force on him during a lengthy interrogation. Officer Kill choked him and put his cigarette in his face. Walker testified he had never been in Hampton's vehicle. He further testified that police interviewed his girlfriend and mother of his child and also threatened her. Walker testified his car (a red Delta 88) had not suffered any damage in May 1990.

Hampton, Walker, Jackson, and McCurine all testified they never knew Demond Weston before they were ultimately charged together for the May 29, 1990 shootings. Indeed, none of them were even asked about Weston during their interrogations. Nor is Weston mentioned in the police summary of their interviews.

**5. "Shank" is identified as a suspect with a bullet-damaged car fitting the description of the car near the 57th & Wolcott scene and a .9 mm gun.**

On June 1, 1990, detectives spoke with Sylvester Washington who reported that a "Shank" had a four-door Blue Chevy with a bullet hole in it. "Shank" had a .9 mm gun. "Shank" is not identified by his proper name in the police file.

Washington added that "Terrell" knew who did the shooting[3]; the file does not show any follow up on that lead. According to police, Washington later implicated Hampton and McCurine in the shootings, along with Darrin Laws.

---

[3] Elsewhere witnesses identified a "Don Teril" as a relative of Deneen Coats and a Vice Lord.

On June 4, 1990, a "Kavin McMorris" was given a polygraph exam. Nothing in the homicide file identifies who Mr. McMorris is or why he was interviewed. However, the prosecutor's file contains polygraph notes that state that Mr. McMorris's nickname was "Shank." The polygraph report notes appear to state "'S' stated Farmer Dell told him he & six others involved in shooting—Farmer Dell say he shoot one in the head."

Detective Moser testified he would have interviewed Mr. McMorris, a suspect in the shootings, before sending him to be polygraphed and that a report of that interview should exist. It is not in the police file or prosecutor file.

**6. Additional Suspects Never Pursued**

Other witnesses blamed the "Bogus boys" and "Dan Tanna and boys" for the shootings as well as "Black Mike, Killer Ed, Baby Midnite," and "Pac Man." These individuals apparently wanted to retaliate against the Vice Lords. Another witness noted the presence of "Sly" and "Ezell." The police file records show no follow-up on any of these leads beyond a few notes of potential identifying information.

**7. No One Mentioned Demond's Name During the Entire Investigation from May 29, 1990-June 8, 1990.**

Between the murder of Joseph Watson and the arrest of Demond Weston, the following persons were interviewed by CPD: James Hale, Solomon Montague, Bryan Hampton, Darrin Laws, Nathaniel McCurine, Maria Johnson, Servan Allen, Keith Jackson, John Walker, Anita Gladney. Each person interviewed gave various descriptions of what they did and who they saw on the night of Watson's murder.

It is clear reviewing the totality of these 10 person's statements, that many, if not all, know each other. Some link the possibility of persons in this group discussing and taking gang action against others on May 29, 1990. Some name potential suspects, for example:
- Hale names Walker and CC
- Montague also names Walker and CC
- Hampton names McCurine and Laws
- Laws named Walker and Smith
- McCurine names Smith, Walker, and Allen, stating they all had guns

None of the people name Demond Weston as being seen with any of those named the night of Watson's murder. In fact, Weston is not mentioned at all by any of the 10 persons listed.

### 8. The Firearms Analysis

On June 1, 1990, police determined that the same gun had fired .9 mm cartridges found at each of the three scenes of the May 29 shootings.

A June 1, 1990 memorandum written to Captain Paul Gall from Firearms Examiner Ernest Warner connects the weapon used in the May 27, 1990 Murder of Michael Thomas to the three shootings on May 29, 1990.

On June 2, 1990, police learned that bullets from a .38 mm and .22 mm were found in the body of Joseph Watson.

### B. The Murder of Curtis Sims

On June 8, 1990, Curtis Sims was shot and killed. Chicago Police Department (CPD) detectives developed suspects in the Sims murder. The suspects were identified as Dwayne Macklin, William Childs, and "Cortez Brown" (an alias used by Victor Safford) also known as "Vic."

On June 9, 1990, at approximately 10 a.m. police came to 5928 S. Union Street and arrested Dwayne Macklin for the murder of Curtis Sims. Apparently, Brown fled from this location causing CPD detectives to drive around the neighborhood with Macklin looking for Brown.

Police seized a gun believed to be used in the Sims shooting. Police determined that the same gun, a .9 mm, had been used in the May 29, 1990 shootings and the shooting of Curtis Sims. In 2009, it came to light that Pamela McCurdy, the mother of Vic Brown, purchased the .9 mm gun on May 14, 1990.

### 1. The Search for Vic Brown and Arrest of Demond Weston

According to Macklin and Weston, Macklin was in the back of Detective Kill's police car at about 12:00 p.m. when Detective Kill stopped the vehicle and seized Weston on the street at 5926 S. Union, next door to the location where Defendants had arrested Macklin and from which Brown had escaped, earlier that morning.

8

In a 2019 affidavit Macklin names a fellow suspect as William Childs being arrested with him on June 9, 1990 related to the Sims murder. Macklin calls him "Boo-man."

According to Detective Kill, he arrested Macklin on June 9, 1990 and took him back to the station and interrogated him, at which point Macklin implicated Weston in the May 29, 1990 shootings. According to Kill, he then went and arrested Weston at approximately 4:00 p.m.

By contrast, Macklin stated that he watched Kill seize Weston from the street without ever having been taken to a police station and without ever having implicated Weston in anything.

Weston testified that Kill asked him more than once if he was "Vic." Weston testified that he said no, Kill said "you'll do," and later said "Macklin better come up with something." Weston describes Detective Kill telling persons present to mind their own business because they will "never see his (Weston) black ass again." Michael Covington, who was present that day, also testified in his deposition that he remembered a remark to that effect.

## 2. The Interrogation of Dwayne Macklin

Macklin testified at his deposition that police officers, including Kill, physically abused him and threatened him during his interrogation. The police eventually fed him facts about the May 29, 1990 shootings. According to Macklin, his entire statement was fabricated by police.

According to police, Macklin reported that on May 29, 1990 he was with "Vic Brown" and "Boo Man Demond Weston[4]" when they were approached by Ronnie Black and told they were forming a "wrecking crew" because Vice Lords were selling drugs on their turf. According to police, Keith Jackson and "Tony Miller" approached Macklin. In this account, Macklin saw a "Cadillac" with ten male Black persons in it, including "John Walker, Keith Jackson, Tony Miller and Ronnie Black." Willie Walker, Cortez Brown, and Demond Weston got in a "red Delta 88" with John Walker and Keith Jackson while "Tony Miller and Ronnie Black" got in the Cadillac "with others." Walker and Jackson had handguns. According to this statement, Macklin said Brown had a .9 mm and "Weston either had a .38 caliber handgun or a .22 caliber, a break open type." Weston, Brown and Walker later reported to Macklin that "business was taken care of" and the

---

[4] Macklin denies saying that Demond Weston's nickname was "Boo Man." Weston also denies that nickname. "Boo man" was a nickname for William Childs (who originally gave the name William Walker).

following day Brown and "Jacob Lee" drove around and Brown pointed out to Macklin where the shootings occurred.

### C. The Interrogation of Demond Weston

During the drive to the CPD, Weston stated that Detective Kill told him that Kill can't stand gangsters and would like them all to be placed at Soldier Field and "have at" each other. He also told Weston he hopes he spends the rest of his life in jail getting raped and is given the death penalty.

Once at CPD Weston describes various forms of abuse that occurred over numerous hours. Weston says he was arrested at 12 p.m. and police say it was around 3-4 pm. He was still at the CPD detective bureau at 4 am the next morning. The only actual time accounted for in the CPD homicide report is the 25 minutes the court recorded interview took place. All other comments in the report related to Weston are in summary form without the time noted. This leaves more than 11 hours unaccounted for during which Weston states he was abused by CPD detectives.

At CPD Weston said he was handcuffed to a chair on the third floor and Detective Kill told him he was arrested for killing Curtis (Curtis Sims). Weston describes being interviewed first by Detective Moser and Detective Maslanka, with Detective Moser leading the interview. Weston was told they had his prints on a gun and two witnesses. Weston told them he did not know what they were talking about, asked to see his mother, and asked to use the bathroom.

Detective Maslanka told him he did not care if Weston "shit his pants" he wasn't getting out of the chair until he answered their questions and his mother was not going to save him. Defendants threatened to "make him talk," that he could never leave till he said what they wanted to hear, that no one knew where he was so they could do whatever they wanted to him.

Detective Moser told Weston to quit playing stupid at that point and told him he was there for shooting Joseph. Weston responded "Who is Joseph the other cop said it was Curtis", at which point Detective Moser slapped him. Weston said Detective Moser slapped him 3-4 more times.

Weston denied any involvement in the murder of Curtis Sims. It appears, based on the criminal investigation as well as depositions taken at later times, that CPD detectives initially thought Weston was Vic "Cortez" Brown. When it was discovered this was not true, the interrogation shifted to the multiple shootings on May 29, 1990.

10

Later, Weston describes multiple detectives in the interview room. They told him that he was playing stupid for denying what he had been accused of. At this point, Detective Maslanka placed him in a chokehold and began to choke him until he passed out.

Weston said he then defecated himself which was a "high-five moment" for the detectives. They told him to stand up and then sit down because they wanted to see a "nigger stew in his own shit." They laughed about how bad "nigger shit" smelled. Defendants made him stand up and sit down in his own waste, and used racial slurs. Defendants continued to deny him access to his mother, food, and sleep.

Detective Moser told Weston someone was going to ask him questions and the sooner he answered the questions the sooner he would be home. Weston said Detective Moser told him what to say when interviewed.

Weston describes significant fact-feeding in the course of his interrogation, including: showing Weston photos of others who were purportedly involved in the shooting, telling him other people had already implicated him, telling him his fingerprints were on a gun, telling him he was involved in a shooting at 57th and Wolcott, telling him about "Joseph," that Macklin and Brown were involved and that he could be home soon if he explained about killing "Joseph." Defendant Moser "drilled" Weston on what to say. This included showing him Macklin's statement, telling him about a meeting of Gangster Disciples, a "mission" for the gang, and Vic Brown carrying a .9 mm gun. Moser told Weston that he (Weston) used a .22 derringer and that since "Joseph" was not killed with a .22, Weston would be free to go home. Moser coached Weston throughout his court-reported statement.

When he was interviewed by the state's attorney with the court reporter, Detective Moser would motion by nodding up or down for yes and no questions. If it was a longer answer that Weston needed help with the facts the attorney and reporter would leave the room so Detective Moser could tell Weston what to say.

After more than nine hours in police custody Weston allegedly confessed to the murder of Joseph Watson.

Keith Jackson and John Walker testified that they saw Demond Weston at 39th & California after Weston was arrested. Walker saw police hit Weston and heard Weston scream. Jackson also heard Weston screaming during Weston's interrogation, as if

11

Weston were dying. Jackson saw Weston in the transport vehicle from the station and Weston looked disheveled.

According to police, Weston stated that he was with Brown and Macklin when a car pulled up and the occupants said they the Vice Lords were giving them trouble so they were "putting a crew together." Weston said Macklin gave Brown a .9 mm. and that "this was the gun Brown always used." Weston confessed to having a .22 caliber two-shot derringer already in his pocket. Weston took the bus and then walked to 57th and Winchester where Weston saw four individuals he did not know. He and Vic walked down one side of the street while the other guys walked down the other side until they saw three Vice Lords. The group on the other side of the street shot at the Vice Lords and Brown and Weston each ended up in a gangway. Weston "heard Vic shooting also." Weston left the gangway, saw Vic running, and saw a male Black person fall to the ground while "his group" continued chasing "the others." Weston got close to the person on the ground and shot him twice. Weston then took the bus and hid the weapon. Weston's confession provides no information about the shootings on Honore and Justine.

All of the information recorded in Weston's confession was known by CPD detectives prior to his interview. In a March 2023 Deposition, Weston reported all of the facts in his confession were told to him by Detective William Moser. Weston described Detective Moser motioning with his head yes and no answers to questions asked by the Assistant State Attorney. If the answer required more than a yes or no answer the attorney and court reporter would step out of the interview room, so Detective Moser could give Weston the answer he wanted him to give to the State Attorney.

After Weston's confession to the Assistant State's Attorney, recorded by a court reporter, he was arrested, charged, and convicted in the murder of Joseph Watson and additional criminal offenses.

**D. The Arrest & Interrogation of Jerrod Smith**

After Weston's arrest, Jerrod Smith ("J. Dilla") was later arrested. He testified at deposition that he was interrogated by Detective Kill along with other detectives. He was physically abused by detectives in the course of the interrogation. Despite the fact that he had no knowledge of the May 29, 1990 shootings and told the detectives that, the police told him a "narration" of what his part in the May 29, 1990 shootings supposedly was and that there was supposedly a meeting in Cornell Park about a "wrecking crew." Smith testified that when he participated in a line-up he heard Tim Jones's sister saying to police "you can't make him say it was him."

12

### E. Line Ups in the Investigation of the May 29, 1990 Shootings

Timothy Jones was interviewed after being shot during the same incident in which Joseph Watson was murdered. When interviewed, Jones said he did not believe he had ever seen the suspects before the shooting. However, he would be able to identify them. On July 17, 1990, Jones viewed a live line-up which Weston was in. Timothy Jones, the only eyewitness to the murder of Joseph Watson, did not identify Weston as one of the shooters.

After the line-up, Keith Jackson learned that Jones was shown photos before the line-up and the officers were trying to suggest who Jones should select.

Deneen Coats was also interviewed by the detectives. She reported to investigator Susan Swanson that about a week after the shooting, the police told her that they had the people who committed the shooting. The police showed her photographs of possible perpetrators on at least two occasions. The first time, Coats was early on, perhaps the next day, while she was in the hospital. She picked out two photographs that she was allegedly 100% sure of. The second time the police showed her photographs was shortly before the lineup. At that time, Coats picked out two photographs and the police picked out two additional photographs for her. According to Swanson's interview of Coats, Coats told her that the detectives told Coats that the first two offenders that Coats picked out implicated the other two individuals that the police identified. Coats was then shown a lineup at the police station on July 17, 1990. According to the lineup report, there were 9 people in the lineup, including five suspects: Jerrod Smith, Demond Weston, Dwayne Macklin, John Walker and Keith Jackson. Coats selected three people from this lineup: Smith, Weston and Jackson. It is not clear from Swanson's interview what two people Coats was 100% sure of and what two people the police selected for her. Coats died before Swanson could show her any photographs.

### F. The Statement of Nathaniel McCurine

Nathaniel McCurine testified at his deposition that he had nothing to do with the May 29, 1990 shootings, but police would not accept his account. The police coerced him into providing a fabricated account. He signed a handwritten statement in July1990 implicating Demond Weston. He testified that he could not read or write at the time he signed the statement.  He did not know Demond Weston before being charged.

13

According to the statement attributed to McCurine taken on July 14, 1990, well after Demond Weston's arrest, McCurine was driving the Blue Chevy when John Walker, Jerrod Smith and Keith Jackson got in the car. According to the statement, Jerrod Smith had a .38, John Walker had a .9 mm, and Keith Jackson had a "fully automatic gun." McCurine parked the car at 56th and Damen and Vic Brown, Dwayne Macklin, and Demond Weston were all there. Brown had a "very large gun," Macklin had a .9 mm, and Weston had a small gun. He saw Jerrod Smith shoot a boy on a bike. He saw Walker shoot a guy on a porch. He saw Demond with a gun and heard a shot from behind him while he and Demond were separated. His statement describes his supposed route running from shooting location to shooting location (information that was not included in Demond Weston's confession). Detective Moser took Demond's confession and later took McCurine's confession.

**G. The Arrest of Vic Brown (also known as "Victor Safforld" or "Cortez Brown")**

Victor Safforld (also known as Vic Brown and Cortez Brown) was eventually arrested and charged with the Sims murder. Neither the Watson homicide file nor the Sims homicide file demonstrate that he was interrogated or arrested regarding the May 29, 1990 shootings.

**H. The City's File-keeping Practices**

In 1990, police detectives within CPD, including the detectives involved in investigating the May 29, 1990 shootings, maintained "working files." Working files were known also as "street files" or "running files." This practice came to light a decade earlier during the prosecution of George Jones. When the CPD investigated the use of street files, it found that the files were being used to communicate steps to be taken during the investigation; opinions of the detectives; and information about alternative suspects.

The use of street files was supposed to end with the issuance of various orders—Detective Notice 82-2, G.O. 83-1, G.O. 83-2, G.O. 86-3; and then the 1988 SOP. The problem in practice, however, was that it did not actually end. For example, two civil juries found that the practice of street files continued well after it was supposed to end (*Rivera*, *Fields*). James Hickey, the City's corporate representative in *Kluppelberg* testified that there were no efforts to determine whether the "street file" practice ended and the orders were implemented.

**Analysis: Opinions Based on Review of the Above Facts**

**Opinion 1: The Defendants' Investigation Departed From Generally Accepted Law Enforcement Principles.**

CPD's investigation of the Watson and Sims murders departed significantly from generally accepted law enforcement practices in several respects. The result of those failures are investigations into two murders that are nearly impossible to follow, and at many points, simply, make no sense.

### A. Defendants' Failed to Follow Up on Leads & Engaged in "Tunnel Vision"

Early on in the investigation, Defendants began focusing on the Blue Chevy which was seen near one of the three shootings. While there is no error in trying to develop further information from that fact, Defendants proceeded to build their entire theory of the case based on that one fact—including accusing young men they had encountered a few months earlier as prime suspects. Numerous other leads were disregarded. And if the witnesses testimony is credited, any new witness or suspect who was interviewed was apparently coerced to make that person's account fit the facts that Defendants had already decided upon.

### 1. CPD Did Not Make Links Between Weston and Other Witnesses

The arrest of Demond Weston occurred more than 10 days after the May 29 shootings. Prior to his arrest, Defendants had never heard his name from any witness. Between the dates of May 29, 1990 and the arrest of Demond Weston on June 9, 1990 CPD detectives interviewed numerous potential witnesses and suspects. Each interview provided names of potential suspects involved in the murder of Joseph Watson. The following names were recorded in the CPD report, James Hale, John Walker, CC Hale, Solomon Montague, Darrin Laws, Bryan Hampton, Nathaniel McCuren, Jerrod Smith and Keith Jackson. Weston was not mentioned in any of the interviews prior to June 9, 1990.

It is clear that most of the above-named persons knew each other prior to the murder of Watson and some were members of a local Chicago street gang, the Gangster Disciples. The CPD homicide report does not record a nexus between Weston and the above persons. The CPD homicide report also does not show a nexus between Weston and the other named and arrested suspects in the murder of Watson. Hampton, McCurine, Jackson, Walker, and Smith all testified they never knew Weston before they were arrested.

A generally accepted law enforcement practice in a multiple suspect case is to record the relationship between the suspects through prior contacts with CPD. For example, CPD located them together on a prior date, arrested them together, suspects went to school together etc. There is no record of this. Weston was not named in the investigation of Watson's murder until the arrest of Dwayne Macklin on June 9, 1990.

Detective Moser in his deposition January 2023, stated when Detective Kill told him about Demond Weston, he responded, "Okay, who is he? I wasn't even sure who Demond Watson was, no one was naming him?"

Once Defendants decided the shootings must be linked to Bryan Hampton, Nathaniel McCurine, John Walker, Keith Jackson, and Jerrod Smith, they seem to have worked to make the rest of the facts "fit"—including adding in Demond Weston's name even though none of those individuals were connected to Weston in any way. Nor did Defendants try to "test" the reliability of any purported statement from Dwayne Macklin. As discussed more fully below, Defendants failed to develop evidence leading to other suspects. This approach was contrary to generally accepted law enforcement practices in 1990.

Vic Brown was never arrested—or even interrogated—about the May 29, 1990 shootings, despite his link to the .9mm which was used in all four shootings. This also demonstrates tunnel vision because once police settled on their suspects, they didn't even try to determine if physical implicated Brown in the crime.

## 2. Weston Was Apparently Arrested Because of Mistaken Identity for the Sims Murder and Then Charged with the Watson Murder

Crediting the testimony of Weston and Macklin, it appears Weston was drawn into the investigation entirely because he was seen on the street near where Vic Brown had been an hour before. Arresting a suspect because of his location, without any verification of his actual identity, is another example of extreme tunnel vision.

In the alternative, if one credits Defendant Kill's testimony[5], Weston was arrested based soley on a statement from Dwayne Macklin—but total reliance on an incentivized witness also amounts to tunnel vision, and was also a departure from law enforcement practices, as I explain below.

---

[5] Detective McWeeny testified in his deposition that he spoke to Macklin on June 9, 1990 after his arrest around 10am. McWeeny states that Macklin "never implicated Weston in the shooting of Sims" which was the case he was investigating.

16

There is not a record attempting to link Weston to the murder of Joseph Watson. A generally accepted law enforcement practice would be to corroborate Macklin's statement by linking Weston to the murder of Joseph Watson. This could be done by common police investigative practices for example:

Physical evidence linking Weston to the murder scene
CPD database search showing a relationship between Weston and the victim or other suspects
Confirmation of the name "Boo-man" supposedly given by Macklin, a name which he also used in reference to another suspect, William Childs

Suspect Macklin's statement recorded in the CPD homicide report states the murder of Watson was connected to a drug turf issue, which contradicts the numerous prior statements taken by CPD detectives which link the murder to retaliation for an earlier shooting and car damage. This contradiction should challenge his credibility, yet Macklin's statement alone is used as the only cause to arrest Weston.

## B. Defendant Kill's Seizure of Demond Weston Departed From Generally Accepted Law Enforcement Principles

The arrest of Demond Weston, as described by Michael Covington, Dwayne Macklin, and Demond Weston, does not comport with generally accepted law enforcement principles. Crediting Macklin, Kill was provided no information implicating Weston in any criminal activity whatsoever. Instead, Weston happened to be standing a few houses away from the house where Kill, Christopherson, and McWeeny had arrested Macklin earlier that morning and from which Brown apparently escaped. From this, it appears Detective Kill believed that Weston was Brown.

A reasonable professional officer in Detective Kill's position would have tried to verify Demond's identify, perhaps by speaking with family members, checking Weston's name, photo, or date of birth in CPD databases, or checking for Brown's name, photo, or date of birth in CPD databases. Even after Weston and Macklin confirmed that Weston was not Brown, Kill took no steps to verify his identity. The arrest was outside of generally accepted law enforcement principles because a reasonable, professional officer would have had no reason to believe that Weston had been involved in any criminal activity. A reasonable professional officer would have taken steps to verify Weston's identity before placing him in handcuffs and in the police car, but if this wasn't done, then such verification should have taken place at the station prior to interrogating Weston.

Even if the fact finder credits Kill's account over Macklin's, the arrest of Weston is still outside of generally accepted police practices. Dwayne Macklin was interviewed on June 9, 1990, after his arrest in the Curtis Sims murder. The CPD report notes that Detective Kill had information that could be pertinent to the Joseph Watson homicide investigation. The report does not note what that information was and as I will cover in the report writing portion of this review it appears Detective Kill did not complete any reports related to the Watson murder. The next paragraph in the CPD report starts; The R/D's then had an interview with one Macklin, Dwayne M/B 24 years. The reader must make the assumption that Detective Kill's information is related to Macklin and that one of the eight detectives from Area #3 Violent Crimes interviewed Macklin. In addition to not documenting which of the eight detectives listed as authoring this report interviewed Macklin, the time of the interview is not listed.

Macklin's alleged statement is that he was with Cortez Brown "Vic" and "Boo-man" Demond Weston on May 29, 1990, at approximately 6 pm near 5928 South Union Street. Ronnie Blatt and others Macklin identified by photograph as Keith Jackson, Johnny Walker, and Tony Miller were forming a wrecking crew to take action against the Vice Lords for selling drugs on their turf. They were specifically going after the Vice Lords on 57th and Wolcott.

Between 9-10 pm, he saw members of the above-named group get into two cars, Weston was one of the people who entered a car. Macklin said that Weston was in possession of a .38 or .22 caliber break-open style handgun. At approximately 11:30 pm Demond Weston, Cortez Brown, and Willie Walker walked back to 59th and Union, and "they" told Macklin they had taken care of business and laid some "niggers" down.

Even crediting the police version of Macklin's interrogation (that he gave a voluntary statement implicating Weston), an experienced detective would immediately be suspicious of Macklin's statement. He is in custody on serious charges, and detectives know when you have an incentivized witness he or she must be corroborated. An incentivized witness is one who can trade their testimony for less time in custody for their crimes. It has been my experience that the greatest currency for a person in custody is less time in custody.

Macklin does not provide new information that the CPD detectives can corroborate but rather is recorded allegedly providing information they would have already known. For example, the caliber weapon Macklin describes Weston as having "a .38 or .22" which would match either expended projectile collected during the autopsy of Watson. The autopsy report records "1 medium caliber 1 small caliber" collected. The

interview of Macklin does not narrow down this scope leaving conveniently with an either-or scenario related to Weston's alleged gun possession.

Macklin, however, is not asked to describe the gun or how he knows about the gun, - did he see it or hear a conversation about it. If he had seen Weston with it before May 29, 1990, where did he conceal it? These questions were not asked.

Macklin is not asked how he knows Weston. They are not close in age and would not have been in school together. The connection between them would be very important. Macklin is naming Weston as a possible suspect in a murder and the CPD detectives fail to follow generally accepted interview methods to develop information that would link the witness to the suspect and the suspect to the crime.

Macklin also very specifically states the wrecking crew is going to take action at 57th and Wolcott, the location of the Watson murder, and the focus of this CPD investigation. Did the conversation not include the other two locations of the May 29th shootings? This homicide report does not record Macklin linking the shootings together.

In both affidavit statements given years after this murder by Macklin and his deposition, he describes coercion and just repeating facts that CPD detectives told him to say. Due to him being an incentivized witness he clearly had the motivation to repeat the information provided to him. CPD detectives fail to corroborate Macklin's statement with any other witness and or physical evidence which would be a generally accepted police practice.

Macklin's statement alone was not sufficient evidence to arrest Weston for any crime, especially murder. Macklin was not a witness to the Watson murder. A generally accepted law enforcement practice would be to verify Macklin's statement with other facts, evidence, and or witness statements/identification. The State never relied on Macklin's statements in the prosecution of Weston or any of his codefendants.

## C. Defendants' Interrogation Tactics With Suspects Departed From Generally Accepted Law Enforcement Practices.

### 1. The Tactics Used During the Interrogations of Hampton, Jerrod Smith, Keith Jackson, John Walker, Nathaniel Mccurine, Dwayne Macklin, and Vic Brown Departed From Generally Accepted Law Enforcement Practices.

Defendants violated fundamental principles of law enforcement by conducting coercive and abusive interrogations of numerous witnesses and suspects in the May 29 shooting investigation and the investigation of the murder of Curtis Sims. These individuals describe shocking physical abuse, such as pulling hair, slapping, hitting, beatings, and putting cigarette butts put in individuals' faces. For example, Bryan Hampton explained when he answered a question in a way that Defendants did not like he would get hit and if he echoed back a version of the story that Defendants gave him, he would not get hit. The witnesses describe being threatened with harsh sentences if they didn't provide a statement to police or being told that if they just provided the statement they could be released. The witnesses were lied to, being told that co-defendants had made statements against them, or that they could go home if they gave statements. In addition, these witnesses were typically held for lengthy interrogations—nearly three days in the case of Hampton. McCurine was questioned over and over again over several months.

Defendants' interrogation tactics were contrary to generally accepted law enforcement practices in 1990. Detectives were well aware that statements must be freely and voluntarily given and not the result of violence or coercion.

**2. The Interrogation Tactics Used with Witnesses and Suspects in the May 29, 1990 Shooting Investigation Were Consistent with Tactics Used by Defendants in Other Cases, and Tactics Used Within CPD.**

Between 1980-1998 at least 59 citizen complaints were filed against Detective Anthony Maslanka, Detective William Moser, and Detective Michael Kill. A review of the allegations noted numerous cases of physical abuse, with suspects being struck, kicked, choked, knocked to the ground, struck with nightsticks, metal clubs, flashlights, and phonebooks. Threats and verbal abuse are recorded in the allegations and one subject describes defecating himself during physical abuse. Nothing in the materials I reviewed suggested that the detectives said they thought these were acceptable practices, just that they deny such abuse; a jury will decide the credibility of those denials.

Assistant State Attorney Terrance Johnson describes a corrupt system of prosecution based on "teamwork" between the ASA office and CPD detectives. Johnson in a statement to the Department of Justice in 2012 describes working for the Cook County State's Attorney's Office from 1990-2000.

The training materials provided to me indicate that the police were trained that they should convince a suspect he is guilty, and that the confession must be "provoked

and manipulated" and that such tactics are the "essence of interrogation." Detective Training 1990 Lesson plans by Sgt. Paul Carroll, under the topic interrogations, instructs on the voluntariness of a statement. Carroll does say that the statement must not be forced from the suspect and the suspect must not be beaten. But those statements ring hollow given the broader context where detectives are told to "bait" suspects and are encouraged to coerce and provoke confessions.

Thus, the tactic described by witnesses in the May 29, 1990 investigation were not isolated and instead were common for Defendants and across their department. Homicide detectives were well-aware in 1990 that such tactics were unacceptable and led to unreliable witness statements. Defendants in this case agreed that physical abuse of suspects is not a legitimate law enforcement practice.

### 3. The Tactics Used During the Interrogation of Demond Weston are Contrary to Generally Accepted Law Enforcement Practices.

Defendants Moser, Maslanka, and Kill used an even greater degree of physical violence and threats with Weston than with the other suspects and doing so was completely at odds with acceptable law enforcement practices. Detective Kill set the tone for the entire encounter by drawing his weapon when he first seized Weston. He also immediately began threatening Weston with rape in prison and the death penalty. None of these tactics is consistent with sound law enforcement investigative approaches. Law enforcement officers were well aware in 1990 that false confessions could occur as a result of physical abuse.

If the factfinder credits Weston's testimony, the physical abuse inflicted on Weston was absolutely unacceptable. Police officers are trained to use physical force in very discrete circumstances (including active resistance or violence by the arrestee), none of which were present here. The physical violence inflicted on Weston appears to have been intended to elicit a false confession. Choking, hitting, and slapping suspects is inherently at odds to free and voluntary confessions.

Defendants' humiliation of Weston, including taunting him, using racial slurs, and having him stand up and sit down in soiled clothing, is far outside the realm of reasonable law enforcement tactics. Of course, such tactics are also unlikely to result in reliable statements.

Telling Weston that no one knew where he was, threatening to kill him, denying him access to his mother, to food, or to a bathroom, are all extremely coercive and

contrary to generally accepted law enforcement practices. These tactics break a subject's will, which is contrary to a voluntary confession.

Moreover, during the lengthy interrogation, Defendants tried to coerce Weston into confessing to not only the Sims murder, but also the Watson murder. Needless to say, coercing a suspect into confessing to multiple murders is not appropriate investigative work either.

### D. Defendants' Feeding Facts to Suspects Departed from Generally Accepted Law Enforcement Practices

Law enforcement officers are trained, now as well as for many decades before 1990, to try to find out information from witnesses or suspects, not give information to the witnesses or suspects. Simply put, if investigators tell witnesses and suspects about the investigators' theory of the case, the integrity of the investigation is called into question; officers no longer can determine whether suspects are telling them accurate information or providing officers information that was suggested to them. Investigators should not "lead" witnesses or suspects during their interviews, let alone engage in the tactics which witnesses and suspects (including Demond Weston) described here, such as:

- continually telling suspects they are lying (especially when they don't have any evidence suspects are lying)
- showing a suspect photos and telling him to say he knew the people in the photos
- saying they had his fingerprints on something when they didn't
- making promises that suspects could go home/get something to eat if they made a statement
- telling the suspect how the crime could have occurred
- abusing a suspect when he doesn't parrot back the version that detectives proposed in leading questions
- showing witnesses statements of other witnesses or allowing them to overhear one another's statements
- rehearsing statements in advance of the final statement and pausing statements to "correct" the suspect

According to the statements of John Walker, Dwayne Macklin, Jerrod Smith, Keith Jackson, Bryan Hampton, Nathaniel McCurine, Victor Safford, and Demond Weston, Defendants fed facts or attempted to feed facts in every interrogation in this investigation.

The statements of ASA Johnson indicate that Defendants and their colleagues in the CPD were well aware that a confession could solve a case and fed suspects facts in order to do just that, but that they also knew it was not a legitimate practice that could be openly discussed and acknowledged.

ASA Johnson said in general when he was called to meet a suspect in a case the suspect seemed "prepped" by the detective regarding what to say. Johnson believed detectives fed suspects information for both the court-reported and written statements. If the suspect said something that did not match up the detective would say "That's not what you told me." Johnson worried the suspect statements were fabricated because they were too consistent and the cops fed the subjects information during the statements.

Johnson's statement to the Department of Justice corroborates the statements of Demond Weston, John Walker, Keith Strong, Nathaniel McCurine, Jeremiah Smith, and Dwayne Macklin.

Johnson's statement additionally corroborates Weston's statement in the fact that Johnson believed suspects statements were too consistent and so likely fabricated. Weston's court reported statement was consistent with all facts already known by CPD detectives prior to his arrest, Weston provided no new information.

Based on the fact that no witnesses place Weston at the scene of the Joseph Watson murder, no physical evidence linked to the scene, and even Macklin's coerced statement about Weston was of limited value, there was intense pressure to obtain a confession.

The following information related to the shootings on May 29, 1990, were known by CPD detectives, and allegedly given by Weston in his court reported statement:

- Location of a meeting of Gangster Disciples on May 29, 1990
- "Vic" and Dwayne were linked to the gun
- Keith Jackson, John Walker were involved
- Trouble with Vice Lords
- Walker and Jackson looking for help to take action against Vice Lords
- "Vic" got a gun from "Buttercup"
- .22 caliber projectile recovered during Watson autopsy
- 57th and Wolcott is the location of a shooting
- Victim Watson was found laying in the street/position of the body and trajectory

Weston's interview with the Assistant State Attorney is reported to have taken 25 minutes. A reading of the transcript at a normal reading pace takes 11-12 minutes. The missing 13-14 minutes lend credence to Weston's description of the interaction with Detective Moser and the Assistant State Attorney.

Terence Johnson stated it was his experience that suspects were prepared to give a statement that would match the facts known by detectives. Demond Weston's statement is that he gave the above facts as they were provided to him by Detective Moser after ongoing physical, verbal, and psychological abuse by Detective Moser, Detective Maslanka, and other CPD detectives. Weston's statement is consistent with Johnson's experience of a subject being fed facts by CPD detectives thus giving a fabricated statement.

The interrogation tactics used by Defendants, and their efforts to make Weston's statements "match" the information they already had (or had fabricated) about the crimes, were not legitimate law enforcement practices. Fact feeding was apparently widespread in the Chicago Police Department, but police officers were well aware in 1990 that fact feeding is not an acceptable approach to interrogations. Defendants admit that they knew they should not provide facts to witnesses or suspects and should instead receive information from those witnesses or suspects. If a fact finder credits the testimony of the witnesses and suspects who were interrogated in this case, then the interrogation methods in this case were contrary to generally accepted law enforcement standards at the time of this incident. This type of contamination of statements is entirely at odds with generally accepted police practices in 1990 and well before that.

**E. Defendants' Failure to Document the Investigation Departed from Generally Accepted Law Enforcement Principles**

**1. The Documents Do Not Explain Who Did What**

Author Vernon Geberth comments on the official police report; "The official police report is a tool used by the criminal investigator to document the findings of his investigation. It is the principal source used by the courts, the defense, the district attorney's office, and the police department to evaluate the thoroughness of an investigation and the ability of the reporting detective."[6]

The Joseph Watson homicide report lists eight detectives as the authors of the report without designating specific roles completed by specific detectives. An example

---

[6] Practical Homicide Investigation, Vernon J. Geberth p1144

of this is the interview of Dwayne Macklin, a key interview in this investigation. The report reads' "The R/D's then had an interview with one Macklin, Dwayne." The reader is left wondering which of the eight detectives interviewed this witness.

Another very important example of the lack of clarity in this report is the arrest of Demond Weston. The report simply states he was taken into custody listing the time and date as well as the location. It does not list the arresting officer, the circumstances surrounding the arrest, the probable cause for the arrest, or any statements made by Weston.

Detective Dan McWeeney in his deposition in 2023 stated he had no involvement in the Watson homicide investigation yet he is listed as an author of the homicide report.

Detective McCarthy is not listed as an author of this homicide report yet in a supplemental report she is the detective requesting a polygraph examination of Sylvester Washington.

These examples place this homicide report outside the generally accepted police practice for report writing and leave many unanswered questions as to what detective did what when and challenges the reliability of the report itself.

**2. Detective Kill's Failure to Document Reports Is Outside the General Practice of Homicide Detectives.**

During the criminal proceedings for victim Watson, Detective Kill testified that Officers Maslanka and Moser were the primary detectives in this murder case. He also testified after he arrested Demond Weston he transported him to the police department where he read him his Miranda warnings which he waived. Detective Kill did not document these critical facts in the police report.

Detective Kill testified he told Weston they had arrested Dwayne Macklin and had recovered a 9-millimeter pistol. At this time Weston allegedly responded per Detective Kill, "You've got the wrong gun. I shot him with a .22." Detective Kill did not record these critical facts in the police report. Based on what I reviewed, that critical fact is first discussed in his testimony.

Detective Kill testified he informed Officers Maslanka and Moser of Weston's arrest and statement but did not document these facts in a police report. It is well outside generally acceptable police practices to not document an arrest and alleged

murder confession in a police report. Detective Kill's failure to document is not consistent with generally accepted police practices.

### 3. Defendants' Failure to Document an Interview with Suspect McMorris Was Outside Generally Accepted Law Enforcement Practices.

From the evidence I have reviewed, any interview of suspect Kavin McMorris ("Shank") was either not documented or the interview documents were not included in the police file. Although McMorris is only identified by nickname in the police file, the prosecutor file reveals that his proper name as well as certain notes about his polygraph exam. Documents in the police file corroborate that Kavin McMorris was sent for a polygraph. Interviewing, and documenting the interview, of suspects is a standard part of police investigations, now and in 1990. Defendants should have documented an interview of McMorris and ensured that such documentation was provided to the prosecutor (who would then provide it to the defense). Failure to document interviews with suspects (or failing to provide the relevant report to the prosecutor) ultimately can prevent further investigation as to that suspect, both by the police or by the criminal defendant. In this case, McMorris was not only apparently a suspect, but he also had a 9 mm gun and a car damaged by gunfire and provided information to the polygraph technician about who committed the crime. Failure to document the initial interview of McMorris before the polygraph, as well as the information he provided during the polygraph, was outside generally accepted police practices in 1990.

### 4. The Failure to Document Evidence In Formal Police Reports Is Contrary to Generally Accepted Law Enforcement Practices

Sylvester Washington is another key person in this investigation that does not have his statement recorded as part of the homicide report. A General Progress Report authored by Detective Tony Maslanka records Washington naming potential suspects to the May 29, 1990 shootings as well as who was in possession of firearms; however, this information was not recorded in the Homicide report.

These exclusions are problematic specifically as they relate to Demond Weston, both McMorris and Washington name potential shooting suspects, however neither name Weston. Excluding their statements from the view of the courts, prosecuting and defense attorneys are outside the generally accepted police practice.

Defendants seem to have used handwritten GPRs, that are often nearly illegible, without putting that information into a legible, typewritten police report. This is contrary

to police practices because it does not allow prosecutors or defendants to make use of the evidence police documented.

### 5. The Failure to Adequately Document the Interrogation of Demond Weston Is Contrary to Generally Accepted Law Enforcement Practices.

The alleged confession of Demond Weston is also problematic from a report-writing perspective. The report simply gives a summary of the alleged statement. It does not list the time of the interview, who conducted the interview, was it one interview as recorded or was it multiple interviews over a period of time? The report does not record any questions or follow-up questions asked by detectives.

The reports lack of specific information that would allow for corroboration, for example:

- Weston was not asked how he knew other persons he named as potential suspects.
- Weston allegedly said Brown had the gun he always used, He was not asked how he knew that fact.'
- Weston allegedly said he heard Vic shooting, he was not asked if he saw anyone actually shooting, or how did you know it was Vic?
- Weston was not asked follow-up questions about the .22 caliber gun he allegedly possessed.

This lack of documentation is consistent throughout the Watson homicide report with all persons interviewed leaving many unanswered questions as well as the lack of information that could be corroborated.

The Joseph Watson homicide reports do not meet generally acceptable police practice in key areas. If Detective Moser was the lead detective for this investigation it would have been his as well as his supervisor's responsibility to provide a thorough homicide report, which did not happen.

### F. Defendants' Failure to Investigate Alternative Suspects Was Contrary to Generally Accepted Law Enforcement Principles.

Defendants failed to follow up on many leads related to alternative suspects.

On June 1, 1990, Sylvester Washington was interviewed by Detective Maslanka recorded on a GPR. Sylvester named potential suspects to the May 29, 1990 shootings. Sylvester was with a group of people who got into "Biz's" car. "Biz" has been identified

27

by CPD as Bryan Hampton. Washington states "Ezel" had a .38 and "Shank" had a 9mm. They went to the area of 57th and Wolcott and saw approximately 5 people. The notes end without further information.

Washington names two persons with firearms at the scene of the Joseph Watson murder. "Ezel" with a .38 and "Shank" with a 9mm, of note he does not mention Demond Weston in his statement.

CPD detectives do not investigate or interview potential suspect "Ezel" which is outside of generally acceptable police practice.

The polygraph notes (from the prosecutor's file and absent from the homicide file) state about McMorris, "S alleged to be involved in shootings." The polygraph was on June 4, 1990 days after McMorris was named a suspect by Washington which may explain why he is named as a potential suspect.

The examiner notes "deception" and also that McMorris names a shooting suspect. "S stated Farmer Dell told him he & six of his involvement in shootings-Farmer Dell said he shoot one in the head."

Three persons are clearly named as potential suspects in the May 29, 1990 shootings, "Ezel", McMorris, and "Farmer Dell." There is no documentation in the CPD homicide report that these suspects were investigated.

As discussed above, "Dan Tanna," and the "Bogus boys" and were blamed for the shootings by various witnesses as well as "Black Mike, Killer Ed, Baby Midnite," and "Pac Man." "Terril" is discussed as someone who "knows" who did the crimes. Coats told police that Reginald Norwood apparently knew the shooters. According to the police version of events, Macklin named "Ronnie Blatt" and "Tony Miller" as being involved.

None of these alternative suspects were ever followed up on in any way.

Firearms examiner Ernest Warner confirmed on June 1, 1990 that a 9mm firearm used in the murder of Michael Thomas on May 27, 1990 was the same firearm used in the murder of Joseph Watson and the two other related shootings on May 29, 1990. This physical evidence connects the suspect in the murders of Thomas and Watson, this suspect is another alternative suspect to the May 29, 1990 shootings. Generally accepted police practice would be for the CPD detectives to record this fact in their investigation. The Michael Thomas murder was not connected to the Joseph

Watson investigation which prevented Weston access to an additional alternative suspect to be considered in his defense.

A generally acceptable criminal justice principle is that it is more important that the innocent are not arrested than the guilty go free. Exculpatory evidence is evidence that exonerates or tends to exonerate a defendant of guilt. In this case, Demond Weston was arrested several days after the above-named suspects were known by CPD detectives. And there is no indication that the detectives attempted to link these alternative suspects to the murder of Watson. That means that either the detectives never bothered to follow these leads—which is contrary to accepted practice—or the detectives followed these leads but the evidence about the leads was placed in a street file and not disclosed to the prosecutor—which is also contrary to accepted police practices. I will discuss the street file below.

## G. Defendants' Photographic Array with Deneen Coats Was Unduly Suggestive and Contrary to Generally Accepted Law Enforcement Principles

As noted above, Deneen Coats spoke to Susan Swanson about the identifications that she made in her case. In summary, Ms. Coats told Ms. Swanson that she was shown photographs on two occasions prior to viewing the lineup. First, she was shown photographs while she was in the hospital shortly after the shooting – she said either the same day or next day after the shooting. She told Ms. Swanson that before she saw the photographs, the police told her that they had the one or the guys who killed the boy. She then said she was shown photographs and she selected two suspects out of those photographs. Second, Ms. Coats said she saw photographs, again in the hospital, right before the lineup. According to Ms. Swanson, Ms. Coats told her that she saw a book of pages of small photographs. She picked two photographs out. Police showed her larger, different pictures of those two photographs. Police then told her that the two people she selected implicated two other people. The police then identified for her those two additional people.

Ms. Coats then viewed a lineup. Although she told Ms. Swanson that she identified four people at the lineup, the supplementary report indicates that she only identified three people: Jerrod Smith, Demond Weston and John Walker. The lineup had nine people in it, five of which were suspects: Jerrod Smith, Demond Weston, Dwayne Macklin, John Walker and Keith Jackson. According to the supplementary reports in the Watson and Sims investigation, these suspects ranged in height from 5'7" to 6'3", and in age from 17 to 20 years old. The fillers in the lineup were in positions 2, 3, 4 and 8, and ranged in age from 21 to 32 years (ages were 32, 30, 21 and 20).

If we credit Ms. Swanson's interview of Ms. Coats, the way in which Ms. Coats's identification procedures were conducted deviated from police practices (and the CPD SOP) in a number of ways. First, the detectives told Ms. Coats prior to her viewing any photographs that they had the guys that committed the crime. This statement was improper and could have influenced her decision to pick someone out of the lineup.

Second, the detectives showed Ms. Coats photographs on multiple occasions and did not document the fact that they did that. That is not only a significant deviation from expected practice but also from CPD requirements as described in its own Investigative Manual and training materials —particularly because Ms. Coats made identifications.[7] The failure to document this information also meant that it was likely not disclosed to the prosecutor or to the defense attorney notwithstanding its obvious importance. For example, if Ms. Coats was repeatedly shown photographs of the same four people—including in different formats or from different views—then it would reinforce to her that those are the four people, the guys, that the police told her they had found who had committed the crime.

Third, the detectives told Ms. Coats who to select. The point of showing a witness photographs is for the witness to select who he or she remembers seeing, if anyone—not to confirm the detectives' version of the crime. It is not appropriate for the police to tell Ms. Coats who to select—either by actually selecting persons for her or by telling her that the two she selected implicated two other people that the police pointed out—and then falsely attribute that selection to her. That is contrary to basic policing.

### H. Defendants' Line Up Techniques Departed from Generally Accepted Law Enforcement Principles.

On May 29, 1990, Deneen Coats was shot at 5530 South Justine at approximately 11:35 pm. Ronald Nesbitt, who was next to Coats at the time of the shooting, testified that it was too dark for him to see the offenders' faces.

On July 17, 1990 Coats viewed a live line-up at CPD. The line-up consisted of nine individuals, five of which had been named as potential suspects in the multiple shootings on May 29, 1990, including the shooting of Coats.

To meet the generally accepted police practice line-up there must be a limited number of suspects as compared to non-suspects in a line-up. In the case of the line-up

---

[7] Chicago Police Department Investigator's Manual (1990), p. 1 (WESTON 47770); Chicago Police Department Detective Training 1990, p. 2 (WESTON 047780).

viewed by Coats more than half of those viewed were known as potential suspects by CPD detectives.

CPD General Order 88-18 September 24, 1988, states that if there is more than one suspect placed in a line-up ideally four non-suspects should also be in the line-up. While G.O. 88-18 allowed detectives to include multiple suspects in the same lineup as a general matter, it was only permissible to do so if there was no "great disparity" between the suspects in terms of their appearance (e.g., height, weight, age, skin color). Here, there was substantial variation in height between Mr. Weston, for example, and Dwayne Macklin, who was standing beside him. According to the supplementary reports in the Watson and Sims homicide files, Mr. Weston was 5'8" and Mr. Macklin was 6'3". In addition, Mr. Jackson had much longer hair than anyone else in the photo array.

Based on CPD policy then, the detectives should have separated out the suspects into separate lineups. At a minimum, the detectives should have separated the suspects potentially into three smaller line-ups to meet policy. The recommendation from DeVere Woods in his book on the criminal investigation is a "line-up with six persons including the one suspect."[8]

The identification by Coats is problematic as she had a more than 50% chance of identifying any person in the line-up as a suspect. In addition, Coats was being shot at which decreases the ability of a person to make an eyewitness identification as eyewitness testimony by itself can be questionable.

 An article in Scientific Magazine by Hal Arkowitz, January 1, 2010, is titled "Why science tells us not to rely on eyewitness accounts."[9] This article lists reasons why eyewitness testimony can be error-prone. Two factors he lists that can reduce the accuracy of a witness are:

- Extreme witness stress at the crime scene.
- Presence of a weapon at the crime scene.

Both of these factors occurred in this case, as well as Coats being shot at and struck.

Generally accepted police practice would have been to provide an explanation as to why Demond Weston was added to a live line-up viewed by Coats and then to have Coats view an unbiased line-up, this did not happen in this case.

---

[8] Fundamentals of Criminal Investigation, DeVere Woods p162
[9] Scientific Magazine, Arkowitz, January 1, 2010

I. **Defendant Officers Failure to link Weston to Any Physical Evidence Departed From Generally Accepted Police Practices**.

The CPD homicide report does not record a witness identifying Demond Weston as being present at the scene of the murder of Joseph Watson. Without eyewitness testimony, a generally accepted police practice would be to then link him to the scene or other known suspects through physical evidence. That did not happen in this investigation.

At the scene of the Watson murder, numerous 9mm expended casings were located and collected by CPD. No attempt was made to collect latent fingerprints from these casings, failing to follow generally accepted police practice.

A 9mm Taurus semi-automatic handgun was collected during this investigation by Detective Kill. Based on eyewitness Timothy Jones' statement CPD knew at the time of the Watson murder that there were at least four suspects. Generally accepted police practice would be to examine this weapon for latent fingerprints to link a suspect to the weapon. CPD did not do this, thus not linking any suspect to the weapon.

A suspect vehicle in the Watson homicide was processed by CPD Evidence Technicians. A 1976 Chevrolet blue in color, it appears seven fingerprints were lifted from this vehicle. The CPD homicide report does list a Blue Chevrolet as a possible suspect vehicle in the Watson murder. Generally accepted police practice would be to attempt to match the lifted fingerprints to suspects in this case however the report does not record this being done. Demond Weston is not linked to this potential suspect vehicle by any physical evidence.

No physical evidence links Demond Weston to the scene of Watson's murder.

J. **The Failure to Maintain Accurate and Complete Homicide Files Departed from Standard Police Practices.**

In the CPD, there were multiple files for any given homicide investigation: a records division ("RD") file, an investigative file kept at the Area where the crime was being investigated and possibly a street file or working file. These files were not the same. For example, the RD file did not have any GPRs in it.

The City has identified the Bates range for the various files in this case:

- RD File: City 11-70

- Investigative File: City 71-310 and City 9338-9350

Having multiple files for the same investigation was unusual and could be problematic: It made it difficult to keep track of documents and keep track of the entire contents of the police investigation. Additionally, if the files were not the same, and only one was produced to the prosecutor in discovery, significant and important information could be withheld.

The CPD required that an Inventory be made of the Investigative File. That Inventory would be copied and kept in the RD file to show what the contents were of the Investigative File. That way anyone looking at the RD file would presumably know what documents were missing from the RD file, what documents were in the Investigative File and what the full set of documents that made up the police investigation were.

There are three problems with the Inventory for the Watson homicide. First, there are two different inventories for the Watson file, and only one of those Inventories is in the Records Division File (City 13-15). By the City's own rules, both of the Inventories for the Investigative File should be in the Records Division File. But the Records Division file is missing the second Inventory in the Investigative File (City 72-74), which lists 44 GPRs and several other documents. Even if this second inventory is considered a supplemental inventory—although the dates on both inventories overlap—it still does not explain why the inventory is not also in the Records Division file.

Second, the Inventory does not match up with the contents of the file. For example, there are things that are in the Investigative File but not inventoried—e.g., a lineup report, a memo/letter, and a supplementary report. Additionally, there appear to be things on the Inventory that are not in the Investigative File. For example, the number of GPRs do not seem to add up. If you add up City 13-15 (14 GPRs) and City 72-74 (44 GPRs), there should be 58 GPRs. If you count as 1 GPR, a GPR that has multiple pages (the same way you would count a supplementary report that has multiple pages as 1 supplementary report, and do not include notes that are not on a GPR, there are 55 GPRs in the file. This begs the question of where the missing 3 GPRs are. If you include notes that are not on a GPR as a GPR (notwithstanding the fact that there are entries for "Written Notes"), then there are 59 GPRs in the file. That also does not match up.

Third, and related, some of the entries in the Inventory are so vague as to be almost meaningless. For example, most entries for "GPR" just say "GPR"--it does not say how many pages are on each GPR, when the GPR was written or who it was written by. As a result, it is virtually impossible to keep track of what the actual contents of the Investigative File were.

The disconnect between the Inventory and the Investigative File begs the question of whether there was in fact a street file in this case that contained some of the

missing documents; or whether certain documents that were in the Investigative File but not inventoried were disclosed to the prosecutor.

Additionally, there was yet another file in this case—that was the file maintained at the Crime Lab, in the polygrapher's office. According to Detective Tovar, polygraph documents—such as the Polygraph Case Review, Polygraph Worksheet and raw data—would be stored in the file for a case in the Polygraph Unit. Polygraphers would generally not disclose materials to the police or prosecutor beyond the final report absent a subpoena for them. I did not see any indication in the documents that I reviewed that there was a subpoena for the polygraph notes or other materials in this case although a copy of them was located in the prosecutor's file. It is unclear when those documents were placed in that file.

This is yet another illustration of the problem of not having a central repository for documents. The polygrapher worksheet and case review were important because they provided investigative leads in the case. For example, according to the Polygraph Case Review relating to Kavin McMorris, McMorris told Tovar that "Farmer Dell told him he and six others involved in shooting" and that "Farmer Dell said he shot one in the head." Although Tovar appears to have asked him if the information about Farmer Dell was truthful, there is no indication that the detectives followed up on this lead—e.g., by trying to identify and question "Farmer Dell." The detectives could not have followed up on this information if they were not aware of it. I did not see any mention in the police files of "Farmer Dell" or of any attempts to identify "Farmer Dell" or test the truthfulness of this information.

Finally, it appears that even when police believed different crimes were related to one another and committed sequentially—as in the case of the May 29, 1990 shootings—they still maintained separate files for each shooting and there was no policy about putting evidence that related to more than one shooting in more than one file. The Deneen Coats aggravated battery CPD file has long been destroyed per CPD retention policy, but we know that the Coats lineup report is not in the Watson file. This suggests that there was no uniform policy for ensuring that all material relevant to a string of shootings was in one place. This, too, was contrary to sound police file keeping practices.

If called to testify, I would testify consistently with this report. I am being compensated at a rate of $250/hour for my work on this matter.

I have previously testified in the following matters in the last four years:

Deposition Michael Liggins v. City of Chicago, October 3, 2022;
Deposition Robert Bouto v. City of Chicago, January 30, 2023;
Deposition John Whitney v. City of Vallejo, et al., March 16, 2023.

/s/ Joseph Allio

# Appendix A: Materials Reviewed

Complaint
Successive Petition for Post-Conviction Relief, Bates stamped WESTON 3666
Watson Homicide File, Bates stamped CITY-DW-11-310
Sims Homicide File, Bates stamped CITY-DW-311-477
Weston trial transcripts A-I, Bates stamped WESTON 33126-34084
Motion to Suppress Testimony *People v. Macklin*; IND DEF 312420-32
William Moser Deposition with Exhibits
Johnny Walker Deposition
Nathaniel McCurine Deposition
Jeremiah Smith Deposition
Victor Breska Deposition with Exhibits
Andrew Christophersen Deposition with Exhibits
Dwayne Macklin Deposition with Exhibits
John Paladino Deposition with Exhibits
Demond Weston Pro Se Post Conviction Petition, Bates stamped IND DEF 292517-292556
Demond Weston Habeas Petition, Bates stamped IND DEF 297605-297660
Demond Weston Affidavit, Bates stamped IND DEF 297960-297973
OSP Closing Memo from Patrick Calihan, March 5, 2006, Bates stamped IND DEF 298704-298706

OSP Closing Memo from Parick Calihan, April 5, 2006, Bates stamped IND DEF 298707-298708

Demond Weston Statement for OSP with Patrick Calihan, Bates stamped IND DEF 299762-299798

Audio of Demond Weston talking to the Torture Inquiry Relief Commission, Bates stamped IND DEF 302501-302502

Demond Weston Victim Impact Statement, Bates stamped WESTON 34191-34197

Demond Weston Deposition with Exhibits

**Kill Complaints**
- 86-CR-15796; Testimony of Jason Gray, Bates stamped IND DEF 50563-50565

- 86-CR-15796; Testimony of Manuel Bobe, Bates stamped IND DEF 98951-99050
- 2006-CV-06772; Affidavit of Peter Williams, Bates stamped IND DEF 50696-50698
- 2006-CV-06772; Amended Complaint, Bates stamped IND DEF 97164-97199
- Dwayne Macklin affidavit; Bates stamped IND DEF 246034
- Complaint Register 159408 (Johnny Walker); Bates stamped IND DEF 29446-29448
- Complaint Register 162922 (James Coston); Bates stamped IND DEF 25650-25652
- Complaint Register 166416 (Mark Craighead); Bates stamped IND DEF 27998-28002
- Complaint Register 179723 (Deshawn and Bobby Spencer); Bates stamped IND DEF 33478-33513
- Complaint Register 191637 (Alnoraindus Burton); Bates stamped IND DEF 34124-34270
- Documents Bates stamped FOIA_034-000001-000476 (Michael Kill Deposition, Kenneth Boudreau Deposition, police reports from Permanent Retention File
- Kill Deposition in Harold Hill; Bates stamped IND DEF 282562-282611
- Kill Deposition in Harold Hill part 2; Bates stamped IND DEF 195049-195299
- Kill Deposition in Ronald Kitchen, Vol 1; Bates stamped IND DEF 282612-282887
- Kill Deposition in Ronald Kitchen, Vol 2; Bates stamped IND DEF 282888-283046
- Testimony of Dan Young in People v. Harold Hill and Dan Young; Bates stamped IND DEF 50757-50779
- Testimony of Demond Weston; Bates stamped IND DEF 362465-362506
- Testimony of Eric Wilson; Bates stamped IND DEF 97077-97122
- Testimony of George Ellis Anderson; Bates stamped IND DEF 89225-89234
- Testimony of James Coston; Bates stamped IND DEF 163397-163400
- Testimony of Johnnie Plummer; Bates stamped IND DEF 247830-247929
- Testimony of Marcus Wiggins; Bates stamped IND DEF 246090-246118
- Testimony of Anthony Jakes in 92-CR-5073; Bates stamped IND DEF 42798-42660
- Torture Relief Inquiry Commission form for Geral Reed; Bates stamped IND DEF 238404-238405

## Maslanka Complaints

- Complaint Register 193591 (Damoni Clemon); Bates stamped IND DEF 57029-57108
- Complaint Register 195947 (Bryan Etten(; Bates stamped IND DEF 22694-22838
- Complaint Register 231432 (Louis Pannos, Jack Accardi, George Robertazzo, Joseph Imbragono); Bates stamped IND DEF 34465-34531
- Complaint Register 239430 (Anthony Mariel Nanasi); Bates stamped IND DEF 28234-28271
- Complaint Register 289235 (Rekia Carothers); Bates stamped IND DEF 23144-23172
- Special Prosecutor's Report and Supplement: Bates stamped IND DEF 159683-160209
- OPS Decision suspending Maslanka for 5 days; Bates stamped IND DEF 283859-283865
- Maslanka Deposition in Post-Conviction case; Bates stamped Sidley 1140-1160

### Anderson
  - Anderson testimony, 11/16/1990; Bates stamped IND DEF 251053-251061
  - Anderson testimony, 5/1/1991; Bates stamped IND DEF 258714-258763
  - Anderson affidavit in support of Motion to Vacate Pleas, 10/23/1991; Bates stamped IND DEF 251783-251784
  - Anderson affidavit, 10/19/1999; Bates stamped IND DEF 252039-252040
  - Anderson memo to Special Prosecutor, 8/31/04; Bates stamped IND DEF 258645-258649

- o Anderson memo to Egan, 10/25/04; Bates stamped IND DEF 258827
- o Anderson memo to Special Prosecutor, 10/1/05; Bates stamped IND DEF 259650
- o Anderson TIRC form, 5/19/11; Bates stamped IND DEF 263728-263729
- o Anderson affidavit (undated); Bates stamped IND DEF 252725
- o Anderson testimony; Bates stamped 258199-258234

**Brown**
- o Cortez Brown statement, 9/21/90; Bates stamped IND DEF 310438-310443
- o Cortez Brown statement, 9/22/91; Bates stamped IND DEF 310444-310458
- o Cortez Brown affidavit, 7/27/2000; Bates stamped IND DEF 318820-318821
- o Cortez Brown affidavit, 12/6/2000; Bates stamped IND DEF 122509-122510
- o Brown testimony (aka Victor Safford), 5/18/09; Bates stamped IND DEF 355682-355824
- o Victor Safford (aka Brown) letter to Judge Strahorn; bates stamped IND DEF 351369-351371

**Daniel**
- o Complaint Register 155072; Bates stamped CITY-DW 6342-6374
- o Complaint Register 155072 (Daniel); Bates stamped IND DEF 25103-25139

**Harris**
- o Complaint Register 150921 (Harris); Bates stamped CITY-DW 5870-5999

**Johnson**
- o Eric Johnson affidavit, 3/28/06; Bates stamped IND DEF 113565-113571
- o Eric Johnson affidavits, 3/28/06; Bates stamped IND DEF 112173-112183
- o Eric Johnson interview, 4/13/06; Bates stamped IND DEF 113572-113628
- o Complaint Register 1009053; Bates stamped IND DEF 221778-221798
- o Complaint Register 1035379 (Johnson); Bates stamped IND DEF 89898-89954
- o Johnson testimony (Motion to Quash Arrest, Motion to Suppress Statements); Bates stamped IND DEF 112204-112239
- o Johnson TIRC form; Bates stamped IND DEF 283867-283868

**Mack**
- o Complaint Register 180224 (Raymond Mack); Bates stamped IND DEF 33514-33719
- o Complaint Register 180224; Bates stamped CITY-DW 6885-7205

**Morissette**
- o Case Disposition (Morissette); Bates stamped 283891-283892
- o Morissette – Burge victim claim form and letter; Bates stamped 283884-283890

**Pinex**
- o Pinex testimony, 3/26/86; Bates stamped IND DEF 353830-353902
- o Pinex statement, 6/29/95; Bates stamped IND DEF 353792-353793
- o Report of Special Prosecutor regarding McKeever murder; Bates stamped IND DEF 353775-353793
- o Pinex deposition in Wilson v. Chicago; Bates stamped IND DEF 37841-37930

**Smith**

- Complaint Register 215387 (JT Smith); Bates stamped IND DEF 34361-34449

**Torrence**
- Complaint Register 170457, 9/19/89; Bates stamped IND DEF 25613-25635
- OPS File Memo regarding Donald Torrence, 6/7/04; Bates stamped IND DEF 328143-328146
- Torrence v. Chicago, Amended Complaint; Bates stamped IND DEF 342626-342629

**Wiggins and Clemon**
- Statement of Damoni Clemon, 9/26/91; Bates stamped IND DEF 175263-175268
- Complaint Register 193591; Bates stamped CITY-DW 7568-8303
- Complaint Register 193591; Bates stamped IND DEF 57029-57108
- File related to CR 193591; Bates stamped IND DEF 283055-286865
- Wiggins affidavit; Bates stamped IND DEF 162496-162500
- Wiggins Deposition; Bates stamped IND DEF 94128-94229
- Wiggins interview; Bates stamped IND DEF 94236-94290
- Wiggins letter in support of actual innocence; Bates stamped IND DEF 94233-94235
- Wiggins letter; Bates stamped IND DEF 94291
- Wiggins letter; Bates stamped IND DEF 94400-94403
- Wiggins statement, 9/26/91; Bates stamped IND DEF 94230-94232
- Wiggins testimony (no case info); Bates stamped IND DEF 94292-94366
- Wiggins testimony (note says Cortez Brown); Bates stamped IND DEF 94367-94399
- Wiggins v. Burge complaint; Bates stamped IND DEF 94084-94127

**Zahora**
- Complaint Register 186135; Bates stamped IND DEF 25578-25612

**Moser**
- Testimony of Sean Tyler, 94-CR-11503; Bates stamped IND DEF 246582-246623
- Michael Taylor affidavit, 1994; Bates stamped IND DEF 228356-228359
- Peter Williams affidavit, 2006-CV-6772; Bates stamped IND DEF 50696-50698
- Harold Hill amended Complaint, 2006-CV-6772; Bates stamped IND DEF 97164-97199
- Peter Williams testimony, 2006-CV-6772; Bates stamped IND DEF 133641-133691
- Dwayne Macklin affidavit, 10/4/97; Bates stamped IND DEF 246034
- Eric Johnson affidavit, 3/28/06; Bates stamped IND DEF 112173-112180
- Complaint Register 173046 (Eric Johnson); Bates stamped IND DEF 278068-278123
- Complaint Register 173046 and interview (James Gibson); Bates stamped IND DEF 1366-1370, 1411
- Complaint Register 183196 and interview (Sandy Curtis); Bates stamped IND DEF 28706, 28715
- Complaint Register 186135 (Steve Zahora); Bates stamped IND DEF 29730-29733
- Complaint Register 189688 (Julia Murray); Bates stamped IND DEF 25671-25677

- o Complaint Register 200398 (Emmett White); Bates stamped IND DEF 208570-208574
- o Complaint Register 247568 and interview (Joy Marie); Bates stamped IND DEF 22965-22978, 23008-23010
- o Testimony of Dan Young, 9/19/94; Bates stamped IND DEF 50757-50779
- o Testimony of Harold Hill, Bates stamped IND DEF 51097-51149
- o Testimony of Reginald Henderson, 5/21/96; Bates stamped IND DEF 228373-228417

Daniel McWeeny Deposition with Exhibits

Jerome Rusnak Deposition with Exhibits

Training Materials – Weston 47767-48053
- Training materials regarding lineups, including General Order 88-18; Bates stamped WESTON 47767-47786
- Training materials regarding interviewing and interrogations, including General Orders 87-7 and 85-2; Bates stamped WESTON 47787-48038
- Training materials regarding identification procedures; Bates stamped WESTON 48039-48053

Orlandis McCurdy affidavit, 3/31/14, Bates stamped WESTON 14290-92

Lineup Report, Deneen Coats; Bates stamped CCSAO 2455-2456

Bryan Hampton Deposition with Exhibits

Paul Katz Deposition with Exhibits

Demetrise McIntosh Deposition with Exhibit

Bernard Murray Deposition with Exhibits

Victor Safforld Deposition with Exhibits

Robert Tovar Deposition with Exhibits

Kavin McMorris Documents, Bates stamped CITY-DW 9888-9955

Maslanka Complaint, CR 17830, Bates stamped IND DEF 24930-25016

Moser Complaint, CR 197216, Bates stamped IND DEF 22490-22551

Pamela McCurdy document; Bates stamped IND DEF 332208-332215

Pamela McCurdy testimony; Bates stamped IND DEF 334680-334702

Paul Sabin Deposition with Exhibits

Terrence Johnson 302; Bates stamped WESTON 56601-56606

Michael Covington Deposition

Nathson Fields – Judgment

Nathson Fields v City of Chicago,et al. – Westlaw

Jacques Rivera v Reynaldo Guevara, et al – Westlaw

Transcript from Fields case & Post trial exhibit from Fields case; Bates-Stamped WESTON 48054-56041

Susan Swanson Deposition with Exhibits

Janet McCarthy Deposition with Exhibits

City of Chicago response to Plaintiff's second set of interrogatories