**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| DEMOND WESTON,<br><br>　　　　Plaintiff,<br><br>v.<br><br>CITY OF CHICAGO, *et al.*,<br><br>　　　　Defendants. | Case No. 20 C 6189<br><br>Hon. LaShonda A. Hunt |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Demond Weston brings this wrongful-conviction action under 42 U.S.C. § 1983 against Defendants the City of Chicago; former Chicago police officers Michael Kill, Anthony Maslanka, William Moser, John Paladino, Andrew Christopherson, Jerome Rusnak, Victor Breska, and Dan McWeeny[1]; and Unknown Employees of the City of Chicago. The City of Chicago and Defendants Michael Kill, Anthony Maslanka, William Moser, John Paladino, Andrew Christopherson, Jerome Rusnak, Victor Breska, and Dan McWeeny (the "Individual Defendants") move separately for summary judgment. (Dkts. 284, 285). Also pending are several *Daubert* motions. (Dkts. 295, 296, 297, 298, 300, 302, 304, 305, 307, 308, 323). For the reasons discussed below, the Individual Defendants' motion for summary judgment will be granted in part and denied in part, and the City's motion for summary judgment will be denied. The Unknown Employees of the City of Chicago will be dismissed from this case. Finally, the parties' *Daubert* motions will be denied without prejudice.

---

[1] Defendant Kill died before Plaintiff commenced this action and has been substituted with George Becker, the special representative of his estate. (Dkt. 119). Defendant McWeeny died in March 2025, (Dkt. 399), so Geri Lynn Yanow, the special representative of McWeeny's estate, was likewise substituted, (Dkt. 404). Defendant Maslanka passed away in November 2022. (Dkt. 165). Pursuant to the parties' stipulation (Dkt. 182) and Rule 25, Geri Lynn Yanow, as Special Representative for deceased Defendant Anthony Maslanka, is substituted for deceased Defendant Anthony Maslanka. For clarity, the Court will refer to the substituted defendants by the deceased officers' names.

## **BACKGROUND**

The relevant facts are taken from the parties' respective Local Rule 56.1 statements and are undisputed unless otherwise noted.[2]

Before turning to the facts, the Court will address a couple of recurring evidentiary objections that the parties make to each other's statements of fact. First, the Individual Defendants challenge many of Plaintiff's statements of fact as immaterial and inconsistent with the purposes of Local Rule 56.1 for various reasons. In resolving the motions for summary judgment, the Court considers only those material factual assertions supported by the record and disregards any improper argument or editorializing. Where the Court cites a particular party's statement of fact, it does so only for convenience and not as a ruling on the parties' objections.

The Individual Defendants also object to various affidavits Plaintiff relies on as inadmissible hearsay. (*See, e.g.*, Dkt. 388 ¶ 37) ("Defendant Officers also object to the citation to an affidavit as it is hearsay."). Under Rule 56(c), an affidavit can be used to support or oppose summary judgment so long as it is based on personal knowledge, sets out facts that would be admissible evidence, and shows that that the affiant is competent to testify. Fed. R. Civ. P. 56(c)(4). Thus, to the extent the Individual Defendants oppose the affidavits themselves, that objection is overruled. However, any statements contained *within* the affidavits that would be inadmissible will be disregarded. *See Winskunas v. Birnbaum*, 23 F.3d 1264, 1267-1268 (7th Cir. 1994) (explaining that at summary judgment, "[t]he evidence need not be in admissible *form* . . . .[b]ut it must be admissible in *content*").

---

[2] The Court refers to Plaintiff's Response to the Individual Defendants' Amended Local Rule 56.1 Statement of Material Facts as "Dkt. 330" and the Individual Defendants' Response to Plaintiff's Statement of Additional Facts in Opposition to Summary Judgment as "Dkt. 388." Furthermore, the Individual Defendants' response to Plaintiff's statement of facts (Dkt. 388) contains two paragraph 20s. As a result, all of the paragraphs following the first paragraph 20 are off by one when compared to Plaintiff's statement of facts. Thus, when referencing Docket 388, the Court will cite the paragraph numbers as they appear in the document unless otherwise stated.

Lastly, for many of the Individual Defendants' statements of fact, Plaintiff does not dispute the underlying fact, but objects on the grounds that it is based on a police report, which Plaintiff contends is inadmissible hearsay. (*See, e.g.*, Dkt. 330 ¶ 4). Plaintiff's objection is not well taken. Plaintiff asserts a blanket "hearsay" objection, seemingly to the entire police report, which is nearly 300 pages long and contains numerous distinct statements. Plaintiff not only fails to identify any specific statements within the police report that he contends are hearsay but he also cites the police report in support of his own fact statements. (*See, e.g.*, Dkt. 388 ¶ 8). Moreover, the case he relies upon here, *Jordan v. Binns*, 712 F.3d 1123 (7th Cir. 2013), does not support exclusion of the entire police report. Rather, *Jordan* explains that third-party statements within police reports are not admissible solely because they appear in a public record and must have an independent basis for admissibility. *Id.* at 1133. Again, Plaintiff criticizes the Individual Defendants and then cites third-party statements within the police report to support his factual statements. (*See, e.g.*, Dkt. 388 ¶¶ 24, 26). Accordingly, the nature of Plaintiff's exact objection is unclear. Nevertheless, the Court considers those portions of the police report that could be presented in admissible form at trial. *See Winskunas*, 23 F.3d at 1267-1268.

I. **Facts**

   A. **May 29, 1990, Shootings**

Between 10:00 and 10:30 p.m. on May 29, 1990, three shootings occurred in close proximity on Chicago's South Side. At 57th and Wolcott, a group of unknown teens shot Joseph Watson and Timothy Jones. (Dkt. 330 ¶ 5). Watson died, but Jones survived. (*Id.* ¶ 6). At 5530 S. Justine, Deneen Coats and Ronald Nesbitt were shot after a group of unknown men approached the residence. (Dkt. 388 ¶¶ 7, 9-10). And at 5759 S. Honore, JD Lee, Pierre Solomon, and Derek

Mason were shot. (*Id.* ¶ 12). Defendants Moser, Maslanka, and Paladino were assigned to investigate the May 29th Watson/Jones and Coats/Nesbitt shootings. (Dkt. 330 ¶¶ 8, 106).

### B. Bryan Hampton's Interview

Within hours of the shootings, individuals said they saw a blue Chevrolet near the Watson/Jones shooting and that four members of the Black Disciples gang, including "Johnny Walker" and "C.C.", got out of the vehicle. (Dkt. 388 ¶ 15). Based on that lead, police located a blue Chevy and determined that Bryan Hampton was its owner. (*Id.* ¶ 16). Police took Hampton to the police station for questioning. (*Id.*)

Plaintiff contends that Hampton was beaten and coerced into making a statement during questioning, which the Individual Defendants dispute. (Dkt. 388 ¶ 20). At his deposition, Hampton testified that he initially told the police that he did not know anything about the shootings, but then he started to agree with whatever the police asked him because if he did not, they would hit him. (*Id.* ¶¶ 18-19; Resp., Ex. 19 at 5649, Dkt. 327-2).[3] According to Hampton, police slapped him, pulled his hair, and detained him for a period of three days. (Dkt. 388 ¶ 18). Hampton ultimately told police the following story:

> Hampton, Darrin Laws, and [Nathaniel] McCurine met up with Jerrod Smith ("J. Dilla") and John Walker; Walker and Smith talked about putting a "wrecking crew" together "because the Vice Lords had been shooting at them recently," and "Walker's rear window had been shot out;" J. Dilla wanted use of Hampton's car because "Walker's front passenger door was broken;" Hampton gave his car to McCurine for the "wrecking crew;" McCurine later told Hampton that he picked up Smith, Walker, and Servan Allen, and dropped them off at 57th and Wolcott, he heard gun shots, and then Smith, Walker, and Allen got back in the car and said they had "done their business."

---

[3] Unless otherwise noted, page numbers in citations to the docket reference the "PageID #" in the CM/ECF header of the document, not other page numbers in the header or footer.

(*Id.* ¶ 20). Hampton testified that during his interview, he overheard other people being interviewed implicate him in the shootings, so he felt like he had to "come up with something." (Dkt. 388, Ex. 71 at 9695, Dkt. 388-9).

Defendants Maslanka and Paladino interviewed Hampton. (Dkt. 388 ¶ 20). Hampton testified that one detective took notes during his interview and the other beat him. (*Id.*) According to the police report, Officer Maslanka took notes on Hampton's interview. (*Id.*) Individual Defendants deny that abuse or misconduct occurred during Hampton's interview. (*Id.* ¶¶ 18-19).

### C. Nathaniel McCurine's First Interview

On June 6, 1990, Defendants Moser and Paladino interviewed Nathaniel McCurine about the May 29, 1990 shootings. (*Id.* ¶¶ 24-25). Based on the police report, McCurine admitted to discussing a "wrecking crew" with Walker and Smith and that Walker's car windows had been shot out. (*Id.* ¶ 24). Paladino wrote in the police report that he believed McCurine was "wavering" and "might admit that he drove them or was a look-out." (*Id.* ¶ 25).

Defendant Maslanka interviewed McCurine on June 8, 1990. (*Id.* ¶ 26). According to the police report, McCurine said that he saw Smith, Walker, and Keith Jackson the night of the shooting and that later Jackson, Smith, and Walker admitted to being involved in the shootings, that Smith was armed with a .38 caliber handgun and Walker had a 9mm semi-automatic pistol, and said he had driven Jackson, Smith, and Walker on the night of the shooting. (*Id.*)

The parties dispute what transpired during McCurine's interview. Plaintiff asserts that Defendants Moser, Maslanka, and Paladino told McCurine what to say and physically abused him. (*Id.* ¶¶ 28-29). McCurine testified at his deposition that during his interviews, he told the officers that he did not know anything about the shootings, but "[t]hey did not accept" that and "kept on pressuring [him] and pressuring [him]." (Resp., Ex. 21 at 5665, Dkt. 327-3). He further testified

that the officers kept telling him that "Biz" said certain things and that he was not telling the truth and was "going [to] face murder charges." (*Id.* at 5666). McCurine testified one officer slapped the back of his head and he just started saying "the stuff that they fe[d] him" so that he could go home. (*Id.* at 5667). At his deposition, Defendant Paladino denied coercing or using force against McCurine, as did Defendant Moser. (Dkt. 388 ¶¶ 28-29).

### D. <u>Murder of Curtis Sims and June 9, 1990 Arrests</u>

On June 8, 1990, Curtis Sims was shot and killed in Chicago at 5313 S. Bishop. (Dkt. 330 ¶ 11). The Chicago Police Department identified Dwayne Macklin, William Childs, and Cortez "Vic" Brown as suspects. (Dkt. 388 ¶ 30). Police arrested Macklin at 5928 S. Union Street on the morning of June 9, 1990. (*Id.* ¶ 31). Defendants Kill, Christopherson, and McWeeny were present for the arrest. (*Id.* ¶¶ 31-32). Brown was with Macklin that morning, but he fled when the police arrived. (*Id.*)

That afternoon, Defendant Kill seized Plaintiff on the street at 5926 S. Union Street, next door to the location where Macklin was arrested and Brown had fled.[4] (*Id.*¶ 37). Plaintiff was 17 years old at the time. (*Id.* ¶ 3). According to Plaintiff, Defendant Kill asked Plaintiff if his name was "Vic," and Plaintiff responded, "I'm not Vic."[5] (Dkt. 330 ¶ 54). Plaintiff knew who "Vic" was. (*Id.*) Defendant Kill then handcuffed Plaintiff and put him in his car. (*Id.* ¶¶ 54, 57). At the time of Plaintiff's arrest, Macklin was present at the scene in a different police car driven by either Defendants Breska and Rusnak or McWeeny and Christopherson.[6] (*Id.* ¶ 53).

---

[4] The exact time of Plaintiff's seizure and subsequent arrest is not clear. The Individual Defendants say that it happened at 4:00 p.m., but Plaintiff contends that it was at 12:00 p.m. (Dkt. 330 ¶ 55).

[5] The Individual Defendants dispute that this exchange occurred. (Dkt. 388 ¶ 38).

[6] There is contradictory evidence in the record regarding which officers transported Macklin on June 9, 1990. Macklin testified that he was in a car with Defendants Christopherson and McWeeny when Plaintiff was arrested. (Resp., Ex. 28 at 5735, 5743, Dkt. 327-3). However, Christopherson testified at his deposition that he did not transport Macklin. (Ind. Defs. SOF, Ex. 7 at 3625, Dkt. 293-1). Breska testified that he did not believe he participated in

The following is disputed. (Dkt. 388 ¶ 39). According to Plaintiff, he and Defendant Kill traveled south on Union Street but before they got to Halsted Street, Kill pulled over into a vacant lot. (Dkt. 330 ¶ 57) The police car transporting Macklin also pulled over. (*Id.*) Kill got out of the car, opened the back door of the other car, and said something to Macklin that Plaintiff could not hear. (*Id.*) Kill then came back to Plaintiff's door, opened it, and said "you are not—your name is not Vic Brown?" To which Plaintiff replied "No." (*Id.*) Kill then returned to Macklin in the other car, and Plaintiff heard Macklin say, "That's not him." (*Id.*) Kill slammed the door and said, "Macklin better come up with something." (*Id.*)

The parties agree that Defendant Kill took Plaintiff to the Area 3 police station. (Dkt. 388 ¶ 48). According to Plaintiff, on the way there, Kill told Plaintiff that he hoped Plaintiff would spend the rest of his life in jail getting raped and would be given the death penalty. (*Id.*) Macklin arrived at the police station at the same time as Plaintiff. (Dkt. 330 ¶ 58).

### E. **Firearms Evidence**

Cartridges from a 9mm gun were found at all three of the May 29, 1990 shootings. (Dkt. 388 ¶ 13). The Chicago Police Department's Crime Lab examined the cartridges and concluded that they were fired from the same weapon. (Dkt. 330 ¶ 21). Two bullets, a .38 caliber and a .22 caliber, were recovered from Joseph Watson's body during an autopsy. (*Id.* ¶ 22).

On June 9, 1990, police seized a 9mm gun believed to have been used in the Sims shooting. (Dkt. 388 ¶ 44). At some point later that day, Defendant Kill learned that the 9mm gun had also been used in the May 29, 1990 shootings. (*Id.*¶ 45).

---

Macklin's arrest. (Ind. Defs. SOF, Ex. 3 at 3550, Dkt. 293-1). And at a hearing prior to Plaintiff's criminal trial, Defendant Kill testified that Defendants Rusnak and Breska drove Macklin. (Resp., Ex. 32 at 5770-5771, Dkt. 327-4).

### F. Dwayne Macklin's Interview

Defendants Kill, Christopherson, and McWeeny interviewed Macklin on June 9th after he arrived at the police station. (*Id.* ¶ 47). Following his interview, Macklin gave a statement about the Watson/Jones shooting that implicated Plaintiff. (*Id.*; Dkt. 330 ¶ 72). The parties dispute the nature of Macklin's interview. Plaintiff contends that Defendants Kill, Christopherson, and McWeeny physically abused Macklin, threatened him, and told him what to say in his statement. (Dkt. 330 ¶ 72). Macklin testified that he told Defendant Kill that he had no knowledge of the May 29th shootings or the Curtis Sims murder; that Defendant Kill "hit[] on him"; that the detectives hit him with phone books and open hands; and that the detectives told him that he would receive a break in his case if he cooperated. (Resp., Ex. 28 at 5736; Resp., Ex. 35 ¶ 13, Dkt. 324-4). Macklin testified that he agreed to make a statement identifying Plaintiff as the shooter. (*Id.*)

The Individual Defendants dispute Macklin's version of events and allegations of misconduct. (Dkt. 388 ¶ 47). At his deposition, Christopherson denied being aware of Macklin being abused during his interrogation and denied observing any detectives threatening Macklin. (Ind. Defs. SOF, Ex. 7 at 3622).

### G. Plaintiff's Interview

According to Plaintiff, after he arrived at the police station, Defendant Kill put him in a room on the third floor, handcuffed his right arm to the back of a chair, and told him that he had been arrested "for killing Curtis," which Defendants dispute. (Dkt. 388 ¶ 49). The parties agree that Defendants Moser, Maslanka, and Kill interviewed Plaintiff, but virtually all of the remaining details are disputed. (*Id.* ¶ 50).

Plaintiff recounts that the interview began several hours after his arrival at the station. (*Id.*) Defendants Moser and Maslanka showed Plaintiff photographs of people he did not know and told

him that police had his prints on a gun and that the two witnesses in the photo had implicated him. (*Id.*) Plaintiff told Moser and Maslanka that he did not know what they were talking about and asked them to call his mother. (*Id.* ¶ 51). They told him to stop crying and stop "playing stupid." (*Id.*) At some point, Moser lifted Plaintiff out of his chair by his shirt and told Plaintiff he knew he had done "it." (*Id.* ¶ 52). Moser slapped Plaintiff across the face and said they were "trying to be nice," but if he wouldn't cooperate and stop crying they were going to "make [him] talk." (*Id.*) Moser continued to hit Plaintiff and threaten him. (*Id.*) Defendant Maslanka told Plaintiff, "Niggers don't have any rights," and he did not care if Plaintiff "shit his pants," he wasn't getting out of the chair until he started saying what they wanted to hear. (*Id.* ¶ 53). Moser explained that no one knew where Plaintiff was, so they could do whatever they wanted to him. (*Id.*) Moser continued to slap him. (*Id.*) Defendant Kill returned and asked, "Did you break him yet?" (*Id.* ¶ 54). Moser and Maslanka told Kill that Plaintiff was "playing stupid." (*Id.*)

Defendant Kill returned again later and told Moser and Maslanka that Plaintiff was not "Vic Brown." (*Id.* ¶ 55). Moser, Maslanka, and Kill then left the room. (*Id.*) Defendant Moser returned to the room and told Plaintiff that they had a gun with his fingerprints on it from the shooting at 57th and Wolcott, and that Macklin and the two other witnesses they had shown him had said Plaintiff was involved. (*Id.*) Moser told Plaintiff that, even though they had his fingerprints, he could "help" Plaintiff because Macklin had said that "Vic Brown" killed "Joseph." (*Id.* ¶ 56). Moser said that he would let Plaintiff call his mother and go home within a few hours if Plaintiff would say that he saw Brown shoot "Joseph" and that the two people in the photographs were at the scene of the shooting. (*Id.*) Plaintiff was confused and asked which person was shot, Curtis or Joseph, because earlier the officer had said "Curtis." (*Id.* ¶ 57). Moser told Plaintiff he

was "playing stupid" and slapped him several more times. (*Id.* ¶ 58). He said if Plaintiff wanted to make it home at all, he should take the offer to cooperate. (*Id.*) Moser then left the room. (*Id.*)

Moser and Maslanka returned to the interview room with several other officers. (*Id.* ¶ 59). Maslanka said, "You know we can kill you right now, right? We should take you out back and string you up and make you beg for your life like Joseph did." (*Id.*) Defendant Maslanka placed Plaintiff in a chokehold and began to choke him until he passed out. (*Id.* ¶ 60). Plaintiff defecated himself. (*Id.*) Officers told Plaintiff to stand up and then sit down because they wanted to see a "nigger stew in his own shit." (*Id.* ¶ 61). They laughed about how bad "nigger shit" smelled. (*Id.*)

Defendant Moser "drilled" Plaintiff on what to say to the prosecutor who would take his statement. (*Id.* ¶ 62). This included showing him Macklin's statement, telling him about a meeting of Gangster Disciples, a "mission" for the gang, and Vic Brown carrying a 9mm gun. (*Id.*) Moser told Plaintiff that he (Plaintiff) used a .22 Derringer and that since "Joseph" was not killed with a .22, Plaintiff would be free to go home. (*Id.*)

According to the Individual Defendants, Kill, Moser, and Maslanka interviewed Plaintiff on June 9, 1990. (Dkt. 330 ¶ 61). Moser was not present for Kill's interview with Plaintiff, and Kill was not present when Moser and Maslanka spoke with Plaintiff. (*Id.*) Plaintiff told Moser and Maslanka that on May 29, 1990, he was at 5928 South Union Street in the company of Cortez "Vic" Brown and Dwayne Macklin. (*Id.* ¶ 62). They went up to Vic and told him that some Vice Lords were giving them trouble and that they were getting a crew together to take care of it but wanted some help. (*Id.*) Plaintiff said that they agreed because they were all Gangster Disciples. (*Id.*) Plaintiff explained that he, Brown, and Macklin were told to be around 57th and Winchester at 9:30 or 10:00 p.m. on May 29, 1990. (*Id* ¶ 63). Plaintiff said he observed Macklin give Brown a blue steel 9mm pistol and that this was a gun Brown always used. (*Id.*) Plaintiff stated that he

had a .22 caliber two-shot Derringer in his pocket. (*Id.*) Plaintiff was shown photos in which he identified Keith Jackson and John Walker as two of the individuals asking for assistance in pursuit of the Vice Lords. (*Id.* ¶ 64). Plaintiff also viewed a photo of Cortez Brown and identified him as "Vic." (*Id.*)

There is no dispute that on June 10, 1990, starting at 1:10 a.m. Plaintiff gave a court-reported statement in question-and-answer format to Assistant State's Attorney ("ASA") Paul Sabin concerning the shooting of Joseph Watson. (Dkt. 388 ¶ 65). Plaintiff discussed seeking revenge on the Vice Lords with Jackson, Walker, Macklin, and Brown, and ultimately confessed to the murder of Watson. (*Id.*) Plaintiff asserts that Moser coached him throughout his court-reported statement, which the Individual Defendants dispute. (*Id.* ¶ 63). According to Plaintiff, when ASA Sabin asked him questions, Moser would motion by nodding up or down for yes and no questions. (*Id.*) If it was a longer answer that Plaintiff needed help with, the attorney and court reporter would leave the room so that Moser could tell Plaintiff what to say. (*Id.*)

At his deposition, Defendant Moser testified that he was present for Plaintiff's interview with the state's attorney but that ASA Sabin never left the room. (Ind. Defs. SOF, Ex. 19 at 3695, Dkt. 293-2). He also denied telling Plaintiff what to say to ASA Sabin. (*Id.* at 3694).

## H. Probable Cause Hearing and First Grand Jury Indictment

On June 11, 1990, Plaintiff, John Walker, and Keith Jackson appeared before a judge for a probable cause hearing on first-degree murder charges related to the shooting of Joseph Watson. (Dkt. 330 ¶ 109). The prosecutor told the judge that Plaintiff, Walker, and Jackson were members of the Gangster Disciples, and that the shooting arose out of ongoing warfare between the Gangster Disciples and the Vice Lords. (*Id.*) The judge found probable cause for the charges. (*Id.*)

11

On June 26, 1990, Defendant Maslanka testified before a grand jury. (*Id.* ¶ 110). Plaintiff was subsequently indicted and charged with First-Degree Murder of Watson, Attempt First-Degree Murder of Jones, four counts of Armed Violence, Conspiracy to Commit First-Degree Murder, and three counts of Aggravated Battery. (*Id.*)

## I. Nathaniel McCurine's Second Interview

On July 14, 1990, Nathaniel McCurine gave a handwritten statement about the Watson homicide to ASA George Andrews. (Dkt. 388 ¶ 78). Defendants Kill and Moser were present when McCurine gave the statement implicating Plaintiff, Macklin, and Vic Brown. (*Id.* ¶ 79; Dkt. 330 ¶ 35). According to McCurine, the police did not use physical force on him during his second interview, but they pressured him again and fed him information and names to include in his statement. (Resp., Ex. 21 at 5673-5674). McCurine testified that he included Plaintiff in the statement because the officers mentioned Plaintiff's name, and he believed that he had to in order to be let go. (*Id.* at 5674). The Individual Defendants dispute McCurine's account of the interview. (Dkt. 388 ¶ 78).

## J. Deneen Coats's Identification of Plaintiff

Deneen Coats survived the May 29, 1990 shooting. (Dkt. 388 ¶ 84). On July 17, 1990, Defendants Paladino and Maslanka administered a lineup at the Area 3 police station that consisted of nine individuals: Thomas Baxter, Nikita Powell, Jonathan Bessent, Al Robinson, Jerrod Smith, Plaintiff, Dwayne Macklin, John Walker and Keith Jackson. (*Id.* ¶ 90; Dkt. 330 ¶ 84). Coats viewed the lineup, and she identified Jerrod Smith, John Walker, and Plaintiff as members of the group who had handguns and were shooting at her on May 29, 1990. (Dkt. 330 ¶ 87).

**K. Second Grand Jury Indictment and Court Proceedings**

In December 1991, Defendant Paladino testified before the grand jury. (Dkt. 388, Ex. 70 at 9677-9685, Dkt. 388-8). Plaintiff, John Walker, and Jerrod Smith were subsequently indicted and charged with Attempt First Degree Murder, Armed Violence, Aggravated Battery with a Firearm, and Conspiracy to commit First Degree Murder in connection with the Coats/Nesbitt Shootings. (*Id.*)

Plaintiff's criminal trial began on April 13, 1992. (Dkt. 330 ¶ 119). The prosecution called the following witnesses: McKinley Phillips (half-brother of Joseph Watson); Timothy Jones (victim of attempted murder); Antonio Harris (eye witness to Timothy Jones shooting); Defendant Moser; Pierre Solomon (victim in May 29, 1990 shootings); J.D. Lee (victim in May 29, 1990 shootings); Deneen Coats (victim); Ronald Nesbitt (victim); Joesph Moran (evidence technician), Officer Ernest Warner (firearms expert); Dr. Nancy Jones (medical examiner); Bryan Hampton (testified to conversations with Plaintiff's co-defendants Smith and Walker); Defendant Kill; Officer Robert Dieringer (Crime Lab); Defendant Maslanka; Officer Robert Belczak (responding officer to the 5759 S. Honore scene); Officer Michael McLaughlin (responding officer to the 5530 S. Justine scene); and ASA Sabin. (*Id.* ¶ 120). Defendants Breska, Rusnak, Paladino, McWeeny, and Christopherson did not testify at Plaintiff's criminal trial. (*Id.*) Macklin and McCurine did not testify at Plaintiff's criminal trial either, and their statements were not introduced as evidence. (*Id.* ¶¶ 120, 153). Plaintiff's court-reported statement was introduced at his trial, and ASA Sabin read it to the jury. (*Id.* ¶¶ 152, 155).

Plaintiff testified in his own defense. (*Id.* ¶ 159). He denied that he shot anyone and further denied being part of a wrecking crew. (*Id.* ¶ 165). He further testified that Defendant Moser struck him in the face about ten times, that Defendant Moser kept telling him that he was lying, and that

13

he ultimately agreed to say whatever Defendant Moser wanted him to say because he got scared and tired of Moser hitting him. (*Id.* ¶ 172; Resp., Ex. 2 at 5352-5353, Dkt. 327-1).

The jury found Plaintiff guilty of the murder of Joseph Watson and the attempted murder of Tim Jones, Deneen Coats, and Ronald Nesbitt.[7] (Dkt. 388 ¶ 120). He was sentenced to 45 years for the murder of Joseph Watson and a concurrent term of 30 years for the attempted murder of Timothy Jones. (Dkt. 330 ¶ 189). Plaintiff was also sentenced to 30 years each for the attempted murder of Deneen Coats and Ronald Nesbitt, to run concurrently. (*Id.*)

### L.  Post-Conviction Proceedings

On direct appeal Plaintiff's conviction was affirmed. (*Id.* ¶ 193). Plaintiff filed two unsuccessful petitions for post-conviction relief. (*Id.*) In December 2011, Plaintiff filed a claim with the Illinois Torture Inquiry and Relief Commission ("TIRC"). (*Id.* ¶ 194). The TIRC issued a decision on the claim in December 2017, finding sufficient evidence of torture to refer Plaintiff's claim to the Circuit Court for further review. (Ind. Defs. SOF, Ex. 48 at 4021-4031, Dkt. 293-5).

On December 18, 2019, a Cook County Special State's Attorney vacated Plaintiff's criminal convictions.[8] (Dkt. 388 ¶ 122). The Special State's Attorney's Office and Plaintiff had entered into an agreement and stipulated that the state would *nolle prosequi* Plaintiff's charges, and that Plaintiff would not seek a Certificate of Innocence. (Dkt. 330 ¶ 199). The Special State's Attorney deemed Plaintiff's allegations of physical abuse unsubstantiated but concluded that it could not prove Plaintiff's guilt beyond a reasonable doubt. (*Id.* ¶ 197; Dkt. 388 ¶ 122).

---

[7] Keith Jackson was acquitted of the attempted murder of Deneen Coats. (Dkt. 388 ¶ 121). Following bench trials, Walker and Smith were found guilty of the attempted first-degree murder of Coats only. (Dkt. 330 ¶ 191). Walker and Smith remain convicted of the attempted first-degree murder of Coats. (*Id.* ¶ 192).

[8] While Plaintiff's claim with the TIRC was pending, he filed another petition for post-conviction relief. (Dkt. 330 ¶ 195). The state court allowed Plaintiff's coerced confession claim to advance to a third-stage hearing, (*id.*), although it appears that hearing did not happen before Plaintiff's convictions were vacated.

## II.     **Procedural History**

Plaintiff's complaint in this action consists of eleven counts: (1) coerced and false confession in violation of the Fifth Amendment (Count I); (2) coerced confession in violation of the Fourteenth Amendment (Count II); (3) violation of due process under the Fourteenth Amendment (Count III); (4) malicious prosecution and unlawful pretrial detention in violation of the Fourth and Fourteenth Amendments (Count IV); (5) failure to intervene (Count V); (6) conspiracy (Count VI); (7) malicious prosecution in violation of Illinois law (Count VII); (8) intentional infliction of emotional distress in violation of Illinois law (Count VIII); (9) civil conspiracy in violation of Illinois law (Count IX); (10) *respondeat superior* (Count X); and, (11) indemnification of the Individual Defendants under 745 ILCS 10/9-102 (Count XI). (Dkt. 1). Plaintiff asserts the § 1983 claims in Counts I through VI against not only the Individual Defendants but also the City of Chicago, alleging that the City's widespread practices caused Plaintiff's constitutional injuries. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). The Court previously bifurcated Plaintiff's *Monell* claims from those against the Individual Defendants. (Dkt. 110).

The Individual Defendants move for summary judgment on Counts I-IX (Dkt. 285), and the City moves for summary judgment on Counts X and XI (Dkt. 284). Both parties also move to exclude certain experts retained by the other side pursuant to *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). (Dkts. 295, 296, 297, 298, 300, 302, 304, 305, 307, 308, 323).

## **LEGAL STANDARD**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party" and "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial," *id.* at 324, and support their position with "more than a scintilla of evidence," *Conley v. Vill. of Bedford Park*, 215 F.3d 703, 709 (7th Cir. 2000). Summary judgment is the time for a litigant to "put up or shut up" by "show[ing] what evidence it has that would convince a trier of fact to accept its version of events." *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 938 (7th Cir. 2021) (internal quotation marks omitted) (quoting *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020)). Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In considering a motion for summary judgment, all "justifiable" inferences are drawn in favor of the non-moving party. *Anderson*, 477 U.S. at 255. Additionally, a court must refrain from weighing evidence or making credibility determinations. *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). Finally, "[s]peculation cannot create a genuine issue of fact that defeats summary judgment." *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024).

## DISCUSSION

### I. *Daubert* Motions

The Court finds that consideration of the parties' numerous *Daubert* motions, (*see* (Dkts. 295, 296, 297, 298, 300, 302, 304, 305, 307, 308, 323) is not necessary to resolve the pending

summary judgment motions. Indeed, it is unclear why the parties filed them after the Court directed the parties to focus solely on expert opinions determinative for summary judgment purposes. (*See* Dkt. 283). In any event, because the motions need not be decided right now, and the relevance of certain experts is likely impacted by this ruling, the motions are all denied without prejudice. *Cf. Serrano v. Menard, Inc.*, 671 F. Supp. 3d 877, 883 (N.D. Ill. 2023) ("Thus, because the Court does not find it essential to rule on defendant's *Daubert* motion before resolving the summary judgment motion, we deny defendant's *Daubert* motion as moot."). The Court will set a separate schedule for all pretrial submissions.

## II.     The Unknown Defendants

The City of Chicago contends that that the Unknown Employees of the City of Chicago should be dismissed from this action because Plaintiff failed to identify them during discovery. (City's Mot. at 2948, Dkt. 284). Because Plaintiff did not respond to the City's argument, any opposition is waived. *See Nichols v. Mich. City Plant Plan. Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) (explaining that at summary judgment "[t]he non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment"). The City is correct regardless. *See Huerta v. Vill. of Carol Stream*, No. 09 C 1492, 2011 WL 111685, at *3 (N.D. Ill. Jan. 13, 2011) (citing *Williams v. Rodriguez*, 509 F.3d 392, 402 (7th Cir. 2007)) ("[D]ismissal of an unnamed defendant at summary judgment stage is warranted where the plaintiff has failed to identify and serve the defendant with process before discovery closes."). Accordingly, the Unknown Employees of the City of Chicago will be dismissed.

### III. <u>Individual Defendants' Motion for Summary Judgment</u>

The Individual Defendants move for summary judgment on all of Plaintiff's claims. They assert qualified immunity as a defense to every Section 1983 claim and contend that the state-law claims fail as a matter of law. (Ind. Defs. Mem. at 3139-3141, 3139; Dkt. 292).

"Qualified immunity protects public servants from liability for reasonable mistakes made while performing their public duties." *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013) (citing *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000)). Once the defense is properly raised, the plaintiff must show two elements to defeat it: "first, that the facts show 'a violation of a constitutional right,' and second, that the 'constitutional right was clearly established at the time of the alleged violation.'" *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019) (quoting *Gill v. City of Milwaukee*, 850 F.3d 335, 340 (7th Cir. 2017)). To establish the second element, the plaintiff must "show either a reasonably analogous case that has both articulated the right at issue and applied it to a factual circumstance similar to the one at hand or that the violation was so obvious that a reasonable person necessarily would have recognized it as a violation of the law." *Id.* (internal quotation marks omitted) (quoting *Howell v. Smith*, 853 F.3d 892, 897 (7th Cir. 2017)).

#### A. <u>Count I: § 1983 Coerced and False Confession (5th Amendment)</u>

Count I alleges that the Individual Defendants conducted an unlawful interrogation that caused Plaintiff to falsely and involuntarily implicate himself in Watson's murder in violation of his Fifth Amendment right against self-incrimination. (Compl. ¶ 120, Dkt. 1). The Court will first consider whether the right at issue was clearly established at the time of Plaintiff's confession in 1990 and trial in 1992. *See Mason-Funk v. City of Neenah*, 895 F.3d 504, 507 (7th Cir. 2018) (noting courts have discretion to choose which prong of the qualified immunity analysis to address first). Plaintiff contends that "courts have long held that coercing a confession in the matter that

Plaintiff alleged—including being hit, slapped, choked until he was unconscious and threatened to be harmed further—was unconstitutional." (Sur-reply at 9909, Dkt. 398) (citing *Blackburn v. Alabama*, 361 U.S. 199, 205 (1960) and *Brown v. Mississippi*, 297 U.S. 278, 286 (1936)).

The Court concurs with Plaintiff. The Fifth Amendment's Self-Incrimination Clause provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In 1964, the U.S. Supreme Court recognized that the "Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment against abridgment by the States." *Malloy v. Hogan*, 378 U.S. 1, 6 (1964). And a long line of Supreme Court precedent prohibits the use of confessions obtained through mental or physical coercion in criminal proceedings. *See Brown*, 297 U.S. at 286 ("[T]he trial . . . is a mere pretense where the state authorities have contrived a conviction resting solely upon confessions obtained by violence."); *Blackburn*, 361 U.S. at 206 ("Since *Chambers v. Florida*, 309 U.S. 277, this Court has recognized that coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition."); *Sims v. Georgia*, 389 U.S. 404, 407 (1967) ("It needs no extended citation of cases to show that a confession produced by violence or threats of violence is involuntary and cannot constitutionally be used against the person giving it."); *New Jersey v. Portash*, 440 U.S. 450, 459 (1979) (providing that under the Fifth and Fourteenth Amendments, a defendant's compelled statements . . . may not be put to any testimonial use whatever against him in a criminal trial."). Thus, a reasonable officer interrogating a suspect in the 1990s "would have recognized that coercing a confession by abusive language and physical contact, along with coaching the suspect as to the details of the confession, clearly violates the suspect's constitutional right against self-incrimination." *Hill v. City of Chicago*, No. 06 C

19

6772, 2009 WL 174994, at *8 (N.D. Ill. Jan. 26, 2009) (finding that right was clearly established in 1992).

Nonetheless, the Individual Defendants contend that they are entitled to qualified immunity as to Count I based on *Blackmon v. Jones*, 132 F.4th 522, 525 (7th Cir. 2025), *reh'g denied,* No. 23-3288, 2025 WL 1154854 (7th Cir. Apr. 18, 2025). (Ind. Defs. Reply at 9875, Dkt. 397). In *Blackmon*, the Seventh Circuit held that police officers generally cannot be held liable under § 1983 for conducting a suggestive lineup. 132 F.4th at 525. The Seventh Circuit reasoned that "[a] prosecutor's use of evidence at trial is a weak ground of liability for police officers" and the appropriate remedy is exclusion of the evidence at trial. *Id.* The Individual Defendants argue that the same logic applies to coerced confession claims. (Ind. Defs. Reply at 9875). They maintain that *Blackmon* stands for the principle that Plaintiff "may recover damages only if the law clearly established that 'police officers [were] liable in damages when judges allowed prosecutors to introduce [an involuntary statement] into evidence at trial." (*Id.* at 9876) (quoting *Blackmon*, 132 F.4th at 526). *Blackmon*, however, appears limited to its holding. The Seventh Circuit noted,

> The officers have not asked for qualified immunity with respect to the counts of Blackmon's complaint that charge them with manufacturing evidence or coercing testimony. Their appeal is limited to Blackmon's contention that an unduly suggestive photo array or lineup *by itself* entitles an accused to damages. And our answer—that it does not—is limited to that issue.

*Id.* at 525. Thus, *Blackmon* does not appear to reach coerced confession claims against police officers. *See Brown v. City of Chicago*, No. 19 C 4082, 2025 WL 2785426, at *18 (N.D. Ill. Sept. 30, 2025) (rejecting argument that *Blackmon* bars Fifth Amendment coerced confession claims and noting that "is that it is not clear whether the Seventh Circuit intended for *Blackmon* to displace prior decisions, which permit similarly situated plaintiffs to pursue such claims"); *Marshall v. Gus*

*Petropoulous,*, No. 22-CV-0525-BHL, 2023 WL 372162, at *4 (E.D. Wis. Jan. 24, 2023) (collecting cases holding police officers liable for eliciting coerced statements).

In sum, Plaintiff has shown that the constitutional right at issue was clearly established at the time of the alleged violation. As such, the Court must now consider whether Plaintiff has established the constitution violation itself. *Leiser*, 933 F.3d at 701. The Individual Defendants challenge Plaintiff's claim on two main grounds.

First, they assert that Plaintiff "converted his Fifth Amendment claim into a due process claim that is identical to that pled in Count III" because Plaintiff alleges that his confession was fabricated and caused a deprivation of liberty. (Ind. Defs. Mem. at 3167). But the Individual Defendants cite no authority to support this contention, and the Court is aware of none. (*See id.* at 3167-3168). Accordingly, that argument is a nonstarter.[9] *See Bezingue v. Steuben Lakes Reg'l Waste Dist.*, 507 F. Supp. 3d 1021, 1043 (N.D. Ind. 2020) (collecting cases) ("It is well-settled that failure to cite authorities in support of an argument constitutes waiver of an issue.").

Second, the Individual Defendants contend that Count I fails on the merits because Plaintiff cannot establish that his confession was fabricated. (Ind. Defs. Mem. at 3167). They are mistaken. Plaintiff does not have to show that his confession was fabricated; he must show that it was *coerced*. To prevail on a Fifth Amendment coerced confession claim, Plaintiff must prove that (1) his confession was improperly coerced, and (2) it was used against him in his criminal case. *Chavez v. Martinez*, 538 U.S. 760, 770-771 (2003). To determine whether Plaintiff's confession was coerced, the Court considers the totality of the circumstances and asks whether Plaintiff's "will was overborne in such a way as to render his confession the product of coercion." *Arizona v.*

---

[9] In addition, the Individual Defendants argue that Plaintiff cannot recover actual damages for Count I because the claim is identical to Count III, and Plaintiff cannot recover twice for the same injury. (Ind. Defs. Mem. at 3167). However, that argument fails because it is based on the Individual Defendants' unsupported assertion that Counts I and III are identical.

21

*Fulminante*, 499 U.S. 279, 288 (1991). The Court "evaluate[s] coercion from the perspective of a reasonable person in [Plaintiff's] position." *Hicks v. Hepp*, 871 F.3d 513, 527 (7th Cir. 2017) (citing *United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001)). Relevant factors include Plaintiff's "age, education, intelligence level, and mental state; the length of [his] detention; the nature of the interrogations; the inclusion of advice about constitutional rights; and the use of physical punishment, including deprivation of food or sleep." *Id.* (internal quotation marks omitted) (quoting *United States v. Sturdivant*, 796 F.3d 690, 695 (7th Cir. 2015)).

Plaintiff's confession was used against him at his trial, (Dkt. 330 ¶¶ 152, 155), so the first element is satisfied, *see Chavez*, 538 U.S. at 770-771. As to the second element, at the time of his interrogation, Plaintiff was 17 years old. (Dkt. 388 ¶ 3). He was questioned without an attorney present, and according to his testimony, the interrogating officers threatened his life, repeatedly called him a racial slur, choked him until he lost consciousness and defecated himself, said that he could call his mom and go home if he would say certain things, told him that he should cooperate if he ever wanted to make it home, and then coached him through the confession he ultimately made. (*See, e.g.*, Dkt. 388 ¶¶ 50, 52-54, 58-63, 65, 62-63). Plaintiff was at the police station for several hours: he was either arrested at 12:00 p.m. or at 4:00 p.m. on June 9, 1990, (Dkt. 330 ¶ 55), and it undisputed that he started his recorded statement at 1:10 a.m. the next day, (Dkt. 388 ¶ 65). Furthermore, Jackson, Walker, and Macklin all testified that they heard Weston screaming in pain and agony in the interrogation room, and Mackin observed afterwards that Weston looked beat up. (*Id.* ¶ 66).

Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that person in Plaintiff's position—a teenager, at a police station for at least nine hours, and subjected to psychological and physical abuse—would feel compelled to "cooperate" with the

officers. "It is axiomatic that a confession extracted with violence or the threat of violence is involuntary." *Holland v. McGinnis*, 963 F.2d 1044, 1050 (7th Cir. 1992) (citing *Miller v. Fenton*, 474 U.S. 104, 109-110 (1985) and *Brown*, 297 U.S. at 285-87). Thus, Plaintiff has presented sufficient evidence to create a triable issue of fact concerning the voluntariness of his confession.

Plaintiff asserts Count I against all of the Individual Defendants, but "[i]ndividual liability pursuant to § 1983 'requires personal involvement in the alleged constitutional deprivation.'" *Est. of Perry v. Wenzel*, 872 F.3d 439, 459 (7th Cir. 2017) (quoting *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017)). The evidence viewed in the light most favorable to Plaintiff supports the conclusion that Defendants Moser, Maslanka, and Kill were personally involved in coercing Plaintiff's confession, but the record contains nothing showing that any of the other Defendants were involved. Plaintiff admits that Defendant Paladino "did not mistreat or coerce a statement from [him]," (*id.* ¶ 59), and he does not appear to argue that any of the remaining Individual Defendants were directly involved in any event. Accordingly, Defendants Paladino, McWeeny, Christopherson, Rusnak, and Breska are entitled to qualified immunity as to Count I because Plaintiff has failed to establish that they violated his rights. *Leiser*, 933 F.3d at 701. The factual dispute over whether Defendants Moser, Maslanka, and Kill coerced Plaintiff's confession precludes a finding that those officers are entitled to qualified immunity at this time. *See Smith v. Finkley*, 10 F.4th 725, 750 (7th Cir. 2021) (finding that "[t]he existence of material factual disputes" prevented the court from ruling on qualified immunity but that the defense was preserved for later determination).

In sum, on Count I, summary judgment will be granted in favor of Defendants Paladino, McWeeny, Christopherson, Rusnak, and Breska and denied as to Defendants Moser, Maslanka, and Kill.

### B. Count II: § 1983 Coerced Confession (14th Amendment)

"Convictions based on evidence obtained by methods that are 'so brutal and so offensive to human dignity' that they 'shoc[k] the conscience' violate the Due Process Clause." *Chavez*, 538 U.S. at 774 (quoting *Rochin v. California*, 342 U.S. 165, 172, 174 (1952)). In Count II, Plaintiff alleges that Officers Moser, Maslanka, and Kill forced him to falsely incriminate himself using extreme physical and psychological torture techniques that shock the conscience.[10] (Compl. at ¶¶ 136-137; Resp. at 7492, Dkt. 335).

The Individual Defendants argue that Plaintiff failed to address qualified immunity with respect to Count II in his response brief and therefore waived opposition to the defense. (Ind. Defs. Reply at 9883). Plaintiff's treatment of qualified immunity as to Count II is perfunctory at best. That section of his response brief does not mention "qualified immunity" at all. Plaintiff seemingly only references qualified immunity in an explanatory parenthetical, where he notes that the Ninth Circuit in *Martinez v. City of Oxnard*, 337 F.3d 1091, 1092 (9th Cir. 2003), found that the interrogation tactics at issue violated the plaintiff's clearly established substantive due process rights, (*see* Resp. at 7486-7487). Such an undeveloped argument can constitute waiver. *See Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived.")

Regardless, *Martinez* is not analogous to this case. There, the plaintiff alleged that an officer "brutally and incessantly questioned him, after he had been shot in the face, back, and leg and would go on to suffer blindness and partial paralysis, and interfered with his medical treatment while he was 'screaming in pain . . . and going in and out of consciousness.'" *Martinez*, 337 F.3d

---

[10] In his response brief, Plaintiff abandoned Count II as to Defendants Paladino, Christopherson, Rusnak, Breska, and McWeeny. (*See* Resp. at 7492).

at 1092 (alteration in original). The Ninth Circuit denied qualified immunity to the officer, finding that "freedom from coercive police interrogation" was a clearly established right, and that if the plaintiff's allegations were true, the officer violated that right. *Id.*

Although disturbing, Plaintiff's allegations, which concern beatings during questioning, are not like the plaintiff's in *Martinez*. To defeat the Individual Defendants' assertion of qualified immunity, Plaintiff does not have to cite a case "directly on point," but "the clearly established law must be particularized to the facts of the case." *Gill*, 850 F.3d at 340 (internal quotation marks omitted) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)). The fact that the Ninth Circuit in *Martinez* found the right to freedom from coercive police interrogation clearly established does not suffice to establish that the Individual Defendants here violated Plaintiff's clearly established substantive due process rights. "Highly generalized assertions of the right to be free from coercive or conscience-shocking interrogation will not defeat a qualified immunity defense in the absence of a close factual analog to the facts of the case at bar." *Sanders v. Splittorff*, No. 17 C 864, 2024 WL 3470892, at \*6 (S.D. Ill. July 19, 2024) (citing *Gill*, 850 F.3d at 341). Because Plaintiff did not identify any such "close factual analog" or otherwise meaningfully address the Individual Defendants' assertion of qualified immunity, Defendants Moser, Maslanka, and Kill are entitled to qualified immunity as to Count II.

### C. Count III: § 1983 Violation of Due Process (14th Amendment)

In Count III, Plaintiff alleges that the Individual Defendants violated his right to due process and a fair trial in two ways: (1) by fabricating evidence and (2) by "with[olding] exculpatory and impeachment evidence from Plaintiff, his attorneys, and prosecutors, among others, thereby misleading and misdirecting Plaintiff's criminal prosecution" in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). (Compl. ¶¶ 142-143). The Individual Defendants contend

that "Plaintiff cannot show that any Defendant violated his right of access to evidence by withholding exculpatory evidence or fabricating evidence." (Ind. Defs. Mem. at 3142). As explained below, the evidence does not show that the Individual Defendants fabricated evidence, but there is a triable issue as to whether the Individual Defendants violated *Brady* by suppressing evidence of the alleged coercion of Hampton, Macklin, and McCurine. Accordingly, Defendants Paladino, Kill, Christopherson, McWeeny, Moser, and Maslanka are not entitled to qualified immunity as to Count III at this time.

### i. Fabricated Evidence

"Obviously, law enforcement officers 'may not knowingly use false evidence, including false testimony, to obtain a tainted conviction.'" *Coleman v. City of Peoria*, 925 F.3d 336, 344 (7th Cir. 2019) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). Doing so "violates a defendant's right to a fair trial guaranteed by the Fourteenth Amendment's Due Process Clause." *Id.* To show that the Individual Defendants fabricated evidence, Plaintiff must show that they: (1) knowingly fabricated evidence against him, (2) the evidence was used at his criminal trial, (3) the evidence was material, and (4) he was damaged as a result. *Brown v. City of Chicago*, 633 F. Supp. 3d 1122, 1157 (N.D. Ill. 2022) (citing *Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020)). "It does not satisfy the knowledge requirement to show that the officers had reason to doubt the evidence." *Mims v. City of Chicago*, No. 18 C 7192, 2024 WL 1075152, at *12 (N.D. Ill. Mar. 12, 2024), *aff'd*, 155 F.4th 970 (7th Cir. 2025) (citing *Coleman*, 925 F.3d at 345). Plaintiff must show that the Individual Defendants knew, "with certainty," that the evidence was false, which "is a high bar to clear." *Coleman*, 925 F.3d at 344.

Plaintiff contends that he "has adduced several fabricated pieces of evidence used to deprive him of his liberty[,] including the fabricated statements of Hampton, Macklin, and

26

McCurine and [his own] fabricated confession." (Resp. at 7492). According to Plaintiff, "[t]here is ample evidence that Defendants knew they were eliciting false statements, given the coercive and violent circumstances required to do it." (*Id*. at 7499). The Individual Defendants' primary argument is that Plaintiff conflates coerced testimony with fabricated testimony and fails to "identify any fact in any of the statements that was known to be false to any defendant." (Ind. Defs. Reply at 9831).

### a. Hampton's statement

According to Plaintiff, a jury could find that Defendants Paladino and Kill, specifically, fabricated Hampton's statement. (Resp. at 7493). Plaintiff likely waived his ability to rely on this document because he did not "did not disclose Hampton's statement in his interrogatory answer listing the evidence that was allegedly fabricated" or in his complaint. (Ind. Defs. Reply at 9840); *see* Fed. R. Civ. P. 37(c)(1). But, in any event, Plaintiff cannot show that Paladino and Kill fabricated Hampton's statement.

Even when viewing the evidence in the light most favorable to Plaintiff, Hampton's testimony indicates that *Hampton* knew that his statement was false, but the evidence does not show that Kill and Paladino knew, "with certainty," that the statement was false. *Coleman*, 925 F.3d at 344. Hampton testified that he made up the wrecking crew story because he overheard other witnesses implicate him in the shootings and he did not "want to go to jail for something [he] didn't do." (Dkt. 388, Ex. 71 at 9694-9695). Hampton said, "at that point, [he] had to . . . do what the other guys w[ere] doing." (*Id.* at 9696) He saw that the other witnesses went home "when they told [the officers] that, so [he] wanted to go home, too." (*Id.*)

Plaintiff argues that the Individual Defendants' coercive interrogation tactics demonstrate that they knew they were eliciting false testimony. (Resp. at 7499). But Plaintiff's argument incorrectly assumes that coercion equals fabrication. *See Anderson v. City of Rockford*, 932 F.3d

27

494, 510 (7th Cir. 2019) ("[C]oercion and fabrication are not synonyms."). The Seventh Circuit

has explained that

> [c]oercively interrogating witnesses, paying witnesses for testimony, and witness-shopping may be deplorable, and these tactics may contribute to wrongful convictions, but they do not necessarily add up to a constitutional violation even when their fruits are introduced at trial. Evidence collected with these kinds of suspect techniques, unlike falsified evidence and perjured testimony, may turn out to be true.

*Whitlock v. Brueggemann*, 682 F.3d 567, 584 (7th Cir. 2012). In other words, an officer "fabricating

evidence that she knows to be false is different than getting 'a reluctant witness to say what may

be true.'" *Petty v. City of Chicago*, 754 F.3d 416, 422 (7th Cir. 2014) (quoting *Fields v. Wharrie*,

740 F.3d 1107, 1113 (7th Cir. 2014)). Evidence of coercion alone is therefore insufficient to prove

fabrication, and Plaintiff has not produced evidence that bridges the gap. Ultimately, the Individual

Defendants correctly describe Hampton's story as "one not of fabrication, but of alleged coercion

and admitted self-interest." (Ind. Defs. Reply at 9841). Because Plaintiff "cannot save a claim

based on coercive interrogation techniques via speculation that defendants were knowingly

fabricating evidence," his evidence-fabrication theory fails with respect to Hampton's statement.

*Coleman*, 925 F.3d at 346 (citing *Petty*, 754 F.3d at 423).

### b.  Macklin's statement

Plaintiff contends that a jury could find that Defendants Kill, Christopherson, and

McWeeny fabricated Macklin's statement. (Resp. at 335). But to succeed on an

evidence-fabrication theory, Plaintiff must show that the fabricated evidence was used against him

at trial. *Brown*, 633 F. Supp. 3d at 1157; *Avery v. City of Milwaukee*, 847 F.3d 433, 442

(7th Cir. 2017) ("[T]he due-process violation wasn't complete until the false confession was

introduced at Avery's trial."). Because Macklin's statement was not used against Plaintiff at his

28

trial, (Dkt. 330 ¶ 153), Plaintiff cannot rely on Macklin's statement for his evidence-fabrication theory.

### c. McCurine's statement

Plaintiff argues that a jury could find that Defendants Paladino, Maslanka, and Moser fabricated McCurine's statement, but McCurine's statement was not used in Plaintiff's trial either. (*Id.*) Accordingly, Plaintiff's evidence-fabrication theory fails with respect to McCurine's statement as well. *See Brown*, 633 F. Supp. 3d at 1157; *Avery*, 847 F.3d at 442.

### d. Plaintiff's confession

Lastly, Plaintiff contends that a jury could find that Defendants Kill, Moser, and Maslanka "knowingly fabricated [Plaintiff's] false confession implicating himself in the Watson murder and attempted murder of Jones." (Resp. at 7497). Plaintiff argues that "Defendants knew that Plaintiff had consistently denied any knowledge of the May 29 shootings and that they had to supply him with all the information for his statements to the prosecutor." (*Id.*) (citing Dkt. 388 ¶¶ 49-68). Plaintiff also highlights his testimony that "Defendant Moser had to 'drill' [him] on the facts and take breaks in the statement so that [he] could get the 'facts' right.'" (*Id.*) (citing Dkt. 388 ¶¶ 63-64). In response, the Individual Defendants argue that Plaintiff "tells the same story of coercion that the Seventh Circuit rejected as supporting an inference of fabrication in *Coleman*. (Ind. Defs. Reply at 9845). The Individual Defendants are correct.

In *Coleman*, an exoneree asserted that the police fabricated evidence by coercing a false statement from a witness that implicated the exoneree in a home invasion. 925 F.3d at 344. When questioned by police, the witness initially denied any involvement in the home invasion, but the officer told the witness that he did not believe him, informed the witness that another witness had already identified him, showed the witness a photograph of the exoneree, and "told [the witness]

29

he would spend the rest of his life in prison and never see his family again if he did not incriminate [the exoneree]." *Id.* at 340. The witness ultimately confessed to committing the home invasion with the exoneree and other individuals. *Id.*

The Seventh Circuit rejected the exoneree's argument that the officer "must have known" that the witness's statement was false because the officer coerced the witness into confessing and supplied the witness with details about the crime, reasoning that "the fact [the officer] applied coercive interrogation techniques is insufficient to find fabrication of evidence." *Id.* at 346 (citing *Avery*, 847 F.3d at 439 ("[A] claim that an officer coerced a witness to give incriminating evidence does not, at least standing alone, violate the wrongly convicted person's due-process rights.")). The Seventh Circuit noted that, based on the witness's testimony, the officer confronted the witness "with facts provided by the victims and the police's theory of the crime" and explained that "[t]here is nothing unconstitutional about a law enforcement officer confronting a suspect with direct questions about information supplied by others." *Id.*

Plaintiff's argument here is not meaningfully different from the exoneree's in *Coleman*. Indeed, Plaintiff asks the Court to infer that Defendants Kill, Moser, and Maslanka knew that his confession was false based on their alleged coercive interrogation tactics and fact-feeding. But as the Seventh Circuit explained, that evidence is not enough to establish fabrication. *Id.* at 346. Accordingly, Plaintiff's showing falls short. *See id.*; *see also Petty*, 754 F.3d at 423 (rejecting argument that officers knew or should have known that witness's statements were flawed where the officers "threaten[ed] [the witness] with jail time if he did not cooperate, h[eld] him against his will in a locked room without food or water for over 13 hours, badger[ed] him, and pressur[ed] him to identify [the plaintiff] as one of the assailants"). Without evidence that Moser, Maslanka, and Kill knowingly created false evidence, Plaintiff cannot sustain his fabrication theory. At most,

30

he has a coercion claim. *See Avery*, 847 F.3d at 439 ("What's relevant is not the label on the claim, but whether the officers 'created evidence that *they knew to be false*.'" (quoting *Petty*, 754 F.3d at 423)).

For the reasons explained above, Plaintiff has failed to produce evidence showing that the Individual Defendants knowingly fabricated evidence to obtain his conviction. Consequently, he cannot proceed with Count III based on an evidence-fabrication theory.

### ii. *Brady*

To establish a *Brady* violation, a "plaintiff must demonstrate that the suppressed evidence was favorable to him, the defendant officers suppressed the favorable evidence, and, due to the materiality of the withheld evidence, the plaintiff was prejudiced." *Brown*, 633 F. Supp. 3d at 1163 (citing *Anderson*, 932 F.3d at 504). "Evidence is 'suppressed' when (1) the prosecution failed to disclose the evidence in time for the defendant to make use of it, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence." *Carvajal v. Dominguez*, 542 F.3d 561, 567 (7th Cir. 2008). "Evidence is 'material' 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* A reasonable probability is a lesser standard of proof a preponderance of evidence and exists if "the cumulative effect of all the suppressed information is to undermine confidence in the verdict." *Goudy v. Cummings*, 922 F.3d 834, 842 (7th Cir. 2019).

Plaintiff asserts that the Individual Defendants withheld the following evidence: (1) "the coercion used to induce Hampton, Macklin and McCurine to give false and fabricated statements implicating a 'wrecking crew' in Watson's murder, and for Macklin and McCurine, specifically implicating Plaintiff in that 'wrecking crew' and homicide"; (2) "how they induced Coats to identify Plaintiff"; (3) evidence about an alternative suspect, Kavin McMorris; and (4) "the street

31

file from the prosecutor, which would have included information about the case, including about McMorris." (Resp. at 7502). The Individual Defendants challenge Plaintiff's *Brady* theory from several angles.

### a.  <u>Inducement of Coats</u>

First, the Individual Defendants contend that Plaintiff has no evidence that Coats's identification of Plaintiff was the result of suggestive lineup procedures because the basis for Plaintiff's assertion is inadmissible hearsay. (Ind. Defs. Reply at 9862-9863). Coats passed away in 2012 before anyone in this lawsuit could depose her. (Dkt. 330 ¶ 207).  However, Susan Swanson, a private investigator who has worked on Plaintiff's case, testified that she and Coats talked in 2010 and that Coats said police showed her a photo array while she was in the hospital immediately after the May 29, 1990 shootings. (*Id.* ¶¶ 201-203; Dkt. 388, Ex. 67 at 9616-9617, Dkt. 388-5). According to Swanson, Coats said that she picked out two suspects but then the police showed her who the third and fourth suspects were. (Dkt. 330 ¶ 203). Coats further said that the police told her that the two guys she picked told the police who the other guys were. (*Id.*) Plaintiff admits that Coats's statement to Swanson is hearsay but argues that it is admissible as a statement against interest or under the residual exception to the hearsay rule. (Resp. at 7478).

Because "[a] party may not rely on inadmissible hearsay to avoid summary judgment," *MMG Fin. Corp. v. Midwest Amusements Park, LLC*, 630 F.3d 651, 656 (7th Cir. 2011) (citing *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997)), the Court must determine whether Coats's statement is admissible under an exception. Under Federal Rule of Evidence 804(b)(3), "hearsay statements are not excluded by the hearsay rule if '(1) the declarant is unavailable as a witness, (2) the statement was against the declarant's penal interest when made, and (3) corroborating circumstances clearly suggest that the statement is trustworthy.'" *United States*

*v. Jackson*, 540 F.3d 578, 588 (7th Cir. 2008) (quoting *United States v. Loggins*, 486 F.3d 977, 981 (7th Cir. 2007)).

Here, the first element is met because Coats is deceased. (Dkt. 330 ¶ 207). Plaintiff argues that the second element is met because Coats, "in providing a statement recanting her trial testimony, exposed herself to criminal liability for perjury." (Resp. at 7479). Coats did not recant her prior testimony, however. "A recantation is generally understood to be the formal renunciation or withdrawal of one's prior statement or testimony." *Arnold v. Dittmann*, 901 F.3d 830, 841 (7th Cir. 2018) (citing Black's Law Dictionary 1459 (10th ed. 2014)). Coats did not sign a statement recanting her testimony at Plaintiff's trial nor did she tell Swanson that her identifications were false. (Dkt. 388, Ex. 67 at 9643, 9649-9650). Based on Swanson's testimony, Coats became less confident in her identifications after Swanson told her that she was there on behalf of someone who she believed was innocent. (*Id.* at 9642). Additionally, the statute of limitations for perjury had expired by the time Coats and Swanson talked. 720 ILCS 5/3-5(b) (providing three-year limitations period for all felonies not enumerated in 720 ILCS 5/3-5(a)). Therefore, Rule 804(b)(3) does not apply.

For Coats's statement to be admissible under the residual exception provided by Rule 807, Plaintiff must establish five elements: "(1) circumstantial guarantees of trustworthiness; (2) materiality; (3) probative value; (4) the interests of justice; and (5) notice." *United States v. Ochoa*, 229 F.3d 631, 638 (7th Cir. 2000) (citing *United States v. Hall*, 165 F.3d 1095, 1110 (7th Cir. 1999)). The Seventh Circuit instructs that Rule 807 is to be construed narrowly. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 233 (7th Cir. 2021). The Individual Defendants argue that Plaintiff cannot establish the first or third elements. (*See* Ind. Defs. Reply at 9865).

33

According to Plaintiff, there are "ample" corroborating circumstances supportive of the trustworthiness of Coats's statement. (Resp. at 334, 335). Plaintiff argues that Swanson "took detailed notes of her conversation with Coats, recording everything, regardless of whether it was positive or negative for her client" and that Swanson was "deposed and read through the notes line by line and answered questions about the circumstances of the statement." (*Id.*) (citing Dkt. 388 ¶¶ 94, 96). Plaintiff further argues that independent evidence supports the statement, pointing "all the other fabrications of evidence in this case" and Defendant Paladino's invocation of his Fifth Amendment rights when asked if he would show victims photo arrays of suspects before showing them a lineup containing those suspects. (*Id.* at 334-335) (citing Dkt. 388 ¶ 130).

Plaintiff has not shown that the statement has the circumstantial guarantees of trustworthiness necessary for admission under Rule 807. Swanson talked to Coats for roughly one hour, while Coats was in the hospital, almost 20 years after the lineup occurred. (Dkt. 330 ¶¶ 201-202). The significant lapse of time alone calls the trustworthiness of Coats's statement into question. *See United States v. Sinclair*, 74 F.3d 753, 759 (7th Cir. 1996) ("The immediacy of this knowledge is one of the key circumstances indicating trustworthiness. These exceptions to the hearsay rule do not include statements that express memory of distant events."). Coats's statement indicates that her memory had degraded to some extent by the time she talked to Swanson, or at least there was a miscommunication, because she told Swanson that she picked four individuals from the July 17, 1990 lineup, when the record evidence shows that she picked three. (Dkt. 388, Ex. 66 at 9640-9641; Resp., Ex. 49 at 5937, Dkt. 327-5). Coats herself also testified at Plaintiff's trial that she identified three individuals in the lineup. (Resp., Ex. 76 at 6259-6264, Dkt. 327-8). Although Coats spoke with Swanson voluntarily, she was not under oath

nor subject to cross-examination or a penalty for perjury. *See United States v. Moore*, 824 F.3d 620, 622 (7th Cir. 2016) (listing factors to consider when evaluating trustworthiness of a hearsay statement). Moreover, Plaintiff focuses almost entirely on Swanson's credibility, thereby failing to address whether *Coats* is a reliable source of information. *See id.* (providing that "the character of the witness for truthfulness and honesty" is a factor to consider for trustworthiness analysis).

Also, the probative value of Coats's statement is questionable. Coats did not tell Swanson which two witnesses she identified herself, and which ones the police identified for her when they visited her at the hospital. (Dkt. 388, Ex. 67 at 9633, 9635, 9648). Nor did Coats say that police told her who to pick out of the July 17, 1990 lineup or whether the lineup contained the same people as those in the photographs the police showed her at the hospital. (*Id.* at 9640-9641) So, it is unclear whether the police actually influenced her identification of Plaintiff. Finally, Coats testified about the line-up at Plaintiff's trial, and she was under oath at that time, subject to cross-examination by Plaintiff's defense counsel, and the line-up had only occurred two years prior. (Dkt. 388 ¶ 117; *see* Dkt. 388, Ex. 66 at 9582-9611, Dkt. 388-4). When asked then if she recognized the three people she identified as being part of the group that shot her before she communicated her identifications to the police, she responded yes, and Plaintiff's defense counsel also questioned her about her identification of Plaintiff, specifically. (Dkt. 388, Ex. 66 at 9583, 9601-9611). Plaintiff has not demonstrated why the Court should trust Coats's inconsistent, unsworn statement made nearly 20 years after the line-up, over her sworn testimony at Plaintiff's trial. For these reasons, Plaintiff has not shown that Coats's statement would be admissible, so he may not rely on it to create a factual dispute. *See MMG Fin. Corp.*, 630 F.3d at 656.

### b. <u>Coercion of Hampton, Macklin, and McCurine</u>

According to the Individual Defendants, Plaintiff's *Brady* theory cannot be premised on the alleged coercion of Hampton, Macklin, and McCurine because *Brady* does not require officers

35

to admit wrongdoing, (Ind. Defs. Mem. at 3147) (citing *Saunders-El v. Rohde*, 778 F.3d 556, 561-662 (7th Cir. 2015)). They further contend that *Brady* does not require officers "to create exculpatory evidence by generating reports reflecting truthful versions of events." (*Id.*) (citing *Saunders-El*, 778 F.3d at 562). Additionally, the Individual Defendants argue that the alleged coercion of Macklin and McCurine was not material because they did not testify against Plaintiff at his trial nor were their statements used against him. (*Id.* at 3152). Plaintiff responds that the Individual Defendants' mischaracterize his *Brady* theory, which is based on "the pressure tactics" used to obtain Macklin's, McCurine's, and Hampton's statements. (Resp. at 7505) (internal quotation marks omitted) (quoting *Avery*, 847 F.3d at 443).

The parties made these same arguments at the motion-to-dismiss stage, so the Court will not spend much time rehashing them. Judge Alonso allowed Plaintiff to proceed with his *Brady* theory, finding it akin to *Brady* claims deemed actionable in other cases.[11] *See Weston v. City of Chicago*, No. 20 C 6189, 2021 WL 2156459, at *7 (N.D. Ill. May 27, 2021) ("There was similar *Brady* evidence in cases such as *Anderson*, *Avery*, *Kyles*, and *Goudy*, and under those cases, plaintiff states a *Brady* claim."). Judge Alonso's reasoning remains sound as Plaintiff's *Brady* theory has not changed. Indeed, "[c]oerced testimony triggers a due process claim when the officer fails to disclose *how* he coerced the witness, meaning the 'coercive tactics' used to compel testimony." *Hill v. Cook Cnty.*, 463 F. Supp. 3d 820, 834 (N.D. Ill. 2020) (quoting *Avery*, 847 F.3d at 439). This is so even when a witness subjected to coercion does not testify, as the disclosure of a non-testifying witness's conflicting statements "raise[] opportunities to attack not only the probative value of crucial physical evidence and the circumstances in which it was found, but the

---

[11] This case was reassigned from Judge Alonso to Judge Hunt on June 2, 2023. (Dkt. 215).

thoroughness and even the good faith of the investigation, as well." *Kyles v. Whitley*, 514 U.S. 419, 445 (1995). Accordingly, Plaintiff's *Brady* theory remains valid.

The Individual Defendants also argue that the alleged coercion of Macklin, McCurine, and Hampton was not suppressed because Plaintiff had access to the information through the witnesses themselves. (Ind. Defs. Reply at 9859). However, "it is simply not true that a reasonably diligent defense counsel will always be able to extract all the favorable evidence a . . . witness possesses." *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001). Although "[d]efense counsel can certainly be expected to ask witnesses (defense and otherwise) questions relevant to what counsel understands the witness's role to be in the case," "defense counsel cannot be expected to ask witnesses about matters completely unrelated to the witness's role in the case." *Id.* Expecting otherwise "would require defense counsel to conduct a fishing expedition with every defense witness (and potential defense witness)," which "[r]easonable diligence does not require." The Individual Defendants' argument therefore misses the mark.

Finally, Plaintiff correctly notes that at the time of his trial, it was clearly established that police officers had to disclose exculpatory and impeachment evidence, including evidence of witness coercion. (Resp. at 7509) (citing *Manning v. Miller*, 355 F.3d 1028, 1033 (7th Cir. 2004) and *Engel v. Buchan*, 710 F.3d 698, 708-709 (7th Cir. 2013)). Indeed, "[i]t was already clearly established as early as 1981 that police could not withhold exculpatory information from prosecutors." *Goudy*, 922 F.3d at 844 (denying qualified immunity from *Brady* claim based on suppression of evidence that several witnesses initially identified different suspect and another suspect initially denied involvement in crime but later changed his story); *see also Ott v. City of Milwaukee*, 48 F. Supp. 3d 1197, 1207-1208 (E.D. Wis. 2014) (finding it clearly established in 1995 that detectives "could not coerce and manipulate a witness with promises of leniency and

37

then withhold the fact of that coercion and promise of leniency from the prosecutor and [plaintiff]").

For these reasons, a reasonable jury could find that evidence of the alleged coercion of Hampton, Macklin, and McCurine was suppressed in violation of *Brady.* On the other hand, Plaintiff has not shown that Defendants Rusnak and Breska, who were not involved in interviewing Hampton, Macklin, or McCurine, had any knowledge of the alleged coercion or could have disclosed evidence of it. Accordingly, the only triable issue is whether the interviewing officers—Paladino, Kill, Christopherson, McWeeny, Moser, and Maslanka—suppressed evidence of coercion.

### c. McMorris Evidence

Plaintiff contends that the Individual Defendants also withheld evidence of an alternative suspect named Kavin McMorris. (Resp. at 7512).

On June 1, 1990, a witness told detectives, including Defendants Breska and Maslanka, that Kavin "Shank" McMorris had a four-door blue Chevy. (Dkt. 330 ¶ 95; Dkt. 388 ¶ 103). On June 4, 1990, Detective Robert Tovar gave Kavin McMorris a polygraph examination at the request of Defendant Paladino. (Dkt. 330 ¶ 96). Tovar created several documents in conjunction with the polygraph: a Crime Lab Report, Polygraph Case Review, Polygraph Examination Worksheet and Polygraph Subject Consent. (Dkt. 388 ¶ 105). The results of the polygraph indicated deception. (Dkt. 330 ¶ 96). According to the Polygraph Case Review, McMorris "alleged to be involved in the shootings," and he "stated Farmer Dell told him that he and six others involved in shooting [sic]—Farmer Dell said he shoot [sic] one in the head." (*Id.* ¶ 97).

Plaintiff asserts that the Polygraph Case Review, Polygraph Examiner's Worksheet, Polygraph Subject Consent and Detective Tovar's notes (the "McMorris Evidence") were not turned over to the prosecutor, Bernard Murray, prior to Plaintiff's trial. (Dkt. 388 ¶ 107). The

38

parties agree, however, that the McMorris Evidence was in the Cook County State's Attorney's Office ("CCSAO") file for Plaintiff's case. (Dkt. 330 ¶¶ 96-98). And Bernard Murray testified at his deposition that he had all of the documents in the CCSAO file at the time of Plaintiff's trial. (Resp., Ex. 65 at 6095, Dkt. 327-7). Murray explained that he created the CCSAO file in response to the subpoenas he sent out within the Chicago Police Department and that he received the McMorris Evidence "pursuant to subpoena." (*Id.* at 6099-6100).

Seventh Circuit "case law has established that the police generally discharge their *Brady* duty by turning over exculpatory evidence to the prosecutor, thereby triggering the prosecutor's disclosure obligation." *Beaman v. Freesmeyer*, 776 F.3d 500, 512 (7th Cir. 2015) (citing *Carvajal*, 542 F.3d at 566). The Individual Defendants argue that the McMorris Evidence was not withheld because it was in the CCSAO file and Bernard Murray said he had the McMorris Evidence before Plaintiff's trial. (Ind. Defs. Reply at 9851-9852). Plaintiff admits that Murray said he received the McMorris evidence pursuant to a subpoena but argues that the "summary judgment record does not bear that out." (Resp. at 7512). As explained below, Plaintiff's argument rests on a chain of speculative inferences and misrepresentations of testimony.

Plaintiff argues that the McMorris Evidence was not disclosed because Tovar "testified that he would only disclose the Crime Lab Report that he created for a given polygraph unless the Crime Lab was specifically subpoenaed for the additional documents that he would create during a polygraph," and he "further testified that if the Crime Lab were subpoenaed, he would place the original subpoena in the Crime Lab file for their records," but "[t]here is no such subpoena in the Crime Lab file for the Watson homicide." (Resp. at 7513). Plaintiff asserts that "the only subpoena in the CCSAO file that Murray issued on this topic is not directed to the Crime Lab, but instead to the Chicago Police Department," and "it does not request the Polygraph Case Review, Examiner's

39

Worksheet, Subject Consent, or any notes . . . . it seeks only 'lab reports.'" (*Id.*) Plaintiff also argues that "Murray testified that if he had received the McMorris Evidence prior to Plaintiff's criminal trial he would have turned it over." (*Id.*) And lastly, Plaintiff's criminal defense attorney, Paul Katz, "testified that he would use evidence of an alternative suspect," but he did not, "supporting the inference that he did not possess it." (*Id.*)

Plaintiff provides no evidentiary support for his claim that the subpoena in the CCSAO file was not a subpoena for the McMorris Evidence simply because it was not specifically directed to the "Crime Lab" or did not list out the McMorris Evidence specifically. The fact that the subpoena was directed to the Chicago Police Department is generally consistent with Murray's testimony that his subpoenas went "to all different parts of the Chicago Police Department." (Resp., Ex. 65 at 6100). Also, no record evidence supports Plaintiff's claim that Murray testified that "if he had received the McMorris Evidence prior to Plaintiff's criminal trial he would have turned it over." (Resp. at 7513). On top of being unsupported, Plaintiff's assertion is puzzling considering Plaintiff admits Murray testified that he had the McMorris Evidence prior to Plaintiff's trial. (*Id.* at 7512).

As to Plaintiff's last point, Paul Katz testified that if he had documents showing a police interview with an alternative suspect, he "would probably try to introduce some evidence about it or question a witness about it." (Resp., Ex. 71 at 6160, Dkt. 327-8). But that question was not specific to the McMorris Evidence or any other evidence in Plaintiff's case; it was hypothetical. (*See id.*) Based on Katz's deposition testimony, or at least the excerpts in the record, it is unclear what evidence Katz had in his possession at the time of Plaintiff's trial because he gave away the file from Plaintiff's case and his independent recollection appears limited. (Dkt. 388, Ex. 65 at 9570-9580, Dkt. 388-3). However, even if Katz did not have the McMorris Evidence as Plaintiff contends, that does not prove that the Individual Defendants failed to turn over the evidence to

*Murray*. Generally, it is the prosecutor's responsibility to turn over exculpatory evidence to defense counsel, not the police's. *See Beaman*, 776 F.3d at 512 ("Usually, a police officer's *Brady* obligations are discharged by disclosing material exculpatory evidence to the prosecutor, for it is the prosecutor's responsibility to turn the evidence over to defense counsel.").

In sum, the undisputed record evidence shows that the prosecutor possessed the McMorris Evidence prior to Plaintiff's trial. Plaintiff's attempt to suggest otherwise is based not on evidence, but speculation, which is insufficient to create a genuine issue of fact. *See Flowers*, 105 F.4th at 946.

### d. Street File

In support of his *Brady* theory, Plaintiff argues that the Individual Defendants failed to disclose a "street file," which Plaintiff describes as a file "detectives kept for investigative information that did not always make it into official reports." (Resp. at 7476). Plaintiff contends that "[i]nformation about alternative suspects was the kind of information that was kept in the street file." (*Id.*)

The Individual Defendants argue that Plaintiff is barred from claiming an undisclosed "street file" as grounds for his due process claim because he did not identify it as a factual basis of his claim response to Defendants' interrogatory, and he did not allege in his complaint that a "street file" was withheld in violation of *Brady*. (Ind. Defs. Reply at 9848). Even if Plaintiff can rely on the street file for his claim, the Individual Defendants argue that Plaintiff's position is meritless because he "has failed to provide any evidence to support his theory that a report was hidden away in a file that was not disclosed to prosecutors." (*Id.*)

The Court agrees with the Individual Defendants on both fronts. Notwithstanding Plaintiff's failure to disclose the "street file" as a basis for his due process claim, Plaintiff's assertion that the Individual Defendants failed to turn over a street file in this case is based entirely

41

on speculation, as this Court has already explained. (*See* Order on Mot. to Reconsider at 2815, Dkt. 249).

In sum, Plaintiff has not shown that the Individual Defendants suppressed evidence of a suggestive lineup, the McMorris Evidence, or a street file. Even so, Defendants Paladino, Kill, Christopherson, McWeeny, Moser, and Maslanka are not entitled to qualified immunity as to Count III at this time because a genuine issue of fact remains with regard to Plaintiff's theory that they withheld evidence of the alleged coercion of Hampton, Macklin, and McCurine, conduct which would violate *Brady*. *See Avery*, 847 F.3d at 439. But Defendants Rusnak and Breska are entitled to qualified immunity as to Count III because Plaintiff has not demonstrated their personal involvement in the alleged coercion or suppression thereafter. *See Est. of Perry*, 872 F.3d at 459.

### D. <u>Count IV: § 1983 Malicious Prosecution and Unlawful Pretrial Detention (4th and 14th Amendments)</u>

In Count IV, Plaintiff alleges that the Individual Defendants subjected him to a malicious prosecution in violation of the Fourth and Fourteenth Amendments. As explained below, qualified immunity shields the Individual Defendants from Count IV because Plaintiff has not established a constitutional violation. *See Leiser*, 933 F.3d at 701.

#### i. <u>Fourteenth Amendment</u>

The Individual Defendants argue that Plaintiff's Fourteenth Amendment malicious prosecution claim fails as a matter of law because "[a]ny claim for pre-trial detention without probable cause . . . rests exclusively in the Fourth Amendment." (Ind. Defs. Mem. at 3154). Plaintiff seemingly abandoned his 14th Amendment claim in his response to the Individual Defendants' motion. (*See* Resp. at 7521) ("Plaintiff brings claims for malicious prosecution under the Fourth Amendment (Count IV) and state law (Count VI)). Regardless, the Individual Defendants are correct because "a § 1983 claim for unlawful pretrial detention rests *exclusively* on

the Fourth Amendment." *Lewis v. City of Chicago*, 914 F.3d 472, 478 (7th Cir. 2019). Accordingly, Plaintiff cannot establish a Fourteenth Amendment violation.

### ii. <u>Fourth Amendment</u>

A plaintiff bringing a Fourth Amendment malicious prosecution claim must prove "that criminal proceedings (1) were instituted without probable cause and (2) for a malicious motive; (3) ended without a conviction; and (4) resulted in the plaintiff's seizure by government officials." *Jackson v. City of Chicago*, No. 22 C 4337, 2024 WL 5264703, at *3 (N.D. Ill. Dec. 31, 2024) (citing *Evans v. Matson*, No. 23-2954, 2024 WL 2206638, at *2 (7th Cir. May 16, 2024)).

The Individual Defendants argue that probable cause to initiate Plaintiff's criminal proceedings existed as a matter of law. (Ind. Defs. Mem. at 3157). They note that the criminal proceedings began with a judicial determination of probable cause on June 11, 1990, and that a grand jury found probable cause for the first-degree murder of Watson, attempted first-degree murder of Jones, four counts of armed violence, conspiracy to commit first degree murder, and three counts of aggravated battery on June 29, 1990. (*Id.*) (citing Dkt. 330 ¶¶ 109-110).

Probable cause "exists whenever an officer or a court has enough information to warrant a prudent person to believe criminal conduct has occurred." *Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010) (citing *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)). "A judicial determination of probable cause is normally entitled to a presumption of validity," *Lewis*, 914 F.3d at 477, and "an indictment is prima facie evidence of probable cause," *Coleman*, 925 F.3d at 351. However, "[t]hese presumptions can be rebutted 'when legal process itself goes wrong—when, for example, a judge's probable-cause determination is predicated solely on a police officer's false statements.'" *Stephenson v. City of Chicago*, No. 21 C 338, 2024 WL 3251346, at *6 (N.D. Ill. July 1, 2024) (quoting *Washington v. City of Chicago*, 98 F.4th 860, 869 (7th Cir. 2024)). To rebut the

43

presumptions, a plaintiff must show: (1) "that the officer who sought the [determination] knowingly or intentionally or with a reckless disregard for the truth, made false statements to the judicial officer," and (2) "that the false statements were necessary to the judicial officer's determination that probable cause existed for the arrest." *Washington*, 98 F.4th at 870 (internal quotation marks omitted) (quoting *Whitlock*, 596 F.3d at 410).

Plaintiff argues that he can rebut the presumptions because his arrest and indictment for the murder of Joseph Watson were based on the "false and fabricated" statements of Hampton and Macklin and his own "false and fabricated" confession, and that his arrest and indictment for the attempted murder of Coats were based on Coats's identification, which was "wholly unreliable" and "the by-product of police misconduct." (Resp. at 7523). As discussed previously, though, Plaintiff has not established that the Individual Defendants fabricated his statement or Hampton's. Plaintiff relies on evidence of coercive interrogative tactics and fact-feeding by the Individual Defendants to establish that Macklin's statement was fabricated, but again, that evidence is insufficient to establish fabrication. *See Coleman*, 925 F.3d at 336. Moreover, Plaintiff has not shown that Coats's identification was unreliable because the basis for Plaintiff's contention is inadmissible hearsay.

Accordingly, Plaintiff has failed to rebut the presumption that probable cause existed for his criminal proceedings. The existence of probable cause is a complete defense to a Fourth Amendment malicious prosecution claim. *See Fleming v. Livingston Cnty.*, 674 F.3d 874, 878 (7th Cir. 2012). As a result, Plaintiff cannot show a constitutional violation, and summary judgment will be entered in favor of the Individual Defendants on Count IV.

44

### E. Count V: § 1983 Failure to Intervene

The Individual Defendants argue that Plaintiff waived any argument opposing qualified immunity on his failure to intervene claim. (Ind. Defs. Reply at 9883). "In the context of failure to intervene liability, a defendant is entitled to qualified immunity unless 'the law clearly established that he was legally obligated to prevent' the constitutional violation." *Coleman v. City of Chicago*, No. 17 C 8696, 2025 WL 2410325, at * 50 (N.D. Ill. Aug. 20, 2025) (quoting *Stewardson v. Titus*, 126 F.4th 1264, 1277 (7th Cir. 2025)). With respect to Count V, Plaintiff's qualified immunity argument consists of one sentence: "Finally, Defendants echo their qualified immunity arguments once again, but for all the reasons previously stated, qualified immunity is not available." (Resp. at 7540). That is not enough; the Court does not know what "reasons" Plaintiff refers to. *See Mahaffey*, 588 F.3d at 1146 ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived."); *McCormick v. Goebel*, 655 F. Supp. 3d 748, 761 (N.D. Ind. 2023) (finding waiver where qualified immunity argument was "two sentences long and . . . devoid of any citation to legal authority"). Because Plaintiff failed to develop this point, the Individual Defendants are entitled to qualified immunity as to Count V.

### F. Count VI: § 1983 Conspiracy

In Count VI, Plaintiff alleges that all of the Individual Defendants reached an agreement to frame him "for Joseph Watson's murder and for the attempted murders of Timothy Jones, Deneen Coats, and Ronald Nesbitt, and thereby to deprive [him] of his constitutional rights." (Compl. ¶ 172). Plaintiff also alleges, that before and after his conviction, the Individual Defendants conspired "to deprive [him] of exculpatory materials to which he is entitled and that would have led to his earlier exoneration." (*Id.* ¶ 173).

To prevail on a § 1983 conspiracy claim, Plaintiff must prove that the defendants reached an agreement to deprive him of his constitutional rights, and that a member of the conspiracy engaged in an overt act to deprive him of those rights. *Daugherty v. Page*, 906 F.3d 606, 612 (7th Cir. 2018). "A conspiracy may be proved by circumstantial evidence." *Oliver v. Hinton*, No. 95 C 4651, 1996 WL 99901, at *6 (N.D. Ill. Feb. 29, 1996) (collecting cases). "[C]onspiracy is not an independent basis of liability in § 1983 actions." *See Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008). Thus, "if a plaintiff fails to prove an underlying constitutional injury, any attendant conspiracy claim necessarily fails." *Hill*, 2009 WL 174994, at *9 (citing *Cefalu v. Vill. of Elk Grove*, 211 F.3d 416, 423 (7th Cir. 2000)).

Plaintiff has established a genuine issue of fact as to his Fifth Amendment coerced confession claim against Defendants Moser, Maslanka, and Kill, so "he has established an underlying constitutional deprivation as a basis for his Section 1983 conspiracy claim." *Id.* (citing *Cefalu*, 211 F.3d at 423). The evidence, viewed in the light most favorable to Plaintiff, indicates that Moser, Maslanka, and Kill were working together to coerce Plaintiff's confession. Specifically, Plaintiff testified at his deposition that Moser and Maslanka physically and mentally abused him during his interview; that Kill appeared at least twice during the interview to confer with Moser and Maslanka, one time asking, "Did you break him yet?"; and that Moser coached him throughout his court-reported statement. (Dkt. 388 ¶¶ 51-63).

Plaintiff has established a genuine dispute as to Count III as well, which can also serve as a basis for his conspiracy claim. Again, construing the evidence in Plaintiff's favor, a reasonable jury could find that Defendants Paladino, Kill, Christopherson, McWeeny, Paladino, Moser, and Maslanka conspired to suppress the coercion they used to extract Hampton's, Macklin's and McCurine's statements. Hampton, Macklin, and McCurine all described similar stories of abuse

46

and coercion during their interviews, which were conducted by some combination of Paladino, Kill, Christopherson, McWeeny, Paladino, Moser, and Maslanka. Thus, the evidence indicates that multiple officers knew of the coercion, but none disclosed it. Although Plaintiff has not presented evidence of an explicit agreement among the interrogating officers to suppress the coercion, the shared knowledge combined with the collective failure to disclose supports a reasonable inference that the officers had at least formed a tacit agreement. *See Coleman*, 2025 WL 2410325, at \*32 ("Conspiracy liability does not require a more specific agreement 'on the details of the conspiratorial scheme,' so long as the conspirators 'understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do [their] part to further them.'" (quoting *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988))).

As to Defendants Rusnak and Breska, the evidence indicates that their involvement in this case as a whole was at best minimal. There is a dispute as to whether they or Christopherson and McWeeny were present at the time of Plaintiff's arrest, but beyond that, there is no indication that they had any further involvement with Plaintiff. Plaintiff contends that if they were present at the time of his arrest, they witnessed Plaintiff tell Defendant Kill that he was not Vic Brown and "did nothing" to stop the arrest of "an innocent teenager." (Resp. at 7535). But Plaintiff does not have a false arrest claim, and he cites no authority showing that their "doing nothing" supports his conspiracy claim. Plaintiff also argues that "once [he] was at the station and in the interrogation room, John Walker and Keith Jackson could hear him screaming as a result of Defendants Moser and Maslanka's abuse, which suggests that Defendants McWeeny and Christopherson or Rusnak and Breska could have heard the same and put a stop to the torture." (*Id.*) That argument is purely speculative; there is nothing in the record regarding where McWeeny and Christopherson or Rusnak and Breska were in the police station or what they could hear at the time of Plaintiff's

47

interrogation. Accordingly, Plaintiff has not shown that Defendants Rusnak and Breska were personally involved in any conspiracy or underlying constitutional violation.

The Individual Defendants argue that the intracorporate conspiracy doctrine bars Plaintiff's conspiracy claim. (Ind. Defs. Mem. at 3169; Ind. Defs. Reply at 9880). Under the intracorporate conspiracy doctrine, "an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy." *Ziglar v. Abbasi*, 582 U.S. 120, 153 (2017). Whether the doctrine applies to § 1983 conspiracy claims is an open question. *See Weston*, 2021 WL 2156459, at *9. Regardless, it does not apply in this case. "The intracorporate conspiracy doctrine 'applies only when the agents of a corporation or government entity act within the scope of their employment in joint pursuit of the entity's *lawful* business.'" *Jordan v. Bonano*, 636 F. Supp. 3d 924, 932 (N.D. Ill. 2022) (quoting *Gray v. City of Chicago*, No. 18 C 2624, 2022 WL 910601, at *14 (N.D. Ill. Mar. 29, 2022)). The alleged illegal conduct here— coercing Plaintiff's confession and suppressing *Brady* evidence of additional witness coercion— "cannot be the goal of the City or its police department." *Ochoa v. Lopez*, No. 20 C 2977, 2021 WL 4439426, at *9 (N.D. Ill. Sept. 28, 2021); *see Salaita v. Kennedy*, 118 F. Supp. 3d 1068, 1085 (N.D. Ill. 2015) (noting that most courts have found the doctrine inapplicable in police misconduct cases because the alleged conduct "is usually not the product of routine police department decision-making" (internal quotation marks omitted) (quoting *Newsome v. James*, No. 96 C 7680, 2000 WL 528475, at *15 (N.D. Ill. Apr. 26, 2000))). Accordingly, the intracorporate conspiracy doctrine does not bar Plaintiff's claim.

The Individual Defendants also argue that Plaintiff waived any argument opposing qualified immunity on his conspiracy claim by not mentioning qualified immunity with respect to Count VI. (Ind. Defs. Reply at 9883). However, for conspiracy claims, "so long as the underlying

constitutional right is clearly established, qualified immunity does not apply." *Walker v. White*, No. 16 C 7024, 2021 WL 1058096, at *16 n.16 (N.D. Ill. Mar. 19, 2021); *see Liggins v. City of Chicago*, No. 20 C 4085, 2021 WL 2894167, at *6 (N.D. Ill. July 9, 2021) ("The Court believes what must be clearly established is limited to the *underlying constitutional right* that the Defendants conspired to violate."). Because Plaintiff has established that the rights at issue in Counts I and III were clearly established and there are factual disputes as to those claims, Defendants Moser, Maslanka, Kill, Paladino, McWeeny, and Christopherson are presently not entitled to qualified immunity as to Count VI. Defendants Rusnak and Breska are entitled to qualified immunity, however, because Plaintiff has not shown that they committed a constitutional violation.

### G. Count VII: State Law Malicious Prosecution

"Under Illinois law, malicious prosecution requires proof of: '(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff.'" *Moran v. Calumet City*, 54 F.4th 483, 499 (7th Cir. 2022) (quoting *Swick v. Liautaud*, 169 Ill. 2d 504, 513 (1996)). Summary judgment is warranted if the defendants "demonstrate that no reasonable jury could find an absence of probable cause to initiate the charges." *Cairel v. Alderden*, 821 F.3d 823, 834 (7th Cir. 2016). Because Plaintiff has failed to establish an absence of probable cause to initiate the charges against him, the Individual Defendants are entitled to summary judgment on Count VII. *See Coleman*, 925 F.3d at 351 (affirming summary judgment on state and federal malicious prosecution claims where plaintiff failed to rebut presumption of probable cause).

49

### H. Count VIII: State Law IIED

In Count VIII, Plaintiff alleges that the Individual Defendants' "actions, omissions, and conduct . . . were extreme and outrageous." (Compl. ¶ 186) Plaintiff further alleges that the Individual Defendants' actions "were rooted in an abuse of power and authority and were undertaken with the intent to cause, or with reckless disregard for the probability that they would cause Plaintiff severe emotional distress." (*Id.*)

The Individual Defendants challenge Plaintiff's IIED claim on three grounds. First, they argue that they are immune from Plaintiff's claim under Section 2-208 of the Illinois Tort Immunity Act, (Ind. Defs. Mem. at 3175), which provides that "[a] public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, unless he acts maliciously and without probable cause," 745 ILCS 10/2-208. Section 2-208 "mirrors and codifies the malicious prosecution standard." *Holland v. City of Chicago*, 643 F.3d 248, 255 (7th Cir. 2011). If Plaintiff's IIED claim arose solely from the alleged acts underlying his malicious prosecution claim, the Individual Defendants would likely be immune from the IIED claim as Plaintiff has not established that he was subjected to a malicious prosecution. Plaintiff's IIED claim, however, is not limited to his malicious prosecution allegations, but instead concerns the totality of the Individual Defendants' alleged conduct. (*See* Resp. at 7541) ("Plaintiff does not base his IIED claim on his mere arrest and prosecution."). As a result, the Individual Defendants are not entitled to immunity as to Plaintiff's IIED claim under Section 2-208.

The Individual Defendants' second argument is that Plaintiff's IIED claim is time-barred to the extent he bases his "claim on his allegations of physical and psychological abuse at the police station." (Ind. Defs. Mem. at 3172). Plaintiff's IIED claim is subject to a one-year statute

50

of limitations. *See* 745 Ill. Comp. Stat. 10/8-101(a) ("No civil action ... may be commenced in any court against a local entity or any of its employees for any injury unless it is commenced within one year from the date that the injury was received or the cause of action accrued."). Relying on *Bridewell v. Eberle*, 730 F.3d 672, 678 (7th Cir. 2013), the Individual Defendants assert that Plaintiff's claim accrued on the date of his arrest. (Ind. Defs. Mem. at 3172).

In response, Plaintiff contends that his IIED claim did not accrue until his conviction was vacated pursuant to *Heck v. Humphrey*, 512 U.S. 477 (1994). (Resp. at 7541). Under *Heck*, "a claim that implies the invalidity of a criminal conviction does not accrue, and the statute of limitations does not begin to run, until the conviction is set aside by the judiciary or the defendant receives a pardon." *Moore v. Burge*, 771 F.3d 444, 446 (7th Cir. 2014). In *Parish v. City of Elkhart*, the Seventh Circuit applied *Heck*'s deferred-accrual rule to an IIED claim brought under Indiana law where the plaintiff alleged that he "was innocent and that the officers committed perjury, falsified evidence, coerced witnesses to commit perjury, and withheld exculpatory evidence." 614 F.3d 677, 684 (7th Cir. 2010). The Seventh Circuit concluded that "under Indiana's adoption of *Heck*, [the plaintiff] could not have brought th[o]se claims until his conviction was disposed of in a manner favorable to him." *Id.*

"Illinois, like Indiana, has adopted *Heck*," *Andersen v. City of Chicago*, No. 16 C 1963, 2019 WL 6327226, at *6 (N.D. Ill. Nov. 26, 2019), and courts in this district have applied *Heck* to Illinois IIED claims challenging a conviction, *see, e.g.*, *Serrano v. Guevara*, 315 F. Supp. 3d 1026, 1043 (N.D. Ill. 2018) ("IIED claims based on wrongful convictions do not accrue until the conviction is overturned."); *Smith v. Burge*, 222 F. Supp. 3d 669, 693 (N.D. Ill. 2016) ("Illinois' adoption of *Heck*—like Indiana's—bars a plaintiff from bringing a claim that is inconsistent with his valid conviction until the conviction is set aside.").

51

Here, as mentioned previously, Plaintiff's IIED claim is based on the totality of the Individual Defendants' alleged conduct leading to his conviction. Because Plaintiff's alleged wrongful conviction is therefore the "the crux" of his IIED claim, his claim did not accrue until his conviction was vacated. *See Hill v. City of Chicago*, No. 19 C 6080, 2020 WL 509031, at *5 (N.D. Ill. Jan. 31, 2020), *on reconsideration,* No. 19 C 6080, 2020 WL 4226672 (N.D. Ill. July 23, 2020). Plaintiff filed this lawsuit less than one year after his conviction was vacated, so Count VIII is timely.

The Individual Defendants' third and final argument is that the evidence viewed in the light most favorable to Plaintiff only implicates Defendant Moser in the alleged abuse, so the remaining Individual Defendants are entitled to summary judgment on Plaintiff's IIED claim. (Ind. Defs. Mem. at 3172). The Individual Defendants cite no authority for their argument and thereby do not meaningfully challenge the merits of Plaintiff's IIED claim. *See Mahaffey*, 588 F.3d at 1146. But even if they did, summary judgment on Plaintiff's IIED claim is unwarranted.

To prove his IIED claim, Plaintiff "must show (1) that the conduct was extreme and outrageous; (2) that the actor intended that his conduct inflict severe emotional distress or knew that there was a high probability that his conduct would inflict such distress; and (3) that the conduct in fact caused severe emotional distress." *Brown*, 633 F. Supp. 3d at 1172 (citing *Bailey v. City of Chicago*, 779 F.3d 689, 696 (7th Cir. 2015)). "In making this determination, the court considers the totality of the circumstances and 'does not look at each of the acts separately.'" *Id.* (quoting *Holder v. Ivanjack*, 39 F. Supp. 2d 965, 970 (N.D. Ill. 1999)).

A reasonable jury could find that Defendants Moser, Maslanka, and Kill acted in an extreme and outrageous manner by coercing Plaintiff's confession, and that Defendants Paladino, Kill, Christopherson, McWeeny, Moser, and Maslanka acted in the same manner by withholding

exculpatory evidence. *See Carroccia v. Anderson*, 249 F. Supp. 2d 1016, 1028 (N.D. Ill. 2003) (explaining that concealing exculpatory evidence from prosecutors "is sufficiently 'outrageous' to support a claim for intentional infliction of emotional distress'"); *cf. Davis v. Zonfrilli*, No. 13 C 2155, 2014 WL 12738906, at *6 (C.D. Ill. Sept. 11, 2014) ("That Robb is alleged to have coerced a confession leading to the conviction and thirty-one-year imprisonment of an innocent man is truly extreme and outrageous."). Accordingly, Defendants Moser, Maslanka, Kill, Paladino, Christopherson, and McWeeny are not entitled to summary judgment on Count VIII. Defendants Breska and Rusnak are, however, because Plaintiff has not shown that they engaged in any extreme or outrageous acts.

## I. Count IX: State Law Civil Conspiracy

The Individual Defendants contend that Sections 2-208 and 2-204 of the Tort Immunity Act shield them from Plaintiff's state-law conspiracy claim. (Ind. Defs. Mem. at 3172-3173). Section 2-208 does not immunize the Individual Defendants from Plaintiff's civil conspiracy claim for the same reason it does not immunize them from Plaintiff's IIED claim—both claims concern conduct beyond the scope of that which Section 2-208 protects.

Regarding the Individual Defendants' second claim to immunity, Section 2-208 of the Tort Immunity Act provides that "a public employee, as such and acting within the scope of his employment, is not liable for an injury caused by the act or omission of another person." 745 ILCS 5/2-204. The Individual Defendants argue that they are immune from Plaintiff's conspiracy claim under Section 2-204 because "[a] conspiracy claim, by definition, seeks to hold an individual liable for the wrongful acts of others." (Ind. Defs. Mem. at 3173). The Individual Defendants cite no authority for this proposition, and the Court disagrees with them because "[u]nder Illinois law, a 'civil conspiracy occurs when two or more people combine to accomplish, through concerted

action, either an unlawful act or a lawful act in an unlawful manner.'" *Ohio Nat'l Life Assurance Corp. v. Davis*, 13 F. Supp. 3d 876, 886 (N.D. Ill. 2014) (quoting *Multiut Corp. v. Draiman*, 359 Ill. App. 3d 527, 537 (2005)). Accordingly, conspiracy liability arises from agreement *and participation*. The Individual Defendants thus are not immune from Plaintiff's state-law conspiracy claim under Section 2-204 either.

To prevail on his civil conspiracy claim, Plaintiff "must prove that two or more people agreed to participate in an unlawful act, and that one of the parties performed a tortious act in furtherance of the agreement that caused an injury." *Brown*, 633 F. Supp. 3d at 1174 (citing *Fritz v. Johnston*, 209 Ill. 2d 302, 317 (2004)). Although the standard is similar to that for § 1983 conspiracy claims, "[u]nder Illinois law, a plaintiff can succeed on a conspiracy claim using circumstantial evidence only if that evidence is clear and convincing." *Id.* (citing *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 134 (1999)).

For the same reasons previously discussed with respect to Plaintiff's Section 1983 conspiracy claim, a reasonable jury could find that Defendants Moser, Maslanka, and Kill conspired to coerce Plaintiff's confession, and that Defendants Paladino, Kill, Christopherson, McWeeny, Moser, and Maslanka conspired to withhold exculpatory evidence.[12] Thus, Defendants Moser, Maslanka, Kill, Paladino, Christopherson, and McWeeny are not entitled to summary judgment on Count IX, but Defendants Breska and Rusnak are.

---

[12] The Individual Defendants also suggest, without citing any authority, that Plaintiff's state-law conspiracy claim must be premised on an underlying state law violation. (*See* Ind. Defs. Mem. at 3173) ("In addition, since Weston's malicious prosecution and IIED claims fail, there is no underlying tort."). Plaintiff asserts that the Individual Defendants conspired to violate his constitutional rights. (Resp. at 7532). Courts have permitted Illinois conspiracy claims premised on constitutional violations. *See, e.g.*, *Azroui v. Hahs*, No. 10 C 4772, 2011 WL 3876948, at *7 (N.D. Ill. Aug. 30, 2011) ("Azroui's Section 1983 claims relating to this February 2009 arrest are not subject to the Defendants' Motion to Dismiss and form the predicate acts upon which Azroui may base his [state-law] conspiracy claim."); *Milliman v. McHenry Cnty.*, No. 11 C 50361, 2012 WL 5200092, at *3-4 (N.D. Ill. Oct. 22, 2012) (denying motion to dismiss state-law conspiracy claim alleging conspiracy to violate the plaintiff's First Amendment rights).

IV.     **City of Chicago's Motion for Summary Judgment**

The City seeks summary judgment on Plaintiff's derivative claims, Count X (*respondeat superior*) and Count XI (indemnification), to the extent summary judgment is entered in favor of the Individual Defendants on Plaintiff's claims against them. (City's Mot. at 2947). Because Plaintiff has surviving state law and Section 1983 claims, the City's motion for summary judgment will be denied, and Plaintiff's indemnification and *respondeat superior* claims may proceed. *See Cole v. Meeks*, No. 15 C 1292, 2018 WL 4682297, at *9 (C.D. Ill. Sept. 28, 2018) (denying summary judgment on indemnification and *respondeat superior* claims against City because plaintiff had surviving claim against officer).

## CONCLUSION

For all the foregoing reasons, the Individual Defendants' motion for summary judgment (Dkt. 285) is granted in part as to Defendants Paladino, McWeeny, Christopherson, Rusnak, and Breska on Count I; to all the Individual Defendants on Count II; to Defendants Rusnak and Breska on Count III; to all the Individual Defendants on Counts IV-V; to Defendants Rusnak and Breska on Count VI; to all the Individual Defendants on VII; and to Defendants Rusnak and Breska on Counts VIII-IX. The Individual Defendants' motion is denied in part as to Defendants Moser, Maslanka, and Kill on Count I; and to Defendants Paladino, Kill, Christopherson, McWeeny, Moser, and Maslanka on Counts III, VI, and VIII-IX. The City of Chicago's motion for summary judgment (Dkt. 284) is denied. The parties' *Daubert* motions (Dkts. 295, 296, 297, 298, 300, 302,

304, 305, 307, 308, 323) are denied without prejudice. Finally, the Unknown Employees of the City of Chicago are dismissed from this case.


**DATED**: March 25, 2026                    **ENTERED**:

*LaShonda A. Hunt*
LaShonda A. Hunt
United States District Judge

56