# Exhibit 5

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



# KENTUCKIANA
## COURT REPORTERS

**CASE NO. 1:20-CV-06189**

**DEMOND WESTON**

**V.**

**CITY OF CHICAGO, ET AL.**

**DEPONENT:**

**RICHARD RUDOLPH**

**DATE:**

**May 09, 2024**



a courtroom **powerhouse**

✉ schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273

www.kentuckianareporters.com

Page 22

A. Yeah, as needed.

Q. Okay. And so, would you say -- well, strike that, please. Do you receive a pension from NYPD?

A. I do.

Q. Okay. What percentage of your income at this point is coming from your expert work?

A. What percentage of my income?

MR. ZECCHIN: I'm going to object to form.

THE WITNESS: I -- I -- I don't -- I'd have to guess. I wouldn't even know. 10, 15, 20 percent? I don't know. Because it's not all the time, so -- the pension is all the time.

BY MS. KLEINHAUS:

Q. You did pretty well in your first year as an expert; would you agree? 85,000 in expert work?

A. It was a lot of work. It was a lot.

Q. Yeah.

A. So it wasn't -- it wasn't easy money. I could tell you that.

Q. Okay. I wanted to look at your CV. SO that's addendum A. So it's Page 28 of your report.

A. Okay.

Q. So the report we'll mark as Exhibit 1.

(EXHIBIT 1 MARKED FOR IDENTIFICATION)

MS. KLEINHAUS: Tony, I assume you have it in

Page 23

front of you, but if you need me to --

MR. ZECCHIN: I do have it. No, I do have it --

MS. KLEINHAUS: Okay.

MR. ZECCHIN: -- in front of me. If you could just reference the pages you're looking at, that would make it easier for me, so --

MS. KLEINHAUS: Okay, sure.

MR. ZECCHIN: Thanks.

BY MS. KLEINHAUS:

Q. Okay. So sir, if you can turn to Page 30 of your report, it lists your education there. Do you see that part?

A. I'm catching up. Okay.

Q. Are you on Page 30?

A. I got it.

Q. Okay. All right. There are no years included here, so I just wanted to clarify. Starting at the top there, it's graduate of the FBI National Academy. What year did you do that?

A. That was in 2009. So we started in September and we graduated December.

Q. And were you attending classes full-time during that --

A. Oh, yes. Yeah, the FBI is run just like when

Page 24

you go to college. You -- you have a dorm, roommate, share a bathroom with two other people, class Monday -- Monday, Tuesday, Wednesday -- Monday, Tuesday, Thursday, Friday, and Wednesday's what they call an enrichment day.

Q. Okay.

A. So I guess you do some training.

Q. The next item is a master of arts from Seton Hall?

A. Yes.

Q. What year did you receive your master's from Seton Hall?

A. That was probably 2006 or '7, I believe. Yeah, so it was right before I made lieutenant. Yeah, I think that was 2006 or '7.

Q. Okay. And beneath that, you have bachelor of science from St. John's University. What year did you receive that?

A. I finalized that in -- I think it was -- it had to be the fall. Yeah, the fall -- fall semester of '91, because I had -- I dropped out and went to the police academy. Went back and finished.

Q. Okay. So you actually finished and got your degree in '91; is that right?

A. Yeah. So I joined the police department,

Page 25

October '90. I graduated April '91. And I picked up my remaining credits that following fall semester and graduated, I guess, December. Or I think it was January.

Q. Okay. And you can put that page to the side for now. I want to go through your career at NYPD briefly. So I think you've just told us you attended the police academy in '91; is that right?

A. October '90. Graduated in '91. Went for six months.

Q. Okay. And -- oh, I forgot to ask you this: Have you ever worked for any law enforcement agency besides NYPD? And when I say law enforcement agency, I'm using that very broadly. So like, if you were a correctional officer, you were a parole officer, I'm including that. Have you ever had any other job in law enforcement?

A. No, only NYPD.

Q. Okay. And then, what was -- I know you said you made supervisor in 1996. So what -- tell me about the work that you did from '91 to '96.

A. So 1991, I graduated from the police academy, was assigned to a precinct out in Queens. And typical, we're assigned to a field training sergeant for six months. Basically, foot patrol, doing details. When we

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

Page 26

say details, we mean, like, parades and demonstrations, things like that. And then, after that six months, I was assigned to the platoon, which would be the 4:00 to 12:00, regular patrol. I think it was probably around 1994. I was assigned to the precinct's anti-crime unit, which is basically what we call plain clothes, not undercover.

So jeans and T-shirts and -- or proactively trying to, you know, prevent burglaries, robberies, any violent street crime. From there, I was assigned to the citywide street crime unit. Almost the same type of job, except we were citywide, so we would work sometimes up in the Bronx, Manhattan, Queens. But in a few months after that, we had gotten decentralized, and I was assigned back to Queens South, just Queens. And so basically, I was doing the same thing. We would work strictly nights. So from 6:00 in the morning to -- 6:00 at night to 2:00 in the morning, and four -- four days on, two days off.

And that's all we did was work, you know, trying to prevent violent street crimes, burglaries, robberies, things like that. From there, I was assigned to narcotics, and I was assigned to the Manhattan -- northern Manhattan initiative, which is up in northern Manhattan, specifically Washington Heights, around --

Page 27

well, now you guys would know Columbia University is right -- right there. So just active drug enforcement. It was a big initiative back then with the city to combat major drug -- drug enforcement. So we did a lot of case work, a lot of buy and bust operations. And so, I was assigned specifically -- my module spot was specifically assigned to 161st Street, 162, 163rd Street.

So that's how -- that's how big this module was. We only had three streets to take care of. We were responsible in our module. From there, I was promoted to sergeant, and I was sent out to -- back out to Queens, on South Jamaica in the 113 Precinct, where I was a -- a patrol supervisor. So the theory in New York City Police Department, no matter how high you make it, once you get promoted, you go back to patrol. And the theory is to bring whatever you learn back to the new people out on the street. So I was there and then I wanted to go to -- I know you said up to supervisor.

Want me to keep going?

Q. Yes, keep going, actually. I think that's --
A. Okay.
Q. -- that's the way to do it. Yeah.
A. So I wanted to go be a supervisor in an investigative unit. And I thought my background is

Page 28

street crime narcotics, I wanted to go to the gang unit. So I applied to Detective Bureau. So in New York City, once you applied to Detective Bureau as a supervisor, you have to serve two years in Internal Affairs if you can get that, before you get assigned to an investigative assignment. So I was assigned to Internal Affairs. Transferred to Internal Affairs, and I was assigned to the force unit, which is called Group 54. And essentially, we investigated all allegations of excessive force. Anything from handcuffs too tight to what we call MOS.

MOS is a -- a -- a -- a -- a member of the police department. MOS-involved shootings where we actually shot and hit somebody. If the police officer had let a round go and didn't hit anybody, that would not be handled by us, but -- and everything in-between. So any allegations citywide. We had the entire city. And from there, I didn't -- I -- I was doing a lot of investigative detective work, which I liked. And so, when my time was up in Internal Affairs, I was also getting a little bit older. I really enjoyed the investigative part of it, so I was assigned to the Detective Bureau instead of going to Gang. And that's where I ended up --
Q. Sorry.

Page 29

A. Sorry?
Q. What year was that that you were assigned to --
A. Oh, it was --
Q. -- the Detective Bureau?
A. 2000. 2000, I went there. So it was probably -- it was probably '99 that I went to Internal Affairs. Yeah, so it'll be two years before that. '98, '99. And then -- so I was -- I've been in the Detective Bureau since then. I was up in Astoria, Queens. So I was the executive officer of the 114 Precinct detective squad. And then, from -- want me to keep going?
Q. Let me just ask you a couple of follow-ups --
A. Yeah.
Q. -- on what you've said so far. So in order for you to become a sergeant, did you have to take any type of exam for that?
A. I did. Straight civil service test.
Q. Okay. How many times did you take the test?
A. Oh, God. I think I failed every test at least once. Because the first time, I was too young to appreciate what I was doing. I figured I could pass it, no problem. But I think I passed it on my second time for sergeant. Yeah.
Q. Okay. And then in order to switch from being



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 30

a patrol sergeant to being in Internal Affairs, do you have to take a test for that?

A. No, it's a -- it's a -- you apply, like a job application.

Q. Okay. And then, when you were assigned to Internal Affairs investigating allegations of excessive force, did you investigate any allegations of force used during interrogations?

A. Well, any allegation of excessive force. I mean, if -- if -- if somebody had made an allegation that he was beaten during his interrogation, then we're going to investigate that. And, you know, sometimes, it -- you know, it was so unbelievable, it couldn't happen, and then when we got there, guess what, it did happen. So it was -- you know, it wasn't a fun time and I didn't take any enjoyment out of it, but we did our job. And -- so one of the cases that I -- one of the cases that I -- when I first got assigned there -- like you asked me before, did I reference any material for this case. And Internal Affairs, we call it, like, a clean team. It doesn't mean -- you know, it -- it doesn't mean dirty or not. It's clean team means I have no -- no knowledge of this case. So I got to the tail end of that. It was called Diallo. I don't know if you remember that. He got --

Page 31

Q. I'm familiar.

A. Yeah, he got a stick inserted into him by the cops. And it was so horrific, nobody believed it, but guess it was true. And so, as a clean team, I would go in there and conduct follow-up interviews, not knowing anything about the case. So I think it made for a better investigation. I mean, it was so dark -- it was --

Q. Sorry. Were you finished?

A. That's all right. I'm just saying stuff like that is more stressful on us than probably, you know -- I'm not talking about the victim. I'm talking about, you know, police officers, but yeah.

Q. Right.

A. Seeing -- seen them a lot.

Q. So when you say a clean team, you mean you were trying to as best you could go in unbiased?

A. Well, clean team means that I -- I didn't read the case file. I don't know anything about it. And my lieutenant would say, all right. I want you to go and interview this person about what he did on Saturday, June 4th, 19-whatever. Okay. And I would have, you know, basic some questions to ask him, but not know what he had said before in prior interviews or anything like that, because the federal government was involved and --

Page 32

and they wanted to make sure everything was, you know, all the bases were covered. So it was -- it was a tough thing to deal with.

Q. Sure. And in cases like that -- I'm just trying to make sure I understand the concept of the clean team.

A. Uh-huh.

Q. Would you have reviewed police reports to know why that person was arrested or what the police version of events was?

A. Well, we knew what the case was, but you know, we didn't want -- my supervisor didn't want us to know any intimate details about the case. You know, everybody knows what was on TV and -- and -- and, you know, talking around the office, but they don't want to know if anything -- that way it makes somewhat for -- I don't know if you want to say better interview, but that's how they wanted it done.

Similar to like when I get a case like this, I don't want to know any -- I don't Google any cops. I don't Google any, you know, defendants. I just want to read what's in front of me and get my own idea.

Q. Other than the Diallo case, did you investigate any other allegations of excessive force that occurred during an interrogation or allegedly

Page 33

occurred during an interrogation?

A. Yeah, I had a few of them. The majority of them weren't substantiated. You know, all our cases that we have, Internal Affairs, we conduct our investigation and before we're able to interview a member of the service or a detective or any allegation against that member of the New York City Police Department, we have to present that case to the district attorney.

And once the district attorney refuses to prosecute, then we can conduct an interview because the department and the -- New York City is a little bit complex with, you know, if he -- if we interview him during an official police department investigation, you have to answer my questions. If you answer my questions, it can't be used against you at trial because that's Miranda and -- and -- and legal issues and stuff like that. So yeah.

Q. So you would conclude any criminal investigation before you do, like, an administrative investigation; is that right?

MR. ZECCHIN: I'm object -- I'm object to form. You can answer.

THE WITNESS: Yes. So we conduct our investigation and the results of my investigation,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 194

Q. Okay.

A. It should be in the case file.

Q. And do you have any issue with the fact that, in this case, there's a, like, an eight- or nine-page supplemental report describing the investigation listing eight arresting officers referring to everybody as RD or RO?

A. Yeah. So --

MR. ZECCHIN: I'm going to object to that -- the form and misstates the documents that are being asked about. Go ahead.

THE WITNESS: Talking about the -- the sup part, right?

BY MS. KLEINHAUS:

Q. Yeah. There's like -- I mean, I can bring it up if you want to take a look at it.

A. No, that's all I -- I know what you're talking about.

Q. Okay. There's, like, one main case report --

A. Yeah.

Q. -- right? It describes the investigation.

A. I get it, but you know, obviously I want every detective to type their own or her own what they did that day on one separate piece of paper and then put it together like a book. That being said, the other

Page 195

detective -- the other cases that I read for the Chicago PD back in 1990, that was the way they did it. That was their practice.

I mean, did I like it? Not really. I mean, I'd rather have it separated, which, you know, and have each person -- so we don't end up in court with hearsay stuff or, you know, trying to find out, you know, exactly what happened from another detective. Each detective should type their own investigative steps that they conducted on their separate form and then put it in the case file. I don't know how Chicago does it today. I would hope probably they -- maybe they changed that since then, but that's how they did it in 1990.

Q. That's how they did it in 1990. Is it your opinion that the national standard for police practices in 1990 was that you could write a report where it's not clear who did what?

A. The --

MR. ZECCHIN: Object to argumentative. Go ahead.

THE WITNESS: Yeah. Yeah. That's not what I said at all. Yeah, so that's the --

BY MS. KLEINHAUS:

Q. Okay. Sure. I mean, I hear you saying that's what they did in Chicago in 1990. And I've worked on a

Page 196

lot of Chicago in 1990 cases, too. So I -- I'll agree with you: That is what they did. My question is a little bit different. Was that the standard across the profession in 1990?

A. I don't think we really had investigative standards back in 1990. And obviously, you know, I didn't read a lot of cases from 1990. I only read them later on in my career and I could tell you the cases that I read from New York City Police Department, some of them were worse than the cases that I read for Chicago PD, but that was their -- that was their standard and their -- and how they operated back then. So the standards were in their rules and procedures on how to write supplemental reports, and that's how they did it. I mean, I would like it to be different, but that's how they did it back then.

Q. Okay. Are you aware of any standard or manual or document from 1990 that you believe sets forth what the police practices standard was for police writing in 1990?

A. Yeah, the -- I don't know if they actually had a format for Chicago PD. I did read one. I think it was a format for supplement report. And I don't remember when -- when I read it, but -- excuse me. That's the -- that's the only thing that I could recall.

Page 197

It wasn't, you know, how to write it, it was more the format.

Q. Okay. And you would agree with me, generally speaking, that police reports are going to be relied on by people who weren't actually part of the investigation, right?

A. Absolutely.

Q. Okay. Let's talk for a moment about the lineups. You -- if I understand your report correctly, you concluded that you don't think Deneen Coats was shown photos before she viewed a lineup, right?

A. I didn't say that. I said -- what -- what page are we on? I'm sorry.

Q. I didn't give you a page, so let's --

A. Yeah, I know what you're talking about. I just don't have it in front of me. 18? Oh, no, that's -- that's the line-up. Swanson is on 19. 19?

Q. Sure. I mean, I'm not directing you actually to a specific part, but if you need your report to answer it...

A. Okay. I'm just following along.

Q. Okay. You describe -- you say this -- I'm sorry. Let me give you a reference. So in the first paragraph you're discussing Swanson's report of what happened you say, "This strongly suggests that this



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com